Case: 3:06-cv-02950-JZ Doc #: 101-5 Filed: 02/04/08 1 of 10. PageID #: 1067

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 1

```
        IN THE UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF OHIO

                   WESTERN DIVISION


OLD GRANITE DEVELOPMENT    :
LTD,
                           :

      Plaintiff,           :

vs.                        :Case No. 3:06CV2950
                            Judge Zouhary
THE CITY OF TOLEDO, et al,:

      Defendants.          :

                         - - -
```

Deposition of JOHN McCARTHY, a Witness herein, called by the Defendants as upon Cross Examination under the Ohio Rules of Civil Procedure taken before Maureen St. John, Registered Professional Reporter and Notary Public in and for the State of Ohio, pursuant to stipulations of counsel, at the office of Bahret & Associates, 7050 Spring Meadows West Dr., Holland, Ohio, on Wednesday, January 23, 2008, at 11:10 a.m.

```
            ST. JOHN REPORTING
            251 BLUE HARBOR CT.
          PERRYSBURG, OHIO 43551
               (419) 872-1935
```

John McCarthy  Old Granite Development vs. The City of Toledo, et al

Page 118

1  there? Do you see that?
2  A. Yes.
3  Q. It looks like you're moving that or removing
4  that or doing something to that fence in this
5  picture, correct?
6  A. Well, I don't know what we are doing with
7  it.
8  Q. Looks like you're reaching down and got your
9  right arm on it or right hand, correct?
10 A. Yeah. We might have been repositioning
11 that. They may have had it over on our side or
12 something, but we made sure we kept that up
13 because we asked them to put that little fence up
14 there.
15 Q. Do you know from looking at this picture
16 what lot this is on?
17 A. It's got to be Lot 15.
18 Q. Now, in the direction that you would be
19 looking in this picture, you see there is a tree
20 growing up behind where the backhoe is?
21 A. Yes.
22 Q. Obviously, that tree is in bloom, and it's a
23 living tree at this time, isn't it?
24 A. Yep.
25 Q. Tell me when you started building your

Page 119

1  mound?
2  A. It was shortly after they did the clearing.
3  Q. So the clearing took place -- you're not
4  exactly sure of the month it took place in,
5  right?
6      MR. ROBON: Asked and answered
7  three times.
8  Q. I mean, I'm just -- I'm trying to remember
9  what you said.
10 A. I'm not -- we would have to get our things
11 out here again, but I think it's --
12 Q. As you sit here today, you don't know?
13 A. March, give or take a month.
14 Q. So after the clearing --
15     MR. ROBON: Just don't guess. I
16 know you're getting tired.
17     THE WITNESS: I'm not tired.
18     MR. ROBON: Think about what the
19 hell you're saying. That's not what you said a
20 little bit ago.
21     MR. TASSE: Is that an objection?
22     MR. BAHRET: Yes, it actually what
23 he said a little bit ago. He said it was either
24 February or April, and now he says March, give or
25 take a month, which is about the same.

Page 120

1      MR. TASSE: All right.
2      MR. ROBON: You're right, Bob. I
3  apologize. Bob is always right.
4      MR. BAHRET: Thank you.
5      MR. ROBON: Ninety-nine percent of
6  the time you are.
7  Q. After the clearing, is that when you hired
8  the Gradel Company, George Gradel Company?
9  A. We hired them, yes, we did. When we hired
10 them to save the sale or whatever, we were going
11 to build this mound.
12 Q. All right. So what did you do to start
13 building the mound?
14 A. We went and found some dirt and trucked it
15 in and brought it in on the property and started
16 pushing it up.
17 Q. Where did you start pushing the dirt up on
18 what property?
19 A. At the end of -- right on 16.
20 Q. You say you trucked it in from where?
21 A. From Bates Road.
22 Q. Where did you get it on Bates? What was
23 going on up there?
24 A. Nothing. We just came down the railroad,
25 the old railroad bed.

Page 121

1  Q. I'm sorry, where did you get the dirt?
2  A. We got I think all of it, we got it from
3  Five Point Road in Perrysburg. It was a sewer
4  job up there.
5  Q. Did you buy it or did you have permission to
6  take it or how did you get it?
7  A. No, I made arrangements with the sewer
8  contractor to bring the soil down here.
9  Q. Do you know what kind of dirt that was? Was
10 it clean fill, was it --
11 A. Yeah, it was virgin fill. I mean, it was a
12 new sewer line that they were putting down.
13 Q. Who was the sewer job from?
14 A. Who was it from? Who was the contractor?
15 Q. Yeah, who did you get the dirt from?
16 A. I would have to look it up. They were from
17 out of town.
18 Q. So you have that record somewhere?
19 A. Yes.
20 Q. You brought what kind of a truck, like a
21 semi tractor full of dirt or pickup truck? What
22 did you use?
23 A. We had a dozen dump trucks, tandem dump
24 trucks come in.
25 Q. Came in on the railroad right-of-way?

31 (Pages 118 to 121)

Case: 3:06-cv-02950-JZ  Doc #: 101-5  Filed: 02/04/08  3 of 10.  PageID #: 1069

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 122

1 A. Came down from Bates Road. Came up and back
2 onto Cambridge property that way.
3 Q. Where did they dump the dirt, all on 15 or
4 16?
5 A. 15 and 16 is where we started.
6 Q. What did you do with the dirt after it was
7 dumped?
8 A. We started, as the trucks dumped, he would
9 be pushing it out and grading it up and starting
10 a mound.
11 Q. He being Gradel Company?
12 A. Yeah, I had a separate guy bring the dirt
13 in. George Gradel Company, they went and they
14 provided the equipment.
15 Q. Who was your man from Gradel Company?
16 A. The superintendent?
17 Q. Yes.
18 A. His name was Tom Briggs.
19 Q. Was he the guy doing the grading on the
20 Cambridge property?
21 A. He was the superintendent. The guys worked
22 for him, the equipment operators.
23 Q. So he had operators that were there doing
24 the grading?
25 A. Right.

Page 123

1 Q. What kind of vehicle or what kind of truck
2 did they use to do the grading?
3 A. They had a bulldozer and they had a backhoe.
4 Q. In addition to what we see in Exhibit F?
5 A. Yes, this was just to uncover the trees
6 here.
7 Q. So they brought how many trucks, a dozen
8 dump trucks full of dirt and put it down, and
9 then it was graded on to your property; is that
10 right?
11 A. They used a dozen different trucks, but they
12 ran it for a day. They probably had ten loads
13 apiece, probably a hundred, maybe a hundred loads
14 of dirt we brought in.
15 Q. Did you start to make your mound?
16 A. Yeah, yeah. They went and started shaping
17 it up. They had the dozer there.
18 Q. First of all, they probably had to do some
19 filling of low levels on your property, didn't
20 they, with the first loads of dirt?
21 A. Well, it was already -- you know, this was
22 already graded. It was already a finished
23 development. We were raising up the grade of the
24 backyard.
25 Q. Am I correct in understanding where they

Page 124

1 dumped the dirt would have been the property edge
2 of Old Granite right next to where the railroad
3 property was? They started there and then worked
4 toward the home?
5 A. Yes.
6 Q. How far did they grade from that point
7 toward the home? What distance was that?
8 A. Oh, it was probably about 20 feet, 25 feet.
9 Q. How deep, how high did this mound get at any
10 particular time?
11 A. You can see here; this is all we got. We
12 got up to about this grade, which is only about
13 six feet high or five feet you can see here.
14 Q. Is the dirt that we see on the left-hand
15 portion of this picture, is that part of the
16 mound?
17 A. This is our dirt over here.
18 Q. So what, if that's your dirt and that's the
19 mound partially shown in Exhibit F, what is the
20 hole for that's dug by this backhoe in picture
21 Exhibit F?
22 A. This hole here?
23 Q. Yes.
24 A. That's where we were verifying where the
25 trees were so that we could go and survey them

Page 125

1 and put a line on these and show which trees were
2 actually, the base of them were on Cambridge
3 property. We were uncovering the top.
4 Q. Did you have a record of the date when you
5 brought in the hundred loads of dirt?
6 A. Yes, we do. I've got records of that.
7 Q. What are those records called, I mean?
8 A. They billed us and everything, so that's the
9 foreman's report or the daily -- some kind of a
10 daily report.
11 Q. Do you have records from Gradel Company?
12 A. Same thing.
13 Q. Obviously, that work was done prior to any
14 of the piping laid for the water main project,
15 wasn't it?
16 A. Yes.
17 Q. Let me show you a few more pictures.
18         (Plaintiff's Exhibit G marked
19         for identification.)
20 Q. Do you have Exhibit G in front of you?
21 A. Yes.
22 Q. I take it that's you in the picture shown
23 next to the pipe?
24 A. It looks like me.
25 Q. And do you know who that other gentleman is

Case: 3:06-cv-02950-JZ  Doc #: 101-5  Filed: 02/04/08  4 of 10.  PageID #: 1070

John McCarthy                                           Old Granite Development vs. The City of Toledo, et al

Page 126

1  standing behind the backhoe?
2  A. I can't tell.
3  Q. All right. And is this another view of the
4  same hole that you had dug in the ground shown in
5  Exhibit F?
6  A. It appears to be, yes.
7  Q. The purpose of digging that hole to that
8  depth was exactly for what?
9  A. We were trying to go and locate the trees,
10 and we took it right down to the base of this
11 wall. If you get it real close, you can even see
12 some of the timbers. We took it right down in
13 some place to make sure we were showing the wall
14 because the wall shows up from before we ran this
15 dirt out of here. We dug it down to the wall
16 right along our property line.
17 Q. Was this digging that took place in this
18 picture, Exhibit G, was this before or after the
19 VCP pipe had been cut?
20 A. No, this was way before.
21 Q. So you had in mind to build yourself the
22 mound before the VCP pipe issue ever came up,
23 isn't that right?
24 A. Yes.
25 Q. Did you ever have approval to build a mound

Page 127

1  at that point from any governmental agency?
2  A. Yes.
3  Q. Who gave you approval to build your mound?
4  A. Township. I went and saw the zoning guy.
5  Q. Tom who?
6  A. I didn't say Tom. The -- we have a, in
7  Perrysburg Township, they call them the zoning
8  director. I can't remember his name, but I went
9  and asked him.
10         I said, "You know, we are going to
11 build this mound, what kind of permits do I need
12 or anything?" And he said, "You don't need
13 anything as long as you don't have a fence higher
14 than seven feet." And so we weren't intending on
15 doing that. We were going to make -- he said,
16 "If you just do it with dirt, you don't need a
17 permit. If you want to just raise the grade on
18 your property, that's fine."
19 Q. How high of a mound were you able to build
20 with the hundred truckloads of dirt?
21 A. You just seen it here. It's just up to the
22 top of the railroad, which is probably five feet.
23 Q. So the dirt that you're standing on in
24 Exhibits F and G, that's the dirt that was
25 trucked in by you the hundred or so truckloads;

Page 128

1  is that right?
2  A. Well, you're getting real close to the, you
3  know, that's right on the line. Whether Ric-Man
4  did it or we did it, I couldn't tell you because
5  it's really close. That's, right where that
6  little fence is and that the property line was.
7  Q. What I'm getting at is the dirt that you dug
8  up, for example, in Exhibit F to look for what
9  was under it, that was dirt that you had trucked
10 in; isn't that right?
11 A. Most of it.
12      MR. ROBON:  You're now 30 minutes
13 past your 20 minutes.
14      (Plaintiff's Exhibit H marked
15      for identification.)
16 Q. Let me show you Exhibit H. Can you identify
17 what that is?
18 A. Well, this is the construction fence.
19 Q. Right.
20 A. I don't see anything.
21 Q. The construction fence and then to the left
22 of what we are looking at in this picture is the
23 water pipe, correct? That's on the railroad
24 property, isn't it?
25 A. No, this has got to be on our property. I

Page 129

1  think that's -- I don't know what that is.
2  Q. Sir, what I'm trying to show you, as you
3  look at this picture on the left of this fence,
4  that goes toward the railroad property, doesn't
5  it?
6  A. Right.
7  Q. That is where the water pipe is sitting?
8  A. Yes, that's where the --
9  Q. And then to the right of this would be the
10 Cambridge property, correct?
11 A. Yeah, this is Cambridge over here, and this
12 is the railroad up here.
13 Q. This is obviously after the clearing had
14 been done because they're laying the pipe there
15 to be put in; isn't that right?
16 A. Yeah, this is the --
17 Q. All right. Then this is a view down that
18 way. Can you tell what direction? Is that
19 looking back towards the Hospice area, the view
20 in this picture?
21 A. It appears to be looking towards the
22 Hospice.
23 Q. What we see there in the foreground right in
24 front of this picture, you see some vines or
25 perhaps the brambles and things that have been

Case: 3:06-cv-02950-JZ Doc #: 101-5 Filed: 02/04/08 5 of 10. PageID #: 1071

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 130

1  talked about, isn't that right, in the foreground
2  right here on the right side?
3  A. Yes.
4  Q. Then as you look back in that picture, you
5  see some mature trees that are grown up there,
6  correct?
7  A. Back in here?
8  Q. Yes.
9  A. Yes, I see some trees back in there.
10 Q. Those are standing, and that's after the
11 clearing was done, correct?
12 A. I don't know whether they took them down.
13 Yeah, I think those were left over, and I think
14 they're still standing, too.
15 Q. Just a couple more pictures. Let me show
16 you Exhibit I.
17       (Plaintiff's Exhibit I marked
18        for identification.)
19 Q. That's you in the picture, isn't it?
20 A. Yes, sir.
21 Q. And that's your backhoe that you either
22 hired from Gradel?
23 A. Right.
24 Q. Or somebody else, correct?
25 A. Right.

Page 131

1  Q. And is that the same hole that you had dug
2  that we talked about in the earlier pictures?
3  A. Yes.
4       (Plaintiff's Exhibit J marked
5        for identification.)
6  Q. On the boom of that vehicle, it says
7  American Rental?
8  A. Yes.
9  Q. Does that tell you that that's one that you
10 personally rented?
11 A. Right.
12 Q. As opposed to what Gradel Company did,
13 right?
14 A. They just operated it.
15 Q. So you obviously trucked a backhoe over
16 there yourself to this property, correct?
17 A. Yep.
18 Q. And how did you get this onto the location
19 where it is? Did you go back on the railroad
20 right-of-way and drive in that way?
21 A. I think with this little machine, we just
22 brought it down from next door. There's a path
23 on Lot 16.
24 Q. But the Gradel Company vehicles, those had
25 to come in from the railroad property in order to

Page 132

1  get access, right?
2  A. Right.
3  Q. Did you get permission to do that when you
4  brought in the Gradel Company vehicles or did you
5  just do it?
6  A. No, we had permission.
7  Q. You did? From whom?
8  A. CSX.
9  Q. Who at CSX?
10 A. I got a letter. We sent them a notice, told
11 them we weren't going to change their railroad
12 bed, and if they had any objections, let me know.
13 Q. Do you still have a copy of that letter?
14 A. Yes.
15       MR. FAGNILLI: I'm sorry, is that
16 letter from them or to them?
17       THE WITNESS: To them.
18 Q. Did you ever get any response from them?
19 A. No.
20 Q. So you sent the letter, and then after that
21 you brought your equipment in, correct?
22 A. Right.
23 Q. Never actually talked to anybody and got
24 permission to do this?
25 A. No, I actually talked to somebody, too.

Page 133

1  Q. Who?
2  A. The real estate guy. I've got his name
3  down. I can get you his name. They have a real
4  estates guy, who's kind of like the coordinator
5  of outside activities.
6  Q. You're going to produce that as well?
7  A. Yeah, I can.
8  Q. Let me show you Exhibit J.
9       (Plaintiff's Exhibit J marked
10       for identification.)
11 Q. Do you have Exhibit J in front of you?
12 A. Yes.
13 Q. That's a picture of you walking away from
14 the photographer?
15 A. Yep.
16 Q. Somebody's operating the backhoe; do you see
17 that?
18 A. Yes.
19 Q. That appears to be a different hole from the
20 one that was shown in the earlier exhibits; isn't
21 that right?
22       MR. ROBON: If you know.
23 A. Well, let's take a look.
24 Q. Let me ask it this way: In picture Exhibit
25 J we see two holes that are dug or two trenches,

34 (Pages 130 to 133)

Case: 3:06-cv-02950-JZ Doc #: 101-5 Filed: 02/04/08 6 of 10. PageID #: 1072

John McCarthy                                              Old Granite Development vs. The City of Toledo, et al

Page 134

1   or whatever you want to call them, correct?
2   A. Uh-huh.
3   Q. Yes?
4   A. Yes.
5   Q. And the man that's operating the backhoe in
6   Exhibit J looks like he is pretty close to, right
7   up against a tree that's remaining and standing
8   on the property, correct?
9   A. Right.
10  Q. Did he knock that tree over? Did he take
11  that tree out?
12  A. No, I think that tree is still there.
13  Q. Do you know if when he was doing this
14  digging shown in Exhibit J, he damaged the roots
15  or the base of that tree?
16  A. No, we tried to stay away from it.
17  Q. The dirt that he was digging, piling to the
18  operator's right, is that part of the mound that
19  you were creating?
20  A. No, this was just to locate the stumps.
21  This was going to go back in the hole whenever we
22  got back on track on this thing.
23  Q. What we see in Exhibit J is a man operating
24  a backhoe digging out dirt that you had trucked
25  in from another location in order to see what was

Page 135

1   underneath it?
2   A. Right, to see the trees.
3   Q. All right. But the dirt that he is on and
4   the dirt that you're walking on there, that's
5   dirt that you had trucked in from the other
6   location, correct?
7   A. Like I said, where he is that's definitely
8   true, but where I am at, you're really close to
9   the property line. That was probably there by --
10  Q. All right. Let's assume that in this
11  picture that you're on your own property. Just
12  for this picture can you do that, Exhibit J?
13  A. No, I'm pretty sure this is -- this is the
14  stakes of the property line, and I'm on the
15  railroad property.
16  Q. Where you are is on the railroad property?
17  A. Yeah.
18  Q. Are you immediately adjacent to the
19  Cambridge property?
20  A. Yes.
21  Q. So off to your left would be the Cambridge
22  property?
23  A. That's right.
24  Q. So everything from your left out towards the
25  Cambridge property, all that dirt was what was

Page 136

1   trucked in by you in the hundred trucks or so you
2   said from another location?
3   A. You can see the property line right there.
4   Q. Is what I said true?
5   A. All the --
6   Q. The dirt to your left --
7        MR. ROBON: Repeat it.
8        MR. TASSE: Here, I'll do it again.
9   Q. In Exhibit J, was the dirt that's from your
10  left towards the houses, was that dirt that you
11  had trucked in?
12  A. No, just from the stakes.
13  Q. Just from what stakes?
14  A. These stakes. See these stakes here?
15  That's the property line. That's what we trucked
16  in.
17  Q. I'm trying to see what you're --
18  A. It's a little bit different than where I'm
19  standing. See how I'm a foot or two over? This
20  is our dirt; this is your dirt.
21  Q. Clearly the man on the backhoe is on top of
22  dirt that you trucked in from another location?
23  A. That's true.
24       (Plaintiff's Exhibit K marked
25       for identification.)

Page 137

1   Q. Show you Exhibit K, and you recognize this
2   as being part of the Cambridge property adjacent
3   to the railroad?
4   A. Yes.
5   Q. All right. Now, that appears to be a
6   different trench than what we have seen in the
7   earlier pictures, F to J; is that correct?
8   A. I think it's the same one, same one.
9   Q. Same one as what?
10  A. These two pictures are of the same trench.
11  Q. Which two pictures, the one before it?
12  A. Yes.
13  Q. Exhibit J and K?
14  A. Yes.
15  Q. Are the same trench?
16  A. Yes. It's the same tree, same old tree.
17  Q. Okay, K is just a little bit closer?
18  A. Yes.
19  Q. What was the purpose of digging the ditch in
20  Exhibit K?
21       MR. ROBON: Objection, asked and
22  answered five times.
23  A. To see the stumps.
24  Q. No other reason?
25  A. No, that was the only reason.

Case: 3:06-cv-02950-JZ  Doc #: 101-5  Filed: 02/04/08  7 of 10.  PageID #: 1073

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 138

1     (Plaintiff's Exhibit L marked
2     for identification.)
3  Q. Show you Exhibit L. Do you recognize that
4  as being the same area of the Cambridge property?
5  A. Yes.
6  Q. Would you agree with me that this shows a
7  longer continuous trench of some sort?
8  A. Yeah, it's the same trench.
9  Q. What did you dig this trench for?
10 A. This is the same trench. See all the vines
11 and all the stuff coming out? That's what we
12 were trying to show them.
13 Q. You or your man from Gradel dug this trench
14 shown in Exhibit L, correct?
15 A. Yes.
16 Q. And it appears to me, but I wasn't there at
17 the time, that it's a longer ditch that goes the
18 whole back --
19 A. Right, we connected them.
20 Q. You connected the trenches that you dug?
21 A. Yes, there's a couple holes. We connected
22 them. We went right down the line to show that
23 this was where the heaviest trespassing was, and
24 there was trees that were rooted in Cambridge
25 property that they tore down.

Page 139

1  Q. When you dug the trenches shown in Exhibit L
2  and you placed the dirt off towards the Cambridge
3  property, did you cover up any of your catch
4  basins or manholes?
5  A. No.
6  Q. How do you know that?
7  A. Well, we've only got three of them. We
8  stayed away from them; we needed them.
9  Q. Did anyone ever tell you that you had
10 covered them up or plugged them in any way?
11 A. No, they were never covered up. Our catch
12 basins were never covered up; still are not.
13 Q. After you dug the trenching shown in Exhibit
14 L, what did you do with them? Did you leave that
15 trench the way it is or did you refill it or what
16 did you do?
17 A. No, we left it there. We took photos and we
18 cleared out the bigger stumps that were ten-inch
19 diameter stumps on Cambridge property. We
20 cleared it out, and it's still there to this day.
21 Q. What is still there?
22 A. The trench.
23 Q. The trench as we see it in Exhibit L?
24 A. Yes.
25     (Plaintiff's Exhibit M marked

Page 140

1     for identification.)
2  Q. Let me show you Exhibit M. Do you have
3  Exhibit M in front of you?
4  A. Yes, I do.
5  Q. Do you recognize that, either the manhole or
6  catch basin shown in that picture?
7  A. I think so.
8  Q. Where is that located?
9     MR. ROBON: Are you representing
10 that's on this property someplace.
11 Q. Yes.
12 A. And this appears to be at -- yeah, this is
13 at Lot 15.
14 Q. There is also a cable box or a phone box
15 shown there in that picture, isn't there?
16 A. Yeah, there is a phone and there's a cable
17 box, both of them.
18 Q. In those boxes and what's depicted in
19 Exhibit M is from work that you or Gradel Company
20 have done on your behalf; isn't that right?
21 A. This dirt was from the mound, that's right.
22 Q. Right. And the box that's over on its side,
23 that's something that you or your Gradel
24 contractor had done; isn't that right?
25 A. Yeah, they took the top off that time. This

Page 141

1  was in preparation to raise them up to build the
2  mound?
3  Q. And this is the last picture I have.
4     (Plaintiff's Exhibit N marked
5     for identification.)
6  Q. Showing you what I've marked as Exhibit N,
7  do you recognize that as views at the back of
8  your property adjacent to the railroad property?
9  A. Yes.
10 Q. In the top left-hand picture of that, of
11 this page, as you look down the property line,
12 you see the trees and some of the vegetation
13 still there?
14 A. Yes.
15 Q. And the dirt that we see in the picture in
16 the top left corner of Exhibit N, the dirt to the
17 right there, that's the dirt that you had trucked
18 in from the other location, right?
19 A. That's right.
20 Q. The picture directly below that one on the
21 lower left-hand corner, that's the trench that
22 you had dug that's shown in the other pictures?
23 A. Yep, yes.
24 Q. And the same if you go to the right side of
25 the picture in the lower right-hand corner,

John McCarthy            Old Granite Development vs. The City of Toledo, et al

Page 142

1  that's also the trench that you dug with --
2  either you dug with the backhoe or Gradel Company
3  dug at your request, right?
4  A. Yes.
5  Q. Did you ever speak to anyone from Ric-Man
6  whenever you were on the premises?
7  A. Yes.
8  Q. When did you talk to anybody you identified
9  as being from Ric-Man?
10 A. That same period, March or give or take a
11 month.
12 Q. Do you know who you spoke to?
13 A. I have his name; a big guy. I don't know if
14 you know that superintendent. He is their
15 general superintendent.
16 Q. So you don't know it as you sit here, but
17 you have it somewhere else?
18 A. Yes.
19 Q. You can provide who you talked to?
20 A. Yes.
21 Q. How many times did you talk to somebody from
22 Ric-Man?
23 A. Oh, probably three or four times.
24 Q. Were any of those times alone with you and
25 the Ric-Man person, or was it always in the

Page 143

1  company with other folks from Toledo or the
2  railroad?
3  A. I think most of the time it was with Christy
4  Soncrant, but I think I talked to -- I talked to
5  the foreman at least once alone in person, and by
6  the phone I talked to him. I talked to Steve
7  Mancini, I think it's Steve Mancini, about trying
8  to get dirt for the mound. And I talked to at
9  least two different people from Ric-Man
10 significantly.
11 Q. You were talking to them about trying to get
12 dirt from the project in order to use to build
13 your mound, correct?
14 A. Right, we were talking -- I talked to them
15 about the crossover pipe, that we needed that,
16 the field guy I did.
17 Q. The field guy is different from Mr. Mancini,
18 right?
19 A. Yes. I'll remember his name in a second.
20 Q. The discussions you had about the crossover
21 pipe, is that essentially the same things that
22 you talked about with the people from Toledo and
23 the county, etc.?
24 A. Yes, and I think he was there when we talked
25 to the county engineer.

Page 144

1  Q. It was a group?
2  A. Yes.
3  Q. Just so we're clear, you were not present
4  for any part of the process when the crossover
5  pipe was unearthed or taken out?
6  A. Right, I was not there.
7  Q. And you were never there at any time before
8  that area was covered up so you could see what
9  remained, correct?
10 A. Before what was covered up? Oh, I did not
11 see the ends of the pipe that they broke off.
12 All I had was, you know, Christy told me what
13 happened, that they deliberately cut the pipe.
14 And, you know, she said, "Well, if you can show
15 that you needed it, we'll put it back."
16 Q. She also told you that it was plugged and it
17 was deteriorated and it was decrepit and it was
18 not in use, didn't she? Isn't that what she told
19 you?
20 A. Not exactly. I don't think she ever saw it
21 either. I think she was told that by their
22 inspector or by Ric-Man and that kind of thing.
23 Q. In fairness to you, you never saw it
24 unearthed so you don't know what the condition
25 was underground, do you?

Page 145

1  A. Well, I saw it in the manhole and I saw it
2  in the ditch, both ends, I saw it.
3  Q. Right. We talked about what you're going to
4  try to show us in pictures, right?
5  A. Right.
6  Q. But you never saw it when it was unearthed
7  and exposed to the elements so you could
8  visualize it, right?
9  A. Right.
10 Q. And you don't know what condition it was in
11 when they made the decision to cut it off?
12 A. Well, they told me; they both told me.
13 Q. They told you it was all plugged up and
14 cracked and not in use, didn't they?
15 A. Not exactly. They said, you know, it would
16 never work. They implied that it was at least
17 mainly plugged up.
18 Q. No one ever told you from the City, the
19 County, Ric-Man, anyone else relating to this
20 project that that was a fully functioning
21 drainage pipe under the railroad, did they?
22 A. The County did.
23 Q. What did they tell you?
24 A. That we needed that pipe.
25 Q. No, that's not my question.

37 (Pages 142 to 145)

John McCarthy                                                  Old Granite Development vs. The City of Toledo, et al

Page 150

1  check to make sure that their control point,
2  which I believe was down on Bates Road, that that
3  was in synch. They checked that out.
4  Q. It's your testimony that the property line
5  is 101 feet from the center of the railroad?
6  A. I would have to look.
7  Q. The stakes with orange ribbon around them
8  that are shown in the photographs F through N,
9  who put those stakes up, do you know?
10  A. I think we've already kind of been through
11  that. We are not sure whether this was Peterman,
12  the City. I believe this is Peterman's lath, so
13  that we can --
14  Q. But you're not sure?
15  A. No.
16  Q. There was at one time a railroad fence that
17  ran along the railroad right-of-way between the
18  property line and the -- for the old Cambridge
19  and the railroad right-of-way; is that correct?
20  A. This railroad tie fence that we're talking
21  about.
22  Q. There was a, not just a railroad tie fence,
23  but there was an actual metal fence that ran
24  along that property right-of-way, and it runs
25  along the right-of-way all the way to the Maumee

Page 151

1  River, right, from Bates Road all the way to the
2  Maumee River.
3  A. No, that fence, that metal fence was on the
4  face of the railroad ties for that 150 feet, and
5  that was the only thing left on the Cambridge
6  property of that old railroad fence, as I recall.
7  It wasn't continuous down there.
8  Q. Well, is there --
9  A. I shouldn't say. Maybe I never -- but there
10  was no sign of it or anything.
11  Q. Was there a fence like that to the -- that
12  exists today to the east of the Cambridge
13  property?
14  A. There is still some semblances of it there;
15  there's some little bits of it along there.
16  Certainly, a hundred years ago, that was up and
17  standing all the way when this thing was active.
18  But it wasn't there. At least when I first got
19  on the scene, that was long gone. The only part
20  of it was the part that was on the face of those
21  timbers.
22  Q. Is there a fence like that to the west of
23  the Cambridge property along the railroad
24  right-of-way?
25  A. It's not -- it's a newer one, but it's along

Page 152

1  the -- they do have a fence. I don't know whose
2  it is, whether it's -- but it's not the same kind
3  as the old railroad fence.
4  Q. Do you know why the fence isn't there any
5  longer in the area of the Cambridge property?
6  A. No, I don't.
7  Q. Do you know what clearing was done to put in
8  the Cambridge property initially?
9  A. I wasn't around for that. The only evidence
10  we have of that is that the aerial photos show
11  that it was farm field before and farm field, you
12  know, development afterwards. It wasn't --
13  Q. Have you seen aerial photographs prior to
14  2001?
15  A. I believe so.
16  Q. The only aerial photograph I've seen from
17  Plaintiff's attorney is the one from 2005, which
18  would be after the development was put in. And
19  what I'm asking you is if you have any aerial
20  photographs that you've seen that show the area
21  before Jacqueline Drive was put in and before the
22  development was done? Have you seen anything
23  like that?
24  A. I believe so. I believe that we went and
25  looked at -- we went over -- it might have been

Page 153

1  somebody Gary Buck said he went over to -- looked
2  at the aerials.
3  Q. Where did he go to look at these aerials?
4  A. Over at Mannik & Smith, and there was
5  some --
6  Q. What is Mannik & Smith?
7  A. That was a consultant, and they did some of
8  the environmental stuff on this project. And
9  they're like the consultant that does aerial
10  photography around there. He kind of has access
11  to all the computerized and whatnot.
12  Q. What consulting did Mannik & Smith do on
13  what project?
14  A. They did some environmental review.
15  Q. For who?
16  A. For the City of Toledo.
17  Q. For the water main project?
18  A. That's the way I understand it. But they're
19  kind of like the custodian of aerial photography,
20  and I can't remember whether I saw it or Gary
21  Buck saw it. This was back before 2005 or before
22  2000 -- actually 1999 I think is when this
23  project, the Cambridge project started, that
24  there were aerial photographs back in that era
25  that showed that this was farm field.

39 (Pages 150 to 153)

Case: 3:06-cv-02950-JZ  Doc #: 101-5  Filed: 02/04/08  10 of 10.  PageID #: 1076

John McCarthy                                              Old Granite Development vs. The City of Toledo, et al

Page 154

1  And the Gillette man next to Cambridge
2  also confirmed to me that, you know, this was all
3  farm land long before you guys got here with this
4  Cambridge project.
5  So I believe that -- I think all the
6  clearing or essentially all the clearing was done
7  before Cambridge got there because it was farm
8  field from way back.
9  Q. So is it your testimony that before the
10 mound was built, there was some survey done by
11 Peterman & Associates, a legal surveyor, or are
12 you not sure about that?
13 A. I'm sure of that.
14 Q. Before the mound was built, did you or
15 anyone acting on behalf of Old Granite contact
16 Vermillion to tell them that the mound was going
17 to be built?
18 A. Vermillion?
19 Q. Yes.
20 A. No.
21 Q. Did you or anyone acting on behalf of Old
22 Granite ever contact anyone at Vermillion to
23 complain about the clearing and claim there was a
24 trespass by the clearing at any time before the
25 mound was built?

Page 155

1  A. No, we didn't even know Vermillion existed.
2  Q. Did you contact anyone from Edwards Tree
3  Clearing Service?
4  A. No.
5  Q. Well, you saw the trucks, right, from the
6  land-clearing company?
7  A. That was afterwards, afterwards.
8  Q. It was before the mound was built?
9  A. Yes.
10 Q. I'm asking you before the mound was built
11 and after the clearing was done, did anyone
12 contact anyone from Vermillion or Edwards Tree
13 Clearing Service to let them know that there was
14 a complaint about alleged trespassing here?
15 A. We dealt with the City.
16 Q. That's not my question.
17 A. No, we did not go in -- we did not -- I did
18 not call or contact Edwards or Vermillion.
19 Q. And that's true for both the claim that
20 there was a trespass and the notice that there
21 was going to be this filling or this mounding
22 done on the property line?
23 A. That's right, I did not contact them.
24 Q. Did you take any photographs of any stumps
25 or roots that you claim were cleared on the

Page 156

1  Cambridge property or the Old Granite property at
2  any time before this fill was put in?
3  A. Yes, yes.
4  Q. And you have those photographs?
5  A. Yes, I do. Hope we got all of them.
6  Q. Do you know if any of those photographs have
7  been deleted or altered in any way?
8  A. I hope not.
9  Q. Do you know?
10 A. No, I don't know.
11 Q. What have you done to preserve those
12 photographs to ensure that they won't be deleted
13 or altered?
14 A. Well, I gave them to the City of Toledo, for
15 one thing.
16 Q. When did you give them to the City of
17 Toledo?
18 A. Right after we took them, right before we
19 did the mound.
20 Q. Did you give them to them in electronic
21 format or did you give them to them in printed
22 format?
23 A. Both.
24 Q. So they should have a disk with all these
25 photographs?

Page 157

1  A. I didn't say all. We went and we tried to
2  go with the City of Toledo. We went -- before we
3  did this mound, we took all the pictures, we
4  brought them out. I gave Christy the main photos
5  that showed these stumps clearly on Cambridge
6  property, trees going in 20 feet.
7  We shared it with them. We tried to
8  have a joint survey. They didn't want to do
9  that, but they did, they and Ric-Man did come
10 back and put more stakes in. And they lined up
11 with ours.
12 So we did make an effort before we did
13 this mound to bring them out, and Ric-Man
14 certainly was there. And I don't know, maybe
15 Vermillion was gone by this time.
16 But we made a conscientious effort to
17 get everybody to see all of the trespass stumps
18 that we had through there, plus all the vines
19 that were sticking up that you can still see from
20 some of these. We did do that.
21 Q. You're not answering my question. I want
22 you to listen to my question very carefully and
23 answer the specific question I'm asking you
24 rather than get off on a tangent, okay? You have
25 to answer out loud, yes or no.