Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

OLD GRANITE DEVELOPMENT    :
LTD,
                           :

    Plaintiff,            :

vs.                       :Case No. 3:06CV2950
                           Judge Zouhary
THE CITY OF TOLEDO, et al,:

    Defendants.           :

                       - - -

     Deposition of JOHN McCARTHY, a Witness
herein, called by the Defendants as upon
Cross Examination under the Ohio Rules of Civil
Procedure taken before Maureen St. John,
Registered Professional Reporter and Notary
Public in and for the State of Ohio, pursuant to
stipulations of counsel, at the office of Bahret
& Associates, 7050 Spring Meadows West Dr.,
Holland, Ohio, on Wednesday, January 23, 2008, at
11:10 a.m.

_____

ST. JOHN REPORTING
251 BLUE HARBOR CT.
PERRYSBURG, OHIO 43551
(419) 872-1935

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 2

1    DEPOSITION OF JOHN McCARTHY

2                      I N D E X

3    CROSS EXAMINATION
     BY MR. BAHRET                              6
4
     CROSS EXAMINATION
5    BY Mr. TASSE                               64

6    CROSS EXAMINATION
     BY MR. FAGNILLI                            147
7
     CROSS EXAMINATION
8    BY Mr. WAGONER                             189

9    RECROSS EXAMINATION
     BY MR. BAHRET                              222
10
     RECROSS EXAMINATION
11   BY MR. TASSE                               242

12
     RECROSS EXAMINATION
13   BY MR. FAGNILLI                            254

14

15

16

17

18

19

20

21

22

23

24

25

ST. JOHN REPORTING   251 BLUE HARBOR CT., PERRYSBURG, OH 43551      419-872-1935

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 3

```
 1                 E X H I B I T S

 2

 3        Defendant's Exhibit E              112
          Defenant's Exhibit F               114
 4        Defendant's Exhibit G              125
          Defendant's Exhibit H              128
 5        Defendant's Exhibit I              130

 6        Defendant's Exhibit J              133
          Defendant's Exhibit K              136
 7        Defendant's Exhibit L              138
          Defendant's Exhibit M              139
 8        Defendant's Exhibit N              141
          Defendant's Exhibit O              161
 9        Defendant's Exhibit P              163
          Defendant's Exhibit Q              205
10        Defendant's Exhibit R              211
              Def's   Exhibit S              242
11

12

13            O B J E C T I O N S

14
          MR. ROBON                          31
15        MR. ROBON                          53
          MR. ROBON                          63
16        MR. ROBON                          64
          MR. ROBON                          68
17        MR. ROBON                          74
          MR. ROBON                          94
18        MR. ROBON                          97
          MR. ROBON                         116
19        MR. ROBON                         119
          MR. ROBON                         168
20        MR. ROBON                         172
          MR. ROBON                         172
21        MR. ROBON                         174
          MR. ROBON                         174
22        MR. ROBON                         175
          MR. TASSE                         198
23        MR. BAHRET                        198
          MR. TASSE                         199
24        MR. ROBON                         200
          MR. BAHRET                        202
25        MR. FAGNILLI                      202
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 4

| | | |
|---|---|---|
| 1 | MR. ROBON | 202 |
| | MR. ROBON | 202 |
| 2 | MR. ROBON | 203 |
| | MR. ROBON | 204 |
| 3 | MR. ROBON | 216 |
| | MR. ROBON | 217 |
| 4 | MR. ROBON | 217 |
| | MR. ROBON | 218 |
| 5 | MR. ROBON | 220 |
| | MR. ROBON | 221 |
| 6 | MR. ROBON | 221 |
| | MR. ROBON | 236 |
| 7 | MR. ROBON | 246 |
| | MR. ROBON | 255 |
| 8 | MR. ROBON | 255 |
| | MR. ROBON | 256 |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

```
                                                            Page 5

  1        APPEARANCES:

  2        On behalf of the Plaintiff:

  3        Barkan & Robon
           Marvin A. Robon
  4        Ethan Davis
           1701 Woodlands Dr.
  5        Maumee, Ohio 43537

  6        On behalf of the Defendant The City of Toledo:

  7        Bahret & Associates
           Robert J. Bahret
  8        7050 Spring Meadows West Dr.
           Holland, OH 43528
  9
           City of Toledo, Ohio
 10        Joyce Anagnos
           420 Madison Ave, Ste. 100
 11        Toledo, Ohio 43604

 12        On behalf of the Defendant Ric-Man:

 13        Weston Hurd
           Jeffrey L. Tasse
 14        The Tower at Erieview
           1301 East 9th St., Ste. 1900
 15        Cleveland, Ohio 44114

 16        On behalf of the Defendant Vermillion:

 17        Davis & Young
           David J. Fagnilli
 18        1200 Fifth Third Center
           600 Superior Ave, East
 19        Cleveland, Ohio 44114

 20        On behalf of the Defendant CSX:

 21        Anspach, Meeks, Ellenberger
           Gregory H. Wagoner
 22        300 Madison Ave, Ste. 1600
           Toledo, Ohio 43604
 23
           Also Present:
 24
           John Laskey
 25
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 6

1              MR. BAHRET:  Usual stipulations?

2                   (All agreed)

3                JOHN A. MCCARTHY,

4       was by me first duly sworn, as hereinafter

5       certified, testified and said as follows:

6                CROSS EXAMINATION

7       BY MR. BAHRET:

8       Q.   Could you state your full name?

9       A.   It's John A. McCarthy.

10      Q.   My name is Bob Bahret.  I'm one of the

11      attorneys that represents the City of Toledo.

12      Have you ever been through this procedure before?

13      A.   Yes, I have.

14      Q.   So you understand the basic ground rules?

15      A.   I think so.

16      Q.   Then we will get right to it.  What is your

17      age?

18              MR. ROBON:  By the way, we should

19      decide, who is he billing?  Is he billing the

20      City for his expert time or everybody?

21              MR. BAHRET:  I assume he is billing

22      you.

23              MR. ROBON:  He is our expert; you

24      called him as your witness.

25              MR. BAHRET:  I didn't call him as

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 7

1        my witness.

2                     MR. ROBON:  Well, you called him to

3        be deposed.

4                     MR. BAHRET:  Okay.

5                     MR. FAGNILLI:  He is a fact witness.

6                     MR. ROBON:  Well, he is really an

7        expert witness too.

8                     MR. FAGNILLI:  He is really a fact

9        witness though.

10                    MR. ROBON:  No opinions then.

11                    THE WITNESS:  Throw me out.

12                    MR. ROBON:  I mean, if you ask

13       expert opinions --

14                    MR. TASSE: You've read other

15       transcripts, have you?

16       Q.  What is your age?

17       A.  I'm 61.

18                    MR. ROBON:  Let the record indicate

19       that we have designated him as an expert, but

20       they're not going to ask any expert opinions

21       today.

22       Q.  What is your residence address?

23       A.  529 Loomis Drive.

24       Q.  Say it again, Loomis?

25       A.  Loomis, L-o-o-m-i-s, Perrysburg, Ohio.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 8

1      Q.  Tell me about your educational background.

2      A.  I'm a civil engineer.

3      Q.  Where did you go to college?

4      A.  I went to Clarkson University in Potsdam,

5      New York.

6      Q.  Where in New York?

7      A.  Potsdam.

8      Q.  What degree did you get?

9      A.  It was a B.S. in civil engineering.

10     Q.  What year?

11     A.  '68.

12     Q.  Any formalized education after that?

13     A.  No master's degree or anything like that.

14     Q.  By whom are you employed?

15     A.  I'm self-employed.

16     Q.  How long have you been self-employed?

17     A.  I retired from the Corps of Engineers in

18     2004, and I started consulting basically last

19     year, so it's only been about a year.

20     Q.  How long did you work for the Corps of

21     Engineers?

22     A.  Thirty years.

23     Q.  You started there in?

24     A.  '74, worked until 2004.

25     Q.  Where did you work between '68 and '74?

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

1      A.  I was -- I worked in New York City for the

2      Con Edison Power Company for a couple years, and

3      I worked another six or seven years in home

4      building business.

5      Q.  Can you be a little more specific?  What did

6      you do in the area of home building?

7      A.  Yes, I was a construction superintendent

8      mostly and mostly involved in home developments,

9      construction.

10     Q.  Where did you do that?

11     A.  In New York and New Jersey.

12     Q.  Why did you get out of that business?

13     A.  Well, when the bottom fell out of the

14     housing business in '73, I went to work for the

15     Corps because there really wasn't any work in the

16     home building business.

17     Q.  What was your job with the Corps of

18     Engineers?

19     A.  Most of my years I spent as area engineer in

20     Northwest Ohio.

21     Q.  What does an area engineer in Northwest Ohio

22     do?

23     A.  The main job is construction administration,

24     and we did, Corps of Engineers mainly, water

25     resources, and we did dikes and levies along Lake

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 10

1     Erie and dredging of Toledo harbor and various

2     projects associated with those two main functions

3     that we had.

4     Q.  When you say construction, what type of

5     construction are you talking about?

6     A.  Earth moving.  Earth moving is dredging,

7     too, but earth moving, building levies, doing the

8     -- probably our biggest project, probably the

9     easiest way to explain it would be we did Point

10    Place dike with the City of Toledo was our

11    partner in that.

12              And that was a major project, $15

13    million project, and we would do the rebuilding

14    of levies, the pump houses, all the sewers and

15    things that led to them and back-up dikes, sheet

16    piling, concrete roads, the whole complex project

17    like that, you end up doing the pretty full gamut

18    of civil engineering kind of things.

19    Q.  I'm assuming that you haven't been involved

20    since you went to work for the Corps of Engineers

21    in the development of any residential areas?

22    A.  I haven't been, I haven't done any real

23    residential work during that time, no.

24    Q.  Have you done any since you've retired from

25    the Corps?

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 11

1       A.  Residential work?  I haven't done anything
2       other than in my own home and that kind of thing,
3       just adding onto our house.  But, no, I haven't
4       done any actual development work.
5       Q.  You said that you started doing some
6       consulting work last year?
7       A.  Uh-huh.
8       Q.  That's a yes?
9       A.  Yes.
10      Q.  Was this Old Granite case your first
11      consulting job?
12      A.  No, I don't -- I believe we -- I've had a
13      couple other jobs that we were -- I had one other
14      job.  But it's one of my first ones, yes.
15      Q.  What other job did you have besides Old
16      Granite?
17      A.  I did some work on a permit down in a case
18      down in Port Clinton where we were the developer
19      of a marina.  Marina area was trying to get a
20      permit and that kind of thing, I was helping him
21      out with some design work and some Corps of
22      Engineers coordination, that kind of thing.
23      Q.  What other clients have you had?
24      A.  I worked for -- that's residential, too.
25      I've worked for Dillin Associates, Dillin Homes

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

Page 12

```
 1        they call it over at Levis Commons.
 2        Q.  What did you do for them?
 3        A.  I was their construction manager for their
 4        new brownstones or condominiums over there.  Yes,
 5        that was another residential thing after.  That
 6        was in 2006, so, yes, I did.  Hard to remember.
 7        Q.  What other clients have you had?
 8        A.  None other.  Those are really the only three
 9        significant ones.  I've done some other small
10        jobs, consulting jobs for a mobile home developer
11        helping him out with some land development work,
12        getting some letters written to the state for
13        approval of some of his designs and things like
14        that.  But I think that's about the only ones I
15        really worked for.
16        Q.  How much are you charging Old Granite per
17        hour for your services?
18        A.  Well, we haven't really been charging them
19        anything, really.
20        Q.  Are you working for free?
21        A.  Yep.
22        Q.  Why is that?
23        A.  Well, Jack hasn't had any money for one
24        thing, and he has paid for some expenses, you
25        know.  I guess you wouldn't call that free, but
```

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

Page 13

1    he has paid for some of my expenses, that kind of

2    thing.  He really hasn't had any money to

3    reimburse me.  He has given me a few checks for a

4    few thousand dollars, maybe six, $8,000,

5    something like that.

6              But we had a contractor working for us

7    one time, we started to build a mound, and we had

8    some expenses like that.  We had -- he did some

9    -- we went and hired, or I went and hired for him

10   Peterman to come out, Peterman Associates, which

11   is a consultant that did the site design over at

12   Cambridge.

13             We got him over, and he did surveying

14   and did some.  But most of that money he gave me

15   was given to other people, some guys that helped

16   me do some surveying over there and things like

17   that.  My mileage and things like that.  He has

18   given me some expenses.

19   Q.  Let me interrupt you because I think the

20   question that I asked you is how much were you

21   getting paid, not how much were your expenses.

22   And I think the simple answer to that is zero.

23   A.  Right.

24             MR. BAHRET:  Well, Marv, we will pay

25   him the same hourly rate for his opinions.

John McCarthy                                     Old Granite Development vs. The City of Toledo, et al

Page 14

 1              MR. ROBON:   He would decline your

 2      offer.

 3              THE WITNESS:  No thanks.

 4              MR. ROBON:  He was hoping to get

 5      $1,000 an hour here to make up.

 6      Q.  Do you have an hourly rate in mind that

 7      you're going to charge?

 8      A.  No.  You know, I kind of got involved in

 9      this thing as a -- because my kid lives at the

10      development in Jack's sales office there.  They

11      have a model home like, and that's how I got

12      involved in it.  And we just, Jack and I have

13      kind of become acquaintances and that, and we

14      just -- I just can't believe what has happened

15      over there.  Kind of got -- we were going to

16      build a mound, we were going to do this and that,

17      and then this thing goes to another thing, and

18      now we are here.

19      Q.  Are you an expert in surveying?

20      A.  Uh-huh.

21      Q.  You are?

22      A.  I'm not a registered surveyor, but I'm an

23      expert in it because I've had a lot of training

24      and experience in surveying.

25      Q.  Have you ever done a survey?

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 15

1       A.  Uh-huh.

2       Q.  Yes?

3       A.  Uh-huh.

4       Q.  Yes?  Use a word.

5       A.  Yes.

6                   MR. ROBON:   She can't write down

7       uh-huh or a shake of the head.

8       Q.  For whom did you do surveys in the past?

9       A.  Mostly with the Corps of Engineers.

10      Q.  By the way, are you a registered

11      professional engineer?

12      A.  Yes.

13      Q.  How long have you been registered?

14      A.  I've been registered in Ohio since 1980, I

15      think it was, and in New York since 1977 or '78.

16      Q.  Getting back to the surveying idea, you said

17      you did surveying for the Corps?

18      A.  Yes, I had a survey crew that worked for me,

19      and I would do the training with them and that.

20      In the Federal Government you didn't need to be a

21      registered surveyor to do surveys.  As a matter

22      of fact, we didn't have any, and we did a lot of

23      surveying.

24      Q.  Did you do any surveys for Old Granite?

25      A.  Yes, I did some spot check surveys.  But

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 16

1      when we had what we call legal surveys, what we

2      needed it tied in with actual monuments and that,

3      we used Peterman, who has a registered land

4      surveyor.

5      Q.  Did you ever hire any independent sources to

6      do a --

7      A.  Yeah, Peterman.

8      Q.  The reason I was suggesting is Peterman

9      might not be independent is my understanding is

10     he's the guy that laid out the development to

11     begin with.

12     A.  Oh, yes, he was, and that was the only one

13     we had.

14     Q.  Did you ever check with anybody else to see

15     if Peterman did it right?

16     A.  Yeah, the City surveyors came out.

17     Q.  City of Toledo?

18     A.  Yeah, the City surveyors, they had no

19     problem with the monuments that Peterman put in,

20     which is really the legal part of the whole

21     thing.  And, furthermore, one survey overlapped

22     the other.  They were just on top of each other,

23     within a quarter of an inch on the part that

24     we're talking about here, the boundary lines.  So

25     there was no --

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 17

1        Q.  So you're saying the City of Toledo survey

2        crew agreed exactly with the parameters of the

3        Peterman survey?

4        A.  Oh, yes, and told me that, that they --

5        Q.  Who was it that you were speaking to?

6        A.  I would have to look back and get his name,

7        but they have a survey party chief that was out

8        on the site.  He confirmed that the monuments

9        were good, and they put -- we had a -- they put

10       lath out there and we put lath out there.  We're

11       right on top of each other.  They were within a

12       quarter of an inch.

13       Q.  What is lath?

14       A.  That's the little boards that the surveyors

15       use.  Usually they put the ribbons on and that.

16       Q.  I call them stakes, that sort of thing.

17       A.  Well, a stake is something.  In surveying, a

18       stake is a square peg in the ground, and they put

19       the lath on above it so you can see it.  And

20       that's also a marker.

21       Q.  When was it that you had this conversation

22       with the City of Toledo survey crew?

23       A.  When they came out, which would have been

24       early on in 2006 when they come out.

25       Q.  Was this after the land was cleared?

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 18

1     A.  Yes.

2     Q.  Let me back up here.  When did you first get

3     involved in anything dealing with Old Granite?

4     A.  The first time was, I believe, when my son

5     called me and said, you know, I don't know

6     whether I was over there or whether he called me.

7     But he said, "You know, what the heck do you

8     think this is in the back here, all this

9     clearing?"  I didn't know, but that was the first

10    time I got involved when my son mentioned it to

11    me.

12    Q.  When historically was that conversation?

13    A.  I would say it was early 2006, probably -- I

14    would say probably February of 2006.

15    Q.  Your understanding is that this clearing

16    took place in the winter?

17              MR. ROBON:  Don't guess, don't

18    guess.

19    A.  I don't -- we don't really know whether it

20    was -- at this point.  We could look it up.

21    Whether it was February or April, it was in that

22    time frame, and that was the first time I really

23    got involved was when the clearing was already

24    done and my son called me up.  I think it was

25    February that they started the clearing.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

                                                                        Page 19

1        Q.  And what was the issue for you at that

2        point?

3        A.  Well, he was asking me, you know, what would

4        this be?  Why would they be doing this?  Then I'm

5        kind of involved with these kind of things, you

6        know, any kind of like land development stuff,

7        you know, railroads, cities, public works, that

8        kind of thing.  My son was just asking me.

9        Q.  When did your son move into that house in

10       the development?

11       A.  He moved in there in, it must have been

12       sometime in 2005.

13       Q.  Do you know when?

14             MR. ROBON:  Don't guess.

15       A.  I don't know.  I think -- but sometime in

16       2005.

17       Q.  Do you know how long he was there before

18       this clearing took place?

19       A.  I would say he was there most of that year,

20       most of 2005.

21       Q.  So he was in the house at least a year then

22       before this clearing took place?

23       A.  Well, I don't know if it was a whole year,

24       but it was approximately a year.

25       Q.  In that time how many payments did he make

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

Page 20

1        on the house, do you know?

2        A.  That I don't know.

3        Q.  Had you been to the house before the land

4        behind the house was cleared?

5        A.  Yes.

6        Q.  Do you have any pictures?

7        A.  No, not that I took or anything.

8        Q.  When your son called you to say that

9        somebody had cleared some of the stuff from

10       behind his house near the railroad area, did you

11       do any studies or anything?

12       A.  When I came out, I think the first thing we

13       did was --

14       Q.  Who's the we?

15       A.  Jack and I.

16       Q.  By the way, did you know Mr. Laskey before

17       that?

18       A.  I think so.  I think we knew each other

19       casually, but this was the first time we really

20       got involved with anything specific.  I never

21       worked for him before or anything, but I knew him

22       from my son and that before then.

23       Q.  So what did you do then?

24       A.  As I recall, I think the first thing we did

25       was Jack finally came down and we went like, you

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 21

1      know, who's clearing this thing and why are they

2      taking down all these trees?

3              And I said that I would find out.  I

4      would find out what was going on.  After that I

5      did.  I went and started inquiring what was going

6      on with the people.  I think the clearing people

7      had not finished or were still out there.  Some

8      of their equipment was still out there, I

9      remember that.

10     Q.  Where was it?

11     A.  The equipment was down just a little bit

12     east of Cambridge, by the time I got out there

13     and was talking to the guys.

14     Q.  By the time you got there, the clearing

15     behind --

16     A.  Cambridge.

17     Q.  Was done?

18     A.  Was done, and was done -- I shouldn't say --

19     they were still -- it was basically done, but

20     there was some little further clean up and things

21     like that.  But they had already gone through

22     there, and the bulk of the trees were out of

23     there before I ever got out, you know, on the

24     site and talked to anybody.

25     Q.  Did you take any pictures on that occasion?

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 22

1       A.  Yeah, I took some -- I think we took

2       pictures then, we took pictures of --

3       Q.  Who took pictures?

4       A.  I took pictures, my son took pictures.

5       Q.  Where are those pictures?

6       A.  Between my house and my son's house, and

7       some of them we turned over to Marv.

8       Q.  Are they digital or film?

9       A.  Digital.

10      Q.  How many pictures were taken?

11      A.  Well, at the outset we took, I would guess,

12      you know, a dozen pictures, but we probably have

13      taken, you know, dozens of pictures since then.

14      Q.  And all of them are still available?

15      A.  I don't know.  Not all of them.  I was just

16      looking over myself.  I have to really go back

17      and look and see how much I could -- I went and

18      seen some of my computer stuff and that.  But I

19      think between the three of us, we got most of

20      them available, yes.

21              MR. BAHRET:  Do you need a formal

22      request, Marv, to get all of the photos?

23              MR. ROBON:  No.  He has been looking

24      for them for me.  I wanted a picture of the

25      machine.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 23

 1      Q.  Did you take a picture of the machine?

 2      A.  Yeah, but I couldn't find it.

 3      Q.  When did you take the picture?

 4      A.  When they -- it was before they moved the

 5      equipment off site.  There was a couple of major

 6      pieces of equipment from Edwards Land Clearing

 7      that I took pictures of.

 8      Q.  Did you take any pictures of the machinery

 9      in operation?

10      A.  No, they were done by the time I took the

11      pictures.

12      Q.  So obviously no videotape taken of the

13      machinery either then?

14      A.  No.

15      Q.  What was the problem identified on that

16      first day other than some vegetation is now gone?

17      A.  Well, it appeared they were on the

18      development property as well, that they had

19      trespassed as well as cleared, and --

20      Q.  How did you make the determination that this

21      machinery had been on development property?

22      A.  Well, along this particular place by my

23      son's house, there was an old wall that was a

24      railroad tie wall.  And we knew because we had

25      our monuments real close to my son's place, we

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 24

 1      could see --

 2      Q.  What do you mean we had our monuments there?

 3      A.  The development monuments that Peterman put

 4      in.  They put corner monuments on, which are

 5      fairly recent.  We still had them there, and we

 6      could just sighting down, we could see that the

 7      clearing was several -- on the land was several

 8      feet onto Jack's land just sighting down the

 9      monuments before we brought Peterman in to

10      confirm it.

11              Plus the trees were 20 feet on Jack's

12      property, the way they grew, actually growing in

13      on his property.  These were big, these were

14      giant trees.  I mean, you know, we have pictures

15      of them.  I don't remember all the diameters.

16      Q.  I'm not sure what you're telling me.  You're

17      telling me a tree was removed that was 20 feet

18      into the development?

19      A.  It grew 20 feet into the development, the

20      branches and that, yes.

21      Q.  Are you claiming the trunk was 20 feet in?

22      A.  No, no.

23      Q.  Are you claiming the trunk was on the

24      development at all?

25      A.  Yes, oh, yeah, there was a lot of them.  It

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

1    was apparent right from the start without

2    surveying.

3    Q.  Were there survey stakes out there, or I

4    forget the term, laths, were there survey laths

5    out there?

6    A.  No, the corners are monuments.  They're set

7    in concrete on a pipe.

8    Q.  I'm not asking about the monument.  I'm

9    asking if there were any survey stakes or laths?

10   A.  No, there wasn't anything there.

11            MR. ROBON:   Wait for a question.

12   Q.  Did you see any indications of survey laths

13   or stakes anywhere along this railroad

14   right-of-way?

15   A.  There weren't any at the time.  I don't

16   really recall as far as lath.  I do recall there

17   were some markings that the City surveyors, I

18   believe it was the City surveyors they told me

19   later anyways, they had gone and painted little

20   marks in the trees to tell the clearing equipment

21   where to go.  And that was -- there was some of

22   them still there.

23   Q.  They painted trees?

24   A.  Yeah, they spray paint the -- in clearing

25   operations, they usually spray paint here and

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

                                                                              Page 26

 1      there to keep -- whatever marks they have removed

 2      when they're clearing, they spray paint every 20

 3      feet or something.  They just --

 4      Q.  The sprayed item is to mark a boundary or

 5      what?

 6      A.  Yeah, to tell them where to stop clearing.

 7      Q.  Were those painted markings still around?

 8      A.  There was still some of them around, yes; I

 9      could see them.

10      Q.  Were they on the railroad right-of-way?

11      A.  They were right along the line, but you

12      couldn't tell because even then when you're

13      spraying a branch like that, you can't really

14      establish it went a few feet, you know, where

15      they meant to go because the clearing, they've

16      already pulled all the trees and stuff out of

17      there, so that was highly disturbed.  That was

18      the only markings that I saw at the time.

19      Q.  Did you see any markings that you believed

20      were on the development property?

21      A.  No, none of these things were -- the ones

22      that were there were not.  They weren't even --

23      they were down at the very end of the property

24      where it had already been cleared.  It didn't

25      make any appearance that there was --

Page 27

1      Q.  Whatever markings you saw were on the

2      railroad right-of-way?

3      A.  It was along the boundary.  I couldn't tell

4      you whether it was on their property or ours, but

5      it was near the boundary.

6      Q.  You didn't see any of these painted markings

7      that you can tell us were on the Old Granite

8      property?

9      A.  No, I can't.

10     Q.  Did you ever talk to anybody that was using

11     this land-clearing equipment?

12     A.  No, not anybody that was using it.

13     Q.  Did you talk to anybody that claimed they

14     had used it?

15     A.  I think all their people were where -- I

16     think all their people were -- when I first saw

17     the -- went out there, the basic operation they

18     were either done with or they just had a little

19     clearing up.  I didn't talk to any of the

20     land-clearing guys themselves.  I think I talked

21     to the low-boy operator or something was picking

22     up the equipment and taking it away.  That was

23     the only guy I think I talked to.

24     Q.  So the answer is no, you did not talk to

25     anybody that either used the equipment or claimed

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 28

1      to have used the equipment?

2      A.  Right, that's true.

3      Q.  Did you ever talk to anybody for the City of

4      Toledo other than these people that you believed

5      were the survey crew?

6      A.  Then or later or what?

7      Q.  Let's -- at the beginning, you talked to a

8      survey crew?

9      A.  Right.

10     Q.  And how long after this clearing was that?

11     A.  That was later, too.  That was not at that

12     time.  The survey crew didn't come out till quite

13     a bit later.

14     Q.  About when did you believe this survey crew

15     came out and you had conversation with them?

16     A.  That was in the April timeframe.

17     Q.  Besides the survey crew, who have you

18     communicated with on behalf of the City of

19     Toledo?

20     A.  This is all later because --

21     Q.  Right.

22     A.  At first we didn't.

23     Q.  I understand.  Just give me the names.

24     A.  I spoke with -- her name is Christy

25     Soncrant, their engineer.  I spoke with several

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 29

1        people in the City.  I spoke with the survey

2        chief.  It's a survey chief from the City of

3        Toledo that was in charge of it, the people I

4        talked to.  Their surveyors, which spoke to their

5        inspector, Joe Crandall, and particularly their

6        survey personnel.

7        Q.  When did you first have contact with Joe

8        Crandall?

9        A.  I think the first time I had any contact

10       with him was when -- probably when the surveyors

11       came out in the April timeframe.  I say April

12       timeframe.  I mean, it might have been a week or

13       so into May.  It may have been even --

14       Q.  Was that your only contact with him?

15       A.  No.  I saw him there several times through

16       the course of this thing.

17       Q.  What were you discussing with him?  What

18       were the topics?

19       A.  Well, the surveying, and he was involved

20       with like, oh, he wanted me to make sure I wore a

21       hardhat and that kind of thing.  But, you know, I

22       asked him himself, you know, what was going on

23       here.  Why did they have to come over on our, you

24       know, development property, and, you know, those

25       kind of things.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 30

```
 1              But I talked to him.  He had
 2    something, you know, like an inspector on a job,
 3    he kind of like coordinates the surveying thing,
 4    too, and so we talked about the surveys, you
 5    know.
 6              And later on when they were building
 7    the water main, we talked a couple of times
 8    about, you know, why they were regrading it the
 9    way they were.  I think I talked to him about the
10    drainage manhole that we were concerned about,
11    why they were knocking that manhole cover, and
12    the system that we relied on for draining
13    Cambridge, why they were knocking that -- why he
14    was letting the contractor knock that thing to
15    hell.
16    Q.  What was that manhole that you're talking
17    about that you claim Cambridge relied upon?
18    A.  That's 30 feet from Cambridge to the east.
19    Q.  Upon what information do you rely upon to
20    claim that it's part of the drainage plan for
21    Cambridge?
22    A.  Well, I spoke with the county engineer and
23    the drainage engineer.
24    Q.  Did you review the drainage plan for
25    Cambridge?
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 31

```
 1        A.  Yes.
 2        Q.  Then you're aware of the fact that Cambridge
 3    does not rely upon any drainage ditches or
 4    manholes that are --
 5        A.  That's not true.
 6        Q.  It is according to the plan they filed.
 7        A.  No, it isn't.  That's -- the City thinks
 8    that, but the City doesn't understand it.
 9        Q.  Mr. Robon asked some questions at a
10    deposition of Glen Anger or Agner --
11        A.  Agner, yeah.
12        Q.  -- suggesting that the drainage plan for
13    Cambridge is a linear flow of water from the side
14    of Cambridge closest to Hospice down the other
15    way towards Bates Road.  Do you agree with that?
16        A.  That the water from where?
17        Q.  That the flow of water is intended to go
18    behind Cambridge at the back of the lots?
19        A.  Right.
20        Q.  In one smooth direction from one end to the
21    other, basically from Hospice down towards Bates
22    Road?
23        A.  That's right.
24              MR. ROBON:   Objection to the word
25    smooth.  I'm not sure what that means.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

```
 1        Q.  Are you aware of the fact that the drainage

 2        plan actually has water going in both directions?

 3        A.  The drainage plan of what?

 4        Q.  The drainage plan filed by Old Granite and

 5        submitted to the County?

 6        A.  Our drainage plan has the drainage in the

 7        back.  We have our own drainage system in the

 8        back, right?  And in designing that system, they

 9        went and relied on that water passing in the back

10        to that manhole.  We only took a portion of that

11        water, okay?

12        Q.  What document do you have that shows that

13        Old Granite relied upon any drainage ditches or

14        pipes or manholes that weren't on Old Granite

15        property?

16        A.  I spoke to the engineer that designed it.

17        Q.  Who is that?

18        A.  Todd Perkins -- or Jenkins.

19        Q.  Todd Jenkins?

20        A.  Yes.

21        Q.  Is he a Peterman employee?

22        A.  Uh-huh.

23        Q.  Yes?

24        A.  Uh-huh.

25        Q.  Yes?
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 33

1     A.  Yes, I'm sorry.

2     Q.  Did he show you a document that shows that

3     they were relying upon anything that wasn't on

4     Old Granite property?

5     A.  No.  There wouldn't be -- there normally

6     isn't such a document, but he and I went over in

7     detail because I know how I've done some

8     development design myself like this --

9     Q.  The answer is no, he didn't show you a

10    document?

11    A.  No, he did not show -- he didn't have --

12    there was no document.

13    Q.  You're unaware of any document that would

14    show that Old Granite was relying upon drainage

15    of any kind that wasn't even on their property,

16    any pipes, ditches or any other method of

17    removing water?  You can answer with a yes or a

18    no.  Either you are aware of a document or you're

19    not.

20    A.  Well, I'm not sure it's either one because

21    he told me that they had done the drainage

22    review, and I would think, and maybe he had me to

23    understand that there was some other documents

24    developed that would have those calculations to

25    show all the drainage that was going by Cambridge

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 34

```
 1        and what portion we were taking away.  He may

 2        have that.  Now, I don't -- but to me, I'm not

 3        aware of --

 4        Q.  I haven't seen any such document, and the

 5        question to you is, have you seen such a

 6        document?

 7        A.  No.

 8        Q.  I'm not asking you to --

 9        A.  I haven't seen that document, but I --

10        Q.  All right, because you understand I'm not

11        asking you to speculate as to whatever Todd

12        Jenkins may have seen or not seen, okay?  I just

13        want to know what you've seen.  And we agree that

14        neither one of us have seen any document?

15        A.  That's true.

16        Q.  When did you first become aware of any

17        problem with flooding on the Old Granite

18        property?

19        A.  During the construction we became aware of

20        it.  Physically aware of it are you talking

21        about?

22        Q.  I don't know how else you would be aware of

23        it.

24        A.  Well, we were doing the engineering review

25        of the thing with him, so that's what I was going
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

1      on.  But as far as the real flooding problem, we

2      became aware of it when it was obvious that --

3      right after they cut the main drainage pipe

4      underneath the railroad there.

5              And I was trying to explain to Christy

6      Soncrant.  Even before this, I was trying to

7      explain to her you can't cut that pipe, but, you

8      know, when they did cut the pipe, they started

9      pumping, and -- down by Bates Road.  That water

10     was coming backwards to Cambridge all the way

11     from Bates Road coming into our system at

12     Cambridge.

13             And I called her and Joe Crandall came

14     out, and I think she came out, too, you know, and

15     said, "Oh, that's just a temporary thing. We were

16     just" -- and I said, "Isn't this some kind of

17     proof that you shouldn't have cut that pipe in

18     there?"

19             But we saw it then, and then we had a

20     pretty decent rain, and the rain, at least

21     according to Lori, and Lori is my son's wife, she

22     called me up, said, "Hey, we got this ponding in

23     the back of the house now."

24     Q.  Is that after the nine inches of rain one

25     day followed by eight inches two days later?  Is

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 36

```
 1        that the rainfall you're talking about?

 2        A.  We never had that.

 3        Q.  Yes, we did.

 4        A.  No, we didn't.  That was in Findlay.

 5        Q.  You don't know what the official numbers

 6        were for Toledo area then?

 7        A.  Official?

 8        Q.  Yeah.

 9        A.  There probably is no official at Cambridge,

10        but, you know, we knew it was the most we had one

11        night was three inches in that area in Perrysburg

12        from the gauges that we had.

13        Q.  You're telling me that at Toledo Express

14        Airport they get nine inches and in Perrysburg

15        they only got three?

16        A.  You're saying they got nine inches at Toledo

17        Express Airport?

18        Q.  Yes, I am.

19        A.  In 2006?

20        Q.  Yes.

21        A.  Overnight?

22        Q.  Yes, Sylvania Country Club went almost under

23        water.

24        A.  Well, the most we got was three and a half

25        in Perrysburg.
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 37

```
 1      Q.  How do you know?

 2      A.  From our gauges.

 3              MR. ROBON:   Can we talk about a

 4      time?  We said in '06, but is this in the winter

 5      or spring, fall, summer?  Let Mr. Bahret -- Jack,

 6      you can't say anything.  You can't say anything.

 7      Q.  How do you know what the official rainfall

 8      was in Perrysburg?

 9      A.  Well, I have a rain gauge.

10      Q.  Do you record that data?

11      A.  No, I just look at it, and we have golf

12      courses.  I'm a golfer too.  We are kind of very

13      sensitive to what the difference was between

14      Findlay and Perrysburg.  But, to my

15      understanding, even though we don't have the

16      official numbers, the most we got in any night

17      was around three inches.

18      Q.  Are you aware of the fact that the flooding

19      in Findlay was in the year 2007?  I mean, are you

20      thinking of the right year?

21      A.  Yeah, I mean that's the one we have been

22      comparing everything to is this major flood.

23      Q.  No, I'm talking about the summer of 2006,

24      the rainfall.  You're telling me in the summer of

25      2006?
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 38

1      A.  Summer of 2006, my understanding was there

2      was nothing more than around three inches in that

3      area.

4      Q.  Okay.  And that understanding is based on

5      you looking at your rain gauge?

6      A.  And from other reports at our golf courses.

7      Q.  Regardless of our respective golf courses, I

8      heard you say that you said something to Christy

9      Soncrant before a pipe was cut?

10     A.  Right.

11     Q.  When did that conversation take place?

12     A.  That would have been in the summer of --

13     that would have been in 2006, probably a month or

14     two before they cut it.

15     Q.  And how did you become aware of the fact

16     that there was even a pipe there?

17     A.  When we were out there looking at the

18     clearing, we went and noticed that it was a new

19     manhole cover top knocked off by the clearing

20     equipment and dirt pushed down in the manhole.

21     And I complained about that to Christy and that.

22     But that was -- when I did that, when I looked

23     and saw that that manhole was knocked over, I'm

24     wondering, you know.

25     Q.  When you say it was knocked over, you mean

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 39

```
 1      the lid was knocked off?

 2      A.  No, this was a clay pipe manhole about

 3      30-inch diameter, and the top section, which was

 4      probably about two or three-foot, probably about

 5      a three-foot pipe with a bell on it, that the

 6      cover sits on, that had been knocked over.

 7               Well, she came, and I said, "Oh,

 8      Ric-Man said that they didn't -- it was already

 9      messed up."  And I said, "Well, you know, this is

10      fresh dirt that's just been pushed in there and

11      that."

12               So any rate, that's when I first

13      became aware that there was a manhole there.  And

14      I went and I asked the neighbor whose property it

15      sits next to, I asked the neighbor, I said, "What

16      is this pipe here?"  And the guy whose been

17      living there all his life --

18      Q.  Do you know this person's name?

19      A.  Yeah.  Well, the property is the Gillette

20      property.  I have his name at home.  This is Mrs.

21      Gillette's son-in-law who takes care of the

22      property.

23               And he says, he told me, he says, "Oh,

24      no."  He said, "That's the main drain before you

25      got here with the development, you know, that's
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

1      the main drain all the way from Bates all the way

2      up to W.W. Knight and Hospice.  It drains that

3      whole area.  It comes all the way down here.  It

4      even flooded all the way up to the top of the

5      railroad tracks when they didn't take care of

6      that thing once."  And I'm like -- okay, but

7      that's how I found out that this --

8      Q.  To the top of the railroad tracks would be

9      at least 10 or 12 feet, wouldn't it?

10     A.  About seven right there.  And he explained

11     how they had this big flood there and that that

12     was -- that they had to clean out this -- he was

13     complaining that the railroad never maintained

14     that darn thing.

15     Q.  When did this big flood that this guy is

16     talking about occur?

17     A.  He was talking about in the neighborhood of

18     1985 or something like that.  And he said that he

19     had -- because the railroad neglected it, he had

20     to go and maintain it and clean it sometimes.

21     Q.  Clean what?

22     A.  The manhole out and make sure that that pipe

23     worked; otherwise, his property got flooded.  So

24     that was when I first came to realize that

25     this -- what this manhole was and what this pipe

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 41

1    that connected to it going underneath the

2    railroad and why, you know, Cambridge relied on

3    that pipe for the overflow from our system when

4    we had heavy rains.

5             So that's how I got to know, and it

6    was kind of confirmed that this thing wasn't just

7    some old thing hanging in there.  I was trying to

8    get her to, Christy and them to make sure you

9    take care of the -- put the cover back on so this

10   thing doesn't get screwed up because we need this

11   thing for Cambridge, this guy and Hospice and the

12   rest of us.  That's the only drain for a whole

13   mile.

14   Q.  You're saying all of this before anybody cut

15   the pipe?

16   A.  Right.

17   Q.  By the way, do you know, did you ever see

18   that manhole cover?  I think you already said you

19   didn't.  But had you ever seen it before you are

20   walking by and you notice that it's knocked off?

21   A.  I think I did see it before it was knocked

22   off.

23   Q.  How would you have had the opportunity to

24   see it before?

25   A.  Before they went and -- because what they

ST. JOHN REPORTING   251 BLUE HARBOR CT., PERRYSBURG, OH 43551      419-872-1935

John McCarthy                           Old Granite Development vs. The City of Toledo, et al

Page 42

1      did, they cleared and then they graded everything

2      off.  They went and came with a bulldozer and

3      pushed the dirt all the way over on our edge and

4      into the ditch and everything, you know, slightly

5      into the ditch and built up the bank.

6                  And that's when I saw how much, you

7      know, that the dirt was actually pushed in there

8      and why we were arguing over -- "Hey, I don't say

9      that this thing was in great shape before Ric-Man

10     ever got there, or Vermillion or any of them," I

11     said.

12                 But I had seen the thing, and it was

13     -- I didn't take a real good look at it because

14     it was all grown up still around there before

15     they bulldozed it.  But I had seen it before I

16     actually had Christy and those people out there.

17     Q.  Let me see if I can understand what you're

18     saying.  You never saw this manhole before the

19     clearing machine was used, correct?

20     A.  Yes, I think that's true.

21     Q.  But you're telling me you saw it after a

22     clearing machine was used but before a bulldozer

23     was used?

24     A.  Yes, that's right.

25     Q.  And you took pictures at that point?

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 43

 1    A.  I didn't take early pictures, but I think we

 2    did take pictures of the dirt going down in the

 3    manhole because I thought that was pretty bad for

 4    them to --

 5    Q.  But that's after the bulldozer, right?

 6    A.  Right, that was after the bulldozer.

 7    Q.  Did you take pictures before the bulldozer,

 8    but after the clearing operation?  I thought you

 9    said earlier you and your son took pictures your

10    very first time out there?

11    A.  Yeah, and I'm not sure that we -- I really

12    don't recall whether we took pictures then or

13    not; may have.

14    Q.  You haven't deleted any pictures that you

15    took in the Old Granite area, have you?

16    A.  I hope not.

17    Q.  Have you checked with your son to see if he

18    still has the pictures he took?

19    A.  I asked him generally, and he says he's got

20    some photos too.  But we just -- Marv was asking

21    me, too.  We just haven't recently gone through

22    and see what we really do have, you know.

23    Q.  And you said you took pictures in this

24    manhole?

25    A.  Of the manhole.  Not in it, but, you know,

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 44

1       standing right above it showing the dirt going

2       down in it.

3       Q.  Did you ever measure how far down the

4       manhole goes?

5       A.  Huh-uh.

6       Q.  How far down does it go?

7       A.  As I recall, we had -- the pipe is down --

8       from the lid it's down about 12 feet.  I think

9       the invert, you know, the bottom of that pipe I

10      think it was 12-1/2 feet.

11      Q.  Now, did you know where the pipe went in

12      this manhole when you looked in it?

13      A.  Yes, when we -- and I don't remember whether

14      it was -- probably when the bulldozer --

15              MR. ROBON:   Can we clarify one

16      thing, Bob?  Which pipe because there is more

17      that one pipe in the manhole.

18      Q.  Did you know where any pipes went?

19      A.  Yes, I knew where all the pipes went.

20      Q.  At what point did you know that?

21      A.  Probably after the bulldozer went through.

22      At that point we went and checked out where all

23      the -- there are two inlet pipes to it and the

24      one main outlet pipe that goes to the center

25      ditch of the railroad.

Page 45

```
 1                  And that was still visible.  We could

 2       still see where that came out to the center

 3       ditch, plus where the two inlet pipes came from

 4       on the Cambridge side.

 5       Q.  And the center ditch you're talking about is

 6       between the two railroad right-of-ways there's a

 7       ditch?

 8       A.  Right.

 9       Q.  And, as you called it, an outlet pipe that's

10       visible?

11       A.  Yeah, that's -- outlet from that manhole to

12       that ditch.

13       Q.  That's visible?

14       A.  It was visible.

15       Q.  Is it visible now?

16       A.  No.  No, they tore the -- I understand they

17       tore the whole thing out.  We couldn't see it

18       after they went and tore --

19       Q.  Do you have any pictures of the outlet pipe?

20       A.  I don't know.

21       Q.  Do you have any recollection of taking any

22       picturing of the outlet pipe?

23       A.  I think so.  I think we did take pictures of

24       that outlet pipe.

25       Q.  Did you ever have any discussion with
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 46

```
 1      anybody on behalf of the City of Toledo about the

 2      outlet pipe?

 3      A.  Yes.

 4      Q.  Who?

 5      A.  Christy.

 6      Q.  What was the height of that outlet pipe

 7      below the grade of the railroad right-of-way?

 8               MR. ROBON:   In which part?  Are you

 9      talking about the tracks or the --

10      A.  The main pipe going under?

11               MR. BAHRET:  There were no tracks.

12               MR. ROBON:  The tracks are next to

13      it.

14      A.  Underneath it it's -- well, that's what I

15      was saying, that 12-1/2 feet, that was, that

16      manhole top is almost to the top of the railroad.

17      So that was about -- that pipe was down there,

18      the invert, the bottom of it was down there about

19      13 feet below the surface.

20      Q.  How deep is the ditch between the railroads?

21      A.  That was the same -- that thing was right

22      down at the bottom of that ditch.

23      Q.  The ditch between the railroads is 12, 13

24      feet deep?

25      A.  Uh-huh.
```

John McCarthy                                Old Granite Development vs. The City of Toledo, et al

Page 47

1      Q.  Yes?

2      A.  Yes.  At that point right down there, yes.

3      Q.  How deep is that ditch now?

4              MR. ROBON:   If you know.

5              MR. BAHRET:  Marv, you don't have to

6      keep telling him the hints that he should say he

7      doesn't know.  He is a smart enough guy; he knows

8      the rules.  You don't have to coach him.

9      A.  Right now it's eight to ten feet.

10     Q.  You were telling me there's two inlet pipes

11     to that manhole?

12     A.  Right.

13     Q.  Where did they come from?

14     A.  One came from the Gillette property and one

15     came from Cambridge.

16     Q.  From Cambridge?

17     A.  Uh-huh.

18     Q.  That's a yes?

19     A.  Yes.

20     Q.  It was on Cambridge property?

21     A.  Uh-huh.

22     Q.  That's a yes?

23     A.  Yes.

24     Q.  Where on Cambridge did the pipe originate?

25     A.  I believe it's on Lot 13.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 48

```
 1        Q.  What is the form of the origination?  Is it

 2        a manhole or cistern or what do we got?

 3        A.  No.  All it is, it's just an open railroad

 4        pipe.  It's a 12-inch clay pipe, and it's right

 5        on the edge.  That was right at the ditch that's

 6        on the side of Cambridge.  All that water from

 7        Hospice and that went into that pipe, collected

 8        there.

 9        Q.  Is it in the ditch?

10        A.  Yes, at the end of the ditch.  The ditch

11        comes from Hospice, goes to this pipe, and it

12        goes underground past Lot 15 and 16 and down.

13        Q.  Is any part of that ditch on Cambridge

14        property?

15        A.  The pipe is not.  The pipe is just inside --

16        is on the railroad property by a foot or two.

17        And the ditch -- but the ditch, there is a little

18        swale there.  That is on -- you know, the ditch

19        is a little bit on Cambridge property, a little

20        bit on -- most of the ditch, the high-bank ditch,

21        is up on CSX property.

22        Q.  So one of these pipes came from -- I forget

23        the name you gave me.

24        A.  Gillette.

25        Q.  Gillette?
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 49

    1        A.  Yeah, that's --
    2        Q.  How long was the run of that pipe?
    3        A.  That one was -- I think that one was a
    4        couple hundred feet, and the one from Cambridge
    5        was like 250, 300.
    6        Q.  Was there a ditch behind Old Granite, or did
    7        the ditch end before Old Granite?
    8        A.  Half of Old Granite had a ditch, half of it
    9        had -- 300 feet of it had this pipe, okay?  From
   10        what I could gather, the railroad must not have
   11        had enough property or something.  They tried to
   12        squeeze it in.
   13               Rather than have a ditch, they put it
   14        in a pipe the last 300 feet before it went into
   15        this manhole.  That's why they had a little
   16        railroad tie wall along that property line, too,
   17        and just inside that was this pipe.
   18        Q.  How would water drain from Old Granite into
   19        this pipe then?
   20        A.  It's -- most of Old Granite up above, you
   21        know, all those other lots with the backyards
   22        would go into that pipe.  You know, that was very
   23        close to -- it's deeper than -- it's deeper
   24        than --
   25        Q.  Certainly Lots 15 and 16 wouldn't drain to

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 50

1          that pipe, would they?

2          A.  No, they wouldn't go to that pipe,

3          especially now with our own system in there.

4          Q.  Let me change topics for a minute and get

5          back to the discussions about cutting the pipe.

6          Were you there when the pipe was cut?

7          A.  No, I wasn't.

8          Q.  Were you ever there before it was cut when

9          anybody, any officials from Wood County were

10         there?

11         A.  Yes.

12         Q.  And who was there?

13         A.  I had asked -- again, I asked for the

14         meeting.  We had Christy Soncrant came out, Ray

15         Huber was there.  Ric-Man's superintendent was

16         there, I can't remember his name, and I think it

17         was the four of us.

18                  And we were trying to go, and the

19         whole idea was to try to figure out what the heck

20         was with this pipe underneath the railroad, and

21         this is before it was cut.  And --

22         Q.  Anybody identify what the reason the pipe

23         was there?

24         A.  Yeah.  Ray Huber, the county engineer, he

25         told me and Christy that he was a former Toledo

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

                                                                        Page 51

    1           Terminal employee, and he dug up this map showing

    2           that there was a drain pipe in there.

    3           Q.  Was this before or after it was cut?

    4           A.  Before.  So Ray's like, "Hey, you know, this

    5           is your project, City of Toledo.  Here's all I

    6           could come up with."  And he is telling me, you

    7           know, "I don't know how good it is or what it" --

    8           but he says, "This shows the culvert."  And

    9           that's what it calls it on this little drawing

   10           which the county has.  Later on we found the

   11           County had all along on file.  They had the

   12           railroad drawings and everything.  And it was,

   13           you know, it was right there.

   14           Q.  It shows a culvert?

   15           A.  Yes, it shows a culvert, a 24-inch culvert.

   16           It calls it a culvert.  A culvert is usually a

   17           main drainage pipe.

   18           Q.  Isn't a culvert like a ditch?

   19           A.  No, but the railroad call them culverts

   20           pipe, too.  As a matter of fact, they call it a

   21           VCP, which is a vitrified clay pipe culvert,

   22           which was what it was.  This was a clay pipe, and

   23           the manhole was a clay.

   24                 The thing is 90 years old or whatever,

   25           but it's still -- the old railroad, they had the

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 52

1      thing in there, and they had it at the right

2      depth and everything to drain that whole side of

3      the railroad thing.

4              So I thought it was clear to Christy

5      right then that, you know, "Here's the guy

6      confirming here it is.  Why the hell didn't you

7      have your consultants knowing this thing was

8      here?"

9              We were also talking about the

10     manhole, knocking that over, and the disrespect

11     to that.  Never really -- couldn't believe that

12     they would actually cut the thing, you know.

13             But any rate, we did have real clear

14     ahead of time that we knew it was there, you

15     know, and that --

16                 MR. ROBON:   Let him ask the

17     question.

18     Q.  Did anybody say it served any function?

19     A.  I did.

20     Q.  Did anybody other than you say that it

21     served any useful function?

22     A.  No.  This is when Ray was like, "Hey, I'm

23     just bringing out this drawing.  I don't know

24     which way it goes.  I don't know."

25     Q.  Did anybody say it was even open?

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

                                                                      Page 53

1      A.  No.  At this point we didn't know.

2      Q.  Were you there at any time after that thing

3      was cut to look into what was left of the pipe?

4      A.  Just in the manhole, I saw what, you know,

5      what the --

6      Q.  Do you know if the pipe itself, this VCP

7      culvert, was it totally plugged?

8      A.  No, it wasn't totally plugged, at least at

9      the manhole it was not, which usually means

10     it's -- whatever is there is usually what it is

11     in the pipe.

12     Q.  Did you see any section of the pipe to

13     verify what you just told me?

14     A.  No, I never saw any of the -- other than the

15     -- I saw the pipe at both ends, and, you know, it

16     confirmed there's probably half or two-thirds

17     full of the sediment from the railroad not taking

18     care of it.

19     Q.  Are you claiming that there are wetlands at

20     any point on the Old Granite subdivision?

21               MR. ROBON:  I'm going to object.  I

22     think that gets to opinion testimony.  And if you

23     want to ask him opinions, I think that's fine.

24               MR. BAHRET:  I don't think it's an

25     opinion.  I'm asking if he claims there are

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 54

1        wetlands there.

2                    MR. ROBON:  No, that's an opinion.

3        I don't think that's a fact question.

4                    MR. BAHRET:  You don't think the

5        existence of a wetland is a fact?

6                    MR. ROBON:  I don't think the

7        common person could look at a piece of property

8        and say whether it is or is not a wetlands.  I

9        think a professional could.

10                   MR. BAHRET:  Okay.  I'll pay him the

11       same hourly rate as he gets paid.

12                   MR. ROBON:  Can we stipulate we'll

13       let the Court decide what he should get paid?

14                   MR. BAHRET:  If he should be paid.

15                   MR. ROBON:  Right.  Go ahead and

16       answer.

17       Q.  Are you claiming there are wetlands behind

18       Old Granite?

19       A.  Behind it or on it?

20       Q.  On it or behind it?

21       A.  I asked our wetlands guy to come out and

22       look at it, and -- Gary Buck.

23       Q.  Who is Gary Buck?

24       A.  Gary Buck is a -- he is a regulatory

25       investigator for the Corps, retired, who I worked

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

                                                                              Page 55

 1      with in Point Place.  He claims that that's, the

 2      railroad property itself, not the farm that Jack

 3      bought because that was farm.  You can develop

 4      that, but that the railroad letting those trees

 5      grow up, that that is truly a wetland, that whole

 6      embankment.  Once they let those trees grow up

 7      the years that they did, that his opinion was

 8      that that would be clearly a valuable wetland.

 9      Q.  Did he see it before the trees were cut

10      down?

11      A.  No, he didn't.

12      Q.  Did he see it at all?

13      A.  He was out there and he saw aerial photos.

14      Q.  Did you have an opinion one way or another,

15      or are you just telling us what this other guy's

16      opinion is?

17      A.  I'm really relying on him.  My work in the

18      Corps was not a wetlands guy.

19              MR. BAHRET:  There goes your request

20      for fees, Marv.  He doesn't have an opinion.

21      Q.  Did you pull any kind of permit to --

22              MR. ROBON:  He does have an

23      opinion, but it's based upon somebody else's

24      consultation.

25              MR. BAHRET:  He just told me he

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 56

 1      doesn't have an opinion, Marv.

 2      Q.  Did you pull any kind of permits to do any

 3      work behind Old Granite after the trees were cut

 4      down?

 5      A.  You mean like wetland permits?

 6      Q.  Yeah.  Did you -- somebody was putting dirt

 7      in there; is that correct?

 8      A.  In the wetlands area or on the embankment or

 9      what are you talking about?

10      Q.  Did anybody move any dirt after the City had

11      the trees and vegetation cut down on the

12      railroad?

13      A.  Yeah, the City did or their contractors did.

14      Q.  They moved dirt?

15      A.  Yeah.

16      Q.  My understanding is that Old Granite moved

17      dirt.  Do you have any understanding on that

18      issue?

19      A.  No, not on the railroad property.  We moved

20      it on the Cambridge property.  We started a

21      mound.

22      Q.  Did anybody pull a permit to build the

23      mound?

24      A.  It wouldn't be necessary.

25      Q.  Why would it not be necessary?

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 57

1      A.  It's farmland.  It's been farmland forever,

2      and you don't need a permit for that.  The trees

3      weren't growing up on it.  It's only if the trees

4      have grown up that these things return back to

5      wetlands is the real issue.

6      Q.  Your understanding is the wetlands then were

7      not on old Cambridge property?

8      A.  Right.

9      Q.  So if whatever your friend claims was a

10     wetland, if trees were removed, that wasn't done

11     on Old Granite property?

12     A.  Right.

13     Q.  I'm assuming you don't have an understanding

14     as to the definition of a wetland, the legal

15     definition?

16     A.  No, I'd leave that to --

17     Q.  You'd leave that to --

18     A.  Gary.

19     Q.  Gary?

20     A.  That's his bag.

21     Q.  Did you ever walk on that railroad

22     right-of-way before it was cleared?

23     A.  Probably not.

24     Q.  Do you have any knowledge of any trees back

25     there, weeping willow trees or anything of that

```
 1      nature?
 2      A.  On the actual railroad itself?
 3      Q.  Not on the railroad itself, but on their
 4      right-of-way.
 5      A.  On their right-of-way?
 6      Q.  Yeah.
 7      A.  No, I don't have any direct knowledge, just
 8      photos and that kind of thing.
 9      Q.  Did you see anything in the photos that you
10      were shown that would indicate there were any
11      trees commonly associated with wet areas, such as
12      a weeping willow tree?
13      A.  All the trees were.  They're all, I mean,
14      according to Gary, you know, this is the way it
15      goes.  You had the farmland there.
16      Q.  If I should talk to Gary, I guess I will,
17      and I'm not an expert, but I've never heard
18      anybody claim that oak trees and things like that
19      are ever in wetlands?
20      A.  Is that right?
21      Q.  Yeah, I've never heard that.
22      A.  Well, that's not so.  I know that much.
23      There are certain types of oaks that are
24      definitely wetland trees, and that's what we have
25      back there.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 59

1              MR. ROBON:  Pin oaks.

2       Q.  Did you ever measure how deep the area was

3       behind Old Granite, between Old Granite and the

4       railroad, as far as the depth of any vegetation?

5       Not the height, the depth?

6       A.  The width?

7       Q.  Width.

8       A.  Coming out.

9       Q.  I was trying to avoid using width because to

10      me that means side to side, you know, behind the

11      development.  There is a measure that you can put

12      on whatever was there allegedly as vegetation

13      from the back of Old Granite walking straight to

14      the railroad track or the railroad right-of-way.

15      Are you following me on that?

16      A.  Right.  And you're wondering about like the

17      trees that were growing out over Cambridge

18      property?

19      Q.  No, not --

20      A.  That distance?

21      Q.  No.  At ground level, what's the depth, the

22      measure of how thick any of this vegetation was

23      between Old Granite and the railroad right-of-way

24      that was cleared?

25      A.  Oh, oh, okay.  You mean like -- well, let me

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

                                                                                    Page 60

1          kind of answer it this way, if I understand it

2          right.  The right-of-way is 68 feet and, even

3          though I didn't see, you know, I didn't go out

4          there specifically and see this, I had been there

5          before it was torn down.

6                    You know, the year before I had been

7          out there, but never really looking at it like

8          maybe Jack or somebody would that was developing

9          the property.  I'm just visiting my son.

10                   But what appears from what little I

11         saw, and aerials we saw that were there in 2005,

12         the growth that had come up, I think what you're

13         getting at is that there was 68 feet of

14         right-of-way.  The trees were heaviest on the

15         edges, and the trees grew out 10, 15, 20 feet out

16         to either side.

17                   So you got 68, plus you've got another

18         say 10 or 15 feet.  You've got about a hundred

19         feet of vegetation that was there that would have

20         kept you from viewing those trains.

21         Q.  I'm not following you at all.  A hundred

22         feet of vegetation between, let's say, Lot 15

23         and --

24         A.  The active railroad.

25         Q.  The area where the railroad tracks used to

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 61

1       be for the Toledo Terminal, was that already

2       cleared, or were there trees there?

3       A.  There was trees there over the whole thing.

4       Q.  You're not claiming there was a hundred feet

5       of vegetation on Old Granite's property?

6       A.  No, no, no.  Old Granite was basically a

7       farmland; it was cleared.  There was a couple of

8       trees that were there.  They're grown up,

9       whatever, but that was basically cleared.  This

10      hundred feet of vegetation was between --

11      Q.  It was on railroad property?

12      A.  On railroad property that was cut down.

13      Q.  And are you claiming that there was a

14      hundred feet of vegetation across the whole back

15      side of Old Granite or just in spots?

16      A.  No, the whole thing was that.  The aerial

17      photos prove that, too.

18      Q.  Not the ones I've seen, but if you're saying

19      the ones you've seen show that?

20      A.  Right.

21      Q.  There were no gaps in the development of

22      sight line to the railroad?

23      A.  No, there was no gaps; it was solid.

24      Q.  Did you know there was a railroad there

25      before the clearing was done by the City of

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 62

1        Toledo's contractor?

2        A.  Uh-huh.

3        Q.  Yes?

4        A.  Yes.

5        Q.  How did you know?

6        A.  We have been involved with that railroad

7        before, and as far as permits and stuff like

8        that, Gary Buck and I, and we knew from way back

9        when kind of the history of the old Toledo

10       Terminal Railroad.

11                The impact of the bridge, the bridge

12       crossing was mainly our main concern, but that

13       lead to the abandoning of the railroad and that.

14       We were involved with this railroad line several

15       times before with CSX and that.

16                So I knew roughly how old it was.  I

17       can't remember if there was one or two tracks,

18       but there was a track down the middle of that old

19       railroad embankment back 30, 40 years ago,

20       whenever it was.

21       Q.  Did you know that the CSX twin tracks were

22       back behind the development?

23       A.  Did I know?

24       Q.  Yes.

25       A.  Yes.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 63

```
 1        Q.  And how did you know that?
 2        A.  The B & O main, the active ones now?
 3        Q.  Whatever they're called, yeah, the active
 4        ones.  How did you know?
 5        A.  Well, I mean, they have been there forever.
 6        I've lived in Perrysburg for 30-some years.  I've
 7        know that.
 8        Q.  Did you ever see a train go by the back of
 9        the Old Granite development before the clearing
10        was done?
11        A.  No, not -- I really probably never did, no.
12        Q.  Did you ever hear one go by?
13        A.  No, I'm sure I never heard one either
14        because the few times I was there in 2005 before
15        all the clearing -- you are talking about before
16        the clearing and all that, I'm sure.  I never saw
17        that either.
18        Q.  How many times do you think you were there
19        before the clearing was done?
20        A.  A few times.
21        Q.  Can you put a number on a few, two, three?
22                   MR. ROBON:   Objection if you're
23        guessing.
24        A.  I don't want to guess, but a few times; I
25        don't know.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 64

1      Q.  No more that a handful?

2              MR. ROBON:  Objection.  He answered

3      the question.

4      A.  A half dozen.

5      Q.  On those occasions, how long would you

6      typically be there?

7      A.  My grandson was there.  I would be there for

8      typically, I'm there to see them.  I'm hanging

9      around there for a little bit, but I don't ever

10     recall seeing a train or hearing a train.

11     Q.  Would your typical visit be an hour or two

12     or something?

13     A.  Yeah.

14     Q.  You didn't really spend the night or

15     anything?

16     A.  No.

17     Q.  Why don't we take five?

18             (Off the record.)

19                 - - -

20             CROSS EXAMINATION

21     BY MR. TASSE:

22     Q.  Mr. McCarthy, my name is Jeff Tasse.

23     I'm an attorney for Ric-Man.  I'm going to ask

24     you some questions following those of Mr. Bahret.

25     A.  Yes.

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

Page 65

1     Q.  So far you are doing well, you're answering

2     with words, and we will keep doing that, okay?

3     Fair enough?

4     A.  No uh-huhs.

5              MR. ROBON:  Let the record indicate

6     that his opinions will be paid for.

7              MR. TASSE:   At the same rate.

8              MR. BAHRET:  Yeah, at the going

9     rate.

10    Q.  You're not on any medications or anything

11    today, are you, sir?

12    A.  No, no, I'm not.

13    Q.  The reason we ask is we don't want you to go

14    to court and say, "Well, I was on some sort of

15    painkiller and couldn't answer clearly."  That's

16    not an issue, is it?

17    A.  No.

18    Q.  You said you've testified before.  How many

19    times have you testified in a deposition or a

20    trial?

21             MR. ROBON:   Don't guess.

22    Q.  Again, let's be clear here.  Don't guess.

23    Answer if you know so that Marv doesn't have to

24    remind you every time the question comes up, all

25    right?  But you can give us your best estimate or

Page 66

1       your best recollection.

2       A.  Dozens.

3       Q.  Have you ever testified as an expert

4       witness?

5       A.  Yes.

6       Q.  How many times would you say you've done

7       that?

8       A.  Well, it goes back a lot of years.  So, I

9       don't know, maybe half a dozen, dozen times.

10      Q.  Are these in your work with the Corps of

11      Engineers?

12      A.  Yes.  Most of this was -- I can't remember

13      anything back before that.

14      Q.  Since you've been self-employed, as you

15      talked about earlier, have you testified as an

16      expert witness in any of those matters?

17      A.  No.

18      Q.  Have you ever been paid outside of your

19      salary for the Army Corps of Engineers, have you

20      ever been paid separately to give expert

21      testimony in a deposition for trial?

22      A.  No.

23      Q.  No?

24      A.  No.

25      Q.  And you don't think you've given testimony

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

Page 67

```
 1      since you've been self-employed?  Is that what
 2      you said?
 3      A.  Yes.
 4      Q.  I have to jump around a little bit, so bear
 5      with me.  You talked about some work you did
 6      after your schooling in New York, and you said
 7      you were doing some construction superintendent
 8      work; is that right?
 9      A.  Uh-huh.
10      Q.  Yes.
11      A.  Yes, sorry.
12      Q.  And you said the bottom fell out of the
13      housing market, right?
14      A.  Yes.
15      Q.  So that was time for you to get out of that
16      and do something lucrative, fair enough?
17      A.  Yeah, I didn't have a job anymore.
18      Q.  All right.  You're aware that the housing
19      market ebbs and flows, aren't you?
20      A.  Uh-huh.
21      Q.  You have to --
22      A.  Yes, yes.
23      Q.  We have to make a record.  That's why we do
24      that, okay?  I'm not trying to embarrass you.
25      And so it's fair to say that like in the current
```

Page 68

1      times you would agree that the housing market has

2      kind of bottomed out; isn't that right?

3      A.  Yes.

4      Q.  That started with the terrorist attacks of

5      9/11 and gone forward since then; isn't that

6      right?

7               MR. ROBON:   Objection.

8      A.  No.

9               MR. ROBON:   You can answer if you

10     know.

11     A.  I've been a little bit involved with that

12     even though that's not my expertise.  I think

13     around Perrysburg, when I was working in the

14     housing business over there, Levis Commons, the

15     bottom really fell out last year.

16     Q.  In what year?

17     A.  We are talking about 2006, middle or end of

18     2006 things got really bad.

19     Q.  You're aware there were no sales of any

20     properties of Old Granite, either real estate or

21     housing, in the years approximately 2002 or '03

22     up and through '06, are you not?

23               MR. ROBON:   If you know.

24     A.  It wasn't involved with the sales stuff.

25     I'm not familiar with that.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 69

1      Q.  So you don't have any knowledge of the sales
2      history of properties at Old Granite from 2002 to
3      2006; is that right?
4      A.  None.
5      Q.  You know that your son was living in that
6      house on Lot 15, but I think we heard testimony
7      he wasn't paying any rent, isn't that right, in
8      '05, '06?
9      A.  Don't ever tell him that.  I don't know -- I
10     really don't know that.  That's debatable.
11     Q.  It's kind of a nebulous prospect?
12     A.  I'm not familiar with what the arrangements
13     were.
14     Q.  Do you know if he ever took out a mortgage
15     for any property out there?
16     A.  I don't know.
17     Q.  With respect to your work for the county, or
18     the Corps of Engineers, I'm sorry, did you ever
19     have any expertise with drainage plans?  Did you
20     ever work with drainage plans and that?
21     A.  Yes.
22     Q.  Did you ever develop a drainage plan for any
23     subdivision during your time with the Army Corps?
24     A.  No, not for specific subdivisions.  The
25     Corps of Engineers generally was on more bigger

John McCarthy                                Old Granite Development vs. The City of Toledo, et al

1     scale, the more regional kind of things.

2     Q.  Tell me what experience you had with

3     drainage plans for bigger scales, as you

4     described it?

5     A.  Well, one of our main things with the Corps

6     of Engineers is flood control.  And probably I

7     spent more time on that than any other single

8     thing.  And, say, Point Place we had to put in

9     all new --

10                    MR. ROBON:   Do you know where Point

11     Place is or where it is?

12     A.  It's a section of Toledo.

13     Q.  Go ahead.

14     A.  And we had to design and build the new

15     interceptor sewers, storm sewers for Point Place

16     because we put all new pump stations to take it

17     all out over the wall when it rained too hard up

18     there.

19                    And we, you know, as far as rainfall

20     and accumulation of water, that was our main

21     business.  What was a nine-inch rain, which is a

22     six-inch rain, you know what does it do, the

23     water calculations.

24                    We call it H & H, our hydrology and

25     hydraulics work.  That was the kind of thing,

John McCarthy                           Old Granite Development vs. The City of Toledo, et al

Page 71

```
 1        even though I was mainly a construction

 2        administrator, when I worked for the Corps, we

 3        were trained in these things on Buffalo as a

 4        young engineer.

 5               And in the course of events while

 6        you're the administrator, we end up changing

 7        everything.  Everything, maybe like this thing

 8        here, there's all kinds of questions come up,

 9        changes and whatnot, and I was involved with --

10        Q.  Supervision of that?

11        A.  Supervision of it, and I had a small office.

12        A lot times I would be doing some of it myself.

13        Q.  Let me ask you this:  Its sounds like you

14        had some training in storm sewers and the like in

15        your early years with the Corps of Engineers; is

16        that right?

17        A.  Right.

18        Q.  So much like the lawyers at this table take

19        courses in estate or family practice, we had some

20        training early in our careers, but we really

21        don't specialize in it.  Is that true; you didn't

22        specialize in drainage and storm sewers?

23        A.  No, because --

24        Q.  Or did you?  Did you or did you not?

25        A.  Our work, this is OJT or whatever.  Our work
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

                                                                              Page 72

1      did involve those specific things, you know, like

2      I'm saying.

3      Q.  What about you?

4      A.  Me?

5      Q.  Did you specialize -- is it your testimony

6      you specialized in drainage and subdivision

7      drainage plans and the like?

8      A.  Let's leave the subdivision off.  I mean,

9      every neighborhood is a subdivision somehow.

10     Q.  Did you specialize in that though?

11     A.  I did not specialize in it.

12     Q.  You were in construction administration?

13     A.  Construction administration.

14     Q.  You had a supervisory role?

15     A.  That was my main role.

16     Q.  Thank you.  That's what I'm trying to find

17     out.  You mentioned along the way in your

18     testimony that you had a contractor you hired to

19     build a mound.  Who was that?

20     A.  We hired, I think the only one we hired was

21     the George Gradel Company.

22     Q.  Spell that last name.

23     A.  G-r-a-d-e-l, Toledo.

24     Q.  In Toledo?

25     A.  Uh-huh.

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 73

1    Q.  That's a yes?

2    A.  Yes.

3    Q.  And when did you hire him?

4    A.  That would have been sometime in early 2006.

5    Q.  Had you hired them before the clearing was

6    done?

7    A.  No.

8    Q.  Did you have any association with the Old

9    Granite property in the way you are associated

10   with them now prior to the clearing taking place?

11   A.  No.

12   Q.  As you told Mr. Bahret, you were out there a

13   few times to visit your son, grandson or

14   grandchild, but nothing more extensive than that

15   prior to any clearing take place?

16   A.  Right, and then I want to correct that.  My

17   son just called.  I wasn't -- my grandson wasn't

18   over there until early 2006.  So even though I

19   was there in 2005, it wasn't for hours.  It was

20   probably a couple three times for half hour or

21   something.  We were looking at the house or doing

22   some other things prior to him actually moving in

23   there.

24   Q.  So you never -- is it fair to say that in

25   2005 and prior to the clearing, any of the times

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 74

```
 1      you were there, you never really paid any

 2      attention to the backyards, to the vegetation or

 3      to the foliage behind the house?

 4      A.  I never paid direct attention to that.

 5      Q.  Whatsoever, right?

 6              MR. ROBON:   Objection.  You're

 7      putting words.

 8              MR. TASSE:  That's the point of

 9      Cross-Examination.  I'm asking him for his

10      testimony.

11              MR. ROBON:   Don't limit yourself.

12              MR. BAHRET:  Marv, do you think you

13      really need to be coaching the witness so openly?

14              MR. ROBON:   He is asking the same

15      questions you asked.

16      A.  Well, yeah, I agree.  I didn't look at them

17      specifically, you know, but I was aware.  I was

18      in the backyard and that kind of thing.

19      Q.  Fair enough, but you never measured, you

20      never took pictures, anything like that?

21      A.  Did not do anything of that, no.

22      Q.  Isn't it fair to say that you never did any

23      measurements?  Even after you got involved and

24      after the clearing, you never took a tape rule

25      out and did measurements of distances from behind
```

1       the house to the railroad properties, etc.?

2       A.  Yeah, we did that.

3       Q.  You did?  What did you do?

4       A.  We measured all the distances.  We made sure

5       that, you know, that the development and houses

6       were where they were supposed to be and what the

7       distance was from the back of the house to the

8       property line.  You know, a lot of times you

9       build a house, the guy just puts it there.  It

10      might be five or ten feet off.  I did measure

11      that kind of thing.

12      Q.  Why did you do that?

13      A.  To verify that our plans were right and the

14      things physically did, you know, sit where they

15      were supposed to.

16      Q.  You measured from property line to the

17      houses to make sure the houses were the right

18      places?

19      A.  Uh-huh.

20      Q.  Yes?

21      A.  Yes.

22      Q.  You did that after you were hired, after the

23      clearing, right?

24      A.  Right.

25      Q.  But you never measured, prior to any

Page 76

```
 1        clearing, you never measured the depth or the
 2        distance of vegetation behind the house to the
 3        Old Granite property?
 4        A.  No, no, we never would have done that.
 5        Q.  So you don't have any measurement of that?
 6        A.  No.
 7        Q.  So any testimony you give, like you talked
 8        about a hundred feet earlier of something or
 9        other, that's based on aerial photos that you've
10        seen, right?
11        A.  Aerial photos, and we had -- the City did
12        some videotaping before the clearing, and Christy
13        gave me a copy of that tape, and, you know, I
14        had -- I went through that, and I saw the
15        pictures that were taken.
16        Q.  The distances you gave to Mr. Bahret, those
17        are just speculation or best guesses, aren't
18        they?  You didn't have any specific measuring
19        devices to do that, did you?
20        A.  No, we didn't.  What I was really doing was
21        I wanted --
22                    MR. ROBON:   Answer his question.
23                    THE WITNESS:  It's hard to answer.
24                    MR. ROBON:  Did you measure anything
25        or not?
```

Page 77

```
 1                    THE WITNESS:  Yes, we did.  We

 2       measured right down to the --

 3       Q.  You told me what you measured, sir; isn't

 4       that right?  Have you told me what you measured?

 5       A.  No.  I said we measured a lot of the things.

 6       We, before we brought Peterman in, I went and I

 7       measured from the railroad, the active railroad,

 8       which is the baseline for all of Perrysburg, to

 9       make sure that what those drawings were that

10       Peterman had made, that they were correct.

11       Q.  You were measuring from the railroad to the

12       property?

13       A.  To the development.

14       Q.  To the development property, right?

15       A.  Yes, to make sure that the railroad and all

16       that was just like it showed on the drawings

17       because we were -- the City, we were all arguing

18       about whether you're off a few inches, whether

19       this tree is on this line or that line.

20                    So I went, before we brought Peterman

21       in, I did go and check to make sure that he was

22       right on this thing.

23       Q.  And basically you said that what you found

24       was the City of Toledo's survey and markings were

25       essentially correct; isn't that right?
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 78

1     A.  The lath that they put in there finally was

2     correct.

3     Q.  What I'm asking you, though, and what I

4     think you've told me is you didn't take any

5     measurement of any width or depth of vegetation

6     at any time; isn't that right?

7     A.  It was gone.

8     Q.  The answer is no?

9     A.  No.

10    Q.  You don't hold yourself out as an expert in

11    aerial photography?

12    A.  No.

13    Q.  You don't hold yourself out as an expert in

14    aerial photography, do you?

15    A.  No, I don't.

16    Q.  And you don't hold yourself out as an expert

17    surveyor for hire, do you?

18    A.  Can't.

19    Q.  Never been paid to do that in your

20    independent business, right?

21    A.  Right.

22    Q.  You mentioned at one time you were talking

23    about the pictures that you're going to provide

24    for us.  Do you remember that testimony?

25    A.  Yes.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 79

```
1        Q.  Do you have those on your home computer?
2        A.  Yes, some of them.  Some of them are on my
3        son's or his computer, and Marv has some.
4        Q.  You understand we are making a formal
5        request that you produce those and not delete
6        anything, correct?
7        A.  Yes, I gather that, yes.
8        Q.  All right.  And you said at one point, I
9        think, "Between the three of us, we've got all
10       sorts of photographs."  And I take it you mean
11       you, right?
12       A.  Right.
13       Q.  Your son, and what's his name again?
14       A.  Michael.
15       Q.  Michael McCarthy?
16       A.  Yes.
17       Q.  Who's the third person?
18       A.  We turned some of them over to --
19       Q.  Mr. Robon?
20       A.  -- Mr. Robon.  And I think he has a couple
21       photos, too, but whatever.
22       Q.  Those are the three you're talking about?
23       A.  Yes.  This is where they are.
24       Q.  I take it from your testimony that you had
25       no involvement with the preparation of any
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 80

1      drainage plan for Old Granite with Peterman when

2      they did it originally; isn't that right?

3      A.  Right.

4      Q.  You talked about some sort of flooding issue

5      during construction, and you said that you worked

6      on -- "They started pumping down by Bates."  Do

7      you remember that testimony?

8      A.  Right.

9      Q.  What were you talking about there?  Who's

10     they started pumping?

11     A.  Ric-Man, your client.

12     Q.  What do you mean when you say they were

13     pumping down by Bates?  What does that mean?

14     A.  When they were working down by Bates Road,

15     they had a lot of the water coming in.  And so

16     they were pumping -- they were pumping in that

17     manhole, that same manhole.  They had a hose

18     sticking in the manhole.  I said, and it's coming

19     out of the manhole back into Cambridge ditch,

20     Cambridge drainage system and going out our

21     system.

22             So I asked -- I told Christy Soncrant,

23     I said, you know, "Hey," I think this would have

24     been after they -- this is after they cut the

25     culvert.  And I said, "Well, you know, here's

John McCarthy                    Old Granite Development vs. The City of Toledo, et al

1      your proof it's coming back the other way."

2      Q.  Let me ask you this because I'm not

3      following you.  You say first of all there is

4      pumping going on by Bates Road, right?

5      A.  And they put a --

6      Q.  No, no, we can agree that Bates Road is far

7      beyond and in an easterly direction from where

8      Cambridge property is, correct?

9      A.  Well, 500 feet or so.

10     Q.  It's certainly not on your property?

11     A.  Right.

12     Q.  Now, when you say there is pumping going on

13     there, I have no idea what you mean by that.

14     What do you mean pumping at Bates Road?

15     A.  Ric-Man was dewatering on or along Bates

16     Road.

17     Q.  Along Bates Road?

18     A.  Yes, for the pipe, the water main to go

19     through there.

20     Q.  And you say they had pumps and pipes going

21     somewhere, or hoses?

22     A.  Yeah, they had their trench pump pumping

23     into, with a hose into this manhole.

24     Q.  Into what manhole?

25     A.  The manhole that we have been talking about

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 82

```
 1      earlier that's 30 feet or so away from the corner
 2      of Cambridge.
 3      Q.  All right.  What was the designation you
 4      gave that?  It was three letters?
 5      A.  VCP.
 6      Q.  VCP.  Okay, can we agree as we go forward --
 7                MR. ROBON:  V or P?
 8                MR. TASSE:  V.
 9                THE WITNESS:  Vitrified.
10      Q.  Can we agree that as we go forward here,
11      when you're talking about the manhole or the VCP
12      pipe, it's that one that's 30 feet east of Old
13      Cambridge property, right?
14      A.  Yes, Old Granite property.
15      Q.  Old Granite, Cambridge, right.  And we can
16      also agree that that VCP manhole is not on any
17      Cambridge property, correct?
18      A.  That's right.
19      Q.  All right.  So your testimony now about this
20      pumping at Bates Road is that they were pumping
21      out for dewatering at Bates?
22      A.  Uh-huh.
23      Q.  And they were pumping the water somewhere.
24      Where do you claim they were pumping the water
25      to?
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 83

1       A.  Into that manhole or that VCP manhole.

2       Q.  All right.  And this was after the cutting

3       of that VCP?

4       A.  Right.

5       Q.  All right.  Then what else did you observe?

6       A.  That the water was coming out at Cambridge.

7       Q.  Where?

8       A.  Right out, right out the pipe that, you

9       know, led to our catch basins in the back.

10      Q.  What pipe?  What property are you on?

11      A.  Right at the back of Cambridge, right where

12      this manhole was.  We had -- we could see that

13      this was leaking right through and coming back

14      into the -- there wasn't any rain or anything.

15      This water was going right over land right into

16      our catch basin, you know, the Cambridge catch

17      basin, and it only started when they started

18      doing this pumping.

19      Q.  You say there was water over land.  That

20      sounds like you mean on top of the ground?

21      A.  On the ground.

22      Q.  So you saw water on top of the ground from

23      that pumping?

24      A.  Right.

25      Q.  Going onto Cambridge?

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 84

 1      A.  Right.  Right from that manhole, it went

 2      down in that manhole, came back.  These intake

 3      pipes that we were talking about earlier, it was

 4      flowing backwards, coming down through those

 5      intake pipes into our catch basin, our catch

 6      basins that we had put in, and we were picking up

 7      -- we were taking care of their water.

 8      Q.  Who was with you when you saw this?

 9      A.  I called out Christy Soncrant, and I know

10      that Joe Crandall, I believe he came over to see

11      this incident.  So, "Well, that's not really

12      bothering you." I said, "Yeah, but can't you see

13      that, you know, if you hadn't cut this thing, you

14      know, it would have been going out that way."

15      Well, that wasn't really -- that was plugged off

16      or something.

17      Q.  You haven't told me what manhole on the

18      Cambridge property you claim to have seen

19      evidence of water coming from?

20      A.  At Lot 15 right at my son's.

21      Q.  So on Lot 15 --

22      A.  On Lot 15, there is --

23      Q.  There is a manhole?

24      A.  There is a manhole.  We call them a catch

25      basin, a little --

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

```
 1        Q.  What exactly did you see in the catch basin

 2        on Lot 15 on this one occasion?

 3        A.  This water.

 4        Q.  You saw water doing what?

 5        A.  Going into our catch basin and then out.

 6        Q.  You saw water flowing --

 7        A.  Flowing over land and into this catch basin,

 8        and we were -- they were using our system to pump

 9        out Bates Road.

10        Q.  How did the water get from a piece of hose

11        going into the manhole, the VCP manhole and then

12        go over land?  How did that happen?

13        A.  Well, we have an outlet pipe there at

14        Cambridge.

15        Q.  Where is that?

16        A.  That's a couple hundred feet from -- a

17        couple hundred feet from Lot 15.

18        Q.  Going which way?

19        A.  We probably need a little sketch or

20        something.  There is a pipe that picks up water.

21        Q.  Tell me where this outlet pipe is that

22        you're talking about.  A couple hundred feet from

23        Lot 15 going towards the Hospice area?

24        A.  Yes, going toward the Hospice.

25        Q.  And that outlet pipe is different from your
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 86

1       manhole?

2       A.   Right.

3       Q.   The catch basin?

4       A.   That's what feeds -- in normal times, that

5       would have been picking up this top --

6                    MR. ROBON:   Answer his question.

7       Is it different?

8       A.   Yeah.

9       Q.   So your outlet is different from your catch

10      basin; is that what you're saying?

11      A.   The outlet goes to the catch basin.

12      Q.   Is the outlet visible from the ground?

13      A.   Uh-huh.

14      Q.   Yes?

15      A.   Yes.

16      Q.   Does it look the same?

17      A.   No, no.  This is a one-foot diameter pipe.

18      This is down at the bottom of the trench; that's

19      where it picks up.  Now it's flowing backwards

20      because they're pumping water in from Bates Road.

21      It's flowing back there and out into the

22      Cambridge.  So the whole system is working

23      backwards.

24      Q.   So, basically, you're the only person on

25      behalf of Cambridge who knows about this one

John McCarthy                                  Old Granite Development vs. The City of Toledo, et al

Page 87

1      event, right?  Nobody else was there?

2      A.  My son might have seen it.  I don't know

3      whether or not.

4      Q.  Well, did he or did he not?

5      A.  I couldn't say.

6      Q.  You're the only one who knows, to your

7      knowledge; is that right?

8      A.  Uh-huh.

9      Q.  Yes?

10     A.  Yes.

11     Q.  It happened on one occasion, right?

12     A.  Yeah, they only pumped out once.

13     Q.  You didn't do any specific tests in that VCP

14     manhole ever to determine which way or where --

15     or if water flowed anywhere, did you?  You?

16     A.  No.

17     Q.  Are you aware of tests that can be done?

18     A.  As far as the flow?

19     Q.  Yes.

20     A.  Yeah, we have tests to say what can flow.

21     Q.  What are those?  What kind of tests can you

22     do to verify flow?

23     A.  You know, the main one we use is we put

24     orange peels in and see which way it flows.

25     Q.  So you have your orange peel test.  What

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 88

```
 1      other tests are you aware of?

 2      A.  We wouldn't -- you wouldn't use anything.  I

 3      mean, this thing already been --

 4      Q.  I'm just asking if there are tests to

 5      determine flow.  Orange peel test, what else?

 6      Any others you're aware of?

 7      A.  No.

 8      Q.  All right.

 9      A.  We never used any.

10      Q.  Did you do an orange peel test on this

11      manhole?

12      A.  We couldn't.  It was, you know --

13      Q.  I'm just asking if you did.

14      A.  No.

15      Q.  And you talked at length with Mr. Bahret

16      about what pipes you saw in the VCP manhole.  Do

17      you remember that?

18      A.  Uh-huh.

19      Q.  Yes?

20      A.  Yes.

21      Q.  How do you know?  Are you talking about from

22      standing above ground looking down into it?  Is

23      that how you know?

24      A.  It went right down in there.

25      Q.  It did?
```

Page 89

```
 1      A.  Uh-huh.

 2      Q.  Okay, tell me -- and pardon me for jumping

 3      around here.  I want to find out when you claim

 4      the pumping exercise from Bates Road took place

 5      that you just talked about a minute ago.  When

 6      did that happen?

 7      A.  That would have been in the summer of 2006.

 8      Q.  Was that after the water main pipe had been

 9      laid behind Cambridge?

10      A.  Yes.

11      Q.  Can you give me -- can you be any more

12      specific besides summer of '06?

13      A.  August, give or take a month.

14      Q.  That happened one time, right?

15      A.  Yes, they only did that once.

16      Q.  Now, you say you climbed down into the VCP

17      manhole; is that right?

18      A.  Yes.

19      Q.  You personally?

20      A.  Yes.

21      Q.  Was anybody present?

22      A.  I think my son was there when I climbed down

23      in it, and --

24      Q.  You think he was or you don't know?

25      A.  I don't know.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

                                                                              Page 90

```
 1        Q.  All right.  Was anybody else there, any of

 2        your people from Peterman or anyone like that?

 3        A.  No.

 4        Q.  So you basically did that alone?

 5        A.  Uh-huh.

 6        Q.  Yes?

 7        A.  Yes.

 8        Q.  Did you take any pictures or videotape down

 9        there?

10        A.  Yes.

11        Q.  Which of those?

12        A.  Pictures.

13        Q.  How far down did you go?  All the way to the

14        bottom?

15        A.  Yes.

16        Q.  What did you do when you got down there?

17        A.  Well, I had to dig a little bit to make sure

18        that we had the pipes.

19        Q.  You had to what?

20        A.  Had to dig a little bit.

21        Q.  Dig what?

22        A.  There was mud in the bottom of it.

23        Q.  So you had to dig dirt and mud out of the

24        pipes; is that right?

25        A.  No, out of the manhole, you know, the
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

```
 1      manhole, pipes comes in, three pipes come in, and
 2      clean it up to make sure that we could see
 3      everything.
 4      Q.  How much dirt and mud did you have to dig
 5      out?
 6      A.  Not much.  It was mostly just pushing to the
 7      side, and you get oriented down there so you
 8      could see where the -- I mean, you have to do
 9      this upside down.  This isn't a kind of thing
10      that you would normally do.
11      Q.  So you leaned over the top and looked in; is
12      that what you're saying?
13      A.  No, I climbed right down in there.
14      Q.  Then why are you upside down?  I'm not
15      following you.
16      A.  It's deep.
17      Q.  What made you go upside down?
18      A.  So you could get down in and see what was,
19      you know, what was there and be able to reach
20      around the bottom and get pictures and that kind
21      of thing.
22      Q.  I'm trying to figure out how you got upside
23      down if you climbed down in there.  What do you
24      mean?  Did you climb down like head first?
25      A.  Yes.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 92

1      Q.  You're hanging upside down and taking

2      pictures; is that right?

3      A.  I think I did have my son there because he

4      had to make sure I didn't crash down in there.

5      Q.  What, was he holding your ankles?

6      A.  Yeah, or my legs.  But, any rate, I went

7      down in there, and I think I had -- I had some

8      kind of tool so I could reach down the rest of

9      the way, and we took pictures.

10     Q.  What was the tool for?

11     A.  Move some of the dirt, make sure you got the

12     pipes --

13     Q.  With a shovel or something?

14     A.  Yeah, I forget what I had.  But I had some

15     kind of a little lawn tool or rake or some little

16     thing.

17     Q.  So you're moving the dirt around so you

18     could see?

19     A.  Yeah, make sure you could see which pipes

20     were which.

21     Q.  All right.  Because without that, you had a

22     hard time determining, right?

23     A.  Right.  But at any rate, I saw them, I took

24     pictures, and I took -- and I -- well, I didn't

25     go upside down with Marv.  We went down and took

ST. JOHN REPORTING   251 BLUE HARBOR CT., PERRYSBURG, OH 43551      419-872-1935

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

                                                                    Page 93

1       other pictures from the top, and you could see

2       the pipes.

3       Q.  When did you do your upside down thing in

4       the pipe?  When did you do that?

5       A.  That would have been, you know, summer of

6       2006.

7       Q.  After the clearing?

8       A.  After the clearing?  Yes, yeah, it would

9       have had to be.

10      Q.  Can you be more specific other than summer

11      of '06?

12      A.  Well, I really don't know because, you know,

13      I was in that -- you see --

14              MR. ROBON:   Answer the question.

15      A.  It had to have been early summer because the

16      top was knocked off.  That is how I was able to

17      get way down in there.  The top three or four

18      feet were knocked off already, and that's why you

19      could get, easily get down in there and see.

20      Q.  The pipe was broken off?

21      A.  Yeah, they knocked off the top of the

22      manhole.

23      Q.  So the cover was off?

24      A.  The cover and --

25      Q.  Three or four feet?

Page 94

1      A.  And the top piece of the clay pipe.

2      Q.  Three or four feet, is that what you said?

3      A.  Yeah, Ric-Man had knocked that over and

4      knocked dirt down in there, and that's why I had

5      to have -- that's why I was doing some digging to

6      get some of the dirt out of the way so I could

7      see the pipe.

8      Q.  How do you know Ric-Man knocked it over, as

9      you claim?

10     A.  That was only because they just done and

11     probably -- I don't know whether the clearing

12     guy -- we say Ric-Man as a collective thing.

13     Q.  Try to be specific as to who you're talking

14     about.  Is that because you really don't know?

15     You say Ric-Man.  Could it have been anybody out

16     there?

17     A.  No, Ric-Man was the only one that had

18     bulldozers that I understand.  And this was after

19     they had graded down there.  It's my

20     understanding that was Ric-Man's bulldozer.

21     Q.  Now, you never went in that or examined that

22     VCP manhole prior to the clearing; isn't that

23     right?

24              MR. ROBON:  Asked and answered.

25     Q.  Is that right?

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

                                                                        Page 95

```
 1        A.  I think, yeah, we've already answered that.
 2        Q.  All right.  So you don't know the condition
 3        of it before the clearing was done; is that fair?
 4        A.  Right.
 5        Q.  And you didn't see anybody physically, you
 6        didn't personally observe anybody break that
 7        manhole pipe, did you?
 8        A.  Wait a minute.
 9        Q.  Did you personally observe it or not?
10        A.  I did not.
11        Q.  So in fairness to you, you really can't
12        testify of your own personal knowledge how that
13        manhole pipe came to be in the condition it was
14        in when you saw it; isn't that right?
15        A.  No, that's not quite true.  Remember, we
16        already --
17        Q.  Tell me how you can do it if you didn't
18        observe it, if you never observed it before then?
19        A.  I did.  Remember we talked about earlier, I
20        was out there when they first did the clearing,
21        before the bulldozer came by.  And I had seen the
22        thing was disturbed.  No telling who did it. Then
23        we came back again.
24        Q.  When is that now?
25        A.  That would have been in April, give or take
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

1       a month, whenever the clearing was done.

2       Q.  So in April or after the clearing was done?

3       A.  After the clearing was done we saw this

4       thing had been -- this thing was knocked off.  No

5       telling who did it.  There was some -- whether

6       the clearing guys did it or not, I don't know.

7       But the only one to my knowledge that came by

8       through there with a bulldozer was Ric-Man, and

9       if you didn't --

10      Q.  Let me just ask you this and we can move on.

11      If you didn't see this manhole, this VCP manhole

12      area before then, how do you know anybody knocked

13      it off to be in that condition when you first saw

14      it?

15      A.  I never said they did.

16      Q.  You don't know?

17      A.  I do not know.

18      Q.  That's all I'm asking you.  Let's see, did

19      you tell us the name of the neighbor from the

20      Gillette property?  Did you give us that name?

21      A.  The name of the property owner is Gillette,

22      and I was going to --

23      Q.  You're going to get us the name of the guy?

24      A.  Yeah, I can get you the name of the man that

25      actually I talked to.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 97

1      Q.  Can you describe him for us at all, elderly,

2      white male, anything?

3      A.  He is probably 50 years old or something,

4      and he is Mrs. Gillette's son-in-law or

5      grandson-in-law.  But he is married to one of the

6      Gillette daughters, takes care of the place.

7      Q.  Have you talked to him more than one time?

8      A.  Uh-huh, yes.

9      Q.  How many times would you say you have talked

10     to that person?

11     A.  Twice.

12     Q.  When was the last time?

13     A.  The last time was probably a few months ago.

14     Q.  Is that in late 2007?

15     A.  Yes.

16     Q.  Like December, November?

17     A.  I stopped there, asked him to confirm some

18     of this stuff he had said.

19     Q.  Did you ask him if he would be a witness for

20     you when this case went to trial?

21     A.  I did not.

22     Q.  Do you anticipate doing that?

23                MR. ROBON:  Objection.  He is not

24     the lawyer.

25     Q.  You can answer.

Page 98

```
 1      A.  I don't know.

 2      Q.  Let me ask you a little bit about the

 3      flooding you talked about in 2006.  Do you

 4      remember that?

 5      A.  Uh-huh -- yes.

 6      Q.  Now, as I understand it, the only place

 7      there was flooding and we have pictures of is in

 8      that back corner, say Lot 15 and then off of the

 9      Cambridge property over toward the VCP manhole;

10      is that right?  That's what we are talking about?

11      A.  Lot 15, 16, a little bit on 14.

12      Q.  Back in the corner there, is that right?

13      A.  Yes, back in the corner.

14      Q.  All right.  Now, on that occasion, there was

15      no personal injury that arose out of that

16      flooding; isn't that right?

17      A.  Right.

18      Q.  There was no property damage that arose out

19      of that flooding; isn't that right?

20              MR. ROBON:   If you know.

21      A.  I don't know.

22      Q.  Are you aware of any claim for property

23      damage ever being made from that flooding?

24      A.  That wasn't my --

25      Q.  You're not aware of any, are you?
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 99

1      A.  I'm not aware of any.

2      Q.  Your son didn't say his basement flooded,

3      did he?

4      A.  No.

5      Q.  You've never heard that, have you?

6      A.  No.

7      Q.  You're not aware of any basements in the

8      subdivision, any of those properties, ever having

9      any flooding, are you?

10     A.  No.

11     Q.  That was a one time event; am I correct?

12     A.  No.

13     Q.  To your knowledge.

14     A.  No, I think this has been a steady

15     situation.  Whenever it rains, you know, after

16     they have cut the manhole, they cut the pipe that

17     went to the manhole, the main culvert, every time

18     it rains, it takes a little longer to drain it.

19     Q.  How do you know that?

20     A.  Well, the main evidence would be that it

21     flows backwards from the manholes.

22     Q.  Mr. McCarthy, are you off into speculation

23     here as to every time it rains, you've got

24     flooding in that back corner?  Is that what

25     you're trying to say?

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 100

```
 1      A.  I've been over there several times when it
 2      rained.
 3      Q.  Have you kept records of it?
 4      A.  I think we got records, if you call
 5      pictures.
 6      Q.  Tell me what records you have of flooding
 7      other than the one-time occasion of April of
 8      2006?
 9      A.  We have other pictures.
10      Q.  What pictures?
11      A.  Several times of pictures.
12      Q.  You've got pictures.  Do you have any
13      written records?
14              MR. ROBON:  Let me clarify the
15      record.
16              MR. TASSE:  Jack -- or it's Marv.
17      Marv.
18              MR. ROBON:  Let me object and
19      clarify something.  You said April.
20              MR. TASSE:  Wait, wait, wait.
21              MR. ROBON:  Wait a minute. You're
22      putting words in his mouth.
23              MR. TASSE:  No, I'm not.
24              MR. ROBON:  You're speaking so fast
25      you said April of '06.  There's no claim that
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 101

```
 1        there was flooding in April of '06.  I think you
 2        meant to say December, '06.
 3                    MR. TASSE:  No, I wanted --
 4                    MR. ROBON:  I want to get the record
 5        straight.
 6                    MR. TASSE:  Marv, I'd asked you on
 7        the record not to testify.  All right, I
 8        understand.
 9                    MR. ROBON:  He is confusing the hell
10        out of you.
11                    MR. TASSE:  Are you finished?
12                    MR. ROBON:  I'm finished.
13                    MR. BAHRET:  In fairness to Maureen,
14        let's have one person speaking at a time, okay?
15                    MR. TASSE:  I'd ask you not to
16        testify for the witness.  I'd ask you not to
17        coach the witness, please.
18                    MR. ROBON:  I'm not, I'm not.
19                    MR. TASSE:  I'd ask you to state an
20        objection as to form or any other legal basis,
21        but don't testify and don't give verbatim answers
22        to the witness.
23                    MR. ROBON:  Well, Jeff, when I make
24        an objection, you overrule me and start talking
25        and don't stop.
```

Page 102

```
 1              MR. TASSE:  Just trying to save the
 2      Judge some trouble.
 3              MR. ROBON:  Am I correct that you
 4      say April of '06 and you intended to say December
 5      of '06?
 6              MR. TASSE:  You understand my
 7      problem with what you're doing, okay?  Just state
 8      your objection and let the witness testify.
 9      Q.  All right.  When do you claim there was
10      flooding out at Old Granite based on anything to
11      do with the VCP manhole?
12      A.  There has been -- now, we don't use the word
13      flooding.
14      Q.  Okay, what is it?
15      A.  Unless it's serious.  It's ponding, extra
16      ponding in the backyard.  Flooding to engineers,
17      you know, like us guys would be more like major
18      flooding.
19      Q.  This is not major; this is some ponding,
20      right?
21      A.  This is ponding of the backyard.  There was
22      several, you know, I would say at least three
23      times I was over there in 2006.
24      Q.  Tell me when those three times were.
25      A.  Huh.
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 103

1      Q.  You don't know?

2      A.  I was there before the pipe was cut, and I

3      was there after the pipe was cut, and it seemed

4      to me by my eyes and pictures that there was an

5      impact from that.  It was obvious right on the

6      ground the way the water was flowing that there

7      was more water in that backyard coming in than

8      without that pipe.

9      Q.  Is it your testimony that prior to the VCP

10     pipe issue we are talking about being cut that

11     there was never any ponding in the back corner of

12     the properties, the back corner of Cambridge

13     there next to Gillette?  Is that your testimony?

14     A.  I didn't say that.

15     Q.  Because you really have no way of testifying

16     to that, do you?

17     A.  I saw --

18     Q.  Do you, because you weren't there, right?

19     A.  I saw the condition before --

20     Q.  Can you answer my question?  Prior to the

21     pipe being cut, you never inspected that area

22     back around the VCP manhole after a rainfall in

23     the Cambridge Subdivision?

24     A.  Yes, we did.  Oh, yes, we did.

25     Q.  You did?

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 104

1      A.  I did, too, yeah.

2      Q.  When?  I'm trying to find out --

3      A.  In the summertime, that's what I was saying.

4      I looked at that at least three times before they

5      cut the pipe and after they cut the pipe.  You

6      know, true enough, I didn't know from 2005 what

7      little ponding was out there and that.

8      Q.  So it could have --

9      A.  But this is overland water that's coming

10     from --

11     Q.  It could have ponding that you're not aware

12     of in 2005 because you never looked at it; is

13     that right?

14     A.  I never looked at it in 2005.

15     Q.  All right.  In 2006 you think you were out

16     there a few times and never saw any ponding.  Is

17     that what you're telling us?

18     A.  All I'm saying is that the ponding was worse

19     after they cut that pipe, and I saw evidence of

20     it.

21     Q.  So there was ponding before that you saw,

22     right?

23     A.  There was ponding before and there was

24     ponding afterwards.

25     Q.  All right.  But in your visual eye, you

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 105

 1      think it was worse after the cutting; is that
 2      right?
 3      A.  And the flow, the visual flow, you could see
 4      where it was coming from.
 5      Q.  But you don't have any scientific evidence
 6      or proof of the amount of ponding before being
 7      less than the amount of ponding after, do you?
 8      A.  No, you couldn't --
 9      Q.  You told me you didn't do any measurements,
10      right?
11      A.  Just the pictures.
12      Q.  And the pictures you have, are they dated?
13      Are they printed?
14      A.  Yeah.
15      Q.  Are they described as to times and places
16      and events?
17      A.  Yes, all of our pictures -- I think all of
18      the digitals now time them.
19      Q.  They're still on your computer, right?
20      A.  I hope so.
21      Q.  But you had never printed them out and
22      written on them, have you?
23      A.  No, I haven't done anything like that with
24      those pictures.
25      Q.  I think you testified earlier that you

Page 106

```
 1      personally observed in the VCP manhole, you

 2      observed an open pipe in there that went in the

 3      direction of the railroad, right?

 4      A.  Right.

 5      Q.  After you dug out the dirt and stuff, right?

 6      A.  Right.

 7      Q.  And then you observed an outlet over on the

 8      railroad property, is that correct?

 9      A.  There was three pipes coming into that

10      manhole down below.

11      Q.  I'm just asking you this question for now.

12      Did you observe an outlet pipe that ran

13      underneath the railroad right-of-way?

14      A.  Yes.

15      Q.  And you observed an outlet pipe?

16      A.  The end of it.

17      Q.  You could see the end of it?

18      A.  Right.

19      Q.  Who was with you when you saw the end of it?

20      A.  No one.

21      Q.  What record did you make, contemporaneous

22      record, meaning at the same time you saw it, of a

23      visualization of the outlet pipe from the VCP

24      manhole on the railroad property?  What record

25      did you make of that?
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 107

1      A.  Just pictures, and I don't think the

2      pictures can really show -- I'm not sure whether

3      the pictures really show the end of the pipe.

4      Mainly a visual thing of me.

5      Q.  In your memory, huh?  Is that right?

6      A.  Oh, yes.

7      Q.  So you got pictures of it, you think, right?

8      A.  Uh-huh.

9      Q.  You have to say yes.

10     A.  Yes.

11     Q.  But your pictures may not even show it is

12     what you're telling us, right?

13     A.  Right, because the pictures are -- it's

14     tough to take a picture down in the manhole to

15     actually show the end of the pipe.

16     Q.  But you said you saw the end of the pipe?

17     A.  Right.

18     Q.  You visualized this on the railroad

19     property, correct?

20     A.  Uh-huh, yes.

21     Q.  So when you took the pictures, the purpose

22     of taking that picture was to memorialize or make

23     a record of the end of that pipe, correct?

24     A.  Correct.

25     Q.  I mean, that was your goal, right?

Page 108

```
 1     A.  Right.
 2     Q.  All right.  So I take it if you could see
 3     it, it ought to show up on your pictures; is that
 4     right?
 5     A.  I'm not so sure about that.  Down in the
 6     manhole whether you could actually -- I'd have to
 7     look at the picture really to tell you whether --
 8     Q.  Well, did you take a picture of the exit on
 9     the railroad property from in the manhole, or did
10     you take it from outside on the railroad
11     property?
12     A.  We are not even talking about -- we are not
13     visualizing this thing right.  All there is is a
14     manhole.  The only way you can get at it is go
15     down in it up on the railroad property, and that
16     is where we took the pictures there.
17     Q.  What I'm trying to say --
18     A.  I'm not sure how much of those pipes you can
19     really see from the picture.
20     Q.  Do you claim that inside that manhole there
21     was a pipe that ran underneath the railroad
22     property and then had an exit?
23     A.  Exited out into the center ditch.
24     Q.  What I'm asking you is did you observe an
25     exit out into the center ditch of that pipe that
```

Page 109

1      was cut?  Did you observe it?

2      A.  Yes, I said that earlier.

3      Q.  That's what we just talked about and you

4      took pictures of, right?

5      A.  Right.

6      Q.  You're going to produce pictures of whatever

7      of that exit; isn't that right?

8      A.  I hope to.

9      Q.  It may or may not show it; is that right?

10     A.  No, if we have pictures, that will show it.

11     Q.  If you don't have pictures, nobody else has

12     seen that beside you?

13     A.  No, I don't think the City ever denies.

14     Ric-Man took it out.

15     Q.  Sir, Christy Soncrant testified that she

16     looked for and never found an exit to that pipe?

17     A.  No, but she understands there was a pipe in

18     there.

19     Q.  But she never found an exit to that pipe

20     onto CSX Railroad.  Does that refresh your memory

21     as to whether you saw anything or not?

22     A.  No, I saw it.

23     Q.  You saw it, okay.

24     A.  It was down in the weeds, and we had to go

25     to some trouble to locate it.

Page 110

```
 1       Q.  You're going to produce the pictures of it?

 2       A.  I hope to.

 3       Q.  You talked about a railroad wall of some

 4       sort back in the area of that manhole cover.  Can

 5       you describe what that's about?

 6       A.  The railroad had a short, what we call a

 7       railroad tie wall, and it was meant to be put

 8       right on the property line from the base of it,

 9       but that was leaning out into the Cambridge

10       property.

11       Q.  Where was it?

12       A.  That ran on the back of Lot 15 and part of

13       Lot 14 and a little bit of Lot 16.

14       Q.  How long was this wall?

15       A.  I would say it's a hundred, maybe 200 feet

16       long, a 150, 200 feet long is what I said it was.

17       Q.  Was that removed?

18       A.  No, that wall was not -- that wall was not

19       removed.

20       Q.  Where is it now?

21       A.  It's still there.

22       Q.  Is it something you can see?

23       A.  No, you can't see the -- no, you can't see

24       it -- yeah, you can still see it.  You can still

25       see it in parts.
```

Page 111

    1       Q.  How high is that wall?

    2       A.  It was about four, five feet tall.

    3       Q.  What's it made out of?

    4       A.  Railroad ties.

    5       Q.  Did you claim to know the purpose of that

    6       wall?

    7       A.  It appeared to us that it was because they

    8       didn't have enough property there to -- however

    9       the alignment worked.  They had to build a wall

    10      so they could have their grades.  It was just a

    11      typical kind of wall, I mean, when you squeeze

    12      the railroad through a narrower space and you

    13      don't want to get on somebody's property or by

    14      it, you build a little wall so you can start your

    15      grades higher and need less property, and that

    16      was --

    17      Q.  That's what you think it was for?

    18      A.  Yeah, and I talked to the railroad about it,

    19      too, and they confirmed that.

    20      Q.  I'm sorry, you talked to who?

    21      A.  The railroad, the CSX guy.

    22      Q.  Who confirmed that?

    23      A.  Gene Wheeler from the railroad.

    24      Q.  Is that a man?

    25      A.  Uh-huh, yes.

John McCarthy                                  Old Granite Development vs. The City of Toledo, et al

Page 112

```
 1      Q.  What was his job or title?

 2      A.  He is a road master for that section.

 3      Q.  When did you talk to him?

 4      A.  That would have been right after the

 5      clearing.

 6      Q.  Did you talk to him on more than one

 7      occasion?

 8      A.  In person only once, I think.

 9      Q.  Did you talk to him at the property site?

10      A.  Yes.

11      Q.  He came out there?

12      A.  Yes.

13      Q.  And was he alone when he came out?

14      A.  Yes.

15      Q.  Was there any document or record made of

16      that meeting, to your knowledge?

17      A.  I don't think so.

18      Q.  Sir, I want to run though some pictures with

19      you, ask you to help identify them, see if you

20      can.  Hand you marked as Exhibit E?

21                  (Defendant's Exhibit E marked

22                  for identification.)

23                  MR. BAHRET:  Can you identify what

24      Exhibit E is.

25      A.  I can't tell you which corner it is, but
```

Old Granite Development vs. The City of Toledo, et al

Page 113

1          it's a corner marker for our subdivision.

2          Q.  Right.

3          A.  I can gather from the pipe.

4          Q.  That piece of wood sticking up, is that the

5          lath you talked about earlier?

6          A.  I don't know if this is the lath.  This is

7          probably -- I couldn't tell you whether that's a

8          Peterman lath or a City of Toledo lath, but

9          that's our -- you know, with the lay of the land

10         here, I can't tell which corner it is.  But it's

11         one of the corners of the Cambridge.

12         Q.  It's the type of lath you saw on the

13         property when you first came back there after the

14         clearing; isn't that right?

15         A.  I didn't say I saw any lath then; I saw some

16         spray paint.

17         Q.  Did you see any lath?

18         A.  I don't remember seeing any lath.

19         Q.  But you don't recall one way or the other?

20         A.  I don't recall.

21         Q.  Could it have been there; you just don't

22         know?

23         A.  That's --

24         Q.  Is that fair?

25         A.  That's possible, but that one is probably,

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 114

```
 1      that's our -- I couldn't tell you whether that's

 2      City or whether we did it or they did it.

 3      Q.  You can see on the ground right below it

 4      there is another weathered lath that's laying on

 5      the ground.  It appears to be coming from the

 6      same point; isn't that correct?

 7      A.  Yes.

 8      Q.  Isn't that what that is on the ground?

 9      A.  Uh-huh. That's probably an original Peterman

10      lath.

11      Q.  Do you know that?

12      A.  No, I don't.

13                MR. ROBON:  Don't guess.

14      Q.  When you say that's probably an original

15      Peterman, you're talking about the one that's

16      laying on the ground that's weathered?

17      A.  Yes, it looks pretty old.

18      Q.  The one that's sticking up is obviously new,

19      correct?

20      A.  Yes.

21                (Defendant's Exhibit F marked

22                for identification.)

23      Q.  Let me show you what's been marked as

24      Exhibit F.  Do you have Exhibit F in front of

25      you?
```

Page 115

```
 1      A.  I do.
 2      Q.  Why don't you help me identify some of the
 3      things on here.  First of all, the gentleman
 4      that's bending with his back toward the
 5      photograph, that's you, isn't it?
 6      A.  That's me.
 7      Q.  Who's the other man behind you in like a
 8      golf shirt of some sort?
 9      A.  Don't know.
10      Q.  That piece of equipment, what do you call
11      that piece of equipment?
12      A.  That's a tiny backhoe.
13      Q.  Is that a backhoe of Gradel Company?
14      A.  This one?  I don't think that was a Gradel
15      backhoe.
16      Q.  Whose was it?
17      A.  I think I rented it, but I may have had
18      their man on it.  It doesn't matter.
19      Q.  I was going to ask you if you ever operated
20      that backhoe that's shown in this picture?
21      A.  Yes, I moved it around a little bit for
22      them.
23      Q.  You know how to operate a backhoe, don't
24      you?
25      A.  Sort of.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 116

1       Q.   You know how to dig with a backhoe?

2              MR. ROBON:  Objection.

3       Q.   I'm asking if he does.

4              MR. ROBON:  He answered it.

5              MR. TASSE:  Well, I didn't ask him

6       if he knew how to dig with it.

7       Q.   Is that something you can do?

8       A.   Sort of.

9       Q.   Did you do any digging on the Old Granite

10      property at any time during this project of '06?

11      A.   Yes, with that little backhoe, we went and

12      cleared some of this dirt off so we could see the

13      trees, but that's on -- this is on -- we were on

14      the Cambridge property.

15      Q.   This hole that's in the ground in Exhibit F,

16      that's on Cambridge property, right?

17      A.   Yes.

18      Q.   AND that was made by the backhoe that's

19      shown in this picture, correct?

20      A.   That's right.

21      Q.   That was made by you or one of the guys you

22      hired to dig it, isn't that right?

23      A.   That's right.

24      Q.   What was the purpose of you digging that

25      hole that's shown in Exhibit F?

John McCarthy                    Old Granite Development vs. The City of Toledo, et al

Page 117

1        A.  We were trying to go and confirm that, yes,

2        there were trees, tree stumps and that down there

3        because we started building a mound out here on

4        the Cambridge property.  At one point we thought

5        we would build this mound because we couldn't

6        bear the site of this -- the railroad because of

7        sales and everything.

8                  But anyway, we came back here just to

9        verify that, yes, these bigger trees and that

10       were on the Cambridge property, and we dug it out

11       and resurveyed it and showed, so we could

12       document the ten-inch trees or eight-inch trees,

13       or whatever.

14                 I think you probably got some of the

15       pictures here, just where they were, that they

16       were, indeed, on Cambridge property.  That's what

17       we were doing.

18       Q.  First of all, let's clarify some things

19       here.  You see the pipe, this very large water

20       pipe that's in this photograph?

21       A.  Yes.

22       Q.  Clearly, that's on the railroad property

23       right-of-way, correct?

24       A.  Yes.

25       Q.  There is some sort of snow fence that's up

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

                                                                          Page 118

1        there?  Do you see that?

2        A.  Yes.

3        Q.  It looks like you're moving that or removing

4        that or doing something to that fence in this

5        picture, correct?

6        A.  Well, I don't know what we are doing with

7        it.

8        Q.  Looks like you're reaching down and got your

9        right arm on it or right hand, correct?

10       A.  Yeah.  We might have been repositioning

11       that.  They may have had it over on our side or

12       something, but we made sure we kept that up

13       because we asked them to put that little fence up

14       there.

15       Q.  Do you know from looking at this picture

16       what lot this is on?

17       A.  It's got to be Lot 15.

18       Q.  Now, in the direction that you would be

19       looking in this picture, you see there is a tree

20       growing up behind where the backhoe is?

21       A.  Yes.

22       Q.  Obviously, that tree is in bloom, and it's a

23       living tree at this time, isn't it?

24       A.  Yep.

25       Q.  Tell me when you started building your

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

```
 1      mound?

 2      A.  It was shortly after they did the clearing.

 3      Q.  So the clearing took place -- you're not

 4      exactly sure of the month it took place in,

 5      right?

 6                  MR. ROBON:   Asked and answered

 7      three times.

 8      Q.  I mean, I'm just -- I'm trying to remember

 9      what you said.

10      A.  I'm not -- we would have to get our things

11      out here again, but I think it's --

12      Q.  As you sit here today, you don't know?

13      A.  March, give or take a month.

14      Q.  So after the clearing --

15                  MR. ROBON:   Just don't guess. I

16      know you're getting tired.

17                  THE WITNESS:  I'm not tired.

18                  MR. ROBON:   Think about what the

19      hell you're saying.  That's not what you said a

20      little bit ago.

21                  MR. TASSE:  Is that an objection?

22                  MR. BAHRET:  Yes, it actually what

23      he said a little bit ago.  He said it was either

24      February or April, and now he says March, give or

25      take a month, which is about the same.
```

Page 120

```
 1                    MR. TASSE:  All right.

 2                    MR. ROBON:  You're right, Bob.  I

 3          apologize.  Bob is always right.

 4                    MR. BAHRET:  Thank you.

 5                    MR. ROBON:  Ninety-nine percent of

 6          the time you are.

 7      Q.  After the clearing, is that when you hired

 8          the Gradel Company, George Gradel Company?

 9      A.  We hired them, yes, we did.  When we hired

10          them to save the sale or whatever, we were going

11          to build this mound.

12      Q.  All right.  So what did you do to start

13          building the mound?

14      A.  We went and found some dirt and trucked it

15          in and brought it in on the property and started

16          pushing it up.

17      Q.  Where did you start pushing the dirt up on

18          what property?

19      A.  At the end of -- right on 16.

20      Q.  You say you trucked it in from where?

21      A.  From Bates Road.

22      Q.  Where did you get it on Bates?  What was

23          going on up there?

24      A.  Nothing.  We just came down the railroad,

25          the old railroad bed.
```

Page 121

```
 1        Q.  I'm sorry, where did you get the dirt?
 2        A.  We got I think all of it, we got it from
 3        Five Point Road in Perrysburg.  It was a sewer
 4        job up there.
 5        Q.  Did you buy it or did you have permission to
 6        take it or how did you get it?
 7        A.  No, I made arrangements with the sewer
 8        contractor to bring the soil down here.
 9        Q.  Do you know what kind of dirt that was?  Was
10        it clean fill, was it  --
11        A.  Yeah, it was virgin fill.  I mean, it was a
12        new sewer line that they were putting down.
13        Q.  Who was the sewer job from?
14        A.  Who was it from?  Who was the contractor?
15        Q.  Yeah, who did you get the dirt from?
16        A.  I would have to look it up.  They were from
17        out of town.
18        Q.  So you have that record somewhere?
19        A.  Yes.
20        Q.  You brought what kind of a truck, like a
21        semi tractor full of dirt or pickup truck?  What
22        did you use?
23        A.  We had a dozen dump trucks, tandem dump
24        trucks come in.
25        Q.  Came in on the railroad right-of-way?
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 122

1      A.  Came down from Bates Road.  Came up and back

2      onto Cambridge property that way.

3      Q.  Where did they dump the dirt, all on 15 or

4      16?

5      A.  15 and 16 is where we started.

6      Q.  What did you do with the dirt after it was

7      dumped?

8      A.  We started, as the trucks dumped, he would

9      be pushing it out and grading it up and starting

10     a mound.

11     Q.  He being Gradel Company?

12     A.  Yeah, I had a separate guy bring the dirt

13     in.  George Gradel Company, they went and they

14     provided the equipment.

15     Q.  Who was your man from Gradel Company?

16     A.  The superintendent?

17     Q.  Yes.

18     A.  His name was Tom Briggs.

19     Q.  Was he the guy doing the grading on the

20     Cambridge property?

21     A.  He was the superintendent.  The guys worked

22     for him, the equipment operators.

23     Q.  So he had operators that were there doing

24     the grading?

25     A.  Right.

Page 123

1    Q.  What kind of vehicle or what kind of truck
2    did they use to do the grading?
3    A.  They had a bulldozer and they had a backhoe.
4    Q.  In addition to what we see in Exhibit F?
5    A.  Yes, this was just to uncover the trees
6    here.
7    Q.  So they brought how many trucks, a dozen
8    dump trucks full of dirt and put it down, and
9    then it was graded on to your property; is that
10   right?
11   A.  They used a dozen different trucks, but they
12   ran it for a day.  They probably had ten loads
13   apiece, probably a hundred, maybe a hundred loads
14   of dirt we brought in.
15   Q.  Did you start to make your mound?
16   A.  Yeah, yeah.  They went and started shaping
17   it up.  They had the dozer there.
18   Q.  First of all, they probably had to do some
19   filling of low levels on your property, didn't
20   they, with the first loads of dirt?
21   A.  Well, it was already -- you know, this was
22   already graded.  It was already a finished
23   development.  We were raising up the grade of the
24   backyard.
25   Q.  Am I correct in understanding where they

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 124

1     dumped the dirt would have been the property edge

2     of Old Granite right next to where the railroad

3     property was?  They started there and then worked

4     toward the home?

5     A.  Yes.

6     Q.  How far did they grade from that point

7     toward the home?  What distance was that?

8     A.  Oh, it was probably about 20 feet, 25 feet.

9     Q.  How deep, how high did this mound get at any

10    particular time?

11    A.  You can see here; this is all we got.  We

12    got up to about this grade, which is only about

13    six feet high or five feet you can see here.

14    Q.  Is the dirt that we see on the left-hand

15    portion of this picture, is that part of the

16    mound?

17    A.  This is our dirt over here.

18    Q.  So what, if that's your dirt and that's the

19    mound partially shown in Exhibit F, what is the

20    hole for that's dug by this backhoe in picture

21    Exhibit F?

22    A.  This hole here?

23    Q.  Yes.

24    A.  That's where we were verifying where the

25    trees were so that we could go and survey them

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 125

```
 1        and put a line on these and show which trees were
 2        actually, the base of them were on Cambridge
 3        property.  We were uncovering the top.
 4        Q.  Did you have a record of the date when you
 5        brought in the hundred loads of dirt?
 6        A.  Yes, we do.  I've got records of that.
 7        Q.  What are those records called, I mean?
 8        A.  They billed us and everything, so that's the
 9        foreman's report or the daily -- some kind of a
10        daily report.
11        Q.  Do you have records from Gradel Company?
12        A.  Same thing.
13        Q.  Obviously, that work was done prior to any
14        of the piping laid for the water main project,
15        wasn't it?
16        A.  Yes.
17        Q.  Let me show you a few more pictures.
18                    (Defendant's Exhibit G marked
19                    for identification.)
20        Q.  Do you have Exhibit G in front of you?
21        A.  Yes.
22        Q.  I take it that's you in the picture shown
23        next to the pipe?
24        A.  It looks like me.
25        Q.  And do you know who that other gentleman is
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 126

1        standing behind the backhoe?

2        A.  I can't tell.

3        Q.  All right.  And is this another view of the

4        same hole that you had dug in the ground shown in

5        Exhibit F?

6        A.  It appears to be, yes.

7        Q.  The purpose of digging that hole to that

8        depth was exactly for what?

9        A.  We were trying to go and locate the trees,

10       and we took it right down to the base of this

11       wall.  If you get it real close, you can even see

12       some of the timbers.  We took it right down in

13       some place to make sure we were showing the wall

14       because the wall shows up from before we ran this

15       dirt out of here.  We dug it down to the wall

16       right along our property line.

17       Q.  Was this digging that took place in this

18       picture, Exhibit G, was this before or after the

19       VCP pipe had been cut?

20       A.  No, this was way before.

21       Q.  So you had in mind to build yourself the

22       mound before the VCP pipe issue ever came up,

23       isn't that right?

24       A.  Yes.

25       Q.  Did you ever have approval to build a mound

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

Page 127

```
 1      at that point from any governmental agency?

 2      A.  Yes.

 3      Q.  Who gave you approval to build your mound?

 4      A.  Township.  I went and saw the zoning guy.

 5      Q.  Tom who?

 6      A.  I didn't say Tom.  The -- we have a, in

 7      Perrysburg Township, they call them the zoning

 8      director.  I can't remember his name, but I went

 9      and asked him.

10              I said, "You know, we are going to

11      build this mound, what kind of permits do I need

12      or anything?"  And he said, "You don't need

13      anything as long as you don't have a fence higher

14      than seven feet."  And so we weren't intending on

15      doing that.  We were going to make -- he said,

16      "If you just do it with dirt, you don't need a

17      permit.  If you want to just raise the grade on

18      your property, that's fine."

19      Q.  How high of a mound were you able to build

20      with the hundred truckloads of dirt?

21      A.  You just seen it here.  It's just up to the

22      top of the railroad, which is probably five feet.

23      Q.  So the dirt that you're standing on in

24      Exhibits F and G, that's the dirt that was

25      trucked in by you the hundred or so truckloads;
```

Page 128

```
 1      is that right?
 2      A.  Well, you're getting real close to the, you
 3      know, that's right on the line.  Whether Ric-Man
 4      did it or we did it, I couldn't tell you because
 5      it's really close.  That's, right where that
 6      little fence is and that the property line was.
 7      Q.  What I'm getting at is the dirt that you dug
 8      up, for example, in Exhibit F to look for what
 9      was under it, that was dirt that you had trucked
10      in; isn't that right?
11      A.  Most of it.
12                MR. ROBON:   You're now 30 minutes
13      past your 20 minutes.
14                (Defendant's Exhibit H marked
15                 for identification.)
16      Q.  Let me show you Exhibit H.  Can you identify
17      what that is?
18      A.  Well, this is the construction fence.
19      Q.  Right.
20      A.  I don't see anything.
21      Q.  The construction fence and then to the left
22      of what we are looking at in this picture is the
23      water pipe, correct?  That's on the railroad
24      property, isn't it?
25      A.  No, this has got to be on our property.  I
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 129

1       think that's -- I don't know what that is.

2       Q.  Sir, what I'm trying to show you, as you

3       look at this picture on the left of this fence,

4       that goes toward the railroad property, doesn't

5       it?

6       A.  Right.

7       Q.  That is where the water pipe is sitting?

8       A.  Yes, that's where the --

9       Q.  And then to the right of this would be the

10      Cambridge property, correct?

11      A.  Yeah, this is Cambridge over here, and this

12      is the railroad up here.

13      Q.  This is obviously after the clearing had

14      been done because they're laying the pipe there

15      to be put in; isn't that right?

16      A.  Yeah, this is the --

17      Q.  All right.  Then this is a view down that

18      way.  Can you tell what direction?  Is that

19      looking back towards the Hospice area, the view

20      in this picture?

21      A.  It appears to be looking towards the

22      Hospice.

23      Q.  What we see there in the foreground right in

24      front of this picture, you see some vines or

25      perhaps the brambles and things that have been

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 130

```
 1      talked about, isn't that right, in the foreground

 2      right here on the right side?

 3      A.  Yes.

 4      Q.  Then as you look back in that picture, you

 5      see some mature trees that are grown up there,

 6      correct?

 7      A.  Back in here?

 8      Q.  Yes.

 9      A.  Yes, I see some trees back in there.

10      Q.  Those are standing, and that's after the

11      clearing was done, correct?

12      A.  I don't know whether they took them down.

13      Yeah, I think those were left over, and I think

14      they're still standing, too.

15      Q.  Just a couple more pictures.  Let me show

16      you Exhibit I.

17                  (Defendant's Exhibit I marked

18                   for identification.)

19      Q.  That's you in the picture, isn't it?

20      A.  Yes, sir.

21      Q.  And that's your backhoe that you either

22      hired from Gradel?

23      A.  Right.

24      Q.  Or somebody else, correct?

25      A.  Right.
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 131

 1      Q.  And is that the same hole that you had dug

 2      that we talked about in the earlier pictures?

 3      A.  Yes.

 4                  (Defendant's Exhibit J marked

 5                  for identification.)

 6      Q.  On the boom of that vehicle, it says

 7      American Rental?

 8      A.  Yes.

 9      Q.  Does that tell you that that's one that you

10      personally rented?

11      A.  Right.

12      Q.  As opposed to what Gradel Company did,

13      right?

14      A.  They just operated it.

15      Q.  So you obviously trucked a backhoe over

16      there yourself to this property, correct?

17      A.  Yep.

18      Q.  And how did you get this onto the location

19      where it is?  Did you go back on the railroad

20      right-of-way and drive in that way?

21      A.  I think with this little machine, we just

22      brought it down from next door.  There's a path

23      on Lot 16.

24      Q.  But the Gradel Company vehicles, those had

25      to come in from the railroad property in order to

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 132

```
 1      get access, right?

 2      A.  Right.

 3      Q.  Did you get permission to do that when you

 4      brought in the Gradel Company vehicles or did you

 5      just do it?

 6      A.  No, we had permission.

 7      Q.  You did?  From whom?

 8      A.  CSX.

 9      Q.  Who at CSX?

10      A.  I got a letter.  We sent them a notice, told

11      them we weren't going to change their railroad

12      bed, and if they had any objections, let me know.

13      Q.  Do you still have a copy of that letter?

14      A.  Yes.

15              MR. FAGNILLI:  I'm sorry, is that

16      letter from them or to them?

17              THE WITNESS:  To them.

18      Q.  Did you ever get any response from them?

19      A.  No.

20      Q.  So you sent the letter, and then after that

21      you brought your equipment in, correct?

22      A.  Right.

23      Q.  Never actually talked to anybody and got

24      permission to do this?

25      A.  No, I actually talked to somebody, too.
```

Page 133

```
 1      Q.   Who?

 2      A.   The real estate guy.  I've got his name

 3      down.  I can get you his name.  They have a real

 4      estates guy, who's kind of like the coordinator

 5      of outside activities.

 6      Q.   You're going to produce that as well?

 7      A.   Yeah, I can.

 8      Q.   Let me show you Exhibit J.

 9               (Defendant's Exhibit J marked

10               for identification.)

11      Q.   Do you have Exhibit J in front of you?

12      A.   Yes.

13      Q.   That's a picture of you walking away from

14      the photographer?

15      A.   Yep.

16      Q.   Somebody's operating the backhoe; do you see

17      that?

18      A.   Yes.

19      Q.   That appears to be a different hole from the

20      one that was shown in the earlier exhibits; isn't

21      that right?

22               MR. ROBON:   If you know.

23      A.   Well, let's take a look.

24      Q.   Let me ask it this way:  In picture Exhibit

25      J we see two holes that are dug or two trenches,
```

Page 134

1      or whatever you want to call them, correct?

2      A.  Uh-huh.

3      Q.  Yes?

4      A.  Yes.

5      Q.  And the man that's operating the backhoe in

6      Exhibit J looks like he is pretty close to, right

7      up against a tree that's remaining and standing

8      on the property, correct?

9      A.  Right.

10     Q.  Did he knock that tree over?  Did he take

11     that tree out?

12     A.  No, I think that tree is still there.

13     Q.  Do you know if when he was doing this

14     digging shown in Exhibit J, he damaged the roots

15     or the base of that tree?

16     A.  No, we tried to stay away from it.

17     Q.  The dirt that he was digging, piling to the

18     operator's right, is that part of the mound that

19     you were creating?

20     A.  No, this was just to locate the stumps.

21     This was going to go back in the hole whenever we

22     got back on track on this thing.

23     Q.  What we see in Exhibit J is a man operating

24     a backhoe digging out dirt that you had trucked

25     in from another location in order to see what was

Page 135

```
 1     underneath it?

 2     A.  Right, to see the trees.

 3     Q.  All right.  But the dirt that he is on and

 4     the dirt that you're walking on there, that's

 5     dirt that you had trucked in from the other

 6     location, correct?

 7     A.  Like I said, where he is that's definitely

 8     true, but where I am at, you're really close to

 9     the property line.  That was probably there by --

10     Q.  All right.  Let's assume that in this

11     picture that you're on your own property.  Just

12     for this picture can you do that, Exhibit J?

13     A.  No, I'm pretty sure this is -- this is the

14     stakes of the property line, and I'm on the

15     railroad property.

16     Q.  Where you are is on the railroad property?

17     A.  Yeah.

18     Q.  Are you immediately adjacent to the

19     Cambridge property?

20     A.  Yes.

21     Q.  So off to your left would be the Cambridge

22     property?

23     A.  That's right.

24     Q.  So everything from your left out towards the

25     Cambridge property, all that dirt was what was
```

Page 136

```
 1      trucked in by you in the hundred trucks or so you

 2      said from another location?

 3      A.  You can see the property line right there.

 4      Q.  Is what I said true?

 5      A.  All the --

 6      Q.  The dirt to your left --

 7              MR. ROBON:  Repeat it.

 8              MR. TASSE:  Here, I'll do it again.

 9      Q.  In Exhibit J, was the dirt that's from your

10      left towards the houses, was that dirt that you

11      had trucked in?

12      A.  No, just from the stakes.

13      Q.  Just from what stakes?

14      A.  These stakes.  See these stakes here?

15      That's the property line.  That's what we trucked

16      in.

17      Q.  I'm trying to see what you're --

18      A.  It's a little bit different than where I'm

19      standing.  See how I'm a foot or two over?  This

20      is our dirt; this is your dirt.

21      Q.  Clearly the man on the backhoe is on top of

22      dirt that you trucked in from another location?

23      A.  That's true.

24              (Defendant's Exhibit K marked

25               for identification.)
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 137

 1      Q.  Show you Exhibit K, and you recognize this

 2      as being part of the Cambridge property adjacent

 3      to the railroad?

 4      A.  Yes.

 5      Q.  All right.  Now, that appears to be a

 6      different trench than what we have seen in the

 7      earlier pictures, F to J; is that correct?

 8      A.  I think it's the same one, same one.

 9      Q.  Same one as what?

10      A.  These two pictures are of the same trench.

11      Q.  Which two pictures, the one before it?

12      A.  Yes.

13      Q.  Exhibit J and K?

14      A.  Yes.

15      Q.  Are the same trench?

16      A.  Yes.  It's the same tree, same old tree.

17      Q.  Okay, K is just a little bit closer?

18      A.  Yes.

19      Q.  What was the purpose of digging the ditch in

20      Exhibit K?

21             MR. ROBON:  Objection, asked and

22      answered five times.

23      A.  To see the stumps.

24      Q.  No other reason?

25      A.  No, that was the only reason.

Page 138

```
 1                (Defendant's Exhibit L marked
 2                for identification.)
 3      Q.  Show you Exhibit L.  Do you recognize that
 4      as being the same area of the Cambridge property?
 5      A.  Yes.
 6      Q.  Would you agree with me that this shows a
 7      longer continuous trench of some sort?
 8      A.  Yeah, it's the same trench.
 9      Q.  What did you dig this trench for?
10      A.  This is the same trench.  See all the vines
11      and all the stuff coming out?  That's what we
12      were trying to show them.
13      Q.  You or your man from Gradel dug this trench
14      shown in Exhibit L, correct?
15      A.  Yes.
16      Q.  And it appears to me, but I wasn't there at
17      the time, that it's a longer ditch that goes the
18      whole back --
19      A.  Right, we connected them.
20      Q.  You connected the trenches that you dug?
21      A.  Yes, there's a couple holes.  We connected
22      them.  We went right down the line to show that
23      this was where the heaviest trespassing was, and
24      there was trees that were rooted in Cambridge
25      property that they tore down.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 139

```
 1        Q.  When you dug the trenches shown in Exhibit L
 2        and you placed the dirt off towards the Cambridge
 3        property, did you cover up any of your catch
 4        basins or manholes?
 5        A.  No.
 6        Q.  How do you know that?
 7        A.  Well, we've only got three of them.  We
 8        stayed away from them; we needed them.
 9        Q.  Did anyone ever tell you that you had
10        covered them up or plugged them in any way?
11        A.  No, they were never covered up.  Our catch
12        basins were never covered up; still are not.
13        Q.  After you dug the trenching shown in Exhibit
14        L, what did you do with them?  Did you leave that
15        trench the way it is or did you refill it or what
16        did you do?
17        A.  No, we left it there.  We took photos and we
18        cleared out the bigger stumps that were ten-inch
19        diameter stumps on Cambridge property.  We
20        cleared it out, and it's still there to this day.
21        Q.  What is still there?
22        A.  The trench.
23        Q.  The trench as we see it in Exhibit L?
24        A.  Yes.
25                    (Defendant's Exhibit M marked
```

Page 140

1              for identification.)

2    Q.  Let me show you Exhibit M.  Do you have

3    Exhibit M in front of you?

4    A.  Yes, I do.

5    Q.  Do you recognize that, either the manhole or

6    catch basin shown in that picture?

7    A.  I think so.

8    Q.  Where is that located?

9              MR. ROBON:  Are you representing

10   that's on this property someplace.

11   Q.  Yes.

12   A.  And this appears to be at -- yeah, this is

13   at Lot 15.

14   Q.  There is also a cable box or a phone box

15   shown there in that picture, isn't there?

16   A.  Yeah, there is a phone and there's a cable

17   box, both of them.

18   Q.  In those boxes and what's depicted in

19   Exhibit M is from work that you or Gradel Company

20   have done on your behalf; isn't that right?

21   A.  This dirt was from the mound, that's right.

22   Q.  Right.  And the box that's over on its side,

23   that's something that you or your Gradel

24   contractor had done; isn't that right?

25   A.  Yeah, they took the top off that time.  This

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 141

1     was in preparation to raise them up to build the

2     mound?

3     Q.  And this is the last picture I have.

4                (Defendant's Exhibit N marked

5                for identification.)

6     Q.  Showing you what I've marked as Exhibit N,

7     do you recognize that as views at the back of

8     your property adjacent to the railroad property?

9     A.  Yes.

10    Q.  In the top left-hand picture of that, of

11    this page, as you look down the property line,

12    you see the trees and some of the vegetation

13    still there?

14    A.  Yes.

15    Q.  And the dirt that we see in the picture in

16    the top left corner of Exhibit N, the dirt to the

17    right there, that's the dirt that you had trucked

18    in from the other location, right?

19    A.  That's right.

20    Q.  The picture directly below that one on the

21    lower left-hand corner, that's the trench that

22    you had dug that's shown in the other pictures?

23    A.  Yep, yes.

24    Q.  And the same if you go to the right side of

25    the picture in the lower right-hand corner,

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 142

```
 1      that's also the trench that you dug with --

 2      either you dug with the backhoe or Gradel Company

 3      dug at your request, right?

 4      A.  Yes.

 5      Q.  Did you ever speak to anyone from Ric-Man

 6      whenever you were on the premises?

 7      A.  Yes.

 8      Q.  When did you talk to anybody you identified

 9      as being from Ric-Man?

10      A.  That same period, March or give or take a

11      month.

12      Q.  Do you know who you spoke to?

13      A.  I have his name; a big guy.  I don't know if

14      you know that superintendent.  He is their

15      general superintendent.

16      Q.  So you don't know it as you sit here, but

17      you have it somewhere else?

18      A.  Yes.

19      Q.  You can provide who you talked to?

20      A.  Yes.

21      Q.  How many times did you talk to somebody from

22      Ric-Man?

23      A.  Oh, probably three or four times.

24      Q.  Were any of those times alone with you and

25      the Ric-Man person, or was it always in the
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 143

1      company with other folks from Toledo or the

2      railroad?

3      A.  I think most of the time it was with Christy

4      Soncrant, but I think I talked to -- I talked to

5      the foreman at least once alone in person, and by

6      the phone I talked to him.  I talked to Steve

7      Mancini, I think it's Steve Mancini, about trying

8      to get dirt for the mound.  And I talked to at

9      least two different people from Ric-Man

10     significantly.

11     Q.  You were talking to them about trying to get

12     dirt from the project in order to use to build

13     your mound, correct?

14     A.  Right, we were talking -- I talked to them

15     about the crossover pipe, that we needed that,

16     the field guy I did.

17     Q.  The field guy is different from Mr. Mancini,

18     right?

19     A.  Yes.  I'll remember his name in a second.

20     Q.  The discussions you had about the crossover

21     pipe, is that essentially the same things that

22     you talked about with the people from Toledo and

23     the county, etc.?

24     A.  Yes, and I think he was there when we talked

25     to the county engineer.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 144

```
 1        Q.  It was a group?

 2        A.  Yes.

 3        Q.  Just so we're clear, you were not present

 4        for any part of the process when the crossover

 5        pipe was unearthed or taken out?

 6        A.  Right, I was not there.

 7        Q.  And you were never there at any time before

 8        that area was covered up so you could see what

 9        remained, correct?

10        A.  Before what was covered up?  Oh, I did not

11        see the ends of the pipe that they broke off.

12        All I had was, you know, Christy told me what

13        happened, that they deliberately cut the pipe.

14        And, you know, she said, "Well, if you can show

15        that you needed it, we'll put it back."

16        Q.  She also told you that it was plugged and it

17        was deteriorated and it was decrepit and it was

18        not in use, didn't she?  Isn't that what she told

19        you?

20        A.  Not exactly.  I don't think she ever saw it

21        either.  I think she was told that by their

22        inspector or by Ric-Man and that kind of thing.

23        Q.  In fairness to you, you never saw it

24        unearthed so you don't know what the condition

25        was underground, do you?
```

Page 145

```
 1        A.  Well, I saw it in the manhole and I saw it
 2        in the ditch, both ends, I saw it.
 3        Q.  Right.  We talked about what you're going to
 4        try to show us in pictures, right?
 5        A.  Right.
 6        Q.  But you never saw it when it was unearthed
 7        and exposed to the elements so you could
 8        visualize it, right?
 9        A.  Right.
10        Q.  And you don't know what condition it was in
11        when they made the decision to cut it off?
12        A.  Well, they told me; they both told me.
13        Q.  They told you it was all plugged up and
14        cracked and not in use, didn't they?
15        A.  Not exactly.  They said, you know, it would
16        never work.  They implied that it was at least
17        mainly plugged up.
18        Q.  No one ever told you from the City, the
19        County, Ric-Man, anyone else relating to this
20        project that that was a fully functioning
21        drainage pipe under the railroad, did they?
22        A.  The County did.
23        Q.  What did they tell you?
24        A.  That we needed that pipe.
25        Q.  No, that's not my question.
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 146

1     A.  Oh.

2     Q.  Did anyone ever tell you at the time that

3     they unearthed it and made a decision to cap it

4     off?

5     A.  Oh, no, not then.

6     Q.  The County told you based on some drawings

7     he found somewhere back in the --

8     A.  That it was there.

9     Q.  A long time ago, right?

10    A.  That it was there, and that we needed it.

11    Q.  He said it was there based on his drawings,

12    correct?

13    A.  Right.

14    Q.  But he never told you that it was a fully

15    functioning working pipe in 2006, did he?

16    A.  No, he never was out there.

17    Q.  Do you recall any conversations with anyone

18    from Ric-Man that was inconsistent with what you

19    talked about or learned from the City of Toledo

20    or the County with respect to the crossover pipe?

21    A.  If Ric-Man was saying something different

22    than what I heard otherwise?  I don't -- you

23    know, I think that it was consistent with what

24    their superintendent said it was.  From what I

25    remember, he agreed with them that it was not,

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

Page 147

1       you know, not --

2       Q.  Not functioning?

3       A.  Not functioning, he didn't think it was

4       functioning.  "What the heck do you need it for?"

5       and that kind of thing.

6                   MR. TASSE:  That's all the questions

7       I have.  Thanks very much.

8                   MR. FAGNILLI:  I have some

9       questions, and we've got this other depo coming

10      in at 3, so I would like to start with --

11                  MR. ROBON:  He was well over an

12      hour.

13                  MR. FAGNILLI:  I understand.

14                  MR. ROBON:  An hour and a half.  But

15      please let's not be duplicative.

16                  MR. FAGNILLI:  I just will try to

17      fill in the issues that are important to my

18      client and the gaps that I think that there are.

19                  MR. ROBON:  My stomach is growling.

20                       - - -

21

22                  CROSS EXAMINATION

23      BY MR. FAGNILLI:

24      Q.  My name is David Fagnilli, Mr. McCarthy, and

25      I represent Vermillion Tree and Land Clearing,

Page 148

```
 1      and I have a few follow-up questions for you.  I

 2      just want to clear up a couple of things so that

 3      I understand them.

 4              First of all, with regard to these

 5      photographs that we have seen here in response to

 6      Mr. Tasse's questions, and that would be Exhibits

 7      F through N, would show the mound at Lots 15 and

 8      16 that you built.  What's the time frame that

 9      that mound was built?  Is that shortly after the

10      clearing was done?

11      A.  Yes.

12      Q.  And was there a legal survey done by

13      Peterman & Associates at any time before the

14      mound was built?

15      A.  Before, yes, they came out, and I'm pretty

16      sure that was before they built the mound.  They

17      came out and verified and put lath, new lath

18      along some intermediate points rather than just

19      the main corners.  They did come out and do that.

20      Q.  Do you know the date that that was done?

21      A.  We got a bill from them.  I'm sure we could

22      establish that.

23      Q.  And you have the bills for the contractor

24      that you hired to build the mound as well, right?

25      A.  Right.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 149

```
 1        Q.  At some point in time, you did some
 2   measurements on your own, I take it, before you
 3   called Peterman?
 4        A.  Yes.
 5        Q.  And those measurements, did you take those
 6   from the center of the railroad?  Is that how you
 7   established your baseline for your survey?
 8        A.  We took them from the, yes, from the center
 9   of the active railroad.
10        Q.  When Peterman came out and did their survey,
11   were you present?
12        A.  Yes.
13        Q.  Did they do the same thing?  Did they do it
14   from the center of the railroad?
15        A.  They went -- they had some base control
16   points.  They went back and took it from there,
17   which these points were taken from the center of
18   the railroad someplace, but they had a base point
19   that they used.
20             And then I believe they checked it
21   against the railroad to make sure.  I know they
22   did because we talked about how his drawings show
23   101 feet from the active railroad.  I came up
24   with 101 feet; they came up with 101 feet.
25             And they even went further back to
```

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

Page 150

1       check to make sure that their control point,

2       which I believe was down on Bates Road, that that

3       was in synch.  They checked that out.

4       Q.  It's your testimony that the property line

5       is 101 feet from the center of the railroad?

6       A.  I would have to look.

7       Q.  The stakes with orange ribbon around them

8       that are shown in the photographs F through N,

9       who put those stakes up, do you know?

10      A.  I think we've already kind of been through

11      that.  We are not sure whether this was Peterman,

12      the City.  I believe this is Peterman's lath, so

13      that we can --

14      Q.  But you're not sure?

15      A.  No.

16      Q.  There was at one time a railroad fence that

17      ran along the railroad right-of-way between the

18      property line and the -- for the old Cambridge

19      and the railroad right-of-way; is that correct?

20      A.  This railroad tie fence that we're talking

21      about.

22      Q.  There was a, not just a railroad tie fence,

23      but there was an actual metal fence that ran

24      along that property right-of-way, and it runs

25      along the right-of-way all the way to the Maumee

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 151

1       River, right, from Bates Road all the way to the

2       Maumee River.

3       A.  No, that fence, that metal fence was on the

4       face of the railroad ties for that 150 feet, and

5       that was the only thing left on the Cambridge

6       property of that old railroad fence, as I recall.

7       It wasn't continuous down there.

8       Q.  Well, is there --

9       A.  I shouldn't say.  Maybe I never -- but there

10      was no sign of it or anything.

11      Q.  Was there a fence like that to the -- that

12      exists today to the east of the Cambridge

13      property?

14      A.  There is still some semblances of it there;

15      there's some little bits of it along there.

16      Certainly, a hundred years ago, that was up and

17      standing all the way when this thing was active.

18      But it wasn't there.  At least when I first got

19      on the scene, that was long gone.  The only part

20      of it was the part that was on the face of those

21      timbers.

22      Q.  Is there a fence like that to the west of

23      the Cambridge property along the railroad

24      right-of-way?

25      A.  It's not -- it's a newer one, but it's along

ST. JOHN REPORTING   251 BLUE HARBOR CT., PERRYSBURG, OH 43551        419-872-1935

Page 152

 1      the -- they do have a fence.  I don't know whose

 2      it is, whether it's -- but it's not the same kind

 3      as the old railroad fence.

 4      Q.  Do you know why the fence isn't there any

 5      longer in the area of the Cambridge property?

 6      A.  No, I don't.

 7      Q.  Do you know what clearing was done to put in

 8      the Cambridge property initially?

 9      A.  I wasn't around for that.  The only evidence

10      we have of that is that the aerial photos show

11      that it was farm field before and farm field, you

12      know, development afterwards.  It wasn't --

13      Q.  Have you seen aerial photographs prior to

14      2001?

15      A.  I believe so.

16      Q.  The only aerial photograph I've seen from

17      Plaintiff's attorney is the one from 2005, which

18      would be after the development was put in.  And

19      what I'm asking you is if you have any aerial

20      photographs that you've seen that show the area

21      before Jacqueline Drive was put in and before the

22      development was done?  Have you seen anything

23      like that?

24      A.  I believe so.  I believe that we went and

25      looked at -- we went over -- it might have been

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

Page 153

```
1     somebody Gary Buck said he went over to -- looked
2     at the aerials.
3     Q.  Where did he go to look at these aerials?
4     A.  Over at Mannik & Smith, and there was
5     some --
6     Q.  What is Mannik & Smith?
7     A.  That was a consultant, and they did some of
8     the environmental stuff on this project.  And
9     they're like the consultant that does aerial
10    photography around there.  He kind of has access
11    to all the computerized and whatnot.
12    Q.  What consulting did Mannik & Smith do on
13    what project?
14    A.  They did some environmental review.
15    Q.  For who?
16    A.  For the City of Toledo.
17    Q.  For the water main project?
18    A.  That's the way I understand it.  But they're
19    kind of like the custodian of aerial photography,
20    and I can't remember whether I saw it or Gary
21    Buck saw it.  This was back before 2005 or before
22    2000 -- actually 1999 I think is when this
23    project, the Cambridge project started, that
24    there were aerial photographs back in that era
25    that showed that this was farm field.
```

John McCarthy                    Old Granite Development vs. The City of Toledo, et al

Page 154

1            And the Gillette man next to Cambridge

2      also confirmed to me that, you know, this was all

3      farm land long before you guys got here with this

4      Cambridge project.

5            So I believe that -- I think all the

6      clearing or essentially all the clearing was done

7      before Cambridge got there because it was farm

8      field from way back.

9      Q.  So is it your testimony that before the

10     mound was built, there was some survey done by

11     Peterman & Associates, a legal surveyor, or are

12     you not sure about that?

13     A.  I'm sure of that.

14     Q.  Before the mound was built, did you or

15     anyone acting on behalf of Old Granite contact

16     Vermillion to tell them that the mound was going

17     to be built?

18     A.  Vermillion?

19     Q.  Yes.

20     A.  No.

21     Q.  Did you or anyone acting on behalf of Old

22     Granite ever contact anyone at Vermillion to

23     complain about the clearing and claim there was a

24     trespass by the clearing at any time before the

25     mound was built?

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 155

1        A.  No, we didn't even know Vermillion existed.

2        Q.  Did you contact anyone from Edwards Tree

3        Clearing Service?

4        A.  No.

5        Q.  Well, you saw the trucks, right, from the

6        land-clearing company?

7        A.  That was afterwards, afterwards.

8        Q.  It was before the mound was built?

9        A.  Yes.

10       Q.  I'm asking you before the mound was built

11       and after the clearing was done, did anyone

12       contact anyone from Vermillion or Edwards Tree

13       Clearing Service to let them know that there was

14       a complaint about alleged trespassing here?

15       A.  We dealt with the City.

16       Q.  That's not my question.

17       A.  No, we did not go in -- we did not -- I did

18       not call or contact Edwards or Vermillion.

19       Q.  And that's true for both the claim that

20       there was a trespass and the notice that there

21       was going to be this filling or this mounding

22       done on the property line?

23       A.  That's right, I did not contact them.

24       Q.  Did you take any photographs of any stumps

25       or roots that you claim were cleared on the

ST. JOHN REPORTING   251 BLUE HARBOR CT., PERRYSBURG, OH 43551      419-872-1935

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 156

```
 1        Cambridge property or the Old Granite property at
 2        any time before this fill was put in?
 3        A.  Yes, yes.
 4        Q.  And you have those photographs?
 5        A.  Yes, I do.  Hope we got all of them.
 6        Q.  Do you know if any of those photographs have
 7        been deleted or altered in any way?
 8        A.  I hope not.
 9        Q.  Do you know?
10        A.  No, I don't know.
11        Q.  What have you done to preserve those
12        photographs to ensure that they won't be deleted
13        or altered?
14        A.  Well, I gave them to the City of Toledo, for
15        one thing.
16        Q.  When did you give them to the City of
17        Toledo?
18        A.  Right after we took them, right before we
19        did the mound.
20        Q.  Did you give them to them in electronic
21        format or did you give them to them in printed
22        format?
23        A.  Both.
24        Q.  So they should have a disk with all these
25        photographs?
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 157

```
 1        A.  I didn't say all.  We went and we tried to

 2        go with the City of Toledo.  We went -- before we

 3        did this mound, we took all the pictures, we

 4        brought them out.  I gave Christy the main photos

 5        that showed these stumps clearly on Cambridge

 6        property, trees going in 20 feet.

 7                   We shared it with them.  We tried to

 8        have a joint survey.  They didn't want to do

 9        that, but they did, they and Ric-Man did come

10        back and put more stakes in.  And they lined up

11        with ours.

12                   So we did make an effort before we did

13        this mound to bring them out, and Ric-Man

14        certainly was there.  And I don't know, maybe

15        Vermillion was gone by this time.

16                   But we made a conscientious effort to

17        get everybody to see all of the trespass stumps

18        that we had through there, plus all the vines

19        that were sticking up that you can still see from

20        some of these.  We did do that.

21        Q.  You're not answering my question.  I want

22        you to listen to my question very carefully and

23        answer the specific question I'm asking you

24        rather than get off on a tangent, okay?  You have

25        to answer out loud, yes or no.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 158

 1      A.  Yes.

 2      Q.  What I'm asking you is with regard to my

 3      client, Vermillion and Edwards.  Did you ever --

 4      first of all, you knew -- you saw the trucks that

 5      said Edwards Land Clearing Service?

 6      A.  Machines; I never saw any of the trucks.

 7      Q.  You saw a low-boy that they were being

 8      loaded onto, right?  You said you talked to the

 9      low-boy driver.

10      A.  Yeah, but I don't know if that had the cab

11      there, but I saw -- the only place I remember

12      seeing Edwards was on the machines themselves,

13      but whatever.

14      Q.  Did you ever make any attempt to contacted

15      Edwards or Vermillion Land Clearing Service or

16      find out who the land clearer was before this

17      mound was built?  I think your answer to that was

18      no.

19      A.  But you slipped one other thing in there.

20      Q.  What's that?

21      A.  Did I ever -- you said -- I mean, I did not

22      call them.  I did not -- before or after, I don't

23      think I've ever contacted Vermillion.

24      Q.  Right.

25      A.  Other than seeing their truck out there, the

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

Page 159

1     machine out there and taking pictures.  But I did

2     not have any contact with them, if that's your

3     question.

4     Q.  Your contact was strictly with the City of

5     Toledo and with Ric-Man?

6     A.  Right.

7     Q.  You never followed up to find out who the

8     land clearer was and to try to put them on notice

9     at some time before you did all of this fill; is

10    that correct?

11    A.  That was kind of the new part, but I did try

12    to find out who the clearing company was.

13    Q.  What did you do to try to find that out?

14    A.  I think I asked Christy Soncrant.

15    Q.  Did she tell you?

16    A.  Yes.

17    Q.  Then what did you do?  Did you try to

18    contact them?

19    A.  No, I didn't try to contact them.  I just

20    wanted to find out who it was since, you know,

21    that was the actual party that did the tree

22    clearing.

23    Q.  But you never tried to give them any notice

24    before you put in this fill over the area where

25    you claim the clearing had been done?

Page 160

```
 1                 MR. ROBON:   Asked and answered.

 2                 THE WITNESS:  But the question is

 3      screwed up.

 4                 MR. ROBON:   Tell him yes or no.

 5      A.  Where the trees were taken out, the part I

 6      think we got -- the trees were taken out on

 7      Cambridge property, the trees were taken out on

 8      their property.  I did not go and contact them

 9      and try to get into this whole thing about where

10      it was, but you made it sound like I -- we built

11      this mound over the trees.

12                 MR. ROBON:   Don't worry what it

13      sounds like.  Did you contact them?

14                 THE WITNESS:  I did not contact

15      them.

16                 MR. ROBON:  Thank you.

17      Q.  You said you did have some contact with

18      someone at the site that you thought was either

19      an Edwards or a Vermillion employee that worked

20      for the land clearer; is that correct?

21      A.  I think so.

22      Q.  Who was that?

23      A.  I don't know.  I think it might have been

24      somebody, like I said, with a -- picking up the

25      machine or had a low-boy there they were taking
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

```
 1      it away because somebody said something about --
 2                  MR. ROBON:   You have answered his
 3      question.
 4      A.  Okay.
 5      Q.  What do you remember about the conversation
 6      with him?
 7      A.  Nothing.  It was just a driver or something.
 8      He didn't know anything about it.  Maybe --
 9                  MR. ROBON:   You've answered the
10      question.  Please, answer the question.  We will
11      be here all day.
12                  MR. FAGNILLI:  Marv, these are the
13      photographs that you used at the Wood County
14      Engineer's deposition.  I just wanted to ask him
15      about those.  They're your photographs.
16      Q.  Show you what was --
17                  MR. FAGNILLI:  I don't know how
18      these were marked, but maybe we can put an
19      exhibit sticker on this.
20                  (Defendant's Exhibit O marked
21                  for identification.)
22      Q.  I'm going to mark this on the back here as
23      Exhibit O.  This is a photo of you standing next
24      to this, to this manhole cover.  Do you see that?
25      A.  Right.
```

Page 162

1    Q.  And do you know the date that this photo was

2    taken? It shows the date of December of 2007 on

3    the back.  That's the date it was printed out,

4    December 11, 2007.  It doesn't show the date that

5    it was taken.  Do you know the date that it was

6    taken?

7              MR. ROBON:   Yes or no.

8    A.  No, I guess I don't.

9    Q.  This is a photo of you standing next to the

10   manhole that we were talking about earlier today,

11   right?

12   A.  Right, but this is -- I mean, it's --

13              MR. ROBON:   You've answered the

14   question, yes or no.

15   A.  2007.

16   Q.  Was this 2006 or 2007?

17   A.  2007.

18   Q.  So this is after the job has been finished?

19   A.  Yes.

20   Q.  This is not before the clearing was done?

21   A.  Right.

22   Q.  And the railroad fence is visible in the

23   background?

24   A.  Right, this is what's left of it, that

25   little bit.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

                                                                        Page 163

 1        Q.  On the other side of the railroad fence,

 2        that would be the Cambridge property or is that

 3        the Gillette property?

 4        A.  This is the Gillette property.

 5                    (Defendant's Exhibit P marked

 6                    for identification.)

 7        Q.  I showing you what we marked as Exhibit P.

 8        That's another photograph.  I think it's number

 9        seven out of that same packet of photos that

10        Mr. Robon has given us.  This shows the manhole

11        again, right?

12        A.  Yes.

13        Q.  And it shows Lot 15, your son's house, in

14        the background, correct?

15        A.  Yes.

16        Q.  And it also shows the railroad fence in the

17        shrubbery there?

18        A.  Yes.

19        Q.  And the brush?

20        A.  I don't know if you can see it, but there is

21        bits and pieces of it there, yes.

22        Q.  And that photo again was taken in 2007?

23        A.  Yes, I believe so.

24        Q.  So this would be after the clearing was

25        done, after all of the work was done?

Page 164

```
 1      A.  Right.

 2      Q.  Is that correct?

 3      A.  Yes.

 4      Q.  Going back to the photos that Mr. Tasse

 5      showed you, Exhibits F through L, and those are

 6      the photos that show you in the pictures.  Who

 7      took those photos?

 8      A.  I don't know.

 9      Q.  So we don't know who took the photos and we

10      don't know the date that they were taken; is that

11      fair to say?

12      A.  Well, we took the other --

13              MR. ROBON:  Yes or no.  Answer his

14      question.

15      A.  We know that this is -- this is 2006.  The

16      other ones are --

17              MR. ROBON:  No, the question is do

18      you know who took the picture.

19      Q.  And do you know the date?

20      A.  2006, I don't know.

21              MR. ROBON:  Thank you.

22      A.  And I believe the pictures were taken by

23      Ric-Man.

24      Q.  I'm not talking about the Exhibits N and M.

25      I'm talking about --
```

John McCarthy                            Old Granite Development vs. The City of Toledo, et al

Page 165

 1      A.  Yeah, these.

 2      Q.  Exhibits F through L, you think those were

 3      taken by Ric-Man?

 4      A.  I believe so.

 5      Q.  You worked with the City of Toledo in your

 6      job as -- with the Army Corps of Engineers; is

 7      that correct?

 8      A.  Yes.

 9      Q.  Did you have someone who was your primary

10      contact over there?

11      A.  Yes.

12      Q.  Who was that?

13      A.  The main one in engineering at the time was

14      Dave Young and Burt Lydy (sic).

15      Q.  Are they still there?

16      A.  No.

17      Q.  Is there anyone that's still there that you

18      would have had contact with?

19      A.  Carty has them all shifted around.  I don't

20      know.

21      Q.  I'm sorry?

22              MR. ROBON:  Just yes or no.

23      A.  I don't know.

24      Q.  Other than engineering, was there anyone

25      else that you had regular contact with from the

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 166

1     City of Toledo on this project?

2     A.  Yes, I had contact with their sewer people,

3     all their departments.  We are building some

4     major projects with them, so we did all the

5     technical service, and Bill Franklin and just

6     about every department that had anything to do

7     with physical things, roads, whatever.

8     Q.  Did you ever have contact with Christy

9     Soncrant before you were involved in this

10    project?

11    A.  No.

12    Q.  Why did you stop building the mound?  Why

13    did you discontinue that?

14    A.  Well, the main thing was that we were -- it

15    was alleged that we were covering it up, that we

16    were covering up the evidence.  And that in all

17    the pictures we took beforehand, now that the

18    City was starting to say, "Oh, it was only a few

19    trees or something like that."  So after we

20    started, we stopped so we didn't cover up

21    anything further.

22    Q.  You covered up the property line along Lot

23    15 and 16; is that correct?

24    A.  Oh, I don't think so.  This is --

25                    MR. ROBON:  You've answered the

Page 167

```
 1    question.
 2    Q.  Well, don't these photographs show that
 3    there is a mound of dirt that runs all the way
 4    along the back of Lots 15 and 16?
 5    A.  Right, but that's a --
 6                MR. ROBON:  Listen to his question.
 7    Q.  Is that correct or isn't it?
 8    A.  Yes.
 9                MR. ROBON:  Lot 16?  Are you getting
10    tired?  Do you want a break?
11    A.  No, 16, part of Lot 16 was on there.
12    Q.  And Lot 15 is completely covered at the
13    property line?
14    A.  We didn't put anything on the -- this dirt
15    on the railroad property was put there by
16    Ric-Man, not us.
17    Q.  But the dirt -- you put dirt along the
18    property line along 15 and 16?
19    A.  On the Cambridge side, yes.
20    Q.  How about the lots to the west of those?
21    Did you cover those lots as well?
22    A.  No.
23    Q.  Just Lots 15 and 16?
24    A.  15, 16 and I think we might have been a few
25    feet into 14.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 168

1       Q.  You said something about 20 foot of

2       vegetation onto Cambridge or a tree 20 foot over.

3       Are you claiming the tree stumps were 20 foot

4       into the Cambridge property?

5                   MR. ROBON:   Asked and answer three

6       times.

7                   MR. FAGNILLI:  But he made the

8       statement again, and I would like to clear this

9       up.

10      Q.  Are you claiming that the roots and the

11      stump was into the Cambridge property or are you

12      claiming that the overgrowth was onto the

13      Cambridge property?

14      A.  The overgrowth, in my opinion, was onto

15      Cambridge property by 20 feet.

16      Q.  So it's your position that if there is a

17      tree that has its stump on the railroad

18      right-of-way and it overhangs onto the Cambridge

19      property, the railroad doesn't have the right to

20      remove the tree?

21                  MR. ROBON:  Objection, that's not

22      what he ever said.

23                  MR. FAGNILLI:  That's what I'm

24      trying to find out.

25                  MR. ROBON:  He's asked the question;

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 169

 1      he's answered it three times.

 2                    MR. FAGNILLI:  No, he hasn't.

 3                    MR. ROBON:  Every lawyer's.

 4                    MR. FAGNILLI:  I'm trying to

 5      understand.

 6      A.  I don't think that.

 7      Q.  What do you think?

 8      A.  They could have a right to take those trees

 9      out if they did their homework right, you know.

10      But as far as the land thing, I understand that.

11      We have done a lot of clearing.

12                    MR. ROBON:   You answered the

13      question.

14      Q.  It's not your position that they can't clear

15      the trees off of the railroad property; is that

16      correct?  They have a right to do that, the

17      railroad has a right?

18      A.  I didn't say that they do.

19                    MR. ROBON:   Are you talking about

20      trees in the wetlands or regular trees?

21                    MR. BAHRET: Objection.

22                    MR. FAGNILLI:  I'm not talking about

23      wetlands.  Forget about the wetlands.

24      A.  Just from a land property aspect, that's

25      true.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 170

1       Q.  They could clear the trees that are on their

2       property, even if they overhung onto the

3       Cambridge property; is that correct?

4       A.  If this was just a land property deal, yes.

5       Q.  Now, you're not an expert in wetlands

6       regulations; is that correct?

7                   MR. ROBON:   Asked and answered

8       three times.

9                   MR. FAGNILLI:  It's the basis for

10      another question, Marv.

11                  MR. ROBON:  Already asked and

12      answered.

13                  MR. FAGNILLI:  No, it isn't.  Marv,

14      if you have an objection, make it and let's go.

15      A.  No, I don't claim to be.

16      Q.  Is it your contention that there was

17      permanent standing or flowing bodies of water on

18      the railroad right-of-way that flowed into

19      navigable waters?

20      A.  That you need a -- that's the kind of thing

21      you need an expert to tell you just what that all

22      means.

23      Q.  Well, from your observation?

24                  MR. ROBON:   Can you answer it, yes

25      or no?

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 171

```
 1        Q.  From your observation, was there any
 2   permanent or standing or flowing bodies of water
 3   on the railroad right-of-way?
 4        A.  Yes, there were.
 5        Q.  There's permanent standing or flowing bodies
 6   of water?
 7        A.  Yes.
 8        Q.  Is there permanent standing flowing bodies
 9   of water on the railroad right-of-way now?
10        A.  Yes.
11        Q.  Where?
12        A.  The center ditch.
13        Q.  Other than the ditch?
14        A.  No, other than the ditches, that's not true.
15        Q.  So the only standing or flowing bodies of
16   water on the railroad right-of-way would be the
17   ditch; is that correct?
18        A.  Ditches, yes.
19        Q.  There is more than one ditch?
20        A.  On either side.
21        Q.  But there is only one side that was cleared?
22        A.  They cleared both sides.
23        Q.  Both sides of the ditch?
24        A.  Both sides of the railroad embankment, on
25   the Cambridge side and the center ditch side.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 172

1    There were trees over there too.  They took them

2    down.

3    Q.  Other than the water that was in the ditch,

4    there was no other standing or flowing permanent

5    bodies of water; is that correct?

6    A.  That is correct.

7    Q.  Is it your contention that in order to clear

8    trees, absent earth moving, in order to clear

9    trees from an area adjacent to wetlands, you need

10   a permit from the Army Corps of Engineers?

11   A.  Say that again.

12           MR. ROBON:  Objection to the form.

13   Q.  If you were clearing trees on an area

14   adjacent to a wetland, do you need a permit from

15   the Army Corps of Engineers if you're not going

16   to be disturbing earth?

17           MR. ROBON:  Objection.  You're

18   saying adjacent; you mean within the wetlands.

19           MR. FAGNILLI:  No, that's not what I

20   mean.

21   A.  No, I don't think -- I don't believe there

22   is anything that says if you're adjacent to it.

23   Q.  If you're within a wetland and you're

24   clearing trees but not disturbing earth, do you

25   know if there is any requirement to get an Army

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 173

1       Corps of Engineers permit?

2       A.  I believe there is.

3       Q.  Do you know -- what do you base that on?

4       A.  I worked with the Army Corps of Engineers

5       for a long time.  I actually worked in this

6       department for a while, so I know that those kind

7       of things are pretty obvious.

8       Q.  Are you familiar with the United States

9       Supreme Court decision in Rapanos versus United

10      States that came out in 2006?

11      A.  Yes.

12      Q.  And what is your understanding of Rapanos?

13                  MR. ROBON:  Objection, calls for a

14      legal conclusion.

15                  MR. FAGNILLI:  He says he was

16      familiar with it.

17      Q.  What is your understanding of it?

18      A.  We reviewed that thing on another matter,

19      and it didn't seem to have any bearing on this

20      case or anything else that we were working on.

21      That's all I can remember about it.

22      Q.  What did you review it on?  What matter did

23      you review it on?

24      A.  Some shoreline job.

25      Q.  The project you were doing in Port Clinton?

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 174

```
 1      A.  Yes.

 2      Q.  Who were you doing that project for?

 3      A.  For Howard Emery.

 4      Q.  Is that project going forward?

 5      A.  No, it's on hold.

 6      Q.  Why is it on hold?

 7              MR. ROBON:   Objection, irrelevant.

 8      If you know.

 9      A.  He needs a permit.

10      Q.  And he can't get it?  You have to answer out

11      loud.

12      A.  Yes.

13      Q.  Why can't he get it?

14              MR. ROBON:  Objection, irrelevant.

15      A.  It would be all afternoon.

16      Q.  What is your date of the birth?

17      A.  2/22/46.

18      Q.  You mentioned that you testified on maybe a

19      dozen times as a witness.  That was all for the

20      Army Corps of Engineers; is that correct?

21      A.  Yes, that's what I was talking about.

22      Q.  Have you ever testified in court or in a

23      deposition other than in your capacity as in the

24      Army Corps of Engineers?

25      A.  I can't remember.
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 175

```
 1        Q.  Have you ever been a party to litigation
 2        before?  Have you ever been sued by anyone, has
 3        anyone ever sued you?
 4                   MR. ROBON:  Objection.  You can
 5        answer.
 6        A.  No.
 7        Q.  Have you ever developed any real estate?
 8        A.  Personally, no; my own home.
 9        Q.  Did you do any consulting work while you
10        were employed by the Corps of Engineers?
11        A.  No, I didn't.
12        Q.  Were you involved in any construction work,
13        any development work on the side during the time
14        that you were working for the Corps of Engineers?
15        A.  Occasionally.
16        Q.  What construction work were you involved in
17        during the time period you were working for the
18        Corps of Engineers?
19        A.  I did some electrical contracting once.  I
20        did some consulting on, like I said here earlier,
21        for mobile home, some problems a guy had with
22        some mobile home sites.
23        Q.  That's while you were with the Corps?  I
24        understood that to be afterwards.
25        A.  No, I did that some of that before, too, but
```

John McCarthy                                     Old Granite Development vs. The City of Toledo, et al

Page 176

```
 1      they were minor kind of things.  I basically
 2      worked for the Corps.
 3      Q.  Your son, Michael, is the one that lives in
 4      Lot 15; is that correct?
 5      A.  Yes.
 6      Q.  And has he been involved in the construction
 7      business?  I know he is a real estate broker, but
 8      has he also worked in the construction business?
 9                  MR. ROBON:   If you know.
10      A.  No.
11      Q.  Have you been involved in developing any
12      property with him?
13      A.  No.
14      Q.  Who was your supervisor at the Army Corps of
15      Engineers?
16      A.  When I left?
17      Q.  Yes.
18      A.  My last one?  His name was -- I can't even
19      remember -- John Rintoul, R-i-n-t-o-u-l.
20      Q.  Spell that last name again for me, sir.
21      A.  R-i-n-t-o-u-l.
22      Q.  Was he located here in Toledo?
23      A.  No, he was in Buffalo, New York.
24      Q.  Were you in charge of the Toledo office
25      then?
```

Page 177

```
 1      A.  Yes, I was.

 2      Q.  Are you familiar with a Hydro-Axe?

 3      A.  Yes.

 4      Q.  Have you ever seen those used before?

 5      A.  Yes.

 6      Q.  When?

 7      A.  Oh, many times, and Edwards, your company,

 8      too.  I believe they did a lot of the clearing we

 9      had out in the boondocks.  I think in Sandusky

10      and I don't know when else, but they're quite a

11      major clearing company around here.

12      Q.  You had seen Vermillion or Edwards use a

13      Hydro-Axe before on projects when you were at the

14      Corps?

15      A.  Yes.

16      Q.  Were they a direct contractor with the Corps

17      or did they contract with --

18      A.  They were a sub.

19      Q.  Have you ever talked to anyone at Edwards or

20      Vermillion directly?

21      A.  I -- in the past I can't remember. Probably.

22                  MR. ROBON:  You've answered the

23      question.

24      Q.  With regard to the Hydro-Axe, what do you

25      know about it as far as using it for clearing and
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

1      so forth?

2      A.  Well, in our line of work, we didn't use a

3      Hydro-Axe in residential areas.  We didn't allow

4      that.

5      Q.  Was there some Corps requirement that said

6      it wasn't permitted?

7      A.  I don't know if there was any specific

8      mention of that.  There is all kinds of different

9      equipment, but, generally speaking, forestry type

10     equipment is not allowed to be used around

11     residential areas.

12     Q.  Do you know of any regulation or requirement

13     on that?

14     A.  The closest thing would be in our specs we

15     used to call it suitable equipment, and that was

16     it.

17     Q.  Did your Army Corps of Engineers

18     specifications identify what suitable equipment

19     was?

20     A.  We didn't have a list of it, no.

21     Q.  Do you recall any occasion where someone

22     wanted to use a Hydro-Axe and you told them no?

23     A.  No.

24     Q.  And is a Hydro-Axe specifically excluded in

25     any regulation that you're aware of?

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 179

1        A.  No.

2        Q.  You don't consider yourself an expert in

3        land clearing methods, do you?

4        A.  I don't know what an expert would be on land

5        clearing, but I'm not a clearing expert, no, I

6        guess.

7        Q.  Who's the trucking company that trucked the

8        dirt from Five Points to this project?

9        A.  I promise I'll get his name.

10       Q.  You don't know?

11       A.  I can't remember.

12       Q.  Did you pay for that dirt, or was that dirt

13       given to you just to get rid of it?

14       A.  Paid for it.

15       Q.  Do you know what you paid for it?

16       A.  I can't exactly remember.

17       Q.  Do you know what type of soil it was?  Was

18       it evaluated in any way?

19       A.  No, it was from Perrysburg.

20       Q.  Did you have any test done on it to

21       determine what it was, whether it was clay or

22       something else?

23       A.  No, just went and looked at it and had it

24       shipped.

25       Q.  Have you prepared any written report of your

Page 180

1      opinions for either Mr. Robon or for Old Granite?

2      A.  I sent a few letters to the City and that.

3      We have positions that I took back when, when we

4      were trying to get this thing resolved last year,

5      in 2006.

6      Q.  Anything since 2006?

7      A.  No, we haven't sent them anything.

8      Q.  Was there a survey that was done by Peterman

9      & Associates sometime after these photographs

10     were taken which we have marked as Exhibits F

11     through N?

12     A.  Yes, they came back and did another survey.

13     They have two surveys out there; they came out

14     there twice.  They did a survey specifically on

15     each of the trees that were on Cambridge

16     property, made a map and that kind of thing of

17     all the trespass kind of clearing stumps.  They

18     surveyed each one of them, went through all that

19     trouble.

20     Q.  I show you what was marked as Exhibit E.

21     You have that in front of you, don't you?  That's

22     the photo that has the concrete monument?

23     A.  Monument, yes.

24     Q.  Do you know the date this photograph was

25     taken?

Page 181

```
 1    A.  I think we just went over this.  This was --
 2    oh, no, we didn't.  Surely this was early 2006,
 3    but --
 4              MR. ROBON:  Do you know?  Do you
 5    have any idea?  It could have been -- you don't
 6    know, do you?
 7              MR. BAHRET:  He just gave an answer.
 8    How can you tell him he doesn't know?
 9              MR. ROBON:   I'm tired and hungry
10    and he is tired and hungry.
11    Q.  Are you tired and hungry, sir?
12    A.  Yes.
13    Q.  Take a break then.  Do you need to take a
14    break?
15    A.  I don't need to take a break.  I would just
16    as soon get out of here.
17    Q.  Okay.
18              MR. ROBON:  How much longer is this
19    going to go on?
20              MR. FAGNILLI:  I'm almost --
21    A.  But this is clearly, you know, early 2006,
22    first half of 2006, if that helps you.
23    Q.  That's what I want to know.  You believe
24    that this is -- do you know who took the
25    photographs?
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 182

1     A.  No.

2     Q.  Do you believe this is the monument for Lot

3     15?

4     A.  I said I couldn't tell whether it's Lot 9 or

5     Lot 16.

6     Q.  There is a railroad fence that's shown on

7     the right-hand side of the photograph.  See that?

8     A.  Oh, yeah.  So it is Lot 16.

9     Q.  And does that railroad fence still exist?

10    A.  Yes.

11    Q.  Do you know if this is looking east or west?

12    A.  This would be looking east.

13    Q.  And the brush that's on the ground on the

14    left-hand side of photograph, is it your

15    contention that that's the Cambridge property?

16    A.  Yeah, you can see the fence there.

17              MR. ROBON:  Well, that's what I'm

18    saying.  Don't guess what it says.

19    Q.  You can see the fence there?

20    A.  Yeah, you can.

21    Q.  You can see the steel wire between the

22    railroad ties if you look.

23              MR. ROBON:  I sure as hell don't

24    see it.

25              MR. FAGNILLI:  I'm not asking you,

Page 183

 1      Marv.

 2                  MR. ROBON:   It looks like tree

 3      limbs to me.

 4      A.  And just so you understand, this is --

 5                  MR. ROBON:  You answered the

 6      question.

 7                  THE WITNESS:  He asked me another

 8      question.

 9                  MR. FAGNILLI:  I did ask him another

10      question before you interrupted, Marv.

11      Q.  Would you answer the question, please?

12      A.  But you said to the left.  We have to

13      clarify that.

14      Q.  Yes.

15      A.  This is a corner monument of the property,

16      okay? The Cambridge property comes like this and

17      like this, okay?

18      Q.  Okay.

19      A.  This is Cambridge property, this is, you

20      know, Gillette property over here.

21                  MR. ROBON:  Let the record indicate

22      he is indicating the left side of the picture as

23      Cambridge property.

24                  MR. FAGNILLI:  I think that's what I

25      asked.

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 184

```
 1        Q.  And it doesn't show any clearing on the
 2        Cambridge property in the photograph; is that
 3        correct?
 4        A.  You know, they didn't --
 5                  MR. ROBON:   Yes or no?
 6        A.  I think --
 7                  MR. ROBON:   Can you tell, yes or
 8        no?  Not what you think.
 9        A.  I would have to say it was right on the
10        border.  I really don't know whether they reached
11        in here and took this out or whether we cleared
12        all this.  I really can't say for sure.
13        Q.  You just don't know one way or the other?
14        A.  I don't know one way or the other.
15        Q.  You believe that this stake was put up
16        sometime after the clearing was done, is that
17        correct, the stake that's showing in Exhibit E?
18        A.  Yes.
19        Q.  When you first went out after the clearing
20        was done, did you see any survey stakes on the
21        property line with ribbons on them along the
22        Cambridge property and the railroad right-of-way?
23        You told us that you saw the painting on the
24        trees.  Did you see any of those ribbons?
25        A.  I think we also went through that.  I didn't
```

John McCarthy                                Old Granite Development vs. The City of Toledo, et al

Page 185

1    see -- I don't recall seeing lath.  I mean, it

2    was all pulled out; it was cleared.  So I don't

3    believe I saw any City lath, anything that was on

4    the ground at that time.

5    Q.  Did you take photos the first day that you

6    saw this?

7    A.  I don't know.

8    Q.  Again, I asked you these questions.  Marv

9    interrupted before we got through with this.  I

10   would like to get through with this.  I want to

11   know what you've done to preserve those

12   photographs so that we can be sure of the

13   integrity of the photographs that were taken, the

14   date they were taken, who took them and that they

15   haven't been altered.

16              MR. ROBON:   Don't answer it.

17   They've asked you three times.  I'm tired of it.

18              MR. FAGNILLI:  You've never let him

19   answer the question.

20              MR. ROBON:   He left them in his

21   computer is what he said and he gave some to the

22   City.

23   Q.  But you never let him answer the question as

24   to what he did to preserve the integrity of those

25   photographs.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 186

```
 1                    MR. ROBON:   If he did anything.  Go
 2          ahead and answer.  Let's get out of here.
 3          A.  I did my best.  I filed them.  I got some
 4          copies in the file.  I have them on my computer.
 5          I said earlier people screw around with your
 6          computer.  I don't know how much I got there.  I
 7          have to have my son -- my son kind of helps me
 8          with my computer to see just what I got in there,
 9          what I don't.
10          Q.  Do you have a different computer now than
11          you had back in spring of 2006?
12          A.  Yes, I got a whole new set-up, whole new
13          program and that kind of thing.
14          Q.  Did you throw the old box away?
15          A.  No, we just put new programs in it.
16          Q.  You didn't get a new computer box?
17          A.  No.
18          Q.  Did you switch from like Windows XP to
19          Windows Vista or something like that?
20          A.  I went to XP and some other things.
21          Q.  What kind of camera did you have, digital
22          camera?
23          A.  I have a -- I got a cheap one.  We had three
24          cameras.
25                    MR. ROBON:   Do you know what kind
```

Page 187

1       it is?  That's what he asked you.

2       A.  I don't know the brand.

3       Q.  What other cameras were used to take these

4       photographs other than the cheap one you don't

5       know the brand?

6       A.  We have -- my son's got one, it's a good

7       one, and I had another one at my house a friend

8       of mine lent me that was better quality.

9       Q.  Do you know what kind that is?

10      A.  No, I don't know what kind that one is.

11      Q.  Were all of those photos downloaded onto to

12      your computer?

13      A.  Yes.  All those that I took with my camera

14      or my friend's camera were downloaded on mine.

15      My son would have -- he sent me some, and he

16      downloaded them on his computer.

17      Q.  Now, when you take them on a digital camera

18      like that, you save them on a little disk that's

19      in the camera, right?

20      A.  Yes.

21      Q.  Have you erased the disk that's in the

22      camera?

23      A.  Yes, my cheap one I did because it only gave

24      you 30 or whatever.  The other one, like I say,

25      the one belongs to my friend, that's -- we might

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 188

1      be able to get at that disk.  He could save

2      hundreds, and he may have put in different disks

3      or something, but --

4      Q.  Who's the friend?

5      A.  My friend is Tom Heinemann, my neighbor, and

6      we have a -- and my son.

7      Q.  Does he live on the same street you live on?

8      A.  Down two blocks.

9      Q.  Where does he live?

10     A.  He lives on Sandusky Street.

11     Q.  Did you keep any kind of a log that would

12     tell you the dates when they were taken, the

13     photos were taken?

14     A.  Yes, I think all my cheap ones, they printed

15     right on the picture.

16     Q.  We have seen some digital photographs that

17     your lawyer has given us today that don't have

18     the date printed on them.  So that's why I'm

19     wondering, is there some other record when the

20     photographs were taken?

21              MR. DAVIS:  Objection, I don't

22     believe that Counsel has provided any photographs

23     today.

24              MR. FAGNILLI:  No, this Counsel

25     provided us.  Plaintiff's counsel provided us

Page 189

1     with photographs.

2                    MR. ROBON:  At a previous

3     deposition, but not today.

4                    MR. FAGNILLI:  Previous deposition

5     that we showed him today that don't have dates on

6     them.  So I'm trying to figure out how we are

7     going to be able to determine the dates these

8     photographs were taken, and is there any

9     independent log of the dates the photographs were

10    taken.

11    A.  I would have to look.  We have -- certainly

12    the ones that we have hard copies of, we did date

13    them.  You know, it's a year ago.

14    Q.  How many photos are there altogether?

15    A.  Oh, I'd guess there's 100, 200.

16    Q.  How long have you lived at the 529 Loomis

17    Drive address in Perrysburg?

18    A.  Since '85, 22 years.

19    Q.  No further questions.

20                    (Recess taken.)

21                       - - -

22                    CROSS EXAMINATION

23    BY MR. WAGONER:

24    Q.  Mr. McCarthy, my name is Greg Wagoner.  I'm

25    an attorney for CSX Transportation.  I'm going to

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 190

 1      ask you a few questions as well.  The same rules

 2      apply.  If anything is unclear, let me know, is

 3      that fair?

 4      A.  Yep.

 5      Q.  If you don't understand something -- but if

 6      you answer something, I'll assume you understood

 7      it.  Is that also correct?

 8      A.  Yep, yes.

 9      Q.  Who have you talked to at CSX about Old

10      Granite development?

11      A.  Probably three people.

12      Q.  Who?

13      A.  Gene Wheeler.

14      Q.  Who's Gene Wheeler?

15      A.  He was the road master.

16      Q.  Road master where?

17      A.  He told me he was road master from

18      Perrysburg to Dayton.  That was 2006.

19      Q.  Where was Gene Wheeler out of?

20      A.  Dayton.  I think he told me Dayton somewhere

21      because he had to drive all the way from Dayton

22      to meet with me.  This is at the very end of his

23      jurisdiction or his line is Bates Road, so

24      he's --

25                      MR. ROBON:  You've answered the

Page 191

```
 1    question.  What's the next guy?

 2               MR. WAGONER:  Hold on.  I'm not

 3    done.

 4               MR. ROBON:  Well, you said you were

 5    going to just ask three --

 6               MR. WAGONER:   Yeah, I know, but I

 7    was asking a question about Mr. Wheeler.  How did

 8    you get in touch with Mr. Wheeler?

 9    A.  Now, names are starting to come back.  Dan

10    Murphy was the real estate guy.  I'm pretty sure

11    that was his name.

12    Q.  He was an employee of CSX Transportation?

13    A.  Yes, in Jacksonville, I think.

14    Q.  How did you get in touch with Mr. Murphy?

15    A.  There is another guy, who I definitely can't

16    remember his name, but I do have it written down,

17    and I can produce the names of the guys I talked

18    to down in Jacksonville, one of the -- I don't --

19    it seems he was some kind of coordinator in

20    Jacksonville.

21    Q.  Coordinator of what?

22    A.  Like adjacent property owners or whatever,

23    something like that.  He was the one that told me

24    all this, how this whole thing works.  I was

25    calling them to find out, you know.
```

John McCarthy                                   Old Granite Development vs. The City of Toledo, et al

Page 192

1       Q.  How what whole thing works?

2       A.  Like the drainage, and what was the deal on

3       the City of Toledo coming down your railroad

4       line, and about bringing the trucks over the

5       railroad bed.

6       Q.  What trucks?

7       A.  The ones when we started building this

8       mound.

9       Q.  The 120 truckloads of dirt?

10      A.  One hundred truckloads.

11                  MR. ROBON:  It was a hundred.

12      Q.  A hundred truckloads of dirt.  Is this the

13      individual that you wrote the letter to that you

14      talked about earlier?

15      A.  I think the letter was to Dan Murphy.  He

16      seemed to be the main coordinator and was quite

17      helpful on how all these things go.  But I think

18      the name was Dan Murphy.  The letter was sent to

19      him asking them for permission to come on that

20      little stretch for so many months or something.

21      That's really the three.  I think I had three

22      contacts with CSX.

23      Q.  So those are three individuals you talked

24      to, correct?

25      A.  Yes.

Page 193

```
 1        Q.  How frequently did you talk with them?

 2        A.  I talked to Dan probably three or four

 3        times, and I talked to Gene once in person and on

 4        the phone once or twice.  And the guy in

 5        Jacksonville, the coordinator for this area, I

 6        sent him stuff.  He sent me -- I remember he

 7        faxed me some stuff, so I was in touch with him.

 8        Talked to him probably just once, but we went

 9        back and forth on like that.

10        Q.  Did you communicate via e-mail at all?

11        A.  I don't think with CSX, no.  By fax I think

12        we did.

13        Q.  So the only communication that you have with

14        CSX written was the one letter that you sent

15        regarding the hundred truckloads of dirt?

16        A.  No, I had more than that.  I'd sent them at

17        least two.

18        Q.  What other communications did you send them?

19        A.  I can't remember, but it was on one of those

20        subjects, you know, on drainage or the City of

21        Toledo coming down this line, and, you know, what

22        we -- how we could resolve this thing, that kind

23        of thing.

24        Q.  Were those e-mails or what were they?

25        A.  I believe the letters were letters that were
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 194

1      faxed, mailed, both.

2      Q.  Do you still have copies of those?

3      A.  I'm pretty sure I do.

4                MR. WAGONER:  Marv, could you

5      produce a copy of those letters?

6                MR. ROBON:   He is a consultant

7      expert.  If he gives them to me, I'll produce

8      them.  I've asked him for other things, and I

9      haven't gotten them.

10               MR. TASSE:  So they're friendly.

11               THE WITNESS:  I'll get them, whoever

12     wants them.

13               MR. ROBON:  Just being candid.

14     Q.  Mr. McCarthy, you talked about a lot of

15     documents.  Do you have an Old Granite file where

16     all this information is contained?

17     A.  Yes.

18     Q.  How thick is that file, roughly?

19     A.  Four inches.  Well, yeah, four, eight

20     inches, depending on whether you count drawings

21     and stuff.

22     Q.  What is contained generally in that file?

23     A.  Generally in there is we got photos and

24     these letters or addresses.  We wrote letters to

25     -- I wrote letters to the City and different

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 195

1      people, the County back in 2006 trying to get

2      them to agree to give us free dirt and different

3      things that we thought we could -- correspondence

4      like that.

5      Q.  And that's what, at your home office or

6      something?

7      A.  My home is my office.

8      Q.  You could easily make a copy of that file,

9      correct?

10     A.  Yeah.  It would be a lot of paperwork in

11     there.

12     Q.  But you know where it is?  You know how to

13     access it, correct?

14     A.  Yes.

15     Q.  So you said you have two communications,

16     written communications with CSX Transportation?

17     A.  Right, at least.

18     Q.  Is it two or more?

19     A.  I don't know.  I say it's at least two.

20     Q.  You know of two?

21     A.  Right.

22     Q.  To whom were those communications?

23     A.  Well, I said one went to Dan Murphy.  The

24     other one went to this other guy down there that

25     I do have his name.  I can get that for you.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 196

1      Q.  Would that be in your file probably?

2      A.  Yes.

3      Q.  Both individuals in Jacksonville, correct?

4      A.  Yes.

5      Q.  No written communications that you can

6      remember with Gene Wheeler?

7      A.  No, we didn't have any written

8      communications.

9      Q.  And the subject of the written

10     communications you had, what was the subject of

11     those communications?

12     A.  Well, I think -- we already said that.

13     Access to get into the property was the main one,

14     and I believe the other one was something about,

15     you know, railroad drainage, whatever, you know,

16     asking for information on that, if they had any

17     information on this, or the history of it or all

18     that kind of stuff.  One was more of a background

19     thing and the specific one was for, you know,

20     that access.

21     Q.  And the access was the hundred dump trucks,

22     correct?

23             MR. ROBON:   Asked and answered four

24     times already.

25     Q.  You have to answer out loud.

Page 197

1       A.  Yes.

2       Q.  You met Gene Wheeler out at the development

3       one time; is that correct?

4       A.  Yes.

5       Q.  What was the reason for that?

6       A.  I had a couple of reasons.  We talked about,

7       you know, the property line.  I was showing him

8       how the contractor was over the line on our

9       property.  We looked at the wall, this wall, and,

10      you know, we talked about how they could, you

11      know, how they could have got off that far into

12      our property.

13      Q.  How who would have got off that far?

14      A.  You know, the contractor for the City, you

15      know.  I was really asking them, you know, "Did

16      you know they were doing all this stuff and that

17      this is -- they came onto our property and all

18      that?"

19      Q.  What did he say?

20      A.  He said, well, he said, "Well, we made kind

21      of a deal, if the City gets down all those trees,

22      we give them this ditch he could fill with dirt

23      over on the center ditch.

24      Q.  What trees are you talking about?

25      A.  The trees that were along the property line

1       and the trees that were on our property line, so

2       they're on the Cambridge property.

3                   And he is going like, "Well, you know,

4       so they went a little bit over on your" -- I

5       said, "But why did they have to take the trees

6       down anyways?  All you had to do was put this

7       six-foot diameter pipe down the center.  What the

8       heck is going on here."

9                   He says, "You know, hey, we want all

10      those trees -- CSX wants all those trees out of

11      there.  We made a deal with Ric-Man that, you

12      know, what the heck, while you are there with

13      this big equipment, get them all down.  Get them

14      all out of here."  He didn't realize they were

15      going to go over on the Cambridge property.

16      Q.  When you talked to Mr. Wheeler, he indicated

17      to you that he had no knowledge that Ric-Man

18      would go off CSX property, if they actually did?

19                  MR. ROBON:  If you know.

20                  MR. TASSE:  I'll object.  Object to

21      the form.

22                  MR. BAHRET:  I object too because I

23      object to the implication that anybody went off

24      the railroad property.

25      Q.  Yeah, if they did at all.

```
 1                    MR. TASSE:  I object if Ric-Man did
 2        the clearing.  Vermillion did.
 3                    MR. WAGONER:  That's fair.
 4                    MR. TASSE:  Vermillion did the
 5        clearing.
 6                    MR. FAGNILLI:  Then I object.
 7        A.  We talked about those kind of things.  I
 8        believe I asked about the drainage.  He said, "I
 9        don't know anything about drainage.  I take care
10        of 150 miles or something of this stuff," these
11        old things like that.
12                    But that is what we were talking about
13        was right after the clearing and the property
14        line.  You know, he made it sound like as if CSX
15        was -- you know, not only that, he himself talked
16        to Ric-Man's superintendent or someone in Ric-Man
17        to make this arrangement that, "Yeah, we are
18        going to get all of these trees down."
19        Q.  How do you know that?
20        A.  He told me that.
21        Q.  What did he say specifically?
22        A.  Well, now, this was back at 2006.
23        Q.  What did he say?
24        A.  April, March.
25        Q.  Who did you meet with?
```

Page 200

```
 1      A.  The same, probably March or April of 2006.

 2      And, you know, he is like, "Hey, you know, we can

 3      take all these trees down," and, you know, he was

 4      going on like that.

 5      Q.  Is there anything wrong with CSX taking

 6      trees down on their own property?

 7                MR. ROBON:  Objection, calls for a

 8      legal conclusion.

 9      Q.  You can answer.

10                MR. ROBON:  Are you referring to

11      wetland trees or regular trees?

12                MR. BAHRET:  There are no wetland

13      trees on their property.

14      Q.  You can answer.

15      A.  Well, my understanding is that, you know, if

16      they are wetland trees, you know, they shouldn't

17      be taken down.  You shouldn't be taking any more

18      than you need to put your pipeline in.

19      Q.  What if they're not wetland trees?

20      A.  That's the only regulatory that you, other

21      than endangered species, that's the only thing

22      you have to worry about.

23      Q.  So if they're not wetland trees, there's is

24      nothing wrong with CSX taking trees down on their

25      own property, correct?
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 201

```
 1      A.  There was one --

 2      Q.  That's either a yes or no question.  Is that

 3      correct or incorrect?

 4              MR. ROBON:  I'll answer that because

 5      there is certain trees you can't take down with

 6      --

 7      A.  It's incorrect.

 8      Q.  Why?

 9      A.  To my way of seeing clearing, and we have

10      done miles of clearing along property lines, the

11      trees -- first you got to have a definition of

12      what are the trees.  The stump trees are what

13      you're probably talking about.

14              But when you're going along a property

15      line, if somebody else's trees are growing into

16      your trees, at least in common construction that

17      we did, you can't be taking out their trees that

18      have grown into your trees.

19              You can't be just knocking them down,

20      taking them out.  You have to do it by hand.  You

21      can't just go, depending on how you're doing it,

22      taking out somebody else trees that have grown

23      into yours.

24              You have to be a good neighbor and try

25      to preserve as best you can whatever trees he has
```

Page 202

```
 1      because those -- like your trees will grow out

 2      there, his trees grow in here.

 3      Q.  Let's go back to my question.

 4              MR. BAHRET:  Move to strike.  It

 5      wasn't responsive.

 6              MR. FAGNILLI:  I join in that

 7      motion.

 8      Q.  Is it your testimony that there is nothing

 9      wrong with CSX Transportation taking down trees

10      on their property, yes or no?

11              MR. ROBON:  Objection.

12      A.  They can't always take the trees down on

13      their property.

14      Q.  When were the trees taken down on CSX

15      property?

16      A.  What were they?

17      Q.  When were they?

18      A.  When they did the clearing.

19      Q.  When was that?

20              MR. ROBON:  Objection.  My god, it's

21      been answered -- don't answer it.  You've

22      answered it four times.  I'm not letting you

23      answer it again.

24              Go to the next question.  If you

25      want to call the judge, go ahead.
```

John McCarthy                           Old Granite Development vs. The City of Toledo, et al

Page 203

```
1         Q.  So you don't remember when -- when did you
2    -- you testified earlier you went down backwards
3    down the manhole, correct?  You have to answer
4    out loud.
5         A.  Yes.
6              MR. BAHRET: He said upside down, not
7    backwards.
8         Q.  Upside down, right.  Correct?
9         A.  Yes.
10        Q.  You snapped some photographs, correct?
11        A.  Yes.
12        Q.  How many photographs did you take, if you
13   remember?
14        A.  A few.
15        Q.  Six?
16        A.  A few, I don't know.
17        Q.  You were with your son when you did that,
18   correct?
19        A.  I think so.
20              MR. ROBON:  Objection, asked and
21   answered.
22        Q.  When was that done?
23        A.  Right after the clearing.
24        Q.  Whose permission at CSX did you ask to come
25   on the property and snap those photographs?
```

Page 204

```
 1      A.  The only -- I had no -- back in that time I

 2      didn't have any permission.

 3      Q.  So you did not ask for permission, correct?

 4      A.  That's right.

 5      Q.  At that time.

 6      A.  At that time.

 7      Q.  So is it fair to say that at the time you

 8      took those photographs, you're trespassing on CSX

 9      property?

10              MR. ROBON:  Objection, don't answer.

11              MR. FAGNILLI:  What's the basis for

12      not answering?

13              MR. ROBON:  He is invoking the Fifth

14      Amendment.

15              MR. FAGNILLI:  I didn't realize he

16      was doing that.

17              MR. BAHRET:  He's got to do it.  You

18      can't afford him.

19              (Off the record.)

20      Q.  (By Mr. Wagoner) Mr. McCarthy, you sent

21      several e-mails regarding the Old Granite project

22      to Christy Soncrant among others?

23      A.  Yes.

24      Q.  I'm going to go over some of those emails

25      with you quickly.
```

John McCarthy                    Old Granite Development vs. The City of Toledo, et al

Page 205

1      A.  Okay.

2      Q.  Mark this as McCarthy Q.

3              (Defendant's Exhibit Q marked

4              for identification.)

5      Q.  This is a June 4th, 2006, e-mail that you

6      had sent to Ms. Soncrant, correct?

7      A.  Yes.

8      Q.  You have to look down.  There's the FYI up

9      top.  It looks like your e-mail is --

10     A.  I'm looking at the top, something sent.

11     Q.  I want to refer you -- I'm not going to go

12     through this paragraph by paragraph.  I want to

13     refer you to paragraph three where you said, "CSX

14     indicated to me that they were in direct contact

15     with Ric-Man about doing some extra clearing

16     while Ric-Man's sub was doing your water main

17     clearing."  Do you see that?

18     A.  Yes.

19     Q.  Who at CSX communicated that to you?

20     A.  The only one that I was talking about on

21     that subject was this Gene Wheeler.  Is that what

22     you mean?

23     Q.  Yeah.

24     A.  The CSX guy, yes.

25     Q.  That's the only individual, correct, at CSX?

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 206

```
 1        A.  Yes, the only one I really talked any detail

 2        like this was Gene Wheeler.

 3        Q.  And you exchanged no written communications

 4        with Mr. Wheeler?

 5        A.  Not that I recall.

 6        Q.  You have none in your file?

 7        A.  No.

 8        Q.  Then the next sentence says, "I can

 9        understand that CSX might have wanted your

10        contractor to clear the heavy growth along the

11        right-of-way line that they had neglected."  Do

12        you see that?

13        A.  Same paragraph?

14        Q.  Correct, the next sentence.

15        A.  If you would have seen it -- you're on

16        the third paragraph?

17        Q.  I'm asking you to read the second sentence

18        in that third paragraph.

19        A.  I'm on the fourth paragraph.  "CSX indicated

20        to me that they were in direct contact with

21        Ric-Man about doing some extra clearing while

22        Ric-Man sub was doing your water main clearing.

23        I can understand that CSX might have wanted your

24        contractor to clear the heavy growth along the

25        right-of-way lines that they had neglected, but
```

Page 207

```
 1    stayed back from with heavy clearing of equipment
 2    now that homes were built."
 3    Q.  I just want you to read that one because I
 4    don't want to get --
 5    A.  Okay.
 6    Q.  How do you know that CSX neglected this
 7    area?
 8    A.  As far as the trees?  That they had grown up
 9    all these years.  They had never done the cutting
10    of the trees.
11    Q.  Had you been in this area before the trees
12    were cut down?
13    A.  Yeah, generally in this area.  Now, I
14    wasn't --
15            MR. ROBON:  Yes or no.  You answered
16    the question.
17    A.  I have seen this area, yes.
18    Q.  My question is how do you know it was
19    neglected because by the time you were there, the
20    trees were cut down?
21    A.  The stumps indicated and whatever was laying
22    around that there was some big trees that were
23    cut, and they didn't grow up, you know, in ten
24    years.  These were major trees, and that's what I
25    was talking about here.  If it had been
```

Page 208

1    neglected, that's what I meant.

2    Q.  So is it your testimony that since these

3    trees were neglected, they should have been cut

4    down?

5    A.  No.  Why is he cutting them down now under

6    the guise of this water main contract, you know.

7    Q.  I don't understand.

8    A.  Here's this big piece of equipment from, you

9    know, Vermillion, and now you're letting CSX take

10   down all these trees along the edge, you know,

11   that they've neglected for years.  They want to

12   take advantage of them having this big piece of

13   equipment in there and getting them down.

14   Q.  What is wrong with that?  What's wrong with

15   CSX taking trees down along their property?

16   A.  They shouldn't be taking it down on the

17   guise of this water main, as I'm telling her.

18   "You didn't need to take these down for the water

19   main.  You let CSX do this, you know."

20   Q.  Did you write these e-mails yourself?

21   A.  Yes.

22   Q.  Why did you CC Mr. Robon on these e-mails?

23   A.  Because we are already into this thing.

24   What time is this?  This is June.  We are meeting

25   with the City, we are trying to get this settled.

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 209

 1      We had meetings with the City trying to get them

 2      to build a mound, get some money from them to

 3      replace these trees and all this stuff.  So we

 4      were already -- Marv was already involved.

 5      Q.  Before you sent these e-mails out, did you

 6      send them to Marv to review them?

 7      A.  No.

 8      Q.  Then in the last paragraph --

 9           MR. ROBON:  If he did, they wouldn't

10      have gone.

11      Q.  The second-to-last paragraph on that page

12      that begins with lastly?

13      A.  Yes.

14      Q.  There is a sentence in the middle of that

15      paragraph.  It says, "CSX might donate the real

16      estate rights for their role in the excess

17      clearing"?

18      A.  Uh-huh.

19      Q.  Do you see that?

20      A.  Right.

21      Q.  Yes?

22      A.  Yes, I see it.

23      Q.  What do you mean, that CSX should donate

24      that entire right-of-way?

25      A.  No.  What we were talking about, at this

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 210

1       time we were about ready to build a mound.  And

2       we really wanted to build the mound up on the

3       railroad because it would save us a lot of

4       trouble, and at least we wanted to be able to

5       build up along the edge, raise the edge of it

6       five or ten feet so we wouldn't be so far back

7       into the backyards.

8                And that's what I think I'm referring

9       to there that -- as far as we were talking about

10      this mound that we wanted time to build up.  That

11      was all the rage now; we had to have this mound

12      built, and we were in the process of maybe

13      building it.

14      Q.  Before this, before Old Granite, before this

15      development with your time with the Army Corps of

16      Engineers, had you dealt with CSX on a regular

17      basis?

18      A.  Every year or two.

19      Q.  Are you familiar with working with them?

20      A.  Yes.

21      Q.  You knew who to talk to?

22      A.  Those people were not around anymore.  I

23      didn't know any -- I didn't really know anybody

24      anymore.

25      Q.  Have you ever done any projects out at the

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 211

```
 1     docks, the CSX docks?

 2     A.  Yes, that is where I saw them because the

 3     Corps really is involved in all the shipping

 4     stuff and that, the dredging and that.

 5               (Defendant's Exhibit R marked

 6               for identification.)

 7     Q.  Mr. McCarthy, I'm handing you Exhibit R.

 8     This is an e-mail that looks like you sent on

 9     August 19th to Christy Soncrant?  Do you see

10     that?  You have to go down.

11     A.  Yep.

12     Q.  I'm referring you to the fifth paragraph.

13     A.  The big one?

14     Q.  Correct.  It says, "See my other e-mail."

15     A.  Yeah.

16     Q.  That first sentence ends that, "The

17     probable," and take as much time as you want to

18     read this over.  "The probable impact of your

19     project on the impact of CSX's long-term neglect

20     of drainage to the general area and Cambridge."

21     A.  Uh-huh.

22     Q.  Do you see that?

23     A.  Yes.

24     Q.  What did you mean by that?

25     A.  Like I was talking earlier, I had already
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 212

1    talked to the neighbor.  He said that, you know,

2    Gillette, and they said, you know, "They haven't

3    been a good neighbor anyway.  They haven't taken

4    care of this cross drain."

5              And that was really the -- I don't

6    know if it was the only thing, but that was

7    probably the thing that I was referring to there,

8    that they haven't been a good neighbor as far as

9    keeping the drainage working.

10   Q.  Again, the only person that told you that

11   was, I don't know if it's Mr. Gillette, but

12   Gillette's son-in-law?

13   A.  Yeah.  He told me that and the county

14   drainage engineer, he also, the Glenn Agner that

15   we deposed, he confirmed it was there.  He

16   also --

17   Q.  He confirmed that what was there?

18   A.  That the pipe was there, and that CSX, they

19   probably did neglect it.

20   Q.  What is that based on?

21   A.  His experience with CSX.

22   Q.  But not on this specific drain, correct?

23   A.  No, he was not --

24   Q.  He had no knowledge of this specific drain,

25   correct?

John McCarthy                                Old Granite Development vs. The City of Toledo, et al

Page 213

```
 1        A.  That's right.

 2        Q.  And neither did you?

 3        A.  Before the clearing?

 4        Q.  Correct.

 5        A.  Yes.

 6        Q.  Then you talk about, "CSX is apparently

 7        directing your contractor to change the center

 8        drainage ditch and to abandon the 24-inch

 9        crossover storm drain that Cambridge relied on to

10        get flood water past their property to Bates

11        Road."  Do you see that?

12        A.  Yeah, I heard it.

13        Q.  Take your time to read it, too, if you need

14        to.

15        A.  That same paragraph?

16        Q.  Correct.  What's that based on, CSX

17        apparently directing the City's contractor?

18        Where did you get that information?

19        A.  Just the only direct thing I knew was that

20        from Gene Wheeler, you know.  I didn't ask him

21        for it.  He just told me that was the way it

22        went.

23        Q.  So Gene Wheeler told you that CSX had

24        directed the City to bypass that drain?

25        A.  No, they had made arrangements with Ric-Man.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 214

1      I can't remember whether he said he did it or
2      what, but that they had made arrangements with
3      Ric-Man to trade trees for disposal areas,
4      including the center ditch.
5      Q.  "We had already had minor problems with CSX
6      flooding Cambridge's backyards."  Do you see that
7      sentence in there?  What prior flooding problems
8      had you had?
9      A.  I think what I was talking about is because
10     they haven't -- this guy was telling me back in
11     '85 they had had problems before with CSX not
12     keeping that drain working a hundred percent.
13     Q.  So 21 years before there was -- he told you
14     of one example 21 years ago or 21 years prior to
15     this e-mail?
16     A.  Well, he told me more than that.
17     Q.  What else did he tell you?
18     A.  He said that he had to maintain the darn
19     thing because CSX won't come out.  They don't
20     even treat Toledo Terminal as if it's theirs.
21     Q.  What do you mean?  What do you mean they
22     don't treat Toledo Terminal like it's theirs?
23     A.  Like as if they don't even know it.  There's
24     not anybody around anymore that even knows it's
25     there.  They don't even take him seriously.  But

Page 215

```
 1      that was the flavor of his thing was that he

 2      himself, every time it rained real hard, all the

 3      water from Hospice and that all came down, and

 4      they relied on that thing.  And he had to go out

 5      there, make sure the manhole wasn't plugged up.

 6      Q.  So he would go out there himself on CSX

 7      property and unplug the manhole?

 8      A.  He said he did that himself, and the time in

 9      '85, they had a big pile of dirt on the other

10      side outlet.  So he's -- and he couldn't do

11      anything about that because they were doing some

12      construction or something.  So he says that was

13      the other -- old railroad lines and that, he

14      says, they neglected.  That's what I was trying

15      to say here.

16      Q.  If you go down further in that chain of

17      e-mail, if you go to page two, this is your

18      e-mail on August 3, 2006, to Christy.  The second

19      paragraph where you talk about your familiarity

20      with these lopsided agreements between railroads

21      and oil companies?

22      A.  Yes.

23      Q.  Do you see that?

24      A.  Yes.

25      Q.  What are you talking about there?
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 216

1      A.  We're talking about this, the agreement

2      between --

3                MR. ROBON:  Objection, the document

4      speaks for itself.  But you can answer.

5      A.  That document that was between, this

6      agreement between the City and CSX to allow the

7      City of Toledo to put the water main down the

8      railroad line.

9      Q.  What other agreements are you aware of

10     involving railroads or oil companies?  You said

11     you're quite familiar?

12     A.  Well, we in the Corps dealt quite a bit with

13     the railroad, and even though I wasn't an

14     attorney dealing with, you know, the agreements

15     and such, that I suppose that's what I was

16     referring to is some of our past experience with

17     the railroad that these agreements are all on

18     their side.

19                And even the City of Toledo told us,

20     you know, we had meetings there last summer that

21     they --

22     Q.  What was the silver lining?  In the next

23     sentence you say, "But a cup of silver linings

24     for Cambridge and the City can emerge."  What did

25     you mean by that?

Page 217

```
 1      A.  Second paragraph?  You're still on the

 2      second paragraph?

 3      Q.  Yes.  And then it say the millions of

 4      liability coverage the City paid for only CSX

 5      liability can lead to a simplified and expedited

 6      solution."  Do you see that?

 7      A.  Yes.  I think I'm -- or maybe there is some

 8      assurety that we can get the mound paid for.

 9      Q.  So is that what you meant?  You were looking

10      to get the mound paid for?

11      A.  That is what we were after.  At this time

12      last year we were trying to go -- we met with the

13      City to try to get money to build a mound and put

14      trees on top of it.  They even agreed to do some

15      of it, and we thought maybe -- I thought maybe

16      one of the -- or charity could help pay for some

17      of this stuff.

18      Q.  Had you had some bad experiences with CSX in

19      the past?

20                  MR. ROBON:  Objection, you can

21      answer.

22      A.  Bad?  What do you mean bad?

23      Q.  Did you dislike CSX?

24                  MR. ROBON:  Objection.  That calls

25      for a personal opinion.
```

Page 218

```
 1     A.  No.  We dealt with all the railroads and,
 2     you know.
 3     Q.  Why did you refer to CSX as distant and
 4     aloof?
 5               MR. ROBON:  Because they are.
 6     A.  They are.  They're in Jacksonville.  There's
 7     50 million departments.  We have to go through
 8     hell to get any answers from them.
 9     Q.  Do you know how many people they employ in
10     the Toledo area?
11     A.  Who?
12     Q.  CSX.
13               MR. ROBON:  Objection, irrelevant.
14     A.  No, I don't.
15     Q.  Who is the guy you worked with at the Corps
16     of Engineers who -- regarding the flooding or the
17     drainage issue?  Scott, Bob Scott?  You talked
18     about him earlier.
19     A.  There was a -- Gary Buck is our wetlands
20     guy.
21     Q.  Gary Buck?
22     A.  Yes, he was retired wetlands guy from the
23     Corps of Engineers.
24     Q.  Have you exchanged a lot of e-mails between
25     you and Mr. Buck regarding Old Granite?
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 219

1      A.  Not really.

2      Q.  You have?

3      A.  We have got some.

4              MR. FAGNILLI:  Is he going to be an

5      expert for you in this case, Gary Buck?

6              MR. ROBON:  Possibly.  I haven't

7      talked to him yet.  Possibly.  When he was with

8      the Corps, he was impossible to get ahold of, and

9      he is still impossible.

10             MR. FAGNILLI:  It's kind of ironic

11     to have a guy from the Corps talking about

12     arrogant and aloof.

13             THE WITNESS:  Not our department.

14             MR. FAGNILLI: When you try to get a

15     permit or something.

16     Q.  (By Mr. Wagoner) What do you think CSX did

17     wrong here?

18     A.  Well, I think, you know, they shouldn't have

19     encouraged, gone along with this deal to take

20     down all those trees.  That was the number one

21     thing.

22             Secondly, they should have gone and

23     known about, and when they let the City go on

24     this property to explain that they did, maybe it

25     was a hundred years ago, but they did have an

Page 220

1      active culvert.  Maybe it wasn't in good shape,

2      but they should have told or known that or when

3      the City, I believe they asked, should have been

4      able to explain that.  But those are the two main

5      things, the drainage and the excess trees being

6      cut down on the edges.

7      Q.  What should they have done?

8              MR. ROBON:  Objection. You can

9      answer.

10     A.  They should have dug it a little deeper and

11     found out that there was a drain there and it's

12     needed.  And rather than just let the City

13     stumble around and not knowing what the hell it

14     was or whatever --

15     Q.  But you, yourself, have never done any

16     drainage studies to indicate that that drain is

17     needed, correct?

18     A.  We have done some preliminary work, yeah, I

19     have.

20     Q.  Do you have a copy of that study?

21     A.  Yes.

22     Q.  Is it in your folder?

23     A.  Yes, it is.

24     Q.  If it's determined that all these trees are

25     on CSX's property, is it your testimony that with

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 221

1     respect to the trimming of the trees or the

2     removal of the trees that CSX did nothing wrong?

3                    MR. ROBON:  Objection, calls for a

4     legal conclusion.

5     A.  I think we've already established that, you

6     know.

7     Q.  When is the last time you had contact with

8     anyone from CSX?

9     A.  2006.

10    Q.  When Mr. Wheeler came out?

11    A.  No.  I was still talking to Dan Murphy I

12    think after that.

13    Q.  You have had no direct communications after

14    the filing of this lawsuit?

15    A.  Right.

16                    MR. WAGONER:  That's it.  No more

17    questions.

18                    MR. ROBON:  We reserve signature.

19                    MR. BAHRET:  We are not done.

20                    MR. ROBON:  Show an objection to

21    there was no direct exam.  These are all cross,

22    so the second bite of the apple I don't think

23    they're entitled to.

24                    MR. BAHRET:  Well, we are doing it

25    anyway.

Page 222

```
 1                    MR. ROBON:  I'm sure you'll be

 2       concise.

 3                    MR. BAHRET:  I'll try.

 4                         - - -

 5

 6                    RECROSS EXAMINATION

 7       BY MR. BAHRET:

 8       Q.  Mr. McCarthy, when you were talking with

 9       Jeff Tasse, you were talking about a wall or a --

10       a wall made of railroad ties.  Do you remember

11       that discussion?

12       A.  Yes.

13       Q.  My understanding is this wall was five or

14       six feet tall?

15       A.  Yeah, about five feet tall.

16       Q.  And it was, looking at the map of the

17       development, it would be along Lots 14, 15 and

18       that portion of 16 that abuts the railroad

19       property?

20       A.  Yes.

21       Q.  And you can't see the entirety of that wall

22       now because dirt has been put there since this

23       project?

24       A.  You can still see it down in that trench, if

25       you look down in there.
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 223

1        Q.  What I meant, and I'm not sure you

2        understood, it doesn't look the same now.  It's

3        not like there is a five-foot wall that you can

4        walk up to and see it and touch it?  You can see

5        a portion of it?

6        A.  I think we --

7                MR. ROBON:  Yes or no is how you

8        answer that question.

9        A.  That it's the same now as it was then is

10       what you're asking, right?

11       Q.  I'm saying based on testimony and what I've

12       seen out there, I'm assuming it is not the same

13       now than it was then?

14       A.  That's true.

15       Q.  So on the day that this land clearing took

16       place, the land clearing device would have been

17       five feet higher than the bottom of the back of

18       these lots?

19       A.  Yes.

20       Q.  At least in that section of the Cambridge

21       property, it would be virtually improbable to

22       clear the land on the other side of the wall; is

23       that right?

24       A.  No, they had major equipment.  They reached

25       right in and pulled it out.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 224

```
 1      Q.  They reached over this five-foot wall?
 2      A.  Oh, yeah, and they were sitting right up on
 3      top.
 4      Q.  You saw that?
 5      A.  No, I didn't see it, but I knew the trees
 6      were there.  It was all gone by the time I got
 7      there.
 8      Q.  They pulled trees out, stump and all?
 9      A.  Yes, anything that came out.  You know,
10      smaller stuff was pulled out, and the top
11      railroad ties were knocked off.
12      Q.  If land was cleared, if a sizeable tree was
13      cut, it would have been cut at least five feet
14      higher than ground level then, correct?
15      A.  Oh, no, no.  This type of a -- this
16      Hydro-Axe cut them right in the dirt, okay?
17      That's the beauty of it.  It actually spins the
18      dirt and throws everything.
19      Q.  It will cut five feet lower than where the
20      device is?
21      A.  It will cut right down to -- you know, you
22      could.  You know, it's on a back front-end
23      loader, and you could go and set the thing down.
24      But in this case, I don't think we are really --
25      he just cut the top.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 225

```
 1      Q.  Let me ask you about the other side of the
 2      development, the side closer to Hospice, which I
 3      think is Lots 9, 10, 11, 12, 13, so forth.
 4      A.  Right.
 5      Q.  Would you agree with me on that side of the
 6      development that the boundary stakes that
 7      Peterman staked there and that the City staked
 8      there are on the opposite side of the ditch as
 9      the railroad right-of-way?
10      A.  They're down in the ditch, down in the
11      bottom of the ditch.
12      Q.  On the side of the property where Lot 9 is?
13      A.  Yes.  There was a ditch all along there,
14      okay?  There still is.
15      Q.  Yeah.
16      A.  And the property line is right down at the
17      bottom of that ditch, okay?
18      Q.  How sure of that are you because I've got
19      photographs.
20      A.  I've got photographs too before, and what
21      you have to remember --
22      Q.  Has the ditch changed?
23      A.  Yes.  They filled the ditch in, too.
24      Q.  There is not a ditch there now?
25      A.  They made it so it's much more vertical.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 226

1       They filled the top of that ditch in, and the
2       property line -- you may see that the stakes may
3       be up near the top of that embankment now because
4       they filled that in.
5       Q.  The stakes that I've got pictures of, and if
6       we go out there you can see, are not in a ditch.
7       They're on the Cambridge side of the ditch.
8       A.  And are you talking about property line?
9       What, you think they're property line stakes?
10      Q.  Yeah, but they're Peterman stakes.
11      A.  But they're right down at the bottom of that
12      ditch.
13      Q.  All right.  Well, then we will just agree to
14      disagree and let the jury see the photos.  But
15      your testimony is that the ditch is not in the
16      same place now as it was then?
17      A.  The side of the ditch is not the same, okay?
18      Q.  One side of it?
19      A.  One side.  The bottom of it is the same.
20      Q.  So if we can find the bottom of the ditch,
21      we know where the ditch was even on the day this
22      here was done?
23      A.  On those lots up at the end, yes.
24      Q.  Now, one other topic I wanted to address,
25      and that is my understanding of your testimony is

Page 227

```
 1      that the -- although you said that in your view

 2      Cambridge relied upon this ditch and the manhole

 3      with the crossover tile?

 4      A.  Right.

 5      Q.  That it did not support drainage from Lots

 6      15 or 16; is that correct?

 7      A.  It was used for the whole development, the

 8      whole development.

 9      Q.  How would drainage from Lot 15 or 16 get to

10      that, get in the manhole?

11      A.  Before it went right down that feeder pipe,

12      a one-inch diameter pipe that went to the manhole

13      underneath that -- right behind that wall.  Right

14      behind the wall there is a 12-inch diameter pipe

15      that runs that whole distance past 15, 16.

16      Q.  But there is no opening to gain access to

17      get water in that pipe?

18      A.  Yes, there is; it's wide open.  We got

19      pictures of it.

20      Q.  Where is the opening?  My understanding is

21      that this pipe that you're talking about, it's a

22      total circumference?  It's a pipe?

23      A.  Right, it's a 12-inch diameter clay pipe.

24      Q.  It begins somewhere down near Lot?

25      A.  14 -- 13, 13.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 228

1      Q.  13.

2      A.  13.

3      Q.  And then it is solid and underground?

4      A.  Underground behind the wall.

5      Q.  And goes to that manhole?

6      A.  Manhole, right.

7      Q.  And then another pipe goes into that manhole

8          where the only opening to that pipe is you said

9          250 feet away on this other guy's property?

10     A.  Right, both of them come to the manhole.

11     Q.  So there is no access to that pipe or the

12         manhole from Lots 15 -- actually, 14, 15 or 16?

13     A.  That's true; it's underground.

14     Q.  So it can't possibly be supporting drainage

15         from Lots 14, 15 and 16?

16     A.  Not so.

17     Q.  How could it support drainage from those

18         lots?

19     A.  When our -- when we are overwhelmed with

20         flood waters, that water is going to go down, you

21         know, go down to both ends of that.  You know, we

22         are talking about two, three, four feet, six feet

23         of water, which this guy saw at Cambridge, four

24         feet up into my kid's house, which is what it

25         would be, that water is going to go back in both

Page 229

```
 1      ends of that pipe or would have.
 2      Q.  Have they had water like that since this
 3      land clearing was done?
 4      A.  No, of course not.
 5      Q.  All right.  You're talking about a small
 6      amount of ponding at the back corner of Lot 16,
 7      correct?
 8      A.  I'm not.  I'm talking about that you can't
 9      even develop this place.  You know, if the county
10      was doing their job, we wouldn't even have a
11      building permit.
12      Q.  You're talking about Lot 16, correct?
13      A.  16, 15, 14, all the way up through there you
14      could have major flooding.  You're going to drain
15      all of Hospice, W.W. Knight down through there
16      and it has no place to go now.
17      Q.  I'm not talking to you about what could
18      happen in theory.  I'm asking what you have seen,
19      and you described it as ponding?
20      A.  That's true.
21      Q.  Where did you see the ponding?
22      A.  Only at Lot 15, 16 and that.
23      Q.  All right.  And this ponding is not
24      sufficient, this ponding that you've seen cannot
25      get off that property by use of this underground
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

 1       pipe, correct?

 2       A.  That little bit there, it can't get around

 3       to the ends of it.

 4       Q.  All right.

 5       A.  It's not backed up enough.

 6       Q.  So whatever ponding you've seen has nothing

 7       to do with cutting the crossover pipe?

 8       A.  That's not quite so.

 9       Q.  That's got to be so.  You tell me how it's

10       not so.

11       A.  Because what we talked about earlier.

12       Q.  I don't remember what we talked about

13       earlier.

14       A.  Water is coming back.  We've got pictures of

15       it flowing -- a pipe that we put -- we put a

16       drain into that -- we put a pipe into that

17       12-inch --

18       Q.  The pipe that is underground and goes behind

19       Cambridge, whether you call it the end or the

20       beginning at Lot 13 is in a ditch?

21               MR. ROBON:  Can we clarify one

22       thing.  It's not a pipe; it's a field tile.

23               THE WITNESS:  It's a pipe, Marv.

24       Nice try.

25               MR. BAHRET:  But he said it's a

Page 231

```
 1      pipe.

 2                  THE WITNESS:  Marv, but it's solid.

 3      It's a solid pipe.

 4                  MR. BAHRET:  Go back to sleep, Marv.

 5      A.  It's a solid pipe.

 6      Q.  I understood that.  I think Marv missed it.

 7                  MR. ROBON:   I didn't understand

 8      it's a solid pipe.

 9      Q.  That pipe, whether you call it the beginning

10      or the end behind Lot 13, it's in a ditch,

11      correct?

12      A.  It's in the bank.  From there it's buried.

13      Q.  Well, it comes out somewhere?

14      A.  I think it comes -- it goes into the

15      manhole.

16      Q.  The other end --

17      A.  Right.

18      Q.  That's in a ditch, correct?

19      A.  The other end does the same thing.  The

20      other end runs up a couple hundred feet the other

21      way.  That's the low point right there where that

22      manhole is, and that drain and stuff --

23      Q.  Sir, I really find it hard to believe that

24      you don't understand this question.  There are

25       two ends of this pipe.
```

John McCarthy                        Old Granite Development vs. The City of Toledo, et al

Page 232

```
 1      A.  Right.
 2      Q.  One is in the manhole, right?  Am I right?
 3      A.  Yeah, the pipe you're talking about.
 4      Q.  I want to talk about the other end of that
 5      pipe?
 6      A.  Yes, on Lot 13.
 7      Q.  And it ends or begins, however you want to
 8      look at it, behind Lot 13?
 9      A.  Right.
10      Q.  It's not on Lot 13; it's behind Lot 13,
11      correct?
12      A.  Right.
13      Q.  And that spot where it begins or ends is in
14      a ditch; is that correct?
15      A.  That's down at the bottom of a ditch.  That
16      ditch goes right into it.
17      Q.  And so if water is coming backwards, as you
18      put it, because of the crossover drain, that
19      water would be in the ditch?
20      A.  It would back up to that ditch.
21      Q.  And the only way water is going to get on
22      Cambridge property from what you allege is water
23      coming backwards is if the ditch completely
24      floods?  Am I right?  That seems real simple.
25      A.  Yeah.  There is a little ditch.  Then the
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

                                                                              Page 233

     1     water doesn't go down the pipe.  The water moves

     2     out to the ditch in front of this wall.

     3     Q.  Okay.

     4     A.  And it comes down and feeds that pond in

     5     front of and behind Lot 15, 16.  It backs up and

     6     goes around and goes around the front.  Same with

     7     the other end; it goes back around that way.

     8     Q.  How does it get out of the ditch to come

     9     around and feed the pond?

    10     A.  It's an open gravity pipe.  It just, you

    11     know, comes right back around.  It's almost a

    12     flat property.

    13     Q.  The ditch where this pipe terminates?

    14     A.  Yes.

    15     Q.  It's a ditch from that spot all the way down

    16     toward Hospice, isn't it?

    17     A.  Yeah, but it's running towards us.  You

    18     know, it's running towards Lot 15.  All that is

    19     downhill.

    20     Q.  Can we agree water runs downhill?

    21     A.  Yes, we can.

    22     Q.  Can we agree water isn't going to go up on

    23     top of -- out of this ditch unless the ditch is

    24     full?

    25     A.  And it feeds, goes back around and down to

Page 234

1     my kid's house.  It backs up both ways, fills

2     this thing.

3     Q.  To back up, can we agree the ditch has to be

4     full of water?

5     A.  It was.

6     Q.  And you say going around the other end, you

7     believe it's doing the same thing on this

8     other -- I forget the guy's name.

9     A.  Gillette.

10    Q.  The Gillette property, and it feeds back

11    down to this little pond?

12    A.  Right.

13    Q.  The only way the water gets out of this area

14    where the pond is now or ever would be absorption

15    or just leaching into the soil, correct?

16    A.  Or go out our Cambridge system.  We have

17    manholes, we have catch basins all along in the

18    back there, too.

19    Q.  Well, why wouldn't the water that you say is

20    ponding at the back of 16 or 15 go out your catch

21    basins that were bought and paid for by

22    Cambridge?

23    A.  It does, it does.  But not -- it was

24    designed -- that only was designed for our

25    property, not for draining all of Hospice,

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 235

1        Gillette.  All that water is coming down.  Our
2        system wasn't designed to take that.
3                  It can't take it out fast enough.  It
4        will take it out, but it takes some time.  That's
5        the only thing, those ponds are only -- it's only
6        a temporary thing until our system catches up.
7        Q.  Before the tree removal project or whatever
8        you want to call it, had you ever walked on the
9        back of Lot 16?
10       A.  I'm sure I walked back there, but, like I
11       said, I wasn't thinking anything like this was
12       going to happen.
13       Q.  Were you present shortly after a major
14       rainfall?
15       A.  No.  If I was, I don't remember it.
16       Q.  So whatever the extent of ponding was before
17       this incident, you're just basically guessing?
18       A.  Only thing I'm saying is we had Lori, my
19       son's wife, claims that they never had ducks on
20       this thing before.
21       Q.  Never had what?
22       A.  Ducks in the backyard before that it ponded
23       this much.  And the only other thing was that
24       when the water is coming right out of the ground
25       when these guys are pumping, we knew that this

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

Page 236

 1        thing was not -- this thing was needed, you know.

 2        Q.  You're going to hear testimony from City of

 3        Toledo workers, probably Ric-Man workers and

 4        maybe others that even when they were working

 5        there, they remember ponding in the area that's

 6        in question.  Now, are you going to be able to

 7        say they're wrong?

 8        A.  No, we don't deny that there was some

 9        ponding.  I mean, it's just that we say it got

10        worse.

11        Q.  Have you spoken with whoever owns Lot 16?

12        A.  No, I've never spoken to him.

13        Q.  Do you know who owns it?  Is it the Berman

14        lot or the Hoffman lot?

15        A.  I think it's the Berman lot.  I've seen that

16        on the sign, but I've never had contact with him.

17        Q.  You don't know what he would say about any

18        ponding?

19        A.  No.

20        Q.  I assume you were asked by Mr. Robon to come

21        here with various conclusions or opinions.  On

22        what subjects were you asked to render opinions?

23                    MR. ROBON:  Objection.  Show that --

24                    MR. BAHRET:  I'm not asking what his

25        opinions are, Marv.  I'm asking on what subjects.

Old Granite Development vs. The City of Toledo, et al

Page 237

1              MR. ROBON:  These are things that

2    were not brought up during Mr. Bahret's original

3    examination, and nor were they brought up by any

4    other counsel.  So they're a new matter.  So just

5    show an objection to it.  You can answer.

6    Q.  I'm assuming one of them is the effect of

7    the drainage pipe, the crossover pipe?

8    A.  The drainage, and particularly where does

9    that put the hundred-year flood where the houses

10   are going to be flooded out in the future when

11   you really have a nine-inch rain.

12              We look at that, and the drainage and,

13   you know, the trees.  In the sense that we did a

14   lot of clearing where I was from, is this proper,

15   and particularly with the design of this thing or

16   whatever.

17   Q.  The design of what?  What were you asked to

18   render an opinion as far as the design?

19   A.  Well, as far as looking at the drawings and

20   the design of the thing, you know, whether this

21   thing should have happened, whether somebody

22   should have looked into whether we needed all

23   these trees to be taken down to put this water

24   main in.  The drainage pipe, should they have

25   spotted this thing in the design stage when the

Page 238

```
 1      consultant did it.  Those are really the two

 2      things that I've been working on, so the trees

 3      and the drainage.

 4      Q.  As far as the trees, you're questioning

 5      whether they should have removed as many trees as

 6      they removed, whether they're on Cambridge

 7      property or not?

 8      A.  Yes.

 9      Q.  And so you believe, whether right or wrong,

10      that a landowner doesn't have the right to do

11      tree removal on their land, no matter what you

12      think about it?

13      A.  No, they have that right, but they got to go

14      through the permit process, and, you know, you

15      have to be careful around the edges.  Those are

16      kind of --

17      Q.  And the permit process you're talking about

18      is, I assume, this wetlands thing?

19      A.  Yes.

20      Q.  The topic that you're not an expert in and

21      we have to talk to your associate?

22      A.  Right.

23      Q.  You would agree if there isn't a wetlands

24      issue, there is no requirement for a permit from

25      the Corps of Engineers?
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

                                                                        Page 239

```
 1        A.  If there is what?  If there is no what?
 2        Q.  If it's not a wetlands issue, if it's not a
 3        wetlands area, you don't need to get a permit
 4        from the Corps of Engineers, correct?
 5        A.  I don't -- I think -- again I'm not the
 6        expert.  You should be asking Gary.  But I think
 7        because of the bridge, I think there is a special
 8        hoop the City had to go through.
 9        Q.  Over what bridge?  You lost me.
10        A.  There is a river crossing.  It crosses the
11        Maumee a mile down from Cambridge.  Where the
12        bridge goes across the river, there is an Army
13        Corps of Engineers permit for that bridge.
14             And if you're doing any project that
15        has any impact on that river crossing, you have
16        to go and get a special permit for all of your
17        work, the whole project, not just the bridge.
18        That's just an extra review that I understand
19        should have been done here.  I don't know whether
20        it was or not.
21        Q.  Do you know if the City obtained any sort of
22        permit to put a pipe under the river?
23        A.  They did.  They did make an application.
24        Q.  So the process you're talking about --
25        A.  Is in conjunction with that.
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 240

```
 1      Q.  And it was done?
 2      A.  I don't know if it was done, as far as you
 3      would have --
 4      Q.  If it wasn't done, whose fault is that, the
 5      Corps of Engineers or the City?
 6      A.  No, the City had -- the City, it was their
 7      water main.  For their project you have to have
 8      all the wetland.  Could be there are certain
 9      specific things in the regulatory process you
10      have to submit, particularly any old wetland --
11      Q.  I'm not -- I'm with you on wetlands.  I
12      think we agree that if there is wetlands and
13      you're going to do something in the wetland
14      that's destructive, you need a permit.  The issue
15      is --
16      A.  This is the same.
17      Q.  Pardon?
18      A.  This is basically the same thing other than
19      it's a few more hoops you have to jump through to
20      make sure that those trees, the trees, especially
21      on a railroad line, they support wildlife
22      migration and that type.  And the Corps wants to
23      see all of that stuff before you go and get your
24      permit to go underneath the river.  It's a little
25      more than what --
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 241

1       Q.  What regulations are you citing?

2       A.  I have no idea what the name of the law is.

3       Q.  You don't have any idea what regulation

4       you're talking about?

5       A.  This has to do with navigable waters at the

6       Maumee River.  You got a major river crossing.

7       In order for you to do any -- to get a permit

8       associated with that, it's underneath that permit

9       that the Corps has given CSX.

10                    And if the City wants to use that

11      right-of-way for that bridge, they have to get

12      some -- they have to get not just a permit, a

13      special -- a specially reviewed permit.

14      Q.  Did they do it?

15      A.  I don't know.

16      Q.  Did you check?

17      A.  Marv says that the -- that there's a

18      document down somewhere, and we are going to -- I

19      believe we are going to look at that before --

20      and have Gary Buck look at that sometime.

21      Q.  There is a document somewhere?

22                    MR. ROBON:  That's the documents

23      that you showed me.

24                    MR. BAHRET:  The wetland studies?

25                    MR. ROBON:   Yes.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 242

1        Q.  Is that the same thing as this permit to go

2        under the river you're talking about?

3        A.  No, I think it might be -- that's the

4        critical question whether that was an

5        environmental review of the whole project or

6        whether that included the special hoops you got

7        to go through because of the river crossing

8        thing.

9                    MR. BAHRET:  I have no other

10       questions.

11                   MR. TASSE:  I just have a couple

12       more.

13                         - - -

14                   RECROSS EXAMINATION

15       BY MR. TASSE:

16       Q.  Let me show you what's marked as Exhibit S,

17       and it's part of Mr. Robon's package, tab number

18       three.  Have you ever seen that picture before?

19       A.  I think I did, yes.  I certainly saw it.  He

20       gave me a copy of this thing, too.

21       Q.  Did you take this picture?

22       A.  No, I didn't.

23       Q.  The date on there is 12/1/06.  Do you see

24       that?

25       A.  Uh-huh.

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 243

```
 1      Q.  Yes?

 2      A.  Yes.  That's got to be -- oh, yeah,

 3      December, '06.

 4      Q.  You seem to be questioning the date of that.

 5      Does that sound wrong to you?

 6      A.  No, I just thought it was the year before.

 7      I thought it was before the project.  I see the

 8      project on it.  No, that's probably right.

 9      Q.  Have you ever seen that condition?  Did you

10      ever see the condition of that, the property

11      which is actually off of Old Granite, in the

12      condition that's shown in Exhibit S?

13      A.  I was there either then or slightly before

14      or after this.

15      Q.  Do you have a picture that shows the

16      condition of the property that appears in Exhibit

17      S different than from Exhibit S?

18      A.  Do I have?

19      Q.  Do you have another picture that's different

20      from Exhibit S that shows that condition?

21      A.  Yeah, I probably do.

22      Q.  You think you do?

23      A.  Uh-huh, and we took some --

24      Q.  We went out there a couple times, so if that

25      condition shown in Exhibit S ever existed at any
```

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

                                                                        Page 244

 1      other time, you would have a picture of it?

 2      A.  You know, after --

 3      Q.  After you became involved?

 4      A.  Yeah, we went out there a few times.  I

 5      don't know which -- all of them or whatever, but

 6      I have a couple other pictures of the flooding in

 7      the backyard.

 8      Q.  Do you know if it was on a different date or

 9      that same date?

10      A.  I have pictures of other days.

11      Q.  Are you certain of that?

12      A.  Yeah.

13      Q.  Those are undated though, right?

14      A.  No, I think they are dated.  Somehow or

15      other, we got other dated pictures, if they're

16      not screwed up in the computer.  I did take other

17      pictures.

18      Q.  If you're not able to produce them, then

19      this is the only picture we have to show the

20      condition is Exhibit S; is that right?

21      A.  But we got -- we will come up with them.

22                  MR. ROBON:  On your list, be sure

23      you get all the photographs.

24      Q.  Right, we're going to get all the

25      photographs.  But if you don't have them, this is

Page 245

```
 1      the only picture we have; isn't that right?

 2      A.  I don't know.  There is probably -- he's

 3      probably got more of them that he gave to Marv.

 4      I don't know.

 5      Q.  Have you seen others from Marv?

 6      A.  No, I haven't seen --

 7      Q.  All right.  I'm just asking about your

 8      pictures.  If you don't have them, then this is

 9      the only picture you're aware of to show that

10      condition; is that right?

11      A.  Yes.

12      Q.  You claim that this picture, Exhibit S, is

13      due solely to the fact that the crossover pipe

14      was cut?

15      A.  I didn't say that.

16      Q.  No?

17      A.  I say that it exaggerated this, and we had

18      water -- we received pouring right back in here.

19      Q.  So you had water, you had this condition

20      before and you claim that the crossover pipe

21      situation made it worse?

22      A.  Exaggerated it, right.

23      Q.  Isn't it true that if the crossover pipe

24      were plugged before this project ever started,

25      then the cutting of the crossover pipe wouldn't
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 246

```
 1          have had any effect whatsoever on the condition

 2          we see in Exhibit S; isn't that right?

 3          A.  Yeah, if it was completely plugged.

 4          Q.  Right.

 5          A.  Which I don't think anybody ever said.

 6          Q.  It would have no effect?  Witnesses will say

 7          that, but if it's completely plugged, then it

 8          would have no effect; is that right?

 9          A.  If it was completely plugged.

10          Q.  You would agree?

11          A.  Yes.

12          Q.  Then lastly, with respect to this mystery

13          12-inch pipe that you talked about with

14          Mr. Bahret, the 12-inch pipe?

15          A.  Right.

16                    MR. ROBON:  Objection to the mystery

17          pipe.  It's visible.

18          Q.  Did you ever excavate down to the pipe to

19          examine what it looked like from its length at

20          the origin to the manhole?

21          A.  The length of it?  I've seen both ends of it

22          at the manhole and at the far end.

23          Q.  When you say both ends, you mean the

24          termination point, the very last inch of it or

25          so, right?
```

John McCarthy                                Old Granite Development vs. The City of Toledo, et al

Page 247

1          A.  We got pictures of that, too.

2          Q.  All right.  But you never excavated along it

3      to see what it looks like, right?

4          A.  No.

5          Q.  And to your knowledge --

6          A.  I take that back.  When we started the

7      mound, we did open it up and we tapped into that

8      with an another 12-inch pipe.

9          Q.  Where?

10         A.  Right at Lot 16, right at 15 or 16.

11         Q.  Why did you do that?

12         A.  To make sure that we had good drainage

13     there.

14         Q.  This is after the project and after the

15     crossover had been cut?

16         A.  No, this was before.

17         Q.  You're saying you were doing the mounding?

18         A.  Right, we were doing the mounding.  Before

19     we did the mounding, we had to relocate the

20     drainage.  We had to relocate --

21         Q.  Because of your mounding?

22         A.  Right, because of the mounding.

23         Q.  Because the mounding was going to change the

24     water flow?

25         A.  We were going to plug the mystery pipe.  We

Page 248

1     were going to be plugging that in and bring the

2     -- put that in either a pipe or have the ditch

3     much closer to Michael's house.

4     Q.  What authority did you have to tap into the

5     12-inch pipe behind 16?

6     A.  We didn't have anything other than, you

7     know, as far as I was concerned, we gave them

8     notice.  We were not materially changing their

9     facilities.

10    Q.  You didn't have authority; you just did it?

11    A.  We basically just did it.

12    Q.  And is the end point or origin point that's

13    -- of the 12-inch pipe that's behind Lot 13, is

14    that visible today?

15    A.  Yes.

16    Q.  If you go out there and look, you can see

17    it?

18    A.  You can see.  It's right near our manhole.

19    Q.  Is it open or is there a cover or a grate or

20    a mesh or a cap on it at all?

21    A.  No, it's just sitting there wide open.

22    Q.  Just open?

23    A.  Right.

24    Q.  Is it susceptible to leaves or debris?

25    A.  Yes, and they pushing the dirt out.  They

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 249

```
 1      put dirt in that, too, that we had to clear it
 2      out.
 3      Q.  If your hundred truckloads of dirt had gone
 4      over into that area, it would have covered it up,
 5      right?
 6      A.  That would have covered it up.  We would
 7      have to relocate that more towards the
 8      development.
 9      Q.  Did you ever do any kind of test at the end
10      of that 12-inch pipe to see and make certain that
11      it flowed to where you thought it flowed, orange
12      peel test or whatever you do?
13      A.  At the time we did not.
14      Q.  Any time?
15      A.  I knew at that time that the manhole was
16      there.
17      Q.  I'm just asking you how do you know that
18      this open end at Lot 13 ends up going to this
19      manhole?  How do you know that?
20      A.  Well, we saw the same type of pipe in that
21      manhole, same 12-inch; we could see that.  Of
22      course, we opened it up and put a 12-inch pipe
23      coming out the other way.
24      Q.  Yours at 16, right?
25      A.  Yes.
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

Page 250

 1        Q.  But that doesn't tell you anything about
 2        where that pipe goes?  I'm wondering --
 3        A.  No, but that was one place we did open up
 4        and it was there.  It was just as we suspected,
 5        right behind this railroad tie wall.  That is
 6        where it was, and we tapped into it and made sure
 7        we had plenty of run-off drainage in there.  And
 8        that's the one that flowed backwards when they
 9        pumped, and it couldn't go out the other way.
10        Q.  When it flowed backwards, did you see water
11        coming out of the end of the pipe at Lot 13?
12        A.  Yes.  You know, it's hard to tell, but it
13        appeared to me that it was coming out there, and
14        it was gushing out the temporary pipe that we put
15        for the mound to pull the drainage.  It was
16        gushing out of that.
17        Q.  Out of the one you put in at 16?
18        A.  16, out of that the same pipe.  It was
19        gushing out, and I called Christy, I told her,
20        "Hey, you know, it's not working."  Well, maybe
21        it wasn't working to begin with.
22        Q.  What's the status of the renegade pipe at
23        16?  What is the status of that pipe that you put
24        to tap into the mystery pipe at 12-inch?
25        A.  It's still there, and it still, you know,

John McCarthy                              Old Granite Development vs. The City of Toledo, et al

Page 251

1       flows backwards.

2       Q.  That's still there?

3       A.  That's still there.

4       Q.  Where is it?  Where do we find it on 16?

5       A.  If you just go in the back of 16 right at

6       the -- right near the property line, you'll see.

7       Q.  Pretty direct straight down because it's

8       right by the dirt you put in?

9       A.  It's about -- if you look at the catch basin

10      that's there on Lot 15, it's about 20 feet to the

11      -- the end of it is 20 feet to the east.

12      Q.  The pipe you put in on 16, what's the top of

13      it look like?

14      A.  It's just sitting there.  It's a plastic Q

15      pipe they call it, the plastic with the rings, a

16      12-inch, and it's just sitting there.

17      Q.  I'm not sure; I don't know what a Q pipe is.

18      A.  Black plastic pipe.

19      Q.  Does it have like a grate over it?

20      A.  No, it's just open, just sticking right out

21      of the mound.

22      Q.  Like a flexible black pipe?

23      A.  Yeah, one of those -- you know, you've seen

24      them.

25                  MR. ROBON:  Accordion look.

Page 252

1    A.  Yeah, that accordion black pipe, but that's

2    sticking out there still right out of the base of

3    the mound that we started building.  That's still

4    right there.

5    Q.  The reason you put that in is because you

6    had altered the topography when you put your

7    hundred truckloads of dirt in; is that right?

8    That's why you put the one at 16 in?

9    A.  No.  Our intention was that we were going to

10   go and block that one at 13.

11   Q.  Yeah.

12   A.  And that this would be, this would make sure

13   we had some good drainage right there, that we

14   weren't going -- you know, that this would take

15   the run-off right into that pipe just like the

16   one at Lot 13 did.

17   Q.  But the reason you did that is because you

18   brought the dirt in?

19   A.  Yes, of course.

20   Q.  And now it changed things?

21   A.  Yes.

22   Q.  Did you ever go on block 13?  Did you ever

23   follow up and do that?

24   A.  Did we ever -- the one --

25   Q.  You said you were going to go in and block

Page 253

1      13?  Did you?

2      A.  No, we never got that far.  That's still

3      there.

4      Q.  Then the other end of this pipe that's 250

5      feet the other way, where is that?  Did you ever

6      go look and at that?

7      A.  The guy showed me where it was.

8      Q.  This same guy on the Gillette property?

9      A.  And that ends up in a kind of French drain

10     where the railroad just threw a big rock and

11     stuff so it wouldn't -- they didn't put a manhole

12     or cover or anything on it.

13     Q.  They said that is where it is?

14     A.  That is where it is, and I could see the

15     rock and that.

16     Q.  You say the rock, but you don't if the pipes

17     are there?  He told you that?

18     A.  I never saw the pipe.  We never dug it up or

19     anything like that, but that is where he said

20     that they had their pick-up point for his area.

21                  MR. TASSE:  Thank you.

22                  MR. FAGNILLI:  A couple quick

23     follow-up questions.

24                       - - -

25

John McCarthy                    Old Granite Development vs. The City of Toledo, et al

Page 254

```
 1                    RECROSS EXAMINATION

 2      BY MR. FAGNILLI:

 3      Q.  What's the address for Gary Buck?  Where

 4      does he live?

 5      A.  I can get it for you.

 6      Q.  Do you know what city?

 7      A.  He lives in Toledo.

 8      Q.  Toledo?

 9      A.  Yes.

10      Q.  The City of Toledo?

11      A.  Yes.

12      Q.  Do you know what street?

13      A.  Yes.

14      Q.  What street is it?

15      A.  Robinwood down in the Old West End.

16      Q.  All right.  Just to follow up on what

17      Mr. Tasse was asking you about, when you put this

18      pipe in at 16, you excavated on the railroad

19      property to do that?

20      A.  That train was right on it, and I'm sure

21      there was some property of theirs that we were on

22      to get that connection made.

23      Q.  Well, is the pipe on the Cambridge property

24      or the pipe on the CSX right-of-way?

25      A.  Right on the line.
```

Page 255

```
 1        Q.  Well, it's either on one or the other.

 2                    MR. ROBON:  Objection.

 3        A.  I don't think so.

 4        Q.  Is it part on one and part on the other?

 5        A.  I think so.

 6        Q.  Did you excavate onto the CSX property to

 7        get to that?

 8        A.  We didn't get into that how close we were.

 9        Q.  What do you mean, you didn't get into it?

10        A.  We didn't survey it.  All we went, opened it

11        up, got to that pipe and hooked into it.

12        Q.  Why didn't you survey it before you did it

13        to see where you were at?

14        A.  Well, we had plenty of surveys.  We weren't

15        -- I didn't imagine that this would be

16        questioned, you know.

17        Q.  Well, didn't you think you would have to

18        have permission to do that?

19                    MR. ROBON:  Objection, being

20        argumentative.

21        Q.  You have to answer out loud.

22        A.  No.

23        Q.  Were you on the CSX side of the five-foot

24        railroad tie wall, or were you on the Cambridge

25        side of the railroad tie wall when you excavated
```

John McCarthy                                    Old Granite Development vs. The City of Toledo, et al

```
 1      at Lot 16?

 2      A.  It was all right on the line.

 3      Q.  Well, but there is a wall there, right?

 4      A.  And I would -- you know, but you got to

 5      understand the wall moved five feet up at the

 6      top, and how far up and down you are, but --

 7      Q.  Were you on top --

 8      A.  Basically, here's the way it was.  You had

 9      railroad ties, and that pipe was right against

10      the railroad ties on the inside of it on the

11      railroad property, you know.

12      Q.  So you excavated on the railroad side of the

13      railroad ties?

14              MR. ROBON:  Objection.

15      A.  The whole thing had shifted.  We don't know

16      whose property it was unless you went and

17      surveyed it and that.  You know, that thing could

18      have been pushed over a little bit, only a foot

19      or so, and it would have been all on the

20      Cambridge property.  I don't really know.  We

21      didn't survey it.

22      Q.  You didn't think it was important to survey

23      it?

24      A.  No, we didn't.  But it's right there, and

25      it's easily seen now.
```

Page 257

```
 1        Q.  Then at the other end where you were going

 2        to fill it in --

 3        A.  Right.

 4        Q.  -- is that on CSX property, or is that on

 5        Cambridge property?

 6        A.  That's right on the line, but I would say

 7        it's the same thing, inches inside on their

 8        property.

 9        Q.  So it was your intention to bring the mound

10        to that area where the 12-inch pipe is in the

11        ditch?

12        A.  We were going to do that.

13        Q.  You were going to fill in that ditch?

14        A.  And we proposed it to the City of Toledo

15        and --

16        Q.  Did you have written approval from CSX to

17        fill in the ditch on their property?

18        A.  The ditch was half on our property.

19        Q.  Well, did you have approval to fill in the

20        side that was on their property?

21        A.  We gave them notice as to what we wanted to

22        do, and I talked to --

23                    MR. ROBON:  You answered the

24        question.  You are done.

25        A.  I'm done.
```

Page 258

```
 1              MR. ROBON:  Yes or no.

 2    Q.  What's the answer, yes or no?  Did you have

 3    permission to fill in the ditch on the CSX

 4    property?

 5              MR. ROBON:   He answered that

 6    question.

 7              MR. FAGNILLI:  No, he didn't.  He

 8    started to give an answer and then you

 9    interrupted him.

10              MR. ROBON:  He answered

11    specifically.  I could repeat it verbatim.  He

12    said, "I gave them notice and considered that

13    sufficient."

14              MR. FAGNILLI:  And then you told him

15    to answer yes or no.

16              MR. ROBON:  No, no.

17              MR. BAHRET: Yes, you did.

18              MR. ROBON:  No, he wanted to give

19    more, and I said just answer -- I mean, get your

20    answers yes or no, not that question.

21    A.  I mean, can this --

22              MR. ROBON:  There's not a question.

23    Q.  What's your answer to the --

24              MR. ROBON:  Let him ask the

25    questions, please.
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 259

```
 1                    THE WITNESS:  Okay.

 2    Q.  In order, you know --

 3    A.  I did talk this over with Gene Wheeler, you

 4    know, and it's like, "What do we care?  This is

 5    the old railroad thing here," you know, and I'm

 6    sure that's not a real permission.  But we hadn't

 7    -- we weren't making some secret, you know, that

 8    we were sneaking in here and doing this.  We

 9    talked to the City, we talked to the County, and

10    wedid do --

11                    MR. ROBON:   That's all.

12                    MR. FAGNILLI:  That's all the

13    questions I have.

14                    (Deposition concluded at 2:46 p.m.)

15

16

17                    JOHN McCARTHY

                           - - -
18

19

20

21

22

23

24

25
```

John McCarthy                          Old Granite Development vs. The City of Toledo, et al

Page 260

1                    C E R T I F I C A T E

2

     STATE OF OHIO    )
3                     ) SS.
     COUNTY OF WOOD   )

4

5          I, Maureen St. John, Registered
     Professional Reporter and Notary Public in and
6    for the State of Ohio, duly commissioned and
     qualified, do hereby certify that the
7    within-named JOHN McCarthy, was by me first duly
     sworn to testify the truth, the whole truth and
8    nothing but the truth in the cause aforesaid;
     that the testimony then given by him was by me
9    reduced to stenotypy in the presence of said
     witness, afterwards transcribed upon a computer;
10   that the foregoing is a true and correct
     transcript of the testimony so given by him as
11   aforesaid; that this deposition was taken at the
     time and place in the foregoing caption specified
12   and was completed without adjournment; that the
     signature of the said witness to the transcribed
13   copy of his deposition was reserved.

14         I do further certify that I am not a
     relative, employee, or attorney of any of the
15   parties hereto; further that I am not a relative
     or employee of any attorney or counsel employed
16   by the parties hereto or financially interested
     in this action.

17

18         IN WITNESS WHEREOF, I have hereunto set
     my hand and affixed my notarial seal of office
19   at Toledo, Ohio, this _____ day of
     February, 2008.

20

21              --------------------------------
                  MAUREEN ST. JOHN, RPR
22              Notary Public in and for the
                      State of Ohio

23

     My Commission expires November 8, 2010

24

25