```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION

 3

 4   OLD GRANITE DEVELOPMENT, LTD.,   -  Case No. 3:06-CV-2950
                                      -
 5      Plaintiffs,                   -  Toledo, Ohio
                                      -  May 20, 2008
 6           v.                       -  TRIAL
                                      -
 7   CITY OF TOLEDO,                  -
                                      -
 8      Defendants.                   -
     -------------------------------
 9
                             VOLUME 2
10                      TRANSCRIPT OF TRIAL
                  BEFORE THE HONORABLE JACK ZOUHARY
11        UNITED STATES DISTRICT JUDGE, AND A JURY

12   APPEARANCES:

13   For the Plaintiffs:   Barkan & Robon
                           By:  Marvin A. Robon
14                              R. Ethan Davis
                           Suite 100
15                         1701 Woodlands Drive
                           Maumee, OH 43537
16                         (419) 897-6500

17   For the Defendants:   Bahret & Associates
                           By:  Robert J. Bahret
18                              Keith J. Watkins
                           Suite 709
19                         7050 Spring Meadows, W
                           Holland, OH 43528-1844
20                         (419) 861-7800

21   Court Reporter:       Tracy L. Spore, RMR, CRR
                           1716 Spielbusch Avenue
22                         Toledo, Ohio 43624
                           (419) 243-3607
23

24

25   Proceedings recorded by mechanical stenography,
     transcript produced by notereading.
```

| | | |
|---|---|---|
| 13:05:01 | 1 | (Reconvened at 1:05 p.m.) |
| 13:05:01 | 2 | THE COURT:  You may continue with your |
| 13:05:02 | 3 | cross-examination. |
| 13:05:03 | 4 | MR. ROBON:  Thank you, Your Honor. |
| 13:05:04 | 5 | - - - |
| 13:05:04 | 6 | CHRISTY SONCRANT, CROSS-EXAMINATION |
| 13:05:06 | 7 | BY MR. ROBON: |
| 13:05:06 | 8 | Q.  Mrs. Soncrant, I'm going to hand you Exhibit |
| 13:05:10 | 9 | Number 1.  This is an aerial photo showing the Cambridge |
| 13:05:14 | 10 | subdivision taken in 2006 prior to the -- do you |
| 13:05:19 | 11 | recognize that? |
| 13:05:20 | 12 | A.  Yes. |
| 13:05:20 | 13 | Q.  And that is an accurate depiction of -- |
| 13:05:23 | 14 | A.  Of the area, yeah. |
| 13:05:25 | 15 | Q.  From an aerial? |
| 13:05:33 | 16 | I'm going to hand you what's been marked as |
| 13:05:35 | 17 | Exhibit Number 9.  This goes all the way from Bates |
| 13:05:40 | 18 | Road to Ford Road. |
| 13:05:43 | 19 | A.  Okay. |
| 13:05:45 | 20 | Q.  Does that accurately depict what is there? |
| 13:05:47 | 21 | A.  Yes. |
| 13:05:54 | 22 | MR. ROBON:  Mr. Bahret, this other one is |
| 13:05:57 | 23 | Number 1. |
| 13:05:58 | 24 | MR. BAHRET:  Thank you. |
| 13:06:18 | 25 | Q.  Can you tell the jury the last time that you were |

| | | |
|---|---|---|
| 13:06:21 | 1 | out to the Cambridge subdivision? |
| 13:06:24 | 2 | A.  Oh, boy.  It's been a while. |
| 13:06:28 | 3 | Q.  Would you say it's been since the summer of 2006? |
| 13:06:33 | 4 | A.  Oh, no.  It's been more recent than that. |
| 13:06:37 | 5 | Q.  Can you tell the jury the purpose of your |
| 13:06:39 | 6 | visiting the Cambridge subdivision? |
| 13:06:44 | 7 | A.  Oh, I'm sorry, the subdivision?  I've been on the |
| 13:06:47 | 8 | railroad property, not the subdivision itself.  I |
| 13:06:50 | 9 | apologize. |
| 13:06:50 | 10 | Q.  What were you doing on the railroad property? |
| 13:06:53 | 11 | A.  Checking to see how the seeding is coming up, how |
| 13:06:56 | 12 | the property is looking since we've been through there. |
| 13:07:00 | 13 | Q.  Did you see the manhole that is 150 feet roughly |
| 13:07:06 | 14 | from the property line of Cambridge? |
| 13:07:10 | 15 | A.  Yes, I did. |
| 13:07:11 | 16 | Q.  And did you see the water ponding on the side of |
| 13:07:14 | 17 | the manhole? |
| 13:07:19 | 18 | A.  I may have.  There may have been water there |
| 13:07:22 | 19 | when I was there. |
| 13:07:23 | 20 | Q.  Did you wonder why the water's still there? |
| 13:07:27 | 21 | A.  No, I did not. |
| 13:07:30 | 22 | Q.  Did you make a note of it in your report or |
| 13:07:34 | 23 | anything? |
| 13:07:37 | 24 | A.  I do not do reports.  The construction |
| 13:07:40 | 25 | technician does those. |

13:07:41  1      Q.   Did you tell anybody in the City that there was

13:07:45  2  water by the manhole; not in the manhole, but outside of

13:07:49  3  it when you were there?

13:07:52  4      A.   When I was there this last time, no, I did not.

13:07:55  5      Q.   What about the time before?

13:07:56  6      A.   Other times, yes, I have mentioned that there's

13:08:00  7  water there.

13:08:00  8      Q.   Who did you mention it to?

13:08:02  9      A.   My boss.

13:08:04  10     Q.   And that's Mr. Moline?

13:08:06  11     A.   No, my direct boss, which is Mr. Scott Sibley.

13:08:11  12     Q.   Scott?

13:08:11  13     A.   Scott Sibley.

13:08:13  14     Q.   Sibley.   I've never heard that name.   Was he

13:08:16  15  involved in the construction of this project?

13:08:18  16     A.   He is my boss, so he's the direct boss.

13:08:21  17     Q.   Is he the one who made the decision not to do

13:08:24  18  anything --

13:08:27  19              MR. BAHRET:   Objection.

13:08:28  20     Q.   -- about the flooding, after the pipe was

13:08:32  21  severed?

13:08:34  22     A.   He would be part of it, part of the

13:08:37  23  decision-making process, yes.

13:08:47  24              THE COURT:   That objection was overruled, by

13:08:48  25  the way.

13:08:51  1     Q.  I'm handing you what's been marked as Exhibit

13:08:54  2  Number 37.  This is a picture taken from the back of

13:08:58  3  lot 15, which is the house that's on the Cambridge

13:09:02  4  subdivision facing the railroad.  Do you see the cable

13:09:08  5  and the electrical boxes in the back?

13:09:11  6     A.  Yes, I do.

13:09:12  7     Q.  And do you recall that Cambridge -- within a

13:09:27  8  couple feet there is a catch basin here between lots 15

13:09:31  9  and 10?

13:09:32  10     A.  I do recall there's a catch basin down there,

13:09:35  11  yes.

13:09:35  12     Q.  Did you see this kind of water when you were at

13:09:37  13  the site?

13:09:38  14     A.  I don't remember seeing that much water when I

13:09:41  15  was out there.

13:09:43  16     Q.  Would that, if you saw that today, would that

13:09:46  17  give you concern?

13:09:53  18     A.  I don't know if I would be -- I mean, I feel

13:09:59  19  concern for the people whose property it is, but I can't

13:10:03  20  say that it's anything that we did.

13:10:06  21     Q.  So you're denying that the City has caused the

13:10:09  22  excess flooding?

13:10:10  23     A.  I do not believe they have.

13:10:13  24     Q.  But you do admit to severing the --

13:10:17  25     A.  Yes, I do.

13:10:19  1    Q.   And you said just before we took a lunch break, I

13:10:23  2    believe you said, yes, maybe I made a mistake?

13:10:27  3    A.   Yes, I said that.

13:10:33  4    Q.   I'm going to hand you Exhibit Number 20.   This

13:10:38  5    is a photograph --

13:11:40  6              MR. BAHRET:   Judge, these lights are not

13:11:42  7    individually controlled.

13:11:43  8              THE COURT:   During the lunch break we played

13:11:46  9    with the overhead.  We therefore dimmed the overhead

13:11:49  10   just directly above.  It helped a little bit, but

13:11:53  11   obviously is not the source of the problem.

13:11:55  12   BY MR. ROBON:

13:11:55  13   Q.   When you were driving to the site in 2005 before

13:11:59  14   anything took place, is this the path that you drove

13:12:03  15   down with your vehicle with the trains off to the left

13:12:08  16   and all this brush on the right?

13:12:11  17   A.   Yes.

13:12:12  18   Q.   Is that a fair depiction of what you saw from the

13:12:14  19   windshield of your car?

13:12:15  20   A.   Yes.

13:12:29  21   Q.   I'm going to hand you what's been marked as

13:12:31  22   Exhibit Number 18 and ask:  Is that a fair depiction of

13:12:37  23   the brambles and brush that abutted the Cambridge

13:12:41  24   subdivision when you drove by in 2005 before any

13:12:46  25   clearing took place?

| | | |
|---|---|---|
| 13:12:47 | 1 | A.  It could be, yes. |
| 13:12:48 | 2 | Q.  Very similar? |
| 13:12:50 | 3 | A.  Yes. |
| 13:12:50 | 4 | Q.  If not the same? |
| 13:12:51 | 5 | A.  Yes. |
| 13:12:56 | 6 | Q.  And the same with regard to Exhibit Number 19, is |
| 13:13:03 | 7 | that the same type of brambles and trees and brush that |
| 13:13:07 | 8 | was growing at the rear of the Cambridge subdivision? |
| 13:13:10 | 9 | A.  I think so. |
| 13:13:13 | 10 | Q.  And you see how thick they are? |
| 13:13:16 | 11 | A.  Yes. |
| 13:13:16 | 12 | Q.  And you see there are no leaves on them at that |
| 13:13:19 | 13 | time, correct? |
| 13:13:20 | 14 | A.  Correct. |
| 13:13:21 | 15 | Q.  Were there leaves on them when you saw them? |
| 13:13:23 | 16 | A.  No, there were not. |
| 13:13:24 | 17 | Q.  They were just like this? |
| 13:13:26 | 18 | A.  Yes. |
| 13:13:26 | 19 | Q.  Exhibit Number 19. |
| 13:13:43 | 20 | I want you to look at Exhibit Number 60.  This |
| 13:13:47 | 21 | is an e-mail from you to Jim Bilicki dated June 4 of |
| 13:13:54 | 22 | '06 -- I'm sorry.  Yes, you forwarded it on to Mr. |
| 13:13:58 | 23 | Bilicki? |
| 13:13:59 | 24 | A.  Yes. |
| 13:14:00 | 25 | Q.  It was an e-mail from John McCarthy? |

13:14:02    1    A.   Yes

13:14:07    2    Q.   Was this the beginning of this engineer's

13:14:10    3    concerns about what had happened with the Cambridge

13:14:12    4    subdivision?

13:14:18    5    A.   Probably pretty close to the time, yeah, because

13:14:20    6    that's early June.

13:14:24    7    Q.   Isn't he giving you suggestions on how to solve

13:14:28    8    the problem?

13:14:43    9    A.   He's talking about the trees that were there.

13:14:51   10    Q.   Replanting them?

13:14:55   11    A.   Yes.

13:14:56   12    Q.   Would you acknowledge that the grade of the

13:15:03   13    property, the height of the property where the water

13:15:06   14    main is is now higher than what it was before the

13:15:11   15    excavation took place next to the Cambridge subdivision?

13:15:16   16    A.   I'm not 100 percent sure if it is or not.

13:15:21   17    I'm -- I did not -- I don't know if we took any

13:15:24   18    elevation shots of now how it is compared to when it was

13:15:28   19    before.

13:15:29   20    Q.   Were you aware that Ric-man Construction, the

13:15:35   21    general contractor of the City, did not haul away any

13:15:39   22    fill dirt or earth?

13:15:40   23    A.   I knew that they didn't haul away at all, so yes.

13:15:43   24    Q.   So if I have a six foot wide elliptical pipe, six

13:15:48   25    feet high and six feet wide, a mile long, that's an

13:15:54  1   awful lot of fill dirt, isn't it?

13:15:56  2       A.   Yes.

13:15:58  3       Q.   It had to go someplace, right?

13:16:01  4       A.   Right.

13:16:01  5       Q.   And they didn't haul it away, so would you say a

13:16:04  6   safe assumption for this jury is they left it on the

13:16:07  7   height and raised the height?

13:16:08  8       A.   Yes.

13:16:15  9       Q.   Now we're going to look at Exhibit Number 104.

13:16:23  10  This is another e-mail, June 19, originally June 15,

13:16:29  11  from Mr. McCarthy, correct?

13:16:31  12      A.   Yes.

13:16:32  13      Q.   And you forwarded it on to Mr. Bilicki?

13:16:35  14      A.   Yes, I did.

13:16:36  15      Q.   And he was your boss?

13:16:39  16      A.   No, that's the contractor.

13:16:40  17      Q.   That's the contractor.  Well, you gave the

13:16:46  18  contractor this information, but you didn't follow up

13:16:48  19  and ask them to do anything about it, did you?

13:16:51  20      A.   Well, I wanted to keep him abreast of one of the

13:16:55  21  complaints of a property owner.

13:17:00  22      Q.   Did you look upon this as the complaint of the

13:17:02  23  property owner, or did you look upon this as an opinion

13:17:06  24  of a professional engineer who said there is a problem?

13:17:12  25      A.   Probably more of an engineer, that there was a

13:17:16    1    problem.

13:17:17    2       Q.   Probably more of, but did you view Mr. McCarthy

13:17:22    3    as a pest, bothering you all the time?

13:17:25    4       A.   I wouldn't call him a pest, no.

13:17:27    5       Q.   Well, was he bothering you, calling you

13:17:30    6    constantly asking for action?

13:17:32    7       A.   He was calling, but it wasn't bothering.

13:17:37    8       Q.   Did you ever give him any satisfaction?

13:17:41    9       A.   No.

13:17:48   10       Q.   Handing you what we've marked as Exhibit Number

13:17:52   11    8, it's an e-mail dated June 27 of '06.  It looks like

13:18:00   12    you forwarded this to Cynthia Morefield.   Who is she?

13:18:05   13       A.   That's, again, with the contractor.

13:18:10   14            THE COURT:  When it says Leslie, who is

13:18:12   15    Leslie?

13:18:13   16       A.   Leslie Kovacik, City lawyer.

13:18:15   17       Q.   Would you read to the jury what you wrote?

13:18:23   18            MR. BAHRET:  Could you move that off there,

13:18:25   19    and can we approach?  Also, 8 in your book is a

13:18:28   20    different document.

13:18:29   21            MR. ROBON:  I'm sorry; this is 105.  It was

13:18:32   22    marked as a previous exhibit.

13:18:35   23            THE COURT:  It is a map?

13:18:36   24            MR. ROBON:  This is -- I'm sorry, but my gal

13:18:39   25    didn't cover up the old number.

13:18:42  1                    THE COURT:  So this is 105?

13:18:44  2                    MR. ROBON:  Yes.

13:18:46  3                    MR. BAHRET:  We still need to approach.

13:18:55  4              (Discussion had off the record.)

13:20:12  5    BY MR. ROBON:

13:20:13  6        Q.  Did you say to Leslie:  What do I do with this

13:20:15  7    gentleman? referring to Mr. McCarthy?

13:20:19  8        A.  Yes, I did.

13:20:32  9        Q.  And he sent you another e-mail, Exhibit Number 61

13:20:40  10   on August 19 of '06?

13:20:42  11       A.  Okay.

13:20:43  12       Q.  So one every week or two?

13:20:46  13       A.  Yes.

13:20:47  14       Q.  That's your recollection?

13:20:48  15       A.  Yes.

13:20:49  16                    MR. BAHRET:  Exhibit 61?

13:20:51  17                    MR. ROBON:  Yes.

13:20:54  18       Q.  I want you to identify Exhibit Number 97.   Is

13:20:59  19   this the contract that was entered into between the City

13:21:04  20   of Toledo and Ric-man Construction?

13:21:06  21       A.  Yes, it is.

13:21:15  22       Q.  Did the contract provide for special care to be

13:21:17  23   taken for trees and shrubbery; do you recall?

13:21:23  24       A.  It probably -- it usually has directions on how

13:21:27  25   to clear and grub.

13:21:30  1     Q.  I'm going to call your attention to page SP-86 in

13:21:39  2  this contract.  It says, "Protection, removal, and

13:21:44  3  repair of trees and shrubs."  It says, "Consult with

13:21:48  4  engineer," that means the contractor is to consult with

13:21:54  5  the engineer?

13:21:54  6     A.  Yes.

13:21:54  7     Q.  Did Ric-man or Vermillion ever consult with you?

13:21:58  8     A.  No, they did not.

13:21:59  9     Q.  Did you consult with them?

13:22:01  10     A.  No, I did not.

13:22:05  11     THE COURT:  Well, in fairness, do you want

13:22:07  12  to read the entire -- what you're reading from.

13:22:10  13     MR. ROBON:  Subparagraph B, fell trees to be

13:22:14  14  removed so as not to injure trees to remain.

13:22:16  15     THE COURT:  No, part A.  "Consult with

13:22:18  16  engineer and obtain permission prior to removal of any

13:22:21  17  tree or shrub not noted on the drawings to be removed

13:22:25  18  well in advance of such removals."

13:22:28  19  BY MR. ROBON:

13:22:28  20     Q.  Was there any kind of consultation?

13:22:30  21     A.  No, there was not.

13:22:32  22     Q.  On the drawings that were given to the

13:22:36  23  contractor, did it show the big trees that were to be

13:22:39  24  removed, or did it just show the demarcation line, cut

13:22:44  25  everything in the way?

13:22:45  1      A.   It just showed the right of way lines.

13:22:56  2      Q.   So the City prepared the plans or had the plans

13:23:02  3   prepared for Ric-man Construction, correct?

13:23:05  4      A.   Correct.

13:23:06  5      Q.   So the City would have had to demarcate or note,

13:23:10  6   stay away five or ten feet from property lines, or

13:23:14  7   anything like that?

13:23:14  8      A.   That is correct.

13:23:15  9      Q.   And the City did not do that?

13:23:16  10     A.   No.

13:23:30  11     Q.   Until today, did you ever acknowledge that

13:23:36  12  perhaps the City made a mistake with the Cambridge

13:23:40  13  subdivision?

13:23:41  14     A.   No.

13:23:45  15     Q.   And you do acknowledge it now?

13:23:47  16     A.   I did earlier, yes.

13:23:49  17              MR. ROBON:  No further questions.

13:23:51  18              THE COURT:  Do you reserve the right to call

13:23:54  19  during your case, I assume?

13:23:55  20              MR. BAHRET:  I do.

13:23:55  21              THE COURT:  You may step down then.

13:23:59  22              You may call your next witness.

13:24:33  23              (The witness was sworn by the clerk.)

13:24:57  24              THE COURT:  That's the mike, and it works.

13:25:00  25  We ask you to swing it however you need to to be heard.

| | | |
|---|---|---|
| 13:25:03 | 1 | Thank you. |
| 13:25:08 | 2 | - - - |
| 13:25:08 | 3 | RAY HUBER, DIRECT EXAMINATION |
| 13:25:09 | 4 | BY MR. ROBON: |
| 13:25:09 | 5 | Q.  Would you introduce yourself to the jury? |
| 13:25:11 | 6 | A.  Good afternoon, everybody.  My name is Ray |
| 13:25:14 | 7 | Huber.  I'm the Wood County engineer, Wood County, |
| 13:25:16 | 8 | Ohio. |
| 13:25:17 | 9 | Q.  And how long have you been the Wood County |
| 13:25:19 | 10 | engineer? |
| 13:25:19 | 11 | A.  About three and a half years now. |
| 13:25:21 | 12 | Q.  And is the Wood County engineer responsible for |
| 13:25:25 | 13 | public drainage? |
| 13:25:27 | 14 | A.  For public drainage, yes. |
| 13:25:28 | 15 | Q.  But you're not responsible for private drainage, |
| 13:25:31 | 16 | correct? |
| 13:25:31 | 17 | A.  That is correct. |
| 13:25:32 | 18 | Q.  And the railroad property at the CSX railroad is |
| 13:25:37 | 19 | considered private property; is it not? |
| 13:25:40 | 20 | A.  That is correct. |
| 13:25:40 | 21 | Q.  And the land adjacent to the CSX railroad, |
| 13:25:44 | 22 | whether it's the Cambridge subdivision or other |
| 13:25:46 | 23 | property, is private property, correct? |
| 13:25:49 | 24 | A.  That is correct. |
| 13:25:56 | 25 | Q.  Back in 2006, my understanding is the City of |

13:25:59  1    Toledo engineers called you when they ran into a 24-inch

13:26:04  2    diameter drain tile going from a manhole into a drainage

13:26:11  3    ditch next to the active tracks; do you recall that?

13:26:15  4        A.   No, sir, they did not.

13:26:17  5        Q.   They didn't call you?

13:26:18  6        A.   No, sir.

13:26:19  7        Q.   Who did they call?

13:26:20  8        A.   I don't know.

13:26:21  9        Q.   Did you meet with them?

13:26:23  10       A.   With the City of Toledo relative to that issue?

13:26:26  11       Q.   Yes.

13:26:27  12       A.   No, sir.

13:26:27  13       Q.   You never did?

13:26:29  14       A.   No.

13:26:30  15       Q.   Did you meet with Christy Soncrant here?

13:26:34  16       A.   I met with her in -- I believe it was July or

13:26:38  17   sometime in that area of '06.

13:26:41  18       Q.   Was that before or after that drain tile was

13:26:45  19   severed; do you know?

13:26:46  20       A.   I believe it was before.

13:26:49  21       Q.   And can you tell the jury what you told her?

13:26:53  22       A.   I advised her that about a month prior to that

13:26:58  23   time that I had been on that property, the Cambridge

13:27:01  24   subdivision property, to look at an issue relative to

13:27:07  25   vegetation, and in the process of walking around the

13:27:11  1   property, I did observe a catch basin and a pipe inside

13:27:16  2   that catch basin that appeared to go underneath the

13:27:19  3   railroad or what was the old Toledo terminal railroad,

13:27:22  4   which is on your graphics there called a waterline.

13:27:26  5   And --

13:27:27  6       Q.   Why don't you come over here and point that out

13:27:29  7   for the jury here.

13:27:31  8       A.   Sure.

13:27:43  9       Q.   This is Exhibit Number 6.

13:27:51  10      A.   I did observe this little catch basin at that

13:27:54  11  point right here the day I was out there, which was in

13:27:57  12  May of 2006.   I did see a pipe that appeared to go

13:28:00  13  under the -- it looked like the blue line, which is the

13:28:04  14  old abandoned Toledo terminal railroad, which the City

13:28:07  15  of Toledo was going to use to place their waterline.

13:28:10  16  And at that time I noticed over here between the

13:28:15  17  existing railroad and where the waterline was going to

13:28:18  18  go, there appeared to be an outlet at that location

13:28:21  19  right there.

13:28:22  20      Q.   Right here, in the ditch?

13:28:25  21      A.   That ditch.   I had no way of knowing at that

13:28:27  22  time if the two were connected.   I have no evidence to

13:28:30  23  that -- at that point.   I had no idea as to which way

13:28:33  24  the water, if it did go through there at all, whether it

13:28:36  25  drained from here to there, or from there back up the

13:28:39  1   other way.  But I did see it.

13:28:41  2       Q.   And did you call it to the City's attention?

13:28:43  3       A.   I subsequently -- I don't know whether I called

13:28:46  4   it to her attention or you called it to my attention.

13:28:49  5   Somehow the message got back to the City of Toledo.  I

13:28:52  6   agreed to meet with the City of Toledo on the job site

13:28:55  7   about a month, month and a half later, something along

13:28:59  8   those lines.  I can't recall the exact date because I

13:29:02  9   didn't note it down.  But what I had done is I went

13:29:04  10  back to the office.  When I saw this, one of the things

13:29:08  11  that as a county engineer I'm responsible for is

13:29:11  12  drainage.  I am sensitive to drainage issues.  When I

13:29:15  13  saw that I thought, I wonder if that's been considered,

13:29:19  14  that this waterline is going to pass through there.

13:29:22  15  Went back to the office, checked the old railroad plans;

13:29:24  16  I think they're on file here somewhere.  Noted on the

13:29:28  17  railroad plans there was a 24-inch diameter pipe shown

13:29:31  18  on the railroad drawings.  I said, I wonder if the City

13:29:35  19  has picked that up on their plans.  I checked the copy

13:29:38  20  of the plan I have in my office courtesy of the City of

13:29:42  21  Toledo, noted it was not there.  Said, uh-uh.  Somebody

13:29:45  22  better know about this.  That's when I was in contact

13:29:48  23  with the City.  I took a copy of the railroad plans

13:29:50  24  with me to the site when I met the young lady here,

13:29:53  25  and --

13:29:54  1    Q.   You're referring to Christy Soncrant?

13:29:58  2    A.   I'm assuming this is Christy.   Said you ought to

13:30:01  3  be aware of this because I see it on my plan, here, see.

13:30:04  4  I don't see it on your plans.   As a courtesy, one

13:30:07  5  professional to another professional, I offered that

13:30:10  6  courtesy to the City of Toledo.   That's the last I

13:30:13  7  heard about it.

13:30:16  8    Q.   When your deposition was taken, Mr. Huber, a

13:30:20  9  question was asked:  Now that this six-foot in diameter

13:30:25  10  plus pipe is in the ground, how would you get water from

13:30:33  11  the manhole over to this ditch?

13:30:37  12       And we talked about a pumping station.

13:30:39  13    A.   If, in fact, that pipe were cut, and I had been

13:30:43  14  advised by attorneys that it has been cut, the only way

13:30:46  15  to get it over the railroad now would either to be

13:30:48  16  probably to pump it across, up and over and into the

13:30:52  17  ditch that's between the two railroads.

13:30:54  18    Q.   Do you recall that you gave me a $200,000

13:30:58  19  estimate to do that?

13:30:58  20            MR. BAHRET:   Objection.

13:30:59  21            THE COURT:   Sustained.

13:31:01  22            MR. ROBON:   I'll rephrase.

13:31:01  23  BY MR. ROBON:

13:31:01  24    Q.   Can you advise the jury what you believe the cost

13:31:04  25  of a pumping station would be to solve that problem?

192

13:31:07    1      A.   At that time I did use a number of $200,000 off

13:31:11    2   the top of my head without any engineering expertise --

13:31:15    3   or not expertise, but engineering data available to me

13:31:18    4   to make a statement like that.

13:31:19    5      Q.   But it would be a rough idea, $10,000, $20,000

13:31:25    6   either way?

13:31:25    7      A.   It might even be more today.

13:31:28    8      Q.   More than 200, you mean?

13:31:30    9      A.   More than 200.

13:31:31   10      Q.   And permission would have to be obtained from the

13:31:35   11   CSX railroad and the City of Toledo to put a pumping

13:31:38   12   station at that point, correct?

13:31:41   13           MR. BAHRET:   Objection, Your Honor.   Two

13:31:45   14   reasons:   One, it's not only leading; secondly, this man

13:31:48   15   would have no idea if he needs permission from the City

13:31:52   16   of Toledo.

13:31:52   17           MR. ROBON:   I'll rephrase the question.

13:31:53   18           THE COURT:   Thank you.

13:31:55   19   BY MR. ROBON:

13:31:56   20      Q.   Since the pumping station would be on the CSX

13:31:59   21   right-of-way, what do you believe would be necessary to

13:32:02   22   get permission?

13:32:11   23           THE COURT:   If you know.

13:32:15   24      A.   Number one, as I see the project right now, the

13:32:18   25   pumping station would not be on the railroad's property.

13:32:20  1   It's on private property.   But in order to get from

13:32:23  2   private property to the middle of the ditch, you would

13:32:26  3   have to cross railroad -- well, now, railroad property

13:32:29  4   and the City of Toledo property.   Permits would have to

13:32:31  5   be obtained from both.

13:33:17  6      Q.   I'm going to put up on the stand here Exhibit

13:33:23  7   Number 37.   This is a picture taken behind the house on

13:33:28  8   lot 15 in the Cambridge subdivision.   It was taken

13:33:32  9   December 1 of '06 showing flooding.  Do you believe that

13:33:39  10  flooding may have been caused by the cutting of the

13:33:42  11  manhole drainage pipe?

13:33:43  12          MR. BAHRET:   Objection.

13:33:46  13          THE COURT:   I'm not sure a proper

13:33:48  14  foundation's been laid.   Is that the basis for your

13:33:52  15  objection?

13:33:53  16          MR. BAHRET:   It's leading, no foundation.

13:33:55  17  And if it's opinion testimony, it isn't to the proper

13:33:58  18  standard.  So there's three reasons.

13:34:01  19          MR. ROBON:   I'll start over.

13:34:02  20          THE COURT:   Thank you.

13:34:04  21  BY MR. ROBON:

13:34:04  22     Q.   Mr. Huber, when you were out there, have you been

13:34:07  23  out by the manhole since 2006?

13:34:11  24     A.   Yes, on one other occasion.

13:34:13  25     Q.   Did you see water ponding at the bottom outside

| | |
|---|---|
| 13:34:16 | 1 | the manhole? |
| 13:34:17 | 2 | A.  No, I did not. |
| 13:34:18 | 3 | Q.  Was it summertime? |
| 13:34:20 | 4 | A.  No, it was early spring, March, somewhere in that |
| 13:34:24 | 5 | area. |
| 13:34:25 | 6 | Q.  Things were frozen? |
| 13:34:26 | 7 | A.  Things were pretty cold, yes.  There was snow on |
| 13:34:29 | 8 | the ground. |
| 13:34:33 | 9 | Q.  The county approved the development plans for the |
| 13:34:36 | 10 | Cambridge subdivision, correct? |
| 13:34:38 | 11 | A.  That's correct. |
| 13:34:39 | 12 | Q.  And there's a drainage plan for Cambridge |
| 13:34:42 | 13 | subdivision? |
| 13:34:43 | 14 | A.  That's correct. |
| 13:34:43 | 15 | Q.  And the drainage plan shows several catch basins |
| 13:34:50 | 16 | alongside or near the CSX property, one of which the |
| 13:34:55 | 17 | testimony is right in this area between lots 15 and 16. |
| 13:35:01 | 18 | My question to you is:  If that drainage was installed |
| 13:35:07 | 19 | according to the plans, should there be ponding of this |
| 13:35:12 | 20 | depth and this magnitude on the back of the Cambridge |
| 13:35:15 | 21 | subdivision? |
| 13:35:16 | 22 | MR. BAHRET:  Objection. |
| 13:35:19 | 23 | THE COURT:  I'll overrule. |
| 13:35:22 | 24 | MR. ROBON:  You can answer. |
| 13:35:23 | 25 | A.  This picture is on Cambridge's property? |

13:35:26  1      Q.   Yes.

13:35:26  2      A.   It should not have been that deep, no, unless

13:35:29  3  there was an obstruction.

13:35:31  4      Q.   And I'm going to hand you -- we had those plans

13:35:35  5  up here.

13:35:36  6      A.   The railroad?

13:35:36  7      Q.   Yeah.

13:35:38  8           I'm going to hand you what we've marked as

13:35:41  9  Exhibit Number 45.   Are these the plans that you gave

13:35:49  10  to Christy Soncrant showing the crossover pipe back in

13:35:54  11  2006?

13:35:57  12      A.   Yes, it is, or a portion of it.

13:36:58  13      Q.   Was there an implicit or other approval of the

13:37:02  14  severing of the drainage pipe by your office in your

13:37:05  15  opinion?

13:37:05  16      A.   No.

13:37:07  17                MR. ROBON:   No further questions.

13:37:09  18                THE COURT:   You may cross.

13:37:10  19                MR. BAHRET:   Thank you.

13:37:20  20                       - - -

13:37:20  21                RAY HUBER, CROSS-EXAMINATION

13:37:20  22  BY MR. BAHRET:

13:37:20  23      Q.   Mr. Huber, you know who I am, right?

13:37:23  24      A.   Yes, sir.

13:37:24  25      Q.   And you and I, I don't remember the date, but we

13:37:27  1   had occasion to speak with you down in the Wood County

13:37:29  2   offices?

13:37:30  3       A.   That is correct.

13:37:30  4       Q.   And by the way, the attractive woman sitting

13:37:35  5   there at the table, do you know who that is?

13:37:37  6       A.   That is Linda Holmes, our assistant prosecuting

13:37:40  7   attorney in Wood County.

13:37:43  8       Q.   That was kind of a trick question.   I was

13:37:47  9   wondering which woman you were going to pick.

13:37:49  10      A.   The best.

13:37:56  11      Q.   Mr. Huber, my understanding is you don't have a

13:37:58  12  subspecialty.  You are an engineer?

13:38:00  13      A.   That is correct.

13:38:01  14      Q.   Civil engineer?

13:38:02  15      A.   Right.

13:38:02  16      Q.   But you're not a water expert?

13:38:04  17      A.   No.

13:38:05  18      Q.   And as far as actually doing any specific study

13:38:09  19  out at the Cambridge property, you really didn't do any

13:38:12  20  studies of any kind, did you?

13:38:14  21      A.   No, sir.

13:38:14  22      Q.   On this crossover pipe issue, that's basically

13:38:19  23  been the focus of your testimony, and I want to talk

13:38:21  24  about that.   Do you know if the pipe was open?

13:38:28  25      A.   When I observed it the day I was there, I did see

13:38:31  1    that the pipe had silt built up in it over Lord knows

13:38:36  2    how long a time it was there.  I can't say it was

13:38:39  3    plugged completely.

13:38:40  4        Q.  But it was mostly plugged; was it not?

13:38:43  5        A.  Define "mostly."

13:38:44  6        Q.  So that it would have a substantial impact on its

13:38:47  7    ability to move water in any direction.

13:38:52  8        A.  Again, "substantial impact."   There was an

13:38:55  9    obstruction to the flow of water; I could say that.

13:38:58  10       Q.  Did you ever see the pipe when it was cut so you

13:39:01  11   could see it from the middle looking out, its condition?

13:39:05  12       A.  No, sir.

13:39:05  13       Q.  Would that be the best way to judge how plugged

13:39:08  14   it was?

13:39:08  15       A.  That would be one way, yes.

13:39:10  16       Q.  Okay.  How far below ground was that pipe?

13:39:16  17       A.  Not measuring it the day I was there, I estimated

13:39:20  18   it was probably in the neighborhood of eight feet deep,

13:39:23  19   maybe ten feet.   The more I was standing looking at

13:39:26  20   it --

13:39:27  21       Q.  First of all, do you know for sure it's that

13:39:31  22   deep, or could it have been six?

13:39:32  23       A.  It could have been six.   It could have been ten.

13:39:35  24   I don't really --

13:39:36  25       Q.  Do you know how deep the City water main is

13:39:38  1  installed?

13:39:39  2      A.   Looking at the plans that I've looked at since

13:39:44  3  this time, the rule of thumb for most waterlines that

13:39:47  4  are built is the top of the pipe is usually five to six

13:39:50  5  feet below grade.   The pipe diameter itself is five and

13:39:54  6  a half feet in diameter.   The wall thickness of the

13:39:57  7  pipe is probably close to a foot, accumulative value.

13:40:03  8  So adding those numbers together, you're into the ground

13:40:07  9  12, 13 feet right off the bat.

13:40:09  10     Q.   I was referring to the top.

13:40:10  11     A.   Five to six feet is the norm.

13:40:13  12     Q.   And, in fact, that would be specified as a

13:40:16  13  minimum.   They'd be upset if it was less than that;

13:40:19  14  would they not?

13:40:20  15     A.   Normally, yes.

13:40:21  16     Q.   And do you know if the crossover pipe could fit

13:40:25  17  on top of the water main?

13:40:27  18     A.   Could a pipe fit on top of it, or did it?

13:40:30  19     Q.   Did it?

13:40:31  20     A.   I don't know that.

13:40:31  21     Q.   Okay.   So you're not saying that one couldn't

13:40:34  22  simply put another pipe in right where it was but going

13:40:38  23  over the water main?

13:40:40  24     A.   You're asking me my learned opinion.   I would say

13:40:44  25  it would be very impractical at this point.

13:40:46  1    Q.   But you're not saying it can't be done?

13:40:48  2    A.   I'm not saying it can't be done.

13:40:50  3    Q.   Would you agree with me, sir, that when you were

13:40:53  4  out there studying this project -- that's the wrong

13:40:57  5  word.   When you were there as a consultant, you were of

13:41:00  6  the opinion that more likely than not that pipe, if it's

13:41:03  7  draining any water at all --

13:41:04  8              MR. ROBON:  I'm going to object to the use

13:41:07  9  of the word "consultant."   He was there as a county

13:41:10  10  engineer, not as a consultant.

13:41:13  11              THE COURT:  Well, let's ask the witness.   In

13:41:15  12  what position were you there?

13:41:17  13              THE WITNESS:  I was there at the invite of

13:41:18  14  the Wood County Commissioner to visit Mr. Jack Laskey,

13:41:21  15  who had invited the commissioner to come to the site to

13:41:24  16  look at vegetation.

13:41:26  17  BY MR. BAHRET:

13:41:26  18    Q.   So would your role be like an informal

13:41:30  19  consultant, or was I off base?

13:41:31  20    A.   I was simply there as the county engineer as a

13:41:34  21  guest of the Wood County Commissioner.

13:41:37  22    Q.   Whatever your capacity was, when you were there,

13:41:40  23  did you advise that you believed if the pipe was moving

13:41:44  24  water, it was likely moving it from railroad property

13:41:49  25  towards the private property next to it?

13:41:51  1     A.   No.

13:41:51  2     Q.   You did not?

13:41:52  3     A.   Because I needed information to corroborate that

13:41:56  4  information.

13:41:56  5     Q.   Isn't it a fact that the railroads typically

13:41:59  6  don't allow water from private property to come on the

13:42:03  7  railroad property?

13:42:05  8     A.   I can't answer that question.

13:42:07  9     Q.   Did you advise Mr. Laskey that that was your

13:42:12 10  thought?

13:42:12 11     A.   No, I did not.

13:42:18 12     Q.   What condition was the catch basin -- is that the

13:42:22 13  proper term for this manhole, the catch basin?

13:42:25 14     A.   Either one is acceptable.

13:42:27 15     Q.   What was the condition of it?

13:42:28 16     A.   It was broken down.  It was not in good repair.

13:42:32 17  How to describe its actual condition, from what I could

13:42:36 18  observe, it was old block, concrete block.  It had

13:42:41 19  been -- some of it was broken down.  The top was

13:42:44 20  missing.  Those were the small details that I do

13:42:47 21  recall.

13:42:49 22     Q.   Are you aware of the fact that Cambridge had a

13:42:53 23  water issue on its land even before there was any

13:42:55 24  construction on the pipeline?

13:42:57 25     A.   No, sir.

| | | |
|---|---|---|
| 13:43:24 | 1 | Q.  Can you read that?  You can see it? |
| 13:43:27 | 2 | A.  Yes. |
| 13:43:28 | 3 | Q.  And that's from page 31 -- |
| 13:43:30 | 4 | A.  Okay. |
| 13:43:30 | 5 | Q.  -- of the transcript. |
| 13:43:32 | 6 | And I asked you:  "Did they have a water issue |
| 13:43:35 | 7 | there?" |
| 13:43:36 | 8 | And you said, "They had some water issues down in |
| 13:43:39 | 9 | here." |
| 13:43:40 | 10 | Question:  This is before any construction? |
| 13:43:42 | 11 | And your answer is, "This is before any |
| 13:43:43 | 12 | construction." |
| 13:43:47 | 13 | Was that -- |
| 13:43:48 | 14 | A.  You moved it away before I had a chance to -- |
| 13:43:53 | 15 | Q.  I'm sorry. |
| 13:44:12 | 16 | A.  What timeframe are we looking at here?  I'm |
| 13:44:15 | 17 | totally confused as to what I'm reading here relative to |
| 13:44:18 | 18 | the timeframes that were involved in this project.  Are |
| 13:44:23 | 19 | we talking about when I was there the first time or |
| 13:44:25 | 20 | later? |
| 13:44:26 | 21 | Q.  Before the construction.  The question was, was |
| 13:44:30 | 22 | there water before the construction?  I think that's |
| 13:44:33 | 23 | what the question said. |
| 13:44:52 | 24 | A.  What is your specific question?  I still haven't |
| 13:44:55 | 25 | been able to come up with an answer to your specific |

13:44:59   1   question.

13:44:59   2       Q.   Was there a water issue in the back of Cambridge

13:45:02   3   before construction?

13:45:04   4       A.   Of the waterline?

13:45:05   5       Q.   Yes.   Before construction of the waterline and

13:45:09   6   cutting of the drainage culvert and those sorts of

13:45:13   7   things.

13:45:13   8       A.   On the day that I was there, there didn't seem to

13:45:16   9   be.   But as I recall there had been some issues with

13:45:18   10  water in that corner.

13:45:19   11      Q.   They advised you that there was an issue,

13:45:22   12  correct?

13:45:22   13      A.   From what I can recollect, I think it was

13:45:25   14  mentioned.   But again, I'm not real clear on it in my

13:45:29   15  mind.

13:45:29   16      Q.   Mr. Huber, that would be the only way you'd know

13:45:31   17  about it is if they told you, right?

13:45:34   18      A.   That's correct.

13:45:41   19      Q.   By the way, did you ever look in that manhole?

13:45:45   20      A.   I looked into it, yes.

13:45:54   21      Q.   When did do you that?

13:45:56   22      A.   The day I was there, the first time.   Two years

13:45:59   23  ago this month.

13:46:14   24      Q.   Can you read that?

13:46:15   25      A.   We're looking at what?   Question number -- the

13:46:18  1   second question down?

13:46:19  2       Q.   Right.   Page 61 of your deposition.

13:46:23  3       A.   Okay.

13:46:25  4       Q.   It says, "Did you open up the manhole and look

13:46:27  5   down into it?

13:46:28  6       A.   I didn't have to look down into it.   It was

13:46:32  7   already opened.   Okay.

13:46:39  8       Q.   So in response to a question, "Did you open it up

13:46:42  9   and look down into it?"  You say, "I did not."

13:46:44 10       A.   It was already opened.

13:46:46 11       Q.   But what about the part of the question, "Did you

13:46:47 12   look down into it?"

13:46:48 13       A.   I did.

13:46:49 14       Q.   Why doesn't it say that?

13:46:58 15            MR. ROBON:  Objection, Your Honor.  That's

13:46:59 16   not the question he asked at the deposition.

13:47:01 17       A.   Are we talking about opening it up or looking

13:47:04 18   down into it?

13:47:05 19       Q.   Well, it's a two-part question.

13:47:06 20       A.   Well, the first part is, no, I did not because it

13:47:10 21   was already opened.

13:47:11 22            Did I look down into it?  Yes, I did.

13:47:24 23       Q.   Let me get my book back together.   All right,

13:47:42 24   Mr. Huber.   Let me get my notes together here.

13:47:56 25            And back on that standing water issue, sir,

13:48:00   1   you -- I think we've already covered this.  You would

13:48:07   2   expect or you would not be surprised by a standing water

13:48:11   3   issue back in that back part of the Cambridge property

13:48:14   4   and on the adjoining land, correct?

13:48:17   5       A.  That's correct.

13:48:17   6       Q.  And tell the jury why you would not be surprised

13:48:20   7   that there would be a standing water problem there even

13:48:23   8   if this pipe had never been cut.

13:48:26   9       A.  Like I mentioned earlier, when I did look into

13:48:29   10   the manhole and did see the pipe, there was no question

13:48:32   11   that there was some obstruction in the pipe.  The

13:48:36   12   buildup of silt and mud over who knows how long a period

13:48:40   13   of time, which would, in fact, obstruct the flow of

13:48:43   14   water through the structure.  The corner of that lot is

13:48:45   15   the lowest point of the private property immediately

13:48:49   16   adjacent to it, and I believe probably one of the lower

13:48:52   17   points in the subdivision itself.  So natural run off

13:48:56   18   was going to cause water to collect in that corner.  If

13:48:59   19   it can't get through the pipe, it's going to pond.

13:49:02   20       Q.  Incidentally, speaking of ponding, you mentioned

13:49:07   21   you're familiar with the fact the subdivision itself has

13:49:10   22   a drainage plan?

13:49:11   23       A.  Yes.

13:49:11   24       Q.  There's a design capacity for any drainage plan,

13:49:15   25   correct?

13:49:15    1    A.   Right.

13:49:16    2    Q.   They're not going to design it for a huge

13:49:18    3  rainfall; they'll design it for some normal rainfall?

13:49:22    4    A.   That is correct.

13:49:22    5    Q.   So if one has a big rainfall, one is going to

13:49:27    6  have flooding or ponding in the back of that area you've

13:49:30    7  talked about, the low spot of the development at 15, 16

13:49:36    8  lots -- I'm putting a whole bunch of things in there.

13:49:39    9  Are you agreeing with me so far?

13:49:43   10    A.   I'm with you so far.

13:49:44   11    Q.   And we've had some substantial rains in '06 and

13:49:48   12  '07, correct?

13:49:49   13    A.   That's correct.

13:49:49   14    Q.   Rains that would be far beyond the capacity that

13:49:52   15  the drainage system at Cambridge would be designed for?

13:49:55   16    A.   That's correct.

13:49:56   17    Q.   So without question you would expect and assume

13:49:58   18  that there would be ponding in that area even similar to

13:50:02   19  what you saw in that one exhibit?

13:50:04   20    A.   That could very well be.

13:50:05   21    Q.   Okay.  And those would be transient after a

13:50:09   22  little while?  Day or two or whatever they -- the water

13:50:13   23  leaves?

13:50:14   24    A.   That's correct.

13:50:23   25    Q.   You had nothing to do with the planning or

13:50:31   1   construction of the water project?

13:50:33   2       A.   That is correct.

13:50:34   3       Q.   You had nothing to do with approving or

13:50:38   4   disapproving any plans?

13:50:40   5       A.   That is correct.

13:50:41   6       Q.   You had nothing to do with approving or

13:50:44   7   disapproving any plans for the development and

13:50:47   8   construction of Cambridge itself?

13:50:51   9       A.   That is correct.

13:50:52   10       Q.   But despite that, it is -- people do --

13:50:57   11   developers and contractors do file plans with the

13:50:59   12   county?

13:51:00   13       A.   They do.

13:51:00   14       Q.   And the county expects them to follow those

13:51:03   15   plans?

13:51:05   16       A.   Yes.

13:51:08   17       Q.   Now, are you familiar with the drainage plan for

13:51:11   18   Cambridge?  Would you recognize it if you saw it?

13:51:16   19       A.   I would now.

13:51:18   20       Q.   Because of all this?   Well said.

13:51:23   21       Let me show you the drainage plan which is marked

13:51:26   22   as --

13:51:28   23           MR. ROBON:  Mr. Barrett, what Exhibit

13:51:31   24   Number?

13:51:31   25           MR. BAHRET:  F.

13:51:33  1            MR. ROBON:  Is that the one you took out of

13:51:35  2    my book?   Because I don't have it.

13:51:41  3            MR. BAHRET:  I was an indian giver, Marv.

13:51:44  4            THE COURT:  Defendant's Exhibit F?

13:51:47  5            MR. BAHRET:  Correct.

13:51:48  6    BY MR. BAHRET:

13:51:48  7       Q.  You've seen that before?

13:51:49  8       A.  Yes, I have.

13:51:50  9       Q.  What does the little legend that I pointed out to

13:51:54  10   you say?

13:51:54  11      A.  The contractor shall clear and grade all the rear

13:51:57  12   lot lines for pipes, utilities, and drainage.

13:52:01  13      Q.  So that means the area -- the last 30 feet of the

13:52:06  14   development immediately abutting the railroad property,

13:52:11  15   if they follow that plan, is going to be stripped?

13:52:14  16      A.  I wouldn't say that.

13:52:16  17      Q.  It means it has to be cleared?

13:52:19  18      A.  It doesn't say that.   It says for pipes,

13:52:25  19   utilities, and drainage.

13:52:29  20      Q.  Let's put this up.

13:52:30  21      A.  It doesn't say for easements.

13:52:35  22      Q.  Does it say that the contractor shall clear and

13:52:39  23   grade all the rear lot lines for pipes, utilities, and

13:52:44  24   drainage?

13:52:44  25      A.  That, it does.

13:52:45  1    Q.   Is there a legend on that for what that easement

13:52:51  2    is?

13:52:51  3    A.   That, I don't know.  I'd have to look at the plan

13:52:54  4    again.

13:54:16  5    Q.   If you don't see it, that's fine?

13:54:17  6    A.   I don't see what you're driving at.   I see an

13:54:20  7    indication that there could be an easement.   I see an

13:54:23  8    indication there could be an easement on this property,

13:54:26  9    but I don't see it spelled out in any particular width.

13:54:29  10   Q.   I'll ask a different witness that then.   Thanks.

13:54:32  11   A.   Okay.

13:54:33  12   Q.   Would you agree, though, that the property was --

13:54:36  13   the intent of that document is that the property would

13:54:40  14   need to be cleared all the way to the property line and

13:54:43  15   mowed?

13:54:44  16            MR. ROBON:   Objection.   The document intent

13:54:50  17   is --

13:54:51  18            THE COURT:   If he can answer, you can go

13:54:54  19   ahead.

13:54:55  20   A.   I could say that it may have been the intent of

13:54:58  21   the consulting firm that did the plans.   That's a

13:55:02  22   general note.   I've seen it before.   Whether it was

13:55:05  23   actually accomplished, whether the owner told him to do

13:55:08  24   it or not, I don't know that.

13:55:09  25   Q.   That's not what I asked you.   I just asked was

13:55:13  1   it intended in that drawing, as you read that drawing in

13:55:15  2   your capacity as an engineer, that the rear of the lots

13:55:20  3   in Cambridge were supposed to be cleared, correct?

13:55:21  4       A.  No, I can't say that.  I know what it says, but I

13:55:26  5   can't say that that's the intent.

13:55:28  6       Q.  All right.   Well, at your deposition, again,

13:55:32  7   when I asked you:  "So that would require the property

13:55:35  8   to be cleared all the way to the property line and

13:55:39  9   mowed?"

13:55:40  10          Your answer:  "That is probably the intent."

13:55:46  11      A.  That word "probably," I'll use it again.

13:55:49  12  Probably.   But I can't say that it was.

13:55:51  13      Q.  Then also would you expect that they would, in

13:55:53  14  fact, clear this property on the back?

13:55:58  15      A.  That's a fair assumption.

13:56:00  16      Q.  And that's because, as you told us on the day of

13:56:03  17  your deposition, you'd have to do it to put in the pipe

13:56:10  18  system for their drainage plan?

13:56:13  19      A.  A portion of it, yes.   All of it, I can't say

13:56:16  20  that.

13:56:16  21      Q.  But that's what you told us then, correct?

13:56:18  22      A.  Without the benefit of any numerical values, yes.

13:56:40  23      Q.  You've never been a consultant for the City of

13:56:42  24  Toledo, have you?

13:56:43  25      A.  No, sir.

13:56:44  1    Q.   And you've never been retained to be a consultant
13:56:46  2  for Old Granite or Cambridge either?
13:56:48  3    A.   No, sir.
13:56:56  4    Q.   You haven't been asked -- you never did anything
13:56:59  5  to form any opinion as to whether any encroachment
13:57:02  6  occurred?
13:57:02  7    A.   No, sir.
13:57:05  8    Q.   My guess is, and I think you told us this before,
13:57:08  9  your office really wouldn't have jurisdiction in that
13:57:11  10  issue anyway?
13:57:12  11    A.   That is correct.
13:57:13  12    Q.   So you would -- it's not that you didn't do your
13:57:16  13  job; it's that isn't part of your job?
13:57:18  14    A.   That is correct.
13:57:24  15    Q.   Did it appear to you -- if this is repetition,
13:57:28  16  Mr. Huber, forgive me.   This catch basin or manhole,
13:57:32  17  that was in poor repair; was it not?
13:57:34  18    A.   Yes, sir.
13:57:35  19          MR. ROBON:   Objection.   Asked and answered.
13:57:36  20          THE COURT:   It has.   And the answer may
13:57:38  21  stand.   Try not to repeat things.
13:57:44  22          MR. BAHRET:   I will not.   I forgot to cross
13:57:47  23  it off in my note.
13:57:48  24  BY MR. BAHRET:
13:57:48  25    Q.   Your office didn't go out to assure that the

13:57:52 1   plans, including the drainage plan, were complied with,

13:57:55 2   did you?

13:57:55 3       A.   The only extent that my office was at that site

13:57:58 4   was to insure that any of the infrastructure, including

13:58:03 5   the road itself, within the public right-of-way was

13:58:05 6   installed properly.

13:58:07 7       Q.   And so if I'm hearing you right, this is not in

13:58:12 8   the public right-of-way; and therefore, it would not be,

13:58:15 9   as you see it, it would not be in the jurisdiction of

13:58:18 10  the Wood County engineer?

13:58:19 11      A.   That is correct.

13:58:20 12      Q.   Now, the concern -- the meeting was called

13:58:25 13  because of express concerns from Mr. Laskey to Mr. Alvie

13:58:31 14  Perkins, the commissioner, about the vegetation issue;

13:58:34 15  is that right?

13:58:34 16      A.   That was the original intent.

13:58:36 17      Q.   All right.   And so the vegetation had already

13:58:38 18  been cut?

13:58:40 19      A.   No, it had not.

13:58:41 20      Q.   It had not.   So you were out there before there

13:58:44 21  was any clearing?

13:58:46 22      A.   That is correct.

13:58:47 23      Q.   And Mr. Laskey was there expressing concern as to

13:58:52 24  what they might be doing?

13:58:53 25      A.   That's correct.

13:58:54    1      Q.   So in your mind there's no problem at all; you

13:58:56    2   can say affirmatively that Mr. Laskey had notice of this

13:59:00    3   project?

13:59:02    4      A.   Repeat the question, please.

13:59:03    5      Q.   You know, in fact, you can prove that Mr. Laskey

13:59:06    6   and Old Granite knew about this project before it ever

13:59:10    7   began because you're there having a meeting before --

13:59:13    8      A.   That's right.

13:59:17    9      Q.   You can still see train tracks from the Cambridge

13:59:21   10   property when you were there, correct?

13:59:23   11      A.   That's correct.

13:59:24   12      Q.   You had no problem seeing and hearing a train,

13:59:28   13   correct?

13:59:29   14      A.   That's -- I did not see a train that particular

13:59:33   15   day.

13:59:33   16      Q.   That's not because it's invisible or anything;

13:59:37   17   it's in your visit one did not go by?

13:59:39   18      A.   No.

13:59:39   19      Q.   Had one gone by, you feel confident you would

13:59:43   20   have both seen it and heard it?

13:59:44   21      A.   Yes, sir.

13:59:47   22      Q.   And this is before any work had been done?

13:59:50   23      A.   That is correct.

13:59:57   24      Q.   And in that first meeting Mr. McCarthy was there;

14:00:03   25   that would be Jack Mr. McCarthy, correct?

14:00:05  1      A.   Yes, he was.

14:00:06  2      Q.   That first meeting is obviously before the

14:00:08  3   crossover pipe had been cut, correct?

14:00:12  4      A.   That's correct.

14:00:12  5      Q.   That was before the City even knew the crossover

14:00:15  6   pipe was there?

14:00:15  7      A.   That's correct.

14:00:18  8      Q.   And on that occasion, Mr. McCarthy complained

14:00:22  9   about a water drainage issue in the back corner of the

14:00:25  10  property?

14:00:26  11     A.   I don't recall that statement, no.

14:00:36  12          MR. BAHRET:  Could I just hand him his --

14:00:38  13  refresh his recollection?

14:00:40  14          THE COURT:  Yes.

14:00:40  15  BY MR. BAHRET:

14:00:40  16     Q.   Let me just show you this page of your

14:00:43  17  transcript.  Does that reviewing that page of your

14:01:02  18  transcript, does that refresh your recollection?

14:01:05  19     A.   A moment please.   All right.

14:01:21  20     Q.   Refreshed?

14:01:22  21     A.   Well, as best as can possibly be done.

14:01:26  22     Q.   Now, did Mr. McCarthy complain to you when you

14:01:30  23  were out there before the project that there -- or maybe

14:01:34  24  "complain" is the wrong word.   It's the word I used in

14:01:37  25  here.   But did he at least mention the water problem

14:01:40  1    with you?

14:01:40  2        A.   Probably did.   I just don't recall it in that

14:01:43  3    detail.   If I said it there, I must have said it then.

14:01:47  4        Q.   It's on that page.

14:01:48  5        A.   It's on that page?

14:01:52  6             THE COURT:   Can we have for the record what

14:01:56  7    his answer was at that time?

14:01:59  8             MR. BAHRET:   I'm sorry.   Do you want me to

14:02:06  9    read the whole thing to put it in context.

14:02:10  10            THE COURT:   Maybe the witness can paraphrase

14:02:14  11   it.   Right now there's nothing before the jury what his

14:02:16  12   answer was.

14:02:17  13   BY MR. BAHRET:

14:02:17  14       Q.   Would you, reviewing all this -- let me get you

14:02:21  15   the page before that to help you put it in context, if

14:02:31  16   you need this.   Try to paraphrase what that idea is in

14:02:36  17   the context of whether Mr. McCarthy was mentioning a

14:02:39  18   concern about water in that meeting with you that took

14:02:42  19   place before any construction began.

14:03:04  20       A.   It appears that we were talking about the pipe

14:03:07  21   that I had mentioned earlier, one that went under the

14:03:11  22   old abandoned railroad.   I'm trying to get some idea as

14:03:16  23   to terminology to use.

14:03:22  24       Q.   Would it be fair to summarize it as saying before

14:03:26  25   construction began he mentioned an issue with water at

14:03:29   1   the back corner?

14:03:30   2       A.   I'm trying to recall two years ago as to what I

14:03:34   3   actually said in the field, but Mr. McCarthy probably

14:03:39   4   did bring up the issue of drainage back there.   I do

14:03:42   5   recall saying -- you know, as I said here, we don't need

14:03:46   6   to go there because I had no information, no data to

14:03:51   7   substantiate anything I could have said at that

14:03:54   8   particular point in time.   So in my specific answer to

14:03:58   9   that question was, I really don't know until I've had a

14:04:01   10   chance to evaluate the situation.

14:04:03   11       Q.   Is that what it says on this page?

14:04:04   12       A.   No, it doesn't say that specifically.   What I

14:04:07   13   said in that deposition is --

14:04:11   14           THE COURT:   Let's just read a couple lines

14:04:13   15   of your answer to try to get an idea of what your answer

14:04:17   16   was.   That's all we're trying to get.

14:04:19   17           THE WITNESS:   That's what I'm trying to do.

14:04:22   18   I guess to start off with, "What drainage issues did

14:04:25   19   they want to address?"

14:04:27   20           "Well, the whole issue of water on the

14:04:30   21   property here in the back in the low corner right here."

14:04:34   22           And at that particular point in time I think

14:04:36   23   I pointed to a drawing that showed the corner that we

14:04:39   24   were making reference to, if I remember that situation.

14:04:44   25   You have to look at the topographic map to understand

14:04:47   1   what I'm talking about.  The topographic map shows how

14:04:51   2   the land, looking at a plan view, looking down at a

14:04:54   3   picture, the lines represent different elevations.  And

14:04:57   4   at this particular point in time we were looking at, I

14:05:00   5   believe, a drainage map or an aerial photograph that

14:05:03   6   showed that point where that manhole was at we looked at

14:05:06   7   earlier.

14:05:07   8               "Question:  Did they have water issues

14:05:10   9   there?

14:05:11  10               "They had some water issues down in here."

14:05:14  11               Down in here being at that particular point.

14:05:18  12               THE COURT:  That's enough.  That gives us

14:05:20  13   the gist, I think.

14:05:21  14               THE WITNESS:  That's basically it.

14:05:22  15               THE COURT:  Thank you.

14:05:25  16   BY MR. BAHRET:

14:05:25  17       Q.   And importantly, that line, "Before any

14:05:28  18   construction"?

14:05:30  19       A.   Yes.

14:05:53  20       Q.   Would you agree in general that River Road in the

14:05:57  21   area of this -- I didn't mean to say River Road.   The

14:06:02  22   property near the railroad tracks, the back of Cambridge

14:06:05  23   generally runs from the Ford Road direction towards THE

14:06:09  24   Bates Road direction?

14:06:11  25       A.   Generally speaking, yes, I would say that.

14:06:13  1     Q.   So in general the water from what you saw when

14:06:17  2   you were out there and from your review of various topos

14:06:21  3   that you said you had, water's going towards that low

14:06:25  4   spot?

14:06:25  5     A.   That's correct.

14:06:26  6     Q.   Towards the area where we see the ponding,

14:06:29  7   correct?

14:06:31  8             MR. BAHRET:   Can you use a word.

14:06:33  9     A.   Yes.   That's correct.

14:06:34  10    Q.   I see you nodding your head, but you've got to

14:06:37  11  say something.

14:06:38  12    A.   Okay.

14:06:58  13    Q.   So far as you know, you never pointed out to

14:07:00  14  anybody the annulet for this crossover drainage pipe,

14:07:03  15  did you?

14:07:04  16    A.   No, I did not.

14:07:09  17    Q.   Does cleaning out a ditch, like if one would fill

14:07:13  18  a ditch then dig it out, is it -- would that actually

14:07:17  19  improve drainage to dig this ditch out?

14:07:20  20    A.   Yes, it does.

14:07:31  21    Q.   Would you agree that the Cambridge water removal

14:07:33  22  plan, drainage plan does not rely upon the railroad

14:07:38  23  water drainage plan?

14:07:39  24    A.   Yes, sir.

14:07:43  25    Q.   Would you acknowledge, sir, or do you agree that

14:07:46   1   Mr. McCarthy was rather insistently on you?

14:07:51   2       A.  Oh, yes.

14:07:52   3       Q.  Was it to the point where you told him to leave

14:07:55   4   you alone?

14:07:55   5       A.  It got to that level.

14:07:59   6       Q.  Would you agree that your opinion as cutting that

14:08:04   7   culvert did not alter the drainage from the subdivision?

14:08:09   8       A.  Repeat the question, please.

14:08:11   9       Q.  Do you believe that cutting that crossover drain

14:08:14  10   pipe altered the drainage from the subdivision?

14:08:20  11            MR. ROBON:  Your Honor, I'm going to object

14:08:21  12   to that question.   I think it's a misleading, unfair

14:08:24  13   question.

14:08:24  14            THE COURT:  Overruled.   He may answer.

14:08:49  15            We're all waiting for each other.

14:08:51  16            If you remember the question, I overruled

14:08:54  17   the objection.   You may answer.

14:08:56  18            THE WITNESS:  Thank you.  Thank you.

14:08:57  19       A.  No, I can't say that.   I cannot say that.

14:09:02  20       Q.  So you're saying now that you do not have an

14:09:05  21   opinion at all as to whether cutting the drainage

14:09:10  22   culvert actually, in fact, altered drainage from the

14:09:13  23   subdivision?

14:09:14  24       A.  I can't say that it did.

14:09:17  25       Q.  Did you have an opinion when I took your

```
14:09:20   1   deposition?

14:09:20   2       A.   Oh, probably.   I'm sure you're going to show me,

14:09:25   3   too.

14:09:27   4       Q.   Right there.   It's the exact same question.

14:09:33   5   You were asked:  "You have no opinion at all as to

14:09:36   6   whether cutting that drainage, the culvert under the

14:09:39   7   railroad, actually, in fact, altered drainage from the

14:09:43   8   subdivision, do you?"

14:09:44   9        And your answer is at line 13:  "As far as I'm

14:09:49  10   concerned, it did not."

14:09:51  11        Do you see that?

14:09:52  12       A.   Yes, I did.

14:09:53  13       Q.   Was that your opinion back at the time of the

14:09:56  14   deposition?

14:09:56  15       A.   That's my opinion at the time of the deposition.

14:09:58  16       Q.   Is it your opinion now?

14:10:01  17       A.   I can say yes with qualifications, if I'm allowed

14:10:06  18   to use that word.

14:10:10  19       Q.   Go ahead.

14:10:11  20       A.   The subdivision was designed to contain its storm

14:10:15  21   water solely within the boundary of the subdivision.

14:10:19  22   In other words, all rain water that falls in that

14:10:22  23   subdivision was directed to a storm drainage system that

14:10:26  24   directed the water from that subdivision to a storm

14:10:30  25   drainage system in State Route 65, and carried it to the
```

14:10:35    1    Maumee River.

14:10:36    2        Water that falls on adjacent property that does

14:10:39    3    not have a proper outlet could, in fact, then inundate

14:10:44    4    or cause additional waters to be put on the

14:10:49    5    subdivision's property, and hence affect the drainage of

14:10:52    6    the subdivision itself.  I hope I got that through okay.

14:11:05    7        Q.  Did you complete your answer?

14:11:07    8        A.  That's my answer.

14:11:08    9        Q.  Sir, let me totally change subjects on you.  You

14:11:11   10    probably wanted me to anyway.

14:11:13   11        A.  Sure.

14:11:14   12        Q.  When you were out there, the railroad fence was

14:11:18   13    still intact behind Cambridge; was it not?

14:11:20   14        A.  What was left of it?  Yes.

14:11:22   15        Q.  I mean, you could clearly see a fence line?

14:11:24   16        A.  Yes.

14:11:26   17        Q.  I'm not saying it was in perfect condition, but

14:11:29   18    there's a fence line there?

14:11:30   19        A.  There was a fence.

14:11:31   20        Q.  And you knew it to be a railroad fence?

14:11:33   21        A.  Well, now, that, I can't testify to.  I know

14:11:36   22    there was a fence there.  That's all that was there.

14:11:38   23        Q.  Well, you've seen railroad fences, correct?  Do

14:11:42   24    they typically use the big beams then have some metal

14:11:46   25    meshing that goes between them?

14:11:48   1       A.   That is one kind, yes.

14:11:49   2       Q.   And that's what you saw?

14:11:50   3       A.   That's what I saw.

14:11:52   4       Q.   Now, back to the issue I asked you earlier about

14:11:56   5   did you express an opinion as to which way the water

14:11:58   6   would be flowing if it flowed at all?   Do you remember

14:12:02   7   that discussion?

14:12:03   8       A.   Uh-huh.

14:12:05   9            THE COURT:   That was a yes?

14:12:06  10            THE WITNESS:   Yes.

14:12:08  11            THE COURT:   Thank you.

14:12:10  12            THE WITNESS:   Excuse me.

14:12:15  13   BY MR. BAHRET:

14:12:15  14       Q.   Was it your understanding, your initial

14:12:17  15   impression and belief that the drainage that would occur

14:12:21  16   would actually go from the railroad tracks towards the

14:12:25  17   Maumee River?

14:12:26  18       A.   That was my first impression, that's correct.

14:12:29  19       Q.   Okay.   All right.   I misunderstood your

14:12:32  20   testimony earlier then.   So the point being when you

14:12:34  21   were there examining this pipe, the crossover pipe, you

14:12:39  22   believed if it allowed water to flow at all, at least

14:12:44  23   your initial impression was that it would be coming from

14:12:47  24   the railroad onto private property?

14:12:50  25       A.   That is correct.

14:12:51    1     Q.  And you even said that opinion to Christy

14:12:55    2   Soncrant and the others that were at this meeting,

14:12:59    3   correct?

14:13:01    4     A.  I don't recall the statement, but more than

14:13:03    5   likely I did.

14:13:04    6     Q.  That's two pages later if you need it.

14:13:08    7     A.  I'm sure you're going to point it out to me.

14:13:12    8     Q.  Now, having heard from the Wood County engineer,

14:13:20    9   the City folks having heard from the Wood County

14:13:23   10   engineer that if this thing is moving water at all, it's

14:13:27   11   probably making things worse for Cambridge than if it's

14:13:30   12   not moving water, would it be reasonable for them to

14:13:33   13   think:  Cut the pipe?

14:13:41   14     A.  You'd better try that question again.   I'm not

14:13:45   15   sure how to interpret it.

14:13:46   16     Q.  All right.   You're an engineer, and your job is

14:13:49   17   for Wood County.   And this project or this portion of

14:13:52   18   this project was in Wood County.   You're called out

14:13:56   19   there to give your opinions on certain subjects.   And

14:13:59   20   you rendered certain opinions?

14:14:01   21          MR. ROBON:  Objection to the use of the word

14:14:03   22   "opinions."

14:14:04   23          THE COURT:  Overruled.

14:14:08   24     Q.  You had opinions, and you spoke, correct?

14:14:10   25     A.  I had an opinion at that point, yes.

14:14:14  1    Q.   And the opinion that you rendered at that time

14:14:16  2  was that this crossover pipe, if it even works, is

14:14:20  3  making things worse for Cambridge than if it simply was

14:14:27  4  plugged because the water's going that direction?

14:14:33  5    A.   That would be a logical statement to make at this

14:14:36  6  time.   With that opinion still paramount in my mind,

14:14:43  7  not knowing exactly which way it goes, but that's what I

14:14:46  8  thought.

14:14:46  9    Q.   In hindsight I think you came to a different

14:14:49  10  opinion?

14:14:49  11    A.   That's exactly correct.

14:14:51  12    Q.   Just so the jury knows that.

14:14:53  13       But at least as of the time of your meeting with

14:14:56  14  the City -- because there wasn't a subsequent meeting,

14:14:58  15  was there?  You only met with them one time?

14:15:01  16    A.   I was there one time then I met with Christy

14:15:04  17  about a month later.

14:15:05  18    Q.   But the meeting when you're talking about the

14:15:07  19  pipe with Christy, that was only one meeting?

14:15:09  20    A.   That was one meeting.

14:15:11  21    Q.   And at that meeting you told Christy, and there

14:15:13  22  were other people there too, I believe, but you told

14:15:16  23  them that I think the water is moving towards the

14:15:19  24  subdivision?

14:15:22  25    A.   That was probably a fair statement at that time.

14:15:24  1        Q.   In other words, railroad water is getting over

14:15:26  2   here?

14:15:27  3        A.   That's correct.

14:15:29  4        Q.   Did you ever call Christy and tell her you had

14:12:12  5   come to a different opinion?

14:12:12  6        A.   No, because it was about a year later that I

14:12:14  7   finally found out the way it really worked.

14:12:16  8             MR. BAHRET:   Okay.   Thank you, sir.

14:12:36  9             THE COURT:   Any redirect?   You may inquire.

14:18:38  10            MR. ROBON:   Thank you.

14:18:41  11                              - - -

14:18:41  12            RAY HUBER, REDIRECT EXAMINATION

14:18:42  13  BY MR. ROBON:

14:18:42  14       Q.   Mr. Huber, when you gave the B & O, which is now

14:18:47  15  CSX, the plan showing the crossover pipe which is

14:18:51  16  identified as Exhibit 45, were you aware at that point

14:18:56  17  in time that the water drained away from the Cambridge

14:19:01  18  subdivision underneath the railroad track into the

14:19:05  19  railroad ditch?

14:19:05  20       A.   No.

14:19:07  21       Q.   When you found out, did you inform Mrs. Soncrant?

14:19:12  22       A.   No, I did not.   It was too late.

14:19:15  23       Q.   It was too late?   What should she have done?

14:19:20  24  What should the City have done when they encountered

14:19:24  25  that pipe?

14:19:25    1              MR. BAHRET:  Objection.

14:19:29    2              MR. ROBON:  Let me rephrase the question.

14:19:31    3    BY MR. ROBON:

14:19:31    4      Q.  Wouldn't the logical thing to do is do a dye test

14:19:35    5    where you pour a can of dye into the water?

14:19:38    6              MR. BAHRET:  I object.  This is still his

14:19:39    7    witness.  He can't lead.

14:19:40    8              THE COURT:  Let's try one more time.

14:19:47    9    BY MR. ROBON:

14:19:47   10      Q.  Would you tell the jury ways that you can test

14:19:49   11    the flows of water?

14:19:51   12      A.  You put dye in the water to determine which

14:19:53   13    direction it flows.

14:19:56   14      Q.  Could the City have done that?

14:20:02   15      A.  We do it in the county.

14:20:05   16      Q.  Common practice?

14:20:07   17      A.  Yes.  Yes.

14:20:15   18      Q.  And what's the expense of a dye test?

14:20:18   19      A.  Minuscule.

14:20:27   20      Q.  Wouldn't there typically be an engineering study

14:20:29   21    done with a dye test and other things to be certain

14:20:33   22    they're not causing a problem or in particular with a

14:20:36   23    pipe that's two feet in diameter?

14:20:38   24              MR. BAHRET:  Your Honor, I'm not sure

14:20:39   25    counsel knows how to ask a question that isn't leading.

14:20:42   1              MR. ROBON:  I'll rephrase it.

14:20:47   2   BY MR. ROBON:

14:20:47   3      Q.   What's the purpose of a drainage study?

14:20:51   4      A.   To try to evaluate all drainage structures in the

14:20:55   5   immediate area of the project.

14:20:56   6      Q.   Is that common in the industry?

14:20:58   7      A.   Yes, it is.

14:21:04   8      Q.   And when you indicated that you're out there and

14:21:10   9   the land wasn't cleared yet, and you met with Mr.

14:21:13  10   Perkins and Mr. Laskey, do you remember that?

14:21:16  11      A.   Yes.

14:21:16  12      Q.   The trees were cut, but they were piled up and

14:21:20  13   all the brush --

14:21:21  14              MR. BAHRET:  Objection.

14:21:22  15      Q.   -- was laying around?  That's why they called you

14:21:25  16   out?

14:21:25  17              THE COURT:  Well, there's an objection, and

14:21:28  18   we are leading.  A little leading is okay, but a lot of

14:21:31  19   leading is not.

14:21:32  20   BY MR. ROBON:

14:21:32  21      Q.   Mr. Huber, you do recall the time that you went

14:21:36  22   out there with Alvie Perkins, the county commissioner?

14:21:40  23      A.   Yes.

14:21:41  24      Q.   When you went to the site, can you describe what

14:21:44  25   you saw behind Lot 15?  And tell us when it was.  Was it

14:21:51　1　in May?

14:21:52　2　　　A.　It was May of 2006, two years ago this month.

14:21:56　3　　　Q.　Okay.

14:21:57　4　　　A.　There was a lot of rough vegetation, some trees.

14:22:02　5　I did not count the trees, but there were some oak trees

14:22:05　6　and some other kinds of trees there, a lot of scrub

14:22:10　7　brush, wild grape, wildflower rose, which is a thorny

14:22:14　8　bush growing along there, typical fence row vegetation.

14:22:20　9　　　Q.　And you're sure it was in May?

14:22:25　10　　　A.　This was in May.

14:22:26　11　　　Q.　If I informed you that other witnesses will

14:22:29　12　testify that the clearing took place in April, would

14:22:33　13　your opinion change, or that's still your recollection?

14:22:36　14　　　A.　It would not change a word.

14:22:40　15　　　Q.　Did you see trees on the ground?

14:22:42　16　　　A.　There may have been a few trees laying on the

14:22:45　17　ground.　I don't know whose trees they were, though.

14:22:50　18　　　Q.　What did Alvie Perkins indicate to you the

14:22:54　19　purpose of your going out to this property was?

14:22:57　20　　　A.　To visit a friend of his.

14:23:01　21　　　Q.　What was the purpose?

14:23:03　22　　　A.　To look at this property, to -- before

14:23:07　23　construction began, to see if there's anything the

14:23:11　24　county might be able to do.　I don't know the real

14:23:14　25　intent.　Mr. Perkins simply called me on the phone;

14:23:17    1   said, Ray, can you go with me to see a constituent.   I

14:23:21    2   said, Yes, sir, we can.

14:23:22    3       Q.   What did you and Mr. Perkins do, if anything?

14:23:25    4       A.   Went out; met Mr. McCarthy's son, John McCarthy's

14:23:30    5   son; met Mr. McCarthy; met Mr. Laskey; had a cup of

14:23:35    6   coffee in the family room; looked out the window, saw

14:23:38    7   what I call, quote, "green fence," that is, the

14:23:41    8   vegetation screening that was there.   We walked the

14:23:44    9   property afterwards, actually walked up onto the old

14:23:48   10   abandoned railroad bed.   This is long before

14:23:50   11   construction got there.   And that's when I happened to

14:23:53   12   notice that catch basin that started the whole different

14:23:58   13   scenario that we're here talking about today.   It was

14:24:01   14   not the original intent to go looking for drainage.

14:24:04   15       Q.   But I got the impression from your testimony that

14:24:08   16   there was some concern about what was going to happen.

14:24:11   17   Did you or Mr. Perkins contact the City or do any -- can

14:24:15   18   you tell the jury what you did?

14:24:17   19       A.   Got the hell out of there.

14:24:20   20            THE WITNESS:  Excuse me, Your Honor.

14:24:21   21       Q.   That's all you did?

14:24:25   22            THE COURT:  You didn't get out soon enough,

14:24:29   23   obviously.

14:24:30   24            THE WITNESS:  You're right.   That's exactly

14:24:31   25   right.

14:24:31  1      A.  It was all on private property.   I told Mr.

14:24:34  2   Perkins, we have no business being here.

14:24:59  3      Q.  Can you tell the jury the cost of an engineering

14:25:03  4   study or the dye test, drainage study?

14:25:06  5              MR. BAHRET:  Objection.  Asked and answered.

14:25:09  6              MR. ROBON:  Drainage study.

14:25:10  7              THE COURT:  I'm sorry, drainage study?

14:25:12  8              MR. BAHRET:  I thought he said dye test.

14:25:14  9              MR. ROBON:  And/or dye test.

14:25:15  10             THE COURT:  Let's just focus it on a

14:25:18  11  drainage study.

14:25:19  12  BY MR. ROBON:

14:25:19  13     Q.  Drainage study, a ballpark range?

14:25:22  14     A.  To what extent?

14:25:23  15     Q.  Just to find out where that 24-inch diameter pipe

14:25:27  16  flowed?   How long would it take an engineer to figure

14:25:32  17  it out on-site?

14:25:34  18     A.  Well, I'm going to be very vague in that answer

14:25:37  19  because a lot depends on whether there's water flowing

14:25:41  20  or not flowing.   On a warm summer day, water could be

14:25:45  21  very stagnant.   You could wait there for days for

14:25:48  22  anything to happen.   Put the dye in the water when

14:25:51  23  there's a rain storm or something going on, it could go

14:25:54  24  a few hours or an hour or less or a few hours, depends

14:25:58  25  upon the length of the run.   But a consultant is going

14:26:02  1  to charge you on a per-hour basis, and you're probably
14:26:05  2  going to be looking at anywhere from $80 to $100 an hour
14:26:10  3  to accomplish that feat.
14:26:11  4     Q.  Could be done in day, sometimes more?
14:26:13  5     A.  It could be done in a day sometimes.  I've done
14:26:17  6  it in less time than that.  Other times we've seen it
14:26:20  7  just sit there; water is not flowing.
14:26:35  8     Q.  Even if that manhole was 40, 50, 60, 70 years
14:26:42  9  old, how long do drains physically sometimes provide
14:26:49  10  outlets, drainage, like farm tiles?
14:26:57  11    A.  Well, here we go again.  Difficult question
14:27:02  12  because there were so many variables.  But 20, 30 years
14:27:07  13  would be something, like a farm tile, four inch, six
14:27:12  14  inch diameter tile.  A bigger tile like this one, 24
14:27:16  15  inch, half full of silt still may cause the water to
14:27:22  16  flow.
14:27:22  17    Q.  Would you indicate to the jury when this problem
14:27:26  18  was encountered, was the cure a lot easier simply to put
14:27:32  19  the 60-some inch pipe underneath it?  It would have been
14:27:39  20  a lot less expensive than curing it today?
14:27:42  21             MR. BAHRET:  Objection.
14:27:43  22             THE COURT:  Sustained.
14:27:44  23  BY MR. ROBON:
14:27:44  24    Q.  Would you indicate how a cure could have been
14:27:50  25  implemented at the time the drainage pipe was cut?

14:27:56   1          MR. BAHRET:  Your Honor, I'm going to

14:27:57   2   object.  This is outside of this man's expertise, and

14:28:00   3   it's not fair to put these questions to him.  He's

14:28:04   4   never installed a pipe --

14:28:09   5          THE COURT:  Well, I'll defer to the witness

14:28:11   6   on how comfortable he feels to answer the question.  If

14:28:14   7   he feels he can't, he can say so.

14:28:16   8   A.   I would go back to my original statement that one

14:28:19   9   of the possible solutions would have been a pump station

14:28:23  10   to lift the water over the top of the waterline and

14:28:27  11   discharge it back into the ditch where we found out that

14:28:31  12   it actually goes.  That would have been a solution, not

14:28:35  13   the only solution, but one of the solutions.

14:28:37  14   Q.   What other solution could there have been at the

14:28:41  15   time?

14:28:41  16   A.   Tried to direct it in a different direction,

14:28:44  17   maybe tie it into the Cambridge subdivision drainage

14:28:47  18   system.  I don't know if that was even feasible or not.

14:28:50  19   But that would have been something we would have

14:28:53  20   probably looked at.  We probably would have looked at

14:28:56  21   running a lane along the railroad out to Bates Road to

14:28:59  22   see if there was anything out at Bates Road that might

14:29:02  23   be able to pick it up and direct it to the Maumee River.

14:29:06  24   There were a number of options that were open.  That's

14:29:08  25   all I can say.

14:29:08   1      Q.   To your knowledge, none of those occurred?

14:29:11   2      A.   To my knowledge, none of them occurred.

14:29:14   3           MR. ROBON:   No further questions.

14:29:15   4           MR. BAHRET:   Just very briefly a couple.

14:29:19   5                         - - -

14:29:19   6           RAY HUBER, RECROSS-EXAMINATION

14:29:21   7  BY MR. BAHRET:

14:29:21   8      Q.   When you were out there in May, and Mr. Robon

14:29:23   9  said that's after the clearing was done supposedly, you

14:29:26   10 still saw this green barrier?

14:29:29   11     A.   Right.

14:29:31   12     Q.   Despite the barrier, you could still see a train

14:29:34   13 if a train went by?

14:29:36   14     A.   Yes, you could.

14:29:37   15     Q.   In fact, you walked through that green barrier

14:29:39   16 back there in the area where you saw the ponding in that

14:29:42   17 picture?

14:29:43   18     A.   That's correct.

14:29:43   19     Q.   Right.   That same area, you walked through there

14:29:46   20 and got all scratched up?

14:29:47   21     A.   Yep.

14:29:48   22     Q.   Including your suit?

14:29:49   23     A.   That's right.

14:29:51   24     Q.   You haven't been there to see why or how or who

14:29:55   25 removed all that stuff, have you?

| | | |
|---|---|---|
| 14:29:57 | 1 | A.   No. |
| 14:30:02 | 2 | Q.   To the manhole, there was -- when you looked into |
| 14:30:08 | 3 | it, there was no water in it going in or out, correct? |
| 14:30:10 | 4 | A.   That's correct. |
| 14:30:11 | 5 | Q.   So if one were going to do a water test, one |
| 14:30:15 | 6 | would find out nothing? |
| 14:30:16 | 7 | A.   That's correct. |
| 14:30:20 | 8 | MR. BAHRET:  Thank you. |
| 14:30:20 | 9 | THE COURT:  You may step down.   Thank you. |
| 14:30:24 | 10 | MR. BAHRET:  Thank you. |
| 14:30:25 | 11 | THE COURT:  I hope your next visit to our |
| 14:30:27 | 12 | county is enjoyable. |
| 14:30:41 | 13 | Do you need a break? |
| 14:30:45 | 14 | MR. DAVIS:  Could I just have a quick break? |
| 14:30:47 | 15 | THE COURT:  A quick ten minute break. |
| 14:30:49 | 16 | Remember the rules.   Court's in recess. |
| 14:43:50 | 17 | (Recess taken.) |
| 14:44:38 | 18 | (The witness was sworn by the clerk.) |
| 14:44:38 | 19 | THE COURT:  Ladies and gentlemen, the |
| 14:44:39 | 20 | plaintiff has called their next witness.   He has been |
| 14:44:43 | 21 | sworn. |
| 14:44:43 | 22 | - - - |
| 14:44:43 | 23 | NICK NIGH, DIRECT EXAMINATION |
| 14:44:43 | 24 | BY MR. ROBON: |
| 14:44:46 | 25 | Q.   Mr. Nigh, would you introduce yourself to the |

14:44:48  1   jury.  Tell the jury where you live and what you do for

14:44:50  2   a living.

14:44:51  3        A.  My name is Nick Edwin Nigh.  I live at 7300

14:44:55  4   Township Road 136, Findlay, Ohio.  I'm a registered

14:45:00  5   surveyor.

14:45:00  6        Q.  Are you employed with a particular company?

14:45:02  7        A.  I'm a principal owner of Peterman Associates,

14:45:05  8   Incorporated.

14:45:06  9        Q.  And would you explain to the jury what Peterman &

14:45:10  10  Associates does?

14:45:13  11       A.  My function at Peterman Associates is basically

14:45:18  12  in the land survey department.  We do land surveys,

14:45:21  13  subdivision plats, also do construction layout staking

14:45:26  14  for subdivisions and major roadways.

14:45:29  15       Q.  And throughout northwest Ohio?

14:45:31  16       A.  Throughout all of Ohio.

14:45:33  17       Q.  And what's your educational background?

14:45:36  18       A.  I spent a year at Ohio State University, and at

14:45:40  19  that point in time I did quit school and went on to get

14:45:44  20  my license through a time period thing that was allowed

14:45:49  21  at that time in the State of Ohio.

14:45:51  22       Q.  An apprentice-type thing?

14:45:53  23       A.  Yes.

14:45:54  24       Q.  How long have you been a registered surveyor?

14:45:56  25       A.  Since 1992.

14:45:58   1    Q.   Could you give the jury a rough guesstimate of

14:46:02   2    the number of surveys that you've done in your lifetime?

14:46:05   3    A.   Probably somewhere in the neighborhood of 20,000.

14:46:16   4    Q.   My understanding is that your firm worked on the

14:46:21   5    Cambridge subdivision when it was built in 2001?

14:46:26   6    A.   That's correct.

14:46:27   7    Q.   And when I say worked on, would you explain to

14:46:31   8    the jury what an engineer and surveyor does when a

14:46:36   9    subdivision is designed and built?

14:46:38  10    A.   Originally we go in with a bare piece of ground.

14:46:42  11    We'll do what's called a topographic survey and a

14:46:46  12    boundary survey.  At that point in time we establish

14:46:48  13    the boundary lines of the property to be subdivided.

14:46:52  14    Then we'll do a topographic survey which shows what the

14:46:55  15    existing contour or ground elevations are at that time.

14:47:00  16    That is the information that you use to design the

14:47:03  17    subdivision by.

14:47:05  18    Q.   And you prepare plans for the county, I'm

14:47:13  19    assuming?

14:47:14  20    A.   The engineering department does prepare the plans

14:47:16  21    for the developer, which is then usually approved and

14:47:20  22    reviewed by the county or cities, the government

14:47:22  23    agencies responsible for that.

14:47:25  24    Q.   And in this case the plans that your firm drew

14:47:29  25    were implemented and the construction was completed on

14:47:33 1    the Cambridge subdivision?

14:47:34 2      A.  Yes.

14:47:34 3      Q.  And you heard nothing more until sometime in the

14:47:39 4    spring of 2006 about the Cambridge subdivision, correct?

14:47:43 5      A.  That's correct.

14:47:44 6      Q.  Would you tell the jury what you learned in

14:47:48 7    spring of 2006, what occurred?

14:47:51 8      A.  In the spring of 2006, it was sometime in April,

14:47:55 9    I got a phone call from John McCarthy.  At that point

14:47:59 10   in time pretty much saying he had a problem, didn't

14:48:02 11   really go into what the details were, but asked me to

14:48:05 12   flag up the southeast corner and the southwest corner of

14:48:10 13   the subdivision.

14:48:11 14      Q.  And when you say flag up, what does that mean to

14:48:13 15   the jury?

14:48:14 16      A.  Mark the corners so that they're visible to see

14:48:18 17   what the boundary limits are.

14:48:20 18      Q.  And were there boundary monuments already

14:48:24 19   existing on the corners?

14:48:26 20      A.  Yes.

14:48:27 21      Q.  And all you did was put a stick and a flag on

14:48:30 22   them?

14:48:30 23      A.  That's correct.

14:48:31 24      Q.  And what could you observe visually looking from

14:48:36 25   one corner to the other around the rear of the Cambridge

14:48:40   1   subdivision?

14:48:40   2       A.   I didn't observe anything.   I wasn't there.

14:48:43   3       Q.   One of your people did it?

14:48:45   4       A.   That's correct.

14:48:46   5       Q.   And did they leave notes on what they observed?

14:48:50   6       A.   Not at that time.   That was pretty much just a

14:48:53   7   quick in and out, flag two corners up and be gone.

14:48:57   8       Q.   What did you then do later?

14:49:01   9       A.   Later probably sometime, I'm going to guess

14:49:06  10   around the end of August, we got another call asking to

14:49:11  11   go in and locate some trees and roots that had been cut.

14:49:16  12       Q.   And did you do that?

14:49:18  13       A.   Yes, I sent a crew out.   And on that trip,

14:49:22  14   because of the nature of the problem, I also visited the

14:49:27  15   site, actually a couple days before the crew did so I

14:49:31  16   could see what was needed or what they were actually

14:49:34  17   after.

14:49:35  18       Q.   And can you tell me what you observed and what

14:49:38  19   your crew observed?

14:49:40  20       A.   At that point in time there was -- several trees

14:49:43  21   had been cut down, and you could see a bunch of plant

14:49:46  22   roots that had been cut off in the ground.

14:49:49  23       Q.   Like brambles or brush?

14:49:53  24       A.   That's what they're calling them, brambles.

14:49:56  25       Q.   Can you describe how thick the stumps were?   I

14:50:01  1   mean, were they spread out or --

14:50:02  2       A.   The tree stumps themselves were spread out over a

14:50:07  3   pretty good area.   Over 900 feet you might say that

14:50:10  4   there was seven or eight, maybe a dozen, I can't

14:50:13  5   remember, something like that, but they were spread out.

14:50:16  6       Q.   The trees were spread out?

14:50:19  7       A.   That's correct.   The bramble roots, they were

14:50:21  8   all over the place.   There were so many that on that

14:50:24  9   first trip I didn't even tell the survey crew to

14:50:28  10  possibly locate all of them.   I just asked them to

14:50:31  11  locate areas of them.

14:50:34  12      Q.   And were you locating -- what areas were you

14:50:38  13  locating the brambles, on the railroad property or the

14:50:41  14  subdivision property?

14:50:44  15      A.   They were probably, I would say, on both sides of

14:50:48  16  the line at that time.   We were just -- our primary

14:50:52  17  concern was what was on the subdivision property.

14:50:55  18      Q.   Okay.   And did you find that there were cuttings

14:50:57  19  on the subdivision property?

14:50:59  20      A.   Yes.

14:51:02  21      Q.   Recent cuttings?   I mean, like, within the last

14:51:06  22  three, four months?

14:51:08  23            MR. BAHRET:   Objection.

14:51:10  24            THE COURT:   Overruled.   You may answer.

14:51:12  25      A.   I mean, yeah, you could tell that they had been

14:51:15  1   cut recently.   I couldn't tell within three or four

14:51:18  2   months, but within a year, I would say.   They weren't

14:51:21  3   aged or rotten; let's put that it way.

14:51:24  4      Q.   And how far into the Cambridge subdivision did

14:51:27  5   you find cuttings?

14:51:29  6      A.   About six to seven feet, maybe eight feet,

14:51:33  7   somewhere in there.

14:51:34  8      Q.   And could you tell from the cuttings that were

14:51:38  9   left how big the actual brambles or the brush could have

14:51:44  10  been?

14:51:44  11     A.   I couldn't, no.

14:51:47  12          MR. ROBON:   Judge, could I have him come

14:51:49  13  over here and point the survey out for the jury.

14:51:51  14          THE COURT:   Sure.

14:52:02  15          MR. ROBON:   Can you all see that?

14:52:07  16  BY MR. ROBON:

14:52:07  17     Q.   Would you describe for the jury -- this is lot

14:52:10  18  15; this is where the house is.  Describe for the

14:52:25  19  jury -- is that working?

14:52:28  20          THE COURT:   Yes, but I need to see you for a

14:52:31  21  moment.

14:52:35  22          (Discussion had off the record.)

14:52:47  23     Q.   Would you describe for the jury what this print,

14:52:50  24  which is Exhibit Number 7, depicts?

14:52:55  25     A.   This depicts the south line of the subdivision or

14:52:57  1   the southern area of the subdivision along with what

14:53:02  2   would be the north rail of the railroad track.

14:53:06  3              MR. BAHRET:  Marv, I don't know where else

14:53:08  4   to put it, but I can tell you half the jury can't see

14:53:11  5   this, and I can't see it either.

14:53:21  6              MR. ROBON:  How about like this?

14:53:26  7              THE WITNESS:  Now I can't see it.

14:53:33  8   BY MR. ROBON:

14:53:33  9   Q.   You use the little pointer.   And tell the jury,

14:53:37  10  where's the property line on the back of the Cambridge

14:53:39  11  subdivision?

14:53:40  12  A.   This line right here, along with that orange

14:53:50  13  southern line is the line of the subdivision.

14:53:55  14  Q.   And there are markings that are -- I guess that

14:53:58  15  would be north, the curlycues here?

14:54:04  16  A.   Yes, those curlycues represent an area of brushy

14:54:09  17  area.

14:54:10  18  Q.   With the brambles?

14:54:13  19  A.   That's part of it, yes.   But I think that area

14:54:16  20  there depicts there may have still been some brush and

14:54:19  21  so forth remaining.   As a matter of fact, you can see

14:54:23  22  right there.   I know it's probably hard for you guys to

14:54:26  23  read, but it does say "brush area."   This area right

14:54:29  24  here is the area that was mainly disturbed where it was

14:54:32  25  just wide open.

14:54:33  1   Q.   When you say disturbed and wide open, you mean it

14:54:36  2   was clear cut?

14:54:37  3   A.   Yeah.   I mean there wasn't anything left in that

14:54:39  4   area.

14:54:40  5   Q.   Except the --

14:54:42  6   A.   -- the brambles and the tree stumps.

14:54:44  7   Q.   The remnants of the stumps?

14:54:46  8   A.   Correct.

14:54:46  9   Q.   And how far -- how can the jury tell how far into

14:54:51  10  the subdivision those encroachments occurred?

14:54:54  11  A.   This orange shaded area is the area that we are

14:54:59  12  talking about the encroachment area.

14:55:02  13  Q.   And you said up to six feet?

14:55:04  14  A.   Yeah, it's about six or seven feet.

14:55:10  15              THE JUROR:  Could you pass that back here?

14:55:13  16              MR. ROBON:  Sure.

14:55:22  17              THE JUROR:  So the dark black line is the

14:55:25  18  Cambridge subdivision?

14:55:26  19              THE COURT:  Time out.   I'm sorry, jurors.

14:55:29  20              THE JUROR:  I can't understand this.

14:55:31  21              THE COURT:  Well, that's the lawyers' job to

14:55:32  22  help you understand that.   I appreciate that --

14:55:39  23              MR. ROBON:  Your Honor, can I show the

14:55:40  24  second row of the jury since it's light coloring and

14:55:44  25  it's very difficult to see.

14:55:45  1           THE COURT:  Sure.   If they haven't seen it,

14:55:47  2  you can pass it through the jury box without objection.

14:55:51  3           MR. ROBON:  Can the witness point out some

14:55:53  4  things on it?

14:55:54  5           THE COURT:  New things or --

14:55:56  6           MR. ROBON:  Things he's already talked about

14:55:59  7  to the second row.

14:56:00  8           THE COURT:  Was the second row unable to see

14:56:02  9  during the presentation?

14:56:05  10           THE JUROR:  Yes.

14:56:06  11           THE JUROR:  It's very fine.

14:56:07  12           THE COURT:  Yes, it is very fine.   I

14:56:09  13  noticed that the very first time it was used.

14:56:12  14           MR. ROBON:  Would you stand over here and

14:56:14  15  point out to the jurors what you were showing here in

14:56:17  16  the first row?

14:56:23  17           THE JUROR:  That black line right there

14:56:26  18  represents the property line.   So that line coming

14:56:30  19  right through there, that's the south line of the

14:56:33  20  Cambridge subdivision or the north line of the railroad.

14:56:36  21  The area that we're talking about that's been disturbed

14:56:38  22  is that area in orange with all those little dots right

14:56:41  23  there.

14:56:55  24  BY MR. ROBON:

14:56:56  25    Q.  Now, on this diagram, Mr. Nigh, there are some

14:56:59  1   trees that are marked.  I assume it says "stump."  That
14:57:04  2   means it was cut?
14:57:06  3       A.  There's a symbol right there.  It's a tree stump
14:57:09  4   that we've called -- that's just a typical designation
14:57:14  5   for a stump by the figure that's been drawn.  Along with
14:57:16  6   that are the sizes.
14:57:19  7       Q.  And are the brambles so numerous that you didn't
14:57:23  8   count them?
14:57:23  9       A.  That's correct.
14:57:24  10      Q.  And when I say numerous, would you estimate
14:57:29  11  towards the back of that subdivision how many were cut?
14:57:33  12      A.  Thousands.
14:57:33  13      Q.  Thousands?
14:57:51  14              MR. ROBON:  Take a seat.
14:57:53  15      Q.  And when we say thousands, you're referring to
14:57:57  16  thousands on the Cambridge property?
14:57:59  17      A.  Yes.
14:58:01  18      Q.  Now, this is Exhibit Number 41.  This is a
14:58:12  19  corner monument on the Cambridge subdivision?
14:58:15  20      A.  Yes.
14:58:16  21      Q.  And is that the kind of flagging that you talked
14:58:19  22  about, you told your crew to do the first time?
14:58:21  23      A.  Yes.
14:58:31  24      Q.  And would you explain -- I need my little
14:58:38  25  thing -- in the surveying world, what is this thing

14:58:46  1    here?   What is this called?

14:58:48  2        A.   That's referred to as a concrete monument.

14:58:51  3    That's about the most permanent structure that we can

14:58:53  4    place that will be preserved over time.

14:58:56  5        Q.   And how deep is the concrete?

14:58:58  6        A.   Three feet.

14:58:59  7        Q.   So it's supposed to last 100 years or longer?

14:59:03  8        A.   That's the intent, sure.

14:59:05  9        Q.   And when you put that monument there, did you

14:59:09  10   look at that monument in comparison to where the

14:59:13  11   railroad fence was?

14:59:14  12       A.   Again, I didn't place the monument.   So no, not

14:59:19  13   me personally.

14:59:21  14       Q.   When you were out there and you did Exhibit

14:59:26  15   Number 7, did you come to a conclusion or opinion about

14:59:32  16   any trespass?

14:59:35  17       A.   Well, yeah.   I mean, that's what the drawing

14:59:38  18   indicates, yes.

14:59:40  19       Q.   But tell the jury, based upon a reasonable degree

14:59:42  20   of surveying certainty, what your opinions -- what did

14:59:46  21   you derive from completing that survey?

14:59:48  22       A.   That somebody had cut trees and bramble roots or

14:59:57  23   brambles down to the roots on that property.

15:00:01  24       Q.   And thousands of brambles?

15:00:04  25       A.   Yeah.

15:00:09    1    Q.   And I'm going to mark Exhibit 92.   Is that the

15:00:21    2    type of cuttings or the cuttings that you actually saw

15:00:25    3    when you were out at the site?

15:00:27    4    A.   Yes.   Those would be the tree cuttings that I'm

15:00:33    5    thinking of.   Those probably we would have identified

15:00:37    6    as trees stumps.

15:00:38    7    Q.   And the bigger one in the center is probably

15:00:42    8    what, eight or ten inches?

15:00:44    9    A.   Probably six to eight inches, I'd say.

15:00:48   10    Q.   And do you see the red line that is on the bottom

15:00:56   11    there?

15:00:57   12    A.   Yes.

15:00:57   13    Q.   Was that superimposed by you or Mr. McCarthy to

15:01:03   14    show the property line?

15:01:04   15    A.   It was not done by me.

15:01:35   16    Q.   And if the monument is determined to be closer to

15:01:49   17    the railroad than the railroad fence, which would be

15:01:52   18    more accurate for the boundary line, the railroad fence

15:01:56   19    or your monument?

15:01:58   20    A.   Well, the monument would be because that's where

15:02:01   21    we determined the line to be.

15:02:03   22    Q.   So that's the guiding line?

15:02:05   23    A.   Yes.

15:02:44   24    Q.   I'm going to hand you Plaintiff's Exhibit 8.   Is

15:02:48   25    this an accurate layout that your firm prepared of the

15:02:51  1  Cambridge subdivision?

15:02:57  2      A.  It is -- this is a drawing or a drawing that we

15:03:01  3  would have prepared for sales purposes.  I wouldn't

15:03:08  4  call it an accurate drawing.  The reason I say that is

15:03:10  5  you'll see that there's plus or minus depictions.  This

15:03:14  6  is for sales purposes only.

15:03:16  7      Q.  But the configuration --

15:03:17  8      A.  The configuration and lot numbers, that does

15:03:24  9  depict the subdivision.

15:03:59  10          MR. ROBON:  No further questions, Your

15:04:00  11  Honor.

15:04:00  12          THE COURT:  Thank you.  Cross?

15:04:02  13          MR. BAHRET:  Thank you.

15:04:12  14                    - - -

15:04:14  15          NICK NIGH, CROSS-EXAMINATION

15:04:15  16  BY MR. BAHRET:

15:04:15  17      Q.  Good afternoon, Mr. Nigh.

15:04:20  18      A.  Good afternoon.

15:04:27  19      Q.  You and I met before in your office down in

15:04:30  20  Findlay?

15:04:31  21      A.  Yes.

15:04:31  22      Q.  Have you reviewed your deposition transcript to

15:04:33  23  get ready here today?

15:04:35  24      A.  No, I did not.

15:04:37  25      Q.  Obviously you know we talked to you -- where's

| | | |
|---|---|---|
| 15:04:44 | 1 | the date? |
| 15:04:44 | 2 | A.  It was in February. |
| 15:04:46 | 3 | Q.  February of this year? |
| 15:04:46 | 4 | A.  I think it was the 27th. |
| 15:04:48 | 5 | Q.  You are correct.  The 27th.  Obviously you gave |
| 15:04:51 | 6 | information to the best of your ability accurately -- |
| 15:04:53 | 7 | A.  That's correct. |
| 15:04:54 | 8 | Q.  -- under oath.  All right. |
| 15:04:55 | 9 | Let's talk about a few things.  Your only |
| 15:05:05 | 10 | involvement in Cambridge was to supervise a survey crew |
| 15:05:08 | 11 | after the problem arose? |
| 15:05:09 | 12 | A.  That's correct.  Yes. |
| 15:05:13 | 13 | Q.  You had nothing to do with Cambridge before the |
| 15:05:15 | 14 | water main was installed? |
| 15:05:16 | 15 | A.  No. |
| 15:05:17 | 16 | Q.  Your company size, sir, you're smaller now than |
| 15:05:23 | 17 | you were some years ago? |
| 15:05:24 | 18 | A.  We're a little bit smaller, yes. |
| 15:05:27 | 19 | Q.  The reason for that -- I'm not implying anything |
| 15:05:30 | 20 | negative.  The reason for that is because the housing |
| 15:05:34 | 21 | market has a direct effect on your company and the |
| 15:05:38 | 22 | services you can provide? |
| 15:05:39 | 23 | A.  On some of them, yes. |
| 15:05:41 | 24 | Q.  And because the real estate market went into the |
| 15:05:46 | 25 | toilet, basically, your business downsized? |

15:05:50   1    A.   We had some people leave, and we did not rehire

15:05:56   2  or replace those positions.

15:05:58   3    Q.   And when did -- you know when the market,

15:06:01   4  basically when it took a header?

15:06:04   5    A.   Yes.  Sure.

15:06:06   6    Q.   When was that?

15:06:06   7    A.   I would say we started noticing it in about 2004.

15:06:14   8    Q.   And it really went down hard in 2006?

15:06:17   9    A.   Yes.

15:06:20  10    Q.   In fact, right about the time this project was

15:06:24  11  done, the water project?

15:06:25  12    A.   The water project?

15:06:27  13    Q.   Yes.

15:06:27  14    A.   Yeah, I'd say.

15:06:29  15    Q.   You're familiar with drainage plans?

15:06:34  16    A.   Somewhat, yes.

15:06:36  17    Q.   And you reviewed, I guess after the fact, the

15:06:41  18  drainage plan for Cambridge?

15:06:43  19    A.   Yes.

15:06:44  20    Q.   And you know that the drainage plan -- first of

15:06:47  21  all, when you prepare those plans, you don't just do it

15:06:51  22  because you want to charge for your services; you expect

15:06:54  23  somebody to follow those plans?

15:06:55  24    A.   That's correct.

15:06:56  25    Q.   And the drainage plan for Cambridge required not

15:07:03  1   just everything going from Ford roadside down to Bates

15:07:08  2   roadside; it was coming in both directions to each

15:07:12  3   individual catch basin?

15:07:14  4       A.   That's -- I know what you're trying to say.

15:07:17  5       Q.   Am I basically right?

15:07:19  6       A.   Yeah.

15:07:19  7       Q.   Do you know if they actually laid it out that

15:07:23  8   way?

15:07:23  9       A.   I do not know, no.

15:07:25  10      Q.   Now, if it were, as somebody else suggested, with

15:07:28  11  the water just going from one side of the property down

15:07:31  12  to the other towards lot 15 and 16, that would overload

15:07:34  13  that catch basin, correct?

15:07:37  14      A.   It could, yes.

15:07:39  15      Q.   Okay.  You had nothing to do with figuring out

15:07:46  16  any ponding water issue?

15:07:48  17      A.   No.

15:07:48  18      Q.   You were just the encroachment issue?

15:07:51  19      A.   Correct.

15:07:51  20      Q.   And at least based on your deposition, you agree

15:07:56  21  with me that in order to comply with the drainage plan

15:08:00  22  your company prepared, and Cambridge filed with Wood

15:08:05  23  County, they would need to remove all of the vegetation

15:08:08  24  and brambles and bushes at the rear of their lots?

15:08:12  25      A.   Right, between the basins and so forth and the

15:08:16   1   soils, yes.

15:08:17   2      Q.  So if they complied with the plan, the back of

15:08:20   3   those properties as it abuts the railroad would be

15:08:23   4   naked?

15:08:25   5      A.  Could be.

15:08:26   6      Q.  Well, it should be if they complied with your

15:08:29   7   plan, correct?

15:08:30   8      A.  Sure.

15:08:33   9      Q.  And so if that's true, if anybody were to clear

15:08:38  10   all the vegetation off the railroad right-of-way, now

15:08:41  11   we've got nothing?

15:08:42  12      A.  That's correct.

15:08:45  13      Q.  But nobody to complain about it too either,

15:08:49  14   right?

15:08:49  15      A.  I don't understand the question.

15:08:51  16      Q.  Well, I don't want to suggest you have a dog in

15:08:56  17   this fight, and if you don't, say so, but you're not

15:08:59  18   suggesting that the City of Toledo doesn't have the

15:09:01  19   right to remove vegetation from the railroad property?

15:09:04  20      A.  No, that's correct.  I'm not suggesting that at

15:09:07  21   all.

15:09:07  22      Q.  And you're not suggesting that Cambridge has the

15:09:09  23   right to complain about what happened on railroad

15:09:12  24   property concerning vegetation?

15:09:14  25      A.  I'm not saying they can or can't.

15:09:21  1    Q.   Your firm did nothing with the -- to figure out
15:09:27  2  if the crossover pipe works or doesn't work?
15:09:29  3    A.   Not to my knowledge.
15:09:33  4    Q.   All right.   Let me get to these brambles that
15:09:37  5  you said you found.   And we want to talk a little bit
15:09:39  6  about how you found them, too.   You can't tell us the
15:09:44  7  age of a bramble or even a tree, could you?   Well, I
15:09:50  8  guess you could count the rings on a tree.   Forget
15:09:53  9  that.   You can't tell us the age of a bramble?
15:09:56  10   A.   No, I couldn't.
15:09:57  11   Q.   And you couldn't tell us the health of brambles
15:09:59  12  or weeds or the other things?
15:10:01  13   A.   No.
15:10:01  14   Q.   You couldn't tell us the health of any of the
15:10:04  15  trees that were cut?
15:10:05  16   A.   Not that were cut, no.
15:10:07  17   Q.   And did you take note of the health of trees that
15:10:09  18  were not cut?
15:10:12  19   A.   Not really.   I mean, I saw other trees, and they
15:10:16  20  all seemed to have leaves and so forth on them.
15:10:19  21   Q.   But did you focus on it at all?
15:10:21  22   A.   No, I didn't.
15:10:22  23   Q.   And my understanding is based on your work that
15:10:28  24  you did, you determined that there was absolutely no
15:10:32  25  encroachment on lots 9, 10, and 11?

15:10:36　1 　　A.　Nine, 10, and 11, did not notice any

15:10:41　2 　encroachment, no.

15:10:41　3 　　Q.　So whatever the condition is, the view, if you

15:10:44　4 　will, on that part of the subdivision, the City of

15:10:50　5 　Toledo didn't cause that?

15:10:53　6 　　A.　I don't really know.　I did not see what was

15:10:57　7 　there before, so I'm -- there wasn't anything disturbed

15:11:02　8 　there.　There was no --

15:11:03　9 　　Q.　You might have misunderstood me.　You were there

15:11:06　10 　to try to document encroachment?

15:11:08　11 　　A.　That's correct.

15:11:09　12 　　Q.　And you determined there was no encroachment?

15:11:11　13 　　A.　In that area I determined there wasn't anything

15:11:14　14 　that I noticed that we needed to locate.

15:11:16　15 　　Q.　Okay.　Did anybody show you any pictures of the

15:11:19　16 　property when you were trying to determine what

15:11:21　17 　happened?

15:11:23　18 　　A.　Not at that time, not yet, no.

15:11:26　19 　　Q.　Were you aware of the fact that the appearance of

15:11:29　20 　the subdivision, the back of those lots, at least up at

15:11:33　21 　lots 14, 15, and 16, was radically altered by

15:11:40　22 　Cambridge's folks after this incident and before you saw

15:11:43　23 　it?

15:11:44　24 　　A.　No.

15:11:46　25 　　Q.　Okay.　Did you know that McCarthy, a guy named

15:11:51  1  McCarthy -- did you meet with him?

15:11:53  2      A.  I know John, yes.

15:11:55  3      Q.  Did you know that John McCarthy brought in over

15:11:59  4  100 -- somewhere between 100 to 140 truckloads, tandem

15:12:05  5  axle truckloads of dirt then bulldozed it into position?

15:12:10  6      A.  No.

15:12:10  7      Q.  You would agree with me that sure could alter our

15:12:13  8  brambles and bushes; could it not?

15:12:15  9      A.  Sure.

15:12:15  10     Q.  How did you locate where these brambles and

15:12:18  11  bushes were?

15:12:19  12     A.  Are you talking about technique?

15:12:21  13     Q.  Yeah.  How did you --

15:12:23  14     A.  We used a survey instrument, a transit or total

15:12:27  15  station, it's called today.  And with a data collector,

15:12:31  16  along with what's called a prism rod that reflects

15:12:36  17  light, and we just individually located clumps or groups

15:12:41  18  the first time as best we could.

15:12:43  19     Q.  Let me interrupt you because we're not -- I'll

15:12:46  20  take the blame for it.

15:12:48  21     A.  That's what I thought.

15:12:49  22     Q.  Bad question.  I meant, how did you observe

15:12:53  23  them?

15:12:54  24     A.  Okay.  There were bramble roots coming out of the

15:12:58  25  ground.

15:12:58  1    Q.  Okay.  And did you pull any of these to determine
15:13:04  2  if they're actually rooted there?
15:13:06  3    A.  No.
15:13:07  4    Q.  Do you know if the root structures were pushed by
15:13:11  5  the bulldozer?
15:13:12  6    A.  I couldn't tell, no.
15:13:13  7    Q.  Certainly makes sense, would it not?  That's
15:13:16  8  possible?
15:13:16  9    A.  It's possible.
15:13:17 10    Q.  In fact, were there areas, sir, where to see the
15:13:25 11  brambles, you were actually looking in trenches that
15:13:28 12  McCarthy dug up for you; were you not?
15:13:31 13    A.  I believe that somebody had gone down through
15:13:34 14  there and dug some trenches or something, if I'm
15:13:39 15  recalling right.  It wasn't like it was undisturbed
15:13:42 16  soil.
15:13:42 17    Q.  Okay.  Like -- it's pretty dark.  Have you ever
15:13:54 18  seen this photograph, sir?
15:13:56 19    A.  You asked me if I've ever seen it?  I think I do
15:14:03 20  remember seeing this at depositions, but it's not clear
15:14:06 21  here at all.
15:14:08 22          MR. BAHRET:  Exhibit K-11.
15:14:09 23    Q.  Do you recognize that as being the back of the
15:14:11 24  Cambridge development?
15:14:12 25    A.  It looks like it, yes.

15:14:14  1    Q.   And if I told you that's Mr. McCarthy's folks on

15:14:18  2    a bulldozer pushing dirt from the railroad property onto

15:14:21  3    Cambridge, would you believe me?

15:14:25  4            THE COURT:  Ask him to assume that, then ask

15:14:28  5    a question.

15:14:29  6    BY MR. BAHRET:

15:14:29  7    Q.   If I ask you to assume that this is Mr.

15:14:32  8    McCarthy's contractor pushing dirt from the railroad

15:14:35  9    right-of-way onto the Cambridge subdivision, are you

15:14:39  10   willing to do that?

15:14:40  11   A.   Yes.

15:14:41  12   Q.   And would you agree that in the process of doing

15:14:44  13   that, absolutely everything is covered?   You see it in

15:14:50  14   that photograph?

15:14:53  15   A.   You know what, I can't see anything.

15:14:56  16   Q.   Let me show you the original.

15:14:57  17   A.   There's a lot of glare.

15:15:00  18   Q.   It's much easier to see?

15:15:02  19   A.   Yes.

15:15:03  20   Q.   And so basically all the evidence is gone, right,

15:15:07  21   of the area where you were looking for brambles?

15:15:13  22   A.   Yes.

15:15:14  23           MR. BAHRET:  Can I show this to the jury,

15:15:16  24   Your Honor?

15:15:18  25           THE COURT:  Yes.

15:15:28  1    Q.   Did you do anything to determine if the dirt

15:15:31  2  containing the remains of the brambles had been moved

15:15:34  3  from one location to another?

15:15:41  4    A.   You mean, like, hauled in from outside or pushed?

15:15:45  5    Q.   Pushed five feet.

15:15:46  6    A.   Not really, no.

15:15:48  7    Q.   You would agree that the evidence would show the

15:15:51  8  railroad fence, what's left of it, leaning in towards

15:15:56  9  Cambridge?

15:15:56  10   A.   There was some fence remains pushed in, yes.

15:16:00  11   Q.   And whatever fence was remaining was leaning in,

15:16:03  12 correct?

15:16:04  13   A.   That's correct, yes.

15:16:05  14   Q.   Do you know if that was from being bulldozed by

15:16:09  15 McCarthy and his boys?

15:16:10  16   A.   I do not know.

15:16:11  17   Q.   Could a bulldozer move a railroad fence?

15:16:15  18   A.   Easily.

15:16:16  19   Q.   Let's talk about the railroad fence.  Are there

15:16:24  20 different ways to survey, first of all?

15:16:26  21   A.   Yes.

15:16:26  22   Q.   Is it common for surveyors to disagree with one

15:16:30  23 another?

15:16:31  24   A.   More so than we'd like to say.

15:16:33  25   Q.   And that's because surveying, it's an art, and I

15:16:40  1   don't want to say an inexact science; I'm looking for

15:16:43  2   the words.

15:16:44  3       A.   Different theories.

15:16:45  4       Q.   Thank you.   And it doesn't mean that anybody is

15:16:51  5   bad.   It's just there can be honest differences of

15:16:54  6   opinion as to the location of a survey line?

15:16:58  7       A.   Yes.

15:16:59  8       Q.   And everybody complying with all reasonable

15:17:05  9   standards?

15:17:05  10      A.   That's correct.   Yes.

15:17:09  11      Q.   And in this case, there may be such a

15:17:11  12  disagreement?

15:17:15  13          MR. ROBON:   Objection.   There's no evidence

15:17:16  14  of it, Your Honor.

15:17:18  15          THE COURT:   Are you aware of a disagreement?

15:17:21  16          MR. BAHRET:   Let me just strike that.

15:17:23  17  BY MR. BAHRET:

15:17:23  18      Q.   Do you know after the fact, after the fact your

15:17:25  19  company did a survey, and the City did a survey.   I

15:17:29  20  think you're aware of that, right?

15:17:31  21      A.   I wasn't aware the City did a survey.

15:17:33  22      Q.   Are you aware of the fact the survey stakes in

15:17:35  23  many places are literally side by side?

15:17:38  24      A.   No.

15:17:38  25      Q.   Okay.   Did you see any survey stakes when you

15:17:42   1    were there?

15:17:43   2        A.   No.   Not when I was there.

15:17:50   3        Q.   The jury will hear witnesses say, and I'm going

15:17:53   4    ask you to assume the truth of this, that markings were

15:17:58   5    still evident in trees and on lathes placed on the

15:18:04   6    ground after Vermillion cleared the land.   Can you

15:18:08   7    assume that for me?

15:18:09   8        A.   I know that we set some in there too after

15:18:11   9    Vermillion cleared the land.

15:18:13   10       Q.   No, you weren't even there until long after

15:18:16   11   Vermillion cleared the land?

15:18:18   12       A.   That's correct.

15:18:18   13       Q.   I'm talking about ten minutes after they're done,

15:18:21   14   there's still stuff there.

15:18:22   15       A.   Okay.

15:18:23   16       Q.   That's what I want you to assume.

15:18:25   17       A.   Okay.

15:18:25   18       Q.   Do you know who got rid of all those markings?

15:18:30   19       A.   I have no idea.

15:18:31   20       Q.   But they were gone when you were there?

15:18:32   21       A.   That's correct.

15:18:33   22       Q.   In fact, you didn't even see any evidence in the

15:18:37   23   trees that were remaining of markings?

15:18:39   24       A.   No.

15:18:40   25       Q.   Is it common when going through a big project

15:18:43  1  like this to -- I mean, you don't look for every survey

15:18:49  2  monument, do you, when you're on a water main project?

15:18:52  3      A.   Not every one, no.

15:18:53  4      Q.   And in fact, is it common to give credibility or

15:18:59  5  historical reference to various markings?

15:19:02  6      A.   Sure.   Yes.

15:19:03  7      Q.   And a railroad fence is one of those things that

15:19:06  8  is common in your industry to give credibility and honor

15:19:10  9  to it?

15:19:11  10      A.   You could, yes.

15:19:12  11      Q.   By that what you mean is if we're doing a big

15:19:15  12  water main project, I'm not trying to specifically

15:19:18  13  locate the corner of a subdivision, I'm putting the

15:19:21  14  water main in now.   It would be a very common and

15:19:25  15  accepted practice to just stay on this side of the

15:19:29  16  railroad fence?

15:19:30  17      A.   I would -- yes, I would agree with that.

15:19:32  18      Q.   And what you saw is that that's what happened,

15:19:38  19  correct?

15:19:39  20                  MR. ROBON:   Objection.

15:19:42  21                  THE COURT:   He may answer.

15:19:43  22      A.   That --

15:19:44  23      Q.   Do you want me to define that a little bit better

15:19:47  24  for you?

15:19:48  25      A.   Yes.

15:19:48  1      Q.   Anytime you don't follow one of my questions,

15:19:51  2  you're not going to insult me if you tell me, Bahret,

15:19:55  3  you didn't get it clear.

15:19:57  4           From the evidence you saw, the clearing that had

15:20:01  5  been done was on the railroad side of the fence?

15:20:07  6      A.   It was on both sides.

15:20:08  7      Q.   Both sides of the railroad fence?

15:20:10  8      A.   Yes.

15:20:27  9      Q.   Do you recall being asked that at deposition?

15:20:29  10     A.   No, I don't.

15:20:30  11     Q.   I don't know if this will show it because I only

15:20:33  12  got the condensed version here.

15:20:38  13          Page 34 of your transcript.  There's the

15:20:47  14  question.  It begins at the bottom of 33.  Can you see

15:20:50  15  it there?

15:20:51  16     A.   Yes.

15:20:51  17     Q.   Can you read it?  I mean, are you able to read

15:20:54  18  it?

15:20:54  19          THE COURT:  Why don't you read the question

15:20:55  20  and answer.

15:20:57  21     Q.   I was just making sure he could follow along.

15:21:00  22          "Question:  Would you agree at least in that

15:21:05  23  picture, that's the one where you're claiming

15:21:07  24  encroachment?"

15:21:08  25     A.   Can you tell me what line we're on?

| | | |
|---|---|---|
| 15:21:10 | 1 | Q.  Go to 33.   The last line. |
| 15:21:14 | 2 | "Would you agree at least in that picture, |
| 15:21:17 | 3 | obviously no clearing of brush or trees was done on the |
| 15:21:20 | 4 | wrong side of the railroad fence?" |
| 15:21:23 | 5 | Do you see that? |
| 15:21:24 | 6 | A.  No, I don't.   I'm not following you. |
| 15:21:56 | 7 | (Discussion had off the record.) |
| 15:22:00 | 8 | BY MR. BAHRET: |
| 15:22:01 | 9 | Q.  Can you read it now? |
| 15:22:02 | 10 | A.  Yes. |
| 15:22:02 | 11 | Q.  "Would you agree at least in that picture, |
| 15:22:05 | 12 | obviously no clearing of brush or trees was done on the |
| 15:22:08 | 13 | wrong side of the railroad fence?" |
| 15:22:10 | 14 | And you say, "yes." |
| 15:22:12 | 15 | A.  Okay. |
| 15:22:13 | 16 | Q.  Then the next question: "Did you see any evidence |
| 15:22:16 | 17 | that there was any clearing of brush, brambles or trees |
| 15:22:21 | 18 | on the wrong side of the railroad fence?" |
| 15:22:24 | 19 | And what did you say, sir? |
| 15:22:25 | 20 | A.  "Of the fence, no." |
| 15:22:27 | 21 | Q.  Okay.  And so you would take that question to |
| 15:22:31 | 22 | mean -- I mean, you knew I wanted to know if there's |
| 15:22:35 | 23 | evidence of going on the wrong side of the fence to |
| 15:22:37 | 24 | clear anything? |
| 15:22:38 | 25 | A.  I agree with that.   Where I could physically see |

15:22:42  1   the fence, yeah, there was not any clearing on the other

15:22:45  2   side of that.

15:22:46  3       Q.   All right.   And incidentally -- I think you may

15:22:49  4   have already answered this.   You don't know if the

15:22:52  5   fence was literally pushed one or more feet away?

15:22:55  6       A.   I have no idea.   I only saw a very little bit of

15:23:01  7   fence that was remaining.   There was a little bit of

15:23:04  8   fence that was pushed over, but there were several

15:23:06  9   hundred feet in there where I never saw any fence at

15:23:09  10  all.

15:23:13  11      Q.   Well, let's take a look at a couple of these.

15:23:20  12  Exhibit A13.   Can you make that out?

15:23:32  13      A.   Yes.   Yeah.

15:23:34  14      Q.   Would you agree that's several pieces of railroad

15:23:38  15  fence?

15:23:38  16      A.   Yes.

15:23:39  17      Q.   And this is in an area not disturbed by

15:23:43  18  McCarthy's crew?

15:23:43  19      A.   Okay.

15:23:44  20      Q.   Do you see that?

15:23:45  21      A.   Yes.

15:23:45  22      Q.   The area where you didn't see railroad fence, as

15:23:48  23  evidenced here with a whole series of fence posts, is in

15:23:53  24  the area where a gazillion tons of dirt were put there

15:23:57  25  and a bulldozer pushed --

15:23:59   1    A.   That could be, yes.

15:24:07   2    Q.   Nobody ever told you that the fence that was

15:24:10   3   obliterated by McCarthy wasn't just like as shown in

15:24:15   4   Exhibit A13?

15:24:16   5    A.   That's right.

15:24:18   6    Q.   And assuming that fence was there, it would be an

15:24:22   7   acceptable technique to honor that fence and cut down

15:24:27   8   what's on the railroad side of the fence and leave alone

15:24:31   9   the stuff on the development side of the fence?

15:24:33  10           MR. ROBON:  Objection.

15:24:38  11           THE COURT:  One second, please.

15:24:44  12           He may answer.

15:24:47  13    A.   I'm not going to say it would be an acceptable

15:24:52  14   practice, but I'd say it is a practice.  Me, as a

15:24:57  15   surveyor personally, I probably wouldn't go in there and

15:25:01  16   just clear up to the fence if I wasn't sure that was the

15:25:04  17   exact line.  However, a contractor may.

15:25:08  18    Q.   Now I've got to fence with you.

15:25:11  19           THE COURT:  No pun intended.

15:25:20  20    Q.   It's important to me, sir, that word "accepted."

15:25:25  21    A.   Okay.

15:25:32  22    Q.   Can you read it?

15:25:33  23    A.   Yep.

15:25:33  24    Q.   Do you see where I'm pointing?

15:25:35  25    A.   Yes.

15:25:36  1      Q.   Now, the question is:  "Is that an accepted

15:25:40  2    method?"   All right?

15:25:42  3      A.   Yes.

15:25:42  4      Q.   So what I'm trying to get at is that word

15:25:45  5    "accepted."

15:25:45  6      A.   Right.

15:25:46  7      Q.   What was your answer?

15:25:47  8      A.   It's "Yes.   It is accepted."   But sometimes

15:25:50  9    it's not.   I mean, I understand what you're saying, but

15:25:56  10   there are other ways of establishing the right-of-way

15:25:59  11   besides just the fence.

15:26:02  12     Q.   I'm not arguing that point.   I'm just trying to

15:26:05  13   find out this method.

15:26:06  14     A.   It is sometimes accepted, yes.

15:26:08  15     Q.   So if a survey crew went down there and gave

15:26:12  16   honor and credibility to the railroad fence for three

15:26:15  17   miles, you wouldn't say:  Wow, are they crazy?

15:26:20  18     A.   Not unless it was, like, five or six feet off.

15:26:24  19     Q.   And you don't have any evidence that it was five

15:26:27  20   or six feet off?

15:26:28  21     A.   No, I do not.

15:26:30  22     Q.   And the area -- where did that map go that you

15:26:36  23   did?   What was it, Exhibit 7?

15:26:48  24          (Discussion had off the record.)

15:26:54  25     Q.   This area where you're showing disturbed area --

15:26:58  1    A.   Yes.

15:26:58  2    Q.   -- that's the area where McCarthy brought the

15:27:02  3    dirt in; is that right?

15:27:05  4    A.   That's the area that we located.   You keep

15:27:08  5    talking to me about where McCarthy brought the dirt in.

15:27:11  6    I don't know that he brought the dirt in.

15:27:13  7    Q.   If I ask you to assume that the dirt -- well, you

15:27:18  8    saw the bulldozer picture, right?

15:27:20  9    A.   Right.   But I don't know whose bulldozer that is

15:27:24  10   either other than what you're telling me.

15:27:27  11   Q.   Okay.   Well, look at A8.   Is this a picture

15:27:44  12   you've ever seen before?   Probably not.

15:27:46  13   A.   Might have saw it at deposition, but I'm not

15:27:49  14   sure.   I remember seeing some pictures with pipe.

15:27:51  15   Q.   And you recognize that -- I mean, would you

15:27:58  16   accept as true if I asked you to assume that's the water

15:28:01  17   main pipe?

15:28:01  18   A.   Yes.

15:28:02  19   Q.   And you see some fencing there?

15:28:07  20   A.   The construction fence?

15:28:08  21   Q.   Yes.

15:28:08  22   A.   Yes.

15:28:09  23   Q.   And are there any marks in this as far as there's

15:28:12  24   one faint one down there, that machine, I think, showing

15:28:15  25   any kind of survey line?   If you don't see any just --

15:28:21   1      A.   I don't see it.

15:28:21   2      Q.   Would you agree that there's no brambles or brush

15:28:27   3   or anything even inward of that massive tree?

15:28:33   4      A.   I would agree with that.

15:28:34   5      Q.   Do you have any idea who cut that stuff down?

15:28:37   6      A.   No idea.

15:28:42   7      Q.   And you see all that dirt in this picture?

15:28:45   8      A.   Yes.

15:28:46   9      Q.   Most of that dirt on the right of that pipe is on

15:28:50  10   Cambridge property; is it not?

15:29:00  11      A.   I don't really know where Cambridge property line

15:29:03  12   is relative in that picture.  I mean, I see some

15:29:06  13   construction fence.  Most of it's on the other side of

15:29:09  14   the construction fence.

15:29:10  15      Q.   Sir, if you were called upon -- and believe me,

15:29:13  16   I'm not saying this is any of your fault, so don't get

15:29:16  17   offended at my question.  But if you are getting called

15:29:20  18   upon to answer a question as to was there an

15:29:24  19   encroachment, would you prefer to see undisturbed land?

15:29:33  20      A.   I guess it would depend on what the encroachment

15:29:36  21   is, but yes.

15:29:37  22      Q.   Well, in this very case.

15:29:38  23      A.   In this case, yes, I would prefer to see

15:29:41  24   undisturbed.

15:29:42  25      Q.   And the day after the clearing took place, if you

15:29:45  1   had been called by McCarthy or anybody else, and they

15:29:51  2   said, we really want to know if there's been an

15:29:54  3   encroachment here, the first thing you would have said

15:29:57  4   is:  Don't touch a thing; right?

15:29:58  5       A.   I mean, that's the way I would prefer it, yes.

15:30:01  6       Q.   I mean, if they said, come on up in August, five

15:30:05  7   months afterwards or four months afterwards, and after

15:30:09  8   we dump, you know, thousands and thousands of tons of

15:30:12  9   dirt and bulldoze it, you would have probably said

15:30:17  10  that's not a good idea?

15:30:17  11      A.   I would have said, I'll do the best I can do.

15:30:21  12      Q.   Okay.  How many times were you at the property

15:30:33  13  after the fact personally?

15:30:35  14      A.   I've been there three times.   I was there twice,

15:30:39  15  and then I did go once after depositions to look at it

15:30:42  16  again.

15:30:43  17      Q.   Did you learn anything at deposition -- excuse

15:30:46  18  me, at your visit post-deposition that affected your

15:30:49  19  opinions in any way?

15:30:50  20      A.   No, not really.

15:30:51  21      Q.   You could just tell from the questions that were

15:30:54  22  being asked, it piqued your curiosity?

15:30:58  23      A.   Yeah, and I just wanted to see the condition of

15:31:02  24  the site at that time.   And it was in much better shape

15:31:05  25  than when we were there.

15:31:07    1    Q.   All right.   Did Mr. McCarthy or Mr. Laskey or

15:31:15    2    anybody else tell you even after clearing was done there

15:31:18    3    was still any kind of a green barrier?

15:31:25    4    A.   No.

15:31:25    5    Q.   Did you know clearing was in April?   I think you

15:31:28    6    said you did.

15:31:28    7    A.   That's when I was called.   I don't know when the

15:31:31    8    clearing actually occurred.

15:31:33    9    Q.   Let me rephrase, and you're correct.   It

15:31:36   10    obviously had to have taken place before you were

15:31:38   11    called.

15:31:39   12    A.   That's correct.

15:31:39   13    Q.   So we know it was April at the latest?

15:31:42   14    A.   That's right.

15:31:43   15    Q.   And we know that Mr. Huber was there in May, or

15:31:49   16    maybe you don't know that.

15:31:50   17    A.   I don't know that.

15:31:51   18    Q.   Okay.   Mr. Huber testified that when he walked

15:31:57   19    behind lot 15, he tore his clothes up and got scratched

15:32:03   20    walking through a four-foot barrier of brambles.

15:32:09   21           MR. ROBON:   Your Honor, I don't recall that

15:32:10   22    testimony.

15:32:12   23           THE COURT:   Well, if it's not exact, it's an

15:32:14   24    approximation of his testimony that he walked through

15:32:19   25    brambles and it cut his suit, as I recall.

15:32:24  1          MR. BAHRET:  Right.  And he estimated the

15:32:26  2   depth at about four feet.

15:32:30  3   BY MR. BAHRET:

15:32:30  4    Q.  Why are there no brambles visible, if you know,

15:32:34  5   in A12 behind lot 15?

15:32:43  6          THE COURT:  The date that photo was taken,

15:32:46  7   do you know?

15:32:48  8          MR. BAHRET:  We will get that from one of

15:32:49  9   the Ric-man witnesses.  Ric-man took these photos when

15:32:53  10  he saw McCarthy doing his thing.

15:32:55  11   A.  I don't know why there weren't any brambles

15:32:59  12  there.  But I think if you look at my survey, there is

15:33:02  13  an area clear at the southeast corner of the subdivision

15:33:05  14  that was not disturbed, the southeast property corner.

15:33:11  15   Q.  Let me get my compass directions.  Lot nine.

15:33:15  16   A.  No, 15, clear at the southeast.

15:33:18  17          THE COURT:  16.

15:33:19  18   A.  It is 16 if it's right at the corner.  At the

15:33:24  19  southeast corner.  That might be another lot number.

15:33:27  20  I'm not sure.

15:33:27  21   Q.  Let me see if I can get that picture.  In fact,

15:33:33  22  that's the one that shows the railroad fence right

15:33:36  23  near --

15:33:37  24   A.  Right there at that monument.  That's correct.

15:33:39  25   Q.  So that's an area where the fence is leaning in.

15:33:42  1  Had it been standing up, it would basically be at that

15:33:46  2  monument?

15:33:47  3      A.   Probably pretty close.

15:33:48  4      Q.   In that area you didn't see any evidence that

15:33:50  5  they cut on the other side of the monument or the fence?

15:33:53  6      A.   No.   That's correct.

15:33:59  7      Q.   I don't know what's with my pictures; they don't

15:34:02  8  show it very well on the ELMO.

15:34:04  9      A.   There's glare coming off.

15:34:06  10             THE COURT:  We're trying to get somebody in

15:34:09  11  to help with that.   I'm not sure whether it's the

15:34:12  12  photos or what.

15:34:13  13  BY MR. BAHRET:

15:34:14  14      Q.   Sir, you were asked a question at deposition, and

15:34:16  15  I don't really remember how we qualified this, but you

15:34:19  16  know what a hydro-axe is, correct?

15:34:21  17      A.   We talked about some cutting equipment, that's

15:34:25  18  correct.

15:34:25  19      Q.   You're familiar with that?  You've been out on

15:34:28  20  job sites and so forth?

15:34:29  21      A.   I have seen some, yes.

15:34:31  22      Q.   All right.   And you know that a hydro-axe does

15:34:34  23  not pull things out of the ground?

15:34:36  24      A.   Not the ones that I'm familiar with; that's

15:34:40  25  correct.

15:34:40 1    Q.   They cut, and if there's a bramble, it's not

15:34:44 2   going to pull five feet away from another bramble; it

15:34:48 3   just cuts over here?

15:34:49 4    A.   I mean, yes.

15:34:59 5            MR. BAHRET:  Okay.  Thank you.

15:35:01 6            THE COURT:  Anything further?

15:35:03 7            MR. ROBON:  Yes, Your Honor.

15:35:05 8                        - - -

15:35:05 9            NICK NIGH, REDIRECT EXAMINATION

15:35:06 10  BY MR. ROBON:

15:35:06 11   Q.   Several questions, Mr. Nigh.   When Mr. Bahret

15:35:09 12  indicated the little notation on a drawing that's

15:35:13 13  submitted to the county for utilities or drainage, and

15:35:19 14  there's an easement, let's say, reserved for five or ten

15:35:24 15  feet for an electrical line or a gas line or

15:35:29 16  Cable-vision, that's just an easement; is it not.   It

15:35:34 17  doesn't mean that property has to be cut or cleared?

15:35:37 18            MR. BAHRET:  Objection.

15:35:38 19            MR. ROBON:  I'll rephrase the question.

15:35:38 20  BY MR. ROBON:

15:35:40 21   Q.   Tell us what your experience is in easement areas

15:35:44 22  with regard to clearing of the property in the rear of a

15:35:51 23  residential subdivision.

15:35:52 24   A.   There's -- most subdivision plat requirements

15:35:56 25  require a survey -- or an easement around the perimeter

| | | |
|---|---|---|
| 15:36:00 | 1 | of the subdivision.  That gives them the ability to put |
| 15:36:03 | 2 | in all sorts of utilities.  It might be telephone; it |
| 15:36:06 | 3 | might be electric; it might be storm drain; it might be |
| 15:36:10 | 4 | sanitary sewers or water lines.  That easement is in |
| 15:36:13 | 5 | place to run those utilities.  That is all the easement |
| 15:36:18 | 6 | is for.  It doesn't mean you have to clear it all.  It |
| 15:36:21 | 7 | doesn't mean you can't clear it all.  The easement is |
| 15:36:27 | 8 | specifically there for the utilities. |
| 15:36:29 | 9 | Q.  Isn't it true, for example, when you have |
| 15:36:30 | 10 | underground wiring, you can actually draw a line around |
| 15:36:34 | 11 | the trees so the trees aren't cut down by the utility |
| 15:36:38 | 12 | company? |
| 15:36:38 | 13 | A.  Sure. |
| 15:36:39 | 14 | MR. BAHRET:  Your Honor, could we ask Mr. |
| 15:36:40 | 15 | Robon to at least try once during the trial for a |
| 15:36:43 | 16 | question that isn't leading. |
| 15:36:44 | 17 | THE COURT:  Well, let's make an objection |
| 15:36:46 | 18 | without the speeches, please. |
| 15:36:48 | 19 | MR. BAHRET:  I'm sorry.  Objection. |
| 15:36:50 | 20 | THE COURT:  Sustained.  But we'll let that |
| 15:36:52 | 21 | answer stand. |
| 15:36:54 | 22 | MR. ROBON:  Thank you. |
| 15:36:58 | 23 | MR. BAHRET:  Because of my speaking? |
| 15:37:00 | 24 | THE COURT:  To move things along. |
| 15:37:02 | 25 | BY MR. ROBON: |

15:37:03  1    Q.  When you identified the thousands of brambles on

15:37:06  2    your survey, can you tell the jury the condition of the

15:37:10  3    brambles?  I mean, were they -- was there mud on them?

15:37:16  4    Were they just cut?  Could you tell if it was natural

15:37:19  5    terrain?

15:37:22  6    A.  I wouldn't say it was natural terrain.  I really

15:37:26  7    couldn't tell.  I mean, there was -- they were in real

15:37:33  8    rough shape.  Obviously they were cut.  I can't tell

15:37:36  9    whether they were cut by a hydro-axe or they were cut by

15:37:39  10   a backhoe.  I really don't know.  But obviously they'd

15:37:44  11   been disturbed at some point in time.

15:37:46  12   Q.  Were they fairly in alignment, in a row, straight

15:37:52  13   line?

15:37:53  14   A.  Most of the brambles that we located were in a

15:37:57  15   fairly straight line.  And when I say fairly straight,

15:37:59  16   I mean, I don't want you to think it's a string line or

15:38:02  17   anything like that, but probably within a couple of

15:38:05  18   feet, maybe weaving back and forth a little bit.

15:38:08  19   Q.  So if I would stand here in front of this jury

15:38:10  20   counter, and this is the property line, the brambles may

15:38:15  21   have been six feet into the property, but they were

15:38:19  22   pretty much in alignment?

15:38:21  23   A.  That's --

15:38:21  24   Q.  Weaving in and out little bit?

15:38:24  25   A.  Yes.

15:38:28   1   Q.   The tree stumps that you noted on your survey,
15:38:32   2   did you see any evidence of movement of any of those
15:38:35   3   tree stumps?
15:38:37   4   A.   No, they were still in the ground.
15:38:39   5   Q.   And it looked like in their original position?
15:38:42   6   A.   Yes.
15:38:51   7   Q.   And the surveying monuments that you put in were
15:38:55   8   in there before the clearing of the land, correct?
15:38:57   9   A.   They were placed sometime in 2001, probably, so
15:39:02   10  yes.
15:39:03   11  Q.   Tell me as an engineer -- I'm sorry, as a
15:39:08   12  surveyor, if you were surveying a railroad property, and
15:39:14   13  there was a relatively new subdivision abutting it, give
15:39:21   14  us your opinion as to whether or not the surveyor would
15:39:25   15  know if there were corner monuments?
15:39:28   16  A.   He wouldn't necessarily know.  He might think so,
15:39:36   17  but really when we're -- I do construction layout
15:39:41   18  staking also.  We really refer to the plans most of the
15:39:45   19  time.  I mean, what monumentation is shown on the plans
15:39:49   20  is usually what we use in determining locations of
15:39:55   21  waterlines.
15:40:00   22  Q.   The monuments that your firm installed in 2001,
15:40:04   23  are they reflected anywhere on the construction drawings
15:40:09   24  in Wood County?
15:40:10   25  A.   On the Cambridge --

15:40:13   1      Q.   Yes.

15:40:14   2      A.   Yes, they are.

15:40:15   3      Q.   And are the records then -- tell us of the

15:40:19   4  availability of records in the county.

15:40:23   5      A.   All subdivision plats are recorded in the sub --

15:40:26   6  or actually, the county recorder's office, depending on

15:40:30   7  which county you're in.   All subdivision plats are

15:40:33   8  readily available to the public.

15:40:35   9      Q.   And as Mr. Bahret suggested, the City surveyors

15:40:39  10  just looked at the railroad fence.  If that's what they

15:40:43  11  were doing, was there any reason for a survey?   They

15:40:46  12  were just marking where the railroad fence was?

15:40:50  13      A.   If they're just marking where the railroad fence

15:40:52  14  is?

15:40:53  15      Q.   Right.   Anybody could have done that?

15:40:55  16      A.   Exactly.

15:41:09  17      Q.   Of the thousands of brambles that you saw, that

15:41:12  18  you depicted on Exhibit Number 7, the survey drawing, do

15:41:22  19  you believe that any of those brambles were moved?

15:41:25  20           MR. BAHRET:   Objection.   He'd have no

15:41:28  21  foundation to know.

15:41:28  22           THE COURT:   I sustain that.

15:41:30  23           MR. ROBON:   I'll rephrase the question.

15:41:30  24  BY MR. ROBON:

15:41:32  25      Q.   Was there any evidence that there was a false

15:41:35  1   impression given to you as a surveyor to perpetrate a

15:41:41  2   fraud on the City of Toledo, which is what Mr. Bahret

15:41:44  3   may be suggesting?

15:41:46  4                MR. BAHRET:  Your Honor, I object and move

15:41:47  5   to strike.

15:41:48  6                THE COURT:  I'm going to -- take a breath.

15:41:51  7   I'm going to ask you, Mr. Robon, to please -- both

15:41:57  8   sides, let's keep the side remarks out of the record,

15:42:00  9   please.  Just ask the question.  Make your argument in

15:42:04  10  closing.

15:42:05  11  BY MR. ROBON:

15:42:13  12     Q.  In your opinion, was there any effort by anyone

15:42:21  13  to change the status of the property when you went out

15:42:25  14  and located the tree stumps and the brambles?

15:42:28  15               MR. BAHRET:  Objection.  How would he know.

15:42:28  16  BY MR. ROBON:

15:42:31  17     Q.  If you know.  Was there any evidence?

15:42:33  18               THE COURT:  Let's find out if he knows.

15:42:35  19  I'll overrule.

15:42:36  20               Can you tell?  Can you tell?  Do you know?

15:42:40  21     A.  It didn't appear to me that anybody was trying to

15:42:43  22  do anything funny.  I mean, that's what you're trying

15:42:46  23  to say?

15:42:46  24     Q.  Right.

15:42:46  25     A.  I believe the brambles were in the location that

| | |
|---|---|
| 15:42:49 | 1 |
| 15:42:54 | 2 |
| 15:42:57 | 3 |
| 15:43:00 | 4 |
| 15:43:06 | 5 |

1  they originally were.   I don't believe that -- maybe a

2  bulldozer pushed some dirt on top of them or something

3  of that sort.   But I don't think that they were pushed

4  away or onto the Cambridge property.   I think that's

5  what they're trying to get at.

6              MR. ROBON:  Thank you.   Nothing further,

7  Your Honor.

8                         - - -

9              NICK NIGH, RECROSS-EXAMINATION

10  BY MR. BAHRET:

11    Q.  Sir, would you agree with me that you would have

12  liked to have known that the scene was changed?

13    A.  I mean, I think I would have liked to have known

14  if there was some work done in there.   After the fact or

15  after some clearing was done?

16    Q.  Yeah.

17    A.  I would have like to do have known that, yes.

18    Q.  And nobody told you?

19    A.  Nobody told me that.

20    Q.  And the areas where you were finding brambles

21  were places --

22              MR. BAHRET:  How come this thing doesn't

23  show anything?   Here we go.

24  BY MR. BAHRET:

25    Q.  Can you see that ditch?

15:43:58   1      A.   Yeah.

15:44:00   2      Q.   That's the places where the evidence was in these

15:44:05   3   ditches?

15:44:05   4      A.   There was -- there were some things in areas like

15:44:09   5   that.   That's correct.

15:44:10   6      Q.   And this is A2, photograph A2.

15:44:22   7           And then photograph A3, you see Mr. McCarthy and

15:44:30   8   his crew there digging up the scene after they covered

15:44:33   9   up the scene?

15:44:33  10      A.   I see someone.   I don't know who it is.

15:44:36  11      Q.   And a close up in A17.   That shows up great,

15:44:42  12   doesn't it?  This is the sort of thing you never knew

15:44:48  13   about?

15:44:48  14      A.   You're right.   I did not know about that.

15:45:07  15      Q.   And had you known about that, had you known you

15:45:08  16   were going to be asked questions about whether the

15:45:11  17   brambles actually moved, you would have studied them a

15:45:17  18   bit further?  Instead of just identifying them, you

15:45:20  19   would have checked to see if the root structure is

15:45:23  20   attached to anything?

15:45:27  21      A.   I think if that -- if that came up, yes, you

15:45:32  22   know.   I mean --

15:45:33  23      Q.   Again, I'm not implying anything.

15:45:35  24      A.   I know.   What I'm trying to say is, I mean, I

15:45:38  25   get a phone call.   I was asked to locate some brambles.

15:45:42  1    Q.   I'm with you.

15:45:43  2    A.   That's the bottom line.

15:45:44  3    Q.   But had you known these other issues, you had the

15:45:48  4  wherewithal and the knowledge to investigate further to

15:45:52  5  be able to definitively state:  Did these brambles move

15:45:56  6  or not when the bulldozer and tons of dirt were here?

15:45:59  7    A.   Again, probably if my client asked me to.

15:46:02  8    Q.   Okay.

15:46:03  9    A.   You know, I'm in a --

15:46:05  10   Q.   But you would have suggested --

15:46:07  11        MR. ROBON:  Your Honor, can we let him

15:46:09  12  finish the answer, please.

15:46:09  13        THE COURT:  Were you done with your answer?

15:46:11  14   A.   I'm in a situation where, you know, I'm working

15:46:14  15  for somebody.   So I'm doing what they ask me to do.

15:46:17  16   Q.   Okay.  But my point is, and again, I'm not

15:46:21  17  arguing with what you said.   I appreciate the answer.

15:46:24  18        Had you known of this issue or this problem, you

15:46:27  19  would at least tell the client how I can help you better

15:46:31  20  answer this question?

15:46:33  21   A.   When I'm out there I might take a better look at

15:46:35  22  it, you know, to see, knowing that I would be asked

15:46:40  23  these questions, you know.   But I didn't know these

15:46:43  24  questions were going to be asked, so I'm out there

15:46:45  25  locating brambles.   That's my focus.

| 15:46:52 | 1 | Q. I'll just leave that issue there. |
| 15:47:09 | 2 | Mr. Robon asked you if you saw any evidence that |
| 15:47:12 | 3 | anybody was doing any funny business and trying to cover |
| 15:47:15 | 4 | anything up intentionally. |
| 15:47:18 | 5 | THE COURT: I think struck that; did we not. |
| 15:47:22 | 6 | MR. BAHRET: I didn't think so, but if we |
| 15:47:24 | 7 | did, I won't go there. |
| 15:47:27 | 8 | MR. ROBON: Let him go there, Your Honor. |
| 15:47:29 | 9 | THE COURT: I'm not going to let him open a |
| 15:47:32 | 10 | door I've already shut. |
| 15:47:34 | 11 | MR. BAHRET: I was going to ask a corollary. |
| 15:47:37 | 12 | Does he think the City did anything intentionally. |
| 15:47:40 | 13 | THE COURT: Doesn't that go to the, again, |
| 15:47:42 | 14 | our discussion earlier about whether he had a foundation |
| 15:47:44 | 15 | or what he knew and didn't know? |
| 15:47:47 | 16 | MR. BAHRET: You're right. I'm done. |
| 15:47:49 | 17 | Thank you. |
| 15:47:50 | 18 | THE COURT: Thank you. You may step down. |
| 15:47:52 | 19 | Thank you. |
| 15:47:56 | 20 | Ready to call your next witness? |
| 15:47:59 | 21 | MR. ROBON: Can I have a five-minute break? |
| 15:48:01 | 22 | THE COURT: We can take a five-minute |
| 15:48:03 | 23 | standing break, or if someone needs to use the jury |
| 15:48:07 | 24 | room, you may. |
| 15:53:48 | 25 | (The witness was sworn by the clerk.) |

15:54:09   1          MR. ROBON:  We're going faster than I

15:54:11   2   thought today.

15:54:12   3          John, have you been sworn?

15:54:14   4          THE WITNESS:  Yeah.

15:54:16   5                  - - -

15:54:16   6          JOHN McCARTHY, DIRECT EXAMINATION

15:54:17   7   BY MR. ROBON:

15:54:17   8     Q.  Would you introduce yourself to the jury.  Tell

15:54:19   9   the jury about yourself and what you do.

15:54:22  10     A.  My name is John McCarthy.  I'm a retired

15:54:28  11   professional engineer.  I spent my 30 years with the

15:54:33  12   Corps of Engineers, mostly as head of the Corps of

15:54:39  13   Engineers here in Toledo.  But we did a number of jobs

15:54:47  14   with the City.  But I've been an engineer mostly with

15:54:51  15   the Corps.  I've done some development work before I

15:54:57  16   was with the Corps, and some home development work

15:55:00  17   afterwards.  My particularly -- not too many people

15:55:08  18   know really what the Corps does.  The Corps of

15:55:10  19   Engineers is mainly into flooding, drainage, flood

15:55:16  20   control, and here in Toledo it was particularly

15:55:22  21   dredging; that was my main expertise was in those type

15:55:24  22   of things.

15:55:25  23     Q.  And is the Corps of Engineers in charge of all

15:55:29  24   navigable waters like Lake Erie and things like that?

15:55:33  25     A.  Yes.  They are.  In the Corps of Engineers here

15:55:39  1   in Toledo I was not involved in the wetlands issues and

15:55:44  2   things like that.   I was not -- that was not part of my

15:55:48  3   office.   I had a couple of people that sat in there

15:55:52  4   that -- they did not work for me.

15:55:53  5      Q.   What on a weekly basis, can you describe your 30

15:55:59  6   years of experience with the Corps of Engineers, the

15:56:02  7   kinds of things that you would be involved in with

15:56:04  8   drainage and things like that?

15:56:07  9      A.   Well, particularly -- maybe the most pertinent

15:56:12  10  thing here was in the '80s and '90s we did flood control

15:56:20  11  projects with the City of Toledo, both at Point Place

15:56:24  12  and at Swan Creek where my office -- we wouldn't do the

15:56:30  13  main designs in my little office.  We had nine people,

15:56:35  14  mostly surveyors and half surveyors, and contract

15:56:41  15  people, and I had another engineer assistant.   But we

15:56:45  16  would do -- we would typically on these type of flood

15:56:52  17  control projects, we would do the contract

15:56:55  18  administration, the contractors that built these levies

15:56:59  19  and dikes, worked for me.  We decide what were we to pay

15:57:10  20  them.   The problems we had, especially in my earlier

15:57:14  21  career, we did most of the problem resolving, redesign,

15:57:19  22  details, and things like that where we would get

15:57:22  23  involved with things like the drainage of -- was still

15:57:28  24  not right in the backyards, people that we built flood

15:57:32  25  control dikes for, and all the other issues that you'd

15:57:37  1   have with public works projects.  We typically were

15:57:45  2   doing public works projects along the shoreline or along

15:57:49  3   the river line, so we were particularly involved with

15:57:59  4   the residents and their properties as opposed to our

15:58:03  5   properties and coordinating that with the contractors

15:58:07  6   and our own people, our own surveyors and that kind of

15:58:11  7   thing.

15:58:11  8       Maybe the most pertinent thing here, we would do

15:58:17  9   redesigns, or when we had problems we would use our

15:58:20  10  basic civil engineering type of things as far as basic

15:58:30  11  ponding and what the impacts of pipes being in or out,

15:58:36  12  or how big you needed a pipe to drain a certain area,

15:58:41  13  you know, that kind of thing.

15:58:43  14      We did construction of the -- in a flood control

15:58:48  15  project you typically have as much incidental

15:58:52  16  construction as far as the roads and the sewers and

15:58:56  17  waterlines and gas lines and everything else that has to

15:59:01  18  be rearranged when you put a flood control project in.

15:59:05  19  You have to redo all these things.  And you have impacts

15:59:10  20  from all the other lines or you're typically crossing

15:59:14  21  and a pump station and that kind of thing.

15:59:18  22      So the Corps of Engineers experience was quite --

15:59:21  23  from a civil engineering -- I'm a civil engineer -- kind

15:59:26  24  of covered the gamut as far as civil engineering kind of

15:59:31  25  things.

15:59:31  1    Q.   Can you tell the jury how you first met Jack

15:59:37  2    Laskey and under what circumstances?

15:59:40  3    A.   Yes.   I think -- the first time I really met him

15:59:48  4    was when this situation came up with the tree clearing

15:59:53  5    out behind my son's house.

15:59:56  6    Q.   Where is your son's house?

15:59:58  7    A.   My son's house is on lot 15 on Cambridge

16:00:03  8    development.

16:00:05  9    Q.   The one that backs up to the railroad?

16:00:07  10   A.   The one that backs up to the railroad.

16:00:09  11   Q.   And he lives there?

16:00:10  12   A.   He lives there.   And he's -- he had just moved

16:00:16  13   in there.   I understand now.   I thought it was 2005,

16:00:19  14   but it was actually early 2006.   He had just moved in

16:00:23  15   there.   And he called me up and he said, What do you

16:00:26  16   think they're doing back here?  I didn't know; I said,

16:00:29  17   Well, I'll find out.   And I came over to look at it.

16:00:34  18        And I'm not sure if it was that day or shortly

16:00:37  19   thereafter I met Jack.  I'm not -- we might have met

16:00:40  20   before that incidentally because my son had worked with

16:00:44  21   Jack before.   That's when I first met Jack, when this

16:00:49  22   problem started.

16:00:51  23   Q.   And can you give us kind of a dateline after your

16:00:57  24   son called you, and you went out and you saw the tree

16:01:00  25   clearing, which would have been in April of '06?

16:01:04  1    A.    '06.

16:01:06  2    Q.   Tell us what you did.

16:01:11  3    A.   Well, I did a number of things.  First of all,

16:01:18  4  we started finding out who it was that was clearing the

16:01:22  5  trees.  And we found out.  I don't know.  I can't

16:01:27  6  remember, just who we found that out from at first.  But

16:01:32  7  we found out that it was a City project and it was a

16:01:35  8  water main project.

16:01:38  9      And my son and I first -- I think before Jack

16:01:43  10  came along, my son and I went to different ideas, what

16:01:46  11  are we going to do here because, you know, his house

16:01:49  12  was -- his wife and his kids were -- I think he had one

16:02:00  13  son then.  How are we going to deal with this thing?  So

16:02:03  14  we went with that, looking at what it was and what we

16:02:07  15  could do to kind of mitigate the tree damage.  And

16:02:18  16  we -- I started looking at different options, of

16:02:22  17  building a mound like somewhat like the levies that we

16:02:26  18  did in the Corps, putting a levy back there, a mound

16:02:30  19  back there to put trees up on.  And we came up with

16:02:36  20  different ideas and different -- talked to different

16:02:39  21  people, prices, and how we could do that.  And talked

16:02:44  22  to Jack a lot about, you know, where are we going to get

16:02:47  23  the money to do this at this point.  And, you know,

16:02:53  24  that's how we --

16:02:56  25    Q.   At that point did you become a consultant to Old

16:02:59  1    Granite Development?

16:03:00  2        A.   Well, I'm not sure we formalized this as a

16:03:04  3    consultant until really the following year.   I was just

16:03:09  4    doing it.   Jack was getting some money for basically

16:03:15  5    for the -- when we started building this mound and

16:03:18  6    trying to do the treeing ourselves there, and towards

16:03:22  7    the end of April.   So Jack was trying to get some

16:03:29  8    money.   And he was paying me at first as just as an

16:03:33  9    employee of Old Granite.   And then in 2007 I had some

16:03:41  10   other things going on, and I got incorporated and became

16:03:47  11   a consultant.   That was kind of the way that -- the

16:03:50  12   situation evolved.

16:03:53  13       Q.   Can you tell the jury when you first realized

16:03:59  14   that there may have been a problem with the tree

16:04:03  15   cutting?

16:04:06  16       A.   A problem as far as the local residents were

16:04:11  17   concerned or as far as --

16:04:13  18       Q.   As far as the property line in the back of the

16:04:17  19   Cambridge subdivision.   And if you don't understand my

16:04:20  20   question, please ask --

16:04:27  21       A.   I think back in April, we started looking at it

16:04:34  22   and saying, Well, you know, hey, this is right along the

16:04:39  23   property line here.   Certainly at least some of these

16:04:43  24   trees look like they're out on Cambridge property.   And

16:04:48  25   I called -- I did some -- I did some investigation

16:04:54  1   myself.   I went and had some guys working for me.   I'm

16:04:59  2   putting an addition on my own home, and I brought them

16:05:02  3   over and we measured from the railroad track.  We had

16:05:05  4   that drawings from Jack and from his site developer.

16:05:11  5   And we started checking some things out, found the

16:05:14  6   monuments on the property.

16:05:16  7       Q.   The corner monuments?

16:05:17  8       A.   The corner monuments on the property.  We found

16:05:20  9   them and we --

16:05:21  10      Q.   Let me stop you right there for a moment.

16:05:34  11  Having you look at Exhibit 41, is that one of the corner

16:05:39  12  monuments you found?

16:05:40  13      A.   Yes.   I'm sure.   It's got a green plastic tube

16:05:45  14  around it.

16:05:45  15      Q.   Yes.   I didn't mean to interrupt you.

16:05:47  16      A.   We found those, and from them, with the railroad

16:05:50  17  right there, we were able to measure off.   And it was

16:05:53  18  pretty clear to us that there was -- there was some

16:05:57  19  trespassing as well.

16:05:59  20           MR. BAHRET:  Objection.

16:06:02  21           THE COURT:  Overruled.   He may continue.

16:06:04  22      Q.   Trespassing by whom?

16:06:06  23      A.   By the clearing contractor.

16:06:08  24      Q.   City of Toledo?

16:06:09  25      A.   City of Toledo.

16:06:10   1          MR. BAHRET:  Objection.

16:06:11   2      A.  They were working for the City of Toledo.

16:06:15   3          MR. BAHRET:  Objection.  They were not

16:06:16   4  working for the City of Toledo.  They were working for

16:06:19   5  Ric-man.

16:06:19   6          THE COURT:  Well, let's -- we'll sustain

16:06:22   7  that objection.  The jury will disregard the answer.

16:06:25   8  Let's keep moving.

16:06:26   9      A.  Of course, we didn't know anything about who was

16:06:29  10  the subcontractor or anything at that time.  We just

16:06:32  11  knew this was something to do with the City of Toledo.

16:06:36  12      Q.  Okay.  So you became suspicious?

16:06:39  13      A.  Yes.  We marked it out ourselves.  With the

16:06:45  14  railroad there, it's not a big surveying mystery.  You

16:06:49  15  can come right off the railroad.  The railroad goes

16:06:52  16  right up parallel with the property line.

16:06:54  17      Q.  Explain that to the jury.  I don't understand

16:06:57  18  what you're telling me.

16:06:58  19      A.  Well, in the engineering world, if you're near a

16:07:06  20  railroad, that's usually your base line for your control

16:07:10  21  of all your property alignments and that kind of thing.

16:07:15  22  And fortunately we had a railroad right there, so it

16:07:20  23  was -- it was very easy to measure off that center line

16:07:25  24  of railroad, the active railroad, which was over about

16:07:28  25  100 feet.  You could accurately go along that back

16:07:33    1    property line of Cambridge and see just what it was.

16:07:39    2        Q.   And what did you see?

16:07:40    3        A.   We saw there were -- at that time there were

16:07:50    4    whole trees, whole large trees, a few large trees,

16:07:57    5    stumps that were clearly on Cambridge property.   There

16:08:03    6    were bushes or brambles that were coming out of the

16:08:08    7    ground; those were clearly on -- between the trees; they

16:08:15    8    were clearly on Cambridge property.   And I think -- I'm

16:08:23    9    not sure exactly when I called Christy Soncrant, but

16:08:28   10    somewhere along the line we got in touch with them, and

16:08:32   11    I got in touch with our site engineer to double-check

16:08:39   12    the monuments make sure the monuments -- because they'd

16:08:42   13    only been there for, at that time, five, six years.

16:08:46   14        Q.   Is that Mr. Night?

16:08:46   15        A.   Yes, I talked to his boss.

16:08:51   16        Q.   What happened with Peterman Associates then?

16:08:54   17        A.   I asked them to come out and double-check the

16:08:57   18    monuments and for them to put in a couple of

16:09:03   19    intermediate stakes along the back property.

16:09:06   20        Q.   What do you mean, intermediate stakes?

16:09:08   21        A.   Well, the intermediate stakes, we have a monument

16:09:12   22    at each corner, that's approximately 1,000 feet apart.

16:09:16   23    It's a long ways to eyeball anything.   So they put in

16:09:21   24    at least one or two intermediate stations at 500 feet

16:09:27   25    and maybe more.

16:09:29  1    Q.   Were these stakes then on the property line?

16:09:31  2    A.   Yes.   They were put right on the property line.

16:09:34  3    Q.   And from those station, what did you determine?

16:09:37  4    A.   That, indeed, our more exacting measurements, and

16:09:43  5    we actually put lines up, that -- we were right on, too.

16:09:51  6    That we were accurate.  That our -- when we measured

16:09:57  7    back from the railroad, we put in little stations along

16:10:00  8    that line, especially where the trees looked like they

16:10:04  9    were trespassing.

16:10:04  10   Q.   Can you describe for the jury whether there were

16:10:07  11   cuttings beyond the surveyor markers into the Cambridge

16:10:10  12   subdivision at that point in time?

16:10:13  13   A.   Yes.  We could see that right from the beginning.

16:10:15  14   Q.   And how far?   How far into the subdivision?

16:10:19  15   A.   Well, the worst area that we saw that was on the

16:10:22  16   ground, the stumps, was about five feet.   And it was

16:10:29  17   leaning -- there's a -- it's not -- so it was -- the

16:10:39  18   worst area was about five feet; five, six feet,

16:10:44  19   depending on whether you included the railroad ties,

16:10:47  20   which didn't have trees on them, but the trees were

16:10:50  21   hanging right over them.   So it was about -- it was

16:10:54  22   about five or six feet that we ascertained was the worst

16:10:58  23   part in there.

16:10:59  24   Q.   And the stuff was cut down in there?

16:11:01  25   A.   Yes, it was cut down in there.

16:11:06   1       Q.   Take a look at Exhibit Number 92.   Is that a

16:11:18   2   photograph that you took?

16:11:19   3       A.   Yes, it's one of my guys -- yes, this is -- one

16:11:25   4   of my people took this photograph.

16:11:27   5       Q.   And you were there?

16:11:29   6       A.   Yes.

16:11:30   7       Q.   Can you explain to the jury what that picture

16:11:54   8   connotes or shows?

16:11:57   9       A.   Yes.   This is one of those intermediate stakes

16:12:02  10   that we put in.

16:12:04  11       Q.   You or Peterman?

16:12:05  12       A.   No, not Peterman.   These one-inch diameter

16:12:10  13   stakes we put in.   And he just had to put the

16:12:17  14   intermediate station on, that we had checked these, tied

16:12:21  15   these in too.   These, my guys put in.   This wasn't done

16:12:27  16   by the surveyor.

16:12:27  17       Q.   Well, I'm confused.   This is before Peterman

16:12:30  18   came out or after Peterman came out?

16:12:37  19       A.   This was after his initial time out.   This is

16:12:41  20   marked here May 10.   Nick told me that the first time

16:12:47  21   they came out, when Nick did not come out, was the end

16:12:51  22   of April.

16:12:55  23       Q.   I'm sorry, I didn't have that over here.   So you

16:12:58  24   dated this photograph?

16:12:59  25       A.   Yes.   Yes.   This is dated with a stationing

16:13:05  1    along the City system that was located.   And -- but

16:13:10  2    Peterman had already been out, checked the corner

16:13:14  3    monuments, put an intermediate stake in the area that we

16:13:18  4    could go and further put these liner stakes in.   So we

16:13:26  5    had that checked.   He was out there earlier.

16:13:29  6       Q.   What's the red line that is in the left-hand

16:13:35  7    corner going this way from the left-hand corner down the

16:13:42  8    line?

16:13:42  9       A.   That's the property line that we superimposed on

16:13:46  10   this.

16:13:47  11      Q.   When you say we, who is we?

16:13:49  12      A.   I had a young fellow working for me.   He was

16:13:53  13   kind of a computer graphics guy.   And he put that line

16:13:59  14   on.   I told him, let's -- so, because we don't know

16:14:03  15   where we're going here, let's put it in, the angle, as

16:14:06  16   best we can on that.

16:14:08  17      Q.   And does that photograph accurately depict where

16:14:11  18   the property line was back in May 10 of 2006 --

16:14:17  19              MR. BAHRET:   Objection.

16:14:18  20      Q.   -- in connection with the tree cutting?

16:14:20  21              MR. BAHRET:   Objection.   No foundation that

16:14:22  22   he can establish the property line.

16:14:23  23              THE COURT:   I think we need to do that

16:14:25  24   first.   Sustained.

16:14:28  25   BY MR. ROBON:

16:14:28   1    Q.   Did you indicate -- explain to the jury, Mr.

16:14:31   2    McCarthy, how you determined that the property line was

16:14:37   3    where you said it was?   You had Peterman come out, do

16:14:42   4    the corner stakes, then he put some stakes in the

16:14:44   5    middle?

16:14:45   6    A.   Right.

16:14:45   7    Q.   What did you do after that --

16:14:46   8    A.   We went --

16:14:48   9    Q.   -- from a surveying perspective?

16:14:50   10   A.   We went from those stakes, and we extended that

16:14:55   11   line, using the railroad line, you know, those stakes

16:15:00   12   were 101 feet from the railroad line, and we came down

16:15:05   13   and we used that same distance to set these stakes.   So

16:15:10   14   we knew we were on the -- within an inch or so.   We were

16:15:17   15   on the line.

16:15:20   16   Q.   On the property line?

16:15:21   17   A.   On the property line.   And this superimposed red

16:15:24   18   line I think, even as Christy and I agreed, the exact

16:15:28   19   angle of this thing is not of the same order of

16:15:34   20   accuracy.   This could be trusted a little bit.   It's

16:15:36   21   very hard to take a photo and get the angle just right.

16:15:40   22   Q.   When you say you and Christy, you mean Mrs.

16:15:44   23   Soncrant?

16:15:44   24   A.   Yes.

16:15:45   25   Q.   Did he agree with you on something with regard to

16:15:48    1    the property line regarding this photo?

16:15:55    2        A.   No.   She had -- the City surveyors came out.   We

16:16:03    3    brought Peterman back.   And we treated this as, you

16:16:14    4    know, this was, I think -- I think, as I recall, Christy

16:16:23    5    didn't have any problem so much with the stake, but the

16:16:26    6    line may be twisted somewhat.

16:16:30    7        Q.   Well, tell us what you did after May 10 of '06.

16:16:38    8        A.   Well, after May 10, we were building -- I think

16:16:48    9    we were still -- we were building the mound.

16:16:52   10        Q.   Behind lot 15 and 16?

16:16:56   11        A.   Lot 15.   I think we started this.   I think we

16:16:59   12    did some of the work even -- my dates on some of the

16:17:03   13    receipts was even before this that we avoided this area.

16:17:06   14    We were hauling in dirt.

16:17:08   15        Q.   And can you tell the jury why you were hauling

16:17:11   16    dirt in?

16:17:12   17        A.   Well, this was a disaster as far as the

16:17:17   18    development, the sales, my son.

16:17:20   19             MR. BAHRET:   Objection and move to strike

16:17:22   20    reference to sales.   He has no qualifications on that.

16:17:29   21             THE COURT:   Unless a proper foundation can

16:17:31   22    be laid, I'll sustain that.

16:17:32   23    BY MR. ROBON:

16:17:32   24        Q.   Just tell the jury the facts, what you did and

16:17:35   25    why you did it with regard to the mud.

16:17:43  1      A.   I went and hired a contractor to start bringing

16:17:48  2   fill in, to start building the mound to put the trees on

16:17:52  3   top of it.

16:17:54  4      Q.   Okay.  And can you tell the jury roughly how many

16:17:57  5   loads of earth that you had brought in?

16:18:00  6      A.   Yes.  We brought in -- I think it was -- I think

16:18:08  7   we said 100.  And we said 60.  But I think it was -- I

16:18:15  8   think it was 60 when we rechecked it after deposition

16:18:19  9   and that.  I think it was 60 loads of dirt, and about

16:18:24  10  600 cubic yards of dirt was brought in as the first

16:18:28  11  stage of building a mound to put trees on it.

16:18:33  12     Q.   And you brought it in how?

16:18:35  13     A.   By truck.  We --

16:18:37  14     Q.   From where?

16:18:38  15     A.   We brought it in from Five Point Road.  I talked

16:18:43  16  to some of the contractors that I knew in the area, and

16:18:46  17  they showed me an area that they had clean fill.

16:18:49  18     Q.   And how did you get access?

16:18:51  19     A.   We came down the -- right down the railroad.  It

16:18:55  20  was all cleared and there was no one there.  We brought

16:18:59  21  it right down the -- right from Bates Road down the

16:19:04  22  railroad line and dumped it, dumped it into the

16:19:09  23  property.

16:19:09  24     Q.   And can you tell the jury how long a period of

16:19:13  25  time did this dumping of earth last:  a day, a week, a

16:19:20  1  month?

16:19:20  2     A.  We only run one day.  We only ran one day the

16:19:25  3  trucks.  We had, like, a dozen big dump trucks coming

16:19:30  4  from Five Point Road.

16:19:31  5     Q.  And was the dirt free?

16:19:34  6     A.  Well, it was supposed to be free, but then at the

16:19:37  7  last moment they wanted a couple dollars per cubic yard,

16:19:41  8  which I paid them.

16:19:43  9     Q.  And what did you do after the one day that the

16:19:46  10  earth was delivered to the site?

16:19:51  11     A.  That day we also had equipment there moving the

16:19:53  12  dirt.  And the following day we also started placing

16:19:58  13  the fill, getting ready to readjust the drainage to

16:20:02  14  receive this fill, and we did -- we started the mound.

16:20:09  15     Q.  Okay.  Now, when you say adjusted the drainage,

16:20:13  16  when we were on the jury view, there was a drain tile

16:20:16  17  that was perpendicular to the railroad?

16:20:19  18     A.  Right.

16:20:21  19     Q.  About three to four inches under water, looked

16:20:24  20  like it was about 12 inches in diameter?

16:20:27  21     A.  We put that in.

16:20:28  22     Q.  Who installed that?

16:20:29  23     A.  We put that in.  That was all to do with the

16:20:31  24  mound.

16:20:31  25     Q.  Where did that drainage pipe go to?

16:20:34   1      A.   That drainage pipe went into the railroad -- the
16:20:40   2  railroad storm drain that they had right inside there.
16:20:43   3  We tapped into that and brought that out to make sure
16:20:46   4  that we had good drainage all along through there.
16:20:50   5      Q.   First of all, can you tell the jury whether or
16:20:53   6  not that drain tile is operative today?
16:20:56   7      A.   No, it's not operative today.
16:20:58   8      Q.   Can you explain why it's not operative today?
16:21:01   9      A.   It's not operative today because the pipe
16:21:05  10  crossing that connected it and let all that out the main
16:21:09  11  culvert that let it out to the south, out to the center
16:21:12  12  ditch, was cut off during the water main construction.
16:21:16  13      Q.   Now, can you tell the jury why you only dumped
16:21:21  14  earth one day?
16:21:25  15      A.   Yes.   I think the main thing was that we were --
16:21:34  16  Jack and you and I, I think you were talking to Jack.  I
16:21:37  17  didn't even --
16:21:38  18      Q.   Forget the conversations.   Tell us why you
16:21:41  19  stopped.
16:21:41  20      A.   Because it looked like we were covering up -- we
16:21:45  21  were covering up some of this evidence of trees.
16:21:49  22      Q.   And you were advised to stop?
16:21:51  23           MR. BAHRET:   Objection.
16:21:52  24      A.   Yes.
16:21:53  25           THE COURT:   Overruled.

16:21:56   1     Q.   What did you then do?

16:22:00   2     A.   Well, we disbanded this -- we disbanded this

16:22:10   3   operation of building this mound and that, and we pretty

16:22:16   4   much started -- I was trying to, you know, ask the City

16:22:23   5   of Toledo to come out and, you know, verify these trees

16:22:30   6   are there, we'd still like to build this mound, and that

16:22:33   7   kind of thing.   And the City came out and did -- they

16:22:40   8   did surveys.   I recalled Nick Nigh --

16:22:47   9     Q.   From Peterman?

16:22:48  10     A.   -- from Peterman.   I asked him to come out and,

16:22:52  11   you know, in light of us having this dirt.

16:22:57  12          And the City was saying, Well, you know, some of

16:23:02  13   this is covered up.   And I said, well, you come out;

16:23:06  14   I'll -- whatever seems to be -- some of this right on

16:23:12  15   the edge of this was covered up.   We'll bring a small

16:23:16  16   backhoe in, and we'll clear out the very edge here so

16:23:21  17   that we can see -- we can see this -- the worst part of

16:23:27  18   the trespass clearing.

16:23:28  19     Q.   And did you do that?

16:23:29  20     A.   Yes, we did that.   We dug -- I had an equipment

16:23:35  21   operator, and I even helped operate the machine myself.

16:23:40  22   We carefully dug it out and --

16:23:42  23     Q.   How deep did you dig?

16:23:44  24     A.   We dug about four or five feet deep.   The trench

16:23:49  25   that you might have seen still out there is kind of

16:23:53   1   partially filled in.

16:23:54   2       Q.  And what -- when you dug four or five feet deep,

16:23:58   3   what was exposed?

16:23:59   4       A.  Like you see here, this was -- these shoots that

16:24:11   5   were sticking up, the trunks, all of this was -- it had

16:24:19   6   some dirt on it.  Most of it was just under the surface

16:24:23   7   but some of it we had to clean off by hand to show these

16:24:26   8   were freshly cut trees.

16:24:28   9       Q.  Did you show the City surveyors that?

16:24:30  10       A.  Yes.  The surveyors came out.  Christy came out

16:24:36  11   afterwards.  I think this -- maybe probably right

16:24:45  12   around this time in this picture that's up here, Christy

16:24:48  13   came out and we went through this again.  Here's the

16:24:57  14   trees.  Here's -- it's cleared up now.  Let's not have

16:25:00  15   any doubt that this stuff was -- really, it was the

16:25:05  16   extent of it, particularly on the -- what was covered up

16:25:09  17   was the brambles and the small shoots the size of your

16:25:13  18   fingers and thumbs that were coming up and coming out

16:25:16  19   onto just over the property line, was coming up on

16:25:22  20   Cambridge property.  But those were hard to see because

16:25:25  21   some of those were busted off.  The way those bushes

16:25:34  22   grow, there's -- the clumps, the stump is actually below

16:25:38  23   ground, and they branch out underground, and they come

16:25:41  24   out of the ground as shoots.  And so we were trying to

16:25:44  25   clear as much of that up, even some of these things

16:25:48  1    here, some of the bigger shoots.  But there were shoots

16:25:53  2    every two inch, six inches.   This was a maze of

16:26:01  3    small --

16:26:02  4       Q.  Mr. Nigh testified a minute ago that there were

16:26:06  5    thousands of brambles.   Tell the jury what you saw?

16:26:09  6       A.  We even tried to go --

16:26:11  7       Q.  Tell the jury what you saw.

16:26:13  8       A.  We saw thousands of brambles coming up to just in

16:26:21  9    this 300 feet, whatever we were investigating here, 250

16:26:25  10   feet.

16:26:26  11      Q.  So the earth that you brought to the site only

16:26:32  12   covered a portion of a couple of the lots in the back?

16:26:35  13      A.  Yes.   Six -- part of 16, 15, and part of 14.

16:26:43  14      Q.  So you didn't affect 12 or 13, part of 14?

16:26:49  15      A.  No, we didn't build a mound on there.  We were

16:26:53  16   getting ready to build a mound down there.

16:26:55  17      Q.  I understand, but no dirt was hauled in --

16:26:58  18      A.  No, we didn't bring any dirt down there.

16:27:01  19      Q.  Tell the jury about the attitude of the City

16:27:04  20   personnel when you kept communicating with them?

16:27:07  21            MR. BAHRET:  Objection.

16:27:13  22            MR. ROBON:  I'll rephrase the question.

16:27:14  23            THE COURT:  Thank you.

16:27:14  24   BY MR. ROBON:

16:27:14  25      Q.  Would you tell the jury your impression of the

16:27:17  1   City's interest with regard to the Cambridge

16:27:24  2   subdivision.

16:27:24  3                 MR. BAHRET:   I object to that too.

16:27:26  4                 THE COURT:   Sustained.

16:27:27  5      Q.   What was your impression of the City's attitude?

16:27:30  6                 MR. BAHRET:   Objection.

16:27:33  7                 THE COURT:   Let me see counsel up here.

16:27:36  8                 (Discussion had off the record.)

16:28:52  9   BY MR. ROBON:

16:28:53  10     Q.   Mr. McCarthy --

16:28:55  11     A.   Yes, sir.

16:28:55  12     Q.   -- would you indicate to the jury whether you

16:28:58  13  felt a cooperative or uncooperative colloquia, or with

16:29:07  14  the City of Toledo representatives?

16:29:09  15                MR. BAHRET:   Objection, Your Honor.

16:29:10  16                THE COURT:   Overruled.   He may answer.

16:29:13  17     A.   Maybe I'll just tell you what transpired, and

16:29:17  18  make up your own mind.   But I asked that they send out

16:29:24  19  the survey crew.   And we talked to the survey crew when

16:29:27  20  they were out there.   Our surveyor, my surveyors, not

16:29:33  21  Nick Nigh, but my guys were throughout who had put these

16:29:37  22  lines in, these stakes.   And we talked to the

16:29:40  23  surveyors.   And the surveyors, they're just working

16:29:47  24  guys, like my own working guys.   We didn't have any

16:29:50  25  problem with them.   They were trying to do GPS, and

16:29:53  1  they were trying to bring this in and make sure -- check

16:29:58  2  our monuments and that.   So they were at least out

16:30:03  3  there checking it.

16:30:05  4        And the only rub came in, they sent -- they went

16:30:14  5  back; they didn't give us anything.   They went back to

16:30:18  6  their office, and it just seemed as though after we had

16:30:24  7  talked to them, and when I say we, my man, Will Heineman

16:30:30  8  was a fellow that was working for me.   He talked to

16:30:32  9  them more than I did.   But they were very -- the

16:30:39  10  workmen themselves were very cooperative.   They said

16:30:42  11  right then, we don't have any problem.   The railroad is

16:30:45  12  right here.   Your stakes are right on.   Your

16:30:51  13  monuments, we don't have any problem with your

16:30:53  14  monuments.   But, you know, all we're working with is

16:30:56  15  this GPS.   We're not -- our drawings aren't tied into

16:31:03  16  your monuments and that kind of thing.   And, you know,

16:31:09  17  our main office might have a different idea about, yeah,

16:31:15  18  your stakes and your line and our lines, the same thing.

16:31:18  19    Q.   When you say your main office, you're talking

16:31:22  20  about?

16:31:22  21    A.   The City of Toledo.

16:31:23  22    Q.   The administration?

16:31:24  23    A.   Their administration.   They have a man, his name

16:31:27  24  is Babcock, I think was his name.   And so I called him

16:31:35  25  up and I said, Hey, are we square on this surveying?

16:31:39  1  Your guys are out here.

16:31:41  2          MR. BAHRET:  Your Honor, I'm going to object

16:31:42  3  to this.

16:31:43  4          THE COURT:  He's now getting into hearsay.

16:31:48  5      A.  But that's what we did.  We talked to them.   And

16:31:51  6  he told me, Mr. Babcock told me --

16:31:56  7          MR. BAHRET:  There's not a question here.

16:31:58  8  It's still hearsay, and I still object.

16:32:00  9          MR. ROBON:  He's indicating what happened,

16:32:02 10  Your Honor.

16:32:02 11          THE COURT:  He's giving a narrative of the

16:32:08 12  question.

16:32:08 13          MR. ROBON:  I'll rephrase the question.

16:32:11 14  BY MR. ROBON:

16:32:11 15      Q.  Would you tell the jury about your conversation

16:32:14 16  with Mr. Babcock?  Was he the commissioner at the time?

16:32:18 17          MR. BAHRET:  Objection.

16:32:19 18      A.  He was the survey chief.

16:32:21 19          THE COURT:  Overruled.

16:32:22 20      Q.  You can answer.

16:32:23 21      A.  He was their survey office chief.

16:32:26 22      Q.  And tell us about the conversation.

16:32:29 23          MR. BAHRET:  I object.

16:32:32 24          THE COURT:  That's inviting hearsay in part.

16:32:34 25  I don't know what he's going to say.

16:32:36   1                    MR. ROBON:  The point is it's the City of

16:32:38   2        Toledo.   They're a defendant in this case.   There is

16:32:40   3        no hearsay.   They're a party defendant.   It's an

16:32:43   4        admission against interest.

16:32:45   5                    MR. BAHRET:  No, it's not an admission

16:32:46   6        against interest.   Plus he's not in a position to make

16:32:50   7        admissions or denials on behalf of the City.   You have

16:32:52   8        to have somebody from administration.

16:32:55   9                    THE COURT:  I'm unclear on Mr. Babcock's

16:32:58  10        position.

16:32:58  11                    MR. BAHRET:  He's the chief surveyor.

16:33:00  12                    THE COURT:  Employed by the City?

16:33:01  13                    MR. BAHRET:  Yes.

16:33:04  14                    THE COURT:  Let's go back to the question.

16:33:09  15        Did you have a conversation with Mr. Babcock at some

16:33:13  16        point?

16:33:13  17                    THE WITNESS:  Yes, by phone.

16:33:17  18                    THE COURT:  By phone.   And, Mr. Robon, your

16:33:20  19        question is?

16:33:20  20        BY MR. ROBON:

16:33:21  21          Q.   My question is, can you tell us about that

16:33:23  22        conversation, what transpired?

16:33:26  23          A.   Just what he was saying is --

16:33:29  24                    MR. BAHRET:  I object.

16:33:30  25                    THE COURT:  Overruled.

16:33:33   1      A.   These surveys, you don't know within a foot or

16:33:36   2   two, that you can never really be that accurate, and

16:33:43   3   basically the stuff that my men saw out there, if it was

16:33:48   4   a foot or two over this way, none of these trees would

16:33:51   5   be on your property.   He mentioned that type of thing.

16:33:59   6   That was his -- that was his -- the gist of what he

16:34:06   7   said.

16:34:06   8      Q.   Okay.

16:34:07   9      A.   And so what I did then was say, Well, look --

16:34:11  10   what I requested, why don't we have a joint survey.   You

16:34:15  11   bring your people out here.   We'll have our people out

16:34:17  12   here, and we'll both survey.   This is what, at least in

16:34:20  13   the Corps of Engineers, when we had a survey dispute, it

16:34:23  14   was the only way we could sanely resolve it because once

16:34:28  15   this stuff goes back a way, just like you guys are

16:34:32  16   having trouble with, the same with the administration on

16:34:35  17   these things, we can't figure it out.

16:34:36  18      Q.   Tell us what occurred.   Did a joint survey

16:34:39  19   occur?

16:34:39  20      A.   We scheduled it.   We tried to schedule it with

16:34:45  21   Christy.   They were going to come back out, and we were

16:34:48  22   both going to go and sit on these things, and have

16:34:53  23   exactly what -- where these things were.   Not this foot

16:34:58  24   or two difference that Mr. Babcock was alluding to.

16:35:02  25      Q.   Did that ever happen?

16:35:03   1      A.   We came out.

16:35:04   2           THE COURT:  Did it happen?  Yes or no.

16:35:06   3           THE WITNESS:  No.

16:35:06   4           THE COURT:  Thank you.

16:35:07   5      A.   They wouldn't come out.

16:35:08   6           MR. BAHRET:   Objection.

16:35:10   7      Q.   Can you tell the jury why it didn't happen?

16:35:13   8      A.   Christy told me that they had to go do something

16:35:16   9  else.

16:35:22  10           THE COURT:  There's no question pending.

16:35:24  11  Unless you're still answering the question.

16:35:27  12      A.   Well, I think it is in the sense eventually they

16:35:32  13  did put a guideline there exactly.  We put our line in

16:35:36  14  more exactly with Nick Nigh.  And both lines did indeed

16:35:42  15  fall on top of each other.  This was sort of like a

16:35:46  16  nothing thing with Bob Babcock.

16:35:49  17      Q.   So the City -- is it your testimony that the City

16:35:53  18  then agreed with your and Nick Nigh's survey?

16:35:57  19      A.   The property line they -- they put their stakes

16:36:03  20  right next to ours, or we put our stakes right next to

16:36:09  21  theirs.   Without them coming and acknowledging, yes,

16:36:11  22  and all, the fact is, though, the stakes were against

16:36:15  23  each other.   The lath, quarter-inch lath is right up

16:36:19  24  against each other.   And as far as I was concerned, we

16:36:23  25  didn't have a survey problem or a foot or two

16:36:27    1    difference.  This thing that you're looking at here was

16:36:31    2    tied into them.  This was, you know, no question about

16:36:38    3    it.

16:36:38    4        Q.  Okay.  And so tell the jury where the brambles

16:36:44    5    were after the City came out and staked it a second

16:36:48    6    time.  Were they on the railroad property or on the

16:36:50    7    Cambridge property, the ones that were cut?

16:36:55    8        A.  When they came out the second time, we had

16:36:58    9    already dug -- like we just talked about earlier, we had

16:37:02    10   already dug this out.  And they came out --

16:37:05    11              THE COURT:  The question is -- I'm sorry to

16:37:07    12   interrupt you -- which side were the brambles located.

16:37:10    13       A.  The brambles that we were talking about were

16:37:14    14   still on the Cambridge side.

16:37:17    15       Q.  Okay.  Thank you.  Now, this occurred in what

16:37:23    16   month?  Do you recall?

16:37:24    17       A.  Yes.  This was in May.  This May 10th -- the

16:37:31    18   thing here.

16:37:32    19       Q.  What was the next major event that occurred with

16:37:39    20   the City of Toledo and the Cambridge subdivision after

16:37:45    21   May of 2006?

16:37:53    22       A.  Well, I'm not sure which -- how far away you're

16:37:56    23   talking about, Marv, but we went as far as we could with

16:38:04    24   this survey.  We brought Nick Nigh out to make this

16:38:08    25   drawing and survey, each one of the stumps and as many

16:38:12  1   of the bramble shoots that he could, and make that map.

16:38:16  2   We did that.  And I think that's really all that we did

16:38:21  3   on this.

16:38:25  4    Q.  Tell the jury whether or not you or anybody

16:38:28  5   employed by Mr. Laskey or Mr. Taylor or by the

16:38:32  6   contractor you hired to run the dozer, did anybody move

16:38:37  7   any of the roots of the brambles or the tree stumps?

16:38:42  8    A.  No, we didn't remove anything.

16:38:45  9    Q.  Move, m-o-v-e?

16:38:48  10   A.  You mean move?

16:38:50  11   Q.  Did you push the brambles from one side to

16:38:55  12   another?

16:38:55  13   A.  Understand, these brambles and trees are not

16:38:59  14   moved.

16:38:59  15   Q.  Answer my question, please.  Did you or anybody

16:39:03  16   on your behalf, Mr. Laskey's behalf, use a bulldozer or

16:39:08  17   a backhoe or any kind of equipment and move the location

16:39:13  18   of those original brambles that were cut?

16:39:16  19   A.  No.  How could we do that?

16:39:19  20   Q.  That's not what I'm asking.

16:39:21  21   A.  No, we didn't do that.

16:39:23  22   Q.  Thank you.

16:39:23  23    What then occurred with regard to the

16:39:26  24   installation of the 66-inch water main?

16:39:40  25   A.  Right after this they were -- they were regrading

16:39:47  1  the area on top of the old railroad.

16:39:50  2      Q.  They, being?

16:39:51  3      A.  The contractor, Ric-man.

16:39:53  4      Q.  For the City?

16:39:54  5      A.  For the City.  Was regrading the area up on the

16:39:59  6  railroad bed.  And the next -- the issue we started

16:40:07  7  getting into immediately was the cross drain, the

16:40:14  8  railroad cross drain.

16:40:16  9      Q.  And how did you know about that?

16:40:20  10      A.  When we went out there during the course of this

16:40:27  11  situation, they were still continuing back into May.

16:40:33  12  They were continuing to prepare to put this water main

16:40:36  13  in, grading off and cleaning up things.  And one of the

16:40:43  14  things that I saw, and I may have seen this before out

16:40:48  15  there, but I noticed that the cross drain manhole, which

16:40:52  16  is just off the Cambridge property --

16:40:56  17      Q.  Would you come over here.  I want you to identify

16:40:59  18  where that is, please, here on Exhibit Number 6.  Use

16:41:13  19  this and point for the jury what manhole you're

16:41:17  20  referring to.

16:41:23  21      A.  This manhole right here.

16:41:25  22      Q.  How did you first observe that?

16:41:28  23      A.  I believe the first I saw this was in walking

16:41:33  24  around with this tree clearing thing, we noticed this.

16:41:36  25  And we didn't really know -- I didn't really know what

16:41:40  1    it was.   And then immediately as they were grading up

16:41:44  2    this area, I noticed that Ric-man was pushing dirt into

16:41:48  3    this and knocked the top off, and maybe part of the top

16:41:51  4    was already off.

16:41:52  5         Q.   Of the manhole?

16:41:53  6         A.   Of the manhole right here.   That there was dirt

16:41:57  7    being pushed into that.   And I looked around.   Being

16:42:04  8    the engineer I am, I guess, that this certainly appears

16:42:08  9    to anybody, this is the low area of this whole region.

16:42:14  10        Q.   The manhole area?

16:42:15  11        A.   The manhole area.

16:42:17  12             And I'm thinking that this must be an underdrain

16:42:27  13   for this whole region.   And, you know, maybe we better

16:42:32  14   take care of this.   And I first noticed that.   I don't

16:42:40  15   know whether I talked with Ric-man or Christy, but we

16:42:45  16   mentioned it.   That was the first I saw -- really

16:42:55  17   noticed of that manhole.

16:42:56  18        Q.   And was that -- tell us timing-wise, was that

16:42:59  19   before they were excavating behind Cambridge subdivision

16:43:04  20   and installing that big water main?

16:43:06  21        A.   Yes.   Yes.   That was grading off prior to so

16:43:10  22   that they could bring the --

16:43:13  23        Q.   So tell the jury what you did about what you saw

16:43:16  24   on the manhole.

16:43:17  25        A.   Well, I believe I talked to Christy, to

16:43:21  1   Ric-man's -- someone with Ric-man or perhaps Joe

16:43:27  2   Crandall, the inspector.

16:43:30  3       Q.   He's an inspector for the City?

16:43:32  4       A.   Yes.

16:43:33  5       Q.   What did you tell them?

16:43:35  6       A.   I'm not sure which one I did, Marv, because this

16:43:38  7   is two years ago now.   But we did make a fuss about,

16:43:42  8   Hey, maybe this thing has some value to the properties

16:43:45  9   over here.   And, you know, we don't blame you for the

16:43:51 10   whole thing, the railroad had neglected it before.   And

16:43:55 11   I think I had seen that the thing was -- the top was

16:43:59 12   knocked around or something.   But it was worse because

16:44:02 13   of this grading.   You're letting it -- the dirt go

16:44:06 14   right down in the manhole.   Later on I found that there

16:44:09 15   was a cross pipe in there, and that was right where the

16:44:12 16   dirt was going.   And in the brush, because they were

16:44:16 17   putting -- some of this brush was still around, and they

16:44:19 18   were -- some of the limbs -- I think we've got pictures

16:44:22 19   of that someplace.   So that was the first I really got

16:44:27 20   into this cross drain and this manhole that is tied to

16:44:33 21   it.

16:44:40 22           Do you want me to keep going on this drainage

16:44:43 23   thing?

16:44:44 24               MR. ROBON:   No, never mind.   I found it.

16:44:52 25       Q.   I'm looking at Exhibit 56.

16:44:58  1    A.    Yes.

16:44:59  2    Q.    Is this the manhole after it was repaired, or is

16:45:03  3    this the manhole before it was repaired?

16:45:06  4    A.    This manhole has been repaired from the time I

16:45:12  5    was talking about it.

16:45:13  6    Q.    Okay.  Is this the manhole that we're talking

16:45:16  7    about?

16:45:17  8    A.    This is the manhole that we were talking about.

16:45:19  9    And that's me.   And this is the manhole.   And

16:45:25  10   somewhere along the line I thought we were doing pretty

16:45:27  11   good because Ric-man or somebody went and repaired the

16:45:30  12   thing.   And --

16:45:33  13   Q.    So could you tell us the timing of this picture?

16:45:36  14   Was this before or after the 66-inch water main was

16:45:43  15   behind the Cambridge subdivision?

16:45:47  16   A.    I can't tell.

16:45:53  17   Q.    That's you in the picture?

16:45:55  18   A.    Yeah.   But I can't really -- I can't really say.

16:46:00  19   I can't tell the -- well, what's around it?

16:46:05  20               THE COURT:  No date on the photo?

16:46:07  21               MR. ROBON:  No date on the photo, Your

16:46:09  22   Honor.

16:46:09  23               THE COURT:  Thank you.

16:46:09  24   A.    How much longer on your direct, please?

16:46:13  25               MR. ROBON:  I'm going to be quite some time,

16:46:16    1    Your Honor.

16:46:16    2                    THE COURT:  Define "quite some time."

16:46:18    3                    MR. ROBON:  Hour.    I'll try to make it 45

16:46:24    4    minutes.    I didn't realize what time it was.

16:46:28    5                    THE COURT:  I want to break in the next 15

16:46:30    6    minutes.    So whenever you get to a breaking point, let

16:46:34    7    me know.

16:46:36    8                    MR. ROBON:  Sure.

16:46:37    9    Q.    You say Ric-man repaired the manhole, and you're

16:46:41   10    looking at the repair?

16:46:42   11    A.    Right.    Sometime before they did the water main

16:46:46   12    they -- I believe they fixed -- they put the top piece

16:46:51   13    back up on here and fixed up -- put the lid back on top.

16:46:57   14    Q.    Okay.    And --

16:46:58   15    A.    But I can't tell from here whether the water main

16:47:00   16    was already in here or not.

16:47:02   17    Q.    Okay.    Well, what I want to know is tell the jury

16:47:06   18    whether or not you looked into the manhole to see what

16:47:09   19    was down at the bottom?

16:47:10   20    A.    Yes.

16:47:12   21    Q.    What did you see?

16:47:14   22    A.    I saw the three pipes, the two pipes coming in,

16:47:20   23    and the one pipe going out.

16:47:23   24    Q.    And where did the pipe -- the emptying pipe,

16:47:26   25    where did that go?

16:47:27  1      A.   That went across the railroad, the old railroad

16:47:29  2   bed.

16:47:31  3      Q.   And how could you tell that?

16:47:35  4      A.   Just the way it was pointed, and then early on we

16:47:41  5   went -- or I went and I thought we took pictures, but I

16:47:46  6   guess we didn't, somewhere we could see the other end

16:47:51  7   coming out in the center ditch of the railroad.  We

16:47:54  8   could see both ends, or I could see both ends even

16:47:57  9   though the one in the center ditch was down, way down in

16:48:00  10  the bottom and it was all tangled up, and you couldn't

16:48:05  11  really, without digging it out ourselves, you couldn't

16:48:08  12  really tell how -- other than identify it as this same

16:48:13  13  type, 24-inch VC, we call it, vitrified clay pipe

16:48:20  14  installation.  I also went down in there.

16:48:25  15     Q.   Physically in the manhole?

16:48:26  16     A.   I went physically in the manhole and we took --

16:48:31  17  because it's -- this is from the top of this manhole

16:48:38  18  down to the bottom is about -- it's about eight feet

16:48:41  19  deep.

16:48:41  20     Q.   Could you come back over here for a moment,

16:48:44  21  please.

16:49:14  22          When you went down to the bottom of the manhole,

16:49:17  23  did you discover that there were these other drains

16:49:23  24  literally along the railroad draining into it?

16:49:25  25     A.   Yes.   I was -- I was in this manhole more than

16:49:29  1   once.   Meaning, you know, to go down in it with your

16:49:36  2   head and look.   The one time I went down and looked,

16:49:43  3   and I had a little rake, and I got the leaves and stuff

16:49:46  4   out so I could identify this pipe was still there, this

16:49:50  5   pipe was still coming in.   And I had -- I had a mirror

16:49:54  6   on Lori's little dust pan --

16:50:02  7      Q.   Lori is your daughter-in-law?

16:50:03  8      A.   Lori is my daughter-in-law who lives here.

16:50:06  9           And I had a little mirror on there.   Because

16:50:09  10  it's seven or eight feet deep down at the bottom of it.

16:50:14  11  So I could see the end of this pipe coming in and how

16:50:18  12  filled with debris it was, which was about two thirds

16:50:22  13  full of debris.   There was a lot of debris in it.   But

16:50:25  14  it still appeared, at least from this end, that it was

16:50:28  15  working.

16:50:29  16     Q.   Now, my next question, on Exhibit Number 6, this

16:50:32  17  is a graphic with an overlay of the subdivision and the

16:50:35  18  railroad and the ditches and the manhole.   Did you help

16:50:39  19  a graphic artist prepare this to scale?

16:50:42  20     A.   Yes.

16:50:42  21     Q.   And does this exhibit accurately depict what is

16:50:47  22  currently there physically today?

16:50:50  23     A.   Yes.   We tried to do that as best we could.

16:50:56  24     Q.   Now, after you discovered this manhole and you

16:51:02  25  felt that the water drained into this railroad ditch

16:51:08   1   right here, what communications did you have with the

16:51:15   2   contracting firm or the City of Toledo?

16:51:22   3      A.   Well, early on when I looked into this manhole,

16:51:29   4   before I went down there with a mirror or anything, the

16:51:32   5   question arose:  Which way does its go?   Maybe the

16:51:40   6   drain goes this way.   And early on I asked Ray Huber.

16:51:48   7   Christy came out, and we had the contractor there --

16:51:52   8      Q.   She had a meeting with everybody?

16:51:53   9      A.   We had a meeting with everybody.

16:51:54  10      Q.   Did you given an opinion?

16:51:56  11      A.   Yes.

16:51:57  12      Q.   What was your opinion at that time when you had

16:51:59  13   the meeting with all these engineers?

16:52:02  14      A.   I thought we needed this -- we needed this drain

16:52:08  15   for this whole area and that it went this way.

16:52:11  16      Q.   It went across, underneath the water main?

16:52:15  17      A.   It went this way (motioning).   But I was not --

16:52:23  18   I hadn't really given this thing a lot of thought,

16:52:27  19   hadn't really been down there to see exactly if these

16:52:32  20   pipes were there and whatnot.   So we came out, and we

16:52:35  21   met.  We met on-site.   And we talked about this thing.

16:52:40  22         Ray Huber even brought a little drawing that the

16:52:44  23   County had that showed that it was a drain that was not

16:52:51  24   on the City of Toledo drawings.   Certainly a main drain

16:52:58  25   like this should be, but it wasn't.   And Ray at first,

16:53:04 1    all he said was basically, hey, I got this drawing.

16:53:08 2    His assistant gave it to him.   He was just bringing it

16:53:12 3    out there to show us.   And he confirmed that, yes,

16:53:16 4    there was a drain pipe there, but had not himself at

16:53:20 5    that time, he didn't really know which way it went or

16:53:24 6    anything about this thing.   Said, hey, this was a City

16:53:28 7    of Toledo project, and my office is not really involved

16:53:33 8    in it.

16:53:33 9    Q.   "My office" being Ray's office?

16:53:35 10   A.   Being the county engineer's office.

16:53:37 11   Q.   So he came out, and we had that initial meeting.

16:53:46 12   And then I went back.   And I don't know exactly the

16:53:53 13   time, but I went back with his assistant eventually and

16:54:00 14   we got it kind of confirmed:   Yes, that it does go this

16:54:05 15   way, this type of 24-inch cross drain, according to his

16:54:11 16   assistant, who is the drainage engineer for Wood County.

16:54:15 17   He said this type of drain, yes, would drain about 40

16:54:19 18   acres.   And yes, this kind of matches with the part of

16:54:24 19   this 100 acres that's in this drainage area.   Part of

16:54:28 20   that would be going in here.   He even said that --

16:54:31 21        MR. BAHRET:   Objection.

16:54:32 22   Q.   Let me ask another question.

16:54:34 23        THE COURT:   Thank you.

16:54:34 24   BY MR. ROBON:

16:54:35 25   Q.   When we talk about the water draining towards the

16:54:37  1  manhole, have you seen what they call a topo map,

16:54:42  2  topography?

16:54:46  3      A.  Yes.

16:54:47  4      Q.  Would you tell the jury, where are the high spots

16:54:50  5  on Exhibit Number 6, and where the low spots?

16:54:55  6      A.  Engineers, when you do a water basin study like

16:55:06  7  this, the main tool you use is this U.S. quad sheet,

16:55:14  8  which is a contour map.   And the contour map, which I

16:55:18  9  think we've got someplace, contour maps show contours

16:55:22  10  running this way, that this was the low area of this

16:55:25  11  whole region, both sides, that this came down here --

16:55:28  12      Q.  Towards the manhole?

16:55:30  13      A.  -- towards the manhole.   And this was obviously,

16:55:33  14  you know, the manhole, the pipe that drained this area

16:55:38  15  across to -- this is a grassy creek, I guess they call

16:55:43  16  it, over here and down to Rossford.

16:55:49  17      Q.  My next question is once you informed everybody

16:55:51  18  that you thought that active pipe was draining this

16:55:55  19  area, what next happened with the City of Toledo?

16:56:01  20      A.  Well, I talked to Christy Soncrant, and I guess

16:56:10  21  her main --

16:56:11  22      Q.  Just what happened?   Concise.   Everyone wants to

16:56:17  23  go home.

16:56:17  24      A.  Okay.   Basically she indicated that she wasn't

16:56:28  25  sure the county engineer -- he wasn't really tuned in on

| | |
|---|---|
| 16:56:32 | 1 |

this thing.   He might not know -- she led me to believe
the contract --
                THE COURT REPORTER:  Excuse me?
                THE COURT:  If you can take your seat now if
you're done with the map, that would help, with the
microphone.
BY MR. ROBON:
    Q.   The contract said he did not need it?
    A.   That the contract said -- I'll correct that, that
it wasn't needed.   That it was -- that it was clogged
up.   That it was clogged up, that -- but she told me
that, too, hey, you couldn't ever prove it's needed, and
that we can always put it back.   And I mentioned as far
as I was concerned, I'm still convinced that there's a
problem putting this back now with the water main in
there.   But that was the end of -- her last thing to me
was that, you know, we can always put it back later.
    Q.   But they ignored your --
                MR. BAHRET:  Objection.
    Q.   -- recommendation?
                THE COURT:  Sustained.
BY MR. ROBON:
    Q.   I'll rephrase.   What did they do with your
recommendations?
    A.   They went nowhere.

```
16:58:01   1              MR. ROBON:  Your Honor, I'm at a good
16:58:03   2   breaking point.
16:58:04   3              THE COURT:  We're going to go somewhere.
16:58:06   4   We're going to go home.   Ladies and gentlemen, what
16:58:08   5   time would you like to start tomorrow morning?
16:58:13   6              THE JUROR:  10:30.   I want to see my
16:58:15   7   granddaughter's concert.   She's moving.
16:58:18   8              THE COURT:  Is the concert tonight?
16:58:20   9              THE JUROR:  No, tomorrow morning at 9:00.
16:58:22  10   She's moving to the state of Washington in two weeks.
16:58:25  11   And she just moved here from Britain a year ago.
16:58:28  12              THE COURT:  Do you want to borrow my video
16:58:30  13   camera?
16:58:31  14              THE JUROR:  No.   I want to see it.
16:58:32  15              THE COURT:  That's not an option.   I
16:58:36  16   appreciate that.   If we start that late, I'm afraid our
16:58:41  17   timetable will become askew.
16:58:45  18              THE JUROR:  Can't you start without me and I
16:58:47  19   can catch up?
16:58:48  20              THE COURT:  It's a nice thought.
16:58:50  21              MR. BAHRET:  I've never heard that question
16:58:52  22   asked.
16:58:53  23              THE COURT:  I'm afraid I might start a
16:58:55  24   stampede.   Other than 10:30, what time would you like
16:59:01  25   to start tomorrow morning?
```

| | | |
|---|---|---|
| 16:59:05 | 1 | THE JUROR:  8:00. |
| 16:59:06 | 2 | THE COURT:  Can you all be here at 8:00? |
| 16:59:08 | 3 | Counsel, you'll need to be here before 8:00 so you're |
| 16:59:12 | 4 | set and ready to go and we can walk in at 8:00. |
| 16:59:15 | 5 | I'm sending you home.  Some of you I'm |
| 16:59:18 | 6 | sending home not very happy, I understand.  I remind |
| 16:59:23 | 7 | you you're going to again get questioned when you walk |
| 16:59:25 | 8 | in the doors.  I ask you to please remember the rules. |
| 16:59:28 | 9 | We're in recess until 8:00 tomorrow morning. |
| 17:00:41 | 10 | MR. ROBON:  I wanted to proffer what Mr. |
| 17:00:44 | 11 | Stawinski would have said about this steel. |
| 17:00:49 | 12 | THE COURT:  Sure.  Bob, do you want to |
| 17:00:51 | 13 | listen in to the proffer? |
| 17:00:54 | 14 | MR. BAHRET:  Sure.  Yes. |
| 17:00:57 | 15 | MR. ROBON:  Let the record indicate there |
| 17:00:59 | 16 | was an objection to Mr. Stawinski being asked about |
| 17:01:04 | 17 | flying debris, and we would have offered Exhibit Number |
| 17:01:08 | 18 | 10, which is part of a steel coil from a rail car that |
| 17:01:12 | 19 | he would have testified that when the trees were being |
| 17:01:16 | 20 | cleared by the City's contractors, he went out, forgot |
| 17:01:22 | 21 | to get his paper or mail, and he heard a cling, and a |
| 17:01:27 | 22 | piece of debris flew into the lot next to him.  He |
| 17:01:31 | 23 | retrieved it.  It's Exhibit 10.  And we wanted to show |
| 17:01:37 | 24 | the recklessness of the City of Toledo, and the |
| 17:01:41 | 25 | contractor's type of equipment that they were using was |

17:01:45    1    inappropriate in a subdivision where -- in a residence

17:01:50    2    with kids, especially when the machine itself said "Stay

17:01:53    3    back 300 feet."

17:01:54    4               MR. WATKINS:  It was not the City of Toledo

17:01:56    5    doing the work.

17:01:57    6               MR. BAHRET:  And besides, he testified it

17:01:59    7    wasn't the feller buncher that had the label on it.   He

17:02:04    8    said it was the hydro-axe, which doesn't stay back 300

17:02:09    9    feet.   So Marv is intentionally mixing up his pictures.

17:02:13   10    The City of Toledo did not pick nor supervise the

17:02:17   11    subcontractor of Ric-man to do the clearing.

17:02:20   12    Vermillion testified they were entirely under the

17:02:22   13    control of Ric-man as to how much to clear.   That's in

17:02:26   14    the record.   And this individual that claims he almost

17:02:31   15    got hit by this device is not a party to this case, and

17:02:34   16    it has no relevance to any actions of the City of

17:02:37   17    Toledo.

17:02:38   18               THE COURT:  The Court indicated earlier off

17:02:40   19    the record that it felt that any possible relevance, and

17:02:44   20    frankly, I still struggle to see the relevance of this

17:02:49   21    testimony or exhibit to the issues pending in this

17:02:51   22    trial, is clearly outweighed by prejudice and confusion

17:02:56   23    to the jury.   There is no claim for personal injury or

17:03:01   24    infliction of emotional distress.   The issue is, as

17:03:05   25    I've been listening to it, and as I understand it, was

17:03:08  1    there an encroachment?  Was there a trespass?   And if

17:03:12  2    so, what are the damages attributable to that?   And this

17:03:15  3    goes beyond the scope of those issues.   So that was the

17:03:19  4    reason for my ruling and excluding that testimony.

17:03:23  5                  MR. ROBON:  Thanks, Judge.

17:03:24  6                  THE COURT:  Thank you all.

          7                  (Adjourned at 5:03 p.m.)

          8                            -  -  -

          9

         10                    C E R T I F I C A T E

         11

         12       I certify that the foregoing is a correct transcript

         13    from the record of proceedings in the above-entitled

         14    matter.

         15

         16    /s Tracy L. Spore_____           _____

         17    Tracy L. Spore, RMR, CRR                 Date

         18

         19

         20

         21

         22

         23

         24

         25

1                          I N D E X

2    CHRISTY SONCRANT, CROSS-EXAMINATION              175

3    BY MR. ROBON:

4    RAY HUBER, DIRECT EXAMINATION                    187

5    BY MR. ROBON:

6    RAY HUBER, CROSS-EXAMINATION                     195

7    BY MR. BAHRET:

8    RAY HUBER, REDIRECT EXAMINATION                  224

9    BY MR. ROBON:

10   RAY HUBER, RECROSS-EXAMINATION                   232

11   BY MR. BAHRET:

12   NICK NIGH, DIRECT EXAMINATION                    233

13   BY MR. ROBON:

14   NICK NIGH, CROSS-EXAMINATION                     246

15   BY MR. BAHRET:

16   NICK NIGH, REDIRECT EXAMINATION                  271

17   BY MR. ROBON:

18   NICK NIGH, RECROSS-EXAMINATION                   277

19   BY MR. BAHRET:

20   JOHN McCARTHY, DIRECT EXAMINATION                281

21   BY MR. ROBON:

22

23

24

25

## $

**$10,000** - 192:5
**$100** - 230:2
**$200,000** - 192:5
**$200,000** - 191:18, 192:1
**$80** - 230:2

## '

**'06** - 180:22, 183:11, 184:10, 188:17, 193:9, 205:11, 284:25, 285:1, 294:7
**'07** - 205:12
**'80s** - 282:10
**'90s** - 282:10

## /

**/s** - 323:16

## 1

**1** - 175:9, 175:23, 193:9
**1,000** - 289:22
**10** - 178:9, 251:25, 252:1, 291:20, 292:18, 294:7, 294:8, 321:18, 321:23
**100** - 174:14, 181:16, 244:7, 253:4, 288:25, 295:7, 317:19
**101** - 293:12
**104** - 182:9
**105** - 183:21, 184:1
**10:30** - 320:6, 320:24
**10th** - 307:17
**11** - 251:25, 252:1
**12** - 198:9, 296:20, 300:14
**13** - 198:9, 219:9, 300:14
**136** - 234:4
**14** - 252:21, 300:13, 300:14
**140** - 253:4
**15** - 178:3, 178:8, 182:10, 193:8, 194:17, 205:7, 226:25, 239:18, 249:12, 252:21, 268:19, 269:5, 269:16, 284:7, 294:10, 294:11, 300:13, 313:5
**150** - 176:13
**16** - 194:17, 205:7, 249:12, 252:21, 269:17, 269:18, 294:10, 300:13
**1701** - 174:15
**1716** - 174:21
**175** - 324:2
**18** - 179:22
**187** - 324:4
**19** - 180:6, 180:19, 182:10, 184:10
**195** - 324:6
**1992** - 234:25
**1:05** - 175:1

## 2

**20** - 174:5, 179:4, 230:12
**20,000** - 235:3
**200** - 192:8, 192:9
**2001** - 235:5, 274:9, 274:22
**2004** - 248:7
**2005** - 179:13, 179:24, 284:13
**2006** - 175:10, 176:3, 187:25, 189:12, 193:23, 195:11, 227:2, 236:4, 236:7, 236:8, 248:8, 284:14, 292:18, 307:21

**2007** - 286:9
**2008** - 174:5
**224** - 324:8
**232** - 324:10
**233** - 324:12
**24** - 230:14
**24-inch** - 188:1, 190:17, 229:15, 314:13, 317:15
**243-3607** - 174:22
**246** - 324:14
**250** - 300:9
**27** - 183:11
**271** - 324:16
**277** - 324:18
**27th** - 247:4, 247:5
**281** - 324:20

## 3

**3** - 174:9
**30** - 207:13, 230:12, 281:11, 282:5
**300** - 300:9, 322:3, 322:8
**31** - 201:3
**33** - 260:14, 261:1
**34** - 260:13
**37** - 178:2, 193:7
**3:o6-cv-2950** - 174:4

## 4

**4** - 180:21
**40** - 230:8, 317:17
**41** - 243:18, 287:11
**419** - 174:16, 174:20, 174:22
**43528-1844** - 174:19
**43537** - 174:15
**43624** - 174:22
**45** - 195:9, 224:16, 313:3

## 5

**50** - 230:8
**500** - 289:24
**56** - 311:25
**5:03** - 323:7

## 6

**6** - 189:9, 309:18, 315:16, 318:5
**60** - 180:20, 230:8, 295:7, 295:8, 295:9
**60-some** - 230:19
**600** - 295:10
**61** - 184:9, 184:16, 203:2
**65** - 219:25
**66-inch** - 308:24, 312:14

## 7

**7** - 239:24, 244:15, 264:23, 275:18
**70** - 230:8
**7050** - 174:19
**709** - 174:18
**7300** - 234:3

## 8

**8** - 183:11, 183:19, 245:24
**861-7800** - 174:20
**897-6500** - 174:16
**8:00** - 321:1, 321:2, 321:3, 321:4, 321:9

## 9

**9** - 175:17, 251:25

**900** - 238:3
**92** - 245:1, 291:1
**97** - 184:18
**9:00** - 320:9

## A

**A12** - 269:5
**A13** - 262:12, 263:4
**A17** - 278:11
**A2** - 278:6
**A3** - 278:7
**A8** - 265:11
**abandoned** - 189:14, 214:22, 228:10
**ability** - 197:7, 247:6, 272:1
**able** - 201:25, 227:24, 231:23, 260:17, 279:5, 287:17
**above-entitled** - 323:13
**abreast** - 182:20
**absolutely** - 251:24, 255:13
**abuts** - 250:3
**abutted** - 179:23
**abutting** - 207:14, 274:13
**accept** - 265:16
**acceptable** - 200:14, 263:7, 263:13
**accepted** - 259:15, 263:20, 264:1, 264:5, 264:8, 264:14
**access** - 295:18
**accomplish** - 230:3
**accomplished** - 208:23
**according** - 194:19, 317:15
**accumulative** - 198:7
**accuracy** - 293:20
**accurate** - 175:13, 245:18, 245:25, 246:4, 290:6, 305:2
**accurately** - 175:20, 247:6, 288:25, 292:17, 315:21
**acknowledge** - 181:12, 186:11, 186:15, 217:25
**acknowledging** - 306:21
**acres** - 317:18, 317:19
**action** - 183:6
**actions** - 322:16
**active** - 188:3, 288:24, 318:18
**actual** - 200:17, 239:9
**adding** - 198:8
**addition** - 287:2
**additional** - 220:4
**address** - 215:19
**adjacent** - 187:21, 204:16, 220:2
**adjoining** - 204:4
**Adjourned** - 323:7
**adjusted** - 296:15
**administration** - 282:18, 302:22, 302:23, 304:8, 305:16
**admission** - 304:4, 304:5
**admissions** - 304:7
**admit** - 178:24
**advance** - 185:18
**advise** - 191:24, 199:23, 200:9
**advised** - 188:22, 191:14, 202:11, 297:22
**aerial** - 175:9, 175:15, 216:5
**affect** - 220:5, 300:14
**affected** - 267:18
**affirmatively** - 212:2
**afraid** - 320:16, 320:23
**afternoon** - 187:6, 246:17,

246:18
**afterwards** - 228:9, 267:7, 281:17, 299:11
**age** - 251:7, 251:9
**aged** - 299:3
**agencies** - 235:23
**ago** - 202:23, 215:2, 227:2, 247:17, 300:4, 311:7, 320:11
**agree** - 199:3, 208:12, 216:20, 217:21, 217:25, 218:6, 249:20, 253:7, 255:12, 256:7, 259:17, 260:22, 261:2, 261:11, 261:25, 262:14, 266:2, 266:4, 277:11, 293:25
**agreed** - 190:6, 293:18, 306:18
**agreeing** - 205:9
**ahead** - 208:19, 219:19
**alignment** - 273:12, 273:22
**alignments** - 288:21
**allow** - 200:6
**allowed** - 219:17, 221:22, 234:20
**alluding** - 305:24
**almost** - 322:14
**alone** - 218:4, 263:8
**alongside** - 194:16
**alter** - 218:7, 253:7
**altered** - 218:10, 218:22, 219:7, 252:21
**Alvie** - 211:13, 226:22, 227:18
**angle** - 292:15, 293:19, 293:21
**annulet** - 217:14
**Answer** - 308:15
**answer** - 194:24, 200:8, 201:11, 201:25, 208:18, 209:10, 210:20, 214:7, 214:12, 215:8, 215:15, 218:14, 218:17, 219:9, 220:7, 220:8, 229:18, 231:6, 238:24, 259:21, 260:20, 263:12, 264:7, 266:18, 272:21, 279:12, 279:13, 279:17, 279:20, 289:7, 301:16, 303:20
**answered** - 210:19, 229:5, 262:4
**answering** - 306:11
**Anytime** - 260:1
**anyway** - 210:10, 220:10
**apart** - 289:22
**apologize** - 176:9
**appear** - 210:15, 276:21
**appearance** - 252:19
**Appearances** - 174:12
**appeared** - 189:2, 189:12, 189:18, 315:14
**appreciate** - 241:22, 279:17, 320:16
**apprentice** - 234:22
**apprentice-type** - 234:22
**approach** - 183:19, 184:3
**approval** - 195:13
**approved** - 194:9, 235:21
**approving** - 206:3, 206:6
**approximation** - 268:24
**April** - 227:12, 236:8, 268:5, 268:13, 284:25, 286:7, 286:21, 291:22
**area** - 175:14, 188:17, 194:5, 194:17, 205:6, 205:18, 207:13, 216:21, 217:6, 226:5, 232:16, 232:19, 238:3, 240:1, 240:16, 240:17, 240:19, 240:23, 240:24, 241:4,

241:11, 241:12, 242:21, 242:22, 252:13, 255:21, 262:17, 262:22, 262:24, 264:22, 264:25, 265:2, 265:4, 269:13, 269:25, 270:4, 283:12, 290:15, 290:18, 292:3, 294:13, 295:16, 295:17, 309:1, 309:5, 310:2, 310:9, 310:10, 310:11, 316:15, 317:19, 318:10, 318:14, 318:19
**areas** - 238:11, 238:12, 254:10, 271:21, 277:20, 278:4
**arguing** - 264:12, 279:17
**argument** - 276:9
**arose** - 247:11, 316:5
**art** - 256:25
**artist** - 315:19
**ascertained** - 290:22
**askew** - 320:17
**assistant** - 196:6, 282:15, 317:2, 317:13, 317:16
**Associates** - 174:17, 234:7, 234:10, 234:11, 289:16
**assume** - 186:19, 205:17, 243:1, 255:4, 255:7, 258:4, 258:7, 258:16, 265:7, 265:16
**assuming** - 191:2, 235:19, 263:6
**assumption** - 182:6, 209:15
**assure** - 210:25
**attached** - 278:20
**attention** - 185:1, 190:2, 190:4
**attitude** - 300:19, 301:5
**attorney** - 196:7
**attorneys** - 191:14
**attractive** - 196:4
**attributable** - 323:2
**August** - 184:10, 237:10, 267:6
**availability** - 275:4
**available** - 192:3, 275:8
**Avenue** - 174:21
**avoided** - 294:13
**aware** - 181:20, 191:3, 200:22, 224:16, 252:19, 257:15, 257:20, 257:21, 257:22
**awful** - 182:1
**axe** - 270:16, 270:22, 273:9, 322:8
**axle** - 253:5

**B**

**Babcock** - 302:24, 303:6, 303:16, 304:15, 305:24, 306:16
**Babcock's** - 304:9
**background** - 234:17
**backhoe** - 273:10, 298:16, 308:17
**backs** - 284:9, 284:10
**backyards** - 282:24
**Bad** - 253:22
**bad** - 257:5
**Bahret** - 174:17, 175:22, 175:24, 177:19, 179:6, 183:18, 184:3, 184:16, 186:20, 191:20, 192:13, 193:12, 193:16, 194:22, 195:19, 195:22, 199:17, 206:25, 207:3, 207:5, 207:6, 210:22, 210:24, 213:12, 213:15, 214:8, 214:13, 216:17, 217:8, 221:13,

224:8, 225:1, 225:6, 225:24, 226:14, 229:5, 229:8, 230:21, 231:1, 232:4, 232:7, 233:8, 233:10, 238:23, 240:3, 246:13, 246:16, 254:22, 255:6, 255:23, 257:16, 257:17, 260:2, 261:8, 269:1, 269:3, 269:8, 270:13, 271:5, 271:11, 271:18, 272:14, 272:19, 272:23, 275:9, 275:20, 276:2, 276:4, 276:15, 277:10, 277:22, 277:24, 280:6, 280:11, 280:16, 287:20, 288:1, 288:3, 292:19, 292:21, 294:19, 297:23, 300:21, 301:3, 301:6, 301:15, 303:2, 303:7, 303:17, 303:23, 304:5, 304:11, 304:13, 304:24, 306:6, 317:21, 319:19, 320:21, 321:14, 322:6, 324:7, 324:11, 324:15, 324:19
**ballpark** - 229:13
**bare** - 235:10
**Barkan** - 174:13
**Barrett** - 206:23
**barrier** - 232:10, 232:12, 232:15, 268:3, 268:20
**base** - 199:19, 288:20
**based** - 244:19, 249:20, 251:23
**basic** - 283:10
**basin** - 178:8, 178:10, 189:1, 189:2, 189:10, 200:12, 200:13, 210:16, 228:12, 249:3, 249:13, 318:6
**basins** - 194:15, 249:25
**basis** - 193:14, 230:1, 282:5
**bat** - 198:9
**Bates** - 175:17, 216:24, 231:21, 231:22, 249:1, 295:21
**beams** - 220:24
**became** - 286:10, 288:12
**become** - 285:25, 320:17
**bed** - 228:10, 309:6, 314:2
**began** - 212:7, 214:19, 214:25, 227:23
**beginning** - 181:2, 290:13
**begins** - 260:14
**behalf** - 304:7, 308:16
**Behind** - 294:10
**behind** - 193:7, 220:13, 226:25, 268:19, 269:5, 284:5, 310:19, 312:15
**belief** - 221:15
**below** - 197:16, 198:5, 299:22
**benefit** - 209:22
**best** - 196:10, 197:13, 213:21, 247:6, 253:18, 267:11, 292:16, 315:23
**better** - 190:22, 222:14, 259:23, 267:24, 279:19, 279:21, 310:13
**between** - 178:8, 184:19, 189:16, 191:17, 194:17, 220:25, 249:25, 253:4, 289:7
**beyond** - 205:14, 290:11, 323:3
**big** - 185:23, 205:5, 220:24, 239:9, 258:25, 259:11, 283:12, 288:14, 296:3, 310:20
**bigger** - 230:14, 245:7, 300:1
**Bilicki** - 180:21, 180:23,

182:13
**bit** - 179:10, 247:18, 251:5, 259:23, 262:6, 262:7, 273:18, 273:24, 278:18, 293:20
**black** - 241:17, 242:17
**blame** - 253:20, 311:9
**block** - 200:18
**blue** - 189:13
**Bob** - 306:16, 321:12
**book** - 183:19, 203:23, 207:2
**borrow** - 320:12
**boss** - 177:9, 177:11, 177:16, 182:15, 289:15
**bothering** - 183:8, 183:5, 183:7
**bottom** - 193:25, 245:10, 260:14, 279:2, 313:19, 314:10, 314:18, 314:22, 315:10
**boundary** - 219:21, 235:12, 235:13, 236:17, 236:18, 245:18
**box** - 242:2
**boxes** - 178:5
**boy** - 176:2
**boys** - 256:15
**bramble** - 238:7, 244:22, 251:7, 251:9, 253:24, 271:1, 271:2, 308:1
**brambles** - 179:23, 180:7, 237:23, 237:24, 238:13, 239:9, 240:18, 241:6, 243:7, 244:23, 244:24, 249:24, 251:4, 251:11, 253:8, 253:10, 254:11, 255:21, 256:2, 261:17, 266:2, 268:20, 268:25, 269:4, 269:11, 273:1, 273:3, 273:14, 273:20, 275:17, 275:19, 276:14, 276:25, 277:20, 278:17, 278:25, 279:5, 279:25, 289:6, 299:17, 300:5, 300:8, 307:4, 307:12, 307:13, 308:7, 308:11, 308:13, 308:18
**branch** - 299:23
**break** - 179:1, 179:8, 233:13, 233:14, 233:15, 280:21, 280:23, 313:5
**breaking** - 313:6, 320:2
**breath** - 276:6
**briefly** - 183:1
**bring** - 215:4, 298:15, 300:18, 302:1, 305:11, 310:22
**bringing** - 295:1, 317:2
**Britain** - 320:11
**broken** - 200:16, 200:19
**brought** - 253:3, 265:2, 265:5, 265:6, 287:2, 294:3, 295:5, 295:6, 295:10, 295:12, 295:15, 295:20, 297:3, 300:11, 307:24, 316:22
**brush** - 179:16, 179:23, 180:7, 226:13, 227:7, 237:23, 239:9, 240:20, 240:23, 261:3, 261:12, 261:17, 266:2, 311:16, 311:17
**brushy** - 240:16
**build** - 298:6, 300:15, 300:16
**building** - 285:17, 286:5, 294:8, 294:9, 295:2, 295:11, 298:3
**buildup** - 204:12
**built** - 197:1, 198:4, 235:5,

235:9, 282:18, 282:24
**bulldoze** - 267:9
**bulldozed** - 253:5, 256:14
**bulldozer** - 254:5, 255:2, 256:17, 262:25, 265:8, 265:9, 277:2, 279:6, 308:16
**bunch** - 205:8, 237:21
**buncher** - 322:7
**bush** - 227:8
**bushes** - 249:24, 253:8, 253:11, 289:6, 299:21
**business** - 229:2, 247:25, 280:3
**busted** - 299:21

**C**

**Cable** - 271:16
**cable** - 178:4
**Cable-vision** - 271:16
**Cambridge** - 175:9, 176:1, 176:6, 176:14, 178:3, 178:7, 179:23, 180:8, 181:3, 181:15, 186:12, 187:22, 188:23, 193:8, 194:10, 194:12, 194:20, 196:19, 200:22, 202:2, 204:3, 205:15, 206:8, 206:18, 209:3, 210:2, 212:9, 216:22, 217:21, 220:13, 222:11, 223:3, 224:17, 231:17, 235:5, 236:1, 236:4, 236:25, 239:4, 240:10, 241:18, 242:20, 243:16, 243:19, 246:1, 247:10, 247:13, 248:18, 248:25, 249:22, 250:22, 254:24, 255:3, 255:9, 256:9, 266:10, 266:11, 274:25, 277:4, 284:7, 286:19, 286:24, 289:1, 289:5, 289:8, 290:11, 299:20, 301:1, 307:7, 307:14, 307:20, 309:16, 310:19, 312:15
**Cambridge's** - 194:25, 252:22
**camera** - 320:13
**cannot** - 218:19
**capacity** - 199:22, 204:24, 205:14, 209:2
**car** - 179:19, 321:18
**care** - 184:22, 310:14
**career** - 282:21
**carefully** - 298:22
**carried** - 219:25
**Case** - 174:4
**case** - 186:19, 235:24, 257:11, 266:22, 266:23, 304:2, 322:15
**catch** - 178:8, 178:10, 189:1, 189:2, 189:10, 194:15, 200:12, 200:13, 210:16, 228:12, 249:3, 249:13, 320:19
**caused** - 178:21, 193:10
**causing** - 225:22
**center** - 245:7, 288:23, 297:11, 314:7, 314:9
**certain** - 222:19, 222:20, 225:21, 283:12
**Certainly** - 254:7, 286:23, 316:24
**certainly** - 310:8
**certainty** - 244:20
**certify** - 323:12
**chance** - 201:14, 215:10
**change** - 220:9, 227:13, 227:14, 276:13
**changed** - 277:12
**charge** - 230:1, 248:22,

281:23
**check** - 289:11, 289:17, 302:1
**checked** - 190:15, 190:19, 278:19, 291:14, 292:2, 292:5
**Checking** - 176:11
**checking** - 287:5, 302:3
**chief** - 303:18, 303:21, 304:11
**Christy** - 175:6, 188:15, 191:1, 191:2, 195:10, 222:1, 223:16, 223:19, 223:21, 224:4, 289:9, 293:18, 293:22, 294:4, 299:10, 299:12, 305:21, 306:8, 310:15, 310:25, 316:7, 318:20, 324:2
**circumstances** - 284:2
**cities** - 235:22
**City** - 174:7, 177:1, 178:21, 181:21, 183:16, 184:19, 186:2, 186:5, 186:9, 186:12, 187:25, 188:10, 189:14, 190:5, 190:6, 190:18, 190:20, 190:23, 191:6, 192:11, 192:15, 193:4, 197:25, 209:23, 213:5, 222:9, 223:14, 224:24, 225:14, 228:17, 250:18, 252:4, 257:19, 257:21, 275:9, 276:2, 280:12, 281:14, 282:11, 285:7, 287:24, 287:25, 288:2, 288:4, 288:11, 292:1, 294:2, 298:4, 298:7, 298:12, 299:9, 300:19, 301:14, 302:21, 304:1, 304:7, 304:12, 306:17, 307:5, 307:20, 309:4, 309:5, 311:3, 316:2, 316:24, 317:6, 318:19, 321:24, 322:4, 322:10, 322:16
**City's** - 190:2, 301:1, 301:5, 321:20
**Civil** - 196:14
**civil** - 283:10, 283:23, 283:24
**claim** - 322:23
**claiming** - 260:23
**claims** - 322:14
**clay** - 314:13
**clean** - 295:17, 299:7
**cleaning** - 217:17, 309:13
**clear** - 184:25, 202:14, 207:11, 207:22, 209:14, 241:2, 250:9, 254:20, 260:3, 261:24, 263:16, 269:13, 269:16, 272:6, 272:7, 287:18, 298:16, 299:25, 322:13
**cleared** - 207:17, 208:14, 209:3, 209:8, 226:9, 258:6, 258:9, 258:11, 271:17, 295:20, 299:14, 321:20
**clearing** - 179:25, 211:21, 227:12, 232:9, 260:4, 261:3, 261:12, 261:17, 262:1, 266:25, 268:2, 268:5, 268:8, 271:22, 274:8, 277:15, 284:4, 284:25, 285:4, 287:23, 298:18, 309:24, 322:11
**clearly** - 220:15, 289:5, 289:7, 289:8, 322:22
**clerk** - 186:23, 233:18, 280:25
**client** - 279:7, 279:19
**cling** - 321:21
**clogged** - 319:10, 319:11
**close** - 181:5, 198:7,

270:3, 278:11
**closer** - 245:16
**closing** - 276:10
**clothes** - 268:19
**clumps** - 253:17, 299:22
**coffee** - 228:6
**coil** - 321:18
**cold** - 194:7
**collect** - 204:18
**collector** - 253:15
**colloquia** - 301:13
**coloring** - 241:24
**comfortable** - 231:6
**coming** - 176:11, 221:23, 242:18, 249:2, 253:24, 270:9, 289:6, 296:3, 299:18, 299:19, 300:8, 306:21, 313:22, 314:7, 315:5, 315:11
**Commissioner** - 199:14, 199:21
**commissioner** - 199:15, 211:14, 226:22, 303:16
**Common** - 225:16
**common** - 226:6, 256:22, 258:25, 259:4, 259:8, 259:14
**communicating** - 300:20
**communications** - 316:1
**company** - 234:6, 247:16, 247:21, 249:22, 257:19, 272:12
**compared** - 181:18
**comparison** - 244:10
**compass** - 269:15
**complain** - 213:22, 213:24, 250:13, 250:23
**complained** - 213:8
**complaint** - 182:22
**complaints** - 182:21
**complete** - 220:7
**completed** - 235:25
**completely** - 197:3
**completing** - 244:21
**complied** - 211:1, 250:2, 250:6
**comply** - 249:21
**complying** - 257:8
**computer** - 292:13
**concern** - 178:17, 178:19, 211:12, 211:23, 214:18, 228:16, 238:17
**concerned** - 219:10, 286:17, 306:24, 319:14
**concerning** - 250:24
**concerns** - 181:3, 211:13
**concert** - 320:7, 320:8
**Concise** - 318:22
**conclusion** - 244:15
**concrete** - 200:18, 244:2, 244:5
**condensed** - 260:12
**condition** - 197:11, 200:12, 200:15, 200:17, 220:17, 252:3, 267:23, 273:2
**confident** - 212:19
**configuration** - 246:7, 246:8
**confirmed** - 317:3, 317:14
**confused** - 201:17, 291:17
**confusion** - 322:22
**connected** - 189:22, 297:10
**connection** - 292:20
**connotes** - 291:8
**considered** - 187:19, 190:13
**constantly** - 183:6
**constituent** - 228:1
**Construction** - 181:20, 184:20, 186:3
**construction** - 176:24,

177:15, 200:24, 201:10, 201:12, 201:21, 201:22, 202:3, 202:5, 206:1, 206:8, 214:19, 214:25, 216:18, 222:9, 228:11, 234:13, 235:25, 265:20, 266:13, 266:14, 274:17, 274:23, 283:14, 283:16, 297:12
**Consult** - 185:3, 185:15
**consult** - 185:4, 185:7, 185:9
**consultant** - 199:5, 199:9, 199:10, 199:19, 209:23, 210:1, 229:25, 285:25, 286:3, 286:11
**consultation** - 185:20
**consulting** - 208:21
**contact** - 190:22, 228:17
**contain** - 219:20
**containing** - 256:2
**context** - 214:9, 214:15, 214:17
**continue** - 175:2, 287:21
**continuing** - 309:11, 309:12
**contour** - 235:15, 318:8, 318:9
**contours** - 318:9
**contract** - 184:19, 184:22, 185:2, 282:14, 282:17, 319:2, 319:8, 319:9
**contracting** - 316:2
**contractor** - 181:21, 182:16, 182:17, 182:18, 183:13, 185:4, 185:23, 207:11, 207:22, 255:8, 263:17, 287:23, 295:1, 308:6, 309:3, 316:7
**contractor's** - 321:25
**contractors** - 206:11, 282:18, 283:5, 295:16, 321:20
**control** - 281:20, 282:10, 282:17, 282:25, 283:14, 283:18, 288:20, 322:13
**controlled** - 179:7
**conversation** - 303:15, 303:22, 304:15, 304:22
**conversations** - 297:18
**convinced** - 319:14
**cooperative** - 301:13, 302:10
**coordinating** - 283:5
**copy** - 190:19, 190:23
**corner** - 202:10, 204:14, 204:18, 213:9, 215:1, 215:21, 215:23, 236:12, 236:25, 243:19, 259:13, 269:13, 269:14, 269:18, 269:19, 274:15, 287:7, 287:8, 287:11, 289:22, 292:2, 292:7, 293:4
**corners** - 236:16, 236:19, 237:7
**corollary** - 280:11
**Corps** - 281:12, 281:15, 281:16, 281:18, 281:23, 281:25, 282:6, 283:22, 285:18, 305:13
**correct** - 180:13, 182:11, 186:3, 186:8, 187:16, 187:17, 187:20, 187:23, 187:24, 192:12, 194:10, 194:11, 194:14, 196:3, 196:13, 202:12, 202:18, 204:4, 204:5, 204:25, 205:4, 205:12, 205:13, 205:16, 205:24, 206:2, 206:5, 206:9, 209:3, 209:21, 210:11, 210:14, 211:11, 211:22,

211:25, 212:10, 212:11, 212:13, 212:23, 212:25, 213:3, 213:4, 213:7, 217:5, 217:7, 217:9, 220:23, 221:18, 221:25, 222:3, 222:24, 223:11, 224:3, 232:18, 233:3, 233:4, 233:7, 235:6, 236:4, 236:5, 236:23, 237:4, 238:7, 243:9, 247:5, 247:7, 247:12, 248:24, 249:13, 250:7, 250:12, 250:20, 252:11, 256:12, 256:13, 257:10, 258:12, 258:21, 259:19, 268:9, 268:12, 269:24, 270:6, 270:16, 270:18, 270:25, 274:8, 278:5, 319:9, 323:12
**Correct** - 180:14, 186:4, 207:5, 241:8, 249:19
**corroborate** - 200:3
**cost** - 191:24, 229:3
**counsel** - 225:25, 301:7
**Counsel** - 321:3
**count** - 227:5, 243:8, 251:8
**counter** - 273:20
**County** - 187:7, 187:9, 187:12, 196:1, 196:7, 199:14, 199:21, 211:10, 222:8, 222:9, 222:17, 222:18, 249:23, 274:24, 316:23, 317:16
**county** - 190:11, 194:9, 199:9, 199:20, 206:12, 206:14, 225:15, 226:22, 227:24, 233:12, 235:18, 235:22, 271:13, 275:4, 275:6, 275:7, 317:10, 318:25
**couple** - 178:8, 215:14, 232:4, 237:15, 262:11, 273:17, 282:3, 289:18, 296:7, 300:12
**course** - 288:9, 309:10
**Court** - 174:1, 174:21, 175:2, 177:24, 179:8, 183:14, 183:23, 184:1, 185:11, 185:15, 186:18, 186:21, 186:24, 191:21, 192:18, 192:23, 193:13, 193:20, 194:23, 195:18, 199:11, 207:4, 208:18, 210:20, 213:14, 214:6, 214:10, 215:14, 216:12, 216:15, 218:14, 221:9, 221:11, 222:23, 224:9, 225:8, 226:17, 228:22, 229:7, 229:10, 230:22, 231:5, 233:9, 233:11, 233:15, 233:19, 238:24, 239:14, 239:20, 241:19, 241:21, 242:1, 242:5, 242:8, 242:12, 246:12, 255:4, 255:25, 257:15, 259:21, 260:19, 263:11, 263:19, 268:23, 269:6, 269:7, 270:10, 271:6, 272:17, 272:20, 272:24, 275:22, 276:6, 276:18, 279:13, 280:5, 280:9, 280:13, 280:18, 280:22, 287:21, 288:6, 292:23, 294:21, 297:25, 300:23, 301:4, 301:7, 301:16, 303:4, 303:11, 303:19, 303:24, 304:9, 304:12, 304:14, 304:18, 304:25, 306:2, 306:4, 306:10, 307:11, 312:20, 312:23, 313:2, 313:5, 317:23, 319:3, 319:4, 319:21, 320:3, 320:8,

320:12, 320:15, 320:20, 320:23, 321:2, 321:12, 322:18, 323:6
**Court's** - 233:16
**courtesy** - 190:20, 191:4, 191:6
**cover** - 183:25, 280:3
**covered** - 204:1, 255:13, 278:8, 283:24, 298:13, 298:15, 299:16, 300:12
**covering** - 297:20, 297:21
**Crandall** - 311:2
**crazy** - 264:17
**credibility** - 259:4, 259:8, 264:16
**creek** - 318:15
**Creek** - 282:12
**crew** - 237:13, 237:15, 237:19, 238:9, 243:22, 247:10, 262:18, 264:15, 278:8, 301:19
**cross** - 175:3, 193:3, 195:18, 210:22, 309:7, 309:8, 309:15, 311:15, 311:20, 317:15
**Cross** - 175:6, 195:21, 246:12, 246:15, 324:2, 324:6, 324:14
**cross-examination** - 175:3
**Cross-examination** - 175:6, 195:21, 246:15, 324:2, 324:6, 324:14
**crossing** - 283:20, 297:10
**crossover** - 195:10, 196:22, 198:16, 213:3, 213:5, 217:14, 218:9, 221:21, 223:2, 224:15, 251:2
**Crr** - 174:21, 323:17
**Csx** - 187:18, 187:21, 192:11, 192:20, 194:16, 224:15
**cubic** - 295:10, 296:7
**culvert** - 202:6, 218:7, 218:22, 219:6, 297:11
**cup** - 228:5
**cure** - 230:18, 230:24
**curing** - 230:20
**curiosity** - 267:22
**curlycues** - 240:15, 240:16
**Cut** - 222:13
**cut** - 185:24, 191:13, 191:14, 197:10, 204:8, 211:18, 213:3, 226:12, 230:25, 237:11, 237:21, 237:22, 239:1, 241:2, 243:2, 243:11, 244:22, 251:15, 251:16, 251:18, 263:7, 266:5, 268:25, 270:5, 271:1, 271:17, 272:11, 273:4, 273:8, 273:9, 290:24, 290:25, 297:12, 299:8, 307:7, 308:18
**cuts** - 271:3
**cutting** - 193:10, 202:6, 218:6, 218:9, 218:21, 219:6, 270:17, 286:15, 292:20
**cuttings** - 238:18, 238:21, 239:5, 239:8, 245:2, 245:4, 290:11
**Cynthia** - 183:12

**D**

**damage** - 285:15
**damages** - 323:2
**dark** - 241:17, 254:17
**data** - 192:3, 215:6, 253:15
**date** - 190:8, 195:25,

247:1, 269:6, 312:20, 312:21
**Date** - 323:17
**dated** - 180:21, 183:11, 291:24, 291:25
**dateline** - 284:23
**dates** - 294:12
**daughter** - 315:7, 315:8
**daughter-in-law** - 315:7, 315:8
**Davis** - 174:14, 233:14
**days** - 229:21, 237:15
**deal** - 285:13
**debris** - 315:12, 315:13, 321:17, 321:22
**December** - 193:9
**decide** - 282:19
**decision** - 177:17, 177:23
**decision-making** - 177:23
**deep** - 195:2, 197:18, 197:22, 197:25, 244:5, 298:23, 298:24, 299:2, 314:19, 315:10
**defendant** - 304:2, 304:3
**Defendant's** - 207:4
**Defendants** - 174:8, 174:17
**defer** - 231:5
**define** - 259:23
**Define** - 197:5, 313:2
**definitively** - 279:5
**degree** - 244:19
**delivered** - 296:10
**demarcate** - 186:5
**demarcation** - 185:24
**denials** - 304:7
**denying** - 178:21
**department** - 234:12, 235:20
**depict** - 175:20, 246:9, 292:17, 315:21
**depicted** - 275:18
**depiction** - 175:13, 179:18, 179:22
**depictions** - 246:5
**depicts** - 239:24, 239:25, 240:20
**deposition** - 191:8, 203:2, 203:16, 209:6, 209:17, 215:13, 219:1, 219:14, 219:15, 246:22, 249:20, 260:9, 265:13, 267:17, 267:18, 270:14, 295:8
**depositions** - 254:20, 267:15
**depth** - 194:20, 269:2
**derive** - 244:21
**describe** - 200:17, 226:24, 237:25, 239:17, 239:23, 282:5, 290:10
**Describe** - 239:18
**design** - 204:24, 205:2, 205:3, 235:16
**designation** - 243:4
**designed** - 205:15, 219:20, 235:9
**designs** - 282:13
**Despite** - 232:12
**despite** - 206:10
**detail** - 214:3
**details** - 200:20, 236:11, 282:22
**determine** - 225:12, 252:16, 254:1, 256:1, 290:3
**determined** - 245:16, 245:21, 251:24, 252:12, 252:13, 293:2
**determining** - 274:20
**developer** - 235:21, 287:4
**developers** - 206:11
**development** - 194:9,

205:7, 206:7, 207:14, 254:24, 263:9, 281:15, 281:16, 284:8, 294:18
**Development** - 174:4, 286:1
**device** - 322:15
**diagram** - 242:25
**diameter** - 188:2, 190:17, 191:9, 198:5, 198:6, 225:23, 229:15, 230:14, 291:12, 296:20
**difference** - 305:24, 307:1
**differences** - 257:5
**different** - 183:20, 208:10, 216:3, 223:9, 224:5, 228:12, 231:16, 256:20, 285:16, 285:16, 285:20, 302:17
**Different** - 257:3
**Difficult** - 230:11
**difficult** - 241:25
**dig** - 217:18, 217:19, 298:23
**digging** - 278:8, 314:11
**dikes** - 282:19, 282:25
**dimmed** - 179:9
**Direct** - 187:3, 233:23, 281:6, 324:4, 324:12, 324:20
**direct** - 177:11, 177:16, 231:16, 231:23, 247:21, 312:24
**directed** - 219:23, 219:24
**direction** - 197:7, 216:23, 216:24, 223:4, 225:13, 231:16
**directions** - 184:24, 249:2, 269:15
**directly** - 179:10
**dirt** - 181:22, 182:1, 253:5, 255:2, 255:8, 256:1, 262:24, 265:3, 265:5, 265:6, 265:7, 266:7, 266:9, 267:9, 277:2, 279:6, 294:14, 294:16, 295:9, 295:10, 296:5, 296:12, 298:11, 299:6, 300:17, 300:18, 310:2, 310:6, 311:13, 311:16
**disagree** - 256:22
**disagreement** - 257:12, 257:15
**disapproving** - 206:4, 206:7
**disaster** - 294:17
**disbanded** - 298:2
**discharge** - 231:11
**discover** - 314:23
**discovered** - 315:24
**Discussion** - 184:4, 239:22, 261:7, 264:24, 301:8
**discussion** - 221:7, 280:14
**dispute** - 305:13
**disregard** - 288:7
**distance** - 293:13
**distress** - 322:24
**District** - 174:1, 174:11
**disturbed** - 240:24, 241:1, 242:21, 252:7, 262:17, 264:25, 269:14, 273:11
**ditch** - 188:3, 189:20, 189:21, 191:11, 191:17, 193:2, 217:17, 217:18, 217:19, 224:19, 231:11, 277:25, 297:12, 314:7, 314:9, 315:25
**ditches** - 278:3, 315:18
**Division** - 174:2
**document** - 183:20, 208:13, 208:16, 252:10
**dog** - 250:16
**dollars** - 296:7

done - 190:9, 199:1, 199:2, 212:22, 213:21, 224:23, 224:24, 225:14, 225:21, 230:4, 230:5, 232:9, 235:2, 245:15, 248:11, 258:13, 260:5, 261:3, 261:12, 268:2, 275:15, 277:14, 277:15, 279:13, 280:16, 281:15, 291:15, 319:5
**door** - 280:10
**doors** - 321:8
**dots** - 242:22
**double** - 289:11, 289:17, 289:17
**double-check** - 289:11, 289:17
**doubt** - 299:15
**Down** - 216:11
**down** - 178:10, 179:15, 186:21, 190:9, 196:1, 200:16, 200:19, 201:8, 203:1, 203:5, 203:6, 203:9, 203:12, 203:18, 203:22, 216:2, 216:10, 233:9, 237:24, 244:23, 246:19, 248:8, 249:1, 249:11, 254:13, 263:7, 264:15, 265:24, 266:5, 272:11, 280:18, 290:24, 290:25, 292:7, 293:12, 295:19, 295:21, 300:16, 300:18, 311:14, 313:19, 314:9, 314:14, 314:18, 314:22, 315:1, 315:2, 315:10, 316:4, 316:19, 318:11, 318:16
**downsized** - 247:25
**dozen** - 238:4, 296:3
**dozer** - 308:6
**drain** - 188:2, 188:18, 218:9, 272:3, 283:12, 296:16, 297:2, 297:6, 309:7, 309:8, 309:15, 311:20, 316:6, 316:14, 316:23, 316:24, 317:4, 317:15, 317:17
**Drainage** - 229:6, 229:13
**drainage** - 187:13, 187:14, 187:15, 188:2, 190:12, 193:11, 194:12, 194:15, 194:18, 195:14, 202:6, 204:22, 204:24, 205:15, 206:17, 206:21, 207:12, 207:19, 207:24, 209:18, 211:1, 213:9, 215:4, 215:18, 216:5, 217:14, 217:19, 217:22, 217:23, 218:7, 218:10, 218:21, 218:22, 219:6, 219:7, 219:23, 219:25, 220:5, 220:15, 226:3, 226:4, 228:14, 229:4, 229:7, 229:11, 230:10, 230:25, 231:17, 248:15, 248:18, 248:20, 248:25, 249:21, 271:13, 281:19, 282:8, 282:23, 296:13, 296:15, 296:25, 297:1, 297:4, 311:22, 317:16, 317:19
**drained** - 189:25, 224:17, 315:25, 318:14
**draining** - 199:7, 314:24, 317:25, 318:18
**drains** - 230:9, 314:23
**draw** - 272:10
**drawing** - 209:1, 215:23, 244:17, 246:2, 246:4, 271:12, 275:18, 307:25, 316:22, 317:1
**drawings** - 185:17, 185:22, 190:18, 274:23,

287:4, 302:15, 316:24
**drawn** - 243:5
**dredging** - 281:21
**drew** - 235:24
**Drive** - 174:15
**driving** - 179:13, 208:6
**drove** - 179:14, 179:24
**dug** - 254:12, 254:14,
298:20, 298:22, 298:24,
299:2, 307:9, 307:10
**dump** - 267:8, 296:3
**dumped** - 295:22, 297:13
**dumping** - 295:25
**during** - 186:19, 242:9,
272:15, 297:12, 309:10
**During** - 179:8
**dust** - 315:6
**dye** - 225:4, 225:5, 225:12,
225:18, 225:21, 229:4,
229:8, 229:9, 229:22

---

**E**

---

**e-mail** - 180:21, 180:25,
182:10, 183:11, 184:9
**early** - 181:6, 194:4,
284:14, 314:4, 316:3, 316:6
**earth** - 181:22, 295:5,
295:25, 296:10, 297:14,
300:11
**easement** - 208:1, 208:7,
208:8, 271:14, 271:16,
271:21, 271:25, 272:4,
272:5, 272:7
**easements** - 207:21
**easier** - 230:18, 255:18
**Easily** - 256:18
**easy** - 288:23
**edge** - 298:15, 298:16
**educational** - 234:17
**Edwin** - 234:3
**effect** - 247:21
**effort** - 276:12
**eight** - 197:18, 238:4,
239:6, 245:8, 245:9, 314:18,
315:10
**Either** - 200:14
**either** - 191:15, 192:6,
210:2, 240:5, 250:13, 265:10
**electric** - 272:3
**electrical** - 178:5, 271:15
**elevation** - 181:18
**elevations** - 216:3, 235:15
**elliptical** - 181:24
**Elmo** - 270:8
**emotional** - 322:24
**Employed** - 304:12
**employed** - 234:6, 308:5
**employee** - 286:9
**emptying** - 313:24
**encountered** - 224:24,
230:18
**encroachment** - 210:5,
241:12, 249:18, 251:25,
252:2, 252:10, 252:12,
260:24, 266:19, 266:20,
267:3, 323:1
**encroachments** - 241:10
**end** - 237:10, 286:7,
291:21, 314:6, 315:11,
315:14, 319:16
**ends** - 314:8
**engineer** - 182:24, 182:25,
185:4, 185:5, 185:16, 187:7,
187:10, 187:12, 190:11,
196:12, 196:14, 199:10,
199:20, 209:2, 211:10,
222:8, 222:10, 222:16,
229:16, 235:8, 274:11,
281:11, 281:14, 282:15,

283:23, 289:11, 310:8,
317:16, 318:25
**engineer's** - 181:2, 317:10
**engineering** - 192:2,
192:3, 225:20, 229:3,
235:20, 283:10, 283:23,
283:24, 288:19
**Engineers** - 281:12,
281:13, 281:19, 281:23,
281:25, 282:6, 283:22,
305:13, 318:6
**engineers** - 188:1, 316:13
**enjoyable** - 233:12
**entered** - 184:19
**entire** - 185:12
**entirely** - 322:12
**entitled** - 323:13
**equipment** - 270:17,
296:11, 298:20, 308:17,
321:25
**Erie** - 281:24
**especially** - 282:20, 290:8,
322:2
**establish** - 235:12, 292:22
**establishing** - 264:10
**estate** - 247:24
**estimate** - 191:19, 243:10
**estimated** - 197:17, 269:1
**Ethan** - 174:14
**evaluate** - 215:10, 226:4
**event** - 307:19
**eventually** - 306:12,
317:13
**evidence** - 189:22, 255:20,
256:7, 257:13, 258:22,
260:4, 261:16, 261:23,
264:19, 270:4, 274:2,
275:25, 276:17, 278:2,
280:2, 297:21
**evidenced** - 262:23
**evident** - 258:5
**evolved** - 286:12
**exact** - 190:8, 219:4,
263:17, 268:23, 293:18
**exacting** - 290:4
**exactly** - 223:7, 223:11,
228:24, 289:9, 305:23,
306:13, 306:14, 316:19,
317:12
**Exactly** - 275:16
**examination** - 175:3,
175:6, 195:21, 232:6,
246:15, 277:9, 324:2, 324:6,
324:10, 324:14, 324:18
**Examination** - 187:3,
224:12, 233:23, 277:9,
281:6, 324:4, 324:8, 324:12,
324:16, 324:20
**examining** - 221:21
**example** - 272:9
**excavating** - 310:19
**excavation** - 181:15
**Except** - 241:5
**excess** - 178:22
**excluding** - 323:4
**excuse** - 267:17
**Excuse** - 221:12, 228:20,
319:3
**exhibit** - 183:22, 205:19,
315:21, 322:21
**Exhibit** - 175:8, 175:17,
178:1, 179:4, 179:22, 180:6,
180:19, 180:20, 182:9,
183:10, 184:9, 184:16,
184:18, 189:9, 193:6, 195:9,
206:23, 207:4, 224:16,
239:24, 243:18, 244:14,
245:1, 245:24, 254:22,
262:12, 263:4, 264:23,
275:18, 287:11, 291:1,

309:18, 311:25, 315:16,
318:5, 321:17, 321:23
**existing** - 189:17, 235:15,
236:19
**expect** - 204:2, 205:17,
209:13, 248:22
**expects** - 206:14
**expense** - 225:18
**expensive** - 230:20
**experience** - 271:21,
282:6, 283:22
**expert** - 196:16
**expertise** - 192:2, 192:3,
231:2, 281:21
**Explain** - 288:17
**explain** - 234:9, 235:7,
243:24, 291:7, 293:1, 297:8
**exposed** - 299:3
**express** - 211:13, 221:5
**expressing** - 211:23
**extended** - 293:10
**extent** - 211:3, 229:14,
299:16
**eyeball** - 289:23

---

**F**

---

**facing** - 178:4
**fact** - 191:13, 198:12,
200:5, 200:22, 204:13,
204:21, 209:14, 212:5,
218:22, 219:7, 220:3,
232:15, 240:21, 248:10,
248:17, 252:19, 254:10,
257:18, 257:22, 258:22,
259:4, 267:13, 269:21,
277:14, 306:22
**facts** - 294:24
**faint** - 265:24
**fair** - 179:18, 179:22,
209:15, 214:24, 223:25,
231:3
**fairly** - 273:12, 273:15
**fairness** - 185:11
**fall** - 306:15
**falls** - 219:2, 220:2
**false** - 275:25
**familiar** - 204:21, 206:17,
248:15, 270:19, 270:24
**family** - 228:5
**far** - 196:18, 197:16, 205:9,
205:10, 205:14, 217:13,
219:9, 239:4, 241:9, 265:23,
283:10, 283:16, 283:24,
286:16, 286:17, 286:18,
290:14, 294:17, 306:24,
307:22, 307:23, 319:13
**farm** - 230:10, 230:13
**faster** - 311:1
**fault** - 266:16
**feasible** - 231:18
**feat** - 230:3
**February** - 247:2, 247:3
**feet** - 176:13, 178:8,
181:25, 186:6, 197:18,
197:19, 198:5, 198:6, 198:9,
198:11, 207:13, 225:23,
238:3, 239:6, 241:13,
241:14, 244:6, 256:5, 262:5,
262:9, 264:18, 264:20,
269:2, 271:2, 271:15,
273:18, 273:21, 288:25,
289:22, 289:24, 290:16,
290:18, 290:22, 293:12,
298:24, 299:2, 300:9,
300:10, 314:18, 315:10,
322:3, 322:9
**fell** - 185:13
**feller** - 322:7
**fellow** - 292:12, 302:8

**felt** - 301:13, 315:25,
322:19
**fence** - 220:12, 220:15,
220:18, 220:19, 220:20,
220:22, 227:8, 228:7,
244:11, 245:17, 245:18,
256:8, 256:10, 256:11,
256:17, 256:19, 259:7,
259:16, 260:5, 260:7, 261:4,
261:13, 261:18, 261:20,
261:23, 262:1, 262:5, 262:7,
262:8, 262:9, 262:15,
262:22, 262:23, 263:2,
263:6, 263:7, 263:8, 263:9,
263:16, 263:18, 264:11,
264:16, 265:20, 266:13,
266:14, 269:22, 269:25,
270:5, 275:10, 275:12,
275:13
**fences** - 220:23
**fencing** - 265:19
**few** - 227:16, 229:24,
247:9, 289:4
**field** - 215:3
**fight** - 250:17
**figure** - 229:16, 243:5,
251:1, 305:17
**figuring** - 249:15
**file** - 190:16, 206:11
**filed** - 249:22
**fill** - 181:22, 182:1, 217:17,
295:2, 295:17, 296:13,
296:14
**filled** - 299:1, 315:12
**finally** - 224:7
**Findlay** - 234:4, 246:20
**fine** - 208:5, 242:11,
242:12
**fingers** - 299:18
**finish** - 279:12
**firm** - 208:21, 235:4,
235:24, 245:25, 251:1,
274:22, 316:2
**first** - 201:19, 202:22,
203:20, 212:24, 213:2,
221:18, 238:9, 242:13,
242:16, 243:22, 248:20,
253:18, 256:20, 267:3,
284:1, 284:3, 284:21, 285:6,
285:9, 286:8, 286:13,
291:20, 292:24, 295:10,
309:22, 309:23, 310:14,
310:16, 311:19, 316:25
**First** - 197:21, 285:3, 297:5
**fit** - 198:16, 198:18
**five** - 186:6, 198:4, 198:5,
256:5, 264:18, 264:19,
267:6, 271:2, 271:14,
280:21, 280:22, 289:13,
290:16, 290:18, 290:22,
298:24, 299:2
**Five** - 198:11, 295:15,
296:4
**five-minute** - 280:21,
280:22
**fixed** - 313:12, 313:13
**flag** - 236:12, 236:14,
236:21, 237:7
**flagging** - 243:21
**flew** - 321:22
**flood** - 281:19, 282:10,
282:16, 282:24, 283:14,
283:18
**flooding** - 177:20, 178:22,
193:9, 193:10, 205:6, 281:19
**flow** - 197:9, 204:13,
221:22, 230:16
**flowed** - 221:6, 229:16
**flowing** - 221:6, 229:19,
229:20, 230:7

**flows** - 225:11, 225:13
**flying** - 321:17
**focus** - 196:23, 229:10, 251:21, 279:25
**folks** - 222:9, 252:22, 255:1
**follow** - 182:18, 206:14, 207:15, 248:23, 260:1, 260:21
**following** - 261:6, 286:3, 296:12
**foot** - 181:24, 191:9, 198:7, 268:20, 305:1, 305:4, 305:23, 306:25
**Ford** - 175:18, 216:23, 249:1
**foregoing** - 323:12
**Forget** - 251:8, 297:18
**forgive** - 210:16
**forgot** - 210:22, 321:20
**form** - 210:5
**formalized** - 286:2
**forth** - 240:21, 249:25, 251:20, 270:20, 273:18
**fortunately** - 288:22
**forwarded** - 180:22, 182:13, 183:12
**foundation** - 193:16, 275:21, 280:14, 292:21, 294:21
**foundation's** - 193:14
**four** - 230:13, 238:22, 239:1, 267:7, 268:20, 269:2, 296:19, 298:24, 299:2
**four-foot** - 268:20
**frankly** - 322:20
**fraud** - 276:2
**free** - 296:5, 296:6
**freshly** - 299:8
**friend** - 227:20
**front** - 273:19
**frozen** - 194:6
**full** - 230:15, 315:13
**function** - 234:11
**funny** - 276:22, 280:3
**fuss** - 311:7

**G**

**gal** - 183:24
**gamut** - 283:24
**gas** - 271:15, 283:17
**gazillion** - 262:24
**general** - 181:21, 208:22, 216:20, 217:1
**generally** - 216:23
**Generally** - 216:25
**gentleman** - 184:7
**gentlemen** - 233:19, 320:4
**gist** - 216:13, 305:6
**given** - 185:22, 276:1, 316:10, 316:18
**giver** - 207:3
**glare** - 255:17, 270:9
**government** - 235:22
**Gps** - 301:25, 302:15
**grade** - 181:12, 198:5, 207:11, 207:23
**grading** - 309:13, 310:1, 310:21, 311:13
**granddaughter's** - 320:7
**Granite** - 174:4, 210:2, 212:6, 286:1, 286:9
**grape** - 227:7
**graphic** - 315:17, 315:19
**graphics** - 189:4, 292:13
**grassy** - 318:15
**great** - 278:11
**green** - 228:7, 232:10, 232:15, 268:3, 287:13

**ground** - 191:10, 194:8, 197:16, 198:8, 227:15, 227:17, 235:10, 235:15, 237:22, 253:25, 258:6, 270:23, 274:4, 289:7, 290:16, 299:23, 299:24
**groups** - 253:17
**grow** - 299:22
**growing** - 180:8, 227:8
**grub** - 184:25
**guess** - 210:8, 215:18, 237:9, 240:14, 248:17, 251:8, 266:20, 310:8, 314:6, 318:15, 318:20
**guesstimate** - 235:1
**guest** - 199:21
**guideline** - 306:13
**guiding** - 245:22
**guy** - 252:25, 292:13
**guys** - 240:22, 287:1, 291:3, 291:15, 301:21, 301:24, 303:1, 305:15

**H**

**half** - 187:11, 190:7, 198:6, 230:15, 240:4, 282:14
**hand** - 175:8, 175:16, 179:4, 179:21, 195:4, 195:8, 213:12, 245:24, 292:6, 292:7, 299:7
**handing** - 178:1
**Handing** - 183:10
**hanging** - 290:21
**happy** - 321:6
**hard** - 240:22, 248:8, 293:21, 299:20
**haul** - 181:21, 181:23, 182:5
**hauled** - 256:4, 300:17
**hauling** - 294:14, 294:15
**head** - 192:2, 217:10, 281:12, 315:2
**header** - 248:4
**health** - 251:11, 251:14, 251:17
**hear** - 258:3
**heard** - 177:14, 186:25, 191:7, 212:20, 222:8, 222:9, 236:3, 320:21, 321:21
**hearing** - 211:7, 212:12
**hearsay** - 303:4, 303:8, 303:24, 304:3
**height** - 181:13, 182:7
**Heineman** - 302:7
**hell** - 228:19
**help** - 214:15, 241:22, 270:11, 279:19, 315:18, 319:5
**helped** - 179:10, 298:21
**hence** - 220:5
**high** - 181:25, 318:4
**higher** - 181:14
**himself** - 317:4
**hindsight** - 223:9
**hired** - 295:1, 308:6
**historical** - 259:5
**hit** - 322:15
**Holland** - 174:19
**Holmes** - 196:6
**home** - 281:16, 287:2, 318:23, 320:4, 321:5, 321:6
**honest** - 257:5
**honor** - 259:8, 263:7, 264:16
**Honor** - 175:4, 192:13, 203:15, 218:11, 225:24, 228:20, 231:1, 241:23, 246:11, 255:24, 257:14, 268:21, 271:7, 272:14,

276:4, 277:7, 279:11, 280:8, 301:15, 303:2, 303:10, 312:22, 313:1, 320:1
**Honorable** - 174:10
**hope** - 220:6, 233:11
**Hour** - 313:3
**hour** - 229:24, 230:1, 230:2
**hours** - 229:24
**house** - 178:3, 193:7, 239:18, 284:5, 284:6, 284:7, 285:11
**housing** - 247:20
**Huber** - 187:3, 187:7, 191:8, 193:22, 195:21, 195:23, 196:11, 202:16, 203:24, 210:16, 224:12, 224:14, 226:21, 232:6, 268:15, 268:18, 316:6, 316:22, 324:4, 324:6, 324:8, 324:10
**huge** - 205:2
**hundred** - 262:9
**hydro** - 270:16, 270:22, 273:9, 322:8
**hydro-axe** - 270:16, 270:22, 273:9, 322:8

**I**

**idea** - 189:23, 192:5, 192:15, 214:16, 214:22, 215:15, 258:19, 262:6, 266:5, 266:6, 267:10, 302:17
**ideas** - 285:10, 285:20
**identified** - 224:16, 245:5, 273:1
**identify** - 184:18, 309:17, 314:12, 315:4
**identifying** - 278:18
**ignored** - 319:18
**immediate** - 226:5
**immediately** - 204:15, 207:14, 309:7, 310:1
**impact** - 197:6, 197:8
**impacts** - 283:11, 283:19
**implemented** - 230:25, 235:25
**implicit** - 195:13
**implying** - 247:19, 278:23
**important** - 263:20
**importantly** - 216:17
**impractical** - 198:25
**impression** - 221:15, 221:18, 221:23, 228:15, 276:1, 300:25, 301:5
**improve** - 217:19
**inappropriate** - 322:1
**inch** - 230:13, 230:14, 230:15, 230:19, 291:12, 293:14, 300:2, 306:23
**inches** - 245:8, 245:9, 296:19, 296:20, 300:2
**incident** - 252:22
**incidental** - 283:15
**incidentally** - 262:3, 284:20
**Incidentally** - 204:20
**included** - 290:19
**including** - 211:1, 211:4
**Including** - 232:22
**incorporated** - 286:10
**Incorporated** - 234:8
**indeed** - 290:4, 306:14
**indian** - 207:3
**indicate** - 227:18, 230:17, 230:24, 293:1, 301:12, 321:15
**indicated** - 226:8, 271:12, 318:24, 322:18

**indicates** - 244:18
**indicating** - 303:9
**indication** - 208:7, 208:8
**individual** - 249:3, 322:14
**individually** - 179:7, 253:17
**industry** - 226:6, 259:8
**inexact** - 257:1
**infliction** - 322:24
**inform** - 224:21
**informal** - 199:18
**information** - 182:18, 200:3, 200:4, 215:6, 235:16, 247:6
**informed** - 227:11, 318:17
**infrastructure** - 211:4
**initial** - 221:14, 221:23, 291:19, 317:11
**injure** - 185:14
**injury** - 322:23
**inquire** - 224:9
**inside** - 189:1, 297:2
**insistently** - 218:1
**inspector** - 311:2, 311:3
**installation** - 308:24, 314:14
**installed** - 194:18, 198:1, 211:6, 231:4, 247:14, 274:22, 296:22
**installing** - 310:20
**Instead** - 278:18
**instrument** - 253:14
**insult** - 260:2
**insure** - 211:4
**intact** - 220:13
**intended** - 209:1, 263:19
**intent** - 208:13, 208:16, 208:20, 209:5, 209:10, 211:16, 227:25, 228:14, 244:8
**intentionally** - 280:4, 280:12, 322:9
**interest** - 301:1, 304:4, 304:6
**intermediate** - 289:19, 289:20, 289:21, 289:24, 291:9, 291:14, 292:3
**interpret** - 222:15
**interrupt** - 253:19, 287:15, 307:12
**introduce** - 187:5, 233:25, 281:8
**inundate** - 220:3
**investigate** - 279:4
**investigating** - 300:9
**investigation** - 286:25
**invisible** - 212:16
**invite** - 199:13
**invited** - 199:15
**inviting** - 303:24
**involved** - 177:15, 201:18, 282:1, 282:7, 282:23, 283:3, 317:7
**involvement** - 247:10
**inward** - 266:3
**issue** - 188:10, 188:24, 196:22, 200:23, 201:6, 202:2, 202:11, 203:25, 204:3, 210:10, 211:14, 213:9, 214:25, 215:4, 215:20, 221:4, 249:16, 249:18, 279:18, 280:1, 309:6, 322:24
**issues** - 190:12, 201:8, 202:9, 215:18, 216:8, 216:10, 279:3, 282:1, 282:25, 322:21, 323:3
**itself** - 176:8, 198:5, 204:17, 204:21, 206:8, 211:5, 220:6, 322:2

## J

**Jack**- 174:10, 199:14, 212:25, 284:1, 284:19, 284:21, 285:9, 285:22, 286:4, 286:7, 287:4, 297:16
**Jim**- 180:21
**job** - 190:6, 210:13, 222:16, 241:21, 270:20
**jobs** - 281:13
**Joe**- 311:1
**John**- 180:25, 228:4, 236:9, 253:2, 253:3, 281:3, 281:6, 281:10, 324:20
**joint** - 305:10, 305:18
**Judge**- 174:11, 179:6, 239:12, 323:5
**judge** - 197:13
**July**- 188:16
**June**- 180:21, 181:6, 182:10, 183:11
**jurisdiction** - 210:9, 211:9
**Juror**- 241:15, 241:17, 241:20, 242:10, 242:11, 242:17, 320:6, 320:9, 320:14, 320:18, 321:1
**jurors** - 241:19, 242:15
**jury** - 175:25, 176:5, 182:6, 183:17, 187:5, 188:21, 189:7, 191:24, 204:6, 214:11, 223:12, 225:10, 228:18, 229:3, 230:17, 234:1, 234:9, 235:1, 235:8, 236:6, 236:15, 239:13, 239:17, 239:19, 239:23, 240:4, 240:9, 241:9, 241:24, 242:2, 244:19, 255:23, 258:3, 273:2, 273:19, 280:23, 281:8, 281:9, 284:1, 286:13, 288:7, 288:17, 290:10, 291:7, 293:1, 294:15, 294:24, 295:4, 295:24, 296:16, 297:5, 297:13, 300:5, 300:7, 300:19, 300:25, 301:12, 303:15, 306:7, 307:4, 308:4, 309:19, 310:23, 313:17, 318:4, 322:23
**Jury**- 174:11

## K

**K-11** - 254:22
**keep** - 182:20, 265:4, 276:8, 288:8, 311:22
**Keith**- 174:18
**kept** - 300:20
**kids** - 285:12, 322:2
**kind** - 178:12, 185:20, 196:8, 196:20, 221:1, 243:21, 265:25, 268:3, 283:6, 283:13, 283:21, 283:23, 283:24, 284:23, 285:15, 286:11, 288:21, 292:13, 298:7, 298:25, 302:16, 308:17, 317:14, 317:18
**kinds** - 227:6, 282:7
**knocked** - 310:3, 311:12
**knowing** - 189:21, 223:7, 279:22
**knowledge** - 232:1, 232:2, 251:3, 279:4
**known** - 277:12, 277:13, 277:17, 278:15, 279:3, 279:18
**knows** - 197:1, 204:12, 223:12, 225:25, 276:18
**Kovacik** - 183:16

## L

**label** - 322:7
**Ladies**- 233:19, 320:4
**lady** - 190:24
**laid** - 193:14, 249:7, 294:22
**Lake**- 281:24
**land** - 187:21, 200:23, 204:4, 216:2, 226:9, 234:12, 258:6, 258:9, 258:11, 266:19, 274:8
**lane** - 231:21
**large** - 289:4
**Laskey**- 199:14, 200:9, 211:13, 211:23, 212:2, 212:5, 226:10, 228:5, 268:1, 284:2, 308:5
**Laskey's**- 308:16
**last** - 175:25, 177:4, 191:6, 207:13, 238:21, 244:7, 261:1, 295:25, 296:7, 319:16
**late** - 224:22, 224:23, 320:16
**latest** - 268:13
**lath** - 306:23
**lathes** - 258:5
**law** - 315:7, 315:8
**lawyer** - 181:6
**lawyers'** - 241:21
**laying** - 226:15, 227:16
**layout** - 234:13, 245:25, 274:17
**lead** - 225:7
**leading** - 192:14, 193:16, 225:25, 226:18, 226:19, 272:16
**leaning** - 256:8, 256:11, 269:25, 290:17
**learn** - 267:17
**learned** - 198:24, 236:6
**least** - 213:25, 221:22, 223:13, 249:20, 252:20, 260:22, 261:2, 261:11, 272:15, 279:19, 286:23, 289:24, 302:2, 305:12, 315:14
**leave** - 218:3, 237:5, 248:1, 263:8, 280:1
**leaves** - 180:12, 180:15, 205:23, 251:20, 315:3
**led** - 319:1
**left** - 179:15, 182:6, 220:14, 239:9, 241:3, 256:8, 292:6, 292:7
**left-hand** - 292:6, 292:7
**legend** - 207:9, 208:1
**length** - 229:25
**Leslie**- 183:14, 183:15, 183:16, 184:6
**less** - 198:13, 229:24, 230:6, 230:20
**letting** - 311:13
**level** - 218:5
**levies** - 282:18, 285:17
**levy** - 285:18
**license** - 234:20
**lid** - 313:13
**lifetime** - 235:2
**lift** - 231:10
**light** - 241:24, 253:17, 298:11
**lights** - 179:6
**likely** - 199:6, 199:24, 222:5
**limbs** - 311:18
**limits** - 236:17
**Linda**- 196:6
**line** - 176:14, 185:24,

**189**:13, 208:14, 209:8, 216:17, 219:9, 220:15, 220:18, 238:16, 239:25, 240:10, 240:12, 240:13, 241:17, 242:17, 242:18, 242:19, 242:20, 245:10, 245:14, 245:18, 245:21, 245:22, 257:6, 260:25, 261:1, 263:17, 265:25, 266:11, 271:15, 272:10, 273:13, 273:15, 273:16, 273:20, 279:2, 283:3, 286:18, 286:23, 288:16, 288:20, 288:23, 289:1, 289:10, 290:1, 290:2, 290:8, 292:6, 292:8, 292:9, 292:13, 292:18, 292:22, 293:2, 293:11, 293:12, 293:15, 293:16, 293:17, 293:18, 294:1, 294:6, 295:22, 299:19, 302:18, 306:13, 306:19, 312:10
**liner** - 292:4
**lines** - 186:1, 186:6, 190:8, 207:12, 207:23, 215:14, 216:3, 235:13, 272:4, 283:17, 283:20, 290:5, 301:22, 302:18, 306:14
**listen** - 321:13
**listening** - 322:25
**literally** - 257:23, 262:5, 314:24
**live** - 234:1, 234:3
**lives** - 284:11, 284:12, 315:8
**living** - 234:2
**loads** - 295:5, 295:9
**local** - 286:16
**locate** - 237:11, 238:10, 238:11, 252:14, 253:10, 259:13, 278:25
**located** - 253:17, 265:4, 273:14, 276:14, 292:1, 307:12
**locating** - 238:12, 238:13, 279:25
**location** - 189:18, 256:3, 257:6, 276:25, 308:17
**locations** - 274:20
**logical** - 223:5, 225:4
**look** - 180:20, 182:9, 182:22, 182:23, 188:24, 199:16, 202:19, 203:4, 203:6, 203:9, 203:10, 203:22, 204:9, 208:3, 215:25, 227:22, 244:10, 259:1, 262:11, 265:11, 267:15, 269:12, 279:21, 284:17, 286:24, 287:11, 291:1, 305:9, 315:2
**looked** - 189:13, 198:2, 202:20, 216:6, 228:6, 231:20, 233:2, 274:5, 275:10, 290:8, 296:19, 297:20, 310:7, 313:18, 315:2, 316:3
**looking** - 176:12, 197:11, 197:19, 201:16, 202:25, 203:17, 216:2, 216:4, 228:14, 230:2, 236:24, 254:11, 255:21, 257:1, 285:14, 285:16, 286:21, 307:1, 311:25, 313:10
**Looking**- 198:2
**looks** - 183:11, 254:25
**Lord**- 197:1
**Lori**- 315:7, 315:8
**Lori's**- 315:6
**low** - 205:7, 215:21, 217:3, 310:9, 318:5, 318:10

## M

**machine** - 265:24, 298:21, 322:2
**magnitude** - 194:20
**mail** - 180:21, 180:25, 182:10, 183:11, 184:9, 321:21
**main** - 181:14, 197:25, 198:17, 198:23, 247:14, 259:2, 259:12, 259:14, 265:17, 281:21, 282:13, 285:8, 297:10, 297:12, 297:15, 302:17, 302:19, 308:24, 309:12, 310:20, 312:14, 313:11, 313:15, 316:16, 316:24, 318:7, 318:21, 319:15
**major** - 234:14, 307:19
**man** - 181:20, 184:20, 185:7, 186:3, 192:14, 269:9, 288:5, 302:7, 302:23, 309:3, 310:2, 310:15, 311:1, 312:11, 313:9, 322:11, 322:13
**man's** - 231:2, 311:1
**manhole** - 176:13, 176:17, 177:2, 188:2, 191:11, 193:11, 193:23, 194:1, 200:13, 202:19, 203:4, 204:10, 210:16, 216:6, 230:8, 233:2, 300:15, 309:19, 309:21, 310:5, 310:6, 310:10, 310:11, 310:17, 310:24, 311:14, 311:20, 312:2, 312:3, 312:4, 312:6, 312:8, 312:9, 313:9, 313:18, 314:15, 314:16, 314:17, 314:22, 314:25, 315:18, 315:24, 316:3, 318:1, 318:12, 318:13, 318:14
**map** - 183:23, 215:25, 216:1, 216:5, 264:22, 308:1, 318:1, 318:8, 319:5
**maps** - 318:9
**March** - 194:4
**mark** - 245:1
**Mark** - 236:16
**marked** - 175:16, 178:1, 179:21, 183:10, 183:22, 195:8, 206:21, 243:1, 288:13, 291:20
**markers** - 290:11
**market** - 247:21, 247:24, 248:3
**marking** - 275:12, 275:13
**markings** - 240:14, 258:4, 258:18, 258:23, 259:5
**marks** - 265:23
**Marv** - 207:3, 240:3, 307:23, 311:6, 322:9
**Marvin** - 174:13
**massive** - 266:3
**matches** - 317:18
**matter** - 240:21, 323:14
**Maumee** - 174:15, 220:1, 221:17, 231:23
**maze** - 300:2
**Mccarthy** - 180:25, 182:11, 183:2, 184:7, 212:24, 212:25, 213:8, 213:22, 214:17, 215:3, 218:1, 228:5, 236:9, 245:13, 252:25, 253:1, 253:3,

254:12, 256:15, 263:3, 265:2, 265:5, 267:1, 268:1, 269:10, 278:7, 281:6, 281:10, 293:2, 301:10, 324:20
**Mccarthy's** - 228:4, 255:1, 255:8, 262:18
**Meadows** - 174:19
**mean** - 178:18, 192:8, 216:21, 220:15, 236:14, 238:1, 238:21, 238:25, 241:1, 241:3, 244:17, 251:19, 256:4, 257:4, 259:1, 259:11, 260:17, 261:22, 264:9, 265:15, 266:12, 267:5, 267:6, 271:4, 271:17, 272:6, 272:7, 273:3, 273:7, 273:16, 274:19, 276:22, 277:13, 278:22, 278:24, 287:15, 289:20, 293:22, 308:10
**Meaning** - 315:1
**means** - 185:4, 207:13, 207:17, 243:2
**meant** - 253:22
**measure** - 287:17, 288:23
**measured** - 287:3, 290:6
**measurements** - 290:4
**measuring** - 197:17
**mechanical** - 174:25
**meet** - 188:9, 188:15, 190:6, 253:1
**meeting** - 211:12, 212:7, 212:24, 213:2, 214:18, 222:2, 223:13, 223:14, 223:18, 223:19, 223:20, 223:21, 316:8, 316:9, 316:13, 317:11
**men** - 305:3
**mention** - 177:8, 213:25
**mentioned** - 177:6, 202:14, 204:9, 204:20, 214:21, 214:25, 305:5, 310:16, 319:13
**mentioning** - 214:17
**meshing** - 220:25
**message** - 190:5
**met** - 188:16, 190:24, 223:15, 223:16, 226:9, 228:4, 228:5, 246:19, 284:1, 284:3, 284:19, 284:21, 316:21
**metal** - 220:24
**method** - 264:2, 264:13
**microphone** - 319:6
**middle** - 193:2, 197:11, 293:5
**Might** - 265:13
**might** - 192:7, 211:24, 227:24, 231:22, 238:3, 252:9, 269:19, 272:2, 272:3, 274:16, 279:21, 284:19, 298:25, 302:17, 319:1, 320:23
**mike** - 186:24
**mile** - 181:25
**miles** - 264:17
**mind** - 202:15, 212:1, 223:6, 301:18, 311:24
**minimum** - 198:13
**minus** - 246:5
**Minuscule** - 225:19
**minute** - 233:15, 280:21, 280:22, 300:4
**minutes** - 258:13, 313:4, 313:6
**mirror** - 315:5, 315:9, 316:4
**misleading** - 218:12
**missing** - 200:20

**mistake** - 179:2, 186:12
**misunderstood** - 221:19, 252:9
**mitigate** - 285:15
**mixing** - 322:9
**Moline** - 177:10
**moment** - 213:19, 239:21, 287:10, 296:7, 314:20
**money** - 285:23, 286:4, 286:8
**month** - 188:22, 190:7, 202:23, 223:17, 227:2, 296:1, 307:16
**months** - 238:22, 239:2, 267:7
**monument** - 243:19, 244:2, 244:9, 244:10, 244:12, 245:16, 245:19, 245:20, 259:2, 269:24, 270:2, 270:5, 289:21
**monumentation** - 274:19
**monuments** - 236:18, 274:7, 274:15, 274:22, 287:6, 287:7, 287:8, 287:12, 289:12, 289:18, 292:3, 302:2, 302:13, 302:14, 302:16
**Morefield** - 183:12
**morning** - 320:5, 320:9, 320:25, 321:9
**Most** - 266:9, 266:13, 273:14, 299:6
**most** - 198:3, 244:3, 271:24, 274:18, 282:9, 282:21, 283:8
**mostly** - 197:4, 197:5, 281:12, 281:14, 282:14
**motioning** - 316:17
**mound** - 285:17, 285:18, 286:5, 294:9, 295:2, 295:11, 296:14, 296:24, 298:3, 298:6, 300:15, 300:16
**move** - 183:18, 197:7, 256:17, 272:24, 276:4, 279:5, 294:19, 308:6, 308:10, 308:17
**Move** - 308:9
**moved** - 201:14, 256:2, 275:19, 278:17, 284:12, 284:14, 308:14, 320:11
**movement** - 274:2
**moving** - 199:23, 199:24, 222:10, 222:12, 223:23, 288:8, 296:11, 320:7, 320:10
**mowed** - 208:15, 209:9
**mud** - 204:12, 273:3, 294:25
**must** - 214:3, 310:12
**mystery** - 288:14

**N**

**naked** - 250:4
**name** - 177:14, 187:6, 234:3, 281:10, 302:23, 302:24
**named** - 252:25
**narrative** - 303:11
**natural** - 204:17, 273:4, 273:6
**nature** - 237:14
**navigable** - 281:24
**near** - 194:16, 216:22, 269:23, 288:19
**necessarily** - 274:16
**necessary** - 192:21
**need** - 184:3, 186:25, 208:14, 214:16, 215:5, 222:6, 233:13, 239:20, 243:24, 249:23, 292:23,

319:8, 321:3
**needed** - 200:3, 237:16, 252:14, 283:12, 316:14, 319:10, 319:12
**needs** - 192:15, 280:23
**negative** - 247:20
**neglected** - 311:10
**neighborhood** - 197:18, 235:3
**never** - 177:14, 188:13, 204:8, 209:23, 210:1, 210:4, 217:13, 231:4, 262:9, 278:12, 305:2, 311:24, 320:21
**New** - 274:13
**New** - 242:5
**next** - 181:15, 186:22, 188:3, 199:25, 233:11, 233:20, 261:16, 280:20, 306:20, 307:19, 309:6, 313:5, 315:16, 318:17, 318:19, 321:22
**nice** - 320:20
**Nick** - 233:23, 234:3, 246:15, 271:9, 277:9, 291:20, 291:21, 298:8, 301:21, 306:14, 306:18, 307:24, 324:12, 324:14, 324:16, 324:18
**Nigh** - 233:23, 233:25, 234:3, 242:25, 246:15, 246:17, 271:9, 271:11, 277:9, 298:8, 300:4, 301:21, 306:14, 307:24, 324:12, 324:14, 324:16, 324:18
**Nigh's** - 306:18
**Night** - 289:14
**Nine** - 252:1
**nine** - 269:15, 282:13
**Nobody** - 263:2, 277:19
**nobody** - 250:13, 277:18
**none** - 232:1, 232:2, 305:4
**norm** - 198:11
**normal** - 205:3
**Normally** - 198:15
**north** - 240:2, 240:15, 242:20
**Northern** - 174:1
**northwest** - 234:15
**notation** - 271:12
**note** - 176:22, 186:5, 190:9, 208:22, 210:23, 251:17
**Noted** - 190:16
**noted** - 185:17, 190:21, 274:1
**notereading** - 174:25
**notes** - 203:24, 237:5
**Nothing** - 277:6
**nothing** - 205:25, 206:3, 206:6, 214:11, 233:6, 236:3, 247:13, 249:15, 250:11, 251:1, 306:16
**notice** - 212:2, 228:12, 252:1
**noticed** - 189:16, 242:13, 252:14, 309:15, 309:24, 310:2, 310:14, 310:17
**noticing** - 248:7
**nowhere** - 319:25
**Number** - 175:9, 175:17, 175:23, 178:2, 179:4, 179:22, 180:6, 180:19, 180:20, 182:9, 183:10, 184:9, 184:18, 189:9, 192:24, 193:7, 195:9, 206:24, 239:24, 243:18, 244:15, 275:18, 291:1, 309:18, 315:16, 318:5, 321:17

**number** - 183:25, 192:1, 202:25, 231:24, 235:2, 269:19, 281:13, 285:3
**numbers** - 198:8, 246:8
**numerical** - 209:22
**numerous** - 243:7, 243:10

**O**

**oak** - 227:5
**oath** - 247:8
**object** - 199:8, 218:11, 225:6, 231:2, 276:4, 301:3, 303:2, 303:8, 303:23, 304:24
**Objection** - 177:19, 191:20, 192:13, 193:12, 194:22, 203:15, 208:16, 210:19, 222:21, 225:1, 226:14, 229:5, 230:21, 238:23, 257:13, 259:20, 263:10, 271:18, 272:19, 275:20, 276:15, 287:20, 288:1, 288:3, 292:19, 292:21, 294:19, 297:23, 300:21, 301:6, 301:15, 303:17, 306:6, 317:21, 319:19
**objection** - 177:24, 193:15, 219:17, 226:17, 242:2, 272:17, 288:7, 321:16
**obliterated** - 263:3
**observe** - 189:1, 189:10, 200:18, 236:24, 237:2, 253:22, 309:22
**observed** - 196:25, 237:5, 237:18, 237:19
**obstruct** - 204:13
**obstruction** - 195:3, 197:9, 204:11
**obtain** - 185:16
**obtained** - 192:10, 193:5
**obviously** - 179:11, 213:2, 228:23, 261:3, 261:12, 268:10, 273:10, 318:13
**Obviously** - 246:25, 247:5, 273:8
**occasion** - 193:24, 196:1, 213:8
**occur** - 221:15, 305:19
**occurred** - 210:6, 232:1, 232:2, 236:7, 241:10, 268:8, 305:18, 307:15, 307:19, 308:23
**offended** - 266:17
**offered** - 191:5, 321:17
**office** - 190:10, 190:15, 190:20, 195:14, 210:9, 210:25, 211:3, 246:19, 275:6, 282:3, 282:12, 282:13, 302:6, 302:17, 302:19, 303:21, 317:7, 317:9, 317:10
**offices** - 196:2
**Ohio** - 174:1, 174:5, 174:22, 187:8, 234:4, 234:15, 234:16, 234:18, 234:21
**old** - 183:25, 189:3, 189:14, 190:15, 200:18, 214:22, 228:9, 230:9, 309:1, 314:1
**Old** - 174:4, 210:2, 212:6, 285:25, 286:9
**on-site** - 229:17, 316:21
**once** - 267:15, 272:15, 305:14, 315:1, 318:17
**One** - 192:14, 237:3, 263:11
**one** - 175:22, 177:17, 182:20, 184:12, 190:10,

191:4, 192:24, 193:24,
194:16, 197:15, 198:21,
200:14, 204:16, 205:5,
205:19, 207:1, 212:17,
212:19, 214:21, 217:17,
221:1, 223:15, 223:16,
223:19, 223:20, 225:8,
230:14, 231:8, 231:13,
233:5, 236:25, 245:7,
249:11, 256:3, 256:22,
259:3, 259:7, 260:1, 260:23,
262:5, 265:24, 269:8,
269:22, 284:9, 284:10,
285:12, 287:11, 289:24,
291:3, 291:9, 291:12,
295:20, 296:2, 296:9,
297:14, 307:25, 308:11,
309:13, 311:6, 313:23,
314:9, 315:2
  **one-inch** - 291:12
  **ones** - 270:24, 307:7
  **open** - 196:24, 203:4,
203:8, 231:24, 240:25,
241:1, 280:9
  **opened** - 203:7, 203:10,
203:21
  **opening** - 203:17
  **operate** - 298:21
  **operation** - 298:3
  **operative** - 297:6, 297:7,
297:8, 297:9
  **operator** - 298:21
  **opinion** - 182:23, 193:17,
195:15, 198:24, 199:6,
210:5, 218:6, 218:21,
218:25, 219:5, 219:13,
219:15, 219:16, 221:5,
222:1, 222:25, 223:1, 223:6,
223:10, 224:5, 227:13,
244:15, 257:6, 274:14,
276:12, 316:10, 316:12
  **opinions** - 222:19, 222:20,
222:22, 222:24, 244:20,
267:19
  **opposed** - 283:4
  **option** - 320:15
  **options** - 231:24, 285:16
  **orange** - 240:12, 241:11,
242:22
  **order** - 193:1, 249:21,
293:19
  **original** - 211:16, 228:14,
231:8, 255:16, 274:5, 308:18
  **originally** - 182:10, 277:1
  **Originally** - 235:10
  **ought** - 191:2
  **ourselves** - 286:6, 288:13,
314:11
  **outlet** - 189:18, 220:3
  **outlets** - 230:10
  **outside** - 177:2, 193:25,
231:2, 256:4
  **outweighed** - 322:22
  **overhead** - 179:9
  **overlay** - 315:17
  **overload** - 249:12
  **overrule** - 194:23, 276:19
  **Overruled** - 218:14,
222:23, 238:24, 287:21,
297:25, 301:16, 303:19,
304:25
  **overruled** - 177:24, 218:16
  **own** - 283:6, 287:2,
301:18, 301:24
  **owner** - 182:21, 182:23,
208:23, 234:7

**P**

  **page** - 185:1, 201:3,
213:16, 213:17, 214:4,
214:5, 214:15, 215:11
  **Page** - 203:2, 260:13
  **pages** - 222:6
  **paid** - 296:8
  **pan** - 315:6
  **paper** - 321:21
  **parallel** - 288:16
  **paramount** - 223:6
  **paraphrase** - 214:10,
214:16
  **part** - 177:22, 185:15,
203:11, 203:19, 203:20,
204:3, 210:13, 240:19,
252:4, 282:2, 290:23,
298:17, 300:13, 300:14,
303:24, 303:3, 317:18,
321:18
  **Part** - 317:19
  **partially** - 299:1
  **particular** - 208:9, 212:14,
215:8, 215:22, 216:4,
216:11, 225:22, 234:6
  **particularly** - 281:17,
281:20, 282:9, 283:3, 299:16
  **party** - 304:3, 322:15
  **pass** - 190:14, 241:15,
242:2
  **path** - 179:14
  **pay** - 282:19
  **paying** - 286:8
  **pending** - 306:10, 322:21
  **people** - 178:19, 206:10,
223:22, 237:3, 248:1,
281:17, 282:3, 282:13,
282:15, 282:24, 283:6,
285:21, 291:4, 305:11
  **per** - 230:1, 296:7
  **per-hour** - 230:1
  **percent** - 181:16
  **perfect** - 220:17
  **perhaps** - 186:12, 311:1
  **perimeter** - 271:25
  **period** - 204:12, 234:20,
295:24
  **Perkins** - 211:14, 226:10,
226:22, 227:18, 227:25,
228:3, 228:17, 229:2
  **permanent** - 244:3
  **permission** - 185:16,
192:10, 192:15, 192:22
  **Permits** - 193:4
  **perpendicular** - 296:17
  **perpetrate** - 276:1
  **personal** - 322:23
  **personally** - 244:13,
263:15, 267:13
  **personnel** - 300:20
  **perspective** - 293:9
  **pertinent** - 282:9, 283:8
  **pest** - 183:3, 183:4
  **Peterman** - 234:7, 234:9,
234:11, 289:16, 291:11,
291:12, 291:17, 291:18,
292:2, 293:3, 294:3, 298:9,
298:10
  **phone** - 227:25, 236:9,
278:25, 304:17, 304:18
  **photo** - 175:9, 269:6,
293:21, 294:1, 312:20,
312:21
  **photograph** - 179:5,
216:5, 254:18, 255:14,
278:6, 278:7, 291:2, 291:4,
291:24, 292:17
  **photos** - 269:9, 270:12
  **physically** - 230:9, 261:25,
314:16, 315:22
  **Physically** - 314:15
  **pick** - 196:9, 231:23,
322:10
  **picked** - 190:19
  **picture** - 178:2, 193:7,
194:25, 216:3, 232:17,
260:23, 261:2, 261:11,
265:8, 265:11, 266:7,
266:12, 269:21, 291:7,
299:12, 312:13, 312:17
  **pictures** - 252:15, 265:14,
270:7, 311:18, 314:5, 322:9
  **piece** - 235:10, 313:12,
321:22
  **pieces** - 262:14
  **piled** - 226:12
  **pipe** - 177:20, 181:24,
189:1, 189:12, 190:17,
191:10, 191:13, 193:11,
195:10, 195:14, 196:22,
196:24, 197:1, 197:10,
197:16, 198:4, 198:5, 198:7,
198:16, 198:18, 198:22,
199:6, 199:23, 204:8,
204:10, 204:11, 204:19,
209:17, 213:3, 213:6,
214:20, 217:14, 218:10,
221:21, 222:13, 223:2,
223:19, 224:15, 224:25,
225:23, 229:15, 230:19,
230:25, 231:4, 251:2,
265:14, 265:17, 266:9,
283:12, 296:25, 297:1,
297:9, 311:15, 313:23,
313:24, 314:13, 315:4,
315:5, 315:11, 317:4,
318:14, 318:18
  **pipeline** - 200:24
  **pipes** - 207:12, 207:18,
207:23, 283:11, 313:22,
316:20
  **piqued** - 267:22
  **Place** - 282:11
  **place** - 179:14, 179:25,
181:15, 189:15, 214:19,
227:12, 238:8, 244:4,
244:12, 266:25, 268:10,
272:5
  **placed** - 258:5, 274:9
  **places** - 257:23, 277:21,
278:2
  **placing** - 296:12
  **plaintiff** - 233:20
  **Plaintiff's** - 245:24
  **Plaintiffs** - 174:5, 174:13
  **plan** - 190:20, 191:3,
194:12, 194:15, 204:22,
204:24, 206:17, 206:21,
207:15, 208:3, 209:18,
211:1, 216:2, 217:22,
217:23, 224:15, 248:18,
248:20, 248:25, 249:21,
250:2, 250:7
  **planning** - 205:25
  **plans** - 186:2, 190:15,
190:17, 190:19, 190:23,
191:4, 194:9, 194:19, 195:4,
195:9, 198:2, 204:4, 206:7,
206:11, 206:15, 208:21,
211:1, 235:18, 235:20,
235:24, 248:15, 248:21,
248:23, 274:18, 274:19
  **plant** - 237:21
  **plastic** - 287:13
  **plat** - 271:24
  **plats** - 134:13, 275:5,
275:7
  **played** - 179:8
  **plugged** - 197:3, 197:4,
197:13, 223:4
  **plus** - 191:10, 246:5
  **Plus** - 304:6
  **Pm** - 175:1, 323:7
  **Point** - 282:11, 295:15,
296:4
  **point** - 189:6, 189:11,
189:23, 192:12, 198:25,
204:15, 215:8, 215:22,
216:4, 216:6, 216:11, 218:3,
221:20, 222:7, 222:25,
224:16, 234:19, 235:12,
236:9, 237:20, 239:13,
242:3, 242:15, 264:12,
273:11, 279:16, 285:23,
285:25, 290:12, 304:1,
304:16, 309:19, 313:6, 320:2
  **pointed** - 207:9, 215:23,
217:13, 314:4
  **pointer** - 240:9
  **pointing** - 263:24
  **points** - 204:17
  **pond** - 204:19
  **ponding** - 176:16, 193:25,
194:19, 204:20, 205:6,
205:18, 217:6, 232:16,
249:16, 283:11
  **poor** - 210:17
  **portion** - 195:12, 209:19,
222:17, 300:12
  **position** - 199:12, 253:5,
274:5, 304:6, 304:10
  **positions** - 248:2
  **possible** - 231:9, 254:8,
254:9, 322:19
  **possibly** - 213:21, 238:10
  **post** - 267:18
  **post-deposition** - 267:18
  **posts** - 262:23
  **pour** - 225:5
  **practice** - 225:16, 259:15,
263:14
  **prefer** - 266:19, 266:23,
267:5
  **prejudice** - 322:22
  **prepare** - 235:18, 235:20,
248:21, 309:12, 315:19
  **prepared** - 186:2, 186:3,
245:25, 246:3, 249:22
  **presentation** - 242:9
  **preserved** - 244:4
  **pretty** - 181:5, 194:7,
236:10, 237:6, 238:3,
254:17, 270:3, 273:22,
287:18, 298:3, 312:10
  **previous** - 183:22
  **prices** - 285:21
  **primary** - 238:16
  **principal** - 234:7
  **print** - 239:23
  **prism** - 253:16
  **private** - 187:15, 187:19,
187:23, 193:1, 193:2,
199:25, 200:6, 204:15,
221:24, 229:1
  **problem** - 179:11, 181:8,
182:24, 183:1, 191:25,
204:7, 212:1, 212:12,
212:23, 225:22, 230:17,
236:10, 237:14, 247:11,
279:18, 282:21, 284:22,
286:14, 286:16, 294:5,
301:25, 302:11, 302:13,
306:25, 319:15
  **problems** - 282:20, 283:9
  **proceedings** - 323:13
  **Proceedings** - 174:25
  **process** - 177:23, 188:25,
255:12
  **produced** - 174:25
  **professional** - 182:24,
191:5, 281:11
  **proffer** - 321:10, 321:13

**project** - 177:15, 192:24, 199:4, 201:18, 206:1, 212:3, 212:6, 213:23, 222:17, 222:18, 226:5, 248:10, 248:11, 248:12, 258:25, 259:2, 259:12, 283:15, 283:18, 285:7, 285:8, 317:7
**projects** - 282:11, 282:17, 283:1, 283:2
**proper** - 193:13, 193:17, 200:13, 220:3, 294:21
**properly** - 211:6
**properties** - 250:3, 283:4, 283:5, 311:8
**property** - 176:8, 176:10, 176:12, 176:14, 178:19, 181:13, 182:21, 182:23, 186:6, 187:18, 187:19, 187:23, 188:23, 188:24, 189:1, 192:25, 193:1, 193:2, 193:3, 193:4, 194:16, 194:25, 196:19, 199:24, 199:25, 200:6, 200:7, 204:3, 204:15, 207:14, 208:8, 208:12, 208:13, 208:14, 209:7, 209:8, 209:14, 212:10, 213:10, 215:21, 216:22, 220:2, 220:5, 221:24, 227:19, 227:22, 228:9, 229:1, 235:13, 238:13, 238:14, 238:17, 238:19, 240:10, 242:18, 243:16, 244:23, 245:14, 249:11, 250:19, 250:24, 256:12, 255:2, 266:10, 266:11, 267:12, 269:14, 271:17, 271:22, 273:20, 273:21, 274:12, 276:13, 277:4, 286:18, 286:23, 286:24, 287:6, 287:8, 288:16, 288:21, 289:1, 289:5, 289:8, 289:19, 290:1, 290:2, 292:9, 292:18, 292:22, 293:2, 293:16, 293:17, 294:1, 295:23, 299:19, 299:20, 305:5, 306:19, 307:6, 307:7, 309:16
**prosecuting** - 196:6
**Protection** - 185:2
**prove** - 212:5, 319:12
**provide** - 184:22, 230:9, 247:22
**public** - 187:13, 187:14, 211:5, 211:8, 275:8, 283:1, 283:2
**pull** - 254:1, 270:23, 271:2
**pump** - 191:16, 231:9, 283:21
**pumping** - 191:12, 191:25, 192:11, 192:20, 192:25
**pun** - 263:19
**purpose** - 176:5, 226:3, 227:19, 227:21
**purposes** - 246:3, 246:6
**push** - 308:11
**pushed** - 254:4, 256:4, 256:10, 262:5, 262:8, 262:25, 277:2, 277:3, 310:7
**Pushed** - 256:5
**pushing** - 255:2, 255:8, 310:2
**put** - 192:11, 193:6, 198:22, 207:20, 209:17, 214:9, 214:15, 220:4, 222:12, 230:18, 231:3, 236:21, 239:3, 240:4, 244:9, 262:24, 272:1, 274:7, 283:18, 285:19, 289:18, 289:23, 290:2, 290:5, 290:7, 291:10, 291:13, 291:15,

292:3, 292:4, 292:13, 292:15, 293:4, 295:2, 295:11, 296:21, 296:23, 301:21, 306:13, 306:19, 306:20, 309:12, 313:12, 313:13, 319:13, 319:17
**Put** - 229:22
**putting** - 205:8, 259:13, 285:18, 287:2, 311:17, 319:15

**Q**

**quad** - 318:7
**qualifications** - 219:17, 294:20
**qualified** - 270:15
**quarter** - 306:23
**quarter-inch** - 306:23
**questioned** - 321:7
**questions** - 186:17, 195:17, 231:3, 232:3, 246:10, 260:1, 267:21, 271:11, 278:16, 279:23, 279:24
**quick** - 233:14, 233:15, 237:7
**quit** - 234:19
**quite** - 283:22, 312:25, 313:2
**quote** - 228:7

**R**

**radically** - 252:21
**rail** - 240:2, 321:18
**railroad** - 176:8, 176:10, 178:4, 187:18, 187:21, 189:3, 189:14, 189:17, 190:15, 190:17, 190:18, 190:23, 191:15, 192:11, 193:3, 195:6, 199:24, 200:7, 207:14, 214:22, 216:22, 217:22, 219:7, 220:12, 220:20, 220:23, 221:16, 221:24, 224:1, 224:18, 224:19, 228:10, 231:21, 238:13, 240:2, 242:20, 244:11, 245:17, 245:18, 250:3, 250:10, 250:19, 250:23, 255:2, 255:8, 256:8, 256:17, 256:19, 259:7, 259:16, 260:5, 260:7, 261:4, 261:13, 261:18, 262:14, 262:22, 263:8, 264:16, 269:22, 274:12, 275:10, 275:12, 275:13, 284:9, 284:10, 287:3, 287:16, 288:14, 288:15, 288:20, 288:22, 288:24, 290:7, 290:19, 293:11, 293:12, 295:19, 295:22, 296:17, 297:1, 297:2, 302:11, 307:6, 309:1, 309:6, 309:8, 311:10, 314:1, 314:7, 314:24, 315:18, 315:25
**railroad's** - 192:25
**railroads** - 191:17, 200:5
**rain** - 219:22, 229:23
**rainfall** - 205:3, 205:5
**rains** - 205:11
**Rains** - 205:14
**raised** - 182:7
**rake** - 315:3
**ran** - 188:1, 296:2
**range** - 229:13
**rather** - 218:1
**Ray** - 187:3, 187:6, 195:21, 224:12, 228:1, 232:6, 316:6, 316:22, 316:25, 324:4,

324:6, 324:8, 324:10
**Ray's** - 317:9
**read** - 183:17, 185:12, 201:1, 202:24, 209:1, 214:9, 215:14, 240:23, 260:17, 260:19, 261:9, 263:22
**readily** - 275:8
**reading** - 185:12, 201:17
**readjust** - 296:13
**ready** - 246:23, 296:13, 300:16, 321:4
**Ready-** 280:20
**real** - 202:14, 227:24, 247:24, 273:7
**realize** - 313:4
**realized** - 286:13
**really** - 196:19, 197:24, 210:9, 215:9, 224:7, 236:11, 248:8, 251:19, 252:6, 256:6, 266:11, 267:2, 267:20, 270:15, 273:6, 273:10, 274:17, 274:18, 281:18, 284:3, 286:3, 299:15, 305:2, 308:2, 309:25, 310:16, 311:19, 312:18, 314:11, 314:12, 316:18, 316:19, 317:5, 317:7, 318:25
**rear** - 180:8, 207:11, 207:23, 209:2, 236:25, 249:24, 271:22
**rearranged** - 283:18
**reason** - 246:4, 247:19, 247:20, 275:11, 323:4
**reasonable** - 222:12, 244:19, 257:8
**reasons** - 192:14, 193:18
**recalled** - 298:8
**recalling** - 254:15
**receipts** - 294:13
**receive** - 296:14
**recent** - 176:4
**Recent** - 238:21
**recently** - 239:1
**recess** - 233:16, 321:9
**Recess** - 233:17
**rechecked** - 295:8
**recklessness** - 321:24
**recognize** - 175:11, 206:18, 254:23, 265:15
**recollect** - 202:13
**recollection** - 184:14, 213:13, 213:18, 227:13
**recommendation** - 319:20
**recommendations** - 319:24
**Reconvened-** 175:1
**record** - 184:4, 214:6, 239:22, 261:7, 264:24, 276:8, 301:8, 321:15, 322:14, 322:19, 323:13
**recorded** - 174:25, 275:5
**recorder's** - 275:6
**records** - 275:3, 275:4
**Recross-** 232:6, 277:9, 324:10, 324:18
**Recross-examination-** 232:6, 277:9, 324:10, 324:18
**red** - 245:10, 292:6, 293:17
**redesign** - 282:21
**redesigns** - 283:9
**redirect** - 224:9
**Redirect-** 224:12, 271:9, 324:8, 324:16
**redo** - 283:19
**refer** - 274:18
**reference** - 215:24, 259:5, 294:20
**referred** - 244:2
**referring** - 184:7, 191:1, 198:10, 243:15, 309:20

**reflected** - 274:23
**reflects** - 253:16
**refresh** - 213:13, 213:18
**regard** - 186:6, 271:22, 293:25, 294:25, 301:1, 308:23
**regarding** - 294:1
**region** - 310:9, 310:13, 318:11
**registered** - 234:4, 234:24
**regrading** - 308:25, 309:5
**rehire** - 248:1
**relative** - 188:10, 188:24, 201:17, 266:12
**relatively** - 274:13
**relevance** - 322:16, 322:19, 322:20
**rely** - 217:22
**remain** - 185:14
**remaining** - 240:21, 256:11, 258:23, 262:7
**remains** - 256:2, 256:10
**remarks** - 276:8
**Remember-** 233:16
**remember** - 178:14, 195:25, 215:24, 218:16, 221:6, 226:10, 238:5, 254:20, 265:14, 270:15, 285:6, 321:8
**remind** - 321:6
**remnants** - 241:7
**removal** - 185:2, 185:16, 217:21
**removals** - 185:18
**remove** - 249:23, 250:19, 308:8
**removed** - 185:14, 185:17, 185:24, 232:25
**rendered** - 222:20, 223:1
**repair** - 185:3, 200:16, 210:17, 313:10
**repaired** - 312:2, 312:3, 312:4, 312:11, 313:9
**Repeat-** 212:4, 218:8
**repeat** - 210:21
**repetition** - 210:15
**rephrase** - 191:22, 192:17, 225:2, 226:1, 268:9, 271:19, 275:23, 300:22, 303:13, 319:23
**replace** - 248:2
**Replanting-** 181:10
**report** - 176:22
**Reporter-** 174:21, 319:3
**reports** - 176:24
**represent** - 216:3, 240:16
**representatives** - 301:14
**represents** - 242:18
**requested** - 305:10
**require** - 209:7, 271:25
**required** - 248:25
**requirements** - 271:24
**reserve** - 186:18
**reserved** - 271:14
**residence** - 322:1
**residential** - 271:23
**residents** - 283:4, 286:16
**resolve** - 305:14
**resolving** - 282:21
**response** - 203:8
**responsible** - 187:12, 187:15, 190:11, 235:23
**retained** - 210:1
**retired** - 281:10
**retrieved** - 321:23
**review** - 217:2
**reviewed** - 235:22, 246:22, 248:17
**reviewing** - 213:17, 214:14

**Ric**- 181:20, 184:20, 185:7, 186:3, 269:9, 288:5, 309:3, 310:2, 310:15, 311:1, 312:11, 313:9, 322:11, 322:13
**Ric-man**- 181:20, 184:20, 185:7, 186:3, 269:9, 288:5, 309:3, 310:2, 310:15, 311:1, 312:11, 313:9, 322:11, 322:13
**Ric-man's**- 311:1
**rid** - 258:18
**right-of-way** - 192:21, 211:5, 211:8, 250:10, 255:9, 264:10
**rings** - 251:8
**river** - 283:3
**River**- 216:20, 216:21, 220:1, 221:17, 231:23
**Rmr**- 174:21, 323:17
**Road**- 175:18, 216:20, 216:21, 216:23, 216:24, 231:21, 231:22, 234:4, 295:15, 295:21, 296:4
**road** - 211:5
**roads** - 283:16
**roadside** - 249:1, 249:2
**roadways** - 234:14
**Robert**- 174:17
**Robon**- 174:13, 175:4, 175:7, 175:22, 179:12, 183:21, 183:24, 184:2, 184:5, 184:17, 185:13, 185:19, 186:17, 187:4, 191:22, 191:23, 192:17, 192:19, 193:19, 193:21, 194:24, 195:17, 199:8, 203:15, 206:23, 207:1, 208:16, 210:19, 218:11, 222:21, 224:10, 224:13, 225:2, 225:3, 225:9, 226:1, 226:2, 226:20, 229:6, 229:9, 229:12, 230:23, 232:3, 232:8, 233:24, 239:12, 239:15, 239:16, 240:6, 240:8, 241:16, 241:23, 242:3, 242:6, 242:14, 242:24, 243:14, 246:10, 257:13, 259:20, 263:10, 268:21, 271:7, 271:10, 271:19, 271:20, 272:15, 272:22, 272:25, 275:23, 275:24, 276:7, 276:11, 276:16, 277:6, 279:11, 280:2, 280:8, 280:21, 281:1, 281:7, 292:25, 294:23, 300:22, 300:24, 301:9, 303:9, 303:13, 303:14, 304:1, 304:18, 304:20, 311:24, 312:21, 312:25, 313:3, 313:8, 317:24, 319:7, 319:22, 320:1, 321:10, 321:15, 323:5, 324:3, 324:5, 324:9, 324:13, 324:17, 324:21
**rod** - 253:16
**role** - 199:18
**room** - 228:6, 280:24
**root** - 254:4, 278:19
**rooted** - 254:2
**roots** - 237:11, 237:22, 238:7, 244:22, 244:23, 253:24, 308:7
**rose** - 227:7
**Rossford**- 318:16
**rotten** - 239:3
**rough** - 192:5, 227:4, 235:1, 273:8
**roughly** - 176:13, 295:4
**Route**- 219:25

**row** - 227:8, 241:24, 242:7, 242:8, 242:16, 273:12
**rub** - 302:4
**rule** - 198:3
**rules** - 233:16, 321:8
**ruling** - 323:4
**run** - 204:17, 229:25, 272:5, 296:2, 308:6
**running** - 231:21, 318:10
**runs** - 216:23

## S

**safe** - 182:6
**sales** - 246:3, 246:6, 294:18, 294:20
**sanely** - 305:14
**sanitary** - 272:4
**sat** - 282:3
**satisfaction** - 183:8
**saw** - 178:16, 179:18, 180:15, 190:10, 190:13, 205:19, 206:18, 217:1, 221:2, 221:3, 226:25, 228:6, 232:10, 232:16, 245:2, 251:19, 252:22, 259:18, 260:4, 262:6, 262:9, 265:8, 265:13, 269:10, 275:17, 280:2, 284:24, 289:3, 290:15, 300:5, 300:7, 300:8, 305:3, 309:14, 309:23, 310:16, 310:23, 313:22
**scale** - 315:19
**scenario** - 228:13
**scene** - 277:12, 278:8, 278:9
**schedule** - 305:20
**scheduled** - 305:20
**school** - 234:19
**science** - 257:1
**scope** - 323:3
**Scott** - 177:11, 177:12, 177:13
**scratched** - 232:20, 268:19
**screening** - 228:8
**scrub** - 227:6
**seat** - 243:14, 319:4
**second** - 203:1, 241:24, 242:7, 242:8, 263:11, 307:5, 307:8
**secondly** - 192:14
**see** - 176:11, 176:13, 176:16, 178:4, 178:12, 180:10, 180:12, 189:12, 190:1, 191:13, 191:4, 192:24, 193:25, 196:25, 197:10, 197:11, 201:1, 204:10, 208:5, 208:6, 208:7, 208:9, 211:9, 212:9, 212:14, 217:6, 217:10, 219:11, 220:15, 227:15, 227:23, 228:1, 231:22, 232:12, 232:24, 236:16, 237:16, 237:21, 239:15, 239:20, 240:4, 240:5, 240:7, 240:21, 241:25, 242:8, 245:10, 246:5, 252:6, 254:10, 255:13, 255:15, 255:18, 257:25, 258:22, 260:14, 261:5, 261:16, 261:25, 262:20, 262:22, 263:24, 265:19, 265:25, 266:1, 266:7, 266:12, 266:19, 266:23, 267:23, 269:21, 270:4, 274:2, 277:25, 278:7, 278:10, 278:19, 279:22, 289:1, 289:2, 290:13, 298:17, 299:4, 299:20, 301:7, 313:18, 313:21,

314:6, 314:8, 315:11, 316:19, 320:6, 320:14, 322:20
**seeding** - 176:11
**seeing** - 178:14, 212:12, 254:20, 265:14
**seem** - 202:8
**send** - 301:18
**sending** - 321:5, 321:6
**sense** - 254:7, 306:12
**sent** - 184:9, 237:13, 302:4
**series** - 262:23
**services** - 247:22, 248:22
**set** - 258:8, 293:13, 321:4
**seven** - 238:4, 239:6, 241:14, 315:10
**several** - 194:15, 237:20, 262:8, 262:14
**Several** - 271:11
**severed** - 177:21, 188:19
**severing** - 178:24, 195:14
**sewers** - 272:4, 283:16
**shaded** - 241:11
**shall** - 207:11, 207:22
**shape** - 267:24, 273:8
**sheet** - 318:7
**shoots** - 299:4, 299:17, 299:24, 300:1, 308:1
**shoreline** - 283:2
**shortly** - 284:18
**shots** - 181:18
**show** - 185:23, 185:24, 206:21, 213:16, 219:2, 241:23, 245:14, 252:15, 255:16, 255:23, 256:7, 260:11, 270:8, 277:23, 299:7, 299:9, 317:3, 318:9, 321:23
**showed** - 186:1, 215:23, 216:6, 295:17, 316:23
**showing** - 175:9, 193:9, 195:10, 224:15, 242:15, 264:25, 265:24
**shown** - 190:17, 263:3, 274:19
**shows** - 194:15, 216:1, 235:14, 269:22, 278:11, 291:8
**shrub** - 185:17
**shrubbery** - 184:23
**shrubs** - 185:3
**shut** - 280:10
**Sibley** - 177:11, 177:13, 177:14
**side** - 176:16, 249:11, 257:23, 259:15, 260:5, 261:4, 261:13, 261:18, 261:23, 262:2, 263:8, 263:9, 266:13, 270:5, 276:8, 307:12, 307:14, 308:11
**sides** - 238:15, 260:6, 260:7, 276:8, 318:11
**silt** - 197:1, 204:12, 230:15
**similar** - 180:2, 205:18
**simply** - 198:22, 199:20, 223:3, 227:25, 230:18
**sit** - 230:7, 305:22
**site** - 178:13, 179:13, 190:6, 190:24, 199:15, 211:3, 226:24, 229:17, 237:15, 245:3, 267:24, 287:4, 289:11, 296:10, 300:11, 316:21
**sites** - 270:20
**sitting** - 196:4
**situation** - 215:10, 215:24, 279:14, 284:4, 286:12, 309:11
**Six** - 300:13

**six** - 181:24, 181:25, 191:9, 197:22, 197:23, 198:4, 198:11, 230:13, 239:6, 241:13, 241:14, 245:9, 264:18, 264:20, 273:21, 289:13, 290:18, 290:22, 300:2
**six-foot** - 191:9
**size** - 247:16, 299:17
**sizes** - 243:6
**small** - 200:20, 298:15, 299:17, 300:3
**smaller** - 247:16, 247:18
**snow** - 194:7
**soil** - 254:16
**soils** - 250:1
**solely** - 219:21
**solution** - 231:12, 231:13, 231:14
**solutions** - 231:9, 231:13
**solve** - 181:7, 191:25
**someone** - 278:10, 280:23, 311:1
**someplace** - 182:3, 311:19, 318:9
**Sometime** - 313:11
**sometime** - 188:17, 236:3, 236:8, 237:9, 274:9
**sometimes** - 230:4, 230:5, 230:9, 264:8, 264:14
**Somewhat** - 248:16
**somewhat** - 285:17, 294:6
**somewhere** - 190:16, 194:4, 235:3, 239:7, 253:4, 289:10, 312:10, 314:6, 320:3
**son** - 228:4, 228:5, 284:20, 284:24, 285:9, 285:10, 285:13, 294:18
**son's** - 284:5, 284:6, 284:7
**Soncrant** - 175:6, 175:8, 188:15, 191:1, 195:10, 222:2, 224:21, 289:9, 293:23, 318:20, 324:2
**soon** - 228:22
**sorry** - 176:7, 180:22, 183:21, 183:24, 201:15, 214:8, 229:7, 241:19, 272:19, 274:11, 291:23, 307:11
**sort** - 277:3, 278:12, 306:15
**sorts** - 202:6, 272:2
**source** - 179:11
**south** - 239:25, 242:19, 297:11
**southeast** - 236:12, 269:13, 269:14, 269:16, 269:19
**southern** - 240:1, 240:13
**southwest** - 236:12
**Sp-86** - 185:1
**speaking** - 204:20, 216:25, 272:23
**special** - 184:22
**specific** - 196:18, 201:24, 201:25, 215:8
**specifically** - 215:12, 259:12, 272:8
**specified** - 198:12
**speeches** - 272:18
**spelled** - 208:9
**spent** - 234:18, 281:11
**Spielbusch** - 174:21
**Spore** - 174:21, 323:16, 323:17
**spot** - 205:7, 217:4
**spots** - 314:8, 318:5
**spread** - 238:1, 238:2, 238:5, 238:6
**Spring** - 174:19

spring - 194:4, 236:4, 236:7, 236:8
square - 302:25
stage - 295:11
stagnant - 229:21
stake - 292:3, 294:5
staked - 307:5
stakes - 257:22, 257:25, 289:19, 289:20, 289:21, 290:1, 291:9, 291:13, 292:4, 293:4, 293:10, 293:11, 293:13, 301:22, 302:12, 302:18, 306:19, 306:20, 306:22
staking - 234:13, 274:18
stampede - 320:24
stand - 193:6, 210:21, 242:14, 272:21, 273:19
standard - 193:18
standards - 257:9
standing - 197:19, 203:25, 204:2, 204:7, 270:1, 280:23
start - 193:19, 215:18, 295:1, 295:2, 320:5, 320:16, 320:18, 320:23, 320:25
started - 228:12, 248:7, 284:22, 285:4, 285:16, 286:5, 286:21, 287:5, 294:11, 296:12, 296:14, 298:4, 309:6
state - 279:5, 320:10
State - 219:25, 234:18, 234:21
statement - 192:4, 213:11, 222:4, 223:5, 223:25, 231:8
States - 174:1, 174:11
station - 191:12, 191:25, 192:12, 192:20, 192:25, 231:9, 253:15, 283:21, 290:3, 291:14
stationing - 291:25
stations - 289:24, 290:7
status - 276:13
Stawinski - 321:11, 321:16
Stay - 322:2
stay - 186:6, 259:15, 322:8
steel - 321:11, 321:18
stenography - 174:25
step - 186:21, 233:9, 280:18
stick - 236:21
sticking - 299:5
still - 176:20, 184:3, 201:24, 212:9, 220:13, 223:6, 225:6, 227:13, 230:15, 232:10, 232:12, 240:20, 258:5, 258:14, 268:3, 274:4, 282:23, 294:9, 298:6, 298:25, 303:8, 306:11, 307:14, 309:11, 311:17, 315:4, 315:5, 315:14, 319:14, 322:20
stop - 287:10, 297:22
stopped - 297:19
storm - 219:20, 219:23, 219:24, 229:23, 272:3, 297:2
straight - 273:12, 273:15
strike - 257:16, 276:5, 294:19
string - 273:16
stripped - 207:15
struck - 280:5
structure - 204:14, 244:3, 278:19
structures - 226:4, 254:4
struggle - 322:20
studied - 278:17
studies - 196:20
study - 196:18, 225:20, 226:3, 229:4, 229:6, 229:7,

229:11, 229:13, 318:6
studying - 199:4
stuff - 232:25, 258:14, 263:9, 266:5, 290:24, 299:15, 305:3, 305:15, 315:3
stump - 243:1, 243:3, 243:5, 299:22
stumps - 237:25, 238:2, 241:6, 241:7, 245:6, 274:1, 274:3, 276:14, 289:5, 290:16, 307:25, 308:7
sub - 275:5
subcontractor - 288:10, 322:11
subdivided - 235:13
subdivision - 175:10, 176:1, 176:6, 176:7, 176:8, 178:4, 179:24, 180:8, 181:4, 181:15, 186:13, 187:22, 188:24, 193:8, 194:10, 194:13, 194:21, 204:17, 204:21, 218:7, 218:10, 218:23, 219:8, 219:20, 219:21, 219:23, 219:24, 220:6, 223:24, 224:18, 231:17, 234:13, 235:5, 236:9, 235:17, 236:1, 236:4, 236:13, 237:1, 238:14, 238:17, 238:19, 239:4, 239:25, 240:1, 240:11, 240:13, 241:10, 241:18, 242:20, 243:11, 243:19, 246:1, 246:9, 252:4, 252:20, 255:9, 259:13, 269:13, 271:23, 271:24, 272:1, 274:13, 275:5, 275:7, 286:19, 290:12, 290:14, 301:2, 307:20, 310:19, 312:15, 315:17, 322:1
subdivision's - 220:5
subdivisions - 234:14
subjects - 220:9, 222:19
submitted - 271:13
Subparagraph - 185:13
subsequent - 223:14
subsequently - 190:3
subspecialty - 196:12
substantial - 197:6, 197:8, 205:11
substantiate - 215:7
suggest - 250:16
suggested - 249:10, 275:9, 279:10
suggesting - 250:18, 250:20, 250:22, 276:3
suggestions - 181:7
suit - 232:22, 268:25
Suite - 174:14, 174:18
summarize - 214:24
summer - 176:3, 229:20
summertime - 194:3
superimposed - 245:13, 292:9, 293:17
supervise - 247:10, 322:10
supposed - 209:3, 244:7, 296:6
supposedly - 232:9
surface - 299:6
surprised - 204:2, 204:6
survey - 234:12, 235:11, 235:12, 235:14, 238:9, 239:13, 244:21, 247:10, 253:14, 256:20, 257:6, 257:19, 257:21, 257:22, 257:25, 259:1, 264:15, 265:25, 269:12, 271:25, 273:2, 274:1, 275:11, 275:18, 301:19, 303:18, 303:21, 305:10, 305:12,

305:13, 305:18, 306:18, 306:25, 307:24, 307:25
surveying - 243:25, 244:20, 256:25, 274:7, 274:12, 288:14, 293:9, 302:25
surveyor - 234:5, 234:24, 235:8, 263:15, 274:12, 274:14, 276:1, 290:11, 291:16, 301:20, 304:11
surveyors - 256:22, 275:9, 282:14, 283:6, 294:2, 299:9, 299:10, 301:20, 301:23
surveys - 234:12, 235:2, 298:8, 305:1
suspicious - 288:12
sustain - 275:22, 288:6, 294:22
Sustained - 191:21, 230:22, 272:20, 292:24, 301:4, 319:21
Swan - 282:12
swing - 186:25
sworn - 186:23, 233:18, 233:21, 280:25, 281:3
symbol - 243:3
system - 205:15, 209:18, 219:23, 219:25, 231:18, 292:1

## T

table - 196:5
tandem - 253:4
tangled - 314:10
tapped - 297:3
Taylor- 308:5
technician - 176:25
technique - 253:12, 263:7
telephone - 272:2
ten - 186:6, 197:19, 197:23, 233:15, 245:8, 258:13, 271:14
term - 200:13
terminal - 189:3, 189:14
terminology - 214:23
terrain - 273:5, 273:6
test - 225:4, 225:10, 225:18, 225:21, 229:4, 229:8, 229:9, 233:5
testified - 268:18, 300:4, 321:19, 322:6, 322:12
testify - 220:21, 227:12
testimony - 193:17, 194:17, 196:23, 221:20, 228:15, 268:22, 268:24, 306:17, 322:21, 323:4
theirs - 306:21
themselves - 238:2, 302:10
theories - 257:3
thereafter - 284:19
therefore - 179:9, 211:8
thick - 180:10, 237:25
thickness - 198:6
thinking - 245:5, 310:12
thirds - 315:12
thorny - 227:7
Thousands - 243:12, 243:13
thousands - 243:15, 243:16, 244:24, 267:8, 273:1, 275:17, 300:5, 300:8
three - 187:11, 193:18, 238:22, 239:1, 264:16, 267:14, 296:19, 313:22
Three- 244:6
throughout - 234:15, 301:21
Throughout- 234:16

thumb - 198:3
thumbs - 299:18
tie - 231:17
tied - 291:14, 302:15, 307:2, 311:20
ties - 290:19
tile - 188:2, 188:18, 230:13, 230:14, 296:16, 297:6
tiles - 230:10
timeframe - 201:16
timeframes - 201:18
timetable - 320:17
timing - 310:18, 312:13
timing-wise - 310:18
today - 178:16, 186:11, 192:7, 228:13, 230:20, 246:23, 253:15, 281:2, 297:6, 297:7, 297:8, 297:9, 315:22
together - 198:8, 203:23, 203:24
toilet - 247:25
Toledo - 174:5, 174:7, 174:22, 184:20, 188:1, 188:10, 189:3, 189:14, 189:15, 190:5, 190:6, 190:21, 191:6, 192:11, 192:16, 193:4, 209:24, 250:18, 252:5, 276:2, 281:13, 281:20, 282:1, 282:11, 287:24, 287:25, 288:2, 288:4, 288:11, 298:5, 301:14, 302:21, 304:2, 307:20, 316:2, 316:24, 317:7, 318:19, 321:24, 322:4, 322:10, 322:17
tomorrow - 320:5, 320:9, 320:25, 321:9
tonight - 320:8
tons - 262:24, 267:8, 279:6
took - 179:1, 179:14, 179:25, 181:15, 181:17, 190:23, 207:1, 214:18, 218:25, 227:12, 248:4, 266:25, 269:9, 291:2, 291:4, 314:5, 314:16
tool - 318:7
top - 192:2, 198:4, 198:10, 198:17, 198:18, 200:19, 231:10, 277:2, 295:3, 306:15, 309:1, 310:3, 311:11, 313:12, 313:13, 314:17
topo - 318:1
topographic - 215:25, 216:1, 235:11, 235:14
topography - 318:2
topos - 217:2
tore - 268:19
total - 253:14
totally - 201:17, 220:9
touch - 267:4, 289:10, 289:11
Towards - 217:6, 318:12
towards - 199:25, 216:23, 217:3, 221:16, 223:23, 243:11, 249:12, 256:8, 286:6, 317:25, 318:13
Township - 234:4
track - 224:18, 240:2, 287:3
tracks - 188:3, 212:9, 216:22, 221:16
Tracy- 174:21, 323:16, 323:17
train - 212:9, 212:12, 212:14, 232:12, 232:13
trains - 179:15
Transcript- 174:10

**transcript** - 174:25, 201:5, 213:17, 213:18, 246:22, 260:13, 323:12
**transient** - 205:21
**transit** - 253:14
**transpired** - 301:17, 304:22
**treated** - 294:3
**tree** - 185:17, 238:2, 241:6, 243:3, 245:4, 251:7, 251:8, 266:3, 274:1, 274:3, 276:14, 284:4, 284:24, 285:15, 286:14, 292:20, 308:7, 309:24
**treeing** - 286:6
**trees** - 180:7, 181:9, 184:23, 185:3, 185:13, 185:14, 185:23, 226:12, 227:4, 227:5, 227:6, 227:15, 227:16, 227:17, 237:11, 237:20, 238:6, 243:1, 244:22, 245:6, 251:15, 251:17, 251:19, 258:5, 258:23, 261:3, 261:12, 261:17, 272:11, 285:5, 285:19, 286:24, 289:4, 289:7, 290:8, 290:20, 295:2, 295:11, 297:21, 298:5, 299:8, 299:14, 305:4, 308:13, 321:19
**trench** - 298:24
**trenches** - 254:11, 254:14
**trespass** - 244:16, 298:18, 323:1
**trespassing** - 287:19, 290:9
**Trespassing** - 287:22
**trial** - 272:15, 322:22
**Trial-** 174:6, 174:10
**trick** - 196:8
**tried** - 300:6, 305:20, 315:23
**Tried-** 231:16
**trip** - 237:13, 238:9
**trouble** - 305:16
**truck** - 295:13
**truckloads** - 253:4, 253:5
**trucks** - 296:3
**true** - 250:9, 265:16, 272:9
**trunks** - 299:5
**trusted** - 293:20
**truth** - 258:4
**Try-** 210:21, 214:16
**try** - 215:15, 222:14, 225:8, 226:4, 252:10, 272:15, 313:3
**trying** - 214:22, 215:2, 215:16, 215:17, 249:4, 252:16, 259:12, 264:4, 264:12, 270:10, 276:21, 276:22, 277:5, 278:24, 280:3, 286:6, 286:7, 298:4, 299:24, 301:25, 302:1
**tube** - 287:13
**tuned** - 318:25
**twice** - 267:14
**twisted** - 294:6
**Two-** 192:13, 202:22
**two** - 184:12, 189:22, 191:17, 203:19, 205:22, 215:2, 222:6, 225:23, 227:2, 237:7, 289:24, 300:2, 305:2, 305:4, 305:24, 306:25, 311:7, 313:22, 315:12, 320:10
**two-part** - 203:19
**type** - 180:7, 234:22, 245:2, 281:21, 282:16, 283:10, 305:5, 314:13, 317:15, 317:17, 321:25
**typical** - 227:8, 243:4

**typically** - 200:5, 220:24, 225:20, 282:16, 283:1, 283:15, 283:20

**U**

**unable** - 242:8
**unclear** - 304:9
**uncooperative** - 301:13
**under** - 189:13, 214:21, 219:6, 247:8, 284:2, 296:19, 299:6, 322:12
**underdrain** - 310:12
**underground** - 272:10, 299:23
**underneath** - 189:2, 224:18, 230:19, 316:16
**undisturbed** - 254:15, 266:19, 266:24
**unfair** - 218:12
**United** - 174:1, 174:11
**University** - 234:18
**Unless** - 294:21, 306:11
**unless** - 195:2, 264:18
**up** - 176:11, 182:18, 183:25, 189:25, 190:19, 191:16, 193:6, 195:5, 197:1, 201:25, 203:4, 203:8, 203:17, 207:20, 215:4, 226:12, 228:9, 231:23, 232:20, 236:12, 236:14, 237:7, 241:13, 252:20, 254:12, 263:16, 267:6, 268:19, 270:1, 278:8, 278:9, 278:11, 278:21, 280:4, 284:4, 284:9, 284:10, 284:15, 285:19, 288:16, 290:5, 297:20, 297:21, 298:13, 298:15, 299:5, 299:12, 299:14, 299:16, 299:18, 299:19, 299:25, 300:8, 301:7, 301:18, 302:25, 306:23, 309:5, 309:13, 310:1, 313:13, 314:10, 319:11, 320:19, 322:9
**upset** - 198:13
**utilities** - 207:12, 207:19, 207:23, 271:13, 272:2, 272:5, 272:8
**utility** - 272:11

**V**

**vague** - 229:18
**value** - 198:7, 311:8
**values** - 209:22
**variables** - 230:12
**various** - 217:2, 259:5
**Vc-** 314:13
**vegetation** - 188:25, 199:16, 211:14, 211:17, 227:4, 227:8, 228:8, 249:23, 250:10, 250:19, 250:24
**vehicle** - 179:15
**verify** - 298:5
**Vermillion** - 185:7, 258:6, 258:9, 258:11, 322:12
**version** - 260:12
**video** - 320:12
**view** - 183:2, 216:2, 252:3, 296:16
**visible** - 236:16, 269:4
**vision** - 271:16
**visit** - 199:14, 212:17, 227:20, 233:11, 267:18
**visited** - 237:14
**visiting** - 176:6
**visually** - 236:24
**vitrified** - 314:13

**Volume** - 174:9

**W**

**wait** - 229:21
**waiting** - 218:15
**walk** - 321:4, 321:7
**walked** - 228:8, 228:9, 232:15, 232:19, 268:18, 268:24
**walking** - 188:25, 268:20, 309:23
**wall** - 198:6
**wants** - 318:22
**warm** - 229:20
**water** - 176:16, 176:18, 177:2, 177:7, 178:12, 178:14, 181:13, 189:24, 191:10, 193:25, 196:16, 197:7, 197:9, 197:25, 198:17, 198:23, 199:7, 199:24, 200:6, 200:23, 201:6, 201:8, 201:22, 202:2, 202:10, 203:25, 204:2, 204:7, 204:14, 204:18, 205:22, 206:1, 213:9, 213:25, 214:18, 214:25, 215:20, 216:8, 216:10, 217:1, 217:21, 217:23, 219:21, 219:22, 219:24, 221:5, 221:22, 222:10, 222:12, 223:23, 224:1, 224:17, 225:5, 225:11, 225:12, 229:19, 229:20, 229:22, 230:7, 230:15, 231:10, 233:3, 233:5, 247:14, 248:11, 248:12, 249:11, 249:16, 259:2, 259:12, 259:14, 265:16, 272:4, 285:8, 296:19, 297:12, 308:24, 309:12, 310:20, 312:14, 313:11, 313:15, 315:25, 316:16, 317:25, 318:6, 319:15
**Water-** 220:2
**water's** - 176:20, 217:3, 223:4
**waterline** - 189:4, 189:15, 189:17, 190:14, 202:4, 202:5, 231:10
**waterlines** - 198:3, 274:21, 283:17
**waters** - 204:4, 281:24
**Watkins** - 174:18, 322:4
**ways** - 225:10, 256:20, 264:10, 289:23
**weaving** - 273:18
**Weaving** - 273:24
**weeds** - 251:12
**week** - 184:12, 295:25
**weekly** - 282:5
**weeks** - 320:10
**Western** - 174:2
**wetlands** - 282:1
**whatnot** - 316:20
**wherewithal** - 279:4
**whole** - 205:8, 214:9, 215:20, 228:12, 262:23, 289:4, 310:9, 310:13, 311:10, 316:15, 318:11
**wide** - 181:24, 181:25, 240:25, 241:1
**width** - 208:9
**wife** - 285:12
**wild** - 227:7
**wildflower** - 227:7
**willing** - 255:10
**window** - 228:6
**windshield** - 179:19

**wiring** - 272:10
**wise** - 310:18
**Witness** - 199:13, 215:17, 216:14, 218:18, 221:10, 221:12, 228:20, 228:24, 240:7, 281:4, 304:17, 306:3
**witness** - 186:22, 186:23, 199:11, 208:10, 214:10, 225:7, 231:5, 233:18, 233:20, 242:3, 280:20, 280:25
**witnesses** - 227:11, 258:3, 269:9
**woman** - 196:4, 196:9
**wonder** - 176:20, 190:13, 190:18
**wondering** - 196:9
**Wood** - 187:7, 187:9, 187:12, 196:1, 196:7, 199:14, 199:21, 211:10, 222:8, 222:9, 222:17, 222:18, 249:22, 274:24, 317:16
**Woodlands** - 174:15
**word** - 199:5, 199:9, 209:11, 213:24, 217:8, 219:18, 222:21, 227:14, 263:20, 264:4
**words** - 219:22, 224:1, 257:2
**workmen** - 302:10
**works** - 186:24, 223:2, 251:2, 283:1, 283:2
**world** - 243:25, 288:19
**worse** - 222:11, 223:3, 311:12
**worst** - 290:15, 290:18, 290:22, 298:17
**Wow-** 264:17
**wrote** - 183:17

**Y**

**yard** - 296:7
**yards** - 295:10
**year** - 224:6, 234:18, 239:2, 247:3, 286:3, 320:11
**years** - 187:11, 202:22, 215:2, 227:2, 230:8, 230:12, 244:7, 247:17, 281:11, 282:6, 289:13, 311:7
**young** - 190:24, 292:12
**yourself** - 187:5, 233:25, 281:8, 281:9

**Z**

**Zouhary** - 174:10