```
1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
2                          WESTERN DIVISION


3


4    OLD GRANITE DEVELOPMENT, LTD.,    -  Case No. 3:06-CV-2950
                                       -
5        Plaintiffs,                   -  Toledo, Ohio
                                       -  May 22, 2008
6            v.                        -  TRIAL
                                       -
7    CITY OF TOLEDO,                   -
                                       -
8        Defendants.                   -
     -------------------------------
9
                            VOLUME 4
10                     TRANSCRIPT OF TRIAL
               BEFORE THE HONORABLE JACK ZOUHARY
11        UNITED STATES DISTRICT JUDGE, AND A JURY

12   APPEARANCES:

13   For the Plaintiffs:   Barkan & Robon
                           By:  Marvin A. Robon
14                              R. Ethan Davis
                           Suite 100
15                         1701 Woodlands Drive
                           Maumee, OH 43537
16                         (419) 897-6500

17   For the Defendants:   Bahret & Associates
                           By:  Robert J. Bahret
18                              Keith J. Watkins
                           Suite 709
19                         7050 Spring Meadows, W
                           Holland, OH 43528-1844
20                         (419) 861-7800

21   Court Reporter:       Tracy L. Spore, RMR, CRR
                           1716 Spielbusch Avenue
22                         Toledo, Ohio 43624
                           (419) 243-3607
23


24


25   Proceedings recorded by mechanical stenography,
     transcript produced by notereading.
```

08:24:55  1            (Reconvened at 8:24 a.m.)

08:24:55  2            MR. DAVIS: Plaintiff moves for admission of

08:24:57  3  Exhibits 13, 14, 15 -- without objection we move for

08:25:27  4  admission of Plaintiff's 13, 14, 15, 16, 17, 20, 30, 43,

08:25:39  5  1, 6, 4, 9, 19, 20, I think I already said, 41, 83, 84,

08:26:08  6  7, 45, 37, 18, 19, 97, 41, 8, 56, 95, 55, 58, 59.  And

08:27:14  7  those are all the ones we agreed on, Bob, with the

08:27:17  8  exception of what was discussed last night with

08:27:21  9  Laskey's.  I don't think we talked about that.

08:27:23  10            THE COURT:  Without objection from defense

08:27:25  11  counsel, those exhibits will be admitted.

08:27:30  12            MR. DAVIS: The ones that defense counsel

08:27:32  13  objects to are 91.

08:27:46  14            THE COURT:  Basis for the objection?

08:27:48  15            MR. BAHRET:  The only witness that I know of

08:27:50  16  that was asked about that said he could not identify it.

08:27:56  17            MR. DAVIS: I believe there were several

08:27:57  18  witnesses that identified that, weren't there?

08:27:59  19            THE COURT:  Well, we have a disagreement.

08:28:02  20  I'll have to look at my notes and see who talked about

08:28:05  21  91.  We'll reserve ruling on that.

08:28:08  22            MR. DAVIS: 5, which is the board showing

08:28:16  23  the -- this board.

08:28:20  24            THE COURT:  Are you offering 4 and 5?

08:28:24  25            MR. DAVIS: 4 came in without objection.

08:28:27  1          MR. BAHRET:  The objection is the flow.

08:28:29  2  This never happened.

08:28:30  3          THE COURT:  I do recall the testimony this

08:28:31  4  was inaccurate in that respect.  I will sustain the

08:28:34  5  objection to Exhibit Number 5.

08:28:44  6          MR. DAVIS: Objection to Plaintiff's 92.   I

08:28:49  7  believe your objection there, Bob, is because of the red

08:28:51  8  line.

08:28:52  9          MR. BAHRET:  Yes.  McCarthy put this on

08:28:54  10  there.   That's not from a surveyor or anything.

08:28:57  11  There's no showing from any surveyor that he put it in

08:29:00  12  the right place.

08:29:09  13          THE COURT:  I will look at my notes on 92

08:29:11  14  and reserve ruling on that as well.

08:29:24  15          MR. BAHRET:  Can I just show you in no

08:29:26  16  particular order --

08:29:28  17          Plaintiff's Exhibit 43 that we just talked

08:29:33  18  about -- that was 91.   I don't recall anybody saying 43

08:29:41  19  had anything relevant either.

08:29:44  20          THE COURT:  He read that in as admitted

08:29:47  21  without objection.

08:29:49  22          MR. BAHRET:  I think that was a mistake

08:29:51  23  because the pile over here was the ones that we were

08:29:53  24  opposing.

08:29:56  25          MR. DAVIS: I had 43 without a problem.

08:29:59  1          THE COURT:  So you are having a problem with

08:30:01  2   43?

08:30:06  3          MR. DAVIS:  That was identified by Kevin

08:30:09  4   Stawinski.

08:30:11  5          MR. BAHRET:  Did he say it looked like the

08:30:13  6   area in question?  I don't recall anybody saying it had

08:30:16  7   any relevance.

08:30:17  8          THE COURT:  What does it depict?  It is

08:30:19  9   along the railroad tracks or at the end of the cul de

08:30:22  10  sac?

08:30:22  11         MR. BAHRET:  It's definitely not along the

08:30:25  12  railroad tracks; that much I know.

08:30:26  13         THE COURT:  Unless you can identify a

08:30:29  14  witness who identified it for the record and that's

08:30:33  15  relevant to the lawsuit, I'll sustain the objection and

08:30:37  16  deny admission of Exhibit 43.

08:30:42  17         MR. BAHRET:  97.   They handwrote 97A on

08:30:47  18  here, which is a page out of the contract.  They

08:30:49  19  already got the contract in.

08:30:51  20         THE COURT:  I will deny the admission of

08:30:54  21  Exhibit 97A.  The document's in evidence.  A blowup is

08:30:58  22  okay for demonstrative purposes, but not for admission

08:31:01  23  in the jury room.

08:31:02  24         MR. BAHRET:  114 is the report from their

08:31:05  25  appraiser.  He's testified.  I think typically reports

08:31:08  1   don't go in plus testimony; it's just the testimony.

08:31:11  2              THE COURT:  Typically that's true.

08:31:13  3              MR. ROBON:  The only reason I would want

08:31:15  4   this one to go in is in the beginning, Judge, instead of

08:31:19  5   coming up with just a typical value, he specifically

08:31:23  6   listed certain lots.

08:31:24  7              THE COURT:  He testified to that.

08:31:25  8              MR. ROBON:  But I don't know which lots were

08:31:29  9   which and prices which were --

08:31:30  10             THE COURT:  I think he did.  I recall that

08:31:32  11  you summarized with him that testimony.

08:31:37  12             MR. DAVIS: Well, we would also argue the

08:31:39  13  comparables that he said were in his report are brought

08:31:44  14  into detail.

08:31:46  15             THE COURT:  I understand.  He did testify

08:31:48  16  about that.  And reports don't go in unless there's

08:31:53  17  some good reason or unless there's a section of it that

08:31:57  18  you agree.

08:31:57  19             MR. ROBON:  I assume they'll keep Mr.

08:32:01  20  Domini's out.

08:32:01  21             MR. BAHRET:  I never intended to offer his.

08:32:03  22             THE COURT:  114 is denied.

08:32:07  23             MR. BAHRET:  116, frankly that wasn't on

08:32:11  24  their exhibit list to begin with, but secondly, it shows

08:32:15  25  a sale that doesn't even involve Old Granite.  Bill

08:32:19  1   Shown bought the lot in 2002, built a house on it, and

08:32:24  2   sold the house in 2005, which has nothing to do with

08:32:28  3   this case.

08:32:29  4            THE COURT:  We had testimony about this.

08:32:31  5   And I will sustain the objection and deny admission of

08:32:36  6   116.

08:32:38  7            MR. BAHRET:  Then I'm not sure which ones of

08:32:40  8   these they're offering.  I just grabbed from the pile

08:32:43  9   Plaintiff's 61, Plaintiff's 60, Plaintiff's -- I think

08:32:50  10  that says 104 and 105, all of which are e-mails in the

08:32:55  11  negotiation process of trying to deal with these

08:32:57  12  problems.

08:33:00  13            THE COURT:  Do you want to offer these?

08:33:01  14            MR. ROBON:  I want to offer those, Judge.

08:33:03  15  If there's any settlement things that Mr. Bahret is

08:33:07  16  worried about, I think we can just redact them.  But

08:33:10  17  notice that was given to the City of Toledo by Mr.

08:33:14  18  McCarthy --

08:33:15  19            MR. BAHRET:  These have already been

08:33:17  20  identified that he was all over it.  There's no purpose

08:33:20  21  of those other than his demands and the City's

08:33:24  22  responses, which has nothing to do with proving your

08:33:26  23  damages or enhancing your claim.

08:33:28  24            THE COURT:  I tend to agree with defense

08:33:30  25  counsel.  Unless you can --

08:33:32   1            MR. ROBON:  Well, it also shows that these

08:33:33   2  e-mails were forwarded to her supervisors.

08:33:36   3            MR. BAHRET:  What's the relevance of that?

08:33:38   4            MR. ROBON:  The City administration became

08:33:41   5  aware of all the problems.

08:33:42   6            THE COURT:  I don't think that's an issue,

08:33:45   7  that the City was aware of these problems.  Whether it

08:33:48   8  was Christy, her supervisor or boss, notice was

08:33:51   9  presented.  You've got testimony to that. I'm going to

08:33:54  10  sustain the objection to these four exhibits and deny

08:33:59  11  60, 61, 104, 105.

08:34:05  12            MR. DAVIS:  There are several others we

08:34:06  13  didn't have a chance to talk about because we discussed

08:34:09  14  these at lunch time.

08:34:11  15            THE COURT:  "We" being you two?  We'll let

08:34:14  16  you do that during lunchtime or a break.  We'll do that

08:34:18  17  after you've had a chance to talk so we don't take the

08:34:20  18  jury's time.

08:34:21  19            And I have two that I have to rule on that I

08:34:24  20  will take a look at my notes.

08:34:31  21            MR. BAHRET:  On the video, DVD, did you

08:34:35  22  bring a copy for me, Marv?  Marv, did you bring a copy

08:34:39  23  of this for me?

08:34:47  24            I'll just hand the DVD we played yesterday,

08:34:51  25  a portion of it, we played it from station 175 to 189.

08:34:58  1          THE COURT:  Have you marked it as an

08:34:59  2   exhibit?

08:35:01  3          MR. BAHRET:  We'll have to do that.

08:35:03  4          THE COURT:  When you do that, let's do it

08:35:05  5   all at once so we have it accurately for the record.

08:35:11  6              If there's nothing further, we'll bring

08:35:14  7   the jury in.   Before we start, are we going out of turn

08:35:21  8   back again?

08:35:24  9          MR. ROBON:  Yes.

08:35:25  10          THE COURT:  There is a motion in limine that

08:35:26  11   was filed yesterday.   I don't know if plaintiff is

08:35:30  12   intent on pursuing it.   It was document Number 216, a

08:35:45  13   motion in limine opposing the testimony of Todd Jenkins.

08:35:49  14   I know counsel had some discussion.  Is it still your

08:35:53  15   intent to pursue that motion?

08:35:55  16          MR. ROBON:  I didn't realize he was going to

08:35:57  17   testify.  We took his deposition, and he really didn't

08:36:00  18   know anything.

08:36:00  19          MR. BAHRET:  That is simply not true.

08:36:02  20          THE COURT:  Just a moment.   Relevancy is

08:36:05  21   another issue we can address when he takes the witness

08:36:07  22   stand.   The purpose of this motion was indicating that

08:36:10  23   he was not disclosed.   I know counsel had a

08:36:12  24   conversation about disclosure.   You're now indicating

08:36:15  25   you did depose him, and for some reason I know on the

08:36:18  1    first date of the trial his name was added to the

08:36:21  2    witness list that we showed the jury during voir dire

08:36:25  3    and that I provided to my court staff.   So when you all

08:36:30  4    learned of it, I can't say, but if you're indicating he

08:36:33  5    was deposed, it sounds like there's no surprise there.

08:36:36  6    I'll deny the motion in limine.   Obviously plaintiff

08:36:38  7    can reserve the right to object to the relevancy of his

08:36:41  8    testimony.   We'll address that later.

08:36:43  9              Mr. McCarthy, are you going to be the first

08:36:45  10   witness?   I'm going to have you come up, and our

08:36:52  11   courtroom deputy will swear you in.

08:37:30  12              (The witness was sworn by the clerk.)

08:40:54  13              (The jury enters the courtroom.)

08:40:54  14              THE COURT:   Good morning, ladies and

08:40:56  15   gentlemen.   We are back on the record.   And you may

08:41:02  16   recall yesterday we had a witness taken out of turn.

08:41:05  17   We're back with the plaintiff again for a witness.   This

08:41:07  18   is a plaintiff's witness offered on behalf of their

08:41:11  19   case.   He has been sworn before taking the stand.   And

08:41:14  20   we're ready to go.

08:41:15  21              MR. ROBON:   Thank you.

08:41:16  22                          - - -

08:41:16  23          MICHAEL McCARTHY, DIRECT EXAMINATION

08:41:16  24   BY MR. ROBON:

08:41:16  25     Q.  Would you introduce yourself to the jury.   Tell

08:41:19  1   the jury who you are, your background, where you grew

08:41:21  2   up, your education, and where you live?

08:41:23  3       A.   Michael McCarthy.   I live at 30332 Jacqueline

08:41:28  4   Place in Perrysburg, Ohio.

08:41:30  5       Q.   That's in Cambridge?

08:41:31  6       A.   The Cambridge Subdivision.   Grew up in

08:41:34  7   Perrysburg, went to high school there, went to college

08:41:38  8   at the University of Toledo.   Currently in real estate,

08:41:41  9   commercial real estate for the last nine years.

08:41:44  10      Q.   And you know Mr. Laskey?

08:41:47  11      A.   Yes.

08:41:48  12      Q.   And you moved into that spec house that he had on

08:41:50  13  lot 15?

08:41:51  14      A.   Yes, in February '06.

08:41:53  15      Q.   And you're still living there?

08:41:55  16      A.   Yes.

08:41:55  17      Q.   Are you delinquent on the rent?

08:41:57  18      A.   Yes.

08:41:59  19      Q.   Tell the jury one of your purposes of originally

08:42:02  20  living there.

08:42:03  21      A.   In part to help market the house, furnish it.

08:42:10  22  Homes show better when they have furniture in it.   We've

08:42:14  23  got some nice stuff.

08:42:15  24      Q.   And was it your -- tell the jury whether or not

08:42:19  25  there was an intention on your part perhaps to buy the

08:42:22  1   house if it didn't sell.

08:42:24  2       A.   Yeah, I had an interest in buying the house if it

08:42:27  3   had not sold.

08:42:28  4       Q.   And Mr. Laskey testified that he had $539,000

08:42:33  5   into the house with the lot.   Does that sound right?

08:42:36  6       A.   That sounds right.

08:42:39  7       Q.   Tell the jury in April of '06 what happened that

08:42:46  8   really affects the house?

08:42:49  9       A.   Well, obviously the tree clearing, just the

08:42:51  10  general condition around the house, and the neighborhood

08:42:56  11  is not conducive to really being --

08:43:01  12      Q.   You have how many children?

08:43:03  13      A.   We have three.

08:43:06  14      Q.   If you were to buy the house today, what would

08:43:09  15  you pay for that house?

08:43:12  16      A.   $275,000, about $275,000.

08:43:16  17      Q.   And you know it's in foreclosure?

08:43:18  18      A.   Yes.

08:43:19  19      Q.   Now, you took a couple of videos and some

08:43:23  20  photographs of some flooding, correct?

08:43:28  21      A.   Yes.

08:43:28  22           (Videotape is shown in open court.)

08:43:28  23      Q.   I would like you to look on the screen and tell

08:43:31  24  the jury -- it's not a professional, needless to say,

08:43:38  25  but tell the jury what you're looking at.   You took the

08:43:41  1    videos, right?

08:43:42  2        A.   Yes.

08:43:43  3        Q.   And tell the jury which way the water is flowing?

08:43:47  4        A.   The water would be flowing from the left of the

08:43:51  5    screen to an area just right of those utility boxes.

08:43:57  6        Q.   So is it coming from another -- it's not coming

08:44:01  7    from the subdivision lots; it's coming from lot 16 and

08:44:05  8    coming from the railroad?

08:44:06  9        A.   It's coming from --

08:44:07  10            MR. BAHRET:  Objection.

08:44:09  11       A.   It's coming from the left neighboring property

08:44:12  12   along the railroad line there.   The lots come to a

08:44:15  13   point there.

08:44:19  14            THE COURT:  Objection was overruled.

08:44:27  15       Q.   Now, where is this photograph?  That's the

08:44:33  16   adjoining property?

08:44:39  17       A.   Yes.

08:44:41  18       Q.   Where is your backyard?  Tell us when your

08:44:44  19   backyard starts.

08:44:51  20       A.   It's coming into view.

08:44:55  21            MR. ROBON:  Can you freeze right there?

08:44:55  22            (The video is paused.)

08:45:01  23            THE VIDEOGRAPHER:  The resolution goes down.

08:45:03  24   BY MR. ROBON:

08:45:03  25       Q.   My question is, when the jury -- when it turns

08:45:07   1   back on, you're standing near the railroad towards your

08:45:10   2   house?

08:45:11   3       A.   Right.

08:45:11   4       Q.   And the water's coming -- you're standing on the

08:45:14   5   railroad?

08:45:15   6               MR. BAHRET:   Objection.

08:45:16   7               THE COURT:   We need to have the witness

08:45:17   8   testify.

08:45:19   9               MR. ROBON:   I want to know which way the

08:45:20  10   water is coming.

08:45:23  11       A.   It's coming from the right to left as I'm looking

08:45:25  12   towards the house.

08:45:26  13       Q.   And you're standing on the railroad?

08:45:32  14       A.   Right.

08:45:51  15       Q.   Tell us when your yard shows up.

08:45:56  16           (Video continues.)

08:46:10  17       A.   It's coming into view.

08:46:12  18       Q.   Is that in the upper --

08:46:14  19       A.   Upper left.

08:46:16  20       Q.   And where is this water going?

08:46:21  21       A.   It's going into the manhole or drainage for the

08:46:25  22   subdivision, just to the left of the utility boxes.

08:46:39  23       Q.   That's the first one.   Show this second one,

08:46:44  24   please.

08:46:44  25               THE COURT:   Did we identify when that video

08:46:46   1   was taken?

08:46:47   2   BY MR. ROBON:

08:46:47   3       Q.   Do you recall the month or even the year?

08:46:56   4       A.   Well, it would be in late '06.

08:47:02   5       Q.   What about the second video?

08:47:08   6       A.   Actually, this would be in February.

08:47:11   7       Q.   Of?

08:47:12   8       A.   Of '07 -- excuse me, of '08.

08:47:15   9       Q.   This year?

08:47:16  10       A.   Yeah.

08:47:36  11       Q.   And the water is running where, here?

08:47:38  12       A.   It's running to the right, or towards the back of

08:47:42  13   my yard.

08:47:43  14       Q.   You have a good close-up there?

08:47:53  15       A.   That's the neighboring lot on the neighboring

08:47:55  16   property where the water is coming from.

08:48:10  17               MR. ROBON:  That's it.

08:48:11  18               (Videotape is off.)

08:48:37  19               MR. ROBON:  This is our paralegal's husband,

08:48:40  20   Judge, who's volunteered to do this for us.

08:48:43  21               THE COURT:  Thank you.

08:48:45  22               THE VIDEOGRAPHER:  My pleasure.

08:48:53  23               MR. ROBON:  What should I do, Judge, as far

08:48:55  24   as offering the video into evidence?

08:48:58  25               THE COURT:  We'll do that later.

08:49:02   1            (Discussion had off the record.)

08:49:12   2   BY MR. ROBON:

08:49:13   3       Q.  Mr. McCarthy, why did you take the videos?

08:49:18   4       A.  It seemed alarming that that was happening.

08:49:21   5       Q.  Would you tell the jury how often since February

08:49:25   6   of '06 when you moved in that the water has been in the

08:49:28   7   backyard doing that?

08:49:30   8       A.  It isn't uncommon.   A good rain will create that

08:49:34   9   situation.

08:49:35   10      Q.  And how long does it take for your yard to dry

08:49:39   11  out in the summertime, or does it ever dry out?

08:49:45   12      A.  No, it does dry out when it's dry.   But there's

08:49:51   13  an area of standing water that's there pretty much all

08:49:55   14  the time.

08:50:04   15          MR. ROBON:  No further questions, Your

08:50:06   16  Honor.

08:50:06   17          THE COURT:  Thank you.

08:50:09   18                    - - -

08:50:09   19          MICHAEL McCARTHY, CROSS-EXAMINATION

08:50:11   20  BY MR. BAHRET:

08:50:11   21      Q.  Good morning, sir.

08:50:20   22      A.  Good morning.

08:50:21   23      Q.  My name is Bob Bahret.   I represent the City of

08:50:25   24  Toledo.   I don't think you and I ever met before, did

08:50:28   25  we?

08:50:28  1      A.   I don't think so.

08:50:29  2      Q.   But somebody on behalf of the City, one of the

08:50:32  3  other attorneys in my office participated in your

08:50:34  4  deposition?

08:50:35  5      A.   That's right.

08:50:36  6      Q.   All right.   The home where you live, you've

08:50:45  7  already indicated that you're not paying anything for

08:50:48  8  it?

08:50:49  9      A.   No, I'm paying utilities.

08:50:52  10     Q.   But you're not paying Old Granite?

08:50:55  11     A.   Not paying rent, correct.

08:50:58  12     Q.   As far as your background, you're in real estate?

08:51:01  13     A.   Correct.   Yes.

08:51:02  14     Q.   Commercial?

08:51:03  15     A.   Yes.

08:51:04  16     Q.   Never worked in residential real estate?

08:51:06  17     A.   Never.

08:51:06  18     Q.   Never have in your life?  Have you tried to

08:51:08  19  market a house except for maybe something you owned

08:51:11  20  yourself?

08:51:11  21     A.   No, never marketed.

08:51:15  22     Q.   And you didn't actually appraise the house you're

08:51:19  23  living in free, did you?

08:51:21  24     A.   No.

08:51:21  25     Q.   You know that that house was up for sale before

08:51:24  1   you moved into it?

08:51:25  2       A.   Yes.

08:51:25  3       Q.   And you know that not a single person put a bid

08:51:28  4   in on it?

08:51:30  5       A.   There was no bids that I'm aware of, no.

08:51:32  6       Q.   And there hasn't been any bid since you moved in

08:51:35  7   either?

08:51:35  8       A.   No.

08:51:36  9       Q.   Including the time after you moved in and in

08:51:40  10  those months before trees were cut?

08:51:42  11      A.   Yeah, a couple months, right.

08:51:45  12      Q.   The house isn't even up for sale now, is it?

08:51:49  13      A.   It is available, but I don't believe it's being

08:51:52  14  marketed.

08:51:53  15      Q.   How would one know it's available if it's not

08:51:56  16  being marketed?  There's no sign in the yard; nobody's

08:52:00  17  advertising anything?  You mean it's for sale just like

08:52:05  18  anything's for sale; somebody could knock at my door and

08:52:09  19  say, hey, I'll pay you for your house?

08:52:11  20      A.   I guess I can't answer that.

08:52:12  21      Q.   Would you agree that no effort is being made by

08:52:14  22  anybody to sell your house above and beyond whatever

08:52:17  23  efforts I'm making to sell my house?

08:52:20  24          MR. ROBON:  Objection.

08:52:22  25      A.   I can't say --

08:52:24  1          THE COURT:  I'll sustain.   He probably

08:52:26  2   doesn't know what efforts you're making.

08:52:28  3      Q.   If I told you that my house is not up for sale;

08:52:30  4   it's not advertised; there's no signs in the yard; does

08:52:33  5   that sound just like yours?

08:52:37  6      A.   The house is in a subdivision that they're

08:52:40  7   marketing lots.   The house is intended to be a model

08:52:43  8   home.  If we encountered someone that was interested in

08:52:47  9   the house, we would make them aware it is for sale.

08:52:51  10     Q.   And how would you encounter somebody that was

08:52:53  11  interested in the house without doing any marketing?

08:52:56  12     A.   Well, just by living there is a form of

08:52:59  13  marketing.  We do live in the area.

08:53:01  14     Q.   Okay.  But if one would drive into that

08:53:04  15  neighborhood, how on earth would one know that that

08:53:07  16  house is available?

08:53:08  17     A.   By looking at it from the street you would not

08:53:10  18  know it's available for sale.

08:53:13  19     Q.   Your wife currently works for Mr. Laskey?

08:53:17  20     A.   Yes.

08:53:20  21     Q.   The house that you're living in is about 2,700

08:53:24  22  square feet?

08:53:25  23     A.   Approximately, a little less, I think.

08:53:29  24     Q.   Is it true that you really have no idea what the

08:53:32  25  fair market value of that house is?

08:53:38  1    A.  I understand through an appraisal it was worth at

08:53:41  2  one time $310,000.

08:53:43  3    Q.  Do you have any idea what the house is worth?

08:53:47  4    A.  I have an idea what I would pay for it.

08:53:49  5    Q.  Do you have any idea what it is worth?

08:53:54  6    A.  I suppose yes, I mean, comparing -- I mean, it's

08:53:59  7  2,600, 2,700 square feet.  At $100 a square foot it

08:54:05  8  would be about $260,000, $270,000.

08:54:08  9    Q.  Okay.  And what you just said, the $100 a square

08:54:13  10  foot, that's a fairly common measuring tool on values of

08:54:17  11  homes; is it not?

08:54:18  12    A.  It's a nice round number for construction.

08:54:25  13    Q.  I mean, if this home were to be marketed for

08:54:28  14  $550,000 or something like that, that would be almost

08:54:33  15  double; it would be close to $200 a square foot, right?

08:54:39  16    A.  Yes.

08:54:40  17    Q.  You wouldn't pay that, would you?

08:54:43  18    A.  No.  But it was marketed as a 5,000 square foot

08:54:49  19  house originally.

08:54:52  20    Q.  It was originally marketed as a 5,000 square foot

08:54:56  21  house?

08:54:56  22    A.  Correct.  It is -- there's areas in the house

08:54:59  23  that aren't completed that could be completed to suit

08:55:03  24  someone, the buyer, whether it be the area up above the

08:55:08  25  garage or in the basement, which is a walkout basement.

08:55:11  1     Q.   Okay.  So if you included the basement space and

08:55:15  2  the attic space, then you could say it's 5,000 square

08:55:18  3  feet?

08:55:19  4     A.   That's what I understand, yes.

08:55:23  5     Q.   My understanding is you've never paid anything.

08:55:35  6  It's not just that you're not current in your payments;

08:55:38  7  you've never paid?

08:55:39  8     A.   I've never paid any cash.

08:55:48  9     Q.   The photograph that started that video with the

08:55:54  10  ponding in your backyard, do you remember that

08:55:57  11  photograph?  I forget the number, but it was taken in

08:56:01  12  December of '06.  Here we go.  37.

08:56:06  13     A.   Yes.

08:56:14  14          MR. BAHRET:  I guess I can't do it this way.

08:56:33  15          You can see I'm a real techno wizard here,

08:56:37  16  Mr. McCarthy.

08:56:39  17          THE COURT:  It takes a second to warm up.

08:56:44  18     Q.   This here, you took this picture with, I'm

08:56:47  19  assuming, a digital camera?

08:56:48  20     A.   Uh-huh.

08:56:49  21     Q.   That's the date stamp?

08:56:50  22     A.   Yes.

08:56:51  23     Q.   So you took it December 1, '06.  My

08:56:53  24  understanding, sir, is that's the absolute worst ponding

08:56:57  25  that you've seen in your yard.

08:57:01  1    A.   That would be approximately.   It's been like

08:57:04  2  that before, but that's about as worse as it's been

08:57:08  3  through the time period.

08:57:09  4    Q.   If I'm hearing you right, it's been like that

08:57:12  5  more than once?

08:57:13  6    A.   Yes.

08:57:13  7    Q.   But it's never been worse than that?

08:57:15  8    A.   No, not much worse than that.

08:57:17  9    Q.   What did you say?

08:57:19  10   A.   Not much worse than that.

08:57:24  11   Q.   And that photograph was taken right after a major

08:57:28  12  snowfall had melted?

08:57:31  13   A.   I wouldn't know what a major snowfall is, but

08:57:34  14  there was a good deal of snow that had melted, yes.

08:57:38  15   Q.   If I used the word -- you have reviewed your

08:57:41  16  deposition transcript, sir?

08:57:42  17   A.   Yes.

08:57:42  18   Q.   And in the deposition we agreed that it was a

08:57:46  19  substantial snow that melted; you'd stand by that?

08:57:49  20   A.   That sounds right, yes.

08:57:51  21   Q.   And when this sort of thing happens, it's after a

08:57:55  22  pretty darn good snowfall, not just a dusting, or a

08:58:00  23  pretty good rain fall?

08:58:02  24   A.   Correct.

08:58:04  25   Q.   Like when we were out in your yard the other day

| | | |
|---|---|---|
| 08:58:07 | 1 | on Monday, obviously you know it had rained Sunday, |
| 08:58:12 | 2 | correct? |
| 08:58:12 | 3 | A.  I wasn't here Sunday. |
| 08:58:14 | 4 | Q.  All right.  If I told you it did rain Sunday but |
| 08:58:18 | 5 | yet your yard was still dry, would you believe me? |
| 08:58:22 | 6 | A.  That it had rained Sunday and on Monday it was |
| 08:58:25 | 7 | dry? |
| 08:58:26 | 8 | Q.  Yeah. |
| 08:58:26 | 9 | A.  Would I believe you?  Sure. |
| 08:58:28 | 10 | Q.  In fact, you know that your yard near that catch |
| 08:58:31 | 11 | basin Monday afternoon was dry? |
| 08:58:36 | 12 | A.  It could be dry.  I wasn't there. |
| 08:58:43 | 13 | Q.  Let's talk about the train.  When you moved in, |
| 08:58:46 | 14 | even actually before you moved in, you knew there was |
| 08:58:50 | 15 | trains going right by the backyard? |
| 08:58:51 | 16 | A.  I did. |
| 08:58:52 | 17 | Q.  You could see the train; could you not? |
| 08:58:54 | 18 | A.  You can see them, yes. |
| 08:58:56 | 19 | Q.  And that is before the trees were cut? |
| 08:58:58 | 20 | A.  Yes. |
| 08:59:00 | 21 | Q.  Okay.  And you could hear the train, correct? |
| 08:59:02 | 22 | A.  Yes. |
| 08:59:02 | 23 | Q.  In fact, you could really hear the train; could |
| 08:59:05 | 24 | you not? |
| 08:59:06 | 25 | A.  I can hear the train. |

08:59:08  1    Q.  The train even woke you up at night, didn't it?

08:59:11  2    A.  No.  No.

08:59:39  3    Q.  Do you see this transcript page?

08:59:41  4    A.  Yes.

08:59:41  5    Q.  It's your deposition page 49.  And you see the

08:59:44  6    item next to Number 3?

08:59:46  7    A.  Uh-huh.

08:59:48  8    Q.  Do you see where you were asked if the train

08:59:52  9    noise -- that's what we're talking about; if you want me

08:59:55  10   to go back to the prior page to put it in context, I'd

08:59:58  11   be glad to, but you see the question:  "Is that

09:00:00  12   something that your kids have had to get used to, and

09:00:04  13   does it disturb them in their sleep?"

09:00:07  14        MR. ROBON:  I object, Your Honor.  I don't

09:00:09  15   think that's the question he asked.  He asked if it

09:00:12  16   woke him up.

09:00:13  17   A.  Yes.

09:00:13  18   Q.  Let me rephrase it because you're absolutely

09:00:16  19   right.

09:00:17  20        The trains disturb your children's sleep; is that

09:00:21  21   right?

09:00:21  22   A.  I believe so.

09:00:25  23   Q.  I mean, the trains go day and night; do they not?

09:00:28  24   A.  Yes.

09:00:28  25   Q.  And every time they get near Bates Road,

09:00:31  1    regardless of what direction they're coming from,

09:00:34  2    they're blowing their whistle?

09:00:36  3         A.   Yes.

09:00:37  4         Q.   In fact, directly -- if the train is coming from

09:00:41  5    Ford Road towards Bates Road, behind your house is one

09:00:44  6    of the whistle stations; is it not?

09:00:47  7         A.   Yes, it seems that way.

09:00:49  8         Q.   So when the train is 150 feet from the back of

09:00:52  9    your house, it's hammering that whistle?

09:00:54  10        A.   Yes.  Yes.

09:00:58  11        Q.   If you're outside, you're in the backyard when

09:01:01  12   the train is going by, and you were having a

09:01:03  13   conversation, you'd stop for a minute to let the train

09:01:07  14   go by; would you not?

09:01:08  15             MR. ROBON:  Are you talking before or after?

09:01:12  16             MR. BAHRET:  Both.

09:01:13  17        A.   It can at times, yes.

09:01:16  18        Q.   And in fact, its tough to have a normal

09:01:21  19   conversation with the train going by?

09:01:24  20        A.   In the backyard?

09:01:25  21        Q.   Yes.

09:01:27  22        A.   Yes.

09:01:32  23        Q.   Now, I understand that you can probably see the

09:01:34  24   train; I mean, you already told us that you could see it

09:01:39  25   before the trees were taken out.   You probably can see

09:01:42  1    it even easier now?

09:01:44  2        A.   Yes.

09:01:44  3        Q.   But there was never any secret even before the

09:01:47  4    trees were removed that this is an active railroad; I

09:01:50  5    can see it; I can hear it; and I can feel it?

09:01:55  6        A.   Yes.   But not as prominently as today.

09:02:00  7        Q.   And that would be true -- are you generally

09:02:03  8    familiar with this subdivision?

09:02:04  9        A.   Yes.

09:02:05  10       Q.   That would be true even on any of those lots that

09:02:11  11   face the back, lots 9 through 16?

09:02:15  12       A.   Yes.

09:02:16  13       Q.   And especially when you start going down lots 9,

09:02:20  14   10, 11, 12, 13, down there it was pretty sparse to begin

09:02:25  15   with, correct?

09:02:26  16       A.   Sparse?

09:02:27  17       Q.   Not much trees, and may have been some brambles

09:02:33  18   and things like that, but in the video we saw we didn't

09:02:36  19   see that many trees?

09:02:40  20             MR. ROBON:  Do you mean before the cutting?

09:02:43  21             MR. BAHRET:  The video was taken before

09:02:45  22   there was any cutting.

09:02:46  23             MR. ROBON:  You're talking about the Ric-man

09:02:48  24   video?

09:02:49  25             MR. BAHRET:  Can I do this alone?

09:02:53  1          THE COURT:  We have had a couple videos, so

09:02:55  2   it's appropriate, I think, to make sure which one we're

09:02:58  3   talking about.

09:02:59  4      A.  Are you asking if the trees are denser by my

09:03:03  5   house or further south, or are they less dense?  I'm not

09:03:08  6   sure what the question is.

09:03:09  7      Q.  Okay.  That's a fair comment.  Anytime I ask a

09:03:12  8   question that you didn't follow me --

09:03:14  9      A.  Right.

09:03:14  10     Q.  You did it just exactly right.  Make me clear it

09:03:18  11  up.  I'll be glad to do it.

09:03:19  12     A.  Okay.

09:03:20  13     Q.  What I'm referencing is down on the other end of

09:03:24  14  the subdivision closest to Ford Road, was it less dense

09:03:31  15  vegetation down there than it was at your end, if you

09:03:36  16  know?

09:03:38  17     A.  My house starts at -- that's where the lots

09:03:44  18  border the railway.  So any lots going towards Ford

09:03:55  19  Road, yes.  If you look to the right, those lots to the

09:03:59  20  right, the vegetation, as you got further to the right,

09:04:03  21  to me it appeared more dense than it was towards my

09:04:08  22  house.

09:04:08  23     Q.  It was more dense down there?

09:04:09  24     A.  Right.  It was --

09:04:12  25     Q.  But that -- the subdivision, the back of the

09:04:16  1   subdivision actually is a little further from the
09:04:19  2   railroad right-of-way over there.
09:04:20  3       A.   That's right.   Yes.
09:04:21  4       Q.   So the trees down there were on the railroad
09:04:24  5   right-of-way?
09:04:26  6       A.   I wouldn't know one way or the other.
09:04:29  7       Q.   Okay.  Sir, you've never had any water in your
09:04:46  8   house or any damage to your personal property because of
09:04:49  9   this ponding issue, have you?
09:04:51  10      A.   No.
09:04:58  11      Q.   You were aware there was ponding in that area
09:05:00  12  that the photograph was taken in even before the City
09:05:04  13  water main was installed?
09:05:07  14      A.   I'm not aware of it, there was any ponding.
09:05:13  15      Q.   I'll get back to that point when I find the note.
09:05:26  16           You had walked on the property adjacent to yours
09:05:32  17  before the water main was put in?
09:05:35  18      A.   Yes.
09:05:36  19      Q.   In other words, lot 16 and the property that
09:05:39  20  abuts lot 16?
09:05:40  21      A.   Yes.
09:05:41  22      Q.   And when you walked on that even before the water
09:05:43  23  main was put in, you noticed some sort of ponding issue
09:05:47  24  there; did you not?
09:05:49  25      A.   Well, there was a collection area.

09:05:52  1      Q.   Of water?

09:05:53  2      A.   Yeah, some water, yes.

09:05:54  3      Q.   And that was always wet; was it not?

09:05:58  4      A.   Yes.   But it -- yes.

09:06:03  5      Q.   Did you ever see a duck in there?

09:06:05  6      A.   No.

09:06:09  7      Q.   Your yard.  Your yard, sir, was -- you didn't

09:06:18  8  just walk up a hill to the railroad right-of-way before

09:06:20  9  the project and what your dad did.   There was a wall

09:06:25  10  there, correct?

09:06:26  11      A.   Correct.

09:06:26  12      Q.   And that wall was railroad ties up -- it's been

09:06:30  13  estimated five or six feet high or something like that?

09:06:33  14      A.   Four to six feet, somewhere in there.

09:06:36  15      Q.   And nobody cleared anything from the downside of

09:06:41  16  your backyard?  All the clearing was done up above the

09:06:46  17  wall and over, correct?

09:06:49  18      A.   Right, on the top of the plateau.

09:06:55  19      Q.   By the way, do you know of any efforts that have

09:06:58  20  been undertaken at all by you or anybody to plant any

09:07:02  21  vegetation on the back parts of old Cambridge -- I mean

09:07:08  22  Old Granite's Cambridge Subdivision?

09:07:10  23      A.   No, I'm not aware of anything.

09:07:13  24      Q.   You would agree -- you know your dad is a guy

09:07:17  25  that orchestrated moving in all this dirt after the

09:07:20  1  vegetation was cut?

09:07:21  2     A.  Yes.

09:07:21  3     Q.  And you know that he and his helpers dumped so

09:07:25  4  much dirt that they pushed it deep into your yard and

09:07:31  5  the lots next to you and absolutely covered that wall?

09:07:36  6     A.  It covers the wall.

09:07:37  7     Q.  The wall is gone now, correct?

09:07:39  8     A.  You can't see the wall, no.

09:07:46  9     Q.  Is it true that you never complained to the

09:07:49  10  people that were clearing the trees or asked them to

09:07:51  11  either move further away or stop?

09:07:56  12     A.  No, I didn't.  They just -- I didn't know it was

09:08:03  13  my --

09:08:06  14     Q.  Do you know if there was any ponding on your yard

09:08:12  15  as shown in Exhibit 37, again, before your dad put

09:08:23  16  thousands of tons of dirt on the Cambridge property?

09:08:29  17     A.  Was there any prior -- I don't believe so.

09:08:33  18     Q.  Do you know if there was any problem like we see

09:08:36  19  on Exhibit 37 before your dad, without any authority or

09:08:40  20  permission from anybody, knocked a hole in the drainage

09:08:44  21  pipe owned by the railroad?

09:08:47  22     A.  I'm not aware that he knocked a hole in the

09:08:50  23  drainage pipe.

09:09:09  24     Q.  You were familiar with lot 15 even before you

09:09:11  25  moved in; were you not?

09:09:13  1    A.  Yes.

09:09:14  2    Q.  I'll ask you again if there was any ponding on

09:09:16  3  that property before the water main project?

09:09:27  4    A.  In that area as we're discussing in the exhibit?

09:09:31  5  What are you asking me again?

09:09:33  6    Q.  Was there ponding water in the back of your

09:09:38  7  property to some extent after heavy rains and heavy

09:09:43  8  snows?  And that's prior to the water main project.

09:09:46  9    A.  There was a little area to the right in a

09:09:48  10  different area right at the edge of where the railroad

09:09:53  11  tie wall once was, just that area.

09:10:03  12    Q.  Have you seen any ponding issues further down the

09:10:08  13  subdivision, the lots -- you're 15; 13, 14, 12, so on

09:10:17  14  and so forth?

09:10:18  15    A.  I haven't seen any going that direction.

09:10:22  16    Q.  If counsel made a comment that there's a ponding

09:10:25  17  problem on those lots that was never there before,

09:10:27  18  that's simply false?

09:10:29  19          MR. ROBON:  Objection.

09:10:29  20    A.  I don't know the answer.

09:10:33  21          MR. ROBON:  Mike, you can't talk when

09:10:35  22  there's an objection until the Judge says so.

09:10:38  23          THE COURT:  Let me ask you all to pause for

09:10:40  24  a moment.

09:10:46  25          I think you can rephrase the question.

09:10:47    1   I'll sustain the objection.

09:10:49    2       Q.   You have never seen any ponding on any lot next

09:10:55    3   to you except for 16.   So 14 -- you've never seen

09:10:59    4   ponding on 14, 13, 12, 11, 10, or 9?

09:11:04    5       A.   No, I've never walked over there and observed it.

09:11:08    6   But I've never seen it, no.

09:11:09    7       Q.   You've been in your backyard?  I'm assuming that

09:11:12    8   when you look at the ponding in your yard you may look

09:11:14    9   around?

09:11:15   10       A.   Yeah.   But you don't have a straight line view

09:11:18   11   of the edge of the property.   But I have not seen any

09:11:22   12   ponding.

09:11:29   13       Q.   You're aware that when your dad dumped all this

09:11:54   14   dirt he covered one of the catch basins?

09:11:54   15       A.   I'm not sure if he covered the catch basin or

09:11:54   16   not.

09:11:54   17       Q.   You're aware he at least partially covered one of

09:11:54   18   the catch basins; are you not?

09:11:54   19       A.   I believe there was dirt there, and there was a

09:11:54   20   rainfall, and some of the dirt had tumbled onto the

09:11:54   21   catch basin.

09:12:06   22       Q.   You saw the manhole that's up beyond -- it's not

09:12:12   23   on your property; it's down, I don't know how far, I'll

09:12:15   24   say 200 feet or something like that?

09:12:16   25       A.   Okay.   Yes.

09:12:18   1      Q.   If my estimate of distance is wrong, just rely on
09:12:21   2   your own recollection where it is.
09:12:22   3      A.   Okay.
09:12:23   4      Q.   But you know the manhole I'm talking about?
09:12:26   5      A.   Yes.
09:12:27   6      Q.   Closer to Bates Road than your house is?
09:12:29   7      A.   Yes.
09:12:30   8      Q.   You had seen that even before the project, the
09:12:32   9   water project?
09:12:35  10      A.   I believe so, yes.
09:12:36  11      Q.   And you would describe that as looking like some
09:12:39  12   sort of an abandoned, dilapidated pipe sticking out of
09:12:44  13   the ground at that point, correct?
09:12:45  14      A.   In the neighboring property or the other
09:12:48  15   direction?
09:12:49  16      Q.   Towards Bates Road.
09:12:51  17      A.   Yeah.
09:12:51  18      Q.   The one at the top of the hill.
09:12:54  19      A.   Yes.
09:12:55  20      Q.   I mean, you saw it?  I'm not saying you
09:12:58  21   investigated it or studied it, but you at least saw it,
09:13:02  22   knew it was there, and it looked like a wrecked up mess?
09:13:05  23      A.   Yeah.   In exploring in that area shortly after
09:13:09  24   moving in, that area where we talked about earlier where
09:13:13  25   there's some ponding, there appeared to be some sort of

09:13:17  1  a pipe drainage system.

09:13:26  2      Q.  You didn't know if it worked?

09:13:27  3      A.  I didn't understand its purpose or if it worked.

09:13:46  4      Q.  And you personally have not done anything to

09:13:48  5  determine if any of the vegetation or trees that were

09:13:51  6  cut were on Cambridge property, did you?

09:13:54  7      A.  No.

09:13:56  8              MR. BAHRET:  Thank you, sir.

09:13:58  9              THE WITNESS:  Thank you.

09:13:58  10              THE COURT:  Redirect?

09:13:59  11              MR. ROBON:  Thank you, Your Honor.

09:14:02  12                        - - -

09:14:02  13          MICHAEL McCARTHY, REDIRECT EXAMINATION

09:14:03  14  BY MR. ROBON:

09:14:03  15      Q.  When Mr. Bahret asked you about the lots, your

09:14:12  16  house is here.  He asked about whether there was water

09:14:15  17  on these other lots.  Can you tell the jury how deep

09:14:20  18  the weeds and the brush is, it slopes down, would you

09:14:24  19  even see water if it was there?

09:14:25  20      A.  They're minimum knee-high.

09:14:28  21      Q.  Could you see the water if it was there?

09:14:30  22      A.  Probably not if it were there, no.

09:14:33  23      Q.  And when this photograph was taken, did the water

09:14:44  24  also go onto the lot next door, the pond?

09:14:50  25              MR. BAHRET:  Which next door?

09:14:52  1           MR. ROBON:  To the south.

09:14:53  2      A.  It covered, yes, the entire lot and into the lot

09:14:56  3  next door.

09:14:58  4           MR. ROBON:  Nothing further.

09:15:01  5                    - - -

09:15:01  6        MICHAEL McCARTHY, RECROSS-EXAMINATION

09:15:02  7  BY MR. BAHRET:

09:15:02  8      Q.  When you say the lot next door, you're talking

09:15:04  9  about 16?

09:15:05  10     A.  To the right as I'm looking at the front of the

09:15:07  11 house.

09:15:07  12          MR. ROBON:  Lot 14.

09:15:09  13     A.  14, 15 -- I don't know the numbers.

09:15:13  14          THE COURT:  What's easiest for you?  As

09:15:15  15 you're standing in the driveway of your home and looking

09:15:17  16 towards the back of your house, to the right or to the

09:15:20  17 left?

09:15:21  18          MR. ROBON:  We're looking at Exhibit

09:15:24  19 Number --

09:15:24  20          THE COURT:  Mr. McCarthy?

09:15:25  21          THE WITNESS:  The right of the house as I

09:15:27  22 look to the front of the house.

09:15:29  23          THE COURT:  So if you're standing at the

09:15:31  24 back of the house, looking to the front of the house, it

09:15:34  25 would be to the right?

```
09:15:35   1              THE WITNESS:  It would be to left.
09:15:38   2              THE COURT:  You can point out.
09:15:39   3              MR. ROBON:  You live on lot 15.  We want to
09:15:41   4    know, is it this lot or this lot?
09:15:43   5       A.  The water comes through here and across the back
09:15:47   6    yard into this (motioning).
09:15:48   7              MR. ROBON:  It comes from 16 into 15 into
09:15:53   8    14?
09:15:53   9              THE WITNESS:  Yes.
09:15:54  10              MR. ROBON:  Nothing further.
09:15:56  11              MR. BAHRET:  Nothing further.
09:15:57  12              THE COURT:  You may step down.  Thank you.
09:16:07  13              We're now going to be like a yo-yo and go
09:16:10  14    back to defendant's case.  The record should reflect
09:16:13  15    the plaintiff is resting subject to admission of
09:16:16  16    exhibits and subject to a motion which we will take care
09:16:19  17    of outside the presence of the jury.  And the defendant
09:16:23  18    may call its next witness.
09:16:26  19              MR. BAHRET:  I'll call Bob Domini, Robert
09:16:29  20    Domini.
09:17:31  21              MR. WATKINS:  Your Honor, can we approach
09:17:32  22    briefly?
09:17:33  23              THE COURT:  Sure.
09:17:46  24              (The witness was sworn by the clerk.)
09:17:47  25              (Discussion had off the record.)
```

```
09:18:12   1                          - - -

09:18:12   2              ROBERT DOMINI, DIRECT EXAMINATION

09:18:13   3   BY MR. BAHRET:

09:18:13   4       Q.  Good morning.

09:18:27   5       A.  Good morning.

09:18:28   6       Q.  Would you state your full name for the jury?

09:18:31   7       A.  Robert Domini.

09:18:33   8       Q.  Mr. Domini, how old are you?

09:18:36   9       A.  61.

09:18:38  10       Q.  And what is your profession?

09:18:40  11       A.  Real estate appraiser.

09:18:43  12       Q.  Can you tell us about just briefly your

09:18:47  13   educational background then how you got into the real

09:18:50  14   estate appraisal business?

09:18:52  15       A.  I have an undergraduate degree in business, a

09:18:56  16   master's degree in business, and I was a school teacher

09:18:59  17   for 18 years, and had a background in real estate, made

09:19:05  18   a transition and started a new career.  Been an

09:19:09  19   appraiser for 20 years.  And the master's in business

09:19:15  20   and all the real estate experience seemed to be natural

09:19:20  21   for changing careers midlife.

09:19:22  22       Q.  And what is the nature of your business now?

09:19:25  23       A.  We're a real estate appraisal firm.  We have

09:19:29  24   commercial; we do road widening projects for the

09:19:34  25   government, and we have a residential appraisal
```

```
09:19:39   1   department.
09:19:40   2      Q.   Okay.  Do you carry any certifications as an
09:19:48   3   appraiser?
09:19:48   4      A.   I'm state certified in five states:  Ohio,
09:19:51   5   Michigan, Pennsylvania, Virginia, and Florida.   And I
09:19:55   6   hold an MAI designation.
09:19:58   7      Q.   What does that mean?  I heard that term
09:20:00   8   yesterday.
09:20:01   9            MR. ROBON:  Your Honor, we'll stipulate to
09:20:02  10   his qualifications.
09:20:04  11            THE COURT:  That's fine.
09:20:08  12      Q.   Just tell us what that means, an MAI, then I'll
09:20:12  13   move on.
09:20:13  14      A.   It's like master of appraising.   It's a
09:20:16  15   designation that's confirmed by one of three major
09:20:20  16   organizations in the appraisal industry, and they're
09:20:23  17   tied into the federal government through the Appraisal
09:20:25  18   Foundation.   So --
09:20:28  19      Q.   And, Mr. Domini, you've been retained by Mr.
09:20:32  20   Robon in the past?
09:20:34  21      A.   Yes, I have.
09:20:36  22      Q.   And you've testified in cases at his request?
09:20:43  23      A.   I don't -- I've done work for him.   I don't
09:20:46  24   think anything that I've done for him has gone to court.
09:20:50  25      Q.   But you've done appraisals for him?
```

09:20:52  1      A.   Yes.

09:20:53  2      Q.   Okay.  So far as I know this is the first time

09:20:58  3   you and I had ever worked together; is that right?

09:21:01  4      A.   That's true.

09:21:02  5      Q.   In fact, I don't think we had ever even met

09:21:06  6   before this case?

09:21:07  7      A.   That is true.

09:21:08  8      Q.   Tell the jury how you got involved here.

09:21:11  9      A.   Well, essentially I had met a gentleman from the

09:21:18  10  City of Toledo in a prior case, and evidently he had

09:21:23  11  recommended me to you, and so that kind of started the

09:21:28  12  process and ended up doing the appraisal.

09:21:31  13     Q.   And that would be Jeff Charles?

09:21:33  14     A.   Yes.

09:21:36  15     Q.   And at some point you were called upon to do some

09:21:40  16  work dealing with the Cambridge Subdivision?

09:21:42  17     A.   Yes.   That's true.

09:21:45  18     Q.   Basically to speed it up that was to come up with

09:21:48  19  a valuation as to what the project would be -- I hate to

09:21:53  20  use the term, what it's worth?

09:21:55  21     A.   Yeah.   My job was to do an appraisal of the

09:21:58  22  remaining of the unsold lots, which I believe there were

09:22:04  23  13 of those, and of the house that was still in

09:22:08  24  ownership, still owned by the developer.

09:22:13  25     Q.   The spec house?

09:22:14  1    A.   14 -- yeah, it was lot 15.  So 14 properties in

09:22:19  2    total.

09:22:20  3    Q.   What I'd like you to do is tell us the event that

09:22:28  4    we're trying to compare, was that the removal of trees?

09:22:34  5    A.   That was the original purpose.  Yeah.  In fact,

09:22:36  6    that was the purpose of my appraisal was to look at the

09:22:41  7    value of the property before the project began, and then

09:22:48  8    look at it again after the project.

09:22:52  9    Q.   Now, with the focus being on the removal of

09:22:58  10   trees, did you in any way concern yourself with whether

09:23:00  11   those trees were on Cambridge property or railroad

09:23:05  12   property?

09:23:06  13   A.   At first I tried to figure it out and -- but

09:23:11  14   ultimately I wasn't able to do that.  I just figured

09:23:16  15   this is the job of the engineers and other people, not

09:23:19  16   me.

09:23:19  17   Q.   All right.  And so it's possible to have a

09:23:25  18   reduction in value of real estate even if the tree is

09:23:28  19   removed on the neighbor's property; is that correct?

09:23:32  20   A.   It sure is.

09:23:33  21   Q.   So without -- I'm not going to ask any question

09:23:37  22   about whose trees these were, but just tell us, what did

09:23:41  23   you do, how did you do it, and what conclusions you

09:23:44  24   reached.

09:23:45  25   A.   Well, what I did, I appraised the whole property

09:23:52  1   as it sat so of the date -- the official date that we

09:23:58  2   used for the project was June 1, I believe, of '06.   So

09:24:06  3   basically went through a process to do that appraisal.

09:24:12  4   I can run through -- would you like me just to kind of

09:24:15  5   run through it?

09:24:16  6       Q.   You can feel free to refer to your note, your

09:24:19  7   materials, or whatever materials you need.

09:24:25  8       A.   All right.   The first thing I did was studied

09:24:33  9   other subdivisions that had similar characteristics.

09:24:38  10  Four out of the five subdivisions that I studied were

09:24:41  11  backing to railroads.   Three of them were in the

09:24:45  12  Perrysburg schools, and two of them in Rossford schools.

09:24:50  13      Q.   And how is that relevant when you mention the

09:24:53  14  schools?

09:24:53  15      A.   Well, I just wanted to get, since the subject is

09:24:58  16  in Rossford schools, I wanted to get a view of the sales

09:25:01  17  activity in the Perrysburg schools and the sales

09:25:04  18  activity in the Rossford schools where the subject is

09:25:07  19  just so I'd have a basis for comparison.

09:25:10  20      Q.   All right.   And so then how did it proceed?

09:25:14  21      A.   Well, some of these subdivisions had sold out a

09:25:20  22  while ago, but the first one I looked at was

09:25:25  23  Valleybrook, which was platted in 1988 and sold out in

09:25:30  24  1996.   And they sold about 15 lots a year there, and

09:25:37  25  many of which were on the railroad tracks.   And so

09:25:41  1   we'll get into that in a minute.   But Belmont Meadows,

09:25:46  2   which is -- which is essentially the south side of Ford

09:25:52  3   Road, and this is also in Perrysburg school, has the

09:25:55  4   turnpike behind it and the railroad basically very near

09:26:02  5   to the subdivision.   And it sold -- it sold out in two

09:26:09  6   years in 1996 and 1997; they sold 31 lots, some of which

09:26:15  7   were backing to the turnpike and backing to the railroad

09:26:18  8   tracks, and they sold 31 lots in two years.

09:26:21  9      Q.   Back in the timeframe of those two subdivisions

09:26:24  10  you've mentioned, how was the housing market in general?

09:26:27  11     A.   I traced the housing market back to 2000, and I

09:26:35  12  believe that the market was still pretty solid.   It was

09:26:41  13  very solid back in the mid to late '90s, but I do have

09:26:47  14  the figures here for the market, 2000 on through to

09:26:56  15  2007.   In Wood County house sales --

09:27:00  16     Q.   We'll get to that in a minute.   But those two

09:27:02  17  subdivisions you just mentioned were in the mid to late

09:27:06  18  '90s, I think you said?

09:27:06  19     A.   Right.   I'd say sales in that period of time were

09:27:10  20  good.   They were strong.

09:27:11  21     Q.   Go ahead.   I had interrupted you, Bob.

09:27:13  22     A.   The other was a subdivision out on Eckle Junction

09:27:18  23  Road, Fort Meigs Road.   Not really near the subject

09:27:24  24  property, but we chose it because it was on the railroad

09:27:26  25  tracks.   And it sold 1994 to 2002, and they sold nine

09:27:33  1  lots a year in that one, many of which were on the

09:27:36  2  railroad tracks.

09:27:39  3      Creek Bend Farms is very near to the -- near to

09:27:43  4  our property.

09:27:46  5      Q.  When you say "our property" --

09:27:47  6      A.  This subject property.  And it's off of Bates

09:27:51  7  Road, and it's on the railroad tracks, and many of those

09:27:56  8  lots have a clear view of the railroad tracks.  We have

09:28:01  9  pictures of it in my appraisal.  It sold 1999 to 2006,

09:28:07  10  still has few lots available today, and are selling at

09:28:15  11  about two lots a year.

09:28:17  12      And then I looked at Belmont Woods.  It's not on

09:28:21  13  the railroad tracks, but it's a good example of a

09:28:25  14  subdivision that's very -- it's high end.  It's near to

09:28:30  15  the subject property.  And so I wanted to have a look

09:28:35  16  that one.

09:28:35  17      Q.  But it's not on the tracks?

09:28:37  18      A.  It's not really on the tracks at all, no.

09:28:42  19      Q.  What was the other one you mentioned?

09:28:46  20      A.  Creek Bend Farms is on the railroad track, yes.

09:28:48  21      Q.  What's the price range of homes over there,

09:28:51  22  though, compared to what they intended in Cambridge?

09:28:54  23      A.  I drove through there yesterday and looked at

09:28:59  24  those homes.  Didn't go check to see what the prices

09:29:03  25  were, but I would say those houses would be more two-car

09:29:06  1    garage, not the bigger homes that you see and like the

09:29:10  2    ones that had been built in the subject subdivision and

09:29:14  3    in Belmont Woods.   I'd say more in the range of

09:29:18  4    $200,000 to $250,000.

09:29:19  5        Q.   So different market entirely?

09:29:20  6        A.   It's a little bit lower price market, yes.

09:29:24  7        Q.   Once again, I interrupted you.

09:29:25  8        A.   Belmont Woods is what I talked about that is a

09:29:31  9    sold out subdivision.   They built a pond; they are

09:29:35  10   surrounded by trees.   It's a very secluded kind of

09:29:39  11   rolling subdivision.   Very nice homes.   And it sold

09:29:44  12   out 1991 through 1999 and at 3 and a half lots a year.

09:29:53  13   So it had a pretty good sales record, but not nearly as

09:29:56  14   good as some of those in Perrysburg that we talked about

09:30:00  15   earlier.

09:30:02  16       Q.   And gathering all that data that you just talked

09:30:06  17   about, what else did you need to do, if anything, to

09:30:08  18   reach your conclusions as to values?

09:30:12  19       A.   I wanted to see what the effect was of the

09:30:17  20   railroad and highway influence, and so I selected

09:30:24  21   certain home sales in Valleybrook, Belmont Meadows,

09:30:31  22   Creek Bend Farms, and Indian Meadows, all four of which

09:30:35  23   were on the tracks of lots that sold on the tracks, lots

09:30:42  24   that sold in those same subdivisions that were not on

09:30:45  25   the tracks, and just to see where they fell.

09:30:49  1        And so first of all, Valleybrook had an average

09:30:54  2   on four lots that I looked at that were on the railroad

09:30:59  3   tracks, had an average selling price of $36,900.  The

09:31:08  4   lots that I looked at that were not on the railroad

09:31:11  5   tracks had a selling price of $38,000.  So essentially a

09:31:16  6   pretty small difference, about three percent.

09:31:19  7        And then Belmont Meadows, there was about an

09:31:23  8   eight percent difference comparing lots on the railroad,

09:31:28  9   lots not on the railroad.   And some of the lots in

09:31:32  10  Belmont Meadows had the turnpike behind them as well.

09:31:38  11        Creek Bend Farms was the biggest difference.

09:31:42  12  Some of those lots are completely open to tracks today.

09:31:45  13  You can drive there and see them.   And there was about

09:31:51  14  a 24 percent difference there between the lots that were

09:31:55  15  on the tracks and those that were not.

09:32:01  16        Indian Meadows is the one off of Eckle Junction,

09:32:05  17  Fort Meigs Road area, had a 17 percent difference.

09:32:09  18        So we've got a pretty big difference of upwards

09:32:12  19  to 20 to 25 percent was the result of our study that we

09:32:16  20  conducted.   That's why we picked those subdivisions to

09:32:20  21  begin with, because they were all on railroad tracks.

09:32:22  22    Q.  And the difference, I'm assuming the ones that

09:32:25  23  abut the railroad were selling for less than the ones

09:32:28  24  not abutting?

09:32:29  25    A.  It's about 20, 25 percent difference.

09:32:32  1      Q.   I just needed you to say difference which way?

09:32:35  2      A.   Yes.   The ones on the railroad tracks were

09:32:37  3   selling for about 25 percent less.

09:32:41  4      Q.   Okay.   What else did you do in order to reach

09:32:45  5   your conclusions?

09:32:55  6      A.   Well, the first thing is to look at the prices of

09:32:59  7   lots and determine what the selling price of your

09:33:08  8   property should be.

09:33:14  9      Q.   Not my property, Bob.

09:33:17  10      A.   Of the property you are appraising, your subject

09:33:21  11   property, yes, it is.   So looking at all the data from

09:33:27  12   these various subdivisions, you -- and looking at the

09:33:35  13   sales history of the subject property, you make that

09:33:39  14   determination.

09:33:40  15          And I determined that the non-railroad frontage

09:33:45  16   lots of our subdivision had -- should be sold at

09:33:50  17   $60,000, and the lots that are on the railroad tracks at

09:33:55  18   $48,000.   So that is about a 28 percent discount, as

09:34:03  19   the data had indicated.

09:34:06  20      Q.   Before you began your task or in the early stages

09:34:09  21   of it, did we make a number of materials available to

09:34:12  22   you?

09:34:12  23      A.   Well, yes.   I mean, we -- I'm not sure that --

09:34:18  24      Q.   Well, for example, you had the Peterman survey?

09:34:21  25      A.   You did give me the Peterman survey that

09:34:23  1   indicated that shaded areas were --

09:34:26  2        Q.   They call that "disturbed area"?

09:34:29  3        A.   Where allegedly trees had been removed.   So yes,

09:34:33  4   I had a copy of that.

09:34:34  5        Q.   So you were able to have an understanding as to

09:34:37  6   what the changes were, how much vegetation was removed

09:34:40  7   and so forth?

09:34:41  8        A.   Yes.

09:34:42  9        Q.   Okay.   The numbers that you just gave us on the

09:34:48  10  lot prices, was that before or after the tree removal?

09:34:50  11       A.   That value would be before.

09:34:59  12       Q.   Okay.   Did you come up with a total then using

09:35:03  13  the calculations that you made as far as the total value

09:35:06  14  for the underdeveloped -- that's the wrong word -- the

09:35:10  15  unsold lots?

09:35:11  16       A.   Well, yeah.   I mean, you add all the 14 -- 13

09:35:20  17  lots, you would get $708,000.   So that's a total.   But

09:35:29  18  you can't sell all of those lots in one year.   If you

09:35:31  19  could sell those lots all right now, well, then you

09:35:35  20  could say, sure, the value is $708,000.   But you can't

09:35:38  21  do that.   So you have to sell them off over time.   And

09:35:41  22  so you have to do a scenario and take each year, you're

09:35:46  23  going to sell so many lots, and bring those cash flows

09:35:50  24  back to present value.   And you have to take into

09:35:54  25  account the time that it takes you to sell those

09:35:56  1    properties.

09:35:57  2        Q.   You just mentioned present value.   And maybe the

09:36:01  3    jury already understands that concept.   But just take a

09:36:05  4    minute and tell us, what does it mean to reduce a number

09:36:08  5    to present value?

09:36:09  6        A.   Well, it's like a dollar a year from now isn't

09:36:14  7    worth the same as a dollar today.   And so a dollar a

09:36:20  8    year from now has to be discounted.   And that's what we

09:36:23  9    do.   So if you're going to sell a property and make

09:36:26  10   sales next year, the year after, the year after, then

09:36:30  11   you apply a discount factor to those annual cash flows,

09:36:37  12   and you essentially -- you reduce them; you reduce the

09:36:42  13   amount that the present worth is.

09:36:46  14       Q.   So similar to if I win a $10 million lottery and

09:36:49  15   take the cash option, they're not going to give me

09:36:52  16   $10 million.   They'll give me some other number that's

09:36:55  17   less.   Is that reduction to present value?

09:36:58  18       A.   Exactly.   I mean, if the plan is that you get X

09:37:03  19   amount of dollars, say, each year for five years, or

09:37:09  20   would you like it all right now, you're not going to get

09:37:11  21   the whole thing right now.

09:37:13  22       Q.   Okay.   So did you apply that concept, that -- and

09:37:17  23   by the way, is that an accepted technique to use in

09:37:21  24   valuing?

09:37:22  25       A.   Yes, that is a very commonly used technique in

09:37:27  1  appraising.

09:37:28  2      Q.   And using that and whatever other information you

09:37:34  3  had, what value did you come up with for the unsold lots

09:37:39  4  in Cambridge prior to the tree removal?

09:37:43  5      A.   Well, I also included the sale of the house.

09:37:49  6      Q.   Oh.

09:37:50  7      A.   We appraised -- I had the residential people who

09:37:56  8  pay rent to me in my office, hired them to do the house

09:38:00  9  appraisal.

09:38:01  10      Q.   On lot 15?

09:38:03  11      A.   On lot 15.   So we included -- I included that in

09:38:07  12  the annual cash flows.   And I made the assumption that

09:38:11  13  that house would sell for $310,000, and that it would

09:38:17  14  sell in the first year.   And I also, based on my

09:38:22  15  research, determined -- and based on the subject's own

09:38:26  16  performance, and that's something we haven't talked

09:38:29  17  about yet is the sales history of the subject property,

09:38:34  18  but that was something that was very important in my

09:38:40  19  determining at what rate of sales I could expect for the

09:38:44  20  subject property.   Once I made that determination, I

09:38:51  21  made the decision that the subject property would have

09:38:56  22  sales of two lots per year for, I believe, the first

09:39:01  23  five years, and then the sixth year would sell three

09:39:05  24  lots.   The first year would sell two lots plus the

09:39:09  25  house.

09:39:10  1     Q.   Okay.  And did the sales data in the couple years

09:39:17  2     leading up to the date the trees were removed support

09:39:21  3     two lots per year?

09:39:22  4     A.   The subject for the period of 2001 through June

09:39:28  5     of 2006 was selling lots at the rate of 1.7 lots per

09:39:34  6     year.  I believe there were eight or nine sales.  And

09:39:40  7     what is that, about five years, and it's just under two

09:39:48  8     lots per year that had been -- that's the subject's

09:39:51  9     history.  The last sale of a lot for the subject

09:39:55  10    property was in January of 2004.  So there was a two

09:40:01  11    and a half year period between the last date that any

09:40:07  12    lot had sold in the subdivision and the date the project

09:40:11  13    came through in June of '06.  So I had to look at that,

09:40:18  14    the sales, basically.  Then I looked at the sales in

09:40:21  15    the township and in Lucas County as to what the level of

09:40:28  16    sales had been during the years that we had no sales.

09:40:31  17    And all through '04, '05, and half of '06, and those

09:40:37  18    were very strong years in Perrysburg Township and Wood

09:40:40  19    County, very strong sales years.

09:40:45  20          THE COURT:  When you say no lots had sold

09:40:47  21    since January of '04, we're referring to

09:40:50  22    Old-Granite-owned lots?

09:40:51  23          THE WITNESS:  Yes.

09:40:52  24    Q.   And the other thing, on figuring out the -- I

09:40:57  25    forget the technical term, how many houses are going to

09:41:00   1   be or lots are going to be sold per year.

09:41:02   2       A.   Absorption.

09:41:04   3       Q.   Figuring out the absorption rate, would it be

09:41:07   4   true that the faster I assume they are absorbed, the

09:41:12   5   higher my value that I come up with would be?

09:41:15   6       A.   Absolutely.

09:41:17   7       Q.   So if we were to say they're going to sell these

09:41:21   8   things at five lots per year, we'd come up with an even

09:41:25   9   higher value?

09:41:26  10            MR. ROBON:   Objection.

09:41:27  11       A.   Your value would be higher.

09:41:28  12       Q.   And you're using two --

09:41:30  13            MR. ROBON:   I made an objection, Your Honor.

09:41:33  14   Every question is yes or no.

09:41:35  15            THE COURT:   Every question is what?

09:41:37  16            MR. ROBON:   Requires a yes or no answer.

09:41:39  17   He's leading the witness.

09:41:41  18            THE COURT:   Well there's two different

09:41:43  19   points you're making.

09:41:51  20            There is a little leading.   The last answer

09:41:54  21   may stand, however.

09:41:55  22            MR. BAHRET:   Thank you, Your Honor.

09:41:57  23   BY MR. BAHRET:

09:41:58  24       Q.   Bob, were there any other major concerns for you?

09:42:01  25   I just want to shorten it up and get to your

09:42:04  1    conclusions, if we could.   If there's anything major

09:42:07  2    you feel you need to explain to the jury as to how you

09:42:10  3    got there and why you think your numbers are to be

09:42:12  4    supported, I'll give you a chance.   Just walk us

09:42:17  5    through in short form; speed it up, in other words.

09:42:20  6    Tell us your conclusions.

09:42:25  7       A.   Well, my conclusions were that you would sell two

09:42:29  8    lots per year, you'd sell the house and two lots per

09:42:33  9    year for five years.   The sixth year you would sell

09:42:37  10   three lots.   And that you would sell the non-railroad

09:42:44  11   fronting lots for $60,000, the railroad fronting lots

09:42:47  12   for $48,000, that you would not have any increase in

09:42:53  13   prices during the sell-out period, that they would be

09:42:57  14   flat.   And I base that on history, and Belmont Meadows

09:43:03  15   had steadily declining -- Belmont Woods, I'm sorry, that

09:43:07  16   had steadily declining sale prices.

09:43:09  17        And the only other factor is the discount rate

09:43:13  18   that you use, and  that I took out of a national

09:43:17  19   publication.   And that's basically the factor that

09:43:20  20   takes the annual cash flows and converts them to present

09:43:25  21   worth.   So those were my major assumptions.

09:43:29  22      Q.   Okay.   And using those assumptions, what value

09:43:32  23   did you put on the unsold property in Cambridge prior to

09:43:40  24   the tree removal?

09:43:43  25      A.   Including the house, $606,850.

09:43:53  1    Q.   And then after you factored in the tree removal,

09:43:57  2  did you come up with another number?

09:44:01  3    A.   When I looked at the drawing that Peterman had

09:44:04  4  done, and it showed, I think, maybe three of the lots --

09:44:11  5  three or four of the lots were affected by the tree

09:44:15  6  removal, and it was -- I scaled it off; it was about an

09:44:20  7  eight-foot wide section of trees that, according to

09:44:23  8  Peterman's sketch, had been removed.  What I did was

09:44:29  9  just estimate what it would cost to replace those trees.

09:44:34  10   Q.   Okay.

09:44:34  11   A.   So I figured river birch or other tall trees you

09:44:41  12  can buy 20, 25 foot tall trees, have them installed for

09:44:45  13  $400, $450.  How many trees would it take to fill in

09:44:49  14  that whole area?   And I think I calculated $20,000

09:44:54  15  dollars.

09:44:54  16   Q.   So what value did you come up with for the land,

09:44:58  17  the same --

09:45:00  18   A.   Essentially I just subtracted $20,000 of what I

09:45:04  19  thought it would cost to replace the foliage that

09:45:07  20  allegedly had been taken out.   And so that -- it was,

09:45:11  21  like, $586,000.

09:45:17  22   Q.   So a $20,000 difference?

09:45:19  23   A.   Yes.

09:45:19  24   Q.   Now, did there come a time when I asked you to

09:45:22  25  direct some attention to claims of ponding?

09:45:26　1　　A.　Yes, you did.

09:45:28　2　　Q.　And did you analyze that issue?

09:45:30　3　　A.　I did.　I wasn't able to come up with any

09:45:36　4　rational method for calculating the value based upon

09:45:43　5　occasional ponding at the back of a property.　And I

09:45:52　6　believe I just, for the lack of any rationale that I

09:45:57　7　could come up with, I didn't think that there was any

09:46:02　8　difference that I could measure as a result of that

09:46:07　9　factor.

09:46:08　10　　Q.　Did you, in fact, go back to the property site

09:46:12　11　when asked that question?

09:46:16　12　　A.　I did.　I went back; I went through the property

09:46:19　13　again.　I took some pictures of the backyard.　There

09:46:22　14　was a little bit of water.　It was a very rainy time of

09:46:25　15　year.　It was the very end of April, first of May at

09:46:28　16　the time.　I think I gave you the pictures earlier

09:46:31　17　today.　But there was some water in the very back of

09:46:37　18　the house that Mike McCarthy lived in.

09:46:40　19　　Q.　Did you have occasion to speak with Mr. McCarthy?

09:46:43　20　　A.　Yeah.　He -- he's the one who allowed me to have

09:46:47　21　a look at it.

09:46:51　22　　Q.　And my understanding is that Mr. McCarthy gave

09:47:03　23　you a copy of a picture he took back in 2006?

09:47:07　24　　A.　He did, yes.

09:47:08　25　　Q.　For the jury, that's the same picture that has

09:47:11   1   been marked as Exhibit 37.   And then you took a couple

09:47:14   2   of photos?

09:47:19   3      A.   The rest are photos I took.   The rest is taken

09:47:24   4   at lot 16; it shows some water at the very rear of lot

09:47:30   5   16 which is owned by Todd Berman, not part of my

09:47:34   6   appraisal.

09:47:35   7            MR. BAHRET:   This isn't yet marked as an

09:47:37   8   exhibit, but if counsel wants we can mark them.

09:47:40   9            MR. ROBON:   I want you to mark it.

09:47:42   10           MR. BAHRET:   Okay.

09:47:44   11           MR. ROBON:   Why didn't you provide these to

09:47:46   12   me previously?

09:47:47   13           THE COURT:   Gentlemen we'll have those

09:47:49   14   discussions, please, at the bench.   Otherwise, mark IT

09:47:51   15   before you discuss it so the record is clear or don't

09:47:54   16   use it.

09:48:20   17           For some reason this wasn't done before we

09:48:22   18   began testimony today.

09:48:24   19           MR. BAHRET:   Unfortunately I first saw these

09:48:27   20   photographs half an hour ago.

09:48:29   21           THE COURT:   Not an excuse.

09:48:29   22   BY MR. BAHRET:

09:48:36   23      Q.   I don't need to mark them.   I'll have you

09:48:39   24   describe.   What did you see?

09:48:43   25      A.   Essentially there's about maybe an eight- to

09:48:49  1   ten-foot wide section of water at the very rear of Mike

09:48:57  2   McCarthy's property, the property of the house he's

09:49:01  3   LIVING IN.  And there was, I think, a very small amount

09:49:04  4   on Berman's lot next door, five or ten feet, a small

09:49:12  5   puddle back there.

09:49:13  6      Q.   Did you get information from Mr. McCarthy about

09:49:17  7   how often this sort of thing happens or how long it

09:49:20  8   lasts?  I'm not asking you to repeat what he said; just,

09:49:31  9   did you get information from him?

09:49:32  10     A.   He talked about it, yes.

09:49:34  11     Q.   And using that information, did you -- was that

09:49:53  12   in your thought process as you were trying to determine

09:49:53  13   whether these temporary water issues affected the value?

09:49:54  14     A.   I believe there are periods of time during a

09:49:57  15   given year, especially during heavy rains, where there

09:50:02  16   was -- it was evident there was some water back there

09:50:07  17   that day; I could see that.  There is some water that

09:50:13  18   collects at the rear of his property, the property of

09:50:16  19   the house where he lives.  So yes, I mean, I believe it

09:50:20  20   does happen, yes.

09:50:24  21     Q.   With the ponding issue there, would you have the

09:50:26  22   same value for the house that you had in your original

09:50:29  23   calculation?

09:50:33  24     A.   My main problem is I didn't have any rationale

09:50:37  25   for --

```
09:50:38   1              THE COURT:  Is the answer yes to the
09:50:41   2   question?
09:50:41   3              THE WITNESS:  Could you repeat the question?
09:50:42   4              THE COURT:  Thank you.
09:50:43   5   BY MR. BAHRET:
09:50:43   6    Q.  When you directed your attention to the ponding
09:50:45   7   issue, did you come up with any different value for the
09:50:48   8   house than you had come up with before you --
09:50:53   9    A.  No.
09:50:54  10              MR. BAHRET:  Thank you.  I have no other
09:50:55  11   questions presently.
09:50:58  12              THE COURT:  Cross?
09:51:00  13                          - - -
09:51:00  14              ROBERT DOMINI, CROSS-EXAMINATION
09:51:45  15   BY MR. ROBON:
09:51:45  16    Q.  Mr. Domini, you and I know each other, correct?
09:51:48  17    A.  Yes, sir.
09:51:49  18    Q.  And you know that trees will not live in ponds,
09:51:59  19   correct?  Or don't you know that?
09:52:02  20    A.  No, if there's standing water, yes, trees will
09:52:08  21   not live.
09:52:09  22    Q.  If you lived in Mike McCarthy's house, wouldn't
09:52:13  23   you want to plant pine trees or build up a mound and try
09:52:18  24   and screen out the railroad track?
09:52:22  25    A.  I would.
```

09:52:26  1      Q.   And wouldn't it be fruitless to plant trees where
09:52:33  2   there's water if they're going to dye?
09:52:40  3      A.   Yeah.  I mean, I wouldn't --
09:52:44  4      Q.   Well, how can you possibly say to this jury that
09:52:47  5   there's no devaluation because the property floods?
09:52:51  6   That doesn't make any sense?
09:52:52  7      A.   I just said -- what I told Mr. Bahret is I
09:52:56  8   didn't -- I couldn't come up with any measurable
09:52:59  9   rationale for the occasional ponding, the occasional
09:53:04  10  water that occurs during rainy season at the very back
09:53:09  11  of that lot.
09:53:14  12     Q.   Would you tell the jury what you valued the lots
09:53:18  13  at before the cutting of the trees?
09:53:21  14     A.   $60,000, and $48,000.
09:53:24  15     Q.   Total for all the lots?
09:53:27  16     A.   $708,000.
09:53:30  17     Q.   $708,000.   And what did you value the trees
09:53:35  18  after?
09:53:35  19     A.   The trees, $20,000.
09:53:37  20     Q.   Not the trees, I mean the lots after the trees
09:53:40  21  were cut.
09:53:41  22     A.   The entire process, the after was just -- the
09:53:44  23  only difference I had was the cost to replace the trees,
09:53:48  24  $20,000.
09:53:49  25     Q.   So I would just subtract $20,000, correct?

09:53:57  1    A.   Well the $708,000 is the gross amount.  That

09:54:01  2  doesn't take into account the whole discounted cash

09:54:04  3  flow, et cetera.   That's okay.  But the difference is

09:54:07  4  the $20,000, yes.

09:54:08  5    Q.   So all I need to do is put up $20,000 damage,

09:54:15  6  right?

09:54:16  7    A.   To replace the eight-foot wide strip of trees.

09:54:21  8    Q.   Now, did you consult an arborist to give you a

09:54:26  9  price quotation on planting trees or brush or brambles?

09:54:32  10   A.   Yes.

09:54:32  11   Q.   You did?

09:54:33  12   A.   Yes.

09:54:33  13   Q.   And who was that?

09:54:34  14   A.   Bosgrove (phonetically).

09:54:37  15   Q.   And did he give you information where you came up

09:54:40  16  with this $20,000?

09:54:41  17   A.   I know that he can plant the tree that I

09:54:44  18  mentioned in my report for $400, $450.

09:54:49  19   Q.   And how many trees were you going to plant?

09:54:52  20   A.   I don't recall now.

09:54:54  21   Q.   And how big were the trees going to be?

09:54:56  22   A.   They were going to be 15, 20 feet tall.

09:54:59  23   Q.   15, 20 feet tall?

09:55:01  24   A.   And they were about ten foot wide.

09:55:06  25   Q.   And you don't recall how many, but he was going

| | | |
|---|---|---|
| 09:55:09 | 1 | to do it for? |
| 09:55:10 | 2 | A. Well, if it's $20,000 and it's $400 a tree, |
| 09:55:14 | 3 | that's -- isn't that 50? |
| 09:55:16 | 4 | Q. That's 50 trees? |
| 09:55:18 | 5 | A. Fifty trees. |
| 09:55:19 | 6 | Q. And he's going to plant 15-foot tall -- |
| 09:55:22 | 7 | A. 15 to 20. |
| 09:55:24 | 8 | Q. Norway? |
| 09:55:25 | 9 | A. No, river birch was the one that I -- I'm sure |
| 09:55:29 | 10 | there are other trees that would be equally as |
| 09:55:33 | 11 | attractive.   That's the one I personally have used that |
| 09:55:35 | 12 | I find is -- it's a good tall tree, and it's nice and |
| 09:55:41 | 13 | wide; it will spread out.   You can get them 12 foot |
| 09:55:46 | 14 | wide, maybe a little wider.   And when they fill out in |
| 09:55:50 | 15 | season, they provide a good screening. |
| 09:55:53 | 16 | Q. And is it an evergreen? |
| 09:55:55 | 17 | A. No, it isn't.   But there weren't -- never mind. |
| 09:55:59 | 18 | Q. Well, 12 feet, if I take, one, two, three, |
| 09:56:13 | 19 | four -- are you telling this jury that the trees that |
| 09:56:16 | 20 | are quoted on that are from my hand to the end of the |
| 09:56:21 | 21 | jury box wide now, when they would be planted? |
| 09:56:24 | 22 | A. The river birch that you would plant are -- I |
| 09:56:27 | 23 | didn't say necessarily 12.   Ten to 12, but they're a |
| 09:56:31 | 24 | good ten-foot wide, yes. |
| 09:56:34 | 25 | Q. Now? |

| | | |
|---|---|---|
| 09:56:35 | 1 | A.   The ones that you can get that are about 15 to 20 |
| 09:56:38 | 2 | feet tall. |
| 09:56:45 | 3 | Q.   Are you aware we had an arborist here yesterday |
| 09:56:48 | 4 | who said it would take, I think, $135,000 -- |
| 09:56:52 | 5 | MR. BAHRET:  Objection. |
| 09:56:55 | 6 | THE COURT:  Overruled. |
| 09:56:58 | 7 | Q.   --  to not only replace what was taken out, but |
| 09:57:03 | 8 | that he couldn't do it without bringing in substantial |
| 09:57:07 | 9 | amounts of topsoil to raise the grade so that there |
| 09:57:12 | 10 | would be no flooding and the trees wouldn't die?  That |
| 09:57:17 | 11 | seems like it's about seven or eight times as much as |
| 09:57:20 | 12 | what you're suggesting. |
| 09:57:23 | 13 | THE COURT:  Is that a question? |
| 09:57:27 | 14 | MR. ROBON:  Yes. |
| 09:57:28 | 15 | MR. BAHRET:  It didn't sound like a question |
| 09:57:29 | 16 | to me. |
| 09:57:32 | 17 | BY MR. ROBON: |
| 09:57:33 | 18 | Q.   Isn't that seven or eight times as much? |
| 09:57:35 | 19 | A.   That would be about seven times, yes. |
| 09:57:38 | 20 | Q.   Did you put any value on the nine trees that were |
| 09:57:45 | 21 | actually cut down as shown on the survey? |
| 09:57:50 | 22 | A.   I -- |
| 09:57:54 | 23 | Q.   Yes or no? |
| 09:57:55 | 24 | A.   No. |
| 09:58:21 | 25 | Q.   You've got no dollars for flooding, correct?   No |

09:58:30　1　dollars in reduction in value of the house?

09:58:33　2　　　A.　Correct.

09:58:55　3　　　Q.　And were you aware that these lots that initially

09:58:59　4　sold in the subdivision sold for as high as $145,000?

09:59:08　5　　　A.　Yes, I'm very aware of that.  Lot 16, and I

09:59:13　6　believe it was lot 17 sold for $140,000 and $145,000 to

09:59:18　7　builders.

09:59:21　8　　　Q.　And so you're telling this jury that lot 16 and

09:59:36　9　lot 17 sold for $140,000 and $145,000.  Lot 15 is next

09:59:42　10　to it.  And you're telling the jury that that's only

09:59:44　11　worth $48,000, correct?  A third?

09:59:51　12　　　A.　Can I explain?

09:59:52　13　　　Q.　Yes.

09:59:53　14　　　A.　Well, those lots were sold to two builders in

09:59:58　15　2001, in October and November of 2001.  Both of them to

10:00:04　16　this day still own those lots.  They bought those lots

10:00:08　17　in anticipation of building homes via building

10:00:12　18　contracts, and they have each sat on those lots for

10:00:16　19　seven long years without a building contract.  So those

10:00:22　20　are vacant lots today.  Todd Berman, lot 16, had to

10:00:28　21　enter a lottery to get that lot, which was generally

10:00:31　22　regarded as the best lot in the subdivision --

10:00:35　23　　　Q.　Right.

10:00:36　24　　　A.　-- and got no building contract in seven years.

10:00:39　25　　　Q.　But the question is, he was one -- he's one of

10:00:42   1   the premier builders in northwest Ohio?

10:00:46   2       A.  He is an excellent builder.  So is Todd

10:00:49   3   Huffman -- I'm sorry, Eric Huffman, and both of them

10:00:54   4   have their signs out front, and both of them have sat on

10:00:57   5   those for seven years with no building contract.

10:01:00   6       Q.  But when I see that you go from $145,000 down to

10:01:11   7   $48,000, that's a difference of $97,000.  I just have a

10:01:23   8   tough time -- I can see why it's only worth $48,000 now

10:01:28   9   because the trees are cut down, but you're telling the

10:01:32  10   jury that --

10:01:33  11               MR. BAHRET:  Your Honor, this isn't even a

10:01:34  12   question.   He's in closing argument.

10:01:37  13               MR. ROBON:  I'll rephrase it.

10:01:38  14               THE COURT:  Thank you.   The jury will

10:01:40  15   disregard the interrupted question.   Counsel will start

10:01:43  16   over.

10:01:44  17   BY MR. ROBON:

10:01:44  18       Q.  How many lots do you believe were affected by

10:01:48  19   tree cutting?

10:01:53  20       A.  I believe it was three or four.

10:02:01  21       Q.  All right.   Let's say it's four, lots 12 through

10:02:04  22   15.   Can you agree with that?

10:02:29  23       A.  That is correct.

10:02:31  24       Q.  So if you got four lots, and you're saying the

10:02:35  25   total damage was $20,000, that's $5,000 per lot,

10:02:41  1    correct?

10:02:43  2       A.   That's what I estimate it would cost to replace

10:02:46  3    the trees.

10:02:48  4       Q.   Now, how tall do you believe the brambles and the

10:02:53  5    trees were before they were cut down?   Do you have any

10:02:58  6    idea?

10:02:59  7       A.   Well, I used to have some of those brambles in my

10:03:03  8    backyard until they were cut down.   But --

10:03:07  9       Q.   Tell the jury how upset you and your wife were

10:03:11  10   when the county came by and cut the trees down in the

10:03:16  11   crick bank behind your house.

10:03:18  12      A.   As you well know, Mr. Robon, that's not a good

10:03:23  13   thing, and you're not happy about that.

10:03:26  14      Q.   Right.   In fact, it exposed an apartment

10:03:31  15   building that was on the other side of the creek of your

10:03:33  16   house, didn't it?

10:03:34  17      A.   Yes.

10:03:35  18      Q.   And you and your wife were livid.   And you

10:03:40  19   thought it damaged your property, right?

10:03:46  20      A.   Well, let's just say you're absolutely right, I

10:03:49  21   wasn't happy.

10:04:01  22           You were asking me about how tall they are.

10:04:12  23           MR. ROBON:   I don't have any further

10:04:14  24   questions.

10:04:18  25                              - - -

ROBERT DOMINI, REDIRECT EXAMINATION

BY MR. BAHRET:

Q.   How tall are they?

A.   When I was saying I had them in my backyard,
those are about usually 15, 20 feet tall, those
brambles.  Occasionally you'll get a tree in there that
will be taller.  But the brambles themselves get 15, 20
feet tall.

Q.   And where were these things located with
reference to your house?

A.   They were in a creek.   And many of them were on
the other side of the creek on the Dominion side.   But
the county, to clean the ditch, had to chop them all
down.

Q.   Okay.  So there's no action that you could take
since they're not in your yard?

A.   No.   The county had the right to do that.

Q.   You were asked about the sales.   Did you study
the sales activity and compare prices in Cambridge, sir?

A.   Yes, I did.  We were talking about the pricing of
the lot as compared to what Berman and Huffman had paid
in 2001, and that's when I was about to say, well, if
you look at the sales history of the subject property,
the sales started at $140,000; they went to $145,000,
and they declined all through the years until the last

10:05:46  1   sale was in January of 2004 at $90,000.  So they started

10:05:52  2   at 140, went to 145, and went down to 90.  And it was a

10:06:00  3   steady projection downward in that period of five years.

10:06:07  4       Q.  Mr. Domini, do you know, is it common as

10:06:10  5   subdivisions are in existence the longer they go, the

10:06:13  6   prices generally go down or up or stay the same, or

10:06:16  7   what?

10:06:16  8       A.  They usually go up.  And, in fact, when a

10:06:19  9   subdivision is nearing completion, usually there's a big

10:06:23  10  increase in the prices.

10:06:26  11      Q.  But not -- that has not been evident with

10:06:29  12  Cambridge?

10:06:29  13      A.  Cambridge did not have a single lot sell between

10:06:33  14  January of '04 and June of '06.  Not one during

10:06:39  15  excellent years.  And so the prices steadily declined

10:06:42  16  for five years, and then they stopped dead in January of

10:06:47  17  '04.

10:06:49  18      Q.  And just to explain, I'm sure I'll hear about

10:06:53  19  this later in closing, the $708,000 number that you gave

10:06:58  20  us is before reducing to present value?

10:07:00  21      A.  Exactly.  That -- and it doesn't include the

10:07:05  22  house.  But that's just the gross pricing of the lots

10:07:10  23  before you take into account the time value of money and

10:07:15  24  the selling expenses of marketing and so forth and

10:07:19  25  property taxes that occur during the sell out period.

| | | |
|---|---|---|
| 10:07:22 | 1 | And you're only going to sell two lots a year, so it |
| 10:07:25 | 2 | will be in six years, sell all those lots at these |
| 10:07:29 | 3 | prices. |
| 10:07:30 | 4 | Q.  And, Bob, did you have occasion to speak with |
| 10:07:32 | 5 | Huffman or Berman or Bill Schoen, any of those three? |
| 10:07:36 | 6 | A.  I spoke to Huffman and Berman.  Did not speak to |
| 10:07:42 | 7 | Bill. |
| 10:07:42 | 8 | Q.  Are they pleased with this development? |
| 10:07:44 | 9 | MR. ROBON:  Objection. |
| 10:07:45 | 10 | THE COURT:  Sustained. |
| 10:07:47 | 11 | MR. BAHRET:  No other questions. |
| 10:07:52 | 12 | - - - |
| 10:07:52 | 13 | ROBERT DOMINI, RECROSS-EXAMINATION |
| 10:07:53 | 14 | BY MR. ROBON: |
| 10:07:53 | 15 | Q.  Mr. Domini, when you discounted the $708,000, |
| 10:07:58 | 16 | could you tell the jury what number you discounted it |
| 10:08:02 | 17 | to? |
| 10:08:02 | 18 | A.  Not only did I -- |
| 10:08:04 | 19 | Q.  This is before the trees were cut, right? |
| 10:08:07 | 20 | A.  Right. |
| 10:08:07 | 21 | Q.  And how much was that? |
| 10:08:08 | 22 | A.  Well, it also included in that figure was the |
| 10:08:14 | 23 | house. |
| 10:08:15 | 24 | Q.  No, I'm looking at your report.  It says |
| 10:08:19 | 25 | $606,850. |

| | | |
|---|---|---|
| 10:08:20 | 1 | A. But that included the house. |
| 10:08:21 | 2 | Q. That includes the house? |
| 10:08:22 | 3 | A. Yes. |
| 10:08:22 | 4 | Q. And all the lots? |
| 10:08:23 | 5 | A. Yes. |
| 10:08:24 | 6 | Q. All the lots in the subdivision? |
| 10:08:26 | 7 | A. Yes. |
| 10:08:28 | 8 | Q. Well, there are 13 lots. |
| 10:08:30 | 9 | A. That's what happens over time when you have -- |
| 10:08:36 | 10 | Q. So you're telling this jury that before -- |
| 10:08:39 | 11 | THE COURT: Let's let him finish the answer. |
| 10:08:42 | 12 | That's what happens over time when you have -- |
| 10:08:45 | 13 | A. That's what happens over time when you have a |
| 10:08:47 | 14 | property that's not increasing in value that's selling |
| 10:08:50 | 15 | only two lots per year. And when you discount and |
| 10:08:53 | 16 | deduct the expenses over a six-year period, your value |
| 10:08:58 | 17 | is dramatically affected. And it's not -- it's going to |
| 10:09:06 | 18 | be worth a lot less than it is if you sold them all |
| 10:09:10 | 19 | outright now. |
| 10:09:11 | 20 | Q. The $606,850 is with the house on lot 15? |
| 10:09:16 | 21 | A. That is with the house, but that's what happens |
| 10:09:18 | 22 | when you sell them every year, when you sell them on an |
| 10:09:23 | 23 | annual basis, it's going to take six years to sell them |
| 10:09:26 | 24 | off. |
| 10:09:26 | 25 | Q. Then what would you tell the jury the value was |

10:09:29   1   after the trees were cut?

10:09:33   2       A.   I told you, I just subtracted the $20,000 which I

10:09:37   3   thought it would cost to replace those trees.

10:09:41   4       Q.   So that's $586,850.

10:09:49   5       A.   Correct.

10:09:50   6       Q.   So if I take your $586,000, and I subtract

10:10:13   7   $310,000 for the house -- is that what I would do?

10:10:18   8       A.   Well --

10:10:19   9       Q.   I mean, if I'm trying to figure out the value of

10:10:22   10  the lots --

10:10:23   11      A.   The only way to do that would be to go back to

10:10:28   12  the back to the discounted cash flow, take the house out

10:10:32   13  of there, and do it without the house being in there.

10:10:35   14  The first year cash flow had the house in it.   So --

10:10:39   15      Q.   Well, my question is --

10:10:40   16      A.   I don't think you can just do it and subtract.

10:10:43   17      Q.   I can't subtract $310,000?

10:10:45   18      A.   Well, I have the house selling the first year.

10:10:49   19      Q.   Do you have it selling for 310?

10:10:51   20      A.   Yeah.

10:10:54   21      Q.   So should I discount it one year?

10:10:57   22      A.   That's what I did, yeah.   That would be

10:11:00   23  discounted at one year.

10:11:01   24      Q.   Discount at 10 percent?

10:11:04   25      A.   This is a 20 percent discount rate.

10:11:07   1      Q.   So if I take $310,000 by 20 percent, that's --

10:11:15   2           THE JUROR:   62.

10:11:17   3      A.   I'm not sure.

10:11:18   4      Q.   Well, ten percent would be 31.

10:11:22   5      A.   I'm not sure that's exactly going to work out,

10:11:24   6  but it won't be that far off if you want to do it that

10:11:27   7  way.

10:11:28   8      Q.   So let's say ten percent off the house.

10:11:30   9      A.   That would be 240, something like that.

10:11:34  10  Discounting it one year.

10:11:36  11      Q.   Well, it would be --

10:11:37  12      A.   It would be 80 percent of --

10:11:42  13      Q.   248?

10:11:45  14      A.   Somewhere in that range.

10:11:59  15      Q.   So you're telling the jury that the lots, the 13

10:12:04  16  lots are only worth now, after the trees are gone,

10:12:13  17  338,850 bucks, right?  That's what you said?  I just did

10:12:28  18  the math.

10:12:29  19      A.   I didn't do my appraisal that way, and --

10:12:33  20      Q.   But that's the effect of it; is it not?

10:12:36  21      A.   If you effectively want to make those

10:12:38  22  calculations, that sounds reasonable.

10:12:39  23      Q.   And that's for 13 lots, right?

10:12:46  24      A.   That's what happens when you sell two of

10:12:48  25  something per year over a six-year period.   It wastes

| | |
|---|---|
| 10:12:54 | 1 |
| 10:12:58 | 2 |
| 10:13:03 | 3 |
| 10:13:09 | 4 |
| 10:13:12 | 5 |
| 10:13:16 | 6 |
| 10:13:22 | 7 |
| 10:13:25 | 8 |
| 10:13:31 | 9 |
| 10:13:36 | 10 |
| 10:13:37 | 11 |
| 10:13:43 | 12 |
| 10:13:44 | 13 |
| 10:13:47 | 14 |
| 10:13:50 | 15 |
| 10:13:50 | 16 |
| 10:13:51 | 17 |
| 10:13:53 | 18 |
| 10:13:55 | 19 |
| 10:13:58 | 20 |
| 10:14:06 | 21 |
| 10:14:07 | 22 |
| 10:14:10 | 23 |
| 10:14:11 | 24 |
| 10:14:20 | 25 |

1  away your value tremendously.  Any developer will tell

2  you that if you don't sell off your lots pretty darn

3  quickly, that it's a wasting away process.  And it

4  really deteriorates your value.  The longer it takes

5  and the slower your lots sell out, the less profitable

6  it is, and the less you end up with.  And that's the

7  worst thing that can happen when you develop a property

8  is to have very, very slow sales.

9      Q.  And did you look at Mr. Keesey's appraisal?

10     A.  I did.

11     Q.  He used a different methodology, correct, in

12  doing his appraisal?

13     A.  He simply added all the lots up.

14     Q.  The question is:  Did he use a different

15  methodology?

16     A.  Yeah.

17     Q.  He used a retail value as opposed to a

18  subdivision discount, correct?

19     A.  Yes.

20         MR. ROBON:  No further questions.

21         THE COURT:  Why are you standing up?

22         MR. BAHRET:  Do you want me to sit?

23         THE COURT:  Usually we only let the lawyers

24  go two rounds.  There was a new area of inquiry,

25  although there was no objection to it.  Had there been,

10:14:22  1    I would sustain it.  I will allow you very limited

10:14:25  2    inquiry into that new area.

10:14:28  3    BY MR. BAHRET:

10:14:29  4       Q.  Bob, the only thing I want to ask you about is

10:14:31  5    the Keesey report.  You were asked if he used a

10:14:36  6    different methodology.

10:14:37  7       A.  Yes.

10:14:38  8       Q.  Do you disagree with his methodology?

10:14:40  9       A.  I do.

10:14:41  10      Q.  Why?

10:14:41  11      A.  Well, you can't take lots or -- well, let's just

10:14:49  12   say you can't take lots and say, okay, here's the value

10:14:52  13   of your eight or ten or 13 lots or whatever it is, and

10:14:56  14   add them up and say, here's your number, and that is

10:14:58  15   what the whole thing is worth.  Because you can't sell

10:15:01  16   all of those lots within, say, six months, or whatever

10:15:06  17   current market value would be.  If you want to add all

10:15:09  18   those up into a value, you have to sell them all within

10:15:13  19   six months.  If it's going to take you years, in my

10:15:16  20   estimation, a good six years to sell them off, that is

10:15:19  21   not your value.  It's not worth what those are all added

10:15:24  22   up as a sum total.  That's incorrect.

10:15:29  23      Q.  You need to consider not only present value, but

10:15:33  24   the expenses associated with keeping them for six years?

10:15:36  25      A.  You're going to have selling expenses; you're

```
10:15:39   1   going to have property taxes, and so on and so forth
10:15:42   2   over a six-year period.   They're not worth that because
10:15:44   3   you can't sell them for that today.
10:15:46   4              MR. BAHRET:  Thank you very much.   And
10:15:47   5   thank you, Your Honor, for letting me go there.
10:15:50   6              THE COURT:  You may step down.
10:16:00   7              Defendants may call its next witness.
10:16:04   8              Ladies and gentlemen, do you want to take a
10:16:06   9   break?  We'll take our morning break.   It's 10:15.
10:16:11  10   15 minutes.   10:30.  Please remember the rules.
10:16:14  11              (Recess taken.)
10:17:00  12              (Jury exits the courtroom.)
10:17:01  13              THE COURT:  I have had an opportunity to
10:17:02  14   review two exhibits that I did not rule on this morning.
10:17:05  15   Exhibit Number 91, a photograph, was discussed with Mr.
10:17:10  16   Sumner.   He could not identify the exhibit; and
10:17:13  17   therefore, I'm going to sustain the objection, and
10:17:16  18   Exhibit 91 will not be admitted.
10:17:18  19              With respect to Exhibit 92, this is the
10:17:22  20   picture of the tree stump with the red line.   This was
10:17:25  21   also discussed with Mr. Sumner who could not identify
10:17:28  22   the exhibit as to taking of the photo or the location of
10:17:31  23   the photo.   Mr. Huber did discuss the exhibit briefly
10:17:38  24   with respect to the tree stump but made no
10:17:40  25   identification of the location of the photograph.   And
```

10:17:42  1    Mr. McCarthy did testify about the exhibit, indicated
10:17:46  2    that either he took the photo or was present when it was
10:17:50  3    taken.  However, there is a red line in the photograph.
10:17:53  4    And there was no foundation presented during his
10:17:55  5    testimony.  In fact, there was an objection to Mr.
10:17:58  6    McCarthy testifying about the red line.  I sustained
10:18:02  7    that objection; and therefore, consistently, will rule
10:18:05  8    out Exhibit Number 92 which, although it may have some
10:18:09  9    probative value, I believe is outweighed by prejudice or
10:18:15  10   confusion because of the red line in the photograph.
10:18:18  11              MR. ROBON:  Your Honor, could we just cut
10:18:20  12   off the red line?
10:18:22  13              THE COURT:  You could; however, at this
10:18:23  14   point the photograph has been discussed with the red
10:18:26  15   line.  And to now take it out and to alter it in order
10:18:29  16   to allow it to be admitted, I'm hesitant to do that.
10:18:34  17   But if counsel doesn't object to taking it out -- I'm
10:18:38  18   not sure how you take it off.
10:18:43  19              MR. ROBON:  I was going to say with a paper
10:18:46  20   cutting.
10:18:46  21              MR. BAHRET:  That will draw their attention
10:18:48  22   to it more.
10:18:49  23              MR. ROBON:  They won't know what it was.
10:18:50  24              THE COURT:  Then it will be a strange
10:18:52  25   photograph to them that's been cut off.  I think it

10:18:55   1   raises more questions and contributes to my concern

10:18:58   2   about confusion and misleading the jury.   Therefore, I

10:19:01   3   will rule out Exhibit 92 as well.

10:19:04   4           That covers the exhibits that have been

10:19:06   5   presented to me for ruling.   You may have some more

10:19:09   6   that you're going to talk about.   We'll deal with those

10:19:12   7   later.

10:19:12   8           MR. ROBON:  Your Honor, we would move to

10:19:14   9   strike Mr. Domini's testimony.   None of his opinions

10:19:18   10   met the standard of the rules of being to a reasonable

10:19:22   11   degree of certainty.   He never was asked that question

10:19:25   12   at any point in time.

10:19:29   13           MR. WATKINS:  No objection was made either.

10:19:32   14           THE COURT:  I'll overrule the objection.

10:19:36   15   The jury can weigh the testimony of the two experts and

10:19:39   16   determine what they want to do with it.

10:19:41   17           (Recess taken.)

10:32:27   18           (The witness was sworn by the clerk.)

10:32:28   19           THE COURT:  Defendant has called its next

10:32:30   20   witness.   He has been sworn, and you may inquire.

10:32:37   21                   - - -

10:32:37   22           TODD JENKINS, DIRECT EXAMINATION

10:32:39   23   BY MR. BAHRET:

10:32:39   24     Q.  Sir, could you introduce yourself to the jury,

10:32:43   25   please.

10:32:43 1    A.   Yes.   My name is Todd Jenkins.   I'm with

10:32:47 2  Peterman Associates.

10:32:48 3    Q.   Peterman Associates is what sort of firm?

10:32:50 4    A.   A civil engineering and architectural firm.

10:32:54 5    Q.   What is your specialty?

10:32:56 6    A.   I am the engineering project manager,

10:32:59 7  specializing in the civil engineering portion of the

10:33:01 8  company.

10:33:01 9    Q.   And are you trained as a civil engineer?

10:33:05 10   A.   Yes, I am.   I have a bachelor's and master's

10:33:08 11  degree in civil engineering.

10:33:10 12   Q.   Where did you get your master's?

10:33:12 13   A.   University of Toledo.

10:33:14 14   Q.   How long have you been affiliated with Peterman?

10:33:17 15   A.   Since 1994.

10:33:18 16   Q.   And in the course of your association with

10:33:20 17  Peterman, were you called upon to participate in any

10:33:22 18  part of the plan for Cambridge Subdivision?

10:33:25 19   A.   Yes, I was.

10:33:26 20   Q.   What was your role?

10:33:27 21   A.   I was the engineer that oversaw the design of the

10:33:30 22  original subdivision.

10:33:32 23   Q.   Okay.   And did that include laying out the lots

10:33:35 24  and so forth?

10:33:36 25   A.   Yes, laying out the lots, roadways, and

10:33:39  1    utilities.

10:33:40  2        Q.   Did that include the drainage plan?

10:33:42  3        A.   Yes, it did.

10:33:57  4        Q.   You recognize Exhibit M?

10:34:02  5        A.   Yes, Exhibit M are the construction drawings for

10:34:07  6    Cambridge Subdivision.

10:34:08  7        Q.   Are these things you prepared or supervised the

10:34:11  8    preparation over?

10:34:11  9        A.   I supervised the preparation.

10:34:14  10       Q.   Is that an accurate copy of the plans?

10:34:17  11       A.   It appears to be, yes.

10:34:19  12       Q.   And can you identify Exhibit F?

10:34:27  13       A.   Exhibit F is sheet 9 out of the construction

10:34:30  14   drawings which is the grading plan for Cambridge

10:34:35  15   Subdivision.

10:34:35  16       Q.   So that would be in here also?

10:34:37  17       A.   Yes, it should be.

10:34:39  18       Q.   Okay.  Can you describe what the identifying

10:34:48  19   marks and so forth are on that drainage plan for the

10:34:51  20   jury?

10:34:54  21       A.   There are numbers that are listed which are

10:34:58  22   elevations that show the proposed elevations throughout

10:35:01  23   the subdivision.  There are squiggle lines with

10:35:05  24   arrowheads that indicate the direction of surface water

10:35:08  25   drainage.

10:35:09　1　　Q.　Would it be possible, Mr. Jenkins, could you step

10:35:12　2　over here perhaps and use this device?  If you put it

10:35:16　3　down here -- I know it's a large document, but you might

10:35:20　4　be able to point and explain the things on there.

10:35:34　5　　A.　All right.  The dash lines here with these

10:35:38　6　numbers indicate the existing elevations prior to

10:35:41　7　construction.　These numbers here show proposed

10:35:48　8　elevation, these numbers here.　These numbers in the

10:35:52　9　square show where the building pad elevation should be

10:35:56　10　following the end of construction.　These lines here

10:35:59　11　indicate where storm sewers are located.　The locations

10:36:04　12　labelled with a CB and then a number, those are catch

10:36:08　13　basins which drain surface water, and these squiggle

10:36:12　14　lines here with the arrowheads show the direction that

10:36:15　15　the surface water should flow in order to get into those

10:36:18　16　catch basins.

10:36:19　17　　Q.　Could you take us down and show us the flow

10:36:21　18　starting at lot 9?

10:36:38　19　　A.　Starting up here at lot 9, the rear of the lots

10:36:42　20　were to drain to a catch basin that was to be installed

10:36:45　21　in this location.　The side lot here and the rear lot

10:36:48　22　was also to drain back to this catch basin.　The

10:36:51　23　drainage from lot 10 in the rear yard was to drain back

10:36:55　24　to that catch basin then here in between these lots to

10:37:00　25　this catch basin.

10:37:01  1    Q.   Do I understand correctly lot 9, the water is

10:37:04  2    draining --

10:37:06  3    A.   Looking at that map from the bottom, it's

10:37:09  4    draining from my left to right.  And lot 10 is going

10:37:12  5    from my right to left.  Yes.

10:37:17  6    Q.   And what are these things written outside the --

10:37:25  7    do you see where I'm pointing, the squigglies that are

10:37:29  8    on the south side of that dark line?

10:37:32  9    A.   These here?

10:37:39  10   Q.   Right there.

10:37:39  11   A.   Those lines are existing contours.

10:37:44  12   Q.   Let me get that so the jury can see it.   These

10:37:46  13   are existing contours?

10:37:48  14   A.   Yes.

10:37:49  15   Q.   Does that tell us which way those are sloped?

10:37:56  16   A.   In this particular location, I don't have enough

10:37:59  17   labels to show exactly where those are sloped.   Further

10:38:02  18   down here -- wait a minute.   I can trace it through.

10:38:09  19   These contours slope this way.

10:38:13  20   Q.   So it's sloped towards -- from the railroad

10:38:16  21   property, those contours are on the railroad property?

10:38:19  22   A.   Yes, correct.

10:38:20  23   Q.   So it's sloped toward Cambridge?

10:38:24  24   A.   Yes.

10:38:29  25   Q.   Is it the same deal down here behind lot 15?

10:38:33  1     A.   Yes.

10:38:35  2     Q.   So in the area behind lot 15, the railroad

10:38:38  3   property slopes towards Cambridge?

10:38:40  4     A.   Yes.   There's a portion of the railroad property

10:38:44  5   that slopes towards Cambridge.

10:38:45  6     Q.   So did you -- I think you can go ahead and take

10:38:49  7   your seat back.

10:38:51  8          Did you have to account for some water coming

10:38:53  9   from the railroad then when developing the water plan

10:39:00  10   for Cambridge?

10:39:00  11     A.   Yes, we did.

10:39:03  12     Q.   Was the Cambridge Subdivision water plan supposed

10:39:08  13   to be -- I'll call it self-contained?

10:39:12  14     A.   Yes, all the water from the subdivision was to

10:39:15  15   drain internally to the storm drains that were designed

10:39:18  16   for the subdivision.

10:39:19  17     Q.   Plus some from the railroad?

10:39:20  18     A.   Yes.

10:39:21  19     Q.   And would you tell us what the design standard

10:39:24  20   for the drainage plan was?

10:39:26  21     A.   The design standard was for a five-year design

10:39:29  22   standard.

10:39:29  23     Q.   And you're going to have to help us with that

10:39:32  24   one, sir.

10:39:32  25     A.   Sure.   That would mean on average three inches

| 10:39:36 | 1 | of rainfall over a 24-hour period. |
| 10:39:38 | 2 | Q.   The should be able to handle that then? |
| 10:39:41 | 3 | A.   Yes, that's correct. |
| 10:39:42 | 4 | Q.   What if it exceeds that? |
| 10:39:44 | 5 | A.   If it exceeds that, then the sewers would back up |
| 10:39:47 | 6 | and you would have water that would flow basically out |
| 10:39:50 | 7 | of the catch basins and onto the surface. |
| 10:39:52 | 8 | Q.   Ponding? |
| 10:39:53 | 9 | A.   Ponding, yes. |
| 10:39:55 | 10 | Q.   And you're familiar with the past couple of years |
| 10:39:59 | 11 | in northwest Ohio? |
| 10:40:00 | 12 | A.   Yes. |
| 10:40:01 | 13 | Q.   And generally familiar including up here, not |
| 10:40:05 | 14 | just Findlay? |
| 10:40:06 | 15 | A.   Yes. |
| 10:40:07 | 16 | Q.   Have you had more than one storm exceeding the |
| 10:40:10 | 17 | design standards for the drainage plan for -- |
| 10:40:15 | 18 | MR. ROBON:  Objection. |
| 10:40:16 | 19 | THE COURT:  Grounds? |
| 10:40:17 | 20 | MR. ROBON:  I don't think he's qualified. |
| 10:40:18 | 21 | I think you need someone from the Bureau of Statistics, |
| 10:40:22 | 22 | from the Toledo Express Airport. |
| 10:40:24 | 23 | THE COURT:  Let's see if there's any more |
| 10:40:26 | 24 | information he can elicit that would allow him to do the |
| 10:40:29 | 25 | same thing. |

10:40:29  1  BY MR. BAHRET:

10:40:29  2     Q.  Are you familiar with rainfall amounts that have

10:40:32  3  fallen in the last couple of years?

10:40:34  4     A.  Yes, from hearing the news and so forth, yes.

10:40:37  5     Q.  And from those reports have you received

10:40:39  6  information that we've exceeded the design standards for

10:40:43  7  Cambridge on more than one occasion?

10:40:45  8                MR. ROBON:  Objection.  There's no

10:40:52  9  evidence, Your Honor, that that rain occurred at the

10:40:55  10  Cambridge subdivision.  We know Findlay flooded, where

10:41:02  11  he lived.

10:41:04  12                MR. BAHRET:  I asked him if he was familiar

10:41:06  13  with this area as well, not just Findlay.

10:41:08  14                THE COURT:  I understand.  Is there any

10:41:10  15  other information you can elicit as foundation for his

10:41:13  16  testimony?

10:41:16  17                MR. BAHRET:  Just his familiarity with it.

10:41:18  18  He says he knows.

10:41:20  19                THE COURT:  Is this something that you

10:41:22  20  utilize in the ordinary course of your business, your

10:41:25  21  profession?

10:41:27  22                THE WITNESS:  We typically will just out of

10:41:29  23  professional interest observe rain fall amounts,

10:41:33  24  different storms and so forth.  Again, following the

10:41:36  25  news and so forth.  I have not looked up specific

10:41:39  1    statistics for the Cambridge Subdivision, that area or

10:41:43  2    from Toledo Express Airport; however, I am generally

10:41:45  3    familiar with the severity of the rainfalls that we've

10:41:49  4    had in recent years.

10:41:50  5              THE COURT:  And you're familiar with that

10:41:52  6    severity because of a passing interest?

10:41:57  7              THE WITNESS:  Because I would say a

10:41:58  8    professional interest because obviously we design

10:42:03  9    drainage, so the amount of rainfall that we're getting

10:42:06  10   is of interest, and how that affects developments that

10:42:09  11   we're designing and so forth.

10:42:12  12             THE COURT:  I'll overrule the objection and

10:42:14  13   allow him to answer.

10:42:15  14   BY MR. BAHRET:

10:42:16  15   Q.  Sir, to take that point a bit further, since you

10:42:21  16   do design drainage plans, if we would year after year

10:42:24  17   after year have excessive rain, would you increase the

10:42:27  18   design standards for the next subdivision?

10:42:29  19   A.  We would not increase the design standard;

10:42:32  20   however, we would discuss with our clients the severity

10:42:35  21   of the rainfalls that we've been experiencing and pose

10:42:38  22   the question to them whether they would want us to

10:42:40  23   exceed the design standard or not simply to further

10:42:43  24   protect their subdivision.

10:42:44  25   Q.  And if you would design it to -- what's the next

10:42:50  1    term?  You said yours was a five-year standard?

10:42:52  2        A.  The next is a ten-year.

10:42:56  3        Q.  Would it cost more to do a ten-year drainage plan

10:43:00  4    than a five-year?

10:43:00  5        A.  To construct?

10:43:01  6        Q.  Yeah.  What's the factor?  Why would a client

10:43:04  7    refuse?

10:43:05  8        A.  There's a cost factor for construction.

10:43:07  9        Q.  Okay.  Now, getting back to the question that got

10:43:11  10   us here, do you have information as to whether we've had

10:43:15  11   more than one storm in 2006 and 2007 that exceeds the

10:43:18  12   design standard for the Cambridge Subdivision drainage

10:43:23  13   plan?

10:43:23  14       A.  Again, from following the news and so forth I can

10:43:26  15   say:  Yes, there have been several storms that have

10:43:28  16   exceeded that.

10:43:29  17       Q.  And would it be reasonable to expect any -- is

10:43:34  18   ponding the proper term to use?

10:43:35  19       A.  Yes, that can be used.

10:43:37  20       Q.  Would it be reasonable to expect ponding in the

10:43:39  21   back of the Cambridge Subdivision when we have those

10:43:42  22   storms?

10:43:42  23       A.  Yes.

10:43:44  24            MR. ROBON:  Objection?

10:43:47  25            THE COURT:  Overruled.

10:43:51  1     A.   Yes.

10:43:52  2              THE COURT:  You may cross.

10:43:53  3              MR. ROBON:  Thank you, Your Honor.

10:43:53  4                         -  -  -

10:43:53  5          TODD JENKINS, CROSS-EXAMINATION

10:43:53  6     BY MR. ROBON:

10:43:56  7     Q.   Mr. Jenkins, in the last two or three weeks has

10:44:00  8     there been a lot of rain in Perrysburg or very little?

10:44:02  9     A.   Recently I haven't paid attention to the news to

10:44:05  10    see if there was in Perrysburg.

10:44:07  11    Q.   Let's just assume there was very little.  Okay?

10:44:10  12    A.   Okay.

10:44:10  13    Q.   My question to you is:  When the jury went out to

10:44:13  14    the Cambridge Subdivision, and some of the jurors walked

10:44:18  15    up on the railroad bank and they looked down on lot 16,

10:44:26  16    And they saw water that was probably, I would guess,

10:44:29  17    somewhere between ten and 15 inches deep just sitting

10:44:34  18    there --

10:44:35  19             MR. BAHRET:  Your Honor, I'm going to object

10:44:36  20    to him saying that was on lot 16.

10:44:42  21             THE COURT:  I think we should stay away from

10:44:44  22    describing what the jury saw in the jury view.  What

10:44:48  23    the jury saw on the jury view, as I indicated at the

10:44:51  24    start of the trial, is not evidence.  It was an

10:44:53  25    orientation.  And you can ask a question, I think,

| | | |
|---|---|---|
| 10:44:58 | 1 | without referencing what you saw or what they may have |
| 10:45:01 | 2 | seen during that jury view, please. |
| 10:45:05 | 3 | BY MR. ROBON: |
| 10:45:05 | 4 | Q.  Assume that there's ten to 15 inches of water. |
| 10:45:09 | 5 | There actually was a 12-inch pipe that came out from the |
| 10:45:13 | 6 | railroad property that you could see the 12 inch |
| 10:45:16 | 7 | diameter pipe, and it was under water by probably three |
| 10:45:19 | 8 | inches.   Assume that's there.   Would that water be |
| 10:45:25 | 9 | coming from the Cambridge Subdivision, or would it be |
| 10:45:27 | 10 | coming from another source since there was no rain? |
| 10:45:32 | 11 | MR. BAHRET:  I object to him saying there's |
| 10:45:34 | 12 | been no rain.   There was rain. |
| 10:45:36 | 13 | MR. ROBON:  No significant rain. |
| 10:45:37 | 14 | THE COURT:  It's an assumption in the |
| 10:45:39 | 15 | question.   The objection is overruled.   The witness may |
| 10:45:42 | 16 | answer. |
| 10:45:42 | 17 | A.  I don't have enough information, having not |
| 10:45:45 | 18 | observed the site recently.   I don't know how I could |
| 10:45:48 | 19 | answer the question where the water came from. |
| 10:45:49 | 20 | Q.  Why wouldn't you have stopped out at the site on |
| 10:45:52 | 21 | the way here this morning so that you could personally |
| 10:45:55 | 22 | examine it and tell the jury about the water? |
| 10:46:01 | 23 | A.  I did not think about swinging by the |
| 10:46:05 | 24 | subdivision, no. |
| 10:46:05 | 25 | Q.  And the attorney for the City or the City |

10:46:07  1   engineers didn't tell you to?

10:46:08  2       A.  No.   No one's given me any instructions.

10:46:11  3       Q.  Were you aware of the manhole on the railroad

10:46:15  4   property probably about 100, 150 feet north of the

10:46:22  5   corner of lot 16?

10:46:27  6       A.  I was not aware of it.   I've been told about it

10:46:29  7   recently.

10:46:45  8               MR. ROBON:  Your Honor, could I have the

10:46:46  9   witness come over to the board here?

10:46:50  10              THE COURT:  Sure.

10:47:02  11  BY MR. ROBON:

10:47:03  12      Q.  This is a graphic that has been drawn.   This

10:47:07  13  is -- the drain that you show in your plans is here.

10:47:11  14  There is a manhole --

10:47:13  15              MR. BAHRET:  You guys are going to have to

10:47:15  16  reposition.   Not everybody can see what you're trying

10:47:15  17  to do.

10:47:15  18  BY MR. ROBON:

10:47:18  19      Q.  There is a manhole here on the railroad property

10:47:21  20  that the evidence has indicated that it used to go under

10:47:25  21  the old Toledo terminal tracks to this ditch and empty.

10:47:31  22  AND when they put the City waterline in here, they cut

10:47:35  23  this 24-inch diameter drain pipe and did not replace it.

10:47:42  24  They just bulkheaded it.   So now the evidence has been

10:47:46  25  that there's a railroad drain that enters here, goes

| | | |
|---|---|---|
| 10:47:51 | 1 | down to here, and there's one here that goes down to |
| 10:47:54 | 2 | here, and in this whole area, water is ponding, and the |
| 10:48:01 | 3 | water runs this way.  We saw a video this morning that |
| 10:48:05 | 4 | Mr. McCarthy, who lives in lot 15, we saw the water come |
| 10:48:09 | 5 | this way.   Now, my question to you is, the drainage |
| 10:48:13 | 6 | system that you designed did not account for water |
| 10:48:18 | 7 | coming from off the subdivision, correct? |
| 10:48:21 | 8 | A.   Not all of this down here.   It only accounted |
| 10:48:25 | 9 | for a minimal amount along here.   The ditch handled the |
| 10:48:29 | 10 | rest. |
| 10:48:30 | 11 | THE COURT:  You're going to have to keep |
| 10:48:31 | 12 | your voice up or give Mr. Jenkins the microphone. |
| 10:48:59 | 13 | (Discussion had off the record.) |
| 10:49:00 | 14 | BY MR. ROBON: |
| 10:49:00 | 15 | Q.   Also, Mr. McCarthy brought some fill dirt in one |
| 10:49:04 | 16 | day after they cut the trees.   He thought he was going |
| 10:49:08 | 17 | to build a barrier, said, Stop, because you're going |
| 10:49:11 | 18 | to -- |
| 10:49:12 | 19 | MR. BAHRET:  Objection. |
| 10:49:13 | 20 | THE COURT:  Get to the question without -- |
| 10:49:16 | 21 | Q.   Anyway, there's fill dirt that's been brought in |
| 10:49:18 | 22 | on the back of lot 16 here and also on 15.   Mr. |
| 10:49:22 | 23 | McCarthy testified that he put a drain pipe from here |
| 10:49:26 | 24 | out to here, that's the 12-inch pipe that I referenced a |
| 10:49:33 | 25 | little bit ago that's under water.   Is it probable that |

10:49:36  1   the water that's in this drain tile is now emptying out

10:49:41  2   here or coming out here and that's where all this water

10:49:46  3   is coming from?  This since that has been cut --

10:49:53  4       A.  To clarify, he connected the 12 inch tile to the

10:49:56  5   drain on the railroad property and extended over?

10:49:58  6       Q.  Yes.

10:49:59  7       A.  In that situation it would be potentially

10:50:02  8   possible that water could back up through there, yes.

10:50:05  9       Q.  Because the water would have no outlet here?

10:50:09  10  It's just going to go wherever it can get out, correct?

10:50:12  11  That's what water does?

10:50:13  12      A.  Based on what I've seen here, yes.

10:50:16  13      Q.  Now, my next question to you is:  The grade that

10:50:19  14  was on the railroad here all the way up to Ford Road has

10:50:23  15  been raised because when they excavated the six and a

10:50:29  16  half foot high tile for the water main, they kept all of

10:50:34  17  the earth on-site.  So I don't know if they raised it

10:50:39  18  six inches or two feet, but they raised the grade.

10:50:43  19  Where is that water going?

10:50:45  20          MR. BAHRET:  Objection.  It assumes there's

10:50:49  21  more water that would hit it just because it's higher.

10:50:49  22  BY MR. ROBON:

10:50:51  23      Q.  If there's no drain on the railroad site on this

10:50:54  24  side of the waterline, it would run onto the Cambridge

10:51:01  25  property, wouldn't it?

10:51:03  1          THE COURT:  Mr. Jenkins, do you understand

10:51:05  2   the question?

10:51:09  3          THE WITNESS:  Your Honor I'm trying to

10:51:10  4   follow exactly what he's getting at.

10:51:12  5      A.  I think based on where that fill would be placed,

10:51:15  6   I don't know how I could actually answer that question.

10:51:21  7      Q.  But the water on the railroad property has to go

10:51:25  8   someplace, right?

10:51:26  9      A.  Yes, the water has to go somewhere.

10:51:27  10     Q.  And you would agree with me that on your

10:51:29  11  topographical map, the railroad here is higher than the

10:51:33  12  back of the lots 9 to 16?

10:51:37  13     A.  Yes, there is a portion of the railroad property

10:51:39  14  that was higher.

10:51:40  15     Q.  And if the railroad drain that was here is

10:51:45  16  plugged, then if the railroad made plans to get rid of

10:51:50  17  the water, there's no way it could get rid of the water

10:51:53  18  if it's plugged or severed, correct?

10:51:56  19     A.  Right.   If this was the outlet, there's no way

10:51:59  20  that this 12-inch tile could drain anywhere except to

10:52:02  21  back up.

10:52:06  22     Q.  Do you have an idea what a pumping station would

10:52:10  23  cost to pump the water -- build a pumping station here

10:52:14  24  and pump the water over the top of the water main into

10:52:18  25  this ditch?

10:52:19  1          MR. BAHRET:  I would object.  It's outside

10:52:21  2   the scope.

10:52:22  3          THE COURT:  Overruled.  He may answer.

10:52:24  4     A.  It would depend on the capacity of the pump

10:52:27  5   station, the type of pumps, and so forth.  It would

10:52:30  6   require a lot more analysis than just guesstimating.

10:52:33  7     Q.  Mr. Huber, the Wood County engineer, indicated

10:52:36  8   $200,000-plus.  Is that in the ballpark?

10:52:39  9     A.  That could be in the ballpark depending, again,

10:52:42  10  upon the flow.

10:52:42  11    Q.  My next question for you to answer for the jury

10:52:46  12  is Mr. McCarthy indicated that perhaps they would have

10:52:52  13  to run a drain from either behind lots 15 or 16, a new

10:52:58  14  deeper drain out here or under the road and create a

10:53:04  15  retention pond here to empty into River Road.  And he

10:53:09  16  came up with a cost of approximately $200,000 to run the

10:53:16  17  pipe and another $200,000 for a retention pond.  Do

10:53:21  18  those numbers sound reasonable to you if he had to do

10:53:25  19  that?  Because I assume this would have to be 12 or 13

10:53:28  20  feet deep since the elevations -- well, you can look at

10:53:33  21  the elevations on your exhibit.  This is Exhibit F.  I

10:53:42  22  think they go from 615 feet above sea level to 624.  So

10:53:49  23  there's a nine-foot grade difference between the back of

10:53:53  24  the lot and the front of the lot.  What does that mean

10:53:56  25  for the jury when you're talking about running a drain

10:53:59  1   north?

10:54:01  2       A.   At the low end you would need the pipe to be

10:54:03  3   below the ground, so you would be probably a couple of

10:54:06  4   feet down below that so that when you're going through

10:54:09  5   this area, you have to dig because you have to slope

10:54:12  6   down; you're going to be significantly deeper than two

10:54:15  7   or three feet that you start at.

10:54:17  8       Q.   So if I start at three feet down here, and I'm

10:54:20  9   nine feet, so I'd have to be at least 12 feet deep in

10:54:24  10  this area?

10:54:25  11      A.   Yes, that's a reasonable assumption.

10:54:28  12      Q.   And all the utilities, the underground electric

10:54:32  13  and everything like that are in the right-of-way up here

10:54:35  14  by the street; are they not?

10:54:37  15      A.   I'm not sure where the electric and so forth went

10:54:39  16  in.   But I know the waterlines and sanitary sewer and

10:54:43  17  so forth is along the street.

10:54:45  18      Q.   And to bore under a road is costly?

10:54:51  19      A.   Compared to open cutting it can be costly, yes.

10:54:54  20      Q.   So my question is, is the $200,000 to run a line

10:55:00  21  out to the road a reasonable estimate, and another

10:55:06  22  $200,000 for a retention ponds if it's required?

10:55:11  23      A.   Do you know the distance for the storm sewer, the

10:55:14  24  length?

10:55:15  25      Q.   Well, take your lot distances.   They're on here.

10:55:23   1   Here you have 238 feet.

10:55:26   2       A.   Okay.  So we're looking at maybe 600 feet or so?

10:55:30   3   $200,000 seems a little high.   But that's all

10:55:33   4   subjective.   It would depend on actual costs.

10:55:37   5       Q.   You say a little bit high.  Ten percent too high?

10:55:40   6       A.   It could be as much as 20 or 30 percent high.

10:55:45   7   It all depends on your contractor's bids.

10:55:48   8       Q.   And it could be 10 to 30 percent low?

10:55:51   9       A.   In my opinion, I don't think so.   But depending

10:55:53  10   upon the bidding market.   Yeah, that could be a

10:55:55  11   possibility.

10:55:56  12       Q.   And my next question is, new subdivisions and new

10:56:02  13   drainage plans, the EPA and the government require

10:56:06  14   retention on-site now; do they not?

10:56:10  15       A.   Yes, the EPA does require water quality standards

10:56:13  16   to be enforced.

10:56:14  17       Q.   And when you put this subdivision in, there was

10:56:17  18   no such requirement, correct?

10:56:18  19       A.   Right.   There was no such requirement for

10:56:20  20   detention or for water quality volume.

10:56:23  21       Q.   So there's no assurance that the state would even

10:56:29  22   allow the tapping of the drainage line on River Road,

10:56:35  23   correct?

10:56:36  24       A.   A permit would have to be obtained and the state

10:56:38  25   would have to be consulted whether or not they would

```
10:56:42   1   allow it.
10:56:42   2       Q.  Tell the jury why they might not allow it.
10:56:45   3               MR. BAHRET:  Objection.
10:56:48   4               THE COURT:  Well, are we getting a bit far
10:56:51   5   afield here.
10:56:52   6               MR. ROBON:  One of the cure items is tapping
10:56:54   7   into that storm sewer.
10:56:55   8               THE COURT:  I understand.  But now we're
10:56:57   9   asking this witness to respond how the state might or
10:57:02  10   might not offer a permit.  Do we have a basis for him
10:57:05  11   to offer such opinion testimony?
10:57:06  12               MR. ROBON:  I think he's an expert.
10:57:08  13               THE COURT:  You better lay more of a
10:57:11  14   foundation.  An expert can't talk about anything and
10:57:14  15   everything.
10:57:14  16   BY MR. ROBON:
10:57:15  17       Q.  Mr. Jenkins, you applied for state permits in the
10:57:17  18   past as part of your engineering work?
10:57:19  19       A.  Yes, we have.
10:57:20  20       Q.  And all of them have been approved?
10:57:28  21       A.  I can't say for certain, but I don't recall ever
10:57:31  22   having one denied.
10:57:33  23       Q.  If the capacity of the drain on River Road --
10:57:40  24   let's say this is a ten-inch drain, and we've got a
10:57:44  25   12-inch drain going into it.  Would that be one of the
```

10:57:47  1   reasons that the state might say, No, we're not going to

10:57:51  2   allow you to do it, or, we're going to require you to

10:57:55  3   build a retention pond and only have a three- or

10:57:58  4   four-inch pipe go out to the road?

10:57:59  5              MR. BAHRET:  Objection.  Assumes facts not

10:58:01  6   in evidence, and it's speculative.

10:58:04  7              THE COURT:  The question assumes, and we've

10:58:09  8   had a number of those kind of questions that assume

10:58:12  9   facts.  I will instruct the jury at the end of the case

10:58:14  10  how to handle those.  So with that he may answer the

10:58:17  11  question, if he can.

10:58:18  12     A.   Typically when we look at connecting a storm

10:58:20  13  sewer into a state storm sewer, the state would

10:58:23  14  determine what capacity that sewer has, and we would

10:58:25  15  have to limit our flow in our design to the capacity of

10:58:30  16  the existing sewer.

10:58:32  17     Q.   So since this subdivision does not have any

10:58:35  18  retention on-site, water -- and it's common, like, in a

10:58:43  19  parking lot you see a big slope that goes down to a

10:58:47  20  drain; there's a small tile, and the water ponds up when

10:58:50  21  it rains.  Is that what we're talking about, so the

10:58:53  22  jury understands it?

10:58:55  23     A.   That is one way of providing retention.

10:58:57  24     Q.   Or the other way is to dig a pond.  And the only

10:59:00  25  place for that to happen is in this park area here,

10:59:04   1   correct?

10:59:04   2       A.  That, or at the back of the lots and so forth.

10:59:07   3       Q.  Or give up a building lot?

10:59:09   4       A.  Yes.  Either give up a building lot or, again,

10:59:12   5   you -- these lots are deep enough you could use a

10:59:16   6   portion behind the lots and put it in an easement.

10:59:20   7       Q.  Or cut all those trees?  But you'd have to cut

10:59:25   8   all these trees down back there?

10:59:27   9       A.  That would be one of the results.

10:59:28  10       Q.  The cost of putting in a retention pond on a

10:59:31  11   property of that size?

10:59:32  12       A.  That, again, I can't say with any certainty.

10:59:34  13   The $200,000 figure that was quoted here seems awful

10:59:39  14   high for digging a pond.

10:59:40  15       Q.  But you're not sure?

10:59:41  16       A.  Again, I'm not sure.  We would have to design it

10:59:46  17   and bid it.

11:00:13  18       Q.  You deal with fill dirt all the time, right?

11:00:15  19       A.  Yes, quite a bit.

11:00:18  20       Q.  Can you give the jury a ballpark number of what a

11:00:24  21   cubic yard of fill dirt would cost to have hauled, you

11:00:31  22   know, ten cubic yards, tandem trucks?

11:00:35  23       A.  What type of fill dirt?

11:00:37  24       Q.  Well, fill dirt that would come from the bottom

11:00:39  25   of a ditch.

| | | |
|---|---|---|
| 11:00:40 | 1 | A.   So topsoil? |
| 11:00:41 | 2 | Q.   Not topsoil, regular fill dirt. |
| 11:00:43 | 3 | A.   Regular fill dirt, meaning clay, could range |
| 11:00:47 | 4 | anywhere from five dollars a cubic yard to $30 a cubic |
| 11:00:51 | 5 | yard, depending on where it came from, how far away, and |
| 11:00:54 | 6 | what the trucking costs were. |
| 11:00:55 | 7 | Q.   And what about topsoil? |
| 11:00:57 | 8 | A.   Topsoil, that varies depending, again, upon your |
| 11:01:03 | 9 | location and availability.   Particular clients that I |
| 11:01:07 | 10 | have down in Findlay, they're selling it for around $15 |
| 11:01:11 | 11 | to $20 a cubic yard. |
| 11:01:13 | 12 | Q.   Fifteen to 20 delivered? |
| 11:01:17 | 13 | A.   Delivered, yes. |
| 11:01:27 | 14 | Q.   So if our arborist suggested that we put on the |
| 11:01:35 | 15 | back of these lots topsoil before planting trees to put |
| 11:01:45 | 16 | back the foliage that was taken out, and I wanted to use |
| 11:01:51 | 17 | a space, let's say, ten feet wide, nine feet high, then |
| 11:01:58 | 18 | slope it, would I -- the multiplication would be ten |
| 11:02:03 | 19 | feet times nine feet high times the length of the lot, |
| 11:02:14 | 20 | correct?   Then I would get cubic feet? |
| 11:02:20 | 21 | A.   That would give you cubic feet down the center. |
| 11:02:23 | 22 | That wouldn't account for your taper. |
| 11:02:26 | 23 | Q.   Then I would divide the cubic feet by 27 -- |
| 11:02:29 | 24 | A.   27. |
| 11:02:30 | 25 | Q.   -- to get the number of cubic yards per lot? |

11:02:33  1   A.   Yes.

11:02:35  2              MR. ROBON:   No further questions, Your

11:02:38  3   Honor.

11:02:38  4              THE COURT:   Redirect?

11:02:39  5              MR. BAHRET:   Just a couple.

11:02:42  6                        - - -

11:02:44  7              TODD JENKINS, REDIRECT EXAMINATION

11:02:45  8   BY MR. BAHRET:

11:02:45  9   Q.   You were asked some questions by counsel about

11:02:50  10  the diversion of water from the railroad right-of-way

11:02:53  11  because it sits higher than the subdivision.   Do you

11:02:56  12  remember that?

11:02:56  13  A.   Yes.

11:02:57  14  Q.   Would you agree with me that the amount of water

11:03:02  15  diverted is not going to be dependent upon how much

11:03:06  16  higher that right of way is?

11:03:09  17  A.   Yes, I would agree.

11:03:10  18  Q.   I mean, if I have a two-story house versus a

11:03:14  19  one-story house with the same size roof, exactly the

11:03:17  20  same amount of water hits it, one-story, two-story

11:03:21  21  doesn't matter?

11:03:21  22  A.   That's correct.

11:03:22  23  Q.   And it's going to go down the downspout at the

11:03:26  24  same place whether it's a one-story house or two-story

11:03:29  25  house?

11:03:29  1    A.   Yes.

11:03:30  2    Q.   And so if the railroad right-of-way got higher,

11:03:34  3  that, in and of itself, has no effect at all on

11:03:40  4  Cambridge Subdivision water-wise?

11:03:41  5    A.   Provided the direction of the slope off of that

11:03:44  6  surface wasn't changed, that's correct.

11:03:46  7    Q.   And the direction before when you did the plan

11:03:49  8  was towards Cambridge?

11:03:50  9    A.   Yes.    There was a portion that came towards

11:03:53  10  Cambridge.

11:03:54  11   Q.   Now, you were asked some questions about the area

11:04:04  12  behind lot 16 here.   Do you remember the discussion

11:04:14  13  with Mr. Robon about putting a pipe in here?

11:04:19  14   A.   Yes.

11:04:21  15   Q.   Now, if I knock a hole in the side of the

11:04:24  16  railroad drain and put an open pipe from that to the

11:04:29  17  back of lot 16, would that increase my chances of

11:04:33  18  getting a pond on lot 16?

11:04:34  19   A.   Yes, it would.

11:04:35  20   Q.   Would that be anything that you as a drainage

11:04:39  21  engineer would ever have recommended somebody do?

11:04:42  22   A.   No, it is not.

11:04:50  23   Q.   It is, in fact, likely that that is a cause of

11:04:53  24  ponding behind lot 16 if that is true, that the man

11:04:56  25  knocked a hole in the side of a drainage line?

| | | |
|---|---|---|
| 11:04:59 | 1 | A.  That is possible. |
| 11:05:01 | 2 | Q.  In fact, would you recommend that somebody, |
| 11:05:05 | 3 | somebody who had knocked the hole in it to begin with, |
| 11:05:08 | 4 | fix it? |
| 11:05:09 | 5 | A.  Yes, I would. |
| 11:05:12 | 6 | Q.  Would you agree with me, sir, that that crossover |
| 11:05:15 | 7 | pipe that there was some discussion about, the line that |
| 11:05:17 | 8 | was severed. |
| 11:05:18 | 9 | A.  Yes. |
| 11:05:19 | 10 | Q.  If a pipe is full of dirt, is it going to serve |
| 11:05:25 | 11 | its function? |
| 11:05:27 | 12 | A.  Not if it's full of dirt, no. |
| 11:05:29 | 13 | Q.  And if a pipe is full of dirt, then it's not |
| 11:05:32 | 14 | moving water anywhere? |
| 11:05:33 | 15 | A.  Correct. |
| 11:05:35 | 16 | MR. BAHRET:  Thank you.  I have no other |
| 11:05:37 | 17 | questions. |
| 11:05:41 | 18 | - - - |
| 11:05:41 | 19 | TODD JENKINS, RECROSS-EXAMINATION |
| 11:05:42 | 20 | BY MR. ROBON: |
| 11:05:42 | 21 | Q.  If the pipe on lot 16 that's cut into the |
| 11:05:46 | 22 | railroad drain is sealed, where would the railroad water |
| 11:05:52 | 23 | go that's in the railroad pipe?  There's no longer a |
| 11:05:57 | 24 | manhole or an exit.  Wouldn't it just pond up at the |
| 11:06:01 | 25 | ends of the pipe? |

| | | |
|---|---|---|
| 11:06:02 | 1 | A.   That would be the logical place for it, yes. |
| 11:06:09 | 2 | Q.   Would you come over here again, please.   So the |
| 11:06:21 | 3 | pipe that is right here, if that is terminated, then the |
| 11:06:24 | 4 | water is either going to pond here, here, or here |
| 11:06:28 | 5 | (motioning) on the back of these lots, correct, because |
| 11:06:31 | 6 | it has no place to go? |
| 11:06:33 | 7 | A.   It would pond at the end of the pipe, then |
| 11:06:35 | 8 | wherever the lowest place was, it would overflow into |
| 11:06:39 | 9 | the lowest place. |
| 11:06:40 | 10 | Q.   So it would either overflow here and run back |
| 11:06:43 | 11 | this way, overflow here and run this way, or overflow |
| 11:06:46 | 12 | here and run this way? |
| 11:06:47 | 13 | A.   If, indeed, the ground between the railroad and |
| 11:06:50 | 14 | that is higher, then yes, that would be the direction. |
| 11:06:56 | 15 |            MR. ROBON:  Thank you.   Nothing further. |
| 11:06:57 | 16 |            THE COURT:  You're all done.   And you don't |
| 11:07:00 | 17 | even have to go all the way back. |
| 11:07:04 | 18 |            Defendant may call its next witness. |
| 11:07:09 | 19 |            MR. BAHRET:  They're in the room at the end |
| 11:07:11 | 20 | of the hall.   I'll run down there. |
| 11:07:25 | 21 |            THE COURT:  Jury, you may stand up and |
| 11:07:27 | 22 | wiggle if you want.   The witnesses are being kept in a |
| 11:07:30 | 23 | room down the hall.   It may take a minute. |
| 08:37:30 | 24 |            (The witness was sworn by the clerk.) |
| 08:37:30 | 25 |                     - - - |

```
08:37:30   1              TIMOTHY PAULEY, DIRECT EXAMINATION
08:37:30   2    BY MR. BAHRET:
11:08:38   3        Q.   Sir, could you state your full name.
11:08:40   4        A.   Timothy Bennett Pauley.
11:08:41   5        Q.   Tell us how old you are and your educational
11:08:44   6    background.
11:08:44   7        A.   I'm 39 years old.   I started with civil
11:08:47   8    engineering design in high school, continued my
11:08:53   9    education through high school into community college
11:08:57  10    through architectural civil engineering, mechanical
11:09:01  11    drafting.   I started out, wanted to be a design
11:09:07  12    drafter.   Started for the county as a rod man because I
11:09:13  13    found out the easiest way to be a drafter is to get some
11:09:17  14    survey experience and transfer.   Started surveying for
11:09:21  15    Lucas County.
11:09:23  16        Q.   About how long ago was that?
11:09:24  17        A.   That was in '92 I think I started with the
11:09:30  18    county.
11:09:31  19        Q.   Okay.
11:09:32  20        A.   As a rod man, eight dollars an hour, learning
11:09:36  21    what everything was.
11:09:37  22        Q.   What is a rod man?
11:09:38  23        A.   Rod man is the base step in surveying.   You
11:09:42  24    control the dumb end of the tape, which is if you're
11:09:47  25    reading a measurement, you start at zero, and you go to
```

11:09:49  1   whatever the final measurement is.  I was the zero guy.

11:09:53  2   I was never on because I was always holding zero.   I

11:09:57  3   worked there for four years, worked my way up to an

11:10:00  4   instrument operator, which is the smart guy; he's the

11:10:04  5   one that reads the actual number.  You do everything

11:10:08  6   from steel tapes to rulers to nowadays you're dealing

11:10:13  7   with EDMs, which is electronic distance measurement, and

11:10:18  8   GPS units.

11:10:20  9       Q.   And GPS, for the jury, are global positioning?

11:10:24  10      A.   Correct.

11:10:25  11      Q.   Who do you work for now?

11:10:27  12      A.   I work for the City of Toledo Engineering

11:10:28  13  Services under the Department of Public Utilities.

11:10:31  14      Q.   And what is your role in that department?

11:10:33  15      A.   I am currently a senior engineering aid, which is

11:10:38  16  a level 3 -- I'm not a licensed surveyor, but I operate

11:10:47  17  all the equipment and collect the data that's provided

11:10:51  18  to a licensed surveyor to determine boundaries,

11:10:56  19  location.

11:10:58  20      Q.   Who's that?

11:10:59  21      A.   Robert Babcock.

11:11:00  22      Q.   He's your supervisor?

11:11:02  23      A.   That's correct.

11:11:03  24      Q.   And how long have you been with Toledo?

11:11:06  25      A.   I've been with the City of Toledo for seven years

11:11:10  1   come August.

11:11:11  2      Q.   Did you have any involvement in the surveying for

11:11:16  3   the railroad right of way that's the Toledo water

11:11:19  4   project in 2006?

11:11:21  5      A.   I did not do the initial survey, the gathering of

11:11:24  6   the information for the railroad or its right-of-way.

11:11:28  7      Q.   Did you have anything to do with marking the

11:11:33  8   right-of-way lines?

11:11:34  9      A.   Yes.

11:11:35  10     Q.   What was your role?

11:11:36  11     A.   My role was to determine the clearing area and

11:11:41  12  the public right-of-way for a stretch of nine miles,

11:11:45  13  which was the beginning of the job to the end of the

11:11:48  14  job.

11:11:48  15     Q.   Now let's explain to the jury when you said you

11:11:52  16  were not part of the initial calculations, was that done

11:11:55  17  by Arcadis?

11:11:56  18     A.   I Believe so.   All the plans had the Arcadis

11:12:02  19  stamp on there.   Whether they had a contractor that did

11:12:04  20  the information for them and they calculated it, I don't

11:12:07  21  know, but the plans I've seen have been labeled Arcadis.

11:12:10  22     Q.   So the information saying whatever -- well, tell

11:12:13  23  us, how is that information conveyed from a written plan

11:12:16  24  to you so you know how to put a survey stake --

11:12:20  25          MR. ROBON:  Your Honor, can we approach the

11:12:21  1   bench, please?

11:12:22  2              THE COURT:  Sure.

11:12:24  3              (Discussion had off the record.)

11:13:18  4   BY MR. BAHRET:

11:13:18  5    Q.  Go ahead, Mr. Pauley, tell us, how does the

11:13:21  6   information come to you so you might know where to put a

11:13:24  7   marking?

11:13:24  8              MR. ROBON:  Show an objection, Your Honor.

11:13:26  9              THE COURT:  Overruled.

11:13:27  10  BY MR. BAHRET:

11:13:27  11   A.  I'm given a series of points that are called

11:13:31  12  control.  What they are are points previously set up on

11:13:36  13  the job.  We can call one of them 1 and the other one 2.

11:13:40  14  You set up on point number 1.  You look through a

11:13:43  15  telescope basically at number 2 and determine a bearing

11:13:47  16  off of that.  You set at zero, then you can determine

11:13:49  17  where everything else is based off those two primary

11:13:52  18  control points.  Through that job I localized through

11:13:58  19  GPS approximately 23 control points.  Those control

11:14:02  20  points are in direct relation to the railroad property

11:14:06  21  and outlining public right-of-way, which that's what we

11:14:11  22  do is we find the public right-of-way for the City of

11:14:15  23  Toledo to build in and not encroach upon other plans.

11:14:20  24             MR. ROBON:  I move to strike.  He's not a

11:14:22  25  registered surveyor.

11:14:35  1          THE COURT:  I'm going to overrule.   The

11:14:37  2   question was, What information is given to you for you

11:14:40  3   to mark.  He answered that question.   I don't think you

11:14:43  4   need to be a registered surveyor to answer that

11:14:46  5   question, so I'll overrule it.

11:14:48  6          MR. BAHRET:   Thank you.

11:14:49  7   BY MR. BAHRET:

11:14:49  8      Q.   Mr. Pauley, you were working under the

11:14:52  9   supervision of a registered surveyor?

11:14:55  10      A.   Two.   And under licensed engineers also in the

11:14:58  11   design and construction.

11:14:59  12      Q.   And you were under their supervision during this

11:15:01  13   project?

11:15:02  14      A.   Yes.

11:15:02  15      Q.   Consult with them during this project?

11:15:04  16      A.   Every day.

11:15:08  17      Q.   Tell us, did you have any part in the marking of

11:15:11  18   the property line behind what we now know as Cambridge?

11:15:15  19      A.   Yes.   I have primary control of that.

11:15:17  20      Q.   Could you describe what you did and how you did

11:15:20  21   it?

11:15:20  22      A.   Based on the control points that we set up

11:15:23  23   through GPS, then it is determined by a licensed

11:15:27  24   surveyor where the property lines should fall along the

11:15:31  25   railroad.   I'm given coordinates for an offset from my

11:15:37  1   control points to that right-of-way.   So I take the GPS

11:15:40  2   unit out and stakeout that property line per

11:15:46  3   calculation, and it says, okay, based on where you are,

11:15:49  4   and you're 23 feet off of it or 40 feet off of it, so

11:15:53  5   you take a measurement with a steel tape and measure

11:15:57  6   perpendicular to that line, and then you mark at that

11:16:01  7   line with ribbon -- well, per that job because that was

11:16:04  8   for clearing.

11:16:05  9       Q.   This GPS device that you're talking about, is

11:16:09  10  that a handheld unit?

11:16:11  11      A.   No, this is -- no, a handheld unit, GPS unit that

11:16:15  12  boaters use or golfers use can run from maybe $500 to

11:16:19  13  $600 to $1,000 in price.   The unit I was operating is a

11:16:24  14  $40,000 professional GPS unit that measures

11:16:29  15  subcentimeter.

11:16:30  16      Q.   It measures what?

11:16:31  17      A.   Subcentimeter.   It's greatest error would be a

11:16:35  18  cubic centimeter, and that would be its greatest error.

11:16:39  19      Q.   And how big is this device, and how do you

11:16:43  20  transport it?

11:16:44  21      A.   Well, I don't know if anybody has any dealing

11:16:49  22  with survey equipment, but it looks pretty much like a

11:16:52  23  standard survey rod.   It's two meters in height.   It

11:16:55  24  has about a ten-inch diameter disk on top that is a GPS

11:17:01  25  receive.   It receives satellite signals from the GPS

11:17:05  1    satellites that orbit the world.

11:17:08  2        Q.   So when you position it and you determine within

11:17:12  3    a centimeter or less where you are in the world --

11:17:16  4        A.   Uh-huh.

11:17:17  5        Q.   -- and measure from there to --

11:17:19  6        A.   A coordinated point, this one being the

11:17:22  7    right-of-way of the railroad.

11:17:24  8              MR. ROBON:  Show an objection again, Your

11:17:26  9    Honor.  We're talking about surveying.  He's not

11:17:29  10   registered.

11:17:30  11             THE COURT:  Overruled.

11:17:31  12       Q.   And for purposes of explanation, a centimeter is

11:17:36  13   how big?

11:17:39  14       A.   Well, it would be less than a quarter of an inch.

11:17:44  15       Q.   All right.  Now, the -- you mentioned ribbons.

11:17:48  16   Tell us about that.

11:17:49  17       A.   A flagging ribbon.  It's one to three-quarters

11:17:53  18   of an inch wide.  Nonadhesive tape, comes in various

11:17:58  19   colors:  pink, red, blue, orange, white.  It's used to

11:18:04  20   mark different things:  waterline, electrical,

11:18:07  21   right-of-way.

11:18:08  22       Q.   Do you remember what color was in use?

11:18:10  23       A.   Through that section, no, I don't.  Because we

11:18:12  24   used two different kinds, and I am color blind.  We used

11:18:16  25   pink and orange.  Through that section I believe we

11:18:19  1   used orange.

11:18:19  2      Q.   So somebody else picks out the color for you?

11:18:22  3      A.   The licensed surveyor actually has the ribbon on

11:18:25  4   his hand because I'm doing the data collection of it and

11:18:28  5   keeping track of where we are.   Then he actually sets

11:18:30  6   the physical point in the field.

11:18:34  7      Q.   But he actually sets the physical point means

11:18:37  8   what?

11:18:37  9      A.   He ties the ribbon on the boundary of our area.

11:18:42  10     Q.   Now, behind Cambridge did you encounter any sort

11:18:45  11  of fencing?

11:18:47  12     A.   Yes.

11:18:48  13     Q.   Tell us about that.

11:18:50  14     A.   Cambridge had a railroad tie fence -- well, it

11:18:56  15  was more of a retaining wall with, like, a bar type --

11:19:00  16  the bar fence coming out of the top of it.   It was

11:19:03  17  constructed with wire fencing to tie the posts together.

11:19:07  18  That was in, surveying, poor condition, which meant that

11:19:12  19  less than 90 percent of the fence was upright.

11:19:16  20     Q.   Less than 90 percent was upright?  So over ten

11:19:20  21  percent was down?

11:19:21  22     A.   Yes.

11:19:21  23     Q.   Okay.  But you could still see the fence?

11:19:24  24     A.   Uh-huh.

11:19:25  25     Q.   That's a yes for the record?

11:19:27   1    A.   Yes.   Correct.    Sorry.

11:19:29   2    Q.   Now, was there ever any conflict between the

11:19:35   3    documentation supplied by Arcadis as to where a boundary

11:19:40   4    would be and that railroad fence?

11:19:42   5    A.   Conflict, no.  Was there a discrepancy between

11:19:46   6    the two in the field, yes.   But the fence was outside

11:19:51   7    of the right of way for the railroad.   So what happened

11:19:56   8    is the fence had been, over the years, pushed away from

11:19:59   9    the railroad.   It was obvious, the bottom -- it was

11:20:03   10   leaning over to what I would call the west side of the

11:20:06   11   project.   If you were to stand that fence up

11:20:10   12   vertically, as if it was new, that is where we placed

11:20:15   13   our survey ribbon, which we called occupation.

11:20:20   14   Q.   What's that mean, occupation?

11:20:21   15   A.   Occupation is when you run into a fence, if the

11:20:25   16   right-of-way would have said your right-of-way line is

11:20:30   17   20 feet away, but I measured over 19 feet away, and I

11:20:34   18   found a fence, that's determining occupation.   So I

11:20:36   19   wouldn't go beyond that fence mark and say, well, the

11:20:41   20   right-of-way for the railroad is 25 feet, even though I

11:20:45   21   hit a fence at 20 feet.   I would stay inside of the

11:20:48   22   railroad's occupational or visual right-of-way that they

11:20:51   23   owned, what they've maintained.

11:20:54   24   Q.   All right.   And when you staked, did you -- or

11:20:58   25   not staked; tied ribs on.   It was Mr. Babcock that tied

| | | |
|---|---|---|
| 11:21:03 | 1 | ribbons? |
| 11:21:04 | 2 | A.  Nick Ronau. |
| 11:21:05 | 3 | Q.  Did Nick, did he tie those ribbons just on the |
| 11:21:09 | 4 | railroad fence? |
| 11:21:10 | 5 | A.  They were tied to trees on ground shrub. |
| 11:21:16 | 6 | Q.  And what is Nick Ronau's job? |
| 11:21:19 | 7 | A.  He's a licensed surveyor, my infield supervisor. |
| 11:21:23 | 8 | Q.  Okay.  And were you working as a two-man team or |
| 11:21:27 | 9 | one? |
| 11:21:27 | 10 | A.  Two-man crew. |
| 11:21:28 | 11 | Q.  So Nick was your direct supervisor? |
| 11:21:30 | 12 | A.  Uh-huh. |
| 11:21:31 | 13 | Q.  That's a yes for the record? |
| 11:21:33 | 14 | A.  Yes. |
| 11:21:34 | 15 | Q.  And then Mr. Babcock is your boss? |
| 11:21:38 | 16 | A.  He's our supervisor of surveyors.  So he |
| 11:21:42 | 17 | controls the whole department.  Nick and I were out on a |
| 11:21:45 | 18 | separate team that day. |
| 11:21:47 | 19 | Q.  So your role is simply to identify as best you |
| 11:21:50 | 20 | can where the boundary is? |
| 11:21:52 | 21 | A.  Yes. |
| 11:21:52 | 22 | Q.  And did you do that? |
| 11:21:54 | 23 | A.  Yes. |
| 11:21:56 | 24 | Q.  Did that pretty much end your involvement, or did |
| 11:21:59 | 25 | you ever have more involvement? |

11:22:01  1    A.   No, I've had ongoing involvement with that

11:22:04  2    particular stretch.

11:22:06  3    Q.   And what other involvement did you have?

11:22:08  4    A.   I was sent back out with Nick Ronau again to do a

11:22:15  5    topographical survey of the area.   I have to do a

11:22:20  6    localization physically of fences, trees, public

11:22:22  7    utilities, any kind of electrical, pedestals, ground

11:22:31  8    contours, drainage, a complete survey of anything you

11:22:35  9    would observe without digging in the field.

11:22:39  10   Q.   Do you know what the purpose for that was?

11:22:42  11   A.   At the time I was told that it was to determine

11:22:46  12   the boundary of the subdivision.

11:22:49  13   Q.   And did you collect data?

11:22:51  14   A.   Yes.

11:22:51  15   Q.   And to whom did you submit the data that you

11:22:55  16   collected?

11:22:55  17   A.   Robert Babcock.

11:22:57  18   Q.   And to your knowledge did he then prepare certain

11:23:00  19   diagrams and documents?

11:23:02  20   A.   It was brought into a CAD file and printed out

11:23:06  21   for observation.

11:23:07  22   Q.   When you say brought into a CAD file --

11:23:09  23   A.   That's the translation between the electrical and

11:23:12  24   GPS positioning data that I collect in the field and a

11:23:15  25   hard copy, a drawing, something physical you can look at

11:23:19   1   in front of you.

11:23:20   2     Q.   Did you also have any involvement in analyzing a

11:23:24   3   certain sewer -- not sewer, manhole?

11:23:28   4     A.   Yes, we located all the drainage structures in

11:23:31   5   that stretch.

11:23:34   6     Q.   And did you have occasion -- first of all, who

11:23:45   7   was with you when you went back out to measure the

11:23:48   8   manhole?

11:23:49   9              MR. ROBON:   Could we have a timeframe, Mr.

11:23:51  10   Bahret?

11:23:53  11              THE COURT:   When did you go out and perform

11:23:55  12   this?

11:23:55  13              THE WITNESS:   This was done immediately

11:23:58  14   after the topographical survey of the area, within a

11:24:03  15   one- or two-day period.

11:24:05  16              THE COURT:   And your topo was done when,

11:24:07  17   approximately?

11:24:09  18              MR. BAHRET:   I can give him the exact date

11:24:12  19   on the document if you'd like.

11:24:15  20   BY MR. BAHRET:

11:24:16  21     Q.   Let me show you Exhibit K.   There's a date up

11:24:18  22   there?

11:24:18  23     A.   10-24 of '06.   That's correct.

11:24:22  24     Q.   And do you recognize what Exhibit K is?

11:24:24  25     A.   This is a standard inventory sheet for a manhole.

11:24:30   1      Q.   And does that have information on it where one
11:24:36   2   could calculate the depth of pipe in it?
11:24:39   3      A.   Yes.
11:24:42   4      Q.   Are you able to provide that information from
11:24:44   5   that diagram?
11:24:45   6      A.   Yes, I can read that diagram and interpret that.
11:24:48   7      Q.   And who prepared that?  Was that you?
11:24:51   8      A.   This was Nick.  N.F.R. is Nicholas Franklin -- I
11:24:57   9   think his middle name is Franklin -- Ronau.  And T.B.P.,
11:25:01  10   Timothy Bennett Pauley below that.
11:25:03  11      Q.   What was your role in that manhole investigation,
11:25:07  12   if you will?
11:25:10  13      A.   I would provide the information that Nick would
11:25:13  14   write down on the sheet, being the measurements.
11:25:16  15      Q.   So you were the man actually measuring?
11:25:18  16      A.   Yes.
11:25:19  17      Q.   Tell us the technique.   What did you do to
11:25:22  18   measure?
11:25:22  19      A.   You take -- within this example, this is a
11:25:24  20   manhole.   You pull the lid off and you take a ruler, or
11:25:29  21   in some cases a rod if it's longer than six feet because
11:25:34  22   our rulers only go up to six feet.  If it's longer than
11:25:37  23   that you use a rod.   I noticed in here that there are
11:25:41  24   measurements over six feet.   So we most likely used a
11:25:45  25   fiberglass rod with measurements on that.   You measure

11:25:50  1    the rim, the top of the manhole right down to the invert

11:25:53  2    of whatever points may be inside and the bottom of the

11:25:58  3    structure itself, being concrete or stone.

11:26:01  4        Q.   Help me understand what you're getting at.   Are

11:26:04  5    you getting the top and bottom of the pipe?

11:26:06  6        A.   When you first do the topographical survey you

11:26:09  7    don't open the manhole up.   You take a shot on the

11:26:12  8    manhole lid itself; that's assigned an elevation.   I'm

11:26:19  9    seeing in this diagram here the rim elevation was equal

11:26:23  10   to 618.99 feet.   And from that 618.99 the bottom

11:26:32  11   measured a negative 6.65 feet.   So from there down to

11:26:37  12   the bottom of the structure was 6.65 feet.   That's

11:26:41  13   usually calculate by the drafters in the office.   We

11:26:45  14   just write down the measurements of what they are and

11:26:47  15   report those.

11:26:48  16       Q.   And those numbers, would that be above sea level?

11:26:51  17   Is that 618 -- what is that?

11:26:54  18       A.   That is in relation to the entire project.   It

11:26:59  19   doesn't mean that the datum was directly taken off of

11:27:04  20   mean sea level.   Most likely it was.   But that just

11:27:09  21   gives us a datum to refer to every other elevation

11:27:13  22   throughout the entire project, which was the nine miles.

11:27:15  23       Q.   And are there other measurements on that

11:27:18  24   document?

11:27:18  25       A.   Yes, there are.

11:27:19   1        Q.   What others?

11:27:20   2        A.   There's -- I usually don't have to read Nick's

11:27:27   3   writing.   There's an initial measurement as negative

11:27:31   4   6.30 that has -- I would call north by northwest.   And

11:27:40   5   a 24-inch, that would be heading almost due east with a

11:27:48   6   negative 6.60.   That would be to the invert of a pipe.

11:27:53   7        Q.   Is that 24-inch one the one that would be going

11:27:56   8   under the abandoned railroad right-of-way?

11:27:59   9        A.   Yes.   Correct.

11:28:02  10        Q.   And the 6.6 is to what part of that pipe?

11:28:05  11        A.   The invert of the pipe.   Say the pipe is round;

11:28:10  12   the invert would be the bottom of the U; the lowest

11:28:14  13   point of the structure.

11:28:15  14        Q.   So the very bottom of the pipe was six and a half

11:28:18  15   feet below the rim?

11:28:19  16        A.   6.60.   Correct.   That's in engineering.   So

11:28:23  17   it's not six and a half feet; it's 6.6 feet, which is

11:28:28  18   slightly over six and a half feet.

11:28:30  19        Q.   That was clear as mud.

11:28:32  20        A.   Six and a half feet would be 6.5.   6.6 is another

11:28:38  21   tenth.

11:28:41  22        Q.   I'm with you.   Are there other measurements in

11:28:44  23   there?

11:28:44  24        A.   Yes, there are.

11:28:45  25             THE COURT:   Are there a going to be a lot of

11:28:48  1  measurements?  It might be helpful for the jury to have

11:28:52  2  it on the screen and have him talk about it.

11:28:54  3          MR. BAHRET:  Let me take this from you, Mr.

11:28:56  4  Pauley.  It will show up on your screen right her if I

11:29:00  5  do this right.

11:29:33  6          (Discussion had off the record.)

11:29:33  7          THE COURT:  Counsel will be staying after

11:29:36  8  class today for a remedial session -- both counsel.

11:29:45  9          MR. ROBON:  Find somebody that knows how to

11:29:48  10  work it, Judge.

11:29:49  11          MR. BAHRET:  I deserved that.

11:29:51  12  BY MR. BAHRET:

11:29:51  13  Q.  Sir, if you need to touch the screen, do you have

11:29:54  14  a pen or something to touch it?

11:29:59  15          THE COURT:  Use your finger.

11:30:02  16  Q.  If you touch it -- let me see if I do this right.

11:30:06  17  Do you see it makes a -- that thing?

11:30:09  18  A.  Uh-huh.

11:30:10  19  Q.  And then if you touch the lower right corner of

11:30:13  20  the screen it will erase that.  So if you want to

11:30:15  21  highlight something for the jury, you can do that.

11:30:19  22  A.  Sure.

11:30:19  23  Q.  Tell us, real quickly go through which one of

11:30:24  24  these lines represents, if any, that crossover pipe

11:30:28  25  we're talking about.

11:30:30   1    A.   The end of that line there, the negative 6.60.

11:30:35   2    If you notice next to that there's a circle, 6.1. -- I

11:30:40   3    believe 39.   Then 24 with an inch mark.   That labels

11:30:44   4    the pipe as a 24 inch.   And the 6.1239 is probably the

11:30:50   5    invert elevation.

11:30:52   6    Q.   So this right here, this 24?

11:30:55   7    A.   That's correct.

11:31:01   8    Q.   With reference to the identification of the depth

11:31:04   9    of that crossover pipe, have you talked about all the

11:31:07  10    measurements we need to know, or are there more?

11:31:09  11    A.   There are more.   On this sheet I do not believe

11:31:12  12    they're listed.   That negative 6.60 would be the

11:31:18  13    elevation of the pipe inside of the structure, the

11:31:21  14    manhole.   There's another end of the pipe.   If you

11:31:26  15    were to take this line and extend it out, there's

11:31:29  16    another end, and that would have its own specific

11:31:32  17    elevation of the outlet of that pipe.

11:31:34  18    Q.   Did you find the outlet to that pipe?

11:31:37  19    A.   I believe so.

11:31:38  20    Q.   And do you recall, was it the same elevation?

11:31:43  21    Could you tell if it was going up or down?

11:31:46  22    A.   I don't have that information with me.   I know

11:31:48  23    it was reported and given to, I believe, the engineer.

11:31:53  24    Q.   When you say the engineer, who's that?

11:31:55  25    A.   Christy Soncrant.

11:31:59  1    Q.   All right.  Are there any other measurements on

11:32:02  2    here that would help us understand that 24-inch pipe any

11:32:07  3    better?

11:32:08  4    A.   No, not necessarily.  The only thing that's not

11:32:13  5    written on here is the condition of the structure, which

11:32:16  6    at the time was very poor.  I believe there was

11:32:20  7    actually portions of it exposed.  And I believe the

11:32:25  8    structure was reconstructed.  But I'm not entirely

11:32:29  9    positive.

11:32:29  10   Q.   When you're saying the structure was

11:32:32  11   reconstructed, you mean this manhole?

11:32:34  12   A.   Yes.

11:32:35  13   Q.   All right.  Did that end your involvement in the

11:32:40  14   investigation, if you want to call it that, in this

11:32:43  15   case?

11:32:43  16   A.   As far as physically gathering information, I

11:32:46  17   believe so, yes.

11:32:48  18   Q.   All right.  Did you participate in any resurvey

11:32:56  19   after there was a complaint about an alleged trespass?

11:33:02  20   A.   There was information in the field verified.

11:33:06  21   But I don't recall storing any of that information.  We

11:33:11  22   went back out.  We looked at the area.  I think we took

11:33:15  23   some grade shots.  I don't think that I recorded any

11:33:19  24   information myself.  Nick might have, but I didn't

11:33:26  25   compile any information off that.

11:33:29  1   Q.   Okay.   From what you -- when you went back out,
11:33:34  2   did you determine whether there was or was not any sort
11:33:39  3   of an encroachment, or was that not your task?
11:33:43  4               MR. ROBON:   Objection.
11:33:44  5               THE COURT:   That can be answered yes or no.
11:33:46  6   The objection is overruled.
11:33:48  7               MR. ROBON:   I'm objecting; he's giving a
11:33:50  8   professional opinion.
11:33:51  9               THE COURT:   He hasn't yet.   Let's hear what
11:33:52  10  the answer is.   The answer can require a simple yes or
11:33:55  11  no.   The question was, when you went back out, did you
11:33:58  12  determine whether there was or was not any sort of
11:34:01  13  encroachment, or was that not your task:
11:34:04  14  A.   No, that was not my task.
11:34:06  15  Q.   Was that Mr. Babcock?
11:34:07  16  A.   That's correct.
11:34:15  17              MR. BAHRET:   Thank you.   No other questions.
11:34:19  18                           - - -
11:34:19  19              TIMOTHY PAULEY, CROSS-EXAMINATION
11:34:20  20  BY MR. ROBON:
11:34:20  21  Q.   Sir, I did not catch your name?
11:34:22  22  A.   Timothy Pauley, P-a-u-l-e-y.
11:34:39  23  Q.   Can you tell this jury whether any outside
11:34:42  24  engineer or surveyor was retained by the City once there
11:34:45  25  was a dispute about the property line or the cutting of

| | | |
|---|---|---|
| 11:34:49 | 1 | the storm drainage? |
| 11:34:53 | 2 | A.   Not to my knowledge. |
| 11:34:54 | 3 | Q.   All City employees -- the City regularly uses |
| 11:35:02 | 4 | outside surveyors and outside engineers; does it not? |
| 11:35:06 | 5 | A.   Not in the seven years I've been employed with |
| 11:35:08 | 6 | the City of Toledo. |
| 11:35:09 | 7 | Q.   Well, didn't they use Arcadis to draw the plans? |
| 11:35:13 | 8 | A.   I believe that was prior to the seven years I was |
| 11:35:15 | 9 | employed. |
| 11:35:16 | 10 | Q.   So during the last seven years they don't use any |
| 11:35:18 | 11 | outside -- |
| 11:35:19 | 12 | A.   Minimal. |
| 11:35:20 | 13 | Q.   -- engineers or surveyors? |
| 11:35:23 | 14 | A.   Minimal. |
| 11:35:23 | 15 | Q.   Okay.  I want you to take a look at Exhibit K. |
| 11:35:29 | 16 | And I note up here that this has a date of October 24, |
| 11:35:38 | 17 | '06, which is six months after the cutting of the pipe |
| 11:35:42 | 18 | and the trees. |
| 11:35:45 | 19 | MR. BAHRET:  That's not true. |
| 11:35:46 | 20 | A.   That's not true.   That pipe couldn't have been |
| 11:35:48 | 21 | cut or I wouldn't have taken a measurement on it. |
| 11:35:55 | 22 | Q.   What's not true? |
| 11:35:57 | 23 | A.   That that's after the date. |
| 11:35:59 | 24 | Q.   Well, is this date the date that you took this |
| 11:36:02 | 25 | information, October 24 of '06? |

11:36:06   1    A.   That's the date the paper was submitted.

11:36:09   2    Q.   Well, my question is, the evidence has been that

11:36:16   3    66-inch water main was installed in the summer or late

11:36:19   4    spring of 2006.

11:36:23   5    A.   Through that section?   I didn't write down the

11:36:28   6    date of the pipe installation.   It was nine miles.

11:36:34   7    That was one section.

11:36:35   8    Q.   Well, this -- the evidence -- I think it's

11:36:39   9    unquestioned that in the late spring, early summer,

11:36:41  10    sometime in June or July, maybe even the first part of

11:36:45  11    August, between White and Ford and Bates Road, that big

11:36:49  12    pipe was put in.   Are you disputing that?

11:36:53  13    A.   No.

11:36:53  14    Q.   Well, my question is, how in the world could you

11:36:57  15    measure the end of the 24 inch pipe if it was severed?

11:37:04  16    A.   If it was inside that structure, it wasn't

11:37:07  17    severed.   It was still a part of that structure.

11:37:10  18    Q.   I understand that.   But when I saw you talking

11:37:13  19    about it going down here, you said you measured the

11:37:19  20    other end.

11:37:20  21    A.   At one time, yes.

11:37:21  22    Q.   Well, would you tell the jury how you measured

11:37:24  23    that other end.   Did you dig up the end of the pipe and

11:37:28  24    find the bulkhead?

11:37:29  25    A.   No.   And the other end of the pipe was exposed

11:37:32  1  pipe on the drainage swale of the railroad property.

11:37:37  2  It was an exposed pipe.

11:37:39  3      Q.  So you actually found the other end in the

11:37:46  4  railroad drainage ditch?

11:37:48  5      A.  I believe that information was collected, yes.

11:37:55  6      Q.  My goodness.   Could you come over here, please.

11:38:12  7          This is a map of the area.   Would you stand over

11:38:16  8  here so the jury can see.  This is the manhole you're

11:38:24  9  talking about, correct?  It's a little bit behind the

11:38:27  10  Cambridge subdivision?

11:38:29  11      A.  I don't know what that distance is.

11:38:32  12          THE COURT:  Give him the microphone, please.

11:38:34  13      A.  I'm not sure what that distance is that he's

11:38:38  14  showing me between there.   It quite possibly could be.

11:39:07  15          (Discussion had off the record.)

11:39:08  16          THE WITNESS:  I can speak up.

11:39:09  17          THE COURT:  Thank you.

11:39:10  18          THE WITNESS:  No problem.

11:39:20  19  BY MR. ROBON:

11:39:20  20      Q.  This is the manhole that's been identified as the

11:39:24  21  one that's been the subject of this lawsuit.   And my

11:39:27  22  question is:  This is the other end that goes into the

11:39:30  23  center line ditch.   Is this the end that you actually

11:39:34  24  found and measured?

11:39:35  25      A.  I believe that's the end that I shot.

11:39:38  1    Q.  Did you look through this?

11:39:41  2    A.  No, I did not physically go down.

11:39:45  3    Q.  What was the condition of the end here that you

11:39:48  4  found in the ditch?

11:39:49  5    A.  Concrete.

11:39:50  6    Q.  Concrete.   With a pipe?

11:39:55  7    A.  Round pipe, concrete pipe.

11:39:58  8    Q.  And when you looked into the manhole, when you

11:40:03  9  took the lid off, was there water in the bottom?

11:40:06  10    A.  I don't believe so.

11:40:10  11    Q.  Was that in October of '06, or did you do it in

11:40:14  12  September of '06?

11:40:15  13    A.  The specific date of the measurement I'm not

11:40:19  14  positive on.

11:40:23  15    Q.  Did you know that that pipe was severed by the

11:40:26  16  City contractor?

11:40:27  17    A.  I know it was being questioned on whether or not

11:40:30  18  the 66-inch pipe through that section was going to

11:40:34  19  disturb that drainage pipe.

11:40:38  20    Q.  Well, this is after the fact.   Did you know that

11:40:40  21  before the fact?

11:40:41  22    A.  No, I did not know that before the fact.

11:40:46  23    Q.  Well, you were out here after the City waterline

11:40:49  24  was installed, right?

11:40:50  25    A.  Correct.

11:40:53  1    Q.  And nobody took a backhoe and dug this up, right?

11:40:58  2    A.  The proposed pipe, the 66 inch?

11:41:01  3    Q.  No.   No.    The 24-inch pipe.

11:41:04  4    A.  Not in my presence.

11:41:06  5    Q.  But what you did is you found one end here in the

11:41:09  6    manhole, and then you found the other end over here in

11:41:12  7    the ditch?

11:41:12  8    A.  If that is the structure, I believe so.

11:41:19  9    Q.  You can have a seat.

11:41:40  10          Is this a photograph, City of Toledo A13 -- my

11:42:03  11   question to you is:  This was identified, and it showed

11:42:07  12   the cutting of the various tree stumps by the tree

11:42:12  13   clearing company.   And do you see the railroad fence

11:42:16  14   right behind it?

11:42:18  15   A.  Yes.   I see a railroad tie.

11:42:22  16   Q.  When you put your markings on, did you do an

11:42:27  17   offset where you normally -- if you put a marking on a

11:42:32  18   tree, the marking would remain after the cutting?

11:42:36  19   A.  That's correct.

11:42:37  20   Q.  Did you have offsets is my question?   Do you

11:42:41  21   know what I mean by offsets?

11:42:43  22   A.  To the cut mark?   I guess I'm not understanding

11:42:46  23   your question.   It was all offset, all the offsets --

11:42:49  24   all the ribbon tied onto the trees were offsets.

11:42:52  25   Q.  Okay.   That's my question.   How much of an

11:42:57  1   offset?

11:42:57  2       A.   It would vary depending on what the right-of-way

11:43:00  3   called for.

11:43:00  4       Q.   So if there was a ribbon on a tree, that means

11:43:05  5   that tree shouldn't be taken down; it should be -- they

11:43:08  6   should clear up to one foot of it or two foot of it?

11:43:12  7       A.   As long as that tree is still present they clear

11:43:16  8   up to it.

11:43:16  9       Q.   Up to it?

11:43:17  10      A.   That's correct.

11:43:18  11      Q.   So if the evidence is that they cut the trees

11:43:21  12  where the ribbons were, they went too far?

11:43:25  13      A.   Yes.

11:43:32  14      Q.   When you were out there, will you tell the jury

11:43:35  15  why there was no safety fence installed along the

11:43:41  16  proposed cutting line?

11:43:43  17      A.   No.

11:43:44  18      Q.   Does the City use safety fences?

11:43:48  19      A.   Yes.

11:43:49  20      Q.   Do you recall that the brush and the brambles

11:43:52  21  behind the Cambridge Subdivision were very thick?

11:43:58  22      A.   Describe "very thick."

11:44:01  23      Q.   Hard to walk through.

11:44:03  24      A.   No, we did walk through them.   That's how we

11:44:07  25  placed the ribbon.

11:44:09   1      Q.   Did you pull them aside?

11:44:10   2      A.   In cases.   Not necessarily you had to, but I'm

11:44:13   3   not saying that we didn't move brush to traverse through

11:44:16   4   that area.

11:44:17   5      Q.   Did you cut some down?

11:44:19   6      A.   No.

11:44:25   7      Q.   Did you -- take a look at Exhibit 54.   Did you

11:44:30   8   find any monuments, corner monuments at the Cambridge

11:44:35   9   Subdivision when you were doing your markings?

11:44:37  10      A.   Yes, I found similar monumentation as pictured.

11:44:41  11      Q.   Did you abide by those monuments?

11:44:45  12      A.   For?

11:44:45  13      Q.   For your posting of the ribbons?

11:44:51  14      A.   Those were located posts after the ribbon had

11:44:58  15   been placed for clearing.

11:45:01  16      Q.   Maybe you don't understand my question.   My

11:45:04  17   question is:   Is your ribbon behind this post or more

11:45:10  18   away from the railroad, or was it on the line where

11:45:13  19   these posts were?

11:45:15  20      A.   I don't know what post that is.   I don't know

11:45:18  21   what its location is relative to the railroad.   I used

11:45:22  22   the railroad right-of-way to determine the clearing

11:45:28  23   area.

11:45:28  24      Q.   You didn't use this monument?

11:45:30  25      A.   No.

11:45:30  1   Q.   Did you see the monument when you were out there?

11:45:34  2   A.   Not until after.

11:45:35  3   Q.   So the two monuments at each end of the

11:45:40  4   subdivision you just never saw?

11:45:41  5   A.   They weren't located until there was a question

11:45:44  6   about the clearing area.   The length was insignificant

11:45:51  7   for what my job scope was.

11:45:54  8   Q.   What was insignificant?

11:45:56  9   A.   I dealt with nine miles of project through here.

11:46:00  10  Q.   So whether you were off a few inches, it didn't

11:46:03  11  matter, or you didn't have to worry about looking for a

11:46:06  12  survey monument?

11:46:07  13  A.   Not through areas where occupation was clear.

11:46:10  14  Q.   So when you say occupation, if the railroad fence

11:46:14  15  was three feet onto the Cambridge property, that's where

11:46:18  16  you marked the ribbon, right, on the railroad fence?

11:46:21  17  A.   No.

11:46:22  18  Q.   Well, you said occupation?

11:46:24  19  A.   Only when it was in direct conflict with the

11:46:28  20  right-of-way information I was given.   The right-of-way

11:46:31  21  information I was given would never allow me to go three

11:46:34  22  feet beyond the public right-of-way -- or the railroad's

11:46:37  23  right-of-way, I'm sorry.

11:46:39  24  Q.   Sir, in this photograph you see the stake?   Back

11:46:49  25  here is the railroad fence.   This stake is probably

| 11:46:54 | 1 | three feet closer to the railroad. |
| 11:46:58 | 2 | MR. BAHRET:  Objection. |
| 11:46:59 | 3 | A.  I don't know when this picture was taken. |
| 11:47:01 | 4 | MR. BAHRET:  I object. |
| 11:47:02 | 5 | THE COURT:  The witness has answered, so |
| 11:47:04 | 6 | I'll overrule the objection. |
| 11:47:10 | 7 | MR. BAHRET:  There's been no testimony, Your |
| 11:47:12 | 8 | Honor, about three feet. |
| 11:47:12 | 9 | THE COURT:  I understand.  That's what gave |
| 11:47:14 | 10 | me pause.  Counsel should be careful not to testify or |
| 11:47:20 | 11 | attempt to testify. |
| 11:47:21 | 12 | MR. ROBON:  I'm sorry, Your Honor. |
| 11:47:23 | 13 | BY MR. ROBON: |
| 11:47:23 | 14 | Q.  Mr. Pauley, if you found that monument when you |
| 11:47:28 | 15 | were posting the ribbon, what would you have done? |
| 11:47:33 | 16 | A.  Located it. |
| 11:47:37 | 17 | Q.  Would you have used that as a guide for the |
| 11:47:39 | 18 | property line, yes or no? |
| 11:47:46 | 19 | A.  Yes. |
| 11:47:48 | 20 | Q.  But neither you nor Mr. Babcock could find those |
| 11:47:53 | 21 | monuments, correct? |
| 11:47:54 | 22 | A.  We weren't instructed to look for them. |
| 11:47:57 | 23 | Q.  Okay.  Are you aware -- do you know what a |
| 11:48:01 | 24 | subdivision plat is? |
| 11:48:02 | 25 | A.  Sure. |

11:48:02  1    Q.   Do you know that subdivision plats are filed with
11:48:06  2  the county recorder's office?
11:48:07  3    A.   Yes.
11:48:08  4    Q.   And you know it shows where the corner stakes are
11:48:10  5  in a subdivision plat?
11:48:11  6    A.   Yes.
11:48:14  7    Q.   Was this the only subdivision that abutted the
11:48:16  8  nine miles that you were marking?
11:48:19  9    A.   I don't believe so.
11:48:21  10    Q.   Which other one abutted it?
11:48:23  11    A.   I don't have specific names.   All of them.
11:48:29  12    Q.   Would you -- do you recall seeing the house on
11:48:34  13  the Cambridge Subdivision?
11:48:36  14    A.   After clearing, yes.
11:48:38  15    Q.   After the clearing.   You could not see the house
11:48:41  16  when you were putting ribbons on the right-of-way line?
11:48:45  17    A.   I wasn't -- I wasn't there to locate the house.
11:48:48  18  It wasn't -- I didn't go out there and say, Oh, there's
11:48:51  19  the house or there's not the house.   That wasn't my
11:48:54  20  scope of work.
11:48:54  21    Q.   So you didn't recognize the fact that there was a
11:48:57  22  house in this subdivision until after the clearing took
11:49:01  23  place, which was after you went out and put ribbons on
11:49:04  24  the property line?
11:49:05  25    A.   That's correct.

11:49:28  1    Q.  I'm handing you Exhibit Number 7.  Have you ever

11:49:31  2  seen the Peterman survey?

11:49:37  3    A.  It looks very similar to a survey that I did of

11:49:41  4  the area myself.  Yes, I believe I've seen this picture

11:49:45  5  before.

11:49:48  6    Q.  Did you see any encroachment that Peterman shows

11:49:52  7  on the survey?

11:49:53  8    A.  I didn't physically calculate what that

11:49:56  9  encroachment was or wasn't.  But I've heard that there

11:50:00  10  was a determination there was an encroachment.

11:50:03  11    Q.  Did you go out with a City surveyor to check

11:50:09  12  Peterman's work?

11:50:12  13    A.  I don't think to specifically check his work, no.

11:50:16  14         MR. ROBON:  No further questions, Your

11:50:20  15  Honor.

11:50:20  16         THE COURT:  Redirect?

11:50:21  17         MR. BAHRET:  Briefly.

11:50:22  18                    - - -

11:50:22  19        TIMOTHY PAULEY, REDIRECT EXAMINATION

11:50:23  20  BY MR. BAHRET:

11:50:23  21    Q.  But you did go back out to see if there's an

11:50:26  22  encroachment, correct?

11:50:29  23    A.  Yes.

11:50:29  24    Q.  Not necessarily to verify Peterman's work but to

11:50:32  25  verify whether there's an encroachment?

11:50:34  1    A.   That's correct.

11:50:35  2    Q.   You talked about the word "offset."  I want to

11:50:38  3  make sure we define that for the jury.   As I understand

11:50:40  4  it, you position your GPS, and it tells you go 23 feet

11:50:48  5  left.   You then tape measure or something out there,

11:50:50  6  and you call that an offset?

11:50:52  7    A.   Yes.

11:50:55  8    Q.   Your purpose out there is to identify as close as

11:51:00  9  you can, to the millimeter if you could, a property

11:51:04  10  line; is that right?

11:51:05  11    A.   Yes.

11:51:05  12    Q.   I mean, you don't just willy-nilly say three feet

11:51:09  13  away is the property line, you mark the line?

11:51:11  14    A.   No.

11:51:12  15    Q.   Now, Mr. Robon asked you about the fence.   If

11:51:19  16  you locate your GPS device and it -- I'm just giving you

11:51:24  17  a theoretical -- and it says you're exactly 20 feet off,

11:51:29  18  so you tape measure 20 feet over, but you see a railroad

11:51:32  19  fence five more feet over, where are you going to mark,

11:51:37  20  on the fence or at the --

11:51:39  21    A.   At the 20-foot mark.

11:51:42  22    Q.   Same example -- well, changed example, but the

11:51:44  23  same theory.   GPS tells me go over there 20 feet.   I

11:51:48  24  tape measure out 20 feet, and lo and behold, my tape

11:51:53  25  measure is sticking through the fence.   Where am I going

11:51:55  1   to mark?

11:51:55  2      A.   I mark on the area of occupation, which would be

11:51:59  3   my side of the fence, not the fence itself.

11:52:02  4      Q.   So you'd mark less than what is called for?

11:52:06  5      A.   Yeah.   I would utilize occupation in that

11:52:08  6   instance.

11:52:09  7      Q.   And that's what you mean when you say you honor

11:52:11  8   evidence of occupation?

11:52:12  9      A.   That's correct.

11:52:14  10     Q.   Is that what was done on this job?

11:52:16  11     A.   Yes.

11:52:18  12             MR. BAHRET:  Thank you.

11:52:21  13             MR. ROBON:  Nothing further.

11:52:22  14             THE COURT:  Thank you.   You may step down.

11:52:24  15   We're at a good place for our lunch recess today.   It's

11:52:33  16   10 of 12:00.   Can we be back by 1:00?   Great.   We're

11:52:39  17   in recess until 1:00 p.m.   Please remember the rules.

12:27:20  18             (Lunch recess taken.)

12:27:20  19                        - - -

13:05:40  20           NICHOLAS RONAU, DIRECT EXAMINATION

13:05:41  21   BY MR. BAHRET:

13:05:41  22     Q.   Nick, could you state your full name for the

13:05:48  23   jury?

13:05:48  24     A.   Nicholas Francis Ronau.

13:05:51  25             MR. ROBON:  What was the last name.

13:05:54  1          THE COURT:  Ronau, R-o-n-a-u.

13:05:56  2      Q.  How old are you?

13:05:57  3      A.  Fifty-eight.

13:05:59  4      Q.  Tell me about your educational background.

13:06:03  5      A.  Basically after high school I had a couple years

13:06:08  6   in the service; I took some adult education courses at

13:06:13  7   Com. Tech University of Toledo that led me into

13:06:17  8   surveying.

13:06:17  9      Q.  Okay.  How long have you been in surveying?

13:06:21  10     A.  About 40 years.

13:06:24  11     Q.  Are you licensed in the state?

13:06:26  12     A.  I've been licensed since 1980.

13:06:30  13     Q.  What other qualifications do you hold to do

13:06:33  14  survey work, if any?

13:06:37  15     A.  My licensure and my experience.

13:06:41  16     Q.  Briefly, don't spend a lot of time, but tell us

13:06:44  17  your employment history.  I know now you're with Toledo,

13:06:47  18  but tell us your background?

13:06:49  19     A.  Most of my experience has been doing boundary

13:06:52  20  work, property surveys with survey companies or

13:06:55  21  consulting engineers.  Pretty good balance of both

13:07:00  22  construction and boundary work.

13:07:02  23     Q.  All right.  And have you always been in this

13:07:04  24  general area?

13:07:07  25     A.  Except for a brief couple years -- or actually,

13:07:10    1    only one year in Oklahoma.

13:07:13    2        Q.   In the what?

13:07:14    3        A.   Oklahoma.

13:07:16    4        Q.   How long have you been with the City of Toledo?

13:07:18    5        A.   It will be five years in August.

13:07:23    6        Q.   Did you have any involvement in the staking or

13:07:27    7    the demarcation of the boundaries for the water main

13:07:31    8    project that brings us here today?

13:07:33    9        A.   Yes.

13:07:34   10        Q.   And can you tell us what your role was?

13:07:36   11        A.   Basically field supervision as far as

13:07:44   12    coordinating between what the project engineer, the

13:07:48   13    consultant, and my supervisor wanted done, applying it

13:07:53   14    to what we're trying to accomplish in the field.

13:07:56   15        Q.   Who is your direct supervisor?

13:07:58   16        A.   Robert Babcock.

13:07:59   17        Q.   Do you have anybody working under you or under

13:08:02   18    your direction?

13:08:03   19        A.   Whoever I happen to be out with typically is

13:08:05   20    under my supervision.

13:08:06   21        Q.   All right.   On this particular job in the area

13:08:10   22    near what you now know as Cambridge, who did you have

13:08:14   23    working under you then?

13:08:15   24        A.   Tim Pauley would have been the most likely.

13:08:18   25    There would have been a few other people in and out, but

13:08:22  1   he was the most consistent.

13:08:24  2       Q.   Can you describe how do you work with, in this

13:08:26  3   case, Mr. Pauley?  What's your role?  What's his role?

13:08:30  4   How do you get the job done?

13:08:32  5       A.   Tim typically does most of the technical or

13:08:37  6   mechanical work as far as the instrumentation or as I

13:08:40  7   relate what is actually on the plan and apply it to what

13:08:45  8   we're trying to accomplish in the field.

13:08:48  9       Q.   So you have the Arcadis plans with you?

13:08:51  10      A.   Correct.

13:08:52  11      Q.   Then you and Tim are in conversation?  You give

13:08:57  12  data; he sits on a spot?

13:08:59  13      A.   That's correct.

13:09:00  14      Q.   Then I understood that he called it an offset; he

13:09:04  15  measures from that spot over?

13:09:06  16      A.   That's one of several methods, yes.

13:09:08  17      Q.   Is that an accepted method?

13:09:10  18      A.   Definitely.

13:09:11  19      Q.   And is that a method that was used by Mr. Pauley

13:09:14  20  and yourself?

13:09:16  21      A.   Very often, yes.   If the point I'm trying to

13:09:22  22  establish is easily accessible, we'll walk up to it and

13:09:27  23  set the point itself.   If it's going through brush or

13:09:31  24  trees or whatever, if it's not that accessible, then we

13:09:34  25  create a point, determine what the offset is and make a

13:09:37  1    measurement.

13:09:37  2       Q.   So was it a large part of Mr. Pauley's work

13:09:41  3    looking at -- I gather it's somewhat like on a stake and

13:09:45  4    some machine that's sizeable?

13:09:47  5       A.   It's a data collector.   A field computer

13:09:50  6    actually.

13:09:51  7       Q.   You look down in it and read data?

13:09:54  8       A.   You're just reading a small screen, a very small

13:09:56  9    screen.

13:09:57  10      Q.   Is it on the top of the machine?

13:09:58  11      A.   Yes.

13:09:59  12      Q.   And then how is the line marked?

13:10:04  13      A.   In the field?

13:10:05  14      Q.   Yeah.   What's the methodology for marking the

13:10:09  15   border so that others that follow know where it is?

13:10:12  16      A.   If it's an open area, typically we'd drive a lath

13:10:17  17   and put pink or orange flagging on it.   If it were a

13:10:20  18   wooded or brushy area, we'll measure and tie flagging on

13:10:24  19   a fence or tree limb or a tree itself or a power pole or

13:10:28  20   whatever happens to be there.

13:10:32  21      Q.   And is whatever you tie it on, like a tree limb,

13:10:37  22   is that the border in a vertical sense?

13:10:39  23      A.   Yes.

13:10:43  24      Q.   And then after -- let me back up.   Do you

13:10:49  25   remember working behind what you now know as Cambridge?

13:10:54  1      A.   Not specifically.

13:10:58  2      Q.   Roughly how long was this project, that section

13:11:01  3   of the project that you were working on that year, if

13:11:04  4   you know?

13:11:06  5      A.   It had to be two or three miles.

13:11:09  6      Q.   And at least at this point Cambridge specifically

13:11:13  7   didn't stick out specifically in your mind?

13:11:15  8      A.   No.

13:11:16  9      Q.   Did there ever come a time when it did stick out

13:11:19  10  in your mind?

13:11:19  11     A.   Yes.   Yes.

13:11:21  12     Q.   When was that?

13:11:22  13     A.   Once it became an issue as to what was cleared

13:11:25  14  and what wasn't cleared, then we had made a few other

13:11:29  15  trips out there to verify.

13:11:30  16     Q.   Tell us about that.   To speed it up, you became

13:11:33  17  aware of an allegation that there was an encroachment?

13:11:38  18     A.   Yes.

13:11:39  19     Q.   What did you do when provided that information?

13:11:43  20     A.   We had gone back out and located what tree stumps

13:11:48  21  were visible in that particular area and just did a

13:11:55  22  general -- we call it topographical survey, shot

13:11:59  23  elevations on the ground features, tied in what

13:12:03  24  monumentation we were able to locate.   Just verifying

13:12:07  25  where we were in relation to what was shown on the

13:12:10  1   plans.

13:12:10  2       Q.   And who assisted you, if anybody, on that effort?

13:12:13  3       A.   Most of that would have been Tim Pauley.

13:12:16  4       Q.   What did you determine based upon that work that

13:12:19  5   you did after the clearing was done?

13:12:22  6       A.   Our feelings was that we were inside our limits.

13:12:26  7            MR. ROBON:   Objection to feelings, Your

13:12:32  8   Honor.

13:12:32  9       A.   It was our belief at that point in time that we

13:12:35  10  were within our limits.

13:12:36  11           THE COURT:   Thank you.   Overruled.

13:12:39  12      Q.   Is that belief held to a reasonable degree of

13:12:42  13  certainty within the field of surveying?

13:12:44  14      A.   Yes.

13:12:48  15      Q.   Did you ever come to a contrary conclusion?

13:12:50  16      A.   No.

13:12:57  17      Q.   Were you there when the clearing work itself was

13:12:59  18  done?

13:12:59  19      A.   No.

13:13:00  20      Q.   So you went back and you looked at trees that

13:13:03  21  were cut down -- or the evidence, I should say?

13:13:05  22      A.   Correct.

13:13:11  23      Q.   Do you know was that work done before or after

13:13:14  24  somebody brought in a bunch of dirt on the back of Old

13:13:17  25  Granite?

13:13:17  1      A.   The clearing was done previous.

13:13:19  2      Q.   I lost you there.   I'm sure it's my fault.

13:13:23  3   Your work, when you went back because of the boundary

13:13:26  4   dispute, was that done before or after somebody dumped

13:13:30  5   all the dirt on the back of Cambridge?

13:13:32  6      A.   Actually we were there before and after.

13:13:34  7      Q.   All right.   So you saw the undisturbed evidence,

13:13:39  8   then you later saw whatever was there, the dirt?

13:13:43  9      A.   Yes.

13:13:47  10     Q.   And were you able to reach that conclusion you

13:13:49  11  told us about when you looked at the undisturbed

13:13:52  12  evidence?

13:13:52  13     A.   Yes.

13:13:53  14     Q.   In other words, your opinion was there was no

13:13:55  15  encroachment?

13:13:56  16     A.   Correct.

13:13:57  17     Q.   Now, did you thereafter ever get involved in the

13:14:02  18  issue of a manhole cover or a manhole, I should say, in

13:14:07  19  the vicinity of but not on Cambridge property?

13:14:11  20     A.   Yes.

13:14:11  21     Q.   Tell us about that.   What was the issue that you

13:14:14  22  were involved in there?

13:14:17  23     A.   It was when they installed the waterline, I

13:14:21  24  believe there was a conflict with an existing pipe.   At

13:14:27  25  that point we were trying to determine whether or not --

13:14:30  1  or determine if there was going to be a conflict, so we

13:14:33  2  had to take some measurements on that structure.

13:14:36  3      Q.   Okay.  And to do that measurement, and again

13:14:40  4  speed this up, Mr. Pauley said that he actually used --

13:14:44  5  I forget if he called it a rod or what.  He used some

13:14:48  6  device down in the manhole and took measurements from

13:14:50  7  the top of the pipe, the bottom of the pipe.  Would you

13:14:53  8  agree that basically is what was done?

13:14:55  9      A.   Basically the measurement was made from the top

13:14:58  10  of the manhole to the bottom of the pipe.

13:15:00  11      Q.   Okay.  And what was your role in that?  What did

13:15:03  12  he do and what did you do?

13:15:05  13      A.   Typically he would take the measurements.   I

13:15:07  14  would draw the sketch and record what his measurements

13:15:10  15  are.

13:15:11  16      Q.   And is -- if you'll look at your screen.  Is this

13:15:25  17  exhibit that it's in front of you, Defendant's Exhibit

13:15:28  18  K, the sketch you're talking about?

13:15:29  19      A.   Yes.

13:15:30  20      Q.   Did you have any role in the creation of this

13:15:33  21  sketch?

13:15:33  22      A.   Yes, that's my sketch, and it's my numbers, my

13:15:38  23  notes.

13:15:40  24      Q.   Is the date on that thing 10/24/06?  Is that the

13:15:45  25  date you made the sketch or the date you did the

| | | |
|---|---|---|

13:15:47   1   investigation, or what?

13:15:48   2       A.   I would say it all happened simultaneously.

13:15:55   3       Q.   That refers to a 24-inch pipe on there, right

13:16:05   4   there?

13:16:05   5       A.   Yes.

13:16:06   6       Q.   Would that be -- the 24-inch pipe, is that the

13:16:11   7   crossover pipe under the railroad, the abandoned

13:16:15   8   railroad right-of-way?

13:16:16   9       A.   Yes.

13:16:17   10      Q.   Now, Mr. Pauley said that he believes or he

13:16:22   11   believed at that time that he found the outlet.   Did

13:16:26   12   you find on outlet for that pipe in the ditch between

13:16:29   13   the two railroads?

13:16:30   14      A.   No, we did not.

13:16:31   15      Q.   Were there any other areas that you had

13:16:34   16   investigated in this project where outlet pipes were

13:16:37   17   found?

13:16:38   18      A.   Yes.

13:16:40   19      Q.   And Mr. Pauley identified a concrete outlet pipe.

13:16:50   20   Do you know if the pipe that was measured here was

13:16:53   21   concrete, or was it vitrified clay?

13:17:02   22      A.   I'm not certain.

13:17:04   23      Q.   But are you certain there was no outlet pipe,

13:17:06   24   whether concrete or other material, found, that manhole?

13:17:09   25      A.   There was none found.   There was none visible.

13:17:12   1      Q.   Do you recall looking?

13:17:14   2      A.   Yes.

13:17:23   3      Q.   When the clearing was done behind Cambridge, when

13:17:26   4   you were next there, could you still see markings in the

13:17:30   5   trees or on the weeds or whatever you had marked?

13:17:32   6      A.   Yes, there was still ribbon.

13:17:34   7      Q.   And the line was still visible?

13:17:36   8      A.   Yes.

13:17:38   9           MR. BAHRET:   Thank you, sir.

13:17:42  10                        - - -

13:17:42  11           NICHOLAS RONAU, CROSS-EXAMINATION

13:17:43  12   BY MR. ROBON:

13:17:43  13      Q.   Mr. Ronau, you would agree with me that if the

13:18:02  14   clearing that the City did was inside or beyond the

13:18:08  15   monument, surveying monument, that the contractor and

13:18:14  16   the City would have encroached into private property?

13:18:20  17      A.   Yes.

13:18:24  18      Q.   I'm going to hand you Exhibit Number 54.   You

13:18:49  19   see this concrete monument?

13:18:51  20      A.   Yes.

13:18:54  21      Q.   When was the first time you ever saw that

13:18:56  22   concrete monument?

13:18:58  23      A.   I don't know if I've ever seen it before.   I

13:19:01  24   have no idea where that monument is or what it

13:19:04  25   represents.

13:19:04   1    Q.   You're telling this jury that you went out and
13:19:07   2   surveyed the rear of the Cambridge Subdivision and never
13:19:12   3   saw -- there's two monuments there.   You never saw
13:19:16   4   either one of them?
13:19:17   5    A.   I've seen both monuments of Cambridge, but how do
13:19:22   6   I know that's this monument.
13:19:24   7    Q.   Well, there's been testimony about that.
13:19:27   8    A.   Not in my presence.
13:19:30   9    Q.   So do you acknowledge that you saw monuments of
13:19:33   10  the Cambridge Subdivision?
13:19:34   11   A.   Yes, I do.
13:19:35   12   Q.   When was the first time you saw it?   I mean, you
13:19:40   13  went out --
13:19:41   14   A.   At some point after the clearing.
13:19:43   15   Q.   And did you string a line or run a transit
13:19:47   16  between the two monuments and see clearing towards the
13:19:52   17  Cambridge Subdivision?
13:19:53   18   A.   No, I did not.
13:19:54   19   Q.   You didn't do that?   Do you acknowledge that
13:19:58   20  there was clearing towards the subdivision beyond the
13:20:02   21  monument?   Could you see that?   The tree stumps that
13:20:08   22  you saw --
13:20:08   23   A.   No, I have no knowledge of that.
13:20:09   24   Q.   Did you do a survey print for this jury?
13:20:12   25   A.   I collected information in the field.   I didn't

13:20:17  1    create any documentation.

13:20:19  2        Q.   Did Mr. Babcock at the City of Toledo create a

13:20:24  3    survey?

13:20:25  4        A.   Yes.

13:20:25  5        Q.   And where is that?

13:20:28  6        A.   I believe he has it in his possession.

13:20:36  7             MR. BAHRET:   For the record it's an

13:20:38  8    identified exhibit, and we've given them copies.

13:20:43  9    BY MR. ROBON:

13:20:43  10       Q.   Mr. Ronau, when you did this two or three miles

13:20:47  11   of staking, how many subdivisions did the railroad

13:20:52  12   right-of-way abut, residential subdivisions?   Any other

13:20:58  13   than Cambridge?

13:20:58  14       A.   There were other subdivisions, yes.

13:21:01  15       Q.   Did you see the house that was constructed on the

13:21:06  16   Cambridge Subdivision when you first went out and put

13:21:09  17   ribbons on the trees?

13:21:10  18       A.   Yes.

13:21:11  19       Q.   Did you think about the fact that maybe the

13:21:16  20   contractor ought to stay a few feet away from the

13:21:19  21   subdivision?

13:21:20  22       A.   No.

13:21:22  23       Q.   Did you use the railroad fence as a guide --

13:21:25  24       A.   Yes.

13:21:26  25       Q.   -- for the property line?

13:21:29   1        A.   We honored all the occupation, yes.

13:21:32   2        Q.   So if the railroad fence was pushed over four or

13:21:38   3   five feet onto the Cambridge Subdivision, you still

13:21:41   4   would have used the railroad as a guide?

13:21:43   5        A.   We would have tried to determine where the bottom

13:21:45   6   of the fence would have been, yes.

13:21:47   7        Q.   Well, was there a fence all along the back of the

13:21:55   8   Cambridge Subdivision, or you don't remember?

13:21:57   9        A.   I really don't recall.

13:22:00  10        Q.   Do you remember any railroad ties?

13:22:02  11        A.   Yes.

13:22:03  12        Q.   Were they pushed over?

13:22:05  13        A.   They were leaning.

13:22:07  14        Q.   They were leaning in towards the Cambridge

13:22:09  15   Subdivision?

13:22:09  16        A.   Correct.

13:22:09  17        Q.   Several feet?

13:22:13  18        A.   I would say a foot plus or minus.

13:22:16  19        Q.   And were they kind of rotten at the top?

13:22:19  20        A.   Yeah, they were in pretty bad shape.

13:22:40  21        Q.   I'm going to hand you Exhibit 7.   This is a

13:22:42  22   survey that Peterman & Associates prepared.   And it

13:22:47  23   shows an encroachment up to six feet into the Cambridge

13:22:54  24   Subdivision, lots 12, 13, 14, and 15.   Have you seen

13:22:58  25   that document in the past?

| | | |
|---|---|---|
| 13:23:00 | 1 | A.   No, I haven't. |
| 13:23:02 | 2 | Q.   The City lawyers never gave you that survey? |
| 13:23:06 | 3 | A.   The City may have seen it.   I have not seen it |
| 13:23:10 | 4 | personally, no. |
| 13:23:16 | 5 | Q.   Do you know Nick Nigh of Peterman Surveying |
| 13:23:20 | 6 | Company -- Engineering? |
| 13:23:21 | 7 | A.   No, I do not. |
| 13:23:22 | 8 | Q.   Do you know of the name Peterman? |
| 13:23:24 | 9 | A.   Yes. |
| 13:23:25 | 10 | Q.   Are they recognized to be fine engineers and |
| 13:23:28 | 11 | surveyors? |
| 13:23:28 | 12 | A.   To the best of my knowledge, yes. |
| 13:23:33 | 13 | Q.   Had anybody ever discussed with you the survey |
| 13:23:36 | 14 | that's in your hands prepared by Peterman? |
| 13:23:39 | 15 | A.   It was mentioned, yes. |
| 13:23:41 | 16 | Q.   You never asked to see it? |
| 13:23:43 | 17 | A.   No. |
| 13:23:46 | 18 | Q.   Do you think Mr. Nigh is in error when he sealed |
| 13:23:51 | 19 | there at the bottom? |
| 13:23:54 | 20 | A.   I would say no. |
| 13:23:56 | 21 | Q.   Do you think his survey is accurate? |
| 13:24:00 | 22 | A.   I have no reason not to think so. |
| 13:24:05 | 23 | MR. ROBON:  No further questions. |
| 13:24:06 | 24 | THE COURT:  Any redirect? |
| 13:24:07 | 25 | MR. BAHRET:  Yes. |

```
13:24:11   1                          - - -

13:24:11   2              NICHOLAS RONAU, REDIRECT EXAMINATION

13:24:14   3    BY MR. BAHRET:

13:24:14   4      Q.   When you say the survey is accurate, are you

13:24:16   5    talking about the property line or the evidence that he

13:24:18   6    claims he saw of tree stumps and so forth?

13:24:21   7      A.   I don't know that either one would be inaccurate.

13:24:27   8      Q.   Sir, when we talked about giving credibility to

13:24:32   9    the -- I forget what you called it, not monument,

13:24:38   10   credibility to the historical occupancy or something

13:24:41   11   like that?

13:24:41   12     A.   Yes.

13:24:42   13     Q.   If you locate your GPS device, and it says the

13:24:49   14   border is 20 feet to my left, you take the tape or

13:24:54   15   whatever, you walk 20 feet, make sure you're at 20 feet

13:24:58   16   and not 21, what if the fence is five more feet away?

13:25:02   17   Where do you mark?

13:25:03   18     A.   We mark the 20 feet.  We never go beyond our

13:25:06   19   limits.

13:25:07   20     Q.   So if the fence is less than 20 feet, say it's 18

13:25:11   21   feet --

13:25:11   22     A.   Then we mark the fence.

13:25:14   23     Q.   So it's the lesser of either the historical

13:25:17   24   monument or what our data shows is the property line?

13:25:21   25     A.   Correct.
```

13:25:23  1          MR. BAHRET:  Thank you.

13:25:27  2          THE WITNESS:  I might mention also by

13:25:28  3   measuring the offset, you'll never end up with a low

13:25:31  4   measurement.  You will always end up short because you

13:25:34  5   may not be perpendicular, or there may be obstructions.

13:25:38  6   So it's never going to be a greater than 20-foot

13:25:41  7   measurement.  It would be less than.

13:25:44  8      Q.  By that you mean if you take out your tape 20

13:25:47  9   feet and you walk offline, you're not going to be 20

13:25:53  10  feet; you can only be -- or the farthest distance will

13:25:56  11  be at a 90 degree angle?

13:25:58  12     A.  That is correct.

13:26:01  13         MR. BAHRET:  Okay.  Thank you.

13:26:02  14         THE COURT:  Further --

13:26:03  15                    - - -

13:26:04  16         NICHOLAS RONAU, RECROSS-EXAMINATION

13:26:06  17  BY MR. ROBON:

13:26:06  18     Q.  You still don't dispute the accuracy of Mr.

13:26:12  19  Nigh's showing an encroachment, do you?

13:26:15  20     A.  No.

13:26:16  21         THE COURT:  You may step down.  Thank you.

13:26:18  22  Your next witness?

13:26:33  23         MR. BAHRET:  The next witness, Your Honor,

13:26:35  24  is going to be Mr. Babcock.

13:26:40  25         MR. ROBON:  Your Honor, one of the jurors --

13:26:45 1          THE JUROR:  Could I have that turned just a

13:26:47 2   little bit.   The light is absolutely blinding me.

13:27:12 3          (The witness was sworn by the clerk.)

13:27:23 4                          - - -

13:27:23 5          ROBERT BABCOCK, DIRECT EXAMINATION

13:27:24 6   BY MR. BAHRET:

13:27:24 7      Q.   Good afternoon.   Can you state your full name

13:27:33 8   for the jury.

13:27:33 9      A.   My name is Robert Allen Babcock, B-a-b-c-o-c-k.

13:27:38 10     Q.   How old are you, sir?

13:27:39 11     A.   Thirty-five.

13:27:40 12     Q.   And tell me about -- well, you're a surveyor,

13:27:45 13  chief surveyor for the City of Toledo?

13:27:47 14     A.   Correct.

13:27:48 15     Q.   How did you become qualified to be the chief

13:27:50 16  surveyor for the City of Toledo?

13:27:52 17     A.   Well, I was hired in by the City, and I met the

13:27:56 18  qualifications, and I applied for the position, and I

13:27:58 19  met all their qualifications.

13:28:00 20     Q.   Okay.   That was -- we didn't communicate.   That

13:28:03 21  was a fancy way of asking you how did you become -- what

13:28:09 22  is your licensure?   Where did you go to school, your

13:28:12 23  experience?

13:28:12 24     A.   I've been in surveying since the Corps, 1983.

13:28:17 25     Q.   When you say the Corps?

13:28:19   1      A.   Corps of Engineers.

13:28:20   2      Q.   Okay.

13:28:21   3      A.   And then I took my test in '85, passed my

13:28:25   4   professional.   I'm sorry, '95, because you had to have

13:28:30   5   ten years requirement in the field.   I basically am a

13:28:33   6   field surveyor from the old ten-year law, the ten years

13:28:39   7   you had to qualify.

13:28:40   8      Q.   Okay.

13:28:41   9      A.   And that's how you met the minimum standards for

13:28:44  10   state law.

13:28:45  11      Q.   Is it something different now?

13:28:46  12      A.   Yeah, four years.   They don't have as much field

13:28:51  13   work.

13:28:51  14      Q.   Okay.   Are you licensed?

13:28:53  15      A.   Yes.

13:28:54  16      Q.   And how long have you been licensed?

13:28:56  17      A.   Thirteen years.

13:28:57  18      Q.   And you may have told me this.   Forgive me.  How

13:29:00  19   long have you worked for the City?

13:29:01  20      A.   Eleven.

13:29:04  21      Q.   And in what -- what capacity do you have or what

13:29:08  22   was your involvement, if any, in the project for the

13:29:11  23   water main that we now know goes behind Cambridge?

13:29:16  24      A.   I basically took the information that our

13:29:18  25   consultant did.

13:29:19  1      Q.   That's Arcadis?

13:29:21  2      A.   Yes, sir.   FPS at that time.   I basically

13:29:27  3   checked it and reviewed it and took their data they

13:29:30  4   provided to us in an auto CAD format and inserted it

13:29:35  5   into our data collectors, then state their design per

13:29:39  6   coordinates.

13:29:40  7      Q.   The jury's going to be shock when I ask you this

13:29:43  8   because they know I'm a real techno wizard.   In English

13:29:47  9   what's it mean to go from the auto CAD and put it into

13:29:50  10  your data?

13:29:51  11     A.   It's a digital format that I'm sure most people

13:29:54  12  have heard of auto CAD.   It's a design program on the

13:29:57  13  computer which is a drafting tool.   Basically the CAD

13:30:02  14  draftsman of the day when they used to use pencils and

13:30:05  15  triangles and slide bars to draft, they're doing it on

13:30:09  16  computers now.   And they design these using cartesian

13:30:13  17  coordinates.   It's a coordinate system that everybody's

13:30:16  18  used in trigonometry.  We basically would take these

13:30:22  19  coordinate systems, and you're working in a data spacial

13:30:27  20  base.   It's almost like the real world, but it's in the

13:30:30  21  computer.   Does that make sense?

13:30:32  22     Q.   Yes.

13:30:34  23     A.   It's taking a real world measurement and drawing

13:30:42  24  it on a computer to be equal to one unit.

13:30:46  25     Q.   Basically you're checking these plans and then

13:30:49    1    loading the data into some sort of device you need in

13:30:52    2    the field then?

13:30:53    3      A.  Yes, sir.

13:30:54    4      Q.  And what was your role thereafter, if any?

13:30:56    5      A.  Basically I made sure that everything checked and

13:31:00    6    was correct per the design of the plans.   And after

13:31:04    7    loading it I gave it to my field crew, and they went out

13:31:07    8    and would localize the GPS unit onto these fixed

13:31:13    9    coordinate points that were relative to the design.

13:31:15    10      Q.  Nick, the guy that just got done testifying here,

13:31:18    11    was he the supervisor of one of these crews?

13:31:21    12      A.  Yes, sir.

13:31:21    13      Q.  And Mr. Pauley works under his supervision?

13:31:24    14      A.  Yes, sir.

13:31:25    15      Q.  What's the chain:  You, Mr. Ronau, then Mr.

13:31:29    16    Pauley?

13:31:30    17      A.  Yes.

13:31:32    18      Q.  Then when did you next have any involvement in

13:31:35    19    any issue involving the marking of the property line for

13:31:39    20    the water main project?

13:31:42    21      A.  Involvement as to?

13:31:43    22      Q.  Were you?

13:31:44    23      A.  I was always involved.

13:31:46    24      Q.  Were you day-to-day out there?

13:31:47    25      A.  No, sir.   I would listen to the day-to-day

13:31:50  1   reports and check the data collectors on a day-to-day

13:31:54  2   basis after the work was completed and they had gone out

13:31:58  3   in the field, verifying what was staked.

13:32:00  4       Q.   Have you been out in the field before any of the

13:32:02  5   land clearing was done?

13:32:03  6       A.   Yes, sir.

13:32:03  7       Q.   Do you have any recollection of being in the area

13:32:06  8   near Cambridge, what we now know is Cambridge?

13:32:09  9       A.   Yes, sir.

13:32:10  10      Q.   What do you recall seeing there?

13:32:11  11      A.   Brambles and briar.   Sumac, basically.

13:32:17  12      Q.   Could you see any housing on that development?

13:32:20  13      A.   Yes, you could see through the foliage, you could

13:32:23  14  see houses.   And actually you can see some of the

13:32:26  15  barren farmland.

13:32:27  16      Q.   Did you have any problem seeing the houses?

13:32:31  17      A.   By problems, just other than the sumac that's

13:32:35  18  kind of like -- you were seeing through; it was like

13:32:38  19  looking through a corn field.

13:32:41  20      Q.   But did you have to take any special effort to

13:32:45  21  see a house?

13:32:46  22      A.   No, sir.

13:32:46  23      Q.   Or it's readily there?

13:32:48  24      A.   Yeah.

13:32:48  25      Q.   Okay.   Were you there as any of the staking near

13:32:54  1   Cambridge was -- I call it staking; I know they tied

13:32:57  2   ribbons and so forth -- when any of that work was being

13:33:01  3   done in the Cambridge area?

13:33:02  4       A.  No.  Delineation of the clearing?

13:33:03  5       Q.  Yes.

13:33:04  6       A.  I was not there personally for that area until it

13:33:07  7   became a problem area.

13:33:09  8       Q.  All right.  By the way, for delineating

13:33:12  9   something, what is the job of the surveyor?  What are

13:33:16  10  you trying to delineate?

13:33:18  11      A.  To mark out -- in the case of the railroad, to

13:33:21  12  mark out the delineation means that we would be marking

13:33:25  13  where the limits of the construction site or the

13:33:28  14  easements were agreed upon by the railroad and the City

13:33:32  15  of Toledo.

13:33:32  16      Q.  All right.  So it's not an order that you have

13:33:35  17  to clear; it's you're marking a border?

13:33:38  18      A.  You're marking where your calculated center line

13:33:44  19  for the design is.  They have the limits laid out on the

13:33:47  20  plans.  We have those right-of-ways drawn on there.  We

13:33:51  21  went out and took that spacial database from the data

13:33:54  22  collector and would plot that into the real world.

13:33:56  23  Whenever we would reach a point where we met the line by

13:34:01  24  design, we would stake that.  But if we ran into

13:34:04  25  somebody else's interest of occupation, we honored their

13:34:08   1   existing occupation.

13:34:12   2       Q.   In fact, on this job did you run into any such

13:34:15   3   circumstances?

13:34:16   4       A.   Several.

13:34:20   5       Q.   What would you do in these instances?

13:34:22   6       A.   Depending on the validity and the severity of the

13:34:25   7   encroachment, if it was minimal, within a foot, we would

13:34:29   8   just honor their occupation.   If it was as severe as 30

13:34:33   9   feet, we would notify the design engineer.

13:34:36  10       Q.   And nobody's alleging there was anything like

13:34:38  11   that at Cambridge, but did you have some pretty

13:34:42  12   significant discrepancies other places on this job?

13:34:45  13       A.   Yes, sir.

13:34:45  14       Q.   And resolved those?

13:34:46  15       A.   Yes.

13:34:47  16       Q.   And in fact --

13:34:49  17       A.   To the satisfaction of both parties.

13:34:52  18       Q.   Wasn't there a garage or something on one place

13:34:55  19   that was in the land --

13:34:56  20       A.   That was in the first phase.   That was just

13:34:59  21   missed on the original topo from the consultant.

13:35:02  22       Q.   In the area behind Cambridge, you mentioned at

13:35:05  23   some point you became aware there was, in fact, a

13:35:07  24   dispute?

13:35:08  25       A.   Yes.

13:35:09    1        Q.   How did that come to your attention?

13:35:11    2        A.   Basically we marked out the clearing, and once

13:35:16    3    the trees were cleared, I believe Joe Crandall was the

13:35:21    4    first individual to tell me that there was a possibility

13:35:25    5    that the homeowner is in disagreement where we cleared.

13:35:29    6        Q.   And so what did you do in response to that?

13:35:32    7        A.   I sent my survey crew out there.

13:35:35    8        Q.   And would that again be Nick and Tim?

13:35:37    9        A.   Yes, sir.   Same crew.

13:35:40   10        Q.   Did you ever go out and try to determine if there

13:35:43   11    had been any encroachment?

13:35:45   12        A.   When I actually went out there, most of the

13:35:50   13    brambles, I guess you could call it, sumac that was left

13:35:53   14    after the clearing had already had dirt dumped on them.

13:36:00   15        Q.   What did you do to try to answer the problem --

13:36:03   16    or the question as to whether there actually was any

13:36:07   17    encroachment?

13:36:08   18        A.   We didn't actually do a survey of the railroad's

13:36:11   19    property center line, which is where we had an easement.

13:36:15   20    We checked the interest of the homeowner and used their

13:36:19   21    subdivision monumentation, and we worked it backwards

13:36:22   22    towards the railroad.   And we basically recalculated

13:36:26   23    and found monumentation along the railroad right-of-way

13:36:29   24    per his subdivision.   I'm not saying it was right, but

13:36:33   25    we honored his monument.

13:36:35  1    Q.   Are the monuments that are marking the corners of

13:36:38  2    Cambridge in any way in conflict with the right-of-way

13:36:41  3    depicted from for the railroad?

13:36:43  4    A.   Per the line that was supplied to us, yes.   Per

13:36:49  5    the actual center line of the railroad, I have no

13:36:52  6    knowledge of that because we didn't do a survey of the

13:36:54  7    railroad property line.

13:36:56  8    Q.   Tell us what you then did, using the monuments

13:37:01  9    that -- I think that's what you said you used, the

13:37:05  10   monuments from the subdivision?

13:37:06  11   A.   Yes, sir.

13:37:06  12   Q.   Did you then plot that out?

13:37:08  13   A.   Yes.

13:37:09  14   Q.   And did you prepare any diagrams or paperwork

13:37:14  15   concerning that?

13:37:14  16   A.   I prepared at least three or four drawings.

13:37:18  17   Q.   Okay.   And I think some of these, you can come up

13:37:24  18   if you want and help me go through which ones you need.

13:37:27  19   What I want you to do is explain to the jury what your

13:37:29  20   conclusions were and how you arrived at those

13:37:33  21   conclusions, and use any of these documents that you

13:37:36  22   need.   And let me show you how we might be able to do

13:37:39  23   this.

13:37:45  24       Have you ever used one of those projector type

13:37:49  25   things?

| | | |
|---|---|---|
| 13:37:49 | 1 | A.   Not since college. |
| 13:37:51 | 2 | Q.   I'm not saying you have to use this document. |
| 13:37:55 | 3 | A.   This is actually the best depiction of -- |
| 13:37:59 | 4 | Q.   All right.   And let me get you a pencil or |
| 13:38:02 | 5 | something to point with.   If you would make sure you're |
| 13:38:10 | 6 | in view because they've got screens, and there's one up |
| 13:38:13 | 7 | here. |
| 13:38:13 | 8 | Explain what you did and what conclusions you |
| 13:38:16 | 9 | came to. |
| 13:38:16 | 10 | And by the way, it's -- if you want to mark it on |
| 13:38:20 | 11 | there for them you can just, I guess, touch that. |
| 13:38:26 | 12 | A.   Well, basically what we did is we did a survey of |
| 13:38:29 | 13 | the monumentation within the subdivision.   We found |
| 13:38:32 | 14 | existing monuments along the center line of the railroad |
| 13:38:35 | 15 | and along the right-of-way.   That led us to where we |
| 13:38:38 | 16 | would find this monument right in this location right |
| 13:38:42 | 17 | here.   It would be in that area.   We found that |
| 13:38:49 | 18 | monument, and we found another monument down here, and |
| 13:38:53 | 19 | we followed that line, and we staked that as if it was |
| 13:38:56 | 20 | true.   I can't guarantee you that that's true because, |
| 13:38:59 | 21 | like I said, I don't know what rights may have been |
| 13:39:02 | 22 | encroached or not encroached onto the railroad because |
| 13:39:04 | 23 | we didn't survey the railroad's property.   So by |
| 13:39:07 | 24 | staking this line and shooting the fence that we had |
| 13:39:10 | 25 | occupied out in the field after the clearing was done, |

| | |
|---|---|
| 13:39:14 | 1 |
| 13:39:18 | 2 |
| 13:39:22 | 3 |
| 13:39:26 | 4 |
| 13:39:30 | 5 |
| 13:39:34 | 6 |
| 13:39:37 | 7 |
| 13:39:43 | 8 |
| 13:39:45 | 9 |
| 13:39:48 | 10 |
| 13:39:54 | 11 |
| 13:39:59 | 12 |
| 13:40:03 | 13 |
| 13:40:06 | 14 |
| 13:40:12 | 15 |
| 13:40:14 | 16 |
| 13:40:18 | 17 |
| 13:40:21 | 18 |
| 13:40:24 | 19 |
| 13:40:27 | 20 |
| 13:40:30 | 21 |
| 13:40:33 | 22 |
| 13:40:37 | 23 |
| 13:40:41 | 24 |
| 13:40:43 | 25 |

we actually were able to get in there prior to any of this dirt being brought and in this area.  We shot the line of the fence.   And then there was fill ribbon in some of these locations that were tied to some of the brambles from the clearing because they didn't cut all the way up to the bramble line that we marked.   They came a little bit shy of that towards the railroad.   So by doing that and taking that information from the subdivision line right through here, and where we shot the fence, we come up with basically four inches to this end.   And then about 240 feet away we were at zero, and we stayed clear all the way through.

Q.   Let me interrupt you.

MR. BAHRET:  He's referring to Exhibit O.

A.   So after we were able to get out there and shoot the existing clearing, we weren't able to get back out there because within a couple days, maybe a week, all the evidence that we needed to pick up for additional stumps -- because it became a question of some of the stumps were destroyed over on his property line.   So I wanted to send a crew back up out there to pick these stumps up that were over in this area assumedly on his property.   By the time we got back out there they had already been covered with three feet of dirt.   So the only thing we have for evidence is what we're

| | | |
|---|---|---|
| 13:40:46 | 1 | hypothesizing on is where the line of the subdivision |
| 13:40:50 | 2 | is.   This is the last information we had from marking. |
| 13:40:53 | 3 | So we really couldn't prove anything other than maybe |
| 13:40:57 | 4 | there was maybe some dappled sumac brush there, four |
| 13:41:04 | 5 | inches to zero by the time you got down to here. |
| 13:41:08 | 6 | Q.   When you say four inches to zero, what are you |
| 13:41:11 | 7 | telling me? |
| 13:41:11 | 8 | A.   At the north end of the subdivision, right where |
| 13:41:15 | 9 | the pen is, there would be about four inches clear to |
| 13:41:18 | 10 | the railroad fence that we shot in occupation to the |
| 13:41:21 | 11 | monument.   And then about 250 feet back this way, it |
| 13:41:26 | 12 | starts to get to where it's just zero.   It's almost |
| 13:41:30 | 13 | crossing.   I don't know any other way to say this, but |
| 13:41:34 | 14 | the railroad was on a different bearing than the |
| 13:41:37 | 15 | subdivision.   The railroad fence's line was a completely |
| 13:41:41 | 16 | different bearing than the subdivision line.   That's |
| 13:41:45 | 17 | just because of the monumentation that was within the |
| 13:41:47 | 18 | subdivision. |
| 13:41:48 | 19 | Q.   Does that mean the railroad and the fence were |
| 13:41:53 | 20 | not exactly parallel? |
| 13:41:56 | 21 | A.   I can't say that because I didn't shoot the |
| 13:41:58 | 22 | railroad like that.   I shot the fence. |
| 13:42:00 | 23 | Q.   I'm not -- trust me, I'm not trying to testify. |
| 13:42:03 | 24 | I don't know what you mean by they're not on the same |
| 13:42:06 | 25 | bearing. |

13:42:06  1      A.   A bearing is a line, like northeast, northwest.

13:42:11  2  Those are bearings.   And the line that -- the line that

13:42:17  3  the railroad would be running on would be something like

13:42:20  4  this.   Then when you do the subdivision monumentation,

13:42:25  5  they would cross.   That's over exaggerating, but that's

13:42:29  6  a totally different bearing that's how you would get

13:42:33  7  this three inches, approximately four inches here, and

13:42:36  8  you would get zero here, because they were not the same

13:42:40  9  bearing.

13:42:41  10      Q.   Okay.   What does this mean here when you --

13:42:45  11  plaintiff's hub online.   What's that.

13:42:52  12      A.   This is when I was notified Mr. McCarthy was not

13:42:55  13  happy with the clearing that was done.   And he went out

13:42:59  14  and set hubs where he assumed his property -- the line

13:43:03  15  was without a proper survey.   And we went out and we

13:43:06  16  shot the hubs.  We shot his hub and we found it to be at

13:43:15  17  this station per our plan.   And this far -- 1.76 feet

13:43:21  18  off of what the actual subdivision line was.   Then if

13:43:26  19  you ran that all the way through, that's the pink line

13:43:30  20  that you see here, that's on a completely different

13:43:33  21  bearing other than the railroad and the subdivision?

13:43:38  22      Q.   So Mr. McCarthy put his stakes in the wrong place

13:43:41  23  down here?  I don't know which lot this would be, but at

13:43:44  24  this end that we're pointing to on the plan here?

13:43:47  25      A.   Yes.   I believe he did it.   I don't know if he

13:43:50   1   did it personally or had it hired.   But they didn't

13:43:53   2   look like any survey hubs of a company.   They looked

13:43:59   3   like something somebody had in the back of their truck

13:44:02   4   for lawn work.

13:44:03   5      Q.   Is there anything else on this document, Exhibit

13:44:06   6   O, that is relevant to our discussion about a potential

13:44:09   7   encroachment that you can use to explain to the jury, or

13:44:16   8   are you pretty well done with that?

13:44:17   9      A.   On this document you'll see there are some other

13:44:20  10   distances in pink or magenta that says 1.29, 1.58.   And

13:44:27  11   basically these numbers are what we could have staked.

13:44:31  12   This is -- it doesn't show up real well, but if you look

13:44:37  13   right here there's a 1.29.   That was the line that was

13:44:41  14   supplied to us from our consultant, FPS.   That's why we

13:44:46  15   didn't honor it.   If we would have staked out exactly

13:44:49  16   the line we were given, we would have been one and a

13:44:51  17   half feet over that fence.   And we didn't want to go

13:44:53  18   over that.   Now, the homeowner at this residence right

13:44:58  19   here had cleared up to this fence.   So they

13:45:00  20   acknowledged that they honored that fence.   So in turn

13:45:03  21   we left basically eight inches on the other side of that

13:45:09  22   fence because it was -- it was deteriorated.   It was

13:45:12  23   laying over, and it was just crumbling.   It was very

13:45:17  24   old.

13:45:18  25      Q.   So if I'm hearing you right, if you had literally

13:45:21  1   put your stakes or your markings in where FPS said was

13:45:28  2   the actual border, they would have been on the wrong

13:45:30  3   side of the fence?

13:45:31  4       A.  Yes, sir.   And it was already cleared on the

13:45:34  5   other side of that fence.   And that individual had

13:45:36  6   honored the railroad fence.   That's why I was telling

13:45:39  7   my guys and I instructed them to honor existing

13:45:42  8   occupation.   If you see a homeowner has an interest up

13:45:45  9   to that fence, then leave the fence.   And that's what

13:45:49  10  they did.

13:45:50  11      Q.  Mr. Babcock, who prepared this document?

13:45:55  12      A.  I did.

13:46:02  13      Q.  You prepared these also over here; did you not?

13:46:05  14      A.  Yes, sir.

13:46:09  15      Q.  Is there anything on this document -- I guess

13:46:12  16  this is Exhibit C -- that you could use to illustrate

13:46:15  17  your point to the jury?

13:46:20  18          MR. ROBON:  Could you hand me the other one.

13:46:43  19      A.  It's kind of a small little square, but if you

13:46:52  20  look at this --

13:46:54  21      Q.  You're looking at Exhibit C?

13:46:57  22      A.  If you look at this in the blue, the lines that

13:47:01  23  you see here, those are contour lines to the half a foot

13:47:07  24  that were supplied by a survey from Finkbeiner, Pettis,

13:47:12  25  & Strout.   This is what we did our profile design off

13:47:14  1   of for our pipe.

13:47:15  2          THE COURT:  If you zoom that it might help.

13:47:28  3   A.  So what you see here is what we had for existing

13:47:31  4   topo from Finkbeiner, Pettis, and Strout.  What you see

13:47:37  5   here in the tan is the earth work that was done within a

13:47:42  6   week after we had gotten out there to shoot this

13:47:46  7   subdivision monument.  We went out and occupied the

13:47:55  8   center line monumentation for the subdivision.  And

13:47:57  9   that's how we were able to basically calculate where the

13:48:02  10  occupation was between the railroad per the subdivision.

13:48:06  11  And all this is showing is how much land was brought in

13:48:11  12  and filled within the area over the existing drainage

13:48:15  13  swale per the subdivision and onto his property and the

13:48:20  14  adjoining property, which of the subdivision --

13:48:24  15  Q.  Is this lot 15, the existing house?

13:48:28  16  A.  Yes, sir, I believe that is.  The house is

13:48:34  17  somewhere right in here.

13:48:35  18  Q.  Are these squigglies here, is that basically --

13:48:38  19  A.  Topography.

13:48:41  20  Q.  So that's up and down?

13:48:42  21  A.  Yes.  That's just a linear way of showing

13:48:45  22  vertical change.

13:48:47  23  Q.  Would this sort of thing change the way water

13:48:50  24  flows?

13:48:50  25  A.  Extremely.  It would actually create a natural

13:48:54  1  barrier because this along here where the red line is,

13:48:58  2  right through here is the red line for the delineation

13:49:02  3  for the drainage easement that goes along here between

13:49:05  4  the edges of the subdivision and back.   And this was

13:49:08  5  all filled almost -- I have to say at least six, seven

13:49:12  6  feet.

13:49:16  7  Q.   What else is relevant on that document?   Help

13:49:25  8  the jury understand.   There's a plastic overlay, an

13:49:28  9  acetate overlay here.   And what does the overlay tell

13:49:32  10  us about the white piece of paper below it?

13:49:36  11  A.   The overlay is showing just what was with

13:49:39  12  Finkbeiner.   It's just showing you how much the land

13:49:44  13  was impacted with this filling of this drainage swell.

13:49:48  14  Q.   Okay.  All right.   So this document, Exhibit C,

13:49:54  15  demonstrates how it impacts the drainage.   Exhibit O is

13:49:59  16  the encroachment document?

13:50:02  17  A.   Correct.

13:50:04  18  Q.   Okay.   I just wanted to make sure I understood.

13:50:08  19       Mr. Babcock, anything else on here that you need

13:50:11  20  to explain?

13:50:12  21  A.   No, sir.

13:50:13  22  Q.   Thank you.   Resume your seat if you would.

13:50:26  23       In summary, sir, were you able to reach opinions

13:50:28  24  to a reasonable degree of certainty in the field of

13:50:31  25  survey work as to whether there was, in fact, an

13:50:34  1   encroachment at all?

13:50:38  2       A.   As for being an encroachment, I'd have to say

13:50:45  3   that the guys honored existing corridor standards that a

13:50:48  4   survey company would do.  We didn't encroach

13:50:52  5   intentionally.  We -- if anything, we looked out for the

13:50:54  6   wellbeing of any of the public that we were going next

13:50:57  7   to.

13:51:01  8       Q.   Let me just directly ask you:  Did the

13:51:04  9   subcontractor of the City's contractor, so far as you

13:51:07  10  were able to tell, go even as much as an inch in

13:51:13  11  Cambridge property determined by their own monuments?

13:51:16  12      A.   By their own monuments, yes.

13:51:17  13      Q.   How deep, was that, the zero to .4 that you were

13:51:22  14  talking about?

13:51:23  15      A.   Yes, sir.

13:51:23  16           MR. ROBON:  You're speaking so fast I didn't

13:51:26  17  even hear.

13:51:27  18           MR. BAHRET:  I'll let you give the answer

13:51:28  19  instead of me anyway.  I think the Judge would prefer

13:51:31  20  that.

13:51:31  21      A.   As for the area per their monumentation,

13:51:35  22  basically I ascertained that we went from about a

13:51:40  23  240-foot stretch at a zero mark where we basically have

13:51:44  24  the bearings matching to about 33/100, which is almost

13:51:50  25  four inches to the north.

13:51:51    1    Q.   So we're not talking four feet or five feet;
13:51:53    2    we're talking at most four inches?
13:51:57    3    A.   Yes, sir.
13:51:57    4    Q.   And are you familiar with the plat map?
13:52:02    5    A.   I've seen the plat but not that particular one,
13:52:06    6    not that drawing.
13:52:07    7    Q.   So the jury understands, the area where you're
13:52:12    8    saying there may have been perhaps as much as a
13:52:16    9    four-inch encroachment is actually down here on -- where
13:52:23   10    the angle in the subdivision is?
13:52:27   11            THE COURT:   What lot number is that?
13:52:29   12            MR. BAHRET:   16.
13:52:31   13    Q.   Are you aware, for example, the plaintiffs do not
13:52:33   14    claim there was an encroachment on that lot?
13:52:36   15    A.   No.
13:52:36   16    Q.   Okay.
13:52:39   17    A.   I thought he owned both.
13:52:42   18    Q.   He does.   But he doesn't claim it.   Now, as we
13:52:46   19    move down this way counting down on the lots, from 16,
13:52:51   20    15, 14, the alleged encroachment or whatever maximum
13:52:57   21    numbers it could be according to your calculations
13:53:00   22    actually gets less?
13:53:02   23    A.   Yes, sir.
13:53:03   24    Q.   Approximately how far down is it?
13:53:05   25    A.   From that corner, the corner of the subdivision,

13:53:08   1   about 245 feet.

13:53:10   2       Q.  I assume you probably cannot tell us what lot

13:53:13   3   number that would be?

13:53:15   4       A.  It's on my drawing.  Not the lot number, but you

13:53:20   5   can associate that zero number to a lot.

13:53:23   6       Q.  But it's 245 feet.  Okay.  Have you seen this

13:53:32   7   drawing, Peterman's Exhibit Number -- or it's made by

13:53:36   8   Peterman, Exhibit Number 7?

13:53:37   9       A.  I've seen a blueprint copy unsigned.  This is

13:53:41  10   the first signed copy I've seen.

13:53:43  11       Q.  Okay.  Say that again.  You saw a what?

13:53:45  12       A.  A blueprint copy unsigned.  It wasn't stamped or

13:53:50  13   anything.  So it must have been before.

13:53:53  14       Q.  But the information is the same?

13:53:55  15       A.  I can't tell you that because I didn't scan that

13:53:57  16   picture as close as I did the original.

13:53:59  17       Q.  Did you, in fact, get in electronic format

13:54:02  18   Peterman's data to check?

13:54:05  19       A.  I got a PDF.

13:54:09  20       Q.  Is that electronic?

13:54:11  21       A.  Yes.

13:54:11  22       Q.  Did you check that data?

13:54:12  23       A.  Yes, I looked at it.  Like I said, I can't

13:54:15  24   testify that that drawing is the same.

13:54:17  25       Q.  Did you agree or do you now agree or disagree

13:54:21   1   with any conclusion that he apparently reached, Nick

13:54:25   2   Nigh, I guess, of four- to six-foot encroachments?

13:54:31   3       A.   I don't see how four to six feet could have came

13:54:34   4   out of that.   There's no way.   But like I said, by the

13:54:40   5   time we went out to occupy actual stumps that had been

13:54:43   6   supposedly chopped by our clearing crew, being the City

13:54:47   7   of Toledo's consultant, they were already covered.

13:54:51   8   Everything was obliterated.   It was -- it wasn't much

13:54:57   9   more time than a week.

13:54:58   10      Q.   Okay.

13:54:59   11      A.   At first we went out on the assumption that, Did

13:55:02   12   we?   And that was my own doing because I wanted to make

13:55:05   13   sure we didn't do something.   And I sent the crew out

13:55:09   14   without even Christy's knowledge just so we can make

13:55:11   15   sure that we didn't have a problem like we're pursuing

13:55:14   16   today.   And we shot their monuments.   And then we came

13:55:18   17   back in, and we started working on it.

13:55:20   18          The next thing I know I'm getting ready to send a

13:55:23   19   crew back up, and there was dirt already covering up

13:55:27   20   those stumps.   If there were stumps caused by our crew

13:55:31   21   and not the ones that brought the dirt in --

13:55:33   22      Q.   That dirt was primarily down on -- in the area

13:55:36   23   where the spec house is?

13:55:39   24      A.   If that's a spec house, yes.   There was a

13:55:42   25   resident living in it from what I understand.

13:55:45   1      Q.   I'll just say the house.   You wouldn't know.

13:55:48   2   The rest of the range to your left, if I'm on the

13:55:50   3   railroad facing the development, dirt had not been

13:55:53   4   dumped on there after the clearing, and you were able to

13:55:57   5   see whatever evidence was there?

13:55:58   6      A.   Yes, sir.

13:55:58   7      Q.   And made your determination that there's no

13:56:01   8   encroachment down there?

13:56:02   9      A.   We made our determination to pick up existing

13:56:05  10   monumentation.   Like I said, we didn't pick up any

13:56:09  11   stumps at that time, which I wish we could have done and

13:56:13  12   occupied those stumps if there were any from our

13:56:16  13   clearing because once the dirt was brought in, they had

13:56:19  14   to doze over any existing vegetation, but there was

13:56:22  15   hardly any vegetation on that particular lot as it was.

13:56:28  16      Q.   Now, did you have anything to do with the other

13:56:30  17   issue that we're focusing on in this case, that

13:56:34  18   crossover pipe?

13:56:34  19      A.   Sir, I have no actual knowledge of that.   Other

13:56:37  20   than driving by it, I don't know anything else about

13:56:40  21   that.

13:56:40  22      Q.   You had no part in studying anything about that

13:56:43  23   pipe?

13:56:43  24      A.   No, sir.

13:56:45  25           MR. BAHRET:   Thank you.   I have no other

13:56:46    1    questions.

13:56:50    2                    THE COURT:  You may inquire.

13:56:51    3                    MR. ROBON:  Thank you, Your Honor.

13:56:53    4                              -  -  -

13:56:53    5                    ROBERT BABCOCK, CROSS-EXAMINATION

13:56:54    6    BY MR. ROBON:

13:56:54    7        Q.  What you've produced here for the jury is not

13:56:56    8    really a survey, is it?

13:56:57    9        A.  It's a survey of that subdivision.  It's a

13:57:01   10    survey of the relativity of that subdivision to the

13:57:04   11    existing railroad fence.

13:57:05   12        Q.  Isn't it really a drawing?

13:57:07   13        A.  No, sir.  I guess in a way it is a drawing, yes.

13:57:12   14        Q.  I don't see any registration, survey number,

13:57:16   15    certification, date.

13:57:18   16        A.  Correct.

13:57:19   17        Q.  So it's not a survey?

13:57:20   18        A.  Because I asked my attorney if that would be an

13:57:22   19    appropriate drawing to submit, and he said yes.

13:57:27   20        Q.  Do you have a seal?

13:57:28   21        A.  Yes, sir.

13:57:29   22        Q.  It's not on there, right?

13:57:30   23        A.  No, sir.

13:57:31   24        Q.  And a seal means that it would be accurate.

13:57:37   25    What you presented today is simply just a sketch?

13:57:41   1              MR. BAHRET:   Objection.

13:57:42   2       A.   No, sir.

13:57:47   3              THE COURT:  He's answered.   The objection

13:57:49   4   is overruled.

13:57:52   5       Q.   Yes?

13:57:52   6       A.   No, sir.

13:57:53   7              THE COURT:  He said no.   "No, sir" is what

13:57:55   8   he said.

13:57:57   9   BY MR. ROBON:

13:57:57  10       Q.   You seem to be blaming the dirt that was brought

13:58:00  11   in as being -- covering up the stumps.   You indicated

13:58:06  12   that you were out there before the dirt was moved, and

13:58:10  13   you shot the two monuments.   Now, by shooting it, I'm

13:58:15  14   assuming you set a transit or some other machine tool on

13:58:22  15   top of one of the survey stakes, the monuments, and did

13:58:28  16   at the other, and looked down, like, a laser line; is

13:58:31  17   that right?

13:58:31  18       A.   No, sir.

13:58:32  19       Q.   What did you do when you shot it?

13:58:34  20       A.   We shot it with a GPS, subcentimeter accurate GPS

13:58:40  21   unit, and then we offset between the two points, and we

13:58:43  22   could stake to that line within a hundredth.

13:58:47  23       Q.   But you didn't stake it at that point in time?

13:58:50  24       A.   No, sir, because at that time it was not an issue

13:58:53  25   to pick up all the stumps.   It was to make sure where

13:58:56  1   the line of the subdivision was.

13:58:57  2      Q.   Well, they're out there for a purpose, right,

13:59:04  3   because somebody complained?   Yes or no?

13:59:07  4      A.   It was just in its infancy.

13:59:09  5      Q.   That's not my point.   You're out there because

13:59:13  6   someone complained and said the City cut down trees on

13:59:16  7   their property, yes or no?

13:59:17  8      A.   Then no.   If you want a yes or no answer, then

13:59:20  9   no.   I went throughout because I heard through the

13:59:22  10  inspector that I should go out.   I took it upon myself

13:59:25  11  to step out there and make sure that we pick up these

13:59:28  12  monumentations to see if there is a need for any further

13:59:31  13  investigation.

13:59:32  14     Q.   You wanted to go out there before anything

13:59:34  15  happened so you could make sure you could cover up

13:59:38  16  anything that occurred?

13:59:41  17     A.   No, sir.

13:59:41  18           MR. BAHRET:   Objection.

13:59:46  19           THE COURT:   He's answered.   The objection

13:59:48  20  is overruled.

13:59:48  21           MR. ROBON:   I'm sorry?

13:59:49  22           THE COURT:   I said he's answered.   The

13:59:51  23  objection is overruled.

13:59:53  24     Q.   Did you take any pictures of the stumps?

13:59:58  25     A.   Yes, sir.   There's photos that should be

14:00:01  1   submitted in the exhibits.   I personally took a couple.

14:00:04  2       Q.   You did?

14:00:05  3       A.   Of not the stumps themselves, but as looking

14:00:09  4   towards the house.   I remember taking those photos.

14:00:11  5       Q.   When did you take those?

14:00:13  6       A.   Sir, that's two years ago.   I'd have to say

14:00:17  7   February, March, somewhere in there.

14:00:19  8       Q.   Before the clearing?

14:00:21  9       A.   I really can't tell you the exact date to the

14:00:23  10  best of my recollection.   I was just giving you an

14:00:26  11  approximate date.

14:00:27  12      Q.   Do you know when the clearing took place?

14:00:29  13      A.   To the exact date, no, sir.

14:00:31  14      Q.   The month?

14:00:32  15      A.   Not 100 percent, no.   When they were through

14:00:35  16  that section, no.

14:00:37  17      Q.   So let me get this straight.   You didn't go out

14:00:41  18  and tie the ribbons on the line the first time?

14:00:45  19  Somebody else did that?

14:00:46  20      A.   Correct.

14:00:50  21      Q.   Then there's a complaint after the clearing

14:00:52  22  occurs, and you went out with whom?

14:00:57  23      A.   With the GPS unit I sent the crews out.

14:01:00  24      Q.   Did you go too?

14:01:01  25      A.   No, sir.   I got a crew that goes out and does

14:01:04  1    these occupations.

14:01:05  2        Q.   So you can't personally testify as to what was

14:01:10  3    there when you say you shoot?  You didn't shoot

14:01:13  4    anything; your crew shot, correct?

14:01:16  5        A.   Correct.

14:01:16  6        Q.   So you're misleading this jury when you say "I

14:01:20  7    shot."   You didn't shoot anything, did you?

14:01:22  8                 MR. BAHRET:   Objection.

14:01:23  9                 THE COURT:   I'll sustain the objection.

14:01:25  10   You may ask a question, but comments, counsel, are

14:01:28  11   unnecessary, for both sides.

14:01:34  12   BY MR. ROBON:

14:01:34  13       Q.   You did not shoot?

14:01:35  14       A.   Being their supervisor, I instructed them to

14:01:37  15   occupy that monumentation.

14:01:39  16       Q.   I understand.

14:01:40  17       A.   Therefore, maybe, yes, I did misspeak by saying

14:01:43  18   when I did the calculations that I shot.   Yes.

14:01:46  19   Physically I was not out there on that particular

14:01:49  20   moment.

14:01:49  21       Q.   On these pieces of paper that you have drawings

14:01:53  22   on, that is based upon what someone else did?

14:01:58  23       A.   Yes, sir.

14:01:59  24       Q.   You didn't do it yourself?

14:02:01  25       A.   Yes, sir.

14:02:17    1    Q.  And you didn't instruct your crew when they found

14:02:20    2    the corner monuments on the Cambridge Subdivision to run

14:02:25    3    a staking line to see whether the stumps are, on which

14:02:28    4    side of the line, right?

14:02:29    5    A.  At that particular moment when we went out to

14:02:32    6    pick up the monumentation in the subdivision --

14:02:36    7    Q.  Answer it yes or no.

14:02:37    8          THE COURT:  We're getting into a problem.

14:02:39    9    The problem is we're tripping over each other.  I would

14:02:42   10    think we would understand -- and I'm talking to the

14:02:45   11    lawyers -- how its works.  Let the witness finish an

14:02:49   12    answer, and the lawyer may begin the next question.

14:02:51   13    And the witness should allow the lawyer to finish the

14:02:53   14    question before the next answer begins.  That having

14:02:57   15    been said, let's go back and start over please.

14:02:59   16          MR. ROBON:  I didn't believe the witness was

14:03:01   17    being responsive, Your Honor.

14:03:05   18    BY MR. ROBON:

14:03:06   19    Q.  My question is, you did not instruct your crew

14:03:10   20    when they found the corner monuments on each corner of

14:03:14   21    the subdivision to run stakes, survey stakes down so

14:03:18   22    anybody that would walk out there could see if the stump

14:03:22   23    is on this side or this side, correct?

14:03:25   24    A.  I did not tell them to stake this property line,

14:03:30   25    that is correct.

14:03:31  1      Q.  You've given an excuse that the stumps --

14:03:35  2           MR. BAHRET:  Objection.

14:03:36  3      Q.  -- were subsequently covered up with --

14:03:41  4           THE COURT:  Overruled.  You may proceed.

14:03:44  5      Q.  You gave an excuse that the stumps were covered

14:03:47  6  up with mud so you couldn't locate them any longer,

14:03:52  7  correct?

14:03:52  8      A.  Not mud.

14:03:54  9      Q.  Earth?

14:03:54  10     A.  He said dirt.  They were covered with probably

14:03:58  11  two feet of dirt.

14:04:00  12     Q.  That's what I'm saying, mud?

14:04:02  13     A.  There's a difference.

14:04:03  14     Q.  Did you ever go back in the last 20 months since

14:04:06  15  those stumps were uncovered with a backhoe and run a

14:04:12  16  survey line and check where those stumps were?  You can

14:04:20  17  answer that yes or no.  You either did or didn't?

14:04:22  18     A.  How do I know which did it, the dozer or us?

14:04:25  19     Q.  I asked you a question, sir.

14:04:27  20     A.  No.

14:04:28  21     Q.  In the last 20 months after Mr. McCarthy went

14:04:31  22  back there with a backhoe and excavated where those

14:04:34  23  stumps were, did you go back and survey the property,

14:04:38  24  yes or no?

14:04:38  25     A.  No.

14:04:40  1        MR. ROBON:  No further questions.

14:04:44  2        MR. BAHRET:  Briefly.

14:04:45  3                    - - -

14:04:45  4        ROBERT BABCOCK, REDIRECT EXAMINATION

14:04:46  5  BY MR. BAHRET:

14:04:46  6    Q.  Mr. Babcock, you were asked if you put your magic

14:04:50  7  seal on here, if that does anything.  Does the

14:04:54  8  information get any better or any worse if you put your

14:04:56  9  seal on it?

14:04:56  10    A.  No, sir.

14:04:57  11    Q.  Are these documents prepared within the scope

14:05:03  12  recognized by your profession?  I mean, are they

14:05:07  13  accurate?

14:05:07  14    A.  With the data that was collected, yes.  Because

14:05:11  15  it's a true and accurate measurement.

14:05:14  16    Q.  You got the underlying data from the people that

14:05:17  17  work under you?

14:05:18  18    A.  Yes, sir, under my supervision.

14:05:20  19    Q.  And is that common?  In fact, that's standard

14:05:24  20  practice in not just your office but in the industry?

14:05:27  21    A.  Yes, sir.

14:05:28  22    Q.  The individual preparing the drawings frequently

14:05:32  23  is not the person that gathered the data?

14:05:34  24    A.  Correct.

14:05:36  25    Q.  And do you stand by these -- well, what would you

14:05:41  1   call these, surveys?

14:05:42  2      A.  Yes.

14:05:42  3      Q.  Would you stand by your surveys?

14:05:44  4      A.  That the topographic drawing is correct to my

14:05:47  5   knowledge.

14:05:47  6      Q.  And the other document, it's O -- I guess it's

14:05:52  7   over here.  Do you stand by this document?

14:05:55  8      A.  Yes, sir.

14:05:56  9      Q.  And what should we call Exhibit O?  Is that a

14:06:00  10  survey?

14:06:01  11     A.  That's an existing topography.

14:06:03  12     Q.  Say again?

14:06:04  13     A.  A topo map.  Topography.

14:06:07  14     Q.  This one?

14:06:08  15     A.  Yes, with delineations for property lines.

14:06:11  16          MR. BAHRET:  Thank you.  I have no other

14:06:12  17  questions.

14:06:18  18                          -  -  -

14:06:18  19          ROBERT BABCOCK, RECROSS-EXAMINATION

14:06:19  20  BY MR. ROBON:

14:06:19  21     Q.  Would you tell the jury how many times you were

14:06:22  22  personally at the Cambridge Subdivision site?

14:06:24  23          MR. BAHRET:  Outside the scope.

14:06:26  24          THE COURT:  He may answer.  How many times

14:06:27  25  were you there?

14:06:28  1    A.   Three times; three, four times that I'd have to

14:06:31  2  say with the encroachment issue before it became a

14:06:36  3  ballooned issue where we had to start spending more time

14:06:40  4  on it because we were also pushing the waterline further

14:06:43  5  north.

14:06:44  6    Q.   So you were there three or four times.   Were you

14:06:47  7  there just to walk by, or did you do any instrumentation

14:06:50  8  yourself?

14:06:51  9    A.   No, sir, that's why I have a survey crew.

14:06:56  10   Q.   So when they had their machines up, you didn't go

14:07:01  11 over and look through and see a delineation of stumps on

14:07:07  12 one side or the other?

14:07:08  13   A.   No, sir.  We do this with GPS.

14:07:11  14   Q.   How often do you test your GPS to make certain

14:07:14  15 that it's working accurately?

14:07:15  16   A.   Actually that particular unit was just purchased.

14:07:20  17   Q.   Just purchased?

14:07:21  18   A.   Yes, sir, from City Blue.   It was a brand new

14:07:26  19 unit.

14:07:27  20   Q.   How often do you have them checked?

14:07:29  21   A.   We try to get our equipment checked every year.

14:07:34  22   Q.   And GPS units can be -- have errors, correct?

14:07:41  23   A.   I'm sure anything can have errors.

14:07:58  24   Q.   Could you explain to the jury what the purpose of

14:08:00  25 sealing a survey and signing it and dating it is?

14:08:04  1   A.   The purpose of signing a survey is to prove that

14:08:06  2   the information shown on the plan is true and accurate

14:08:09  3   to the best of your knowledge.

14:08:18  4   Q.   And it's required by the State of Ohio, correct?

14:08:23  5   A.   Yes, sir, it is required by the State of Ohio

14:08:26  6   when you're submitting it for a client.

14:08:30  7           MR. ROBON:  No further questions.

14:08:33  8           THE COURT:  You may step down.   Thank you.

14:09:12  9           (The witness was sworn by the clerk.)

14:09:16  10                      - - -

14:09:16  11        JOSEPH CRANDALL, DIRECT EXAMINATION

14:09:18  12   BY MR. BAHRET:

14:09:18  13   Q.   Sir, could you'll state your full name for the

14:09:26  14   jury.

14:09:26  15   A.   Joseph Crandall.

14:09:28  16   Q.   How old are you, sir?

14:09:29  17   A.   How old am I?   60 years old.

14:09:37  18   Q.   And what sort of educational background do you

14:09:39  19   have?

14:09:40  20   A.   High school diploma, some college, a few

14:09:45  21   engineering classes, training thing on how to be an

14:09:50  22   inspector at the University of Toledo.

14:09:53  23   Q.   By whom are you employed?

14:09:54  24   A.   City of Toledo.

14:09:55  25   Q.   How long have you been employed by Toledo?

14:09:58　1　A.　30 years.

14:09:59　2　Q.　In what capacity are you presently employed?

14:10:03　3　A.　Construction tech, which is an inspector.

14:10:06　4　Q.　Could you basically describe in abbreviated form,

14:10:11　5　please, what does a construction inspector do?

14:10:15　6　A.　I'm kind of the person that works with the

14:10:20　7　private contractor to see that they're doing the job

14:10:23　8　according to the City's specifications and --

14:10:28　9　Q.　Are you the on-site guy then?

14:10:31　10　A.　Yes, I'm the day-to-day on-site person.

14:10:34　11　Q.　And in this case you had involvement with the

14:10:38　12　Toledo water main project involved behind Cambridge?

14:10:43　13　A.　Yes, sir.

14:10:45　14　Q.　Do you know where that water main -- where it

14:10:48　15　comes from and where it goes to?

14:10:52　16　A.　As we laid it or as the water flows?  It goes

14:10:58　17　from our College Park pumping station to a valve on

14:11:04　18　River Road in the City of Toledo as the water flows.

14:11:09　19　The pipe was installed actually in the reverse order.

14:11:13　20　We started on River Road and came across Toledo

14:11:18　21　underneath the Maumee River, heading towards White Road

14:11:22　22　and heading then towards Bates Road as the pipe was

14:11:25　23　installed.

14:11:26　24　Q.　Okay.  So you mentioned River Road twice.

14:11:30　25　There's a River Road on both sides of the river?

14:11:32  1    A.   Yes, West River Road, East River Road.

14:11:35  2    Q.   So the pipe actually goes from east Toledo

14:11:37  3    through Wood County under the river and back to the City

14:11:41  4    of Toledo?

14:11:41  5    A.   Yes, sir.

14:11:41  6    Q.   Okay.  Do you recall the construction process as

14:11:51  7    it was near Cambridge?

14:11:53  8    A.   Yes, sir.

14:11:54  9    Q.   Now, you had nothing to do with staking or

14:11:56  10   clearing the land, did you?

14:11:58  11   A.   No, sir.

14:11:59  12   Q.   After -- were you there after the clearing was

14:12:02  13   done but before Ric-man brought in pipes and began the

14:12:06  14   construction?

14:12:07  15   A.   Yes, sir.

14:12:08  16   Q.   After the clearing were the markings -- any of

14:12:11  17   the markings still evident behind Cambridge that had

14:12:14  18   been placed by City crews?

14:12:19  19   A.   I saw some flags, little pieces of ribbon that

14:12:23  20   they had tied at various points that normally would

14:12:27  21   indicate how far they could clear the land to.

14:12:31  22   Q.   Okay.  And tell us about the first involvement

14:12:37  23   you had with any dispute between the contractors,

14:12:43  24   including Toledo, I'll say, and Cambridge.   What was

14:12:50  25   the first problem that arose, if you know?

14:12:53  1    A.   I would say it probably was in force when we had

14:12:57  2  a meeting to discuss what went on behind the Cambridge

14:13:00  3  property and possibly some drainage issues from a pipe

14:13:05  4  that was discovered after they had cleared.

14:13:08  5    Q.   What was the issue for the drainage issue then?

14:13:11  6    A.   The main issue was there was a pipe existing in

14:13:15  7  the ground that we were going to cross with our larger

14:13:21  8  pipe.   And we needed to know how that would be taken

14:13:25  9  care of.

14:13:26  10   Q.   Okay.  So who was at the meeting?  Approximately

14:13:30  11 when was the meeting?

14:13:31  12   A.   I would say mid to late May.

14:13:35  13   Q.   And who was there?

14:13:38  14   A.   Myself, Christy, Dean from Ric-man.

14:13:44  15   Q.   Dean Walsh?

14:13:46  16   A.   Dean Walsh from Ric-man, and the Wood County

14:13:49  17 engineer.

14:13:50  18   Q.   Ray Huber?

14:13:51  19   A.   Correct.   And of course Mr. McCarthy.

14:13:55  20   Q.   Do you recall the general discussion?

14:14:00  21   A.   Sure.   Generally they wanted to know how we were

14:14:06  22 going to handle that pipe when we got there, whether

14:14:10  23 water flowed from their property onto railroad property

14:14:14  24 or whether the water flowed from the railroad property

14:14:17  25 onto their property, or the neighbor's property.

14:14:23　1　　Q.　And what did the Wood County engineer indicate he

14:14:27　2　believed?

14:14:27　3　　A.　I thought he said he had some early records of

14:14:32　4　that.　If anything, it flowed from the railroad

14:14:35　5　property onto the neighbor's property or the Cambridge

14:14:38　6　property.

14:14:43　7　　Q.　Was there any particular study done at that

14:14:47　8　point, or just that was the end of the meeting, or what?

14:14:52　9　　A.　Well, we knew we would be laying our pipe, and

14:14:55　10　eventually we will be digging that pipe up, and we could

14:14:59　11　make a determination then, what we found as we got

14:15:06　12　there.

14:15:07　13　　Q.　And so the jury understands, even if that pipe

14:15:11　14　was viable and serving a useful function, it was still

14:15:15　15　going to be broken to lay the water main, correct?

14:15:19　16　　A.　Correct.

14:15:20　17　　Q.　And then if it was viable, would you replace it?

14:15:23　18　　A.　Yes, sir.

14:15:24　19　　Q.　Okay.　What was determined?　Were you there when

14:15:27　20　they -- Ric-man got there and exposed that pipe, broke

14:15:32　21　it?

14:15:32　22　　A.　Not exactly at that particular moment.

14:15:38　23　　Q.　Okay.　Did you get there shortly thereafter?

14:15:40　24　　A.　Shortly thereafter.　It was one of the first

14:15:44　25　things they had -- they had stopped one pipe short of

14:15:47  1   that pipe the night before.   So it was going to be

14:15:50  2   their first or possibly their second pipe.

14:15:52  3       Q.   When you say one pipe short of that pipe, what

14:15:56  4   are you talking about?

14:15:57  5       A.   I'm sorry.   Pipes are 20 feet long.   So we were

14:16:01  6   within 20 to 40 feet of where we think we would cross it

14:16:05  7   the night before.   We knew it was coming up the next

14:16:09  8   day.

14:16:09  9       Q.   Okay.   So this, the encounter with the crossover

14:16:12  10  pipe, then, I'm assuming, happened early in a particular

14:16:16  11  day?

14:16:16  12      A.   Yes, sir.   I'd say in the first two to three

14:16:19  13  hours.

14:16:20  14      Q.   Okay.   And tell us what happened then when you

14:16:25  15  arrived.

14:16:26  16      A.   Okay.   Ric-man had more than one crew working

14:16:29  17  that day.   So I was at a different location at the

14:16:34  18  beginning of the day that first hour.   As I got back to

14:16:37  19  where the main crew was laying the pipe, Pete's crew,

14:16:43  20  they had crossed the pipe already.   They were on -- one

14:16:48  21  pipe past it, approximately one pipe past that point.

14:16:54  22           Some pipe of the small pipe, what I call the

14:16:58  23  18-inch pipe that went across there, was laying -- they

14:17:01  24  had dug it up, and it was sitting on top of the ground.

14:17:05  25  So I didn't actually see them dig it out of the ground,

14:17:07  1   but I did see the pipe that was laying on top of the

14:17:10  2   ground that they, I assume, had dug out of the ground.

14:17:13  3      Q.   And what did it look like?

14:17:15  4      A.   That pipe was completely filled with debris or

14:17:21  5   mud or dirt.

14:17:26  6      Q.   Did it look like it had any useful function in

14:17:29  7   that condition?

14:17:30  8      A.   No, sir.

14:17:31  9      Q.   So what decision was made?

14:17:34  10     A.   Since the pipe was completely filled, there was

14:17:37  11  no need to replace the pipe.

14:17:41  12     Q.   And did the railroad have inspectors on-site?

14:17:44  13     A.   Yes, sir.

14:17:46  14     Q.   And did the inspector object to that decision?

14:17:50  15          MR. ROBON:  Objection.

14:17:51  16     A.   No.

14:17:56  17          MR. ROBON:  Hearsay, Your Honor.

14:17:58  18          MR. BAHRET:  It's not hearsay.  I didn't

14:18:00  19  ask what he said.

14:18:00  20          THE COURT:  Well, were they all present

14:18:02  21  together?  If so, he can answer it.

14:18:06  22  BY MR. BAHRET:

14:18:06  23     Q.   Did you have discussions with the railroad

14:18:08  24  inspector about that pipe?

14:18:11  25     A.   I believe I did.

14:18:13  1    Q.  Did he object?

14:18:14  2    A.  No, sir.

14:18:15  3    Q.  Has he ever objected even in hindsight?

14:18:18  4    A.  No, sir.

14:18:19  5    Q.  Has anybody from the railroad objected to this

14:18:22  6    day?

14:18:22  7    A.  No, sir.

14:18:24  8    Q.  So did you participate in the decision to go

14:18:28  9    ahead and -- I've heard the term "bulkhead" that pipe?

14:18:32  10   A.  Yes, sir.

14:18:34  11   Q.  Incidentally, when there was thought about what

14:18:38  12   may be under there from this manhole and there was the

14:18:41  13   meeting, did anybody make an effort to look in the ditch

14:18:45  14   to see if there's an exit pipe coming out into the ditch

14:18:49  15   between the inactive railroad bed and the active

14:18:53  16   railroad.

14:18:54  17   A.  Yes, sir.   That pipe came out to that ditch.

14:18:56  18   Q.  Okay.   And did you see it?

14:18:59  19   A.  I saw the pipe.

14:19:02  20   Q.  Did it appear that it was open or plugged?

14:19:05  21   A.  On a dry day with no flow, you could not tell.

14:19:12  22   I went out there in June.   I know there was a day when

14:19:15  23   we got three inches of rain.   I personally went through

14:19:20  24   to look to see if water was coming out of that pipe,

14:19:23  25   which would indicate to me that it was flowing.

| | | |
|---|---|---|
| 14:19:27 | 1 | Q.   What did you see? |
| 14:19:28 | 2 | A.   I saw no water coming out of that pipe. |
| 14:19:30 | 3 | Q.   And you're talking about the area between the two |
| 14:19:33 | 4 | road beds, the railroad beds, the ditch between the |
| 14:19:37 | 5 | active railroad and the inactive? |
| 14:19:39 | 6 | A.   Yes, sir. |
| 14:19:41 | 7 | Q.   So even on a day where it was raining, nothing |
| 14:19:45 | 8 | was moving through that pipe? |
| 14:19:47 | 9 | A.   Correct. |
| 14:19:49 | 10 | MR. BAHRET:  Thank you.  I have no other |
| 14:19:51 | 11 | questions. |
| 14:19:52 | 12 | - - - |
| 14:19:52 | 13 | JOSEPH CRANDALL, CROSS-EXAMINATION |
| 14:19:53 | 14 | BY MR. ROBON: |
| 14:19:53 | 15 | Q.   Mr. Crandall? |
| 14:19:56 | 16 | A.   Yes, sir. |
| 14:19:56 | 17 | Q.   Did you take any photographs for the jury of the |
| 14:20:01 | 18 | pipe that you looked at? |
| 14:20:05 | 19 | A.   Which pipe are we talking? |
| 14:20:07 | 20 | Q.   The pipe that you saw dug up by Ric-man. |
| 14:20:10 | 21 | A.   No, sir. |
| 14:20:11 | 22 | Q.   You knew there was a dispute because Mr. McCarthy |
| 14:20:16 | 23 | was there with you, what, a few hours before it was dug |
| 14:20:20 | 24 | up? |
| 14:20:20 | 25 | A.   No, sir, not that I know of. |

14:20:22  1    Q.   How many -- the meeting that you had with Mr.

14:20:25  2  McCarthy and Mr. Huber, when did that occur?

14:20:30  3    A.   May.

14:20:31  4    Q.   That was before -- it was a month before?

14:20:34  5    A.   Before we got there?   We got there in August.

14:20:38  6    Q.   So it was two months before or three months

14:20:40  7  before?

14:20:41  8    A.   Yes, sir.

14:20:44  9    Q.   And during that two to three months, from the

14:20:47  10  time Mr. Huber and Mr. McCarthy and you and Ric-man and

14:20:51  11  the railroad all met, what did you do or what did the

14:20:55  12  City of Toledo do to  investigate where that manhole

14:21:02  13  exited to?

14:21:11  14    A.   I looked at the manhole.

14:21:13  15    Q.   What did you do?

14:21:14  16    A.   The manhole was full of mud and dirt.   And so we

14:21:17  17  tried, along with Dean Walsh, we tried to probe down it

14:21:24  18  to probe to find any pipes that entered or left that

14:21:33  19  structure.   The only pipe that we saw was the pipe that

14:21:36  20  ran, what I would say, across where we were going to lay

14:21:39  21  our waterline and go to the large ditch between the

14:21:43  22  inactive railroad and the active railroad.

14:21:45  23    Q.   So you saw -- you knew the pipe was there?

14:21:48  24    A.   Yes, sir.

14:21:49  25    Q.   You just didn't know which way the water flowed?

| | | |
|---|---|---|
| 14:21:52 | 1 | A.  Correct. |
| 14:21:53 | 2 | Q.  Now, my next question is, if the water would have |
| 14:22:00 | 3 | flowed north, towards the Cambridge Subdivision, there |
| 14:22:04 | 4 | would have to be a pipe in the ground someplace for that |
| 14:22:07 | 5 | water to go, correct? |
| 14:22:10 | 6 | A.  I don't know that. |
| 14:22:12 | 7 | Q.  Well, I mean, the water wouldn't just collect in |
| 14:22:16 | 8 | the manhole, would it? |
| 14:22:17 | 9 | A.  Not normally. |
| 14:22:19 | 10 | Q.  No, I mean, it would come into the manhole and go |
| 14:22:22 | 11 | someplace, right? |
| 14:22:23 | 12 | A.  Yes, sir. |
| 14:22:24 | 13 | Q.  Did you think about using a dye test? |
| 14:22:29 | 14 | A.  No, sir. |
| 14:22:34 | 15 | Q.  I've heard several different versions when people |
| 14:22:37 | 16 | look down in the pipe.  Mr. Forletta yesterday said it |
| 14:22:41 | 17 | was full of garbage.  Mr. Walsh said it was water. |
| 14:22:45 | 18 | Mr. McCarthy said it was water.  Now you're telling me |
| 14:22:48 | 19 | it was full of mud.  Which is right? |
| 14:22:52 | 20 | A.  Maybe all of them are right.  It was quite -- |
| 14:22:59 | 21 | Q.  Deep? |
| 14:22:59 | 22 | A.  No, sir.  Not that I could see.  It -- |
| 14:23:03 | 23 | Q.  How deep do you think it was? |
| 14:23:05 | 24 | A.  Four to five feet. |
| 14:23:11 | 25 | Q.  Did have you a flashlight? |

14:23:12  1     A.   Yes, sir.

14:23:13  2     Q.   Did you shine the flashlight down in it?

14:23:16  3     A.   Yes, sir.   Dirt/mud prevented going any further.

14:23:21  4     Q.   Was there water also in it?

14:23:24  5     A.   There could have been some water in it.

14:23:26  6     Q.   You just don't remember?

14:23:27  7     A.   Yes, sir.

14:23:30  8     Q.   Did you save the pipe -- start over.

14:23:33  9          How long was the piece of pipe that you saw that

14:23:39  10    Ric-man had dug out and laid up on top when you said it

14:23:46  11    was full of mud?

14:23:47  12    A.   Thirty inches.

14:23:48  13    Q.   Thirty inches.   You could have picked that up

14:23:51  14    and put it in the back of your pickup truck?

14:23:53  15    A.   No, sir.

14:23:54  16    Q.   Why not?

14:23:55  17    A.   Eighteen-inch pipe.   I don't have a pickup,

14:24:02  18    first of all.

14:24:02  19    Q.   But they could have preserved that pipe, could

14:24:05  20    they not have, with a front-end loader, put it on

14:24:10  21    something?

14:24:10  22    A.   I guess they could have.

14:24:12  23    Q.   Now, you said it was an 18-inch pipe.   Everybody

14:24:16  24    else told me it's a 24-inch pipe.   Is your recollection

14:24:24  25    wrong?

14:24:25    1      A.   It could possibly be wrong.   I remember it as an

14:24:28    2   18-inch pipe.   The structure, what everyone's calling a

14:24:33    3   manhole, was 24 inches, which was really some pipe laid

14:24:39    4   down in vertically.

14:24:41    5      Q.   What do you think the cost would have been to the

14:24:44    6   City of Toledo when that pipe was dug up to put a new

14:24:51    7   pipe across and just put the waterline down three or

14:24:57    8   four feet deeper?

14:25:01    9      A.   I don't know what the cost would be.   There was

14:25:03   10   no need to do that.

14:25:05   11      Q.   Well, you'd have to buy a piece of pipe about 20

14:25:08   12   feet long, wouldn't you?

14:25:10   13      A.   To move a 66-inch water main four feet?

14:25:14   14      Q.   Yeah.

14:25:15   15      A.   I think you would have to use bends.   You would

14:25:19   16   have to use bends to make it go -- to get it down that

14:25:26   17   quick.

14:25:28   18      Q.   Well, let me ask it this way.   How much money

14:25:31   19   did the City of Toledo save by not replacing the

14:25:36   20   crossover pipe?

14:25:37   21      A.   I don't know that we saved any money.

14:25:44   22      Q.   And you have no idea what it would have cost to

14:25:47   23   replace the pipe?

14:25:49   24      A.   To replace the storm pipe?

14:25:51   25      Q.   The storm water drainage pipe.

14:25:55   1        A.   No, sir.

14:25:58   2        Q.   Did you have the authority on the job site to

14:26:00   3   order that?

14:26:03   4        A.   Yes, sir -- well, I don't know if I had the

14:26:06   5   authority.   I would be the first one to bring it to the

14:26:11   6   City's attention, and then I certainly would call

14:26:14   7   Christy, and then we would have to decide at that point.

14:26:23   8                MR. ROBON:   Your Honor, could I have him

14:26:24   9   come over here an take a look at this?

14:26:26  10        A.   Sure.

14:26:36  11        Q.   Stand on the side here so all the jurors can see.

14:26:43  12   This is the manhole that we're talking about, right?

14:26:46  13   It's behind the Cambridge Subdivision maybe 100 feet or

14:26:50  14   so?

14:26:50  15        A.   Yes, sir.

14:26:50  16        Q.   Now, my question to you is --

14:26:53  17                THE COURT:   Voice up, please.

14:27:07  18   BY MR. ROBON:

14:27:09  19        Q.   My question to you is:   When you knew there was a

14:27:16  20   question or you weren't sure of which way the water

14:27:19  21   went, whether it went that way or whether it went that

14:27:22  22   way, did you take a probing rod -- do you know what a

14:27:27  23   probing rod is?

14:27:28  24        A.   Yes, sir.

14:27:29  25        Q.   -- to find field tile?   About four or five feet

14:27:32  1    long?

14:27:32  2        A.  Yes, sir.

14:27:32  3        Q.  It's got a handle on it and you stick it in the

14:27:35  4    ground, and you see if you hit something.   Did anybody

14:27:40  5    from the City take a probing rod around the outside of

14:27:44  6    this manhole to determine if there was an exit from the

14:27:49  7    manhole?

14:27:51  8        A.  I did not do that.

14:27:54  9        Q.  Would that have been your job to do that or would

14:27:57  10   that have been the engineer's job?

14:28:04  11       A.  There was a pipe inside here.  We probed inside

14:28:09  12   this structure or tried to probe inside this structure

14:28:14  13   and didn't hit anything.

14:28:15  14       Q.  Okay.

14:28:16  15       A.  Except the pipe.

14:28:18  16       Q.  This pipe here.   So you knew, you knew that that

14:28:23  17   pipe went across to this ditch, correct?

14:28:27  18       A.  Yes, sir.

14:28:28  19       Q.  Okay.  My question is, if the water was flowing

14:28:34  20   this way, from south to north, into this manhole, it

14:28:40  21   would have to exit the manhole and go someplace, would

14:28:44  22   it not?   It just doesn't stay in the manhole; am I

14:28:49  23   right or am I wrong?

14:28:51  24       A.  A pipe could have left that manhole.

14:28:53  25       Q.  Right.   My question is --

14:28:55  1      A.   And it could have drained to the open ground.

14:28:58  2      Q.   Okay.  But did you look, investigate or see any

14:29:03  3   opening here; or did you probe for any pipe that, you

14:29:08  4   know, might go out this way?

14:29:10  5      A.   I looked, and I -- what I could see on the

14:29:15  6   surface, and I didn't find anything.   And I did not

14:29:20  7   probe.

14:29:21  8      Q.   Do you have a probe?

14:29:24  9      A.   Yes, sir.

14:29:28  10     Q.   Have you used one in the past?

14:29:30  11     A.   Yes, sir.

14:29:31  12     Q.   Did you suggest to Christy Soncrant that perhaps

14:29:33  13  maybe you should have used one or not?

14:29:36  14     A.   No, sir.

14:29:39  15     Q.   You can have a seat, please.

14:30:04  16          Did Mr. McCarthy at the meeting before the pipe

14:30:09  17  was dug up express concern that that pipe was part or

14:30:18  18  helped drain the area behind the Cambridge Subdivision?

14:30:22  19     A.   Yes, sir.

14:30:25  20     Q.   Did you know he was an engineer?

14:30:27  21     A.   No, sir.

14:30:30  22     Q.   Did the City of Toledo look upon Mr. McCarthy as

14:30:35  23  a pest?

14:30:36  24          MR. BAHRET:  Objection.

14:30:38  25          THE COURT:  Overruled.   He may answer.

14:30:40  1    A.  No, sir.

14:30:46  2    Q.  Did he frequently call you or talk to you?

14:30:49  3    A.  No, sir.

14:31:06  4          MR. ROBON:  No further questions, Your

14:31:11  5  Honor.

14:31:11  6          MR. BAHRET:  I have no redirect, Your Honor.

14:31:13  7          THE COURT:  You may step down.   Thank you.

14:31:17  8          The defendant may call its next witness.

14:31:20  9          MR. BAHRET:  May we approach?

14:31:21 10          THE COURT:  You may.

14:31:30 11          (Discussion had off the record.)

14:31:42 12          THE COURT:  Ladies and gentlemen, the

14:31:43 13  defendant has one more witness, and we're going to take

14:31:47 14  a 15-minute break at this point for that, before that

14:31:50 15  witness takes the stand.   It will be our afternoon

14:31:53 16  break.   If things fall right, we might get out of here

14:31:56 17  a little early tonight.   My estimation is we're going

14:31:59 18  to conclude the evidence this afternoon, and tomorrow

14:32:03 19  morning you'll get instructions and final arguments and

14:32:10 20  deliberations.   Remember the rules.   We're in recess

14:32:14 21  until 2:45.

14:48:35 22          (Recess taken.)

14:50:20 23          THE COURT:  I remind the witness that she

14:50:21 24  has previously been sworn; therefore, it's not necessary

14:50:24 25  to do it again.   You may inquire.

14:50:26    1          MR. BAHRET:  Thank you, Your Honor.

14:50:27    2                        - - -

14:50:27    3          CHRISTY SONCRANT, DIRECT EXAMINATION

14:50:27    4   BY MR. BAHRET:

14:50:27    5      Q.  Christy?

14:50:35    6      A.  Yes.

14:50:35    7      Q.  How are you doing today?

14:50:37    8      A.  Better.   I'm the last one.

14:50:41    9      Q.  I don't know how much background information we

14:50:44   10   got on you; I didn't have it in my notes, so briefly

14:50:48   11   let's go through that.

14:50:49   12          You went to the University of Toledo for your

14:50:52   13   degree?

14:50:52   14      A.  Yes, I did.

14:50:53   15      Q.  And your degree is in what?

14:50:55   16      A.  Civil engineering, bachelor of science.

14:50:57   17      Q.  And how long have you been an engineer?

14:50:59   18      A.  Twelve years.

14:51:02   19      Q.  How long have you worked for the City of Toledo?

14:51:04   20      A.  Twelve years, plus two years as an intern through

14:51:08   21   college.

14:51:09   22          MR. ROBON:  Could you speak up a little bit,

14:51:11   23   please.

14:51:13   24          THE WITNESS:  Yes.

14:51:14   25          MR. ROBON:  Thank you.

BY MR. BAHRET:

Q.   What are your general responsibilities as an engineer for the City of Toledo, Christy?

A.   I'm in charge of the waterlines for the City as in regards to determining which mains each year we replace of small mains.   I'm also in charge of designing waterlines and construction of waterlines.

Q.   All right.   You had some rather heavy involvement in the water main project that brings us all here today; did you not?

A.   Yes, I did.

Q.   And you remember some discussion with counsel about what the purpose of that waterline was for?

A.   Yes.

Q.   And was I correct when I indicated earlier that it starts and ends in Toledo?

A.   Yes, that's correct.

Q.   And it does go through Rossford?

A.   Yes, Perrysburg Township.

Q.   Does it serve -- does it supply water to anybody other than Rossford?

A.   No, just City of Toledo residents and Rossford.

Q.   And in the Rossford area specifically, forget about Toledo, you are the City of Toledo, what's the relationship between Toledo and Rossford with water?

14:52:35   1   A.   When it comes to maintaining their waterline, the
14:52:39   2   City of Toledo workers actually maintain Rossford's
14:52:42   3   lines as in any new buildings that go in, they tap the
14:52:47   4   waterlines to give the buildings water.   If there is a
14:52:51   5   main break, the City water crews go out and fix those
14:52:54   6   water mains.
14:52:55   7   Q.   Does Toledo have that type of relationship with
14:52:57   8   any other municipality?
14:52:58   9   A.   No, Rossford is the only one that we do that work
14:53:01  10   for.
14:53:02  11   Q.   And was there a problem in Rossford with water
14:53:06  12   pressure or anything?
14:53:07  13   A.   Actually, the reason we did put a side connection
14:53:12  14   in this Rossford is LOF is there, and they've had
14:53:19  15   problems with low pressure in the past, so since the
14:53:21  16   waterline was going through there, we figured we'd tie
14:53:25  17   in and help boost LOF.
14:53:27  18   Q.   So there's a benefit for one of the larger Toledo
14:53:31  19   employers in the region?
14:53:32  20   A.   That's correct.
14:53:33  21   Q.   Let's talk about this crossover pipe.   And you
14:53:37  22   know exactly what I'm talking about if I just say that?
14:53:40  23   A.   Yes.
14:53:42  24   Q.   Were you at the meeting when it was discussed
14:53:45  25   that something may be under this abandoned railroad bed

14:53:50  1   before construction began?

14:53:52  2       A.   Yes.

14:53:52  3       Q.   And Mr. Huber indicated that he told you that if

14:53:57  4   the water's moving at all, it's moving from the railroad

14:54:00  5   to the private property?

14:54:02  6       A.   That is correct.

14:54:03  7       Q.   Did he ever tell you anything contrary to that?

14:54:05  8       A.   No, he did not.

14:54:10  9       Q.   After the pipe was encountered during

14:54:13  10  construction, and when it is severed and you can look in

14:54:17  11  it, what information were you given?

14:54:20  12      A.   Joe Crandall informed me that it was full of

14:54:23  13  dirt.

14:54:26  14      Q.   Christy, did you personally see that pipe?

14:54:29  15      A.   No, I did not.

14:54:30  16      Q.   But your supervisor upon the job indicated that

14:54:34  17  it was plugged?

14:54:35  18      A.   Correct.

14:54:35  19      Q.   What did that lead you to believe?

14:54:38  20      A.   That there was no water that could go through

14:54:41  21  that pipe because it was full of dirt, so there's no way

14:54:44  22  that water could get through.

14:54:45  23      Q.   What did you believe the condition of the pipe

14:54:49  24  and manhole system -- if I can use that word -- was

14:54:54  25  based on what you saw in the manhole and what you saw in

14:54:57   1    the pipe?

14:54:58   2        A.   Well, with the manhole being in bad condition,

14:55:01   3    dilapidated when it was found, and then all the dirt in

14:55:05   4    the pipe, it was an abandoned system.  It was old, and a

14:55:09   5    lot of times when they abandon things, they just leave

14:55:12   6    them in the ground.   They don't always remove them.

14:55:14   7        Q.   Is it uncommon to encounter on a construction

14:55:18   8    project things that are, in fact, obsolete, no longer in

14:55:23   9    use?

14:55:23  10        A.   No.   We run across it quite frequently.

14:55:27  11        Q.   Is that what you assumed that crossover pipe was?

14:55:29  12        A.   Yes.

14:55:30  13        Q.   Now, if you assume that if the crossover pipe was

14:55:37  14    clean, not plugged, that it might be able to serve some

14:55:42  15    function, could it be replaced?

14:55:44  16        A.   Yes, it could.

14:55:45  17        Q.   And how would one replace it?

14:55:47  18        A.   Put a new pipe in.

14:55:50  19             MR. ROBON:  Your Honor, may I approach the

14:55:51  20    bench?

14:55:53  21             THE COURT:  Yes.

14:55:56  22             (Discussion had off the record.)

14:57:08  23    BY MR. BAHRET:

14:57:09  24        Q.   Could it be replaced?

14:57:10  25        A.   Yes.

14:57:10   1      Q.   Could you tell us how?

14:57:12   2      A.   We could put a new pipe across there from the --

14:57:16   3           MR. ROBON:   Your Honor, can I just show an

14:57:18   4      objection to this line of questioning?

14:57:20   5           THE COURT:   Yes.

14:57:20   6           MR. ROBON:   Thank you.

14:57:22   7           THE COURT:   The objection is overruled.

14:57:25   8      A.   -- from the manhole over to the ditch.

14:57:27   9      Q.   Would a pipe fit, in view of the water main in

14:57:31  10      position?

14:57:32  11      A.   Yes, you could fit it in there.

14:57:34  12      Q.   How were you able to determine that?

14:57:36  13      A.   When you're installing a pipe, the contractor

14:57:43  14      takes elevation shots of the bottom of the pipe when

14:57:47  15      they're installing it so they know where it is going.

14:57:51  16      We -- at the end of the project you have as-built plans,

14:57:54  17      which are drawings that show where the pipe has been

14:57:56  18      installed.   So we know where that pipe is located, what

14:58:02  19      the elevation is.   And from that drawing that you have

14:58:07  20      seen earlier that the survey crew took, that gave me an

14:58:12  21      elevation of where that existing 24-inch is also.

14:58:23  22      Q.   Okay.  Where would that information B?   Is it

14:58:28  23      visible?  Do I have the right spot?

14:58:30  24      A.   It's actually written on here, right there.  That

14:58:35  25      613.06 is the top of the waterline pipe that was

14:58:39  1   installed.   And then you have right here they're

14:58:48  2   showing the rim elevation of 618.99.   Then right here

14:58:54  3   is that 24-inch pipe that went across.   And if you

14:59:00  4   subtract the 618.99, 6.6, you get the 612.39, which was

14:59:08  5   the bottom of that 24-inch pipe.

14:59:12  6        Q.   Okay.   Give it to us in English.

14:59:15  7        A.   Okay.   So that means that the bottom of the

14:59:23  8   24-inch pipe, the waterline just clipped the bottom of

14:59:30  9   it by about eight inches.   So the 24-inch pipe isn't

14:59:36  10  here, and the waterline didn't go right through center

14:59:40  11  of it.   It clipped the bottom of the pipe, the bottom

14:59:44  12  eight inches.   So you could put in a 12 inch pipe and

14:59:48  13  easily get it across that waterline pipe.

14:59:51  14       Q.   Would a 12 inch clean pipe be more efficient than

14:59:55  15  a 24-inch plugged pipe?

14:59:58  16       A.   Oh, yeah.

15:00:01  17       Q.   What would the approximate cost be to do that?

15:00:06  18            MR. ROBON:   Objection.

15:00:07  19            THE COURT:   Overruled.   She may answer.

15:00:08  20       A.   It would be $10,000.

15:00:14  21       Q.   Now, that crossover pipe is owned by the

15:00:17  22  railroad, correct?

15:00:17  23       A.   That is correct.

15:00:18  24       Q.   Have they ever asked for that to be replaced?

15:00:21  25       A.   No, they have not.

15:00:22  1    Q.   Did the railroad object when the decision was

15:00:26  2  made to cut that pipe?

15:00:27  3    A.   No, they did not.

15:00:29  4    Q.   Was the railroad in consultation?  They had a

15:00:34  5  representative?

15:00:35  6    A.   Yes, they had an inspector.

15:00:39  7    Q.   Did the railroad representative indicate that

15:00:41  8  that served any purpose for Cambridge or any of the

15:00:44  9  private owners?

15:00:47  10   A.   Not to my knowledge.

15:00:49  11   Q.   Not to you anyway?

15:00:50  12   A.   Not to me, no.

15:00:55  13   Q.   On the plans Mr. Robon asked more than one

15:00:59  14  person, including I think you, whether Cambridge showed

15:01:03  15  up on these construction drawings.  Well, I guess the

15:01:07  16  construction drawings are over there.  But the drawings

15:01:10  17  from Arcadis are a very thick set?

15:01:13  18   A.   Yes.

15:01:13  19   Q.   And Cambridge, we've acknowledged, doesn't show

15:01:16  20  up on those drawings.  Is that unusual?

15:01:19  21   A.   No.

15:01:19  22   Q.   Are there other subdivisions and businesses and

15:01:23  23  establishments that don't show up on the construction

15:01:26  24  drawings for a waterline?

15:01:28  25   A.   Yes.

15:01:28  1    Q.   And why is that?   What's the purpose of the

15:01:31  2    construction drawing for a waterline?

15:01:33  3    A.   The construction drawings show your limits where

15:01:37  4    you're working, where you're installing the waterline.

15:01:41  5    So we don't show what's outside of those limits that you

15:01:45  6    are going to be working in.

15:01:52  7    Q.   There was some discussion about this being a

15:01:56  8    relatively tight work area.   In fact, there was

15:01:59  9    discussion about filling the ditch as the crews were

15:02:02  10   going by and then digging the ditch out; do you remember

15:02:05  11   that?

15:02:05  12   A.   Yes.

15:02:06  13   Q.   Did Ric-man need the room that it was allotted in

15:02:10  14   the area behind Cambridge to safely do this pipeline

15:02:15  15   job?

15:02:16  16              MR. ROBON:   Objection.

15:02:24  17              THE COURT:   Overruled.   She may answer.

15:02:26  18   A.   Yes, they did need that room.

15:02:30  19   Q.   Did you see any evidence ever, Christy, that

15:02:33  20   Ric-man overstepped the lines that they were allotted

15:02:37  21   for their construction project?

15:02:39  22   A.   No, I did not.

15:02:42  23   Q.   There was some discussion that you supposedly

15:02:46  24   were rebuffing every effort from Mr. McCarthy.   Do you

15:02:50  25   remember that?   Mr. Robon asked you several questions

15:02:54    1    about that.   Do you recall?

15:02:55    2        A.   Not exactly.

15:02:58    3        Q.   Did you try to work with them in any way?

15:03:01    4        A.   Yes, I did.

15:03:02    5        Q.   We're not allowed to talk about any negotiations,

15:03:05    6    but were -- this is a yes or no answer.   Were

15:03:09    7    accommodation offered?

15:03:11    8        A.   Yes, they were.

15:03:12    9               MR. ROBON:   Objection.

15:03:22   10               MR. BAHRET:   I'm not going to ask what.

15:03:25   11               THE COURT:   I know.   I'm going to sustain

15:03:27   12    the objection and ask the jury to disregard the question

15:03:30   13    and answer unless you can show me at a sidebar the

15:03:33   14    relevance.

15:03:35   15    BY MR. BAHRET:

15:03:36   16        Q.   Christy, who is Craig Schaar?

15:03:38   17        A.   He is a forestry inspector with the City of

15:03:41   18    Toledo.

15:03:41   19        Q.   Did you consult with Mr. Schaar at any point

15:03:44   20    about pricing on trees and vegetation?

15:03:46   21        A.   Yes, I have.

15:03:48   22        Q.   And even -- I guess I can't say that.

15:03:54   23             Mr. Schaar, you know, is occupied with his

15:04:00   24    mother's illness in Cincinnati?

15:04:01   25        A.   That is correct.

15:04:02   1      Q.   Counsel has been informed and has kindly allowed

15:04:05   2   you to give some of the information.   You asked for

15:04:08   3   some estimates for trees and so forth?

15:04:12   4      A.   Yes, I did.

15:04:13   5      Q.   Could you tell us what information you were

15:04:16   6   supplied?

15:04:17   7      A.   Yes.   Craig and I actually went out to the site

15:04:22   8   together so I could show him the area and make sure he

15:04:25   9   understood.   And then he went back and prepared an

15:04:29  10   estimate to replace trees and brush in the area.   And

15:04:39  11   he had a proposal to actually plant almost 200 shrubs

15:04:44  12   along the 500-foot distance in three different rows,

15:04:52  13   then also he put in nine trees to plant also.   And then

15:04:57  14   he stated that soil would need to be brought in and

15:05:02  15   fertilizer for these trees and shrubs.   And he gave me

15:05:06  16   a price of over $22,000 to do that.

15:05:11  17      Q.   $22,400?

15:05:13  18      A.   Yes, $22,497.

15:05:21  19      Q.   Let me get back to a different topic.   Do you

15:05:27  20   believe, Christy, that cutting that crossover pipe has

15:05:31  21   anything to do with the ponding issue on the back of

15:05:34  22   Cambridge or the neighboring property?

15:05:36  23      A.   I do not believe that, no.

15:05:42  24      Q.   Do you believe that the piping system maintained

15:05:45  25   by the railroad had any way of getting the water off

15:05:49   1   that property?

15:05:50   2       A.   No, I do not believe so.   It wouldn't go through

15:05:55   3   that dirt.

15:05:58   4              MR. BAHRET:   Thank you very much.

15:05:59   5              THE COURT:   You may inquire.

15:06:00   6              MR. ROBON:   Thank you, Your Honor.

15:06:02   7                         - - -

15:06:02   8           CHRISTY SONCRANT, CROSS-EXAMINATION

15:06:03   9   BY MR. ROBON:

15:06:03  10       Q.   My understanding, Ms. Soncrant, is that Mr.

15:06:10  11   McCarthy brought to your attention the condition of the

15:06:14  12   manhole, and he told you that there was a pipe that ran

15:06:18  13   underneath the abandoned railroad where the waterline

15:06:23  14   was going to go, correct?

15:06:24  15       A.   I believe so, yes.

15:06:26  16       Q.   And then you had a meeting with Mr. Huber and Mr.

15:06:29  17   McCarthy and a number of others, correct?

15:06:32  18       A.   Yes.

15:06:32  19       Q.   Then Mr. Huber gave you the railroad plans

15:06:36  20   showing this manhole and the crossover pipe, correct?

15:06:42  21       A.   He gave me the plans that showed the crossover

15:06:44  22   pipe, yes.

15:06:45  23       Q.   It's been alleged here that nobody knew which way

15:06:51  24   the water went under the pipe, correct?

15:06:54  25       A.   That's correct.

15:06:57  1      Q.   If you look at the plans that Mr. Huber gave you

15:07:02  2   from the railroad when they put this in 60 or 70 years

15:07:07  3   ago, does it show an outlet from the manhole, so if the

15:07:15  4   water came into the manhole in this 24-inch pipe it

15:07:18  5   would go someplace, or did no one think about if it goes

15:07:23  6   in there, it has to go out someplace?   Did you ever

15:07:27  7   think about that?

15:07:28  8               MR. BAHRET:   Objection.  He's got about four

15:07:30  9   parts to that question.

15:07:31  10              MR. ROBON:   I'll rephrase it.

15:07:32  11              THE COURT:   Thank you.

15:07:32  12  BY MR. ROBON:

15:07:34  13     Q.   I don't want to confuse you.   My question is:

15:07:36  14  You did get the railroad plans?

15:07:38  15     A.   Yes.

15:07:39  16     Q.   And did you get them before the survey was done?

15:07:43  17     A.   Yes.

15:07:46  18     Q.   Did you look at the plans?

15:07:47  19     A.   Yes.

15:07:47  20     Q.   Did anybody else in the City look at them?

15:07:50  21     A.   Joe might have.

15:07:53  22     Q.   Joe Crandall?

15:07:54  23     A.   Yes.

15:07:55  24     Q.   Did you think about if the water came into the

15:07:57  25  pipe from the railroad ditch, it would have to go

15:08:03  1    someplace, or did that not enter your mind?

15:08:07  2        A.   That's true.   At one time it would have had go

15:08:10  3    someplace.

15:08:10  4        Q.   And was there anything on the railroad plans that

15:08:15  5    show that it exited someplace into River Road or Bates

15:08:23  6    Road or into a creek or a ditch?

15:08:25  7        A.   The plans didn't even show the manhole.   It just

15:08:28  8    showed a dash line and 24-inch.   So it didn't show an

15:08:32  9    entry or exit.

15:08:34  10       Q.   Did you think it was important to try to figure

15:08:38  11   out if the water got into the manhole, where it went?

15:08:44  12       A.   We believe that that was, like I said, an

15:08:49  13   abandoned pipe.   And it was old, and if it would have

15:08:56  14   flowed in the past, it left the railroad.   So no.

15:09:02  15       Q.   If the system was abandoned, as you people seem

15:09:07  16   to indicate you thought it was, what was there to

15:09:10  17   replace it?   It was obviously put in for a purpose?

15:09:16  18            MR. BAHRET:   Objection.

15:09:17  19            THE COURT:   Overruled.   She may answer.

15:09:19  20       A.   When you abandon things, it could be because

15:09:22  21   they're not needed anymore.   It doesn't mean that

15:09:24  22   there's something right next to it.

15:09:26  23       Q.   Did you think about inquiring of the people who

15:09:30  24   lived in the area like Mr. Sumner who lives on Bates

15:09:37  25   Road who said their septic tanks even drained into this

15:09:41  1   manhole?  Did anybody from the City ask any of the

15:09:44  2   residents there on Bates Road?

15:09:47  3        A.   No, we did not.

15:09:48  4        Q.   Did you even think about it?

15:09:49  5        A.   No.

15:10:06  6        Q.   My understanding is the decision to sever the

15:10:08  7   pipe was made at that meeting where everybody got

15:10:13  8   together, right?

15:10:15  9        A.   The decision at that meeting was that the pipe

15:10:20  10  was full of dirt and that if it would have worked in the

15:10:27  11  past, it would have flown the other way.  So yes, we

15:10:31  12  figured that it was abandoned.

15:10:34  13       Q.   So you made the decision before you unearthed the

15:10:37  14  pipe to sever it, correct?

15:10:40  15       A.   That's correct.

15:10:43  16       Q.   So how could you suppose that the pipe would be

15:10:48  17  clogged with twigs, dirt, or mud, because you made the

15:10:53  18  decision to cut it anyway, didn't you?

15:10:56  19       A.   If when we actually would have gone through there

15:10:59  20  and it would have been open, and we would have felt that

15:11:03  21  it would have served some purpose, then we would have

15:11:06  22  been -- we would have put something back in there.   But

15:11:09  23  when we went through and it was full of dirt, it was

15:11:13  24  like we had all thought it would be, so we did not put

15:11:17  25  anything back.

15:11:18  1    Q.   Well, you testified that you didn't even see the

15:11:21  2    pipe.

15:11:21  3    A.   No, I did not.

15:11:23  4    Q.   Mr. Crandall testified that they had already laid

15:11:27  5    the big pipe, the 66-inch big tile already past the

15:11:37  6    opening by the time he got there?

15:11:39  7    A.   Yes.

15:11:39  8    Q.   So the decision was made, and it was fete de

15:11:47  9    complete?

15:11:47  10   A.   That's because when they got there, it was full

15:11:50  11   of dirt.   The contractor could communicate with Joe by

15:11:57  12   radio.

15:11:57  13   Q.   Did you see the pipe, the part that was dug out?

15:12:01  14   A.   No, I did not.

15:12:02  15   Q.   You never saw it yourself?

15:12:04  16   A.   No, I did not.

15:12:05  17   Q.   Did you think about having photographs taken of

15:12:08  18   it knowing that the neighbors, Mr. McCarthy in

15:12:12  19   particular, were very concerned about it?

15:12:15  20   A.   No.

15:12:17  21   Q.   So you never saw it?

15:12:18  22   A.   No.

15:12:19  23   Q.   The only one from the City that saw it is Mr.

15:12:21  24   Crandall?

15:12:22  25   A.   That's correct.

15:12:24   1    Q.   Did Mr. Crandall ever tell you that he had a

15:12:26   2    probe, which is several feet long with a handle on it

15:12:29   3    that you can stick in the ground and find tiles and

15:12:32   4    other, you know, monuments?

15:12:35   5    A.   Most of our inspectors carry them.

15:12:53   6    Q.   And you agree that you did not replace a 24-inch

15:12:56   7    pipe?

15:12:57   8    A.   Yes, I agree.

15:12:58   9    Q.   Because the big pipe's in the way?

15:13:02  10    A.   Yes, eight inches of it is in the way.

15:13:05  11    Q.   And you would agree that Old Granite, Limited

15:13:15  12    could not replace that pipe because it's on the property

15:13:21  13    of the railroad, and also because the City of Toledo has

15:13:25  14    an easement?

15:13:26  15    A.   They'd have to get permission to do it.

15:13:29  16    Q.   And, in fact, I have been told that it would be

15:13:34  17    very dangerous because --

15:13:35  18                MR. BAHRET:   Objection.

15:13:37  19                THE COURT:   Sustained.

15:13:41  20    Q.   Tell me if I'm correct.   I have been told that a

15:13:44  21    66-inch water main is under pressure?

15:13:47  22    A.   That's correct.

15:13:48  23    Q.   And that if the top of the water main didn't have

15:13:53  24    at least five or six feet of earth on top of it, it

15:13:57  25    would pop right out of the ground?

15:13:59  1       A.   No.

15:14:00  2       Q.   That's not true?

15:14:01  3       A.   That's not true.

15:14:03  4       Q.   How many feet does it have to have?

15:14:06  5       A.   You have -- if you would dig over to put in a new

15:14:10  6    pipe, the pipe -- say you're putting --

15:14:13  7       Q.   I'm not asking you about digging for the new

15:14:15  8    pipe.   I'm just talking generally.   How many feet do

15:14:18  9    you have to have to keep the thing in the ground?

15:14:21  10      A.   To keep it in the ground?

15:14:22  11      Q.   Yeah, so it doesn't pop up out of the ground?

15:14:26  12      A.   It can be less than five feet, but without doing

15:14:29  13   the actual calculation, I don't know, depending on the

15:14:32  14   soil type and the restraint you put on the pipe.

15:14:34  15   That's how you determine how you're going to restrain

15:14:36  16   the pipe is how much soil is there over a whole length.

15:14:39  17   You can dig up a little area.   We do it quite often.

15:14:43  18   Now, maybe if you had 1,000 feet hanging in the air,

15:14:47  19   that would be different.

15:15:01  20      Q.   And you would agree with me that eventually Mr.

15:15:07  21   Huber told you the water ran the other way; did he not?

15:15:11  22            MR. BAHRET:   Objection.   That's not her

15:15:12  23   testimony, and it wasn't his either.

15:15:14  24      Q.   I'm asking.

15:15:15  25      A.   No, never told me that.

15:15:20  1          THE COURT:  Overruled.   She's answered.

15:15:23  2  It may stand.

15:15:25  3     Q.  Did you hear his testimony here?

15:15:27  4     A.  Yes, I did.

15:15:28  5     Q.  He said later he told you?

15:15:30  6          MR. BAHRET:  Objection.  He did not.   He

15:15:32  7  said he never told her because it was too long after the

15:15:34  8  fact.

15:15:37  9          THE COURT:  Although I let you two fence a

15:15:39  10  bit, I'm going to indicate it was my recollection as

15:15:43  11  well that he did not say that.

15:15:45  12          MR. ROBON:  I may be getting confused with

15:15:47  13  his deposition, Your Honor.

15:15:48  14          MR. BAHRET:  I object to that.   He did not.

15:15:51  15          THE COURT:  I understand.

15:15:52  16          Mr. Bahret, stand down.   The jury will be

15:15:54  17  instructed to disregard the comment of counsel.

15:15:59  18  BY MR. ROBON:

15:16:00  19     Q.  Did you ever talk to Mr. Huber again about

15:16:05  20  anything after that meeting at the site?

15:16:09  21     A.  I don't think I did, no.

15:16:26  22     Q.  And you don't believe that even if you put or

15:16:31  23  somebody put a pipe from that manhole into the railroad

15:16:36  24  ditch it would solve the flooding problem that is

15:16:38  25  occurring at the rear of the Cambridge Subdivision lots,

15:16:43  1   correct?

15:16:43  2       A.   That's correct.

15:16:45  3       Q.   And can you tell the jury, did you do a study or

15:16:49  4   engage an outside engineering firm to do a study to see

15:16:53  5   if that is true or false?

15:16:56  6       A.   No, I did not engage a firm to do a study.

15:16:59  7       Q.   Did you do an engineering study?

15:17:01  8       A.   No, I did not.

15:17:09  9       Q.   What do you think is causing the ponding on lots

15:17:13  10  15 and 16?

15:17:15  11      A.   I can't answer that.   I don't know.

15:17:18  12      Q.   You don't know?

15:17:19  13      A.   I'd be guessing.

15:17:25  14      Q.   Could you come over --

15:17:28  15      A.   Sure.

15:17:29  16      Q.   -- please?

15:17:50  17           Did you know or did you ever see the entry of

15:17:53  18  this drain tile here in the railroad swale -- have you

15:17:59  19  ever seen that?

15:17:59  20      A.   I haven't seen it in the field, no.

15:18:03  21      Q.   Have any of the engineers of the City of Toledo

15:18:07  22  ever bothered to go look and see this beginning of this

15:18:12  23  drain tile?

15:18:13  24      A.   No.

15:18:15  25      Q.   On the railroad right-of-way?

15:18:16  1    A.   No.

15:18:16  2    Q.   Have you ever seen the entry of this -- the

15:18:20  3  drainage tile on the railroad?

15:18:22  4    A.   No.

15:18:26  5    Q.   Doesn't it make sense to you that if Mr. McCarthy

15:18:29  6  put a T in here that the water that's coming down here

15:18:35  7  or into this tile and the water that's coming here that

15:18:38  8  should go to this manhole, it can't go out here, it's

15:18:43  9  either going to come out here, here, or where it was

15:18:48  10  tapped, right?

15:18:49  11    A.   That makes sense.

15:19:12  12    Q.   Thank you.  Do you own a home?

15:19:14  13    A.   Yes, I do.

15:19:14  14    Q.   Do you have gutters?

15:19:16  15    A.   Yes, I do.

15:19:19  16    Q.   Do you have trees in your yard?

15:19:21  17    A.   Yes.

15:19:22  18    Q.   Do you get leaves in your gutter?

15:19:24  19    A.   Yes.

15:19:28  20    Q.   If the leaves plug the gutter -- has that ever

15:19:34  21  happened to you?

15:19:34  22    A.   My husband's pretty good about cleaning the

15:19:37  23  gutters.   I have a good husband.

15:19:42  24          THE COURT:  Don't tell my wife.

15:19:47  25    Q.   If the leaves plug the gutter, and just a little

15:19:52  1  bit of water trickled into the down spout, that doesn't

15:19:56  2  mean that the gutter has been abandoned or useless, does

15:20:01  3  it?

15:20:01  4  A.  No.

15:20:02  5  Q.  We could use that analogy here on this drain

15:20:06  6  tile, correct?

15:20:06  7  A.  I don't feel that it's the same analogy.

15:20:10  8  Q.  And you haven't done a study of the drainage

15:20:17  9  around this manhole or behind the Cambridge Subdivision

15:20:21  10  to come to any conclusion what is causing the water

15:20:25  11  problem?

15:20:25  12  A.  No.

15:20:26  13  Q.  And your opinion is that even if that pipe was

15:20:29  14  put across into the railroad ditch, it would not solve

15:20:32  15  the problem, correct?

15:20:34  16  A.  Correct.

15:20:36  17         MR. ROBON:  No more questions.

15:20:38  18                     - - -

15:20:38  19         CHRISTY SONCRANT, REDIRECT EXAMINATION

15:20:39  20  BY MR. BAHRET:

15:20:39  21  Q.  Just briefly.  Christy, to take Mr. Robon's

15:20:46  22  analogy one step further, this pipe is under an

15:20:52  23  abandoned, not an active, railroad, correct?

15:20:55  24  A.  Correct.

15:20:56  25  Q.  So it's in an area that is no longer in use?

15:21:00  1      A.   That's correct.

15:21:01  2      Q.   Now, if we use Mr. Robon's analogy, and I ask you

15:21:05  3  if your downspout was abandoned, if your house had been

15:21:09  4  vacant and dilapidated for about 60 years, would you

15:21:12  5  think the downspout was also abandoned then?

15:21:16  6      A.   Yes, I would.

15:21:18  7      Q.   I thought so.   Thank you.

15:21:21  8               THE COURT:  Anything further?

15:21:32  9                          -  -  -

15:21:32  10          CHRISTY SONCRANT, RECROSS-EXAMINATION

15:21:33  11  BY MR. ROBON:

15:21:33  12     Q.   Christy, did you tell the jury the fact that the

15:21:36  13  tracks were torn up on the railroad, that doesn't

15:21:38  14  prevent the rain water from still hitting the ground,

15:21:41  15  does it?

15:21:41  16     A.   No.

15:21:42  17     Q.   So even though the track may have been abandoned,

15:21:46  18  the property was not abandoned, correct?

15:21:49  19     A.   That's correct.

15:21:54  20               THE COURT:  You may step down.

15:22:04  21               Subject to admission of exhibits, does the

15:22:07  22  defendant rest?

15:22:08  23               MR. BAHRET:  Yes, Your Honor.

15:22:09  24               THE COURT:  Any rebuttal by plaintiff?

15:22:10  25               MR. ROBON:  No, Your Honor.

15:22:14  1           THE COURT:  Okay.  Ladies and gentlemen, we

15:22:17  2  are at a point where I'm going to send you home a little

15:22:20  3  early today.   And I'm going to keep the lawyers here

15:22:23  4  for a while so when we start tomorrow morning, we'll run

15:22:27  5  smoothly.  We have some homework to do for the next

15:22:29  6  phase, which is the final instruction, the closing

15:22:32  7  arguments, and your deliberations.

15:22:37  8          Again, my cautionary instruction to you when

15:22:40  9  you go home tonight, as always, please remember the

15:22:43  10  rules.  I know that you've heard all the evidence now,

15:22:46  11  and there may be a temptation to discuss the case, but

15:22:49  12  you've not heard the final instruction; you've not heard

15:22:52  13  the closing argument.   So you do not have all the

15:22:54  14  information you need; therefore, I ask you to please

15:22:57  15  hold off one more day until tomorrow before discussing

15:23:00  16  the case with your fellow jurors.

15:23:02  17          What time would you like to start tomorrow

15:23:05  18  morning, now that we have a little clearer schedule and

15:23:08  19  know that not all the names on the witness list I was

15:23:12  20  given at the beginning are being called, and we know

15:23:14  21  we're going to safely get in before the weekend, you may

15:23:18  22  start a little later if you like.

15:23:24  23         THE JUROR:  8:00.

15:23:25  24         THE COURT:  They're ready for an 8:00 start.

15:23:32  25         Some of our people may have a problem with

15:23:34  1  child care and delivering children to school, so let me

15:23:38  2  ask if that's okay with counsel if we start at 8:00

15:23:41  3  tomorrow.

15:23:42  4         MR. BAHRET:  My wife will get them on the

15:23:44  5  bus.   I have no problem.

15:23:46  6         THE COURT:  8:00 a.m. tomorrow.   Counsel,

15:23:48  7  you should plan to be here ahead of time so we can

15:23:51  8  actually and promptly start at 8:00 a.m.   Let me ask

15:23:59  9  our court reporter, is 8:00 a.m. okay?

15:23:59  10        THE COURT REPORTER:  Yes.

15:24:01  11        THE COURT: Counsel, take a short break, then

15:24:03  12  I'll see you in chambers.

15:25:56  13           (The jury exits the courtroom.)

15:38:14  14        MR. DAVIS: Plaintiff's 117, 119, and 120, no

15:38:21  15  objection.

15:38:51  16        Defendant's object to Plaintiff's 88 and 89,

15:39:54  17  which are the complaints for foreclosure.

15:39:57  18        Did you have an objection to the CD?

15:40:46  19        MR. BAHRET:  No.

15:40:47  20        MR. DAVIS: Do you want to call it 121?

15:41:04  21        MR. BAHRET:  Your Honor, we'll give you two

15:41:06  22  CDs.   Theirs is 121.  That was the water flow pictures.

15:41:11  23        MR. ROBON:  This has that on there.   So if

15:41:13  24  you want to save your --

15:41:14  25        THE COURT:  Why don't we go off the record

15:41:16  1    for a moment.

15:41:59  2             (Discussion had off the record.)

15:41:59  3             MR. BAHRET:  The disk that is marked as

15:42:03  4    Plaintiff's Exhibit 121 is a CD that contains the

15:42:06  5    footage of two short videos they showed with the

15:42:09  6    drainage, and it also has the entirety of the

15:42:12  7    preconstruction video, a portion of which the defense

15:42:17  8    played.  And I believe that we played from about

15:42:22  9    station 175 to 189 or so, in that neighborhood.  We

15:42:29  10   didn't play the whole thing, but I don't think it

15:42:32  11   matters.  We'll give you that disk for posterity.

15:42:37  12            THE COURT:  You're going to hold on to all

15:42:40  13   of them until they go to the jury.  Somebody has to keep

15:42:49  14   that because it's part of the case.

15:42:53  15            THE CLERK:  We return the exhibits

15:42:55  16   immediately to counsel after trial.

15:43:02  17            MR. ROBON:  What if there's an appeal?

15:43:04  18            THE COURT:  You two need to decide a

15:43:06  19   repository for that.

15:43:07  20            MR. BAHRET:  Even if there's an appeal, the

15:43:10  21   documents are gone?

15:43:11  22            THE COURT:  No, you hold on to them

15:43:13  23   throughout the pendency of the appeal time.

15:43:15  24            MR. ROBON:  So we have to send them down to

15:43:17  25   the appellate court?

15:43:19  1          THE COURT:  You've got it.

15:43:26  2          MR. BAHRET:  This doesn't have to be on the

15:43:27  3  record.

15:44:04  4          (Discussion had off the record.)

15:44:04  5          MR. BAHRET:  For us, in no particular order.

15:44:08  6          THE COURT:  Before we do that, you have all

15:44:10  7  agreed on Plaintiff's Exhibits except for these four?

15:44:13  8          MR. BAHRET:  Correct.

15:44:14  9          THE COURT:  Let me finish that before we go

15:44:16  10  to the Defendant's.

15:44:18  11          Plaintiff's Exhibit 83 there's an objection.

15:44:22  12  The grounds?

15:44:23  13          MR. BAHRET:  I don't believe those are

15:44:24  14  damages attributable.  It's not a proper element of

15:44:27  15  damages attributable in a trespass case.

15:44:31  16          THE COURT:  What's the relevance of Exhibit

15:44:33  17  83?

15:44:34  18          MR. ROBON:  The relevance, Your Honor, is

15:44:35  19  how much it cost us to construct the subdivision and the

15:44:41  20  current value and how much it's been diminished in value

15:44:44  21  by virtue of the actions of the Defendant.

15:44:48  22          MR. BAHRET:  That doesn't show the current

15:44:49  23  value or how much it's been diminished in value.

15:44:53  24          THE COURT:  It certainly doesn't show any

15:44:56  25  diminishment.

15:44:58  1  　　　　　　MR. ROBON:  It shows what our original costs

15:45:00  2  are.

15:45:00  3  　　　　　　THE COURT:  There's been testimony to that.

15:45:02  4  I'm going to grant the objection and exclude Exhibit 83.

15:45:06  5  Any possible relevance I think is outweighed by

15:45:10  6  misleading and confusion for the jury.  Frankly, I

15:45:12  7  would also exclude it on relevancy grounds.

15:45:15  8  　　　　　　84 is a First Federal loan account

15:45:21  9  statement.  Objection because?

15:45:23  10  　　　　　　MR. BAHRET:  Same basis.  It's irrelevant.

15:45:26  11  Not a proper measure of damages.

15:45:29  12  　　　　　　THE COURT:  We had testimony about it, as I

15:45:31  13  recall.

15:45:32  14  　　　　　　MR. BAHRET:  We did.

15:45:33  15  　　　　　　THE COURT:  I'm not sure the document is

15:45:35  16  appropriate.

15:45:36  17  　　　　　　MR. BAHRET:  There was an objection.

15:45:38  18  　　　　　　MR. ROBON:  This shows the interest rate is

15:45:39  19  6.25 percent, and I believe that part of our damage

15:45:43  20  calculation will be he couldn't have sold it for the

15:45:47  21  last two years, so 6.25 percent is an article of damages

15:45:53  22  we can argue to the jury.

15:45:57  23  　　　　　　MR. WATKINS:  I thought we had prejudgment

15:46:00  24  interest issues weren't permissible.

15:46:01  25  　　　　　　MR. ROBON:  I don't think that deals with

15:46:03  1   prejudgment.   I think that's an issue of damages here,

15:46:06  2   unless you want -- if you want to stipulate that if we

15:46:15  3   get an award, we would be entitled to prejudgment

15:46:19  4   interest, then I wouldn't bring this up.

15:46:21  5          MR. BAHRET:  We absolutely will not do that,

15:46:24  6   which I'm sure doesn't surprise you.

15:46:29  7          MR. WATKINS:  You're claiming the interest

15:46:31  8   as actual damage?

15:46:32  9          MR. ROBON:  Uh-huh.

15:46:34  10          MR. WATKINS:  We disagree.

15:46:35  11          MR. BAHRET:  Absolutely nobody other than

15:46:37  12   Laskey --

15:46:39  13          THE COURT:  Jack testified about that, and

15:46:40  14   he also testified about the interest rate.

15:46:42  15          MR. BAHRET:  He did, but nobody testified

15:46:45  16   that they can't sell lots because of this.   In fact,

15:46:49  17   their appraiser came out an ascribed value to these

15:46:52  18   lots.

15:46:54  19          THE COURT:  I think to be consistent I'm

15:46:56  20   going to exclude Exhibit 84 for the same reason I

15:47:00  21   excluded 83.

15:47:54  22          Next we have Exhibits 88 and 89, each of

15:47:58  23   which is a complaint, and the relevance of these is --

15:48:05  24   or the objection to these is?

15:48:07  25          MR. BAHRET:  They're irrelevant, especially

| | | |
|---|---|---|
| 15:48:10 | 1 | the foreclosure for the taxes that they stopped paying |
| 15:48:13 | 2 | three and a half years before any trees were cleared. |
| 15:48:19 | 3 | It's not a proper element of damage.  It's irrelevant. |
| 15:48:22 | 4 | THE COURT:  We have the testimony. |
| 15:48:24 | 5 | MR. BAHRET:  We do. |
| 15:48:25 | 6 | THE COURT:  I'm not sure the exhibit |
| 15:48:27 | 7 | furthers that testimony in a meaningful way.  I'm going |
| 15:48:31 | 8 | to -- unless you have something for me to grab a hold |
| 15:48:34 | 9 | of, Marv, I'm going to exclude exhibits -- |
| 15:48:39 | 10 | MR. ROBON:  As long as I'm not prohibited |
| 15:48:41 | 11 | from talking about this in final argument. |
| 15:48:43 | 12 | THE COURT:  Anything that came in by way of |
| 15:48:45 | 13 | testimony you can certainly reference, absolutely, |
| 15:48:48 | 14 | unless I ordered it stricken. |
| 15:48:50 | 15 | Which reminds me, I did a check of Mr. |
| 15:48:55 | 16 | Huber's trial testimony, and I was correct that his |
| 15:48:58 | 17 | testimony was that he did not inform Mrs. Soncrant at a |
| 15:49:06 | 18 | later date.  His answer was, quote, "No, I did not.  It |
| 15:49:09 | 19 | was too late," end quote. |
| 15:49:11 | 20 | MR. ROBON:  I just remember it different. |
| 15:49:14 | 21 | I'm sure it was depo because I think he told her a year |
| 15:49:17 | 22 | later or something. |
| 15:49:19 | 23 | MR. BAHRET:  No.  Check your transcript. |
| 15:49:21 | 24 | THE COURT:  I caution you that was ordered |
| 15:49:23 | 25 | stricken from the jury, and there should not be comment |

15:49:25  1    about that in final argument.

15:49:28  2            MR. BAHRET:  Frankly, I thought that was

15:49:31  3    unfair to mention the depo because he most definitely

15:49:34  4    did not.

15:49:34  5            MR. ROBON:  Can we have a stipulation that

15:49:36  6    Mr. Bahret will not mention settlement with the

15:49:39  7    contractor?

15:49:40  8            THE COURT:  Absolutely.  It's a two-way

15:49:43  9    street.  Shame on both of you.

15:49:46  10           Now defendant's exhibits.

15:49:51  11           MR. BAHRET:  They are not objecting to K,

15:49:54  12   which is the sketch.  We've got two series of

15:50:04  13   photographs, A1 through -12, and what should have been

15:50:08  14   B1 through -17.  We cued this up, and we're going to fix

15:50:13  15   it.  Both sets, the copies we gave the Court and

15:50:17  16   counsel, they are correctly marked.  In the originals

15:50:21  17   both sets are A.  A1 through -17 and A1 through -12.

15:50:27  18   I'm going to take these home tonight and -- or to the

15:50:31  19   office and get them relabeled with Bs.  They're not

15:50:35  20   objecting to any of these.  I'd ask the Court if either

15:50:38  21   you or I, to explain to them what may have been

15:50:41  22   referenced as As, and they may be Bs.  All right.

15:50:45  23           THE COURT:  That's fine.  Remind me

15:50:46  24   tomorrow, and I'll make a statement to that effect.

15:50:55  25           MR. BAHRET:  Exhibit M, which is the plans,

```
15:50:58   1   they're not objecting to.   And I think the others they

15:51:05   2   are objecting to.

15:51:11   3                THE COURT:  Then let's start with the

15:51:12   4   objected ones.   Number?

15:51:16   5                MR. BAHRET:  F is the drainage plan.

15:51:19   6   Marv's objection is -- that's page 9 in Exhibit M.

15:51:24   7                THE COURT:  If it's duplication, same ruling

15:51:26   8   as before, one or the other.  If it's in there, in

15:51:30   9   fact, if it helps you to label that page F or something,

15:51:35  10   that's in that exhibit, but we're not going to do it

15:51:38  11   twice.

15:51:39  12                MR. BAHRET:  That's acceptable if I can just

15:51:41  13   put a little label on there that it's -- what did I say

15:51:45  14   this was?

15:51:46  15                THE COURT:  F, as in frank.

15:51:49  16                So Exhibit F, the single page document is

15:51:52  17   excluded.

15:51:53  18                MR. BAHRET:  Okay.  And then the documents

15:51:58  19   down here that were created by -- this first one is O,

15:52:04  20   created by Babcock.

15:52:09  21                MR. ROBON:  We object, Your Honor, on the

15:52:10  22   basis that he's attempting to portray this document as a

15:52:14  23   survey, and it does not meet the standards of a survey

15:52:18  24   in Ohio.  It's not sealed.  It's not signed.  It's

15:52:23  25   not dated.  There is no scale on it.  In other words,
```

15:52:28  1   a survey normally has a scale, one inch equals 30 feet,

15:52:33  2   or something like that.   All it is, it would be like

15:52:35  3   putting someone's notes into evidence.  He testified

15:52:38  4   about it.   But -- and he talks about -- he doesn't talk

15:52:45  5   about property owner; he talks about plaintiff.   And he

15:52:49  6   talks about a 30-foot Edison easement that I don't

15:52:54  7   believe is accurate on here.   There's been no testimony

15:52:56  8   that there's a 30-foot Edison easement on our property.

15:53:01  9           MR. BAHRET:   It's in Exhibit M.

15:53:04  10          THE COURT:   I believe that goes to weight,

15:53:05  11  not admissibility, so I'll overrule that objection and

15:53:08  12  admit Exhibit O, as in Oscar.

15:53:19  13          MR. BAHRET:   Then we've got C.   I think

15:53:21  14  he's got the same objection on that one.

15:53:23  15          THE COURT:   For the same reason I'll admit

15:53:26  16  Exhibit C, as in cat.

15:53:47  17          Does that cover the objected exhibits?

15:53:49  18          MR. ROBON:   Except we would ask the Court to

15:53:52  19  reconsider Exhibit 93 because this drawing here is no

15:53:58  20  different than Exhibit C or O that the defendant is

15:54:02  21  getting into evidence.   That's what this is.   This is

15:54:05  22  a picture with drawing on it.

15:54:07  23          THE COURT:   I think there is a difference.

15:54:08  24  As I recall, the witnesses on the defendant's exhibits

15:54:12  25  testified they were accurate, et cetera.   Whereas in

15:54:18    1    this the witness specifically said, as I recall, that

15:54:23    2    there was not accuracy to it, as in the profession.  And

15:54:31    3    when there was an objection, I sustained it and allowed

15:54:34    4    you an opportunity to establish a foundation for it, and

15:54:37    5    that never took place.  So I think there is a

15:54:40    6    difference, a material difference between the two.

15:54:43    7                MR. BAHRET:  On this exhibit, Your Honor, if

15:54:45    8    you recall the witness specifically said he wasn't sure

15:54:48    9    this was oriented properly, but it was somewhere in that

15:54:51   10    general range.  I'd also point out, to pick up on

15:54:54   11    Marv's objection earlier, my two exhibits were prepared

15:54:58   12    by a registered licensed surveyor.  This one is not.

15:55:03   13                MR. ROBON:  Well, to compromise this, Your

15:55:06   14    Honor, I would cut right off the bottom here, just have

15:55:11   15    three-fourths of a sheet where there's no line because

15:55:14   16    the purpose of the exhibit is to show the tree cutting

15:55:18   17    up to the railroad.

15:55:18   18                THE COURT:  Don't we have that in other

15:55:21   19    testimony and perhaps even in other photographs?

15:55:24   20                MR. ROBON:  Not as good as that one.  It

15:55:27   21    doesn't show the trees as large.

15:55:30   22                MR. WATKINS:  It's the one with the red line

15:55:32   23    in it?

15:55:34   24                MR. ROBON:  Yes.

15:55:35   25                THE COURT:  What do I tell the jury about

15:55:37  1   why that photo's been lopped?

15:55:39  2           MR. ROBON:  They might not even recognize

15:55:42  3   it.

15:55:42  4           MR. WATKINS:  They might.

15:55:43  5           MR. ROBON:  It's no different than redacting

15:55:48  6   something in a written document.  Because the City has

15:55:57  7   contended all along there were no big trees and there

15:56:00  8   was just brush, brambles.  And this evidence disputes

15:56:04  9   that.

15:56:21  10          THE COURT:  Well, if we chop it off there,

15:56:30  11  what's the objection, so that it reads lot 15, and just

15:56:38  12  the top half basically of the photograph.

15:56:43  13          MR. BAHRET:  I think it's practically

15:56:45  14  useless but --

15:56:50  15          THE COURT:  I'm not sure either then what it

15:56:52  16  does for the jury because there won't be any explanation

15:56:54  17  of where it shows on lot 15.

15:57:01  18          MR. ROBON:  But what it does, it shows the

15:57:03  19  size of the trees and stumps.

15:57:06  20          MR. BAHRET:  Frankly, I don't think that

15:57:08  21  exhibit would be proper with the legend on it and the

15:57:10  22  explanation anyway.

15:57:13  23          THE COURT:  We're taking that off.  That's

15:57:15  24  why I'm reexamining it.  I guess I will allow it if you

15:57:19  25  chop it where I'm suggesting so at least the arrow above

15:57:23  1   is on but everything else -- that would be Plaintiff's

15:57:26  2   93 with that modification will be allowed.

15:57:30  3                MR. ROBON:  Do you have a pair of scissors?

15:57:35  4                MR. DAVIS: Safety scissors only.

15:57:38  5                THE COURT:  We give them stickers, training

15:57:44  6   on computers, cookies.

15:58:28  7                Are you ready to have arguments about

15:58:31  8   motions?

15:59:20  9                THE COURT:  The record should reflect that

15:59:24  10  we have concluded the evidence testimony, the admission

15:59:31  11  and exclusion of exhibits.  Because we took several

15:59:36  12  matters out of order, we are now going to entertain any

15:59:40  13  motions as if they were at the conclusion of plaintiff's

15:59:43  14  case.  Any motions by either side?

15:59:48  15               MR. WATKINS:  The defense has a motion.

15:59:50  16               THE COURT:  Proceed.

15:59:51  17               MR. WATKINS:  Thank you.  Motion for

15:59:54  18  directed verdict is what we're asking the Court to enter

15:59:58  19  upon all claims that have been asserted in this case.

16:00:02  20  The argument -- I will try to be brief.  I just want to

16:00:05  21  keep it organized and want to mention that of the

16:00:12  22  greatest significance here that applies to several

16:00:16  23  different arguments is the quite unusual fact that in

16:00:20  24  this case, I mean, when you look at other cases that

16:00:25  25  I've seen that are relevant, it hasn't happened.   The

16:00:28  1  plaintiff in this case, Old Granite, has sued the City

16:00:35  2  of Toledo and no one else on behalf of the City of

16:00:39  3  Toledo, no employees, and for that reason, based upon

16:00:44  4  the law, which I provided to counsel in an excerpt -- I

16:00:51  5  do have the full case here somewhere.

16:00:54  6        THE COURT:  Keith, I may save you some time.

16:00:56  7  You provided the Court with copies of those cases,

16:00:59  8  correct?

16:01:00  9        MR. WATKINS:  Two of them.

16:01:01  10        THE COURT:  And I have issued a ruling on

16:01:03  11  that, and I disagree with your interpretation of those

16:01:06  12  cases.  And so if that is the basis for a motion, and I

16:01:10  13  don't do this to be mean but rather to save time, unless

16:01:13  14  there's something new or different, I'm going to be

16:01:17  15  consistent with the order filed in the case when I

16:01:20  16  denied your motion in limine on that ground, and I'm

16:01:23  17  going to deny it again.

16:01:24  18        MR. WATKINS:  Okay.  I simply want to add a

16:01:26  19  couple authorities quick for the record here based on

16:01:30  20  Board of County Commissioners v. Brown from the Supreme

16:01:33  21  Court of United States, 520 U.S. 397.  The argument

16:01:38  22  that a municipality cannot be held liable solely because

16:01:42  23  it employs a tort feasor or, in other words, a

16:01:45  24  municipality can't be held liable under Section 1983 on

16:01:50  25  an respondeat superior theory or vicarious liability,

16:02:00  1  anything like that.

16:02:03  2          That argument having been said, I'm not

16:02:05  3  going to -- there are other authorities that could be

16:02:08  4  mentioned.

16:02:09  5          I would like to make a preliminary inquiry

16:02:12  6  before I argue much on the taking issue.  We have

16:02:15  7  received the Court's proposed instructions, and in the

16:02:21  8  Court's proposed instructions on page 7, positions of

16:02:25  9  the parties, there is reference to "Plaintiff claims

16:02:31  10  these actions constitute an unconstitutional taking of

16:02:36  11  private property for public use."  That's on page 7,

16:02:40  12  positions of the parties.  However, further

16:02:43  13  instructions prepared by the Court starting on page 8

16:02:46  14  describe Plaintiff's claims in this case as negligence

16:02:50  15  and trespass.  And my inquiry here is as to whether or

16:02:55  16  not that was simply a misprint or a mistype like our

16:02:59  17  staff does sometimes, or whether the Court intended to

16:03:01  18  include and remains pending here the taking clause.

16:03:06  19          THE COURT:  The taking claim remains

16:03:08  20  pending.  I'm waiting to see if you will be persuasive

16:03:11  21  in your argument.

16:03:12  22          MR. WATKINS:  Thank you.  The taking in the

16:03:18  23  case from the Sixth Circuit, Cox v. Tennessee Valley

16:03:23  24  Authority, 19 --

16:03:26  25          THE COURT:  I'm familiar with the case.

16:03:28   1          MR. WATKINS:  Thank you.   The Court ruled

16:03:33   2   that a temporary condition did not constitute a taking

16:03:37   3   of property.   There is no evidence, I would submit, in

16:03:40   4   this case on behalf of the plaintiff that there is any

16:03:43   5   permanent problem whatsoever.   There's talk about

16:03:47   6   vegetation which can be regrown; there is a dispute on

16:03:52   7   that issue for certain, but there is no testimony that

16:03:55   8   this is a permanent problem regarding the vegetation.

16:04:00   9   There is no testimony, I would submit, that there is any

16:04:04  10   permanent problem regarding drainage.   In particular,

16:04:08  11   this Cox case addressed flooding caused by the Tennessee

16:04:16  12   Valley authority four times for homeowners, their homes

16:04:21  13   have been -- their homes have been flooded caused by a

16:04:23  14   change in the operation of the authorities damn.   As a

16:04:29  15   matter of law it was determined that was not a taking

16:04:32  16   because it was temporary and did not constitute

16:04:35  17   permanent taking recoverable under the law.   I don't

16:04:39  18   want -- in that case, though, it wasn't -- as I

16:04:43  19   mentioned, from the Sixth Circuit, but there are several

16:04:45  20   authorities cited in it, particularly from the United

16:04:51  21   States Supreme Court Loretta v. Teleprompter Manhattan,

16:04:56  22   458 U.S. 419.   A temporary invasion is insufficient to

16:05:02  23   constitute a taking.   To create an enforceable

16:05:07  24   liability against the government it must constitute an

16:05:09  25   actual permanent invasion of the land.

16:05:14  1          In Cox it didn't happen.  We submit it

16:05:18  2   hasn't happened here.   No evidence or basis for a

16:05:22  3   legitimate argument that there was permanent taking.

16:05:26  4   That is our argument pertaining to taking.

16:05:30  5          Examples:  The valid taking claims of when a

16:05:34  6   City, without notice, turns your entire backyard into a

16:05:38  7   street.   That's what happened in the Cruz case.

16:05:41  8          When coal companies undermine the stability

16:05:45  9   of your house, that's a keystone case.   The Loretta

16:05:50  10  case involved the permanent physical occupation takeover

16:05:54  11  of your property.

16:05:55  12         There's no evidence here at all that the

16:05:58  13  City of Toledo occupied or took over any of the

16:06:03  14  plaintiff's property.   There's a dispute as to how much

16:06:06  15  in this temporary scenario was invaded.   Temporary

16:06:12  16  flooding is not a taking under the Cox scenario.   Even

16:06:16  17  under their proposals and their argument, it can be

16:06:19  18  fixed.   It's just one of the things they ask for

16:06:23  19  damages here, which may be or may not be actionable

16:06:27  20  under a different theory.   But taking, we submit, is

16:06:30  21  not appropriate.

16:06:31  22         That argument having been made, one of the

16:06:34  23  other arguments I would like to clarify here in terms of

16:06:38  24  whether or not it's necessary in the proposed

16:06:40  25  instructions I have seen from the Court, I see no

16:06:43   1   reference whatever to 42 U.S.C. Section 1983 or

16:06:48   2   constitutional claims.   I will rely upon the arguments

16:06:53   3   we have already presented of record and perhaps

16:06:57   4   decisions of the Court that I am overlooking now, which

16:07:00   5   can happen, but because it is not in the proposed

16:07:02   6   instructions, I am inquiring whether or not I need to

16:07:06   7   argue directed verdict on that point.   I guess for the

16:07:08   8   record I will.

16:07:09   9           THE COURT:  On which point?

16:07:11   10          MR. WATKINS:  42 U.S.C., 1983 claims and

16:07:15   11  constitutional federal claims asserted by the plaintiff

16:07:17   12  in this case.

16:07:18   13          THE COURT:  I'm viewing them all together,

16:07:20   14  the 1983 and the taking constitutional claims, so if you

16:07:23   15  want to address something different or supplementing

16:07:26   16  that, go ahead.   Just remember, the longer you argue,

16:07:37   17  the longer you're here on the jury charge conference.

16:07:59   18          Why is that distinction a difference here?

16:08:02   19  Isn't the 1983 claim, the constitutional claim, aren't

16:08:07   20  they one and the same?

16:08:08   21          MR. WATKINS:  In our view, no.  I can

16:08:10   22  explain why.   In the proposed instructions and

16:08:12   23  authorities we have cited, the standard --

16:08:15   24          THE COURT:  Let me stop you.   Ethan, are

16:08:17   25  they the same or are they different?

16:08:20  1          MR. DAVIS:  They're the same, Your Honor.

16:08:24  2  Owensby v. City of Cincinnati, which is not only

16:08:26  3  directly on point for the 1983 issue, but also on the

16:08:31  4  municipal liability respondeat superior issue as well.

16:08:35  5  So it's an interesting case.   But it does hold that

16:08:38  6  municipal liability may be imposed under 42 U.S.C. 1983

16:08:43  7  for a single decision by municipal policymakers under

16:08:46  8  appropriate circumstances.   And I think the evidence in

16:08:50  9  this case has been very clear that the decision to sever

16:08:53  10  the drainage tile especially was a decision made by the

16:08:56  11  City of Toledo through its authorized group

16:08:58  12  representatives that collectively made a decision to

16:09:02  13  sever that tile.

16:09:03  14          THE COURT:  I've already indicated that I'm

16:09:05  15  denying the motion based on a respondeat superior theory

16:09:12  16  because I believe that that fails for the reasons that

16:09:14  17  I've already expressed in my written order.

16:09:20  18          So we've now heard argument on the taking

16:09:22  19  claim from defendant.   Let's hear from the plaintiff on

16:09:24  20  whether you have, under the Cox case or any other

16:09:28  21  authority, established a prima facie case for taking.

16:09:33  22          MR. DAVIS:  While not as significant as the

16:09:36  23  Cruz case, we think it's on points insofar as the

16:09:39  24  vegetation's not there anymore, and the water is, so

16:09:41  25  it's a take because there's been a physical occupation.

16:09:44  1    It's a fixable physical occupation if we can get a

16:09:48  2    pumping station in there or otherwise divert the water.

16:09:50  3    But I think the evidence has been there was not

16:09:53  4    significant flooding on the rear of these lots prior to

16:09:56  5    the City of Toledo's activities.  As a result of what

16:09:58  6    they did, we now have pretty much permanent standing

16:10:01  7    water on the rear of these lots whenever it rains.

16:10:04  8              THE COURT:  Well, now you exaggerate.  I

16:10:06  9    believe the evidence is, and correct me if I'm wrong,

16:10:08  10   that there was some water before this work was done and

16:10:11  11   that there may be some additional water after this work

16:10:16  12   was done.  And further the evidence, I believe, is

16:10:19  13   undisputed that this, if you want to call it flooding,

16:10:23  14   frankly I view it as ponding, in the back of the lot of

16:10:27  15   several lots of the subdivision, not all the lots, has

16:10:31  16   not interfered with somebody living there and using the

16:10:36  17   property.

16:10:38  18              Your point has been that it has interfered

16:10:40  19   with the value of the property, with making the trains

16:10:46  20   perhaps more visible and more audible.  But tell me how

16:10:49  21   this satisfies the Cox standard cited by the defendant,

16:10:52  22   the Sixth Circuit authority which has held that the

16:10:56  23   standard for a taking under our federal constitution

16:11:00  24   means the land must be subjected to permanent liability;

16:11:05  25   to permanent, even if intermittent, and frequent

16:11:10  1    flooding?

16:11:14  2            MR. DAVIS: I think that's what the evidence

16:11:15  3    that has been presented was. And especially when you

16:11:18  4    consider the jury view, while it's not evidence, it's

16:11:20  5    significant. We've had no rain -- no significant

16:11:23  6    rainfall for a period of weeks, and there was standing

16:11:26  7    water that was visible in the back of lot 16 right there

16:11:29  8    at the drainage tile when we were out there the other

16:11:32  9    day.

16:11:32  10           THE COURT: Would you call that -- even if

16:11:34  11   it were to be considered evidence, which a jury view is

16:11:37  12   not, would you call that sufficient to constitute a

16:11:40  13   taking under our federal constitution, what we observed

16:11:43  14   out there?

16:11:44  15           MR. DAVIS: That, Your Honor, prohibits them

16:11:46  16   from using that portion of their property for any viable

16:11:49  17   use whatsoever except for ponding water.

16:11:51  18           THE COURT: Is that not something that can

16:11:53  19   be corrected? Isn't that what all the evidence here has

16:11:56  20   talked about is how to correct the problem?

16:11:57  21           MR. DAVIS: It can be corrected, as can the

16:12:00  22   vegetation, but it takes a significant period of time

16:12:04  23   and some money to put these plants in, to have them come

16:12:08  24   back.

16:12:08  25           THE COURT: As a practical matter what does

16:12:11  1   the taking claim provide you that you don't get with the

16:12:14  2   trespass and the negligence claim?

16:12:16  3            MR. DAVIS: Good question.  I think they're

16:12:18  4   somewhat redundant in that regard.  But we're arguing

16:12:21  5   over what I think is a matter of degree rather than the

16:12:24  6   take.  I mean, if the City of Toledo takes a portion of

16:12:27  7   my property, even if it's only a couple of feet, they've

16:12:30  8   still taken a portion of my property, Judge, and it

16:12:33  9   doesn't matter that it's not as significant as the Cruz

16:12:36  10  case, but I think applicable law still applies.

16:12:40  11           THE COURT:  I'm sorry I interrupted your

16:12:42  12  argument.  If there's something else you want to offer

16:12:44  13  me, please do.  And you can talk about both the water

16:12:48  14  and the vegetation if you want because they're both

16:12:52  15  factors under the taking claim.

16:13:06  16           MR. DAVIS:  Give me just a moment, Your

16:13:08  17  Honor, while I look for the one provision that I thought

16:13:12  18  might be on point.

16:13:13  19           I think there's, even without a taking

16:13:15  20  claim, there's still a 1983 claim for municipal

16:13:19  21  liability, which I do think is somewhat separate.

16:13:23  22           THE COURT:  You're turning on me now.  You

16:13:25  23  say it's separate.  How so?

16:13:28  24           MR. DAVIS: Because the severing of the

16:13:30  25  drainage tile by a collective City of Toledo decision

16:13:33  1   results in 1983 liability from damage to our property.

16:13:39  2   So even if there's not a legal take, there can still be

16:13:43  3   a constitutional challenge based on the severance of the

16:13:46  4   drainage tile in addition to a taking claim resulting

16:13:50  5   from the diminution of the use of our property.  And

16:13:54  6   for that I would site the Brick v. City of Cleveland

16:13:58  7   case from the Eighth District Court of Appeals.  I have

16:14:03  8   copies if you'd like them.

16:14:05  9         THE COURT:  Please hand one up.  Anything

16:14:07  10  you're going to rely on in argument would be nice to

16:14:10  11  have ahead of time or at the time of --

16:14:13  12        MR. DAVIS:  I didn't know what the defense

16:14:14  13  was going to argue that they hadn't already advanced,

16:14:18  14  Your Honor.

16:14:26  15        Again, when the City of Toledo or any

16:14:29  16  governmental entity comes on your property and starts

16:14:31  17  removing trees --

16:14:33  18        THE COURT:  Is that a take when you remove

16:14:34  19  my tree?

16:14:35  20        MR. WATKINS:  No.  It can be regrown.  It

16:14:39  21  is temporary.  There is no evidence of any permanence

16:14:42  22  at all.

16:14:44  23        MR. DAVIS: I'd like to see a tree stump be

16:14:47  24  regrown.  It can be replaced.  If the City bulldozes

16:14:51  25  my house, it can be replaced, but it can't be regrown,

16:14:55  1    and it is a take.

16:14:58  2                   MR. WATKINS:  Not under that theory.   Not

16:15:01  3    under take.   If he wants to address a Section 1983

16:15:04  4    liability, which he has done, we would suggest it may be

16:15:08  5    under that, with a different standard.   But taking

16:15:11  6    requires permanence.

16:15:13  7                   THE COURT:  What's the standard under 1983?

16:15:16  8                   MR. WATKINS:  Under 1983 the standard is

16:15:19  9    under the Owensby v. City of Cincinnati, which we cited

16:15:23  10   in our proposed jury instructions number 16 and the

16:15:26  11   trial brief, and other cases, the standard that

16:15:28  12   plaintiff must demonstrate as to all claims in this case

16:15:32  13   that the defendant City of Toledo was deliberately

16:15:37  14   indifferent to plaintiff's rights which caused the

16:15:40  15   damages of which they complain.   That's the law we

16:15:43  16   submit.   It's not a general negligence claims.   It's

16:15:47  17   not -- it's deliberate indifference.   They may think

16:15:52  18   they've got that here on a jury issue.   I don't know.

16:15:55  19   We disagree.   We submit directed verdict on those

16:15:58  20   claims are appropriate also.   Is there any evidence

16:16:01  21   that the City of Toledo was deliberately indifferent to

16:16:06  22   Cambridge's claims?   I think at most what they've got

16:16:09  23   here is a four-inch mistake or, by their own expert's

16:16:13  24   testimony, a four- to six-foot mistake; nothing

16:16:16  25   intentional, nothing deliberately indifferent.   That,

16:16:22  1    the defense submits, is the law.

16:16:25  2            Also, one thing I forgot to mention

16:16:27  3    regarding taking.  A loss of view is not actually a

16:16:33  4    taking.   The trees, I guess they're interrelated, the

16:16:37  5    trees, the water, but our belief, returning to where I

16:16:42  6    was, the Owensby v. Cincinnati case is not an unusual

16:16:46  7    case.   It's just the one from the Sixth Circuit in

16:16:51  8    2005, 414 F.3d 596 at pages 602 to '3.   Other cases are

16:17:00  9    cited.   Many others could be cited.   But that one was

16:17:04  10   from the Sixth circuit.   And there are Supreme Court

16:17:06  11   cases as well; I just didn't think they were as clear as

16:17:09  12   this one was.   Deliberate indifference, we submit, is

16:17:13  13   the appropriate standard.

16:17:19  14           MR. DAVIS: Going back to the Cruz case, Your

16:17:21  15   Honor, citing to Armstrong v. United States, I think

16:17:25  16   this is an interest citation.   When faced with a

16:17:28  17   constitutional challenge to a permanent physical

16:17:31  18   occupation of real property, this Court has invariably

16:17:35  19   found a taking.   The modern significance of physical

16:17:41  20   occupation is that courts never deny compensation for a

16:17:45  21   physical takeover.   The one incontestable case for

16:17:50  22   compensation seems to occur when the government

16:17:52  23   deliberately brings it about, that its agents or the

16:17:56  24   public at large regularly use or permanently occupy a

16:18:00  25   space or thing which was therefore understood to be

16:18:03   1   under private ownership.   Those trees were ours.   They

16:18:07   2   took them.

16:18:08   3              THE COURT:   Are they permanently using or

16:18:11   4   occupying the property in Cambridge?

16:18:13   5              MR. DAVIS:   They are permanently using or

16:18:14   6   occupying the trees they took off our property, and the

16:18:18   7   flooding is a permanent physical occupation.   Again, I

16:18:21   8   think we're arguing over degree as to whether that

16:18:24   9   activity constitutes a take or not.

16:18:27  10              MR. WATKINS:   Well, the only argument is the

16:18:29  11   cost of repair here.   $20,000, $10,000 for the

16:18:34  12   flooding --

16:18:35  13              MR. DAVIS:   $200,000 for flooding.

16:18:37  14              THE COURT:   The drainage, whatever.   But

16:18:38  15   the very idea that it can be repaired disputes the idea

16:18:41  16   that it's permanent.   It can be fixed.

16:18:45  17              MR. DAVIS: You know, I've seen in eminent

16:18:49  18   domain cases I've seen cost of cure as an element of

16:18:53  19   damage in a physical take.   So under Mr. Watkins'

16:18:56  20   argument, you'd never have a take when there's an

16:19:00  21   opportunity to cure it.

16:19:02  22              MR. WATKINS:   Well, I cited the cases

16:19:03  23   where -- several case in which there was not a way to

16:19:07  24   cure.

16:19:08  25              But anyway, going back to what we were

16:19:15  1    discussing, the Section 1983 federal claims, deliberate

16:19:20  2    indifference, we submit, is required.   I haven't heard

16:19:23  3    a response to that.   Maybe it's there.

16:19:25  4         I also have a few comments about trespass,

16:19:29  5    which is also in the Court's proposed instruction.   But

16:19:33  6    the deliberate indifference would, in our view, our

16:19:37  7    humble contention, require a different set of

16:19:41  8    instructions rather than ordinary negligence.

16:19:50  9         THE COURT:  Any other arguments for a

16:19:52  10   directed verdict at the conclusion of plaintiff's case?

16:19:55  11        MR. WATKINS:  Yes.   On the trespass issue,

16:20:00  12   the -- during the cross-examination of Mr. McCarthy

16:20:09  13   about the dirt and everything like that, Mr. Bahret, in

16:20:14  14   response to some of the previous questions that had been

16:20:18  15   argued by counsel, asked him to acknowledge that in

16:20:22  16   placing that dirt he was on the CSX right-of-way and

16:20:26  17   trespassed there.

16:20:27  18        THE COURT:  So?

16:20:28  19        MR. WATKINS:  At that point Mr. Robon got up

16:20:30  20   and said, and it's on the record:  "Objection.  Trespass

16:20:34  21   is an intentional act."

16:20:38  22        THE COURT:  So?

16:20:39  23        MR. WATKINS:  So there's no evidence in this

16:20:40  24   case that the City of Toledo intentionally trespassed on

16:20:45  25   the Cambridge Subdivision property.

16:20:47   1            THE COURT:  Isn't there disputed evidence on

16:20:49   2   whether they crossed the boundary line?  And if so, by

16:20:51   3   how much?

16:20:52   4            MR. WATKINS:  There is, but that -- there is

16:20:54   5   no evidence that they intended to do so.  That's our

16:20:59   6   argument and our position in this case.

16:21:01   7            THE COURT:  Response?

16:21:02   8            MR. DAVIS: Your Honor, the City of Toledo by

16:21:03   9   and through its agents certainly intended to cut to

16:21:06  10   those boundary lines.  And I think that's all that's

16:21:09  11   necessary to show a trespass.

16:21:11  12            MR. WATKINS:  To cut through the boundary

16:21:13  13   lines?

16:21:14  14            MR. DAVIS: To cut up to the boundary lines.

16:21:16  15   That was certainly intentional.

16:21:18  16            MR. WATKINS:  But not through.  There's no

16:21:20  17   evidence that they --

16:21:20  18            MR. DAVIS: There's certainly evidence they

16:21:22  19   went six feet over in spots.

16:21:23  20            THE COURT:  Any other arguments on directed

16:21:26  21   verdict at the close of plaintiff's case?

16:21:29  22            MR. WATKINS:  I think that's it.

16:21:33  23            THE COURT:  I'll take all of those motions

16:21:36  24   under advisement.

16:21:37  25            We're now at the close of all evidence in

16:21:39  1  this case.   Do you wish to renew your motions on the

16:21:43  2  same grounds?

16:21:44  3          MR. WATKINS:  Yes.

16:21:46  4          THE COURT:  Any motions from plaintiff?

16:21:51  5          MR. DAVIS: We're open to ideas.

16:21:54  6          THE COURT:  That's a no, I take it?  That's

16:21:56  7  a no?

16:21:56  8          MR. DAVIS: That's a no, Your Honor.

16:21:58  9          THE COURT:  Thank you.   Viewing all the

16:22:00  10  evidence in this case that has been presented, and

16:22:05  11  viewing it in a light most favorable to plaintiff, first

16:22:08  12  I find that there has not been sufficient evidence for a

16:22:13  13  1983 claim to go to the jury.

16:22:22  14          I also find there is not sufficient evidence

16:22:25  15  for a taking claim to go to the jury.   And I will

16:22:28  16  explain that as follows: The Sixth Circuit provides a

16:22:32  17  standard for a taking under the federal constitution for

16:22:34  18  flooding, and it is that a landowner must show either

16:22:39  19  that the government has effectively destroyed the land,

16:22:42  20  and I don't think anyone's claiming here the land has

16:22:44  21  been effectively destroyed, or that the government has

16:22:48  22  subjected the land to a permanent liability.   And it

16:22:52  23  could be an intermittent liability, but it must be

16:22:55  24  permanent and frequent.   And the Cox case cited by the

16:22:59  25  defendant specifically dealt with frequent flooding.

16:23:02    1    The government's actions must have caused worse flooding

16:23:05    2    than would have occurred due to the forces of nature.

16:23:08    3    I believe plaintiffs fail to meet this standard even

16:23:12    4    under the most favorable viewing of the evidence.    At

16:23:14    5    most plaintiff has shown what I describe as minor and

16:23:19    6    occasional ponding of water on a portion of, a portion

16:23:26    7    of, and I repeat that intentionally, the subdivision.

16:23:32    8    What I mean by the latter comment is the back of several

16:23:35    9    lots has been affected, not all the lots.    And the

16:23:39    10   testimony has been that this occurs after heavy rains.

16:23:45    11   So we have a small portion of -- a small portion of the

16:23:49    12   entire subdivision that has been, at best, affected by

16:23:54    13   this ponding.    What is undisputed is that it does not

16:23:58    14   interfere with the use of those lots themselves.    In

16:24:00    15   fact, on one of them, a family has been living for some

16:24:07    16   time, and there's no testimony that this has interfered

16:24:10    17   with the ability to construct another home on those lots

16:24:14    18   that do not currently have a home.

16:24:17    19            I believe plaintiff has failed to show great

16:24:19    20   frequency or that the accumulation is greater than what

16:24:22    21   would occur without the City's conduct in this case, and

16:24:27    22   specifically referencing the flooding, the severance of

16:24:30    23   the pipe.    And there is insufficient evidence to submit

16:24:33    24   this claim to a jury.    The same result would hold under

16:24:36    25   the Ohio Constitution where a City can be liable if it

16:24:40  1   changes the flow of surface water so as to physically

16:24:44  2   encroach upon the property of another by continued

16:24:47  3   flooding which deprives the owner of any of the use and

16:24:50  4   enjoyment of his property, and to borrow an analogy, I

16:24:55  5   suppose, that Mr. McCarthy can still barbecue in his

16:24:59  6   backyard and has not been deprived of any use and

16:25:02  7   enjoyment of his property.  In fact, he still uses his

16:25:05  8   property with his family.  So even under this standard

16:25:08  9   as well, plaintiff fails to produce sufficient evidence

16:25:11  10  for that claim to go to the jury.

16:25:13  11           Next, briefly addressing the takings claim

16:25:16  12  in the context of tree and vegetation removal.

16:25:19  13  Plaintiff here again fails to present sufficient

16:25:21  14  evidence to warrant submitting the physical taking claim

16:25:24  15  to a jury.  The taking clause of the Fifth Amendment

16:25:29  16  which plaintiff claims under this case requires that the

16:25:36  17  clear sort of taking occur when the government

16:25:40  18  encroaches upon private land.  A minimal, quote,

16:25:43  19  "permanent physical occupation of real property," end

16:25:47  20  quote, may require compensation under the clause.  I

16:25:52  21  concede that.  But even if minimal, the occupation must

16:25:56  22  be permanent.  And I don't believe plaintiff has shown

16:25:58  23  a permanent occupancy here, but rather a one-time

16:26:03  24  destruction or removal of trees and other vegetation

16:26:06  25  that, if not replaceable, can certainly be replanted,

16:26:10   1   and if not replaced at its preexisting height, certainly

16:26:14   2   can be compensated in damages otherwise for what was

16:26:18   3   taken, especially considering what is admitted to be a

16:26:22   4   relatively narrow area of potential encroachment.   By

16:26:27   5   that I mean the testimony seems to be a fight over four

16:26:31   6   inches, up to six, seven, eight, maybe nine feet along,

16:26:37   7   again, a sliver of the rear portion of the subdivision.

16:26:41   8   Now, there is no evidence the City occupies any of

16:26:43   9   plaintiff's land or has rendered it unusable in any way

16:26:47   10  as a result of the removal of the trees or vegetation.

16:26:50   11  And while a temporary invasion may constitute a

16:26:54   12  compensable taking, the U.S. Supreme Court has held that

16:27:00   13  this situation applies, that is, a taking here where all

16:27:03   14  use of the property is denied, and we don't have that in

16:27:09   15  this case under any circumstances.

16:27:12   16          I also find under U.S. v. Harris, 467, F.2d,

16:27:16   17  801, Eighth Circuit, "A distinction is therefore to be

16:31:07   18  drawn between mere tortious invasion of one's property

16:31:11   19  rights and an appropriation of sufficient magnitude to

16:31:15   20  amount to a taking."

16:27:31   21          And it cites a U.S. Supreme Court case in

16:27:33   22  that quote.

16:27:35   23          In this case, the cutting/removal of trees

16:27:38   24  and brambles under this standard is best understood as a

16:27:41   25  tortious invasion to property occurring through

16:27:43   1   negligence or trespass.

16:27:46   2       The same holding under the Ohio Constitution

16:27:49   3   for the vegetation removal.  A taking requires under

16:27:52   4   Ohio law a, quote, "substantial or unreasonable

16:27:55   5   interference with a property right," end quote.  And the

16:27:59   6   question here is whether removal of the trees and

16:28:02   7   vegetation deprive plaintiff of, quote, "any valuable

16:28:06   8   use," end quote, of the property.  And the evidence

16:28:08   9   does not bear out any such.

16:28:12   10       For these reasons I am going to grant a

16:28:19   11   directed verdict with respect to the taking claim, the

16:28:24   12   1983 claim, and will submit two claims to the jury; that

16:28:28   13   is, the trespass claim and the negligence claim.

16:28:31   14       Anything further from either side?  If

16:28:35   15   not, we will retire to chambers to have a discussion on

16:28:39   16   the jury charge.

16:28:40   17       MR. BAHRET:  If I heard what you just said

16:28:42   18   correctly when you were describing the taking claim in

16:28:44   19   the context of the water issue, I believe you said that

16:28:48   20   you failed to see sufficient evidence to indicate that

16:28:54   21   the water problem was worse now than it was before.

16:28:57   22       THE COURT:  I said there was evidence to

16:28:59   23   that effect.

16:28:59   24       MR. BAHRET:  You said there was?

16:29:01   25       MR. ROBON:  I thought you said no.

|  |  |
|---|---|
| 16:29:04 | 1 |
| 16:29:08 | 2 |
| 16:29:12 | 3 |
| 16:29:17 | 4 |
| 16:29:20 | 5 |
| 16:29:20 | 6 |
| 16:29:22 | 7 |
| 16:29:25 | 8 |
| 16:29:29 | 9 |
| 16:29:33 | 10 |
| 16:29:34 | 11 |
| 16:29:36 | 12 |
| 16:29:40 | 13 |
| 16:29:42 | 14 |
| 16:29:47 | 15 |
| 16:29:51 | 16 |
| 16:29:53 | 17 |
| 16:29:56 | 18 |
| 16:29:58 | 19 |
| 16:30:01 | 20 |
| 16:30:03 | 21 |
| 16:30:06 | 22 |
| 16:30:08 | 23 |
|  | 24 |
|  | 25 |

THE COURT:  As I recall there was testimony, I forget now from whom, perhaps it was young McCarthy, who indicated it was no worse than it was before or was in the same area that it was before.  Am I right or wrong?

MR. BAHRET:  I believe you're right.  But I guess my point is I don't think there's sufficient credible evidence, especially not scientific evidence, that any flooding problem is because of that pipe being cut.

THE COURT:  Well, I think that's an issue that perhaps we'll let the jury determine.

MR. WATKINS:  If I can make one more quick inquiry.  If it's your intention we're going to go, can I put on the record some of what I want to make sure is on the record to protect ourselves about the instructions regarding negligence and trespass?

THE COURT:  We haven't had our charge conference yet.  We're going to go into chambers, talk off the record, and to the extent you don't agree with my final charge -- this is a draft -- then you can make your record tomorrow morning.

MR. WATKINS:  Very good.  Thank you.

(Adjourned at 4:30 p.m.)

- - -

1

2                        **C E R T I F I C A T E**

3

4      I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled

6    matter.

7

8    /s Tracy L. Spore_____            _____

9    Tracy L. Spore, RMR, CRR                  Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  I N D E X

 2

 3    MICHAEL McCARTHY, DIRECT EXAMINATION           674

 4    BY MR. ROBON:

 5    MICHAEL McCARTHY, CROSS-EXAMINATION            680

 6    BY MR. BAHRET:

 7    MICHAEL McCARTHY, REDIRECT EXAMINATION         698

 8    BY MR. ROBON:

 9    MICHAEL McCARTHY, RECROSS-EXAMINATION          699

10    BY MR. BAHRET:

11    ROBERT DOMINI, DIRECT EXAMINATION              701

12    BY MR. BAHRET:

13    ROBERT DOMINI, CROSS-EXAMINATION               721

14    BY MR. ROBON:

15    ROBERT DOMINI, REDIRECT EXAMINATION            729

16    BY MR. BAHRET:

17    ROBERT DOMINI, RECROSS-EXAMINATION             731

18    BY MR. ROBON:

19    TODD JENKINS, DIRECT EXAMINATION               739

20    BY MR. BAHRET:

21    TODD JENKINS, CROSS-EXAMINATION                749

22    BY MR. ROBON:

23

24    TODD JENKINS, REDIRECT EXAMINATION             762

25    BY MR. BAHRET:
```

1    TODD JENKINS, RECROSS-EXAMINATION              764

2    BY MR. ROBON:

3    TIMOTHY PAULEY, DIRECT EXAMINATION             766

4    BY MR. BAHRET:

5    TIMOTHY PAULEY, CROSS-EXAMINATION              784

6    BY MR. ROBON:

7    TIMOTHY PAULEY, REDIRECT EXAMINATION           795

8    BY MR. BAHRET:

9    NICHOLAS RONAU, DIRECT EXAMINATION             797

10   BY MR. BAHRET:

11   NICHOLAS RONAU, CROSS-EXAMINATION              807

12   BY MR. ROBON:

13   NICHOLAS RONAU, REDIRECT EXAMINATION           812

14   BY MR. BAHRET:

15   NICHOLAS RONAU, RECROSS-EXAMINATION            813

16   BY MR. ROBON:

17   ROBERT BABCOCK, DIRECT EXAMINATION             814

18   BY MR. BAHRET:

19   ROBERT BABCOCK, CROSS-EXAMINATION              836

20   BY MR. ROBON:

21   ROBERT BABCOCK, REDIRECT EXAMINATION           843

22   BY MR. BAHRET:

23   ROBERT BABCOCK, RECROSS-EXAMINATION            844

24   BY MR. ROBON:

25                                                 846

1    JOSEPH CRANDALL, DIRECT EXAMINATION

2    BY MR. BAHRET:

3    JOSEPH CRANDALL, CROSS-EXAMINATION                854

4    BY MR. ROBON:

5    CHRISTY SONCRANT, DIRECT EXAMINATION              863

6    BY MR. BAHRET:

7    CHRISTY SONCRANT, CROSS-EXAMINATION               874

8    BY MR. ROBON:

9    CHRISTY SONCRANT, REDIRECT EXAMINATION            884

10    BY MR. BAHRET:

11    CHRISTY SONCRANT, RECROSS-EXAMINATION             885

12    BY MR. ROBON:

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1,000** - 771:13
**$10** - 712:14, 712:16
**$10,000** - 869:20, 911:11
**$100** - 684:7, 684:9
**$135,000** - 725:4
**$140,000** - 726:6, 726:9, 729:24
**$145,000** - 726:4, 726:6, 726:9, 727:6, 729:24
**$15** - 761:10
**$20** - 761:11
**$20,000** - 717:14, 717:18, 717:22, 722:19, 722:24, 722:25, 723:4, 723:5, 723:16, 724:2, 727:25, 733:2, 911:11
**$200** - 684:15
**$200,000** - 708:4, 755:16, 755:17, 756:20, 756:22, 757:3, 760:13, 911:13
**$22,000** - 873:16
**$22,400** - 873:17
**$22,497** - 873:18
**$250,000** - 708:4
**$260,000** - 684:8
**$270,000** - 684:8
**$275,000** - 676:16
**$30** - 761:4
**$310,000** - 684:2, 713:13, 733:7, 733:17, 734:1
**$36,900** - 709:3
**$38,000** - 709:5
**$40,000** - 771:14
**$400** - 717:13, 723:18, 724:2
**$450** - 717:13, 723:18
**$48,000** - 710:18, 716:12, 722:14, 726:11, 727:7, 727:8
**$5,000** - 727:25
**$500** - 771:12
**$539,000** - 676:4
**$550,000** - 684:14
**$586,000** - 717:21, 733:6
**$586,850** - 733:4
**$60,000** - 710:17, 716:11, 722:14
**$600** - 771:13
**$606,850** - 716:25, 731:25, 732:20
**$708,000** - 711:17, 711:20, 722:16, 722:17, 723:1, 730:19, 731:15
**$90,000** - 730:1
**$97,000** - 727:7

## '

**'04** - 714:17, 714:21, 730:14, 730:17
**'05** - 714:17
**'06** - 675:14, 676:7, 679:4, 680:6, 685:12, 685:23, 705:2, 714:13, 714:17, 730:14, 777:23, 785:17, 785:25, 788:11, 788:12
**'07** - 679:8
**'08** - 679:8
**'85** - 815:3
**'90s** - 706:13, 706:18
**'92** - 766:17
**'95** - 815:4

## /

**/s** - 920:8

## 1

**1** - 667:5, 685:23, 705:2, 769:13, 769:14
**1,000** - 880:18
**1.29** - 827:10, 827:13
**1.58** - 827:10
**1.7** - 714:5
**1.76** - 826:17
**10** - 690:14, 696:4, 733:24, 742:23, 743:4, 757:8, 797:16
**10-24** - 777:23
**10/24/06** - 805:24
**100** - 666:14, 751:4, 839:15, 859:13
**104** - 671:10, 672:11
**105** - 671:10, 672:11
**10:15** - 737:9
**10:30** - 737:10
**11** - 690:14, 696:4
**114** - 669:24, 670:22
**116** - 670:23, 671:6
**117** - 887:14
**119** - 887:14
**12** - 690:14, 695:13, 696:4, 724:13, 724:18, 724:23, 727:21, 750:6, 753:4, 755:19, 756:9, 810:24, 869:12, 869:14, 893:13, 893:17
**12-inch** - 750:5, 752:24, 754:20, 758:25
**120** - 887:14
**121** - 887:20, 887:22, 888:4
**12:00** - 797:16
**13** - 667:3, 667:4, 690:14, 695:13, 696:4, 703:23, 711:16, 732:8, 734:15, 734:23, 736:13, 755:19, 810:24
**14** - 667:3, 667:4, 695:13, 696:3, 696:4, 699:12, 699:13, 700:8, 704:1, 711:16, 810:24, 832:20
**140** - 730:2
**145** - 730:2
**15** - 667:3, 667:4, 675:13, 694:24, 695:13, 699:13, 700:3, 700:7, 704:1, 705:24, 713:10, 713:11, 723:22, 723:23, 724:7, 725:1, 726:9, 727:22, 729:5, 729:7, 732:20, 737:10, 743:25, 744:2, 749:17, 750:4, 752:4, 752:22, 755:13, 810:24, 829:15, 832:20, 882:10, 897:11, 897:17
**15-foot** - 724:6
**15-minute** - 862:14
**150** - 689:8, 751:4
**16** - 667:4, 677:7, 690:11, 692:19, 692:20, 696:3, 699:9, 700:7, 719:4, 719:5, 726:5, 726:8, 726:20, 749:15, 749:20, 751:5, 752:22, 754:12, 755:13, 763:12, 763:17, 763:18, 763:24, 764:21, 832:12, 832:19, 882:10, 906:7, 909:10
**17** - 667:4, 709:17, 726:6, 726:9, 893:14, 893:17
**1701** - 666:15
**1716** - 666:21
**175** - 672:25, 888:9
**18** - 667:6, 701:17, 812:20
**18-inch** - 851:23, 857:23, 858:2

## 2

**2** - 769:13, 769:15
**2,600** - 684:7
**2,700** - 683:21, 684:7
**20** - 667:4, 667:5, 701:19, 709:19, 709:25, 717:12, 723:22, 723:23, 724:7, 725:1, 729:5, 729:7, 733:25, 734:1, 757:6, 761:12, 774:17, 774:21, 796:17, 796:18, 796:23, 796:24, 812:14, 812:15, 812:18, 812:20, 813:8, 813:9, 842:14, 842:21, 851:5, 851:6, 858:11
**20-foot** - 796:21, 813:6
**200** - 696:24, 873:11
**200,000-plus** - 755:8
**2000** - 706:11, 706:14
**2001** - 714:4, 726:15, 729:22
**2002** - 671:1, 706:25
**2004** - 714:10, 730:1
**2005** - 671:2, 910:8
**2006** - 707:9, 714:5, 718:23, 748:11, 768:4, 786:4
**2007** - 706:15, 748:11
**2008** - 666:5
**21** - 812:16
**216** - 673:12
**22** - 666:5
**23** - 769:19, 771:4, 796:4
**238** - 757:1
**24** - 709:14, 782:3, 782:4, 782:6, 785:16, 785:25, 786:15, 858:3
**24-hour** - 745:1
**24-inch** - 751:23, 780:5, 780:7, 783:2, 789:3, 806:3, 806:6, 857:24, 868:21, 869:3, 869:5, 869:8, 869:9, 869:15, 875:4, 876:8, 879:6
**240** - 734:9, 824:11
**240-foot** - 831:23
**243-3607** - 666:22
**245** - 833:1, 833:6
**248** - 734:13
**25** - 709:19, 709:25, 710:3, 717:12, 774:20
**250** - 825:11
**27** - 761:23, 761:24
**28** - 710:18
**2:45** - 862:21

## 3

**3** - 688:6, 708:12, 767:16, 910:8
**30** - 667:4, 757:6, 757:8, 820:8, 847:1, 895:1
**30-foot** - 895:6, 895:8
**30332** - 675:3

## 189

**189** - 672:25, 888:9
**19** - 667:5, 667:6, 774:17, 900:24
**1980** - 798:12
**1983** - 814:24, 899:24, 903:1, 903:10, 903:14, 903:19, 904:3, 904:6, 907:20, 908:1, 909:3, 909:7, 909:8, 912:1, 914:13, 918:12
**1988** - 705:23
**1991** - 708:12
**1994** - 706:25, 740:15
**1996** - 705:24, 706:6
**1997** - 706:6
**1999** - 707:9, 708:12
**1:00** - 797:16, 797:17

## 31

**31** - 706:6, 706:8, 734:4
**310** - 733:19
**33/100** - 831:24
**338,850** - 734:17
**37** - 667:6, 685:12, 694:15, 694:19, 719:1
**39** - 766:7, 782:3
**397** - 899:21
**3:o6-cv-2950** - 666:4

## 4

**4** - 666:9, 667:5, 667:24, 667:25, 831:13
**40** - 771:4, 798:10, 851:6
**41** - 667:5, 667:6
**414** - 910:8
**419** - 666:16, 666:20, 666:22, 901:22
**42** - 903:1, 903:10, 904:6
**43** - 667:4, 668:17, 668:18, 668:25, 669:2, 669:16
**43528-1844** - 666:19
**43537** - 666:15
**43624** - 666:22
**45** - 667:6
**458** - 901:22
**467** - 917:16
**49** - 688:5
**4:30** - 919:24

## 5

**5** - 667:22, 667:24, 668:5
**5,000** - 684:18, 684:20, 685:2
**50** - 724:3, 724:4
**500-foot** - 873:12
**520** - 899:21
**54** - 791:7, 807:18
**55** - 667:6
**56** - 667:6
**58** - 667:6
**59** - 667:6
**596** - 910:8

## 6

**6** - 667:5
**6.1** - 782:2
**6.1239** - 782:4
**6.25** - 890:19, 890:21
**6.30** - 780:4
**6.5** - 780:20
**6.6** - 780:10, 780:17, 780:20, 869:4
**6.60** - 780:6, 780:16, 782:1, 782:12
**6.65** - 779:11, 779:12
**60** - 671:9, 672:11, 846:17, 875:2, 885:4
**600** - 757:2
**602** - 910:8
**61** - 671:9, 672:11, 701:9
**612.39** - 869:4
**613.06** - 868:25
**615** - 755:22
**618** - 779:17
**618.99** - 779:10, 869:2, 869:4
**62** - 734:2
**624** - 755:22
**66** - 789:2
**66-inch** - 786:3, 788:18, 858:13, 878:5, 879:21
**674** - 921:3
**680** - 921:5
**698** - 921:7
**699** - 921:9

**7**

**7** - 667:6, 795:1, 810:21, 833:8, 900:8, 900:11
**70** - 875:2
**701** - 921:11
**7050** - 666:19
**709** - 666:18
**721** - 921:13
**729** - 921:15
**731** - 921:17
**739** - 921:19
**749** - 921:21
**762** - 921:24
**764** - 922:1
**766** - 922:3
**784** - 922:5
**795** - 922:7
**797** - 922:9

**8**

**8** - 667:6, 900:13
**80** - 734:12
**801** - 917:17
**807** - 922:11
**812** - 922:13
**813** - 922:15
**814** - 922:17
**83** - 667:5, 889:11, 889:17, 890:4, 891:21
**836** - 922:19
**84** - 667:5, 890:8, 891:20
**843** - 922:21
**844** - 922:23
**846** - 922:25
**854** - 923:3
**861-7800** - 666:20
**863** - 923:5
**874** - 923:7
**88** - 887:16, 891:22
**884** - 923:9
**885** - 923:11
**89** - 887:16, 891:22
**897-6500** - 666:16
**8:00** - 886:23, 886:24, 887:2, 887:6, 887:8, 887:9
**8:24** - 667:1

**9**

**9** - 667:5, 690:11, 690:13, 696:4, 741:13, 742:18, 742:19, 743:1, 754:12, 894:6
**90** - 730:2, 773:19, 773:20, 813:11
**91** - 667:13, 667:21, 668:18, 737:15, 737:18
**92** - 668:6, 668:13, 737:19, 738:8, 739:3
**93** - 895:19, 898:2
**95** - 667:6
**97** - 667:6, 669:17
**97a** - 669:17, 669:21

**A**

**A1** - 893:13, 893:17
**A13** - 789:10
**abandon** - 867:5, 876:20
**abandoned** - 697:12, 780:8, 806:7, 865:25, 867:4, 874:13, 876:13, 876:15, 877:12, 884:2, 884:23, 885:3, 885:5, 885:17, 885:18
**abbreviated** - 847:4
**abide** - 791:11
**ability** - 915:17
**able** - 704:14, 711:5,

718:3, 742:4, 745:2, 778:4, 802:24, 804:10, 822:22, 824:1, 824:15, 824:16, 829:9, 830:23, 831:10, 835:4, 867:14, 868:12
**above-entitled** - 920:5
**absolute** - 685:24
**Absolutely** - 715:6, 891:11, 893:8
**absolutely** - 688:18, 694:5, 728:20, 814:2, 891:5, 892:13
**absorbed** - 715:4
**Absorption** - 715:2
**absorption** - 715:3
**abut** - 709:23, 809:12
**abuts** - 692:20
**abutted** - 794:7, 794:10
**abutting** - 709:24
**acceptable** - 894:12
**accepted** - 712:23, 800:17
**accessible** - 800:22, 800:24
**accommodation** - 872:7
**accomplish** - 799:14, 800:8
**according** - 717:7, 832:21, 847:8
**account** - 711:25, 723:2, 730:23, 744:8, 752:6, 761:22, 890:8
**accounted** - 752:8
**accumulation** - 915:20
**accuracy** - 813:18, 896:2
**accurate** - 741:10, 811:21, 812:4, 836:24, 837:20, 843:13, 843:15, 846:2, 895:7, 895:25
**accurately** - 673:5, 845:15
**acetate** - 830:9
**acknowledge** - 808:9, 808:19, 912:15
**acknowledged** - 827:20, 870:19
**act** - 912:21
**action** - 729:15
**actionable** - 902:19
**actions** - 889:21, 900:10, 915:1
**active** - 690:4, 853:15, 854:5, 855:22, 884:23
**activities** - 905:5
**activity** - 705:17, 705:18, 729:19, 911:9
**actual** - 757:4, 767:5, 822:5, 826:18, 828:2, 834:5, 835:19, 880:13, 891:8, 901:25
**add** - 711:16, 736:14, 736:17, 899:18
**added** - 674:1, 735:13, 736:21
**addition** - 908:4
**additional** - 824:18, 905:11
**address** - 673:21, 674:8, 903:15, 909:3
**addressed** - 901:11
**addressing** - 916:11
**adjacent** - 692:16
**adjoining** - 677:16, 829:14
**Adjourned** - 919:24
**administration** - 672:4
**admissibility** - 895:11
**admission** - 667:2, 667:4, 669:16, 669:20, 669:22, 671:5, 700:15, 885:21, 898:10
**admit** - 895:12, 895:15
**admitted** - 667:11, 668:20,

737:18, 738:16, 917:3
**adult** - 798:6
**advanced** - 908:13
**advertised** - 683:4
**advertising** - 682:17
**advisement** - 913:24
**affected** - 717:5, 720:13, 727:18, 732:17, 915:9, 915:12
**affects** - 676:8, 747:10
**affiliated** - 740:14
**afield** - 758:5
**afternoon** - 687:11, 814:7, 862:15, 862:18
**agents** - 910:23, 913:9
**ago** - 705:22, 719:20, 752:25, 766:16, 839:6, 875:3
**agree** - 670:18, 671:24, 682:21, 693:24, 727:22, 754:10, 762:14, 762:17, 764:6, 805:8, 807:13, 833:25, 879:6, 879:8, 879:11, 880:20, 919:20
**agreed** - 667:7, 686:18, 819:14, 889:7
**ahead** - 706:21, 744:6, 769:5, 853:9, 887:7, 903:16, 908:11
**aid** - 767:15
**air** - 880:18
**Airport** - 745:22, 747:2
**alarming** - 680:4
**allegation** - 802:17
**alleged** - 783:19, 832:20, 874:23
**allegedly** - 711:3, 717:20
**alleging** - 820:10
**Allen** - 814:9
**allotted** - 871:13, 871:20
**allow** - 736:1, 738:16, 745:24, 747:13, 757:22, 758:1, 758:2, 759:2, 792:21, 841:13, 897:24
**allowed** - 718:20, 872:5, 873:1, 896:3, 898:2
**almost** - 684:14, 780:5, 816:20, 825:12, 830:5, 831:24, 873:11
**alone** - 690:25
**alter** - 738:15
**Amendment** - 916:15
**amount** - 712:13, 712:19, 720:3, 723:1, 747:9, 752:9, 762:14, 762:20, 917:20
**amounts** - 725:9, 746:2, 746:23
**analogy** - 884:5, 884:7, 884:22, 885:2, 916:4
**analysis** - 755:6
**analyze** - 718:2
**analyzing** - 777:2
**angle** - 813:11, 832:10
**annual** - 712:11, 713:12, 716:20, 732:23
**answer** - 682:20, 695:20, 715:16, 715:20, 721:1, 732:11, 747:13, 750:16, 750:19, 754:4, 755:3, 755:11, 759:10, 770:4, 784:10, 821:15, 831:18, 838:8, 841:12, 841:14, 842:17, 844:24, 852:21, 861:25, 869:19, 871:17, 872:6, 872:13, 876:19, 882:11, 892:18
**Answer** - 841:7
**answered** - 770:3, 784:5, 793:5, 837:3, 838:19, 838:22, 881:1
**anticipation** - 726:17

**Anytime** - 691:7
**anyway** - 831:19, 870:11, 877:18, 897:22, 911:25
**Anyway** - 752:21
**apartment** - 728:14
**appeal** - 888:17, 888:20, 888:23
**Appeals** - 908:7
**appear** - 853:20
**Appearances** - 666:12
**appeared** - 691:21, 697:25
**appellate** - 888:25
**applicable** - 907:10
**applied** - 758:17, 814:18
**applies** - 898:22, 907:10, 917:13
**apply** - 712:11, 712:22, 800:7
**applying** - 799:13
**appraisal** - 684:1, 701:14, 701:23, 701:25, 702:16, 703:12, 703:21, 704:6, 705:3, 707:9, 713:9, 719:6, 734:19, 735:9, 735:12
**Appraisal** - 702:17
**appraisals** - 702:25
**appraise** - 681:22
**appraised** - 704:25, 713:7
**appraiser** - 669:25, 701:11, 701:19, 702:3, 891:17
**appraising** - 702:14, 710:10, 713:1
**approach** - 700:21, 768:25, 862:9, 867:19
**appropriate** - 691:2, 836:19, 890:16, 902:21, 904:8, 909:20, 910:13
**appropriation** - 917:19
**approved** - 758:20
**approximate** - 839:11, 869:17
**April** - 676:7, 718:15
**arborist** - 723:8, 725:3, 761:14
**Arcadia** - 768:17, 768:18, 768:21, 774:3, 785:7, 809:9, 816:1, 870:17
**architectural** - 740:4, 766:10
**area** - 669:6, 677:5, 680:13, 683:13, 684:24, 692:11, 692:25, 695:4, 695:9, 695:10, 695:11, 697:23, 697:24, 709:17, 711:2, 717:14, 735:24, 736:2, 744:2, 746:13, 747:1, 752:2, 756:5, 756:10, 759:25, 763:11, 768:11, 773:9, 776:5, 777:14, 783:22, 787:7, 791:4, 791:23, 792:6, 795:4, 797:2, 798:24, 799:21, 801:16, 801:18, 802:21, 818:7, 819:3, 819:6, 819:7, 820:22, 823:17, 824:2, 824:22, 829:12, 831:21, 832:7, 834:22, 854:3, 861:18, 864:23, 871:8, 871:14, 873:8, 873:10, 876:24, 880:17, 884:25, 917:4, 919:19
**areas** - 684:22, 711:1, 792:13, 806:15
**argue** - 670:12, 890:22, 900:6, 903:7, 903:16, 908:13
**argued** - 912:15
**arguing** - 907:4, 911:8
**argument** - 727:12, 886:13, 892:11, 893:1, 898:20, 899:21, 900:2,

900:21, 902:3, 902:4,
902:17, 902:22, 904:18,
907:12, 908:10, 911:10,
911:20, 913:6
   **arguments** - 862:19,
886:7, 898:7, 898:23,
902:23, 903:2, 912:9, 913:20
   **Armstrong** - 910:15
   **arose** - 848:25
   **arrived** - 822:20, 851:15
   **arrow** - 897:25
   **arrowheads** - 741:24,
742:14
   **article** - 890:21
   **as-built** - 868:16
   **ascertained** - 831:22
   **ascribed** - 891:17
   **aside** - 791:1
   **asserted** - 898:19, 903:11
   **assigned** - 779:8
   **assisted** - 803:2
   **associate** - 833:5
   **associated** - 736:24
   **Associates** - 666:17,
740:2, 740:3, 810:22
   **association** - 740:16
   **assume** - 670:19, 715:4,
749:11, 755:19, 759:8,
833:2, 852:2, 867:13
   **Assume** - 750:4, 750:8
   **assumed** - 826:14, 867:11
   **assumedly** - 824:22
   **assumes** - 753:20, 759:7
   **Assumes** - 759:5
   **assuming** - 685:19, 696:7,
709:22, 837:14, 851:10
   **assumption** - 713:12,
750:14, 756:11, 834:11
   **assumptions** - 716:21,
716:22
   **assurance** - 757:21
   **attempt** - 793:11
   **attempting** - 894:22
   **attention** - 717:25, 721:6,
738:21, 749:9, 821:1, 859:6,
874:11
   **attic** - 685:2
   **attorney** - 750:25, 836:18
   **attorneys** - 681:3
   **attractive** - 724:11
   **attributable** - 889:14,
889:15
   **audible** - 905:20
   **August** - 768:1, 786:11,
799:5, 855:5
   **authorities** - 899:19,
900:3, 901:14, 901:20,
903:23
   **authority** - 694:19, 859:2,
859:5, 901:12, 904:21,
905:22
   **Authority** - 900:24
   **authorized** - 904:11
   **auto** - 816:4, 816:9, 816:12
   **availability** - 761:9
   **available** - 682:13, 682:15,
683:16, 683:18, 707:10,
710:21
   **Avenue** - 666:21
   **average** - 709:1, 709:3,
744:25
   **award** - 891:3
   **aware** - 672:5, 672:7,
682:5, 683:9, 692:11,
692:14, 693:23, 694:22,
696:13, 696:17, 725:3,
726:3, 726:5, 751:3, 751:6,
793:23, 802:17, 820:23,
832:13
   **awful** - 760:13

## B

   **B1** - 893:14
   **Babcock** - 767:21, 774:25,
775:15, 776:17, 784:15,
793:20, 799:16, 809:2,
813:24, 814:5, 814:9,
828:11, 830:19, 836:5,
843:4, 843:6, 844:19,
894:20, 922:17, 922:19,
922:21, 922:23
   **bachelor** - 863:16
   **bachelor's** - 740:10
   **background** - 675:1,
681:12, 701:13, 701:17,
766:6, 798:4, 798:18,
846:18, 863:9
   **backhoe** - 789:1, 842:15,
842:22
   **backing** - 705:11, 706:7
   **backwards** - 821:21
   **backyard** - 677:18,
677:19, 680:7, 685:10,
687:15, 689:11, 689:20,
693:16, 696:7, 718:13,
728:8, 729:4, 902:6, 916:6
   **bad** - 810:20, 867:2
   **Bahret** - 666:17, 667:15,
668:1, 668:9, 668:15,
668:22, 669:5, 669:11,
669:17, 669:24, 670:21,
670:23, 671:7, 671:15,
671:19, 672:3, 672:21,
673:3, 673:19, 677:10,
678:6, 680:20, 680:23,
685:14, 689:16, 690:21,
690:25, 698:8, 698:15,
698:25, 699:7, 700:11,
700:19, 701:3, 715:22,
715:23, 719:7, 719:10,
719:19, 719:22, 721:5,
721:10, 722:7, 725:5,
725:15, 727:11, 729:2,
731:11, 735:22, 736:3,
737:4, 738:21, 739:23,
746:1, 746:12, 746:17,
747:14, 749:19, 750:11,
751:15, 752:19, 753:20,
755:1, 758:3, 759:5, 762:5,
762:8, 764:16, 765:19,
766:2, 769:4, 769:10, 770:6,
770:7, 777:10, 777:18,
777:20, 781:3, 781:11,
781:12, 784:17, 785:19,
793:2, 793:4, 793:7, 795:17,
795:20, 797:12, 797:21,
807:9, 809:7, 811:25, 812:3,
813:1, 813:13, 813:23,
814:6, 824:14, 831:18,
832:12, 835:25, 837:1,
838:18, 840:8, 842:2, 843:2,
843:5, 844:16, 844:23,
846:12, 852:18, 852:22,
854:10, 861:24, 862:6,
862:9, 863:1, 863:4, 864:1,
867:23, 872:10, 872:15,
874:4, 875:8, 876:18,
879:18, 880:22, 881:6,
881:14, 881:16, 884:20,
885:23, 887:4, 887:19,
887:21, 888:3, 888:20,
889:2, 889:5, 889:8, 889:13,
889:22, 890:10, 890:14,
890:17, 891:5, 891:11,
891:15, 891:25, 892:5,
892:23, 893:2, 893:6,
893:11, 893:25, 894:5,
894:12, 894:18, 895:9,
895:13, 896:7, 897:13,

897:20, 912:13, 918:17,
918:24, 919:6, 921:6,
921:10, 921:12, 921:16,
921:20, 921:25, 922:4,
922:8, 922:10, 922:14,
922:18, 922:22, 923:2,
923:6, 923:10
   **balance** - 798:21
   **ballooned** - 845:3
   **ballpark** - 755:8, 755:9,
760:20
   **bank** - 728:11, 749:15
   **bar** - 773:15, 773:16
   **barbecue** - 916:5
   **Barkan** - 666:13
   **barren** - 818:15
   **barrier** - 752:17, 830:1
   **bars** - 816:15
   **base** - 716:14, 766:23,
816:20
   **Based** - 753:12, 770:22
   **based** - 713:14, 713:15,
718:4, 754:5, 769:17, 771:3,
803:4, 840:22, 866:25,
899:3, 899:19, 904:15, 908:3
   **basement** - 684:25, 685:1
   **basin** - 687:11, 696:15,
696:21, 742:20, 742:22,
742:24, 742:25
   **basins** - 696:14, 696:18,
742:13, 742:16, 745:7
   **basis** - 705:19, 732:23,
758:10, 818:2, 890:10,
894:22, 899:12, 902:2
   **Basis** - 667:14
   **Bates** - 688:25, 689:5,
697:6, 697:16, 707:6,
786:11, 847:22, 876:5,
876:24, 877:2
   **bear** - 918:9
   **bearing** - 769:15, 825:14,
825:16, 825:25, 826:1,
826:6, 826:9, 826:21
   **bearings** - 826:2, 831:24
   **became** - 672:4, 802:13,
802:16, 819:7, 820:23,
824:19, 845:2
   **become** - 814:15, 814:21
   **bed** - 853:15, 865:25
   **beds** - 854:4
   **began** - 704:7, 710:20,
719:18, 848:13, 866:1
   **begin** - 670:24, 690:14,
709:21, 764:3, 841:12
   **beginning** - 670:4, 768:13,
851:18, 882:22, 886:20
   **begins** - 841:14
   **behalf** - 674:18, 681:2,
899:2, 901:4
   **behind** - 689:5, 706:4,
709:10, 728:11, 743:25,
744:2, 755:13, 760:6,
763:12, 763:24, 770:18,
773:10, 787:9, 789:14,
790:21, 791:17, 801:25,
807:3, 815:23, 820:22,
847:12, 848:17, 849:2,
859:13, 861:18, 871:14,
884:9
   **behold** - 796:24
   **belief** - 803:9, 803:12,
910:5
   **believes** - 806:10
   **Belmont** - 706:1, 707:12,
708:3, 708:8, 708:21, 709:7,
710:10, 716:14, 716:15
   **below** - 756:3, 756:4,
778:10, 780:15, 830:10
   **bench** - 719:14, 769:1,
867:20

   **Bend** - 707:3, 707:20,
708:22, 709:11
   **bends** - 858:15, 858:16
   **benefit** - 865:18
   **Bennett** - 766:4, 778:10
   **Berman** - 719:5, 726:20,
729:21, 731:5, 731:6
   **Berman's** - 720:4
   **best** - 726:22, 775:19,
811:12, 823:3, 839:10,
846:3, 915:12, 917:24
   **better** - 675:22, 758:13,
783:3, 843:8
   **Better** - 863:8
   **between** - 709:14, 714:11,
730:13, 742:24, 749:17,
755:23, 765:13, 774:2,
774:5, 776:23, 786:11,
787:14, 799:12, 806:12,
808:16, 829:10, 830:3,
837:21, 848:23, 853:15,
854:3, 854:4, 855:21,
864:25, 896:6, 917:18
   **beyond** - 682:22, 696:22,
774:19, 792:22, 807:14,
808:20, 812:18
   **bid** - 682:3, 682:6, 760:17
   **bidding** - 757:10
   **bids** - 682:5, 757:7
   **big** - 709:18, 723:21,
730:9, 759:19, 771:19,
772:13, 786:11, 878:5,
879:9, 897:7
   **bigger** - 709:11
   **biggest** - 709:11
   **Bill** - 670:25, 731:5, 731:7
   **birch** - 717:11, 724:9,
724:22
   **bit** - 708:6, 718:14, 747:15,
752:25, 757:5, 758:4,
760:19, 787:9, 814:2, 824:7,
863:22, 881:10, 884:1
   **blaming** - 837:10
   **blind** - 772:24
   **blinding** - 814:2
   **blowing** - 689:2
   **blowup** - 669:21
   **blue** - 772:19, 828:22
   **Blue** - 845:18
   **blueprint** - 833:9, 833:12
   **Board** - 899:20
   **board** - 667:22, 667:23,
751:9
   **boaters** - 771:12
   **Bob** - 667:7, 668:7,
680:23, 700:19, 706:21,
710:9, 715:24, 731:4, 736:4
   **boost** - 865:17
   **border** - 691:18, 801:15,
801:22, 812:14, 819:17,
828:2
   **bore** - 756:18
   **borrow** - 916:4
   **Bosgrove** - 723:14
   **boss** - 672:8, 775:15
   **bothered** - 882:22
   **bottom** - 743:3, 760:24,
774:9, 779:2, 779:5, 779:10,
779:12, 780:12, 780:14,
788:9, 805:7, 805:10, 810:5,
811:19, 868:14, 869:5,
869:7, 869:8, 869:11, 896:14
   **bought** - 671:1, 726:16
   **boundaries** - 767:18,
799:7
   **boundary** - 773:9, 774:3,
775:20, 776:12, 798:19,
798:22, 804:3, 913:2,
913:10, 913:12, 913:14
   **box** - 724:21

**boxes** - 677:5, 678:22
**bramble** - 824:6
**Brambles** - 818:11
**brambles** - 690:17, 723:9, 728:4, 728:7, 729:6, 729:7, 790:20, 821:13, 824:5, 897:8, 917:24
**brand** - 845:18
**break** - 672:16, 737:9, 862:14, 862:16, 865:5, 887:11
**briar** - 818:11
**Brick** - 908:6
**brief** - 798:25, 898:20, 909:11
**briefly** - 700:22, 701:12, 737:23, 863:10, 884:21, 916:11
**Briefly** - 795:17, 798:16, 843:2
**bring** - 672:22, 673:6, 711:23, 859:5, 891:4
**bringing** - 725:8
**brings** - 799:8, 864:9, 910:23
**broke** - 850:20
**broken** - 850:15
**brought** - 670:13, 752:15, 752:21, 776:20, 776:22, 803:24, 824:2, 829:11, 834:21, 835:13, 837:10, 848:13, 873:14, 874:11
**Brown** - 899:20
**brush** - 698:18, 723:9, 790:20, 791:3, 800:23, 825:4, 873:10, 897:8
**brushy** - 801:18
**Bs** - 893:19, 893:22
**bucks** - 734:17
**build** - 721:23, 752:17, 754:23, 759:3, 769:23
**builder** - 727:2
**builders** - 726:14, 727:1
**building** - 726:17, 726:19, 726:24, 727:5, 728:15, 742:9, 760:3, 760:4
**buildings** - 865:3, 865:4
**built** - 671:1, 708:2, 708:9, 868:16
**bulkhead** - 786:24, 853:9
**bulkheaded** - 751:24
**bulldozes** - 908:24
**bunch** - 803:24
**Bureau** - 745:21
**bus** - 887:5
**business** - 701:14, 701:15, 701:16, 701:19, 701:22, 746:20
**businesses** - 870:22
**buy** - 675:25, 676:14, 717:12, 858:11
**buyer** - 684:24
**buying** - 676:2

**C**

**Cad** - 776:20, 776:22, 816:4, 816:9, 816:12, 816:13
**calculate** - 778:2, 779:13, 795:8, 829:9
**calculated** - 717:14, 768:20, 819:18
**calculating** - 718:4
**calculation** - 720:23, 771:3, 880:13, 890:20
**calculations** - 711:13, 734:22, 768:16, 832:21, 840:18
**Cambridge** - 675:5, 675:6,

693:21, 693:22, 694:16, 698:6, 703:16, 704:11, 707:22, 713:4, 716:23, 729:19, 730:12, 730:13, 740:18, 741:6, 741:14, 743:23, 744:3, 744:5, 744:10, 744:12, 746:7, 746:10, 747:1, 748:12, 748:21, 749:14, 750:9, 753:24, 763:4, 763:8, 763:10, 770:18, 773:10, 773:14, 787:10, 790:21, 791:8, 792:15, 794:13, 799:22, 801:25, 802:6, 804:5, 804:19, 807:3, 808:2, 808:5, 808:10, 808:17, 809:13, 809:16, 810:3, 810:8, 810:14, 810:23, 815:23, 818:8, 819:1, 819:3, 820:11, 820:22, 822:2, 831:11, 841:2, 844:22, 847:12, 848:7, 848:17, 848:24, 849:2, 850:5, 856:3, 859:13, 861:18, 870:8, 870:14, 871:9, 871:14, 873:22, 881:25, 884:9, 911:4, 912:25
**Cambridge's** - 909:22
**camera** - 685:19
**cannot** - 833:2, 899:22
**capacity** - 755:4, 758:23, 759:14, 759:15, 815:21, 847:2
**car** - 707:25
**care** - 700:16, 849:9, 887:1
**career** - 701:18
**careers** - 701:21
**careful** - 793:10
**carry** - 702:2, 879:5
**cartesian** - 816:16
**Case** - 666:4
**case** - 671:3, 674:19, 700:14, 703:6, 703:10, 759:9, 783:15, 800:3, 819:11, 835:17, 847:11, 886:11, 886:16, 888:14, 889:15, 898:14, 898:19, 898:24, 899:1, 899:5, 899:15, 900:14, 900:23, 900:25, 901:4, 901:11, 901:18, 902:7, 902:9, 902:10, 903:12, 904:5, 904:9, 904:20, 904:21, 904:23, 907:10, 908:7, 909:12, 910:6, 910:7, 910:14, 910:21, 911:23, 912:10, 912:24, 913:6, 913:21, 914:1, 914:10, 914:24, 915:21, 916:16, 917:15, 917:21, 917:23
**cases** - 702:22, 778:21, 791:2, 898:24, 899:7, 899:12, 909:11, 910:8, 910:11, 911:18, 911:22
**cash** - 685:8, 711:23, 712:11, 712:15, 713:12, 716:20, 723:2, 733:12, 733:14
**cat** - 895:16
**catch** - 687:10, 696:14, 696:15, 696:18, 696:21, 742:12, 742:16, 742:20, 742:22, 742:24, 742:25, 745:7, 784:21
**caused** - 834:20, 901:11, 901:13, 909:14, 915:1
**causing** - 882:9, 884:10
**caution** - 892:24
**cautionary** - 886:8
**Cb** - 742:12

**Cd** - 887:18, 888:4
**Cds** - 887:22
**center** - 761:21, 787:23, 819:18, 821:19, 822:5, 823:14, 829:8, 869:10
**centimeter** - 771:18, 772:3, 772:12
**certain** - 670:6, 708:21, 758:21, 776:18, 777:3, 806:22, 806:23, 845:14, 901:7
**certainly** - 859:6, 889:24, 892:13, 913:9, 913:15, 913:18, 916:25, 917:1
**certainty** - 739:11, 760:12, 803:13, 830:24
**certification** - 836:15
**certifications** - 702:2
**certified** - 702:4
**certify** - 920:4
**cetera** - 723:3, 895:25
**chain** - 817:15
**challenge** - 908:3, 910:17
**chambers** - 887:12, 918:15, 919:19
**chance** - 672:13, 672:17, 716:4
**chances** - 763:17
**change** - 829:22, 829:23, 901:14
**changed** - 763:6, 796:22
**changes** - 711:6, 916:1
**changing** - 701:21
**characteristics** - 705:9
**charge** - 864:4, 864:6, 910:17, 918:16, 919:18, 919:21
**Charles** - 703:13
**Check** - 892:23
**check** - 707:24, 795:11, 795:13, 818:1, 833:18, 833:22, 842:16, 892:15
**checked** - 816:3, 817:5, 821:20, 845:20, 845:21
**checking** - 816:25
**chief** - 814:13, 814:15
**child** - 887:1
**children** - 676:12, 887:1
**children's** - 688:20
**chop** - 729:13, 897:10, 897:25
**chopped** - 834:6
**chose** - 706:24
**Christy** - 672:8, 782:25, 849:14, 859:7, 861:12, 863:3, 863:5, 864:3, 866:14, 871:19, 872:16, 873:20, 874:8, 884:19, 884:21, 885:10, 885:12, 923:5, 923:7, 923:9, 923:11
**Christy's** - 834:14
**Cincinnati** - 872:24, 904:2, 909:9, 910:6
**circle** - 782:2
**Circuit** - 900:23, 901:19, 905:22, 910:7, 914:16, 917:17
**circuit** - 910:10
**circumstances** - 820:3, 904:8, 917:15
**citation** - 910:16
**cited** - 901:20, 903:23, 905:21, 909:9, 910:9, 911:22, 914:24
**cites** - 917:21
**citing** - 910:15
**City** - 666:7, 671:17, 672:4, 672:7, 680:23, 681:2, 692:12, 703:10, 750:25, 751:22, 767:12, 767:25,

769:22, 784:24, 785:3, 785:6, 788:16, 788:23, 789:10, 790:18, 795:11, 799:4, 807:14, 807:16, 809:2, 811:2, 811:3, 814:13, 814:16, 814:17, 815:19, 819:14, 834:6, 838:6, 845:18, 846:24, 847:18, 848:3, 848:18, 855:12, 858:6, 858:19, 860:5, 861:22, 863:19, 864:3, 864:4, 864:22, 864:24, 865:2, 865:5, 872:17, 875:20, 877:1, 878:23, 879:13, 882:21, 897:6, 899:1, 899:2, 902:6, 902:13, 904:2, 904:11, 905:5, 907:6, 907:25, 908:6, 908:15, 908:24, 909:9, 909:13, 909:21, 912:24, 913:8, 915:25, 917:8
**City's** - 671:21, 831:9, 847:8, 859:6, 915:21
**civil** - 740:4, 740:7, 740:9, 740:11, 766:7, 766:10
**Civil** - 863:16
**claim** - 671:23, 832:14, 832:18, 900:19, 903:19, 904:19, 907:1, 907:2, 907:15, 907:20, 908:4, 914:13, 914:15, 915:24, 916:10, 916:11, 916:14, 918:11, 918:12, 918:13, 918:18
**claiming** - 891:7, 914:20
**claims** - 717:25, 812:6, 898:19, 900:9, 900:14, 902:5, 903:2, 903:10, 903:11, 903:14, 909:12, 909:16, 909:20, 909:22, 912:1, 916:16, 918:12
**clarify** - 753:4, 902:23
**class** - 781:8
**classes** - 846:21
**clause** - 900:18, 916:15, 916:20
**clay** - 761:3, 806:21
**clean** - 729:13, 867:14, 869:14
**cleaning** - 883:22
**clear** - 691:10, 707:8, 719:15, 780:19, 790:6, 790:7, 792:13, 819:17, 824:12, 825:9, 848:21, 904:9, 910:11, 916:17
**cleared** - 693:15, 802:13, 802:14, 821:3, 821:5, 827:19, 828:4, 849:4, 892:2
**clearer** - 886:18
**clearing** - 676:9, 693:16, 694:10, 768:11, 771:8, 789:13, 791:15, 791:22, 792:6, 794:14, 794:15, 794:22, 803:5, 803:17, 804:1, 807:3, 807:14, 808:14, 808:16, 808:20, 818:5, 819:4, 821:2, 821:14, 823:25, 824:5, 824:16, 826:13, 834:6, 835:4, 835:13, 839:8, 839:12, 839:21, 848:10, 848:12, 848:16
**clerk** - 674:12, 700:24, 739:18, 765:24, 814:3, 846:9
**Clerk-** 888:15
**Cleveland** - 908:6
**client** - 748:6, 846:6
**clients** - 747:20, 761:9
**clipped** - 869:8, 869:11
**clogged** - 877:17

**close** - 679:14, 684:15, 796:8, 833:16, 913:21, 913:25
**close-up** - 679:14
**closer** - 793:1
**Closer** - 697:6
**closest** - 691:14
**closing** - 727:12, 730:19, 886:6, 886:13
**coal** - 902:8
**collect** - 767:17, 776:13, 776:24, 856:7
**collected** - 776:16, 787:5, 808:25, 843:14
**collection** - 692:25, 773:4
**collective** - 907:25
**collectively** - 904:12
**collector** - 801:5, 819:22
**collectors** - 816:5, 818:1
**collects** - 720:18
**college** - 675:7, 766:9, 823:1, 846:20, 863:21
**College** - 847:17
**color** - 772:22, 772:24, 773:2
**colors** - 772:19
**Com** - 798:7
**coming** - 670:5, 677:6, 677:7, 677:8, 677:9, 677:11, 677:20, 678:4, 678:10, 678:11, 678:17, 679:16, 689:1, 689:4, 744:8, 750:9, 750:10, 752:7, 753:2, 753:3, 773:16, 851:7, 853:14, 853:24, 854:2, 883:6, 883:7
**comment** - 691:7, 695:16, 881:17, 892:25, 915:8
**comments** - 840:10, 912:4
**Commercial** - 681:14
**commercial** - 675:9, 701:24
**Commissioners** - 899:20
**common** - 684:10, 730:4, 759:18, 843:19
**commonly** - 712:25
**communicate** - 814:20, 878:11
**community** - 766:9
**companies** - 798:20, 902:8
**Company** - 811:6
**company** - 740:8, 789:13, 827:2, 831:4
**comparables** - 670:13
**compare** - 704:4, 729:19
**Compared** - 756:19
**compared** - 707:22, 729:21
**comparing** - 684:6, 709:8
**comparison** - 705:19
**compensable** - 917:12
**compensated** - 917:2
**compensation** - 910:20, 910:22, 916:20
**compile** - 783:25
**complain** - 909:15
**complained** - 694:9, 838:3, 838:6
**complaint** - 783:19, 839:21, 891:23
**complaints** - 887:17
**complete** - 776:8, 878:9
**completed** - 684:23, 818:2
**completely** - 709:12, 825:15, 826:20, 852:4, 852:10
**completion** - 730:9
**compromise** - 896:13
**computer** - 801:5, 816:13, 816:21, 816:24

**computers** - 816:16, 898:6
**concede** - 916:21
**concept** - 712:3, 712:22
**concern** - 704:10, 739:1, 861:17
**concerned** - 878:19
**concerning** - 822:15
**concerns** - 715:24
**conclude** - 862:18
**concluded** - 898:10
**conclusion** - 803:15, 804:10, 834:1, 884:10, 898:13, 912:10
**conclusions** - 704:23, 708:18, 710:5, 716:1, 716:6, 716:7, 822:20, 822:21, 823:8
**Concrete** - 788:5, 788:6
**concrete** - 779:3, 788:7, 806:19, 806:21, 806:24, 807:19, 807:22
**condition** - 676:10, 773:18, 783:5, 788:3, 852:7, 866:23, 867:2, 874:11, 901:2
**conducive** - 676:11
**conduct** - 915:21
**conducted** - 709:20
**conference** - 903:17, 919:19
**confirmed** - 702:15
**conflict** - 774:2, 792:19, 804:24, 805:1, 822:2
**Conflict** - 774:5
**confuse** - 875:13
**confused** - 881:12
**confusion** - 738:10, 739:2, 890:6
**connected** - 753:4
**connecting** - 759:12
**connection** - 865:13
**consider** - 736:23, 906:4
**considered** - 906:11
**considering** - 917:3
**consistent** - 800:1, 891:19, 899:15
**consistently** - 738:7
**constitute** - 900:10, 901:2, 901:16, 901:23, 901:24, 906:12, 917:11
**constitutes** - 911:9
**constitution** - 905:23, 906:13, 914:17
**Constitution** - 915:25, 918:2
**constitutional** - 903:2, 903:11, 903:14, 903:19, 908:3, 910:17
**construct** - 748:5, 889:19, 915:17
**constructed** - 773:17, 809:15
**construction** - 684:12, 741:5, 741:13, 742:7, 742:10, 748:8, 770:11, 798:22, 819:13, 847:5, 848:6, 848:14, 864:7, 866:1, 866:10, 867:7, 870:15, 870:16, 870:23, 871:2, 871:3, 871:21
**Construction** - 847:3
**consult** - 723:8, 872:19
**Consult** - 770:15
**consultant** - 799:13, 815:25, 820:21, 827:14, 834:7
**consultation** - 870:4
**consulted** - 757:25
**consulting** - 798:21
**contained** - 744:13
**contains** - 888:4
**contended** - 897:7

**contention** - 912:7
**context** - 688:10, 916:12, 918:19
**continued** - 766:8, 916:2
**continues** - 678:16
**contour** - 828:23
**contours** - 743:11, 743:13, 743:19, 743:21, 776:8
**contract** - 669:18, 669:19, 726:19, 726:24, 727:5
**contractor** - 768:19, 788:16, 807:15, 809:20, 831:9, 847:7, 868:13, 878:11, 893:7
**contractor's** - 757:7
**contractors** - 848:23
**contracts** - 726:18
**contrary** - 803:15, 866:7
**contributes** - 739:1
**control** - 766:24, 769:12, 769:18, 769:19, 770:19, 770:22, 771:1
**controls** - 775:17
**conversation** - 673:24, 689:13, 689:19, 800:11
**converts** - 716:20
**conveyed** - 768:23
**cookies** - 898:6
**coordinate** - 816:17, 816:19, 817:9
**coordinated** - 772:6
**coordinates** - 770:25, 816:6, 816:17
**coordinating** - 799:12
**copies** - 809:8, 893:15, 899:7, 908:8
**copy** - 672:22, 711:4, 718:23, 741:10, 776:25, 833:9, 833:10, 833:12
**corn** - 818:19
**corner** - 751:5, 781:19, 791:8, 794:4, 832:25, 841:2, 841:20
**corners** - 822:1
**Corps** - 814:24, 814:25, 815:1
**correct** - 676:20, 681:11, 687:2, 687:21, 690:15, 693:10, 693:17, 694:7, 697:13, 704:19, 721:16, 721:19, 722:25, 725:25, 726:11, 727:23, 728:1, 735:11, 735:18, 743:22, 745:3, 752:7, 753:10, 754:18, 757:18, 757:23, 760:1, 761:20, 762:22, 763:6, 765:5, 767:23, 777:23, 782:7, 784:16, 787:9, 789:19, 790:10, 793:21, 794:25, 795:22, 796:1, 797:9, 800:13, 813:12, 817:6, 840:4, 841:23, 841:25, 842:7, 844:4, 845:22, 846:4, 850:15, 856:5, 860:17, 863:16, 864:17, 865:20, 866:8, 869:22, 869:23, 872:25, 874:14, 874:17, 874:20, 874:24, 874:25, 877:14, 877:15, 878:25, 879:20, 879:22, 882:1, 882:2, 884:6, 884:15, 884:23, 885:1, 885:18, 885:19, 892:16, 899:8, 905:9, 906:20, 920:4
**Correct** - 681:13, 684:22, 686:24, 693:11, 726:2, 733:5, 764:15, 767:10, 774:1, 780:9, 780:16, 788:25, 800:10, 803:22,

804:16, 810:16, 812:25, 814:14, 830:17, 836:16, 839:20, 840:5, 843:24, 849:19, 850:16, 854:9, 856:1, 866:18, 884:16, 884:24, 889:8
**corrected** - 906:19, 906:21
**correctly** - 743:1, 893:16, 918:18
**corridor** - 831:3
**cost** - 717:9, 717:19, 722:23, 728:2, 733:3, 748:3, 748:8, 754:23, 755:16, 760:10, 760:21, 858:5, 858:9, 858:22, 869:17, 889:19, 911:11, 911:18
**costly** - 756:18, 756:19
**costs** - 757:4, 761:6, 890:1
**Counsel** - 727:15, 781:7, 793:10, 873:1, 887:6, 887:11
**counsel** - 667:11, 667:12, 671:25, 673:14, 673:23, 695:16, 719:8, 738:17, 762:9, 781:8, 840:10, 864:12, 881:17, 887:2, 888:16, 893:16, 899:4, 912:15
**counting** - 832:19
**county** - 728:10, 729:13, 729:17, 766:12, 766:18, 794:2
**County** - 706:15, 714:15, 714:19, 755:7, 766:15, 848:3, 849:16, 850:1, 899:20
**couple** - 676:19, 682:11, 691:1, 714:1, 719:1, 745:10, 746:3, 756:3, 762:5, 798:5, 798:25, 824:17, 839:1, 899:19, 907:7
**course** - 740:16, 746:20, 849:19
**courses** - 798:6
**Court** - 666:1, 666:21, 667:10, 667:14, 667:19, 667:24, 668:3, 668:13, 668:20, 669:1, 669:8, 669:13, 669:20, 670:2, 670:7, 670:10, 670:15, 670:22, 671:4, 671:13, 671:24, 672:6, 672:15, 673:1, 673:4, 673:10, 673:20, 674:14, 677:14, 678:7, 678:25, 679:21, 679:25, 680:17, 683:1, 685:17, 691:1, 695:23, 698:10, 699:14, 699:20, 699:23, 700:2, 700:12, 700:23, 702:11, 714:20, 715:15, 715:18, 719:13, 719:21, 721:1, 721:4, 721:12, 725:6, 725:13, 727:14, 731:10, 732:11, 735:21, 735:23, 737:6, 737:13, 738:13, 738:24, 739:14, 739:19, 745:19, 745:23, 746:14, 746:19, 747:5, 747:12, 748:25, 749:2, 749:21, 750:14, 751:10, 752:11, 752:20, 754:1, 755:3, 758:4, 758:8, 758:13, 759:7, 762:4, 765:16, 765:21, 769:2, 769:9, 770:1, 772:11, 777:11, 777:16, 780:25, 781:7, 781:15, 784:5, 784:9, 787:12, 787:17, 793:5, 793:9, 795:16, 797:14, 798:1, 803:11, 811:24, 813:14, 813:21, 829:2, 832:11, 836:2, 837:3, 837:7,

838:19, 838:22, 840:9,
841:8, 842:4, 844:24, 846:8,
852:20, 859:17, 861:25,
862:7, 862:10, 862:12,
862:23, 867:21, 868:5,
868:7, 869:19, 871:17,
872:11, 874:5, 875:11,
876:19, 879:19, 881:1,
881:9, 881:15, 883:24,
885:8, 885:20, 885:24,
886:1, 886:24, 887:6,
887:10, 887:11, 887:25,
888:12, 888:18, 888:22,
889:1, 889:6, 889:9, 889:16,
892:24, 890:3, 890:12,
890:15, 891:13, 891:19,
892:4, 892:6, 892:12,
892:24, 893:8, 893:15,
893:20, 893:23, 894:3,
894:7, 894:15, 895:10,
895:15, 895:18, 895:23,
896:18, 896:25, 897:10,
897:15, 897:23, 898:5,
898:9, 898:16, 898:18,
899:6, 899:7, 899:10,
899:21, 900:13, 900:17,
900:19, 900:25, 901:1,
901:21, 902:25, 903:4,
903:9, 903:13, 903:24,
904:14, 905:8, 906:10,
906:18, 906:25, 907:11,
907:22, 908:7, 908:9,
908:18, 909:7, 910:10,
910:18, 911:3, 911:14,
912:9, 912:18, 912:22,
913:1, 913:7, 913:20,
913:23, 914:4, 914:6, 914:9,
917:12, 917:21, 918:22,
919:1, 919:11, 919:18
  **court** - 674:3, 676:22,
702:24, 887:9, 888:25
  **Court's** - 900:7, 900:8,
912:5
  **courtroom** - 674:11,
674:13, 737:12, 887:13
  **courts** - 910:20
  **cover** - 804:18, 838:15,
895:17
  **covered** - 694:5, 696:14,
696:15, 696:17, 699:2,
824:24, 834:7, 842:3, 842:5,
842:10
  **covering** - 834:19, 837:11
  **covers** - 694:6, 739:4
  **Cox** - 900:23, 901:11,
902:1, 902:16, 904:20,
905:21, 914:24
  **Craig** - 872:16, 873:7
  **Crandall** - 821:3, 846:11,
846:15, 854:13, 854:15,
866:12, 875:22, 878:4,
878:24, 879:1, 923:1, 923:3
  **create** - 680:8, 755:14,
800:25, 809:1, 809:2,
829:25, 901:23
  **created** - 894:19, 894:20
  **creation** - 805:20
  **credibility** - 812:8, 812:10
  **credible** - 919:8
  **Creek** - 707:3, 707:20,
708:22, 709:11
  **creek** - 728:15, 729:11,
729:12, 876:6
  **crew** - 775:10, 817:7,
821:7, 821:9, 824:21, 834:6,
834:13, 834:19, 834:20,
839:25, 840:4, 841:1,
841:19, 845:9, 851:16,
851:19, 868:20
  **crews** - 817:11, 839:23,

848:18, 865:5, 871:9
  **crick** - 728:11
  **cross** - 749:2, 826:5,
849:7, 851:6, 912:12
  **Cross** - 680:19, 721:12,
721:14, 749:5, 784:19,
807:11, 836:5, 854:13,
874:8, 921:5, 921:13,
921:21, 922:5, 922:11,
922:19, 923:3, 923:7
  **cross-examination** -
912:12
  **Cross-examination** -
680:19, 721:14, 749:5,
784:19, 807:11, 836:5,
854:13, 874:8, 921:5,
921:13, 921:21, 922:5,
922:11, 922:19, 923:3, 923:7
  **crossed** - 851:20, 913:2
  **crossing** - 825:13
  **crossover** - 764:6, 781:24,
782:9, 806:7, 835:18, 851:9,
858:20, 865:21, 867:11,
867:13, 869:21, 873:20,
874:20, 874:21
  **Crr** - 666:21, 920:9
  **crumbling** - 827:23
  **Cruz** - 902:7, 904:23,
907:9, 910:14
  **Csx** - 912:16
  **cubic** - 760:21, 760:22,
761:4, 761:11, 761:20,
761:21, 761:23, 761:25,
771:18
  **cued** - 893:14
  **cut** - 669:9
  **cure** - 758:6, 911:18,
911:21, 911:24
  **current** - 685:6, 736:17,
889:20, 889:22
  **cut** - 682:10, 687:19,
694:1, 698:6, 722:21,
725:21, 727:9, 728:5, 728:8,
728:10, 731:19, 733:1,
738:11, 738:25, 751:22,
752:16, 753:3, 760:7,
764:21, 785:21, 789:22,
790:11, 791:5, 803:21,
824:5, 838:6, 870:2, 877:18,
896:14, 913:9, 913:12,
913:14, 919:10
  **cutting** - 690:20, 690:22,
722:13, 727:19, 738:20,
756:19, 784:25, 785:17,
789:12, 789:18, 790:16,
873:20, 896:16
  **cutting/removal** - 917:23

**D**

  **dad** - 693:9, 693:24,
694:15, 694:19, 696:13
  **damage** - 692:8, 723:5,
727:25, 890:19, 891:8,
892:3, 908:1, 911:19
  **damage** - 728:19
  **damages** - 671:23, 889:14,
889:15, 890:11, 890:21,
891:1, 902:19, 909:15, 917:2
  **damn** - 901:14
  **dangerous** - 879:17
  **dappled** - 825:4
  **dark** - 743:8
  **darn** - 686:22, 735:2
  **dash** - 742:5, 876:8
  **data** - 708:16, 710:11,
710:19, 714:1, 767:17,
773:4, 776:13, 776:15,
776:24, 800:12, 801:5,
801:7, 812:24, 816:3, 816:5,

816:10, 816:19, 817:1,
818:1, 819:21, 833:18,
833:22, 843:14, 843:16,
843:23
  **database** - 819:21
  **Date** - 920:9
  **date** - 674:1, 685:21,
705:1, 714:2, 714:11,
714:12, 777:18, 777:21,
785:16, 785:23, 785:24,
786:1, 786:6, 788:13,
805:24, 805:25, 836:15,
839:9, 839:11, 839:13,
892:18
  **dated** - 894:25
  **dating** - 845:25
  **datum** - 779:19, 779:21
  **Davis** - 666:14, 667:2,
667:12, 667:17, 667:22,
667:25, 668:6, 668:25,
669:3, 670:12, 672:12,
887:14, 887:20, 898:4,
904:1, 904:22, 906:2,
906:15, 906:21, 907:3,
907:16, 907:24, 908:12,
908:23, 910:14, 911:6,
911:13, 911:17, 913:8,
913:14, 913:18, 914:5, 914:8
  **day-to-day** - 817:24,
817:25, 818:1, 847:10
  **days** - 824:17
  **de** - 669:9, 878:8
  **dead** - 730:16
  **deal** - 671:11, 686:14,
739:6, 743:25, 760:18
  **dealing** - 703:16, 767:6,
771:21
  **deals** - 890:25
  **dealt** - 792:9, 914:25
  **Dean** - 849:14, 849:15,
849:16, 855:17
  **debris** - 852:4
  **December** - 685:12,
685:23
  **decide** - 859:7, 888:18
  **decision** - 713:21, 852:9,
852:14, 853:8, 870:1, 877:6,
877:9, 877:13, 877:18,
878:8, 904:7, 904:9, 904:10,
904:12, 907:25
  **decisions** - 903:4
  **declined** - 729:25, 730:15
  **declining** - 716:15, 716:16
  **deduct** - 732:16
  **Deep** - 856:21
  **deep** - 694:4, 698:17,
749:17, 755:20, 756:9,
760:5, 831:13, 856:23
  **deeper** - 755:14, 756:6,
858:8
  **defendant** - 700:17, 862:8,
862:13, 885:22, 895:20,
904:19, 905:21, 909:13,
914:25
  **Defendant** - 739:19,
765:18, 889:21
  **Defendant's** - 805:17,
887:16, 889:10
  **defendant's** - 700:14,
893:10, 895:24
  **Defendants** - 666:8,
666:17, 737:7
  **defense** - 667:10, 667:12,
671:24, 888:7, 898:15,
908:12, 910:1
  **define** - 796:3
  **definitely** - 669:11, 893:3
  **Definitely** - 800:18
  **degree** - 701:15, 701:16,
739:11, 740:11, 803:12,

813:11, 830:24, 863:13,
863:15, 907:5, 911:8
  **Deliberate** - 910:12
  **deliberate** - 909:17, 912:1,
912:6
  **deliberately** - 909:13,
909:21, 909:25, 910:23
  **deliberations** - 862:20,
886:7
  **delineate** - 819:10
  **delineating** - 819:8
  **Delineation** - 819:4
  **delineation** - 819:12,
830:2, 845:11
  **delineations** - 844:15
  **delinquent** - 675:17
  **delivered** - 761:12
  **Delivered** - 761:13
  **delivering** - 887:1
  **demands** - 671:21
  **demarcation** - 799:7
  **demonstrate** - 909:12
  **demonstrates** - 830:15
  **demonstrative** - 669:22
  **denied** - 670:22, 758:22,
899:16, 917:14
  **dense** - 691:5, 691:14,
691:21, 691:23
  **denser** - 691:4
  **deny** - 669:16, 669:20,
671:5, 672:10, 674:6,
899:17, 910:20
  **denying** - 904:15
  **department** - 702:1,
767:14, 775:17
  **Department** - 767:13
  **dependent** - 762:15
  **depict** - 669:8
  **depicted** - 822:3
  **depiction** - 823:3
  **depo** - 892:21, 893:3
  **depose** - 673:25
  **deposed** - 674:5
  **deposition** - 673:17,
681:4, 686:16, 686:18,
688:5, 881:13
  **deprive** - 918:7
  **deprived** - 916:6
  **deprives** - 916:3
  **depth** - 778:2, 782:8
  **deputy** - 674:11
  **describe** - 697:11, 719:24,
741:18, 770:20, 800:2,
847:4, 900:14, 915:5
  **Describe** - 790:22
  **describing** - 749:22,
918:18
  **deserved** - 781:11
  **design** - 740:21, 744:19,
744:21, 745:17, 746:6,
747:8, 747:16, 747:18,
747:19, 747:23, 747:25,
748:12, 759:15, 760:16,
766:8, 766:11, 770:11,
816:5, 816:12, 816:16,
817:6, 817:9, 819:19,
819:24, 820:9, 828:25
  **designation** - 702:6,
702:15
  **designed** - 744:15, 752:6
  **designing** - 747:11, 864:7
  **destroyed** - 824:20,
914:19, 914:21
  **destruction** - 916:24
  **detail** - 670:14
  **detention** - 757:20
  **deteriorated** - 827:22
  **deteriorates** - 735:4
  **determination** - 710:14,
713:20, 795:10, 835:7,

835:9, 850:11
**determine** - 698:5, 710:7, 720:12, 739:16, 759:14, 767:18, 768:11, 769:15, 769:16, 772:2, 776:11, 784:2, 784:12, 791:22, 800:25, 803:4, 804:25, 805:1, 810:5, 821:10, 860:6, 868:12, 880:15, 919:12
**determined** - 710:15, 713:15, 770:23, 831:11, 850:19, 901:15
**determining** - 713:19, 774:18, 864:5
**devaluation** - 722:5
**develop** - 735:7
**developer** - 703:24, 735:1
**developing** - 744:9
**Development** - 666:4
**development** - 731:8, 818:12, 835:3
**developments** - 747:10
**device** - 742:2, 771:9, 771:19, 796:16, 805:6, 812:13, 817:1
**diagram** - 778:5, 778:6, 779:9
**diagrams** - 776:19, 822:14
**diameter** - 750:7, 751:23, 771:24
**die** - 725:10
**difference** - 709:6, 709:8, 709:11, 709:14, 709:17, 709:18, 709:22, 709:25, 710:1, 717:22, 718:8, 722:23, 723:3, 727:7, 755:23, 842:13, 895:23, 896:6, 903:18
**different** - 695:10, 708:5, 715:18, 721:7, 735:11, 735:14, 736:6, 746:24, 772:20, 772:24, 815:11, 825:14, 825:16, 826:6, 826:20, 851:17, 856:15, 873:12, 873:19, 880:19, 892:20, 895:20, 897:5, 898:23, 899:14, 902:20, 903:15, 903:25, 909:5, 912:7
**dig** - 756:5, 759:24, 786:23, 851:25, 880:5, 880:17
**digging** - 760:14, 776:9, 850:10, 871:10, 880:7
**digital** - 685:19, 816:11
**dilapidated** - 697:12, 867:3, 885:4
**diminished** - 889:20, 889:23
**diminishment** - 889:25
**diminution** - 908:5
**diploma** - 846:20
**dire** - 674:2
**direct** - 717:25, 769:20, 775:11, 792:19, 799:15
**Direct** - 674:23, 701:2, 739:22, 766:1, 797:20, 814:5, 846:11, 863:3, 921:3, 921:11, 921:19, 922:3, 922:9, 922:17, 923:1, 923:5
**directed** - 721:6, 898:18, 903:7, 909:19, 912:10, 913:20, 918:11
**direction** - 689:1, 695:15, 697:15, 741:24, 742:14, 763:5, 763:7, 765:14, 799:18
**directly** - 689:4, 779:19, 831:8, 904:3
**dirt** - 693:25, 694:4, 694:16, 696:14, 696:19, 696:20, 752:15, 752:21,

760:18, 760:21, 760:23, 760:24, 761:2, 761:3, 764:10, 764:12, 764:13, 803:24, 804:5, 804:8, 821:14, 824:2, 824:24, 834:19, 834:21, 834:22, 835:3, 835:13, 837:10, 837:12, 842:10, 842:11, 852:5, 855:16, 866:13, 866:21, 867:3, 874:3, 877:10, 877:17, 877:23, 878:11, 912:13, 912:16
**Dirt/mud** - 857:3
**disagree** - 736:8, 833:25, 891:10, 899:11, 909:19
**disagreement** - 667:19, 821:5
**disclosed** - 673:23
**disclosure** - 673:24
**Discount** - 733:24
**discount** - 710:18, 712:11, 716:17, 732:15, 733:21, 733:25, 735:18
**discounted** - 712:8, 723:2, 731:15, 731:16, 733:12, 733:23
**Discounting** - 734:10
**discovered** - 849:4
**discrepancies** - 820:12
**discrepancy** - 774:5
**discuss** - 719:15, 737:23, 747:20, 849:2, 886:11
**discussed** - 667:8, 672:13, 737:15, 737:21, 738:14, 811:13, 865:24
**discussing** - 695:4, 886:15, 912:1
**discussion** - 673:14, 763:12, 764:7, 827:6, 849:20, 864:12, 871:7, 871:9, 871:23, 918:15
**Discussion** - 680:1, 700:25, 752:13, 769:3, 781:6, 787:15, 862:11, 867:22, 888:2, 889:4
**discussions** - 719:14, 852:23
**disk** - 771:24, 888:3, 888:11
**dispute** - 784:25, 804:4, 813:18, 820:24, 848:23, 854:22, 901:6, 902:14
**disputed** - 913:1
**disputes** - 897:8, 911:15
**disputing** - 786:12
**disregard** - 727:15, 872:12, 881:17
**distance** - 697:1, 756:23, 767:7, 787:11, 787:13, 813:10, 873:12
**distances** - 756:25, 827:10
**distinction** - 903:18, 917:17
**District** - 666:1, 666:11, 908:7
**disturb** - 688:13, 688:20, 788:19
**disturbed** - 711:2
**ditch** - 729:13, 751:21, 752:9, 754:25, 760:25, 787:4, 787:23, 788:4, 789:7, 806:12, 853:13, 853:14, 853:14, 854:4, 855:21, 860:17, 868:8, 871:9, 871:10, 875:25, 876:6, 881:24, 884:14
**diversion** - 762:10
**divert** - 905:2
**diverted** - 762:15
**divide** - 761:23

**Division** - 666:2
**document** - 673:12, 742:3, 777:19, 779:24, 810:25, 823:2, 827:5, 827:9, 828:11, 828:15, 830:7, 830:14, 830:16, 844:6, 844:7, 890:15, 894:16, 894:22, 897:6
**document's** - 669:21
**documentation** - 774:3, 809:1
**documents** - 776:19, 822:21, 843:11, 888:21, 894:18
**dollar** - 712:6, 712:7
**dollars** - 712:19, 717:15, 725:25, 726:1, 761:4, 766:20
**domain** - 911:18
**Domini** - 700:19, 700:20, 701:2, 701:7, 701:8, 702:19, 721:14, 721:16, 729:1, 730:4, 731:13, 731:15, 921:11, 921:13, 921:15, 921:17
**Domini's** - 670:20, 739:9
**Dominion** - 729:12
**done** - 693:16, 698:4, 702:23, 702:24, 702:25, 717:4, 719:17, 765:16, 768:16, 777:13, 777:16, 793:15, 797:10, 799:13, 800:4, 803:5, 803:18, 803:23, 804:1, 804:4, 805:8, 807:3, 817:10, 818:5, 819:3, 823:25, 826:13, 827:8, 829:5, 835:11, 848:13, 850:7, 875:16, 884:8, 905:10, 905:12, 909:4
**door** - 682:18, 698:24, 698:25, 699:3, 699:8, 720:4
**double** - 684:15
**down** - 677:23, 690:13, 690:14, 691:13, 691:15, 691:23, 692:4, 695:12, 696:23, 698:18, 700:12, 725:21, 727:6, 727:9, 728:5, 728:8, 728:10, 729:14, 730:2, 730:6, 737:6, 742:3, 742:17, 743:18, 743:25, 749:15, 752:1, 752:8, 756:4, 756:6, 756:8, 759:19, 760:8, 761:10, 761:21, 762:23, 765:20, 765:23, 773:21, 778:14, 779:1, 779:11, 779:14, 782:21, 786:5, 786:19, 788:2, 790:5, 791:5, 797:14, 801:7, 803:21, 805:6, 813:21, 823:18, 825:5, 826:23, 829:20, 832:9, 832:19, 832:24, 834:22, 835:8, 837:16, 838:6, 841:21, 846:8, 855:17, 856:16, 857:2, 858:4, 858:7, 858:16, 862:7, 881:16, 883:6, 884:1, 885:20, 888:24, 894:19
**downside** - 693:15
**downspout** - 762:23, 885:3, 885:5
**downward** - 730:3
**doze** - 835:14
**dozer** - 842:18
**draft** - 816:15, 919:21
**drafter** - 766:12, 766:13
**drafters** - 779:13
**drafting** - 766:11, 816:13
**draftsman** - 816:14
**drain** - 742:13, 742:20, 742:22, 742:23, 744:15, 751:13, 751:23, 751:25,

752:23, 753:1, 753:5, 753:23, 754:15, 754:20, 755:13, 755:14, 755:25, 758:23, 758:24, 758:25, 759:20, 763:16, 764:22, 861:18, 882:18, 882:23, 884:5
**drainage** - 678:21, 694:20, 694:23, 698:1, 741:2, 741:19, 741:25, 742:23, 744:20, 745:17, 747:9, 747:16, 748:3, 748:12, 752:5, 757:13, 757:22, 763:20, 763:25, 776:8, 777:4, 785:1, 787:1, 787:4, 788:19, 829:12, 830:3, 830:13, 830:15, 849:3, 849:5, 858:25, 883:3, 884:8, 888:6, 894:5, 901:10, 904:10, 906:8, 907:25, 908:4, 911:14
**drained** - 861:1, 876:25
**draining** - 743:2, 743:4
**drains** - 744:15
**dramatically** - 732:17
**draw** - 738:21, 785:7, 805:14
**drawing** - 717:3, 776:25, 816:23, 832:6, 833:4, 833:7, 833:24, 836:12, 836:13, 836:19, 844:4, 868:19, 871:2, 895:19, 895:22
**drawings** - 741:5, 741:14, 822:16, 840:21, 843:22, 868:17, 870:15, 870:16, 870:20, 870:24, 871:3
**drawn** - 751:12, 819:20, 917:18
**drive** - 683:14, 709:13, 801:16
**Drive** - 666:15
**driveway** - 699:15
**driving** - 835:20
**drove** - 707:23
**dry** - 680:10, 680:11, 680:12, 687:5, 687:7, 687:11, 687:12, 853:21
**duck** - 693:5
**due** - 780:5, 915:2
**dug** - 789:1, 851:24, 852:2, 854:20, 854:23, 857:10, 858:6, 861:17, 878:13
**dumb** - 766:24
**dumped** - 694:3, 696:13, 804:4, 821:14, 835:4
**duplication** - 894:7
**during** - 672:16, 674:2, 714:16, 716:13, 720:14, 720:15, 722:10, 730:14, 730:25, 738:4, 750:2, 770:12, 770:15, 785:10, 855:9, 866:9, 912:12
**dusting** - 686:22
**Dvd** - 672:21, 672:24
**dye** - 722:2, 856:13

**E**

**e-mails** - 671:10, 672:2
**early** - 710:20, 786:9, 850:3, 851:10, 862:17, 886:3
**earth** - 683:15, 753:17, 829:5, 879:24
**Earth** - 842:9
**easement** - 760:6, 821:19, 830:3, 879:14, 895:6, 895:8
**easements** - 819:14
**easier** - 690:1
**easiest** - 699:14, 766:13

**easily** - 800:22, 869:13
**East** - 848:1
**east** - 780:5, 848:2
**Eckle** - 706:22, 709:16
**edge** - 695:10, 696:11
**edges** - 830:4
**Edison** - 895:6, 895:8
**Edms** - 767:7
**education** - 675:2, 766:9, 798:6
**educational** - 701:13, 766:5, 798:4, 846:18
**effect** - 708:19, 734:20, 763:3, 893:24, 918:23
**effectively** - 734:21, 914:19, 914:21
**efficient** - 869:14
**effort** - 682:21, 803:2, 818:20, 853:13, 871:24
**efforts** - 682:23, 683:2, 693:19
**eight** - 709:8, 714:6, 717:7, 719:25, 723:7, 725:11, 725:18, 736:13, 766:20, 798:3, 827:21, 869:9, 869:12, 879:10, 917:6
**eight-foot** - 717:7, 723:7
**Eighteen** - 857:17
**Eighteen-inch** - 857:17
**Eighth** - 908:7, 917:17
**either** - 668:19, 682:7, 694:11, 738:2, 739:13, 755:13, 765:4, 765:10, 808:4, 812:7, 812:23, 842:17, 880:23, 883:9, 893:20, 897:15, 898:14, 914:18, 918:14
**Either** - 760:4
**electric** - 756:12, 756:15
**electrical** - 772:20, 776:7, 776:23
**electronic** - 767:7, 833:17, 833:20
**element** - 889:14, 892:3, 911:18
**elevation** - 742:8, 742:9, 779:8, 779:9, 779:21, 782:5, 782:13, 782:17, 782:20, 868:14, 868:19, 868:21, 869:2
**elevations** - 741:22, 742:6, 755:20, 755:21, 802:23
**Eleven** - 815:20
**elicit** - 745:24, 746:15
**eminent** - 911:17
**employed** - 785:5, 785:9, 846:23, 846:25, 847:2
**employees** - 785:3, 899:3
**employers** - 865:19
**employment** - 798:17
**employs** - 899:23
**empty** - 751:21, 755:15
**emptying** - 753:1
**encounter** - 683:10, 773:10, 851:9, 867:7
**encountered** - 683:8, 866:9
**encroach** - 769:23, 831:4, 916:2
**encroached** - 807:16, 823:22
**encroaches** - 916:18
**encroachment** - 784:3, 784:13, 795:6, 795:9, 795:10, 795:22, 795:25, 802:17, 804:15, 810:23, 813:19, 820:7, 821:11, 821:17, 827:7, 830:16, 831:1, 831:2, 832:9, 832:14, 832:20, 835:8, 845:2, 917:4

**encroachments** - 834:2
**end** - 669:9, 691:13, 691:15, 707:14, 718:15, 724:20, 735:6, 742:10, 756:2, 759:9, 765:7, 765:19, 766:24, 768:13, 775:24, 782:1, 782:14, 782:16, 783:13, 786:15, 786:20, 786:23, 786:25, 787:3, 787:22, 787:23, 787:25, 788:3, 789:5, 789:6, 792:3, 813:3, 813:4, 824:11, 825:8, 826:24, 850:8, 857:20, 868:16, 892:19, 916:19, 918:5, 918:8
**ended** - 703:12
**ends** - 764:25, 864:16
**enforceable** - 901:23
**enforced** - 757:16
**engage** - 882:4, 882:6
**engineer** - 740:9, 740:21, 755:7, 763:21, 782:23, 782:24, 784:24, 799:12, 820:9, 849:17, 850:1, 861:20, 863:17, 864:3
**engineer's** - 860:10
**Engineering** - 767:12, 811:6
**engineering** - 740:4, 740:6, 740:7, 740:11, 758:18, 766:8, 766:10, 767:15, 780:16, 846:21, 863:16, 882:4, 882:7
**engineers** - 704:15, 751:1, 770:10, 785:4, 785:13, 798:21, 811:10, 882:21
**Engineers** - 815:1
**English** - 816:8, 869:6
**enhancing** - 671:23
**enjoyment** - 916:4, 916:7
**enter** - 726:21, 876:1, 898:18
**entered** - 855:18
**enters** - 674:13, 751:25
**entertain** - 898:12
**entire** - 699:2, 722:22, 779:18, 779:22, 902:6, 915:12
**entirely** - 708:5, 783:8
**entirety** - 888:6
**entitled** - 891:3, 920:5
**entity** - 908:16
**entry** - 876:9, 882:17, 883:2
**Epa** - 757:13, 757:15
**equal** - 779:9, 816:24
**equally** - 724:10
**equals** - 895:1
**equipment** - 767:17, 771:22, 845:21
**erase** - 781:20
**Eric** - 727:3
**error** - 771:17, 771:18, 811:18
**errors** - 845:22, 845:23
**especially** - 690:13, 720:15, 891:25, 904:10, 906:3, 917:3, 919:8
**essentially** - 703:9, 706:2, 709:5, 712:12
**Essentially** - 717:18, 719:25
**establish** - 800:22, 896:4
**established** - 904:21
**establishments** - 870:23
**estate** - 675:8, 675:9, 681:12, 681:16, 701:11, 701:14, 701:17, 701:20, 701:23, 704:18
**estimate** - 697:1, 717:9,

728:2, 756:21, 873:10
**estimated** - 693:13
**estimates** - 873:3
**estimation** - 736:20, 862:17
**et** - 723:3, 895:25
**Ethan** - 666:14, 903:24
**event** - 704:3
**eventually** - 850:10, 880:20
**evergreen** - 724:16
**evidence** - 669:21, 679:24, 746:9, 749:24, 751:20, 751:24, 759:6, 786:2, 786:8, 790:11, 797:8, 803:21, 804:7, 804:12, 812:5, 824:18, 824:25, 835:5, 862:18, 871:19, 886:10, 895:3, 895:21, 897:8, 898:10, 901:3, 902:2, 902:12, 904:8, 905:3, 905:9, 905:12, 906:2, 906:4, 906:11, 906:19, 908:21, 909:20, 912:23, 913:1, 913:5, 913:17, 913:18, 913:25, 914:10, 914:12, 914:14, 915:4, 915:23, 916:9, 916:14, 917:8, 918:8, 918:20, 918:22, 919:8
**evident** - 720:16, 730:11, 848:17
**evidently** - 703:10
**exact** - 777:18, 839:9, 839:13
**Exactly** - 712:18, 730:21
**exactly** - 691:10, 734:5, 743:17, 754:4, 762:19, 796:17, 825:20, 827:15, 850:22, 865:22, 872:2
**exaggerate** - 905:8
**exaggerating** - 826:5
**examination** - 680:19, 699:6, 721:14, 731:13, 749:5, 764:19, 784:19, 807:11, 813:16, 836:5, 844:19, 854:13, 874:8, 885:10, 912:12, 921:5, 921:9, 921:13, 921:17, 921:21, 922:1, 922:5, 922:11, 922:15, 922:19, 922:23, 923:3, 923:7, 923:11
**Examination** - 674:23, 698:13, 701:2, 729:1, 739:22, 762:7, 766:1, 795:19, 797:20, 812:2, 814:5, 843:4, 846:11, 863:3, 884:19, 921:3, 921:7, 921:11, 921:15, 921:19, 921:24, 922:3, 922:7, 922:9, 922:13, 922:17, 922:21, 923:1, 923:5, 923:9
**examine** - 750:22
**example** - 707:13, 710:24, 778:19, 796:22, 832:13
**Examples** - 902:5
**excavated** - 753:15, 842:22
**exceed** - 747:23
**exceeded** - 746:6, 748:16
**exceeding** - 745:16
**exceeds** - 745:4, 745:5, 748:11
**excellent** - 727:2, 730:15
**Except** - 798:25, 860:15, 895:18
**except** - 681:19, 696:3, 754:20, 889:7, 906:17
**exception** - 667:8
**excerpt** - 899:4
**excessive** - 747:17

**exclude** - 890:4, 890:7, 891:20, 892:9
**excluded** - 891:21, 894:17
**exclusion** - 898:11
**excuse** - 679:8, 719:21, 842:1, 842:5
**Exhibit** - 668:5, 668:17, 669:16, 669:21, 694:15, 694:19, 699:18, 719:1, 737:15, 737:18, 737:19, 738:8, 739:3, 741:4, 741:5, 741:12, 741:13, 755:21, 777:21, 777:24, 785:15, 791:7, 795:1, 805:17, 807:18, 810:21, 824:14, 827:5, 828:16, 828:21, 830:14, 830:15, 833:7, 833:8, 844:9, 888:4, 889:11, 889:16, 890:4, 891:20, 893:25, 894:6, 894:16, 895:9, 895:12, 895:16, 895:19, 895:20
**exhibit** - 670:24, 673:2, 695:4, 719:8, 737:16, 737:22, 737:23, 738:1, 755:21, 805:17, 809:8, 892:6, 894:10, 896:7, 896:16, 897:21
**Exhibits** - 667:3, 889:7, 891:22
**exhibits** - 667:11, 672:10, 700:16, 737:14, 739:4, 839:1, 885:21, 888:15, 892:9, 893:10, 895:17, 895:24, 896:11, 898:11
**existence** - 730:5
**existing** - 742:6, 743:11, 743:13, 759:16, 804:24, 820:1, 823:14, 824:16, 828:7, 829:3, 829:12, 829:15, 831:3, 835:9, 835:14, 836:11, 844:11, 849:6, 868:21
**exit** - 764:24, 853:14, 860:6, 860:21, 876:9
**exited** - 855:13, 876:5
**exits** - 737:12, 887:13
**expect** - 713:19, 748:17, 748:20
**expenses** - 730:24, 732:16, 736:24, 736:25
**experience** - 701:20, 766:14, 798:15, 798:19, 814:23
**experiencing** - 747:21
**expert** - 758:12, 758:14
**expert's** - 909:23
**experts** - 739:15
**Explain** - 823:8
**explain** - 716:2, 726:12, 730:18, 742:4, 768:15, 822:19, 827:7, 830:20, 845:24, 893:21, 903:22, 914:16
**explanation** - 772:12, 897:16, 897:22
**exploring** - 697:23
**exposed** - 728:14, 783:7, 786:25, 787:2, 850:20
**express** - 861:17
**Express** - 745:22, 747:2
**expressed** - 904:17
**extend** - 782:15
**extended** - 753:5
**extent** - 695:7, 919:20
**Extremely** - 829:25

**F**

**F.2d-** 917:16

**F.3d**- 910:8
face - 690:11
faced - 910:16
facie - 904:21
facing - 835:3
fact - 687:10; 687:23,
689:4; 689:18, 703:5, 704:5,
718:10, 728:14, 730:8,
738:5; 763:23, 764:2;
788:20, 788:21, 788:22,
794:21, 809:19, 820:2,
820:16, 820:23, 830:25,
833:17, 843:19, 867:8,
871:8, 879:16, 881:8,
885:12, 891:16, 894:9,
898:23, 915:15, 916:7
factor - 712:11, 716:17,
716:19, 718:9, 748:6, 748:8
factored - 717:1
factors - 907:15
facts - 759:5, 759:9
fail - 915:3
failed - 915:19, 918:20
fails - 904:16, 916:9,
916:13
fair - 683:25, 691:7
fairly - 684:10
fall - 686:23, 746:23,
770:24, 862:16
fallen - 746:3
false - 695:18, 882:5
familiar - 690:8, 694:24,
745:10, 745:13, 746:2,
746:12, 747:3, 747:5, 832:4,
900:25
familiarity - 746:17
family - 915:15, 916:8
fancy - 814:21
far - 679:23, 681:12,
696:23, 703:2, 711:13,
734:6, 758:4, 761:5, 783:16,
790:12, 799:11, 800:6,
826:17, 831:9, 832:24,
848:21
farmland - 818:15
Farms- 707:3, 707:20,
708:22, 709:11
farthest - 813:10
fast - 831:16
faster - 715:4
fault - 804:2
favorable - 914:11, 915:4
feasor - 899:23
features - 802:23
February- 675:14, 679:6,
680:5, 839:7
Federal- 890:8
federal - 702:17, 903:11,
905:23, 906:13, 912:1,
914:17
feelings - 803:6, 803:7
feet - 683:22, 684:7, 685:3,
689:8, 693:13, 693:14,
696:24, 720:4, 723:22,
723:23, 724:18, 725:2,
729:5, 729:8, 751:4, 753:18,
755:20, 755:22, 756:4,
756:7, 756:8, 756:9, 757:1,
757:2, 761:17, 761:19,
761:20, 761:21, 761:23,
771:4, 774:17, 774:20,
774:21, 778:21, 778:22,
778:24, 779:10, 779:11,
779:12, 780:15, 780:17,
782:22, 783:20, 792:15,
792:22, 793:1, 793:8, 796:4,
796:12, 796:17, 796:18,
796:19, 796:23, 796:24,
809:20, 810:3, 810:17,
810:23, 812:14, 812:15,

812:16, 812:18, 812:20,
812:21, 813:9, 813:10,
820:9, 824:11, 824:24,
825:11, 826:17, 827:17,
830:6, 832:1, 833:1, 833:6,
834:3, 842:11, 851:5, 851:6,
856:24, 858:8, 858:12,
858:13, 859:13, 859:25,
879:2, 879:24, 880:4, 880:8,
880:12, 880:18, 895:1,
907:7, 913:19, 917:6
fell - 708:25
fellow - 886:16
felt - 877:20
fence - 773:14, 773:16,
773:19, 773:23, 774:4,
774:6, 774:8, 774:11,
774:15, 774:18, 774:19,
774:21, 775:4, 789:13,
790:15, 792:14, 792:16,
792:25, 796:15, 796:19,
796:20, 796:25, 797:3,
801:19, 809:23, 810:2,
810:6, 810:7, 812:16,
812:20, 812:22, 823:24,
824:3, 824:10, 825:10,
825:19, 825:22, 827:17,
827:19, 827:20, 827:22,
828:3, 828:5, 828:6, 828:9,
836:11, 881:9
fence's - 825:15
fences - 776:6, 790:18
fencing - 773:11, 773:17
fertilizer - 873:15
fete - 878:8
few - 707:10, 792:10,
799:25, 802:14, 809:20,
846:20, 854:23, 912:4
fiberglass - 778:25
field - 773:6, 774:6, 776:9,
776:24, 783:20, 799:11,
799:14, 800:8, 801:5,
801:13, 803:13, 808:25,
815:5, 815:6, 815:12, 817:2,
817:7, 818:3, 818:4, 818:19,
823:25, 830:24, 859:25,
882:20
Fifteen- 761:12
Fifth- 916:15
Fifty- 724:5, 798:3
Fifty-eight- 798:3
fight - 917:5
figure - 704:13, 731:22,
733:9, 760:13, 876:10
figured - 704:14, 717:11,
865:16, 877:12
figures - 706:14
figuring - 714:24
Figuring- 715:3
file - 776:20, 776:22
filed - 673:11, 794:1,
899:15
fill - 717:13, 724:14,
752:15, 752:21, 754:5,
760:18, 760:21, 760:23,
760:24, 761:2, 761:3, 824:3
filled - 829:12, 830:5,
852:4, 852:10
filling - 830:13, 871:9
final - 767:1, 862:19,
886:6, 886:12, 892:11,
893:1, 919:21
Findlay- 745:14, 746:10,
746:13, 761:10
fine - 702:11, 811:10,
893:23
finger - 781:15
finish - 732:11, 841:11,
841:13, 889:9
Finkbeiner- 828:24, 829:4,

830:12
firm - 701:23, 740:3,
740:4, 882:4, 882:6
first - 674:1, 674:9,
678:23, 703:2, 704:13,
705:8, 705:22, 709:1, 710:6,
713:14, 713:22, 713:24,
718:15, 719:19, 733:14,
733:18, 777:6, 779:6,
786:10, 807:21, 808:12,
809:16, 820:20, 821:4,
833:10, 834:11, 839:18,
848:22, 848:25, 850:24,
851:2, 851:12, 851:18,
857:18, 859:5, 894:19,
914:11
First- 890:8
fit - 868:9, 868:11
five - 693:13, 702:4,
705:10, 712:19, 713:23,
714:7, 715:8, 716:9, 720:4,
730:3, 730:16, 744:21,
748:1, 748:4, 761:4, 796:19,
799:5, 810:3, 812:16,
814:11, 832:1, 856:24,
859:25, 879:24, 880:12
five-year - 744:21, 748:1,
748:4
fix - 764:4, 865:5, 893:14
fixable - 905:1
fixed - 817:8, 902:18,
911:16
flagging - 772:17, 801:17,
801:18
flags - 848:19
flashlight - 856:25, 857:2
flat - 716:14
flooded - 746:10, 901:13
flooding - 676:20, 725:10,
725:25, 881:24, 901:11,
902:16, 905:4, 905:13,
906:1, 911:7, 911:12,
911:13, 914:18, 914:25,
915:1, 915:22, 916:3, 919:9
floods - 722:5
Florida- 702:5
flow - 668:1, 723:3,
733:12, 733:14, 742:15,
742:17, 745:6, 755:10,
759:15, 853:21, 887:22,
916:1
flowed - 849:23, 849:24,
850:4, 855:25, 856:3, 876:14
flowing - 677:3, 677:4,
853:25, 860:19
flown - 877:11
flows - 711:23, 712:11,
713:12, 716:20, 829:24,
847:16, 847:18
focus - 704:9
focusing - 835:17
foliage - 717:19, 761:16,
818:13
follow - 691:8, 754:4,
801:15
followed - 823:19
following - 742:10,
746:24, 748:14
follows - 914:16
foot - 684:7, 684:10,
684:15, 684:18, 684:20,
717:7, 717:12, 720:1, 723:7,
723:24, 724:13, 724:24,
753:16, 755:23, 790:6,
810:18, 820:7, 828:23,
834:2, 909:24
footage - 888:5
force - 849:1
forces - 915:2
Ford- 689:5, 691:14,

691:18, 706:2, 753:14,
786:11
foreclosure - 676:17,
887:17, 892:1
foregoing - 920:4
forestry - 872:17
forget - 685:11, 714:25,
805:5, 812:9, 864:23, 919:2
Forgive- 815:18
forgot - 910:2
Forletta- 856:16
form - 683:12, 716:5,
847:4
format - 816:4, 816:11,
833:17
Fort- 706:23, 709:17
forth - 695:14, 711:7,
730:24, 737:1, 740:24,
741:19, 746:4, 746:24,
746:25, 747:11, 748:14,
755:5, 756:15, 756:17,
760:2, 812:6, 819:2, 873:3
forwarded - 672:2
foundation - 738:4,
746:15, 758:14, 896:4
Foundation- 702:18
Four- 693:14, 705:10,
856:24
four - 672:10, 708:22,
709:2, 717:5, 724:19,
727:20, 727:21, 727:24,
759:4, 767:3, 810:2, 815:12,
822:16, 824:10, 825:4,
825:6, 825:9, 826:7, 831:25,
832:1, 832:2, 832:9, 834:2,
834:3, 845:1, 845:6, 858:8,
858:13, 859:25, 875:8,
889:7, 901:12, 909:23,
909:24, 917:5
four-inch - 759:4, 832:9,
909:23
fourths - 896:15
Fps- 816:2, 827:14, 828:1
Francis- 797:24
frank - 894:15
Franklin- 778:8, 778:9
frankly - 670:23, 905:14
Frankly- 890:6, 893:2,
897:20
free - 681:23, 705:6
freeze - 677:21
frequency - 915:20
frequent - 905:25, 914:24,
914:25
frequently - 843:22, 862:2,
867:10
front - 699:10, 699:22,
699:24, 727:4, 755:24,
777:1, 805:17, 857:20
front-end - 857:20
frontage - 710:15
fronting - 716:11
fruitless - 722:1
full - 701:6, 764:10,
764:12, 764:13, 766:3,
797:22, 814:7, 846:13,
855:16, 856:17, 856:19,
857:11, 866:12, 866:21,
877:10, 877:23, 878:10,
899:5
function - 764:11, 850:14,
852:6, 867:15
furnish - 675:21
furniture - 675:22
furthers - 892:7

**G**

garage - 684:25, 708:1,
820:18

garbage - 856:17
gather - 801:3
gathered - 843:23
gathering - 708:16, 768:5, 783:16
general - 676:10, 706:10, 798:24, 802:22, 849:20, 864:2, 896:10, 909:16
generally - 690:7, 726:21, 730:6, 745:13, 747:2, 880:8
Generally - 849:21
gentleman - 703:9
Gentlemen - 719:13
gentlemen - 674:15, 737:8, 862:12, 886:1
given - 671:17, 720:15, 751:2, 769:11, 770:2, 770:25, 782:23, 792:20, 792:21, 809:8, 827:16, 842:1, 866:11, 886:20
glad - 688:11, 691:11
global - 767:9
golfers - 771:12
goodness - 787:6
government - 701:25, 702:17, 757:13, 901:24, 910:22, 914:19, 914:21, 916:17
government's - 915:1
governmental - 908:16
Gps - 767:8, 767:9, 769:19, 770:23, 771:1, 771:9, 771:11, 771:14, 771:24, 771:25, 776:24, 796:4, 796:16, 796:23, 812:13, 817:8, 837:20, 839:23, 845:13, 845:14, 845:22
grab - 892:8
grabbed - 671:8
grade - 725:9, 753:13, 753:18, 755:23, 783:23
grading - 741:14
granite - 714:22
Granite - 666:4, 670:25, 681:10, 803:25, 879:11, 899:1
Granite's - 693:22
grant - 890:4, 918:10
graphic - 751:12
great - 915:19
Great - 797:16
greater - 813:6, 915:20
greatest - 771:17, 771:18, 898:22
grew - 675:1
Grew - 675:6
gross - 723:1, 730:22
ground - 697:13, 756:3, 765:13, 775:5, 776:7, 802:23, 849:7, 851:24, 851:25, 852:2, 856:4, 860:4, 861:1, 867:6, 879:3, 879:25, 880:9, 880:10, 880:11, 885:14, 899:16
grounds - 889:12, 890:7, 914:2
Grounds - 745:19
group - 904:11
guarantee - 823:20
guess - 682:20, 685:14, 749:16, 789:22, 821:13, 823:11, 828:15, 834:2, 836:13, 844:6, 857:22, 870:15, 872:22, 897:24, 903:7, 910:4, 919:7
guessing - 882:13
guesstimating - 755:6
guide - 793:17, 809:23, 810:4
gutter - 883:18, 883:20,

883:25, 884:2
gutters - 883:14, 883:23
guy - 693:24, 767:1, 767:4, 817:10, 847:9
guys - 751:15, 828:7, 831:3

H

half - 708:12, 714:11, 714:17, 719:20, 753:16, 780:14, 780:17, 780:18, 780:20, 827:17, 828:23, 892:2, 897:12
hall - 765:20, 765:23
hammering - 689:9
hand - 672:24, 724:20, 773:4, 807:18, 810:21, 828:18, 908:9
handheld - 771:10, 771:11
handing - 795:1
handle - 745:2, 759:10, 849:22, 860:3, 879:2
handled - 752:9
hands - 811:14
handwrote - 669:17
hanging - 880:18
happy - 728:13, 728:21, 826:13
Hard - 790:23
hard - 776:25
hardly - 835:15
Harris - 917:16
hate - 703:19
hauled - 760:21
heading - 780:5, 847:21, 847:22
hear - 687:21, 687:23, 687:25, 690:5, 730:18, 784:9, 831:17, 881:3, 904:19
heard - 702:7, 795:9, 816:12, 838:9, 853:9, 856:15, 886:10, 886:12, 904:18, 912:2, 918:17
hearing - 684:6, 746:4, 827:25
Hearsay - 852:17
hearsay - 852:18
heavy - 695:7, 720:15, 864:8, 915:10
height - 771:23, 917:1
held - 803:12, 899:22, 899:24, 905:22, 917:12
help - 675:21, 744:23, 783:2, 822:18, 829:2, 865:17
Help - 779:4, 830:7
helped - 861:18
helpers - 694:3
helpful - 781:1
helps - 849:9
hesitant - 738:16
High - 846:20
high - 675:7, 693:13, 698:20, 707:14, 726:4, 753:16, 757:3, 757:5, 757:6, 760:14, 761:17, 761:19, 766:8, 766:9, 798:5
higher - 715:5, 715:9, 715:11, 753:21, 754:11, 754:14, 762:11, 762:16, 763:2, 765:14
highlight - 781:21
highway - 708:20
hill - 693:8, 697:18
hindsight - 853:3
hired - 713:8, 814:17, 827:1
historical - 812:10, 812:23
history - 710:13, 713:17, 714:9, 716:14, 729:23,

798:17
hit - 753:21, 774:21, 860:4, 860:13
hits - 762:20
hold - 702:6, 798:13, 886:15, 888:12, 888:22, 892:8, 904:5, 915:24
holding - 767:2, 918:2
hole - 694:20, 694:22, 763:15, 763:25, 764:3
Holland - 666:19
home - 681:6, 683:8, 684:13, 699:15, 708:21, 883:12, 886:2, 886:9, 883:18, 915:17, 915:18
homeowner - 821:5, 821:20, 827:18, 828:8
homeowners - 901:12
homes - 684:11, 707:21, 707:24, 708:1, 708:11, 726:17, 901:12, 901:13
Homes - 675:22
homework - 886:5
Honor - 680:16, 688:14, 698:11, 700:21, 702:9, 715:13, 715:22, 727:11, 737:5, 738:11, 739:8, 746:9, 749:3, 749:19, 751:8, 754:3, 762:3, 768:25, 769:8, 772:9, 793:8, 793:12, 795:15, 803:8, 813:23, 813:25, 836:3, 841:17, 852:17, 859:8, 862:5, 862:6, 863:1, 867:19, 868:3, 874:6, 881:13, 885:23, 885:25, 887:21, 889:18, 894:21, 896:7, 896:14, 904:1, 906:15, 907:17, 908:14, 910:15, 913:8, 914:8
honor - 797:7, 820:8, 827:15, 828:7
Honorable - 666:10
honored - 810:1, 819:25, 821:25, 827:20, 828:6, 831:3
hour - 719:20, 766:20, 851:18
hours - 851:13, 854:23
house - 671:1, 671:2, 675:12, 675:21, 676:1, 676:2, 676:5, 676:8, 676:10, 676:14, 676:15, 678:2, 678:12, 681:19, 681:22, 681:25, 682:12, 682:19, 682:22, 682:23, 683:3, 683:6, 683:7, 683:9, 683:11, 683:16, 683:21, 683:25, 684:3, 684:19, 684:21, 684:22, 689:5, 689:9, 691:5, 691:17, 691:22, 692:8, 697:6, 698:16, 699:11, 699:16, 699:21, 699:22, 699:24, 703:23, 703:25, 706:15, 713:5, 713:8, 713:13, 713:25, 716:8, 716:25, 718:18, 720:2, 720:19, 720:22, 721:8, 721:22, 726:1, 728:11, 728:16, 729:10, 730:22, 731:23, 732:1, 732:2, 732:20, 732:21, 733:7, 733:12, 733:13, 733:14, 733:18, 734:8, 762:18, 762:19, 762:24, 762:25, 794:12, 794:15, 794:17, 794:19, 794:22, 809:15, 818:21, 829:15, 829:16, 834:23, 834:24, 835:1, 839:4, 885:3, 902:9, 908:25
houses - 707:25, 714:25,

818:14, 818:16
housing - 706:10, 706:11, 818:12
hub - 826:11, 826:16
Huber - 737:23, 755:7, 849:18, 855:2, 855:10, 866:3, 874:16, 874:19, 875:1, 880:21, 881:19
Huber's - 892:16
hubs - 826:14, 826:16, 827:2
Huffman - 727:3, 729:21, 731:5, 731:6
humble - 912:7
hundredth - 837:22
husband - 679:19, 883:23
husband's - 883:22
hypothesizing - 825:1

I

idea - 683:24, 684:3, 684:4, 684:5, 728:6, 754:22, 807:24, 858:22, 911:15
ideas - 914:5
identification - 737:25, 782:8
identified - 667:18, 669:3, 669:14, 671:20, 787:20, 789:11, 806:19, 809:8
identify - 667:16, 669:13, 678:25, 737:16, 737:21, 741:12, 775:19, 796:8
identifying - 741:18
illness - 872:24
illustrate - 828:16
immediately - 777:13, 888:16
impacted - 830:13
impacts - 830:15
important - 713:18, 876:10
imposed - 904:6
inaccurate - 668:4, 812:7
inactive - 853:15, 854:5, 855:22
inch - 750:6, 753:4, 758:24, 759:4, 771:24, 772:14, 772:18, 782:3, 782:4, 786:15, 789:2, 831:10, 832:9, 857:17, 869:12, 869:14, 895:1, 909:23
inches - 744:25, 749:17, 750:4, 750:8, 753:18, 792:10, 824:10, 825:5, 825:6, 825:9, 826:7, 827:21, 831:25, 832:2, 853:23, 857:12, 857:13, 858:3, 869:9, 869:12, 879:10, 917:6
Incidentally - 853:11
include - 730:21, 740:23, 741:2, 900:18
included - 685:1, 713:5, 713:11, 731:22, 732:1
includes - 732:2
including - 745:13, 848:24, 870:14
Including - 682:9, 716:25
incontestable - 910:21
incorrect - 736:22
increase - 716:12, 730:10, 747:17, 747:19, 763:17
increasing - 732:14
indeed - 765:13
Indian - 708:22, 709:16
indicate - 741:24, 742:6, 742:11, 848:21, 850:1, 853:25, 870:7, 876:16, 881:10, 918:20
indicated - 681:7, 710:19,

711:1, 738:1, 749:23,
751:20, 755:7, 755:12,
837:11, 864:15, 866:3,
866:16, 904:14, 919:3
**indicating** - 673:22,
673:24, 674:4
**indifference** - 909:17,
910:12, 912:2, 912:6
**indifferent** - 909:14,
909:21, 909:25
**individual** - 821:4, 828:5,
843:22
**industry** - 702:16, 843:20
**infancy** - 838:4
**infield** - 775:7
**influence** - 708:20
**inform** - 892:17
**information** - 713:2,
720:6, 720:9, 720:11,
723:15, 745:24, 746:6,
746:15, 748:10, 750:17,
768:6, 768:20, 768:22,
768:23, 769:6, 770:2, 778:1,
778:4, 778:13, 782:22,
783:16, 783:20, 783:21,
783:24, 783:25, 785:25,
787:5, 792:20, 792:21,
802:19, 808:25, 815:24,
824:8, 825:2, 833:14, 843:8,
846:2, 863:9, 866:11,
868:22, 873:2, 873:5, 886:14
**informed** - 866:12, 873:1
**initial** - 768:5, 768:16,
780:3
**inquire** - 739:20, 836:2,
862:25, 874:5
**inquiring** - 876:23, 903:6
**inquiry** - 735:24, 736:2,
900:5, 900:15, 919:14
**inserted** - 816:4
**inside** - 774:21, 779:2,
782:13, 786:16, 803:6,
807:14, 860:11, 860:12
**insignificant** - 792:6,
792:8
**insofar** - 904:23
**inspector** - 838:10,
846:22, 847:3, 847:5,
852:14, 852:24, 870:6,
872:17
**inspectors** - 852:12, 879:5
**installation** - 786:6
**installed** - 692:13, 717:12,
742:20, 786:3, 788:24,
790:15, 804:23, 847:19,
847:23, 868:18, 869:1
**installing** - 868:13,
868:15, 871:4
**instance** - 797:6
**instances** - 820:5
**instead** - 670:4, 831:19
**instruct** - 759:9, 841:1,
841:19
**instructed** - 793:22, 828:7,
840:14, 881:17
**instruction** - 886:6, 886:8,
886:12, 912:5
**instructions** - 751:2,
862:19, 900:7, 900:8,
900:13, 902:25, 903:6,
903:22, 909:10, 912:8,
919:17
**instrument** - 767:4
**instrumentation** - 800:6,
845:7
**insufficient** - 901:22,
915:23
**intended** - 670:21, 683:7,
707:22, 900:17, 913:5, 913:9
**intent** - 673:12, 673:15

**intention** - 675:25, 919:14
**intentional** - 909:25,
912:21, 913:15
**intentionally** - 831:5,
912:24, 915:7
**interest** - 676:2, 746:23,
747:6, 747:8, 747:10,
819:25, 821:20, 828:8,
890:18, 890:24, 891:4,
891:7, 891:14, 910:16
**interested** - 683:8, 683:11
**interesting** - 904:5
**interfere** - 915:14
**interfered** - 905:16,
905:18, 915:16
**interference** - 918:5
**intermittent** - 905:25,
914:23
**intern** - 863:20
**internally** - 744:15
**interpret** - 778:6
**interpretation** - 899:11
**interrelated** - 910:4
**interrupt** - 824:13
**interrupted** - 706:21,
708:7, 727:15, 907:11
**introduce** - 674:25, 739:24
**invaded** - 902:15
**invariably** - 910:18
**invasion** - 901:22, 901:25,
917:11, 917:18, 917:25
**inventory** - 777:25
**invert** - 779:1, 780:6,
780:11, 780:12, 782:5
**investigate** - 855:12,
861:2
**investigated** - 697:21,
806:16
**investigation** - 778:11,
783:14, 806:1, 838:13
**involve** - 670:25
**involved** - 703:8, 804:17,
804:22, 817:23, 847:12,
902:10
**involvement** - 768:2,
775:24, 775:25, 776:1,
776:3, 777:2, 783:13, 799:6,
815:22, 817:18, 847:11,
848:22, 864:9
**Involvement** - 817:21
**involving** - 817:19
**irrelevant** - 890:10,
891:25, 892:3
**issue** - 672:6, 673:21,
692:9, 692:23, 718:2,
720:21, 721:7, 802:13,
804:18, 804:21, 817:19,
835:17, 837:24, 845:2,
845:3, 849:5, 849:6, 873:21,
891:1, 900:6, 901:7, 904:3,
904:4, 909:18, 912:11,
918:19, 919:11
**issued** - 899:10
**issues** - 695:12, 720:13,
849:3, 890:24
**item** - 688:6
**items** - 758:6
**itself** - 763:3, 779:3, 779:8,
797:3, 800:23, 801:19,
803:17

**J**

**Jack**- 666:10, 891:13
**Jacqueline**- 675:3
**January**- 714:10, 714:21,
730:1, 730:14, 730:16
**Jeff**- 703:13
**Jenkins**- 673:13, 739:22,
740:1, 742:1, 749:5, 749:7,

752:12, 754:1, 758:17,
762:7, 764:19, 921:19,
921:21, 921:24, 922:1
**job** - 703:21, 704:15,
768:13, 768:14, 769:13,
769:18, 771:7, 775:6, 792:7,
797:10, 799:21, 800:4,
819:9, 820:2, 820:12, 847:7,
859:2, 860:9, 860:10,
866:16, 871:15
**Joe**- 821:3, 866:12,
875:21, 875:22, 878:11
**Joseph**- 846:11, 846:15,
854:13, 923:1, 923:3
**Judge**- 666:11, 670:4,
671:14, 679:20, 679:23,
695:22, 781:10, 831:19,
907:8
**July**- 786:10
**Junction**- 706:22, 709:16
**June**- 705:2, 714:4,
714:13, 730:14, 786:10,
853:22
**Juror**- 734:2, 814:1,
886:23
**jurors** - 749:14, 813:25,
859:11, 886:16
**jury** - 669:23, 673:7, 674:2,
674:13, 674:25, 675:1,
675:19, 675:24, 676:7,
676:24, 676:25, 677:3,
677:25, 680:5, 698:17,
700:17, 701:6, 703:8, 712:3,
716:2, 718:25, 722:4,
722:12, 724:19, 724:21,
726:8, 726:10, 727:10,
727:14, 728:9, 731:16,
732:10, 732:25, 734:15,
739:2, 739:15, 739:24,
741:20, 743:12, 749:13,
749:22, 749:23, 750:2,
750:22, 755:11, 755:25,
758:2, 759:9, 759:22,
760:20, 767:9, 768:15,
781:1, 781:21, 784:23,
786:22, 787:8, 790:14,
796:3, 797:23, 808:1,
808:24, 814:8, 822:19,
827:7, 828:17, 830:8, 832:7,
836:7, 840:6, 844:21,
845:24, 846:14, 850:13,
854:17, 872:12, 881:16,
882:3, 885:12, 887:13,
888:13, 890:6, 890:22,
892:25, 896:25, 897:16,
903:17, 906:4, 906:11,
909:10, 909:18, 914:13,
914:15, 915:24, 916:10,
916:15, 918:12, 918:16,
919:12
**Jury**- 666:11, 737:12,
765:21
**jury's** - 672:18, 816:7

**K**

**keep** - 670:19, 752:11,
880:9, 880:10, 886:3,
888:13, 898:21
**keeping** - 736:24, 773:5
**Keesey**- 736:5
**Keesey's**- 735:9
**Keith**- 666:18, 899:6
**kept** - 753:16, 765:22
**Kevin**- 669:3
**keystone** - 902:9
**kids** - 688:12
**kind** - 703:11, 705:4,
708:10, 759:8, 776:7,
810:19, 818:18, 828:19,

847:6
**kindly** - 873:1
**kinds** - 772:24
**knee** - 698:20
**knee-high** - 698:20
**knock** - 682:18, 763:15
**knocked** - 694:20, 694:22,
763:25, 764:3
**knowing** - 878:18
**knowledge** - 776:18,
785:2, 808:23, 811:12,
822:6, 834:14, 835:19,
844:5, 846:3, 870:10
**knows** - 746:18, 781:9

**L**

**label** - 894:9, 894:13
**labeled** - 768:21
**labelled** - 742:12
**labels** - 743:17, 782:3
**lack** - 718:6
**ladies** - 674:14
**Ladies**- 737:8, 862:12,
886:1
**laid** - 819:19, 847:16,
857:10, 858:3, 878:4
**land** - 717:16, 818:5,
820:19, 829:11, 830:12,
848:10, 848:21, 901:25,
905:24, 914:19, 914:20,
914:22, 916:18, 917:9
**landowner** - 914:18
**large** - 742:3, 801:2,
855:21, 896:21, 910:24
**larger** - 849:7, 865:18
**laser** - 837:16
**Laskey** - 675:10, 676:4,
683:19, 891:12
**Laskey's**- 667:9
**last** - 667:8, 675:9, 714:9,
714:11, 715:20, 729:25,
746:3, 749:7, 785:10,
797:25, 825:2, 842:14,
842:21, 863:8, 890:21
**lasts** - 720:8
**late** - 679:4, 706:13,
706:17, 786:3, 786:9,
849:12, 892:19
**lath** - 801:16
**latter** - 915:8
**law** - 815:6, 815:10, 899:4,
901:15, 901:17, 907:10,
909:15, 910:1, 918:4
**lawn** - 827:4
**lawsuit** - 669:15, 787:21
**lawyer** - 841:12, 841:13
**lawyers** - 735:23, 811:2,
841:11, 886:3
**lay** - 758:13, 850:15,
855:20
**laying** - 740:23, 740:25,
827:23, 850:9, 851:19,
851:23, 852:1
**lead** - 866:19
**leading** - 714:2, 715:17,
715:20
**leaning** - 774:10, 810:13,
810:14
**learned** - 674:4
**learning** - 766:20
**least** - 696:17, 697:21,
756:9, 802:6, 822:16, 830:5,
879:24, 897:25
**leave** - 828:9, 867:5
**leaves** - 883:18, 883:20,
883:25
**led** - 798:7, 823:15
**left** - 677:4, 677:11,
678:11, 678:19, 678:22,

699:17, 700:1, 743:4, 743:5,
796:5, 812:14, 821:13,
827:21, 835:2, 855:18,
860:24, 876:14
**legal** - 908:2
**legend** - 897:21
**legitimate** - 902:3
**length** - 756:24, 761:19,
792:6, 880:16
**less** - 683:23, 691:5,
691:14, 709:23, 710:3,
712:17, 732:18, 735:5,
735:6, 772:3, 772:14,
773:19, 797:4, 812:20,
813:7, 832:22, 880:12
**Less**- 773:20
**lesser** - 812:23
**letting** - 737:5
**level** - 714:15, 755:22,
767:16, 779:16, 779:20
**liability** - 899:25, 901:24,
904:4, 904:6, 905:24,
907:21, 908:1, 909:4,
914:22, 914:23
**liable** - 899:22, 899:24,
915:25
**licensed** - 767:16, 767:18,
770:10, 770:23, 773:3,
775:7, 798:11, 798:12,
815:14, 815:16, 896:12
**licensure** - 798:15, 814:22
**lid** - 778:20, 779:8, 788:9
**life** - 681:18
**light** - 814:2, 914:11
**likely** - 763:23, 778:24,
779:20, 799:24
**limb** - 801:19, 801:21
**limine** - 673:10, 673:13,
674:6, 899:16
**limit** - 759:15
**limited** - 736:1
**Limited**- 879:11
**limits** - 803:6, 803:10,
812:19, 819:13, 819:19,
871:3, 871:5
**line** - 668:8, 677:12,
696:10, 737:20, 738:3,
738:6, 738:10, 738:12,
738:15, 743:8, 756:20,
757:22, 763:25, 764:7,
770:18, 771:2, 771:6, 771:7,
774:16, 782:1, 782:15,
784:25, 787:23, 790:16,
791:18, 793:18, 794:16,
794:24, 796:10, 796:13,
801:12, 807:7, 808:15,
809:25, 812:5, 812:24,
817:19, 819:18, 819:23,
821:19, 822:4, 822:5, 822:7,
823:14, 823:19, 823:24,
824:3, 824:6, 824:9, 824:20,
825:1, 825:15, 825:16,
826:1, 826:2, 826:14,
826:18, 826:19, 827:13,
827:16, 829:8, 830:1, 830:2,
837:16, 837:22, 838:1,
839:18, 841:3, 841:4,
841:24, 842:16, 868:4,
876:8, 896:15, 896:22, 913:2
**linear** - 829:21
**lines** - 741:23, 742:5,
742:10, 742:14, 743:11,
768:8, 770:24, 781:24,
828:22, 828:23, 844:15,
865:3, 871:20, 913:10,
913:13, 913:14
**list** - 670:24, 674:2, 886:19
**listed** - 670:6, 741:21,
782:12
**listen** - 817:25

**literally** - 827:25
**live** - 675:2, 675:3, 681:6,
683:13, 700:3, 721:18,
721:21
**lived** - 718:18, 721:22,
746:11, 876:24
**lives** - 720:19, 752:4,
876:24
**livid** - 728:18
**living** - 675:15, 675:20,
681:23, 683:12, 683:21,
834:25, 905:16, 915:15
**Living**- 720:3
**lo** - 796:24
**loader** - 857:20
**loading** - 817:1, 817:7
**loan** - 890:8
**localization** - 776:6
**localize** - 817:8
**localized** - 769:18
**locate** - 794:17, 796:16,
802:24, 812:13, 842:6
**located** - 729:9, 742:11,
777:4, 791:14, 792:5,
802:20, 868:18
**Located**- 793:16
**location** - 737:22, 737:25,
742:21, 743:16, 761:9,
767:19, 791:21, 823:16,
851:17
**locations** - 742:11, 824:4
**Lof**- 865:14, 865:17
**logical** - 765:1
**look** - 667:20, 668:13,
672:20, 676:23, 691:19,
696:8, 699:22, 704:6, 704:8,
707:15, 710:6, 714:13,
718:21, 729:23, 735:9,
755:20, 759:12, 769:14,
776:25, 785:15, 788:1,
791:7, 793:22, 801:7,
805:16, 827:2, 827:12,
828:20, 828:22, 845:11,
852:3, 852:6, 853:13,
853:24, 856:16, 859:9,
861:2, 861:22, 866:10,
875:1, 875:18, 875:20,
882:22, 898:24, 907:17
**looked** - 669:5, 697:22,
705:22, 707:12, 707:23,
709:2, 709:4, 714:14, 717:3,
746:25, 749:15, 783:22,
788:8, 803:20, 804:11,
827:2, 831:5, 833:23,
837:16, 854:18, 855:14,
861:5
**Looking**- 743:3
**looking** - 676:25, 678:11,
683:17, 697:11, 699:10,
699:15, 699:18, 699:24,
710:11, 710:12, 731:24,
757:2, 792:11, 801:3, 807:1,
818:19, 828:21, 839:3
**looks** - 771:22, 795:3
**lopped** - 897:1
**Loretta**- 901:21, 902:9
**loss** - 910:3
**lost** - 804:2
**lottery** - 712:14, 726:21
**low** - 756:2, 757:8, 813:3,
865:15
**lower** - 708:6, 781:19
**lowest** - 765:8, 765:9,
780:12
**Ltd**- 666:4
**Lucas**- 714:15, 766:15
**lunch** - 672:14, 797:15
**Lunch**- 797:18
**lunchtime** - 672:16

# M

**machine** - 801:4, 801:10,
837:14
**machines** - 845:10
**magenta** - 827:10
**magic** - 843:6
**magnitude** - 917:19
**Mai** - 702:6, 702:12
**mails** - 671:10, 672:2
**main** - 692:13, 692:17,
692:23, 695:3, 695:8,
720:24, 753:16, 754:24,
786:3, 799:7, 815:23,
817:20, 847:12, 847:14,
849:8, 850:15, 851:19,
858:13, 864:9, 865:5, 868:9,
879:21, 879:23
**mains** - 864:5, 864:6,
865:6
**maintain** - 865:2
**maintained** - 774:23,
873:24
**maintaining** - 865:1
**major** - 686:11, 686:13,
702:15, 715:24, 716:1,
716:21
**man** - 690:23, 763:24,
766:12, 766:20, 766:22,
766:23, 775:8, 775:10,
778:15, 848:13, 849:14,
849:16, 850:20, 851:16,
854:20, 855:10, 857:10,
871:13, 871:20
**manager** - 740:6
**Manhattan** - 901:21
**manhole** - 678:21, 696:22,
697:4, 751:3, 751:14,
751:19, 764:24, 777:3,
777:8, 777:25, 778:11,
778:20, 779:1, 779:7, 779:8,
782:14, 783:11, 787:8,
787:20, 788:8, 789:6,
804:18, 805:6, 805:10,
806:24, 853:12, 855:12,
855:14, 855:16, 856:8,
856:10, 858:3, 859:12,
860:6, 860:7, 860:20,
860:21, 860:22, 860:24,
866:24, 866:25, 867:2,
868:8, 874:12, 874:20,
875:3, 875:4, 876:7, 876:11,
877:1, 881:23, 883:8, 884:9
**map** - 743:3, 754:11,
787:7, 832:4, 844:13
**March** - 839:7
**mark** - 719:8, 719:9,
719:14, 719:23, 770:3,
771:6, 772:20, 774:19,
782:3, 789:22, 796:13,
796:19, 796:21, 797:1,
797:2, 797:4, 812:17,
812:18, 812:22, 819:11,
819:12, 823:10, 831:23
**marked** - 673:1, 719:1,
719:7, 792:16, 801:12,
807:5, 821:2, 824:6, 888:3,
893:16
**market** - 675:21, 681:19,
683:25, 706:10, 706:11,
706:12, 706:14, 708:5,
708:6, 736:17, 757:10
**marketed** - 681:21,
682:14, 682:16, 684:13,
684:18, 684:20
**marketing** - 683:7, 683:11,
683:13, 730:24
**marking** - 768:7, 769:7,
770:17, 789:17, 789:18,

**794:8, 801:14, 817:19,
819:12, 819:17, 819:18,
822:1, 825:2
**markings** - 789:16, 791:9,
807:4, 828:1, 848:16, 848:17
**marks** - 741:19
**Marv** - 672:22, 892:9
**Marv's** - 894:6, 896:11
**Marvin** - 666:13
**master** - 702:14
**master's** - 701:16, 701:19,
740:10, 740:12
**matching** - 831:24
**material** - 806:24, 896:6
**materials** - 705:7, 710:21
**math** - 734:18
**matter** - 762:21, 792:11,
901:15, 906:25, 907:5,
907:9, 920:6
**matters** - 888:11, 898:12
**Maumee** - 666:15, 847:21
**maximum** - 832:20
**Mccarthy** - 668:9, 671:18,
674:9, 674:23, 675:3, 680:3,
680:19, 685:16, 698:13,
699:6, 699:20, 718:18,
718:19, 718:22, 720:6,
738:1, 738:6, 752:4, 752:15,
752:23, 755:12, 826:12,
826:22, 842:21, 849:19,
854:22, 855:2, 855:10,
856:18, 861:16, 861:22,
871:24, 874:11, 874:17,
878:18, 883:5, 912:12,
916:5, 919:2, 921:3, 921:5,
921:7, 921:9
**Mccarthy's** - 720:2,
721:22
**Meadows** - 666:19, 706:1,
708:21, 708:22, 709:7,
709:10, 709:16, 716:14
**mean** - 682:17, 684:6,
684:13, 688:23, 689:24,
690:20, 693:21, 697:20,
702:7, 710:23, 711:16,
712:4, 712:18, 720:19,
722:3, 722:20, 733:9,
744:25, 755:24, 762:18,
774:14, 779:19, 779:20,
783:11, 789:21, 796:12,
797:7, 808:12, 813:8, 816:9,
825:19, 825:24, 826:10,
843:12, 856:7, 856:10,
876:21, 884:2, 898:24,
899:13, 907:6, 915:8, 917:5
**meaning** - 761:3
**meaningful** - 892:7
**means** - 702:12, 773:7,
790:4, 819:12, 836:24,
869:7, 905:24
**meant** - 773:18
**measurable** - 722:8
**measure** - 718:8, 771:5,
772:5, 777:7, 778:18,
778:25, 786:15, 796:5,
796:18, 796:24, 796:25,
801:18, 890:11
**measured** - 774:17,
779:11, 786:19, 786:22,
787:24, 806:20
**measurement** - 766:25,
767:1, 767:7, 771:5, 780:3,
785:21, 788:13, 801:1,
805:3, 805:9, 813:4, 813:7,
816:23, 843:15
**measurements** - 778:14,
778:24, 778:25, 779:14,
779:23, 780:22, 781:1,
782:10, 783:1, 805:2, 805:6,
805:13, 805:14

**measures** - 771:14, 771:16, 800:15
**measuring** - 684:10, 778:15, 813:3
**mechanical** - 666:25, 766:10, 800:6
**meet** - 894:23, 915:3
**meeting** - 849:2, 849:10, 849:11, 850:8, 853:13, 855:1, 861:16, 865:24, 874:16, 877:7, 877:9, 881:20
**Meigs** - 706:23, 709:17
**melted** - 686:12, 686:14, 686:19
**mention** - 705:13, 813:2, 893:3, 893:6, 898:21, 910:2
**mentioned** - 706:10, 706:17, 707:19, 712:2, 723:18, 772:15, 811:15, 820:22, 847:24, 900:4, 901:19
**mere** - 917:18
**mess** - 697:22
**met** - 680:24, 703:5, 703:9, 739:10, 814:17, 814:19, 815:9, 819:23, 855:11
**meters** - 771:23
**method** - 718:4, 800:17, 800:19
**methodology** - 735:11, 735:15, 736:6, 736:8, 801:14
**methods** - 800:16
**Michael** - 674:23, 675:3, 680:19, 698:13, 699:6, 921:3, 921:5, 921:7, 921:9
**Michigan** - 702:5
**microphone** - 752:12, 787:12
**mid** - 706:13, 706:17, 849:12
**middle** - 778:9
**midlife** - 701:21
**might** - 742:3, 758:2, 758:9, 758:10, 759:1, 769:6, 781:1, 783:24, 813:2, 822:22, 829:2, 861:4, 862:16, 867:14, 875:21, 897:2, 897:4, 907:18
**Mike** - 695:21, 718:18, 720:1, 721:22
**miles** - 768:12, 779:22, 786:6, 792:9, 794:8, 802:5, 809:10
**millimeter** - 796:9
**million** - 712:14, 712:16
**mind** - 724:17, 802:7, 802:10, 876:1
**Minimal** - 785:12, 785:14
**minimal** - 752:9, 820:7, 916:18, 916:21
**minimum** - 698:20, 815:9
**minor** - 915:5
**minus** - 810:18
**minute** - 689:13, 706:1, 706:16, 712:4, 743:18, 765:23
**minutes** - 737:10
**misleading** - 739:2, 840:6, 890:6
**misprint** - 900:16
**missed** - 820:21
**misspeak** - 840:17
**mistake** - 668:22, 909:23, 909:24
**mistype** - 900:16
**model** - 683:7
**modern** - 910:19
**modification** - 898:2
**moment** - 673:20, 695:24, 840:20, 841:5, 850:22,

888:1, 907:16
**Monday** - 687:1, 687:6, 687:11
**money** - 730:23, 858:18, 858:21, 906:23
**month** - 679:3, 839:14, 855:4
**months** - 682:10, 682:11, 736:16, 736:19, 785:17, 842:14, 842:21, 855:6, 855:9
**monument** - 791:24, 792:1, 792:12, 793:14, 807:15, 807:19, 807:22, 807:24, 808:6, 808:21, 812:9, 812:24, 821:25, 823:16, 823:18, 825:11, 829:7
**monumentation** - 791:10, 802:24, 821:21, 821:23, 823:13, 825:17, 826:4, 829:8, 831:21, 835:10, 840:15, 841:6
**monumentations** - 838:12
**monuments** - 791:8, 791:11, 792:3, 793:21, 808:3, 808:5, 808:9, 808:16, 822:1, 822:8, 822:10, 823:14, 831:11, 831:12, 834:16, 837:13, 837:15, 841:2, 841:20, 879:4
**morning** - 674:14, 680:21, 680:22, 701:4, 701:5, 737:9, 737:14, 750:21, 752:3, 862:19, 886:4, 886:18, 919:22
**most** - 778:24, 799:24, 800:1, 800:5, 816:11, 821:12, 832:2, 893:3, 909:22, 914:11, 915:4, 915:5
**Most** - 779:20, 798:19, 803:3, 879:5
**mother's** - 872:24
**motion** - 673:10, 673:13, 673:15, 673:22, 674:6, 700:16, 898:15, 899:12, 899:16, 904:15
**Motion** - 898:17
**motioning** - 700:6, 765:5
**motions** - 898:8, 898:13, 898:14, 913:23, 914:1, 914:4
**mound** - 721:23
**move** - 667:3, 694:11, 702:13, 739:8, 769:24, 791:3, 832:19, 858:13
**moved** - 675:12, 680:6, 682:1, 682:6, 682:9, 687:13, 687:14, 694:25, 837:12
**moves** - 667:2
**moving** - 693:25, 697:24, 764:14, 854:8, 866:4
**mud** - 780:19, 842:6, 842:8, 842:12, 852:5, 855:16, 856:19, 857:11, 877:17
**multiplication** - 761:18
**municipal** - 904:4, 904:6, 904:7, 907:20
**municipality** - 865:8, 899:22, 899:24
**must** - 833:13, 901:24, 905:24, 909:12, 914:18, 914:23, 915:1, 916:21

**N**

**name** - 674:1, 680:23, 701:6, 740:1, 766:3, 778:9, 784:21, 797:22, 797:25, 811:8, 814:7, 814:9, 846:13
**names** - 794:11, 886:19

**narrow** - 917:4
**national** - 716:18
**natural** - 701:22, 915:2
**nature** - 701:22, 915:2
**near** - 678:1, 687:10, 688:25, 706:4, 706:23, 707:3, 707:14, 799:22, 818:8, 818:25, 848:7
**nearing** - 730:9
**nearly** - 708:13
**necessarily** - 724:23, 783:4, 791:2, 795:24
**necessary** - 862:24, 902:24, 913:11
**need** - 678:7, 705:7, 708:17, 716:2, 719:23, 723:5, 730:23, 745:21, 756:2, 770:4, 781:13, 782:10, 817:1, 822:18, 822:22, 830:19, 838:12, 852:11, 858:10, 871:13, 871:18, 873:14, 886:14, 888:18, 903:6
**needed** - 700:1, 824:18, 849:8, 876:21
**needless** - 676:24
**negative** - 779:11, 780:3, 780:6, 782:1, 782:12
**negligence** - 900:14, 907:2, 909:16, 912:8, 918:1, 918:13, 919:17
**negotiation** - 671:11
**negotiations** - 872:5
**neighbor's** - 704:19, 849:25, 850:5
**neighborhood** - 676:10, 683:15, 848:9
**neighboring** - 677:11, 679:15, 697:14, 873:22
**neighbors** - 878:18
**Never** - 661:16, 681:17, 681:18
**never** - 668:2, 670:21, 681:21, 685:5, 685:7, 685:8, 686:7, 690:3, 692:7, 694:9, 695:17, 696:2, 696:3, 696:5, 696:6, 724:17, 739:11, 767:2, 792:4, 792:21, 808:2, 808:3, 811:2, 811:16, 812:18, 813:3, 813:6, 878:15, 878:21, 880:25, 881:7, 896:5, 910:20, 911:20
**new** - 701:18, 735:24, 736:2, 755:13, 757:12, 774:12, 845:18, 858:6, 865:3, 867:18, 868:2, 880:5, 880:7, 899:14
**news** - 746:4, 746:25, 748:14, 749:9
**Next** - 891:22, 916:11
**next** - 688:6, 694:5, 696:2, 698:24, 698:25, 699:3, 699:8, 700:18, 712:10, 720:4, 726:9, 737:7, 739:19, 747:18, 747:25, 748:2, 753:13, 755:11, 757:12, 765:18, 782:2, 807:4, 813:22, 813:23, 817:18, 831:6, 834:18, 841:12, 841:14, 851:7, 856:2, 862:8, 876:22, 886:5
**Nfr** - 778:8
**nice** - 675:23, 684:12, 708:11, 724:12, 908:10
**Nicholas** - 778:8, 797:20, 797:24, 807:11, 812:2, 813:16, 922:9, 922:11, 922:13, 922:15
**Nick** - 775:2, 775:3, 775:6, 775:11, 775:17, 776:4,

778:8, 778:13, 783:24, 797:22, 811:5, 817:10, 821:8, 834:1
**Nick's** - 780:2
**Nigh** - 811:5, 811:18, 834:2
**Nigh's** - 813:19
**night** - 667:8, 668:1, 688:23, 851:1, 851:7
**nilly** - 796:12
**nine** - 675:9, 706:25, 714:6, 725:20, 755:23, 756:9, 761:17, 761:19, 768:12, 779:22, 786:6, 792:9, 794:8, 873:13, 917:6
**nine-foot** - 755:23
**nobody** - 693:15, 789:1, 874:23, 891:11, 891:15
**nobody's** - 682:16, 820:10
**noise** - 688:9
**non** - 710:15, 716:10
**non-railroad** - 710:15, 716:10
**Nonadhesive** - 772:18
**none** - 806:25
**None** - 739:9
**normal** - 689:18
**normally** - 789:17, 848:20, 856:9, 895:1
**north** - 751:4, 756:1, 780:4, 825:8, 831:25, 845:5, 856:3, 860:20
**northeast** - 826:1
**Northern** - 666:1
**northwest** - 727:1, 745:11, 780:4, 826:1
**Norway** - 724:8
**note** - 692:15, 705:6, 785:16
**notereading** - 666:25
**notes** - 667:20, 668:13, 672:20, 805:23, 863:10, 895:3
**Nothing** - 699:4, 700:10, 700:11, 765:15, 797:13
**nothing** - 671:2, 671:22, 673:6, 848:9, 854:7, 909:24, 909:25
**notice** - 671:17, 672:8, 782:2, 902:6
**noticed** - 692:23, 778:23
**notified** - 826:12
**notify** - 820:9
**November** - 726:15
**nowadays** - 767:6
**number** - 684:12, 685:11, 710:21, 712:4, 712:16, 717:2, 730:19, 731:16, 736:14, 742:12, 759:8, 760:20, 761:25, 767:5, 769:14, 769:15, 832:11, 833:3, 833:4, 833:5, 836:14, 874:17, 909:10
**Number** - 668:5, 673:12, 688:6, 699:19, 737:15, 738:8, 795:1, 807:18, 833:7, 833:8, 894:4
**numbers** - 699:13, 711:9, 716:3, 741:21, 742:6, 742:7, 742:8, 755:18, 779:16, 805:22, 827:11, 832:21

**O**

**object** - 674:7, 688:14, 738:17, 749:19, 750:11, 755:1, 793:4, 852:14, 853:1, 870:1, 881:14, 887:16, 894:21
**objected** - 853:3, 853:5,

894:4, 895:17
**objecting** - 784:7, 893:11, 893:20, 894:1, 894:2
**objection** - 667:3, 667:10, 667:14, 667:25, 668:1, 668:5, 668:7, 668:21, 669:15, 671:5, 672:10, 695:22, 696:1, 715:13, 735:25, 737:17, 738:5, 738:7, 739:13, 739:14, 747:12, 750:15, 769:8, 772:8, 784:6, 793:6, 837:3, 838:19, 838:23, 840:9, 868:4, 868:7, 872:12, 887:15, 887:18, 889:11, 890:4, 890:17, 891:24, 894:6, 895:11, 895:14, 896:3, 896:11, 897:11
**Objection** - 668:6, 677:10, 677:14, 678:6, 682:24, 695:19, 715:10, 725:5, 731:9, 745:18, 746:8, 748:24, 752:19, 753:20, 758:3, 759:5, 784:4, 793:2, 803:7, 837:1, 838:18, 840:8, 842:2, 852:15, 861:24, 869:18, 871:16, 872:9, 875:8, 876:18, 879:18, 880:22, 881:6, 890:9, 912:20
**objects** - 667:13
**obliterated** - 834:8
**observation** - 776:21
**observe** - 746:23, 776:9
**observed** - 696:5, 750:18, 906:13
**obsolete** - 867:8
**obstructions** - 813:5
**obtained** - 757:24
**obvious** - 774:9
**obviously** - 676:9, 687:1, 747:8, 876:17
**Obviously** - 674:6
**occasion** - 718:19, 731:4, 746:7, 777:6
**occasional** - 718:5, 722:9, 915:6
**Occasionally** - 729:6
**occupancy** - 812:10, 916:23
**occupation** - 774:13, 774:14, 774:18, 792:13, 792:14, 792:18, 797:2, 797:5, 797:8, 810:1, 819:25, 820:1, 820:8, 825:10, 828:8, 829:10, 902:10, 904:25, 905:1, 910:18, 910:20, 911:7, 916:19, 916:21
**Occupation** - 774:15
**occupational** - 774:22
**occupations** - 840:1
**occupied** - 823:25, 829:7, 835:12, 872:23, 902:13
**occupies** - 917:8
**occupy** - 834:5, 840:15, 910:24
**occupying** - 911:4, 911:6
**occur** - 730:25, 855:2, 910:22, 915:21, 916:17
**occurred** - 746:9, 838:16, 915:2
**occurring** - 881:25, 917:25
**occurs** - 722:10, 839:22, 915:10
**October** - 726:15, 785:16, 785:25, 788:11
**offer** - 670:21, 671:13, 671:14, 758:10, 758:11, 907:12
**offered** - 674:18, 872:7
**offering** - 667:24, 671:8,

679:24
**office** - 681:3, 713:8, 779:13, 794:2, 843:20, 893:19
**official** - 705:1
**offline** - 813:9
**offset** - 770:25, 789:17, 789:23, 790:1, 796:2, 796:6, 800:14, 800:25, 813:3, 837:21
**offsets** - 789:20, 789:21, 789:23, 789:24
**often** - 680:5, 720:7, 800:21, 845:14, 845:20, 880:17
**Ohio** - 666:1, 666:5, 666:22, 675:4, 702:4, 727:1, 745:11, 846:4, 846:5, 894:24, 915:25, 918:2, 918:4
**Oklahoma** - 799:1, 799:3
**Old** - 666:4, 670:25, 681:10, 693:22, 714:22, 803:24, 879:11, 899:1
**old** - 693:21, 701:8, 751:21, 766:5, 766:7, 798:2, 814:10, 815:6, 827:24, 846:16, 846:17, 867:4, 876:13
**Old-granite-owned** - 714:22
**on-site** - 753:17, 757:14, 759:18, 847:9, 847:10, 852:12
**once** - 673:5, 686:5, 695:11, 784:24, 821:2, 835:13
**Once** - 708:7, 713:20, 802:13
**one** - 670:4, 675:19, 678:23, 681:2, 682:15, 683:14, 683:15, 684:2, 689:5, 691:2, 692:6, 696:14, 696:17, 697:18, 702:15, 705:22, 707:1, 707:16, 707:19, 709:16, 711:18, 718:20, 724:9, 724:11, 724:18, 726:25, 730:14, 733:21, 733:23, 734:10, 744:24, 745:16, 746:7, 748:11, 752:1, 752:15, 758:22, 758:25, 759:23, 760:9, 762:19, 762:20, 762:24, 767:5, 769:13, 772:6, 772:17, 775:9, 777:15, 778:1, 780:7, 781:23, 786:7, 786:21, 787:21, 789:5, 790:6, 794:10, 799:1, 800:16, 808:4, 812:7, 813:25, 816:24, 817:11, 820:18, 822:24, 823:6, 827:16, 828:18, 832:5, 837:15, 844:14, 845:12, 850:24, 850:25, 851:3, 851:16, 851:20, 851:21, 859:5, 861:10, 861:13, 862:13, 863:8, 865:9, 865:18, 867:17, 870:13, 875:5, 876:2, 878:23, 884:22, 886:15, 894:8, 894:19, 895:1, 895:14, 896:12, 896:20, 896:22, 899:2, 902:18, 902:22, 903:20, 907:17, 908:9, 910:2, 910:7, 910:9, 910:12, 910:21, 915:15, 916:23, 919:13
**One** - 758:6
**one's** - 751:2, 917:18
**one-story** - 762:19, 762:20, 762:24

**one-time** - 916:23
**ones** - 667:7, 667:12, 668:23, 671:7, 708:2, 709:22, 709:23, 710:2, 725:1, 822:18, 834:21, 894:4
**ongoing** - 776:1
**online** - 826:11
**open** - 676:22, 709:12, 756:19, 763:16, 779:7, 801:16, 853:20, 861:1, 877:20, 914:5
**opening** - 861:3, 878:6
**operate** - 767:16
**operating** - 771:13
**operation** - 901:14
**operator** - 767:4
**opinion** - 757:9, 758:11, 784:8, 804:14, 884:13
**opinions** - 739:9, 830:23
**opportunity** - 737:13, 896:4, 911:21
**opposed** - 735:17
**opposing** - 668:24, 673:13
**option** - 712:15
**orange** - 772:19, 772:25, 773:1, 801:17
**orbit** - 772:1
**orchestrated** - 693:25
**order** - 668:16, 710:4, 738:15, 742:15, 819:16, 847:19, 859:3, 889:5, 898:12, 899:15, 904:17
**ordered** - 892:14, 892:24
**ordinary** - 746:20, 912:8
**organizations** - 702:16
**organized** - 898:21
**orientation** - 749:25
**oriented** - 896:9
**original** - 704:5, 720:22, 740:22, 820:21, 833:16, 890:1
**originally** - 675:19, 684:19, 684:20
**originals** - 893:16
**Oscar** - 895:12
**otherwise** - 905:2, 917:2
**Otherwise** - 719:14
**ought** - 809:20
**ourselves** - 919:16
**outlet** - 753:9, 754:19, 782:17, 782:18, 806:11, 806:12, 806:16, 806:19, 806:23, 875:3
**outlining** - 769:21
**outright** - 732:19
**Outside** - 844:23
**outside** - 689:11, 700:17, 743:6, 755:1, 774:6, 784:23, 785:4, 785:11, 860:5, 871:5, 882:4
**outweighed** - 738:9, 890:5
**overflow** - 765:8, 765:10, 765:11
**overlay** - 830:8, 830:9, 830:11
**overlooking** - 903:4
**overrule** - 739:14, 747:12, 770:1, 770:5, 793:6, 895:11
**Overruled** - 725:6, 748:25, 755:3, 769:9, 772:11, 803:11, 842:4, 861:25, 869:19, 871:17, 876:19, 881:1
**overruled** - 677:14, 750:15, 784:6, 837:4, 838:20, 838:23, 868:7
**oversaw** - 740:21
**overstepped** - 871:20
**Owensby** - 904:2, 909:9, 910:6

**own** - 697:2, 713:15, 726:16, 782:16, 831:11, 831:12, 834:12, 883:12, 909:23
**owned** - 681:19, 694:21, 703:24, 714:22, 719:5, 774:23, 832:17, 869:21
**owner** - 895:5, 916:3
**owners** - 870:9
**ownership** - 703:24, 911:1

**P**

**pad** - 742:9
**page** - 669:18, 688:3, 688:5, 688:10, 894:6, 894:9, 894:16, 900:8, 900:11, 900:13
**pages** - 910:8
**paid** - 685:5, 685:7, 685:8, 729:21, 749:9
**pair** - 898:3
**paper** - 738:19, 786:1, 830:10, 840:21
**paperwork** - 822:14
**paralegal's** - 679:19
**parallel** - 825:20
**Park** - 847:17
**park** - 759:25
**parking** - 759:19
**part** - 675:21, 675:25, 719:5, 740:18, 758:18, 768:16, 770:17, 780:10, 786:10, 786:17, 801:2, 835:22, 861:17, 878:13, 884:17, 890:19
**partially** - 696:17
**participate** - 740:17, 783:18, 853:8
**participated** - 681:3
**Particular** - 761:9
**particular** - 668:16, 743:16, 776:2, 799:21, 802:21, 832:5, 835:15, 840:19, 841:5, 845:16, 850:7, 850:22, 851:10, 878:19, 889:5, 901:10
**particularly** - 901:20
**parties** - 820:17, 900:9, 900:12
**parts** - 693:21, 875:9
**passed** - 815:3
**passing** - 747:6
**past** - 702:20, 745:10, 758:18, 810:25, 851:21, 861:10, 865:15, 876:14, 877:11, 878:5
**Pauley** - 766:1, 766:4, 769:5, 770:8, 778:10, 781:4, 784:19, 784:22, 793:14, 795:19, 799:24, 800:3, 800:19, 803:3, 805:4, 806:10, 806:19, 817:13, 817:16, 922:3, 922:5, 922:7
**Pauley's** - 801:2
**pause** - 695:23, 793:10
**paused** - 677:22
**pay** - 676:15, 682:19, 684:4, 684:17, 713:8
**paying** - 681:7, 681:9, 681:10, 681:11, 892:1
**payments** - 685:6
**Pdf** - 833:19
**pedestals** - 776:7
**pen** - 781:14, 825:9
**pencil** - 823:4
**pencils** - 816:14
**pendency** - 888:23
**pending** - 900:18, 900:20
**Pennsylvania** - 702:5

people - 694:10, 704:15, 713:7, 799:25, 816:11, 843:16, 856:15, 876:15, 876:23, 886:25

Per - 822:4

per - 713:22, 714:3, 714:5, 714:8, 715:1, 715:8, 716:8, 727:25, 732:15, 734:25, 761:25, 771:2, 771:7, 816:5, 817:6, 821:24, 826:17, 829:10, 829:13, 831:21

percent - 709:6, 709:8, 709:14, 709:17, 709:19, 709:25, 710:3, 710:18, 733:24, 733:25, 734:1, 734:4, 734:8, 734:12, 757:5, 757:6, 757:8, 773:19, 773:20, 773:21, 839:15, 890:19, 890:21

perform - 777:11

performance - 713:16

perhaps - 675:25, 742:2, 755:12, 832:8, 861:12, 896:19, 903:3, 905:20, 919:2, 919:12

period - 686:3, 706:19, 714:4, 714:11, 716:13, 730:3, 730:25, 732:16, 734:25, 737:2, 745:1, 777:15, 906:6, 906:22

periods - 720:14

permanence - 908:21, 909:6

permanent - 901:5, 901:8, 901:10, 901:17, 901:25, 902:3, 902:10, 905:6, 905:24, 905:25, 910:17, 911:7, 911:16, 914:22, 914:24, 916:19, 916:22, 916:23

permanently - 910:24, 911:3, 911:5

permissible - 890:24

permission - 694:20, 879:15

permit - 757:24, 758:10

permits - 758:17

perpendicular - 771:6, 813:5

Perrysburg - 675:4, 675:7, 705:12, 705:17, 706:3, 708:14, 714:18, 749:8, 749:10, 864:19

person - 682:3, 843:23, 847:6, 847:10, 870:14

personal - 692:8

personally - 698:4, 724:11, 750:21, 811:4, 819:6, 827:1, 839:1, 840:2, 844:22, 853:23, 866:14

persuasive - 900:20

pertaining - 902:4

pest - 861:23

Pete's - 851:19

Peterman - 710:24, 710:25, 717:3, 740:2, 740:3, 740:14, 740:17, 795:2, 795:6, 810:22, 811:5, 811:8, 811:14, 833:8

Peterman's - 717:8, 795:12, 795:24, 833:7, 833:18

Pettis - 828:24, 829:4

phase - 820:20, 886:6

phonetically - 723:14

photo - 737:22, 737:23, 738:2

photo's - 897:1

photograph - 677:15, 685:9, 685:11, 686:11,

692:12, 698:23, 737:15, 737:25, 738:3, 738:10, 738:14, 738:25, 789:10, 792:24, 897:12

photographs - 676:20, 719:20, 854:17, 878:17, 893:13, 896:19

photos - 719:2, 719:3, 838:25, 839:4

physical - 773:6, 773:7, 776:25, 902:10, 904:25, 905:1, 910:17, 910:19, 910:21, 911:7, 911:19, 916:14, 916:19

physically - 776:6, 783:16, 788:2, 795:8, 916:1

Physically - 840:19

pick - 824:18, 824:21, 835:9, 835:10, 837:25, 838:11, 841:6, 896:10

picked - 709:20, 857:13

picks - 773:2

pickup - 857:14, 857:17

picture - 685:18, 718:23, 718:25, 737:20, 793:3, 795:4, 833:16, 895:22

pictured - 791:10

pictures - 707:9, 718:13, 718:16, 838:24, 887:22

piece - 830:10, 857:9, 858:11

pieces - 840:21, 848:19

pile - 668:23, 671:8

pine - 721:23

pink - 772:19, 772:25, 827:17, 826:19, 827:10

pipe - 694:21, 694:23, 697:12, 698:1, 750:5, 750:7, 751:23, 752:23, 752:24, 755:17, 756:2, 759:4, 763:13, 763:16, 764:7, 764:10, 764:13, 764:21, 764:23, 764:25, 765:3, 765:7, 778:2, 779:5, 780:6, 780:10, 780:11, 780:14, 781:24, 782:4, 782:9, 782:13, 782:14, 782:17, 782:18, 783:2, 785:17, 785:20, 786:6, 786:12, 786:15, 786:23, 786:25, 787:1, 787:2, 788:6, 788:7, 788:15, 788:18, 788:19, 789:2, 789:3, 804:24, 805:7, 805:10, 806:3, 806:6, 806:7, 806:12, 806:19, 806:20, 806:23, 829:1, 835:18, 835:23, 847:19, 847:22, 848:2, 849:3, 849:6, 849:8, 849:22, 850:9, 850:10, 850:13, 850:20, 850:25, 851:1, 851:2, 851:3, 851:10, 851:19, 851:20, 851:21, 851:22, 851:23, 852:1, 852:4, 852:10, 852:11, 852:24, 853:9, 853:14, 853:17, 853:19, 853:24, 854:2, 854:8, 854:18, 854:19, 854:20, 855:19, 855:23, 856:4, 856:16, 857:8, 857:9, 857:17, 857:19, 857:23, 857:24, 858:2, 858:3, 858:6, 858:7, 858:11, 858:20, 858:23, 858:24, 858:25, 860:11, 860:15, 860:16, 860:17, 860:24, 861:3, 861:16, 861:17, 865:21, 866:9, 866:14, 866:21, 866:23, 867:1, 867:4, 867:11, 867:13, 867:18, 868:2,

868:9, 868:13, 868:14, 868:17, 868:18, 868:25, 869:3, 869:5, 869:8, 869:9, 869:11, 869:12, 869:13, 869:14, 869:15, 869:21, 870:2, 873:20, 874:12, 874:20, 874:22, 874:24, 875:4, 875:25, 876:13, 877:7, 877:9, 877:14, 877:16, 878:2, 878:5, 878:13, 879:7, 879:12, 880:6, 880:8, 880:14, 880:16, 881:23, 884:13, 884:22, 915:23, 919:9

pipe's - 879:9

pipeline - 871:14

pipes - 806:16, 848:13, 855:18

Pipes - 851:5

piping - 873:24

place - 668:12, 759:25, 762:24, 765:1, 765:6, 765:8, 765:9, 794:23, 797:15, 820:18, 826:22, 839:12, 896:5

Place - 675:4

placed - 754:5, 774:12, 790:25, 791:15, 848:18

places - 820:12

placing - 912:16

plaintiff - 673:11, 674:6, 674:17, 700:15, 885:24, 895:5, 899:1, 901:4, 903:11, 904:19, 909:12, 914:4, 914:11, 915:5, 915:19, 916:9, 916:16, 916:22, 918:7

Plaintiff - 667:2, 900:9, 916:13

plaintiff's - 674:18, 826:11, 898:13, 902:14, 909:14, 912:10, 913:21, 917:9

Plaintiff's - 667:4, 668:6, 668:17, 671:9, 887:14, 887:16, 888:4, 889:7, 889:11, 898:1, 900:14

plaintiffs - 832:13, 915:3

Plaintiffs - 666:5, 666:13

plan - 712:18, 740:18, 741:2, 741:14, 741:19, 744:9, 744:12, 744:20, 745:17, 748:3, 748:13, 763:7, 768:23, 800:7, 826:17, 826:24, 846:2, 887:7, 894:5

plans - 741:10, 747:16, 751:13, 754:16, 757:13, 768:18, 768:21, 769:23, 785:7, 800:9, 803:1, 816:25, 817:6, 819:20, 868:16, 870:13, 874:19, 874:21, 875:1, 875:14, 875:18, 876:4, 876:7, 893:25

plant - 693:20, 721:23, 722:1, 723:17, 723:19, 724:6, 724:22, 873:11, 873:13

planted - 724:21

planting - 723:9, 761:15

plants - 906:23

plastic - 830:8

plat - 793:24, 794:5, 832:4, 832:5

plateau - 693:18

plats - 794:1

platted - 705:23

play - 888:10

played - 672:24, 672:25, 888:8

pleased - 731:8

pleasure - 679:22

plot - 819:22, 822:12

plug - 883:20, 883:25

plugged - 754:16, 754:18, 853:20, 866:17, 867:14, 869:15

Plus - 744:17

plus - 670:1, 713:24, 810:18, 863:20

Pm - 797:17, 919:24

point - 677:13, 692:15, 697:13, 700:2, 703:15, 738:14, 739:12, 742:4, 747:15, 769:14, 772:6, 773:6, 773:7, 780:13, 800:21, 800:23, 800:25, 802:6, 803:9, 804:25, 808:14, 819:23, 820:23, 823:5, 828:17, 837:23, 838:5, 850:8, 851:21, 859:7, 862:14, 872:19, 886:2, 896:10, 903:7, 903:9, 904:3, 905:18, 907:18, 912:19, 919:7

pointing - 743:7, 826:24

points - 715:19, 769:11, 769:12, 769:18, 769:19, 769:20, 770:22, 771:1, 779:2, 817:9, 837:21, 848:20, 904:23

pole - 801:19

policymakers - 904:7

pond - 698:24, 708:9, 755:15, 755:17, 759:3, 759:24, 760:10, 760:14, 763:18, 764:24, 765:4, 765:7, 765:18, 764:24, 765:7

ponding - 685:10, 685:24, 692:9, 692:11, 692:14, 692:23, 694:14, 695:2, 695:6, 695:12, 695:16, 696:2, 696:4, 696:8, 696:12, 697:25, 717:25, 718:5, 720:21, 721:6, 722:9, 748:18, 748:20, 752:2, 763:24, 873:21, 882:9, 905:14, 906:17, 915:6, 915:13

Ponding - 745:8, 745:9

ponds - 721:18, 756:22, 759:20

poor - 773:18, 783:6

pop - 879:25, 880:11

portion - 672:25, 740:7, 744:4, 754:13, 760:6, 763:9, 888:7, 906:16, 907:6, 907:8, 915:6, 915:11, 917:7

portions - 783:7

portray - 894:22

pose - 747:21

position - 772:2, 796:4, 814:18, 868:10, 913:6

positioning - 767:9, 776:24

positions - 900:8, 900:12

positive - 783:9, 788:14

possession - 809:6

possibility - 757:11, 821:4

possible - 704:17, 742:1, 753:8, 764:1, 890:5

possibly - 722:4, 787:14, 849:3, 851:2, 858:1

post - 791:17, 791:20

posterity - 888:11

posting - 791:13, 793:15, 791:19

posts - 773:17, 791:14, 791:19

potential - 827:6, 917:4

potentially - 753:7

power - 801:19

practical - 906:25

**practically** - 897:13
**practice** - 843:20
**preconstruction** - 888:7
**preexisting** - 917:1
**prefer** - 831:19
**prejudgment** - 890:23, 891:1, 891:3
**prejudice** - 738:9
**preliminary** - 900:5
**premier** - 727:1
**preparation** - 741:8, 741:9
**prepare** - 776:18, 822:14
**prepared** - 741:7, 778:7, 810:22, 811:14, 822:16, 828:11, 828:13, 843:11, 873:9, 896:11, 900:13
**preparing** - 843:22
**presence** - 700:17, 789:4, 808:8
**present** - 711:24, 712:2, 712:5, 712:13, 712:17, 716:20, 730:20, 736:23, 738:2, 790:7, 852:20, 916:13
**presented** - 672:9, 738:4, 739:5, 836:25, 903:3, 906:3, 914:10
**presently** - 721:11, 847:2
**preserved** - 857:19
**pressure** - 865:12, 865:15, 879:21
**pretty** - 680:13, 686:22, 686:23, 690:14, 706:12, 708:13, 709:6, 709:18, 735:2, 771:22, 775:24, 810:20, 820:11, 827:8, 883:22, 905:6
**Pretty** - 798:21
**prevent** - 885:14
**prevented** - 857:3
**previous** - 804:1, 912:14
**previously** - 719:12, 769:12, 862:24
**price** - 707:21, 708:6, 709:3, 709:5, 710:7, 723:9, 771:13, 873:16
**prices** - 670:9, 707:24, 710:6, 711:10, 716:13, 716:16, 729:19, 730:6, 730:10, 730:15, 731:3
**pricing** - 729:20, 730:22, 872:20
**prima** - 904:21
**primarily** - 834:22
**primary** - 769:17, 770:19
**print** - 808:24
**printed** - 776:20
**private** - 807:16, 847:7, 866:5, 870:9, 900:11, 911:1, 916:18
**probable** - 752:25
**probative** - 738:9
**probe** - 855:17, 855:18, 860:12, 861:3, 861:7, 861:8, 879:2
**probed** - 860:11
**probing** - 859:22, 859:23, 860:5
**problem** - 668:25, 669:1, 694:18, 695:17, 720:24, 787:18, 818:16, 819:7, 821:15, 834:15, 841:8, 841:9, 848:25, 865:11, 881:24, 884:11, 884:15, 886:25, 887:5, 901:5, 901:8, 901:10, 906:20, 918:21, 919:9
**problems** - 671:12, 672:5, 672:7, 818:17, 865:15
**proceed** - 705:20, 842:4
**Proceed** - 898:16

**Proceedings** - 666:25
**proceedings** - 920:5
**process** - 671:11, 703:12, 705:3, 720:12, 722:22, 735:3, 848:6
**produce** - 916:9
**produced** - 666:25, 836:7
**profession** - 701:10, 746:21, 843:12, 896:2
**professional** - 676:24, 746:23, 747:8, 771:14, 784:8, 815:4
**profile** - 828:25
**profitable** - 735:5
**program** - 816:12
**prohibited** - 892:10
**prohibits** - 906:15
**project** - 693:9, 695:3, 695:8, 697:8, 697:9, 703:19, 704:7, 704:8, 705:2, 714:12, 740:6, 768:4, 770:13, 770:15, 774:11, 779:18, 779:22, 792:9, 799:8, 799:12, 802:2, 802:3, 806:16, 815:22, 817:20, 847:12, 864:9, 867:8, 868:16, 871:21
**projection** - 730:3
**projector** - 822:24
**projects** - 701:24
**prominently** - 690:6
**promptly** - 887:8
**proper** - 748:18, 826:15, 889:14, 890:11, 892:3, 897:21
**properly** - 896:9
**properties** - 704:1, 712:1
**property** - 677:11, 677:16, 679:16, 692:8, 692:16, 692:19, 694:16, 695:3, 695:7, 696:11, 696:23, 697:14, 698:6, 704:7, 704:11, 704:12, 704:19, 704:25, 706:24, 707:4, 707:5, 707:6, 707:15, 710:8, 710:9, 710:10, 710:11, 710:13, 712:9, 713:17, 713:20, 713:21, 714:10, 716:23, 718:5, 718:10, 718:12, 720:2, 720:18, 722:5, 728:19, 729:23, 730:25, 732:14, 735:7, 737:1, 743:21, 744:3, 744:4, 750:6, 751:4, 751:19, 753:5, 753:25, 754:7, 754:13, 760:11, 769:20, 770:18, 770:24, 771:2, 784:25, 787:1, 792:15, 793:18, 794:24, 796:9, 796:13, 798:20, 804:19, 807:16, 809:25, 812:5, 812:24, 817:19, 821:19, 822:7, 823:23, 824:20, 824:23, 826:14, 829:13, 829:14, 831:11, 838:7, 841:24, 842:23, 844:15, 849:3, 849:23, 849:24, 849:25, 850:5, 850:6, 866:5, 873:22, 874:1, 879:12, 885:18, 895:5, 895:8, 900:11, 901:3, 902:11, 902:14, 905:17, 905:19, 906:16, 907:7, 907:8, 908:1, 908:5, 908:16, 910:18, 911:4, 911:6, 912:25, 916:2, 916:4, 916:7, 916:8, 916:19, 917:14, 917:17, 918:15, 918:8
**proposal** - 873:11
**proposals** - 902:17
**proposed** - 741:22, 742:7,

789:2, 790:16, 900:7, 900:8, 902:24, 903:5, 903:22, 909:10, 912:5
**protect** - 747:24, 919:16
**prove** - 825:3, 846:1
**provide** - 719:11, 724:15, 778:4, 778:13, 907:1
**provided** - 674:3, 767:17, 802:19, 816:4, 899:4, 899:7
**Provided** - 763:5
**provides** - 914:16
**providing** - 759:23
**proving** - 671:22
**provision** - 907:17
**Public** - 767:13
**public** - 768:12, 769:21, 769:22, 776:6, 792:22, 831:6, 900:11, 910:24
**publication** - 716:19
**puddle** - 720:5
**pull** - 778:20, 791:1
**pump** - 754:23, 754:24, 755:4
**pumping** - 754:22, 755:23, 847:17, 905:2
**pumps** - 755:5
**purchased** - 845:16, 845:17
**purpose** - 671:20, 673:22, 698:3, 704:5, 704:6, 776:10, 796:8, 838:2, 845:24, 846:1, 864:13, 870:8, 871:1, 876:17, 877:21, 896:16
**purposes** - 669:22, 675:19, 772:12
**pursue** - 673:15
**pursuing** - 673:12, 834:15
**pushed** - 694:4, 774:8, 810:2, 810:12
**pushing** - 845:4
**Put** - 867:18
**put** - 668:9, 668:11, 682:3, 688:10, 692:17, 692:23, 694:15, 716:23, 723:5, 725:20, 742:2, 751:22, 752:23, 757:17, 760:6, 761:14, 761:15, 763:16, 768:24, 769:6, 786:12, 789:16, 789:17, 794:23, 801:17, 809:16, 816:9, 826:22, 828:1, 843:6, 843:8, 857:14, 857:20, 858:6, 858:7, 865:13, 868:2, 869:12, 873:13, 875:2, 876:17, 877:22, 877:24, 880:5, 880:14, 881:22, 881:23, 883:6, 884:14, 894:13, 906:23, 919:15
**putting** - 760:10, 763:13, 794:16, 880:6, 895:3

**Q**

**qualifications** - 702:10, 798:13, 814:18, 814:19
**qualified** - 745:20, 814:15
**qualify** - 815:7
**quality** - 757:15, 757:20
**quarter** - 772:14
**quarters** - 772:17
**questioned** - 788:17
**questioning** - 868:4
**questions** - 680:15, 721:11, 728:24, 731:11, 735:20, 739:1, 759:8, 762:2, 762:9, 763:11, 764:17, 784:17, 795:14, 811:23, 836:1, 843:1, 844:17, 846:7, 854:11, 862:4, 871:25, 884:17, 912:14

**quick** - 858:17, 899:19, 919:13
**quickly** - 735:3, 781:23
**quite** - 760:19, 787:14, 856:20, 867:10, 880:17, 898:23
**quotation** - 723:9
**quote** - 892:18, 892:19, 916:18, 916:20, 917:22, 918:4, 918:5, 918:7, 918:8
**quoted** - 724:20, 760:13

**R**

**radio** - 878:12
**railroad** - 669:9, 669:12, 677:8, 677:12, 678:1, 678:5, 678:13, 690:4, 692:2, 692:4, 693:8, 693:12, 694:21, 695:10, 704:11, 705:25, 706:4, 706:7, 706:24, 707:2, 707:7, 707:8, 707:13, 707:20, 708:20, 709:2, 709:4, 709:8, 709:9, 709:21, 709:23, 710:2, 710:15, 710:17, 716:10, 716:11, 721:24, 743:20, 743:21, 744:2, 744:4, 744:9, 744:17, 749:15, 750:6, 751:3, 751:19, 751:25, 753:5, 753:14, 753:23, 754:7, 754:11, 754:13, 754:15, 754:16, 762:10, 763:2, 763:16, 764:22, 764:23, 765:13, 768:3, 768:6, 769:20, 770:25, 772:7, 773:14, 774:4, 774:7, 774:9, 774:20, 775:4, 780:8, 787:1, 787:4, 789:13, 789:15, 791:18, 791:21, 791:22, 792:14, 792:16, 792:25, 793:1, 796:18, 806:7, 806:8, 809:11, 809:23, 810:2, 810:4, 810:10, 819:11, 819:14, 821:22, 821:23, 822:3, 822:5, 822:7, 823:14, 823:22, 824:7, 825:10, 825:14, 825:15, 825:19, 825:22, 826:3, 826:21, 828:6, 829:10, 835:3, 836:11, 849:23, 849:24, 850:4, 852:12, 852:23, 853:5, 853:15, 853:16, 854:4, 854:5, 855:11, 855:22, 865:25, 866:4, 869:22, 870:1, 870:4, 870:7, 873:25, 874:13, 874:19, 875:2, 875:14, 875:25, 876:4, 876:14, 879:13, 881:23, 882:18, 882:25, 883:3, 884:14, 884:23, 885:13, 896:17
**railroad's** - 774:22, 792:22, 821:18, 823:23
**railroads** - 705:11, 806:13
**railway** - 691:18
**rain** - 680:8, 686:23, 687:4, 746:9, 746:23, 747:17, 749:8, 750:10, 750:12, 750:13, 853:23, 885:14, 906:5
**rained** - 687:1, 687:6
**rainfall** - 696:20, 745:1, 746:2, 747:9, 906:6
**rainfalls** - 747:3, 747:21
**raining** - 854:7
**rains** - 695:7, 720:15, 759:21, 905:7, 915:10
**rainy** - 718:14, 722:10
**raise** - 725:9

**raised** - 753:15, 753:17, 753:18
**raises** - 739:1
**ran** - 819:24, 826:19, 855:20, 874:12, 880:21
**range** - 707:21, 708:3, 734:14, 761:3, 835:2, 896:10
**rate** - 713:19, 714:5, 715:3, 716:17, 733:25, 890:18, 891:14
**rather** - 864:8, 899:13, 907:5, 912:8, 916:23
**rational** - 718:4
**rationale** - 718:6, 720:24, 722:9
**Ray-** 849:18
**reach** - 708:18, 710:4, 804:10, 819:23, 830:23
**reached** - 704:24, 834:1
**read** - 668:20, 778:6, 780:2, 801:7
**readily** - 818:23
**reading** - 766:25, 801:8
**reads** - 767:5, 897:11
**ready** - 674:20, 834:18, 886:24, 898:7
**real** - 675:8, 675:9, 681:12, 681:16, 685:15, 701:13, 701:17, 701:20, 701:23, 704:18, 781:23, 816:8, 816:20, 816:23, 819:22, 827:12, 910:18, 916:19
**Real-** 701:11
**realize** - 673:16
**really** - 673:17, 676:8, 676:11, 683:24, 687:23, 706:23, 707:18, 735:4, 810:9, 825:3, 836:8, 836:12, 839:9, 858:3
**rear** - 719:4, 720:1, 720:18, 742:19, 742:21, 742:23, 808:2, 881:25, 905:4, 905:7, 917:7
**reason** - 670:3, 670:17, 673:25, 719:17, 811:22, 865:13, 891:20, 895:15, 899:3
**reasonable** - 734:22, 739:10, 748:17, 748:20, 755:18, 756:11, 756:21, 803:12, 830:24
**reasons** - 759:1, 904:16, 918:10
**rebuffing** - 871:24
**rebuttal** - 885:24
**recalculated** - 821:22
**receive** - 771:25
**received** - 746:5, 900:7
**receives** - 771:25
**recent** - 747:4
**Recently-** 749:9
**recently** - 750:18, 751:7
**Recess-** 737:11, 739:17, 862:22
**recess** - 797:15, 797:17, 797:18, 862:20
**recognize** - 741:4, 777:24, 794:21, 897:2
**recognized** - 811:10, 843:12
**recollection** - 697:2, 818:7, 839:10, 857:24, 881:10
**recommend** - 764:2
**recommended** - 703:11, 763:21
**reconsider** - 895:19
**reconstructed** - 783:8, 783:11
**Reconvened-** 667:1

**record** - 669:14, 673:5, 674:15, 680:1, 700:14, 700:25, 708:13, 719:15, 752:13, 769:3, 773:25, 775:13, 781:6, 787:15, 805:14, 809:7, 862:11, 867:22, 887:25, 888:2, 889:3, 889:4, 898:9, 899:19, 903:3, 903:8, 912:20, 919:15, 919:16, 919:20, 919:22, 920:5
**recorded** - 666:25, 783:23
**recorder's** - 794:2
**records** - 850:3
**recoverable** - 901:17
**Recross** 699:6, 731:13, 764:19, 813:16, 844:19, 885:10, 921:9, 921:17, 922:1, 922:15, 922:23, 923:11
**Recross-examination-** 699:6, 731:13, 764:19, 813:16, 844:19, 885:10, 921:9, 921:17, 922:1, 922:15, 922:23, 923:11
**redact** - 671:16
**redacting** - 897:5
**redirect** - 811:24, 862:6
**Redirect-** 698:10, 698:13, 729:1, 762:4, 762:7, 795:16, 795:19, 812:2, 843:4, 884:19, 921:7, 921:15, 921:24, 922:7, 922:13, 922:21, 923:9
**reduce** - 712:4, 712:12
**reducing** - 730:20
**reduction** - 704:18, 712:17, 726:1
**redundant** - 907:4
**reexamining** - 897:24
**refer** - 705:6, 779:21
**reference** - 729:10, 782:8, 892:13, 900:9, 903:1
**referenced** - 752:24, 893:22
**referencing** - 691:13, 750:1, 915:22
**referring** - 714:21, 824:14
**refers** - 806:3
**reflect** - 700:14, 898:9
**refuse** - 748:7
**regard** - 907:4
**regarded** - 726:22
**regarding** - 901:8, 901:10, 910:3, 919:17
**regardless** - 689:1
**regards** - 864:5
**region** - 865:19
**registered** - 769:25, 770:4, 770:9, 772:10, 896:12
**registration** - 836:14
**regrown** - 901:6, 908:20, 908:24, 908:25
**regular** - 761:2
**Regular-** 761:3
**regularly** - 785:3, 910:24
**relabeled** - 893:19
**relate** - 800:7
**relation** - 769:20, 779:18, 802:25
**relationship** - 864:25, 865:7
**relative** - 791:21, 817:9
**relatively** - 871:8, 917:4
**relativity** - 836:10
**relevance** - 669:7, 672:3,

**Relevancy-** 673:20
**relevancy** - 674:7, 890:7
**relevant** - 668:19, 669:15, 705:13, 827:6, 830:7, 898:25
**rely** - 697:1, 903:2, 908:10
**remain** - 789:18
**remaining** - 703:22
**remains** - 900:18, 900:19
**remedial** - 781:8
**Remember-** 862:20
**remember** - 685:10, 737:10, 762:12, 763:12, 772:22, 797:17, 801:25, 810:8, 810:10, 839:4, 857:6, 858:1, 864:12, 871:10, 871:25, 886:9, 892:20, 903:16
**Remind-** 893:23
**remind** - 862:23
**reminds** - 892:15
**removal** - 704:4, 704:9, 711:10, 713:4, 716:24, 717:1, 717:6, 916:12, 916:24, 917:10, 918:3, 918:6
**remove** - 867:6, 908:18
**removed** - 690:4, 704:19, 711:3, 711:6, 714:2, 717:8
**removing** - 908:17
**rendered** - 917:9
**renew** - 914:1
**rent** - 675:17, 681:11, 713:8
**repair** - 911:11
**repaired** - 911:15
**repeat** - 720:8, 721:3, 915:7
**rephrase** - 688:18, 695:25, 727:13, 875:10
**replace** - 717:9, 717:19, 722:23, 723:7, 725:7, 728:2, 733:3, 751:23, 850:17, 852:11, 858:23, 858:24, 864:6, 867:17, 873:10, 876:17, 879:6, 879:12
**replaceable** - 916:25
**replaced** - 867:15, 867:24, 869:24, 908:24, 908:25, 917:1
**replacing** - 858:19
**replanted** - 916:25
**report** - 669:24, 670:13, 723:18, 731:24, 736:5, 779:15
**reported** - 782:23
**Reporter-** 666:21, 887:10
**reporter** - 887:9
**reports** - 669:25, 670:16, 746:5, 818:1
**reposition** - 751:16
**repository** - 888:19
**represent** - 680:23
**representative** - 870:5, 870:7
**representatives** - 904:12
**represents** - 781:24, 807:25
**request** - 702:22
**require** - 755:7, 757:13, 757:15, 759:2, 784:10, 912:7, 916:20
**required** - 756:22, 846:4, 846:5, 912:2
**requirement** - 757:18, 757:19, 815:5
**requires** - 909:6, 916:16, 918:3
**Requires-** 715:16
**research** - 713:15

**reserve** - 667:21, 668:14, 674:7
**residence** - 827:18
**resident** - 834:25
**residential** - 681:16, 701:25, 713:7, 809:12
**residents** - 864:22, 877:2
**resolution** - 677:23
**resolved** - 820:14
**respect** - 668:4, 737:19, 737:24, 918:11
**respond** - 758:9
**respondeat** - 899:25, 904:4, 904:15
**response** - 821:6, 912:3, 912:14
**Response-** 913:7
**responses** - 671:22
**responsibilities** - 864:2
**responsive** - 841:17
**rest** - 719:3, 752:10, 835:2, 885:22
**resting** - 700:15
**restrain** - 880:15
**restraint** - 880:14
**result** - 709:19, 718:8, 905:5, 915:24, 917:10
**resulting** - 908:4
**results** - 760:9, 908:1
**Resume-** 830:22
**resurvey** - 783:18
**retail** - 735:17
**retained** - 702:19, 784:24
**retaining** - 773:15
**retention** - 755:15, 755:17, 756:22, 757:14, 759:3, 759:18, 759:23, 760:10
**retire** - 918:15
**return** - 888:15
**returning** - 910:5
**reverse** - 847:19
**review** - 737:14
**reviewed** - 686:15, 816:3
**ribbon** - 771:7, 772:17, 773:3, 773:9, 774:13, 789:24, 790:4, 790:25, 791:14, 791:17, 792:16, 793:15, 807:6, 824:3, 848:19
**ribbons** - 772:15, 775:1, 775:3, 790:12, 791:13, 794:16, 794:23, 809:17, 819:2, 839:18
**ribs** - 774:25
**Ric-** 690:23, 848:13, 849:14, 849:16, 850:20, 851:16, 854:20, 855:10, 857:10, 871:13, 871:20
**Ric-man-** 690:23, 848:13, 849:14, 849:16, 850:20, 851:16, 854:20, 855:10, 857:10, 871:13, 871:20
**rid** - 754:16, 754:17
**right-of-way** - 692:2, 692:5, 693:8, 756:13, 762:10, 763:2, 768:6, 768:8, 768:12, 769:21, 769:22, 771:1, 772:7, 772:21, 774:16, 774:20, 774:22, 780:8, 790:2, 791:22, 792:20, 792:22, 792:23, 794:16, 806:8, 809:12, 821:23, 822:2, 823:15, 882:25, 912:16
**right-of-ways** - 819:20, 917:19
**rights** - 823:21, 909:14, 917:9
**rim** - 779:1, 779:9, 780:15, 869:2
**river** - 717:11, 724:9, 724:22, 847:25, 848:3

**River-** 755:15, 757:22, 758:23, 847:18, 847:20, 847:21, 847:24, 847:25, 848:1, 876:5

**Rmr-** 666:21, 920:9

**Road-** 701:24, 755:14, 756:18, 756:21, 759:4, 854:4

**Road-** 688:25, 689:5, 691:14, 691:19, 697:6, 697:16, 706:3, 706:23, 707:7, 709:17, 753:14, 755:15, 757:22, 758:23, 786:11, 847:18, 847:20, 847:21, 847:22, 847:24, 847:25, 848:1, 876:5, 876:6, 876:25, 877:2

**roadways -** 740:25

**Robert-** 666:17, 700:19, 701:2, 701:7, 721:14, 729:1, 731:13, 767:21, 776:17, 799:16, 814:5, 814:9, 836:5, 843:4, 844:19, 921:11, 921:13, 921:15, 921:17, 922:17, 922:19, 922:21, 922:23

**Robon-** 666:13, 670:3, 670:8, 670:19, 671:14, 672:1, 672:4, 673:9, 673:16, 674:21, 674:24, 677:21, 677:24, 678:9, 679:2, 679:17, 679:19, 679:23, 680:2, 680:15, 682:24, 688:14, 689:15, 690:20, 690:23, 695:19, 695:21, 698:11, 698:14, 699:1, 699:4, 699:12, 699:18, 700:3, 700:7, 700:10, 702:9, 702:20, 715:10, 715:13, 715:16, 719:9, 719:11, 721:15, 725:14, 725:17, 727:13, 727:17, 728:12, 728:23, 731:9, 731:14, 735:20, 738:11, 738:19, 738:23, 739:8, 745:18, 745:20, 746:8, 748:24, 749:3, 749:6, 750:3, 750:13, 751:8, 751:11, 751:18, 752:14, 753:22, 758:6, 758:12, 758:16, 762:2, 763:13, 764:20, 765:15, 768:25, 769:8, 769:24, 772:8, 777:9, 781:9, 784:4, 784:7, 784:20, 787:19, 793:12, 793:13, 795:14, 796:15, 797:13, 797:25, 803:7, 807:12, 809:9, 811:23, 813:17, 813:25, 828:18, 831:16, 836:3, 836:6, 837:9, 838:21, 840:12, 841:16, 841:18, 843:1, 844:20, 846:7, 852:15, 852:17, 854:14, 859:8, 859:18, 862:4, 863:22, 863:25, 867:19, 868:3, 868:6, 869:18, 870:13, 871:16, 871:25, 872:9, 874:6, 874:9, 875:10, 875:12, 881:12, 881:18, 884:17, 885:11, 885:25, 887:23, 888:17, 888:24, 889:18, 890:1, 890:18, 890:25, 891:9, 892:10, 892:20, 893:5, 894:21, 895:18, 896:13, 896:20, 896:24, 897:2, 897:5, 897:18, 898:3, 912:19, 918:25, 921:4, 921:8, 921:14, 921:18, 921:22, 922:2, 922:6, 922:12, 922:16, 922:20, 922:24,

923:4, 923:8, 923:12

**Robon's-** 884:21, 885:2

**rod -** 766:12, 766:20, 766:22, 771:23, 778:21, 778:23, 778:25, 805:5, 859:22, 859:23, 860:5

**Rod-** 766:23

**role -** 740:20, 767:14, 768:10, 768:11, 775:19, 778:11, 799:10, 800:3, 805:11, 805:20, 817:4

**rolling -** 708:11

**Ronau-** 775:2, 776:4, 778:9, 797:20, 797:24, 798:1, 807:11, 807:13, 809:10, 812:2, 813:16, 817:15, 922:9, 922:11, 922:13, 922:15

**Ronau's-** 775:6

**roof -** 762:19

**room -** 669:23, 765:19, 765:23, 871:13, 871:18

**Rossford-** 705:12, 705:16, 705:18, 864:18, 864:21, 864:22, 864:23, 864:25, 865:9, 865:11, 865:14

**Rossford's-** 865:2

**rotten -** 810:19

**Roughly-** 802:2

**Round-** 788:7

**round -** 684:12, 780:11

**rounds -** 735:24

**rows -** 873:12

**rule -** 672:19, 737:14, 738:7, 739:3

**ruled -** 901:1

**ruler -** 778:20

**rulers -** 767:6, 778:22

**rules -** 737:10, 739:10, 797:17, 862:20, 886:10

**ruling -** 667:21, 668:14, 739:5, 894:7, 899:10

**run -** 705:4, 705:5, 753:24, 755:13, 755:16, 756:20, 756:25, 765:11, 765:12, 765:20, 771:12, 774:15, 808:15, 820:2, 841:2, 841:21, 842:15, 867:10, 886:4

**running -** 679:11, 679:12, 755:25, 826:3

**runs -** 752:3

---

## S

**sac -** 669:10

**safely -** 871:14, 886:21

**Safety -** 898:4

**safety -** 790:15, 790:18

**sale -** 670:25, 681:25, 682:12, 682:17, 682:18, 683:3, 683:9, 683:18, 713:5, 714:9, 716:16, 730:1

**sales -** 705:16, 705:17, 706:15, 706:19, 708:13, 708:21, 710:13, 712:10, 713:17, 713:19, 713:22, 714:1, 714:6, 714:14, 714:16, 714:19, 729:18, 729:19, 729:23, 729:24, 735:8

**sanitary -** 756:16

**sat -** 705:1, 726:18, 727:4

**satellite -** 771:25

**satellites -** 772:1

**satisfaction -** 820:17

**satisfies -** 905:21

**save -** 857:8, 858:19, 887:24, 899:6, 899:13

**saved -** 858:21

**saw -** 690:18, 696:22, 697:20, 697:21, 719:19, 749:16, 749:22, 749:23, 750:1, 752:3, 752:4, 786:18, 792:4, 804:7, 804:8, 807:21, 808:3, 808:9, 808:12, 808:22, 812:6, 833:11, 848:19, 853:19, 854:2, 854:20, 855:19, 855:23, 857:9, 866:25, 878:15, 878:21, 878:23

**scale -** 894:25, 895:1

**scaled -** 717:6

**scan -** 833:15

**scenario -** 711:22, 902:15, 902:16

**Schaar -** 872:16, 872:19, 872:23

**schedule -** 886:18

**Schoen -** 731:5

**school -** 675:7, 701:16, 706:3, 766:8, 766:9, 798:5, 814:22, 846:20, 887:1

**schools -** 705:12, 705:14, 705:16, 705:17, 705:18

**science -** 863:16

**scientific -** 919:8

**scissors -** 898:3, 898:4

**scope -** 755:2, 792:7, 794:20, 843:11, 844:23

**screen -** 676:23, 677:5, 721:24, 781:2, 781:4, 781:13, 781:20, 801:8, 801:9, 805:16

**screening -** 724:15

**screens -** 823:6

**sea -** 755:22, 779:16, 779:20

**seal -** 836:20, 836:24, 843:7, 843:9

**sealed -** 764:22, 811:18, 894:24

**sealing -** 845:25

**season -** 722:10, 724:15

**seat -** 744:7, 789:9, 830:22, 861:15

**secluded -** 708:10

**second -** 678:23, 679:5, 685:17, 851:2

**secondly -** 670:24

**Section -** 899:24, 903:1, 909:3, 912:1

**section -** 670:17, 717:7, 720:1, 772:23, 772:25, 786:5, 786:7, 788:18, 802:2, 839:16

**see -** 667:20, 685:15, 687:17, 687:18, 688:3, 688:5, 688:8, 688:11, 689:23, 689:24, 689:25, 690:5, 690:19, 693:5, 694:8, 694:18, 698:19, 698:21, 707:24, 708:1, 708:19, 708:25, 709:13, 719:24, 720:17, 727:6, 727:8, 743:7, 743:12, 745:23, 749:10, 750:6, 751:16, 759:19, 773:23, 781:16, 781:17, 787:8, 789:13, 789:15, 792:1, 792:24, 794:15, 795:6, 795:21, 796:18, 807:4, 807:19, 808:16, 808:21, 809:15, 811:16, 818:12, 818:13, 818:14, 818:21, 826:20, 827:9, 828:8, 828:23, 829:3, 829:4, 834:3, 835:5, 836:14, 838:12, 841:3, 841:22, 845:11, 847:7, 851:25,

852:1, 853:14, 853:18, 853:24, 854:1, 856:22, 859:11, 860:4, 861:2, 861:5, 866:14, 871:19, 878:1, 878:13, 882:4, 882:17, 882:22, 887:12, 900:20, 902:25, 908:23, 918:20

**seeing -** 779:9, 794:12, 818:10, 818:16, 818:18

**seem -** 837:10, 876:15

**selected -** 708:20

**self -** 744:13

**self-contained -** 744:13

**sell -** 676:1, 682:22, 682:23, 711:18, 711:19, 711:21, 711:23, 711:25, 712:9, 713:13, 713:14, 713:23, 713:24, 715:7, 716:7, 716:8, 716:9, 716:10, 716:13, 730:13, 730:25, 731:1, 731:2, 732:22, 732:23, 734:24, 735:2, 735:5, 736:15, 736:18, 736:20, 737:3, 891:16

**sell-out -** 716:13

**selling -** 707:10, 709:3, 709:5, 709:23, 710:3, 710:7, 714:5, 730:24, 732:14, 733:18, 733:19, 736:25, 761:10

**send -** 824:21, 834:18, 886:2, 888:24

**senior -** 767:15

**sense -** 722:6, 801:22, 816:21, 883:5, 883:11

**sent -** 776:4, 821:7, 834:13, 839:23

**separate -** 775:18, 907:21, 907:23

**September -** 788:12

**septic -** 876:25

**series -** 769:11, 893:12

**serve -** 764:10, 864:20, 867:14

**served -** 870:8, 877:21

**service -** 798:6

**Services -** 767:13

**serving -** 850:14

**session -** 781:8

**set -** 769:12, 769:14, 769:16, 770:22, 800:23, 826:14, 837:14, 870:17, 912:7

**sets -** 773:5, 773:7, 893:15, 893:17

**settlement -** 671:15, 893:6

**seven -** 725:11, 725:18, 725:19, 726:19, 726:24, 727:5, 767:25, 785:5, 785:8, 785:10, 830:5, 917:6

**sever -** 877:6, 877:14, 904:9, 904:13

**Several -** 810:17, 820:4

**several -** 667:17, 672:12, 748:15, 800:16, 856:15, 871:25, 879:2, 898:11, 898:22, 901:19, 905:15, 911:23, 915:8

**severance -** 908:3, 915:22

**severe -** 820:8

**severed -** 754:18, 764:8, 786:15, 786:17, 788:15, 866:10

**severing -** 907:24

**severity -** 747:3, 747:6, 747:20, 820:6

**sewer -** 756:16, 756:23, 758:7, 759:13, 759:14, 759:16, 777:3

**sewers -** 742:11, 745:5

shaded - 711:1
Shame - 893:9
shape - 810:20
sheet - 741:13, 777:25, 778:14, 782:11, 896:15
shine - 857:2
shock - 816:7
shoot - 824:15, 825:21, 829:6, 840:3, 840:7, 840:13
shooting - 823:24, 837:13
short - 716:5, 813:4, 850:25, 851:3, 887:11, 888:5
shorten - 715:25
shortly - 697:23, 850:23
Shortly - 850:24
shot - 779:7, 787:25, 802:22, 824:2, 824:9, 825:10, 825:22, 826:16, 834:16, 837:13, 837:19, 837:20, 840:4, 840:7, 840:18
shots - 783:23, 868:14
Show - 678:23, 769:8, 772:8
show - 668:15, 675:22, 741:22, 742:7, 742:9, 742:14, 742:17, 743:17, 751:13, 777:21, 781:4, 822:22, 827:12, 868:3, 868:17, 870:19, 870:23, 871:3, 871:5, 872:13, 873:8, 875:3, 876:5, 876:7, 876:8, 889:22, 889:24, 896:16, 896:21, 913:11, 914:18, 915:19
showed - 674:2, 717:4, 789:11, 870:14, 874:21, 876:8, 888:5
showing - 667:22, 668:11, 787:14, 813:19, 829:11, 829:21, 830:11, 830:12, 869:2, 874:20
shown - 676:22, 694:15, 725:21, 802:25, 846:2, 915:5, 916:22
Shown - 671:1
shows - 670:24, 672:1, 678:15, 719:4, 794:4, 795:6, 810:23, 812:24, 890:1, 890:18, 897:17, 897:18
shrub - 775:5
shrubs - 873:11, 873:15
shy - 824:7
side - 706:2, 728:15, 729:12, 742:21, 743:8, 753:24, 763:15, 763:25, 774:10, 797:3, 827:21, 828:3, 828:5, 841:4, 841:23, 845:12, 859:11, 865:13, 898:14, 918:14
sidebar - 872:13
sides - 840:11, 847:25
sign - 682:16
signals - 771:25
signed - 833:10, 894:24
significance - 898:22, 910:19
significant - 750:13, 820:12, 904:22, 905:4, 906:5, 906:22, 907:9
significantly - 756:6
signing - 845:25, 846:1
signs - 683:4, 727:4
similar - 705:9, 712:14, 791:10, 795:3
simple - 784:10
simply - 673:19, 695:18, 735:13, 747:23, 775:19, 836:25, 899:18, 900:16
simultaneously - 806:2
single - 682:3, 730:13,

894:16, 904:7
sit - 735:22
site - 718:10, 750:18, 750:20, 753:17, 753:23, 757:14, 759:18, 819:13, 844:22, 847:9, 847:10, 852:12, 859:2, 873:7, 881:20, 908:6
sits - 762:11, 800:12
sitting - 749:17, 851:24
situation - 680:9, 753:7, 917:13
Six - 780:20
six - 693:13, 693:14, 731:2, 732:16, 732:23, 734:25, 736:16, 736:19, 736:20, 736:24, 737:2, 753:15, 753:18, 778:21, 778:22, 778:24, 780:14, 780:17, 780:18, 785:17, 810:23, 830:5, 834:2, 834:3, 879:24, 909:24, 913:19, 917:6
six-foot - 834:2, 909:24
six-year - 732:16, 734:25, 737:2
sixth - 713:23, 716:9
Sixth - 900:23, 901:19, 905:22, 910:7, 910:10, 914:16
size - 760:11, 762:19, 897:19
sizeable - 801:4
sketch - 717:8, 805:14, 805:18, 805:21, 805:22, 805:25, 836:25, 893:12
sleep - 688:13, 688:20
slide - 816:15
slightly - 780:18
sliver - 917:7
slope - 743:19, 756:5, 759:19, 761:18, 763:5
sloped - 743:15, 743:17, 743:20, 743:23
slopes - 698:18, 744:3, 744:5
slow - 735:8
slower - 735:5
small - 709:6, 720:3, 720:4, 759:20, 801:8, 828:19, 851:22, 864:6, 915:11
smart - 767:4
smoothly - 886:5
snow - 686:14, 686:19
snowfall - 686:12, 686:13, 686:22
snows - 695:8
soil - 873:14, 880:14, 880:16
sold - 671:2, 676:3, 705:21, 705:23, 705:24, 706:5, 706:6, 706:8, 706:25, 707:9, 708:9, 708:11, 708:23, 708:24, 710:16, 714:12, 714:20, 715:1, 726:4, 726:6, 726:9, 726:14, 732:18, 890:20
solely - 899:22
solid - 706:12, 706:13
solve - 881:24, 884:14
someone - 683:8, 684:24, 745:21, 838:6, 840:22
someplace - 754:8, 856:4, 856:11, 860:21, 875:5, 875:6, 876:1, 876:3, 876:5
sometime - 786:10
sometimes - 900:17
somewhat - 801:3, 907:4, 907:21

Somewhere - 734:14
somewhere - 693:14, 749:17, 754:9, 829:17, 839:7, 896:9, 899:5
Soncrant - 782:25, 861:12, 863:3, 874:8, 874:10, 884:19, 885:10, 892:17, 923:5, 923:7, 923:9, 923:11
sorry - 716:15, 727:3, 792:23, 793:12, 815:4, 838:21, 851:5, 907:11
Sorry - 774:1
sort - 686:21, 692:23, 697:12, 697:25, 720:7, 740:3, 773:10, 784:2, 784:12, 817:1, 829:23, 846:18, 916:17
sound - 676:5, 683:5, 725:15, 755:18
sounds - 674:5, 676:6, 686:20, 734:22
source - 750:10
south - 691:5, 699:1, 706:2, 743:8, 860:20
space - 685:1, 685:2, 761:17, 910:25
spacial - 816:19, 819:21
sparse - 690:14
Sparse - 690:16
speaking - 831:16
spec - 675:12, 703:25, 834:23, 834:24
special - 818:20
specializing - 740:7
specialty - 740:5
specific - 746:25, 782:16, 788:13, 794:11
specifically - 670:5, 795:13, 802:1, 802:6, 802:7, 864:23, 896:1, 896:8, 914:25, 915:22
specifications - 847:8
speculative - 759:6
speed - 703:18, 716:5, 802:16, 805:4
spend - 798:16
spending - 845:3
Spielbusch - 666:21
Spore - 666:21, 920:8, 920:9
spot - 800:12, 800:15, 868:23
spots - 913:19
spout - 884:1
spread - 724:13
spring - 786:4, 786:9
square - 683:22, 684:7, 684:9, 684:15, 684:18, 684:20, 685:2, 742:9, 828:19
squiggle - 741:23, 742:13
squigglies - 743:7, 829:18
stability - 902:8
staff - 674:3, 900:17
stages - 710:20
stake - 768:24, 792:24, 792:25, 801:3, 819:24, 837:22, 837:23, 841:24
staked - 774:24, 774:25, 818:3, 823:19, 827:11, 827:15
stakeout - 771:2
stakes - 794:4, 826:22, 828:1, 837:15, 841:21
staking - 799:6, 809:11, 818:25, 819:1, 823:24, 841:3, 848:9
stamp - 685:21, 768:19
stamped - 833:12
Stand - 859:11

stand - 673:22, 674:19, 686:19, 715:21, 765:21, 774:11, 787:7, 843:25, 844:3, 844:7, 862:15, 881:2, 881:16
standard - 739:10, 744:19, 744:21, 744:22, 747:19, 747:23, 748:1, 748:12, 771:23, 777:25, 843:19, 903:23, 905:21, 905:23, 909:5, 909:7, 909:8, 909:11, 910:13, 914:17, 915:3, 916:8, 917:24
standards - 745:17, 746:6, 747:18, 757:15, 815:9, 831:3, 894:23
standing - 678:1, 678:4, 678:13, 680:13, 699:15, 699:23, 721:20, 735:21, 905:6, 906:6
start - 673:7, 690:13, 727:15, 749:24, 756:7, 756:8, 766:25, 841:15, 845:3, 857:8, 886:4, 886:17, 886:22, 886:24, 887:2, 887:8, 894:3
started - 685:9, 701:18, 703:11, 729:24, 730:1, 766:7, 766:11, 766:17, 834:17, 847:20
Started - 766:12, 766:14
starting - 742:18, 900:13
Starting - 742:19
starts - 677:19, 691:17, 825:12, 864:16, 908:16
state - 701:6, 702:4, 757:21, 757:24, 758:9, 758:17, 759:1, 759:13, 766:3, 797:22, 798:11, 814:7, 815:10, 816:5, 846:13
State - 846:4, 846:5
statement - 890:9, 893:24
States - 666:1, 666:11, 899:21, 901:21, 910:15
states - 702:4
station - 672:25, 754:22, 754:23, 755:5, 826:17, 847:17, 888:9, 905:2
stations - 689:6
Statistics - 745:21
statistics - 747:1
Stawinski - 669:4
stay - 730:6, 749:21, 774:21, 809:20, 860:22
stayed - 824:12
staying - 781:7
steadily - 716:15, 716:16, 730:15
steady - 730:3
steel - 767:6, 771:5
stenography - 666:25
step - 700:12, 737:6, 742:1, 766:23, 797:14, 813:21, 838:11, 846:8, 862:7, 884:22, 885:20
stick - 802:7, 802:9, 860:3, 879:3
stickers - 898:5
sticking - 697:12, 796:25
still - 673:14, 675:15, 687:5, 703:23, 703:24, 706:12, 707:10, 726:16, 773:23, 786:17, 790:7, 807:4, 807:6, 807:7, 810:3, 813:18, 848:17, 850:14, 885:14, 907:8, 907:10, 907:20, 908:2, 916:5, 916:7
stipulate - 702:9, 891:2
stipulation - 893:5
stone - 779:3

Stop - 752:17
stop - 689:13, 694:11, 903:24
stopped - 730:16, 750:20, 850:25, 892:1
storing - 783:21
storm - 742:11, 744:15, 745:16, 748:11, 756:23, 758:7, 759:12, 759:13, 785:1, 858:24, 858:25
storms - 746:24, 748:15, 748:22
story - 762:18, 762:19, 762:20, 762:24
straight - 696:10, 839:17
strange - 738:24
street - 683:17, 756:14, 756:17, 893:9, 902:7
stretch - 768:12, 776:2, 777:5, 831:23
stricken - 892:14, 892:25
strike - 739:9, 769:24
string - 808:15
strip - 723:7
strong - 706:20, 714:18, 714:19
Strout - 828:25, 829:4
structure - 779:3, 779:12, 780:13, 782:13, 783:5, 783:8, 783:10, 786:16, 786:17, 789:8, 805:2, 855:19, 858:2, 860:12
structures - 777:4
studied - 697:21, 705:8, 705:10
study - 709:19, 729:18, 850:7, 882:3, 882:4, 882:6, 882:7, 884:8
studying - 835:22
stuff - 675:23
stump - 737:20, 737:24, 841:22, 908:23
stumps - 789:12, 802:20, 808:21, 812:6, 824:19, 824:20, 824:22, 834:5, 834:20, 835:11, 835:12, 837:11, 837:25, 838:24, 839:3, 841:3, 842:1, 842:5, 842:15, 842:16, 842:23, 845:11, 897:19
subcentimeter - 771:15, 837:20
Subcentimeter - 771:17
subcontractor - 831:9
Subdivision - 675:6, 693:22, 703:16, 740:18, 741:6, 741:15, 744:12, 747:1, 748:12, 748:21, 749:14, 750:9, 763:4, 790:21, 791:9, 794:13, 808:2, 808:10, 808:17, 809:16, 810:3, 810:8, 810:15, 810:24, 841:2, 844:22, 856:3, 859:13, 861:18, 881:25, 884:9, 912:25
subdivision - 677:7, 678:22, 683:6, 690:8, 691:14, 691:25, 692:1, 695:13, 706:5, 706:22, 707:14, 708:2, 708:9, 708:11, 710:16, 714:12, 726:4, 726:22, 730:9, 732:6, 735:18, 740:22, 741:23, 744:14, 744:16, 746:10, 747:18, 747:24, 750:24, 752:7, 757:17, 759:17, 762:11, 776:12, 787:10, 792:4, 793:24, 794:1, 794:5, 794:7, 794:22, 808:20,

809:21, 821:21, 821:24, 822:10, 823:13, 824:9, 825:1, 825:8, 825:15, 825:16, 825:18, 826:4, 826:18, 826:21, 829:7, 829:8, 829:10, 829:13, 829:14, 830:4, 832:10, 832:25, 836:9, 836:10, 838:1, 841:6, 841:21, 889:19, 905:15, 915:7, 915:12, 917:7
subdivisions - 705:9, 705:10, 705:21, 706:9, 706:17, 708:24, 709:20, 710:12, 730:5, 757:12, 809:11, 809:12, 809:14, 870:22
Subject - 885:21
subject - 700:15, 700:16, 705:15, 705:18, 706:23, 707:6, 707:15, 708:2, 710:10, 710:13, 713:17, 713:20, 713:21, 714:4, 714:9, 729:23, 787:21
subject's - 713:15, 714:8
subjected - 905:24, 914:22
subjective - 757:4
submit - 776:15, 836:19, 901:3, 901:9, 902:1, 902:20, 909:16, 909:19, 910:12, 912:2, 915:23, 918:12
submits - 910:1
submitted - 786:1, 839:1
submitting - 846:6, 916:14
subsequently - 842:3
substantial - 686:19, 725:8, 918:4
subtract - 722:25, 733:6, 733:16, 733:17, 869:4
subtracted - 717:18, 733:2
sued - 899:1
sufficient - 906:12, 914:12, 914:14, 916:9, 916:13, 917:19, 918:20, 919:7
suggest - 861:12, 909:4
suggested - 761:14
suggesting - 725:12, 897:25
suit - 684:23
Suite - 666:14, 666:18
sum - 736:22
Sumac - 818:11
sumac - 818:17, 821:13, 825:4
summarized - 670:11
summary - 830:23
summer - 786:3, 786:9
summertime - 680:11
Sumner - 737:16, 737:21, 876:24
Sunday - 687:1, 687:3, 687:4, 687:6
superior - 899:25, 904:4, 904:15
supervised - 741:7, 741:9
supervision - 770:9, 770:12, 799:11, 799:20, 817:13, 843:18
supervisor - 672:8, 767:22, 775:7, 775:11, 775:16, 799:13, 799:15, 817:11, 840:14, 866:16
supervisors - 672:2
supplementing - 903:15
supplied - 774:3, 822:4, 827:14, 828:24, 873:6
supply - 864:20
support - 714:2

supported - 716:4
suppose - 684:6, 877:16, 916:5
supposed - 744:12
supposedly - 834:6, 871:23
Supreme - 899:20, 901:21, 910:10, 917:12, 917:21
surface - 741:24, 742:13, 742:15, 745:7, 763:6, 861:6, 916:1
surprise - 674:5, 891:6
surrounded - 708:10
survey - 710:24, 710:25, 725:21, 766:14, 768:5, 768:24, 771:22, 771:23, 774:13, 776:5, 776:8, 777:14, 779:6, 792:12, 795:2, 795:3, 795:7, 798:14, 798:20, 802:22, 808:24, 809:3, 810:22, 811:2, 811:13, 811:21, 812:4, 821:7, 821:18, 822:6, 823:12, 823:23, 826:15, 827:2, 828:24, 830:25, 831:4, 836:8, 836:9, 836:10, 836:14, 836:17, 837:15, 841:21, 842:16, 842:23, 844:10, 845:9, 845:25, 846:1, 868:20, 875:16, 894:23, 895:1
surveyed - 808:2
surveying - 766:14, 766:23, 768:2, 772:9, 773:18, 798:8, 798:9, 803:13, 807:15, 814:24
Surveying - 811:5
surveyor - 668:10, 668:11, 767:16, 767:18, 769:25, 770:4, 770:9, 770:24, 773:3, 775:7, 784:24, 795:11, 814:12, 814:13, 814:16, 815:6, 819:9, 896:12
surveyors - 775:16, 785:4, 785:13, 811:11
surveys - 798:20, 844:1, 844:3
sustain - 668:4, 669:15, 671:5, 672:10, 683:1, 696:1, 736:1, 737:17, 840:9, 872:11
sustained - 738:6, 896:3
Sustained - 731:10, 879:19
swale - 787:1, 829:13, 882:18
swear - 674:11
swell - 830:13
swinging - 750:23
sworn - 674:12, 674:19, 700:24, 739:18, 739:20, 765:24, 841:3, 846:9, 862:24
system - 698:1, 752:6, 816:17, 866:24, 867:4, 873:24, 876:15
systems - 816:19

T

takeover - 902:10, 910:21
takings - 916:11
talks - 895:4, 895:5, 895:6
tall - 717:11, 717:12, 723:22, 723:23, 724:6, 724:12, 725:2, 728:4, 728:22, 729:3, 729:5, 729:8
taller - 729:7
tan - 829:5
tandem - 760:22
tanks - 876:25
tap - 865:3

tape - 766:24, 771:5, 772:18, 796:5, 796:18, 796:24, 812:14, 813:8
taper - 761:22
tapes - 767:6
tapped - 883:10
tapping - 757:22, 758:6
task - 710:20, 784:3, 784:13, 784:14
taxes - 730:25, 737:1, 892:1
Tbp- 778:9
teacher - 701:16
team - 775:8, 775:18
tech - 847:3
Tech- 798:7
technical - 714:25, 800:5
technique - 712:23, 712:25, 778:17
techno - 685:15, 816:8
Teleprompter - 901:21
telescope - 769:15
temporary - 720:13, 901:2, 901:16, 901:22, 902:15, 908:21, 917:11
Temporary - 902:15
temptation - 886:11
ten - 720:1, 720:4, 723:24, 724:24, 734:4, 734:8, 736:13, 748:2, 748:3, 749:17, 750:4, 758:24, 760:22, 761:17, 761:18, 771:24, 773:20, 815:5, 815:6
Ten- 724:23, 757:5
ten-foot - 720:1, 724:24
ten-inch - 758:24, 771:24
ten-year - 748:2, 748:3, 815:6
tend - 671:24
Tennessee - 900:23, 901:11
tenth - 780:21
term - 702:7, 703:20, 714:25, 748:1, 748:18, 853:9
terminal - 751:21
terminated - 765:3
terms - 902:23
test - 815:3, 845:14, 856:13
testified - 669:25, 670:7, 676:4, 702:22, 752:23, 878:1, 878:4, 891:13, 891:14, 891:15, 895:3, 895:25
testify - 670:15, 673:17, 678:8, 738:1, 793:10, 793:11, 825:23, 833:24, 840:2
testifying - 738:6, 817:10
testimony - 668:3, 670:1, 670:11, 671:4, 672:9, 673:13, 674:8, 719:18, 738:5, 739:9, 739:15, 746:16, 758:11, 793:7, 808:7, 880:23, 881:3, 890:3, 890:12, 892:4, 892:7, 892:13, 892:16, 892:17, 895:7, 896:19, 898:10, 901:7, 901:9, 909:24, 915:10, 915:16, 917:5, 919:1
Theirs- 887:22
themselves - 729:7, 839:3, 915:14
theoretical - 796:17
theory - 796:23, 899:25, 902:20, 904:15, 909:2
thereafter - 804:17, 817:4, 850:23, 850:24
therefore - 737:17, 738:7, 862:24, 886:14, 910:25,

917:17
**Therefore**- 739:2, 840:17
**they've** - 774:23, 823:6, 865:14, 907:7, 909:18, 909:22
**thick** - 790:21, 790:22, 870:17
**third** - 726:11
**Thirteen**- 815:17
**Thirty**- 814:11, 857:12, 857:13
**Thirty-five**- 814:11
**thousands** - 694:16
**Three**- 705:11, 845:1
**three** - 676:13, 702:15, 709:6, 713:23, 716:10, 717:4, 717:5, 724:18, 727:20, 731:5, 744:25, 749:7, 750:7, 756:7, 756:8, 759:3, 772:17, 792:15, 792:21, 793:1, 793:8, 796:12, 802:5, 809:10, 822:16, 824:24, 826:7, 845:1, 845:6, 851:12, 853:23, 855:6, 855:9, 858:7, 873:12, 892:2, 896:15
**three-fourths** - 896:15
**three-quarters** - 772:17
**throughout** - 741:22, 779:22, 838:9, 888:23
**tie** - 695:11, 773:14, 773:17, 775:3, 789:15, 801:18, 801:21, 839:18, 865:16
**tied** - 702:17, 774:25, 775:5, 789:24, 802:23, 819:1, 824:4, 848:20
**ties** - 693:12, 773:9, 810:10
**tight** - 871:8
**tile** - 753:1, 753:4, 753:16, 754:20, 759:20, 859:25, 878:5, 882:18, 882:23, 883:3, 883:7, 884:6, 904:10, 904:13, 906:8, 907:25, 908:4
**tiles** - 879:3
**Tim**- 799:24, 800:5, 800:11, 803:3, 821:8
**timeframe** - 706:9, 777:9
**Timothy**- 766:1, 766:4, 778:10, 784:19, 784:22, 795:19, 922:3, 922:5, 922:7
**today** - 676:14, 690:6, 707:10, 709:12, 712:7, 718:17, 719:18, 726:20, 737:3, 781:8, 797:15, 799:8, 834:16, 836:25, 863:7, 864:10, 886:3
**Todd**- 673:13, 719:5, 726:20, 727:2, 739:22, 740:1, 749:5, 762:7, 764:19, 921:19, 921:21, 921:24, 922:1
**together** - 703:3, 773:17, 852:21, 873:8, 877:8, 903:13
**Toledo**- 666:5, 666:7, 666:22, 671:17, 675:8, 680:24, 703:10, 740:13, 745:22, 747:2, 751:21, 767:12, 767:24, 767:25, 768:3, 769:23, 785:6, 789:10, 798:7, 798:17, 799:4, 809:2, 814:13, 814:16, 819:15, 846:22, 846:24, 846:25, 847:12, 847:18, 847:20, 848:2, 848:4, 848:24, 855:12, 858:6, 858:19, 861:22, 863:12, 863:19, 864:3, 864:16, 864:22, 864:24,

864:25, 865:2, 865:7, 865:18, 872:18, 879:13, 882:21, 899:2, 899:3, 902:13, 904:11, 907:6, 907:25, 908:15, 909:13, 909:21, 912:24, 913:8
**Toledo's**- 834:7, 905:5
**tomorrow** - 862:18, 886:4, 886:15, 886:17, 887:3, 887:6, 893:24, 919:22
**tonight** - 862:17, 886:9, 893:18
**tons** - 694:16
**took** - 673:17, 676:19, 676:25, 685:18, 685:23, 716:18, 718:13, 718:23, 719:1, 719:3, 738:2, 783:22, 785:24, 788:9, 789:1, 794:22, 798:6, 805:6, 815:3, 815:24, 816:3, 819:21, 838:10, 839:1, 839:12, 868:20, 896:5, 898:11, 902:13, 911:2, 911:6
**tool** - 684:10, 816:13, 837:14
**top** - 693:18, 697:18, 754:24, 771:24, 773:16, 779:1, 779:5, 801:10, 805:7, 805:9, 810:19, 837:15, 851:24, 852:1, 857:10, 868:25, 879:23, 879:24, 897:12
**topic** - 873:19
**topo** - 777:16, 820:21, 829:4, 844:13
**topographic** - 844:4
**topographical** - 754:11, 776:5, 777:14, 779:6, 802:22
**Topography**- 829:19, 844:13
**topography** - 844:11
**Topsoil**- 761:8
**topsoil** - 725:9, 761:1, 761:2, 761:7, 761:15
**torn** - 885:13
**tort** - 899:23
**tortious** - 917:18, 917:25
**Total**- 722:15
**total** - 704:2, 711:12, 711:13, 711:17, 727:25, 736:22
**totally** - 826:6
**touch** - 781:13, 781:14, 781:16, 781:19, 823:11
**tough** - 689:18, 727:8
**toward** - 743:23
**Towards**- 697:16
**towards** - 678:1, 678:12, 679:12, 689:5, 691:18, 691:21, 699:16, 743:20, 744:3, 744:5, 763:8, 763:9, 808:16, 808:20, 810:14, 821:22, 824:7, 839:4, 847:21, 847:22, 856:3
**township** - 714:15
**Township**- 714:18, 864:19
**trace** - 743:18
**traced** - 706:11
**track** - 707:20, 721:24, 773:5, 885:17
**tracks** - 669:9, 669:12, 705:25, 706:8, 706:25, 707:2, 707:7, 707:8, 707:13, 707:17, 707:18, 708:23, 708:25, 709:3, 709:5, 709:12, 709:15, 709:21, 710:2, 710:17, 751:21, 885:13
**Tracy**- 666:21, 920:8, 920:9

**train** - 687:13, 687:17, 687:21, 687:23, 687:25, 688:1, 688:8, 689:4, 689:8, 689:12, 689:13, 689:19, 689:24
**trained** - 740:9
**training** - 846:21, 898:5
**trains** - 687:15, 688:20, 688:23, 905:19
**transcript** - 665:25, 686:16, 688:3, 892:23, 920:4
**Transcript**- 666:10
**transfer** - 766:14
**transit** - 808:15, 837:14
**transition** - 701:18
**translation** - 776:23
**transport** - 771:20
**traverse** - 791:3
**tree** - 676:9, 704:18, 711:10, 713:4, 716:24, 717:1, 717:5, 723:17, 724:2, 724:12, 727:19, 729:6, 737:20, 737:24, 789:12, 789:18, 790:4, 790:5, 790:7, 801:19, 801:21, 802:20, 808:21, 812:6, 896:16, 908:19, 908:23, 916:12
**trees** - 682:10, 687:19, 689:25, 690:4, 690:17, 690:19, 691:4, 692:4, 694:10, 698:5, 704:4, 704:10, 704:11, 704:22, 708:10, 711:3, 714:2, 717:7, 717:9, 717:11, 717:12, 717:13, 721:18, 721:20, 721:23, 722:1, 722:13, 722:17, 722:19, 722:20, 722:23, 723:7, 723:9, 723:19, 723:21, 724:1, 724:4, 724:5, 724:10, 724:19, 725:10, 725:20, 727:9, 728:3, 728:5, 728:10, 731:19, 733:1, 733:3, 734:16, 752:16, 760:7, 760:8, 761:15, 775:5, 776:6, 785:18, 789:24, 790:11, 800:24, 803:20, 807:5, 809:17, 821:3, 838:6, 872:20, 873:3, 873:10, 873:13, 873:15, 883:16, 892:2, 896:21, 897:7, 897:19, 908:17, 910:4, 910:5, 911:1, 911:6, 916:24, 917:10, 917:23, 918:6
**tremendously** - 735:1
**trespass** - 783:19, 889:15, 900:15, 907:2, 912:4, 912:11, 913:11, 918:1, 918:13, 919:17
**Trespass**- 912:20
**trespassed** - 912:17, 912:24
**trial** - 674:1, 749:24, 888:16, 892:16, 909:11
**Trial**- 666:6, 666:10
**triangles** - 816:15
**trickled** - 884:1
**tried** - 681:18, 704:13, 810:5, 855:17, 860:12
**trigonometry** - 816:18
**tripping** - 841:9
**trips** - 802:15
**truck** - 827:3, 857:14
**trucking** - 761:6
**trucks** - 760:22
**true** - 670:2, 673:19, 683:24, 690:7, 690:10, 694:9, 703:4, 703:7, 703:17, 715:4, 763:24, 785:19, 785:20, 785:22, 823:20,

843:15, 846:2, 876:2, 880:2, 880:3, 882:5
**trust** - 825:23
**try** - 721:23, 821:10, 821:15, 845:21, 872:3, 876:10, 898:20
**trying** - 671:11, 704:4, 720:12, 733:9, 751:16, 754:3, 799:14, 800:8, 800:21, 804:25, 819:10, 825:23
**tumbled** - 696:20
**turn** - 673:7, 674:16, 827:20
**turned** - 814:1
**turning** - 907:22
**turnpike** - 706:4, 706:7, 709:10
**turns** - 677:25, 902:6
**Twelve**- 863:18, 863:20
**twice** - 847:24, 894:11
**twigs** - 877:17
**Two**- 770:10, 775:10, 899:9
**two** - 672:15, 672:19, 705:12, 706:5, 706:8, 706:9, 706:16, 707:11, 707:25, 713:22, 713:24, 714:3, 714:7, 714:10, 715:12, 715:18, 716:7, 716:8, 724:18, 726:14, 731:1, 732:15, 734:24, 735:24, 737:14, 739:15, 749:7, 753:18, 756:6, 762:18, 762:20, 762:24, 769:17, 771:23, 772:24, 774:6, 775:8, 777:15, 790:6, 792:3, 802:5, 806:13, 808:3, 808:16, 809:10, 837:13, 837:21, 839:6, 842:11, 851:12, 854:3, 855:6, 855:9, 863:20, 881:9, 887:21, 888:5, 888:18, 890:21, 893:8, 893:12, 896:6, 896:11, 918:12
**two-car** - 707:25
**two-day** - 777:15
**two-man** - 775:8
**Two-man**- 775:10
**two-story** - 762:18, 762:20, 762:24
**two-way** - 893:8
**type** - 755:5, 760:23, 773:15, 822:24, 865:7, 880:14
**typical** - 670:5
**typically** - 669:25, 746:22, 799:19, 800:5, 801:16
**Typically**- 670:2, 759:12, 805:13

## U

**ultimately** - 704:14
**uncommon** - 680:8, 867:7
**unconstitutional** - 900:10
**uncovered** - 842:15
**under** - 714:7, 750:7, 751:20, 752:25, 755:14, 756:18, 767:13, 770:8, 770:10, 770:12, 780:8, 799:17, 799:20, 799:23, 806:7, 817:13, 843:17, 843:18, 848:3, 853:12, 865:25, 874:24, 879:21, 884:22, 899:24, 901:17, 902:16, 902:17, 902:20, 904:6, 904:7, 904:20, 905:23, 906:13, 907:15, 909:2, 909:3, 909:5, 909:7,

909:9, 911:1, 911:19,
913:24, 914:17, 915:4,
915:24, 916:8, 916:16,
916:20, 917:15, 917:16,
917:24, 918:2, 918:3
**Under** - 909:8
**underdeveloped** - 711:14
**undergraduate** - 701:15
**underground** - 756:12
**underlying** - 843:16
**undermine** - 902:8
**underneath** - 847:21,
874:13
**understood** - 800:14,
830:18, 873:9, 910:25,
917:24
**undertaken** - 693:20
**undisputed** - 905:13,
915:13
**undisturbed** - 804:7,
804:11
**unearthed** - 877:13
**unfair** - 893:3
**Unfortunately** - 719:19
**unit** - 771:2, 771:10,
771:11, 771:13, 771:14,
816:24, 817:8, 837:21,
839:23, 845:16, 845:19
**United** - 666:1, 666:11,
899:21, 901:20, 910:15
**units** - 767:8, 845:22
**University** - 675:8, 740:13,
798:7, 846:22, 863:12
**unless** - 670:16, 670:17,
872:13, 891:2, 892:8,
892:14, 899:13
**Unless** - 669:13, 671:25
**unnecessary** - 840:11
**unquestioned** - 786:9
**unreasonable** - 918:4
**unsigned** - 833:9, 833:12
**unsold** - 703:22, 711:15,
713:3, 716:23
**unusable** - 917:9
**unusual** - 870:20, 898:23,
910:6
**Up** - 790:9
**up** - 670:5, 674:10, 675:2,
675:6, 678:15, 679:14,
681:25, 682:12, 683:3,
684:24, 685:17, 688:1,
688:16, 691:11, 693:8,
693:12, 693:16, 696:22,
697:22, 703:12, 703:18,
711:12, 713:3, 714:2, 715:5,
715:8, 715:25, 716:5, 717:2,
717:16, 718:3, 718:7, 721:7,
721:8, 721:23, 722:8, 723:5,
723:15, 730:6, 730:8, 735:6,
735:13, 735:21, 736:14,
736:18, 736:22, 742:19,
745:5, 745:13, 746:25,
749:15, 752:12, 753:8,
753:14, 754:21, 755:16,
756:13, 759:20, 760:3,
760:4, 764:24, 765:21,
767:3, 769:12, 769:14,
770:22, 774:11, 777:21,
778:22, 779:7, 781:4,
782:21, 785:16, 786:23,
787:16, 789:1, 790:6, 790:8,
800:22, 801:24, 802:16,
805:4, 810:23, 813:3, 813:4,
822:17, 823:6, 824:6,
824:10, 824:18, 824:21,
824:22, 827:12, 827:19,
828:8, 829:20, 834:19,
835:9, 835:10, 837:11,
837:25, 838:11, 838:15,
841:6, 842:3, 842:6, 845:10,

850:10, 851:7, 851:24,
854:20, 854:24, 857:10,
857:13, 858:6, 859:17,
861:17, 863:22, 870:15,
870:20, 870:23, 880:11,
880:17, 885:13, 891:4,
893:14, 896:10, 896:17,
908:9, 912:19, 913:14, 917:6
**upper** - 678:18
**Upper** - 678:19
**upright** - 773:19, 773:20
**upset** - 728:9
**upwards** - 709:18
**Usc** - 903:1, 903:10, 904:6
**useful** - 850:14, 852:6
**useless** - 884:2, 897:14
**uses** - 785:3, 916:7
**utilities** - 681:9, 741:1,
756:12, 776:7
**Utilities** - 767:13
**utility** - 677:5, 678:22
**utilize** - 746:20, 797:5

## V

**vacant** - 726:20, 885:4
**valid** - 902:5
**validity** - 820:6
**Valley** - 900:23, 901:12
**Valleybrook** - 705:23,
708:21, 709:1
**valuable** - 918:7
**valuation** - 703:19
**value** - 670:5, 683:25,
704:7, 704:18, 711:11,
711:13, 711:20, 711:24,
712:2, 712:5, 712:17, 713:3,
715:5, 715:9, 715:11,
716:22, 717:16, 718:4,
720:13, 720:22, 721:7,
722:17, 725:20, 726:1,
730:20, 730:23, 732:14,
732:16, 732:25, 733:9,
735:1, 735:4, 735:17,
736:12, 736:17, 736:18,
736:21, 736:23, 738:9,
889:20, 889:23, 891:17,
905:19
**valued** - 722:12
**values** - 684:10, 708:18
**valuing** - 712:24
**valve** - 847:17
**varies** - 761:8
**various** - 710:12, 772:18,
789:12, 848:20
**vary** - 790:2
**vegetation** - 691:15,
691:20, 693:21, 694:1,
698:5, 711:6, 835:14,
835:15, 872:20, 901:6,
901:8, 906:22, 907:14,
916:12, 916:24, 917:10,
918:3, 918:7
**vegetation's** - 904:24
**verdict** - 898:18, 903:7,
909:19, 912:10, 913:21,
918:11
**verified** - 783:20
**verify** - 795:24, 795:25,
802:15
**verifying** - 802:24, 818:3
**versions** - 856:15
**versus** - 762:18
**vertical** - 801:22, 829:22
**vertically** - 774:12, 858:4
**via** - 726:17
**viable** - 850:14, 850:17,
906:16
**vicarious** - 899:25
**vicinity** - 804:19

**video** - 672:21, 677:22,
678:25, 679:5, 679:24,
685:9, 690:18, 690:21,
690:24, 752:3, 888:7
**Video** - 677:16
**Videographer** - 677:23,
679:22
**videos** - 676:19, 677:1,
680:3, 691:1, 888:5
**Videotape** - 676:22,
679:18
**view** - 677:20, 678:17,
696:10, 705:16, 707:8,
749:22, 749:23, 750:2,
823:6, 868:9, 903:21,
905:14, 906:4, 906:11,
910:3, 912:6
**Viewing** - 914:9
**viewing** - 903:13, 914:11,
915:4
**Virginia** - 702:5
**virtue** - 889:21
**visible** - 802:21, 806:25,
807:7, 868:23, 905:20, 906:7
**visual** - 774:22
**vitrified** - 806:21
**Voice** - 859:17
**voice** - 752:12
**voir** - 674:2
**Volume** - 666:9
**volume** - 757:20
**volunteered** - 679:20

## W

**wait** - 743:18
**waiting** - 900:20
**walk** - 693:8, 716:4,
790:23, 790:24, 800:22,
812:15, 813:9, 841:22, 845:7
**walked** - 692:16, 692:22,
696:5, 749:14
**walkout** - 684:25
**wall** - 693:9, 693:12,
693:17, 694:5, 694:6, 694:7,
694:8, 695:11, 773:15
**Walsh** - 849:15, 849:16,
855:17, 856:17
**wants** - 719:8, 909:3
**warm** - 685:17
**warrant** - 916:14
**wastes** - 734:25
**wasting** - 735:3
**water** - 677:3, 677:4,
678:10, 678:20, 679:11,
679:16, 680:6, 680:13,
692:7, 692:13, 692:17,
692:22, 693:1, 693:2, 695:3,
695:6, 695:8, 697:9, 698:16,
698:19, 698:21, 698:23,
700:5, 718:14, 718:17,
719:4, 720:1, 720:13,
720:16, 720:17, 721:20,
722:2, 722:10, 741:24,
742:13, 742:15, 743:1,
744:8, 744:9, 744:12,
744:14, 745:6, 749:16,
750:4, 750:7, 750:8, 750:19,
750:22, 752:2, 752:3, 752:4,
752:6, 752:25, 753:1, 753:2,
753:8, 753:9, 753:11,
753:16, 753:19, 753:21,
754:7, 754:9, 754:17,
754:23, 754:24, 757:15,
757:20, 759:18, 759:20,
762:10, 762:14, 762:20,
763:4, 764:14, 764:22,
765:4, 768:3, 786:3, 788:9,
799:7, 815:23, 817:20,
829:23, 847:12, 847:14,

847:16, 847:18, 849:23,
849:24, 850:15, 853:24,
854:2, 855:25, 856:2, 856:5,
856:7, 856:17, 856:18,
857:4, 857:5, 858:13,
858:25, 859:20, 860:19,
864:9, 864:20, 864:25,
865:4, 865:5, 865:6, 865:11,
866:20, 866:22, 868:9,
873:25, 874:24, 875:4,
875:24, 876:11, 879:21,
879:23, 880:21, 883:6,
883:7, 884:1, 884:10,
885:14, 887:22, 904:24,
905:2, 905:7, 905:10,
905:11, 906:7, 906:17,
907:13, 910:5, 915:6, 916:1,
918:19, 918:21
**water's** - 678:4, 866:4
**water-wise** - 763:4
**waterline** - 751:22,
753:24, 772:20, 788:23,
804:23, 845:4, 855:21,
858:7, 864:13, 865:1,
865:16, 868:25, 869:8,
869:10, 869:13, 870:24,
871:2, 871:4, 874:13
**waterlines** - 756:16,
864:4, 864:7, 865:4
**Watkins** - 666:18, 700:21,
739:13, 890:23, 891:7,
891:10, 896:22, 897:4,
898:15, 898:17, 899:9,
899:18, 900:22, 901:1,
903:10, 903:21, 908:20,
909:2, 909:8, 911:10,
911:22, 912:11, 912:19,
912:23, 913:4, 913:12,
913:16, 913:22, 914:3,
919:13, 919:23
**Watkins'** - 911:19
**ways** - 819:20
**weeds** - 698:18, 807:5
**week** - 824:17, 829:6,
834:9
**weekend** - 886:21
**weeks** - 749:7, 906:6
**weigh** - 739:15
**weight** - 895:10
**wellbeing** - 831:6
**west** - 774:10
**West** - 848:1
**Western** - 666:2
**wet** - 693:3
**whatsoever** - 901:5,
906:17
**Whereas** - 895:25
**whistle** - 689:2, 689:6,
689:9
**white** - 772:19, 830:10
**White** - 786:11, 847:21
**whole** - 704:25, 712:21,
717:14, 723:2, 736:15,
752:2, 775:17, 880:16,
888:10
**wide** - 717:7, 720:1, 723:7,
723:24, 724:13, 724:14,
724:21, 724:24, 761:17,
772:18
**widening** - 701:24
**wider** - 724:14
**wife** - 683:19, 728:9,
728:18, 883:24, 887:4
**wiggle** - 765:22
**willy** - 796:12
**willy-nilly** - 796:12
**win** - 712:14
**wire** - 773:17
**wise** - 763:4
**wish** - 835:11, 914:1

**witness** - 667:15, 669:14, 673:21, 674:2, 674:10, 674:12, 674:16, 674:17, 674:18, 678:7, 700:18, 700:24, 715:17, 737:7, 739:18, 739:20, 750:15, 751:9, 758:9, 765:18, 765:24, 793:5, 813:22, 813:23, 814:3, 841:11, 841:13, 841:16, 846:9, 862:8, 862:13, 862:15, 862:23, 886:19, 896:1, 896:8
**Witness** - 698:9, 699:21, 700:1, 700:9, 714:23, 721:3, 746:22, 747:7, 754:3, 777:13, 787:16, 787:18, 813:2, 863:24
**witnesses** - 667:18, 765:22, 895:24
**wizard** - 685:15, 816:8
**woke** - 688:1, 688:16
**Wood** - 706:15, 714:18, 755:7, 848:3, 849:16, 850:1
**wooded** - 801:18
**Woodlands** - 666:15
**Woods** - 707:12, 708:3, 708:8, 716:15
**word** - 686:15, 711:14, 796:2, 866:24
**words** - 692:19, 716:5, 804:14, 894:25, 899:23
**workers** - 865:2
**works** - 683:19, 817:13, 841:11, 847:6
**world** - 772:1, 772:3, 786:14, 816:20, 816:23, 819:22
**worried** - 671:16
**worry** - 792:11
**worse** - 686:2, 686:7, 686:8, 686:10, 843:8, 915:1, 918:21, 919:3
**worst** - 685:24, 735:7
**worth** - 684:1, 684:3, 684:5, 703:20, 712:7, 712:13, 716:21, 726:11, 727:8, 732:18, 734:16, 736:15, 736:21, 737:2
**wrecked** - 697:22
**write** - 778:14, 779:14, 786:5
**writing** - 780:3
**written** - 743:6, 768:23, 783:5, 868:24, 897:6, 904:17

## Y

**yard** - 678:15, 679:13, 680:10, 682:16, 683:4, 685:25, 686:25, 687:5, 687:10, 693:7, 694:4, 694:14, 696:8, 700:6, 729:16, 742:23, 760:21, 761:4, 761:5, 761:11, 883:16
**yards** - 760:22, 761:25
**year** - 679:3, 679:9, 705:24, 707:1, 707:11, 708:12, 711:18, 711:22, 712:6, 712:8, 712:10, 712:19, 713:14, 713:22, 713:23, 713:24, 714:3, 714:6, 714:8, 714:11, 715:1, 715:8, 716:8, 716:9, 718:15, 720:15, 731:1, 732:15, 732:16, 732:22, 733:14, 733:18, 733:21, 733:23, 734:10, 734:25, 737:2, 744:21, 747:16, 747:17, 748:1, 748:2, 748:3, 748:4, 799:1, 802:3, 815:6, 845:21,

864:5, 892:21
**years** - 675:9, 701:17, 701:19, 706:6, 706:8, 712:19, 713:23, 714:1, 714:7, 714:16, 714:18, 714:19, 716:9, 726:19, 726:24, 727:5, 729:25, 730:3, 730:15, 730:16, 731:2, 732:23, 736:19, 736:20, 736:24, 745:10, 746:3, 747:4, 766:7, 767:3, 767:25, 774:8, 785:5, 785:8, 785:10, 798:5, 798:10, 798:25, 799:5, 815:5, 815:6, 815:12, 815:17, 839:6, 846:17, 847:1, 863:18, 863:20, 875:2, 885:4, 890:21, 892:2
**yesterday** - 672:24, 673:11, 674:16, 702:8, 707:23, 725:3, 856:16
**yo** - 700:13
**yo-yo** - 700:13
**young** - 919:2
**yourself** - 674:25, 681:20, 704:10, 739:24, 800:20, 840:24, 845:8, 878:15

## Z

**zero** - 766:25, 767:1, 767:2, 769:16, 824:11, 825:5, 825:6, 825:12, 826:8, 831:13, 831:23, 833:5
**zoom** - 829:2
**Zouhary** - 666:10