```
 1                    UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION


 3


 4   OLD GRANITE DEVELOPMENT, LTD.,   -  Case No. 3:06-CV-2950
                                      -
 5      Plaintiffs,                   -  Toledo, Ohio
                                      -  May 21, 2008
 6         v.                         -  TRIAL
                                      -
 7   CITY OF TOLEDO,                  -
                                      -
 8      Defendants.                   -
     -------------------------------
 9
                            VOLUME 3
10                      TRANSCRIPT OF TRIAL
                 BEFORE THE HONORABLE JACK ZOUHARY
11           UNITED STATES DISTRICT JUDGE, AND A JURY

12   APPEARANCES:

13   For the Plaintiffs:   Barkan & Robon
                           By:  Marvin A. Robon
14                              R. Ethan Davis
                           Suite 100
15                         1701 Woodlands Drive
                           Maumee, OH 43537
16                         (419) 897-6500

17   For the Defendants:   Bahret & Associates
                           By:  Robert J. Bahret
18                              Keith J. Watkins
                           Suite 709
19                         7050 Spring Meadows, W
                           Holland, OH 43528-1844
20                         (419) 861-7800

21   Court Reporter:       Tracy L. Spore, RMR, CRR
                           1716 Spielbusch Avenue
22                         Toledo, Ohio 43624
                           (419) 243-3607
23


24


25   Proceedings recorded by mechanical stenography,
     transcript produced by notereading.
```

| | | |
|---|---|---|
| 08:08:05 | 1 | (Reconvened at 8:08 a.m.) |
| 08:08:05 | 2 | THE COURT:  We have a juror who has an |
| 08:08:05 | 3 | issue, so we're going to handle it on the record.  If |
| 08:08:05 | 4 | you're not a lawyer in the case, I'd ask you to leave |
| 08:08:05 | 5 | the courtroom, please. |
| 08:08:05 | 6 | We have a juror number 8 whose home in |
| 08:08:05 | 7 | Michigan burned down last night.  She's distraught and |
| 08:08:05 | 8 | distracted.  It's appropriate to let her go if that's |
| 08:08:05 | 9 | what she wants to do. |
| 08:08:05 | 10 | (Juror enters the courtroom.) |
| 08:08:05 | 11 | THE COURT:  The record should reflect we're |
| 08:08:05 | 12 | here in court with Juror Number 8, Jennifer Sherman.  I |
| 08:08:05 | 13 | also have counsel present for both sides.  It is only |
| 08:08:05 | 14 | us and no one else. |
| 08:08:05 | 15 | Mrs. Sherman, I understand that something |
| 08:08:05 | 16 | bad happened last night that is distracting you. |
| 08:08:05 | 17 | THE JUROR:  Yes.  We have a lake house up in |
| 08:08:05 | 18 | northern Michigan which my parents reside in all year. |
| 08:08:05 | 19 | And there's two sections of the home.  There's the main |
| 08:08:05 | 20 | house, and the little cottage.  That's where we reside |
| 08:08:05 | 21 | in the summertime.  Well, it burned yesterday about |
| 08:08:05 | 22 | noon.  My parents are fine, but there's -- the cottage |
| 08:08:05 | 23 | is gone.  So that's kind of on my mind. |
| 08:08:05 | 24 | THE COURT:  Understandably so.  Then the |
| 08:08:05 | 25 | question comes:  Can you remain on this case and keep |

| | |
|---|---|
| 08:08:05 | 1 |
| 08:08:05 | 2 |
| 08:08:05 | 3 |
| 08:08:05 | 4 |
| 08:08:05 | 5 |
| 08:08:05 | 6 |
| 08:08:05 | 7 |
| 08:08:05 | 8 |
| 08:08:05 | 9 |
| 08:08:05 | 10 |
| 08:08:05 | 11 |
| 08:08:05 | 12 |
| 08:08:05 | 13 |
| 08:08:05 | 14 |
| 08:08:05 | 15 |
| 08:08:05 | 16 |
| 08:08:05 | 17 |
| 08:08:05 | 18 |
| 08:08:05 | 19 |
| 08:08:05 | 20 |
| 08:08:05 | 21 |
| 08:08:09 | 22 |
| 08:08:49 | 23 |
| 08:11:28 | 24 |
| 08:11:31 | 25 |

1  your focus on the case with the fire and all that goes
2  with it, or can you not?
3            THE JUROR:  As a mature adult I could
4  probably do it.   I mean, it's little overwhelming.   My
5  kids are freaked out.   It's our home.   We own it.
6  Insurance adjusters are coming.   My parents are 70
7  years old.   Things can move on in life, but --
8            THE COURT:  It is your preference to be
9  excused?
10            THE JUROR:  It would certainly help out
11  because I think we need to go up there.
12            THE COURT:  Sure.   Counsel for either side
13  have any objection to excusing this juror?
14            MR. ROBON:  No objection.
15            MR. BAHRET:  No.
16            THE COURT:  You're excused.
17            What does she need to do?
18            THE JUROR:  I'm sorry.
19            THE COURT:  That's okay.   That's the kind
20  of thing we want you to tell us.   And we're sorry, and
21  we hope it all works out.
22            (End of side-bar discussion.)
23            (The jury enters the courtroom.)
24            THE COURT:  Of course they decided to mow
25  right outside our window this morning, but hopefully

08:11:33  1    that won't distract you.

08:11:36  2            Ladies and gentlemen, Mrs. Sherman had a

08:11:39  3    family misfortune, a fire in a home in Michigan.   And

08:11:42  4    so that is the reason why she has been excused.

08:11:46  5    There's obviously a distraction there and some things

08:11:49  6    that need immediate attention.   It was a home that her

08:11:53  7    elderly parents lived in year round.   They are fine.

08:11:57  8    But that is the reason why she has been excused.

08:12:01  9            And so we may now continue with the direct

08:12:04  10   examination of Mr. McCarthy, which is where we left off

08:12:07  11   yesterday.

08:12:07  12            MR. ROBON:  Thank you.

08:12:09  13                       - - -

08:12:09  14      JOHN McCARTHY, CONTINUED DIRECT EXAMINATION

08:12:10  15   BY MR. ROBON:

08:12:10  16    Q.  John, would you come over here so we can talk

08:12:13  17   about Exhibit Number 4.   Would you explain to the

08:12:22  18   jury --

08:12:23  19            THE COURT:  Mr. Robon, you're going to need

08:12:27  20   to use the mike, especially with the mowing.   Mr.

08:12:33  21   McCarthy may need to share it with you.

08:12:33  22   BY MR. ROBON:

08:12:42  23    Q.  The graphic artist drew this with your

08:12:45  24   assistance, correct?

08:12:46  25    A.  Yes.

08:12:47  1      Q.   Would you explain to the jury what the various

08:12:51  2  layouts are?   This is before the new water main and the

08:12:58  3  trees were removed?  Step back so they can all see it.

08:13:02  4      A.   Good morning.

08:13:05  5           We drew this up to try to help visualize the

08:13:14  6  situation before the trees were cut and that kind of

08:13:19  7  thing.   The main features here are, of course, the

08:13:26  8  trees themselves that looked something like this that

08:13:30  9  were on -- this is the old -- what I refer to as the old

08:13:35  10 railroad bed.  This is the active railroad.  This is the

08:13:39  11 far side, the creek that the system here connects to and

08:13:48  12 takes out of there.   This is the house that's on lot

08:13:54  13 15, which just about everything we have here today is

08:13:57  14 really based at this point on lot 15.  And this

08:14:02  15 indicates that the drainage system that the development

08:14:06  16 put in and takes this -- the development's water,

08:14:11  17 rainwater run off, out to River Road.

08:14:15  18     Q.   Is that the one that we saw as we walked in the

08:14:18  19 back on the left side that was tilted upwards so you

08:14:23  20 could see it?

08:14:23  21     A.   Yes.   This one was the cover was tilted up.   If

08:14:26  22 you walked out there Monday you would have seen this

08:14:29  23 one.   That connects out to River Road.  If we're going

08:14:39  24 to get into this drainage, this is kind of important

08:14:41  25 because in developments today, you put a new development

08:14:46    1    in --

08:14:47    2                   MR. BAHRET:   Your Honor.

08:14:47    3                   THE COURT:   Sustained.   Let's keep our

08:14:49    4    focus.

08:14:51    5        Q.   Just explain what the graphic is depicting?

08:14:55    6        A.   The house, this is the house that my son lives

08:15:02    7    at, if I refer to it that way.   This is the railroad

08:15:15    8    culvert that we were talking about yesterday that was

08:15:19    9    there ahead of time.   This is the -- there's a pipe

08:15:23   10    running this way along this area.   This is a ditch area

08:15:29   11    on this side.

08:15:30   12        Q.   Is that the same as this pipe here?

08:15:36   13        A.   Yes.   This is the pipe.   This is the pipe that

08:15:40   14    goes into this manhole from this direction.   In this

08:15:47   15    view the pipe is going this way.   It's a T, this way

08:15:53   16    and that.   It shows the main features that were there

08:16:03   17    before the project.

08:16:04   18        Q.   And there were two rows of trees in the ditches;

08:16:09   19    one closer to the home, and one closer to the active

08:16:12   20    tracks.   Like is shown on Exhibit Number 1 where you

08:16:24   21    have a row of trees here, and then a second line, a row

08:16:34   22    of trees here, and then a second row closer to the

08:16:37   23    tracks.   Is that what we're depicting here?

08:16:40   24        A.   Yes, Marv.   This is one row here.   This is

08:16:44   25    another row.

08:16:45    1          THE COURT:  Excuse me, gentlemen.  You're

08:16:48    2    blocking the view of some of the jurors.

08:16:52    3      Q.  Can you use the pointer?

08:16:57    4          THE COURT:  You're still making it difficult

08:16:59    5    for those behind you to see.

08:17:02    6      A.  Sorry.   There's two long rows of trees.  This is

08:17:06    7    the old railroad bed that we're talking about.   There's

08:17:08    8    two long rows of trees before the city project; one row

08:17:15    9    here, one row here.

08:17:18   10      Q.  That's what these two --

08:17:20   11      A.  That's what they're depicting there.   I think

08:17:29   12    that's the essentials, Marv.

08:17:33   13      Q.  I want you to compare that with Exhibit Number 5,

08:17:36   14    which is the graphic that is shown in the "after."   And

08:17:43   15    what difference is there now with regard to what the

08:17:49   16    City did on this project?

08:17:50   17          MR. BAHRET:  Objection.

08:17:55   18          THE COURT:  Grounds?   He can comment on the

08:17:58   19    differences between two exhibits.

08:18:00   20          MR. BAHRET:  But he's not qualified to say

08:18:02   21    because of what the City did.

08:18:04   22          THE COURT:  Amend the question to explain

08:18:05   23    what the differences are between the two graphics,

08:18:09   24    please.

08:18:11   25      A.  The two main differences here is, of course, the

08:18:14   1   trees are missing.

08:18:16   2         THE COURT:  Still can't see.   You're going

08:18:18   3   to have to come around to the other side of the exhibit

08:18:22   4   where Marv was standing.  There you go.  Turn around.

08:18:29   5    A.  The trees have been cut down, are missing.   The

08:18:35   6   cross drain that drains this area here, that's been cut

08:18:40   7   because the water main is in there, and the new water

08:18:45   8   main is shown; that's how the -- that's roughly where

08:18:51   9   the new water main, City water main was put in.   But

08:18:54   10   that's the main difference.

08:19:01   11    Q.  What about -- you show water over here flooding.

08:19:06   12   That is caused by what?

08:19:10   13    A.  Without this pipe, this drain pipe, which is a

08:19:18   14   main culvert for the area, this is what we predicted the

08:19:23   15   flooding would be from a study of the water shed in the

08:19:31   16   area.  We predicted this would be a bed that would

08:19:36   17   basically have to go over the top of the railroad to get

08:19:39   18   out.   That's what that water is indicating.   And I

08:19:46   19   think when you were out there you saw some -- there was

08:19:50   20   just some puddles out here indicating the more normal

08:19:58   21   condition, small amounts of ponding laying out in the

08:20:02   22   back here.   But we predicted that.

08:20:07   23         MR. BAHRET:  Your Honor, I object to the

08:20:09   24   "we."   He's the only one that predicted it.

08:20:12   25   BY MR. ROBON:

08:20:13  1    Q.  Just do what you predicted.

08:20:15  2         THE COURT:  With that correction, you may

08:20:17  3    continue.

08:20:20  4    A.  I predicted this from our study of the water

08:20:27  5    shed, and I have an associate that helped me with it;

08:20:33  6    that's why I use the word "our."  That's really the

08:20:36  7    differences.

08:20:38  8    Q.  Thank you.  You can take your seat.

08:20:51  9         And, John, then Exhibits 4 and 5 accurately

08:20:54  10   depict what are shown on those exhibits, correct?

08:20:57  11   A.  Yes.

08:21:14  12   Q.  I'm going to put up Exhibit Number 37.  And the

08:21:47  13   water that is shown in Exhibit 37, is that the water

08:21:51  14   that you're making reference to on Exhibit Number 5 over

08:21:58  15   here behind Mike's house?

08:22:02  16   A.  Yes, it is.  This is a lesser storm in the summer

08:22:07  17   of 2006, and this was the condition that resulted from

08:22:12  18   that.

08:22:22  19   Q.  I want you to take a look at Exhibit Number 95.

08:22:45  20   Can you tell the jury when this photograph was taken,

08:22:49  21   who took it, were you there, and what does the stake

08:22:52  22   show?

08:22:57  23   A.  Marv, I'm having a little trouble reading -- with

08:23:03  24   the glare and stuff I'm not -- okay.  I think I know

08:23:07  25   what it --

| | | |
|---|---|---|
| 08:23:08 | 1 | Q.   Take a look at it first. |
| 08:23:13 | 2 | THE COURT:  First, who took it and when, |
| 08:23:15 | 3 | please? |
| 08:23:17 | 4 | BY MR. ROBON: |
| 08:23:17 | 5 | Q.   Did you take that photo, or was it taken while |
| 08:23:20 | 6 | you were out there? |
| 08:23:24 | 7 | A.   This photo was taken by my men, and I don't know |
| 08:23:32 | 8 | what the date is here on it. |
| 08:23:35 | 9 | Q.   Probably 2006? |
| 08:23:37 | 10 | A.   Yes, it was 2006. |
| 08:23:38 | 11 | Q.   Was it after the cutting? |
| 08:23:40 | 12 | A.   Yes, apparently there's signs of clearing here. |
| 08:23:48 | 13 | But there is a -- |
| 08:23:50 | 14 | Q.   What does the stake depict?   Is that the |
| 08:23:54 | 15 | property line? |
| 08:23:56 | 16 | A.   Yes.   This is -- this has to be the property |
| 08:24:02 | 17 | line because this is the timbers that were right near |
| 08:24:05 | 18 | the property line. |
| 08:24:15 | 19 | Q.   Did you see the big -- it looks like a railroad |
| 08:24:19 | 20 | tie -- in the back? |
| 08:24:20 | 21 | A.   Yes. |
| 08:24:21 | 22 | Q.   And is the property line stake closer to the |
| 08:24:25 | 23 | railroad? |
| 08:24:26 | 24 | A.   Yes, it is.  Maybe we can make this brighter. |
| 08:24:48 | 25 | THE COURT:  Why don't you just take the |

08:24:50   1    photo and hold it in front of the jury box if you like.

08:24:57   2                  MR. ROBON:  We're referring to this big post

08:25:00   3    here, and this is the property line.

08:25:01   4                  MR. BAHRET:  Your Honor, I don't think he

08:25:04   5    should be talking to the jury.  He can show them the

08:25:06   6    document.

08:25:09   7                  THE COURT:  Is that a stake, Mr. McCarthy,

08:25:12   8    that you put there?  Whose stake is that, if you know?

08:25:16   9                  THE WITNESS:  I'm not sure.

08:25:17  10                  THE COURT:  Thank you.

08:25:19  11    BY MR. ROBON:

08:25:19  12      Q.  But does the photograph accurately depict what

08:25:21  13    was there at the time?

08:25:22  14      A.  Yes, it depicts that.

08:25:26  15      Q.  I'm going to mark up here Exhibit Number 55.

08:25:33  16    Now, can you indicate, what does this photograph depict?

08:25:41  17      A.  This depicts -- as we were showing yesterday, we

08:25:51  18    showed the clearing; we filled the -- we started

08:25:56  19    building this mound in this area.  This is also at my

08:26:00  20    son's house, behind my son's house.

08:26:02  21      Q.  This is where the digger is?

08:26:04  22      A.  Right.  And as we were saying yesterday, we

08:26:07  23    started building the mound right after we thought -- we

08:26:11  24    took all these pictures.  We tried to get the City

08:26:16  25    surveyors to come out.  Christy did come out.

08:26:19  1       Q.   Just tell us what the picture shows.

08:26:21  2       A.   Well, I'm trying to say, just to get the timing

08:26:24  3   because the timing is --

08:26:25  4                  THE COURT:  Is there a date on the picture?

08:26:29  5                  MR. ROBON:  No, there's no date on the

08:26:30  6   picture.

08:26:31  7                  THE WITNESS:  But this would have been in

08:26:32  8   the June timeframe.

08:26:34  9   BY MR. ROBON:

08:26:34  10      Q.   And on the right side, what are those big items?

08:26:39  11      A.   This is the -- this is the water main pipe before

08:26:44  12  it was put in.   It was stored right along the property

08:26:48  13  line, just a couple feet, as you can see here.

08:26:53  14      Q.   Does this picture show where you're removing the

08:26:56  15  earth to show the roots of the brambles and things?

08:26:59  16      A.   This is what this is.   This is after we filled

08:27:02  17  it in so we could document it, bring this to the

08:27:06  18  surveyors to survey each of the clumps of earth.

08:27:10  19      Q.   I'm going to mark Exhibit Number 58.   Is that

08:27:14  20  just the same thing but a little bit closer view where

08:27:18  21  it shows at the bottom the various roots that were

08:27:23  22  exposed?

08:27:24  23                  MR. BAHRET:  Objection.

08:27:24  24                  THE COURT:  Overruled.  He may answer.

08:27:27  25      A.   Yes.   Those are -- those dark areas, as you can

08:27:31 1    see there, are some of the roots that we were digging

08:27:35 2    out.  And you can see that the property line are these

08:27:41 3    stakes, particularly --

08:27:44 4        Q.  Are the stakes up here in this area -- look up on

08:27:49 5    this one, John.   Is that the property line stake right

08:27:53 6    there?

08:27:54 7        A.  Yeah, this one's kind of fuzzy.

08:27:56 8                MR. BAHRET:  Your Honor, I'm going to object

08:27:58 9    to this because those are not survey stations.   He

08:28:01 10   bulldozed them, and he put those there for these

08:28:04 11   pictures.

08:28:04 12               THE COURT:  Well, let's clarify whose stakes

08:28:06 13   they are and when they were placed and give some

08:28:11 14   identification to them.

08:28:11 15   BY MR. ROBON:

08:28:13 16       Q.  You didn't take these pictures, did you, John?

08:28:15 17       A.  No, I didn't.

08:28:17 18       Q.  Weren't these pictures taken when you were out

08:28:19 19   there by Ric-man Construction?

08:28:21 20       A.  My understanding was that was true.  We didn't

08:28:24 21   take these.   He --

08:28:27 22               THE COURT:  You don't know who took these

08:28:29 23   photographs; yes or no?

08:28:32 24               THE WITNESS:  Yes.

08:28:34 25               THE COURT:  Yes.

08:28:36   1                THE WITNESS:  I had seen Ric-man's

08:28:38   2    superintendent came out there.   He had a camera.

08:28:42   3                THE COURT:  You believe this is a photo that

08:28:44   4    Ric-man took?

08:28:45   5                THE WITNESS:  Yes.

08:28:46   6                THE COURT:  Thank you.

08:28:47   7        Q.   And he took pictures of you doing the work,

08:28:50   8    right?

08:28:51   9        A.   Yes.

08:28:52  10        Q.   And here you've exposed all kinds of roots and

08:29:00  11    brambles that look like they had about two or three feet

08:29:03  12    of earth on them, correct?

08:29:04  13        A.   Yes.   And I think the previous photo we had

08:29:07  14    better pictures of the stakes that we could at least

08:29:12  15    take a look that.   I think that he --

08:29:20  16        Q.   Which is picture 55?

08:29:22  17        A.   Yes.

08:29:23  18        Q.   Whose stake is this one here in the front?

08:29:27  19        A.   These stakes were from the contractor or City.

08:29:36  20    I'm not sure who exactly put them in.   But these were

08:29:40  21    the stakes we put ours right next to.   These were

08:29:42  22    identified in those previous pictures.   These were

08:29:47  23    confirmed as far as I was concerned; these were the

08:29:50  24    confirmed property lines on this stake here.

08:29:57  25        Q.   Okay.   And photograph number 59, this is just a

08:30:24  1  conglomerate of four photos basically showing the same

08:30:28  2  thing the other photos showed, the pipe before it's

08:30:31  3  installed and where you had excavated?

08:30:34  4      A.  Yes.

08:30:36  5      Q.  Now, would you tell the jury, you said you

08:30:39  6  delivered mud or earth one day?

08:30:42  7      A.  Yes.

08:30:43  8      Q.  What was the urgency of trying to build a mound

08:30:50  9  or making the place look better?

08:30:56  10     A.  Well, the main urgency was that we had -- we were

08:31:05  11  trying -- there were some sales on at the house.   This

08:31:08  12  is a sales office right in front of this location.   And

08:31:11  13  you couldn't, at least as far as I was -- I understood,

08:31:20  14  no one would even come down the road and stop at the

08:31:22  15  sales office after this had happened.   And we needed to

08:31:25  16  put --

08:31:25  17          MR. BAHRET:  Objection, Your Honor.  There's

08:31:27  18  no evidence that anybody had been there in three years

08:31:29  19  before either.

08:31:32  20          MR. ROBON:  I'll rephrase.

08:31:33  21          THE COURT:  I'll ask the jury to disregard

08:31:34  22  that answer.  And let's try to keep our focus, please.

08:31:37  23  BY MR. ROBON:

08:31:37  24     Q.  Did Mr. Laskey have an auction of some of the

08:31:41  25  lots?

08:31:42  1        MR. BAHRET:   Objection.

08:31:44  2    Q.   Were you aware of the auction?

08:31:46  3    A.   Yes.

08:31:47  4    Q.   When was the auction of the lots scheduled?

08:31:50  5    A.   June.

08:31:52  6    Q.   Of '06?

08:31:53  7    A.   It was June of '06.   This was May of '06.   May

08:31:58  8  11 we put the fill in.

08:32:20  9    Q.   Now, we've talked about the cutting of the drain

08:32:23  10  pipe.   Have you as an engineer -- you mentioned that

08:32:29  11  the water is ponding behind the house.   Have you come

08:32:33  12  up with a plan or cost of how to get rid of that access

08:32:38  13  water?

08:32:40  14    A.   Yes.   I went and --

08:32:43  15    Q.   Tell us.

08:32:45  16    A.   I asked the excavator that we use, the one that

08:32:49  17  put the original pipe system in this project, whose --

08:33:03  18  the name, he was our excavator, Sanberg, Ted Sanberg is

08:33:08  19  the name of the excavator.   I asked him what he thought

08:33:12  20  it would cost me to take the water out to River Road

08:33:16  21  back through the -- with this pipe cut.   We talked about

08:33:21  22  the pipe cut, and I asked him what the estimate was,

08:33:25  23  what would be --

08:33:26  24        MR. BAHRET:   Before we get there, I'm going

08:33:27  25  to object.

08:33:29   1               THE COURT:  He can testify about what he was
08:33:31   2    told.
08:33:31   3    BY MR. ROBON:
08:33:31   4      Q.   Tell us what you believe the costs are, not what
08:33:37   5    someone told you.  From  your investigation, what do you
08:33:40   6    believe to a reasonable degree of certainty Old Granite
08:33:44   7    is going to have to spend to clear this water problem?
08:33:48   8               MR. BAHRET:  I object.   That's hearsay in
08:33:51   9    drag.
08:33:52  10               THE COURT:  You can't have somebody tell you
08:33:56  11    something then, without referencing it, say that's your
08:34:01  12    opinion unless you've got a proper foundation that he is
08:34:06  13    qualified to prepare an estimate of that.   You need
08:34:08  14    that other person to say that.
08:34:09  15    BY MR. ROBON:
08:34:09  16      Q.   Did you work with Mr. Sanberg in coming up with a
08:34:13  17    cost?
08:34:13  18      A.   Yes, I did.
08:34:14  19      Q.   Would you tell the Court and the jury how you
08:34:19  20    segmented the various costs and what the total costs
08:34:22  21    are?
08:34:23  22               MR. BAHRET:  Objection, Your Honor.   That
08:34:25  23    doesn't cure the objection.
08:34:28  24               MR. ROBON:  Your Honor, I think when he
08:34:29  25    works with an excavator and they work on how many feet

08:34:33  1   they're going to put it and how deep they're going to

08:34:36  2   put it and they're going to dig a retention pond or not,

08:34:40  3   I think he's qualified.   He's an engineer.

08:34:42  4              THE COURT:  That part, I have no problem

08:34:44  5   with.   But when we start talking about the dollars --

08:34:46  6   Mr. McCarthy, did you prepare the estimate of repair,

08:34:49  7   the dollar cost, yes or no?

08:34:50  8              THE WITNESS:  Yes, I did.

08:34:51  9   BY MR. ROBON:

08:34:51  10     Q.   What was Mr. Sanberg's role in the project?

08:34:54  11     A.   He reviewed it, and he confirmed some of the unit

08:34:58  12   prices for piping and that kind of thing.   And I

08:35:02  13   prepared it for him.

08:35:04  14              THE COURT:  You have prepared estimates of

08:35:07  15   this before?

08:35:08  16              THE WITNESS:  Yes, I've done estimates.

08:35:10  17              THE COURT:  Not estimates in general;

08:35:12  18   estimates of this type of work?

08:35:16  19              THE WITNESS:  Yes, this type of work quite

08:35:17  20   often.

08:35:18  21              THE COURT:  Your testimony can only be given

08:35:19  22   with respect to what you did, not what Mr. Sanberg did.

08:35:23  23   And the jury's instructed to disregard this witness'

08:35:26  24   comments about Mr. Sanberg and whether Mr. Sanberg

08:35:31  25   agreed or disagreed with what Mr. McCarthy did.

| | | |
|---|---|---|
| 08:35:36 | 1 | THE WITNESS:  I understand. |
| 08:35:37 | 2 | THE COURT:  You may proceed. |
| 08:35:39 | 3 | A.  I felt Mr. Sanberg's -- |
| 08:35:42 | 4 | Q.  You can't talk about Mr. Sanberg.  I want to know |
| 08:35:45 | 5 | what you think the cost is going to be? |
| 08:35:47 | 6 | A.  I came up with an estimate for the piping; it was |
| 08:35:52 | 7 | $200,000 to take it out to River Road, that we'd have to |
| 08:35:57 | 8 | have a ponding area; that would be as much as $200,000. |
| 08:36:02 | 9 | Q.  200 more? |
| 08:36:03 | 10 | A.  200 more. |
| 08:36:04 | 11 | Q.  To? |
| 08:36:05 | 12 | A.  To build a ponding area. |
| 08:36:08 | 13 | Q.  That's a retention pond? |
| 08:36:10 | 14 | A.  Retention pond for water, that it can't go |
| 08:36:13 | 15 | immediately right back into the Maumee River; that's |
| 08:36:17 | 16 | what -- that's what I came up with. |
| 08:36:20 | 17 | Q.  And the numbers and the opinions that you've |
| 08:36:23 | 18 | given here today and yesterday are based upon a |
| 08:36:26 | 19 | reasonable degree of engineering certainty? |
| 08:36:28 | 20 | A.  Yes. |
| 08:36:45 | 21 | Q.  There was some discussion yesterday when Mr. |
| 08:36:48 | 22 | Huber was here about the contour of the land.  You've |
| 08:36:57 | 23 | studied a contour of this whole area; have you not? |
| 08:37:01 | 24 | A.  Yes, I have. |
| 08:37:02 | 25 | Q.  And which way does the water drain? |

08:37:08  1        A.   The water.

08:37:10  2        Q.   Why don't you come over here and, with the

08:37:13  3   marker, show the jury.

08:37:39  4             What's the number of that exhibit up in the

08:37:41  5   corner?

08:37:41  6        A.   Six.   The water in the area drains this

08:37:50  7   direction (motioning).

08:37:51  8        Q.   Top to bottom?

08:37:52  9        A.   Top to bottom.

08:37:53  10            And that area also drains to this area.   This is

08:37:57  11   the low point.   That's why this cross drain was put in

08:38:01  12   here.   This drain is the main drain for this whole area

08:38:06  13   other than our own development, which comes out this

08:38:09  14   way.

08:38:09  15       Q.   The development, the water goes out to River

08:38:13  16   Road?

08:38:13  17       A.   It goes out to River Road in the storm sewers.

08:38:44  18            MR. ROBON:   Your Honor, I have no further

08:38:45  19   questions.

08:38:46  20            THE COURT:   Thank you.   You may cross.

08:38:49  21            MR. BAHRET:   Thank you.

08:38:51  22                           - - -

08:38:51  23            JOHN McCARTHY, CROSS-EXAMINATION

08:38:52  24   BY MR. BAHRET:

08:38:52  25       Q.   Mr. McCarthy, you know who I am, and you know who

08:38:59  1   I represent, right?

08:39:00  2        A.   Yes, I do.

08:39:01  3        Q.   We've been together several times?

08:39:04  4        A.   Yes, we have.

08:39:05  5        Q.   And I took your deposition previously?

08:39:08  6        A.   Yes, you did.

08:39:10  7        Q.   Have you reviewed that?

08:39:12  8        A.   Yes, I did.

08:39:14  9        Q.   Any mistakes in it we need to address before we

08:39:17 10   start?

08:39:17 11        A.   Two.

08:39:18 12        Q.   What are the mistakes?

08:39:20 13        A.   Two things that we talked about extensively in

08:39:28 14   the deposition.  The first one was the depth of the

08:39:36 15   manhole that we were talking about here.  After the

08:39:39 16   deposition I went and I looked back and saw it wasn't as

08:39:43 17   deep as I had mentioned, which you had pointed out,

08:39:47 18   because it made no sense with the center ditch, that the

08:39:51 19   manhole itself --

08:39:53 20        Q.   Right.  At the time of the deposition you thought

08:39:55 21   the manhole was --

08:39:56 22        A.   Manhole was, like, ten feet deep, and that made

08:39:59 23   the trench on the other side, I think I said, 13 feet.

08:40:03 24   And it was not.  It was more like nine or ten feet

08:40:07 25   deep.  And -- from the top of the railroad.  So that

08:40:11   1   information --

08:40:13   2       Q.   I planned to talk to you about that, but I guess

08:40:16   3   we've cleared it up already.

08:40:18   4       A.   Because the ditch was not that deep.   It

08:40:20   5   couldn't have been.

08:40:21   6       Q.   Clearly, because at one point you climbed into

08:40:23   7   this manhole upside down?

08:40:25   8       A.   Yes.

08:40:25   9       Q.   And with your feet outside the manhole with your

08:40:29  10   son holding you, you're able to touch the bottom?

08:40:31  11       A.   But I had some tools.

08:40:33  12       Q.   You had a very small hand tool?

08:40:35  13       A.   I had some small hand tools.

08:40:38  14       Q.   You're able to reach, and obviously you're not 12

08:40:42  15   feet tall?

08:40:43  16       A.   I had a rake.

08:40:44  17            THE COURT:  Careful, folks.  You're tripping

08:40:46  18   over each other.   Let's let the question get asked.

08:40:49  19   Let the witness complete an answer.  Then let's ask the

08:40:53  20   next question.

08:40:53  21       A.   Rather than what I had indicated then, that it

08:40:59  22   was 13 feet, it was really nine.  And I apologize for

08:41:06  23   that.

08:41:07  24            And the other deposition problem that we spent a

08:41:11  25   long time on was the ditch and whether the stakes were

08:41:15  1    on the one side of the ditch.  And I think that when I

08:41:22  2    went back out there and I looked and I saw where this

08:41:26  3    ditch was, I think we had a problem with -- the little

08:41:34  4    ditch with the water it in, yes, the stakes were on the

08:41:37  5    other side.  But when I said it was in the center of

08:41:40  6    the ditch, I was referring to the more general swale

08:41:44  7    that was in that area.  But the water ditch that people

08:41:47  8    would generally consider a ditch, yes, the stakes were

08:41:50  9    on the Cambridge side of that ditch.

08:41:53  10    Q.   And the importance of that is because you know

08:41:56  11    clearing machinery didn't go in through a ditch and

08:41:58  12    clear anything on the other side of the ditch, correct?

08:42:02  13    A.   No, I didn't say that.

08:42:03  14    Q.   So you think the machinery went through a ditch?

08:42:06  15    A.   Oh, they pulled stuff out over the ditch, yes.

08:42:11  16    Q.   And you know -- you saw that?

08:42:13  17    A.   I did not.

08:42:15  18    Q.   Okay.  Well, I'll address that with the people

08:42:21  19    that actually did the work since you didn't see it.

08:42:23  20        Were there any other mistakes?

08:42:25  21    A.   Those are the only two.

08:42:27  22    Q.   In no particular order, let's talk about a few

08:42:29  23    things.

08:42:30  24        One, the very last thing, you whipped up an

08:42:34  25    estimate, and you came up with $200,000 for a retention

08:42:38  1  pond?

08:42:38  2      A.  Yes.

08:42:39  3      Q.  Are you aware of the fact that the guy that was

08:42:42  4  responsible for constructing the entire development and

08:42:46  5  did construct this development testified that the cost

08:42:50  6  would be $35,000 to $40,000 for a retention pond?

08:42:56  7              MR. ROBON:  Objection.

08:42:58  8              MR. BAHRET:  Based on what?

08:43:00  9              MR. ROBON:  There's no evidence of that.

08:43:01  10             MR. BAHRET:  Mr. Taylor testified.

08:43:03  11             THE COURT:  Counsel, I'm not going to have

08:43:04  12  either of you testifying in this case.  The objection

08:43:07  13  is overruled.  The jury can recall what somebody said

08:43:11  14  or didn't say.  My jury instruction also address it.

08:43:14  15             So the question is simply, really, it's:

08:43:18  16  Would you disagree with someone who testified or may

08:43:22  17  have testified that the cost for a retention pond would

08:43:25  18  be $35,000 to $40,000?  Agree or disagree?

08:43:29  19             THE WITNESS:  Yes, I would disagree with

08:43:31  20  that.

08:43:31  21  BY MR. BAHRET:

08:43:31  22      Q.  Okay.  Do you know Mr. Taylor?

08:43:33  23      A.  Yes, I do.

08:43:34  24      Q.  Do you know he's a builder?

08:43:36  25      A.  Yes.

08:43:36  1    Q.   Do you know he was the guy in this partnership or

08:43:39  2  this corporation called Old Granite, he was the guy

08:43:41  3  responsible for the construction of the subdivision?

08:43:44  4    A.   Yes, I'm aware of that.

08:43:46  5    Q.   And he testified that he's familiar with pricing

08:43:49  6  because he's the guy that works the prices up.

08:43:51  7    A.   Yes, I'm aware of that.

08:43:52  8    Q.   Do you think he just made up the number?

08:43:54  9    A.   No, he didn't.   He considered a whole different

08:43:58  10  thing.   This is more of an engineering thing.   He never

08:44:01  11  even considered some of the major costs that I

08:44:04  12  considered.

08:44:04  13    Q.   And you know that how?

08:44:06  14    A.   Because I've worked in this area, and I know --

08:44:09  15    Q.   How do you know what he considered, sir?

08:44:11  16    A.   I talked to him.

08:44:12  17    Q.   Well, he testified just the other day as to his

08:44:16  18  estimate.   So apparently if you talked to him, you

08:44:18  19  didn't change his mind.

08:44:20  20    A.   No, he had an idea that you could just go and

08:44:25  21  have a limited retention pond there.

08:44:29  22    Q.   And he testified he's familiar with constructing

08:44:32  23  retention ponds?

08:44:34  24    A.   He didn't go through the efforts that I went

08:44:36  25  through.   He didn't go to the county engineer to find

08:44:38  1   out what kind of pond we might need, what water they'd

08:44:41  2   allow out of there, how big it would have to be.    There

08:44:44  3   was none of that done.

08:44:45  4       Q.   You said that you participated in these graphic

08:44:51  5   designs?

08:44:53  6       A.   Yes, I did.

08:44:55  7       Q.   And on this exhibit, which is 5, of particular

08:45:02  8   interest -- can you all see this?   I note somebody's

08:45:12  9   depicted water going all the way over touching this

08:45:15  10  house.

08:45:16  11      A.   Yes.

08:45:16  12      Q.   Have you ever seen the water like that over

08:45:18  13  there?

08:45:18  14      A.   No.

08:45:19  15      Q.   Anybody ever told you that happened?

08:45:21  16      A.   No, it's never happened.

08:45:22  17      Q.   Okay.   I didn't think so.

08:45:29  18           So this Exhibit 5 does not accurately depict

08:45:32  19  anything that's occurred, does it?

08:45:34  20      A.   It's marked on there, Mr. Bahret, that it's a

08:45:38  21  100-year predicted flood level.

08:45:41  22      Q.   And, in fact, we've had 100 year flood levels of

08:45:48  23  rain since this crossover pipe was severed, correct?

08:45:52  24      A.   No, we haven't.   Not in this area.

08:45:57  25      Q.   You're aware that others disagree with that and

08:46:00   1    have already testified accordingly?

08:46:02   2         MR. ROBON:  Objection.

08:46:04   3    A.   No, I'm not aware of that.

08:46:06   4         THE COURT:  Overruled.

08:46:07   5    Q.   Are you aware of the fact this picture, this

08:46:10   6    Plaintiff's Exhibit 37, that was taken by your son?

08:46:13   7    A.   Yes, I believe so.

08:46:14   8    Q.   And are you aware of the fact that he says that's

08:46:17   9    the worst the water was right there in that picture?

08:46:21  10    A.   Yes.

08:46:22  11    Q.   Nowhere near his house?

08:46:24  12    A.   No, it's nowhere near his house.  We haven't had

08:46:27  13    that kind of rain.

08:46:28  14    Q.   When I say his house, I say that advisedly.

08:46:31  15    He's living in a house without paying any rent, true?

08:46:35  16    A.   No, that's not true.

08:46:37  17    Q.   He says it's true.  Do you have knowledge

08:46:39  18    otherwise?

08:46:39  19    A.   He has an arrangement with Jack for money.

08:46:43  20    That's not my business.

08:46:44  21    Q.   His arrangement is that he was supposed to be

08:46:48  22    paying monthly for the house, or don't you know?

08:46:53  23    A.   That's not what he told me.

08:46:56  24    Q.   We'll let him speak to that.

08:47:04  25         Sir, you never really studied the Cambridge

08:47:09  1  development before your son called you and said, Hey,

08:47:12  2  they've cut some trees?

08:47:13  3      A.   That's true.

08:47:14  4      Q.   You never even walked around and measured

08:47:18  5  anything or studied the depth of foliage or anything

08:47:21  6  like that?

08:47:23  7      A.   I did not.

08:47:24  8      Q.   You did not -- and I'm not saying you should

08:47:28  9  have, sir, but you didn't do anything to ascertain

08:47:30  10  specifically what foliage is on Cambridge property

08:47:34  11  versus on railroad property?

08:47:37  12     A.   No, other than just generally viewing the

08:47:40  13  property.   I did not go and take special note of it or

08:47:44  14  anything.

08:47:44  15     Q.   And I'm not suggesting you had reason to do so,

08:47:50  16  sir, but you didn't -- there was no reason compelling

08:47:54  17  you to try to figure out if all these trees are on the

08:47:57  18  railroad right of way versus Cambridge property is what

08:48:02  19  I'm getting at?

08:48:02  20     A.   No, not beforehand.

08:48:04  21     Q.   You just knew there were trees out there?

08:48:06  22     A.   That's true.

08:48:07  23     Q.   And you know that most of those trees were on

08:48:12  24  railroad property now based on your investigation,

08:48:15  25  correct?

08:48:16  1      A.   That's true.   The stumps were on railroad

08:48:19  2   property, most of the stumps were on railroad property,

08:48:22  3   grew over on his side.

08:48:24  4      Q.   And by the stump, that's where the tree is

08:48:29  5   growing on the railroad property, and the foliage could

08:48:32  6   overhang Cambridge?

08:48:34  7      A.   Right.   And some of the stumps were on

08:48:37  8   Cambridge.

08:48:37  9      Q.   A few, correct?

08:48:39  10     A.   More than a few.

08:48:41  11     Q.   Well, what number do you have?   Somebody

08:48:44  12   yesterday said they found seven.

08:48:48  13     A.   We're talking about thousands.

08:48:49  14     Q.   Thousands of trees?

08:48:52  15     A.   Well, what is a tree?  As they come out of the

08:48:54  16   ground, you know, that's -- and that type of vine grows

08:49:00  17   up 15, 20 feet.

08:49:02  18     Q.   Are you telling me you don't know what a tree is?

08:49:05  19     A.   As far as vegetation.

08:49:09  20     Q.   Do you know what a tree is?

08:49:11  21     A.   A tree is a tree.   As far as we're concerned,

08:49:14  22   anything coming out of the ground is a tree, a potential

08:49:18  23   tree.

08:49:18  24     Q.   Did you count the blades of grass?

08:49:21  25     A.   I did not count the blades of grass.

08:49:24    1    Q.   Why not?  It comes out of the ground.

08:49:26    2    A.   We counted the number of shoots that were of the

08:49:28    3    length that could have gone up 15, 20 feet, and we

08:49:32    4    believe on the Cambridge property there were thousands

08:49:35    5    of trees, what I call trees.

08:49:37    6    Q.   Thousands of trees.   When you say "we believe

08:49:42    7    there were thousands of trees on Cambridge property,"

08:49:45    8    who's the "we"?

08:49:46    9    A.   Well, I'm generally -- I should just refer to

08:49:51   10    myself, but it's my son; I had people working with me;

08:49:55   11    Jack was out there, Jack Laskey was out there with me.

08:50:00   12    That's kind of my "we."

08:50:01   13    Q.   These are things that grow out of the ground,

08:50:06   14    have bark on them, branches, and leaves?

08:50:09   15    A.   Yes.

08:50:09   16    Q.   Thousands?

08:50:10   17    A.   Thousands.

08:50:14   18    Q.   All right.   Your son moved into the house

08:50:18   19    sometime in 2005?

08:50:22   20    A.   Yes, he moved in there in 2005.   I think that

08:50:30   21    was our other correction.   Since we had our deposition

08:50:35   22    we went over and over this.   He was -- he was there in

08:50:42   23    2005 visiting -- the house was built.   He was visiting,

08:50:47   24    but he really didn't move in -- the best we can come up

08:50:50   25    with now was in about February of 2006 he moved in.

08:50:58  1   But in the previous year, I had gone -- I think we even

08:51:03  2   in the deposition kind of straightened this out -- that

08:51:06  3   I had been visiting there.  We had stored a car there.

08:51:09  4   I had stopped there, but really hadn't had any of this,

08:51:14  5   you know, long visit.  They were short visits.  I think

08:51:17  6   we can remember now what we said in deposition.

08:51:20  7       Q.  What you said at deposition was that he moved in

08:51:22  8   there in 2005 and he lived in the house almost a year

08:51:25  9   before the vegetation was removed.   And then after a

08:51:29  10  break you came back and said all --

08:51:31  11      A.  We corrected that.

08:51:33  12      Q.  Let me finish.

08:51:34  13          After the break when you had called him and

08:51:36  14  talked to him, you said he had been there that whole

08:51:38  15  time, but your grandson didn't move in until February of

08:51:42  16  '06.   Do you remember that now?

08:51:43  17      A.  That's exactly what -- what I'm trying to say

08:51:48  18  here.   He moved in in -- the family moved in in 2006.

08:51:54  19  In 2005 I had only been out there on short visits.   I

08:52:00  20  read that again just the other night.   I think I know

08:52:04  21  what -- I think that was all correct.

08:52:06  22      Q.  I don't know how it's corrected, sir.   Even

08:52:09  23  after the break during your deposition when you talked

08:52:12  24  to him you came back and affirmed he had lived there

08:52:15  25  that whole time.   It's just his family didn't move in

08:52:19   1   until 2006.   Are you now correcting the correction?

08:52:23   2      A.   No, we never said that, he lived there full-time

08:52:26   3   in 2005.   He didn't do that.   He was there.   Maybe

08:52:32   4   there was some misunderstanding.   But that's not what I

08:52:34   5   was trying to say then.   And never did.   He moved in

08:52:40   6   in 2006 where he actually lived there with the family.

08:52:46   7      Q.   You were under oath at the tame of your

08:52:48   8   deposition; were you not?

08:52:49   9      A.   Yes.

08:52:55  10      Q.   Are you able to read that on your screen?

08:52:57  11      A.   Yeah, I think so.   Let me put my glasses on.

08:53:03  12             THE COURT:   You might want to zoom it.

08:53:16  13      A.   Yeah, now, is this the --

08:53:18  14             THE COURT:   Here's how we're going to do

08:53:20  15   this.   This is the proper way, ladies and gentlemen.

08:53:22  16   Mr. Bahret, you may ask the witness or you may recite to

08:53:25  17   him the question and the answer.

08:53:27  18             And, Mr. McCarthy, you can either say yes,

08:53:29  19   that's what I testified to; or no, that's not what I

08:53:33  20   testified.   This is will help the process move along.

08:53:38  21             MR. BAHRET:   I don't know how to work this

08:53:40  22   thing.   I didn't put that arrow there?

08:53:42  23             THE COURT:   You touched.   Somebody touched.

08:53:46  24             MR. BAHRET:   What do I touch to make it go

08:53:48  25   off?

08:53:48  1                    THE COURT:  Touch the erase button.

08:53:51  2              Did you touch it, Mr. McCarthy?

08:53:54  3                    THE WITNESS:  I didn't touch anything.

08:53:55  4                    THE COURT:  That's okay.  That's what it's

08:53:58  5   there for.

08:54:03  6                    THE WITNESS:  I brushed it with my finger.

08:54:07  7                    MR. BAHRET:  How did you do that?

08:54:12  8                    THE COURT:  When the witness touches the

08:54:13  9   screen, an arrow or mark will show.

08:54:27  10  BY MR. BAHRET:

08:54:27  11   Q.  You're able to read the question there?  When I

08:54:30  12  asked you at deposition:  "When did your son move into

08:54:32  13  that house in the development?"

08:54:33  14        And your answer was:  "He moved in there, it must

08:54:36  15  have been sometime in 2005."

08:54:38  16        Do you see that?

08:54:39  17   A.  Yes.

08:54:40  18   Q.  And you're trying to correct that now.   Further

08:54:45  19  down here, sir --

08:54:50  20                    MR. BAHRET:  Do you know how to get rid of

08:54:52  21  that yellow dot?

08:54:55  22                    THE COURT:  Hit your screen, Mr. McCarthy.

08:55:01  23                    MR. BAHRET:  I see that.   I'm learning.

08:55:03  24  BY MR. BAHRET:

08:55:03  25   Q.  Further down here:  "Do you know how long he was

08:55:07  1    there before this clearing took place?"

08:55:11  2         Again, you say:  "I would say he was there most

08:55:14  3    of that year, most of 2005."

08:55:18  4         Then you further clarify and say, "You don't know

08:55:21  5    if it was a whole year, but it was approximately a year

08:55:23  6    before the clearing?"

08:55:24  7    A.   Yes.

08:55:26  8    Q.   All right.   And you believe that testimony is

08:55:29  9    inaccurate now?

08:55:30  10   A.   I thought this was what we corrected back then at

08:55:32  11   the deposition.   I thought after I talked to him, he

08:55:36  12   told me he wasn't -- they didn't move in until 2006.   I

08:55:42  13   thought we had it corrected.   He was only there off and

08:55:44  14   on in 2005, and was there off and on in 2005 with things

08:55:49  15   other than him actually living there.

08:55:51  16   Q.   Okay.   Let me show you another page.   During the

08:56:09  17   break in the deposition you had a telephone call with

08:56:12  18   your son, correct?

08:56:13  19   A.   Yes.

08:56:14  20   Q.   And after that you came in and told me your

08:56:18  21   grandson wasn't there until 2006.   Do you see that?

08:56:23  22   A.   Yes.

08:56:24  23   Q.   You didn't tell me your son?

08:56:26  24   A.   Right.   I should have said that.

08:56:35  25   Q.   Well, in any event, whether he lived there or

08:56:38    1   not, you saw the property in 2005?

08:56:41    2       A.   Briefly.

08:56:44    3       Q.   And why did you have contact with that house or

08:56:47    4   that property before your son moved in?   I'm not

08:56:52    5   following that.

08:56:54    6       A.   The one thing I can remember -- now, this is

08:56:57    7   2005.  The one thing I can remember, before -- I believe

08:57:00    8   it was before they moved in.  We had stored a car over

08:57:05    9   there.  The garage was empty.  We put a car in there,

08:57:10   10   and going back and forth with that.

08:57:12   11       Q.   Your car?  Your son's car?  Whose car?

08:57:14   12       A.   My car.

08:57:15   13       Q.   Okay?

08:57:16   14       A.   And we've been over there for that.   I think he

08:57:21   15   showed me the house that he was going to -- that he was

08:57:25   16   going to move into.   I think I was over there for that.

08:57:29   17   Those kind of reasons.   But we weren't -- didn't move

08:57:33   18   in there, weren't really evaluating the place.   Might

08:57:36   19   have helped doing some repairs on the house, little

08:57:39   20   things that it needed.   But I wasn't there very often.

08:57:42   21       Q.   Let me modify my question then.   Whether your

08:57:45   22   son lived there or not, the house existed for roughly a

08:57:49   23   year before the land was cleared?

08:57:54   24       A.   Yes.   I'm not sure exactly when the house was

08:57:57   25   built, but at least a year.

08:57:59  1    Q.  At least a year?

08:58:00  2    A.  Yeah.

08:58:00  3    Q.  And you know it was a spec house?

08:58:04  4    A.  Yes, it was a spec house, and it was the sales

08:58:08  5  office.

08:58:09  6    Q.  And you know it did not sell, correct?

08:58:14  7    A.  It was vacant at the end of 2005, 2006.

08:58:19  8    Q.  It was available for sale, and nobody bought it?

08:58:22  9    A.  That's right.

08:58:24  10   Q.  Nobody even made an offer on it?

08:58:26  11   A.  That, I don't know.

08:58:32  12   Q.  And it's still available for sale now, or don't

08:58:35  13  you know?

08:58:37  14   A.  I believe it's -- my son, basically what he

08:58:41  15  considers renting it.  And it's for sale, yes, as far

08:58:47  16  as I know.

08:58:48  17   Q.  Let's get to the City job.  You had no part in

08:58:52  18  planning the City of Toledo water project?

08:58:55  19   A.  No, I did not.

08:58:56  20   Q.  And obviously, I think it's already clear, but

08:58:59  21  you had no part in developing or building Cambridge?

08:59:01  22   A.  That's right.

08:59:03  23   Q.  Your first part in this project, if I can call it

08:59:08  24  your part in the project, sir, was after the land had

08:59:11  25  already been cleared?

08:59:14  1      A.   You're talking about the railroad property?  Yes.

08:59:21  2   I mean, it wasn't done in one day, but yes.  During and

08:59:26  3   after the clearing of the --

08:59:30  4      Q.   I mean, you didn't see any part of the clearing

08:59:32  5   being done physically, did you?

08:59:37  6      A.   No, I don't believe I ever -- I don't think I

08:59:43  7   ever saw the actual machines moving.  I saw the

08:59:45  8   machines out there afterwards.  But I did not actually

08:59:50  9   see the clearing that I can remember.

08:59:54  10     Q.   All right.  And my understanding is after the

09:00:00  11  area behind Cambridge had been cleared, you went out

09:00:03  12  there and looked around, correct?

09:00:07  13     A.   Yes.  After it started.

09:00:09  14     Q.   And you no longer saw any survey stakes or laths?

09:00:17  15  If there were any there, they were gone?

09:00:19  16     A.   The first time I went out there?

09:00:21  17     Q.   Right.

09:00:21  18     A.   As I recall there was not any lath.  There was

09:00:25  19  some ribbons in the trees every 100 feet or something.

09:00:32  20  We saw a couple ribbons.  I think we mentioned that

09:00:35  21  somewhere.

09:00:35  22     Q.   You did.

09:00:36  23     A.   And some paint on the ground perhaps.

09:00:42  24     Q.   Do you know enough about surveying to verify

09:00:44  25  sometimes that's how markings are made?  If I'm going

| | |
|---|---|
| 09:00:52 | 1 |
| 09:00:54 | 2 |
| 09:00:58 | 3 |
| 09:01:00 | 4 |
| 09:01:04 | 5 |
| 09:01:07 | 6 |
| 09:01:10 | 7 |
| 09:01:14 | 8 |
| 09:01:15 | 9 |
| 09:01:18 | 10 |
| 09:01:21 | 11 |
| 09:01:26 | 12 |
| 09:01:29 | 13 |
| 09:01:32 | 14 |
| 09:01:33 | 15 |
| 09:01:40 | 16 |
| 09:01:42 | 17 |
| 09:01:48 | 18 |
| 09:01:51 | 19 |
| 09:01:53 | 20 |
| 09:01:55 | 21 |
| 09:01:58 | 22 |
| 09:02:01 | 23 |
| 09:02:03 | 24 |
| 09:02:06 | 25 |

to try to mark a boundary, I could do it with a ribbon tied to a tree just as well as with a stake in the ground?  Or don't you know?

A.  We did a lot of -- I've done a lot -- with the Corps of Engineers we did a lot of clearing.  So yes, we're very much into the details.  It's not -- that's not the common way of marking it for when you're at a property line.

Q.  Well, if it's a common way or not, would you agree with me that those marks that you saw, the painted mark, the ribbons, all of them were at the border and not encroaching on Cambridge?

A.  At the time I first saw it?

Q.  Yes.

A.  Those markings, they were near the boundary. That's all I could say.  Because we didn't have any way to tie them in.  Most of it was just -- a ribbon in a tree hadn't been knocked down, blowing around.  It was near the boundary.  That's all I can say.

Q.  Did you see any markings that you believed were on the development property?

A.  No.  I could not verify that.

Q.  Okay.  So everything you saw you were of the opinion that they were either on railroad property or on the border, on the property line?

09:02:10  1      A.   They were near the line.   That doesn't mean they

09:02:12  2  were not on Cambridge property, not on the railroad

09:02:15  3  property.   They were near the line.   All we saw was

09:02:18  4  these --

09:02:20  5      Q.   And that's what you were trying to determine?

09:02:21  6      A.   Right.   I didn't -- at that time I didn't even

09:02:24  7  know where the corner monuments were.   I hadn't gone

09:02:27  8  that far.

09:02:28  9      Q.   Well, sir, do you deny telling me after you had a

09:02:33  10  year and a half to study the problem, you told me that

09:02:37  11  none of those markings were encroaching on the

09:02:41  12  development?

09:02:43  13      A.   That's what I meant.   It was on the borderline.

09:02:47  14  There wasn't any -- nothing I could confirm that was on

09:02:50  15  the development.

09:02:51  16      Q.   And you stand by that testimony today?

09:02:54  17      A.   I will stand by that testimony today.

09:02:56  18      Q.   Thank you.   Do you believe Cambridge has a

09:03:08  19  self-contained drainage plan?

09:03:10  20      A.   Yes, we do.

09:03:12  21      Q.   When did you come up with that belief?   Because

09:03:15  22  that may be another area in your deposition that you may

09:03:18  23  have noted.

09:03:20  24      A.   Well, when we first started building this mound,

09:03:25  25  and that era, which would have been in the end of April,

09:03:34    1    May, beginning of May.

09:03:35    2        Q.   The question is, when did you come up with the

09:03:38    3    conclusion?   I don't need a history.

09:03:41    4        A.   In May.   Early, yeah.

09:03:43    5        Q.   May of what year?

09:03:44    6        A.   2006.

09:03:47    7        Q.   So are you now saying that the manhole on the

09:03:50    8    railroad property is or is not part of the drainage plan

09:03:54    9    for Cambridge?

09:03:56   10        A.   No, it's not.  The self-contained -- it's not

09:04:00   11    part of the self-contained drainage system of Cambridge.

09:04:15   12        Q.   This is page 30 to your deposition.   Are you

09:04:20   13    able to read it?

09:04:21   14        A.   Yes.

09:04:22   15        Q.   And you'll see that I very clearly asked you

09:04:25   16    questions about that manhole including:  "What

09:04:29   17    information do you rely upon to claim that the manhole

09:04:33   18    that isn't even on Cambridge property is part of the

09:04:36   19    drainage plan for Cambridge?"  Do you see that?

09:04:41   20        A.   Yes.

09:04:41   21        Q.   You clearly were telling me it's part of the

09:04:44   22    drainage plan, right?

09:04:45   23        A.   Of the overall scheme for the region that

09:04:49   24    Cambridge is in.   It's not part of -- it's not

09:04:52   25    connected with the Cambridge system.   It's separate.

09:04:56  1  It has to be separate when you develop an area.  It has

09:04:59  2  to be separate.  It went out to River Road.

09:05:21  3     Q.  You know that the culvert that goes behind

09:05:25  4  Cambridge on the railroad property is there to drain the

09:05:28  5  railroad water?

09:05:34  6     A.  And other water, yes.

09:05:36  7     Q.  And you know that the culvert -- I guess maybe we

09:05:48  8  should define that term.  I might call it a pipe.  And

09:05:51  9  it's actually called a culvert, correct?

09:05:54  10     A.  The railroad calls it a culvert.  Most

09:05:57  11  engineers, if it's a general pipe for a general drainage

09:06:01  12  area, yes, they usually call it a culvert or a storm

09:06:05  13  drain, main storm drain.

09:06:13  14     Q.  You might need to come over here, sir, so you can

09:06:17  15  see where I'm pointing.  It begins somewhere here.

09:06:29  16     A.  Yes.

09:06:31  17     Q.  And it's underground?

09:06:35  18        MR. ROBON:  The jury can't see.

09:06:37  19        THE COURT:  If you want to stand, jury, will

09:06:41  20  that help?  Or if you want to move your seat, you may.

09:06:50  21        MR. ROBON:  Yeah, let's do that because this

09:06:53  22  thing is blocking her.  Is that observable for everybody

09:07:16  23  now?

09:07:19  24  BY MR. BAHRET:

09:07:19  25     Q.  The culvert, in laymen's terms, Mr. McCarthy, we

09:07:23  1    could call that a pipe?

09:07:24  2        A.  Yes.   I call it a pipe.

09:07:25  3        Q.  All right.   The pipe begins somewhere towards

09:07:29  4    the middle of Old Granite?

09:07:32  5        A.  This is what they call the culvert, the

09:07:35  6    crossover.   This they never called a culvert.   This is

09:07:38  7    just -- this is just a pipe that leads --

09:07:42  8        Q.  It's a solid, enclosed --

09:07:44  9        A.  It's a solid clay pipe.

09:07:46  10       Q.  It doesn't have holes in it that would allow

09:07:50  11   water to enter it?

09:07:51  12       A.  Just at the end.

09:07:52  13       Q.  And it ends somewhere down here?  You don't know

09:07:56  14   where the end is here, do you?

09:07:57  15       A.  Yes.

09:07:58  16       Q.  Do you?

09:07:58  17       A.  Yes.

09:07:59  18       Q.  So it's somewhere, I don't know, how many feet?

09:08:01  19       A.  A couple hundred feet down this way.

09:08:03  20       Q.  A couple hundred feet?

09:08:04  21       A.  Yes.

09:08:05  22       Q.  Roughly what's the dimension from this manhole

09:08:08  23   down here?

09:08:09  24       A.  This is all 12-inch diameter.

09:08:11  25       Q.  I mean the length.   What's the length?   The

| | | |
|---|---|---|
| 09:08:15 | 1 | distance from here to here? |
| 09:08:17 | 2 | A.  This was 250, 350 feet. |
| 09:08:19 | 3 | Q.  So for 250 to 300 feet, from here to there, and |
| 09:08:25 | 4 | what did you tell me?  I forgot. |
| 09:08:27 | 5 | A.  A couple hundred feet.   200. |
| 09:08:29 | 6 | Q.  So we've got, like, 500 feet or more of enclosed |
| 09:08:32 | 7 | pipe? |
| 09:08:33 | 8 | A.  Yes. |
| 09:08:34 | 9 | Q.  And at least before you did something, no water |
| 09:08:38 | 10 | could enter or get out of that pipe to get on this |
| 09:08:42 | 11 | property, correct? |
| 09:08:48 | 12 | A.  Not in those pipes. |
| 09:08:49 | 13 | Q.  Okay. |
| 09:08:50 | 14 | A.  And I -- |
| 09:08:52 | 15 | Q.  All right.  You've answered the question. |
| 09:08:53 | 16 | I mean, water isn't going to come, if this |
| 09:08:55 | 17 | manhole is full of water, it isn't going to come out and |
| 09:09:00 | 18 | be sitting around here; am I correct?  Am I correct? |
| 09:09:08 | 19 | A.  No, I don't think so. |
| 09:09:09 | 20 | Q.  How would it get out? |
| 09:09:11 | 21 | A.  This -- one thing we never were able to do, |
| 09:09:15 | 22 | whether this also has any kind of a leak down in this |
| 09:09:19 | 23 | basin, I do not know.  These are clay pipes.  Even |
| 09:09:26 | 24 | though they're not gasketed, this is that kind of thing, |
| 09:09:29 | 25 | there is some drainage, and that was the beauty of this |

09:09:32  1   old railroad system, you get some drainage down in here.

09:09:39  2      Q.  You have to rely on an assumption that it was

09:09:43  3   broken then?

09:09:44  4      A.  No, just the joints themselves.  They didn't seal

09:09:47  5   them in those old days.   They're only short pieces.

09:09:51  6   It is somewhat like a --

09:09:53  7      Q.  Well, you enhanced the situation by tapping into

09:09:56  8   that pipe and putting some sort of flexible pipe over

09:10:01  9   here, correct?

09:10:02  10     A.  That's right.   Because we had --

09:10:04  11     Q.  And so now that very clearly would allow water

09:10:08  12  that's in this thing or coming from here getting into

09:10:12  13  this catch basin, that very clearly let it get out and

09:10:16  14  sit right here on this land; would it not?

09:10:19  15     A.  Right, because we're replacing --

09:10:20  16     Q.  Would it not?

09:10:21  17     A.  Yes.

09:10:22  18     Q.  Thank you.   You can go ahead and have your seat.

09:10:52  19          Sir, did you have permission from the railroad to

09:10:55  20  go on their property and do that?

09:10:59  21     A.  To go on their property to make that connection?

09:11:03  22     Q.  Yeah.

09:11:04  23     A.  No, we did not.

09:11:05  24     Q.  So you trespassed on the railroad property,

09:11:11  25  knocked a hole in the railroad pipe, put some sort of

| | | |
|---|---|---|
| 09:11:15 | 1 | connector so that water can come out of that pipe, all |
| 09:11:19 | 2 | without anybody's permission, correct? |
| 09:11:22 | 3 | MR. ROBON:  Objection. |
| 09:11:26 | 4 | THE COURT:  Grounds? |
| 09:11:27 | 5 | MR. ROBON:  The use of the word trespass. |
| 09:11:30 | 6 | Trespass is an intentional act. |
| 09:11:33 | 7 | MR. BAHRET:  Did he accidentally do it? |
| 09:11:35 | 8 | THE COURT:  Well, lawyers, let's keep your |
| 09:11:38 | 9 | conversation with me, please. |
| 09:11:45 | 10 | Why don't you rephrase the question or break |
| 09:11:48 | 11 | it up. |
| 09:11:49 | 12 | MR. BAHRET:  All right. |
| 09:11:50 | 13 | BY MR. BAHRET: |
| 09:11:50 | 14 | Q.  First of all, you knew that pipe was on railroad |
| 09:11:52 | 15 | property, correct? |
| 09:11:54 | 16 | A.  Yes, I did. |
| 09:11:55 | 17 | Q.  And so you knew that you were entering railroad |
| 09:11:58 | 18 | property; did you not? |
| 09:12:00 | 19 | A.  Yes, I did. |
| 09:12:01 | 20 | Q.  You knew that you did not have permission to do |
| 09:12:03 | 21 | so? |
| 09:12:06 | 22 | A.  Not quite true. |
| 09:12:08 | 23 | Q.  You thought you had permission to go in there and |
| 09:12:11 | 24 | tap into their pipe? |
| 09:12:12 | 25 | A.  As we discussed before -- |

09:12:15  1      Q.   I don't recall discussing any permission to tap

09:12:18  2    into a pipe.

09:12:19  3      A.   No, about access to their property, and we were

09:12:22  4    not going to make any significant change to it.   I sent

09:12:25  5    CSX a letter telling them that we were building a mound,

09:12:29  6    that we were going to be temporarily using their

09:12:34  7    property, that we were going to be not having any --

09:12:38  8      Q.   Let's get this straight.

09:12:41  9            MR. ROBON:  Your Honor, can I let the

09:12:42  10   witness finish the answer, please?

09:12:44  11           THE COURT:  No, you can't.   I can.

09:12:45  12           MR. ROBON:  That's what I meant.   Would

09:12:47  13   you, please.

09:12:53  14           THE COURT:  Let's pick it up again.   I'm

09:12:57  15   going to ask the lawyer to ask snappy questions, and I'm

09:13:01  16   going to ask the witness to give snappy answers to the

09:13:04  17   extent you can, okay.   And I think by breaking it up

09:13:07  18   this way, we can get the testimony quicker.

09:13:12  19   BY MR. BAHRET:

09:13:13  20     Q.   The letter you're talking about, sir, you sent a

09:13:15  21   letter to somebody at CSX saying you'd like to enter the

09:13:18  22   property to move dirt?

09:13:20  23     A.   That we would be in there.

09:13:22  24     Q.   To move dirt?

09:13:23  25     A.   Move dirt and do other things, but we were not

09:13:25　1　going to permanently impact their -- the railroad by

09:13:30　2　doing this.   And didn't specifically say that we were

09:13:34　3　going to tap into this pipe.

09:13:35　4　　Q.　You never even mentioned the pipe?

09:13:38　5　　A.　Never mentioned the pipe.

09:13:39　6　　Q.　And you didn't ask permission to do anything to

09:13:41　7　their drainage system, did you?

09:13:45　8　　A.　I did not.

09:13:47　9　　Q.　And you never got a reply to that letter either?

09:13:51　10　　A.　I told them we were going ahead.

09:13:53　11　　Q.　You never got a reply?

09:13:54　12　　A.　They never replied.

09:13:56　13　　Q.　So they didn't say, okay, Mr. McCarthy, go ahead

09:13:59　14　and do whatever you want to do on our land?

09:14:03　15　　A.　If they don't reply --

09:14:05　16　　Q.　Can you say yes or no?

09:14:06　17　　A.　Yes or -- no, they never replied.

09:14:49　18　　Q.　Sir, do you remember telling me that you spoke

09:14:51　19　with the guy that designed the Cambridge drainage plan

09:14:55　20　and he told you that Cambridge relies upon the railroad

09:15:00　21　pipe and manhole?

09:15:03　22　　A.　Yes.

09:15:04　23　　Q.　And do you stand by that testimony?

09:15:07　24　　A.　I'm not sure that was exactly what I said, but --

09:15:15　25　　Q.　I asked you:  "What document do you have that

09:15:18  1    shows that Old Granite relied upon any drainage ditches

09:15:23  2    or pipes or manholes that weren't on Old Granite

09:15:26  3    property?"

09:15:28  4         And you told me you spoke to the engineer that

09:15:31  5    designed it.

09:15:32  6         I asked, "Who is that?"

09:15:33  7         You said, "Todd Perkins -- or Jenkins."

09:15:37  8         Do you remember that now?

09:15:38  9    A.   Yeah, but that wasn't exactly what I said or

09:15:42  10   remembered about it.   Todd Jenkins wasn't the actual

09:15:46  11   designer.   I did speak to Todd Jenkins.

09:15:49  12   Q.   Actually, he was.

09:15:50  13   A.   He did some of the -- he did have some knowledge

09:15:53  14   of the project.   He was the designer's boss.   He did

09:15:56  15   say that the Cambridge system was designed to take care

09:16:04  16   of the rainfall that fell on Cambridge.   They understood

09:16:10  17   that, as far as he knew, that they still relied on the

09:16:14  18   ditch in the back to take water past -- the rainwater

09:16:19  19   from Hospice and that area past --

09:16:23  20   Q.   Could we just confine your answer to what I

09:16:25  21   asked?

09:16:26  22   A.   That's what I was trying to do.

09:16:28  23        MR. ROBON:  Your Honor, could we let the

09:16:29  24   witness finish?

09:16:30  25        THE COURT:  We were getting a bit far afield

09:16:33   1    here.    I go back to let's have the questions be as

09:16:38   2    short as we can, and let's have the answers be as

09:16:41   3    responsive to the question as we can.

09:16:44   4    BY MR. BAHRET:

09:16:44   5        Q.   And, sir, you mentioned something; you believe

09:16:48   6    Todd Jenkins is the boss of whoever designed the

09:16:51   7    drainage plan?

09:16:53   8        A.   That's what he told me, yes.

09:16:54   9        Q.   So I guess you're not aware of the fact that Todd

09:16:58  10    Jenkins is the man that designed the drainage plan and

09:17:00  11    that Nick Nigh is his boss?

09:17:05  12        A.   No, that's not -- that's not my understanding of

09:17:08  13    the situation there.

09:17:09  14        Q.   Well, Mr. Nigh was just here yesterday and said

09:17:12  15    he's the president of the company.

09:17:13  16        A.   He's a partner in the company.

09:17:15  17        Q.   He said he's the president?

09:17:16  18        A.   Well, that -- that may be.   And he may be Todd

09:17:21  19    Jenkins' boss.  But he's not an engineer.   He's a

09:17:26  20    surveyor.   He's a professional surveyor.   He's an

09:17:30  21    engineer, but not in the design thing.   Todd Jenkins

09:17:33  22    was doing that.   Todd Jenkins told me --

09:17:36  23        Q.   I didn't ask you what Todd Jenkins said.   But

09:17:40  24    you are apparently now agreeing Todd Jenkins is the

09:17:44  25    engineer that designed it?

09:17:47  1      A.   That's not what he told me.   He at least had

09:17:50  2  somebody helping him that did the actual details like

09:17:53  3  we're talking about here.

09:17:54  4      Q.   Okay.   Whatever.   We'll let him speak to that.

09:17:59  5  We've already covered this thing.   You told me that you

09:18:02  6  thought the ditch between the railroad beds was 12 to 13

09:18:05  7  feet deep.   You corrected that.   You know now it's not

09:18:09  8  that deep, correct?

09:18:09  9      A.   Right.

09:18:10  10     Q.   Did you ever actually measure anything in the

09:18:19  11 manhole?

09:18:19  12     A.   Yes.

09:18:19  13     Q.   I mean measure depths and things.

09:18:22  14     A.   Yes, we measured from the top of the rim of the

09:18:24  15 manhole like we talked about yesterday.

09:18:26  16     Q.   You measured yesterday?

09:18:29  17     A.   No, that we talked about yesterday.

09:18:31  18     Q.   And when did you do these measurements?

09:18:34  19     A.   I did the measurements back in 2006.   And then

09:18:41  20 we redid them every time this came up, and the manhole

09:18:48  21 was repaired, and then we went -- I was down in there,

09:18:53  22 like I said yesterday, I was down there several times,

09:18:56  23 and I measured at least twice.

09:18:57  24     Q.   Did you write these measurements down?

09:18:59  25     A.   Yes.

| | | |
|---|---|---|
| 09:19:00 | 1 | Q.   What did you measure? |
| 09:19:02 | 2 | A.   We measured from the top of the rim -- |
| 09:19:04 | 3 | Q.   Bad question.   What were the measurements? |
| 09:19:07 | 4 | A.   Seven and a half feet. |
| 09:19:08 | 5 | Q.   To what? |
| 09:19:09 | 6 | A.   To the bottom of the pipe, from the top of the |
| 09:19:11 | 7 | manhole. |
| 09:19:12 | 8 | Q.   Seven and a half feet from the top of the |
| 09:19:14 | 9 | manhole -- |
| 09:19:14 | 10 | A.   Right. |
| 09:19:15 | 11 | Q.   -- to the bottom of -- |
| 09:19:16 | 12 | A.   Bottom of the pipe, the culvert that goes across. |
| 09:19:19 | 13 | Q.   That crossover thing? |
| 09:19:21 | 14 | A.   Yes. |
| 09:19:21 | 15 | Q.   And the top of the manhole that you measured from |
| 09:19:25 | 16 | sticks above ground, correct? |
| 09:19:27 | 17 | A.   Yes -- yes, right.   Just a little bit above |
| 09:19:31 | 18 | ground. |
| 09:19:31 | 19 | Q.   Did you measure how much it sticks up above the |
| 09:19:35 | 20 | ground? |
| 09:19:35 | 21 | A.   It's actually two feet below the railroad bed. |
| 09:19:41 | 22 | It's below the ground that we talked about here.   The |
| 09:19:51 | 23 | railroad bed had a crown on it, so it comes up.   Even |
| 09:19:55 | 24 | though it does stick out a little bit. |
| 09:20:00 | 25 | Q.   Would you agree with me, sir, that lots 15 and |

09:20:03  1   16, their water cannot drain into that pipe that's on

09:20:07  2   the railroad property?

09:20:13  3       A.  Well, now it can't.   It has no place to go.

09:20:18  4       Q.  The water that we see here on Plaintiff's Exhibit

09:20:25  5   37 could not get into that pipe, correct?

09:20:35  6       A.  Well, we have -- as you saw yesterday, there is a

09:20:39  7   pipe that leads right it to.   It can get in there now,

09:20:42  8   but it can't go anyplace.

09:20:44  9       Q.  Would you agree with me that it could not get in

09:20:46  10  that pipe before you did your little fix?

09:20:51  11      A.  I think that's what we just talked about before.

09:20:54  12  It would be slow.  We did not confirm there was any

09:20:57  13  other -- there may be some other entrance in there.

09:21:01  14  But, you know, I don't know.   I don't know what --

09:21:05  15      Q.  The other entrance, if there is one, there's a

09:21:09  16  crack in the pipe or something like that?

09:21:10  17      A.  No, there may be some other entrance there.

09:21:13  18      Q.  You don't know if there's any entrance there?

09:21:15  19      A.  I don't know if there's anything like that.

09:21:17  20      Q.  Would you agree with me at your deposition you

09:21:19  21  told me the water on lots 15 and 16 cannot drain into

09:21:24  22  that pipe?

09:21:24  23      A.  Yes.

09:21:25  24      Q.  Why didn't you mention that little thing that you

09:21:27  25  put in there during your deposition?

09:21:29    1      A.   I think, I did.   I think in the later questions.

09:21:36    2      Q.   Well, when I asked you point blank:  "Could the

09:21:38    3   water from those two lots get into that pipe?"   You

09:21:43    4   specifically say, no.

09:21:46    5      A.   Right.

09:21:46    6      Q.   Right.

09:21:48    7      A.   I guess -- you know, I must have been talking

09:21:53    8   about -- I don't know what the timeframe was.   Maybe

09:21:55    9   that was before.   But it can get into that pipe.   It

09:21:58   10   can't go out through.   That's what I'm talking about.

09:22:01   11      Q.   The question -- you're a big boy; you're a

09:22:04   12   trained engineer, college graduate, right?

09:22:06   13      A.   Yes, I am.

09:22:07   14      Q.   And you know what the English language is and you

09:22:10   15   understood the question?

09:22:10   16      A.   Yes.

09:22:11   17      Q.   And that's what you told me.

09:22:14   18      A.   And it's essentially true.

09:22:19   19      Q.   Now, would you agree, at some point yesterday I

09:22:23   20   think you said you called a meeting or asked for a

09:22:26   21   meeting, and ray Huber participated, Christy

09:22:32   22   participated, and Dean Walsh from Ric-man participated?

09:22:38   23      A.   That's right.

09:22:39   24      Q.   And there was discussion about that crossover

09:22:42   25   pipe?

09:22:43  1      A.   That's right.

09:22:44  2      Q.   And during that discussion, Mr. Huber indicated

09:22:48  3   that he believed the water was moving from the railroad

09:22:54  4   through the crossover pipe towards the private property,

09:22:58  5   correct?

09:22:59  6      A.   No.

09:23:00  7      Q.   Well, he testified that's what he said.   Do you

09:23:03  8   disagree?

09:23:04  9      A.   Yes.

09:23:05  10     Q.   Okay.

09:23:06  11     A.   He wasn't that specific at the meeting that I

09:23:09  12  recall.

09:23:10  13     Q.   What you recall is that he said something more to

09:23:13  14  the effect, I don't know which way the water goes?

09:23:15  15     A.   He was very emphatic that he didn't study this

09:23:18  16  thing.  He didn't really know, but perhaps it goes this

09:23:22  17  way, you know.   I don't know.

09:23:24  18     Q.   Well, he testified yesterday that he told Christy

09:23:27  19  Soncrant that the water moved from the railroad towards

09:23:31  20  private property, and that he never told her anything

09:23:34  21  different.   Do you disagree with that?

09:23:39  22          THE COURT:  Disagree with what he told her?

09:23:43  23          MR. BAHRET:  Yes.

09:23:44  24     Q.   I mean, disagree with the fact he told her that?

09:23:47  25     A.   No, I don't really know what he denied.   But,

09:23:52   1   whatever.

09:23:53   2       Q.   During the meeting, there was discussion about

09:23:56   3   the crossover drain appeared to be plugged, correct?

09:24:02   4       A.   At this early stage, I'm not sure we were --

09:24:10   5   anybody was aware of how plugged it was or whether it

09:24:15   6   was plugged.

09:24:16   7       Q.   Was there discussion?  You can really speed this

09:24:18   8   up with a yes or no.  Do you recall?

09:24:21   9       A.   No, I don't recall.

09:24:23  10       Q.   Okay.  At some point was there discussion that

09:24:26  11   you participated in about that crossover pipe being

09:24:29  12   plugged?

09:24:30  13       A.   Yes.

09:24:32  14       Q.   And, in fact, I think you alluded to that

09:24:34  15   yesterday when you said that Dean Walsh -- or you didn't

09:24:39  16   use a name, but you said the guy from Ric-man and the

09:24:42  17   City engineer -- and there was somebody there from the

09:24:46  18   railroad also, wasn't there?

09:24:50  19       A.   Another meeting we met with someone from the

09:24:53  20   railroad.

09:24:53  21       Q.   And all of those folks were saying, although you

09:24:57  22   disagreed with it, all of these folks were saying that

09:25:00  23   pipe served no function anymore.  Is that right?

09:25:09  24       A.   No.  Ray Huber said he didn't know.  That was

09:25:13  25   his main thing.  He didn't really know.

09:25:15  1    Q.   The rest of them said they believed it served no

09:25:19  2    function, correct?

09:25:20  3    A.   No.   I don't think that's true either because

09:25:23  4    Christy never really said that she believed that.   She

09:25:28  5    just was telling me that's what Ric-man thought, that

09:25:32  6    this thing was plugged.

09:25:33  7    Q.   Just yesterday you testified that the City took

09:25:35  8    the position it served no purpose and that Ric-man

09:25:38  9    said --

09:25:40  10   A.   From Ric-man.   Didn't say -- we're talking about

09:25:43  11   this meeting with her.   I don't think that was her

09:25:45  12   personal thing, that she knew anything about it or said

09:25:48  13   that.

09:25:49  14   Q.   Sir, you know the railroad is aware that that

09:25:51  15   pipe was cut, correct?   You know that from your

09:25:54  16   conversations?

09:25:57  17   A.   Yeah, the railroad now knows that that was cut.

09:26:00  18   Q.   And are you aware of the fact that the railroad

09:26:03  19   has not to this day asked for anything to be done about

09:26:06  20   that pipe?

09:26:07  21           MR. ROBON:   Objection.

09:26:09  22   BY MR. BAHRET:

09:26:10  23   Q.   Their pipe.

09:26:10  24           MR. ROBON:   No evidence of that.

09:26:12  25           MR. BAHRET:   There will be.

09:26:14  1      A.   I don't believe the railroad has or hasn't

09:26:16  2   done --

09:26:16  3            THE COURT:   Overruled.   The answer may

09:26:20  4   stand.

09:26:27  5      Q.   Sir, you know that Old Granite was basically a

09:26:30  6   farm -- I said Old Granite.   I'm sorry.   Cambridge was

09:26:34  7   basically a farm before it became a development?

09:26:37  8      A.   That was what I was told by a neighbor.

09:26:40  9      Q.   And you estimated that there may have been as

09:26:44  10  much as 100 feet thick of vegetation behind Old Granite,

09:26:50  11  correct?

09:26:50  12     A.   Yes.

09:26:51  13     Q.   But all of it was on railroad property?

09:26:56  14     A.   Not all of it was on railroad property.   What

09:27:03  15  was everything we did yesterday?

09:27:18  16     Q.   Page 61 of your deposition, sir.   You see the

09:27:28  17  question there and the answer?   I asked you:   "You're

09:27:32  18  not claiming there was 100 feet of vegetation on Old

09:27:35  19  Granite's property?"

09:27:37  20          And your answer:   "No.  No.  No.   Old Granite

09:27:40  21  was basically a farmland.   It was cleared.   There was a

09:27:46  22  couple of trees that were there.   They're grown-up,

09:27:49  23  whatever.   But that was basically cleared.   This 100

09:27:53  24  feet of vegetation was between" --

09:27:56  25          And then I interrupted you:   "It was on railroad

09:27:59  1  property?"

09:28:00  2      And you continued your answer:  " On railroad

09:28:04  3  property that was cut down."

09:28:06  4      Do you see that?

09:28:07  5  A.   Yes.

09:28:07  6  Q.   Did you mean to tell me that?

09:28:10  7  A.   I thought we all at that point were clear that

09:28:13  8  this little boundary was not, you know, was still under

09:28:20  9  doubt.   Not that this whole thing was -- I didn't mean

09:28:24  10  that like that.   But that's what I said.

09:28:28  11  Q.   You didn't come into that deposition blind sided.

09:28:31  12  You came in preparing, reviewing your note, studying --

09:28:35  13  A.   Right.

09:28:35  14  Q.   -- and talking to Mr. Robon; did you not?

09:28:37  15  A.   Yes.

09:28:38  16  Q.   You were prepared to be asked questions by the

09:28:41  17  battery of attorneys that were sitting there in front of

09:28:44  18  you, including me?

09:28:47  19  A.   Right.   But all I'm saying is there were trees

09:28:50  20  cut on railroad property.

09:28:52  21  Q.   100 feet thick?

09:28:54  22  A.   Yes, 100 feet thick.

09:28:56  23  Q.   And --

09:29:00  24  A.   Plus what was on our property.   I didn't say

09:29:02  25  that.

09:29:03  1    Q.  Do you see where I just put the arrows, that part

09:29:07  2  of your answer?

09:29:08  3    A.  Yes.

09:29:08  4    Q.  When you're talking about Old Granite, and we

09:29:12  5  should have been using the word Cambridge.

09:29:14  6    A.  This, I was referring to away from that boundary

09:29:16  7  that was back to our property.  I wasn't talking about

09:29:19  8  this disputed little stretch there.

09:29:21  9    Q.  You tell me there:  "There was a couple of trees

09:29:24  10  that were there.   They're grown-up, and they're" --

09:29:30  11  you're referring to Cambridge, right?

09:29:32  12    A.  Right.

09:29:32  13    Q.  "A couple of trees."  But you told the jury today

09:29:35  14  thousands.

09:29:36  15    A.  No, I was talking about away from this disputed

09:29:39  16  area on Cambridge property that was there that was a

09:29:43  17  farmland, there were a few trees left after the farmland

09:29:48  18  was there.   Not in the disputed borderline.   I didn't

09:29:53  19  mean that.   Sorry.

09:30:04  20    Q.  You're aware of the fact the housing market

09:30:06  21  really is on rough times?

09:30:09  22    A.  Yes, I am.

09:30:10  23    Q.  You're aware of the fact that the housing market

09:30:13  24  really went into the toilet right around the time the

09:30:17  25  right-of-way was cleared?

09:30:22  1      A.   My opinion of it was it was a little bit later in

09:30:25  2   Perrysburg.   I was working for another developer at the

09:30:29  3   time.

09:30:29  4      Q.   Well, you'd say the middle of 2006, right?

09:30:31  5      A.   Right.

09:30:32  6      Q.   And that's when this project was, correct?

09:30:38  7      A.   Well, this clearing, we said, was in April.

09:30:43  8      Q.   And a month or two later the housing market takes

09:30:46  9   a real nosedive?

09:30:48  10     A.   Five or six months, four months, whatever.

09:30:51  11     Q.   Did you tell me the middle of '06 at deposition?

09:30:54  12     A.   Yes.

09:30:55  13     Q.   Do you want me to pull the page out?

09:30:57  14     A.   Well, August of -- that would be the middle of

09:31:03  15   '06.   That's what I meant.   But it was a few months

09:31:06  16   after this.

09:31:07  17     Q.   All right.   In your mind August is the middle of

09:31:10  18   the year?

09:31:11  19     A.   Yes.

09:31:11  20     Q.   I thought it was June 30 to July 1, but you're

09:31:15  21   the engineer.

09:31:19  22          You would agree that you did not specialize in

09:31:21  23   drainage or subdivision drainage plans when you worked

09:31:24  24   for the Corps?

09:31:27  25     A.   No, we specialized in flooding, evaluating, these

things.

Q.  Would you agree that you did not specialize in drainage and subdivision drainage plans?

A.  Yes, I would agree with that.

Q.  Would you agree that your primary task when you worked for the Corps of Engineers was construction administration?

A.  Half and half.

Q.  Would you agree it was your primary task?

A.  One of my primary tasks.  I was also an engineer.  It's a small office; you have to do the engineering as well, the hands-on engineering.  That was certainly as much as the administration time-wise.

Q.  Changing subjects.  After you brought complaints to the City's attention, the City did send a survey crew out and put markings in; did they not?

A.  The first time, no.  They just sat there with their GPS.

Q.  Can you answer the question without debating it?

    Did the City --

A.  Sorry.

Q.  -- put markings in out there?

A.  Not the first time.

Q.  Did the City put markings out there?

A.  Eventually, yes.

09:32:44  1      Q.   I understand you want to fence with me and say

09:32:46  2  they --

09:32:47  3      A.   I don't want to fence with you.

09:32:48  4           THE COURT:  Gentlemen, I'm going to fence

09:32:50  5  with both of you in a few seconds.

09:32:53  6           MR. BAHRET:  Forgive me, Your Honor.

09:32:54  7           THE COURT:  Without comments and side

09:32:56  8  remarks, let's get a question and an answer.   Move

09:32:59  9  along.

09:32:59  10  BY MR. BAHRET:

09:32:59  11     Q.   They marked out there; they just didn't do it

09:33:02  12  fast enough to suit you?

09:33:03  13     A.   Yes.

09:33:03  14     Q.   And those markings were consistent with the

09:33:06  15  Peterman markings that were put out there after all this

09:33:10  16  work was done?

09:33:12  17     A.   Yes.

09:33:18  18     Q.   Sir, would you agree on this dirt issue, I know

09:33:23  19  yesterday you said maybe only 60 loads of dirt were

09:33:27  20  brought in, but at deposition you did say that you had a

09:33:32  21  dozen dump trucks, and they ran about ten loads or so

09:33:35  22  each.

09:33:35  23     A.   Yes.

09:33:36  24     Q.   So that's another correction?

09:33:38  25     A.   Yes.

09:33:38  1      Q.   But there's a lot of dirt.   How many tons of

09:33:42  2   dirt would that be?

09:33:43  3      A.   We go by yards.

09:33:46  4      Q.   Do you know how many --

09:33:48  5      A.   But a large dump truck, like what we just said,

09:33:52  6   was ten cubic yards.  And as a matter of fact, we

09:33:57  7   have -- since then we have the records; we know -- we've

09:34:01  8   got the records of how many trucks came in.   And they

09:34:04  9   were approximately ten cubic yards, which is a big

09:34:08  10  tandem dump truck.

09:34:09  11     Q.   Ten cubic yards each?

09:34:11  12     A.   Per load.

09:34:12  13     Q.   Are you able to tell us approximately how much

09:34:15  14  ten cubic yards of fill dirt weighs?

09:34:18  15     A.   That weighs about 50,000 pounds.

09:34:25  16     Q.   So each load --

09:34:27  17     A.   25 tons.

09:34:29  18     Q.   So each load is 25 tons roughly?

09:34:32  19     A.   Roughly.

09:34:33  20     Q.   And I realize there could be a variance between a

09:34:36  21  load, but that would be a good average?

09:34:38  22     A.   Right.

09:34:39  23     Q.   And we've got at least 60 of those?

09:34:42  24     A.   Yes.

09:34:49  25     Q.   And then after this tonnage of dirt was brought

09:34:53  1  in, you used a bulldozer or had somebody use a bulldozer

09:34:59  2  to push it from the top of the railroad right of way

09:35:03  3  down?

09:35:04  4     A.  Right while they were bringing it in there was a

09:35:07  5  dozer pushing it out.

09:35:08  6     Q.  They were dumping it up on the level area, of

09:35:11  7  course, that the -- the railroad right-of-way?

09:35:13  8     A.  They were dumping it over the edge onto our

09:35:16  9  property and dozing it forward.

09:35:18  10    Q.  And obviously the doser marks, you can see the

09:35:24  11  scrapings on Exhibit A12 include scraping on the top of

09:35:28  12  the railroad right-of-way, correct?

09:35:33  13    A.  Yeah.  They were operating on top of the

09:35:35  14  railroad.

09:35:35  15    Q.  And pushing the dirt from the right-of-way over

09:35:38  16  towards Old Granite?

09:35:39  17    A.  Yes.  Whatever spilled out up on the top we

09:35:42  18  pushed it back over.

09:35:44  19    Q.  I keep saying Old Granite.  If I mistakenly use

09:35:47  20  Old Granite --

09:35:48  21    A.  I understand.

09:35:49  22    Q.  And does putting that tons and tons of dirt onto

09:35:59  23  Old Granite property in the rear affect the drainage

09:36:01  24  plan for Cambridge?

09:36:05  25    A.  Well, that -- we were going to reroute the

09:36:08   1    drainage.   Certainly now water has to go around that

09:36:12   2    dirt.

09:36:12   3        Q.   Is the answer yes, it affects the drainage plan?

09:36:15   4        A.   Yes, it does.

09:36:16   5        Q.   Did you consult with the man that designed the

09:36:19   6    drainage plan for Cambridge to see if it would be a good

09:36:22   7    idea to put 60-times-25 tons of dirt in the back of the

09:36:30   8    development?

09:36:31   9        A.   Yes, I think -- I'm certain that Todd Jenkins and

09:36:37   10   I had mentioned it.   That wasn't the main reason I was

09:36:41   11   talking to him, but he knew that.

09:36:44   12       Q.   Sir, you testified at deposition he did not know,

09:36:48   13   and Nick Nigh testified right here in court that he did

09:36:52   14   not know.

09:36:52   15       A.   They may have forgot.   I do not know.   But as

09:36:55   16   far as I can remember, I talked to -- I talked to them

09:37:00   17   about it.

09:37:01   18       Q.   You would agree that you never did any sort of

09:37:03   19   testing to determine which direction the water flowed in

09:37:06   20   that crossover drain?

09:37:10   21       A.   No, we never did.   We never could.

09:37:14   22       Q.   You didn't do it before it was cut, did you?

09:37:17   23       A.   No, we didn't.

09:37:18   24       Q.   When it was under discussion, and you were saying

09:37:20   25   the water moved one way; and others were saying no, it

09:37:24    1    didn't, it moved the other way; you didn't do anything

09:37:28    2    to determine who was right, did you?

09:37:30    3        A.   Yes.   I went to the county engineer's assistant

09:37:35    4    and I said, Which way does it flow?  He said, I told the

09:37:38    5    county engineer it flows that way, which way could it

09:37:41    6    go.

09:37:41    7        Q.   When did this conversation take place?

09:37:44    8        A.   This conversation took place after 2006.

09:37:49    9        Q.   Yeah, it took place late in 2007, correct?

09:37:55   10        A.   Could have been, yes.

09:37:56   11        Q.   So it's not a trick question.

09:37:59   12        A.   I understand.

09:38:00   13        Q.   I'm asking you if you --

09:38:02   14        A.   At that time I did not.  No one else apparently

09:38:08   15    was aware this thing obviously went the other way.

09:38:11   16        Q.   What I'm getting at, sir, when this thing was, in

09:38:15   17    your mind, of some importance, and we've heard

09:38:17   18    criticisms the City did no testing, you didn't do any

09:38:21   19    testing either, did you?

09:38:22   20        A.   We did not do any testing.

09:38:24   21        Q.   Including putting dye in it or anything like

09:38:28   22    that?

09:38:30   23        A.   No.   All we -- I tried to explain the drainage

09:38:36   24    situation.

09:38:37   25                 THE COURT:  You've answered no, no testing,

09:38:39  1    no dye.

09:38:41  2                    THE WITNESS:  No.

09:38:44  3        Q.   You're aware that the -- and by the way, I've

09:38:48  4    heard counsel call this flooding behind Cambridge.

09:38:52  5    Flooding is not the proper term, is it?

09:38:55  6        A.   For what we have behind there now, we would not

09:38:57  7    call that flooding.   That's what we call ponding.

09:39:01  8        Q.   And you're aware that the ponding issue would be

09:39:06  9    basically just behind lots 15 and 16 at the low spot

09:39:10  10   near that catch basin?

09:39:12  11       A.   That's where we've had ponding so far.

09:39:14  12       Q.   And, in fact, demonstrated in a photo.  That's

09:39:17  13   the ponding area, just right there?  There's no ponding

09:39:21  14   up on lots 9, 10, 11, 12, 13, correct?

09:39:25  15       A.   No.   Maybe 14 we have some small ponding there

09:39:30  16   by the ditch.  The ditch gets bigger, but it's not

09:39:34  17   ponding.

09:39:34  18       Q.   And you are, in fact, aware of the fact that

09:39:38  19   Cambridge or what is now Cambridge has had ponding

09:39:43  20   issues in those areas near the railroad for many, many,

09:39:47  21   many years?

09:39:52  22       A.   I'm aware of -- I didn't see it specifically

09:39:58  23   before.

09:39:58  24       Q.   But just knowing the general lay of the land, and

09:40:01  25   from what you've heard from neighbors, you know they

09:40:04    1    have had an issue with ponding, correct?

09:40:08    2        A.   The only real --

09:40:11    3        Q.   You answer yes or no.

09:40:14    4        A.   I have some knowledge of ponding before,

09:40:18    5    secondhand knowledge.

09:40:19    6        Q.   Okay.   And you'd predict ponding just looking at

09:40:24    7    the lay of the land after a heavy rain; would you not?

09:40:28    8        A.   Not if that culvert was working.

09:40:31    9        Q.   You wouldn't?

09:40:32   10        A.   No.   After we first looked at it, there's a

09:40:35   11    culvert there.   It should be taking the water away.

09:40:38   12        Q.   Would you agree with me that any drainage system

09:40:40   13    is designed to carry a certain amount of water?

09:40:44   14        A.   Yes.

09:40:45   15        Q.   And would you agree with me that that certain

09:40:51   16    amount of water could be exceeded, which would mean

09:40:55   17    there would be ponding?

09:40:59   18        A.   Yes.

09:41:01   19        Q.   Do you know what the design capacity for

09:41:04   20    Cambridge is?

09:41:08   21        A.   Todd told me that was just for Cambridge, 16

09:41:12   22    acres of drainage.   That's what his system, the

09:41:17   23    Cambridge system, was for, 16 acres.

09:41:20   24        Q.   Do you know -- and I take it that's the size of

09:41:22   25    Cambridge, by the way?

09:41:23  1      A.   Yes, that's the total area.

09:41:25  2      Q.   Do you know that Cambridge was designed for a

09:41:28  3  five-year flood standard?

09:41:35  4      A.   I'm generally aware of that.   I think that was

09:41:37  5  the design standard at that time.

09:41:39  6      Q.   And do you know that we have had rain that

09:41:41  7  exceeds the five-year flood standard in 2006 and 2007?

09:41:49  8      A.   That, I'm not aware of.

09:42:01  9      Q.   If I understand your testimony correctly, you are

09:42:04  10  saying that there was ponding behind the subdivision

09:42:07  11  even before this pipe was cut, and now you claim it to

09:42:11  12  be worse?

09:42:16  13      A.   There was ponding behind that.

09:42:18  14      Q.   And you claim it's worse?

09:42:21  15      A.   It appears to be worse.

09:42:23  16      Q.   And you did -- you never saw the back of the

09:42:27  17  property before the middle of 2006 after a heavy rain,

09:42:34  18  did you?

09:42:35  19      A.   I saw the property before they cut the pipe.

09:42:38  20  And I was out there since February, and it does appear

09:42:43  21  that there's more water backed up without that pipe.

09:42:46  22      Q.   Okay.   Did you hear my question, though?   Did

09:42:51  23  you ever see the property after a heavy rain before it

09:42:56  24  was cut?

09:42:58  25      A.   Yes.

09:43:00  1    Q.   And there was obviously standing water?

09:43:05  2    A.   There was some temporary standing water, yes, but

09:43:09  3  it --

09:43:10  4    Q.   And even now the standing water is temporary as

09:43:13  5  it pertains to lot 15 and lot 16, correct?

09:43:19  6    A.   Well, temporary?   It's been there for longer

09:43:25  7  than it ever -- that I ever saw it.   I wouldn't say

09:43:28  8  it's really temporary now.

09:43:30  9    Q.   Sir, the jury walked through the area where your

09:43:33  10  son lives in lot 15.   They walked right through the

09:43:36  11  area depicted in this picture.

09:43:38  12    A.   Right.

09:43:41  13    Q.   Are you aware of that?

09:43:42  14    A.   Yes, I am.

09:43:43  15    Q.   We walked within three feet of those utility

09:43:47  16  boxes that are shown there on Exhibit 37.

09:43:50  17    A.   Right.

09:43:50  18    Q.   Nobody got muddy.

09:43:52  19    A.   Right.

09:43:53  20    Q.   And that's because the water comes and goes; it's

09:43:59  21  temporary?

09:44:00  22    A.   But the water on 16 has been there.   It was there

09:44:03  23  when they went out too.

09:44:04  24    Q.   The majority of the water that's over there is

09:44:07  25  actually not even on Cambridge property, correct?

09:44:12   1      A.  I would say that's correct, yes.

09:44:19   2      Q.  Let's talk about the back of lots 15, 16, and 17

09:44:27   3   before you brought in the tonnage of dirt.   There was a

09:44:33   4   wall there; was there not?

09:44:35   5      A.  Yes, there was.

09:44:37   6      Q.  There was a retaining wall made up of railroad

09:44:41   7   ties that are stacked up, correct?

09:44:44   8      A.  Yes, there was.

09:44:45   9      Q.  And that wall was at least five if not six feet

09:44:51  10   tall, correct?

09:44:52  11      A.  Yes.   The exposed part was four, five, six feet.

09:44:59  12      Q.  And that wall is not visible now, correct?

09:45:04  13      A.  That's right.

09:45:06  14      Q.  And nobody cleared trees or foliage on the

09:45:13  15   Cambridge side of the wall, did they?

09:45:18  16      A.  We didn't clear anything, no.

09:45:19  17      Q.  Well, neither did Vermillion, did they?

09:45:24  18      A.  Well, the trees were hanging out over it 15 feet.

09:45:28  19   They took all that out.

09:45:30  20      Q.  They took what out?

09:45:31  21      A.  All the trees that were overhanging that wall,

09:45:34  22   the stumps were right on the wall, right against the

09:45:36  23   wall, and they overhang.   They took all that out.

09:45:39  24      Q.  So the stumps that are up on the right-of-way?

09:45:41  25      A.  Up on the wall.

09:45:42  1      Q.   They took the stumps, the trees out that were up
09:45:45  2  top on the railroad right-of-way?
09:45:46  3      A.   That's right.   There was nothing down below.
09:45:49  4  There was little, little or nothing down below at that
09:45:53  5  property.
09:45:53  6      Q.   And those tree, what you're saying is they have,
09:45:56  7  like --
09:45:56  8      A.   A canopy that came out.
09:45:58  9      Q.   And so they're providing shade to the backyard or
09:46:01  10  whatever.   But those stumps or the trunk was up on the
09:46:08  11  railroad property?
09:46:10  12      A.   Trunk and the vines coming out of the ground,
09:46:13  13  whatever you want to call them, the shoots.
09:46:17  14      Q.   So the tonnage that you brought in of dirt is
09:46:21  15  sufficient to cover everything that would be on
09:46:24  16  Cambridge property at the bottom of that wall?
09:46:29  17      A.   That's right.  We put it right up against that
09:46:32  18  wall.
09:46:32  19      Q.   If there was any vegetation of any kind, whether
09:46:35  20  it's brambles, bushes, anything, it's obliterated now?
09:46:44  21      A.   It's not obliterated.   We just covered it up.
09:46:48  22      Q.   Okay.  What's that do to the health of a bush to
09:46:52  23  cover it up with five feet of dirt?
09:46:54  24      A.   A stump?   These were all cut, as we saw
09:46:57  25  yesterday.

09:46:57    1      Q.   No, sir, you just told me that nothing was cut on

09:47:00    2   Cambridge property behind that wall.

09:47:01    3      A.   Well, I mean on top.

09:47:03    4      Q.   Okay.   You covered below?

09:47:07    5      A.   And we brought it up to the top.   It was above.

09:47:14    6   As you can see in the photo, its coved a little bit,

09:47:17    7   just barely covered the vegetation.   The stumps and

09:47:21    8   that, its covered that whole thing.   You couldn't see

09:47:23    9   it.   That's why we had to dig it out again.

09:47:26   10      Q.   And it covered whatever was growing on the

09:47:29   11   Cambridge side of that retaining wall?

09:47:35   12      A.   It covered the ground there, and it spilled up

09:47:40   13   out on top of the --

09:47:42   14      Q.   It covered whatever was growing?   Did you hear

09:47:44   15   the question?   "Growing" is the operative word.

09:47:47   16      A.   Wasn't growing.   It was dead.   It was cut.

09:47:50   17      Q.   We're not communicating.   One more time.

09:47:56   18           Nothing was cut on the Cambridge side of the

09:47:59   19   retaining wall?

09:48:01   20      A.   There was nothing there, basically nothing there.

09:48:07   21      Q.   They had no vegetation?

09:48:09   22      A.   No.   There was the wall.   There was no

09:48:11   23   vegetation down at the bottom of that wall at that

09:48:14   24   property.

09:48:14   25      Q.   Why not?

09:48:15    1    A.    Because that was the yard.    That was already

09:48:19    2    five feet into the yard, leaning five feet into the

09:48:24    3    yard.    The grass went right up to that wall at that

09:48:27    4    point.    There were one or two big trees in there and

09:48:30    5    still are.    But that's -- it was basically grass.

09:48:33    6    Q.    Sir, speaking of big trees, what's it do to a

09:48:37    7    tree to cover the roots by a couple feet of dirt?    Do

09:48:43    8    you know?

09:48:44    9    A.    Yes.

09:48:44   10    Q.    It kills them, doesn't it?

09:48:46   11    A.    Some trees it will kill.

09:48:48   12    Q.    Most trees it will kill, correct?

09:48:52   13    A.    No.

09:48:53   14    Q.    Did you consider the fact that covering these

09:48:56   15    trees with a large amount of dirt would kill them?

09:49:00   16    A.    These were already cut, all of them were cut.

09:49:05   17    They were gone.    It's just the ones we just saw.    We

09:49:09   18    spilled dirt on top of them.

09:49:11   19    Q.    Sir, the jury was out there, and we all saw trees

09:49:18   20    that are still there.

09:49:20   21    A.    Right.    But this is the exceptions, I mean,

09:49:24   22    these couple trees.    But it was grass right up to that

09:49:27   23    wall.

09:49:27   24    Q.    And we all saw trees that are knee-deep in dirt.

09:49:33   25    And that's dirt that you put there?

09:49:34  1      A.   Right.   The two trees that were still there had

09:49:37  2   dirt around them.

09:49:38  3      Q.   And did you consider the fact that doing that

09:49:40  4   would likely kill those trees?

09:49:42  5      A.   Yes, we did.

09:49:43  6      Q.   And you did it anyway?

09:49:46  7      A.   Yes, we did it anyways because we were figuring

09:49:50  8   we were going to put the mound up.   If they died, we'd

09:49:54  9   take them down then.   There's no point in losing that

09:49:57  10  as well.   Yes, we did really consider that.

09:50:06  11     Q.   To your knowledge has Cambridge done anything at

09:50:09  12  all to plant any vegetation of any kind on its border

09:50:14  13  since the water main project was done?

09:50:17  14     A.   No, we haven't done anything.

09:50:19  15     Q.   No trees, no brambles, not even a flower?

09:50:28  16  Haven't done squat, correct?

09:50:33  17             MR. ROBON:   Objection to the phrase --

09:50:35  18             THE COURT:   I'll sustain that objection.

09:50:37  19  Has anything been planted, whatever it may be, yes or

09:50:40  20  no?

09:50:42  21             THE WITNESS:   No.

09:50:42  22             THE COURT:   Thank you.

09:50:46  23  BY MR. BAHRET:

09:50:46  24     Q.   I believe -- I don't know if it was you, but

09:50:49  25  there's been mention of brambles as something that grows

09:50:51  1   pretty fast.   Is that right?

09:50:53  2       A.   I'm told.

09:50:57  3       Q.   And brambles and other forms of vegetation could

09:51:00  4   certainly be planted back behind Cambridge now; could

09:51:04  5   they not?

09:51:10  6       A.   Not really.

09:51:13  7       Q.   Can't get a spade in the ground, or what's the

09:51:17  8   problem?  Why can't we plant brambles now?

09:51:20  9       A.   Need a mound first.

09:51:21  10      Q.   No, you don't need a mound.   You can plant a

09:51:24  11  bramble.

09:51:24  12      A.   Not that kind of ground.   Even our -- the more

09:51:31  13  we look at it, you have to at least put some fill in

09:51:33  14  there to get it up out of that ditch area where it's

09:51:36  15  swampy or whatever you put in there would die.  But we

09:51:40  16  didn't consider that.  We were going to build the mound,

09:51:43  17  put trees on it.  We stopped everything with this -- we

09:51:47  18  thought we were going to settle this thing back in 2006.

09:51:50  19      Q.   Sir, let's not go there.

09:51:52  20      A.   Okay.

09:51:55  21      Q.   You would agree -- maybe you wouldn't; I don't

09:51:59  22  know -- nothing was removed from at least this half of

09:52:05  23  the development, lots 9, 10, 11, 12.   Nothing was

09:52:11  24  removed from Cambridge property, correct?

09:52:15  25      A.   That, I can't say.   I wasn't there.

09:52:18   1       Q.   And the dirt wasn't disturbed, and you didn't put

09:52:22   2    any dirt on that half of the development, did you?

09:52:24   3       A.   We didn't go up there, no.

09:52:27   4       Q.   And so the back of Cambridge on that half of the

09:52:31   5    development is still exactly the same now as it was

09:52:34   6    before the water project?

09:52:39   7       A.   I can't say that.

09:52:42   8       Q.   You can't say I'm wrong either?

09:52:47   9       A.   I can't say you're wrong either.   I didn't see

09:52:50  10    this, how far they came across on Cambridge property up

09:52:57  11    there.   I could not see that.

09:53:00  12       Q.   Sir, back to the dirt issue.  Did you personally

09:53:04  13    drive the bulldozer, or was that somebody else?

09:53:06  14       A.   Both of us.

09:53:07  15       Q.   Did anybody cover --

09:53:09  16       A.   A little backhoe.

09:53:10  17       Q.   No, I'm talking about a bulldozer.

09:53:13  18       A.   I didn't drive a bulldozer.

09:53:16  19       Q.   Did the bulldozer driver cover parts of the

09:53:20  20    railroad fence?

09:53:23  21       A.   Did he cover the fence?

09:53:25  22       Q.   Yes.

09:53:27  23       A.   What fence are we talking about?

09:53:28  24       Q.   The railroad fence.

09:53:29  25       A.   The railroad tie fence?

09:53:32    1       Q.   Yes.

09:53:33    2       A.   We put dirt on top of that too.

09:53:36    3       Q.   Okay.  And, in fact, the debris from the railroad

09:53:40    4  fence that was bulldozed over, one of those pictures

09:53:44    5  shows something knocked over laying sideways in one of

09:53:49    6  the trenches you dug up, correct?

09:53:51    7       A.   The timber.

09:53:52    8       Q.   Yeah.

09:53:53    9       A.   Yeah, there's a timber that's there.  I don't

09:53:56   10  know whether that was originally done or whether we did

09:53:59   11  it.  But one of the timbers --

09:54:01   12       Q.   And that timber wasn't in the same position that

09:54:04   13  it had been in before it was pushed by a bulldozer, was

09:54:08   14  it?

09:54:08   15       A.   That's very possible.  Some of the top timbers

09:54:14   16  were all deteriorated.  When we were putting the dirt

09:54:17   17  on top of it, some of those may be disturbed.

09:54:21   18       Q.   The dirt was pushed about 20 to 25 feet, correct?

09:54:25   19       A.   Yes.  It was dumped on property; it was pushed

09:54:31   20  along the line, 25 feet -- 20, 50 feet down the line.

09:54:38   21            It had to be -- it had to be dozed down where you

09:54:43   22  saw it now, it's more than 25 feet.

09:54:50   23                 THE COURT:  How much longer do we have?

09:54:53   24                 MR. BAHRET:  15.

09:54:54   25                 THE COURT:  Jury are we okay for another ten

09:54:56   1   minutes, 15 minutes?

09:54:59   2           (The jurors nod.)

09:55:01   3       Q.   By the way, you may have said this.   If so, I

09:55:03   4   apologize.   All of the stuff you're doing with the

09:55:06   5   bulldozer and the dirt is before the pipe arrived and

09:55:09   6   before it was installed, correct?

09:55:11   7       A.   Yes.

09:55:12   8       Q.   Then the work where you're excavating, that was

09:55:15   9   done while the pipe was in position and the contractor,

09:55:17  10   Ric-man, is about to begin laying the pipe?

09:55:21  11       A.   Yes.

09:55:22  12       Q.   Did you ask Ric-man for permission to dig

09:55:25  13   trenches next to the construction project?

09:55:30  14       A.   I talked to them about it.   And --

09:55:33  15       Q.   Did you ask permission to dig trenches next to

09:55:37  16   their project?

09:55:38  17       A.   We were on our property.   That trench is on our

09:55:42  18   property.

09:55:43  19       Q.   I'll take that to be a no?

09:55:45  20       A.   We did not ask him, no.   We did not ask him.

09:55:48  21       Q.   Did you consider the fact that you may be putting

09:55:50  22   Ric-man's employees in danger by digging trenches within

09:55:54  23   inches of a construction project?

09:55:57  24       A.   We took that into consideration.   We understood

09:56:01  25   what it was.   He didn't like us there.

09:56:05   1     Q.   And in fact --

09:56:06   2     A.   It was our men we were worried about.

09:56:09   3     Q.   There was a fence put up, one of those yellow --

09:56:14   4   or orange, excuse me, barrier-type fences?

09:56:16   5     A.   Right.

09:56:18   6     Q.   I forget the terminology.   Whatever that's

09:56:21   7   called.

09:56:22   8          And you removed it, correct?

09:56:24   9     A.   We temporarily moved that so we could stand up

09:56:28   10  there and survey and that kind of thing.  We put it back

09:56:32   11  up, that plastic fence, construction fence.

09:56:38   12    Q.   I believe Ric-man's going to say you never put it

09:56:41   13  back up, but you say you did?

09:56:42   14    A.   Yes, we put it back up several times.

09:56:45   15    Q.   You put it up several times?

09:56:48   16    A.   Well, we weren't out there just one day.  We'd

09:56:50   17  take it down, put it back up.   And, you know --

09:57:06   18    Q.   Sir, you've seen pictures of the monument that's

09:57:14   19  here in 16, the corner monument or whatever you call it,

09:57:18   20  the survey monument?

09:57:19   21    A.   Corner monument.

09:57:20   22    Q.   And you've seen the remains of the railroad fence

09:57:23   23  right there near that monument?

09:57:25   24    A.   Yes, I have.

09:57:26   25    Q.   And all the vegetation is still there, correct?

09:57:31   1      A.   That's still there.

09:57:32   2      Q.   And that railroad fence, if it were standing up,

09:57:35   3  it would be basically touching that monument?   I know

09:57:40   4  it's leaning over.

09:57:41   5      A.   Yeah.   If you stood it back up from way down

09:57:44   6  where it is, it would be pretty close to that monument

09:57:48   7  line.

09:57:49   8      Q.   And that area, that area near the -- I don't know

09:57:55   9  if that's north or east.

09:57:57  10      A.   That's east.

09:57:58  11      Q.   But towards Bates Road.   That area right there

09:58:01  12  where that photograph is.   And you know the photograph

09:58:03  13  I'm talking about, right?

09:58:05  14      A.   Yes.

09:58:05  15      Q.   That wasn't encroached upon, correct?   You still

09:58:09  16  see the vegetation there?

09:58:13  17      A.   Well, no, I think it was encroached upon.   There

09:58:16  18  was other vegetation out there when we went out there.

09:58:20  19  They pulled that out of there too.   But a lot of it was

09:58:23  20  left.

09:58:23  21      Q.   So something was bulldozed out of there after the

09:58:25  22  picture was taken?

09:58:26  23      A.   No.   Even at the time of the picture, if you

09:58:30  24  looked up and saw, they went there and cleared it with

09:58:35  25  large equipment.   It was all entangled when they pulled

09:58:39   1   that out.   Some of that upper vegetation was removed.

09:58:42   2   But, you know, they had other trees.   They had other

09:58:48   3   trees to keep their property isolated.   We didn't have

09:58:54   4   that.

09:58:59   5      Q.   Have you ever seen these pictures of Mr. Laskey

09:59:05   6   standing in his -- in this development?   Have you seen

09:59:12   7   this picture before?

09:59:13   8      A.   Yes, I believe that I took this picture.

09:59:15   9      Q.   And that's a survey stake?

09:59:19  10               THE COURT:   Does that have an exhibit

09:59:21  11   number?

09:59:22  12               MR. BAHRET:   A1.   I'm sorry.

09:59:23  13      Q.   Does A1 show what apparently, based on the sign

09:59:30  14   Mr. Laskey is holding, he's posing next to a survey

09:59:34  15   stake saying lot 12?

09:59:36  16      A.   Yes.

09:59:36  17      Q.   What's all that green stuff surrounding him?

09:59:41  18      A.   This is what had grown-up in -- I believe this

09:59:46  19   was towards the end.   Do we have date on this?   I think

09:59:49  20   this was towards the end of 2006.   Some of this has

09:59:53  21   started to grow up a little bit.

10:00:00  22      Q.   You see a fence up there, the barrier fence or

10:00:04  23   whatever I'll call that?

10:00:08  24               THE COURT:   Point to it.

10:00:09  25      A.   That's the silt curtain, silt fence, they call

```
10:00:14    1    it.
10:00:14    2        Q.   That's up on the railroad right-of-way, correct?
10:00:16    3        A.   That was pretty close to the property line.
10:00:21    4        Q.   Nobody did any cutting down here, sir; the
10:00:33    5    cutting was all up here, correct?
10:00:37    6        A.   No.   When they pulled this material from up
10:00:41    7    here, we had, you know -- and I wasn't there.   I didn't
10:00:45    8    see what was there ahead of time.   But from what I saw
10:00:48    9    on either side, this was so entangled that its pulled --
10:00:56   10    it pulled material all the way over to the property
10:00:58   11    line.
10:00:58   12        Q.   Do you see this thing here?
10:01:00   13        A.   Yes.
10:01:00   14        Q.   That's a ditch, correct?
10:01:02   15        A.   Yeah, there's a ditch in there.
10:01:05   16        Q.   And you're claiming that people came 20 feet
10:01:11   17    onto -- over the ditch to get to the back where Mr.
10:01:18   18    Laskey is standing and clear cut that?
10:01:21   19        A.   I believe this is more like ten feet.
10:01:26   20        Q.   And are you aware of the fact that even Nick Nigh
10:01:31   21    doesn't claim, the guy that did the survey for
10:01:35   22    Cambridge, doesn't claim there was an encroachment down
10:01:38   23    there?
10:01:39   24        A.   I understand.   We never asked him to go up there.
10:01:43   25    We could not come up with any solid evidence of the tree
```

| | | |
|---|---|---|
| 10:01:50 | 1 | trunks or the shoots coming out up in this area. |
| 10:01:54 | 2 | Q. Okay. Have you ever seen this picture, sir? |
| 10:02:04 | 3 | THE COURT: Exhibit Number? |
| 10:02:05 | 4 | MR. BAHRET: A3. |
| 10:02:09 | 5 | BY MR. BAHRET: |
| 10:02:09 | 6 | Q. Apparently, based on the clipboard Mr. Laskey, I |
| 10:02:12 | 7 | assume, is holding, that's in the area of lot 4. Do |
| 10:02:16 | 8 | you see that? |
| 10:02:17 | 9 | A. Yes. |
| 10:02:17 | 10 | Q. What's all this stuff over here that appears to |
| 10:02:21 | 11 | be growing between where Mr. Laskey is standing and |
| 10:02:24 | 12 | where the railroad right-of-way is? |
| 10:02:27 | 13 | A. There is some -- this is new growth, whatever |
| 10:02:34 | 14 | wasn't pulled out. |
| 10:02:35 | 15 | Q. That all grew up in the -- since the project was |
| 10:02:40 | 16 | done? |
| 10:02:40 | 17 | A. It turned green. Some of this was -- some of |
| 10:02:43 | 18 | this low stuff was still there. |
| 10:02:56 | 19 | Q. I believe that says lot 9. A5 is the exhibit. |
| 10:03:01 | 20 | Have you seen that before? |
| 10:03:02 | 21 | A. Yes. |
| 10:03:04 | 22 | Q. And Mr. Laskey is there depicted in the middle of |
| 10:03:09 | 23 | what? |
| 10:03:12 | 24 | A. Mr. Laskey is standing there by what appears to |
| 10:03:17 | 25 | be the property line stake. |

10:03:19   1    Q.   And what's all that that's clearly not on the

10:03:22   2    property then, it's even out towards the railroad;

10:03:27   3    what's all that stuff?

10:03:27   4    A.   Up here at line 9, they did not -- there were

10:03:35   5    some big trees.  They couldn't pull them in.   They

10:03:37   6    didn't take down the small stuff.   They didn't clear

10:03:40   7    back up at the last 50 feet of this property.   That's

10:03:44   8    very standard.

10:04:08   9               MR. BAHRET:  Let me check my notes.   I may

10:04:10  10    be done.

10:04:31  11    BY MR. BAHRET:

10:04:31  12    Q.   Sir, you did personally put lath -- and for the

10:04:34  13    jury, lath is those thin --

10:04:37  14    A.   Tall boards.

10:04:42  15    Q.   As a kid I always called those stakes, but I'm

10:04:45  16    told that's the wrong terminology.   But the things that

10:04:48  17    you commonly see --

10:04:49  18    A.   The peg is a stake, generally the surveyors call

10:04:52  19    it.   The lath is what tells you where the peg is.

10:04:55  20    Q.   I've since learned that terminology.   But you

10:04:57  21    put some of that stuff in; did you not?

10:04:59  22    A.   Yes, as we talked about yesterday.

10:05:01  23    Q.   And you are not a surveyor, correct?

10:05:04  24    A.   I'm not a registered surveyor

10:05:11  25               MR. BAHRET:  Thank you.   I don't think I

| | |
|---|---|
| 10:05:13 | 1 |
| 10:05:14 | 2 |
| 10:05:17 | 3 |
| 10:05:18 | 4 |
| 10:05:20 | 5 |
| 10:05:22 | 6 |
| 10:05:26 | 7 |
| 10:05:27 | 8 |
| 10:05:31 | 9 |
| 10:05:34 | 10 |
| 10:05:36 | 11 |
| 10:05:41 | 12 |
| 10:05:41 | 13 |
| 10:05:43 | 14 |
| 10:05:43 | 15 |
| 10:05:49 | 16 |
| 10:05:52 | 17 |
| 10:05:55 | 18 |
| 10:05:59 | 19 |
| 10:06:02 | 20 |
| 10:06:05 | 21 |
| 10:06:08 | 22 |
| 10:06:13 | 23 |
| 10:06:13 | 24 |
| 10:06:18 | 25 |

1   have any further questions at this time.

2          THE COURT:  We're about at break time, but

3   do you have redirect?

4          MR. ROBON:  Just a couple questions.

5          THE COURT:  Okay.  Jury, can we get those

6   in?   Thank you.   You may proceed.

7              How many is a couple?

8          MR. ROBON:  Two.   Judge Franklin once, when

9   I was a really young lawyer, I said I had one question.

10  The problem was it led to more.  And he said -- I think

11  he counted ten.

12                      - - -

13         JOHN McCARTHY, REDIRECT EXAMINATION

14  BY MR. ROBON:

15  Q.  Can I have that photograph, A 5.

16         THE COURT:  The corollary to that story is I

17  was a lawyer in a case, and my mentor partner told the

18  judge, I have one more question.   The judge said, okay.

19  He asked one question, and he sat down.   The judge was

20  so dumbfounded he said, In my 30 years on the bench,

21  that's the only time a lawyer has said I have one

22  question and asked just one question.

23  BY MR. ROBON:

24  Q.  In looking at Exhibit A3 where Mr. Laskey is on

25  lot 14 --

| | | |
|---|---|---|
| 10:06:20 | 1 | A.  Yes. |
| 10:06:20 | 2 | Q.  -- hasn't this whole area here all been cut and |
| 10:06:23 | 3 | the brush just laying there? |
| 10:06:25 | 4 | MR. BAHRET:  Objection to leading. |
| 10:06:27 | 5 | MR. ROBON:  I'll rephrase question. |
| 10:06:28 | 6 | THE COURT:  Overruled. |
| 10:06:31 | 7 | MR. ROBON:  Go ahead. |
| 10:06:32 | 8 | THE COURT:  If you know. |
| 10:06:33 | 9 | A.  That's what it appeared to be.  I didn't see it. |
| 10:06:37 | 10 | Q.  Wasn't this area 15 to 20 feet high -- |
| 10:06:41 | 11 | MR. BAHRET:  Objection. |
| 10:06:43 | 12 | Q.  -- originally? |
| 10:06:44 | 13 | THE COURT:  Overruled.  If you know. |
| 10:06:46 | 14 | A.  I didn't see it.  It appears that it was because |
| 10:06:52 | 15 | of what evidence we have here.  Yes, it appears that |
| 10:06:56 | 16 | way. |
| 10:06:56 | 17 | Q.  My last question is, isn't it true or just tell |
| 10:07:02 | 18 | the jury, where can the water go now from the manhole |
| 10:07:07 | 19 | that doesn't have an exit? |
| 10:07:10 | 20 | A.  Back up on Cambridge property.  We're in the low |
| 10:07:14 | 21 | area.  They were out there.  They saw that's the low |
| 10:07:17 | 22 | area, backs up there. |
| 10:07:20 | 23 | MR. ROBON:  No further questions. |
| 10:07:22 | 24 | THE COURT:  Thank you.  You may step down, |
| 10:07:24 | 25 | Mr. McCarthy. |

| | | |
|---|---|---|
| 10:07:25 | 1 | THE WITNESS:  Thank you. |
| 10:07:26 | 2 | THE COURT:  Ladies and gentlemen, we will |
| 10:07:27 | 3 | take our morning recess.  You put in a good day's work |
| 10:07:30 | 4 | already.  We'll take a 15 minute break at this point. |
| 10:07:32 | 5 | So we'll be back by the courtroom clock at 10:20. |
| 10:07:37 | 6 | We're in recess.  Remember the rules. |
| 10:12:33 | 7 | (Recess taken.) |
| 10:26:40 | 8 | (The witness was sworn by the clerk.) |
| 10:26:41 | 9 | THE COURT:  Ladies and gentlemen, the next |
| 10:26:42 | 10 | witness has been sworn. |
| 10:26:44 | 11 | Mr. Robon, the floor is yours. |
| 10:26:45 | 12 | - - - |
| 10:26:48 | 13 | ROGER HERRETT, DIRECT EXAMINATION |
| 10:26:49 | 14 | BY MR. ROBON: |
| 10:26:49 | 15 | Q.  Would you introduce yourself to jury, tell them |
| 10:26:52 | 16 | what your name is, where you live, and what you do for a |
| 10:26:55 | 17 | living? |
| 10:26:55 | 18 | A.  My name is Roger Herrett.  I live in Defiance, |
| 10:26:59 | 19 | Ohio.  I'm the retired state extension forester in |
| 10:27:04 | 20 | northwest Ohio.  Back in 1960 I started out in southern |
| 10:27:10 | 21 | Ohio out of Chillicothe, and they transferred me up to |
| 10:27:16 | 22 | Defiance in October of 1960 for a temporary appointment |
| 10:27:20 | 23 | there, and I ended up 34 years later retiring from up |
| 10:27:24 | 24 | there.  So if you call that temporary, that's where I |
| 10:27:28 | 25 | was.  I worked 7 to 10 counties in northwest Ohio |

10:27:32   1    working with private land owners in Woodland management,

10:27:36   2    timber harvesting assistance, insect and disease

10:27:43   3    problems, educational, school -- not problems, but

10:27:47   4    situations and activities, tours, et cetera, et cetera.

10:27:50   5    I did lots and lots of tree planting, northwest Ohio,

10:27:56   6    especially as you get closer to the Indiana line it's

10:27:59   7    quite open, and I recognized early on the need for

10:28:03   8    windbreak, and so I initiated my own and got a lot of

10:28:08   9    help later on from soil and water and everybody else the

10:28:12  10    need for windbreak plantings for protection of the soil,

10:28:16  11    wildlife habitat, et cetera.

10:28:19  12         I received an award, which was a real surprise to

10:28:23  13    me.  One year I got a notice or phone call from Columbus

10:28:28  14    that they wanted me to come down to Columbus to the

10:28:30  15    Governor's office.  And, boy, I thought I was in

10:28:34  16    trouble.  But as it turned out I received a very nice

10:28:37  17    award as the state employee that had planted or assisted

10:28:42  18    in planting the most trees that had ever been planted in

10:28:45  19    the State of Ohio with somewhere between three and four

10:28:49  20    million trees that I had sold up here in corn, beans,

10:28:53  21    and wheat territory.  So I was pretty proud of that.

10:28:56  22    Anyway, I'm retired from that job.  I continue to do

10:28:59  23    consulting work.  I'm married.

10:29:02  24    Q.  Is this your wife?

10:29:03  25    A.  My wife is in the back.  The lovely gray-haired

10:29:07  1  lady back there.   We've been married 54-plus years now.

10:29:11  2  We have four children and nine grandchildren.   And

10:29:14  3  without boring you any further, that's who I am and what

10:29:18  4  I do, and thank you.

10:29:19  5    Q.   And when you were in forestry, do you develop

10:29:26  6  specialties about what kind of trees are valuable, how

10:29:31  7  trees are valuable in certain locations?

10:29:33  8    A.   Very much so.   We -- you learn early on that

10:29:41  9  certain trees are very much adaptable to certain soils.

10:29:45  10  So you work closely with it trying to select the proper

10:29:49  11  specie to plan on the land that you're either trying to

10:29:53  12  replant or whatever.   It's been a very interesting

10:29:57  13  situation to know that I have never been able to figure

10:30:01  14  out how God took these little acorns and planted them in

10:30:08  15  the ground.   And all of a sudden the statement came up:

10:30:13  16  Mighty oaks from little acorns do grow.   I've tried

10:30:16  17  planting those little acorns on many occasions and had

10:30:20  18  failures.   But somehow or another nature is able to do

10:30:23  19  what we have trouble doing unless we go through a very

10:30:29  20  careful situation and planting what we're doing on

10:30:34  21  certain soils.

10:30:35  22    Q.   Can you tell the jury what your assignment was,

10:30:41  23  what I asked you to do and what you did?

10:30:45  24    A.   I was asked by Mr. Robon to come up and look at

10:30:52  25  the Cambridge subdivision.   I had been told that some

10:30:58   1    vegetation had been removed from the back of the

10:31:01   2    property.   He sent me some photographs and pictures.

10:31:04   3        Q.   Did I send you the survey also?

10:31:07   4        A.   And sent me a survey also, a copy of which I have

10:31:10   5    here in this folder if I need to reference because I

10:31:15   6    can't remember all this stuff.

10:31:18   7            I'm kind of like Webster, somewhere along the

10:31:22   8    line he said it's not a wise man that knows everything,

10:31:25   9    but he knows where to find the answer to everything.

10:31:27  10    So I carry my notes with me a little bit.   But anyway,

10:31:31  11    I came up and I looked at the property and drove in the

10:31:35  12    streets and got out and walked to the back of the

10:31:37  13    property, but I didn't go any further than where the

10:31:41  14    property lines were, and then walked back and forth.

10:31:45  15    And it was pretty obvious to me that why would anybody

10:31:48  16    want to have lots that run right back to an open area.

10:31:54  17    And it so happened that particular day -- in fact, I was

10:31:58  18    there a couple of times; there were always railroad cars

10:32:02  19    sitting over on what's CSX -- I don't know if it's CSX's

10:32:08  20    railroad, but I believe it is.

10:32:09  21            So he asked me, you know, what I felt had been

10:32:15  22    done here, what the damages might be, and so I've worked

10:32:21  23    to try to figure out what the damages are as best as I

10:32:28  24    can.   And I incorporated a lot of things into that.   If

10:32:33  25    that answers your question.

10:32:34  1     Q.   Yes.   Now, we talked about trying --

10:32:39  2              THE COURT:  I'm sorry, when were you there?

10:32:42  3              THE WITNESS:  Most recently I was there

10:32:44  4     about two weeks ago.   And the first time I was there

10:32:47  5     was about six weeks ago.   I can't tell you exactly the

10:32:49  6     dates.

10:32:50  7              THE COURT:  Thank you.

10:32:51  8              THE WITNESS:  Yes, sir.

10:32:52  9     BY MR. ROBON:

10:32:55  10    Q.   When you and I talked, we talked about trying to

10:32:58  11    create a barrier or a buffer similar to what was there

10:33:04  12    before the vegetation was cut, correct?

10:33:06  13    A.   That's correct.

10:33:07  14    Q.   Can you tell the jury the different things that

10:33:11  15    you thought about and what you ultimately came up with

10:33:16  16    with regard to replacement cost of putting up what the

10:33:21  17    surveyor shows was cut down.   And the surveyor

10:33:26  18    yesterday testified that there were thousands of what

10:33:29  19    they call the brambles that were -- he didn't show them

10:33:34  20    all on the survey, but he testified there were thousands

10:33:36  21    of them within five or six feet that was stripped.

10:33:40  22    A.   That's correct.   And when I looked at the

10:33:45  23    property, I could see lots and lots of stumps, any one

10:33:49  24    that range from the size of my finger to six or eight

10:33:52  25    inches in diameter that had been taken down.   As best

10:33:57  1   as I could, I tried to determine, you know, where the

10:34:00  2   new survey property line was because I -- it had been

10:34:05  3   surveyed back there so that I could tell where it was.

10:34:07  4   But it becomes a real problem to, as I said earlier, to

10:34:13  5   try to replace what just kind of evolved over the last

10:34:18  6   15, 20, 25, 30, 35 years.   I have no way of knowing,

10:34:23  7   and nobody has told me how long it had been since

10:34:28  8   anybody had done any tree, brush, briars control along

10:34:34  9   the back of that property, which offered a wonderful

10:34:38  10  windbreak, wildlife habitat, sound barrier, the whole

10:34:44  11  nine yards.   And it was gone.   It's just bare.

10:34:49  12      Q.   I'm going to hand you what we've marked as

10:34:52  13  Exhibit Number 1.   I think I showed you this aerial

10:35:01  14  that was taken in 2006.   It showed the line of trees

10:35:06  15  behind the Cambridge subdivision.

10:35:08  16      A.   That is correct.

10:35:12  17      Q.   So go ahead.   I didn't mean to interrupt you.

10:35:14  18      A.   That's fine.

10:35:15  19      Q.   You were talking about it would be hard to

10:35:18  20  replace?

10:35:18  21      A.   It would be not impossible to replace it, but it

10:35:23  22  couldn't all be done in one year because it didn't all

10:35:27  23  happen in one year.   So what I did was try to determine

10:35:34  24  the things that would be necessary to try to put living

10:35:39  25  vegetation across there as opposed to some other form of

| | |
|---|---|
| 10:35:46 | 1 |
| 10:35:50 | 2 |
| 10:35:54 | 3 |
| 10:35:59 | 4 |
| 10:36:02 | 5 |
| 10:36:05 | 6 |
| 10:36:09 | 7 |
| 10:36:14 | 8 |
| 10:36:19 | 9 |
| 10:36:23 | 10 |
| 10:36:26 | 11 |
| 10:36:29 | 12 |
| 10:36:32 | 13 |
| 10:36:36 | 14 |
| 10:36:40 | 15 |
| 10:36:46 | 16 |
| 10:36:52 | 17 |
| 10:36:54 | 18 |
| 10:37:01 | 19 |
| 10:37:05 | 20 |
| 10:37:11 | 21 |
| 10:37:14 | 22 |
| 10:37:18 | 23 |
| 10:37:23 | 24 |
| 10:37:26 | 25 |

wall or structure, which I'm not real fond of.

Q.   We even talked about walls, didn't we?

A.   Yes, we did.   It's been interesting not to divert myself from trees to walls, but it's been interesting to see where walls have been put up along highways for sound barriers, et cetera, how they used to just be an old ugly piece of concrete or even boards, you can go from here to Detroit along I-75 and there's still some of the old wood structures there.   Now you go by and you see where the concrete had been molded in molds with leaves on it and with bears and animal, and anything to make it interesting.   They're even doing that on bridge overpasses to make it more attractive. But being a tree person, I guess I find my beauty in what nature provides, and that's natural vegetation. So if you want me to tell you at this point how --

Q.   I want you to tell the jury based upon a reasonable degree of certainty what you believe -- what you believe should be done and what kind of cost would be incurred in trying to put back the five or six feet of vegetation that was stripped?

A.   All right.   Step number one, of course, you go out and you walk over it and you look the area over, you determine what needs to be done before you even get started.   And in this area of five -- four, five, six

10:37:33   1   feet, it varies in distance.  You find all kinds of

10:37:36   2   stumps and obstructions there that have to be removed.

10:37:40   3   So you have a cost involved in clearing that ground,

10:37:46   4   soil, so that you can get ready to plant something new

10:37:51   5   there.  And that can be rather costly to go across 500

10:37:57   6   or so feet, three, four, five, six feet wide to get it

10:38:03   7   all cleared out, get all the old stumps, get all the

10:38:06   8   root, get everything out of there.

10:38:09   9         Why do you have to get them out of there?

10:38:12   10  Because it's just the most effective way to do farming

10:38:15   11  of trees, putting them the ground, that's to get it all

10:38:19   12  cleaned up.

10:38:20   13        So now once all that's done, go to step Number 2.

10:38:23   14  And that is that you take some samples of the soil all

10:38:27   15  the way across there and determine what your soil type

10:38:32   16  is and what nutrients are there, what needs to be there,

10:38:37   17  put in the nutrients if they're missing.  It might be

10:38:42   18  lime; it might be nitrogen; it might be various

10:38:46   19  different things so you then have a good soil bed.

10:38:50   20        And then once this is done, you go to your

10:38:55   21  knowledge books and what you've done in the past, and

10:38:59   22  you determine, well, what might be the best species that

10:39:02   23  I can plant.  And these species can vary.  Some --

10:39:08   24  there are more than one specie, of course, that could be

10:39:11   25  planted across there, but you've got to think, what is

10:39:15  1  it I'm trying to do?  Am I just trying to build a wall,

10:39:19  2  or am I trying to, with the best of human abilities,

10:39:24  3  recreate the wildlife habitat that was there.  Because

10:39:30  4  I have seen many areas like this in my lifetime where

10:39:36  5  it's just a bramble in the eyes of some people.  In the

10:39:41  6  eyes of other people it's a fantastic wildlife habitat

10:39:45  7  that you've got cardinals coming to your feeder, you've

10:39:48  8  got every conceivable type of bird you can think of.

10:39:51  9  And that's what comes out of that type of habitat.  So

10:39:55  10  you try to go in and replant that.  But it's pretty

10:40:02  11  obvious to me, and I hope that the jury might understand

10:40:06  12  that you just can't go in there and replant 15, 20, 25

10:40:13  13  foot tall plants of vegetation.  You have to start with

10:40:18  14  something of a sensible size, and normally that is

10:40:21  15  somewhere in the six to seven to eight foot category.

10:40:25  16  And you plant multiple species of hardwoods, conifer --

10:40:32  17  conifers being evergreen trees of some sort.  It might

10:40:37  18  be red cedar, which have a food value for trees,

10:40:41  19  whatever you know will plant -- will grow on that soil

10:40:45  20  based on your soil sample analysis.  And so you plant

10:40:48  21  those trees.  And now you have something that's fairly

10:40:55  22  nice, you hope.  And then you hope that you have rains,

10:40:57  23  and you hope that the weather conditions are right that

10:41:01  24  the things are going to take hold and they're going to

10:41:04  25  grow for you.  And I've had a lot of failures in my

10:41:08   1   lifetime of planting trees because the good Lord just

10:41:13   2   didn't put down rain when it should have put down rain.

10:41:16   3   And ask any farmer how that works.   And planting trees

10:41:19   4   is just another form of farming.   You have your good

10:41:23   5   crop years, and you have your bad crop years.

10:41:26   6        If you have a bad crop year and you have a lot of

10:41:30   7   failure across there, then you have to do replants, and

10:41:35   8   who knows how many replants nature did across that 500

10:41:40   9   feet or -- well, across the back of there when plants

10:41:45  10   started.  They grew to be little things like that; they

10:41:48  11   died off; nobody was there watching them, but then more

10:41:51  12   seeds took hold and they grew again, and finally the

10:41:55  13   barrier of vegetation was there.   This is what we're

10:41:59  14   trying to recreate.

10:42:01  15        Now, once you get them planted and everything is

10:42:03  16   growing, it's not the size that you want it to be.   So

10:42:08  17   now we have to wait.  And we have to wait maybe seven,

10:42:13  18   eight, nine, ten years until these -- because the trees

10:42:18  19   are going to grow six inches to a foot a year until they

10:42:21  20   get up to be 15, 16, 17 feet tall.   And this is what

10:42:26  21   you try to recreate.   So you've got everything up to

10:42:31  22   the time you plant, and then you have the waiting period

10:42:34  23   until it's back to where it was before it was taken

10:42:38  24   down.   Does that answer your question?

10:42:40  25        Q.   Yes.   Now, since the area is now wet in the back

10:42:46   1   of these lots, would that problem have to be solved

10:42:50   2   first?

10:42:52   3       A.   Very definitely because --

10:42:54   4             MR. BAHRET:   Your Honor, I object.   There's

10:42:56   5   no foundation to suggest it wasn't wet before.   In

10:42:59   6   fact, the testimony is that it was.

10:43:03   7             MR. ROBON:   The testimony was it was wet

10:43:06   8   before they put the subdivision in there.   There's no

10:43:08   9   testimony it was wet after the subdivision was put in

10:43:12  10   and they had the storm drains.

10:43:13  11             THE COURT:   Again, we'll keep counsel's

10:43:15  12   remarks to a minimum.   Perhaps you can rephrase to say

10:43:18  13   if the testimony shows or assuming, and then incorporate

10:43:23  14   that.

10:43:25  15   BY MR. ROBON:

10:43:25  16       Q.   Assuming, Mr. Herrett, that there is standing

10:43:28  17   water in certain spots along the rear of those lots,

10:43:31  18   could you plant vegetation in standing water where water

10:43:36  19   normally ponds?

10:43:37  20       A.   No, you could not and have any success.

10:43:40  21       Q.   It would die?

10:43:41  22       A.   Yes, it would.

10:43:44  23       Q.   Now, my next question is, in order to try and

10:43:48  24   make the vegetation more visible, if fill dirt was

10:43:56  25   brought in and put a wall of seven, eight feet of fill

10:44:03  1   dirt, could you plant on top of the fill dirt, or would

10:44:05  2   it be more or less difficult?

10:44:06  3       A.   I think you could plant on the fill dirt, but in

10:44:10  4   this particular situation that you're talking about it's

10:44:14  5   very, very crucial to bring in soil that is what most of

10:44:19  6   us would refer to as topsoil as opposed to if you did an

10:44:26  7   excavation job, regardless of whether it came from a

10:44:28  8   house or a building or a highway construction.  Our

10:44:33  9   soils have the A horizon, which is the topsoil, the B

10:44:37  10  horizon, which is not as good of soil, but it's down to

10:44:42  11  where our roots get into it, then we have the C horizon

10:44:45  12  of soil.  So often fill, the type that you might be

10:44:50  13  referring to, is the C horizon soil, which just simply

10:44:56  14  doesn't grow hardly anything.   It's just soil that is

10:45:01  15  not yet developed to the point where it has enough

10:45:05  16  organic materials, et cetera, et cetera, in it where it

10:45:08  17  can grow.   So you've got to bring in good soil.   And

10:45:12  18  if you bring in good soil, then planting could be done

10:45:15  19  on that.

10:45:15  20      Q.   Could you bring in, for example, six or eight

10:45:18  21  feet of fill dirt, clay, and then put another couple

10:45:25  22  feet of topsoil on top?   Would that work?

10:45:30  23      A.   I think it would work, but here again, I don't

10:45:33  24  like the fact that you're only talking about a couple of

10:45:38  25  feet of topsoil and then having clay underneath it

10:45:43  1    because when I dig a tree, when I dig a hole to plant a

10:45:47  2    tree of the six-foot category, I've already dug a hole

10:45:54  3    two-feet deep.   So now I'm setting the ball, if I'm

10:45:59  4    doing it this way, right on the top of C horizon type of

10:46:07  5    clay soil.   So I'd prefer to have it much deeper if

10:46:11  6    possible.   So therefore it would require more good soil

10:46:17  7    if you're going to get accelerated growth and not make

10:46:21  8    the root systems have to turn away from this soil.   We

10:46:24  9    can't watch this under the ground, but that is what

10:46:27  10   would happen.   They would turn and come back up to the

10:46:29  11   surface.   So it would be better if we had it much

10:46:33  12   deeper than two feet.

10:46:34  13      Q.   Explain to the jury what you came up with with

10:46:39  14   regard to the tree planting.   What conclusions, based

10:46:45  15   upon a reasonable arborist certainty?

10:46:52  16      A.   I tried to incorporate the various activities

10:46:55  17   that I have already explained to you.  So I don't go all

10:46:59  18   over them again, number one, I cleaned the area up as

10:47:03  19   best I could, got all the wooding and other things out

10:47:07  20   of there.   Number 2, I took soil tests.   Number 3, if

10:47:10  21   the soil needed any nutrient requirements, et cetera, et

10:47:14  22   cetera, I would take care of those things.   And

10:47:17  23   undoubtedly in tree planting of this sort you would need

10:47:22  24   to do that type of thing.   And then I went and tried to

10:47:26  25   select various different trees that I thought would grow

10:47:30  1   in this area.   And then I factored into this additional

10:47:35  2   years of growing, hoping that everything stayed alive,

10:47:39  3   kept growing, and didn't have too much failure.   But

10:47:42  4   I've found in my tree planting programs, not necessarily

10:47:46  5   around the yard, but that you can count on the first

10:47:54  6   year you do a planting, no matter how hard you work on

10:47:57  7   it, if you don't have artificial watering, you're going

10:48:01  8   to be lucky to have a 75 percent survival rate.   So you

10:48:06  9   plant 100 trees, and they cost X number of dollars, and

10:48:11  10  75 of them live, and 25 of them die.   So then you have

10:48:15  11  to go back and you have to buy 25 more to put in those

10:48:18  12  opening holes.   If watering could be done, this might

10:48:22  13  be prevented.   And so then you do your second planting,

10:48:26  14  and you might have a 75 -- and it varies.

10:48:29  15       I mean, I've just kind of hit on a 75 percent

10:48:32  16  number because I've had failures already of almost 100

10:48:37  17  percent when I planted 3,000 and 4,000 trees.   And it's

10:48:41  18  just disastrous.

10:48:43  19       But to go back to the point, I've incorporated

10:48:47  20  the things that I said.   And then we picked out the tree

10:48:49  21  species; we determined how much they might cost.

10:48:53  22       And then we decided, okay, we're going to plant

10:48:56  23  these across 500 feet or thereabouts of soil.

10:48:59  24  Q.   We covered the 500 feet where the lot, that's

10:49:02  25  where the area was shown on the survey?

10:49:05  1    A.   That's correct.   And I don't have my memory, but

10:49:08  2    I think it starts with lot number 14 or something -- 15,

10:49:14  3    and it goes 15, 14 -- it goes backwards across until we

10:49:19  4    get to the north.

10:49:22  5               THE COURT:  Counsel, help me out.  500 feet

10:49:25  6    covers lot 15 through what, please?

10:49:28  7               MR. ROBON:  I think 12.

10:49:31  8    Q.   12, 13, 14, and 15?

10:49:34  9    A.   And that represented, I believe, 500 feet.

10:49:37  10              THE COURT:  Thank you.

10:49:38  11   Q.   And what kind of dollar figure and species did

10:49:42  12   you come up with?

10:49:45  13   A.   I came up with dollar figures of in the

10:49:47  14   neighborhood of -- and if I may refer to my note.  It

10:49:51  15   was $250 per running foot.   I multiplied that $250.

10:50:03  16   Keep in mind that's not just the tree; that's all the

10:50:06  17   other things that we incorporated into it, hiring

10:50:10  18   outside companies and such to come in and do all the

10:50:15  19   land clearing, all the soil testing.

10:50:18  20   Q.   But it doesn't include any soil being brought?

10:50:21  21   A.   It does not include any soil.   It's using the

10:50:24  22   soil we have there.   That would be an extra cost

10:50:26  23   incurred.

10:50:29  24              So you multiply that $250 a running foot, which

10:50:34  25   seemed too high to me in the beginning until I

10:50:37   1   incorporated all the things into it that I know have to

10:50:40   2   be incorporated to try to get a successful planting the

10:50:43   3   first time around.  Multiplied that, came up with

10:50:47   4   $125,000 for the total footage across the back of the

10:50:51   5   property.

10:50:51   6         Now, there were no less than nine trees of some

10:51:00   7   consequence, six, eight, nine, ten, 11 inches or more in

10:51:06   8   diameter that were also cut down across the back of the

10:51:10   9   property.  So I used information that I use in doing

10:51:17  10   tree appraisal from Michigan State University's forestry

10:51:22  11   and horticultural department and tried to do some

10:51:26  12   valuation on trees of that diameter, not pinpointing

10:51:32  13   what specie of tree they were.  And I just rounded the

10:51:36  14   number to $1,000 a tree.  So I added that $9,000 to the

10:51:41  15   $125,000 and came up with $134,000 that it would take to

10:51:50  16   replace that with a living windbreak across the back,

10:51:58  17   wildlife habitat, sound barrier, et cetera.

10:52:01  18         Now, I divided the $134,000 by the -- I believe

10:52:07  19   we said four lots, Your Honor, that was what we came up

10:52:10  20   with, and that represented $33,500.

10:52:19  21   Q.   For each lot?

10:52:20  22   A.   Per lot that it would cost to put -- replace the

10:52:26  23   living vegetation wall across the back that we had.

10:52:29  24   Now, that figure is directly related to the four lots

10:52:37  25   that the 500 feet entails.  But if you would have

10:52:45  1    available the chart that we looked at --

10:52:50  2        Q.   The plat map?

10:52:51  3        A.   The map that shows -- if you could show the jury,

10:52:56  4    please.

10:52:57  5        Q.   If you could come over here, we'll pull it out.

10:53:02  6        A.   Okay.   Thank you.

10:53:04  7        Q.   We're referring to Exhibit Number 8.

10:53:20  8        A.   We started down here.   We started right down

10:53:25  9    here, and we came across here, 15, 14, 13, 12, 11.   And

10:53:30  10   this is where the trees were taken out.   Now --

10:53:35  11            MR. BAHRET:   Your Honor, I'd ask for at

10:53:39  12   least a cautionary instruction.   He's not an expert in

10:53:42  13   where trees were taken out.

10:53:44  14            MR. ROBON:   What he's basing his opinion on

10:53:47  15   is the survey.

10:53:47  16            THE COURT:   We not have established that

10:53:49  17   yet.

10:53:49  18            MR. BAHRET:   And the survey doesn't show --

10:53:52  19            THE COURT:   Right now we have discussion

10:53:54  20   about removal and replacement.   But there's been no

10:53:59  21   testimony from this witness that I can recall about

10:54:04  22   where, with respect to the surveys, he's talking about.

10:54:11  23   BY MR. ROBON:

10:54:11  24        Q.   Well, how did you determine, Mr. Herrett, 12, 13,

10:54:16  25   14, and 15?   Did you take a look at the survey, which is

10:54:19  1  Exhibit Number 7?

10:54:21  2      A.  Yes, I did.   And I have that in my possession in

10:54:24  3  my folder.   So I took -- Your Honor, I took the area

10:54:28  4  that was surveyed, which it shows in the pink color

10:54:33  5  across here, and I tried to, as best I could, to stay

10:54:37  6  within the perimeters of that area across there.

10:54:40  7              THE COURT:  How long and how wide?  We're

10:54:42  8  talking 500 feet long.  How wide?

10:54:46  9              THE WITNESS:  500 feet long.   It varied

10:54:48  10  from about four and a half to six feet in width to the

10:54:51  11  best of my knowledge.

10:54:54  12              THE COURT:  Thank you.

10:54:59  13      A.  Now, when you come up with the fact that this,

10:55:02  14  whatever the width may be, trees were taken out of here

10:55:05  15  on the development's property, then I said, as I looked

10:55:10  16  at this, I said, well, how would this affect me if I

10:55:13  17  lived someplace else rather than here, here, here and

10:55:17  18  this right here.   And so I got to looking at the area.

10:55:21  19  I walked over and I stood there and I walked over to

10:55:24  20  different lots and I looked around.   And right away I

10:55:28  21  could determine in my own mind's eye it might vary if

10:55:32  22  you looked at it or if somebody else looked at it.   But

10:55:34  23  I felt that this lot that had a nice view across here,

10:55:37  24  this lot across the street, this lot across the street,

10:55:41  25  this lot across the street, and this lot across the

| | |
|---|---|
| 10:55:45 | 1 |
| 10:55:50 | 2 |
| 10:55:54 | 3 |
| 10:55:57 | 4 |
| 10:56:02 | 5 |
| 10:56:07 | 6 |
| 10:56:13 | 7 |
| 10:56:20 | 8 |
| 10:56:24 | 9 |
| 10:56:27 | 10 |
| 10:56:30 | 11 |
| 10:56:33 | 12 |
| 10:56:37 | 13 |
| 10:56:40 | 14 |
| 10:56:45 | 15 |
| 10:56:46 | 16 |
| 10:56:49 | 17 |
| 10:56:50 | 18 |
| 10:56:51 | 19 |
| 10:56:53 | 20 |
| 10:56:53 | 21 |
| 10:56:55 | 22 |
| 10:56:59 | 23 |
| 10:57:02 | 24 |
| 10:57:04 | 25 |

1  street all had views of this area that were affected by

2  what had been removed across here.   You understand what

3  I'm saying, Your Honor?   I'm saying that these lots

4  across the street also had straight across or angular

5  view of what had happened over here.   So I took the

6  $33,000-plus number, $33,500 figure that affected these

7  lots, and I multiplied it by these four lots, plus one,

8  two, three, four, five lots across the road which

9  directly were affected by this.   Now, there is a house

10  here, that still has a woods behind it, so I did not

11  include that.   And that's how I came up with my figure,

12  which is around $301,000, or something like that.   It's

13  in my notes up there.   If you have any questions, I can

14  go back, and I'd be glad to look at those numbers.

15  Q.   Now, you know --

16            MR. BAHRET:   Your Honor, could we --

17            THE COURT:   Time out.   We have an

18  objection.

19            MR. BAHRET:   I think we should do this in

20  question and answer form.

21            THE COURT:   There's no question pending.

22  I'm going to ask you to confine your answers to

23  questions.   We don't usually allow long narratives.

24  Let's allow the lawyer to ask a question, and you can

25  given an answer.   Thank you kindly.

10:57:06  1    Q.   Tell us how you came up with a total valuation of

10:57:10  2    what the value of the trees that were behind the four

10:57:12  3    lots and how it impacted the lots across the street.

10:57:21  4    A.   I think I covered most of that.

10:57:22  5         MR. BAHRET:   I object.   There's no

10:57:24  6    foundation that he knows land value.   He's an arborist.

10:57:30  7         MR. ROBON:   I'll rephrase the question.

10:57:32  8    Q.   Do you value trees?

10:57:34  9    A.   Yes, I do.

10:57:35  10   Q.   And can you explain how a person goes about

10:57:40  11   valuing trees, shrubbery, what do you look at?

10:57:46  12   A.   You look at the specie, you look at the effect it

10:57:51  13   has on the surrounding area, you look at why the trees

10:57:56  14   and shrubs and vines and stuff might be there, what

10:58:00  15   purpose are they serving, are they there for a number of

10:58:06  16   reasons, which in this particular case I felt they were.

10:58:09  17   I think I've mentioned those:   From wildlife habitat, to

10:58:13  18   sound barriers, to vision barrier, whatever.   And this

10:58:17  19   is how I try to value trees and shrubs and bushes and

10:58:22  20   vines.

10:58:22  21   Q.   And Michigan State University, I understand,

10:58:26  22   publicizes a recognized journal of valuations?

10:58:31  23   A.   That's correct.   They're not the only one, but

10:58:34  24   they're the ones I use.

10:58:35  25   Q.   And in their journal --

| | | |
|---|---|---|
| 10:58:39 | 1 | MR. BAHRET:  Objection. |
| 10:58:42 | 2 | MR. ROBON:  I thought you said something. |
| 10:58:44 | 3 | MR. BAHRET:  I did.   I objected. |
| 10:58:46 | 4 | THE COURT:  He objected.   Your basis is |
| 10:58:50 | 5 | leading? |
| 10:58:51 | 6 | MR. BAHRET:  Obviously, yes. |
| 10:58:53 | 7 | MR. ROBON:  I'll rephrase the question. |
| 10:59:08 | 8 | BY MR. ROBON: |
| 10:59:08 | 9 | Q.  Would you explain to the jury how, for example, a |
| 10:59:13 | 10 | one-foot in diameter oak tree that's 50 feet tall would |
| 10:59:18 | 11 | have a different value behind a house as compared to |
| 10:59:23 | 12 | being in a woods? |
| 10:59:25 | 13 | A.  If I -- |
| 10:59:26 | 14 | Q.  Sort of an understanding of how things are |
| 10:59:30 | 15 | valued. |
| 10:59:31 | 16 | A.  If I had a 12-inch diameter oak tree, as you |
| 10:59:36 | 17 | asked about, standing in a woodland where it was not |
| 10:59:40 | 18 | used for shade or anything as far as my yard or house |
| 10:59:45 | 19 | was concerned, it could be a $100 tree.  If I have that |
| 10:59:51 | 20 | same 12-inch diameter tree in my yard, I have had many |
| 10:59:57 | 21 | cases where automobiles have gone off the road and run |
| 11:00:01 | 22 | into a tree like that, and then I've gone to my |
| 11:00:03 | 23 | valuation information material and appraised what that |
| 11:00:08 | 24 | tree might be worth because it's in my yard; it adds to |
| 11:00:13 | 25 | the value of my house; it adds to the value of my living |

11:00:17  1   environment, the shade, a place to hang a swing from a

11:00:22  2   limb, or whatever you want to do with it.  And it's not

11:00:24  3   unusual for a tree like that to be worth $4,000 or

11:00:28  4   $5,000, $6,000, depending on the specie and the location

11:00:32  5   where it is in your yard.

11:00:34  6       Q.  Can you explain to jury the methodology that you

11:00:37  7   used in coming up with the $250 a foot and the valuation

11:00:44  8   that you ultimately put not only affects four lots, but

11:00:49  9   affecting the lots across the street?

11:00:52  10      A.  Well, I think I covered that as best as I could.

11:00:59  11  But I went down the ABCs of cleaning the area up --

11:01:06  12              THE COURT:  He already covered that.

11:01:09  13              THE WITNESS:  That's what I thought, Your

11:01:10  14  Honor.

11:01:10  15              THE COURT:  Then let's move on.

11:01:12  16      Q.  So my question is, did you use that methodology

11:01:16  17  of the location of the trees and the brush and the

11:01:20  18  brambles in your valuation?

11:01:21  19      A.  Yes, I did.   Very much so.

11:01:24  20      Q.  And what, in particular, stood out that you put

11:01:28  21  such a high value on the loss of that vegetation?

11:01:32  22      A.  Well, if I were to buy or own one of those lots,

11:01:40  23  and I had the privilege of having a wildlife sanctuary

11:01:45  24  and sound barrier and vegetation and

11:01:51  25  whatever-it-might-be barrier behind my lot, and that's

11:01:54  1  what I looked at, whether the leaves were on in the

11:01:57  2  summertime or off in the wintertime -- I have seen quite

11:02:03  3  a few photographs of this area.  Here again, it's in the

11:02:06  4  eyes of the beholder.   But I would much rather look at

11:02:09  5  that than I would at the side of a railroad car.  Some

11:02:15  6  of those railroad cars do have some interesting

11:02:17  7  paintings and such on them, but that's another point.

11:02:21  8  But that's what I used to determine what I felt was the

11:02:25  9  value of having them there, the trees.

11:02:29 10    Q.   In the $301,000 value that you came up with, what

11:02:33 11  kind of species would you plant to replace them, even

11:02:38 12  though they would only be six or so feet high initially?

11:02:42 13    A.   Again, in this particular soil type, I would

11:02:47 14  probably stick with hardwood species that were adapted

11:02:50 15  to the soil type.   I selected certain ones like

11:02:53 16  sweetgum, and I did mention earlier red cedar, if I

11:02:59 17  wanted to mix a coniferous type of tree -- and a conifer

11:03:04 18  is an evergreen tree that bears its seeds, for the sake

11:03:09 19  of the jury to understand what that is.   And I picked

11:03:13 20  some pin oak, which is adapted to that soil type.   And

11:03:16 21  then I took some other vegetation such as autumn olive

11:03:22 22  and some other smaller branch which are wildlife habitat

11:03:27 23  friendly food sources and such.  And that's what I came

11:03:30 24  up with.

11:03:31 25    Q.   Now, would you plant these trees -- how close

11:03:34    1    would they be planted to one another, or they would be

11:03:37    2    outside the four or five foot area even?

11:03:39    3        A.   Some would be in the four or five foot area.

11:03:42    4    Then the others would encroach upon the depth of the lot

11:03:46    5    because you couldn't put all those back in there.   But

11:03:49    6    I'm trying -- I think a person needs to try to recreate

11:03:54    7    a barrier in close proximity to what was there before.

11:04:00    8    And I can't exactly tell from looking at some of the

11:04:03    9    pictures and the videos and the photographs that I

11:04:07   10    looked at whether that was ten or 15 feet wide.   But

11:04:10   11    I'm guessing it was every bit that wide.   And so I

11:04:13   12    would incorporate the back part of the lot, which is

11:04:18   13    four, five, six feet across there, and then add another

11:04:22   14    four or five, six feet to that.

11:04:25   15        Q.   And your opinion based upon a reasonable degree

11:04:29   16    of certainty, it would take how many years from the time

11:04:33   17    of planting these trees until they would be, let's say,

11:04:37   18    15 to 20 feet tall?

11:04:38   19        A.   I can't entirely answer that question for you,

11:04:42   20    for the simple reason I don't know what the soil types

11:04:45   21    are and such.   But I'm just guessing that to get up to

11:04:50   22    the 15, 18 --

11:04:51   23               MR. BAHRET:   Objection.

11:04:52   24               THE COURT:   I'm sorry, sir.

11:04:53   25        A.   Yes, it would be ten years.

| | | |
|---|---|---|
| 11:04:55 | 1 | THE COURT:  I instruct the jury to disregard |
| 11:04:57 | 2 | the answer.   We cannot have witnesses guessing.   So if |
| 11:05:00 | 3 | you don't know, you simply say, I don't know. |
| 11:05:02 | 4 | A.   I don't know. |
| 11:05:04 | 5 | Q.   Well, for example, how fast does a conifer grow? |
| 11:05:09 | 6 | If you plant one that's six feet high -- you said that |
| 11:05:14 | 7 | was one of the species that you might plant? |
| 11:05:16 | 8 | A.   Six to ten, 12 inches a year, under the best |
| 11:05:21 | 9 | growing conditions. |
| 11:05:24 | 10 | Q.   And what about the pin oaks that you mentioned? |
| 11:05:27 | 11 | A.   Six inches or eight inches or so a year. |
| 11:05:31 | 12 | Q.   So most of the trees would be something around a |
| 11:05:36 | 13 | foot per year on average? |
| 11:05:38 | 14 | A.   I think that would be a rather excessive amount |
| 11:05:42 | 15 | of growth, but it's certainly possible, but I think it |
| 11:05:46 | 16 | would be more to six to eight inches of growth a year. |
| 11:05:49 | 17 | Q.   And if they were watered, would it be more? |
| 11:05:53 | 18 | A.   It wouldn't be a whole lot more.   The survival |
| 11:05:56 | 19 | rate would just be better.   And it could be a little |
| 11:05:59 | 20 | bit more, definitely. |
| 11:05:59 | 21 | Q.   So can you estimate for the jury how many years |
| 11:06:03 | 22 | it would be before it would be a barrier to cover, for |
| 11:06:09 | 23 | example, the bottom of the railroad tracks? |
| 11:06:12 | 24 | MR. BAHRET:  Your Honor, he already told you |
| 11:06:14 | 25 | that he was guessing and he doesn't know. I object. |

11:06:20   1          THE COURT:  Well, let's hear it.   Can you
11:06:22   2   answer the question with some --
11:06:25   3      A.   I believe I can shed some light on that.   Here
11:06:28   4   again --
11:06:28   5          THE COURT:  Without guessing.
11:06:29   6      A.   It's not 100 percent, but I stated I'm very
11:06:33   7   confident that those trees would grow six to eight
11:06:37   8   inches a year.   And so just multiply six inches by ten
11:06:41   9   years, and how much have you got as far as your added
11:06:45  10   growth is concerned?
11:06:46  11          MR. ROBON:  Five feet.
11:06:47  12      A.   That's a right.   So you plant a six foot tall
11:06:51  13   tree, and you've got five feet more added to it.
11:06:54  14   You've got an 11-foot tall tree.
11:06:57  15      Q.   In five years?
11:06:58  16      A.   So that's the best I can do for you.
11:07:01  17      Q.   Do you believe that the valuation you gave the
11:07:04  18   jury of the original $134,000 for the four lots, and
11:07:08  19   then putting it on a per-lot basis, and then adding the
11:07:12  20   lots across the street is a proper method of determining
11:07:15  21   valuation?
11:07:17  22      A.   Yes, I do, or I wouldn't have used that system.
11:07:21  23   It's as best as I knew what to come up with.
11:07:28  24          MR. ROBON:  Nothing further, Your Honor.
11:07:29  25          THE COURT:  Thank you.   You may cross.

```
11:07:34   1                          -  -  -

11:07:34   2               ROGER HERRETT, CROSS-EXAMINATION

11:07:35   3   BY MR. BAHRET:

11:07:35   4     Q.   Good morning.  My name is Bob Bahret; I represent

11:07:46   5   the City of Toledo.

11:07:47   6     A.   Good morning.

11:07:47   7     Q.   Interesting methodology.   Who told you a barrier

11:07:51   8   ten- or 15-foot thick existed?

11:07:55   9     A.   I determined that by my looking at the survey

11:08:02  10   line and seeing how much was on the side of the

11:08:06  11   subdivision, and then I had the opportunity to look at a

11:08:10  12   video that --

11:08:14  13     Q.   So in your work, in your estimate of a ten- to

11:08:18  14   15-foot barrier, you would admit that you're including

11:08:21  15   vegetation and trees that were on railroad property?

11:08:25  16     A.   No, I used that to determine how much width I

11:08:29  17   would have to plant if I was going to plant that onto

11:08:31  18   the subdivision's property to replace what was not --

11:08:36  19   you know, which was part of the total width in the first

11:08:39  20   place.

11:08:40  21     Q.   We're not communicating.   The total width that

11:08:43  22   you say you're trying to model to replace includes trees

11:08:49  23   and vegetation that's on the railroad or was on the

11:08:52  24   railroad property, correct?

11:08:55  25     A.   I don't think we're still communicating.   I see
```

11:08:58   1   what I think you're trying to ask me.   But you're

11:09:01   2   trying to say that the value that I came up with of $250

11:09:06   3   a foot or $300,000 --

11:09:09   4      Q.   Let's go one step at a time.   I'm trying to find

11:09:11   5   out the basis for what you've said.   The 15-foot

11:09:14   6   barrier that you say existed before, are you aware of

11:09:19   7   the fact that absolutely nobody claims that there was an

11:09:23   8   encroachment on Cambridge anywhere near that deep?

11:09:28   9      A.   Yes, I believe I'm aware of that.

11:09:32  10      Q.   All right.   So if we have by one witness's

11:09:37  11   standard a four-foot encroachment, there's 15 feet of

11:09:42  12   barrier that you're trying to replace, if I do the math,

11:09:47  13   I've got 11 feet on railroad property.   Does that make

11:09:51  14   sense to you?

11:09:52  15      A.   That's correct.   It could vary from 11 to 12,

11:09:56  16   whatever the width was.

11:09:58  17      Q.   And you are including that, those trees that are

11:10:01  18   gone, into the equation and the analysis as to what you

11:10:06  19   are trying to replace?

11:10:08  20      A.   No, I'm not.

11:10:09  21      Q.   Well, you've just told us a few times you're

11:10:12  22   trying to create a 12- or 15-foot thick barrier.

11:10:17  23      A.   Yes, but I'm not using the value of the trees

11:10:20  24   over on what was the City's or railroad's property.

11:10:24  25   I'm just saying if I put that same planting over on the

11:10:27  1    subdivision's property, and tried to emulate what was on

11:10:30  2    the other side, to come up with that width, yes, I'm

11:10:35  3    using that as a value factor, but I'm certainly not

11:10:39  4    including the value of the trees there.

11:10:42  5        Q.   You're including it in the cost to replace the

11:10:45  6    barrier, though; are you not?

11:10:46  7        A.   I am.

11:10:47  8        Q.   All right.   So you're charging, if you will, the

11:10:51  9    City of Toledo to rebuild a 15-foot barrier, even though

11:10:56  10   they didn't have a 15-foot barrier contained within

11:10:59  11   their own property; is that right?

11:11:00  12       A.   I think you'd -- I'd have to agree with that.

11:11:04  13       Q.   And another interesting part of the analysis is

11:11:09  14   that you are including lots -- you're including lots --

11:11:22  15   I'll show you first then show the jury.   All these lots

11:11:26  16   on the other side of the street?

11:11:28  17       A.   I'm not including all of them, just down to

11:11:30  18   number four.

11:11:32  19       Q.   Four, five, six, seven, and eight?

11:11:34  20       A.   That's correct.   Looking at the back of the

11:11:38  21   board, I believe that's what it was.

11:11:40  22       Q.   Can you come back up here?

11:11:42  23       A.   Yes, I could.

11:11:54  24       Q.   You're including all of these lots, four through

11:11:57  25   eight?

11:11:57  1    A.  Correct.

11:11:58  2    Q.  You would admit that all of these lots would be

11:12:03  3   able to see a train looking out over lots 12, 11, 10,

11:12:09  4   and 9?

11:12:13  5    A.  These lots over here you're saying would be able

11:12:17  6   to see a train?

11:12:18  7    Q.  No.

11:12:19  8    A.  Yes, they would be able to see a train, but the

11:12:23  9   cutting is here.

11:12:24  10            THE COURT:  Folks, but in fairness to this

11:12:27  11   witness --

11:12:28  12            THE WITNESS:  He's confusing me.

11:12:29  13            THE COURT:  Just a moment, sir.  My point

11:12:31  14   is, you both can't be talking at the same time because

11:12:34  15   we can't then understand, and most importantly, perhaps,

11:12:38  16   our court reporter can't accurately take down the

11:12:41  17   question and the answer.  I'm going to ask the witness

11:12:44  18   to please wait until the question is asked.  I'm going

11:12:47  19   to ask the lawyer to wait until the question is

11:12:49  20   answered.  You may proceed.

11:12:52  21            THE WITNESS:  Will do.  Thank you.

11:12:54  22   BY MR. BAHRET:

11:12:54  23    Q.  I know you're talking about what's down here.  I

11:12:57  24   understand that.  I'm asking you, would they be --

11:13:01  25   somebody that lives in lot 5, if he just looks in this

11:13:05  1    direction instead of this direction, he's going to see a

11:13:08  2    train, correct?

11:13:08  3        A.   Correct.

11:13:11  4        Q.   Of course, there's some negative aesthetics with

11:13:15  5    that?

11:13:16  6        A.   What might those negative aesthetics be?

11:13:19  7        Q.   You already told us you don't like to look at

11:13:21  8    trains.

11:13:21  9        A.   That's correct.   Not if I have an option.

11:13:24  10       Q.   Now, you are ascribing value the way you've

11:13:28  11   worked this up, damages to each of these lots, correct?

11:13:31  12       A.   Yes, sir.

11:13:32  13       Q.   You're not proposing planting anything on those

11:13:35  14   lots; you're just saying those are damaged the same --

11:13:40  15   by the same number that it would cost to replace what

11:13:43  16   was supposedly taken down here?

11:13:44  17       A.   That's correct.

11:13:45  18       Q.   All right.   Who gets the money?

11:13:48  19       A.   Who gets what money?

11:13:50  20       Q.   The money that you're saying these lots are

11:13:52  21   damaged.

11:13:53  22       A.   I suppose the person who owns the lots that sells

11:13:56  23   them.

11:13:57  24       Q.   Does IT concern you that some of these people

11:13:59  25   aren't even parties to this case?

| | | |
|---|---|---|
| 11:14:01 | 1 | A.   I'm not aware of that. |
| 11:14:03 | 2 | Q.   Okay.  Do you know that -- sorry. |
| 11:14:09 | 3 | (Cellular telephone is ringing in the courtroom.) |
| 11:14:24 | 4 | MR. BAHRET:  This would be a good time for |
| 11:14:26 | 5 | everybody to stand up and salute. |
| 11:14:29 | 6 | THE COURT:  This would be a good time for |
| 11:14:31 | 7 | the marshals to confiscate your cell phone. |
| 11:14:36 | 8 | THE WITNESS:  I'm a Michigan State fan. |
| 11:14:38 | 9 | Please. |
| 11:14:40 | 10 | BY MR. BAHRET: |
| 11:14:40 | 11 | Q.   Before we were interrupted -- |
| 11:14:42 | 12 | MR. BAHRET:  I do apologize, Your Honor. |
| 11:14:43 | 13 | Believe it or not, that's never happened to me. |
| 11:14:46 | 14 | THE COURT:  Sure. |
| 11:14:52 | 15 | THE WITNESS:  What, that Michigan lost?  Is |
| 11:14:54 | 16 | that what you're trying to say. |
| 11:14:56 | 17 | MR. BAHRET:  Let's not go there. |
| 11:14:59 | 18 | THE WITNESS:  Let's not. |
| 11:15:01 | 19 | MR. BAHRET:  But it's a good rivalry, |
| 11:15:03 | 20 | though. |
| 11:15:03 | 21 | BY MR. BAHRET: |
| 11:15:04 | 22 | Q.   You are ascribing value up here, damages, I |
| 11:15:06 | 23 | should say, to lots 5 through 8 based on what was cut |
| 11:15:11 | 24 | down on somebody else's property? |
| 11:15:14 | 25 | A.   Yes, I am. |

11:15:15   1      Q.   All right.   Do you -- you can go ahead and take

11:15:18   2   your seat.

11:15:20   3         Do you take the position that if your next-door

11:15:23   4   neighbor has a tree that you like, and he cuts it down

11:15:29   5   even though you didn't want him to cut his own tree

11:15:32   6   down, that you have a damage claim or somebody owes you

11:15:35   7   money?

11:15:37   8      A.   No, I'm not saying that at all.   It happens

11:15:40   9   quite frequently.

11:15:41  10      Q.   All right.   And you would obviously admit that

11:15:44  11   nothing was removed from lots 4, 5, 6, 7 and 8?

11:15:51  12      A.   Nothing was removed from that property except the

11:15:54  13   view across the street.

11:15:56  14      Q.   Nothing was removed from the lots that I

11:15:58  15   mentioned?

11:15:59  16      A.   No, they were not.   There was not.

11:16:05  17      Q.   And so when you talk about replacing for the

11:16:09  18   money that you claim it takes, replacing the barrier

11:16:18  19   down on lots 15 and 14 and 13, I guess it is, that

11:16:24  20   replacement and the monies that you spend on that

11:16:26  21   replacement would also fix lots 4, 5, 6, 7 and 8,

11:16:33  22   correct?

11:16:35  23      A.   Yes.

11:16:36  24      Q.   So it's one replacement we're talking about.   We

11:16:40  25   don't have to add and triple the money to replace it

| | | |
|---|---|---|
| 11:16:43 | 1 | three times, do we? |
| 11:16:47 | 2 | A.  I'm saying that each person in my opinion on |
| 11:16:52 | 3 | these lots 4, 5, 6, 7, 8, whatever, have been damaged. |
| 11:16:59 | 4 | The fact that they have lost or gained -- |
| 11:17:03 | 5 | Q.  We heard that.  But that's not the question. |
| 11:17:05 | 6 | THE COURT:  Let's let him finish. |
| 11:17:07 | 7 | MR. BAHRET:  It wasn't responsive to the |
| 11:17:09 | 8 | question. |
| 11:17:09 | 9 | THE COURT:  Well, yes and no.  Are you |
| 11:17:09 | 10 | done? |
| 11:17:15 | 11 | A.  My point being is when you have something across |
| 11:17:17 | 12 | the street on the back of that that opens up the |
| 11:17:20 | 13 | neighborhood to that type of exposure, that you have |
| 11:17:23 | 14 | been damaged, in my opinion. |
| 11:17:33 | 15 | Q.  I was asking about the replacement cost. |
| 11:17:35 | 16 | A.  The replacement cost is involved with planting |
| 11:17:41 | 17 | the trees on the four lots that we mentioned, trees, |
| 11:17:44 | 18 | shrubs, whatever we plant, and what it affects. |
| 11:17:48 | 19 | Q.  To fix what you claim was done to the property, |
| 11:17:52 | 20 | it would cost $134,000, and that includes replacing 11 |
| 11:18:00 | 21 | feet of trees and vegetation that even you admit wasn't |
| 11:18:05 | 22 | even on Cambridge property.  Am I right? |
| 11:18:08 | 23 | A.  No. |
| 11:18:11 | 24 | Q.  In the cost estimate you gave, and I thought we |
| 11:18:14 | 25 | already established this, you are creating a 15-foot |

11:18:19  1  barrier.    You said that.    Do you stand by that?

11:18:23  2      A.  I'm creating a 15-foot wide barrier over on

11:18:27  3  property that belongs to the subdivision, not on

11:18:30  4  property that belongs to somebody else.

11:18:32  5      Q.  You know, I didn't even ask if you're creating a

11:18:34  6  barrier on somebody else's property.    Nobody heard me

11:18:37  7  ask that.

11:18:38  8      A.  You said I'm recreating a barrier.

11:18:41  9      Q.  A 15-foot barrier, when they only claim a

11:18:44  10  four-foot encroachment, which means the other 11 feet

11:18:47  11  that you are replacing was never on the development

11:18:51  12  property.

11:18:52  13              MR. ROBON:  Objection, Your Honor.    I think

11:18:54  14  the testimony of Mr. Nigh was five to six feet.

11:18:59  15              THE COURT:  Four, five, six feet.    About

11:19:02  16  five feet.  Can we get you two to agree on that?  About

11:19:06  17  five feet.

11:19:07  18              So that we're at about ten feet.    And amend

11:19:11  19  the question therefore.    I think the question is, ten

11:19:14  20  feet.

11:19:15  21  BY MR. BAHRET:

11:19:15  22      Q.  Two-thirds of what you're talking about

11:19:18  23  replacing, I know you're not going to put it back on

11:19:21  24  railroad property, but that's where it was when it was

11:19:24  25  cut down, two-thirds of what you're talking about

| | | |
|---|---|---|
| 11:19:27 | 1 | replacing, correct? |
| 11:19:34 | 2 | THE COURT:  Let me try it this way. |
| 11:19:37 | 3 | THE WITNESS:  Go ahead, Your Honor. |
| 11:19:39 | 4 | Please. |
| 11:19:39 | 5 | THE COURT:  You first. |
| 11:19:47 | 6 | A.  My cost estimates that I came up with were to |
| 11:19:52 | 7 | recreate a windbreak within the four-, five-, six-, |
| 11:19:58 | 8 | seven-, eight-foot distance across the back of that lot. |
| 11:20:02 | 9 | I never thought about ten to 15 feet.  I did not think |
| 11:20:06 | 10 | about recreating a total width of what had been taken |
| 11:20:09 | 11 | off of railroad and subdivision property.  My figures |
| 11:20:15 | 12 | are, let's say, within the six-foot distance from the |
| 11:20:19 | 13 | back of the property and onto the subdivision.  So I |
| 11:20:24 | 14 | may -- I may be adding a foot or a foot and a half or |
| 11:20:27 | 15 | two feet, but not any ten or 12 feet. |
| 11:20:32 | 16 | Q.  You know, everyone in this room heard you say it, |
| 11:20:35 | 17 | though. |
| 11:20:35 | 18 | A.  Say what? |
| 11:20:36 | 19 | Q.  About a 12- to 15-foot barrier, that's why you |
| 11:20:41 | 20 | would need to go onto the property, onto the Cambridge |
| 11:20:44 | 21 | property much deeper than just four feet? |
| 11:20:46 | 22 | A.  Yes, I did say that.  And if I were going to |
| 11:20:48 | 23 | plant it, that's what I would do.  But that's not where |
| 11:20:51 | 24 | my cost figures came from. |
| 11:20:53 | 25 | Q.  So the other planting is free? |

11:20:55  1      A.   No, the other planting is going to cost more

11:20:57  2  money, but we're not -- that's going to be a decision

11:21:01  3  made by whoever owns that property, a developer if he

11:21:04  4  wants to go that wide.   I'm not -- I have not been asked

11:21:09  5  to tell that individual or anybody else how much more

11:21:13  6  it's going to cost.

11:21:15  7      Q.   Let me switch gears.   You were asked about how

11:21:18  8  fast trees grow?

11:21:20  9      A.   Yes.

11:21:21  10      Q.   Do you have expertise in how fast weeds and scrub

11:21:25  11  brush and brambles grow?

11:21:27  12      A.   A certain extent.   Not weeds and grass, but I do

11:21:31  13  on brambles and briars.

11:21:32  14      Q.   Brambles and briars are much faster growing than

11:21:36  15  a tree; would they not?

11:21:37  16      A.   In most cases.

11:21:39  17      Q.   And also there's a limit to how tall brambles and

11:21:44  18  briars get?

11:21:45  19      A.   That's entirely true, depending on what they have

11:21:48  20  to hang onto when they're growing.

11:21:50  21      Q.   Well, if they don't have anything to hang on,

11:21:53  22  they're just out there growing, how tall do they

11:21:56  23  typically get?

11:21:57  24      A.   Oh, probably in the neighborhood -- depending on

11:22:00  25  the species of brambles an briar, somewhere around six,

11:22:05  1    eight feet.

11:22:06  2        Q.  I never heard of anybody saying they're going to

11:22:09  3    plant brambles, but is that something you can plant?

11:22:12  4        A.  Well, it depends on what you call brambles, but

11:22:14  5    for many, many years the Division of Wildlife, until it

11:22:18  6    became illegal, planted multiflora rose around farmers'

11:22:21  7    fields until that -- and the other thing, until they

11:22:25  8    determined it was a noxious plant and spread all over

11:22:28  9    the place.  But it's a great wildlife habitat and

11:22:31  10   living fence.  I'm not advocating planting multiflora

11:22:35  11   rose.  It would grow that height.

11:22:37  12        Now, there are plants like autumn olive, like I

11:22:41  13   mentioned, and some of the same ones I mentioned that

11:22:43  14   will grow to a similar height to multiflora rose.  I

11:22:48  15   have some of those grow to six to eight feet.  I have

11:22:52  16   some on my own property.

11:22:53  17       Q.  You saw some pictures?

11:22:54  18       A.  I saw some pictures.  I don't know exactly which

11:22:57  19   ones I saw.

11:22:57  20       Q.  And what type of brambles did you see?

11:23:02  21       A.  Species-wise, I can't answer that.

11:23:07  22       Q.  If -- is that something you can buy?  Can you go

11:23:12  23   somewhere and buy a bramble?

11:23:15  24       A.  Would you give me the scientific name of what

11:23:17  25   bramble is?  I really don't know.  Or the common name?

11:23:21   1   I mean, bramble is -- are we talking about wild rose

11:23:25   2   bushes?  Are we talking about grape vines?  Are we

11:23:29   3   talking about just a tangle of plant life like that

11:23:32   4   which we commonly refer to as brambles, I guess,

11:23:37   5   rabbits' habitat?

11:23:37   6       Q.   It's been described as a tangled thing that

11:23:40   7   weaves together.

11:23:42   8       A.   Good definition.

11:23:44   9       Q.   Can you get those things?

11:23:46  10       A.   You can buy the individual plants and plant them

11:23:49  11   and let them do their thing.

11:23:50  12       Q.   How long would it take to get them up -- I don't

11:23:53  13   know what size they come when you buy them.   How long

11:23:56  14   would it take to create a five- or six-foot tall

11:23:59  15   barrier?

11:23:59  16       A.   Well, the bramble that we might go to a nursery

11:24:03  17   and buy, and search out, would probably be a foot or so

11:24:07  18   in height or foot and a half.  And so it would probably

11:24:11  19   take another four or five years for them to get up into

11:24:14  20   the height we're talking about.

11:24:15  21       Q.   So they're growing at a rate at least a foot or

11:24:19  22   more a year?

11:24:20  23       A.   Correct.

11:24:21  24       Q.   And probably the "or more" side of that equation,

11:24:24  25   correct?

11:24:24  1    A.   Possibly, but not necessarily true.

11:24:31  2    Q.   In your estimate that you came up with of

11:24:36  3    $134,000, I know you factored in nine trees.   And are

11:24:41  4    you aware that Nigh only claimed he found seven?

11:24:45  5    A.   No, I'm not.   I just used --

11:24:48  6    Q.   So throw in a couple extra?

11:24:50  7    A.   I didn't throw them in.   I was just told there

11:24:52  8    were nine.   And I had photographs that -- but I can't

11:24:57  9    verify that.

11:24:57  10   Q.   In your estimate are you including brambles or

11:25:01  11   the things that I described as brambles?

11:25:04  12   A.   No.   I did not do an appraisal on what had been

11:25:08  13   removed other than for the trees.

11:25:10  14   Q.   And the trees that you're talking about, nine

11:25:14  15   trees, according to your information, to replace the

11:25:21  16   trees is going to cost $134,000?

11:25:24  17   A.   Not to replace the trees.   I'm talking trees,

11:25:28  18   the brambles, plus all the preparation work that I

11:25:33  19   described all that before.

11:25:35  20   Q.   I thought I just got done asking if you were

11:25:38  21   talking about replacing the brambles.   I thought you

11:25:42  22   just told me no?

11:25:45  23   A.   I must have misspoke.   I'm sorry.

11:25:49  24   Q.   And what species are you talking about replacing

11:25:53  25   brambles with?

11:25:54   1    A.   I would probably use autumn olive, and other

11:26:00   2   plants very much like the autumn olive plant, which

11:26:04   3   would be able to grow in that soil.

11:26:06   4    Q.   What is an autumn olive -- autumn?

11:26:09   5    A.   Autumn, autumn of the year.

11:26:12   6    Q.   What is an autumn olive plant?   What does it

11:26:17   7   look like?

11:26:19   8    A.   It looks like a lilac bush in a way, except it

11:26:23   9   grows taller.   It has a narrow thin leaf that gross to

11:26:29  10   be about two and half to three inches long.   And on the

11:26:32  11   underside of the leaf it's very silvery -- pubescent is

11:26:38  12   the terminology.   When the wind blows on them, they

11:26:41  13   have a very attractive color to them.

11:26:45  14    Q.   Does it flower?

11:26:46  15    A.   Then they have a fruit on them.   Yes, it flowers;

11:26:50  16   it has an odor much the same as the honeysuckle.

11:26:54  17    Q.   So that's a decorative item?

11:26:56  18    A.   Not necessarily.   The main objective of planting

11:27:00  19   a plant like that is for the privacy, windbreak, and

11:27:06  20   food quality to bird life.

11:27:08  21    Q.   But it is a decorative-type plant?

11:27:13  22    A.   I guess you could consider it to be that.   It's

11:27:15  23   certainly more attractive than others.

11:27:17  24    Q.   Do you know if that's what was on the property

11:27:19  25   before, decorative stuff instead of stuff that just

11:27:23  1  looked like weeds?

11:27:24  2    A.  I wouldn't be surprised if there might have been

11:27:27  3  some of that, but I can't say because I never saw it in

11:27:29  4  person.

11:27:29  5    Q.  The autumn olive, is that more expensive than

11:27:33  6  just a common old tangled bramble?

11:27:36  7    A.  I can't answer that question.  I don't know.  I

11:27:38  8  never just bought a common old bramble.

11:27:42  9    Q.  You didn't analyze that for your cost estimate?

11:27:45  10    A.  No, I just went with my what my research told me

11:27:50  11  should be planted there.

11:27:52  12              MR. BAHRET:  Thank you.

11:27:54  13              THE WITNESS:  You're welcome.

11:27:55  14              THE COURT:  Any redirect?

11:27:56  15              MR. ROBON:  Just a couple follow-up

11:27:58  16  questions.

11:27:58  17                    - - -

11:27:58  18              ROGER HERRETT, REDIRECT EXAMINATION

11:27:59  19  BY MR. ROBON:

11:27:59  20    Q.  In your $134,000 figure of planting, and then you

11:28:04  21  came up with $301,000 worth of damage, is the difference

11:28:10  22  between those numbers the fact that the damage occurs to

11:28:14  23  several lots, and the fact that even the replanting of

11:28:19  24  the $134,000 is only going to bring six feet, it's not

11:28:25  25  going to bring back what was originally there?

11:28:28   1      A.   That's correct.   It's going to start out with

11:28:32   2   six feet, and it's going to take a number of years to

11:28:35   3   grow on up.

11:28:35   4              MR. ROBON:   Nothing further.

11:28:36   5              THE COURT:   Thank you.

11:28:38   6              MR. BAHRET:   Nothing.

11:28:40   7              THE COURT:   You may step down.   Thank you

11:28:41   8   very much.

11:28:44   9              MR. ROBON:   The next witness, Your Honor?

11:28:45  10              THE COURT:   Yes, please.

11:29:11  11              (The witness was sworn by the clerk.)

11:29:31  12                             -  -  -

11:29:31  13              ROBERT KEESEY, DIRECT EXAMINATION

11:29:32  14   BY MR. ROBON:

11:29:32  15      Q.   Mr. Keesey, would you introduce yourself to the

11:29:35  16   jury, tell the jury where you're from, where you grew

11:29:38  17   up, a little bit about you?

11:29:40  18      A.   Yes.   My name is Robert Keesey.   I grew up in

11:29:44  19   the west end of Toledo around the Ottawa Park area.

11:29:50  20   And I went to Old Orchard grade school and DeVilbiss

11:29:56  21   high school.   Then I continued my education down at

11:29:59  22   Indiana University where I was a business major in the

11:30:02  23   real estate department.   I subsequently was gone from

11:30:08  24   Toledo in excess of 20 years and came back in 1999 to

11:30:13  25   continue my appraisal career, which is now in its 29th

11:30:17  1   year.

11:30:20  2       Q.   And can you indicate to the jury the type of

11:30:27  3   appraisal work that you do?

11:30:29  4       A.   Well, I like to say I've appraised virtually

11:30:33  5   everything but a nuclear storage waste facility.   So

11:30:37  6   it's primarily commercial, although I do get involved in

11:30:40  7   condemnation-type cases where there's residential

11:30:45  8   property involved for highway widenings, and in this

11:30:49  9   case the Cambridge subdivision.   But primarily

11:30:53 10   industrial, retail, apartments, other freestanding

11:30:59 11   retail types of properties, and large vacant land and

11:31:05 12   mixed-use development.

11:31:06 13       Q.   And subdivisions?

11:31:07 14       A.   Quite a few subdivisions, yes.

11:31:09 15       Q.   Would you tell the jury what designation you have

11:31:13 16   as an appraiser, and what's the meaning of it?

11:31:15 17       A.   I'm an MAI, Member Appraisal Institute.   It's a

11:31:23 18   large organization of appraisers in the country.   It

11:31:28 19   would be kind of equivalent to a CPA in accounting.

11:31:32 20       Q.   How many MAI appraisers are in the Toledo area

11:31:36 21   that you're aware of?

11:31:38 22       A.   I believe there's ten practicing MAIs at this

11:31:41 23   time.

11:31:42 24       Q.   How many total appraisers in the Toledo

11:31:46 25   metropolitan area or northwest Ohio?

11:31:50  1      A.   500 to 1,000 probably.   Mostly residential, I

11:31:55  2  would guess.

11:31:55  3      Q.   And only ten of them have the designation?

11:31:58  4  You're one of the ten?

11:32:00  5      A.   Yes.   Correct.

11:32:01  6      Q.   And would you indicate to the jury the percentage

11:32:10  7  of times that you testified for the government versus

11:32:15  8  testifying for private property owners?

11:32:19  9      A.   I'd say it's probably 75 for government-related

11:32:25  10  entities.

11:32:25  11      Q.   75 percent?

11:32:27  12      A.   75 percent.   25 percent for individual property

11:32:31  13  owners.

11:32:33  14      Q.   And would you indicate to the jury where you're

11:32:36  15  employed.

11:32:39  16      A.   I'm currently employed by C.B. Richard Ellis

11:32:42  17  valuation part of their whole conglomerate

11:32:48  18      Q.   Covers Toledo?

11:32:49  19      A.   We cover -- I'm actually working out of

11:32:53  20  Southfield, Michigan.   My home is in Oregon, but --

11:32:57  21      Q.   Oregon, Ohio?

11:32:58  22      A.   -- I work as much in Ohio as I do southeast

11:33:01  23  Michigan.

11:33:04  24      Q.   You have to drive through Toledo every day?

11:33:08  25      A.   Yes, but I'm going to be working part-time out of

11:33:10   1   Toledo also.

11:33:14   2     Q.   Can you indicate to the jury -- nd you've

11:33:18   3   testified many times in the past, correct?

11:33:20   4     A.   Yes.

11:33:21   5     Q.   Both for the government and property owners?

11:33:23   6     A.   That's correct.

11:33:24   7     Q.   Can you indicate to the jury, what does an

11:33:30   8   appraiser do?   What elements constitute determining of

11:33:36   9   value?

11:33:37  10     A.   Well, in the -- let's just use a retail strip

11:33:44  11   center.   We take a look at three different types of

11:33:47  12   appraisal techniques that we have, and that would be the

11:33:51  13   cost approach, the income approach, and the sales

11:33:54  14   comparison approach.   Not all three are always

11:33:57  15   applicable.   When we do subdivisions, we look at sales

11:34:02  16   of other lots, absorption, and we typically look at

11:34:09  17   under, like, land sales, and we use generally the income

11:34:13  18   approach.   But if it's a brand new subdivision, we also

11:34:17  19   use the cost approach to estimate costs of putting in

11:34:21  20   roads, water, sewer, infrastructure, et cetera.

11:34:25  21     Q.   You did an appraisal on the Cambridge

11:34:31  22   subdivision, correct?

11:34:32  23     A.   I did.

11:34:33  24     Q.   And can you tell the jury what information you

11:34:37  25   were given so you could do an appraisal of the lots?

11:34:42  1    A.  Well, the subdivision plat, which shows the

11:34:46  2    individual lots themselves, what's on the internet,

11:34:52  3    which is the assessment of each, and a plat of each

11:34:57  4    site.  And I was also given a survey; I believe Peterman

11:35:03  5    was the name, and it showed in a highlighted shaded area

11:35:09  6    the area affected by the taking of trees, brambles,

11:35:16  7    underbrush, et cetera.

11:35:17  8    Q.  I'm going to hand you what we've marked as

11:35:20  9    Exhibit 7.  Is this a copy of the appraisal -- I'm

11:35:25  10   sorry, the survey?

11:35:26  11   A.  That's actually in the addendum of my report.

11:35:30  12   That's correct.

11:35:32  13   Q.  And you looked at the encroachments on the lots

11:35:36  14   12, 13, 14, and 15, four lots.  When I say encroachment

11:35:44  15   I'm talking about the --

11:35:46  16   A.  Yes, those four lots.

11:35:47  17   Q.  Go ahead.  I didn't mean to interrupt you.

11:35:51  18   A.  I think that was --

11:35:53  19   Q.  That answered the question?

11:35:54  20   A.  That answered the question.

11:35:58  21   Q.  Would you explain to the jury what your

11:36:14  22   assignment was?

11:36:17  23   A.  My assignment was to look at the lots as they

11:36:21  24   existed prior to the taking of the affected area.  I

11:36:28  25   commonly refer to it as the denuded area, but it was the

11:36:33  1  trees that were taken, the underbrush, what's commonly

11:36:37  2  referred to as brambles, which is just a generic term to

11:36:41  3  indicate undergrowth.  And then to look and see if there

11:36:46  4  may be any impact on the value of the individual lots

11:36:52  5  after the -- I'm going to call it an area that separates

11:37:06  6  the railroad tracks from the lots and the view, so that

11:37:12  7  the view of the railroad tracks is unobstructed from

11:37:19  8  what it might have been before.  And then to measure

11:37:23  9  those damages of the lots before and after the taking of

11:37:29  10  the underbrush and trees.

11:37:35  11      Q.  Can you --

11:37:37  12          MR. BAHRET:  Your Honor, just --

11:37:38  13      Q.  Come over here and take a look at this

11:37:40  14  subdivision plat.

11:37:42  15          MR. BAHRET:  Excuse me, Marv.  For purposes

11:37:45  16  of the record, he keeps using the word "taking," which

11:37:48  17  is a legal word.  I object to that.  I don't know if

11:37:50  18  he's trying to say it in the legal connotation.

11:37:52  19          THE COURT:  I didn't interpret it, and the

11:37:54  20  jury will be instructed that he's using it in the sense

11:37:57  21  of removing.

11:38:01  22          MR. BAHRET:  Thank you.

11:38:04  23  BY MR. ROBON:

11:38:04  24      Q.  Mr. Keesey, could you come out and indicate to

11:38:08  25  the jury which lots you felt were impacted.  You can

11:38:12    1    bring your report if you'd like.   Or here's the

11:38:15    2    original, Exhibit 114.

11:38:23    3       A.   I'm going to turn to the actual plat here.   It's

11:38:25    4    in the report.

11:38:31    5         These are the remaining lots.

11:38:34    6       Q.   If you could stand so that all the jurors can

11:38:39    7    see.

11:38:41    8       A.   These are the lots in the entire subdivision,

11:38:46    9    some of which have already been built on.   So I'm not

11:38:53   10    really looking at these lots here because they're not,

11:38:58   11    A, they don't front along the railroad tracks.   Some of

11:39:01   12    these have already been sold and built on.   The

11:39:05   13    affected area with this lot 15, 14, 13, and 12 actually

11:39:14   14    is the area where these were removed.   And then these

11:39:21   15    here have a view through this way also of the railroad

11:39:26   16    tracks.

11:39:28   17              MR. BAHRET:   Could you use a number since

11:39:31   18    I've over here?

11:39:33   19              THE WITNESS:   Lots 9, 10, and 11 also are

11:39:36   20    opened up more to the railroad tracks than they were

11:39:43   21    before.   And then the lots that haven't sold and have

11:39:47   22    not been developed on this side of the road also now

11:39:53   23    have an unobstructed view of the railroad tracks.

11:39:57   24       Q.   So did you use certain lots?   Can you tell the

11:40:02   25    jury which lot numbers and point it out, which lot

11:40:05  1    numbers that you used that say there was a comparative

11:40:11  2    valuation?

11:40:13  3        A.   Yes.   There is in the letter of transmittal, as

11:40:17  4    well as other portions of the appraisal, but lots 6,

11:40:25  5    lots 8, obviously 7 has already been developed, and lots

11:40:32  6    9 through 15.   A total of nine lots.

11:40:39  7        Q.   So those are the only lots you say are affected?

11:40:44  8    You're saying lots 1 through 4 or 22 -- 16 and 22 are

11:40:51  9    not involved?

11:40:51  10       A.   Well, they're not affected by the removal of

11:40:57  11   trees.

11:40:58  12       Q.   And can you tell the jury what value collectively

11:41:02  13   that you placed on lots 6, 8, and then 9 through 15 as a

11:41:13  14   total based upon a reasonable degree of appraisal

11:41:17  15   certainty prior to any destruction of the vegetation on

11:41:22  16   the property of the Cambridge subdivision?

11:41:25  17       A.   $955,000 for these nine lots.

11:41:28  18       Q.   That's what they would sell for?

11:41:30  19       A.   Correct.

11:41:31  20       Q.   And I think you put $100,000 for each one except

11:41:35  21   lot 6 you had 100-and-a-quarter.   Lot 8 you had

11:41:40  22   130,000?

11:41:40  23       A.   That is correct.

11:41:41  24       Q.   That would be the two lots on the other side of

11:41:44  25   the street?

11:41:44  1      A.  Right.  That's correct.

11:41:46  2      Q.  And --

11:41:47  3           MR. BAHRET:  Does he need to stand there or

11:41:49  4  can he resume over here?

11:41:50  5           MR. ROBON:  I was trying to have him point

11:41:52  6  out which lots he was looking at here.

11:41:58  7  BY MR. ROBON:

11:41:59  8      Q.  Were you then asked to do an appraisal as of

11:42:02  9  April and May, 2006, after the vegetation was cut, what

11:42:08  10  the lots are worth even today?

11:42:12  11     A.  Yes.

11:42:13  12     Q.  Based upon a reasonable degree of certainty, can

11:42:16  13  you indicate to the jury what is the value of these same

11:42:20  14  nine lots:  6, 8 and 9 through 15?

11:42:25  15     A.  $620,000.

11:42:29  16     Q.  Is a difference of how much?

11:42:31  17     A.  $335,000.

11:42:37  18     Q.  And in your appraisal, can you explain what is in

11:42:44  19  this big part of your appraisal to the jury?  Are you

11:42:48  20  using comparables?  Do you want to show them what they

11:42:52  21  are?

11:42:52  22     A.  Yes.

11:42:53  23     Q.  In other words, tell the jury how you came up

11:42:55  24  with those numbers.

11:42:59  25     A.  We look at other comparable subdivisions,

11:43:02  1   hopefully in the same jurisdiction.   This is Perrysburg

11:43:05  2   Township and Rossford school district.   So what I tried

11:43:09  3   to do is keep -- confine my primary research to other

11:43:14  4   subdivisions, not necessarily, as I would call this, a

11:43:18  5   relatively high-end subdivision because of the price of

11:43:21  6   the homes and lots within this, and River Road address,

11:43:26  7   and so forth.   But confining it to Perrysburg Township,

11:43:31  8   Rossford schools, and I found two other subdivisions,

11:43:36  9   Creekside and Belmont Meadows that met that criteria as

11:43:40  10  far as lot pricing and so forth.   Although again, these

11:43:46  11  were higher price lots, as was exhibited by the sales

11:43:50  12  that they'd already achieved within the subdivision

11:43:53  13  itself.

11:43:55  14       And then we took a look at the size of the lots,

11:44:01  15  their orientation.   And what I -- one of the reasons we

11:44:05  16  selected those subdivisions is both of them have lots

11:44:08  17  that run along the railroad tracks.

11:44:10  18  Q.   You mean as comparables?

11:44:12  19  A.   As comparables.   So you have a matched pair

11:44:15  20  situation where you can look at the ones that have sold

11:44:19  21  on -- with what I would call a railroad track influence,

11:44:24  22  whether they're on the railroad tracks and have a view

11:44:27  23  or they front against the railroad tracks and the view

11:44:30  24  is blocked by vegetation.   And then we would look at

11:44:36  25  sales within that same subdivision that would be like

11:44:39  1    these lots here across the street that might not have

11:44:43  2    either a view of the railroad tracks or obviously not

11:44:46  3    fronting on the railroad tracks, and make a meaningful

11:44:50  4    comparison between the two.

11:44:52  5         So I was able to do that in both Creekside

11:44:54  6    subdivision as well as Belmont Meadows, two that I

11:44:58  7    selected as being the most comparable.  And again, the

11:45:01  8    three criteria:  let's try to stay within the same

11:45:05  9    school district, and jurisdiction; let's try to have a

11:45:09  10   subdivision that is impacted by a railroad track

11:45:14  11   influence and non-influence.  So the school system, the

11:45:19  12   jurisdiction, and the actual railroad track influence.

11:45:26  13      Q.   And there's a home on lot 15.   You just

11:45:30  14   appraised the lot itself, not the home?

11:45:32  15      A.   That is correct.

11:45:32  16      Q.   So you treated it as a vacant lot?

11:45:34  17      A.   I did.   Yes.

11:45:36  18      Q.   You can take your seat.

11:45:56  19           MR. ROBON:  Judge, some day I think I'll

11:45:59  20   make an invention, push a button and have it come up out

11:46:03  21   of the ground.

11:46:05  22           THE COURT:  I think it's already been

11:46:06  23   invented.

11:46:09  24   BY MR. ROBON:

11:46:09  25      Q.   Have you taken into account, Mr. Keesey, the fact

11:46:13 1    that we're -- everybody talks about a depressed real

11:46:18 2    estate market.

11:46:18 3        A.   Absolutely.

11:46:19 4        Q.   And can you explain to the jury why you take that

11:46:22 5    into account?

11:46:23 6        A.   Well, no market, real estate or otherwise,

11:46:28 7    operates in a vacuum.   It all has to do with market

11:46:32 8    conditions.   And obviously in the late '90s to, say,

11:46:38 9    about the time of this -- or just after this subdivision

11:46:47 10   was impacted by the removal of the vegetation, the

11:46:52 11   market conditions were pretty strong in northwest Ohio

11:46:55 12   and most of the rest of the country.   Recently, of

11:46:59 13   course, we've had what's commonly referred to in the

11:47:03 14   press as the subprime mortgage market, meaning people

11:47:09 15   that were on the edge of qualifying for a loan or their

11:47:12 16   credit is not quite as good, and that collapse has

11:47:16 17   impacted many markets, some worse than others.

11:47:21 18   Northwest Ohio never really goes up very fast, nor does

11:47:26 19   it go down very fast like you might have in areas of

11:47:30 20   Florida, which I call boom/bust markets, but --

11:47:33 21       Q.   Up and down real quick?

11:47:35 22       A.   Well, you know, that was a speculative market

11:47:38 23   where people were buying a home and flipping it and

11:47:40 24   making money.   And many markets across this country --

11:47:44 25   I use Florida as an example because it tends to make the

11:47:47  1    news more often and it's really taken a hit recently,

11:47:50  2    but Toledo's been impacted, too.   Not the least of

11:47:53  3    which is the underlying economic conditions of northwest

11:48:00  4    Ohio, southeast Michigan, which is heavily tied into the

11:48:03  5    automotive industry.   And that also has had a dampening

11:48:09  6    impact on the overall value of real estate in general,

11:48:13  7    including single-family residential lots.

11:48:16  8        Q.   And based upon a reasonable degree of appraisal

11:48:22  9    certainty, you believe that the effect of cutting the

11:48:28  10   five or six feet on these four lots, 12 through 15 on

11:48:33  11   the Cambridge Subdivision, caused a diminution in value?

11:48:36  12       A.   Yes.

11:48:36  13       Q.   And it was how much?

11:48:38  14       A.   $335,000.

11:48:42  15       Q.   Have you had an opportunity -- did you get the

11:48:46  16   appraisal that the City had done by Mr. Domini?

11:48:49  17       A.   Yes, I was -- I looked at Mr. Domini's appraisal.

11:48:54  18       Q.   And can you tell the jury in your appraisal you

11:48:58  19   had values, I think, on seven lots of $100,000 and one

11:49:02  20   of $125,000 and one at $130,000?

11:49:06  21       A.   Before.

11:49:06  22       Q.   Can you tell the jury the dollar figures that you

11:49:10  23   had after the vegetation was cut?  Just give them the

11:49:18  24   numbers, if you would, from your appraisal.

11:49:20  25       A.   Lots 12 through 15 fronting along the railroad

11:49:23  1    tracks, I had $50,000.   Lots 10 and 11, which are on
11:49:28  2    that same side of the street but -- 9, 10, and 11 on the
11:49:35  3    same side of the street but didn't have the vegetation
11:49:38  4    cut but could view the railroad tracks, I had at
11:49:42  5    $70,000.   And lots 6 and 8, which are across the
11:49:46  6    street, I had at $105,000.
11:49:48  7        Q.   And that totalled $655,000, I believe?
11:49:51  8        A.   $620,000.
11:49:52  9        Q.   $620,000.  If you divide nine by -- into
11:49:59  10   $620,000, what's the average price per lot?
11:50:03  11       A.   We're depending heavily on calculators.   I'd say
11:50:08  12   it's close to $75,000.
11:50:10  13       Q.   Nine into six -- around $68,000 to $70,000?
11:50:16  14       A.   That would be reasonable.
11:50:18  15       Q.   When you looked at Mr. Domini's appraisal, what
11:50:21  16   aftermarket price -- I don't want to say aftermarket.
11:50:24  17   What price after the cutting did he give to the lots in
11:50:30  18   the subdivision?
11:50:31  19       A.   If I might refer to it.
11:50:33  20       Q.   Yes, take a look at it.
11:50:59  21       A.   On an individual lot basis or on a --
11:51:02  22       Q.   Just on an individual lot, the average?
11:51:05  23       A.   Just under $60,000.
11:51:07  24       Q.   So you're around $70,000; he's around $60,000 per
11:51:10  25   lot?

11:51:11   1      A.   That's reasonable, yeah.

11:51:13   2      Q.   But what value did he have on the lots prior to

11:51:16   3  the cutting of the vegetation?

11:51:19   4      A.   $60,000.

11:51:21   5      Q.   He didn't change his price?

11:51:23   6      A.   Well, it went down a little bit.

11:51:26   7      Q.   $20,000?

11:51:28   8      A.   $20,000 overall for the lots that he appraised.

11:51:31   9  He actually, I see, appraised more lots than I did.

11:51:35  10      Q.   But he only found a $20,000 discrepancy by

11:51:38  11  cutting of all the shrubbery and the trees, correct?

11:51:41  12      A.   That's what's indicated in the report.

11:51:43  13      Q.   And can you tell the jury the methodology that

11:51:48  14  Mr. Domini used in coming up with his numbers as

11:51:52  15  compared to the methodology you used coming up with your

11:51:56  16  numbers for the first overall value before any trees

11:51:59  17  were cut?

11:52:00  18      A.   Right.  He used similar comparable sales in terms

11:52:07  19  of lot -- residential subdivisions in and around the

11:52:13  20  area, two of which were the same ones I did, Creekside

11:52:16  21  and Belmont Meadows.   And he did a traditional

11:52:21  22  subdivision analysis where he valued the individual

11:52:25  23  retail value of the lots like I did, and then had an

11:52:31  24  absorption period of, I believe, six years to sell them

11:52:35  25  at that price, at $60,000, discounted back to present

11:52:41  1   value based on some return on investment, which I

11:52:47  2   believe was at 20 percent per year, to come up with the

11:52:50  3   actual -- what we call the post-sale value of the

11:52:55  4   subdivision to a single purchaser.

11:52:58  5       Q.   So the difference between your two appraisals and

11:53:02  6   the numbers are based on he's looking at selling the

11:53:07  7   whole subdivision to one buyer; you're looking to sell

11:53:10  8   it to a number of buyers?

11:53:12  9       A.   Well, my appraisal was based on the individual

11:53:17  10  lot prices, what we call retail value.  Retail value,

11:53:21  11  the individual lot prices.

11:53:22  12      Q.   What somebody would pay for them?

11:53:25  13      A.   Like an individual builder or some -- an

11:53:28  14  individual, yes.

11:53:29  15      Q.   And what is the phrase that the appraisal

11:53:32  16  industry uses about buyers and sellers?

11:53:36  17      A.   I'm sorry?

11:53:37  18      Q.   What is the phrase that they use when they talk

11:53:40  19  about buyers and sellers?

11:53:42  20      A.   You mean like grantors and grantees.

11:53:45  21      Q.   No.  No.  No.   The phrase that about

11:53:50  22  willingness, when you find a buyer?

11:53:51  23      A.   A willing buyer, willing seller.  We call it

11:53:54  24  market value, basically.   And it's five or six criteria

11:53:58  25  using funds, U.S. dollars, willing buyer, willing

| 11:54:03 | 1 | seller, each acting in their own self-interest, et |
| 11:54:18 | 2 | cetera. |
| 11:54:18 | 3 | Q.  And the appraisal report, Exhibit 114, contains |
| 11:54:21 | 4 | all the backup data that you looked at in coming to your |
| 11:54:23 | 5 | conclusions? |
| 11:54:25 | 6 | A.  Yes, it does. |
| 11:54:27 | 7 | Q.  And the three -- I think you said 335? |
| 11:54:36 | 8 | A.  Yes. |
| 11:54:37 | 9 | Q.  That is a reasonable figure in your opinion on |
| 11:54:40 | 10 | the devaluation? |
| 11:54:41 | 11 | A.  Yes, it is. |
| 11:54:43 | 12 | MR. ROBON:  No further questions. |
| 11:54:44 | 13 | THE COURT:  Thank you.   You may cross. |
| 11:54:47 | 14 | MR. BAHRET:  Thank you. |
| 11:54:47 | 15 | - - - |
| 11:54:47 | 16 | ROBERT KEESEY, CROSS-EXAMINATION |
| 11:54:48 | 17 | BY MR. BAHRET: |
| 11:54:48 | 18 | Q.  Good morning, Mr. Keesey. |
| 11:55:00 | 19 | A.  Good morning. |
| 11:55:00 | 20 | Q.  I don't think you and I have ever met before, at |
| 11:55:04 | 21 | least I don't think so.   My name is Bob Bahret; I'm an |
| 11:55:07 | 22 | attorney representing the City of Toledo.   Now, the |
| 11:55:12 | 23 | first thing you started talking about when you sat down |
| 11:55:14 | 24 | was that you have this certification, MAI? |
| 11:55:21 | 25 | A.  That's correct. |

| | | |
|---|---|---|
| 11:55:22 | 1 | Q.   Mr. Domini does as well? |
| 11:55:23 | 2 | A.   He certainly does. |
| 11:55:24 | 3 | Q.   You're certainly not any better or greater |
| 11:55:28 | 4 | qualified than him, are you? |
| 11:55:30 | 5 | A.   I don't -- the designation is equivalent.   As |
| 11:55:34 | 6 | far as experience and so forth, I'm not familiar enough |
| 11:55:38 | 7 | with Mr. Domini to answer that question. |
| 11:55:41 | 8 | Q.   Is he reputable in the area? |
| 11:55:43 | 9 | A.   I would say yes, he is. |
| 11:55:45 | 10 | Q.   In fact, he's done work for Mr. Robon? |
| 11:55:48 | 11 | A.   I believe he has. |
| 11:55:51 | 12 | Q.   All right.   With that being said, I'm a bit |
| 11:55:56 | 13 | curious on some of the assumptions you're making in your |
| 11:56:00 | 14 | report.   First of all, lots 9, 10, and 11, are you |
| 11:56:06 | 15 | aware of the fact that nobody is claiming there was any |
| 11:56:09 | 16 | encroachment or any trees or vegetation -- |
| 11:56:13 | 17 | A.   Yes. |
| 11:56:13 | 18 | Q.   But yet you have still come up with a lowered |
| 11:56:16 | 19 | value for those lots because they can now see a train? |
| 11:56:19 | 20 | A.   Yes. |
| 11:56:20 | 21 | Q.   The same train they would see anyway once |
| 11:56:24 | 22 | somebody removes trees that are not on those lots? |
| 11:56:29 | 23 | A.   I'm sorry. |
| 11:56:32 | 24 | Q.   Let me ask it a different way. |
| 11:56:35 | 25 | A.   Thank you. |

11:56:35  1      Q.   If at any time I ask something and you didn't

11:56:38  2   follow me, clue me in.

11:56:42  3           If I built a house on lots 9, 10, and 11, and I'm

11:56:45  4   out in the backyard having a barbecue, even if nobody

11:56:51  5   cut down any trees on lots 12, 13, 14, 15, I'm still

11:56:56  6   going to see and hear a train?

11:56:57  7      A.   You know, I --

11:57:00  8      Q.   Can you start with a yes or no?

11:57:03  9           If I'm on lot 9, 10, or 11 barbecuing in my back

11:57:09  10  yard, I'm sitting there next to barbie, nobody cut down

11:57:12  11  anything on lots 12, 13, 14, 15, am I still going to see

11:57:18  12  a train at my barbecue or not?

11:57:21  13     A.   I don't know.

11:57:23  14     Q.   Well, you do know that there are no trees behind

11:57:26  15  lots 9, 10, and 11, correct?

11:57:31  16     A.   No, that's not correct.   I have photographs, in

11:57:35  17  fact, in the report that would indicate there's a lot of

11:57:38  18  under brush and trees -- maybe not trees, per se, but

11:57:42  19  quite a bit of underbrush.

11:57:44  20     Q.   Underbrush?

11:57:46  21     A.   Well, I call it underbrush.

11:57:47  22     Q.   I didn't see any trees there, but you say you

11:57:51  23  did?

11:57:52  24     A.   I don't believe -- I can't recall.   I do have

11:57:54  25  pictures of each one of those lots and how they front

11:57:58  1   along the railroad tracks.

11:57:59  2       Q.   In any event, those lots are clear except for

11:58:03  3   some knee-high or waist-high scrub, correct?

11:58:09  4       A.   I'm not sure the exact height of it.   I did see

11:58:14  5   it during the summertime, so it was at least

11:58:18  6   shoulder-high in some cases, depending on what part of

11:58:21  7   the lot.   There was significant underbrush, I would

11:58:25  8   say.

11:58:25  9       Q.   And obviously if one builds a house there and has

11:58:27  10  a yard, one needs to get rid of that junk?

11:58:30  11      A.   I wouldn't refer it to as junk, but you would

11:58:33  12  have to clear a portion of the lot to put the house on,

11:58:36  13  yes.

11:58:36  14      Q.   And did you actually go stand on those lots and

11:58:40  15  see if you can see the tracks?

11:58:41  16      A.   I did.

11:58:41  17      Q.   Very easy to see the track, correct?

11:58:44  18      A.   I did not see them before.   I only saw it after

11:58:49  19  the vegetation was removed.

11:58:51  20      Q.   And, of course I meant -- I didn't think you saw

11:58:55  21  it before.   I asked you if you went there now, anytime

11:58:59  22  in 2006 or 2007, and determined it's very easy to see

11:59:03  23  the train?

11:59:03  24      A.   Yes.

11:59:04  25      Q.   So doesn't that answer my question, sir, as far

| | | |
|---|---|---|
| 11:59:06 | 1 | as if I'm sitting in my backyard on lots 9, 10, or 11, |
| 11:59:10 | 2 | flipping the burgers, I'm going to see the train going |
| 11:59:14 | 3 | behind my house, even if nothing happened on lots 12, |
| 11:59:18 | 4 | 13, 14, or 15? |
| 11:59:19 | 5 | A.  I'll answer it the same way:  Not necessarily. |
| 11:59:26 | 6 | Q.  Sir, at some point logic has to take over.  You |
| 11:59:29 | 7 | can see the train now with no problem standing on lot 9, |
| 11:59:35 | 8 | 10, or 11 looking straight in the direction of the |
| 11:59:38 | 9 | train? |
| 11:59:38 | 10 | A.  Yes. |
| 11:59:40 | 11 | Q.  Is there some reason you wouldn't be able to see |
| 11:59:43 | 12 | that train if you had the barbecue going? |
| 11:59:47 | 13 | A.  I'm sorry.  I'm confused.  I believe the first |
| 11:59:50 | 14 | part of your question, which was two ago, we were |
| 11:59:54 | 15 | talking about we didn't -- we didn't distinguish between |
| 11:59:59 | 16 | before with the trees and other vegetation on those four |
| 12:00:05 | 17 | lots, and after, what you can see now.  If you're |
| 12:00:10 | 18 | asking me after, what you can see now, I would say you |
| 12:00:13 | 19 | probably can see the train and certainly hear the train. |
| 12:00:30 | 20 | (Discussion had off the record.) |
| 12:00:39 | 21 | BY MR. BAHRET: |
| 12:00:39 | 22 | Q.  If I'm standing here, here, or here, or sitting |
| 12:00:43 | 23 | next to the barbecue, that's for the record, 9, 10, or |
| 12:00:48 | 24 | 11, the area that supposedly was encroached is down |
| 12:00:53 | 25 | here.  You understand that? |

12:00:54  1      A.   On 12 through 15.

12:00:56  2      Q.   All right.   So let's assume nothing got cut

12:00:59  3   there.

12:00:59  4      A.   Okay.

12:01:00  5      Q.   Those trees, they're still there.

12:01:02  6      A.   Okay.

12:01:03  7      Q.   Assumption.

12:01:04  8      A.   Okay.

12:01:05  9      Q.   If I'm standing here, here, or here, 9, 10, and

12:01:09  10  11 again is, looking in this direction right now, I'm

12:01:12  11  going to see a train?

12:01:14  12     A.   And again, it depends on what time of the year.

12:01:18  13  This time of year and these brambles -- the underbrush

12:01:22  14  is as tall as you are.  You might not be able to see it.

12:01:25  15     Q.   The train tracks are substantially higher than

12:01:28  16  those yards; are they not?

12:01:29  17     A.   I would say eight -- six to eight feet higher.

12:01:38  18  Substantially might --

12:01:39  19     Q.   And the train itself is substantial height?

12:01:46  20     A.   It's higher than the difference between the back

12:01:48  21  of those lots and the train tracks, yes.

12:01:51  22     Q.   So let me try it again.   Are you actually

12:01:54  23  telling me that the brambles themselves would be so tall

12:01:57  24  that I couldn't see a train that's at least 30 feet

12:02:01  25  higher than my ground?

12:02:04  1    A.    If I might, 9, 10 and 11 tend to be a little

12:02:10  2    lower, okay.

12:02:11  3    Q.    That's why they brought all that fill dirt in

12:02:15  4    down there.

12:02:15  5    A.    They're lower than 12 through 15, at least in the

12:02:18  6    backyard.    So they're somewhat depressed.    I did see

12:02:22  7    it in the summer, and I know there was a substantial

12:02:24  8    amount of undergrowth there.    And my pictures would

12:02:27  9    indicate that.    They are in the appraisals.

12:02:29  10   Q.    Even at that time of year you could see the

12:02:32  11   tracks?

12:02:32  12   A.    Well, again --

12:02:34  13   Q.    Can you start with a yes?

12:02:36  14   A.    Not necessarily.

12:02:37  15   Q.    You couldn't necessarily see the tracks when you

12:02:40  16   were there in the summer?

12:02:42  17   A.    Depends where they placed the orientation of the

12:02:44  18   house, where the barbecue is, if it's on an elevated

12:02:49  19   deck or the backyard.

12:02:50  20   Q.    Could you see the train when you were there?

12:02:52  21   A.    You could -- could I see the train when I was

12:02:55  22   there?

12:02:55  23   Q.    Yes.

12:02:56  24   A.    I was able to see the train -- not maybe the full

12:03:01  25   body of the train, but certainly the top of the train

12:03:03    1    when I was there.

12:03:04    2       Q.   All right.   And across the street on Jacqueline

12:03:10    3    is higher yet; is it not?

12:03:11    4       A.   Yes, it is.

12:03:12    5       Q.   The property in general slopes down towards the

12:03:15    6    tracks?

12:03:15    7       A.   It does, yes.

12:03:16    8       Q.   So somebody across the street -- let me get the

12:03:24    9    lot number.   Say lot 7 or 8, these two that are down

12:03:31   10    closest to the cul de sac, those two lots would easily

12:03:36   11    be able to see a train in the area behind lots 9, 10 and

12:03:43   12    11?

12:03:43   13       A.   I would say that's probably accurate.

12:03:46   14       Q.   Now, when you figure your devaluation, you start

12:03:54   15    with the assumption that all the trees that are removed

12:03:58   16    should have stayed.   Let me ask --

12:04:05   17       A.   I'm starting with the assumption that all the

12:04:08   18    trees that were there would have stayed there.

12:04:14   19       Q.   I think maybe we didn't communicate.   I'll take

12:04:17   20    the blame for that one.   You understand that the City

12:04:22   21    and its contractors had every right to take down every

12:04:25   22    tree on railroad property?

12:04:26   23       A.   I believe that's correct.

12:04:28   24       Q.   And even doing that, even though it's legal and

12:04:32   25    may have been, there will be testimony, totally

12:04:36    1    necessary, that, in and of itself, could still devalue a

12:04:39    2    lot for which no action is available?

12:04:41    3        A.   You know, that -- yes.   I would agree with that.

12:04:46    4        Q.   Now, you made some assumptions in your report

12:04:50    5    here including, you say, that they were selling three

12:04:56    6    lots per year?

12:04:59    7        A.   I believe it's 2.5 lots per year.

12:05:08    8        Q.   What's it mean to call it an absorption of about

12:05:13    9    3 lots per year?

12:05:18   10        A.   I think is -- because I just read the appraisal,

12:05:21   11    again, while I was in the room, and I believe somewhere

12:05:26   12    in here it says two and half lots per year.

12:05:29   13        Q.   Go to page 22.   What's it mean to say absorption

12:05:32   14    of three lots per year?

12:05:40   15        A.   The most recent -- if I might read --

12:05:43   16        Q.   Can you answer the question?

12:05:44   17                THE COURT:  Just read it to yourself,

12:05:46   18    please.

12:05:46   19        A.   About three lots per year.   Two and a half is

12:05:49   20    about three lots per year.

12:05:51   21        Q.   But the word -- the answer to my question:

12:05:53   22    What's absorption mean?  That's lots that are moving,

12:05:56   23    sold?

12:05:56   24        A.   Bought and sold, yes.

12:05:58   25        Q.   And in your report I notice that you say the last

| | | |
|---|---|---|
| 12:06:03 | 1 | lot that sold was actually at the end of 2004? |
| 12:06:10 | 2 | A. December of '04. |
| 12:06:11 | 3 | Q. Now, what lot was that, sir? |
| 12:06:22 | 4 | A. I would have to say -- I'd say one speculative |
| 12:06:26 | 5 | home. 15 was a speculative home. |
| 12:06:28 | 6 | Q. You're right. It's their own spec house. So |
| 12:06:30 | 7 | they didn't sell it. They just built a house on it? |
| 12:06:33 | 8 | A. But we often call that an absorption, whether it |
| 12:06:37 | 9 | has a house on it and they sell the whole package or |
| 12:06:39 | 10 | just the lot. |
| 12:06:40 | 11 | Q. Well, we can call it anything we want, I guess, |
| 12:06:42 | 12 | but the fact of the matter is it didn't sell. Are you |
| 12:06:46 | 13 | with me? |
| 12:06:47 | 14 | A. Yes, I am. |
| 12:06:47 | 15 | Q. And you agree? |
| 12:06:48 | 16 | A. I agree. |
| 12:06:49 | 17 | Q. The last actual sale was in January of 2004, |
| 12:06:55 | 18 | correct? |
| 12:06:58 | 19 | A. I'm not absolutely certain on that. |
| 12:07:00 | 20 | Q. All right. If you want to check the records, |
| 12:07:02 | 21 | that's fine, but I'm telling you it was in January of |
| 12:07:06 | 22 | '04. And they sold it to somebody that was an existing |
| 12:07:09 | 23 | homeowner that just wanted an empty lot next door. Are |
| 12:07:13 | 24 | you aware of that? |
| 12:07:14 | 25 | A. I was unaware of that. |

12:07:15   1      Q.   Were you aware that they sold that lot for

12:07:19   2  $90,000?

12:07:19   3      A.   I was aware of that.

12:07:20   4      Q.   So they sold it for about $40,000 to -- $45,000

12:07:25   5  less than its advertised price?

12:07:27   6      A.   That, I was aware of.

12:07:28   7      Q.   Now, the fact of the matter is, sir, your opinion

12:07:31   8  is that these lots were overpriced to begin with?

12:07:34   9      A.   Some of these lots.   So I stated that in the

12:07:38  10  appraisal, yes.

12:07:39  11      Q.   And, in fact, all of them that abut the railroad

12:07:43  12  were tremendously overpriced?

12:07:46  13      A.   They were overpriced.

12:07:47  14      Q.   Significantly overpriced?

12:07:49  15      A.   They were overpriced.

12:07:51  16      Q.   Are we fencing over the word "significant"?

12:07:53  17      A.   I can actually give you the dollar amount.

12:07:56  18      Q.   Okay.   What dollar amount?

12:07:58  19      A.   Well, I believe they were listed for $145,000.

12:08:03  20      Q.   Okay.

12:08:04  21      A.   In my value, $100,000.

12:08:09  22      Q.   So in your mind is a 50 percent overprice

12:08:13  23  significant?

12:08:14  24      A.   Well, it's not quite 50 percent, but I would say

12:08:19  25  50 percent is significant.   But that's a third now.

12:08:22  1       Q.   What's that?

12:08:23  2       A.   The difference between 100 and 150 is actually 33

12:08:28  3   percent.

12:08:29  4       Q.   But the difference going the other way, sir.

12:08:32  5   It's 50 percent more than it should have been priced?

12:08:35  6       A.   I understand.

12:08:36  7       Q.   Are you with me on that one?

12:08:37  8       A.   I understand.

12:08:38  9       Q.   It's 50 percent too much?

12:08:41  10      A.   $45,000 versus $145,000 is still not 50 percent.

12:08:48  11  We're arguing over mathematical semantics.

12:08:52  12      Q.   47 percent.   I don't know the exact percentage,

12:08:56  13  but it's just under 50.

12:08:58  14      A.   It's under 50.

12:08:59  15      Q.   You point out in the comparables those lots were

12:09:02  16  having trouble selling when they abutted the railroad?

12:09:05  17      A.   Yes, sir.

12:09:06  18      Q.   That's because people just don't want to live

12:09:08  19  near the railroad?

12:09:10  20      A.   Generally, my market -- my market information, I

12:09:16  21  would say yes.

12:09:17  22      Q.   And those lots, your comparables, those were

12:09:22  23  selling for around $40,000?

12:09:25  24      A.   Different subdivision, different pricing

12:09:27  25  structure.

12:09:28  1    Q.  But that's what they were selling for?

12:09:30  2    A.  Correct.  Some of them.  There were $50,000 --

12:09:33  3  some of them were $50,000.

12:09:35  4    Q.  All right.  Getting back to the sales, why did

12:09:40  5  they have no activity in 2003 -- or excuse me, 2004?  I

12:09:48  6  misspoke.

12:09:48  7    A.  I can honestly say I don't know.

12:09:52  8    Q.  Why did they not sell a single house in that

12:09:55  9  development or lot in 2005?

12:09:59  10    A.  I don't know.

12:10:01  11    Q.  Why did they not sell a single lot or house in

12:10:04  12  this development in the first four months of 2006?

12:10:09  13    A.  Also, I don't know.

12:10:15  14    Q.  That's certainly not absorbing two and a half to

12:10:18  15  three houses per year?

12:10:19  16    A.  We took the absorption period over the time they

12:10:23  17  started selling until the time they stopped in December

12:10:25  18  of '04.  As you say, January of '04.

12:10:30  19    Q.  All right.  Why would you stop when obviously

12:10:34  20  you have a proven track record, a proven history after

12:10:38  21  January of '04, and you know now my absorption rate is

12:10:44  22  zero.  Why wouldn't you use that?

12:10:50  23    A.  I may have used from the time they started until

12:10:54  24  April of '06.

12:10:58  25    Q.  Why wouldn't we use the most recent data?  You've

12:11:01  1   got two and a half to three years of data that's

12:11:05  2   reliable, accurate, and the answer is, nothing sold.

12:11:10  3      A.   We do appraisals in a snapshot in time.   In this

12:11:15  4   case it was April of '06, and we're dealing with that

12:11:21  5   timeframe or the date of taking.   We commonly refer to

12:11:26  6   that --

12:11:30  7               MR. BAHRET:   Again, Your Honor, could I have

12:11:31  8   a cautionary instruction on the -- his saying the "date

12:11:36  9   of taking"?

12:11:36  10              THE COURT:   I've done it once.   I'll say it

12:11:39  11  again and indicate that the use of that word, ladies and

12:11:42  12  gentlemen, is, in essence, a synonym or another way of

12:11:45  13  saying removing.   We've been talking for a couple days

12:11:48  14  now about the removing of trees and vegetation and

12:11:52  15  bramble.

12:11:53  16              MR. BAHRET:   Thank you.

12:11:55  17  BY MR. BAHRET:

12:11:55  18     Q.   Sir, you mentioned that this subdivision, it's

12:12:01  19  intended to be upscale.   Would you agree with me that

12:12:04  20  although one may intend an upscale subdivision, that

12:12:07  21  doesn't mean one gets what one tries to accomplish?

12:12:11  22     A.   I'm sorry; would you restate that, please?

12:12:14  23     Q.   You said that this subdivision was intended to be

12:12:16  24  a somewhat upscale --

12:12:18  25     A.   Yes.

12:12:19  1    Q.   Not all intentions come to fruition in the

12:12:25  2   development business?

12:12:26  3    A.   Absolutely.

12:12:28  4    Q.   In fact, I could have all the best intentions to

12:12:30  5   attract the wealthy to my development, and if I've got a

12:12:34  6   train going through my backyard, it may not work?

12:12:38  7    A.   The market generally makes those determinations.

12:12:41  8    Q.   And there's been talk about the mansions in the

12:12:45  9   area, the Ford mansion and all that.   All of the

12:12:49  10   mansions on that road are on the other side of River

12:12:52  11   Road, correct?

12:12:54  12    A.   I would say the larger homes are on -- I'm not

12:12:58  13   sure every mansion along River Road is on the river.

12:13:01  14    Q.   Certainly the huge majority?

12:13:04  15    A.   I would -- yes.

12:13:05  16    Q.   And they've got frontage down to the river and

12:13:08  17   stuff?

12:13:08  18    A.   In many cases.

12:13:10  19    Q.   I mean, there are no mansions surrounding on the

12:13:13  20   same side of the street as Cambridge?

12:13:15  21    A.   I didn't really see what I would call a mansion.

12:13:19  22    Q.   And, in fact, most of the housing surrounding

12:13:22  23   Cambridge is actually pretty modest?

12:13:26  24    A.   Some of the subdivisions are modest, and some are

12:13:30  25   better.

12:13:34  1    Q.   I believe I heard you say that you do acknowledge

12:13:37  2    that the market really took a dive sometime right around

12:13:41  3    the spring, first part of summer of '06?

12:13:45  4    A.   Actually, I'd say it was a little later than

12:13:48  5    that.   I'm going to say probably late '06 to early '07

12:13:51  6    is when this subprime market really started to hit the

12:13:55  7    newsstands.

12:13:57  8    Q.   And by the way, do you know that Old Granite

12:14:00  9    Development Company can't peddle lots in two other

12:14:05  10   developments?

12:14:06  11   A.   I am aware of that, yes.

12:14:08  12   Q.   They don't even have a railroad problem?

12:14:10  13   A.   I am aware of that also.

12:14:16  14   Q.   One last thing, and I'll sit down.   You

12:14:19  15   mentioned Perrysburg Township, Rossford schools.   In

12:14:23  16   the real estate world, Rossford schools is a bit of a

12:14:28  17   drawback; is it not?

12:14:29  18   A.   If you're making a comparison to --

12:14:32  19   Q.   That's what I intend to do.

12:14:34  20   A.   You know, I don't know that Rossford's a bit of a

12:14:37  21   drawback, in and of itself.

12:14:41  22   Q.   Did you say it is or isn't?

12:14:43  23   A.   I'm going to answer that no.

12:14:45  24   Q.   You don't believe it is?

12:14:46  25   A.   No.

12:14:46  1    Q.   So, I mean, I know you evaluate, you appraise,
12:14:51  2  but are you involved in marketing at all?
12:14:54  3    A.   Only in inquiring about what the sales and
12:14:59  4  brokerage community is doing.
12:15:01  5    Q.   You don't really know what people are saying to
12:15:03  6  the real estate agents; like, I prefer to be in
12:15:07  7  Perrysburg Township, Perrysburg schools?
12:15:10  8    A.   Actually, I do.   Those are the kind of questions
12:15:12  9  we ask.
12:15:13  10   Q.   And you don't believe there's any -- I'm not
12:15:15  11 saying anything negative about Rossford schools, so
12:15:18  12 don't take this the wrong way, but some people have a
12:15:22  13 view that it's not quite equal with Perrysburg?
12:15:24  14   A.   Now, I would agree with what you just said.
12:15:29  15   Q.   It doesn't mean they're right.   It just means
12:15:31  16 there's that view?
12:15:32  17   A.   That is correct.
12:15:34  18   Q.   Sir, when you wrote this report, you were with
12:15:36  19 William Fall group?
12:15:38  20   A.   I was with the William Fall group.
12:15:40  21   Q.   When did you leave there?
12:15:42  22   A.   I left the first week of March of this year.
12:15:44  23   Q.   Why?
12:15:45  24   A.   A better job opportunity where I was heading up
12:15:50  25 the litigation support department of the largest real

12:15:53  1    estate firm in the world.

12:15:55  2        Q.  C.B. --

12:15:56  3        A.  C.B. Richard Ellis out of their Southfield

12:15:59  4    office.

12:16:00  5        Q.  Aren't they -- Reichle Klein is also part of it?

12:16:05  6        A.  Locally Michael Realty within the past year

12:16:08  7    merged with Reichle Klein, and they're an independent,

12:16:14  8    almost, kind of a franchise.  They're under the

12:16:17  9    umbrella of -- it's just a different organization.

12:16:20  10       Q.  That's not where you hang your hat?

12:16:22  11       A.  No, but I'll probably be working out of there

12:16:27  12   shortly.

12:16:27  13       Q.  So there is a connection?

12:16:29  14       A.  Oh, yes, absolutely.

12:16:32  15            MR. BAHRET:  Thank you, sir.

12:16:33  16            THE COURT:  Any redirect?

12:16:34  17            MR. ROBON:  Yes, Your Honor.

12:16:35  18                         - - -

12:16:35  19            ROBERT KEESEY, REDIRECT EXAMINATION

12:16:36  20   BY MR. ROBON:

12:16:36  21       Q.  I'm going to hand you Exhibit 115.  Have you

12:16:48  22   seen documents like this before, Mr. Keesey?  They're

12:16:51  23   from the county auditor showing sales.

12:16:53  24       A.  Yes, we go to the county websites often, and this

12:16:58  25   is one that I've been on hundreds of times.

12:17:01  1    Q.   And on page 1, does it talk about Cambridge lot

12:17:13  2    four?

12:17:13  3    A.   Cambridge lot four, yes.

12:17:15  4    Q.   And I think on the top of this --

12:17:20  5              THE COURT:  This is 115?

12:17:21  6              MR. ROBON:  Yes.

12:17:29  7    BY MR. ROBON:

12:17:30  8    Q.   On the second page over in the left-hand column,

12:17:35  9    it shows that Schoen Homes, which is a builder, sold a

12:17:44  10   home, obviously it was a new home, on January 12 of '05?

12:17:48  11   A.   Yes.

12:17:49  12   Q.   Did you not consider that a sale of a lot because

12:17:52  13   a home was existing on it, a new home?

12:17:56  14   A.   If it was a new home, generally speaking, Schoen

12:18:02  15   Homes would have bought it from Old Granite, and that

12:18:07  16   was an absorbed lot then.

12:18:10  17   Q.   Wouldn't that show when the ultimate retail

12:18:13  18   purchaser buys it?

12:18:14  19   A.   No, generally when it's sold to the home builder

12:18:17  20   or homeowner.

12:18:19  21   Q.   Okay.  But there were transfers in 2005 of the

12:18:24  22   lots?

12:18:25  23   A.   Of a --

12:18:26  24   Q.   Lot four?

12:18:27  25   A.   Of a lot with a home on it.

| | | |
|---|---|---|
| 12:18:29 | 1 | Q. Right.  My next question is after your |
| 12:18:31 | 2 | questioning by Mr. Bahret, have you changed your opinion |
| 12:18:36 | 3 | at all as to the dimunition in value? |
| 12:18:40 | 4 | A. No, I have not. |
| 12:18:42 | 5 | MR. ROBON:  No further questions. |
| 12:18:44 | 6 | THE COURT:  Anything else? |
| 12:18:45 | 7 | MR. BAHRET:  No, thanks. |
| 12:18:47 | 8 | THE COURT:  You may step down.  Thank you. |
| 12:18:48 | 9 | Ladies and gentlemen, we're at the point for |
| 12:18:50 | 10 | our lunch recess.  I understand some of you may be |
| 12:18:54 | 11 | taking a stroll.  That's a good idea.  I show a little |
| 12:18:59 | 12 | after 12:15.  Let me give you a few extra minutes |
| 12:19:03 | 13 | because we may have some matters that we can take care |
| 12:19:07 | 14 | of off the record to keep the trial moving.  So why |
| 12:19:10 | 15 | don't we plan to start back promptly at 1:30.  That way |
| 12:19:13 | 16 | you won't be, hopefully, rushed and can enjoy a break. |
| 12:19:18 | 17 | Please remember the rules.  We will reconvene at 12:30. |
| 12:19:22 | 18 | We're adjourned. |
| 12:19:25 | 19 | THE JUROR:  1:30? |
| 12:19:26 | 20 | THE COURT:  I'm sorry, 1:30. |
| 13:35:46 | 21 | (Lunch recess taken.) |
| 13:35:48 | 22 | THE COURT:  We're still with the plaintiff. |
| 13:35:49 | 23 | The plaintiff may call its next witness. |
| 13:35:52 | 24 | MR. ROBON:  We call Jack Laskey to the |
| 13:35:58 | 25 | stand. |

```
13:36:08   1              (The witness was sworn by the clerk.)

13:36:14   2              MR. ROBON:  Jack, did you get your plugs?

13:36:18   3              THE WITNESS:  Let me see if I can do it

13:36:20   4    without them.

13:36:23   5                          - - -

13:36:23   6              JOHN LASKEY, DIRECT EXAMINATION

13:36:24   7    BY MR. ROBON:

13:36:24   8     Q.   Do you want to introduce yourself to the jury and

13:36:33   9    tell the jury about your family, how many kids you have

13:36:36  10    and what you do?

13:36:37  11     A.   I think I'm going to need them.   I'm sorry,

13:36:41  12    folks.  I'm hard of hearing.   It's not loudness; it's

13:36:47  13    letters.

13:36:55  14     Q.   Put them on.  Introduce yours to the jury.   Tell

13:37:04  15    the jury where you grew up, your family, and what you

13:37:10  16    do?

13:37:10  17     A.   My name is John Laskey, but I go by Jack Laskey.

13:37:17  18    I am 72 years old.   I grew up in west Toledo, same as

13:37:23  19    the fellow before me, around Ottawa Park.   I went to

13:37:28  20    Gillmore High School.   I went to Notre Dame for a

13:37:32  21    couple years.   Came back and went to the University of

13:37:37  22    Toledo night school.  Got married, had eight children.

13:37:43  23    Got divorced.  Remarried another lady.  My first job was

13:37:55  24    with A.P.; that is a finance division of RCA/Whirlpool.

13:38:24  25    Then I got an opportunity to go to Port Lawrence Title &
```

13:38:28  1   Trust Company.   I've been in the title business for 47

13:38:32  2   years.   I started out as a title examiner at the

13:38:38  3   courthouse for eight years, then became a salesman, and

13:38:43  4   my father and six other stockholders started Port

13:38:48  5   Lawrence in 1930.   My dad and I started buying the

13:38:55  6   heirs, the heirs of the stockholders out.   Then my dad

13:39:03  7   wanted to retire, so I bought him out.   That was just

13:39:06  8   prior to the recession of 1979 and '80.   And my father

13:39:13  9   was 72 years old, so I started to buy him out in the

13:39:18  10  late '70s.   And then we went through a recession, and

13:39:23  11  that was a tough one, but not as tough as the one we're

13:39:28  12  in right now.   And I said if I make it through this

13:39:31  13  one, I'm going to sell this and get out.

13:39:35  14      Q.   Your current title company you're referring to?

13:39:38  15      A.   Pardon me?

13:39:39  16      Q.   What's your current title company?

13:39:41  17      A.   Port Lawrence Title.

13:39:45  18      Q.   When you said sell out, I misunderstood what you

13:39:48  19  were saying.

13:39:49  20      A.   I'm sorry.   I said we went through the

13:39:54  21  recession, and it was a tough recession, like we're in

13:39:58  22  now, and I said if I ever get through this one, I'm

13:40:03  23  going to sell the company.

13:40:04  24      Q.   This one being the recession, okay?

13:40:07  25      A.   Yeah, the recession.   If -- there's been --

13:40:12   1      Q.   Could you get a little closer?  I'm having a hard

13:40:15   2    time hearing you.

13:40:16   3      A.   Do you want me to eat this thing?

13:40:23   4           Anyways --

13:40:24   5      Q.   Tell the jury when you left Port Lawrence and

13:40:27   6    when you started --

13:40:28   7      A.   I sold Port Lawrence in 1988 to First American

13:40:32   8    Title.   I then stayed on until 1999.   When I sold Port

13:40:42   9    Lawrence in 1988, I thought they would throw me out like

13:40:47  10    so many big companies do, so I went in the land

13:40:54  11    development business in 1988.   And I've developed about

13:41:00  12    ten to 12 residential developments, and one commercial.

13:41:07  13    The commercial is -- some might be familiar with; it's

13:41:12  14    called Briarfield Business Park, which is off 475 and

13:41:17  15    Dussel.   It's 135 acres.

13:41:23  16      Q.   That was your biggest development, correct?

13:41:25  17      A.   Yes.

13:41:26  18      Q.   And how many lots would you say that of all those

13:41:32  19    developments you have platted?

13:41:36  20      A.   Six-, 700.

13:41:38  21      Q.   Six- or 700?

13:41:40  22      A.   (Witness nods.)

13:41:41  23      Q.   Tell us how you first got involved with Tom

13:41:45  24    Taylor and the Cambridge property.

13:41:47  25      A.   My wife became president of Port Lawrence Title

13:41:54  1    after I left.   She called me and she -- Tom Taylor -- I

13:41:58  2    had left Port Lawrence in 1999, so this had to be around

13:42:02  3    2000.   She called me and she said, I want you to meet

13:42:06  4    Tom Taylor.   He's doing business with us at Port

13:42:09  5    Lawrence.   He's a good, honest guy, hard-working, and

13:42:13  6    funny.   She said, You'll like him.

13:42:16  7         So I met with him.   And he had a development

13:42:22  8    called Marble Cliffs where he's originally from in

13:42:25  9    Columbus.   He grew up in Marble Cliffs.   He named a

13:42:29  10   subdivision on Brint Road that.   He said, I need a

13:42:33  11   partner to go in with me on this piece on East River

13:42:38  12   Road.   So we took a drive over there and walked the

13:42:42  13   land, and he had a preliminary plat.

13:42:48  14        Q.   That's a preliminary drawing of the lots?

13:42:51  15        A.   Preliminary drawing of all the lots the way it is

13:42:56  16   today.   He had had several different renderings, but

13:43:01  17   that's the one that we liked the best.   He told me

13:43:04  18   Peterman would do it.   I was familiar with Peterman out

13:43:06  19   of Findlay.   So I asked him the price.   I drove up and

13:43:15  20   down -- I'm very familiar; I'm from Perrysburg.   I

13:43:20  21   don't live in Perrysburg; I live out in Wood County out

13:43:25  22   by Waterville and by the Waterville bridge.   And -- but

13:43:31  23   I was very familiar with Perrysburg.   And I said, okay,

13:43:35  24   let's call Betty Lazzaro and get her opinion.

13:43:40  25        Q.   Who is Betty Lazzaro?

13:43:43    1        A.   Betty Lazzaro is probably one of the top

13:43:46    2   producers in the Toledo market for housing.   She is an

13:43:52    3   expert on Perrysburg.   She lives on the corner of

13:43:58    4   Morningside and East River Road, which is across from

13:44:04    5   Hospice, which is right down the road from us.   Betty

13:44:07    6   was a customer of mine or ours at Port Lawrence, and I

13:44:13    7   knew her well.   She's been in the business probably

13:44:15    8   about 25 years and very, very successful.

13:44:18    9        Q.   What did she think of the subdivision?

13:44:20   10        A.   She liked it.   She liked it very well.   So then

13:44:23   11   we said -- we started talking about marketing it.   This

13:44:29   12   is before we ever platted.   This is about February, I

13:44:34   13   would say, January, February, right after the first of

13:44:37   14   the year.   But the property wasn't platted yet or

13:44:42   15   anything.   And we were ready to plat, all ready to go.

13:44:48   16   We said, how do we want to market it?  Okay.  So we

13:44:54   17   said, Well, let's try to find the best builders we can

13:44:58   18   have and sell them the whole, you know, get them to buy

13:45:01   19   a few lots, try it out, and then sell.   We settled --

13:45:06   20   between Betty, Tom, and I, and I know a lot from being

13:45:09   21   in the title business for 47 years, I knew most of the

13:45:13   22   builders.

13:45:14   23        Q.   So you're talking about exclusive builders, only

13:45:17   24   allowing certain ones to build in the subdivision?

13:45:20   25        A.   Yes.

13:45:20    1        Q.   Who were those three builders?

13:45:22    2        A.   Todd Berman, who is the premier builder of

13:45:28    3    Toledo.   Right after him I would say Eric Huffman, who

13:45:33    4    is -- did a lot of building and remodeling in

13:45:37    5    Perrysburg.   And then the next one was Bill Schoen.

13:45:40    6    Bill I knew from -- he went to Notre Dame.   I knew

13:45:45    7    Bill.   I did business with his parents, or his father.

13:45:48    8    Anyways, I called Bill.   So quite -- it was really a

13:45:53    9    pretty good deal because we got all three of those guys

13:45:57   10    together with Betty and the three of us; we all met over

13:46:03   11    in about March.

13:46:06   12        Q.   Of '01?

13:46:07   13        A.   Of '01.   I'm sorry.   Yes.   And we met over

13:46:11   14    there and said, Okay, what do you guys think?   Well, we

13:46:14   15    went over and drove the property, and they liked it.

13:46:17   16    And they all agreed to take two lots.   And --

13:46:24   17        Q.   Each?

13:46:25   18        A.   Each.   Each.   I'm sorry.   Okay.   Agreed to

13:46:31   19    take two lots.

13:46:33   20             We sat down, and we even figured out the pricing

13:46:36   21    of the lots.   And those guys are all competitors in a

13:46:41   22    way; Todd Berman is far bigger.   I mean, he had

13:46:45   23    operations -- he builds all of $2-, $3-, $4-, $5-,

13:46:50   24    $6-million homes.   And he was in not only Toledo but

13:46:55   25    Columbus and Petoskey, Michigan he had operations.

13:46:58   1     Q.   Did the three builders have an input onto the
13:47:06   2   pricing of the lots, $120,000 to $150,000?
13:47:10   3     A.   Yes.   Okay.
13:47:11   4     Q.   Tell us what happened after that.
13:47:14   5     A.   After that, we platted the property on June 4th,
13:47:23   6   2001.   After that they -- 9/11 happened, and they got
13:47:37   7   nervous.   They were all busy doing contract houses;
13:47:44   8   they all had contracts going.
13:47:46   9     Q.   Building houses?
13:47:47  10     A.   Building houses.
13:47:48  11     Q.   Signed contracts with other people?
13:47:50  12     A.   Yes.   Yes.   They had contracts with other
13:47:53  13   people.   And so -- but they did.   They said, we've got
13:47:59  14   reservations about taking down two, but we'll take down
13:48:02  15   one now.   So in October/November of 2001 they took
13:48:08  16   down --
13:48:09  17     Q.   When you say take down, they purchased?
13:48:11  18     A.   They purchased, yes.
13:48:13  19     Q.   Slogan in the industry, take down?
13:48:17  20     A.   Yes.   They each took down a lot.   And we did it
13:48:23  21   by draws, you know, one, two, three.
13:48:27  22     Q.   Then they could decide which lots they wanted?
13:48:30  23     A.   Yes.   And they picked their lots out, and we
13:48:33  24   went forward from there.
13:48:34  25     Q.   Then you sold three more lots to those, one each?

13:48:38    1      A.   No.

13:48:38    2      Q.   Tell us what happened then.

13:48:40    3      A.   What happened then is -- well, nobody really

13:48:44    4   understands in 2002, if you go to the United States

13:48:53    5   Bureau of Statistics, you'll find out that southeast

13:48:59    6   Michigan, northwest Ohio, northeast Ohio, as far over to

13:49:03    7   Cleveland went into a recession.  We all think of it as

13:49:07    8   a recession as the whole nation and everything.   But

13:49:12    9   2002 we went into a recession.   And you can check that

13:49:18   10   with the United States Bureau of Statistics.  We didn't

13:49:23   11   know that at the time, of course, but we knew there

13:49:27   12   was -- nothing was -- nothing was perking.   So I

13:49:37   13   then -- they didn't build anything in 2002.   And the

13:49:42   14   worst thing you can do or second worst thing you do is

13:49:48   15   not get your subdivision going.   And --

13:49:51   16      Q.   When you say get it going, you mean getting

13:49:54   17   houses started?

13:49:55   18      A.   Yes, getting houses started.   By this time we're

13:49:58   19   platted, we've got the streets in, we've got the

13:50:01   20   declaration and restrictions are filed, which were

13:50:05   21   pretty stiff.  But we had the top sales lady; we had the

13:50:11   22   top three builders.  Oh, then Betty Lazzaro threw a

13:50:17   23   reception at Belmont Country Club.   Belmont Country

13:50:22   24   Club was right across the railroad tracks from us.   It

13:50:26   25   used to be a hunting preserve for W.W. Knight, then he

13:50:31  1  sold it to the members to build a golf course.   And

13:50:37  2  they had about 250 members.

13:50:40  3       And the market that we were going through --

13:50:42  4  there's a saying that says demographics is destiny.

13:50:47  5  Well, our market, we thought the most money would be

13:50:50  6  with empty-nesters, wealthy empty-nesters.   Down the

13:50:56  7  road from our -- from Cambridge is a place called the

13:51:01  8  Hamlet.   The Hamlet was developed in 1976 by Bob

13:51:07  9  Cavalear who is the premier developer of Toledo in his

13:51:12  10  day.   He's about 82 years old now, but he's still a

13:51:16  11  developer.   Then our next place was Eagle Point Colony;

13:51:19  12  there's 76 homes in there.   Then we had 250 members at

13:51:24  13  Belmont Country Club.   Betty had threw a reception

13:51:32  14  there at Belmont, and we got a crowd of about 40 people.

13:51:36  15  And I didn't think that was too bad.   Most of them were

13:51:41  16  older; I would say empty-nesters.   And so we decided to

13:51:47  17  go with that idea.   But nobody built anything.

13:51:50  18       And I happened to run into Bob Cavalear today,

13:51:53  19  and he said, you know, Jack, you've got to get something

13:51:57  20  over there.   I said, okay.   So I went to Bill Schoen,

13:52:02  21  and I talked hard to Bill.   I said, Bill, we've got to

13:52:08  22  get going.   I said, they paid good prices for lots,

13:52:14  23  145.   Todd Berman spent 145, Schoen 145, and Eric

13:52:24  24  Huffman 140.   So Bill agreed to build a spec house, and

13:52:29  25  I agreed to back him on it.   And -- because they were

13:52:33   1   scared.

13:52:36   2        Q.   Scared because of what?

13:52:38   3        A.   Well, they were -- he was running out of

13:52:41   4   contracts, you know, and we had to get something.

13:52:44   5        Q.   You mean the market?

13:52:45   6        A.   The market, yeah.   When you're going to build a

13:52:49   7   spec house for $600,000, I mean, it was -- and it was

13:52:53   8   for empty-nesters, and I just gave him a free hand, and

13:52:57   9   I did cosign for him.   And he went ahead and built lot

13:53:01  10   20.

13:53:03  11        And it did sit for a little bit.   And finally a

13:53:09  12   couple came across from Eagle Point Colony.   They had

13:53:13  13   four children, and they were paying a pretty good price,

13:53:17  14   and they asked me if I would sell them the lot next door

13:53:21  15   to them.   They wanted it for a swimming pool.   And we

13:53:24  16   put some restrictions on the fencing on, like, the front

13:53:29  17   of the thing and stuff like that, so they bought that,

13:53:31  18   too, at the same time.   One of the things you want to

13:53:34  19   do in land development --

13:53:35  20        Q.   Would that have been in '02 or '03?

13:53:38  21        A.   I beg your pardon?

13:53:39  22        Q.   What year was that?

13:53:40  23        A.   It was 2004 it was completed.   2004 they started

13:53:57  24   building it.   It's a very expensive --

13:54:03  25        Q.   Fancy house?

13:54:04   1      A.   Huh?

13:54:04   2      Q.   Fancy?

13:54:05   3      A.   Yeah, it's fancy.   It's a fancy house.   It's the

13:54:11   4   first house you people might have saw.   It's on the

13:54:14   5   left.   It's all stone.   And it was an empty-nester's

13:54:17   6   house; had a dynamite first floor, master suite, an open

13:54:23   7   kitchen, open living room, open dining room, but the --

13:54:30   8   where the empty-nester part came in is they had a second

13:54:34   9   bedroom behind the garage with a full bath.   You might

13:54:37  10   call it a -- where you'd have your grandparents or your

13:54:42  11   parents.

13:54:42  12      Q.   Like a mother-in-law suite?

13:54:44  13      A.   What's that, Marv?

13:54:45  14      Q.   A mother-in-law suite?

13:54:47  15      A.   Yeah.   I've never heard that, but yeah.   We

13:54:50  16   called it a granny suite.   But that was there.   The

13:54:57  17   second floor was very common.   It had a big dorm above

13:55:01  18   the garage.

13:55:03  19      Q.   Tell us about the other lots.   What happened to

13:55:06  20   them?

13:55:06  21      A.   The other lots, Todd Berman took down his in

13:55:14  22   2001, Eric Huffman took down in 2001, and that was the

13:55:19  23   end of that.

13:55:23  24           Then we sold nothing in 2002.   But then the

13:55:32  25   first lot we sold to Kevin Stawinski, who testified here

| | | |
|---|---|---|
| 13:55:41 | 1 | the other day, the guy who almost got hit by the -- |
| 13:55:45 | 2 | Q.  You can't talk about that. |
| 13:55:47 | 3 | A.  He sold that to him.  It was down a little |
| 13:55:50 | 4 | further.  We sold that to him for $100,000.  It was |
| 13:55:54 | 5 | 12/30 of '03.  We started building lot five, Todd Berman |
| 13:56:04 | 6 | did.  We sold that to Manguses after it was completed |
| 13:56:10 | 7 | for $550,000. |
| 13:56:12 | 8 | Q.  When was that completed and sold? |
| 13:56:13 | 9 | A.  It was sold on 12 -- on 1/5/04.  Okay.  It |
| 13:56:23 | 10 | was -- sold it to them for $560,000.  They had two |
| 13:56:29 | 11 | children.  The reason I'm going to get to this, there's |
| 13:56:33 | 12 | a purpose of these kids. |
| 13:56:36 | 13 | Then we sold on 2/17/04.  We got an offer to |
| 13:56:44 | 14 | purchase for lot 9 for $120,000.  That offer we thought |
| 13:56:51 | 15 | went dead.  Later found out is not dead. |
| 13:56:54 | 16 | MR. BAHRET:  Your Honor, I object.  This |
| 13:56:58 | 17 | has been the subject of a prior ruling. |
| 13:57:06 | 18 | THE COURT:  One second, please. |
| 13:57:19 | 19 | I'll sustain that objection and ask the jury |
| 13:57:23 | 20 | to disregard the last comment about the sale or |
| 13:57:33 | 21 | potential sale in 2004. |
| 13:57:39 | 22 | Q.  What other lots were sold? |
| 13:57:40 | 23 | A.  Okay.  Then on 8/26/04 we built -- a house was |
| 13:57:49 | 24 | built and sold to Wade Cohen for $579,000.  Then on |
| 13:58:01 | 25 | 1/12/04 Bill Schoen had a contract, oh, and they had two |

13:58:05  1  children.  On 1/12/04 Bill Schoen sold a contract to a

13:58:13  2  couple by the name of Hughes for $568,000.

13:58:19  3      Now, if you also check with the Bureau of

13:58:23  4  Statistics, you'll find out that we started to slide

13:58:26  5  into another recession in 2005.  But one of the things

13:58:34  6  that we talked about is what we finally came to realize,

13:58:42  7  that we were not selling these houses to empty-nesters.

13:58:46  8  Q.  Like you had originally planned?

13:58:49  9  A.  Yeah.  Original plan was off; the demographics

13:58:53  10  weren't proven.  These people were coming in with

13:58:55  11  children.  Everybody had children except the Hughes.

13:59:06  12  He's an executive with Owens-Corning Fiberglass.  So

13:59:10  13  Tommy and I got together.  At that time, I don't know

13:59:13  14  what we had the property listed, we got -- in 2005 we

13:59:18  15  decided to build lot 15.  That's the home that you

13:59:22  16  people visited the other day.  And we built that for

13:59:28  17  people with kids.  And the idea was to downsize it so

13:59:33  18  it wasn't so expensive.  We only charged ourselves

13:59:38  19  $100,000 for a lot instead of what it would have been.

13:59:44  20  We went to First Place Bank in Akron, Ohio and got a

13:59:52  21  loan, a spec loan, speculative loan.  We built a house

14:00:02  22  for a couple.  We put the master suite on the

14:00:06  23  basement -- the first floor, I beg your pardon.  Then a

14:00:09  24  large basement that walked out so, you know, you could

14:00:13  25  fix up the basement.  Then we put a large dormer over

14:00:18  1   the garage, but we didn't finish it.   It wouldn't take

14:00:22  2   much to finish, about $5,000, but we wanted to keep the

14:00:26  3   house as low as we could.   So then we put two baths and

14:00:29  4   two bedrooms upstairs.   And that was to be -- and then

14:00:37  5   we finished that at the end of 2005.   Those houses take

14:00:45  6   anywhere from six months to nine months to finish

14:00:51  7   completely.

14:00:55  8        It already has been mentioned before through John

14:00:58  9   McCarthy, his son Mike was a good friend of mine.   He

14:01:02  10  had bought a condominium from Tom and I over in another

14:01:06  11  development that we had at Belmont Country Club called

14:01:10  12  Golf Villas.   He had bought one of those from us.   And

14:01:14  13  he wanted that house.   And that's what John was

14:01:19  14  referring to this morning, John McCarthy, his father,

14:01:24  15  that Mike wanted that house.   And they kept going back

14:01:28  16  over to the house, kept going back over, his wife and

14:01:31  17  that.   And they had two children.   They just got

14:01:35  18  married.   He and Lori just got married, and they had

14:01:39  19  two children -- or they had one child when they lived in

14:01:45  20  the condo.   He said, Jack, I want that house, and Lori

14:01:48  21  wants it.

14:01:49  22       And I said, well, you know.   And he had sold a

14:01:54  23  building that my son and I -- my son built and I was in

14:01:59  24  with him, and I wanted to get out of it, and I knew Mike

14:02:02  25  through my son, Steve, who is a builder.   And Steve and

14:02:10  1    I had some buildings that I didn't want to be involved

14:02:15  2    in.

14:02:15  3              MR. BAHRET:  Your Honor, I'm just going to

14:02:17  4    object to this format.  I'm used to a

14:02:20  5    question-and-answer type format instead of a speech.

14:02:23  6              THE COURT:  Let's see if we can have a

14:02:26  7    little more give and take.

14:02:28  8       Q.  I want you to get more to the point of the

14:02:30  9    marketing of the development.  Don't get distracted

14:02:33  10   about all the other little things that happened.  We

14:02:36  11   don't want to be here all day.

14:02:37  12      A.  Okay.  Well, that was it.  We wanted to switch

14:02:42  13   to -- every house had kids, and we were working under

14:02:46  14   the wrong assumption, and we made a mistake.

14:02:51  15      Q.  How much money did you have put into the house on

14:02:55  16   lot 15?

14:02:56  17      A.  $539,000.

14:02:59  18      Q.  And did you then change your marketing strategy?

14:03:04  19      A.  Yes.

14:03:05  20      Q.  To?

14:03:06  21      A.  Well, we were going to -- Lori McCarthy was also

14:03:11  22   a realtor.  Mike McCarthy is a commercial realtor.

14:03:15  23   Lori McCarthy -- so we listed it with her and her best

14:03:20  24   friend, because she was pregnant again.  And we listed

14:03:24  25   it with Danberry Realty.  But we were going to use the

14:03:28   1   house.   It's very well furnished as a model.   And we

14:03:33   2   were going to go with that as a model.

14:03:39   3        Q.   Tell us, there were no sales between January

14:03:48   4   of -- or February of '05 and the beginning of '06.

14:03:53   5   What did you decided to --

14:03:55   6        A.   That's when we built lot --

14:03:58   7        Q.   After you built, what did you decide to do in the

14:04:00   8   spring of 2006?

14:04:02   9        A.   To run an auction.

14:04:06  10        Q.   Okay.   And why did you decide to do an auction?

14:04:09  11        A.   Because auction brings people.   It's a sales

14:04:14  12   tool.   Now, I agree that auctions have a bad

14:04:17  13   connotation.   People think it's a desperation move.

14:04:21  14   But it's not.   There's three types of auctions, and the

14:04:26  15   three types are absolute auction, that's where you go in

14:04:29  16   and you bid, and you just -- you go for whatever.   Then

14:04:35  17   you can set a base is another one.   And the one we

14:04:40  18   choose is, okay, put in an offer, and we'll see if we'll

14:04:43  19   accept it.   We'll at least talk to you and see if we

14:04:46  20   could get our price.

14:04:47  21        Q.   When did you have the auction scheduled?

14:04:49  22        A.   We signed the auction papers on March 28 with

14:04:53  23   Beth through Amy Almeister and Pam Rose.   And we set it

14:05:02  24   for June 16.

14:05:03  25        Q.   Of '06?

14:05:04   1      A.   Of '06, yes.

14:05:06   2      Q.   And tell us what happened after March 28 to the

14:05:10   3   subdivision and what happened to the auction?

14:05:15   4      A.   Okay.  Well, Mike and Lori McCarthy moved in the

14:05:20   5   spec house in February.  Sometime after -- I think it

14:05:29   6   was late April, I would stop over there and have dinner

14:05:32   7   with them.  They were good friends, and everything was

14:05:36   8   fine.  And then they called me, Mike called me.  He

14:05:40   9   said, you better get over here.  I said, What?  He

14:05:43  10   said, they're cutting down your trees.  And I said,

14:05:48  11   What?  Who's cutting down our trees?  He said, I don't

14:05:51  12   know who's cutting down your trees, but they're coming,

14:05:54  13   and you better get over here.  So I said, I can't make

14:05:59  14   it right away, but we'll be over there as fast as I can.

14:06:02  15   I went over there, and by the time I got down there, all

14:06:05  16   the trees were gone.  And I was pretty -- what's going

14:06:12  17   on?  Pretty -- really upset.  Because there were two

14:06:16  18   rows of trees.  And that's not been brought up very

14:06:21  19   often, but there were two rows of trees.  There was a

14:06:25  20   row right on what they call the City -- the railroad

14:06:30  21   property, then our property.  But then there's a 68

14:06:37  22   foot -- it was the Toledo terminal tracks.

14:06:42  23      Q.   That's where the path is?

14:06:43  24      A.   That's where the path is.

14:06:46  25      Q.   I should say "was".

14:06:48   1      A.   Huh?

14:06:49   2      Q.   I should say "was," not "is now."

14:06:51   3      A.   Well, and then by then they were laying those big

14:06:57   4   pipes down, which is 66-inch pipes.   I mean, they're

14:07:02   5   huge.  You and I can walk through them.   I can; you

14:07:10   6   can't.   I said, What's going on?  I said, I know

14:07:14   7   Commissioner Perkins; I said, I'll call him.   I said,

14:07:18   8   This has got to be Wood County.   They said, Okay.  So I

14:07:22   9   called Commissioner Perkins, and I asked him to come up

14:07:29  10   and have breakfast with us and look at this situation,

14:07:33  11   because I thought it was Wood County.

14:07:35  12      Q.   Doing the cutting, you mean?

14:07:38  13      A.   The cutting, yeah, and the pipes.   By then, I

14:07:42  14   can't tell you if the pipes were there yet, but they

14:07:45  15   were in shortly.   No, they couldn't have been there

14:07:47  16   because they had to take the cutting and put the pipes

14:07:50  17   down.

14:07:52  18        So Commissioner Perkins came over, and he brought

14:07:57  19   Ray Huber, the county engineer for Wood County.   And --

14:08:07  20      Q.   And the trees were already gone at this point in

14:08:10  21   time?

14:08:10  22      A.   The trees are gone, yeah.   Yeah.   Ray said

14:08:16  23   yesterday they were there, and he was mistaken.

14:08:20  24      Q.   Did Perkins tell you he could help you, or who

14:08:23  25   was doing it?

14:08:24   1      A.   Well, he -- they weren't doing it.   And then I

14:08:28   2   thought, I live in Wood County; I get my water through

14:08:34   3   the Northwest Sewer.   I said, is this the Northwest

14:08:37   4   Sewer?  Ray Huber knew about it, but he said, It's not

14:08:40   5   our deal, Jack.   He said, it's the City of Toledo is

14:08:44   6   putting a water -- then he explained it, and then Alvie

14:08:49   7   Perkins, we just had a nice conversation, went down and

14:08:53   8   walked it, and end of story as far as Alvie's concerned.

14:08:58   9      Q.   What happened with the auction?

14:09:00  10      A.   The auction, we cancelled it.

14:09:02  11      Q.   Would you tell the jury why you cancelled it?

14:09:04  12      A.   We cancelled it because of the cutting of the

14:09:07  13   trees, and also I have to say that we had another

14:09:14  14   subdivision called Rocky Ridge, which was out in

14:09:20  15   Waterville.   It's a -- was Rocky Ridge Airport.   And

14:09:26  16   we had problems with the bank out there.   And so we

14:09:30  17   just -- and then we had another subdivision on Wales

14:09:37  18   Road.

14:09:37  19      Q.   That's Birch Hollow that Tom testified about?

14:09:40  20      A.   That's Birch Hollow.   We were going to do all

14:09:43  21   three.   And we got a price for that.

14:09:45  22      Q.   For the auction?

14:09:46  23      A.   For the auction, yeah, for doing all three.   And

14:09:49  24   a lot of -- like I say, auctions bring people.   And we

14:09:56  25   were also having -- anyways, long story short, we just

14:10:07  1    cancelled the auction.   It was senseless to spend the

14:10:10  2    money -- more money than we had already spent.

14:10:14  3        Q.   What did it cost you to cancel the auction?

14:10:17  4        A.   $6,700, $6,900.

14:10:23  5        Q.   What was that for?

14:10:24  6        A.   To pay for the advertising.  Pam Rose and them

14:10:29  7    had already drew up flyers and that kind of stuff, pay

14:10:35  8    their costs.   They were good -- they didn't take any

14:10:39  9    money.

14:10:39  10       Q.   And tell the jury how you felt that the cutting

14:10:43  11   of the trees would impact the auction?

14:10:46  12       A.   It ruined it.   The cutting of the trees have

14:10:50  13   ruined the whole subdivision.   It's done.   It's shot.

14:11:04  14       Q.   Do you feel at this point in time until there is

14:11:07  15   something done with the subdivision that you could sell

14:11:11  16   any lots?

14:11:14  17       A.   No.   You see, people come down there and they

14:11:22  18   use the cul de sac, you know, the people -- your bus I

14:11:26  19   think maybe turned around.   And they go down there and

14:11:29  20   they see that.   A lot of times the trains set there;

14:11:35  21   and they're big, and they're ugly, of course.

14:11:37  22       Q.   When did you figure out -- let me back up a

14:11:41  23   minute.   Why did John McCarthy start hauling that mud

14:11:46  24   in the one day?  Was that before the auction, before you

14:11:51  25   cancelled the auction?

14:11:53  1    A.   Yeah.   Yes.   We didn't know until John got
14:11:59  2  involved, and we talked to -- I think he started talking
14:12:03  3  to Christy, John being with the Corps of Engineers, he's
14:12:06  4  a bulldog, really, and he talked to Ray Huber, and he
14:12:14  5  went out there and he said, You've got other problems,
14:12:17  6  Jack.   I said, What other problems?   I mean, I didn't
14:12:21  7  know about the sewer coming under the railroad or any of
14:12:25  8  that kind of stuff.   So John started digging into it.
14:12:28  9  I said, John, you've got to help me.   I said, I don't
14:12:31  10  know what to do.   We didn't know what to do about this.
14:12:35  11  So he said, Well, you'll have to monitor --
14:12:37  12          MR. BAHRET:   Your Honor, not only are we far
14:12:41  13  afield from the question, but he's getting into hearsay.
14:12:44  14          THE COURT:   Sustained.
14:12:47  15    Q.   With regard to the impact on the subdivision, it
14:12:55  16  is your opinion at this point in time that without some
14:12:58  17  improvement being made to the subdivision, you just
14:13:01  18  can't sell any of the lots?
14:13:02  19    A.   Yes.
14:13:03  20    Q.   Okay.   Can you tell the jury what efforts you
14:13:06  21  have made to figure out how to improve the subdivision
14:13:13  22  with screening or whatever?
14:13:16  23    A.   Yeah.
14:13:16  24    Q.   Tell the jury what you've done.
14:13:18  25    A.   First thing I did was went down to Bowling Green

| | | |
|---|---|---|
| 14:13:22 | 1 | to the Ohio Department of Transportation, and I asked |
| 14:13:25 | 2 | them -- the first thing I thought about was a wall, like |
| 14:13:30 | 3 | they got along -- I didn't -- a wall, you know, like |
| 14:13:35 | 4 | along the turnpike or along the expressway.   And I |
| 14:13:39 | 5 | asked the Ohio Department of Transportation who they |
| 14:13:42 | 6 | used.   They gave me a couple names.   And a guy called |
| 14:13:47 | 7 | me back.   I told him my situation; I had 900-and-some |
| 14:13:51 | 8 | feet to -- for a wall.   He sent me a quote for |
| 14:14:00 | 9 | $810,000. |
| 14:14:00 | 10 | I then called Don Larry, who's an architect, |
| 14:14:07 | 11 | landscape architect -- Land Design is his company in |
| 14:14:14 | 12 | Perrysburg -- for the purpose of seeing if you could |
| 14:14:20 | 13 | screen out the -- yes. |
| 14:14:22 | 14 | Q.   Go ahead.   What did he tell you? |
| 14:14:24 | 15 | MR. BAHRET:   Objection. |
| 14:14:25 | 16 | THE WITNESS:   What, Marv? |
| 14:14:25 | 17 | Q.   What did you learn?  What did he tell you? |
| 14:14:29 | 18 | MR. BAHRET:   How is that -- |
| 14:14:32 | 19 | A.   I examined -- |
| 14:14:32 | 20 | THE COURT:   Hold on. |
| 14:14:34 | 21 | MR. BAHRET:   What he learned is going to be |
| 14:14:35 | 22 | synonymous with what he was told. |
| 14:14:38 | 23 | A.   I asked him for an estimate. |
| 14:14:40 | 24 | MR. ROBON:   You can't talk when there's an |
| 14:14:42 | 25 | objection. |

| | | |
|---|---|---|
| 14:14:46 | 1 | THE COURT:  Let's try another question, |
| 14:14:48 | 2 | please. |
| 14:14:49 | 3 | BY MR. ROBON: |
| 14:14:49 | 4 | Q.  During your investigation, did you arrive at what |
| 14:14:52 | 5 | you thought it would cost you to landscape the rear of |
| 14:14:56 | 6 | those lots? |
| 14:14:57 | 7 | A.  Yes. |
| 14:14:58 | 8 | Q.  And what was it going to cost you? |
| 14:15:01 | 9 | A.  A million-one to a million-three. |
| 14:15:09 | 10 | Q.  That's more valuable than the subdivision? |
| 14:15:12 | 11 | MR. BAHRET:  Objection. |
| 14:15:13 | 12 | A.  Yes. |
| 14:15:13 | 13 | THE COURT:  Overruled. |
| 14:15:20 | 14 | A.  It's about what we -- on the -- |
| 14:15:30 | 15 | Q.  Mr. Taylor identified the letter from First |
| 14:15:33 | 16 | Federal that showed there was approximately $1,367,000 I |
| 14:15:39 | 17 | think due to First Federal Bank on the subdivision? |
| 14:15:41 | 18 | A.  Yes. |
| 14:15:42 | 19 | Q.  And you saw the exhibit showing that you had |
| 14:15:48 | 20 | roughly -- I think it was a million-nine or close to two |
| 14:15:51 | 21 | million invested in the subdivision? |
| 14:15:52 | 22 | A.  Yes. |
| 14:15:53 | 23 | Q.  Did you see the City's appraisal on what lot 15, |
| 14:16:01 | 24 | the house is worth? |
| 14:16:02 | 25 | A.  $315,000. |

14:16:06  1    Q.   And you said you had $539,000 in it?

14:16:10  2    A.   Correct.

14:16:14  3    Q.   Do you believe that the -- explain why you think

14:16:17  4  the property went down in value by what, $225,000 or

14:16:22  5  whatever?

14:16:22  6    A.   Well, it's in foreclosure.   After they cut the

14:16:27  7  trees down, I said, I'm not going to pay for a dead

14:16:32  8  horse.   So I notified the bank that we had -- what we

14:16:37  9  were doing, and I said, You can foreclose on it if you

14:16:40  10  want.   I know from the title business that they run an

14:16:46  11  appraisal, and they can sell it for two-thirds of the

14:16:52  12  appraised value.

14:16:53  13    Q.   I'm handing you or marking what we've shown as

14:16:56  14  Exhibit 89.   This is a foreclosure that was filed on

14:17:01  15  January 14 of this year?

14:17:03  16    A.   Right.

14:17:03  17    Q.   And you're name personally with Mr. Taylor as

14:17:07  18  defendant?

14:17:09  19    A.   Yes.

14:17:10  20    Q.   Why is that?

14:17:11  21    A.   Every note you sign with the bank you sign

14:17:14  22  personally, including the subdivision.

14:17:36  23    Q.   I'm going to mark Exhibit 117.   When you first

14:17:49  24  started the subdivision, I see that you put Laskey

14:17:54  25  Taylor on the -- what do you call that, the name plate?

```
14:17:59   1        A.   Yeah.

14:18:00   2        Q.   Is that something unusual, or were you very proud

14:18:03   3   of this subdivision?

14:18:04   4        A.   Very proud of it.

14:18:06   5        Q.   And does that photograph accurately depict the

14:18:10   6   front entryway?

14:18:11   7        A.   Did it what, Marv?

14:18:12   8        Q.   Does it accurately depict the front entryway?

14:18:15   9        A.   Yeah.   Yes.   The fence is the same as the

14:18:19  10   mansion across the street.

14:18:25  11        Q.   And let's take a look at Exhibit 119.   Is that a

14:18:53  12   photograph of the front entry gait?

14:18:55  13        A.   Yes.

14:18:56  14        Q.   And tell the jury why you went through the

14:18:58  15   expense of putting stone out in front and the iron

14:19:04  16   gates -- iron railings and gates by the entryway?

14:19:09  17        A.   We intended to make it a gate community where you

14:19:12  18   pushed a button to get in.

14:19:16  19             MR. ROBON:   Your Honor, can I pass this to

14:19:18  20   the jury since it doesn't show up well?

14:19:20  21             THE COURT:   Any objection?

14:19:21  22             MR. BAHRET:   No.

14:19:22  23             THE COURT:   You may.

14:19:30  24        Q.   And I'm going to lastly do Exhibit 120.   This

14:19:34  25   shows the -- I think that's the first house that was
```

14:19:37  1   built in the background?

14:19:38  2       A.   Yes.

14:19:38  3       Q.   Is that the fancy home you were talking about?

14:19:41  4       A.   Yes.

14:19:44  5            MR. ROBON:  Your Honor, can I pass that to

14:19:45  6   the jury also?

14:19:49  7            THE COURT:  We're going to interrupt the

14:19:51  8   flow here.  Why don't you just stand and walk in front

14:19:54  9   of the box and show it quickly.  I don't know how many

14:19:57  10  you have there.

14:19:58  11           MR. ROBON:  I just have three.

14:20:11  12  BY MR. ROBON:

14:20:13  13      Q.   Jack, did you feel that by doing this -- let me

14:20:16  14  back up.  What's directly across the street from your

14:20:19  15  entryway?

14:20:21  16      A.   Our entryway is the Lawrence estate; he's a brain

14:20:25  17  surgeon and she's an attorney.

14:20:28  18      Q.   Very, very large home on the river?

14:20:31  19      A.   I beg your pardon?

14:20:33  20      Q.   It's a very large home on the river?

14:20:36  21      A.   Oh, yeah, very.

14:20:37  22      Q.   Were you doing this upscale to try to keep that

14:20:40  23  same concept in the neighborhood?

14:20:42  24      A.   Exactly.

14:20:55  25      Q.   I'm going to hand you what's been marked as

14:20:58  1   Exhibit 88.   This is a foreclosure from the county; is

14:21:08  2   that correct?

14:21:08  3       A.   On the what?

14:21:08  4       Q.   From the county?

14:21:10  5       A.   Oh, on the taxes, yes.

14:21:12  6       Q.   Yes.   And the county is -- you didn't pay the

14:21:18  7   taxes for the last couple years?

14:21:20  8       A.   No.

14:21:20  9       Q.   And you haven't made the mortgage payments for

14:21:22  10  the last couple of years?

14:21:24  11      A.   Not since they tore down the trees.

14:21:26  12      Q.   How much would the mortgage payments have been?

14:21:30  13  It's almost two years to the date when the trees were

14:21:34  14  taken out.

14:21:34  15           MR. BAHRET:   Objection as to the relevance.

14:21:37  16           THE COURT:   Just a moment, please.

14:21:47  17           I tend to agree.

14:21:48  18           MR. ROBON:   Your Honor, it's an item of

14:21:50  19  damage, the interest that would have been accrued on the

14:21:52  20  bank loan because there could be no sale of lots.

14:21:57  21           MR. BAHRET:   They were already not selling

14:21:59  22  lots, and there's no link.

14:22:02  23           THE COURT:   I haven't heard all the evidence

14:22:04  24  yet, so for now I'll allow it.   You may answer.

14:22:07  25  BY MR. ROBON:

14:22:07  1    Q.   What amount of interest would have accrued on the

14:22:11  2    million-three-plus that was owed for the last two years?

14:22:14  3    A.   I have it in my book there.   If you want to hand

14:22:23  4    me that green book.

14:22:43  5         We owe in principal $1,186,877.09 as of April 30.

14:22:57  6    Q.   And how much in interest is owed?

14:23:00  7    A.   $136,927.70 for a total of 1,324,704.79.

14:23:13  8    Q.   What's the interest rate?

14:23:14  9    A.   The interest rate is -- I think it's -- I haven't

14:23:30  10   paid attention.

14:23:31  11   Q.   I think it's six and a half percent.   I think

14:23:34  12   that's what it is?

14:23:36  13              THE COURT:  Will we stipulate.

14:23:39  14              MR. BAHRET:  I don't know what it is.

14:23:40  15              MR. ROBON:  It's on that other one we had

14:23:42  16   marked.

14:23:43  17              MR. BAHRET:  I never thought it was relevant

14:23:45  18   to read it.

14:23:46  19   A.   Just a minute.   It goes -- range from 7 percent

14:23:51  20   to 6.25.

14:24:00  21   Q.   First Federal Bank has the mortgage on the

14:24:03  22   subdivision, correct?

14:24:04  23   A.   Correct.

14:24:05  24   Q.   They have not filed a foreclosure awaiting the

14:24:08  25   outcome of this lawsuit, correct?

14:24:10  1    A.   Correct.

14:24:10  2            MR. BAHRET:  Objection.  Your Honor, I move

14:24:14  3    that be stricken.

14:24:15  4            THE COURT:  I will sustain that objection,

14:24:17  5    strike the question and answer, and the jury will

14:24:19  6    disregard both the question and the answer.

14:24:22  7    BY MR. ROBON:

14:24:22  8    Q.   In Exhibit 88 it shows all these parcels.   These

14:24:26  9    are the empty lots.   Do you know how much the taxes are

14:24:33  10   per annum on the vacant lots?   Are they roughly

14:24:45  11   $36,000?  Do you recall that number?

14:24:48  12   A.   I haven't looked at -- I've got the sheet here.

14:24:52  13   Q.   Well, take a look?

14:25:08  14   A.   No.   Total tax due, $177,543.80.

14:25:25  15   Q.   So you haven't paid the taxes for the last two or

14:25:28  16   two and a half years, correct?

14:25:30  17   A.   No, I have not.

14:25:37  18   Q.   How has this action of the City impacted you

14:25:43  19   personally?

14:25:44  20   A.   Personally, I'm about an inch from bankruptcy.

14:26:03  21           MR. ROBON:  Just give me a moment, Your

14:26:05  22   Honor.

14:26:05  23           THE COURT:  Sure.

14:26:33  24           MR. ROBON:  No further questions, Your

14:26:36  25   Honor.

| | | |
|---|---|---|
| 14:26:36 | 1 | THE COURT:  Any cross? |
| 14:26:37 | 2 | MR. BAHRET:  Thank you. |
| 14:26:39 | 3 | - - - |
| 14:26:39 | 4 | JOHN LASKEY, CROSS-EXAMINATION |
| 14:26:40 | 5 | BY MR. BAHRET: |
| 14:26:40 | 6 | Q.  Could I see whatever you're referring to up here |
| 14:26:57 | 7 | while you're testifying? |
| 14:26:57 | 8 | A.  What's that, Bob? |
| 14:26:58 | 9 | Q.  Can I see what you have been looking at to |
| 14:27:01 | 10 | testify? |
| 14:27:01 | 11 | A.  That's my notes. |
| 14:27:02 | 12 | Q.  I know; that's why I asked for them.  Can I see |
| 14:27:04 | 13 | those? |
| 14:27:06 | 14 | And what did you find in this book that told the |
| 14:27:09 | 15 | answer on taxes? |
| 14:27:10 | 16 | A.  The stuff I dug out. |
| 14:27:12 | 17 | Q.  Can you show me? |
| 14:27:24 | 18 | A.  (Document exchanged.) |
| 14:27:30 | 19 | Q.  Thank you. |
| 14:27:43 | 20 | If I'm reading this right, sir -- if I'm reading |
| 14:27:54 | 21 | this right, you had stopped paying your taxes back in |
| 14:27:57 | 22 | 2003. |
| 14:27:58 | 23 | A.  Well, that's true. |
| 14:28:04 | 24 | Q.  Okay.   That's very interesting. |
| 14:28:06 | 25 | A.  That may not be true. |

14:28:08    1    Q.   Well, it says it's true right there.   It says

14:28:10    2    you're delinquent from the second half of 2003.   You

14:28:17    3    haven't paid your taxes in five years?

14:28:19    4    A.   That's right, probably.

14:28:21    5    Q.   You're not going to stare at this jury and tell

14:28:23    6    us that's because the trees were cut down?

14:28:29    7    A.   First of all, if you're in a land development

14:28:33    8    business, they don't get assessed right away, okay.   And

14:28:38    9    I was more interested -- Tom and I were more interested

14:28:46   10    in paying the bank, okay.   You can go down and make

14:28:49   11    arrangements with the county treasurer, and you can go

14:28:52   12    on an installment plan.   Anybody that has delinquent

14:28:57   13    taxes can go down.   You try to -- first of all, you

14:29:02   14    think you're going to sell these things, okay.   And then

14:29:06   15    you --

14:29:06   16    Q.   The question was just --

14:29:08   17    A.   Okay.

14:29:09   18    Q.   -- you haven't paid the taxes in five years,

14:29:13   19    right?

14:29:13   20    A.   That's right.

14:29:14   21    Q.   And the $177,000 number that you told this jury

14:29:20   22    goes back three years before any trees were cut down?

14:29:26   23    A.   So.

14:29:27   24    Q.   In your mind is the City of Toledo responsible

14:29:30   25    for that?

14:29:33  1      A.   No, I wouldn't say they're responsible for that.

14:29:36  2      Q.   Okay.   Are you current on your obligations for

14:29:46  3  the other two developments?

14:29:48  4      A.   Yes.   Can I have my paper back, please?

14:29:55  5      Q.   Do you need it to answer that?  Any time you need

14:29:58  6  this to answer a question, let me know, but I'm not done

14:30:01  7  looking at it yet.

14:30:03  8           Rocky Ridge, Old Granite owns that, right?

14:30:06  9      A.   Yes.

14:30:07  10     Q.   And Birch Hollow is the other one?

14:30:09  11     A.   Yes.

14:30:10  12     Q.   They're both at a standstill; is that right?

14:30:14  13     A.   No.   Yes.   No.

14:30:18  14     Q.   Let's settle on one.

14:30:24  15     A.   Let's take one at a time.

14:30:25  16     Q.   You haven't sold anything in Rocky Ridge?

14:30:27  17     A.   No.

14:30:28  18     Q.   And you haven't sold a lot in Birch Hollow since

14:30:32  19  2004?

14:30:32  20     A.   Correct.   But --

14:30:36  21     Q.   What?

14:30:37  22     A.   But all 34 lots in Birch Hollow are sold -- have

14:30:47  23  a purchase contract that was executed with Claystone

14:30:53  24  Builders.

14:30:53  25     Q.   But Claystone ran out of money?

| | | |
|---|---|---|
| 14:30:56 | 1 | A.  Correct. |
| 14:30:56 | 2 | Q.  So they can't follow through on that contract? |
| 14:30:58 | 3 | A.  No. |
| 14:30:59 | 4 | Q.  So you're left holding the bag? |
| 14:31:01 | 5 | MR. ROBON:  Your Honor, could I let the |
| 14:31:04 | 6 | witness please finish his answer? |
| 14:31:06 | 7 | THE COURT:  Sure.  You disagree with the |
| 14:31:08 | 8 | outline given by the lawyer? |
| 14:31:11 | 9 | THE WITNESS:  I beg your pardon, Judge? |
| 14:31:13 | 10 | THE COURT:  The question was:  Apparently |
| 14:31:18 | 11 | there were 34 lots.  There was a purchase contract.  And |
| 14:31:22 | 12 | the question was, the first question:  Claystone ran out |
| 14:31:26 | 13 | of money, and that's why you didn't complete the deal? |
| 14:31:29 | 14 | THE WITNESS:  What we did -- do you want me |
| 14:31:31 | 15 | to say what we did? |
| 14:31:32 | 16 | THE COURT:  First answer whether Claystone |
| 14:31:34 | 17 | ran out of money and did not complete the deal. |
| 14:31:37 | 18 | THE WITNESS:  No.  There's another story |
| 14:31:39 | 19 | here. |
| 14:31:39 | 20 | THE COURT:  Okay.  So the answer is no. |
| 14:31:43 | 21 | THE WITNESS:  No.  Okay. |
| 14:31:44 | 22 | THE COURT:  Is it?  Then you can explain. |
| 14:31:47 | 23 | I just want to get a yes or no. |
| 14:31:49 | 24 | THE WITNESS:  We're still working with them. |
| 14:31:51 | 25 | Okay.  And how we're working with them is what they |

14:31:59   1   found out is they were building Villas, the Villas.  We

14:32:03   2   sold them the lots for $38,000.  They built Villas.

14:32:10   3   The market changed, and people went to single-family.

14:32:16   4   And a good -- you're probably familiar with McCarthy

14:32:24   5   homes.  He's kind of the pacesetter on these.  He went

14:32:28   6   to single-family.  People went from Villas, twinplexes,

14:32:33   7   condos, to empty-nesters -- or not empty-nesters, but to

14:32:39   8   single-families; zero lot line, you still cut the grass

14:32:43   9   and everything.

14:32:44   10          So Claystone came to me about a year ago,

14:32:50   11   and they said, Jack, you've got to go to the City of

14:32:54   12   Northwood.  It's not in Rossford; it's in Northwood.

14:32:59   13   And we're still not in.  Got the zoning changed so that

14:33:05   14   Claystone could still continue on, try to; however, they

14:33:17   15   did have a couple sales, but I have not kept track of

14:33:21   16   them because I'm turning the subdivision back.

14:33:25   17   BY MR. BAHRET:

14:33:25   18   Q.  You did what?

14:33:27   19          THE COURT:  He turned the subdivision back.

14:33:30   20   Q.  So you're not part of that operation anymore?

14:33:32   21   A.  Well I'm still -- still haven't made the deal

14:33:35   22   with the bank yet.  But we're negotiating with them.

14:33:40   23   Q.  The fact of the matter is even though you're

14:33:45   24   hoping something turns around, no lots have moved since

14:33:49   25   2004?

14:33:49  1      A.   No.

14:33:51  2      Q.   All right.   On the listing of houses that you

14:33:56  3   claim sold in Cambridge, when you told the jury there

14:34:00  4   was some activity, like, in 2005 when Bill Schoen sold a

14:34:04  5   house --

14:34:05  6      A.   Yes.

14:34:05  7      Q.   That didn't make any money for you?

14:34:07  8      A.   Yes, it did.

14:34:09  9      Q.   That was Bill Schoen's house that he, according

14:34:12  10  to this document, his company bought from you in 2002.

14:34:16  11  He bought the dirt from you in 2002?

14:34:19  12     A.   Are you sure?

14:34:20  13     Q.   That's what it says on this document your

14:34:23  14  attorney -- right here.   Look at this, sir.

14:34:30  15     A.   I made money, paid the bank.

14:34:33  16     Q.   Yeah, but in 2002.

14:34:42  17     A.   Okay.

14:34:42  18     Q.   And then when the builder pays you for the dirt,

14:34:48  19  and thereafter the builder three years later sells a

14:34:51  20  house that he built on it, that isn't money in Old

14:34:57  21  Granite's pocket?

14:34:58  22     A.   No.   He got his profit.

14:35:01  23     Q.   So if we're talking about lots that Old Granite

14:35:03  24  sold, the answer to that question -- and I'll give you

14:35:07  25  your sheet back -- the last lot sold in Old Granite was

| | | |
|---|---|---|
| 14:35:14 | 1 | exactly what I told this jury before, January of 2004? |
| 14:35:28 | 2 | A.  The last one what, Bob? |
| 14:35:30 | 3 | Q.  The last lot that Old Granite sold, January of |
| 14:35:33 | 4 | 2004? |
| 14:35:39 | 5 | THE COURT:  In Cambridge? |
| 14:35:42 | 6 | MR. BAHRET:  Correct. |
| 14:35:46 | 7 | A.  Well, I don't know when we sold.  We sold a house |
| 14:35:53 | 8 | in 8-26 -- |
| 14:35:56 | 9 | MR. ROBON:  Can you speak up?  I can't hear |
| 14:35:58 | 10 | you. |
| 14:35:59 | 11 | THE COURT:  He's talking to himself until he |
| 14:36:01 | 12 | comes up with an answer. |
| 14:36:05 | 13 | THE WITNESS:  How do you like not hearing? |
| 14:36:09 | 14 | A.  Cohen, I guess, is the last one. |
| 14:36:18 | 15 | Q.  Let's go through a number of matters.  If I can |
| 14:36:23 | 16 | speed this up a bit, several topics to talk about.  Is |
| 14:36:26 | 17 | it true, sir, all three of the builders pulled out of |
| 14:36:29 | 18 | the arrangement? |
| 14:36:29 | 19 | A.  Yes. |
| 14:36:30 | 20 | Q.  And that was back in December of 2003? |
| 14:36:33 | 21 | A.  That's about -- yeah. |
| 14:36:35 | 22 | Q.  And they pulled out because they were absolutely |
| 14:36:38 | 23 | frustrated that this development was going nowhere? |
| 14:36:41 | 24 | A.  No. |
| 14:36:42 | 25 | Q.  They pulled out because they were happy about the |

14:36:44  1   development?

14:36:45  2     A.   No.   First of all, you have to realize that Bill

14:36:53  3   Schoen is no longer in business.   Eric Huffman has gone

14:36:59  4   to straight remodeling.   Todd Berman shut his operation

14:37:03  5   down in Petoskey; he shut down his operation in

14:37:09  6   Columbus.   He, for a guy that builds million-dollar

14:37:14  7   houses, multi-million-dollar houses, and I don't mean

14:37:18  8   this as any putdown to him, but he was at the home show.

14:37:25  9   I had one back in the title business, and he was there.

14:37:29  10  And I said, Bill -- Todd, I said, this guy's big time.

14:37:40  11  I mean, really big time.   And he said -- I said, How

14:37:44  12  are you doing?  What are you doing here?  He's got two

14:37:48  13  companies, one Mercedes, another one, whatever.   I said,

14:37:56  14  What are you doing here?  He said, Surviving.

14:38:00  15  Everybody is surviving.

14:38:01  16    Q.   This all happened back in 2003 when the market

14:38:04  17  was booming?

14:38:05  18    A.   The market was not booming.

14:38:07  19    Q.   In 2003?

14:38:08  20    A.   No.

14:38:08  21    Q.   Okay.   But that's when all three of them the same

14:38:11  22  month pulled out of the development?

14:38:13  23    A.   Yes.

14:38:20  24    Q.   Mr. McCarthy, Mike McCarthy, who lives in that

14:38:24  25  spec house on 15.

14:38:25  1      A.   Yes.

14:38:26  2      Q.   His first few months was kind of a trade.   He

14:38:32  3   was going to live there and trade for a service he

14:38:35  4   performed for you over in Briarfield?

14:38:39  5      A.   Yes.

14:38:39  6      Q.   But he long since used up that grace period?

14:38:42  7      A.   Yes.

14:38:42  8      Q.   And he's not paying rent like he's supposed to,

14:38:46  9   is he?

14:38:46  10     A.   No.

14:38:47  11     Q.   So you're getting no revenue from the spec house

14:38:51  12  on lot 15?

14:38:52  13     A.   No.

14:38:53  14     Q.   And you should be getting $3,000 a month?

14:38:55  15     A.   Yes.

14:38:58  16     Q.   Are you evicting him?

14:38:59  17     A.   No.

14:39:06  18     Q.   Sir, is it true that you have no idea why the

14:39:12  19  sales are the way they have been in the last few years;

14:39:16  20  in other words, the lack of sales?

14:39:18  21     A.   The recession.

14:39:21  22     Q.   Nobody bought a lot, constructed anything

14:39:28  23  abutting the railroad tracks other than you for the spec

14:39:33  24  house?

14:39:33  25     A.   Yes, the one I'm not allowed to mention.

14:39:40  1     Q.  And even before the trees were cut, sir, you

14:39:42  2  could hear the trains if they passed?

14:39:45  3     A.  No.

14:39:45  4     Q.  Somebody with normal hearing could hear the

14:39:48  5  trains pass?

14:39:49  6     A.  I suppose.  But I'd like to quote something on

14:39:54  7  that.

14:39:54  8     Q.  What's that?

14:39:55  9     A.  I'd like to make a comment on that.

14:39:58  10     Q.  I think you've answered the question.  And I

14:40:00  11  hope you don't think what I said was an insult.

14:40:03  12     A.  No.   No.

14:40:11  13     Q.  Is it true, sir, that when the subdivision was

14:40:15  14  built that your contractor cleared the Cambridge

14:40:20  15  property all the way to the back property line?

14:40:24  16     A.  I don't know about that because Tommy is -- takes

14:40:30  17  care of the construction.  I walked -- you know, I've

14:40:37  18  done a number of subdivisions, and you do not take down

14:40:41  19  trees unless you absolutely have to.  Trees are a

14:40:44  20  value.  People like trees.

14:40:54  21     Q.  This is at your deposition, and you remember

14:40:56  22  being deposed in your attorney's office, correct?

14:40:59  23     A.  Yes.

14:41:03  24           THE COURT:  You might want to increase the

14:41:05  25  brightness.  It's awfully dark.

14:41:21  1    Q.   Can you read that now, sir?   That's page 42 of
14:41:25  2   your deposition.   Are you able to read it, sir?
14:41:28  3    A.   Yes.
14:41:29  4    Q.   And at that time you were asked:  "So you don't
14:41:33  5   know if in the development of Cambridge all the lots
14:41:36  6   that face the railroad were actually -- you cleared as
14:41:40  7   far back as your property line?   You don't know if
14:41:45  8   that's true?"
14:41:46  9        And your answer is:  "Probably."
14:41:49  10       Do you see that?
14:41:50  11   A.   I don't know what you meant by cleared.
14:41:52  12   Q.   You don't know what "cleared" means?
14:41:53  13   A.   Do you mean cut the grass, or what are you
14:41:56  14  talking about.
14:41:58  15   Q.   Mr. Laskey, you know what it means to clear the
14:42:02  16  land; do you not?
14:42:04  17   A.   Yes.
14:42:06  18   Q.   And when you answered that question, you answered
14:42:09  19  truthfully?   I mean, your assumption was they cleared
14:42:15  20  the back of the property?
14:42:17  21   A.   But what are you talking about?   By cleared,
14:42:25  22  what are you talking about?   Are you taking down trees?
14:42:29  23  Are you clearing rocks?   Are you picking up junk?   What
14:42:34  24  are you talking about?   Are you saying taking down
14:42:37  25  trees and evergreens and everything else?   No.   We

| | | |
|---|---|---|
| 14:42:42 | 1 | wouldn't take down trees.   Now, did we push it back? |
| 14:42:45 | 2 | I don't know. |
| 14:42:47 | 3 | Q.   You know what the word "cleared" means, though; |
| 14:42:50 | 4 | do you not? |
| 14:42:51 | 5 | A.   Yeah. |
| 14:42:53 | 6 | Q.   All right.   And I correctly read your deposition |
| 14:42:56 | 7 | transcript on that page? |
| 14:42:58 | 8 | A.   I beg your pardon? |
| 14:43:00 | 9 | Q.   I correctly read your testimony? |
| 14:43:02 | 10 | A.   Yes. |
| 14:43:06 | 11 | Q.   The subdivision, the development never intended |
| 14:43:10 | 12 | to tap into the railroad's drainage lines, did it? |
| 14:43:14 | 13 | A.   No. |
| 14:43:17 | 14 | Q.   So far as you know, Mr. McCarthy had no |
| 14:43:20 | 15 | permission to do so? |
| 14:43:22 | 16 | A.   No.   I don't think he ever intended to. |
| 14:43:25 | 17 | Q.   He accidentally tapped into their line? |
| 14:43:28 | 18 | A.   Well, no, I don't think he did.   I don't think |
| 14:43:31 | 19 | he tapped into it. |
| 14:43:33 | 20 | Q.   Well, he said he did. |
| 14:43:35 | 21 | A.   What do you mean by tapped into it? |
| 14:43:38 | 22 | Q.   Knocked a hole in the side of their pipe and |
| 14:43:41 | 23 | joined his pipe in there. |
| 14:43:42 | 24 | A.   Oh, to get rid of the water or something?   I |
| 14:43:47 | 25 | don't know.   I'm not John McCarthy.   I wasn't there |

14:43:50  1    everyday.

14:43:51  2        Q.   All right.   Is it true that you never asked

14:43:54  3    Ric-man to stop doing whatever they were doing when they

14:43:57  4    were there?

14:43:58  5        A.   I walked around the one day, I believe with John

14:44:03  6    McCarthy, and I ran into one of the workmen.

14:44:07  7        Q.   This will go a lot faster if you can answer yes

14:44:12  8    or no.   Did you tell him to stop?

14:44:14  9        A.   No.

14:44:17  10       Q.   And Ric-man, just so everybody knows, I think

14:44:20  11   they already do, that's the contractor that was

14:44:22  12   installing the pipes?

14:44:24  13       A.   Yes.

14:44:27  14       Q.   Is it true that the very first thing that you

14:44:29  15   consulted John McCarthy about was water on the property?

14:44:36  16       A.   I don't know what was the first thing.   We had

14:44:39  17   talked about the whole thing, what were we going to do.

14:45:06  18       Q.   The question on page 62.

14:45:10  19       A.   Yes.

14:45:11  20       Q.   "What was the issue when you first consulted with

14:45:14  21   him?"

14:45:15  22            And you'll see his name higher up on the page.

14:45:18  23   Let me see if this works.

14:45:20  24       A.   Yes.

14:45:21  25       Q.   "What was the issue when you first consulted with

14:45:28   1   him?"  Meaning McCarthy.

14:45:30   2        Answer: "First, the starting to get water in

14:45:34   3   their back yard, the cutting of the trees, the whole

14:45:37   4   thing."

14:45:37   5      A.   That's what I just said, wasn't it?

14:45:39   6      Q.   But water, that's what I'm trying to get at.

14:45:42   7   Water was big, correct?

14:45:44   8      A.   Yeah.

14:45:44   9      Q.   It was a problem already?

14:45:46  10      A.   Yes.

14:45:46  11      Q.   And that was before the pipeline was installed?

14:45:54  12      A.   Yeah.

14:45:55  13      Q.   Okay.  And that's what you were telling me on the

14:46:06  14   next page.  You needed to consult with him about the

14:46:10  15   water?

14:46:11  16      A.   Yes.

14:46:13  17      Q.   And again, that is before the construction of the

14:46:17  18   pipeline?

14:46:20  19      A.   I would assume so.

14:46:27  20      Q.   And, in fact, back when you were under oath, you

14:46:30  21   told us that.  You said that the flooding problem

14:46:34  22   was -- or this is the question:

14:46:35  23        "Your flooding problem was already in existence

14:46:39  24   before that drainage pipe was cut?"

14:46:41  25        And you said, "Yes, I would assume it was."

14:46:44  1          And you stand by that today?

14:46:46  2      A.  I would assume so.

14:46:49  3              MR. ROBON:  Your Honor, could we have him

14:46:52  4  leave the thing up so he can read the next question and

14:46:55  5  answer.

14:46:55  6              THE COURT:  Sure.   If it's appropriate.

14:47:00  7  If it's on the same topic.

14:47:13  8      Q.  Again, two pages later, page 68, you again tell

14:47:18  9  us on this line, "It was before the pipe was put in the

14:47:23  10  ground."

14:47:26  11      All right.   So you got it four or five places in

14:47:29  12  the deposition telling us the same thing, and you'd

14:47:32  13  stand by that?  That problem with standing water that

14:47:35  14  you were addressing an engineer about was most

14:47:38  15  definitely before the pipe was cut, correct?

14:47:43  16      A.  I don't know when they cut -- you mean the City

14:47:48  17  pipe underneath the railroad?

14:47:49  18      Q.  It was before the waterline was installed, the

14:47:53  19  water main.   That's what all those references we just

14:47:59  20  went through said?

14:48:00  21      A.  Okay.

14:48:00  22      Q.  Okay?   Now, sir, you know there's been a couple

14:48:07  23  pictures produced in discovery that showed tree stumps

14:48:10  24  where a tree was cut?

14:48:11  25      A.  Yes.

14:48:12  1    Q.   That are as much as 10 or 15 feet on the

14:48:16  2  Cambridge property.   We've talked about that before,

14:48:19  3  right?

14:48:19  4    A.   Right.

14:48:20  5    Q.   Who cut those down?  Because I know even you

14:48:23  6  don't allege that anybody from Vermillion did.   Who cut

14:48:26  7  those trees down?

14:48:27  8    A.   I don't know.

14:48:28  9    Q.   But you know that Vermillion did not go onto

14:48:32  10  Cambridge property anywhere near that far, if they went

14:48:36  11  on at all?

14:48:37  12    A.   The ones that were chopped off, the ones we've

14:48:40  13  been showing every day?

14:48:41  14    Q.   Those aren't 15 feet into your property, are

14:48:44  15  they?

14:48:44  16    A.   No, those are right along.

14:48:46  17    Q.   Right along the property line?

14:48:48  18    A.   Yes.

14:48:48  19    Q.   But what I'm asking you is the tree stumps that

14:48:51  20  are further in, ten or 15 feet into your property,

14:48:54  21  somebody cut trees down.  You don't know who it was?

14:48:58  22    A.   No.   Those are old trees, aren't they?

14:49:06  23    Q.   I don't know.   I don't know how to tell the age

14:49:10  24  of a tree that's not there.

14:49:14  25    A.   You can look at the bark.

14:49:16  1    Q.   I can do what?

14:49:18  2    A.   At the bark or whatever's there.

14:49:20  3    Q.   That would tell me how old it was before it got

14:49:23  4  cut down.   I don't think it keeps making rings after

14:49:27  5  it's chopped.

14:49:29  6         Would you agree, sir, the main reason the auction

14:49:31  7  was cancelled -- or the main reason the auction was

14:49:34  8  scheduled was to give attention to Rocky Ridge?

14:49:38  9    A.   Yes.

14:49:38  10   Q.   And would you agree that cutting down the trees

14:49:40  11 in Cambridge had nothing to do with Rocky Ridge?

14:49:45  12   A.   No, they had nothing to do with each other.

14:49:48  13   Q.   But even though the primary purpose of this

14:49:50  14 auction that you talked about had something to do with a

14:49:52  15 different development, you cancelled the auction?

14:49:56  16   A.   No.   It had to do with all three developments.

14:50:02  17 I told you that.   There were signs put up and

14:50:05  18 everything else on all three properties.

14:50:07  19   Q.   But the primary reason for the auction, though,

14:50:10  20 was Rocky Ridge?

14:50:12  21   A.   Rocky Ridge.

14:50:13  22   Q.   You were going to try to move all three?

14:50:16  23   A.   Yes.

14:50:16  24   Q.   But the primary stumbling block for you at that

14:50:19  25 time was Rocky Ridge?

14:50:21   1      A.   I -- yeah, I would suppose.   Because people --

14:50:30   2      Q.   Is it true that your company is doing absolutely

14:50:33   3   nothing to try to sell lots in Cambridge right now?

14:50:36   4      A.   No.

14:50:36   5      Q.   That's not true or --

14:50:39   6      A.   We're not trying to do anything.

14:50:40   7      Q.   Okay.  And the reason for that is what?

14:50:44   8      A.   It's a dead dog.   I'm not going to put money in

14:50:50   9   a dead horse.

14:50:53   10     Q.   Did you listen to your witness this morning,

14:51:00   11   Keesey, or whatever his name was?

14:51:02   12     A.   Yeah.

14:51:03   13     Q.   I mean, are you aware of the fact that he says

14:51:16   14   the lots still have value?

14:51:21   15     A.   Try it again, Bob.

14:51:23   16     Q.   I'm sorry.   Are you aware of the fact that Mr.

14:51:27   17   Keesey says that these lots still have value?

14:51:31   18     A.   I disagree with him.

14:51:33   19     Q.   Okay.  And are you aware of the fact that he

14:51:38   20   described value as being what a willing buyer would pay

14:51:42   21   to a willing seller?

14:51:44   22     A.   Yes.

14:51:45   23     Q.   And as they told us in law school, when neither

14:51:48   24   one of them are under compulsion to sell, nobody's

14:51:53   25   holding a gun to their head, right?

```
14:51:55   1        A.   I don't know.   I didn't go to law school.

14:51:57   2        Q.   Well, and he says that you can sell these lots,

14:52:03   3   the combined value of the remaining lots -- and actually

14:52:07   4   not even all the lots, just the ones that are on that

14:52:10   5   end that you can see the railroad, for $620,000.  And

14:52:15   6   then the lots that are up closer to the gate, those

14:52:18   7   still are worth what, $145,000 or something?

14:52:23   8        A.   We've got them priced at that, yeah.

14:52:26   9        Q.   And the bottom line is that if you believe your

14:52:29  10   own expert, you could be selling all these things for a

14:52:33  11   combined total of somewhere near a million dollars.

14:52:36  12   And you think he's flat wrong?  He's off by a million

14:52:40  13   dollars?

14:52:40  14        A.   Yeah.

14:52:40  15        Q.   Because it's worth nothing?

14:52:42  16        A.   Nobody is going to buy those lots with the

14:52:47  17   railroad.  You were there.  You saw it.  Would you?

14:52:52  18        Q.   Sir, I'm not allowed to give answers.

14:52:56  19             THE COURT:  Let's stop the chatter, please.

14:52:58  20   Let's just get to a question and answer.

14:53:10  21   BY MR. BAHRET:

14:53:10  22        Q.   Do you have any idea why nobody has purchased a

14:53:17  23   lot abutting the railroad?  And this is even before the

14:53:23  24   trees are cut.

14:53:24  25        A.   I know.  I know what you're saying.  I think
```

14:53:27  1    that -- I would have bought one of those lots before I

14:53:34  2    bought Kevin's.  Kevin's was okay; the lot next to Kevin

14:53:39  3    is really bad.

14:53:40  4        Q.  Kevin is the guy that testified?

14:53:43  5        A.  The young blonde man.

14:53:45  6        Q.  Lot 7, was it?

14:53:47  7        A.  I beg your pardon?

14:53:49  8        Q.  Lot 7, I think?

14:53:51  9        A.  Yes.

14:53:53  10       Q.  But nobody got down near the train themselves;

14:53:57  11   nobody bought a lot down there?

14:53:59  12       A.  No.   That's what we were trying to encourage

14:54:02  13   when we built on lot 15.   I would buy a lot there, yes.

14:54:09  14       Q.  But you understand, and I hear you, I hear you

14:54:12  15   saying you'd buy a lot, and I believe you.   But would

14:54:16  16   you agree that's an issue for some people in the market?

14:54:20  17       A.  What's that, Bob?

14:54:21  18       Q.  Being that close to the railroad tracks.

14:54:22  19       A.  Sure.

14:54:27  20       Q.  I mean, there isn't any doubt in your mind that

14:54:31  21   the same development in a good location without the

14:54:35  22   railroad track would be a little more attractive than

14:54:39  23   the one development near the tracks?

14:54:41  24       A.  If we were overlooking the river, yeah, sure,

14:54:46  25   that's something more attractive than that.

14:54:49  1      Q.   If you were on the other side of River Road it

14:54:51  2   would be a lot more money, correct?

14:54:55  3      A.   No.

14:54:56  4      Q.   If you had property abutting the river itself,

14:54:59  5   that's not more valuable?

14:55:00  6      A.   Well, sure, River Road -- anything on water,

14:55:05  7   whether it's a lake, a pond.  You go to a regular

14:55:09  8   subdivision, and the houses on a pond draw more money

14:55:14  9   than a regular street lot.

14:55:20  10     Q.   Mr. Laskey, if I already asked you this, forgive

14:55:23  11  me, but you know Cambridge was, in fact, a farm field

14:55:25  12  before you bought it?

14:55:27  13     A.   I beg your pardon?

14:55:28  14     Q.   You know that Cambridge was a farm field?

14:55:32  15     A.   Yes.

14:55:35  16     Q.   And you and your partner decided to clear the

14:55:39  17  property for development?

14:55:41  18     A.   Yes.

14:55:41  19     Q.   Your partner was Mr. Taylor?

14:55:44  20     A.   Correct.

14:55:54  21     Q.   And the decision was made, when you made a

14:55:57  22  decision how far to clear, the decision was to clear all

14:56:01  23  the way up to the railroad right-of-way, correct?

14:56:03  24            MR. ROBON:  Objection.  Asked and answered

14:56:05  25  three times.

14:56:06  1                    THE COURT:  Just a moment, please.

14:56:13  2                    Has that question been asked of this

14:56:15  3    witness?

14:56:19  4                    MR. ROBON:  He put up page 67.

14:56:22  5                    MR. BAHRET:  We did talk about it once.

14:56:23  6                    THE COURT:  Then I'll sustain the objection.

14:56:26  7                    MR. BAHRET:  I had another reference in the

14:56:27  8    deposition where he said it again.

14:56:29  9                    THE COURT:  We already covered it once.

14:56:31  10   Let's not replow the ground.

14:56:37  11                   THE WITNESS:  Can I make a point?

14:56:40  12                   THE COURT:  Your lawyer has asked that you

14:56:42  13   not make the point, and I sustained it.

14:56:47  14   BY MR. BAHRET:

14:56:47  15     Q.  You would agree with me, Mr. Laskey, that you

14:56:50  16   know that Cambridge or Old Granite has no right to

14:56:55  17   control the activities on the railroad property?

14:56:57  18     A.  Sure.

14:57:00  19     Q.  And you understand that even your own expert does

14:57:05  20   not claim that there's been any encroachment on

14:57:09  21   Cambridge property on the portion of the property that's

14:57:14  22   further away from Bates Road; in other words, Lots 9,

14:57:18  23   10, 11?

14:57:19  24     A.  Right.

14:57:21  25     Q.  So since nothing was cleared from Cambridge,

14:57:26  1   whatever was cleared was railroad property, at least in

14:57:30  2   that area --

14:57:30  3       A.   I don't agree.

14:57:31  4       Q.   You disagree with your own expert on that point

14:57:35  5   too?

14:57:35  6       A.   Yes.   I'm particularly interested in Lot 9 down

14:57:42  7   in the corner.

14:57:43  8       Q.   Well, you know, they came in and did the survey

14:57:46  9   and reached that result.

14:57:49  10      A.   I know the surveyors did it, but I walked it.

14:57:53  11      Q.   And you know your attorney told the jury that

14:57:55  12  there's no claim for those lots.   Do you disagree with

14:58:00  13  him, too?

14:58:01  14      A.   Yes.

14:58:17  15      Q.   The area the jury walked, and you did too the

14:58:19  16  other day, where that catch basin is, the lot 15, lot 16

14:58:23  17  border, that's basically the lowest part of your

14:58:26  18  development?

14:58:26  19      A.   Right.

14:58:33  20      Q.   Let me ask you about, you said you have $539,000

14:58:38  21  into the spec house?

14:58:39  22      A.   Yes.

14:58:40  23      Q.   That house is about 2,600, 2,700 square feet?

14:58:47  24      A.   It's about 2800.

14:58:50  25      Q.   And so it's -- you have something just under $200

14:58:54  1   a square foot in that house?

14:58:56  2     A.  Yes.   There's a lot of amenities in that house.

14:59:03  3   One of the things is --

14:59:11  4     Q.  Do you remember what you indicated back at the

14:59:14  5   time of deposition that you had into that house?

14:59:16  6     A.  No.   I think I said 500.

14:59:23  7     Q.  Would it surprise you if the answer was that

14:59:27  8   including the interest that you have paid ever since the

14:59:32  9   house was built, and what you have in the house, the

14:59:36  10  grand total is $395,000?  You don't believe you said

14:59:42  11  that?

14:59:43  12    A.  No.

14:59:55  13    Q.  You had your daughter run the figures, and she

14:59:58  14  came up on the spec house, and the payments on the

15:00:01  15  interest on the loan comes up to $395,000.  Do you see

15:00:06  16  that?

15:00:06  17    A.  Yes.

15:00:07  18    Q.  Well, who ran the numbers that came up $150,000

15:00:13  19  more?

15:00:13  20    A.  I did.

15:00:21  21    Q.  But at least that's what you told me back at the

15:00:23  22  time of the deposition?

15:00:25  23    A.  That was September 25, 2007.

15:00:30  24    Q.  And you would agree that -- in hindsight, you

15:00:33  25  would agree that maybe the houses and the lots were too

| | | |
|---|---|---|
| 15:00:37 | 1 | expensive for the market in Cambridge? |
| 15:00:41 | 2 | A.  From the get-go? |
| 15:00:44 | 3 | Q.  Yeah. |
| 15:00:44 | 4 | A.  From 2001? |
| 15:00:46 | 5 | Q.  Yes.   As far as why they stopped selling, |
| 15:00:50 | 6 | perhaps they were too pricey? |
| 15:00:51 | 7 | A.  Well, we priced -- no, everybody bought at those |
| 15:00:55 | 8 | prices.  We did lower the price for Kevin.  Some lots |
| 15:01:03 | 9 | were more desirable.  But those prices were set by |
| 15:01:06 | 10 | Betty Lazzaro and our three builders and Tommy and I. |
| 15:01:12 | 11 | And the three builders paid those prices.  Now, these |
| 15:01:16 | 12 | guys aren't amateurs.  They were the three best |
| 15:01:21 | 13 | builders in Toledo or in northwest Ohio, at least |
| 15:01:26 | 14 | they're considered that by some.  I'm sure their |
| 15:01:29 | 15 | competition doesn't think that. |
| 15:01:33 | 16 | Q.  Let me see if this refreshes your recollection. |
| 15:01:45 | 17 | Did you tell me one of the problems were the houses were |
| 15:01:47 | 18 | too expensive? |
| 15:01:49 | 19 | A.  Yes. |
| 15:01:52 | 20 | Q.  Do you stand by that testimony today? |
| 15:01:56 | 21 | A.  Yes. |
| 15:02:09 | 22 | MR. BAHRET:  I get my exercise in your |
| 15:02:12 | 23 | courtroom, Your Honor. |
| 15:02:16 | 24 | BY MR. BAHRET: |
| 15:02:16 | 25 | Q.  Mr. Laskey, I think you already said this.   This |

15:02:19  1    will be my last area of inquiry.   The

15:02:23  2    get-off-the-ground party, or whatever it was that Betty

15:02:26  3    Lazzaro held over at Belmont --

15:02:28  4        A.   Uh-huh.

15:02:30  5        Q.   Fairly well attended, at least 40 couples were

15:02:34  6    there or something like that?

15:02:35  7        A.   Yeah.

15:02:35  8        Q.   Not a single sale was generated, though?

15:02:37  9        A.   No.

15:02:42  10       Q.   I know you have a hearing difficulty.   Were you

15:02:45  11   able to hear all my questions, Mr. Laskey?

15:02:46  12       A.   Yes.

15:02:48  13            MR. BAHRET:   Thank you very much.

15:02:50  14            THE WITNESS:   Thank you.

15:02:51  15            THE COURT:   Any redirect?

15:02:52  16            MR. ROBON:   Yes.   Could you give me page

15:02:55  17   67, Mr. Bahret, and 68.

15:02:55  18                     - - -

15:02:55  19            JOHN LASKEY, REDIRECT EXAMINATION

15:02:55  20   BY MR. ROBON:

15:04:03  21       Q.   From 2001 until the summer, spring of 2006, did

15:04:07  22   you ever have a water problem at the rear of lots 12 to

15:04:13  23   15

15:04:16  24       A.   From when?

15:04:18  25       Q.   From the time you constructed the subdivision in

| | | |
|---|---|---|
| 15:04:22 | 1 | 2001 until the summer of 2006, did you ever have a |
| 15:04:29 | 2 | problem with water, standing water or ponding water -- |
| 15:04:32 | 3 | A.   No. |
| 15:04:33 | 4 | Q.   -- at the rear of those lots? |
| 15:04:34 | 5 | A.   No.   No. |
| 15:04:35 | 6 | Q.   Okay.   Now, I know you're a proud man.   Would |
| 15:04:40 | 7 | you tell the jury, did you hear -- I know you've got |
| 15:04:45 | 8 | hearing things on now, but when Mr. Bahret took your |
| 15:04:48 | 9 | deposition at my office, some of your answers didn't |
| 15:04:51 | 10 | sound like they were responsive to the questions. |
| 15:04:54 | 11 | MR. BAHRET:   Objection. |
| 15:04:56 | 12 | A.   Yes. |
| 15:04:59 | 13 | THE COURT:   I'm not sure we're going to go |
| 15:05:01 | 14 | down this path.   Let me see counsel up here. |
| 15:05:17 | 15 | (Discussion had off the record.) |
| 15:06:27 | 16 | BY MR. ROBON: |
| 15:06:28 | 17 | Q.   When Mr. Bahret asked you about you cleared the |
| 15:06:31 | 18 | subdivision -- |
| 15:06:31 | 19 | A.   Yes. |
| 15:06:32 | 20 | Q.   When I was out there with the jury I saw all |
| 15:06:34 | 21 | kinds of trees next to the driveway.   What do you mean |
| 15:06:37 | 22 | by clearing?   When he refers to clearing, he's talking |
| 15:06:44 | 23 | about leveling everything.   What did you mean by |
| 15:06:47 | 24 | clearing? |
| 15:06:48 | 25 | MR. BAHRET:   I point out my question was |

15:06:50   1   clearing at the back line, too.

15:06:52   2           THE COURT:  Let's just make easier,

15:06:56   3   everyone.   Can you -- let's just leave with it the last

15:07:01   4   part of the question.   What did you mean, Mr. Laskey,

15:07:05   5   or what did you understand clearing to mean?   Isn't

15:07:08   6   that the question?

15:07:09   7           MR. ROBON:  Yes.

15:07:10   8   A.   To me a clearing is -- in a subdivision you want

15:07:16   9   to make it as clean as you possibly can, okay.   And by

15:07:20  10   clearing, it could be stones, rocks; it could be tree

15:07:27  11   stumps; it could be anything.   But when you do a

15:07:30  12   subdivision, you run a street down there, you usually

15:07:34  13   cut the grass back; you try to keep -- you don't line up

15:07:38  14   the straws up two, three feet, but you want to make it

15:07:43  15   as pleasant and nice as can be.   If you go out and look

15:07:46  16   at our subdivision right now, you go out and look at

15:07:49  17   Cambridge, you'll see it's cut back there.   Also it was

15:07:52  18   cut around all the front fence so the people can walk

15:07:56  19   around, okay.   So you want to get rid of all the debris.

15:08:00  20   The same as cleaning the streets when you're building

15:08:03  21   houses.

15:08:04  22   Q.   Well, he used clearing in the sense of cutting

15:08:07  23   down all the trees.   That didn't happen, did it?

15:08:10  24           MR. BAHRET:  Objection.

15:08:12  25   A.   Let me say this one.

15:08:20   1              THE COURT:  Well, are we done with clearing,

15:08:22   2   or are we still --

15:08:26   3              MR. ROBON:  I asked him clearing, as the

15:08:29   4   definition that Mr. Bahret used of cutting down the

15:08:31   5   trees, never happened?

15:08:32   6              THE COURT:  I think it was cutting down all

15:08:34   7   the trees at certain locations.

15:08:37   8   BY MR. ROBON:

15:08:37   9      Q.  At the back of the lots.

15:08:39  10      A.  No.

15:08:39  11      Q.  When the jury was out there and they stood by the

15:08:43  12   catch basin, there were all kinds of trees on the back

15:08:46  13   of lot 16; was there not?

15:08:48  14      A.  Yes.

15:08:49  15      Q.  They're still there today?

15:08:50  16      A.  Yes.

15:09:00  17      Q.  Lastly, would you tell the jury why you have not

15:09:03  18   evicted Mike McCarthy?

15:09:06  19      A.  What?

15:09:07  20      Q.  Why you have not evicted Mike McCarthy from the

15:09:11  21   lot 15 home?

15:09:12  22      A.  Because he has three children.

15:09:18  23              MR. ROBON:  Nothing further.

15:09:19  24              THE COURT:  Anything further?

15:09:20  25              MR. BAHRET:  No, Your Honor.

```
15:09:20   1            THE COURT:  You may step down, Mr. Laskey.
15:09:33   2            I understand the plaintiff has another
15:09:34   3   witness who is not available until tomorrow; is that
15:09:38   4   correct?
15:09:38   5            MR. ROBON:  That's correct, Your Honor.
15:09:39   6            THE COURT:  What we're going to do, ladies
15:09:41   7   and gentlemen, to keep the trial moving, is take the
15:09:43   8   next witness out of order, so to speak, and we'll have
15:09:46   9   the defense call their next witness.  This would be a
15:09:49  10   good time maybe to take a short break and get
15:09:52  11   reassembled a bit.  I'll have some matters to handle
15:09:56  12   with the lawyers.  So let's take a 15-minute break,
15:09:59  13   which puts us at 25 after.  Please remember the rules.
15:10:04  14   We're in recess.
15:27:12  15            (Recess taken.)
15:27:21  16            (The witness was sworn by the clerk.)
15:28:32  17            THE COURT:  As I indicated just before the
15:28:34  18   break, ladies and gentlemen, we're going a little out of
15:28:36  19   order.  We are now going to hear a witness offered by
15:28:39  20   the defendant.  You may proceed.
15:28:42  21            MR. BAHRET:  Thank you, Your Honor.
15:28:43  22            THE COURT:  And the witness has been sworn.
15:28:45  23                      - - -
15:28:45  24            PETE FORLETTA, DIRECT EXAMINATION
15:28:45  25   BY MR. BAHRET:
```

15:28:45    1      Q.   Good afternoon.   Could you state your full name

15:28:53    2   for the record, please.

15:28:53    3      A.   Pete Forletta.

15:28:56    4      Q.   Pete, you came over here today and I guess took

15:29:00    5   off work.   Where did you take off from work?

15:29:02    6      A.   26 Mile and Gratiot, New Haven.

15:29:07    7      Q.   For whom do you work?

15:29:09    8      A.   Ric-man Construction.

15:29:10    9      Q.   How long have you worked for Ric-man?

15:29:12   10      A.   Thirty-six years.

15:29:13   11      Q.   What job title?

15:29:14   12      A.   I'm a foreman.

15:29:16   13      Q.   And were you a foreman on the project involving

15:29:20   14   the City of Toledo water main?

15:29:22   15      A.   Yes.

15:29:22   16      Q.   And did that include -- I think it's called

15:29:25   17   contract E, the area that was between Bates Road and

15:29:30   18   Ford Road?

15:29:30   19      A.   Yes.

15:29:31   20      Q.   Are you generally familiar with the events

15:29:34   21   surrounding that work?

15:29:35   22      A.   Yes.

15:29:35   23      Q.   Mr. Forletta, I want to ask you about a pipe that

15:29:42   24   went under the abandoned railroad right-of-way.   Are

15:29:47   25   you familiar with that issue?

15:29:48  1    A.   Yes.

15:29:49  2    Q.   And you're familiar with a manhole cover there?

15:29:53  3    A.   Yeah, it was like a catch basin on the side.

15:29:56  4    Q.   How did you first become aware of the issue

15:29:59  5    involving that catch basin off to the side?

15:30:01  6              MR. ROBON:   Objection, leading.   I take it

15:30:06  7    back.   Go ahead.

15:30:08  8              MR. BAHRET:   Marv you might recognize --

15:30:13  9              THE COURT:   No.   No.   No.

15:30:14  10             MR. ROBON:   I withdraw the objection.

15:30:15  11   BY MR. BAHRET:

15:30:15  12   A.   I was told by Dean Walsh that there might be a

15:30:19  13   pipe there, but nobody knew exactly if it was there or

15:30:22  14   not.

15:30:22  15   Q.   So ultimately tell us, when did you next become

15:30:25  16   involved with any issue involving this pipe?

15:30:28  17   A.   When we were going towards the east, and we kept

15:30:33  18   digging, we ran into it.   We finally broke it with an

15:30:38  19   excavator.

15:30:38  20   Q.   Now, Mr. Forletta, the work -- the way you're

15:30:43  21   going, you're coming from Ford up to Bates or the other

15:30:47  22   way?

15:30:47  23   A.   We're going from White to -- yeah, from White to

15:30:52  24   Bates.

15:30:53  25   Q.   And so as you're progressing further, the

| | | |
|---|---|---|
| 15:30:57 | 1 | subdivision would be to your left? |
| 15:30:59 | 2 | A.  Yes. |
| 15:30:59 | 3 | Q.  All right.  And you mentioned an excavator or |
| 15:31:04 | 4 | something is being used? |
| 15:31:05 | 5 | A.  Well, you have to dig a hole to set the pipe in. |
| 15:31:09 | 6 | You know what I mean?  You have to make, like, a trench |
| 15:31:13 | 7 | so you can put the pipe in. |
| 15:31:14 | 8 | Q.  During that process you came into contact with |
| 15:31:18 | 9 | the pipe? |
| 15:31:19 | 10 | A.  Yes. |
| 15:31:20 | 11 | Q.  Did it break? |
| 15:31:21 | 12 | A.  Yeah. |
| 15:31:22 | 13 | Q.  You could see in it then? |
| 15:31:23 | 14 | A.  You could see both sides of the pipe, yeah. |
| 15:31:27 | 15 | Q.  Tell us what you saw when you're looking at that |
| 15:31:30 | 16 | pipe that was now open? |
| 15:31:31 | 17 | A.  The pipe was full of dirt; it was solid and dry. |
| 15:31:35 | 18 | Q.  So it wasn't moist or muddy; it's dry? |
| 15:31:38 | 19 | A.  Dry, yes. |
| 15:31:39 | 20 | Q.  Did it look like it had any water in it recently? |
| 15:31:43 | 21 | A.  No, it couldn't have.  There was no room. |
| 15:31:45 | 22 | Q.  It didn't even look like it could pass water? |
| 15:31:49 | 23 | A.  No. |
| 15:31:50 | 24 |         MR. BAHRET:  Thank you.  I have no other |
| 15:31:52 | 25 | questions. |

```
15:31:55   1                          - - -

15:31:55   2            PETE FORLETTA, CROSS-EXAMINATION

15:31:55   3   BY MR. ROBON:

15:31:55   4       Q.   You were the foreman on this job?

15:31:57   5       A.   Yes.

15:31:58   6       Q.   Can you tell the jury why you didn't stay five or

15:32:00   7   ten feet away from the back of the subdivision when you

15:32:04   8   cut the trees or ordered the trees cut?

15:32:06   9       A.   I wasn't there when they cut the trees.

15:32:07  10       Q.   You weren't?

15:32:08  11       A.   No.

15:32:08  12       Q.   You came on afterwards?

15:32:10  13       A.   Yes.   I came in to do the open cut.

15:32:15  14       Q.   Did you see the markings that the City put on the

15:32:21  15   trees or laths showing the property line?

15:32:25  16       A.   No.

15:32:25  17       Q.   So when you got there, everything was cut down?

15:32:28  18       A.   Yes.

15:32:28  19       Q.   Would it be your normal procedure as a foreman to

15:32:32  20   stay a few feet, say, away from a chain link fence or

15:32:36  21   from a property line?

15:32:37  22       A.   They give us center line station.   They put

15:32:41  23   stakes.   So we follow their center line.

15:32:44  24       Q.   I understand.   But my question is, Do you

15:32:47  25   normally, when you're working out in the field and
```

15:32:49  1   you're up against a subdivision -- let's pretend this

15:32:53  2   jury box is a subdivision.   It's got grass growing and

15:32:57  3   trees here.   You're working over here where I'm

15:32:59  4   standing.   Would you normally stay a few feet away, or

15:33:02  5   would you work right up to the very edge?  Yes or no?

15:33:05  6      A.   You would stay a few feet -- my guess would be --

15:33:08  7   I don't know.   I've got to be in that situation.

15:33:11  8      Q.   So you normally do stay a few feet away, correct?

15:33:15  9      A.   I guess, yeah.   I don't know.

15:33:18  10     Q.   Can you tell me why you or the City of Toledo or

15:33:24  11  no one took pictures of this pipe that was supposedly

15:33:28  12  blocked?

15:33:30  13     A.   I don't know.

15:33:31  14     Q.   Do you have a camera in your truck?

15:33:33  15     A.   No.

15:33:36  16     Q.   Have you ever taken pictures of a construction

15:33:39  17  site when you think there's a problem?

15:33:40  18     A.   Yes, sometimes.

15:33:41  19     Q.   It's very common; is it not?

15:33:45  20     A.   Usually the -- somebody does it.   Somebody takes

15:33:48  21  a picture for our company.

15:33:50  22     Q.   Were you in any of the meetings with the City

15:33:52  23  representatives?

15:33:54  24     A.   No.

15:33:55  25     Q.   You just -- you're the one that was there when it

15:33:57   1   was cut?

15:33:58   2       A.   Yes.

15:33:58   3       Q.   Did the City authorize you to cut it?

15:34:01   4       A.   No.   It -- we broke it because we didn't know it

15:34:05   5   was there.

15:34:07   6       Q.   Well, that's not what the testimony has been

15:34:09   7   here.

15:34:10   8            MR. BAHRET:   Objection.

15:34:12   9            THE COURT:   Well, counsel for both sides

15:34:14  10   have a habit of making comments.   I'm going to ask you

15:34:17  11   to both refrain from that.   Thank you.

15:34:24  12   BY MR. ROBON:

15:34:24  13       Q.   Was there a construction superintendent from

15:34:26  14   Ric-man that was higher than you as a foreman?

15:34:29  15       A.   Yes.

15:34:29  16       Q.   So he may have had meetings that you don't know

15:34:32  17   about?

15:34:32  18       A.   Right.   I didn't know about any meetings.

15:34:34  19       Q.   Let me ask this:   Were you surprised when the

15:34:37  20   pipe was cut?  Did you know it was there?

15:34:39  21       A.   No.   I told you, we didn't know it was there.

15:34:41  22       Q.   You didn't know it was there?

15:34:43  23       A.   No.

15:34:45  24       Q.   Could you see the manhole?

15:34:47  25       A.   You could see the manhole, but when you looked

15:34:49   1   inside the manhole, you couldn't see anything; it was
15:34:52   2   all full of garbage.
15:34:53   3       Q.   Did you see water in the manhole?
15:34:54   4       A.   No.
15:34:55   5       Q.   Did you drop a light down in the manhole?
15:34:57   6       A.   No.   It was full of garbage.
15:35:01   7       Q.   What kind of garbage?
15:35:02   8       A.   I don't know; broken pipe.   The manhole was
15:35:06   9   leaning on the side.
15:35:13  10       Q.   And you hadn't seen the railroad plans showing
15:35:15  11   the drain pipe?
15:35:17  12       A.   No, I didn't have those, no.
15:35:19  13       Q.   Were you aware they existed?
15:35:22  14       A.   No.
15:35:25  15       Q.   So the first time you knew about that was when
15:35:28  16   the excavator took a great big scoop of earth and pulled
15:35:34  17   up the pipe?
15:35:34  18       A.   Yes.
15:35:35  19       Q.   That's the first time?
15:35:36  20       A.   The first time I saw it, yes.
15:35:39  21       Q.   How big of a bite -- how many yards does the
15:35:43  22   excavator dig out at one time?
15:35:45  23       A.   Five yards, my guess would be.
15:35:48  24       Q.   Five yards.  And I think we heard yesterday that
15:35:51  25   a tandem truck holds ten yards; about right?

15:35:57  1      A.   Something like that.

15:35:58  2      Q.   So it would be about half as big as a tandem

15:36:03  3   truck was.  One big scoop, then the pipe comes out?

15:36:06  4      A.   Well, not really.   It depends how deep the pipe

15:36:09  5   was.

15:36:10  6      Q.   Well, but it would come out in one big scoop?

15:36:14  7      A.   Yeah, it would.

15:36:15  8      Q.   Then you're telling the jury that the pipe was

15:36:17  9   plugged with earth?

15:36:19  10     A.   Right.  Yes.

15:36:20  11     Q.   Well, wouldn't the mud that was in the hole

15:36:23  12   through the excavator fill it up?

15:36:27  13     A.   No.

15:36:28  14     Q.   No?

15:36:29  15     A.   No.

15:36:29  16     Q.   So it got dug out, broken?

15:36:33  17     A.   I'm talking about each edge.   Here's where we

15:36:36  18   dug.  The trench was in the center.   Each edge of the

15:36:39  19   trench, the pipe was still there.   You could see it was

15:36:42  20   full of dirt, each side.   We dug in the middle.

15:36:45  21     Q.   Right.   I understand.   But weren't you digging

15:36:48  22   down about seven, eight, nine feet, or was it deeper?

15:36:51  23     A.   It was deeper than that.

15:36:52  24     Q.   It was about 12 or 13 feet, right?

15:36:56  25     A.   Probably a little deeper than that.

15:36:58   1       Q.   You're telling this jury that when you dug, none
15:37:01   2   of that dirt got in the pipe?
15:37:03   3       A.   No.
15:37:04   4       Q.   You're not telling them that?
15:37:05   5       A.   No, I'm -- I'm telling them that the dirt, it was
15:37:09   6   existing.   It was in the pipe.
15:37:10   7       Q.   Well, what I'm asking you, sir, is when that
15:37:14   8   giant digger went down there and dug that pipe out,
15:37:17   9   you're telling the jury that a half a truckload of earth
15:37:23  10   is being pulled out and nothing fell into either side of
15:37:26  11   the pipe?
15:37:27  12       A.   No, because we clean it with a shovel.   If it
15:37:29  13   gets any dirt, we clean it with a shovel, and we look
15:37:32  14   inside.   It was packed.   Believe me, it was packed.
15:37:35  15       Q.   And you don't -- did you report it on your notes?
15:37:40  16       A.   I think Dean Walsh did.
15:37:43  17       Q.   Did you -- was the City inspector or the City
15:37:48  18   supervisor out there when this happened?
15:37:49  19       A.   The City inspector was, yes.
15:37:51  20       Q.   Who was that?
15:37:52  21       A.   Joe Crandall.
15:37:53  22       Q.   And what did he tell you?
15:37:54  23       A.   He told me -- he directed us to bulkhead it off
15:37:58  24   on each side.
15:38:00  25       Q.   The City did?

| | | |
|---|---|---|
| 15:38:01 | 1 | A.   Yes. |
| 15:38:02 | 2 | Q.   Did he tell you that those plans had already been |
| 15:38:05 | 3 | premade? |
| 15:38:06 | 4 | A.   What? |
| 15:38:08 | 5 | Q.   Did he tell you that was a premade decision, or |
| 15:38:11 | 6 | you didn't know? |
| 15:38:12 | 7 | A.   I didn't know. |
| 15:38:15 | 8 | Q.   And he didn't take a picture either? |
| 15:38:17 | 9 | A.   I don't know. |
| 15:38:23 | 10 | Q.   Do you recall seeing the railroad fence along the |
| 15:38:28 | 11 | north property line of what you were clearing? |
| 15:38:34 | 12 | A.   I don't know what you're talking about. |
| 15:38:38 | 13 | Q.   Where the railroad right-of-way ends, did you |
| 15:38:41 | 14 | recall seeing an old railroad fence anyplace between |
| 15:38:45 | 15 | White Road and Bates Road? |
| 15:38:47 | 16 | A.   I can't recall that. |
| 15:38:48 | 17 | Q.   You don't recall? |
| 15:38:49 | 18 | A.   I don't recall that, no. |
| 15:38:50 | 19 | Q.   Do you know what a monument is? |
| 15:38:52 | 20 | A.   Yeah. |
| 15:38:54 | 21 | Q.   Take a look at Exhibit Number 54. |
| 15:39:01 | 22 | THE COURT:  It's also on the little screen |
| 15:39:02 | 23 | in front of you, sir. |
| 15:39:03 | 24 | A.   Oh, okay. |
| 15:39:05 | 25 | Q.   Do you recall ever seeing this monument near the |

| | | |
|---|---|---|
| 15:39:07 | 1 | subdivision? |
| 15:39:08 | 2 | A.  No. |
| 15:39:10 | 3 | Q.  Did you look for any? |
| 15:39:13 | 4 | A.  No. |
| 15:39:16 | 5 | MR. ROBON:  No further questions. |
| 15:39:18 | 6 | THE COURT:  Anything further? |
| 15:39:20 | 7 | MR. BAHRET:  No, Your Honor. |
| 15:39:20 | 8 | THE COURT:  You may step down.  Thank you. |
| 15:39:22 | 9 | You may call your next witness. |
| 15:40:03 | 10 | (The witness was sworn by the clerk.) |
| 15:40:22 | 11 | - - - |
| 15:40:22 | 12 | DEAN WALSH, DIRECT EXAMINATION |
| 15:40:23 | 13 | BY MR. BAHRET: |
| 15:40:23 | 14 | Q.  Mr. Walsh, could you state your full name. |
| 15:40:26 | 15 | A.  Dean Patrick Walsh. |
| 15:40:29 | 16 | Q.  Thank you for coming over here.  You know my |
| 15:40:32 | 17 | name is Bob Bahret; I represent the City of Toledo, |
| 15:40:34 | 18 | right? |
| 15:40:34 | 19 | A.  Yes. |
| 15:40:35 | 20 | Q.  I think you and I met once before? |
| 15:40:37 | 21 | A.  Yes. |
| 15:40:37 | 22 | Q.  When you were testifying with reference to this |
| 15:40:39 | 23 | case? |
| 15:40:39 | 24 | A.  In deposition. |
| 15:40:42 | 25 | Q.  I forget where that took place, but you recall |

| | | |
|---|---|---|
| 15:40:44 | 1 | the event, anyway? |
| 15:40:46 | 2 | A.   Yes. |
| 15:40:46 | 3 | Q.   Mr. Walsh, for whom do you work? |
| 15:40:50 | 4 | A.   Ric-man Construction. |
| 15:40:51 | 5 | Q.   What is your job title? |
| 15:40:54 | 6 | A.   General superintendent. |
| 15:40:55 | 7 | Q.   How long have you worked for Ric-man? |
| 15:40:57 | 8 | A.   Off and on, 30 years. |
| 15:40:59 | 9 | Q.   How long have you been the superintendent? |
| 15:41:03 | 10 | A.   Eight years. |
| 15:41:05 | 11 | Q.   And so back during the -- that particular portion |
| 15:41:09 | 12 | of the Toledo water main project that went behind |
| 15:41:14 | 13 | Cambridge Subdivision, was that under your control? |
| 15:41:16 | 14 | A.   Yes, that's my responsibility. |
| 15:41:18 | 15 | Q.   Did your company have anything to do with staking |
| 15:41:22 | 16 | the job? |
| 15:41:23 | 17 | A.   No. |
| 15:41:24 | 18 | Q.   In other words, demarcating the right-of-way? |
| 15:41:27 | 19 | A.   No. |
| 15:41:27 | 20 | Q.   And did your company physically clear the land? |
| 15:41:32 | 21 | A.   No. |
| 15:41:33 | 22 | Q.   Who did that? |
| 15:41:35 | 23 | A.   Vermillion. |
| 15:41:37 | 24 | Q.   And then after the -- after it's staked and you |
| 15:41:43 | 25 | know where the property line is, are there any |

15:41:47  1    additional markings put in for Ric-man?

15:41:51  2        A.   For clearing or --

15:41:53  3        Q.   No, not for clearing, for a center line of any

15:41:56  4    kind.

15:41:57  5        A.   After the land is cleared, then the surveyors

15:41:59  6    come back and give us center line stakes and offset

15:42:03  7    stakes for the location of the water main.

15:42:06  8        Q.   So those are more woods pounded into the ground

15:42:11  9    down the middle of the right-of-way?

15:42:14  10       A.   In the middle then offset.

15:42:16  11       Q.   The offset is what?   Help me understand.

15:42:19  12       A.   It's a stake off of the center because when we're

15:42:22  13   digging through the center, those stakes get destroyed

15:42:24  14   so you need a reference that's offset from the center

15:42:28  15   line in order to delineate where the water main goes.

15:42:30  16       Q.   All right.   Good enough.   The pipe that was

15:42:35  17   being installed, what was that, the dimension?

15:42:38  18       A.   It was a 66-inch inside diameter concrete pipe.

15:42:44  19       Q.   All right.   So basically five and a half foot

15:42:47  20   interior diameter?

15:42:48  21       A.   Yes.

15:42:49  22       Q.   You were familiar with installing product like

15:42:52  23   that?

15:42:52  24       A.   Yes.

15:42:54  25       Q.   Ric-man was under a contract with the City?

15:42:58   1      A.   Yes.

15:42:59   2      Q.   In certain specifications?

15:43:02   3      A.   Yes.

15:43:02   4      Q.   And you had plans drawn up by Arcadis, a

15:43:06   5   consultant of the City?

15:43:07   6      A.   The City had the plans drawn up.   That's what we

15:43:10   7   worked by.

15:43:11   8      Q.   I meant to say that, but, I mean, you had them

15:43:13   9   available, and they were prepared by Arcadis?

15:43:17  10      A.   Yes.

15:43:19  11      Q.   And you followed those plans?

15:43:21  12      A.   Yes.

15:43:21  13      Q.   Tell us about in that area behind Cambridge --

15:43:28  14   well, up over the crossover pipe issue was -- if I say

15:43:32  15   crossover pipe, do you know what I'm talking about?

15:43:35  16      A.   Up --

15:43:36  17      Q.   The manhole issue.

15:43:37  18      A.   Yes.

15:43:37  19      Q.   In that area, how deep was the water main pipe

15:43:42  20   buried?

15:43:43  21      A.   Roughly eight foot of cover over a six and a half

15:43:48  22   foot pipe, and the thickness of the pipe, so we were

15:43:53  23   probably excavating 15, 16 feet deep, maybe not quite

15:43:58  24   that deep.

15:43:59  25      Q.   The contract required a minimum of five feet in,

15:44:02  1   right?

15:44:02  2       A.   Yes.

15:44:03  3       Q.   Five feet deep?

15:44:04  4       A.   Yes.

15:44:04  5       Q.   Why were you deeper in that area than the five

15:44:07  6   feet?

15:44:07  7       A.   We were on our way to getting to a valve chamber,

15:44:15  8   which required the pipe to be a little bit deeper for

15:44:18  9   the construction of the chamber.

15:44:22  10      Q.   Without getting too technical, can you tell the

15:44:25  11  jury what you mean when you're talking about a valve

15:44:28  12  chamber?

15:44:29  13      A.   The waterline has to have high points and low

15:44:34  14  points in order to get water out of the system or bleed

15:44:39  15  air out of the system.   So we were on a downhill slope

15:44:43  16  towards the valve chamber, and the valve chamber has to

15:44:48  17  be deeper just because of the structure itself needs so

15:44:51  18  much cover and so much room to build it.

15:44:54  19      Q.   And so in that area, you're going down for that

15:44:57  20  elevation change you just mentioned?

15:45:00  21      A.   Yes.

15:45:01  22      Q.   About how much further away was the -- this valve

15:45:06  23  chamber, roughly?

15:45:07  24      A.   Approximately 300 feet.

15:45:11  25      Q.   How much pipe did that link?

15:45:19    1    A.   Boy, I'd have to recall.   It was -- I can't
15:45:23    2  remember the exact footage on that job.
15:45:26    3    Q.   Can you give a reasonable approximation, or is it
15:45:30    4  just --
15:45:30    5    A.   Approximately five miles of pipe.
15:45:33    6    Q.   Did your company get any complaints other than
15:45:40    7  behind Cambridge?
15:45:41    8    A.   Not that I know of.
15:45:42    9    Q.   Were you involved, sir -- let me back up.
15:45:47   10         Tell us about the space.  How much land?   Was
15:45:50   11  this considered a wide-open work area, a tight job, or
15:45:54   12  what?
15:45:54   13    A.   It was wide open in some areas, tight in others.
15:45:58   14    Q.   There's been testimony that there was some
15:46:04   15  putting dirt in a ditch then taking dirt out of a ditch
15:46:07   16  at the end of the day.   Do you know anything about
15:46:09   17  that?
15:46:09   18    A.   There was an existing ditch between the active
15:46:13   19  rail and the abandoned rail, which was where the water
15:46:18   20  main was going.  That in order to build the project
15:46:21   21  during the day, that ditch would get filled in during
15:46:26   22  the process of excavating and backfilling the pipe, then
15:46:29   23  at the end of the day it was reopened.
15:46:31   24    Q.   And that was in order to give you sufficient room
15:46:35   25  for your equipment and personnel and supplies?

15:46:38  1    A.  That's correct.

15:46:39  2    Q.  So you needed all the space that was demarcated

15:46:43  3  for you?

15:46:43  4    A.  Yes.

15:46:44  5    Q.  Okay.  Did your crews stay within that space?

15:46:48  6    A.  Yes.

15:46:50  7    Q.  All right.  Tell us about your involvement, if

15:46:55  8  any, with -- I'll call it a crossover pipe.  When did

15:46:59  9  you first become aware of the existence or possible

15:47:02  10  existence of a pipe going under the abandoned railway?

15:47:07  11    A.  Early in the project when we were awarded the

15:47:10  12  contract, I walked the job and noticed a piece of broken

15:47:18  13  clay pipe and did some investigation trying to figure

15:47:22  14  out what it was because it was not on our blueprints,

15:47:26  15  and brought it to the attention of engineers for the

15:47:30  16  City.  And they did some investigation.  We didn't know

15:47:35  17  if there was a pipe there.  There was nothing except

15:47:38  18  for a broken manhole section.  And we didn't know what

15:47:42  19  it was for, if there was going to be some pipe across or

15:47:46  20  not.  We knew there might be a possibility of something

15:47:49  21  in the area.

15:47:50  22    Q.  Did you try looking in that manhole?

15:47:52  23    A.  It was open.  The top had been knocked off of it

15:47:56  24  previous before any of our work.  And looked down in

15:47:59  25  there, and all you could see was water.

15:48:01    1       Q.   Okay.   No pipes were visible?

15:48:04    2       A.   No.

15:48:05    3       Q.   So what was the next involvement or discussion

15:48:08    4   dealing with that manhole or the possibility of any pipe

15:48:12    5   that might be in the way of the job?

15:48:15    6       A.   I discussed it with Christy Soncrant and Joe

15:48:22    7   Crandall with the City of Toledo.   Then Christy did

15:48:25    8   some investigation on it.   Then the next conversation I

15:48:29    9   had was when we had a meeting with John McCarthy, and he

15:48:34   10   had Ray Huber, who is a Wood County engineer, and he was

15:48:39   11   at that meeting, and we asked him if he knew anything

15:48:42   12   about any pipe connected to that manhole.   And he gave

15:48:47   13   us a drawing, an old drawing from the railroad showing

15:48:51   14   that pipe going across the abandoned rail section.

15:48:54   15       Q.   Was there any discussion about what that pipe

15:48:57   16   did, if it did anything at all?

15:48:59   17       A.   We asked him if he knew which way the pipe

15:49:03   18   flowed, if it flowed towards private property or just

15:49:07   19   into the ditch on the railroad property.   And he told

15:49:11   20   us that he believed that that pipe drained from the

15:49:14   21   railroad property towards the private property.

15:49:19   22       Q.   And did he ever tell you anything different than

15:49:21   23   that?

15:49:21   24       A.   No.

15:49:26   25       Q.   Was there any water flowing so you could observe

15:49:29  1    what's happening?

15:49:30  2        A.   The water in the manhole looked stagnant.

15:49:35  3        Q.   Did you look in the ditch between the two

15:49:38  4    railroads to see if there's any evidence of a pipe in

15:49:41  5    that area?

15:49:42  6        A.   Yes.  We looked around, and we have a tool called

15:49:46  7    a probe rod, which is a narrow rod of steel that you can

15:49:51  8    poke down in the ground, feel anything hard as far as a

15:49:54  9    pipe or anything like that.   I poked around in the area

15:49:57  10   across from the manhole and never found anything.

15:49:59  11       Q.   So there was no evidence either visually or with

15:50:02  12   your probe of a pipe that actually came out into the

15:50:05  13   ditch?

15:50:06  14       A.   That's correct.

15:50:09  15       Q.   At any time even after this project did you

15:50:12  16   uncover any evidence of a pipe that actually went into

15:50:15  17   that ditch?

15:50:16  18       A.   The crew that installed the water main pipe found

15:50:21  19   a pipe.

15:50:22  20       Q.   They found a pipe under the abandoned

15:50:25  21   right-of-way, but did anybody find any part of that pipe

15:50:28  22   that extended into the ditch?

15:50:31  23            MR. ROBON:   Objection.

15:50:32  24       A.   Can you repeat the question?

15:50:33  25            THE COURT:   Overruled.   Do you remember the

15:50:35  1    question?

15:50:38  2                    THE  WITNESS:   No.   Can  you  repeat  the

15:50:39  3    question?

15:50:39  4                    THE  COURT:   Maybe  a  bit  slower,  please.

15:50:42  5    BY MR. BAHRET:

15:50:42  6        Q.   Presumably -- well, let me not go there.   The

15:50:46  7    assumption is that the pipe may have gone to the

15:50:48  8    manhole; are you with me on that?

15:50:51  9        A.   Yes.

15:50:51  10       Q.   And there's got to be another end to the pipe?

15:50:54  11       A.   Yes.

15:50:55  12       Q.   Presumably that would be out in that ditch?

15:50:57  13       A.   Yes.

15:50:58  14       Q.   Even after the pipe was cut, did anybody ever

15:51:02  15   find a pipe in the ditch?

15:51:04  16       A.   No.

15:51:04  17                    MR. ROBON:   Objection.

15:51:06  18                    THE COURT:   Overruled.

15:51:12  19       Q.   Tell us about what happened when the pipe was

15:51:15  20   encountered and --

15:51:17  21       A.   I wasn't on-site that day.

15:51:22  22       Q.   Did you learn about the issue?

15:51:24  23       A.   Yes.

15:51:24  24       Q.   From whom?

15:51:25  25       A.   Pete Forletta, our foreman.

15:51:27   1      Q.   By what method did you learn?

15:51:29   2      A.   Radio, telephone.

15:51:31   3      Q.   So you were in immediate contact?

15:51:34   4      A.   We were in -- yeah, we had conversations.

15:51:36   5      Q.   Did you have any follow-up, like a visit to the

15:51:40   6   site, see the pipe, or anything like that?

15:51:42   7      A.   I never saw the pipe when it was exposed.

15:51:47   8      Q.   And the information that you were given about the

15:51:49   9   pipe was what?

15:51:51  10      A.   That it was full of sediment and debris.

15:51:56  11           MR. ROBON:  Objection.  It's hearsay, Your

15:52:01  12   Honor.

15:52:01  13           THE COURT:  Hearsay.  Sustained.

15:52:04  14      Q.   What did you do?  Whatever the information was,

15:52:07  15   what did your company do based on that?

15:52:09  16      A.   Our crew bulkheaded the ends of the pipe on

15:52:14  17   either side of our excavation.

15:52:16  18      Q.   What does that terminology mean?

15:52:17  19      A.   It -- they put a brick of cement plug on the ends

15:52:25  20   of the pipe on either side of our excavation.

15:52:27  21      Q.   Then continued with the installation?

15:52:29  22      A.   Yes.

15:52:34  23      Q.   Now, after your company was out of that area, and

15:52:37  24   I don't know if you're done with the job, but you're at

15:52:40  25   least out of that immediate area, did you -- let me

15:52:44  1   strike that and start over.

15:52:45  2          At any time after that pipe was encountered did

15:52:48  3   you come to understand that people associated with

15:52:53  4   Cambridge were doing anything with dirt?

15:52:57  5      A.   After that pipe was encountered?

15:53:01  6      Q.   Actually, I guess that would be before.   I

15:53:03  7   misspoke.   I'm sorry.

15:53:05  8          At any time after the project was staked, did you

15:53:07  9   become aware of people from Cambridge or associated with

15:53:13 10   Cambridge moving any dirt?

15:53:15 11      A.   Yes.

15:53:16 12      Q.   And tell us when did you become aware of people

15:53:21 13   other than Ric-man or any other contractor associated

15:53:25 14   with the City of Toledo water project, when did you

15:53:28 15   become aware of other work?

15:53:30 16      A.   It was sometime in mid May.  I don't know the

15:53:34 17   exact date, but it was the day after we had had a

15:53:37 18   meeting with John McCarthy on the Cambridge property,

15:53:41 19   the day after that there were trucks bringing dirt in

15:53:45 20   through the railroad easement and dumping on the

15:53:48 21   railroad easement and pushing the dirt onto Cambridge

15:53:51 22   property.

15:53:52 23      Q.   So the dirt was put on the flat part of the

15:53:55 24   easement and then dozed into Cambridge?

15:53:57 25      A.   That's correct.

15:53:58  1     Q.  Did they ask you for permission to do that?

15:54:01  2     A.  No.

15:54:04  3     Q.  And how long, if you know, did that activity go

15:54:07  4  on?

15:54:07  5     A.  One day.

15:54:10  6     Q.  And what did that do to any -- well, were you

15:54:15  7  aware of a dispute at that point?

15:54:18  8     A.  Yes.

15:54:20  9     Q.  What did the moving of the dirt do to the

15:54:23  10  evidence of -- that would help resolve that dispute?

15:54:27  11     A.  Covered it up.

15:54:29  12     Q.  Was there a railroad fence along any part of this

15:54:34  13  job?

15:54:34  14     A.  There was remnants of a railroad fence.  It

15:54:37  15  wasn't completely intact.

15:54:38  16     Q.  Did the remnants of the railroad fence, did that

15:54:41  17  include an area behind Cambridge?

15:54:43  18     A.  Yes.

15:54:44  19     Q.  And did the moving of all this dirt from the

15:54:49  20  railroad right-of-way, dozing it onto Cambridge

15:54:52  21  property, did that cover or move any part of those

15:54:56  22  remnants?

15:54:56  23     A.  Yes.

15:54:58  24     Q.  Did it cover or move any vegetation?

15:55:02  25     A.  Yes.

15:55:05   1    Q.   And then thereafter did you have any further

15:55:10   2    occasions to see Mr. McCarthy?   And by this time in the

15:55:15   3    history of the story you knew who he was?

15:55:17   4    A.   Yes.

15:55:18   5    Q.   Did you thereafter see him on or near the job

15:55:22   6    site that you were on again?

15:55:24   7    A.   Yes.

15:55:25   8         MR. ROBON:   Objection.   Leading every

15:55:29   9    question, Your Honor.

15:55:31  10         MR. BAHRET:   Actually, I'm not.

15:55:33  11         THE COURT:   No.   Overruled.

15:55:36  12         Which Mr. McCarthy; have we identified?

15:55:40  13    BY MR. BAHRET:

15:55:40  14    Q.   You said John, right?

15:55:41  15    A.   Yes.

15:55:42  16    Q.   Tell us about the next encounter with Mr.

15:55:44  17    McCarthy near your job site.   What did you see?   Was

15:55:49  18    there any interaction, conversation?

15:55:51  19    A.   Yes.   There was.   We had already strung out the

15:55:57  20    pipe for that project along the right-of-way line on CSX

15:56:01  21    property.   And the area that he had pushed dirt on

15:56:06  22    before, he had a small excavator in there digging

15:56:13  23    trenches next to our pipe that were stockpiled there.

15:56:17  24    And these a pipe were large diameter.   And I was

15:56:20  25    concerned the closeness that he was digging to them that

| | | |
|---|---|---|
| 15:56:23 | 1 | he could cause damage to the pipe or, worse yet, have a |
| 15:56:28 | 2 | pipe roll on top of his work force there because he was |
| 15:56:32 | 3 | digging close to it. |
| 15:56:33 | 4 | Q.  Did you express those concerns? |
| 15:56:34 | 5 | A.  Yes, I did. |
| 15:56:36 | 6 | Q.  And by this time, there was -- what do you call |
| 15:56:40 | 7 | that orange -- |
| 15:56:41 | 8 | A.  Safety fence. |
| 15:56:43 | 9 | Q.  Was there orange safety fence in place? |
| 15:56:46 | 10 | A.  Yes. |
| 15:56:46 | 11 | Q.  Who put that there? |
| 15:56:47 | 12 | A.  We did, Ric-man Construction. |
| 15:56:49 | 13 | Q.  And was -- did Mr. Mr. McCarthy do anything with |
| 15:56:53 | 14 | the fence? |
| 15:56:53 | 15 | A.  He was moving the fence, and there were some |
| 15:56:56 | 16 | other stakes in the area that he was moving. |
| 15:56:58 | 17 | Q.  Tell us about that.  What stakes did Mr. |
| 15:57:01 | 18 | McCarthy move? |
| 15:57:01 | 19 | A.  The City surveyors had restaked the right-of-way |
| 15:57:04 | 20 | line with a lath along the property of Cambridge and in |
| 15:57:11 | 21 | that area where he had filled.  And he was moving those |
| 15:57:15 | 22 | stakes in order to accommodate him digging his trenches. |
| 15:57:19 | 23 | And then he was moving them out of the way, moving our |
| 15:57:24 | 24 | fence out of the way. |
| 15:57:25 | 25 | Q.  Okay.  Do you know if he put them back? |

15:57:28    1    A.   He put the stakes back; I don't know --

15:57:33    2    Q.   Did he get them in the right spots?

15:57:34    3    A.   I couldn't tell you that.

15:57:38    4    Q.   You finally completed your project, right?

15:57:41    5    A.   Yes.

15:57:41    6    Q.   Now, did you have occasion to take photographs

15:57:44    7    out at the job site of any of the activities from Mr.

15:57:49    8    McCarthy?

15:57:49    9    A.   Yes.

15:57:52   10    Q.   Let me hand you a series of photos.   Actually,

15:57:56   11    hopefully these will show up on the monitor right in

15:57:59   12    front of you there, sir.   This is Toledo Exhibit A3.

15:58:11   13    Is that a photograph that you took?

15:58:13   14    A.   Yes.

15:58:13   15    Q.   And tell us briefly what was depicted here.   Is

15:58:17   16    that the pipe you were referencing?

15:58:18   17    A.   Yes, that's our stockpiled pipe.

15:58:21   18    Q.   What's taking place?

15:58:24   19    A.   It's the back of John McCarthy walking away from

15:58:29   20    the camera and another gentleman on a small excavator

15:58:34   21    digging a trench.

15:58:37   22    Q.   And A2?

15:58:39   23    A.   That's a picture of the trench that they were

15:58:42   24    digging.

15:58:47   25    Q.   These are obviously not in order, but A11?

15:58:52  1      A.    This was long before those last two pictures.

15:58:56  2   This was the pictures of the day in mid May when they

15:59:00  3   were trucking dirt onto CSX property and pushing it onto

15:59:05  4   Cambridge property.    That's a picture of the bulldozer

15:59:08  5   pushing dirt onto Cambridge property.

15:59:11  6      Q.    That's the actual dozer and the actual operation

15:59:14  7   there?

15:59:14  8      A.    Yes.

15:59:17  9      Q.    Obviously we're jumping around in time.    Sorry

15:59:20  10  for doing that.    But A8?

15:59:22  11     A.    The picture's not real clear on here.    But

15:59:26  12  that's another picture of -- it shows our safety fence

15:59:30  13  still intact in that area.    And you really can't see it

15:59:35  14  very well on this, but it shows where he had done some

15:59:39  15  excavation after the pipe was in place.

15:59:43  16     Q.    A16?

15:59:45  17     A.    Again, pictures of Mr. McCarthy moving the safety

15:59:49  18  fence out of the way, and I don't know who the gentleman

15:59:53  19  is with the camera on his hip, and their excavator there

15:59:57  20  digging next to the pipe.

15:59:58  21     Q.    Did Mr. McCarthy replace that fence?

16:00:01  22     A.    He did not put it back in place, no.

16:00:04  23     Q.    A1.    Can you make that one out?

16:00:11  24     A.    I can't see the top of the photo.

16:00:13  25     Q.    Let me show you the original.    For some reason

16:00:16   1   we get a glare on some of these.

16:00:21   2       A.   This is just a picture of the pipe in place and

16:00:24   3   the safety fence.

16:00:30   4       Q.   Do you know what this is in the middle?

16:00:33   5       A.   It's a marker for the right-of-way line.   I

16:00:38   6   don't remember whose stake that was because Cambridge

16:00:42   7   had some surveyors out there putting stakes in also.

16:00:45   8   So I'm not sure if that's one that the City put in or

16:00:48   9   one that somebody else put in.

16:00:51   10      Q.   A5?

16:00:53   11      A.   Just another picture of Mr. McCarthy and their

16:00:57   12  excavator.

16:01:01   13      Q.   Did you take this one, A6?

16:01:04   14      A.   Yes.

16:01:04   15      Q.   What is that, the purpose?

16:01:07   16      A.   It doesn't show well on here, but it shows some

16:01:10   17  utilities that had been damaged by their excavation; a

16:01:14   18  phone line, and there was a drain pipe in there.

16:01:18   19      Q.   And A7?

16:01:22   20      A.   Just another picture of the excavator and its

16:01:26   21  close relationship to the pipe.

16:01:32   22      Q.   I'm not sure if this will show it on this screen.

16:01:40   23           THE COURT:   This is A17?

16:01:44   24           MR. BAHRET:   A17.

16:01:46   25  BY MR. BAHRET:

16:01:46   1      Q.   Can you make out whatever this item is in the
16:01:48   2   ditch?
16:01:48   3      A.   I can't on this monitor.
16:01:55   4      Q.   I don't know if you can make it out on there
16:01:58   5   either.
16:02:02   6      A.   It just looks like it might be some type of
16:02:06   7   stump, or it might be one of the timbers that made up
16:02:09   8   the right of way fence.
16:02:12   9      Q.   That's what I was wondering.
16:02:18  10           I'm not sure if you took -- let me just hand you
16:02:22  11   these, and tell me which ones, if any -- here's one, A4.
16:02:28  12   That's another one I presume you took?
16:02:29  13      A.   Yes.
16:02:30  14      Q.   Same idea, just a different view?
16:02:32  15      A.   Then on the top of the trench there you can see
16:02:36  16   one of the timbers that was the railroad fence there,
16:02:39  17   the right-of-way fence.  They pulled that out, it looks
16:02:42  18   like, and set it on top of the ground.
16:02:46  19           THE COURT:  Do you want to point to that,
16:02:51  20   please?  Touch your screen.
16:02:54  21           THE WITNESS:  Just touch the screen?
16:02:56  22           THE COURT:  See what you did.
16:02:57  23           THE WITNESS:  Okay.
16:03:01  24           MR. BAHRET:  I've known how to do that all
16:03:03  25   along.

BY MR. BAHRET:

Q.   Is this a picture you took, sir?

A.   Yes.

Q.   What is that?

     That's A10 for the record, Your Honor.

A.   That's the day in mid May where they were
trucking dirt on there.   That's a picture taken from
Bates Road, our access into the site, and one of the
trucks that was dumping dirt for Cambridge coming off
the site.

Q.   And what type of trucks were they?

A.   Tandem and tri-axle dump trucks.

Q.   And do you happen to know how much dirt one could
fit into a tandem and tri-axle dump truck?

A.   Anywhere between 15 and 20 yards.   Depends on
the size of the box.

Q.   Were these dump trucks that were arriving full?

A.   Yes.   The picture depicts it coming out empty.

Q.   Let me show you these.   Were these yours or
somebody else's?

A.   These are all mine.

Q.   Let's see what we've got here then.   A13?

A.   This picture was taken after our very first
meeting with Mr. McCarthy showing the right-of-way fence
and part of our clearing, the broken branches are part

16:04:38  1    of what we cleared -- or what our subcontractor cleared.

16:04:42  2        Q.   Vermillion?

16:04:43  3        A.   Yes.

16:04:43  4        Q.   The fence remnants or whatever you want to call

16:04:47  5    it, they're still there?

16:04:48  6        A.   Yes.

16:04:49  7        Q.   And to orient us, sir, which -- looking at this

16:04:55  8    picture and this orientation, is this the railroad area

16:04:59  9    over here, and this is Cambridge, or vice versa, or

16:05:03  10   what?

16:05:04  11       A.   You're correct; to the left of the photo, where

16:05:07  12   your pen is right now, that's railroad property.   And

16:05:11  13   the other property is private property.

16:05:13  14       Q.   And is this -- when you called it remnants, is

16:05:17  15   this basically representative of what --

16:05:21  16       A.   Yes.   There were posts like that.   Some places

16:05:24  17   it was wired; some places there was posts missing.

16:05:27  18       Q.   And let's see.   On this one, A14, it's a picture

16:05:33  19   you took?

16:05:33  20       A.   Yes.

16:05:38  21       Q.   In any event, is this remnants of the fence in

16:05:43  22   here?

16:05:43  23       A.   That's correct.

16:05:44  24       Q.   Do you know what this is?

16:05:45  25       A.   That's a survey stake.   I don't recall whose

| | | |
|---|---|---|
| 16:05:50 | 1 | that was, if it was City of Toledo's.   It doesn't look |
| 16:05:54 | 2 | like City of Toledo's because it's got a nail in the top |
| 16:05:58 | 3 | of it.   I don't recall seeing any from the City with |
| 16:06:01 | 4 | nails on top. |
| 16:06:02 | 5 | Q.   A15; is that a picture you took? |
| 16:06:05 | 6 | A.   Yeah.   That's some type of marker that somebody |
| 16:06:09 | 7 | put there.   I don't know who put it there. |
| 16:06:30 | 8 | THE COURT:  Off the record. |
| 16:06:32 | 9 | (Discussion had off the record.) |
| 16:06:32 | 10 | Q.   And the last one here, sir, A9, are you able to |
| 16:06:36 | 11 | see what that depicts if I move it down a little bit |
| 16:06:39 | 12 | here?   Do you see what that is? |
| 16:06:44 | 13 | A.   Yes.   That's a picture of the manhole that I |
| 16:06:46 | 14 | found.   To the right there, the shiny piece of pipe is |
| 16:06:53 | 15 | where somebody had knocked it off.   And it's hard to |
| 16:06:58 | 16 | see, but deep in the picture you can see the old manhole |
| 16:07:02 | 17 | cover, an iron manhole cover.   That's the way I found |
| 16:07:06 | 18 | that existing manhole when I was walking the job. |
| 16:07:09 | 19 | Q.   This is the manhole cover? |
| 16:07:10 | 20 | A.   That's correct. |
| 16:07:11 | 21 | Q.   Is that on the manhole? |
| 16:07:12 | 22 | A.   No, it's laying alongside.   The actual manhole, |
| 16:07:15 | 23 | you can't see it.   It's to the left of the manhole |
| 16:07:19 | 24 | cover. |
| 16:07:20 | 25 | Q.   It's over here somewhere? |

16:07:25  1    A.   Yes.

16:07:25  2    Q.   And then this is --

16:07:27  3    A.   That's a top section.  The manhole was built of

16:07:32  4    vitrified clay pipe standing upright.  That's a piece,

16:07:37  5    three-foot piece knocked off.  It was laying on the

16:07:40  6    side.

16:07:41  7    Q.   Incidentally, sir, the crossover pipe, was that

16:07:44  8    also vitrified clay pipe?

16:07:47  9    A.   I don't know.   I wasn't there.

16:07:49  10   Q.   Do all of these pictures we just went through

16:07:54  11   fairly and accurately depict the conditions that were

16:07:57  12   present when you took these photographs?

16:08:02  13   A.   Yes.

16:08:02  14   Q.   Nothing was changed in order to take these

16:08:04  15   photographs?

16:08:05  16   A.   No.

16:08:07  17   Q.   Are you familiar with a pre-construction video

16:08:12  18   that was done on this job?

16:08:14  19   A.   Yes.

16:08:15  20   Q.   And tell us what the purpose of that and -- well,

16:08:20  21   just start with that.  Why did they do a

16:08:23  22   pre-construction video?

16:08:24  23   A.   Most contracts require it to see what conditions

16:08:29  24   are before the job is started.

16:08:30  25   Q.   And did your company either do a pre-construction

| | |
|---|---|
| 16:08:34 | 1 |

video or commission one to be done?

16:08:37  2    A.   It was required.  We commissioned a company to do

16:08:40  3  it.

16:08:40  4    Q.   And then you obviously produced copies of that in

16:08:45  5  discovery?

16:08:46  6    A.   I don't know if we produced them or the City did.

16:08:49  7  I'm not sure.

16:08:50  8    Q.   Actually, I think it was both.   But in any

16:08:53  9  event, do you remember, -there's staging markings or

16:08:57  10  something.  If I'm using the wrong terminology, help me.

16:09:01  11    A.   Stationing.

16:09:02  12    Q.   Do you remember generally the station number for

16:09:05  13  the area that would be behind Cambridge?

16:09:09  14    A.   Not exactly.

16:09:11  15    Q.   Would you recognize it if you saw it, though?

16:09:13  16    A.   Yes.

16:09:20  17         MR. BAHRET:  Your Honor, I think I'm going

16:09:21  18  to try to do this.  Would you mute the sound?

16:09:26  19         THE COURT:  You can watch this video, ladies

16:09:28  20  and gentlemen, on the little screen or the big screen.

16:09:31  21  If it would help, you can even close the curtains

16:09:34  22  behind.   But let's see how it looks.

16:09:53  23         MR. BAHRET:  Is our wizard here?

16:09:56  24         THE COURT:  I thought you were the wizard.

16:09:57  25         MR. BAHRET:  Oh, no.   Anybody that knows me

```
16:10:00   1   knows that's not true.
16:10:23   2              THE CLERK:  We may need a bigger wizard.
16:10:23   3              (Videotape is played during the following
16:10:23   4   testimony:)
16:11:23   5   BY MR. BAHRET:
16:11:23   6     Q.  The lower left-hand, are those the station marks,
16:11:27   7   sir?
16:11:27   8     A.  Yes.
16:11:29   9     Q.  Let me get up.  What I'd like you to do when I
16:11:32  10   get to the right area is describe -- and this is all
16:11:37  11   before any land clearing is done, correct?
16:11:39  12     A.  Yes.  This is coming off of Bates Road moving
16:11:55  13   towards Cambridge.
16:11:56  14     Q.  All right.  They're broken up in five.  What do
16:12:06  15   those numbers represent between 175 and 180?  How much
16:12:11  16   distance is that?
16:12:12  17     A.  That's 17,500 feet from the point of beginning.
16:12:20  18     Q.  So between 175 and 180, that's 500 feet?
16:12:25  19     A.  Yes.
16:12:29  20              THE COURT:  I'm going to ask you both to
16:12:31  21   keep your voices up because the microphones are off.
16:12:34  22              THE WITNESS:  Okay.
16:12:34  23              THE COURT:  Thank you.
16:12:36  24   BY MR. BAHRET:
16:12:36  25     Q.  Mr. Walsh, as we get closer to Cambridge, and I
```

16:12:40   1    know we're still some distance away, what I'd like you

16:12:44   2    to do is describe what we're seeing on the video.

16:12:47   3         A.   The track that the videographer is walking on is

16:12:51   4    the abandoned railway, which is approximately the center

16:12:55   5    line of where the water main was to be installed.

16:12:59   6              To the right you can -- well, it just went out of

16:13:02   7    the picture.  Well, there was that one big house from

16:13:05   8    the Cambridge subdivision.   To the left you can see

16:13:10   9    there was a parked train on the active railway.   There

16:13:14   10   it is.   That's the house to the -- I guess it would be

16:13:23   11   the northernmost portion of Cambridge.

16:13:26   12        Q.   Did you have any trouble seeing that house from

16:13:28   13   the right-of-way before the clearing was done?

16:13:30   14        A.   No.  You can't see it in there, but between the

16:13:50   15   videographer and the active rail, those -- that's the

16:13:56   16   ditch.

16:13:56   17        Q.   The ditch?

16:13:57   18        A.   The one we refilled and excavated after.

16:14:02   19        Q.   And in the clearing, this vegetation we're seeing

16:14:05   20   down this path, that was removed?

16:14:08   21        A.   Pardon me?

16:14:09   22        Q.   The vegetation that we're seeing down this path,

16:14:13   23   that's what was removed?

16:14:15   24        A.   Yes.

16:14:15   25        Q.   And there's the house?

16:14:17   1      A.   Yes.

16:14:18   2      Q.   That's the existence of what was there between

16:14:21   3   that house and the railroad right-of-way?

16:14:22   4      A.   Yes.

16:14:32   5      Q.   And in this view, sir, we can see that very

16:14:35   6   clearly there's trees and vegetation even in the ditch

16:14:38   7   and deep into the railroad right-of-way?

16:14:40   8      A.   Yes.

16:14:41   9      Q.   And those were removed in order to make room for

16:14:44  10   the project?

16:14:44  11      A.   That's correct.

16:14:57  12      Q.   Do you know what the distance is on that

16:15:00  13   right-of-way, the dimensions?

16:15:03  14      A.   No.   I can't remember.

16:15:06  15      Q.   I mean, it's a lot more than just this path we're

16:15:09  16   walking on?

16:15:10  17      A.   Yes.   Yes.

16:15:26  18           That tree they're showing there I don't believe

16:15:29  19   is on the right-of-way.   I think that tree was on

16:15:31  20   private property, the big one they were just showing

16:15:35  21   there.

16:15:36  22      Q.   Do you know if it's still there now?

16:15:39  23      A.   I'm not sure.   One of them Cambridge cut down

16:15:45  24   themselves.   There was another big one in the same area

16:15:48  25   that was all rotten and fell down.

16:15:50　1　　Q.　And do you happen to know why the tree was all

16:15:53　2　rotten?

16:15:53　3　　A.　No.

16:15:54　4　　Q.　And when you say Cambridge cut down a tree

16:15:57　5　themselves, what's your source of information on that?

16:16:00　6　　A.　The day we had our meeting, first meeting with

16:16:03　7　Mr. McCarthy, he had some young gentleman in there

16:16:06　8　cutting it up.

16:16:10　9　　Q.　Okay.  And this first meeting took place in May?

16:16:15　10　　A.　Mid May.  May 14 seems to stick in my brain

16:16:21　11　here.

16:16:23　12　　Q.　Is this still Cambridge here?

16:16:27　13　　A.　I believe so, yes.

16:16:28　14　　Q.　And here you see some fill dirt down there on

16:16:31　15　these other lots?

16:16:32　16　　A.　Yes.

16:16:34　17　　Q.　That was there before any water main project was

16:16:36　18　started, right?

16:16:37　19　　A.　Yes.  This is all before we did anything more

16:16:41　20　than drive a pickup down this path.

16:16:49　21　　Q.　Now, down -- if the guy taking this will turn.

16:16:55　22　　A.　That's a picture of some utilities on Cambridge

16:16:59　23　property; phone and -- I believe it's a phone and

16:17:01　24　electrical box.

16:17:04　25　　Q.　And that's towards the back of the Cambridge

16:17:06 1    property?

16:17:06 2        A.   Yeah.   At the bottom of that just underneath

16:17:09 3    that was one of the fence posts from the right-of-way

16:17:14 4    markings laid down there.

16:17:16 5        Q.   Down here we see the trees are taller and they go

16:17:20 6    in deeper to the right.   Do you see that?   Is that

16:17:24 7    Cambridge or past Cambridge?

16:17:26 8        A.   I can't see what you're talking about.   To the

16:17:29 9    right, farther down the line?

16:17:31 10       Q.   Yeah.   Nobody can see it now.   Hang on.   Maybe

16:17:35 11   it will get back there.

16:17:42 12            Here you go, to the right.   Do you see on the

16:17:44 13   right side of the screen you can still see the clearing

16:17:48 14   that's that fill dirt, then there's trees behind it?

16:17:51 15       A.   Yes.

16:17:52 16       Q.   We're coming up on an area where the trees next

16:17:55 17   to the right-of-way seem to be taller.   Do you know what

16:17:58 18   that area is?

16:17:59 19       A.   I'm not sure where the Cambridge property line

16:18:02 20   was, but I believe that's a property to the south of

16:18:09 21   Cambridge.

16:18:09 22       Q.   A neighbor, whoever that is?

16:18:11 23       A.   Yes.

16:18:15 24       Q.   Are we basically in this video at the end of

16:18:20 25   Cambridge, sir?

16:18:21  1      A.   We're starting to leave, yes.   You can still see
16:18:24  2   some of the clearing on the right and some of the spoils
16:18:28  3   that had been dumped there.

16:18:34  4      Q.   Now, there's a ditch along part of Cambridge; is
16:18:38  5   there not?

16:18:39  6      A.   Yes.

16:18:40  7      Q.   Right there to the right of that screen there's a
16:18:43  8   ditch?

16:18:43  9      A.   Yeah, there was a ditch all along there.   It was
16:18:47  10  a lower area.

16:18:53  11     Q.   The pipe was installed not in or through that
16:18:56  12  ditch, though; is that correct?

16:18:58  13     A.   No, not that I know of.

16:19:00  14     Q.   You stayed to the -- I don't know what compass
16:19:03  15  direction?

16:19:04  16     A.   Our water pipeline?

16:19:05  17     Q.   Yes.

16:19:05  18     A.   Our water pipeline is right about where this
16:19:08  19  videographer is walking.   This is the center of the
16:19:11  20  abandoned rail bed.   That's virtually where the center
16:19:14  21  of our pipeline was.

16:19:16  22     Q.   So oriented just like this videographer was,
16:19:21  23  walking from Bates down to Ford, which, by the way, is
16:19:24  24  the opposite way the pipe was installed, correct?

16:19:26  25     A.   That's correct.

16:19:27   1       Q.   But oriented as he's walking, the ditch would be

16:19:30   2   to the right?  You didn't install anything in the ditch?

16:19:33   3       A.   No.

16:20:02   4            (Videotape is stopped.)

16:20:11   5       Q.   Mr. Walsh, you obviously were aware of this

16:20:15   6   trespass claim?

16:20:16   7       A.   Yes.

16:20:17   8       Q.   And did you personally observe the area, look

16:20:20   9   around and try to determine if any mistakes had been

16:20:23  10   made?

16:20:23  11       A.   Yes.

16:20:24  12       Q.   Did you find any evidence of any trespass by

16:20:27  13   either your subcontractor, your company, or the City of

16:20:30  14   Toledo?

16:20:31  15            MR. ROBON:  Objection.

16:20:32  16       A.   No.

16:20:33  17            MR. BAHRET:  Thank you.  I don't have any

16:20:34  18   other questions.

16:20:35  19            THE COURT:  Well, the objection is

16:20:37  20   overruled.  The answer may stand.  And you may cross.

16:20:40  21            MR. ROBON:  Thank you, Your Honor.

16:20:43  22                            - - -

16:20:43  23            DEAN WALSH, CROSS-EXAMINATION

16:20:44  24   BY MR. ROBON:

16:20:44  25       Q.   Mr. Walsh, isn't it true that the voice on that

16:20:48  1   video -- you didn't take that video, did you?

16:20:50  2       A.   No, I did not.

16:20:51  3       Q.   That was taken by a company that takes

16:20:53  4   pre-construction videos, correct?

16:20:55  5       A.   Yes.

16:20:56  6       Q.   And you've seen that video in the past?

16:20:58  7       A.   Yes.

16:20:59  8       Q.   And doesn't the person who is taking that video

16:21:03  9   seem surprised when they saw the house off to the right,

16:21:08  10  which would be on lot 15?  They said, here's a house

16:21:11  11  that's not on any of the construction plans?

16:21:15  12      A.   I don't recall his voice.

16:21:16  13      Q.   You don't deny that?

16:21:18  14      A.   I don't deny it.

16:21:20  15      Q.   Could you tell the jury, were you the

16:21:25  16  superintendent before the clearing took place, or did

16:21:28  17  you come on-site after the clearing took place?

16:21:30  18      A.   Before.

16:21:32  19      Q.   Tell the jury the brush and trees and brambles

16:21:36  20  that we saw on the right side that were just past the

16:21:39  21  house, how many feet high would you say those things

16:21:43  22  were?

16:21:44  23      A.   I couldn't tell.  They weren't very high.  That

16:21:49  24  was in the early spring of the year.

16:21:51  25      Q.   There were no leaves?

16:21:52  1    A.   Not many leaves; they were budding.

16:21:55  2    Q.   Tell the jury, the tallest tree that was cut down

16:21:58  3  was what, 75 feet tall?

16:22:00  4    A.   On the entire job?

16:22:02  5    Q.   Well, between those two roads, Bates Road and

16:22:06  6  White or Ford Road?

16:22:08  7         MR. BAHRET:  I'm going to object.  It's not

16:22:10  8  relevant unless we're behind Cambridge.

16:22:13  9         THE COURT:  Was your question a general

16:22:14  10  question, any tree, whether -- no matter whose property

16:22:19  11  it was?

16:22:20  12         MR. ROBON:  Any tree, to get an idea of the

16:22:24  13  different elevations of the trees.

16:22:25  14    A.   Can you restate the question?

16:22:27  15    Q.   What was the highest tree -- was it 75 feet --

16:22:30  16  that was cut down by Vermillion?

16:22:32  17    A.   I don't know.

16:22:34  18    Q.   Did you walk this site prior to having Vermillion

16:22:40  19  clear all the trees?

16:22:41  20    A.   Yes.

16:22:43  21    Q.   Can you tell me why there was no safety fence

16:22:47  22  installed by you or Vermillion before they came out

16:22:51  23  there with those giant machines throwing things?

16:22:54  24         MR. BAHRET:  Objection.

16:22:55  25    Q.   Cutting things.

16:22:56    1          THE COURT:  Overruled.

16:22:59    2      A.  Say again, please.

16:23:00    3      Q.  Why was there no orange or yellow safety fence

16:23:05    4   installed along what you thought the right-of-way was

16:23:10    5   before any tree cutting took place?

16:23:13    6      A.  You could not install a fence because of all the

16:23:17    7   brambles and such.

16:23:19    8      Q.  In other words, the brambles were so thick that

16:23:22    9   you couldn't really walk through it, correct?

16:23:24   10      A.  You couldn't place a fence through it.

16:23:27   11      Q.  Right.  It would be impossible to walk through

16:23:30   12   it.  If that path wasn't there, you wouldn't have been

16:23:32   13   able to go down that right of way, correct?

16:23:35   14      A.  I don't agree with that.

16:23:39   15      Q.  Well, how high is the fence?

16:23:42   16      A.  The safety fence?

16:23:43   17      Q.  Yeah.  It's about three feet?

16:23:45   18      A.  It's four feet.

16:23:46   19      Q.  Four feet.  And you agree that there was no

16:23:49   20   safety fence installed before any construction took

16:23:54   21   place with regard to the tree removal?

16:23:56   22      A.  That's correct.

16:23:58   23      Q.  Okay.  Now, you took all these pictures.  Can you

16:24:02   24   tell me why there's no picture of the pipe that was

16:24:04   25   severed?

16:24:06  1      A.   I wasn't on-site that day.

16:24:08  2      Q.   You didn't instruct your foreman to take a

16:24:11  3  picture?

16:24:11  4      A.   No.

16:24:12  5      Q.   You knew that pipe was in there, correct, because

16:24:15  6  it was discussed beforehand?

16:24:18  7      A.   We were aware there was a --

16:24:19  8      Q.   Yes or no?

16:24:20  9      A.   -- a possibility of pipe being there.

16:24:27  10     Q.   Can you tell the jury, what would have been the

16:24:30  11  cost to dig that trench, let's say, three, four feet

16:24:34  12  deeper and reinstall that pipe?

16:24:36  13     A.   I don't know.

16:24:37  14     Q.   Would you say it would be less than $1,000?

16:24:40  15     A.   I don't know.

16:24:41  16     Q.   Give me an estimate, sir.  You're a construction

16:24:44  17  superintendent.  How many hours would it take?  What do

16:24:47  18  you charge per hour?

16:24:50  19     A.   I'm in charge of day-to-day activities.  I do

16:24:55  20  not get involved in pricing.

16:24:57  21     Q.   Well, let me ask this question:  The gentleman

16:25:01  22  that was just here talked about a giant digger that took

16:25:05  23  five cubic yards in one scoop.  Was that what was used

16:25:11  24  on this particular job site?

16:25:12  25     A.   Yes.

16:25:13  1    Q.   And would you tell the jury, five cubic yards, a
16:25:18  2    cubic yard is 27 square feet?
16:25:22  3    A.   Cubic feet.   27 cubic feet.
16:25:25  4    Q.   And one cubic yard stands three feet high, right?
16:25:30  5    A.   Yes.
16:25:31  6    Q.   So how big, how deep of a hole does one scope
16:25:36  7    make?
16:25:36  8    A.   Depends on how long the scoop --
16:25:39  9    Q.   Well, the scoop that was on the construction
16:25:42  10   site.
16:25:44  11   A.   I don't understand the question.
16:25:46  12   Q.   My question is, how deep of a hole with just one
16:25:50  13   scoop, how deep of a hole would be made to put those
16:25:54  14   tiles in?
16:25:54  15   A.   It depends on how long the scoop is made.   You
16:25:58  16   can make a scoop one foot long; you can make a scoop 20
16:26:04  17   feet long.
16:26:05  18   Q.   How deep could it go from one scoop?  From what
16:26:08  19   to what?  One foot to ten foot?
16:26:12  20   A.   Average would probably be a couple of feet.
16:26:15  21   Q.   So how long does it take to take one scoop, pick
16:26:20  22   it up and lay it on the side or put it in a truck?  A
16:26:24  23   couple minutes?
16:26:26  24   A.   Four or five seconds.
16:26:28  25   Q.   And would you agree with me that they could

16:26:30  1    probably dig another four feet in a matter of less than

16:26:35  2    five minutes?

16:26:37  3        A.   Yes.

16:26:39  4        Q.   And would you agree with me that the trench was

16:26:43  5    what, five feet, six feet wide?   How wide was it?

16:26:46  6        A.   The trench was probably 15, 17 feet wide at the

16:26:50  7    top.

16:26:51  8        Q.   Can you tell the jury what a PVC pipe would cost,

16:26:56  9    two feet in diameter, 20 feet long?

16:26:58  10       A.   I don't know.

16:26:59  11       Q.   Would you say you could probably buy it for 300

16:27:01  12   or 400 bucks?

16:27:02  13       A.   I don't know.

16:27:03  14       Q.   You have no idea?

16:27:04  15       A.   No.

16:27:21  16       Q.   I'm looking at the contract Ric-man had with the

16:27:26  17   City of Toledo.   Did you ever read it?

16:27:32  18            This is Exhibit 97, Your Honor.   Page SP 87.

16:27:45  19            My question was, Did you ever read it?

16:27:46  20       A.   Yes.

16:27:50  21       Q.   Did you read this part that says at the very top

16:27:53  22   under Section 1.1, replace -- "A section includes

16:27:59  23   replacement of existing sewers and drains which must be

16:28:03  24   removed or are damaged during trenching or other

16:28:07  25   operations and not noted to be removed or abandoned."

16:28:13   1          Isn't that the situation with regard to this
16:28:16   2   24-inch drain pipe?
16:28:29   3      A.   That's a section in the specs that includes that
16:28:36   4   operation.
16:28:36   5      Q.   And the drain pipe was described just like this.
16:28:40   6   It was not noted to be removed or abandoned because it
16:28:44   7   wasn't shown in the City plans, right?
16:28:47   8      A.   It was not shown on the City plans.
16:28:48   9      Q.   And the contract covers it, that you would cover
16:28:51  10   replacement of those kinds of things?
16:28:53  11      A.   If directed to.
16:29:08  12      Q.   Would you take a look at Exhibit 54.   Do you see
16:29:15  13   the monument where the stake is?
16:29:20  14      A.   Yes.
16:29:20  15      Q.   Did you ever see that concrete monument at the
16:29:23  16   Cambridge site?
16:29:24  17      A.   Yes.
16:29:25  18      Q.   You did?
16:29:27  19      A.   I took that picture.
16:29:28  20      Q.   You took this picture?
16:29:29  21      A.   I took a picture just like it.
16:29:31  22      Q.   Can you look in the back right here, and do you
16:29:36  23   see the old part of the fence right in here?
16:29:41  24      A.   It's not real clear on this monitor.
16:29:44  25      Q.   Well, let me hand it to you here.   Do you see

| | | |
|---|---|---|
| 16:29:52 | 1 | the wire? |
| 16:29:53 | 2 | A.  Yes. |
| 16:29:53 | 3 | Q.  And the post? |
| 16:29:54 | 4 | A.  Yes. |
| 16:29:55 | 5 | Q.  Let me point it out for the jury.  Or maybe it's |
| 16:30:00 | 6 | not clear for you either. |
| 16:30:02 | 7 | MR. ROBON:  Can I show the jury, Your Honor? |
| 16:30:03 | 8 | THE COURT:  Sure. |
| 16:30:09 | 9 | MR. ROBON:  Here is the wire.  Here is the |
| 16:30:12 | 10 | fence post. |
| 16:30:17 | 11 | These are the wires in the back here.  This |
| 16:30:20 | 12 | is the fence post.  And here's the property line. |
| 16:30:24 | 13 | MR. BAHRET:  Your Honor, I object to him |
| 16:30:25 | 14 | saying there's the property line. |
| 16:30:27 | 15 | THE COURT:  We'll strike the reference to |
| 16:30:29 | 16 | the property line. |
| 16:30:32 | 17 | MR. ROBON:  I meant the surveying monument. |
| 16:30:38 | 18 | BY MR. ROBON: |
| 16:30:38 | 19 | Q.  Doesn't that appear to show that the railroad |
| 16:30:40 | 20 | fence was on the Cambridge property? |
| 16:30:45 | 21 | A.  I can't determine that.  I don't know who put |
| 16:30:49 | 22 | the stake and what reference they used to put the stake. |
| 16:30:51 | 23 | Q.  Not the stake.  I'm referring to the survey |
| 16:30:54 | 24 | monument? |
| 16:30:55 | 25 | A.  Well, that's marking the monument.  The stake is |

16:30:58  1    marking the monument.

16:30:59  2        Q.   But if the monument is correct, it would show the

16:31:03  3    railroad fence was on the property of the Cambridge

16:31:06  4    subdivision?

16:31:08  5        A.   Yes, it would, if that is correct.

16:31:11  6        Q.   Okay.  Can you indicate to the jury, when you do

16:31:23  7    a construction project like this, do you take different

16:31:26  8    precautions when you're next to a subdivision that has

16:31:30  9    houses and kids as opposed to doing something out in the

16:31:34  10   middle of a corn field?

16:31:36  11       A.   I don't understand the question.

16:31:38  12       Q.   Are there different safety procedures used by

16:31:41  13   your company when you're doing construction or

16:31:46  14   excavation out in an open corn field as opposed to when

16:31:50  15   you're abutting a subdivision?

16:31:53  16       A.   No.

16:31:54  17       Q.   You use the same things?

16:31:57  18       A.   Yes.

16:31:58  19       Q.   Can you tell the jury why you didn't -- you knew

16:32:03  20   the subdivision was there, right?

16:32:05  21       A.   Yes.

16:32:06  22       Q.   Can you tell the jury why you didn't stay three,

16:32:09  23   four, five feet away from what you thought was the

16:32:12  24   property line?

16:32:13  25       A.   We're allowed to use -- we're given a certain

16:32:17   1   area to work in, and we need to use all the area.

16:32:22   2       Q.   And you didn't think about the impact of cutting

16:32:27   3   the trees, the noise, or anything right up against the

16:32:33   4   subdivision line with that house on lot 15 in Cambridge?

16:32:38   5       A.   We were allowed to use --

16:32:40   6       Q.   That's not what I asked you, what you're allowed.

16:32:43   7   I asked, Did you think about it?  Yes or no?

16:32:46   8       A.   Repeat the question, please.

16:32:47   9       Q.   Did you think about not cutting all the way up to

16:32:51  10   what you thought the property line was when you were up

16:32:55  11   against the house that you just saw in the Cambridge

16:33:00  12   subdivision?

16:33:01  13       A.   No.

16:33:03  14       Q.   Did you think about whether or not the view from

16:33:15  15   the rear of the house would be impacted by your cutting

16:33:19  16   right up to the property line?

16:33:20  17            MR. BAHRET:  Your Honor, I'm going to

16:33:22  18   object.   That's irrelevant.   We have the absolute

16:33:24  19   right to remove trees from the railroad property whether

16:33:27  20   it disturbs a view or not.

16:33:30  21            MR. ROBON:  He didn't remove it from the

16:33:31  22   railroad.   He removed it from the property.

16:33:33  23            MR. BAHRET:  Listen to your question, Marv.

16:33:35  24            THE COURT:  Gentlemen, comments to me,

16:33:39  25   please.   I'll sustain the objection.

16:33:43  1    BY MR. ROBON:

16:33:54  2        Q.   When you saw Mr. McCarthy digging, did you know

16:34:13  3    what he was looking for?

16:34:15  4        A.   No.

16:34:17  5        Q.   Did you ask him?

16:34:20  6        A.   No.

16:34:25  7        Q.   You have a photograph that you took here, a

16:34:28  8    picture A6; doesn't that show exposure of roots that

16:34:34  9    looks like they just recently have been cut in the

16:34:38  10   bottom of the trench?

16:34:43  11       A.   Repeat the question, please.

16:34:44  12       Q.   Doesn't that picture, A6, look like in the bottom

16:34:50  13   of the trench that Mr. McCarthy dug that you said he

16:34:53  14   testified to, doesn't that look like roots or stumps

16:34:56  15   that were just curt?

16:34:57  16       A.   There's debris in the bottom.

16:35:02  17       Q.   Okay.   And if I look right here, doesn't that

16:35:05  18   look like a freshly cut piece of wood or brambles?

16:35:09  19       A.   It doesn't show well on this monitor.   I can't

16:35:11  20   tell.   That looks like a skinned-up piece of wood.   I

16:35:23  21   can't tell if it's a freshly cut root or not.

16:35:33  22       Q.   And that trench was just what, four or five feet

16:35:36  23   away from the big pipe you had on the property?

16:35:39  24       A.   I never measured it.

16:35:41  25       Q.   Give us -- I'll show you a photograph, and you

16:35:46   1   can tell us.   Take a look at Exhibit A4, what appears

16:35:54   2   to be the property line.   How close were your pipes,

16:35:57   3   five, six feet?

16:36:01   4       A.   Our pipes were probably five feet off, four or

16:36:06   5   five feet off the property line.

16:36:08   6       Q.   And it is your testimony, Mr. Walsh, that you

16:36:13   7   assumed the property line was where the railroad fence

16:36:17   8   was?

16:36:17   9       A.   Can you repeat the question?

16:36:19  10       Q.   You assumed that the property line was where the

16:36:24  11   railroad fence was, correct?

16:36:30  12       A.   That's where it was marked.

16:36:32  13       Q.   You assumed that was the --

16:36:35  14       A.   Yes.

16:36:36  15       Q.   Thank you.   You had no curiosity of asking Mr.

16:36:43  16   McCarthy why he was digging there?

16:36:49  17       A.   This was after Mr. McCarthy had threatened a

16:36:54  18   lawsuit.   And if someone threatens a lawsuit, company

16:36:59  19   policy, I'm not allowed to have conversation with him.

16:37:02  20       Q.   Take a look at photograph A2 in the bottom here,

16:37:14  21   in the trench.   Do you see the exposed stumps?

16:37:18  22       A.   I cannot see it well on this monitor.

16:37:36  23            I can see what looks like stumps down at the

16:37:39  24   bottom of the trench

16:37:47  25                 MR. ROBON:   Can I show this to the jury,

16:37:49   1    Your Honor, since it's not really good on the monitor?

16:37:52   2           THE COURT:  You can walk it by, sure.

16:38:24   3       Q.  It's your testimony that the City of Toledo

16:38:26   4    authorized the bulkheading of the drainage pipe?

16:38:30   5       A.  Yes.

16:38:32   6       Q.  And was it Christy Soncrant or Joe Crandall or

16:38:37   7    somebody else?

16:38:37   8       A.  Joe Crandall was on-site.  I don't know if

16:38:41   9    Christy was on-site that day.

16:38:45   10      Q.  But he was authorized on behalf of the City?

16:38:47   11      A.  I don't know.

16:38:49   12      Q.  Do you gree with me that the construction plans

16:38:52   13   you were given by the City of Toledo did not show the

16:38:54   14   Cambridge subdivision?

16:38:57   15      A.  Yes.

16:39:06   16      Q.  And you testified that you saw water in the

16:39:09   17   manhole when you looked down it, correct?

16:39:12   18      A.  Yes.

16:39:17   19      Q.  Mr. Forletta, who was here about an hour ago,

16:39:20   20   testified he saw garbage at the bottom.  You don't know

16:39:28   21   which is right?  Do you remember seeing the water?

16:39:30   22      A.  I know what I saw.

16:39:31   23      Q.  Okay.  Can you tell me, you've encountered pipes

16:39:36   24   before that have not been shown on plans, correct?

16:39:39   25      A.  That's correct.

16:39:40   1      Q.   And dye tests are done or other things are done

16:39:44   2   to see where pipes drain to or if they're active,

16:39:48   3   correct?

16:39:49   4      A.   They usually do whatever they can to find --

16:39:54   5   there's a lot of different ways to find out if a pipe is

16:39:58   6   active or not.

16:39:59   7      Q.   Very inexpensive ways, are they not?

16:40:01   8      A.   Yes.

16:40:03   9      Q.   Can you tell the jury here, did Ric-man or the

16:40:06   10   City of Toledo take any measures to do any kind of

16:40:11   11   testing on whether that drain pipe worked or not?

16:40:16   12      A.   I don't know.

16:41:01   13      Q.   Did you, knowing that there was a residence up

16:41:04   14   against the right-of-way for the railroad, did you knock

16:41:08   15   on the door and say, We're going to do construction work

16:41:12   16   out here; keep your children inside, or anything like

16:41:14   17   that?

16:41:15   18      A.   No.

16:41:15   19      Q.   Do you normally do that?

16:41:18   20      A.   If I see children that might come in harm's way.

16:41:42   21      Q.   How many dollars do you think the City of Toledo

16:41:44   22   saved or Ric-man saved by not reconnecting that pipe?

16:41:51   23      A.   I couldn't tell you.

16:41:53   24      Q.   Can you tell this jury if it would have delayed

16:41:56   25   the project more than, let's say, four or five hours to

| | | |
|---|---|---|
| 16:42:00 | 1 | just go buy a pipe? |
| 16:42:04 | 2 | A.  Can you state that question again. |
| 16:42:06 | 3 | Q.  Yes.   Would your project have been delayed by |
| 16:42:09 | 4 | more than four or five hours if you went and bought a |
| 16:42:13 | 5 | pipe and then installed the pipe? |
| 16:42:18 | 6 | A.  I don't believe so. |
| 16:42:35 | 7 | MR. ROBON:  Nothing further, Your Honor. |
| 16:42:36 | 8 | THE COURT:  Any redirect? |
| 16:42:37 | 9 | MR. BAHRET:  Just briefly. |
| 16:42:39 | 10 | - - - |
| 16:42:39 | 11 | DEAN WALSH, REDIRECT EXAMINATION |
| 16:42:40 | 12 | BY MR. BAHRET: |
| 16:42:40 | 13 | Q.  Mr. Walsh, you're familiar with construction |
| 16:42:44 | 14 | plans in general; are you not? |
| 16:42:46 | 15 | A.  Yes. |
| 16:42:46 | 16 | Q.  Would it be true to say that it is not uncommon |
| 16:42:49 | 17 | that surrounding structures aren't on the plans? |
| 16:42:53 | 18 | A.  Yes. |
| 16:42:54 | 19 | Q.  I mean, construction plans don't put every |
| 16:42:58 | 20 | surrounding structure on them? |
| 16:43:00 | 21 | A.  That's correct. |
| 16:43:01 | 22 | Q.  So the fact that this subdivision wasn't there, |
| 16:43:03 | 23 | was that unusual in any way? |
| 16:43:05 | 24 | A.  No. |
| 16:43:06 | 25 | Q.  Was it dangerous in any way? |

16:43:08  1     A.  I don't believe so, no.

16:43:11  2     Q.  Did you know the subdivision was there?

16:43:14  3     A.  Yes.

16:43:14  4     Q.  I'm not sure if the jury got the gist of what you

16:43:17  5     were talking about when you say how big of a scrape you

16:43:20  6     make.  Remember the questioning about this scooper?

16:43:22  7     A.  Yes.

16:43:23  8     Q.  Is that called a bucket?

16:43:24  9     A.  Yes.

16:43:25  10    Q.  So if the bucket were to enter the ground and

16:43:31  11    just go two inches, then the operator can scrape 20 feet

16:43:36  12    or -- I don't know what the distance of the arm is; he

16:43:38  13    could make a very long but shallow scrape?

16:43:41  14    A.  That's correct.

16:43:41  15    Q.  That's what you were referring to?

16:43:43  16    A.  That's correct.

16:43:44  17    Q.  If he went in real deep he, of course, would fill

16:43:48  18    it up with less distance.  Either way, he'd have a full

16:43:51  19    bucket?

16:43:52  20    A.  That's correct.

16:43:53  21            MR. BAHRET:  Okay.  Thank you, sir.

16:43:56  22            MR. ROBON:  Nothing further.

16:43:58  23            THE COURT:  You may step down.  Thank you.

16:44:01  24    Is this a breaking point for the day?

16:44:03  25            MR. BAHRET:  I have one more witness here in

```
16:44:06   1   from east Ohio.   I'd like to get him in and out of here
16:44:10   2   today if possible.   I know, famous last words.
16:44:16   3                   THE COURT:  Ladies and gentlemen, are you
16:44:18   4   okay if we try to get this witness on and off in the
16:44:21   5   next -- how long do you anticipate your direct will be?
16:44:25   6                   MR. BAHRET:  I will do everything I can to
16:44:27   7   shorten it up to about ten minutes.
16:44:30   8                   THE COURT:  So if we end around 5:00 or a
16:44:33   9   little after, are we okay?  If not, speak up.   You seem
16:44:37  10   reluctant.
16:44:47  11                   THE JUROR:  Let's do it.
16:44:48  12                   THE COURT:  I opened windows to try to get
16:44:50  13   some breeze.   I apologize.
16:44:51  14                   Sir, if you come up front, our deputy clerk
16:44:53  15   will swear you in, please.
16:45:43  16                   (Discussion had off the record.)
16:46:31  17                   (The witness was sworn by the clerk.)
16:46:43  18                   THE COURT:  Have a seat behind you.   If you
16:46:46  19   need that to hear, I'm going to ask counsel for both
16:46:48  20   sides to please use your microphone.
16:46:55  21                   MR. BAHRET:  You don't have to use that.
16:46:56  22   It's an amplifier.
16:47:01  23                              - - -
16:47:01  24                   CARL KOPOCS, DIRECT EXAMINATION
16:47:02  25   BY MR. BAHRET:
```

16:47:02  1      Q.   Would state your full name for the jury.

16:47:04  2      A.   Carl Kopocs.

16:47:06  3      Q.   Sir, what line of work are you in?

16:47:08  4      A.   I'm in the tree service and land clearing

16:47:10  5  business.

16:47:10  6      Q.   What's the name of the company or companies?

16:47:14  7      A.   The company we're talking about is Vermillion

16:47:17  8  Tree Service and Land Clearing.

16:47:18  9      Q.   And how long have you been in the land clearing

16:47:22  10  and tree service business?

16:47:23  11      A.   Forty-four years.

16:47:25  12      Q.   Okay.  And is it basically a family business?

16:47:28  13      A.   Yes.

16:47:29  14      Q.   And where is it located?

16:47:31  15      A.   Vermillion, Ohio.

16:47:33  16      Q.   Which I guess is where it gets its name then?

16:47:36  17      A.   Yes.

16:47:36  18      Q.   Okay.  Did your company have involvement in the

16:47:40  19  Toledo water main project back in 2006?

16:47:44  20      A.   Yes, sir.

16:47:45  21      Q.   My understanding is you were a subcontractor of

16:47:49  22  Ric-man Construction Company?

16:47:50  23      A.   Yes.

16:47:51  24      Q.   What was the role of your company?

16:47:52  25      A.   They asked us to take the trees out of a

16:47:58  1  designated area, take the stumps out so they could

16:48:02  2  install a water main.

16:48:03  3     Q.   And the designated area would be briefly stated

16:48:06  4  as the railroad right-of-way?

16:48:07  5     A.   The railroad right-of-way with a fence on one

16:48:09  6  side and -- pretty well 50, 60 feet wide, 100 feet wide.

16:48:14  7  It varied a little bit on one side.   The other side was

16:48:18  8  always straight.

16:48:18  9     Q.   And was it staked for you?

16:48:21  10    A.   Yes.

16:48:22  11    Q.   And tell us what the markings looked like.

16:48:25  12    A.   They would be a lath;  it would be three-eighths

16:48:28  13  thick by about two inches.   Typically they're three

16:48:31  14  feet tall, pound them in the ground six, eight inches,

16:48:35  15  and it would say CL on the side of the lath that we

16:48:38  16  would clear on, clearing limits.   So we know we'd clear

16:48:42  17  on the side where the writing was.

16:48:45  18    Q.   And did -- were there markings other than laths

16:48:48  19  such as ribbons or painting, painted marks or anything

16:48:51  20  like that that you saw?

16:48:52  21    A.   I would say it was staked.   That's typically --

16:48:56  22  surveyors just stake it.

16:48:57  23    Q.   Behind Cambridge was there a railroad fence?

16:49:00  24    A.   Yes.

16:49:01  25    Q.   Or at least the remnants of a railroad fence.

16:49:04  1    And did you see that?

16:49:06  2       A.   I saw that when we looked at it.

16:49:10  3       Q.   All right.   Now, you know -- your company

16:49:14  4    operates a bunch of equipment, I guess, including the

16:49:17  5    two that were just under discussion in this case, one

16:49:19  6    called a feller buncher and one called a hydro-axe,

16:49:25  7    correct?

16:49:25  8       A.   Yes.

16:49:26  9       Q.   And were those used in the land clearing on this

16:49:28  10   job?

16:49:29  11      A.   Yes.

16:49:29  12      Q.   Could you just real briefly, I don't want to get

16:49:32  13   into it, especially in view of the hour, just tell the

16:49:35  14   jury how those machines work?

16:49:36  15      A.   A hydro-axe is like a big front-end loader; it's

16:49:40  16   especially made with a mower on the front to mow out the

16:49:44  17   underbrush, like a big lawnmower going through that.

16:49:47  18           Then the feller buncher would take the additional

16:49:50  19   trees; it's an excavator purposely built with a saw so

16:49:54  20   we could saw these trees off, grind them, put them in a

16:49:58  21   pile, take them to the chipper, harvest them, and get

16:50:03  22   them out of there.

16:50:04  23      Q.   The feller buncher is the one that makes this

16:50:07  24   pile?

16:50:08  25      A.   Yes.

16:50:08    1    Q.   Do you know what the biggest tree was that your

16:50:10    2    company cut down behind the Cambridge subdivision?

16:50:14    3    A.   Probably six inches.

16:50:18    4    Q.   And do you have a general idea of the height of

16:50:21    5    that tree?

16:50:22    6    A.   25 to 30 feet.

16:50:27    7    Q.   Did you take down any 75-foot trees behind

16:50:31    8    Cambridge, sir?

16:50:32    9    A.   No.

16:50:33   10    Q.   No three-foot diameter trees?

16:50:35   11    A.   No.

16:50:37   12    Q.   And you understood at some point, anyway, a

16:50:43   13    property dispute arose?

16:50:45   14    A.   Yes.

16:50:46   15    Q.   We were all basically told we trespassed, or at

16:50:50   16    least they claim that?

16:50:51   17    A.   We heard that, yes.

16:50:52   18    Q.   Did you authorize any kind of an undertaking to

16:50:58   19    figure out if any allegation was true?

16:51:02   20    A.   Well, I had no other complaints on the property

16:51:06   21    at the time.   I mean, all the way down was 16,900 feet,

16:51:13   22    and their only complaint was in that small area.

16:51:13   23              MR. ROBON:  Objection.

16:51:16   24    A.   My wife had ovarian cancer, and I was helping her

16:51:19   25    with treatments, so that consumed most of my time (there

16:51:22    1    was an objection in middle of the answer.

16:51:24    2            THE COURT:  Did we have an objection?

16:51:26    3            MR. ROBON:  Yes.  We weren't allowed, Your

16:51:28    4    Honor, to talk about other areas, and he's talking about

16:51:32    5    what he did 16,000 feet away.

16:51:39    6            THE COURT:  Well, we have gotten from time

16:51:41    7    to time away.  I'll let the answer stand.

16:51:43    8    Q.  Sir, if I heard what you just said correctly, in

16:51:46    9    this entire length of this project, the only complaint

16:51:49   10    you got was Cambridge?

16:51:51   11    A.  Yes, sir.

16:51:52   12            MR. ROBON:  Objection.

16:52:04   13            THE COURT:  I'll let it stand.  Let's move

16:52:06   14    on, please.

16:52:08   15    Q.  What did your investigation reveal?  Did

16:52:13   16    Vermillion trespass on Cambridge property?

16:52:16   17    A.  My investigation found we did not.

16:52:19   18    Q.  And were you assisted in that investigation by

16:52:21   19    others?

16:52:23   20    A.  I had the foreman and the assistant foreman out.

16:52:26   21    We found the fence on the Cambridge property.  We found

16:52:29   22    a tree with fence growing in it.  And then the 200-foot

16:52:33   23    problem started, and there was a lot of dirt added.

16:52:35   24    Then you can see where the fence was there again.

16:52:38   25    Somebody had added a whole bench of dirt there from the

16:52:41  1  time we left.

16:52:42  2      Q.   To your knowledge did Vermillion stay -- I don't

16:52:48  3  know what's an appropriate distance, a foot away or

16:52:51  4  something of this --

16:52:52  5      A.   Typically we stay a foot away because we don't

16:52:55  6  want to get the machinery and grab a wire; it would just

16:52:59  7  destroy the machines.

16:53:01  8      Q.   At any point did Vermillion hit the railroad

16:53:04  9  fence or, in your opinion, cross the stakes?

16:53:07  10     A.   No.

16:53:09  11             MR. BAHRET:  Thank you.

16:53:11  12             THE COURT:  You may cross.

16:53:13  13             MR. ROBON:  Thank you, Your Honor.

16:53:15  14               CARL KOPOCS, CROSS-EXAMINATION

16:53:16  15  BY MR. ROBON:

16:53:16  16     Q.   You're in the business of cutting trees, correct?

16:53:30  17     A.   Yes.

16:53:30  18     Q.   You don't plant trees?

16:53:32  19     A.   We do.

16:53:33  20     Q.   Oh, you do.   Do you know how valuable some trees

16:53:38  21  can be in the front yard for shade, things like that?

16:53:42  22     A.   Yes.

16:53:44  23     Q.   What would be the most expensive tree you think

16:53:47  24  you've ever seen?

16:53:49  25             MR. BAHRET:  Objection.

16:53:51  1          THE COURT:  Overruled.   You can answer.

16:53:56  2     A.  What do you mean?  I don't understand your

16:53:59  3  question.

16:54:00  4     Q.  I want to know what you think the most expensive

16:54:03  5  tree to replace that you've ever seen.   Maybe a 50-foot

16:54:08  6  tall blue spruce?   Would you have any idea what

16:54:12  7  something like that would be worth in somebody's front

16:54:14  8  yard?

16:54:14  9     A.  There's a formula for that.  It depends on the

16:54:17  10  species of tree, the condition of the tree to the

16:54:21  11  location of that tree.  That would give you a price on

16:54:23  12  it.   It could be $20; it could be $10,000 or $20,000.

16:54:27  13     Q.  Right.   Thank you.

16:54:28  14     A.  It just depends where it's at.

16:54:30  15     Q.  Thank you.   I'm going to hand you what we've

16:54:33  16  marked as Exhibit 93.

16:54:42  17          MR. ROBON:  Can I approach the witness, Your

16:54:44  18  Honor?

16:54:44  19          THE COURT:  Sure.

16:54:46  20     Q.  My question is, is this the type of remnants that

16:54:49  21  are left by the hydro-axe that you used at the Cambridge

16:54:54  22  subdivision?   When I say remnants, I mean the stumps.

16:55:02  23     A.  I would say yes.

16:55:05  24     Q.  Okay.   And in this photograph, Exhibit 93,

16:55:16  25  doesn't it appear that those stumps are within six or

16:55:18  1    eight inches of the railroad fence, and they are cut

16:55:22  2    down?

16:55:24  3        A.    No, they're about three foot away from the fence.

16:55:28  4    The railroad tie, this vertical one is a six by eight,

16:55:33  5    and these are about ten or 12 inches at the cut, so

16:55:36  6    there's got to be about two and a half, three feet

16:55:39  7    there.

16:55:40  8        Q.    What about this one over here?

16:55:41  9        A.    Same thing.

16:55:42  10       Q.    You think they're three feet away?

16:55:48  11            MR. ROBON:  Your Honor, may I show this to

16:55:49  12    the jury.

16:55:50  13            THE COURT:  Try the screen.  Let's see if

16:55:52  14    the screen works.

16:55:54  15            MR. ROBON:  I tried.  There's an awful lot

16:55:56  16    of glare because the picture is very white.  Maybe if I

16:56:03  17    darken this.

16:56:11  18            MR. BAHRET:  You made it brighter.

16:56:16  19            MR. ROBON:  I'd like to show it to the jury.

16:56:18  20            THE COURT:  Go ahead.  Just walk it along

16:56:20  21    with no comment, please.

16:56:46  22    BY MR. ROBON:

16:56:46  23       Q.    So you're telling this jury that any of these

16:56:49  24    stumps that you cut were at least three feet away from

16:56:51  25    the railroad post in your opinion?

16:56:58  1    A.   Well, that particular photo wasn't right there at
16:57:01  2  the Cambridge property.   That was somewhere else.
16:57:06  3    Q.   How do you know?
16:57:07  4    A.   Because I was out there and looked at it here a
16:57:09  5  couple months ago.   There's no railroad posts left
16:57:13  6  there.
16:57:15  7    Q.   I understand that.   But you told the jury that
16:57:17  8  you saw a bunch of fill brought in.
16:57:19  9    A.   Yeah.
16:57:20  10   Q.   Wasn't the fill covering up some of these stumps?
16:57:26  11   A.   That, I don't know.   Because I don't know where
16:57:30  12  that was taken.   That could have been somewhere else.
16:57:33  13   Q.   The testimony, Mr. McCarthy said he took it.   Do
16:57:37  14  you know who Mr. McCarthy is?
16:57:39  15   A.   No.
16:57:41  16   Q.   I want you to take a look at Exhibit Number 18.
16:57:46  17  Does this look like the type of brambles that were along
16:57:50  18  the back of the Cambridge subdivision that you cut?
16:57:53  19   A.   Yes.
16:57:58  20   Q.   And I'm going to hand you Exhibit 19.   The same
16:58:03  21  thing, the thickness, like the brambles that were behind
16:58:10  22  Cambridge?
16:58:10  23   A.   On the railroad property?
16:58:12  24   Q.   Brambles behind Cambridge.   Let's don't discuss
16:58:16  25  whether it was or was not on railroad property.

16:58:18  1          MR. BAHRET:   Objection.

16:58:20  2      A.   I cut brush like that on railroad property.

16:58:23  3      Q.   My question to you is:  When you see these stems,

16:58:28  4  like, here or here, can you tell the jury roughly how --

16:58:34  5  what's the diameter straight across?   Is it an inch,

16:58:38  6  two inches?

16:58:39  7      A.   Three quarter to an inch and a quarter.

16:58:46  8      Q.   I'm going to hand you Exhibit A13.   I guess I

16:58:53  9  can hand it up here.   This was taken by a gentleman

16:59:00  10  from Ric-man.   Those are the stumps that your machines

16:59:04  11  cut right up against the railroad fence?

16:59:11  12      A.   I'd probably say yes.

16:59:13  13      Q.   How close do those stumps look like they are to

16:59:16  14  the railroad fence or the railroad post?

16:59:19  15      A.   They're probably six, eight inches, ten.

16:59:23  16      Q.   And you told me you tried to stay three feet

16:59:25  17  away?

16:59:26  18      A.   Well, these things were hanging out there.   If

16:59:28  19  the operator would come by, it would probably hit their

16:59:32  20  head if they're driving a bulldozer or something.   We

16:59:34  21  had to clear them back.

16:59:35  22      Q.   That's not my question, sir.   You told me five

16:59:39  23  minutes ago that you normally stayed three feet away

16:59:41  24  from a railroad fence because it would damage your

16:59:43  25  machine.

16:59:43   1      A.   No, I didn't say that.   I said those stumps were

16:59:46   2   three foot away from that fence.

16:59:48   3      Q.   So you do cut all the way up to the fence?

16:59:50   4      A.   Sometimes.

16:59:51   5      Q.   And in this case, on that photograph, you did?

16:59:54   6      A.   Yes.   It's pretty close to the fence.

17:00:00   7            MR. ROBON:   May I show this one to the jury,

17:00:02   8   Your Honor?

17:00:03   9            THE WITNESS:   You bet.   Oh, I'm sorry.

17:00:08  10            THE COURT:   You may have my seat.

17:00:10  11            THE WITNESS:   I'm not used to being in

17:00:12  12   court.

17:00:39  13   BY MR. ROBON:

17:00:39  14      Q.   Is it safe to say that you treated the railroad

17:00:42  15   fence as the boundary line?

17:00:48  16      A.   It was staked.   It was about six inches off.

17:00:51  17      Q.   My question is, is it safe for this jury to

17:00:54  18   assume that you used the railroad fence as the boundary

17:00:58  19   line, what you should cut up to?

17:01:00  20      A.   The stakes were synonymous with the railroad

17:01:03  21   fence.

17:01:03  22      Q.   Okay.   So the stakes were next to the railroad

17:01:06  23   fence?

17:01:06  24      A.   Yes.

17:01:12  25      Q.   And can you tell the jury why you didn't install

17:01:22  1    a safety fence along the back of the Cambridge

17:01:26  2    subdivision before you did any cutting?

17:01:30  3        A.   We never install a fence like that.

17:01:33  4        Q.   You don't?

17:01:33  5        A.   It's not an industry standard.   I never heard of

17:01:37  6    such a request.   How would you do it anyhow with all

17:01:52  7    the brush there?

17:01:55  8        Q.   Handing you Exhibit 16, is this the feller

17:01:59  9    buncher that your company used in cutting trees?

17:02:06 10        A.   Yes.

17:02:06 11        Q.   And you see that big sign on there that says

17:02:10 12    "stay back 300 feet"?

17:02:13 13        A.   Yes.

17:02:14 14        Q.   And can you tell the jury why that's on there?

17:02:20 15             MR. BAHRET:   I'll object to the relevance,

17:02:22 16    Your Honor.

17:02:23 17             THE COURT:   You may be right.   Let's have

17:02:26 18    the answer.   You may answer.

17:02:27 19        A.   That's there because it's an industry standard,

17:02:30 20    and most trees are 150 feet tall maximum out in the

17:02:35 21    woods.   This is for cutting in the woods.   And you're

17:02:38 22    supposed to be two, tree lengths away from a tree.   So

17:02:41 23    that's why you would have this 300 feet on there.

17:02:45 24    That's on all forestry equipment, or pretty well all of

17:02:49 25    it.

17:02:50  1    Q.   And you didn't stay 300 feet from the house that

17:02:54  2    was on lot 15, did you?

17:02:58  3    A.   The people are supposed to stay 300 feet away.

17:03:01  4    Q.   No, my question is, sir, did you stay 300 feet

17:03:04  5    away from the house that was on lot 15 in the Cambridge

17:03:09  6    Subdivision, yes or no?

17:03:10  7    A.   I don't know.   I didn't measure the distance

17:03:12  8    from the railroad fence to the house.

17:03:33  9            MR. ROBON:   A couple of my exhibits

17:03:34  10   disappeared.

17:03:39  11           THE COURT:   Leaning up against your table is

17:03:41  12   the --

17:03:41  13           MR. ROBON:   There it is.   I'm sorry.

17:03:44  14   BY MR. ROBON:

17:03:44  15   Q.   I'm going to hand you what we've marked as

17:03:47  16   Exhibit Number 8.   And can you tell the jury the depth

17:03:54  17   of lot 15, the deepest part?

17:03:57  18   A.   From the -- I don't know from where it's 238

17:04:02  19   feet.   I don't know if they're measuring from the curb

17:04:04  20   or the center of the road.

17:04:06  21   Q.   Would you agree with me if there's a house on the

17:04:08  22   property, the house would be much closer than 300 feet?

17:04:13  23   A.   Yeah, but that sign is for people, not for

17:04:17  24   houses, the 300 feet.

17:04:19  25   Q.   People live in houses, right?

17:04:20  1          MR. BAHRET:  Your Honor, he's arguing now.

17:04:23  2          MR. ROBON:  I'm sorry.  I'll take that

17:04:25  3  back.   I shouldn't do that.

17:04:25  4  BY MR. ROBON:

17:04:31  5    Q.  Now you mentioned that on one side you cut a

17:04:34  6  straight line.   Which side, the tracks or the other

17:04:42  7  side?

17:04:42  8    A.  Where the railroad fence was, that 16,900 feet.

17:04:46  9          MR. BAHRET:  Why are you displaying your

17:04:48  10  notes?

17:04:49  11          MR. ROBON:  I'm sorry, I didn't mean to.

17:04:52  12          MR. BAHRET:  They were interesting, though.

17:04:55  13          MR. ROBON:  I'm not used to working with

17:04:57  14  this.

17:04:58  15  BY MR. ROBON:

17:04:59  16    Q.  So you cut a straight line on the north side of

17:05:03  17  the right-of-way?

17:05:04  18    A.  Yes.

17:05:07  19    Q.  Can you tell the jury when you saw the house and

17:05:13  20  the subdivision, and you saw the protection the brush

17:05:17  21  behind it gave from the railroad view, did you ever

17:05:22  22  think about maybe not cutting right up to what you

17:05:28  23  thought was the property line?

17:05:29  24          MR. BAHRET:  Objection, Your Honor.   It's

17:05:32  25  absolutely irrelevant.   We have every right to remove

```
17:05:35   1    it.
17:05:35   2                 THE COURT:  I understand.   I'll sustain the
17:05:49   3    objection.
17:05:53   4    BY MR. ROBON:
17:05:53   5      Q.  Did you think about staying back a few extra feet
17:05:55   6    so the brambles would provide protection for the home on
17:06:00   7    lot 15 in case those big spinning blades hit something?
17:06:03   8                 MR. BAHRET:  Objection.   Same basis.
17:06:06   9                 THE COURT:  I'll let him answer.   Go ahead.
17:06:09  10      A.  Okay.  The blades have side guards on them, as
17:06:12  11    you can see on the illustration.   So everything's
17:06:14  12    contained in this, just like a lawnmower, but this is
17:06:18  13    better than a lawnmower.
17:06:20  14                 MR. ROBON:  You're not answering my
17:06:21  15    question.
17:06:22  16                 THE COURT:  Let's let him finish and see if
17:06:24  17    he is.
17:06:25  18                 THE WITNESS:  Can I finish?
17:06:26  19                 THE COURT:  Yes.
17:06:27  20      A.  So we're running parallel with the fence, and
17:06:28  21    we're having the machine down on the ground, so things
17:06:31  22    are not coming out on the side.   And we're on railroad
17:06:37  23    property.  We was requested to get as much clearance as
17:06:40  24    possible so that they could install the pipe safely
17:06:44  25    without somebody stumbling or falling on branches.   If
```

17:06:50   1   you ever drive a bulldozer, you certainly don't want to

17:06:53   2   push -- all bulldozers have guards on them, four posts,

17:06:58   3   a canopy.  So if you push a branch back, it's going so

17:07:03   4   far; it's going to come back and hit you in the face.

17:07:06   5       Q.   Your answer is, no, you didn't think about it?

17:07:09   6       A.   Yeah, we thought about it.  We thought about

17:07:11   7   doing it the way the owner requested it to be done.

17:07:14   8       Q.   My question was:  Did you think about staying

17:07:16   9   just a few feet back so the brambles would act as a

17:07:20  10   blockade from anything that might fall or be thrown by

17:07:22  11   your machines towards that house?

17:07:24  12       A.   Well, we start at the other side and work our way

17:07:27  13   to the fence, and then the last --

17:07:28  14       Q.   You're not answering my question, sir.   Did you

17:07:31  15   think about staying a few feet back or leaving a few

17:07:35  16   feet of brambles as a buffer, yes or no?

17:07:38  17                 MR. BAHRET:   Objection to the relevance,

17:07:39  18   Your Honor.

17:07:41  19                 THE COURT:  Go ahead.  You may answer.

17:07:43  20       A.   I said we start away from the --

17:07:46  21       Q.   Yes or no?

17:07:47  22       A.   I'm going to answer it my way, sir.

17:07:49  23       Q.   No, sir, you're going to answer the way the Judge

17:07:51  24   tells you to answer.

17:07:53  25                 THE COURT:   I'm not going to tell you how to

17:07:54   1   answer, but if you can answer yes or no, please do so.

17:07:59   2       A.   We did not think about saving some brush that we

17:08:02   3   was told to cut out.

17:08:05   4       Q.   Thank you.   I want you to take a look at Exhibit

17:08:08   5   17.   Is this the hydro-axe, this big contraption here

17:08:12   6   on the front of the big front-end loader?

17:08:17   7       A.   I would say yes.   I can't see it real clear.

17:08:21   8       Q.   Would you tell the jury how big the blade is, how

17:08:25   9   many feet in diameter?

17:08:26  10       A.   Well, the blade is about 16 or 17 inches long.

17:08:30  11   It's on an arm that spins around.   There's two blades,

17:08:35  12   and the outside of the whole machine is eight feet.   So

17:08:38  13   the inside is probably a little less than 7 feet.

17:08:41  14       Q.   So it takes a seven-foot swath?

17:08:47  15       A.   Yes.

17:09:00  16              MR. ROBON:  Nothing further, Your Honor.

17:09:02  17              THE COURT:  Any redirect?

17:09:03  18              MR. BAHRET:  I don't think so.   Thank you.

17:09:05  19              THE COURT:  Thank you.   You may step down.

17:09:06  20   Thank you.

17:09:08  21              THE WITNESS:  Okay.  Thank you.

17:09:09  22              THE COURT:  Ladies and gentlemen, we're at a

17:09:12  23   break for the day, so I begin by asking you what time

17:09:15  24   you would like to start tomorrow morning.   I can tell

17:09:18  25   you based upon counsel's comments to me that I expect

17:09:21  1   that the evidence will be completed tomorrow.  I can't

17:09:25  2   tell you what time other than the afternoon at some

17:09:28  3   point in time.  Depending when that is will depend

17:09:31  4   whether we continue right into closing and instructions,

17:09:35  5   or whether we come back Friday for that.  But you're on

17:09:42  6   the home stretch, so to speak.  Do we have any issues

17:09:46  7   on starting time tomorrow with counsel, parties?

17:09:51  8                MR. BAHRET:  Would 8:15 -- unless they want

17:09:55  9   to come later, would 8:15 --

17:09:59  10               THE COURT:  Is 8:30 okay, a little later

17:10:01  11  start tomorrow?  Then let's have the lawyers here no

17:10:10  12  later than 8:15 so that we can take care of some

17:10:13  13  business that we didn't tend to today on the record

17:10:15  14  outside the presence of the jury.

17:10:18  15               Are you able to be here, madam courtroom

17:10:29  16  reporter.

17:10:30  17               THE COURT REPORTER:  Yes.

17:10:30  18               THE COURT:  Once again, ladies and

17:10:31  19  gentlemen, I'll send you off with hopefully safe driving

17:10:34  20  and a safe return tomorrow and remind you again we're

17:10:37  21  going to be asked at home perhaps, can you tell me about

17:10:41  22  today, or perhaps you're riding home with someone who's

17:10:44  23  been in the courtroom.  There may be some desire to

17:10:46  24  have some discussion about what happened in court today.

17:10:49  25  And you cannot, obviously.  You can only talk with the

17:10:51  1    jury, and you can only do that when the case is finally

17:10:54  2    submitted to you.  So I encourage you to talk with

17:10:57  3    family and friends about the weather, or anything except

17:11:00  4    the case itself.  We're in recess.

          5                 (Adjourned at 5:11 p.m.)

          6                          - - -

          7

          8                 **C E R T I F I C A T E**

          9

         10        I certify that the foregoing is a correct transcript

         11    from the record of proceedings in the above-entitled

         12    matter.

         13

         14    /s Tracy L. Spore_____            _____

         15    Tracy L. Spore, RMR, CRR                    Date

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

```
 1                       I N D E X

 2

 3   JOHN McCARTHY, CONTINUED DIRECT EXAMINATION        341

 4   BY MR. ROBON:

 5   JOHN McCARTHY, CROSS-EXAMINATION                   357

 6   BY MR. BAHRET:

 7   JOHN McCARTHY, REDIRECT EXAMINATION                423

 8   BY MR. ROBON:

 9   ROGER HERRETT, DIRECT EXAMINATION                  425

10   BY MR. ROBON:

11   ROGER HERRETT, CROSS-EXAMINATION                   451

12   BY MR. BAHRET:

13   ROGER HERRETT, REDIRECT EXAMINATION                466

14   BY MR. ROBON:

15   ROBERT KEESEY, DIRECT EXAMINATION                  467

16   BY MR. ROBON:

17   ROBERT KEESEY, CROSS-EXAMINATION                   483

18   BY MR. BAHRET:

19   ROBERT KEESEY, REDIRECT EXAMINATION                500

20   BY MR. ROBON:

21   JOHN LASKEY, DIRECT EXAMINATION                    503

22   BY MR. ROBON:

23   JOHN LASKEY, CROSS-EXAMINATION                     532

24   BY MR. BAHRET:

25                                                      557
```

```
1    JOHN LASKEY, REDIRECT EXAMINATION

2    BY MR. ROBON:

3    PETE FORLETTA, DIRECT EXAMINATION              561

4    BY MR. BAHRET:

5    PETE FORLETTA, CROSS-EXAMINATION              565

6    BY MR. ROBON:

7    DEAN WALSH, DIRECT EXAMINATION               572

8    BY MR. BAHRET:

9    DEAN WALSH, CROSS-EXAMINATION                602

10   BY MR. ROBON:

11   DEAN WALSH, REDIRECT EXAMINATION             617

12   BY MR. BAHRET:

13   CARL KOPOCS, DIRECT EXAMINATION              619

14   BY MR. BAHRET:

15   CARL KOPOCS, CROSS-EXAMINATION               625

16   BY MR. ROBON:

17

18

19

20

21

22

23

24

25
```

# $

**$1,000** - 440:14, 606:14
**$1,186,877.09** - 530:5
**$1,367,000** - 525:16
**$10,000** - 626:12
**$100** - 445:19
**$100,000** - 474:20, 479:19, 493:21, 514:4, 515:19
**$105,000** - 480:6
**$120,000** - 509:2, 514:14
**$125,000** - 440:4, 440:15, 479:20
**$130,000** - 479:20
**$134,000** - 440:15, 440:18, 450:18, 458:20, 464:3, 464:16, 466:20, 466:24
**$136,927.70** - 530:7
**$145,000** - 493:19, 494:10, 550:7
**$150,000** - 509:2, 555:18
**$177,000** - 533:21
**$177,543.80** - 531:14
**$20** - 626:12
**$20,000** - 481:7, 481:8, 481:10, 626:12
**$200** - 554:25
**$200,000** - 356:7, 356:8, 360:25
**$225,000** - 526:4
**$250** - 439:15, 439:24, 446:7, 452:2
**$3,000** - 540:14
**$300,000** - 452:3
**$301,000** - 443:12, 447:10, 466:21
**$315,000** - 525:25
**$33,500** - 440:20, 443:6
**$335,000** - 475:17, 479:14
**$35,000** - 361:6, 361:18
**$36,000** - 531:11
**$38,000** - 536:2
**$395,000** - 555:10, 555:15
**$4,000** - 446:3
**$40,000** - 361:6, 361:18, 493:4, 494:23
**$45,000** - 493:4, 494:10
**$5,000** - 446:4, 516:2
**$50,000** - 480:1, 495:2, 495:3
**$539,000** - 517:17, 526:1, 554:20
**$550,000** - 514:7
**$560,000** - 514:10
**$568,000** - 515:2
**$579,000** - 514:24
**$6,000** - 446:4
**$6,700** - 522:4
**$6,900** - 522:4
**$60,000** - 480:23, 480:24, 481:4, 481:25
**$600,000** - 512:7
**$620,000** - 475:15, 480:8, 480:9, 480:10, 550:5
**$655,000** - 480:7
**$68,000** - 480:13
**$70,000** - 480:5, 480:13, 480:24
**$75,000** - 480:12
**$810,000** - 524:9
**$9,000** - 440:14
**$90,000** - 493:2
**$955,000** - 474:17

# '

**'01** - 508:12, 508:13
**'02** - 512:20
**'03** - 512:20, 514:5

**'04** - 492:2, 492:22, 495:18, 495:21
**'05** - 501:10, 518:4
**'06** - 353:6, 353:7, 368:16, 397:11, 397:15, 495:24, 496:4, 498:3, 498:5, 518:4, 518:25, 519:1
**'07** - 498:5
**'70s** - 504:10
**'80** - 504:8
**'90s** - 478:8

# /

**/s** - 638:14

# 1

**1** - 343:20, 397:20, 430:13, 474:8, 501:1
**1,000** - 469:1
**1,324,704.79** - 530:7
**1.1** - 608:22
**1/12/04** - 514:25, 515:1
**1/5/04** - 514:9
**10** - 404:14, 413:23, 425:25, 454:3, 473:19, 480:1, 480:2, 484:14, 485:3, 485:9, 485:15, 487:1, 487:8, 487:23, 488:9, 489:1, 490:11, 547:1, 553:23
**100** - 338:14, 363:22, 374:19, 394:10, 394:18, 394:23, 395:21, 395:22, 438:9, 438:16, 450:6, 494:2, 621:6
**100-and-a-quarter** - 474:21
**100-year** - 363:21
**10:20** - 425:5
**11** - 353:8, 404:14, 413:23, 440:7, 441:9, 452:13, 452:15, 454:3, 458:20, 459:10, 473:19, 480:1, 480:2, 484:14, 485:3, 485:9, 485:15, 487:1, 487:8, 487:24, 488:10, 489:1, 490:12, 553:23
**11-foot** - 450:14
**114** - 473:2, 483:3
**115** - 500:21, 501:5
**117** - 526:23
**119** - 527:11
**12** - 359:14, 387:6, 404:14, 413:23, 419:15, 439:7, 439:8, 441:9, 441:24, 449:8, 452:15, 452:22, 454:3, 460:15, 460:19, 471:14, 473:13, 479:10, 479:25, 485:5, 485:11, 487:3, 488:1, 489:5, 501:10, 505:12, 514:9, 557:22, 569:24, 627:5
**12-inch** - 379:24, 445:16, 445:20
**12/30** - 514:5
**120** - 527:24
**12:15** - 502:12
**12:30** - 502:17
**13** - 358:23, 359:22, 387:6, 404:14, 439:8, 441:9, 441:24, 457:19, 471:14, 473:13, 485:5, 485:11, 487:4, 569:24
**130,000** - 474:22
**135** - 505:15
**14** - 404:15, 423:25, 439:2, 439:3, 439:8, 441:9, 441:25, 457:19, 471:14, 473:13, 485:5, 485:11, 487:4, 526:15, 599:10

**140** - 511:24
**145** - 511:23
**15** - 342:13, 342:14, 366:17, 367:3, 388:25, 389:21, 404:9, 407:5, 407:10, 408:2, 408:18, 415:24, 416:1, 424:10, 425:4, 430:6, 433:12, 434:20, 439:2, 439:3, 439:6, 439:8, 441:9, 441:25, 448:10, 448:18, 448:22, 452:11, 457:19, 460:9, 471:14, 473:13, 474:6, 474:13, 475:14, 477:13, 479:10, 479:25, 485:5, 485:11, 487:4, 488:1, 489:5, 492:5, 515:15, 517:16, 525:23, 539:25, 540:12, 547:1, 547:14, 547:20, 551:13, 554:16, 557:23, 560:21, 575:23, 591:15, 603:10, 608:6, 612:4, 632:2, 632:5, 632:17, 634:7
**15-foot** - 451:8, 451:14, 452:5, 452:22, 453:9, 453:10, 458:25, 459:2, 459:9, 460:19
**15-minute** - 561:12
**150** - 494:2, 631:20
**16** - 389:1, 389:21, 404:9, 405:21, 405:23, 407:5, 407:22, 408:2, 417:19, 434:20, 474:8, 518:24, 554:16, 560:13, 575:23, 631:8, 636:10
**16,000** - 624:5
**16,900** - 623:21, 633:8
**17** - 408:2, 434:20, 608:6, 636:5, 636:10
**17,500** - 596:17
**1701** - 338:15
**1716** - 338:21
**175** - 596:15, 596:18
**18** - 448:22, 628:16
**180** - 596:15, 596:18
**19** - 628:20
**1930** - 504:5
**1960** - 425:20, 425:22
**1976** - 511:8
**1979** - 504:8
**1988** - 505:7, 505:9, 505:11
**1999** - 467:24, 505:8, 506:2
**1:30** - 502:15, 502:19, 502:20

# 2

**2** - 432:13, 437:20, 508:23
**2,600** - 554:23
**2,700** - 554:23
**2.5** - 491:7
**2/17/04** - 514:13
**20** - 366:17, 367:3, 415:18, 415:20, 420:16, 424:10, 430:6, 433:12, 448:18, 467:24, 482:2, 512:10, 591:15, 607:16, 608:9, 618:11
**200** - 356:9, 356:10, 380:5
**200-foot** - 624:22
**2000** - 506:3
**2001** - 509:6, 509:15, 513:22, 556:4, 557:21, 558:1
**2002** - 510:4, 510:9, 510:13, 513:24, 537:10, 537:11, 537:16
**2003** - 495:5, 532:22, 533:2, 538:20, 539:16,

**539:19**
**2004** - 492:1, 492:17, 495:5, 512:23, 514:21, 534:19, 536:25, 538:1, 538:4
**2005** - 367:19, 367:20, 367:23, 368:8, 368:19, 369:3, 370:15, 371:3, 371:14, 372:1, 372:7, 373:7, 495:9, 501:21, 515:5, 515:14, 516:5, 537:4
**2006** - 346:17, 347:9, 347:10, 367:25, 368:18, 369:1, 369:6, 371:12, 371:21, 373:7, 377:6, 387:19, 397:4, 403:8, 406:7, 406:17, 413:18, 419:20, 430:14, 475:9, 486:22, 495:12, 518:8, 557:21, 558:1, 620:19
**2007** - 403:9, 406:7, 486:22, 555:23
**2008** - 338:5
**21** - 338:5
**22** - 474:8, 491:13
**238** - 632:18
**24-inch** - 609:2
**243-3607** - 338:22
**25** - 400:17, 400:18, 415:18, 415:20, 415:22, 430:6, 433:12, 438:10, 438:11, 469:12, 507:8, 555:23, 561:13, 623:6
**250** - 380:2, 380:3, 511:2, 511:12
**26** - 562:6
**27** - 607:2, 607:3
**28** - 518:22, 519:2
**2800** - 554:24
**29th** - 467:25

# 3

**3** - 338:9, 437:20, 491:9, 508:23
**3,000** - 438:17
**30** - 377:12, 397:20, 423:20, 430:6, 488:24, 530:5, 573:8, 623:6
**300** - 380:3, 576:24, 608:11, 631:12, 631:23, 632:1, 632:3, 632:4, 632:22, 632:24
**33** - 494:2
**33,000-plus** - 443:6
**335** - 483:7
**34** - 425:23, 534:22, 535:11
**341** - 639:3
**35** - 430:6
**350** - 380:2
**357** - 639:5
**37** - 346:12, 346:13, 364:6, 389:5, 407:16
**3:06-cv-2950** - 338:4

# 4

**4** - 341:17, 346:9, 421:7, 457:11, 457:21, 458:3, 474:8, 508:23
**4,000** - 438:17
**40** - 511:14, 557:5
**400** - 608:12
**419** - 338:16, 338:20, 338:22
**42** - 542:1
**423** - 639:7
**425** - 639:9
**43528-1844** - 338:19
**43537** - 338:15

**43624** - 338:22
**451** - 639:11
**466** - 639:13
**467** - 639:15
**47** - 494:12, 504:1, 507:21
**475** - 505:14
**483** - 639:17
**4th** - 509:5

**5**

**5** - 344:13, 346:9, 346:14,
363:7, 363:18, 423:15,
454:25, 456:23, 457:11,
457:21, 458:3, 508:23
**50** - 415:20, 422:7, 445:10,
493:22, 493:24, 493:25,
494:5, 494:9, 494:10,
494:13, 494:14, 621:6
**50,000** - 400:15
**50-foot** - 626:5
**500** - 380:6, 432:5, 434:8,
438:23, 438:24, 439:5,
439:9, 440:25, 442:8, 442:9,
469:1, 555:6, 596:18, 639:19
**503** - 639:21
**532** - 639:23
**54** - 571:21, 609:12
**54-plus** - 427:1
**55** - 348:15, 351:16
**557** - 639:25
**561** - 640:3
**565** - 640:5
**572** - 640:7
**58** - 349:19
**59** - 351:25
**5:00** - 619:8
**5:11** - 638:5

**6**

**6** - 457:11, 457:21, 458:3,
474:4, 474:13, 474:21,
475:14, 480:5
**6-million** - 508:24
**6.25** - 530:20
**60** - 399:19, 400:23, 621:6
**60-times-25** - 402:7
**602** - 640:9
**61** - 394:16
**617** - 640:11
**619** - 640:13
**62** - 544:18
**625** - 640:15
**66-inch** - 520:4, 574:18
**67** - 553:4, 557:17
**68** - 519:21, 546:8, 557:17

**7**

**7** - 425:25, 442:1, 457:11,
457:21, 458:3, 471:9, 474:5,
490:9, 530:19, 551:6, 551:8,
636:13
**70** - 340:6
**700** - 505:20, 505:21
**7050** - 338:19
**709** - 338:18
**72** - 503:18, 504:9
**75** - 438:8, 438:10, 438:14,
438:15, 469:9, 469:11,
469:12, 604:3, 604:15
**75-foot** - 623:7
**76** - 511:12

**8**

**8** - 339:6, 339:12, 441:7,
456:23, 457:11, 457:21,
458:3, 474:5, 474:13,

**474:21, 475:14, 480:5,**
490:9, 632:16
**8-26** - 538:8
**8/26/04** - 514:23
**82** - 511:10
**86-7800** - 338:20
**87** - 608:18
**88** - 529:1, 531:8
**89** - 526:14
**897-6500** - 338:16
**8:08** - 339:1
**8:15** - 637:8, 637:9, 637:12
**8:30** - 637:10

**9**

**9** - 404:14, 413:23, 421:19,
422:4, 454:4, 473:19, 474:6,
474:13, 475:14, 480:2,
484:14, 485:3, 485:9,
485:15, 487:1, 487:7,
487:23, 488:9, 489:1,
490:11, 514:14, 553:22,
554:6
**9/11** - 509:6
**900-and-some** - 524:7
**93** - 626:16, 626:24
**95** - 346:19
**97** - 608:18

**A**

**A1** - 419:12, 419:13,
588:23
**A10-** 591:5
**A11-** 587:25
**A12-** 401:11
**A13-** 591:22, 629:8
**A14-** 592:18
**A15-** 593:5
**A16-** 588:16
**A17-** 589:23, 589:24
**A2-** 587:22, 614:20
**A3-** 421:4, 423:24, 587:12
**A4-** 590:11, 614:1
**A5-** 421:19, 589:10
**A6-** 589:13, 613:8, 613:12
**A7-** 589:19
**A8-** 588:10
**A9-** 593:10
**abandoned** - 562:24,
577:19, 578:10, 579:14,
580:20, 597:4, 601:20,
608:25, 609:6
**Abcs-** 446:11
**abilities** - 433:2
**able** - 359:10, 359:14,
369:10, 370:11, 377:13,
380:21, 400:13, 427:13,
427:18, 454:3, 454:5, 454:8,
465:3, 477:5, 487:11,
488:14, 489:24, 490:11,
542:2, 557:11, 593:10,
605:13, 637:15
**above-entitled** - 638:11
**absolute** - 518:15, 612:18
**absolutely** - 452:7,
492:19, 500:14, 538:22,
541:19, 549:2, 633:25
**Absolutely** - 478:3, 497:3
**absorbed** - 501:16
**absorbing** - 495:14
**absorption** - 470:16,
481:24, 491:8, 491:13,
491:22, 492:8, 495:16,
495:27
**abut** - 493:11
**abutted** - 494:16
**abutting** - 540:23, 550:23,
552:4, 611:15

**accelerated** - 437:7
**accept** - 518:19
**access** - 353:12, 383:3,
591:8
**accidentally** - 382:7,
543:17
**accommodate** - 586:22
**accomplish** - 496:21
**according** - 464:15, 537:9
**accordingly** - 364:1
**account** - 477:25, 478:5
**accounting** - 468:19
**accrued** - 529:19, 530:1
**accurate** - 490:13, 496:2
**accurately** - 346:9,
348:12, 363:18, 434:16,
527:5, 527:8, 594:11
**achieved** - 476:12
**acknowledge** - 498:1
**acorns** - 427:14, 427:16,
427:17
**acres** - 405:22, 405:23,
505:15
**act** - 382:6, 635:9
**acting** - 483:1
**action** - 491:2, 531:18
**active** - 342:10, 343:19,
577:18, 597:9, 597:15,
616:2, 616:6
**activities** - 426:4, 437:16,
553:17, 587:7, 606:19
**activity** - 495:5, 537:4,
584:3
**actual** - 374:7, 385:10,
387:2, 473:3, 477:12, 482:3,
492:17, 588:6, 593:22
**adaptable** - 427:9
**adapted** - 447:14, 447:20
**add** - 448:13, 457:25
**added** - 440:14, 450:9,
450:13, 624:23, 624:25
**addendum** - 471:11
**adding** - 450:19, 460:14
**additional** - 438:1, 574:1,
622:18
**address** - 358:9, 360:18,
361:14, 476:6
**addressing** - 546:14
**adds** - 445:24, 445:25
**adjourned** - 502:18
**Adjourned** - 638:5
**adjusters** - 340:6
**administration** - 398:7,
398:13
**admit** - 451:14, 454:2,
457:10, 458:21
**adult** - 340:3
**advertised** - 493:5
**advertising** - 522:6
**advisedly** - 364:14
**advocating** - 462:10
**aerial** - 430:13
**aesthetics** - 455:4, 455:6
**affect** - 401:23, 442:16
**affected** - 443:1, 443:6,
443:9, 471:6, 471:24,
473:13, 474:7, 474:10
**affecting** - 446:9
**affects** - 402:3, 446:8,
458:18
**affirmed** - 368:24
**afield** - 385:25, 523:13
**aftermarket** - 480:16
**afternoon** - 562:1, 637:2
**afterwards** - 374:8, 565:12
**age** - 547:23
**agents** - 499:6
**ago** - 429:4, 429:5, 487:14,
536:10, 615:19, 628:5,
629:23

**Agree-** 361:18
**agree** - 375:10, 388:25,
389:9, 389:20, 390:19,
397:22, 398:2, 398:4, 398:5,
398:9, 399:18, 402:18,
405:12, 405:15, 413:21,
453:12, 459:16, 491:3,
492:15, 492:16, 496:19,
499:14, 518:12, 529:17,
548:6, 548:10, 551:16,
553:15, 554:3, 555:24,
555:25, 605:14, 605:19,
607:25, 608:4, 632:21
**Agreed-** 508:18
**agreed** - 355:25, 508:16,
511:24, 511:25
**agreeing** - 386:24
**ahead** - 343:9, 381:18,
384:10, 384:13, 420:8,
424:7, 430:17, 457:1, 460:3,
471:17, 512:9, 524:14,
563:7, 627:20, 634:9, 635:19
**air** - 576:15
**Airport** - 521:15
**Akron** - 515:20
**alive** - 438:2
**allegation** - 623:19
**allege** - 547:6
**allow** - 363:2, 379:10,
381:11, 443:23, 443:24,
529:24
**allowed** - 540:25, 550:18,
611:25, 612:5, 612:6,
614:19, 624:3
**allowing** - 507:24
**alluded** - 392:14
**Almeister** - 518:23
**almost** - 368:8, 438:16,
500:8, 514:1, 529:13
**alongside** - 593:22
**Alvie-** 521:6
**Alvie's-** 521:8
**amateurs** - 556:12
**amend** - 459:18
**Amend** - 344:22
**amenities** - 555:2
**American** - 505:7
**amount** - 405:13, 405:16,
411:15, 449:14, 489:8,
493:17, 493:18, 530:1
**amounts** - 345:21
**amplifier** - 619:22
**Amy** - 518:23
**analysis** - 433:20, 452:18,
453:13, 481:22
**analyze** - 466:9
**angular** - 443:4
**animal** - 431:11
**annum** - 531:10
**Answer** - 545:2
**answer** - 349:24, 352:22,
359:19, 369:17, 370:14,
383:10, 385:20, 394:3,
394:17, 394:20, 395:2,
396:2, 398:19, 399:8, 402:3,
405:3, 428:9, 434:24,
443:20, 443:25, 448:19,
449:2, 450:2, 454:17,
462:21, 466:7, 484:7,
486:25, 487:5, 491:16,
491:21, 496:2, 498:23,
517:5, 529:24, 531:5, 531:6,
532:15, 534:5, 534:6, 535:6,
535:16, 535:20, 537:24,
538:12, 542:9, 544:7, 546:5,
550:20, 555:7, 602:20,
624:1, 624:7, 626:1, 631:18,
634:9, 635:5, 635:19,
635:22, 635:23, 635:24,
636:1

**answered** - 380:15, 403:25, 454:20, 471:19, 471:20, 541:10, 542:18, 552:24
**answering** - 634:14, 635:14
**answers** - 383:16, 386:2, 428:25, 443:22, 550:18, 558:9
**anticipate** - 619:5
**anyhow** - 631:6
**anyplace** - 389:8, 571:14
**anytime** - 486:21
**anyway** - 412:6, 428:10, 484:21, 573:1, 623:12
**Anyway** - 426:22
**anyways** - 412:7, 521:25
**Anyways** - 505:4, 508:8
**Ap** - 503:24
**apartments** - 468:10
**apologize** - 359:22, 416:4, 456:12, 619:13
**appear** - 406:20, 610:19, 626:25
**Appearances** - 338:12
**appeared** - 392:3, 424:9
**applicable** - 470:15
**appointment** - 425:22
**appraisal** - 440:10, 464:12, 467:25, 468:3, 470:12, 470:21, 470:25, 471:9, 474:4, 474:14, 475:8, 475:18, 475:19, 479:8, 479:16, 479:17, 479:18, 479:24, 480:15, 482:9, 482:15, 483:3, 491:10, 493:10, 525:23, 526:11
**Appraisal** - 468:17
**appraisals** - 482:5, 489:9, 496:3
**appraise** - 499:1
**appraised** - 445:23, 468:4, 477:14, 481:8, 481:9, 526:12
**appraiser** - 468:16, 470:8
**appraisers** - 468:18, 468:20, 468:24
**approach** - 470:13, 470:14, 470:18, 470:19, 626:17
**appropriate** - 339:8, 546:6, 625:3
**approximation** - 577:3
**April** - 376:25, 397:7, 475:9, 495:24, 496:4, 519:6, 530:5
**arborist** - 437:15, 444:6
**Arcadis** - 575:4, 575:9
**architect** - 524:10, 524:11
**area** - 343:10, 345:6, 345:14, 345:16, 348:19, 350:4, 356:8, 356:12, 356:23, 357:6, 357:10, 357:12, 360:7, 362:14, 363:24, 374:11, 376:22, 378:1, 378:12, 385:19, 396:16, 401:6, 404:13, 406:1, 407:9, 407:11, 413:14, 418:8, 418:11, 421:1, 421:7, 424:2, 424:10, 424:21, 424:22, 428:16, 431:23, 431:25, 434:25, 437:18, 438:1, 438:25, 442:3, 442:6, 442:18, 443:1, 444:13, 446:11, 447:3, 448:2, 448:3, 467:19, 468:20, 468:25, 471:5, 471:6, 471:24, 471:25, 472:5, 473:13, 473:14, 481:20, 484:8, 487:24, 490:11, 497:9, 554:2, 554:15, 557:1, 562:17, 575:13, 575:19, 576:5, 576:19, 577:11, 578:21, 580:5, 580:9, 582:23, 582:25, 584:17, 585:21, 586:16, 586:21, 588:13, 592:8, 595:13, 596:10, 598:24, 600:16, 600:18, 601:10, 602:8, 612:1, 621:1, 621:3, 623:22
**areas** - 349:25, 404:20, 433:4, 478:19, 577:13, 624:4
**arguing** - 494:11, 633:1
**arm** - 618:12, 636:11
**arose** - 623:13
**arrangement** - 364:19, 364:21, 538:18
**arrangements** - 533:11
**arrive** - 525:4
**arrived** - 416:5
**arriving** - 591:17
**arrow** - 369:22, 370:9
**arrows** - 396:1
**artificial** - 438:7
**artist** - 341:23
**ascertain** - 365:9
**ascribing** - 455:10, 456:22
**assessed** - 533:8
**assessment** - 471:3
**assignment** - 427:22, 471:22, 471:23
**assistance** - 341:24, 426:2
**assistant** - 403:3, 624:20
**assisted** - 426:17, 624:18
**associate** - 346:5
**associated** - 583:3, 583:9, 583:13
**Associates** - 338:17
**assume** - 421:7, 488:2, 545:19, 545:25, 546:2, 630:18
**assumed** - 614:7, 614:10, 614:13
**assuming** - 435:13
**Assuming** - 435:16
**assumption** - 381:2, 490:15, 490:17, 517:14, 542:19, 581:7
**Assumption** - 488:7
**assumptions** - 484:13, 491:4
**attended** - 557:5
**attention** - 341:6, 398:15, 530:10, 548:8, 578:15
**attorney** - 483:22, 528:17, 537:14, 554:11
**attorney's** - 541:22
**attorneys** - 395:17
**attract** - 497:5
**attractive** - 431:13, 465:13, 465:23, 551:22, 551:25
**auction** - 352:24, 353:2, 353:4, 518:9, 518:10, 518:11, 518:15, 518:21, 518:22, 519:3, 521:9, 521:10, 521:22, 521:23, 522:1, 522:3, 522:11, 522:24, 522:25, 548:6, 548:7, 548:14, 548:15, 548:19
**auctions** - 518:12, 518:14, 521:24
**auditor** - 500:23
**August** - 397:14, 397:17
**authorize** - 567:3, 623:18
**authorized** - 615:4, 615:10
**automobiles** - 445:21
**automotive** - 479:5
**Autumn** - 465:5
**autumn** - 447:21, 462:12, 465:1, 465:2, 465:4, 465:5, 465:6, 466:5
**available** - 373:8, 373:12, 441:1, 491:2, 561:3, 575:9
**Avenue** - 338:21
**Average** - 607:20
**average** - 400:21, 449:13, 480:10, 480:22
**awaiting** - 530:24
**award** - 426:12, 426:17
**awarded** - 578:11
**aware** - 353:2, 361:3, 362:4, 362:7, 363:25, 364:3, 364:5, 364:8, 386:9, 392:5, 393:14, 393:18, 396:20, 396:23, 403:15, 404:3, 404:8, 404:18, 404:22, 406:4, 406:8, 407:13, 420:20, 452:6, 452:9, 456:1, 464:4, 468:21, 484:15, 492:24, 493:1, 493:3, 493:6, 498:11, 498:13, 549:13, 549:16, 549:19, 563:4, 568:13, 578:9, 583:9, 583:12, 583:15, 584:7, 602:5, 606:7
**awful** - 627:15
**awfully** - 541:25
**axe** - 622:6, 622:15, 626:21, 636:5
**axle** - 591:12, 591:14

## B

**backed** - 406:21
**backfilling** - 577:22
**background** - 528:1
**backhoe** - 414:16
**backs** - 424:22
**backup** - 483:4
**backwards** - 439:3
**backyard** - 409:9, 485:4, 487:1, 489:6, 489:19, 497:6
**Bad** - 388:3
**bad** - 339:16, 434:5, 434:6, 511:15, 518:12, 551:3
**bag** - 535:4
**Bahret** - 338:17, 340:15, 343:2, 344:17, 344:20, 345:23, 348:4, 349:23, 350:8, 352:17, 353:1, 353:24, 354:8, 354:22, 357:21, 357:24, 361:8, 361:10, 361:21, 363:20, 369:16, 369:21, 369:24, 370:7, 370:10, 370:20, 370:23, 370:24, 378:24, 382:7, 382:12, 382:13, 383:19, 386:4, 391:23, 393:22, 393:25, 399:6, 399:10, 412:23, 415:24, 419:12, 421:4, 421:5, 422:9, 422:11, 422:25, 424:4, 424:11, 435:4, 441:11, 441:18, 443:16, 443:19, 444:5, 445:1, 445:3, 445:6, 448:23, 449:24, 451:3, 451:4, 454:22, 456:4, 456:10, 456:12, 456:17, 456:19, 456:21, 458:7, 459:21, 466:12, 467:6, 472:12, 472:15, 472:22, 473:17, 475:3, 483:14, 483:17, 483:21, 487:21, 496:7, 496:16, 496:17, 500:15, 502:2, 502:7, 514:16, 517:3, 523:12, 524:15, 524:18, 524:21, 525:11, 527:22, 529:15, 529:21, 530:14, 530:17, 531:2, 532:2, 532:5, 536:17, 538:6, 550:21, 553:5, 553:7, 553:14, 556:22, 556:24, 557:13, 557:17, 558:8, 558:11, 558:17, 558:25, 559:24, 560:4, 560:25, 561:21, 561:25, 563:8, 563:11, 564:24, 567:8, 572:7, 572:13, 572:17, 581:5, 585:10, 585:13, 589:24, 589:25, 590:24, 591:1, 595:17, 595:23, 595:25, 596:5, 596:24, 602:17, 604:7, 604:24, 610:13, 612:17, 612:23, 617:9, 617:12, 618:21, 618:25, 619:6, 619:21, 619:25, 625:11, 625:25, 627:18, 629:1, 631:15, 633:1, 633:9, 633:12, 633:24, 634:8, 635:17, 636:18, 637:8, 639:6, 639:12, 639:18, 639:24, 640:4, 640:8, 640:12, 640:14
**ball** - 437:3
**Bank** - 515:20, 525:17, 530:21
**bank** - 521:16, 526:8, 526:21, 529:20, 533:10, 536:22, 537:15
**bankruptcy** - 531:20
**bar** - 340:22
**barbecue** - 485:4, 485:12, 487:12, 487:23, 489:18
**barbecuing** - 485:9
**barbie** - 485:10
**bare** - 430:11
**barely** - 410:7
**bark** - 367:14, 547:25, 548:2
**Barkan** - 338:13
**barrier** - 417:4, 419:22, 429:11, 430:10, 434:13, 440:17, 444:18, 446:24, 446:25, 448:7, 449:22, 451:7, 451:14, 452:6, 452:12, 452:22, 453:6, 453:9, 453:10, 457:18, 459:1, 459:2, 459:6, 459:8, 459:9, 460:19, 463:15
**barrier-type** - 417:4
**barriers** - 431:6, 444:18
**base** - 518:17
**Based** - 361:8, 475:12
**based** - 342:14, 356:18, 365:24, 419:13, 421:6, 431:17, 433:20, 437:14, 448:15, 456:23, 474:14, 479:8, 482:1, 482:6, 482:9, 582:15, 636:25
**basement** - 515:23, 515:24, 515:25
**basin** - 380:23, 381:13, 404:10, 554:16, 560:12, 563:3, 563:5
**basing** - 441:14
**basis** - 445:4, 450:19, 452:5, 480:21, 634:8
**Bates** - 418:11, 553:22, 562:17, 563:21, 563:24, 571:15, 591:8, 596:12, 601:23, 604:5
**bath** - 513:9
**baths** - 516:3
**battery** - 395:17
**beans** - 426:20
**bears** - 431:11, 447:18
**beauty** - 380:25, 431:14
**became** - 394:7, 462:6,

504:3, 505:25
**become** - 563:4, 563:15, 578:9, 583:9, 583:12, 583:15
**becomes** - 430:4
**bed** - 342:10, 344:7, 345:16, 388:21, 388:23, 432:19, 601:20
**bedroom** - 513:9
**bedrooms** - 516:4
**beds** - 387:6
**beforehand** - 365:20, 606:6
**beg** - 512:21, 515:23, 528:19, 535:9, 543:8, 551:7, 552:13
**begin** - 416:10, 493:8, 636:23
**beginning** - 377:1, 439:25, 518:4, 596:17
**begins** - 378:15, 379:3
**behalf** - 615:10
**behind** - 344:5, 346:15, 348:20, 353:11, 374:11, 378:3, 394:10, 404:4, 404:6, 404:9, 406:10, 406:13, 410:2, 413:4, 430:15, 443:10, 444:2, 445:11, 446:25, 485:14, 487:3, 490:11, 513:9, 573:12, 575:13, 577:7, 584:17, 595:13, 595:22, 600:14, 604:8, 619:18, 623:2, 623:7, 628:21, 628:24, 633:21
**Behind** - 621:23
**beholder** - 447:4
**belief** - 376:21
**Belmont** - 476:9, 477:6, 481:21, 510:23, 511:13, 511:14, 516:11, 557:3
**belongs** - 459:3, 459:4
**below** - 388:21, 388:22, 409:3, 409:4, 410:4
**bench** - 423:20, 624:25
**Berman** - 508:2, 508:22, 511:23, 513:21, 514:5, 539:4
**best** - 367:24, 428:23, 429:25, 432:22, 433:2, 437:19, 442:5, 442:11, 446:10, 449:8, 450:16, 450:23, 497:4, 506:17, 507:17, 517:23, 556:12
**bet** - 630:9
**Beth** - 518:23
**better** - 351:14, 352:9, 437:11, 449:19, 484:3, 497:25, 499:24, 519:9, 519:13, 634:13
**Betty** - 506:24, 506:25, 507:1, 507:5, 507:20, 508:10, 510:22, 511:13, 556:10, 557:2
**between** - 344:19, 344:23, 387:6, 394:24, 400:20, 421:11, 426:19, 466:22, 477:4, 482:5, 487:15, 488:20, 494:2, 507:20, 518:3, 562:17, 571:14, 577:18, 580:3, 591:15, 596:15, 596:18, 597:14, 598:2, 604:5
**bid** - 518:16
**big** - 347:19, 348:2, 349:10, 363:2, 390:11, 400:9, 411:4, 411:6, 422:5, 475:19, 505:10, 513:17, 520:3, 522:21, 539:10, 539:11, 545:7, 568:16, 568:21, 569:2, 569:3, 569:6, 595:20, 597:7, 598:20, 598:24, 607:6, 613:23,

618:5, 622:15, 622:17, 631:11, 634:7, 636:5, 636:6, 636:8
**bigger** - 404:16, 508:22, 596:2
**biggest** - 505:16, 623:1
**Bill** - 508:5, 508:6, 508:7, 508:8, 511:20, 511:21, 511:24, 514:25, 515:1, 537:4, 537:9, 539:2, 539:10
**Birch** - 521:19, 521:20, 534:10, 534:18, 534:22
**bird** - 433:8, 465:20
**bit** - 349:20, 385:25, 388:17, 388:24, 397:1, 410:6, 419:21, 428:10, 448:11, 449:20, 467:17, 481:6, 484:12, 485:19, 498:16, 498:20, 512:11, 538:16, 561:11, 576:8, 581:4, 593:11, 621:7
**bite** - 568:21
**blade** - 636:8, 636:10
**blades** - 366:24, 366:25, 634:7, 634:10, 636:11
**blame** - 490:20
**blank** - 390:2
**bleed** - 576:14
**blind** - 395:11
**block** - 548:24
**blockade** - 635:10
**blocked** - 476:24, 566:12
**blocking** - 344:2, 378:22
**blonde** - 551:5
**blowing** - 375:18
**blows** - 461:12
**blue** - 626:6
**blueprints** - 578:14
**board** - 453:21
**boards** - 422:14, 431:7
**Bob** - 451:4, 483:21, 511:8, 511:18, 532:8, 538:2, 549:15, 551:17, 572:17
**body** - 489:25
**book** - 530:3, 530:4, 532:14
**books** - 432:21
**boom/bust** - 478:20
**booming** - 539:17, 539:18
**border** - 375:11, 375:25, 412:12, 554:17
**borderline** - 376:13, 396:18
**boring** - 427:3
**boss** - 385:14, 386:6, 386:11, 386:19
**bottom** - 349:21, 357:8, 357:9, 359:10, 388:6, 388:11, 409:16, 410:23, 449:23, 550:9, 600:2, 613:10, 613:12, 613:16, 614:20, 614:24, 615:20
**Bottom** - 388:12
**Bought** - 491:24
**bought** - 373:8, 466:8, 501:15, 504:7, 512:17, 516:10, 516:12, 537:10, 537:11, 540:22, 551:1, 551:2, 551:11, 552:12, 556:7, 617:4
**boundary** - 375:1, 375:15, 375:19, 395:8, 396:6, 630:15, 630:18
**Bowling** - 523:25
**box** - 348:1, 528:9, 566:2, 591:16, 599:24
**boxes** - 407:16
**Boy** - 577:1
**boy** - 390:11, 426:15
**brain** - 528:16, 599:10

**bramble** - 413:11, 433:5, 462:23, 462:25, 463:1, 463:16, 466:6, 466:8, 496:15
**Brambles** - 461:14, 628:24
**brambles** - 349:15, 351:11, 409:20, 412:15, 412:25, 413:3, 413:8, 429:19, 446:18, 461:11, 461:13, 461:17, 461:25, 462:3, 462:4, 462:20, 463:4, 464:10, 464:11, 464:18, 464:21, 464:25, 471:6, 472:2, 488:13, 488:23, 603:19, 605:7, 605:8, 613:18, 628:17, 628:21, 634:6, 635:9, 635:16
**branch** - 447:22, 635:3
**branches** - 367:14, 591:25, 634:25
**brand** - 470:18
**break** - 368:10, 368:13, 368:23, 371:17, 382:10, 423:2, 425:4, 502:16, 561:10, 561:12, 561:18, 564:11, 636:23
**breakfast** - 520:10
**breaking** - 383:17, 618:24
**breeze** - 619:13
**briar** - 461:25
**Briarfield** - 505:14, 540:4
**briars** - 430:8, 461:13, 461:14, 461:18
**brick** - 582:19
**bridge** - 431:13, 506:22
**briefly** - 587:15, 617:9, 621:3, 622:12
**Briefly** - 372:2
**brighter** - 347:24, 627:18
**brightness** - 541:25
**bring** - 349:17, 436:5, 436:17, 436:18, 436:20, 466:24, 466:25, 473:1, 521:24
**bringing** - 401:4, 583:19
**brings** - 518:11
**Brint** - 506:10
**broke** - 563:18, 567:4
**broken** - 381:3, 568:8, 569:16, 578:12, 578:18, 591:25, 596:14
**brokerage** - 499:4
**brought** - 398:14, 399:20, 400:25, 408:3, 409:14, 410:5, 435:25, 439:20, 489:3, 519:18, 520:18, 578:15, 628:8
**brush** - 424:3, 430:8, 446:17, 461:11, 485:18, 603:19, 629:2, 631:7, 633:20, 636:2
**brushed** - 370:6
**bucket** - 618:8, 618:10, 618:19
**bucks** - 608:12
**budding** - 604:1
**buffer** - 429:11, 635:16
**build** - 352:8, 356:12, 413:16, 433:1, 507:24, 510:13, 511:1, 511:24, 512:6, 515:15, 576:18, 577:20
**builder** - 361:24, 482:13, 501:9, 501:19, 508:2, 516:25, 537:18, 537:19
**builders** - 507:17, 507:22, 507:23, 508:1, 509:1, 510:22, 538:17, 556:10, 556:11, 556:13
**Builders** - 534:24
**Building** - 509:9, 509:10

**building** - 348:19, 348:23, 373:21, 376:24, 383:5, 436:8, 508:4, 512:24, 514:5, 516:23, 536:1, 559:20
**buildings** - 517:1
**builds** - 486:9, 508:23, 539:6
**built** - 367:23, 372:25, 473:9, 473:12, 485:3, 492:7, 511:17, 512:9, 514:23, 514:24, 515:16, 515:21, 516:23, 518:6, 518:7, 528:1, 536:2, 537:20, 541:14, 551:13, 555:9, 594:3, 622:19
**bulkhead** - 570:23
**bulkheaded** - 582:16
**bulkheading** - 615:4
**bulldog** - 523:4
**bulldozed** - 350:10, 415:4, 418:21
**bulldozer** - 401:1, 414:13, 414:17, 414:18, 414:19, 415:13, 416:5, 588:4, 629:20, 635:1
**bulldozers** - 635:2
**bunch** - 622:4, 628:8
**buncher** - 622:6, 622:18, 622:23, 631:9
**Bureau** - 510:5, 510:10, 515:3
**burgers** - 487:2
**buried** - 575:20
**burned** - 339:7, 339:21
**bus** - 522:18
**bush** - 409:22, 465:8
**bushes** - 409:20, 444:19, 463:2
**Business** - 505:14
**business** - 364:20, 467:22, 497:2, 504:1, 505:11, 506:4, 507:7, 507:21, 508:7, 526:10, 533:8, 539:3, 539:9, 620:5, 620:10, 620:12, 625:16, 637:13
**busy** - 509:7
**button** - 370:1, 477:20, 527:18
**buy** - 438:11, 446:22, 462:22, 462:23, 463:10, 463:13, 463:17, 504:9, 507:18, 550:16, 551:13, 551:15, 608:11, 617:1
**buyer** - 482:7, 482:22, 482:23, 482:25, 549:20
**buyers** - 482:8, 482:16, 482:19
**buying** - 478:23, 504:5
**buys** - 501:18

---

**C**

**calculators** - 480:11
**Cambridge** - 360:9, 364:25, 365:10, 365:18, 366:6, 366:8, 367:4, 367:7, 373:21, 374:11, 375:12, 376:2, 376:18, 377:9, 377:11, 377:18, 377:19, 377:24, 377:25, 378:4, 384:19, 384:20, 385:15, 385:16, 394:6, 396:5, 396:11, 396:16, 401:24, 402:6, 404:4, 404:19, 405:20, 405:21, 405:23, 405:25, 406:2, 407:25, 408:15, 409:16, 410:2, 410:11, 410:18, 412:11, 413:4, 413:24, 414:4, 414:10, 420:22, 424:20, 427:25, 430:15, 452:8,

458:22, 460:20, 468:9,
470:21, 474:16, 479:11,
497:20, 497:23, 501:1,
501:3, 505:24, 511:7, 537:3,
538:5, 541:14, 542:5, 547:2,
547:10, 548:11, 549:3,
552:11, 552:14, 553:16,
553:21, 553:25, 556:1,
559:17, 573:13, 575:13,
577:7, 583:4, 583:9, 583:10,
583:18, 583:21, 583:24,
584:17, 584:20, 586:20,
588:4, 588:5, 589:6, 591:9,
592:9, 595:13, 596:13,
596:25, 597:8, 597:11,
598:23, 599:4, 599:12,
599:22, 599:25, 600:7,
600:19, 600:21, 600:25,
601:4, 604:8, 609:16,
610:20, 611:3, 612:4,
612:11, 615:14, 621:23,
623:2, 623:8, 624:10,
624:16, 624:21, 626:21,
628:2, 628:18, 628:22,
628:24, 631:1, 632:5
**camera** - 351:2, 566:14,
587:20, 588:19
**cancel** - 522:3
**cancelled** - 521:10,
521:11, 521:12, 522:1,
522:25, 548:7, 548:15
**cancer** - 623:24
**cannot** - 389:1, 389:21,
449:2, 614:22, 637:25
**canopy** - 409:8, 635:3
**capacity** - 405:19
**car** - 368:3, 372:8, 372:9,
372:11, 372:12, 447:5
**cardinals** - 433:7
**care** - 385:15, 437:22,
502:13, 541:17, 637:12
**career** - 467:25
**careful** - 427:20
**Careful** - 359:17
**Carl** - 619:24, 620:2,
625:14, 640:13, 640:15
**carry** - 405:13, 428:10
**cars** - 428:18, 447:6
**Case** - 338:4
**case** - 339:4, 339:25,
340:1, 361:12, 423:17,
444:16, 455:25, 468:9,
496:4, 572:23, 622:5, 630:5,
634:7, 638:1, 638:4
**cases** - 445:21, 461:16,
468:7, 496:6, 497:18
**catch** - 381:13, 404:10,
554:16, 560:12, 563:3, 563:5
**category** - 433:15, 437:2
**caused** - 345:12, 479:11
**cautionary** - 441:12, 496:8
**Cavalear** - 511:9, 511:18
**Cb** - 469:16, 500:2, 500:3
**cedar** - 433:18, 447:16
**cell** - 456:7
**Cellular** - 456:3
**cement** - 582:19
**center** - 358:18, 360:5,
470:11, 565:22, 565:23,
569:18, 574:3, 574:6,
574:12, 574:13, 574:14,
597:4, 601:19, 601:20,
632:20
**certain** - 402:9, 405:13,
405:15, 427:7, 427:9,
427:21, 435:17, 447:15,
461:12, 473:24, 492:19,
507:24, 560:7, 575:2, 611:25
**certainly** - 340:10, 398:13,
413:4, 449:15, 453:3,

465:23, 484:2, 484:3,
487:19, 489:25, 495:14,
635:1
**Certainly** - 402:1, 497:14
**certainty** - 354:6, 356:19,
431:18, 437:15, 448:16,
474:15, 475:12, 479:9
**certification** - 483:24
**certify** - 638:10
**cetera** - 426:4, 426:11,
431:6, 436:16, 437:21,
437:22, 440:17, 470:20,
471:7, 483:2
**chain** - 565:20
**chamber** - 576:7, 576:9,
576:12, 576:16, 576:23
**change** - 362:19, 383:4,
481:5, 517:18, 576:20
**changed** - 502:2, 536:3,
536:13, 594:14
**Changing** - 398:14
**charge** - 606:18, 606:19
**charged** - 515:18
**charging** - 453:8
**chart** - 441:1
**chatter** - 550:1
**check** - 422:9, 492:20,
510:9, 515:3
**child** - 516:19
**children** - 427:2, 503:22,
512:13, 514:11, 515:1,
515:11, 516:17, 516:19,
560:22, 616:16, 616:20
**Chillicothe** - 425:21
**chipper** - 622:21
**choose** - 518:18
**chopped** - 547:12, 548:5
**Christy** - 348:25, 390:21,
391:18, 393:4, 523:3, 579:6,
579:7, 615:6, 615:9
**city** - 344:8
**City** - 338:7, 344:16,
344:21, 345:9, 348:24,
351:19, 373:17, 373:18,
392:17, 393:7, 398:15,
398:20, 398:24, 403:18,
451:5, 453:9, 479:16,
483:22, 490:20, 519:20,
521:5, 531:18, 533:24,
536:11, 546:16, 562:14,
565:14, 566:10, 566:22,
567:3, 570:17, 570:19,
570:25, 572:17, 574:25,
575:5, 575:6, 578:16, 579:7,
583:14, 586:19, 589:8,
593:1, 593:2, 593:3, 595:6,
602:13, 608:17, 609:7,
609:8, 615:3, 615:10,
615:13, 616:10, 616:21
**City's** - 398:15, 452:24,
525:23
**Cl** - 621:15
**claim** - 377:17, 406:11,
406:14, 420:21, 420:22,
457:6, 457:18, 458:19,
459:9, 537:3, 553:20,
554:12, 602:6, 623:16
**claimed** - 464:4
**claiming** - 394:18, 420:16,
484:15
**claims** - 452:7
**clarify** - 350:12, 371:4
**clay** - 379:9, 380:23,
436:21, 436:25, 437:5,
578:13, 594:4, 594:8
**Claystone** - 523:3,
534:25, 535:12, 535:16,
536:10, 536:14
**clean** - 559:9, 570:12,
570:13

**cleaned** - 432:12, 437:18
**cleaning** - 446:11, 559:20
**clear** - 354:7, 360:12,
373:20, 395:7, 408:16,
420:18, 422:6, 486:2,
486:12, 542:15, 552:16,
552:22, 573:20, 588:11,
604:19, 609:24, 610:6,
621:16, 629:21, 636:7
**clearance** - 634:23
**cleared** - 359:3, 372:23,
373:25, 374:11, 394:21,
394:23, 396:25, 408:14,
418:24, 432:7, 541:14,
542:6, 542:11, 542:12,
542:19, 542:21, 543:3,
553:25, 554:1, 558:17,
574:5, 592:1
**Clearing** - 620:8
**clearing** - 347:12, 348:18,
360:11, 371:1, 371:6, 374:3,
374:4, 374:9, 375:5, 397:7,
432:3, 439:19, 542:23,
558:22, 558:24, 559:1,
559:5, 559:8, 559:10,
559:22, 560:1, 560:3,
571:11, 574:2, 574:3,
591:25, 596:11, 597:13,
597:19, 600:13, 601:2,
603:16, 603:17, 620:4,
620:9, 621:16, 622:9
**clearly** - 377:15, 377:21,
381:11, 381:13, 422:1, 598:6
**Clearly** - 359:6
**Clerk** - 596:2
**clerk** - 426:8, 467:11,
503:1, 561:16, 572:10,
619:14, 619:17
**Cleveland** - 510:7
**Cliffs** - 506:8, 506:9
**climbed** - 359:6
**clipboard** - 421:6
**clock** - 425:5
**close** - 418:6, 420:3,
447:25, 448:7, 480:12,
525:20, 551:18, 586:3,
589:21, 595:21, 614:2,
629:13, 630:6
**closely** - 427:10
**closeness** - 585:25
**closer** - 343:19, 343:22,
347:22, 349:20, 426:6,
500:1, 550:6, 596:25, 632:22
**closest** - 490:10
**closing** - 637:4
**Club** - 510:23, 510:24,
511:13, 516:11
**clue** - 485:2
**clumps** - 349:18
**Cohen** - 514:24, 538:14
**collapse** - 478:16
**collectively** - 474:12
**college** - 390:12
**Colony** - 511:11, 512:12
**color** - 442:4, 465:13
**Columbus** - 426:13,
426:14, 506:9, 508:25, 539:6
**column** - 501:8
**combined** - 550:3, 550:11
**coming** - 340:6, 354:16,
366:22, 381:12, 409:12,
421:1, 433:7, 446:7, 481:14,
481:15, 483:4, 515:10,
519:12, 523:7, 563:21,
572:16, 591:9, 591:18,
596:12, 600:16, 634:22
**comment** - 344:18,
514:20, 541:9, 627:21
**comments** - 355:24,
399:7, 567:10, 612:24,

636:25
**commercial** - 468:6,
505:12, 505:13, 517:22
**commission** - 595:1
**commissioned** - 595:2
**Commissioner** - 520:7,
520:9, 520:18
**common** - 375:7, 375:9,
462:25, 466:6, 466:8,
513:17, 566:19
**commonly** - 422:17,
463:4, 471:25, 472:1,
478:13, 496:5
**communicate** - 490:19
**communicating** - 410:17,
451:21, 451:25
**community** - 499:4,
527:17
**companies** - 439:18,
505:10, 539:13, 620:6
**company** - 386:15,
386:16, 504:14, 504:16,
504:23, 524:11, 537:10,
549:2, 566:21, 573:15,
573:20, 577:6, 582:15,
582:23, 594:25, 595:2,
602:13, 603:3, 611:13,
614:18, 620:6, 620:7,
620:18, 620:24, 622:3,
623:2, 631:9
**Company** - 498:9, 504:1,
620:22
**comparable** - 475:25,
477:7, 481:18
**comparables** - 475:20,
476:18, 476:19, 494:15,
494:22
**comparative** - 474:1
**compare** - 344:13
**compared** - 445:11,
481:15
**comparison** - 470:14,
477:4, 498:18
**compass** - 601:14
**compelling** - 365:16
**competition** - 566:15
**competitors** - 508:21
**complaint** - 623:22, 624:9
**complaints** - 398:14,
577:6, 623:20
**complete** - 359:19,
535:13, 535:17
**completed** - 512:23,
514:6, 514:8, 587:4, 637:1
**completely** - 516:7,
584:15
**compulsion** - 549:24
**conceivable** - 433:8
**concept** - 528:23
**concern** - 455:24
**concerned** - 351:23,
366:21, 445:19, 450:10,
521:8, 585:25
**concerns** - 586:4
**conclusion** - 377:3
**conclusions** - 437:14,
483:5
**concrete** - 431:7, 431:10,
574:18, 609:15
**condemnation** - 468:7
**condemnation-type** -
468:7
**condition** - 345:21,
346:17, 626:10
**conditions** - 433:23,
449:9, 478:8, 478:11, 479:3,
594:11, 594:23
**condo** - 516:20
**condominium** - 516:10
**condos** - 536:7

**confident** - 450:7
**confine** - 385:20, 443:22, 476:3
**confining** - 476:7
**confirm** - 376:14, 389:12
**confirmed** - 351:23, 351:24, 355:11
**confiscate** - 456:7
**confused** - 487:13
**confusing** - 454:12
**conglomerate** - 352:1, 469:17
**conifer** - 433:16, 447:17, 449:5
**coniferous** - 447:17
**conifers** - 433:17
**connected** - 377:25, 579:12
**connection** - 381:21, 500:13
**connector** - 382:1
**connects** - 342:11, 342:23
**connotation** - 472:18, 518:13
**consequence** - 440:7
**consider** - 360:8, 411:14, 412:3, 412:10, 413:16, 416:21, 465:22, 501:12
**consideration** - 416:24
**considered** - 362:9, 362:11, 362:12, 362:15, 556:14, 577:11
**considers** - 373:15
**consistent** - 399:14
**constitute** - 470:8
**construct** - 361:5
**constructed** - 540:22, 557:25
**constructing** - 361:4, 362:22
**Construction** - 350:19, 562:8, 573:4, 586:12, 620:22
**construction** - 362:3, 398:6, 416:13, 416:23, 417:11, 436:8, 541:17, 545:17, 566:16, 567:13, 576:9, 594:17, 594:22, 594:25, 603:4, 603:11, 605:20, 606:16, 607:9, 611:7, 611:13, 615:12, 616:15, 617:13, 617:19
**consult** - 402:5, 545:14
**consultant** - 575:5
**consulted** - 544:15, 544:20, 544:25
**consulting** - 426:23
**consumed** - 623:25
**contact** - 372:3, 564:8, 582:3
**contained** - 376:19, 377:10, 377:11, 453:10, 634:12
**contains** - 483:3
**continue** - 341:9, 346:3, 426:22, 467:25, 536:14, 637:4
**continued** - 395:2, 467:21, 582:21
**Continued** - 341:14, 639:3
**contour** - 356:22, 356:23
**contract** - 509:7, 514:25, 515:1, 534:23, 535:2, 535:11, 562:17, 574:25, 575:25, 578:12, 608:16, 609:9
**contractor** - 351:19, 416:9, 541:14, 544:11, 583:13
**contractors** - 490:21
**contracts** - 509:8, 509:11,

509:12, 512:4, 594:23
**contraption** - 636:5
**control** - 430:8, 553:17, 573:13
**conversation** - 382:9, 403:7, 403:8, 521:7, 579:8, 585:18, 614:19
**conversations** - 393:16, 582:4
**copies** - 595:4
**copy** - 428:4, 471:9
**corn** - 426:20, 611:10, 611:14
**corner** - 357:5, 376:7, 417:19, 507:3, 554:7
**Corner** - 417:21
**corning** - 515:12
**corollary** - 423:16
**corporation** - 362:2
**Corps** - 375:5, 397:24, 398:6, 523:3
**correct** - 341:24, 346:10, 351:12, 360:12, 363:23, 365:25, 366:9, 368:21, 370:18, 371:18, 373:6, 374:12, 378:9, 380:11, 380:18, 381:9, 382:2, 382:15, 387:8, 388:16, 389:5, 391:5, 392:3, 393:2, 393:15, 394:11, 397:6, 401:12, 403:9, 404:14, 405:1, 407:5, 407:25, 408:1, 408:7, 408:10, 408:12, 411:12, 412:16, 413:24, 415:6, 415:18, 416:6, 417:8, 417:25, 418:15, 420:2, 420:5, 420:14, 422:23, 429:12, 429:13, 429:22, 430:16, 439:1, 444:23, 451:24, 452:15, 453:20, 455:2, 455:9, 455:11, 455:17, 457:22, 460:1, 463:25, 467:1, 470:3, 470:6, 470:22, 471:12, 474:23, 475:1, 477:15, 481:11, 483:25, 485:15, 485:16, 486:3, 486:17, 490:23, 492:18, 497:11, 499:17, 505:16, 529:2, 530:22, 530:25, 531:16, 541:22, 545:7, 546:15, 552:2, 552:23, 561:4, 561:5, 566:8, 578:1, 580:14, 583:25, 592:11, 592:23, 593:20, 596:11, 598:11, 601:12, 601:24, 601:25, 603:4, 605:9, 605:13, 605:22, 606:5, 611:2, 611:5, 614:11, 615:17, 615:24, 615:25, 616:3, 617:21, 618:14, 618:16, 618:20, 622:7, 625:16, 638:10
**Correct** - 454:1, 455:3, 463:23, 469:5, 474:19, 495:2, 526:2, 530:23, 531:1, 534:20, 535:1, 538:6, 552:20
**corrected** - 368:11, 368:22, 371:10, 371:13, 387:7
**correcting** - 369:1
**correction** - 346:2, 367:21, 369:1, 399:24
**correctly** - 406:9, 543:6, 543:9, 624:8
**cosign** - 512:9
**cost** - 353:12, 353:20, 354:17, 355:7, 356:5, 361:5, 361:17, 429:16, 431:19, 432:3, 438:9, 438:21, 439:22, 440:22, 453:5,

455:15, 458:15, 458:16, 458:20, 458:24, 460:6, 460:24, 461:1, 461:6, 464:16, 466:9, 470:13, 470:19, 522:3, 525:5, 525:8, 606:11, 608:8
**costly** - 432:5
**costs** - 354:4, 354:20, 362:11, 470:19, 522:8
**cottage** - 339:20, 339:22
**Counsel** - 340:12, 361:11, 439:5
**counsel** - 339:13, 404:4, 558:14, 567:9, 619:19, 637:7
**counsel's** - 435:11, 636:25
**count** - 366:24, 366:25, 438:5
**counted** - 367:2, 423:11
**counties** - 425:25
**country** - 468:18, 478:12, 478:24
**Country** - 510:23, 511:13, 516:11
**county** - 362:25, 403:3, 403:5, 500:23, 500:24, 520:19, 529:1, 529:4, 529:6, 533:11
**County** - 506:21, 520:8, 520:11, 520:19, 521:2, 579:10
**couple** - 349:13, 374:20, 379:19, 379:20, 380:5, 394:22, 396:9, 396:13, 411:7, 411:22, 423:4, 423:7, 428:18, 436:21, 436:24, 464:6, 466:15, 496:13, 503:21, 512:12, 515:2, 515:22, 524:6, 529:7, 529:10, 536:15, 546:22, 607:20, 607:23, 628:5, 632:9
**couples** - 557:5
**course** - 340:24, 342:7, 344:25, 401:7, 431:22, 432:24, 455:4, 478:13, 486:20, 510:11, 511:1, 522:21, 618:17
**Court** - 338:1, 338:21, 339:2, 339:11, 339:24, 340:8, 340:12, 340:16, 340:19, 340:24, 341:19, 343:3, 344:1, 344:4, 344:18, 344:22, 345:2, 346:2, 347:2, 347:25, 348:7, 348:10, 349:4, 349:24, 350:12, 351:6, 352:21, 354:1, 354:10, 354:19, 355:4, 355:14, 355:17, 355:21, 356:2, 357:20, 359:17, 361:11, 364:4, 369:12, 369:14, 369:23, 370:1, 370:4, 370:8, 370:22, 378:19, 382:4, 382:8, 383:11, 383:14, 385:25, 391:22, 394:3, 399:4, 399:7, 403:25, 412:18, 412:22, 415:23, 415:25, 419:10, 419:24, 421:3, 423:2, 423:5, 423:16, 424:6, 424:8, 424:13, 424:24, 425:2, 425:9, 429:2, 429:7, 435:11, 439:5, 439:10, 441:16, 441:19, 442:7, 442:12, 443:17, 443:21, 445:4, 446:12, 446:15, 448:24, 449:1, 450:1, 450:5, 450:25, 454:10, 454:13, 456:6, 456:14, 458:6, 458:9, 459:15, 460:2, 460:5, 466:14, 467:5, 467:7,

467:10, 472:19, 477:22, 483:13, 491:17, 496:10, 500:16, 501:5, 502:6, 502:8, 502:20, 502:22, 514:18, 517:6, 523:14, 524:20, 525:1, 525:13, 527:21, 527:23, 528:7, 529:16, 529:23, 530:13, 531:4, 531:23, 532:1, 535:7, 535:10, 535:16, 535:20, 535:22, 536:19, 538:5, 538:11, 541:24, 546:6, 550:19, 553:1, 553:6, 553:9, 553:12, 557:15, 558:13, 559:2, 560:1, 560:6, 560:24, 561:1, 561:6, 561:17, 561:22, 563:9, 567:9, 571:22, 572:6, 572:8, 580:25, 581:4, 581:18, 582:13, 585:11, 589:23, 590:19, 590:22, 593:8, 595:19, 595:24, 596:20, 596:23, 602:19, 604:9, 605:1, 610:8, 610:15, 612:24, 615:2, 617:8, 618:23, 619:3, 619:8, 619:12, 619:18, 624:2, 624:6, 624:13, 625:12, 626:1, 626:19, 627:13, 627:20, 630:10, 631:17, 632:11, 634:2, 634:9, 634:16, 634:19, 635:19, 635:25, 636:17, 636:19, 636:22, 637:10, 637:17, 637:18
**court** - 339:12, 402:13, 454:16, 630:12, 637:24
**courthouse** - 504:3
**courtroom** - 339:5, 339:10, 340:23, 425:5, 456:3, 556:23, 637:15, 637:23
**coved** - 410:6
**cover** - 342:21, 409:15, 409:23, 411:7, 414:15, 414:19, 414:21, 449:22, 469:19, 563:2, 575:21, 576:18, 584:21, 584:24, 593:17, 593:19, 593:24, 609:9
**Covered** - 584:11
**covered** - 387:5, 409:21, 410:4, 410:7, 410:8, 410:10, 410:12, 410:14, 438:24, 444:4, 446:10, 446:12, 553:9
**covering** - 411:14, 628:10
**covers** - 439:6, 609:9
**Covers** - 469:18
**Cpa**- 468:19
**crack** - 389:16
**Crandall** - 570:21, 579:7, 615:6, 615:8
**create** - 429:11, 452:22, 463:14
**creating** - 458:25, 459:2, 459:5
**credit** - 478:16
**creek** - 342:11
**Creekside** - 476:9, 477:5, 481:20
**crew** - 398:15, 580:18, 582:16
**crews** - 578:5
**criteria** - 476:9, 477:8, 482:24
**criticisms** - 403:18
**crop** - 434:5, 434:6
**cross** - 345:6, 357:11, 357:20, 450:25, 483:13, 532:1, 602:20, 625:9, 625:12

**Cross** - 357:23, 451:2, 483:16, 532:4, 565:2, 602:23, 625:14, 639:5, 639:11, 639:17, 639:23, 640:5, 640:9, 640:15
**Cross-examination** - 357:23, 451:2, 483:16, 532:4, 565:2, 602:23, 625:14, 639:5, 639:11, 639:17, 639:23, 640:5, 640:9, 640:15
**crossover** - 363:23, 379:6, 388:13, 390:24, 391:4, 392:3, 392:11, 402:20, 575:14, 575:15, 578:8, 594:7
**crowd** - 511:14
**crown** - 388:23
**Crr** - 338:21, 638:15
**crucial** - 436:5
**Csx** - 383:5, 383:21, 428:19, 585:20, 588:3
**Csx's** - 428:19
**cubic** - 400:6, 400:9, 400:11, 400:14, 606:23, 607:1, 607:2, 607:3, 607:4
**Cubic** - 607:3
**cul** - 490:10, 522:18
**culvert** - 343:8, 345:14, 378:3, 378:7, 378:9, 378:10, 378:12, 378:25, 379:5, 379:6, 388:12, 405:8, 405:11
**curb** - 632:19
**cure** - 354:23
**curiosity** - 614:15
**curious** - 484:13
**current** - 504:14, 504:16, 534:2
**curt** - 613:15
**curtain** - 419:25
**curtains** - 595:21
**customer** - 507:6
**cut** - 342:6, 345:5, 345:6, 353:21, 353:22, 365:2, 393:15, 393:17, 395:3, 395:20, 402:22, 406:11, 406:19, 406:24, 409:24, 410:1, 410:16, 410:18, 411:16, 420:18, 424:2, 429:12, 429:17, 440:8, 456:23, 457:5, 459:25, 475:9, 479:23, 480:4, 481:17, 485:5, 485:10, 488:2, 526:6, 533:6, 533:22, 536:8, 541:1, 542:13, 545:24, 546:15, 546:16, 546:24, 547:5, 547:6, 547:21, 548:4, 550:24, 559:13, 559:17, 559:18, 565:8, 565:9, 565:13, 565:17, 567:1, 567:3, 567:20, 581:14, 598:23, 599:4, 604:2, 604:16, 613:9, 613:18, 613:21, 623:2, 627:1, 627:5, 627:24, 628:18, 629:2, 629:11, 630:3, 630:19, 633:5, 633:16, 636:3
**cuts** - 457:4
**Cutting** - 604:25
**cutting** - 347:11, 353:9, 420:4, 420:5, 454:9, 479:9, 480:17, 481:3, 481:11, 519:10, 519:11, 519:12, 520:12, 520:13, 520:16, 521:12, 522:10, 522:12, 545:3, 548:10, 559:22, 560:4, 560:6, 599:8, 605:5, 612:2, 612:9, 612:15, 625:16, 631:2, 631:9, 631:21, 633:22

## D

**dad** - 504:5, 504:6
**damage** - 457:6, 466:21, 466:22, 529:19, 586:1, 629:24
**damaged** - 455:14, 455:21, 458:3, 458:14, 589:17, 608:24
**damages** - 428:22, 428:23, 455:11, 456:22, 472:9
**Dame** - 503:20, 508:6
**dampening** - 479:5
**Danberry** - 517:25
**danger** - 416:22
**dangerous** - 617:25
**dark** - 349:25, 541:25
**darken** - 627:17
**data** - 483:4, 495:25, 496:1
**Date** - 638:15
**date** - 347:8, 349:4, 349:5, 419:19, 496:5, 496:8, 529:13, 583:17
**dates** - 429:6
**daughter** - 555:13
**Davis** - 338:14
**day's** - 425:3
**day-to-day** - 606:19
**days** - 381:5, 496:13
**de** - 490:10, 522:18
**dead** - 410:16, 514:15, 526:7, 549:8, 549:9
**deal** - 508:9, 521:5, 535:13, 535:17, 536:21
**dealing** - 496:4, 579:4
**Dean** - 390:22, 392:15, 563:12, 570:16, 572:12, 572:15, 602:23, 617:11, 640:7, 640:9, 640:11
**debating** - 398:19
**debris** - 415:3, 559:19, 582:10, 613:16
**December** - 492:2, 495:17, 538:20
**decide** - 509:22, 518:7, 518:10
**decided** - 340:24, 438:22, 511:16, 515:15, 518:5, 552:16
**decision** - 461:2, 552:21, 552:22, 571:5
**deck** - 489:19
**declaration** - 510:20
**decorative** - 465:17, 465:21, 465:25
**decorative-type** - 465:21
**deep** - 355:1, 358:17, 358:22, 358:25, 359:4, 387:7, 387:8, 411:24, 437:3, 452:8, 569:4, 575:19, 575:23, 575:24, 576:3, 593:16, 598:7, 607:6, 607:12, 607:13, 607:18, 618:17
**deeper** - 437:5, 437:12, 460:21, 569:22, 569:23, 569:25, 576:5, 576:8, 576:17, 600:6, 606:12
**deepest** - 632:17
**defendant** - 526:18, 561:20
**Defendants** - 338:8, 338:17
**defense** - 561:9
**Defiance** - 425:18, 425:22
**define** - 378:8
**definitely** - 435:3, 449:20, 546:15
**definition** - 463:8, 560:4

**degree** - 354:6, 356:19, 431:18, 448:15, 474:14, 475:12, 479:8
**delayed** - 616:24, 617:3
**delineate** - 574:15
**delinquent** - 533:2, 533:12
**delivered** - 352:6
**demarcated** - 578:2
**demarcating** - 573:18
**demographics** - 511:4, 515:9
**demonstrated** - 404:12
**denied** - 391:25
**denuded** - 471:25
**deny** - 376:9, 603:13, 603:14
**Department** - 524:1, 524:5
**department** - 440:11, 467:23, 499:25
**depict** - 346:10, 347:14, 348:12, 348:16, 363:18, 527:5, 527:8, 594:11
**depicted** - 363:9, 407:11, 421:22, 587:15
**depicting** - 343:5, 343:23, 344:11
**depicts** - 348:14, 348:17, 591:18, 593:11
**deposed** - 541:22
**deposition** - 358:5, 358:14, 358:16, 358:20, 359:24, 367:21, 368:2, 368:6, 368:7, 368:23, 369:8, 370:12, 371:11, 371:17, 376:22, 377:12, 389:20, 389:25, 394:16, 395:11, 397:11, 399:20, 402:12, 541:21, 542:2, 543:6, 546:12, 553:8, 555:5, 555:22, 558:9, 572:24
**depressed** - 478:1, 489:6
**depth** - 358:14, 365:5, 448:4, 632:16
**depths** - 387:13
**deputy** - 619:14
**describe** - 596:10, 597:2
**described** - 463:6, 464:11, 464:19, 549:20, 609:5
**design** - 386:21, 405:19, 406:5
**Design** - 524:11
**designated** - 621:1, 621:3
**designation** - 468:15, 469:3, 484:5
**designed** - 384:19, 385:5, 385:15, 386:6, 386:10, 386:25, 402:5, 405:13, 406:2
**designer** - 385:11
**designer's** - 385:14
**designs** - 363:5
**desirable** - 556:9
**desire** - 637:23
**desperation** - 518:13
**destiny** - 511:4
**destroy** - 625:7
**destroyed** - 574:13
**destruction** - 474:15
**details** - 375:6, 387:2
**deteriorated** - 415:16
**determinations** - 497:7
**determine** - 376:5, 402:19, 403:2, 430:1, 430:23, 431:24, 432:15, 432:22, 441:24, 442:21, 447:8, 451:16, 602:9, 610:21
**determined** - 438:21, 451:9, 462:8, 486:22
**determining** - 450:20, 470:8
**Detroit** - 431:8

**devaluation** - 483:10, 490:14
**devalue** - 491:1
**develop** - 378:1, 427:5
**developed** - 436:15, 473:22, 474:5, 505:11, 511:8
**developer** - 397:2, 461:3, 511:9, 511:11
**developing** - 373:21
**Development** - 338:4, 498:9
**development** - 342:15, 342:25, 357:13, 357:15, 361:4, 361:5, 365:1, 370:13, 375:21, 376:12, 376:15, 394:7, 402:8, 413:23, 414:2, 414:5, 419:6, 459:11, 468:12, 495:9, 495:12, 497:2, 497:5, 505:11, 505:16, 506:7, 512:19, 516:11, 517:9, 533:7, 538:23, 539:1, 539:22, 542:5, 543:11, 548:15, 551:21, 551:23, 552:17, 554:18
**development's** - 342:16, 442:15
**developments** - 342:25, 498:10, 505:12, 505:19, 534:3, 548:16
**Devilbiss** - 467:20
**diameter** - 379:24, 429:25, 440:8, 440:12, 445:10, 445:16, 445:20, 574:18, 574:20, 585:24, 608:9, 623:10, 629:5, 636:9
**die** - 413:15, 435:21, 438:10
**died** - 412:8, 434:11
**difference** - 344:15, 345:10, 466:21, 475:16, 482:5, 488:20, 494:2, 494:4
**differences** - 344:19, 344:23, 344:25, 346:7
**Different** - 494:24
**different** - 362:9, 391:21, 429:14, 432:19, 437:25, 442:20, 445:11, 470:11, 484:24, 494:24, 500:9, 506:16, 548:15, 579:22, 590:14, 604:13, 611:7, 611:12, 616:5
**difficult** - 344:4, 436:2
**difficulty** - 557:10
**dig** - 355:2, 410:9, 416:12, 416:15, 437:1, 564:5, 568:22, 606:11, 608:1
**digger** - 348:21, 570:8, 606:22
**digging** - 350:1, 416:22, 523:8, 563:18, 569:21, 574:13, 585:22, 585:25, 586:3, 586:22, 587:21, 587:24, 588:20, 613:2, 614:16
**dimension** - 379:22, 574:17
**dimensions** - 598:13
**diminution** - 479:11
**dimunition** - 502:3
**dining** - 513:7
**dinner** - 519:6
**direct** - 341:9, 619:5
**Direct** - 341:14, 425:13, 467:13, 503:6, 561:24, 572:12, 619:24, 639:3, 639:9, 639:15, 639:21, 640:3, 640:7, 640:13
**directed** - 570:23, 609:11
**direction** - 343:14, 357:7,

402:19, 455:1, 487:8, 488:10, 601:15

**directly** - 440:24, 443:9, 528:14

**dirt** - 383:22, 383:24, 383:25, 399:18, 399:19, 400:1, 400:2, 400:14, 400:25, 401:15, 401:22, 402:2, 402:7, 408:3, 409:14, 409:23, 411:7, 411:15, 411:18, 411:24, 411:25, 412:2, 414:1, 414:2, 414:12, 415:2, 415:16, 415:18, 416:5, 435:24, 436:1, 436:3, 436:21, 489:3, 537:11, 537:18, 564:17, 569:20, 570:2, 570:5, 570:13, 577:15, 583:4, 583:10, 583:19, 583:21, 583:23, 584:9, 584:19, 585:21, 588:3, 588:5, 591:7, 591:9, 591:13, 599:14, 600:14, 624:23, 624:25

**disagree** - 361:16, 361:18, 361:19, 363:25, 391:8, 391:21, 391:24, 535:7, 549:18, 554:4, 554:12

**Disagree** - 391:22

**disagreed** - 355:25, 392:22

**disappeared** - 632:10

**disastrous** - 438:18

**discounted** - 481:25

**discovery** - 546:23, 595:5

**discrepancy** - 481:10

**discuss** - 628:24

**discussed** - 382:25, 579:6, 606:6

**discussing** - 383:1

**discussion** - 340:22, 356:21, 390:24, 391:2, 392:2, 392:7, 392:10, 402:24, 441:19, 579:3, 579:15, 622:5, 637:24

**Discussion** - 487:20, 558:15, 593:9, 619:16

**disease** - 426:2

**displaying** - 633:9

**dispute** - 584:7, 584:10, 623:13

**disputed** - 396:8, 396:15, 396:18

**disregard** - 352:21, 355:23, 449:1, 514:20, 531:6

**distance** - 380:1, 432:1, 460:8, 460:12, 596:16, 597:1, 598:12, 618:12, 618:18, 625:3, 632:7

**distinguish** - 487:15

**distract** - 341:1

**distracted** - 339:8, 517:9

**distracting** - 339:16

**distraction** - 341:5

**distraught** - 339:7

**district** - 476:2, 477:9

**District** - 338:1, 338:11

**disturbed** - 414:1, 415:17

**disturbs** - 612:20

**ditch** - 343:10, 358:18, 359:4, 359:25, 360:1, 360:3, 360:4, 360:6, 360:7, 360:8, 360:9, 360:11, 360:12, 360:14, 360:15, 385:18, 387:6, 404:16, 413:14, 420:14, 420:15, 420:17, 577:15, 577:18, 577:21, 579:19, 580:3, 580:13, 580:17, 580:22, 581:12, 581:15, 590:2, 597:16, 597:17, 598:6, 601:4, 601:8,

601:9, 601:12, 602:1, 602:2

**ditches** - 343:18, 385:1

**dive** - 498:2

**divert** - 431:4

**divide** - 480:9

**divided** - 440:18

**division** - 503:24

**Division** - 338:2, 462:5

**divorced** - 503:23

**Document** - 532:18

**document** - 348:6, 349:17, 384:25, 537:10, 537:13

**documents** - 500:22

**dog** - 549:8

**dollar** - 355:7, 439:11, 439:13, 479:22, 493:17, 493:18, 539:6, 539:7

**dollars** - 355:5, 438:9, 482:25, 550:11, 550:13, 616:21

**Domini** - 479:16, 481:14, 484:1, 484:7

**Domini's** - 479:17, 480:15

**Don** - 524:10

**done** - 355:16, 363:3, 374:2, 374:5, 375:4, 393:19, 394:2, 399:16, 412:11, 412:13, 412:14, 412:16, 415:10, 416:9, 421:16, 422:10, 428:22, 430:8, 430:22, 431:19, 431:24, 432:13, 432:20, 432:21, 436:18, 438:12, 458:10, 458:19, 464:20, 479:16, 494:10, 496:10, 522:13, 522:15, 523:24, 534:6, 541:18, 560:1, 582:24, 588:14, 594:18, 595:1, 596:11, 597:13, 616:1, 635:7

**door** - 457:3, 492:23, 512:14, 616:15

**dorm** - 513:17

**dormer** - 515:25

**doser** - 401:10

**dot** - 370:21

**doubt** - 395:9, 551:20

**down** - 339:7, 345:5, 352:14, 359:7, 370:19, 370:25, 375:18, 379:13, 379:19, 379:23, 380:22, 381:1, 387:21, 387:22, 387:24, 395:3, 401:3, 409:3, 409:4, 410:23, 412:9, 415:20, 415:21, 417:17, 418:5, 420:4, 420:22, 422:6, 423:19, 424:24, 426:14, 429:17, 429:25, 434:2, 434:24, 436:10, 440:8, 441:8, 446:11, 453:17, 454:16, 454:23, 455:16, 456:24, 457:4, 457:6, 457:19, 459:25, 467:7, 467:21, 478:19, 478:21, 481:6, 483:23, 485:5, 485:10, 487:24, 489:4, 490:5, 490:9, 490:21, 497:16, 498:14, 502:8, 506:20, 507:5, 508:20, 509:14, 509:16, 509:17, 509:19, 509:20, 513:21, 513:22, 514:3, 519:10, 519:11, 519:12, 519:15, 520:4, 520:17, 521:7, 522:17, 522:19, 523:25, 526:4, 526:7, 529:11, 533:6, 533:10, 533:13, 533:22, 539:5, 541:18, 542:22, 542:24, 543:1, 547:5, 547:7, 547:21, 548:4, 548:10, 551:10, 551:11, 554:6,

558:14, 559:12, 559:23, 560:4, 560:6, 561:1, 565:17, 568:5, 569:22, 570:8, 572:8, 574:9, 576:19, 578:24, 580:8, 593:11, 597:20, 597:22, 598:23, 598:25, 599:4, 599:14, 599:20, 599:21, 600:4, 600:9, 601:23, 604:2, 604:16, 605:13, 614:23, 615:17, 618:23, 623:2, 623:7, 623:21, 627:2, 634:21, 636:19

**Down** - 511:6, 600:5

**downhill** - 576:15

**downsize** - 515:17

**dozed** - 415:21, 583:24

**dozen** - 399:21

**dozer** - 401:5, 588:6

**dozing** - 401:9, 584:20

**drag** - 354:9

**drain** - 345:6, 345:13, 353:9, 356:25, 357:11, 357:12, 378:4, 378:13, 389:1, 389:21, 392:3, 402:20, 568:11, 589:18, 609:2, 609:5, 616:2, 616:11

**drainage** - 342:15, 342:24, 376:19, 377:8, 377:11, 377:19, 377:22, 378:11, 380:25, 381:1, 384:7, 384:19, 385:1, 386:7, 386:10, 397:23, 398:3, 401:23, 402:1, 402:3, 402:6, 403:23, 405:12, 405:22, 543:12, 545:24, 615:4

**drained** - 579:20

**drains** - 345:6, 357:6, 357:10, 435:10, 608:23

**draw** - 552:8

**drawback** - 498:17, 498:21

**drawing** - 506:14, 506:15, 579:13

**drawn** - 575:4, 575:6

**draws** - 509:21

**drew** - 341:23, 342:5, 522:7

**drive** - 414:13, 414:18, 469:24, 506:12, 599:20, 635:1

**Drive** - 338:15

**driver** - 414:19

**driveway** - 558:21

**driving** - 629:20, 637:19

**drop** - 568:5

**drove** - 428:11, 506:19, 508:15

**dry** - 564:17, 564:18

**Dry** - 564:19

**due** - 525:17, 531:14

**dug** - 415:6, 437:2, 532:16, 569:16, 569:18, 569:20, 570:1, 570:8, 613:13

**dumbfounded** - 423:20

**dump** - 399:21, 400:5, 400:10, 591:12, 591:14, 591:17

**dumped** - 415:19, 601:3

**dumping** - 401:6, 401:8, 583:20, 591:9

**During** - 371:16, 374:2, 392:2, 525:4, 564:8

**during** - 368:23, 389:25, 391:2, 486:5, 573:11, 577:21, 596:3, 608:24

**Dussel** - 505:15

**dye** - 403:21, 404:1, 616:1

**dynamite** - 513:6

---

**E**

**Eagle** - 511:11, 512:12

**Early** - 377:4, 578:11

**early** - 392:4, 426:7, 427:8, 498:5, 603:24

**earth** - 349:15, 349:18, 351:12, 352:6, 568:16, 569:9, 570:9

**easement** - 583:20, 583:21, 583:24

**easier** - 559:2

**easily** - 490:10

**east** - 418:9, 418:10, 563:17, 619:1

**East** - 506:11, 507:4

**easy** - 486:17, 486:22

**eat** - 505:3

**economic** - 479:3

**edge** - 401:8, 478:15, 566:5, 569:17, 569:18

**education** - 467:21

**educational** - 426:3

**effect** - 391:14, 444:12, 479:9

**effective** - 432:10

**efforts** - 362:24, 523:20

**eight** - 429:24, 433:15, 434:18, 435:25, 436:20, 440:7, 449:11, 449:16, 450:7, 453:19, 453:25, 460:8, 462:1, 462:15, 488:17, 503:22, 504:3, 569:22, 575:21, 621:14, 627:1, 627:4, 629:15, 636:12

**Eight** - 573:10

**eight-foot** - 460:8

**eighths** - 621:12

**either** - 340:12, 352:19, 361:12, 369:18, 375:24, 384:9, 393:3, 403:19, 414:8, 414:9, 420:9, 427:11, 477:2, 570:10, 571:8, 580:11, 582:17, 582:20, 590:5, 594:25, 602:13, 610:6

**Either** - 618:18

**elderly** - 341:7

**electrical** - 599:24

**elements** - 470:8

**elevated** - 489:18

**elevation** - 576:20

**elevations** - 604:13

**Ellis** - 469:16, 500:3

**emphatic** - 391:15

**employed** - 469:15, 469:16

**employee** - 426:17

**employees** - 416:22

**empty** - 372:9, 492:23, 511:6, 511:16, 512:8, 513:5, 513:8, 515:7, 531:9, 536:7, 591:18

**empty-nester** - 513:8

**empty-nester's** - 513:5

**empty-nesters** - 511:6, 511:16, 512:8, 515:7, 536:7

**emulate** - 453:1

**enclosed** - 379:8, 380:6

**encounter** - 585:16

**encountered** - 581:20, 583:2, 583:5, 615:23

**encourage** - 551:12, 638:2

**encroach** - 448:4

**encroached** - 418:15, 418:17, 487:24

**encroaching** - 375:12, 376:11

**encroachment** - 420:22, 452:8, 452:11, 459:10,

471:14, 484:16, 553:20
 **encroachments** - 471:13
 **End** - 340:22
 **end** - 373:7, 376:25, 379:12, 379:14, 419:19, 419:20, 467:19, 476:5, 492:1, 513:23, 516:5, 521:8, 550:5, 577:16, 577:23, 581:10, 600:24, 619:8, 622:15, 636:6
 **ended** - 425:23
 **ends** - 379:13, 571:13, 582:16, 582:19
 **engineer** - 353:10, 355:3, 362:25, 385:4, 386:19, 386:21, 386:25, 390:12, 392:17, 397:21, 398:11, 403:5, 520:19, 546:14, 579:10
 **engineer's** - 403:3
 **engineering** - 356:19, 362:10, 398:12
 **Engineers** - 375:5, 398:6, 523:3
 **engineers** - 378:11, 578:15
 **English** - 390:14
 **enhanced** - 381:7
 **enjoy** - 502:16
 **entails** - 440:25
 **entangled** - 418:25, 420:9
 **enter** - 379:11, 380:10, 383:21, 618:10
 **entering** - 382:17
 **enters** - 339:10, 340:23
 **entire** - 361:4, 473:8, 604:4, 624:9
 **entirely** - 448:19, 461:19
 **entities** - 469:10
 **entitled** - 638:11
 **entrance** - 389:13, 389:15, 389:17, 389:18
 **entry** - 527:12
 **entryway** - 527:6, 527:8, 527:16, 528:15, 528:16
 **environment** - 446:1
 **equal** - 499:13
 **equation** - 452:18, 463:24
 **equipment** - 418:25, 577:25, 622:4, 631:24
 **equivalent** - 468:19, 484:5
 **era** - 376:25
 **erase** - 370:1
 **Eric** - 508:3, 511:23, 513:22, 539:3
 **especially** - 341:20, 426:6, 622:13, 622:16
 **essence** - 496:12
 **essentially** - 390:18
 **essentials** - 344:12
 **established** - 441:16, 458:25
 **estate** - 467:23, 478:2, 478:6, 479:6, 498:16, 499:6, 500:1, 528:16
 **estimate** - 353:22, 354:13, 355:6, 356:6, 360:25, 362:18, 449:21, 451:13, 458:24, 464:2, 464:10, 466:9, 470:19, 524:23, 606:16
 **estimated** - 394:9
 **estimates** - 355:14, 355:16, 355:17, 355:18, 460:6
 **et** - 426:4, 426:11, 431:6, 436:16, 437:21, 440:17, 470:20, 471:7, 483:1
 **Ethan** - 338:14
 **evaluate** - 499:1

 **evaluating** - 372:18, 397:25
 **event** - 371:25, 486:2, 573:1, 592:21, 595:9
 **events** - 562:20
 **Eventually** - 398:25
 **evergreen** - 433:17, 447:18
 **evergreens** - 542:25
 **everyday** - 544:1
 **evicted** - 560:18, 560:20
 **evicting** - 540:16
 **evidence** - 352:18, 361:9, 393:24, 420:25, 424:15, 529:23, 580:4, 580:11, 580:16, 584:10, 602:12, 637:1
 **evolved** - 430:5
 **exact** - 486:4, 494:12, 577:2, 583:17
 **Exactly** - 528:24
 **exactly** - 351:20, 368:17, 372:24, 384:24, 385:9, 414:5, 429:5, 448:8, 462:18, 538:1, 563:13, 595:14
 **examination** - 341:10, 357:23, 451:2, 483:16, 532:4, 565:2, 602:23, 625:14, 639:5, 639:11, 639:17, 639:23, 640:5, 640:9, 640:15
 **Examination** - 341:14, 423:13, 425:13, 466:18, 467:13, 500:19, 503:6, 557:19, 561:24, 572:12, 617:11, 619:24, 639:3, 639:7, 639:9, 639:13, 639:15, 639:19, 639:21, 640:1, 640:3, 640:7, 640:11, 640:13
 **examined** - 524:19
 **examiner** - 504:2
 **example** - 436:20, 445:9, 449:5, 449:23, 478:25
 **excavated** - 352:3, 597:18
 **excavating** - 416:8, 575:23, 577:22
 **excavation** - 436:7, 582:17, 582:20, 588:15, 589:17, 611:14
 **excavator** - 353:16, 353:18, 353:19, 354:25, 563:19, 564:3, 568:16, 568:22, 569:12, 585:22, 587:20, 588:19, 589:12, 620:9, 622:19
 **exceeded** - 405:16
 **exceeds** - 406:7
 **except** - 457:12, 465:8, 474:20, 486:2, 515:11, 578:17, 638:3
 **exceptions** - 411:21
 **excess** - 467:24
 **excessive** - 449:14
 **exchanged** - 532:18
 **exclusive** - 507:23
 **excuse** - 417:4, 495:5
 **Excuse** - 344:1, 472:15
 **excused** - 340:9, 340:16, 341:4, 341:8
 **excusing** - 340:13
 **executed** - 534:23
 **executive** - 515:12
 **exercise** - 556:22
 **Exhibit** - 341:17, 343:20, 344:13, 346:12, 346:13, 346:14, 346:19, 348:15, 349:19, 363:18, 364:6, 389:4, 401:11, 407:16, 421:3, 423:24, 430:13,

 441:7, 442:1, 471:9, 473:2, 483:3, 500:21, 526:14, 526:23, 527:11, 527:24, 529:1, 531:8, 571:21, 587:12, 608:18, 609:12, 614:1, 626:16, 626:24, 628:16, 628:20, 629:8, 631:8, 632:16, 636:4
 **exhibit** - 345:3, 357:4, 363:7, 419:10, 421:19, 525:19
 **exhibited** - 476:11
 **exhibits** - 344:19, 346:10, 632:9
 **Exhibits** - 346:9
 **existed** - 372:22, 451:8, 452:6, 471:24, 568:13
 **existence** - 545:23, 578:9, 578:10, 598:2
 **existing** - 492:22, 501:13, 570:6, 577:18, 593:18, 608:23
 **exit** - 424:19
 **expect** - 636:25
 **expense** - 527:15
 **expensive** - 466:5, 512:24, 515:18, 556:1, 556:18, 625:23, 626:4
 **experience** - 484:6
 **expert** - 441:12, 507:3, 550:10, 553:19, 554:4
 **expertise** - 476:11
 **Explain** - 437:13
 **explain** - 341:17, 342:1, 343:5, 344:22, 403:23, 444:10, 445:9, 446:6, 471:21, 475:18, 478:4, 526:3, 535:22
 **explained** - 437:17, 521:6
 **exposed** - 349:22, 351:10, 408:11, 582:7, 614:21
 **exposure** - 458:13, 613:8
 **express** - 586:4
 **expressway** - 524:4
 **extended** - 580:22
 **extension** - 425:19
 **extensively** - 358:13
 **extent** - 383:17, 461:12
 **extra** - 439:22, 464:6, 502:12, 634:5
 **eye** - 442:21
 **eyes** - 433:5, 433:6, 447:4

 **F**

 **face** - 542:6, 635:4
 **facility** - 468:5
 **fact** - 361:3, 363:22, 364:5, 364:8, 386:9, 391:24, 392:14, 393:18, 396:20, 396:23, 400:6, 404:12, 404:18, 411:14, 412:3, 415:3, 416:21, 417:1, 420:20, 428:17, 435:6, 436:24, 442:13, 452:7, 454:4, 466:22, 466:23, 477:25, 484:10, 484:15, 485:17, 492:12, 493:7, 493:11, 497:4, 497:22, 536:23, 545:20, 549:13, 549:16, 549:19, 552:11, 617:22
 **factor** - 453:3
 **factored** - 438:1, 464:3
 **failure** - 434:7, 438:3
 **failures** - 427:18, 433:25, 438:16
 **Fairly** - 557:5
 **fairly** - 433:21, 594:11
 **fairness** - 454:10

 **fall** - 635:10
 **Fall** - 499:19, 499:20
 **falling** - 634:25
 **familiar** - 362:5, 362:22, 484:6, 505:13, 506:18, 506:20, 506:23, 536:4, 562:20, 562:25, 563:2, 574:22, 594:17, 617:13
 **families** - 536:8
 **family** - 341:3, 368:18, 368:25, 369:6, 479:7, 503:9, 503:15, 536:3, 536:6, 620:12, 638:3
 **famous** - 619:2
 **fan** - 456:8
 **Fancy** - 512:25, 513:2
 **fancy** - 513:3, 528:3
 **fantastic** - 433:6
 **far** - 342:11, 351:23, 352:13, 366:19, 366:21, 373:15, 376:8, 385:17, 385:25, 402:16, 404:11, 414:10, 445:18, 450:9, 476:10, 484:6, 486:25, 508:22, 510:6, 521:8, 523:12, 542:7, 543:14, 547:10, 552:22, 556:5, 580:8, 635:4
 **farm** - 394:6, 394:7, 552:11, 552:14
 **farmer** - 434:3
 **farmers'** - 462:6
 **farming** - 432:10, 434:4
 **farmland** - 394:21, 396:17
 **fast** - 399:12, 413:1, 449:5, 461:8, 461:10, 478:18, 478:19, 519:14
 **faster** - 461:14, 544:7
 **father** - 504:4, 504:8, 508:7, 516:14
 **features** - 342:7, 343:16
 **February** - 367:25, 368:15, 406:20, 507:12, 507:13, 518:4, 519:5
 **Federal** - 525:16, 525:17, 530:21
 **feeder** - 433:7
 **feet** - 349:13, 351:11, 354:25, 358:22, 358:23, 358:24, 359:9, 359:15, 359:22, 366:17, 367:3, 374:19, 379:18, 379:19, 379:20, 380:2, 380:3, 380:5, 380:6, 387:7, 388:4, 388:8, 388:21, 394:10, 394:18, 394:24, 395:21, 395:22, 407:15, 408:9, 408:11, 408:18, 409:23, 411:2, 411:7, 415:18, 415:20, 415:22, 420:16, 420:19, 422:7, 424:10, 429:21, 431:20, 432:1, 432:6, 434:9, 434:20, 435:25, 436:21, 436:22, 436:25, 437:3, 437:12, 438:23, 438:24, 439:5, 439:9, 440:25, 442:8, 442:9, 442:10, 445:10, 447:12, 448:10, 448:13, 448:14, 448:18, 449:6, 450:11, 450:13, 452:11, 452:13, 458:21, 459:10, 459:14, 459:15, 459:16, 459:17, 459:18, 459:20, 460:9, 460:15, 460:21, 462:1, 462:15, 466:24, 467:2, 479:10, 488:17, 488:24, 524:8, 547:1, 547:14, 547:20, 554:23, 559:14, 565:7, 565:20, 566:4, 566:6, 566:8, 569:22,

569:24, 575:23, 575:25, 576:3, 576:6, 576:24, 596:17, 596:18, 603:21, 604:3, 604:15, 605:17, 605:18, 605:19, 606:11, 607:2, 607:3, 607:4, 607:17, 607:20, 608:1, 608:5, 608:6, 608:9, 611:23, 613:22, 614:3, 614:4, 614:5, 618:11, 621:6, 621:14, 623:6, 623:21, 624:5, 627:6, 627:10, 627:24, 629:16, 629:23, 631:12, 631:20, 631:23, 632:1, 632:3, 632:4, 632:19, 632:22, 632:24, 633:8, 634:5, 635:9, 635:15, 635:16, 636:9, 636:12, 636:13
**fell** - 385:16, 570:10, 598:25
**feller** - 622:6, 622:18, 622:23, 631:8
**fellow** - 503:19
**felt** - 356:3, 428:21, 442:23, 444:16, 447:8, 472:25, 522:10
**fence** - 399:1, 399:3, 399:4, 414:20, 414:21, 414:23, 414:24, 414:25, 415:4, 417:3, 417:11, 417:22, 418:2, 419:22, 419:25, 462:10, 527:9, 559:18, 565:20, 571:10, 571:14, 584:12, 584:14, 584:16, 586:8, 586:9, 586:14, 586:15, 586:24, 588:12, 588:18, 588:21, 589:3, 590:8, 590:16, 590:17, 591:24, 592:4, 592:21, 600:3, 604:21, 605:3, 605:6, 605:10, 605:15, 605:16, 605:20, 609:23, 610:10, 610:12, 610:20, 611:3, 614:7, 614:11, 621:5, 621:23, 621:25, 624:21, 624:22, 624:24, 625:9, 627:1, 627:3, 629:11, 629:14, 629:24, 630:2, 630:3, 630:6, 630:15, 630:18, 630:21, 630:23, 631:1, 631:3, 632:8, 633:8, 634:20, 635:13
**fences** - 417:4
**fencing** - 493:16, 512:16
**few** - 360:22, 366:9, 366:10, 396:17, 397:15, 399:5, 447:3, 452:21, 468:14, 502:12, 507:19, 540:2, 540:19, 565:20, 566:4, 566:6, 566:8, 634:5, 635:9, 635:15
**Fiberglass** - 515:12
**field** - 552:11, 552:14, 565:25, 611:10, 611:14
**fields** - 462:7
**figure** - 365:17, 427:13, 428:23, 439:11, 440:24, 443:6, 443:11, 466:20, 483:9, 490:14, 522:22, 523:21, 578:13, 623:19
**figured** - 508:20
**figures** - 439:13, 460:11, 460:24, 479:22, 555:13
**figuring** - 412:7
**filed** - 510:20, 526:14, 530:24
**fill** - 353:8, 400:14, 413:13, 435:24, 435:25, 436:1, 436:3, 436:12, 436:21, 489:3, 569:12, 599:14,

600:14, 618:17, 628:8, 628:10
**filled** - 348:18, 349:16, 577:21, 586:21
**finally** - 434:12, 512:11, 515:6, 563:18, 587:4, 638:1
**finance** - 503:24
**Findlay**- 506:19
**fine** - 339:22, 341:7, 430:18, 492:21, 519:8
**finger** - 370:6, 429:24
**finish** - 368:12, 383:10, 385:24, 458:6, 516:1, 516:2, 516:6, 535:6, 634:16, 634:18
**finished** - 516:5
**fire** - 340:1, 341:3
**firm** - 500:1
**first** - 347:1, 358:14, 373:23, 374:16, 375:13, 376:24, 398:17, 398:23, 405:10, 413:9, 429:4, 435:2, 438:5, 440:3, 451:19, 453:15, 460:5, 481:16, 483:23, 487:13, 495:12, 498:3, 499:22, 503:23, 505:23, 507:13, 513:4, 513:6, 513:25, 515:23, 524:2, 526:23, 527:25, 533:13, 535:12, 540:2, 544:14, 544:16, 544:20, 544:25, 563:4, 568:15, 568:19, 568:20, 578:9, 591:23, 599:6, 599:9
**First**- 347:2, 382:14, 484:14, 505:7, 515:20, 523:25, 525:15, 525:17, 530:21, 533:7, 535:16, 539:2, 545:2
**fit** - 591:14
**Five**- 397:10, 450:11, 568:23, 568:24, 576:3
**five** - 406:3, 406:7, 408:9, 408:11, 409:23, 411:2, 429:21, 431:20, 431:25, 432:6, 443:8, 448:2, 448:3, 448:13, 448:14, 450:13, 450:15, 453:19, 459:14, 459:15, 459:16, 459:17, 460:7, 463:14, 463:19, 479:10, 482:24, 514:5, 533:3, 533:18, 546:11, 565:6, 574:19, 575:25, 576:5, 577:5, 596:14, 602:23, 607:1, 607:24, 608:2, 608:5, 611:23, 613:22, 614:3, 614:4, 614:5, 616:25, 617:4, 629:22
**five-year** - 406:3, 406:7
**fix** - 389:10, 457:21, 458:19, 515:25
**flat** - 550:12, 583:23
**flexible** - 381:8
**flipping** - 478:23, 487:2
**flood** - 363:21, 363:22, 406:3, 406:7
**Flooding**- 404:5
**flooding** - 345:11, 345:15, 397:25, 404:4, 404:7, 545:21, 545:23
**floor** - 425:11, 513:6, 513:17, 515:23
**Florida**- 478:20, 478:25
**flow** - 403:4, 528:8
**flowed** - 402:19, 579:18
**flower** - 412:15, 465:14
**flowers** - 465:15
**flowing** - 579:25
**flows** - 403:5
**flyers** - 522:7
**focus** - 340:1, 343:4,

352:22
**folder** - 428:5, 442:3
**foliage** - 365:5, 365:10, 366:5, 408:14
**folks** - 359:17, 392:21, 392:22, 503:12
**Folks**-454:10
**follow** - 466:15, 485:2, 535:2, 565:23, 582:5
**follow-up** - 466:15, 582:5
**followed** - 575:11
**following** - 372:5, 596:3
**fond** - 431:1
**food** - 433:18, 447:23, 465:20
**foot** - 433:13, 433:15, 434:19, 437:2, 439:15, 439:24, 445:10, 446:7, 448:2, 448:3, 449:13, 450:12, 452:3, 452:11, 459:10, 460:8, 460:12, 460:14, 463:14, 463:17, 463:18, 463:21, 519:22, 555:1, 574:19, 575:21, 579:22, 594:5, 607:16, 607:19, 623:10, 625:3, 625:5, 627:3, 630:2, 636:14
**footage** - 440:4, 577:2
**force** - 586:2
**Ford-** 497:9, 562:18, 563:21, 601:23, 604:6
**foreclose** - 526:9
**foreclosure** - 526:6, 526:14, 529:1, 530:24
**foregoing** - 638:10
**foreman** - 562:12, 562:13, 565:4, 565:19, 567:14, 581:25, 606:2, 624:20
**forester** - 425:19
**forestry** - 427:5, 440:10, 631:24
**forget** - 417:6, 572:25
**forgive** - 552:10
**Forgive**- 399:6
**forgot** - 380:4, 402:15
**Forletta**- 561:24, 562:3, 562:23, 563:20, 565:2, 581:25, 615:19, 640:3, 640:5
**form** - 430:25, 434:4, 443:20
**format** - 517:4, 517:5
**forms** - 413:3
**formula** - 626:9
**forth** - 372:10, 428:14, 476:7, 476:10, 484:6
**Forty**- 620:11
**Forty-four**- 620:11
**forward** - 401:9, 509:24
**foundation** - 354:12, 435:5, 444:6
**four** - 352:1, 397:10, 408:11, 426:19, 427:2, 431:25, 432:6, 440:19, 440:24, 442:10, 443:7, 443:8, 444:2, 446:8, 448:2, 448:3, 448:13, 448:14, 450:18, 452:11, 453:18, 453:24, 458:17, 459:10, 460:7, 460:21, 463:19, 471:14, 471:16, 479:10, 487:16, 495:12, 501:2, 501:3, 501:24, 512:13, 546:11, 605:18, 606:11, 608:1, 611:23, 613:22, 614:4, 616:25, 617:4, 620:11, 635:2
**Four**- 452:19, 459:15, 605:19, 607:24
**four-foot** - 452:11, 459:10
**franchise** - 500:8

**Franklin**- 423:8
**freaked** - 340:5
**free** - 460:25, 512:8
**freestanding** - 468:10
**frequently** - 457:9
**freshly** - 613:18, 613:21
**Friday**- 637:5
**friend** - 516:9, 517:24
**friendly** - 447:23
**friends** - 519:7, 638:3
**front** - 348:1, 351:18, 352:12, 395:17, 473:11, 476:23, 485:25, 512:16, 527:6, 527:8, 527:12, 527:15, 528:8, 559:18, 571:23, 587:12, 619:14, 622:15, 622:16, 625:21, 626:7, 636:6
**front-end** - 622:15, 636:6
**frontage** - 497:16
**fronting** - 477:3, 479:25
**fruit** - 465:15
**fruition** - 497:1
**frustrated** - 538:23
**full** - 369:2, 380:17, 489:24, 513:9, 562:1, 564:17, 568:2, 568:6, 569:20, 572:14, 582:10, 591:17, 618:18, 620:1
**full-time** - 369:2
**function** - 392:23, 393:2
**funds** - 482:25
**funny** - 506:6
**furnished** - 518:1
**fuzzy** - 350:7

## G

**gained** - 458:4
**gait** - 527:12
**garage** - 372:9, 513:9, 513:18, 516:1
**garbage** - 568:2, 568:6, 568:7, 615:20
**gasketed** - 380:24
**gate** - 527:17, 550:6
**gates** - 527:16
**gears** - 461:7
**General**- 573:6
**general** - 355:17, 360:6, 378:11, 404:24, 479:6, 490:5, 604:9, 617:14, 623:4
**generally** - 360:8, 365:12, 367:9, 406:4, 422:18, 470:17, 497:7, 501:14, 501:19, 562:20, 595:12
**Generally** - 494:20
**generated** - 557:8
**generic** - 472:2
**gentleman** - 587:20, 588:18, 599:7, 606:21, 629:9
**Gentlemen** - 399:4, 612:24
**gentlemen** - 341:2, 344:1, 369:15, 425:2, 425:9, 496:12, 502:9, 561:7, 561:18, 595:20, 619:3, 636:22, 637:19
**get-go** - 556:2
**get-off-the-ground** - 557:2
**giant** - 570:8, 604:23, 606:22
**Gillmore** - 503:20
**gist** - 618:4
**given** - 355:21, 356:18, 443:25, 470:25, 471:4, 535:8, 582:8, 611:25, 615:13
**glad** - 443:14
**glare** - 346:24, 589:1, 627:16
**glasses** - 369:11

**God** - 427:14
**Golf** - 516:12
**golf** - 511:1
**government** - 469:7, 469:9, 470:5
**government-related** - 469:9
**Governor's** - 426:15
**Gps** - 398:18
**grab** - 625:6
**grace** - 540:6
**grade** - 467:20
**graduate** - 390:12
**grand** - 555:10
**grandchildren** - 427:2
**grandparents** - 513:10
**grandson** - 368:15, 371:21
**Granite** - 338:4, 354:6, 362:2, 379:4, 385:1, 385:2, 394:5, 394:6, 394:10, 394:20, 396:4, 401:16, 401:19, 401:20, 401:23, 498:8, 501:15, 534:8, 537:23, 537:25, 538:3, 553:16
**Granite's** - 394:19, 537:21
**granny** - 513:16
**grantees** - 482:20
**grantors** - 482:20
**grape** - 463:2
**graphic** - 341:23, 343:5, 344:14, 363:4
**graphics** - 344:23
**grass** - 366:24, 366:25, 411:3, 411:5, 411:22, 461:12, 536:8, 542:13, 559:13, 566:2
**Gratiot** - 562:6
**gray** - 426:25
**gray-haired** - 426:25
**great** - 462:9, 568:16
**greater** - 484:3
**gree** - 615:12
**Green** - 523:25
**green** - 419:17, 421:17, 530:4
**grew** - 366:3, 421:15, 434:10, 434:12, 467:16, 467:18, 503:15, 503:18, 506:9
**grind** - 622:20
**gross** - 465:9
**ground** - 366:16, 366:22, 367:1, 367:13, 374:23, 375:3, 388:16, 388:18, 388:20, 388:22, 409:12, 410:12, 413:7, 413:12, 427:15, 432:3, 432:11, 437:9, 477:21, 488:25, 546:10, 553:10, 557:2, 574:8, 580:8, 590:18, 618:10, 621:14, 634:21
**Grounds** - 344:18, 382:4
**group** - 499:19, 499:20
**grow** - 367:13, 419:21, 427:16, 433:19, 433:25, 434:19, 436:14, 436:17, 437:25, 449:5, 450:7, 461:8, 461:11, 462:11, 462:14, 462:15, 465:3, 467:3
**growing** - 366:5, 410:10, 410:14, 410:16, 421:11, 434:16, 438:2, 438:3, 449:9, 461:14, 461:20, 461:22, 463:21, 566:2, 624:22
**Growing** - 410:15
**grown** - 394:22, 396:10, 419:18
**grown-up** - 394:22, 396:10, 419:18

**grows** - 366:16, 412:25, 465:9
**growth** - 421:13, 437:7, 449:15, 449:16, 450:10
**guards** - 634:10, 635:2
**guess** - 359:2, 378:7, 386:9, 390:7, 431:14, 457:19, 463:4, 465:22, 469:2, 492:11, 538:14, 562:4, 566:6, 566:9, 568:23, 583:6, 597:10, 620:16, 622:4, 629:8
**guessing** - 448:11, 448:21, 449:2, 449:25, 450:5
**gun** - 549:25
**guy** - 361:3, 362:1, 362:2, 362:6, 384:19, 392:16, 420:21, 506:5, 514:1, 524:6, 539:6, 551:4, 599:21
**guys** - 508:9, 508:14, 508:21, 556:12

## H

**habit** - 567:10
**habitat** - 426:11, 430:10, 433:3, 433:6, 433:9, 440:17, 444:17, 447:22, 462:9, 463:5
**haired** - 426:25
**half** - 376:10, 388:4, 388:8, 398:8, 413:22, 414:2, 414:4, 442:10, 460:14, 463:18, 465:10, 491:12, 491:19, 495:14, 496:1, 530:11, 531:16, 533:2, 569:2, 570:9, 574:19, 575:21, 627:6
**Half** - 398:8
**Hamlet** - 511:8
**hand** - 359:12, 359:13, 430:12, 471:8, 500:21, 501:8, 512:8, 528:25, 530:3, 587:10, 590:10, 596:6, 609:25, 626:15, 628:20, 629:8, 629:9, 632:15
**Handing** - 631:8
**handing** - 526:13
**handle** - 339:3, 561:11
**hands** - 398:12
**hands-on** - 398:12
**Hang** - 600:10
**hang** - 446:1, 461:20, 461:21, 500:10
**hanging** - 408:18, 629:18
**happy** - 538:25
**hard** - 430:19, 438:6, 503:12, 505:1, 506:5, 511:21, 580:8, 593:15
**hard-working** - 506:5
**hardly** - 436:14
**hardwood** - 447:14
**hardwoods** - 433:16
**harm's** - 616:20
**harvest** - 622:21
**harvesting** - 426:2
**hat** - 500:10
**hauling** - 522:23
**Haven** - 562:6
**head** - 549:25, 629:20
**heading** - 499:24
**health** - 409:22
**hear** - 406:22, 410:14, 450:1, 485:6, 487:19, 538:9, 541:2, 541:4, 551:14, 557:11, 558:7, 561:19, 619:19
**heard** - 403:17, 404:4, 404:25, 458:5, 459:6, 460:16, 462:2, 498:1, 513:15, 529:23, 568:24, 623:17, 624:8, 631:5

**hearing** - 503:12, 505:2, 538:13, 541:4, 557:10, 558:8
**hearsay** - 354:8, 523:13, 582:11
**Hearsay** - 582:13
**heavily** - 479:4, 480:11
**heavy** - 405:7, 406:17, 406:23
**height** - 462:11, 462:14, 463:18, 463:20, 486:4, 488:19, 623:4
**heirs** - 504:6
**held** - 557:3
**help** - 340:10, 342:5, 369:20, 378:20, 426:9, 439:5, 520:24, 523:9, 584:10, 595:10, 595:21
**Help** - 574:11
**helped** - 346:5, 372:19
**helping** - 387:2, 623:24
**Herrett** - 425:13, 425:18, 435:16, 441:24, 451:2, 466:18, 639:9, 639:11, 639:13
**High** - 503:20
**High** - 424:10, 439:25, 446:21, 447:12, 449:6, 467:21, 476:5, 486:3, 486:6, 576:13, 603:21, 603:23, 605:15, 607:4
**high-end** - 476:5
**higher** - 476:11, 488:15, 488:17, 488:20, 488:25, 490:3, 544:22, 567:14
**highest** - 604:15
**highlighted** - 471:5
**highway** - 436:8, 468:8
**highways** - 431:6
**himself** - 588:11
**hindsight** - 555:24
**hip** - 588:19
**hiring** - 439:17
**history** - 377:3, 495:20, 585:3
**Hit** - 370:22
**hit** - 438:15, 479:1, 498:6, 514:1, 625:8, 629:19, 634:7, 635:4
**Hold** - 524:20
**hold** - 348:1, 433:24, 434:12
**holding** - 359:10, 419:14, 421:7, 535:4, 549:25
**holds** - 548:25
**hole** - 381:25, 437:1, 437:2, 543:22, 564:5, 569:11, 607:6, 607:12, 607:13
**holes** - 379:10, 438:12
**Holland** - 338:19
**Hollow** - 521:19, 521:20, 534:10, 534:18, 534:22
**home** - 339:6, 339:19, 340:5, 341:3, 341:6, 343:19, 469:20, 477:13, 477:14, 478:23, 492:5, 501:10, 501:13, 501:14, 501:19, 501:25, 515:15, 528:3, 528:18, 528:20, 539:8, 560:21, 634:6, 637:6, 637:21, 637:22
**homeowner** - 492:23, 501:20
**Homes** - 501:9, 501:15
**homes** - 476:6, 497:12, 508:24, 511:12, 536:5
**honest** - 506:5
**honestly** - 495:7
**honeysuckle** - 465:16
**Honor** - 343:2, 345:23,

348:4, 350:8, 352:17, 354:22, 354:24, 357:18, 383:9, 385:23, 399:6, 435:4, 440:19, 441:11, 442:3, 443:3, 443:16, 446:14, 449:24, 450:24, 456:12, 459:13, 460:3, 467:9, 472:12, 496:7, 500:17, 514:16, 517:3, 523:12, 527:19, 528:5, 529:18, 531:2, 531:22, 531:25, 535:5, 546:3, 556:23, 560:25, 561:5, 561:21, 572:7, 582:12, 585:9, 591:5, 595:17, 602:21, 608:18, 610:7, 610:13, 612:17, 615:1, 617:7, 624:4, 625:13, 626:18, 627:11, 630:8, 631:16, 633:1, 633:24, 635:18, 636:16
**Honorable** - 338:10
**hope** - 340:21, 433:11, 433:22, 433:23, 541:11
**hopefully** - 340:25, 476:1, 502:16, 587:11, 637:19
**hoping** - 438:2, 536:24
**horizon** - 436:9, 436:10, 436:11, 436:13, 437:4
**horse** - 526:8, 549:9
**horticultural** - 440:11
**Hospice** - 385:19, 507:5
**hour** - 606:18, 615:19, 622:13
**hours** - 606:17, 616:25, 617:4
**house** - 339:17, 339:20, 342:12, 343:6, 346:15, 348:20, 352:11, 353:11, 363:10, 364:11, 364:12, 364:14, 364:15, 364:22, 367:18, 367:23, 368:8, 370:13, 372:3, 372:15, 372:19, 372:22, 372:24, 373:3, 373:4, 436:8, 443:9, 445:11, 445:18, 445:25, 485:3, 486:9, 486:12, 487:3, 489:18, 492:6, 492:7, 492:9, 495:8, 495:11, 511:24, 512:7, 512:25, 513:3, 513:4, 513:6, 514:23, 515:21, 516:3, 516:13, 516:15, 516:16, 516:20, 517:13, 517:15, 518:1, 519:5, 525:24, 527:25, 537:5, 537:9, 537:20, 538:7, 539:25, 540:11, 540:24, 554:21, 554:23, 555:1, 555:2, 555:5, 555:9, 555:14, 597:7, 597:10, 597:12, 597:25, 598:3, 603:9, 603:10, 603:21, 612:4, 612:11, 612:15, 632:1, 632:5, 632:8, 632:21, 632:22, 633:19, 635:11
**houses** - 495:15, 509:7, 509:9, 509:10, 510:17, 510:18, 515:7, 516:5, 537:2, 539:7, 552:8, 555:25, 556:17, 559:21, 611:9, 632:24, 632:25
**housing** - 396:20, 396:23, 397:8, 497:22, 507:2
**Huber** - 356:22, 390:21, 391:2, 392:24, 520:19, 521:4, 523:4, 579:10
**Huffman** - 508:3, 511:24, 513:22, 539:3
**huge** - 497:14, 520:5
**Hughes** - 515:2, 515:11
**human** - 433:2

**hundred** - 379:19, 379:20, 380:5
**hundreds** - 500:25
**hunting** - 510:25
**hydro** - 622:6, 622:15, 626:21, 636:5
**hydro-axe** - 622:6, 622:15, 626:21, 636:5

# I

**I-75** - 431:8
**idea** - 362:20, 402:7, 502:11, 511:17, 515:17, 540:18, 550:22, 590:14, 604:12, 608:14, 623:4, 626:6
**identification** - 350:14, 525:15, 585:12
**identified** - 351:22, 525:15, 585:12
**illegal** - 462:6
**illustration** - 634:11
**immediate** - 341:6, 582:3, 582:25
**immediately** - 356:15
**impact** - 384:1, 472:4, 479:6, 522:11, 523:15, 612:2
**impacted** - 444:3, 472:25, 477:10, 478:10, 478:17, 479:2, 531:18, 612:15
**importance** - 360:10, 403:17
**important** - 342:24
**importantly** - 454:15
**impossible** - 430:21, 605:11
**improve** - 523:21
**improvement** - 523:17
**inaccurate** - 371:9
**inch** - 531:20, 629:5, 629:7
**inches** - 416:23, 429:25, 434:19, 440:7, 449:8, 449:11, 449:16, 450:8, 465:10, 618:11, 621:13, 621:14, 623:3, 627:1, 627:5, 629:6, 629:15, 630:16, 636:10
**Incidentally** - 594:7
**include** - 401:11, 439:20, 439:21, 443:11, 562:16, 584:17
**includes** - 451:22, 458:20, 608:22, 609:3
**including** - 377:16, 395:18, 451:14, 452:17, 453:4, 453:5, 453:14, 453:17, 453:24, 464:10, 479:7, 491:5, 526:22, 555:8, 622:4
**Including** - 403:21
**income** - 470:13, 470:17
**incorporate** - 435:13, 437:16, 448:12
**incorporated** - 428:24, 438:19, 439:17, 440:1, 440:2
**increase** - 541:24
**incurred** - 431:20, 439:23
**independent** - 500:7
**Indiana** - 426:6, 467:22
**indicate** - 348:16, 468:2, 469:6, 469:14, 470:2, 470:7, 472:3, 472:24, 475:13, 485:17, 489:9, 496:11, 611:6
**indicated** - 359:21, 391:2, 481:12, 555:4, 561:17
**indicates** - 342:15
**indicating** - 345:18, 345:20
**individual** - 461:5, 463:10, 469:12, 471:2, 472:4, 480:21, 480:22, 481:22,

482:9, 482:11, 482:13, 482:14
**industrial** - 468:10
**industry** - 479:5, 482:16, 509:19, 631:5, 631:19
**inexpensive** - 616:7
**influence** - 476:21, 477:11, 477:12
**information** - 359:1, 377:17, 440:9, 445:23, 464:15, 470:24, 494:20, 582:8, 582:14, 599:5
**infrastructure** - 470:20
**initiated** - 426:8
**input** - 509:1
**inquiring** - 499:3
**inquiry** - 557:1
**insect** - 426:2
**inside** - 568:1, 570:14, 574:18, 616:16, 636:13
**inspector** - 570:17, 570:19
**install** - 602:2, 605:6, 621:2, 630:25, 631:3, 634:24
**installation** - 582:21
**installed** - 352:3, 416:6, 545:11, 546:18, 574:17, 580:18, 597:5, 601:11, 601:24, 604:22, 605:4, 605:20, 617:5
**installing** - 544:12, 574:22
**installment** - 533:12
**instead** - 455:1, 465:25, 515:19, 517:5
**Institute** - 468:17
**instruct** - 449:1, 606:2
**instructed** - 355:23, 472:20
**instruction** - 361:14, 441:12, 496:8
**instructions** - 637:4
**insult** - 541:11
**Insurance** - 340:6
**intact** - 584:15, 588:13
**intend** - 496:20, 498:19
**intended** - 496:19, 496:23, 527:17, 543:11, 543:16
**intentional** - 382:6
**intentions** - 497:1, 497:4
**interaction** - 585:18
**interest** - 363:8, 483:1, 529:19, 530:1, 530:6, 530:8, 530:9, 555:8, 555:15
**interested** - 533:9, 554:6
**Interesting** - 451:7
**interesting** - 427:12, 431:3, 431:5, 431:12, 447:6, 453:13, 532:24, 633:12
**interior** - 574:20
**internet** - 471:2
**interpret** - 472:19
**interrupt** - 430:17, 471:17, 528:7
**interrupted** - 394:25, 456:11
**introduce** - 425:15, 467:15, 503:8
**Introduce** - 503:14
**invented** - 477:23
**invention** - 477:20
**invested** - 525:21
**investigation** - 354:5, 365:24, 525:4, 578:13, 578:16, 579:8, 624:15, 624:17, 624:18
**investment** - 482:1
**involved** - 432:3, 458:16, 468:6, 468:8, 474:9, 499:2, 505:23, 517:1, 523:2, 563:16, 577:9, 606:20
**involvement** - 578:7,

579:3, 620:18
**involving** - 562:13, 563:5, 563:16
**iron** - 527:15, 527:16, 593:17
**irrelevant** - 612:18, 633:25
**isolated** - 419:3
**issue** - 339:3, 399:18, 404:8, 405:1, 414:12, 544:20, 544:25, 551:16, 562:25, 563:4, 563:16, 575:14, 575:17, 581:22
**issues** - 404:20, 637:6
**item** - 465:17, 529:18, 590:1
**items** - 349:10
**itself** - 358:19, 476:13, 477:14, 488:19, 491:1, 498:21, 552:4, 576:17, 638:4

# J

**Jack** - 338:10, 364:19, 367:11, 502:24, 503:2, 503:17, 511:19, 516:20, 521:5, 523:6, 528:13, 536:11
**Jacqueline** - 490:2
**January** - 492:17, 492:21, 495:18, 495:21, 501:10, 507:13, 518:3, 526:15, 538:1, 538:3
**Jenkins** - 385:7, 385:10, 385:11, 386:6, 386:10, 386:21, 386:22, 386:23, 386:24, 402:9
**Jenkins'** - 386:19
**Jennifer** - 339:12
**job** - 373:17, 426:22, 436:7, 499:24, 503:23, 562:11, 565:4, 573:5, 573:16, 577:2, 577:11, 578:12, 579:5, 582:24, 584:13, 585:5, 585:17, 587:7, 593:18, 594:18, 594:24, 604:4, 606:24, 622:10
**Joe** - 570:21, 579:6, 615:6, 615:8
**John** - 341:14, 341:16, 346:9, 350:5, 350:16, 357:23, 423:13, 503:6, 503:17, 516:8, 516:13, 516:14, 522:23, 523:1, 523:3, 523:8, 523:9, 532:4, 543:25, 544:5, 544:15, 557:19, 579:9, 583:18, 585:14, 587:19, 639:3, 639:5, 639:7, 639:21, 639:23, 640:1
**joined** - 543:23
**joints** - 381:4
**journal** - 444:22, 444:25
**Judge** - 338:11, 423:8, 477:19, 535:9, 635:23
**judge** - 423:18, 423:19
**July** - 397:20
**jumping** - 588:9
**June** - 349:8, 353:5, 353:7, 397:20, 509:5, 518:24
**junk** - 486:10, 486:11, 542:23
**jurisdiction** - 476:1, 477:9, 477:12
**juror** - 339:2, 339:6, 340:13
**juror** - 339:10, 339:12, 339:17, 340:3, 340:10, 340:18, 502:19, 619:11
**jurors** - 344:2, 416:2, 473:6

**jury** - 340:23, 341:18, 342:1, 346:20, 348:1, 348:5, 352:5, 352:21, 354:19, 357:3, 361:13, 361:14, 378:18, 378:19, 396:13, 407:9, 411:19, 422:13, 424:18, 425:15, 427:22, 429:14, 431:17, 433:11, 437:13, 441:3, 445:9, 446:6, 447:19, 449:1, 449:21, 450:18, 453:15, 467:16, 468:2, 468:15, 469:6, 469:14, 470:2, 470:7, 470:24, 471:21, 472:20, 472:25, 473:25, 474:12, 475:13, 475:19, 475:23, 478:4, 479:18, 479:22, 481:13, 503:8, 503:9, 503:14, 503:15, 505:5, 514:19, 521:11, 522:10, 523:20, 523:24, 527:14, 527:20, 528:6, 531:5, 533:5, 533:21, 537:3, 538:1, 554:11, 554:15, 558:7, 558:20, 560:11, 560:17, 565:6, 566:2, 569:8, 570:1, 570:9, 576:11, 603:15, 603:19, 604:2, 606:10, 607:1, 608:8, 610:5, 610:7, 611:6, 611:19, 611:22, 614:25, 616:9, 616:24, 618:4, 620:1, 622:14, 627:12, 627:19, 627:23, 628:7, 629:4, 630:7, 630:17, 630:25, 631:14, 632:16, 633:19, 636:8, 637:14, 638:1
**Jury-** 338:11, 415:25, 423:5
**jury's** - 355:23

# K

**Keep** - 439:16
**keep** - 339:25, 343:3, 352:22, 382:8, 401:19, 419:3, 435:11, 476:3, 502:14, 516:2, 528:22, 559:13, 561:7, 596:21, 616:16
**keeps** - 472:16, 548:4
**Keesey** - 467:13, 467:15, 467:18, 472:24, 477:25, 483:16, 483:18, 500:19, 500:22, 549:11, 549:17, 639:15, 639:17, 639:19
**Keith** - 338:18
**kept** - 438:3, 516:15, 516:16, 536:15, 563:17
**Kevin** - 513:25, 551:2, 551:4, 556:8
**Kevin's** - 551:2
**kid** - 422:15
**kids** - 340:5, 503:9, 514:12, 515:17, 517:13, 611:9
**kill** - 411:11, 411:12, 411:15, 412:4
**kills** - 411:10
**kind** - 339:23, 340:19, 342:6, 342:24, 350:7, 355:12, 363:1, 364:13, 367:12, 368:2, 372:17, 380:22, 380:24, 409:19, 412:12, 413:12, 417:10, 427:6, 428:7, 430:5, 431:19, 438:15, 439:11, 447:11, 468:19, 499:8, 500:8, 522:7, 523:8, 536:5, 540:2, 568:7, 574:4, 616:10, 623:18
**kindly** - 443:25

**kinds** - 351:10, 432:1, 558:21, 560:12, 609:10
**kitchen** - 513:7
**Klein** - 500:5, 500:7
**knee** - 411:24, 486:3
**knee-deep** - 411:24
**knee-high** - 486:3
**Knight** - 510:25
**knock** - 616:14
**knocked** - 375:18, 381:25, 415:5, 578:23, 593:15, 594:5
**Knocked** - 543:22
**knowing** - 404:24, 430:6, 616:13
**knowledge** - 364:17, 385:13, 405:4, 405:5, 412:11, 432:21, 442:11, 625:2
**known** - 590:24
**knows** - 393:17, 428:8, 428:9, 434:8, 444:6, 544:10, 595:25, 596:1
**Kopocs** - 619:24, 620:2, 625:14, 640:13, 640:15

## L

**lack** - 540:20
**Ladies** - 341:2, 425:2, 425:9, 502:9, 619:3, 636:22
**ladies** - 369:15, 496:11, 561:6, 561:18, 595:19, 637:18
**lady** - 427:1, 503:23, 510:21
**laid** - 600:4
**lake** - 339:17, 552:7
**Land-** 524:11, 620:8
**land** - 356:22, 372:23, 373:24, 381:14, 384:14, 404:24, 405:7, 426:1, 427:11, 439:19, 444:6, 468:11, 470:17, 505:10, 506:13, 512:19, 533:7, 542:16, 573:20, 574:5, 577:10, 596:11, 620:4, 620:9, 622:9
**landscape** - 524:11, 525:5
**language** - 390:14
**large** - 400:5, 411:15, 418:25, 468:11, 468:18, 515:24, 515:25, 528:18, 528:20, 585:24
**larger** - 497:12
**largest** - 499:25
**Larry**- 524:10
**Laskey**- 352:24, 367:11, 419:5, 419:14, 420:18, 421:6, 421:11, 421:22, 421:24, 423:24, 502:24, 503:6, 503:17, 526:24, 532:4, 542:15, 552:10, 553:15, 556:25, 557:11, 557:19, 559:4, 561:1, 639:21, 639:23, 640:1
**last** - 339:7, 339:16, 360:24, 422:7, 424:17, 430:5, 491:25, 492:17, 498:14, 514:20, 529:7, 529:10, 530:2, 531:15, 537:25, 538:2, 538:3, 538:14, 540:19, 557:1, 559:3, 588:1, 593:10, 619:2, 635:13
**Lastly**- 560:17
**lastly** - 527:24
**late** - 403:9, 478:8, 498:5, 504:10, 519:6
**lath** - 374:18, 422:12, 422:13, 422:19, 586:20,

**laths** - 374:14, 565:15, 621:18
**law** - 513:12, 513:14, 549:23, 550:1
**lawnmower** - 622:17, 634:12, 634:13
**Lawrence**- 503:25, 504:5, 504:17, 505:5, 505:7, 505:9, 505:25, 506:2, 506:5, 507:6, 528:16
**lawsuit** - 530:25, 614:18
**lawyer** - 339:4, 383:15, 423:9, 423:17, 423:21, 443:24, 454:19, 535:8, 553:12
**lawyers** - 382:8, 561:12, 637:11
**lay** - 404:24, 405:7, 607:22
**laying** - 345:21, 415:5, 416:10, 424:3, 520:3, 593:22, 594:5
**laymen's** - 378:25
**layouts** - 342:2
**Lazzaro**- 506:24, 506:25, 507:1, 510:22, 556:10, 557:3
**Leading**- 585:8
**leading** - 424:4, 445:5, 563:6
**leads** - 379:7, 389:7
**leaf** - 465:9, 465:11
**leak** - 380:22
**leaning** - 411:2, 418:4, 568:9
**Leaning**- 612:23
**learn** - 427:8, 524:17, 581:22, 582:1
**learned** - 422:20, 524:21
**learning** - 370:23
**least** - 351:14, 352:13, 372:25, 373:1, 380:9, 387:1, 387:23, 400:23, 408:9, 413:13, 413:22, 441:12, 463:21, 479:2, 483:21, 486:5, 488:24, 489:5, 518:19, 554:1, 555:21, 556:13, 557:5, 582:25, 621:25, 623:16, 627:24
**leave** - 339:4, 499:21, 546:4, 559:3, 601:1
**leaves** - 367:14, 431:11, 447:1, 603:25, 604:1
**leaving** - 635:15
**led** - 423:10
**left** - 341:10, 342:19, 396:17, 418:20, 499:22, 501:8, 505:5, 506:1, 506:2, 513:5, 535:4, 564:1, 592:11, 593:23, 596:6, 597:8, 625:1, 626:21, 628:5
**left-hand** - 501:8, 596:6
**legal** - 472:17, 472:18, 490:24
**length** - 367:3, 379:25, 624:9
**lengths** - 631:22
**less** - 436:2, 440:6, 493:5, 606:14, 608:1, 618:18, 636:13
**lesser** - 346:16
**letter** - 383:5, 383:20, 383:21, 384:9, 474:3, 525:15
**letters** - 503:13
**level** - 363:21, 401:6
**leveling** - 363:22
**levels** - 363:22
**life** - 340:7, 463:3, 465:20
**lifetime** - 433:4, 434:1
**light** - 450:3, 568:5
**likely** - 412:4

**lilac** - 465:8
**limb** - 446:2
**lime** - 432:18
**limit** - 461:17
**limited** - 362:21
**limits** - 621:16
**line** - 343:21, 347:15, 347:17, 347:18, 347:22, 348:3, 349:13, 350:2, 350:5, 375:8, 375:25, 376:1, 376:3, 415:20, 418:7, 420:3, 420:11, 421:25, 422:4, 426:6, 428:8, 430:2, 430:14, 451:10, 536:8, 541:15, 542:7, 543:17, 546:9, 547:17, 550:9, 559:1, 559:13, 565:15, 565:21, 565:22, 565:23, 571:11, 573:25, 574:3, 574:6, 574:15, 585:20, 586:20, 589:5, 589:18, 597:5, 600:9, 600:19, 610:12, 610:14, 610:16, 611:24, 612:4, 612:10, 612:16, 614:2, 614:5, 614:7, 614:10, 620:3, 630:15, 630:19, 633:6, 633:16, 633:23
**lines** - 351:24, 428:14, 543:12
**link** - 529:22, 565:20, 576:25
**listed** - 493:19, 515:14, 517:23, 517:24
**listen** - 549:10
**Listen**- 612:23
**listing** - 537:2
**litigation** - 499:25
**live** - 425:16, 425:18, 438:10, 494:18, 506:21, 521:2, 540:3, 632:25
**lived** - 347:7, 368:8, 368:24, 369:2, 369:6, 371:25, 372:22, 442:17, 516:19
**lives** - 343:6, 407:10, 454:25, 507:3, 539:24
**living** - 364:15, 371:15, 425:17, 430:24, 440:16, 440:23, 445:25, 462:10, 513:7
**load** - 400:12, 400:16, 400:18, 400:21
**loader** - 622:15, 636:6
**loads** - 599:19, 599:21, 629:10, 635:11
**loan** - 478:15, 515:21, 529:20, 555:15
**Locally-** 500:6
**located** - 620:14
**location** - 352:12, 446:4, 446:17, 551:21, 574:7, 626:11
**locations** - 427:7, 560:7
**logic** - 487:6
**look** - 346:19, 347:1, 350:4, 351:11, 351:15, 352:9, 413:13, 427:24, 431:23, 441:25, 443:14, 444:11, 444:12, 444:13, 447:4, 451:11, 455:7, 465:7, 470:11, 470:15, 470:16, 471:23, 472:3, 472:13, 475:25, 476:14, 476:20, 476:24, 480:20, 520:10, 527:11, 531:13, 547:25, 559:15, 559:16, 564:20, 564:22, 570:13, 571:21, 572:3, 580:3, 593:1, 602:8, 609:12, 609:22, 613:12, 613:14, 613:17, 613:18, 614:1, 614:20, 628:16,

628:17, 629:13, 636:4
**Look**- 537:14
**looked** - 342:8, 358:16, 360:2, 374:12, 405:10, 418:24, 428:11, 429:22, 441:1, 442:15, 442:20, 442:22, 447:1, 448:10, 466:1, 471:13, 479:17, 480:15, 483:4, 531:12, 567:25, 578:24, 580:2, 580:6, 615:17, 621:11, 622:2, 628:4
**Looking**- 453:20
**looking** - 405:6, 423:24, 442:18, 448:8, 451:9, 454:3, 473:10, 475:6, 482:6, 482:7, 487:8, 488:10, 532:9, 534:7, 564:15, 578:22, 592:7, 608:16, 613:3
**looks** - 347:19, 454:25, 465:8, 590:6, 590:17, 595:22, 613:9, 613:20, 614:23
**Lord**- 434:1
**Lori**- 516:18, 516:20, 517:21, 517:23, 519:4
**losing** - 412:9
**loss** - 446:21
**lost** - 456:15, 458:4
**loudness** - 503:12
**lovely** - 426:25
**low** - 357:11, 404:9, 421:18, 424:20, 424:21, 516:3, 576:13
**lower** - 489:2, 489:5, 556:8, 596:6, 601:10
**lowered** - 484:18
**lowest** - 554:17
**Ltd**- 338:4
**lucky** - 438:8
**lunch** - 502:10
**Lunch**- 502:21

## M

**machine** - 629:25, 634:21, 636:12
**machinery** - 360:11, 360:14, 625:6
**machines** - 374:7, 374:8, 604:23, 622:14, 625:7, 629:10, 635:11
**madam** - 637:15
**Mai** - 468:17, 468:20, 483:24
**main** - 339:19, 342:2, 342:7, 343:16, 344:25, 345:7, 345:8, 345:9, 345:10, 345:14, 349:11, 352:10, 357:12, 378:13, 392:25, 402:10, 412:13, 465:18, 546:19, 548:6, 548:7, 562:14, 573:12, 574:7, 574:15, 575:19, 577:20, 580:18, 597:5, 599:17, 620:19, 621:2
**Mais** - 468:22
**major** - 362:11, 467:22
**majority** - 407:24, 497:14
**man** - 350:19, 351:4, 386:10, 390:22, 392:16, 393:5, 393:8, 393:10, 402:5, 416:10, 416:12, 428:8, 544:3, 544:10, 551:5, 558:6, 562:8, 562:9, 567:14, 573:4, 573:7, 574:1, 574:25, 583:13, 586:12, 608:16, 616:9, 616:22, 620:22, 629:10
**man's** - 351:1, 416:22,

417:12
**management** - 426:1
**Manguses** - 514:6
**Manhole** - 358:22
**manhole** - 343:14, 358:15, 358:19, 358:21, 359:7, 359:9, 377:7, 377:16, 377:17, 379:22, 380:17, 384:21, 387:11, 387:15, 387:20, 388:7, 388:9, 388:15, 424:18, 563:2, 567:24, 567:25, 568:1, 568:3, 568:5, 568:8, 575:17, 578:18, 578:22, 579:4, 579:12, 580:2, 580:10, 581:8, 593:13, 593:16, 593:17, 593:18, 593:19, 593:21, 593:22, 593:23, 594:3, 615:17
**manholes** - 385:2
**mansion** - 497:9, 497:13, 497:21, 527:10
**mansions** - 497:8, 497:10, 497:19
**map** - 441:2, 441:3
**Marble** - 506:8, 506:9
**March** - 499:22, 508:11, 518:22, 519:2
**mark** - 348:15, 349:19, 370:9, 375:1, 375:11, 526:23
**marked** - 363:20, 399:11, 430:12, 471:8, 528:25, 530:16, 614:12, 626:16, 632:15
**marker** - 357:3, 589:5, 593:6
**market** - 396:20, 396:23, 397:8, 478:2, 478:6, 478:7, 478:11, 478:14, 478:22, 482:24, 494:20, 497:7, 498:2, 498:6, 507:2, 507:16, 511:3, 511:5, 512:5, 512:6, 536:3, 539:16, 539:18, 551:16, 556:1
**marketing** - 499:2, 507:11, 517:9, 517:18
**markets** - 478:17, 478:20, 478:24
**marking** - 375:7, 526:13, 610:25, 611:1
**markings** - 374:25, 375:15, 375:20, 376:11, 398:16, 398:22, 398:24, 399:14, 399:15, 565:14, 574:1, 595:9, 600:4, 621:11, 621:18
**marks** - 375:10, 401:10, 596:6, 621:19
**married** - 426:23, 427:1, 503:22, 516:18
**marshals** - 456:7
**Marv** - 343:24, 344:12, 345:4, 346:23, 472:15, 513:13, 524:16, 527:7, 563:8, 612:23
**Marvin** - 338:13
**master** - 513:6, 515:22
**matched** - 476:19
**material** - 420:6, 420:10, 445:23
**materials** - 436:16
**math** - 452:12
**mathematical** - 494:11
**matter** - 400:6, 438:6, 492:12, 493:7, 536:23, 604:10, 608:1, 638:12
**matters** - 502:13, 538:15, 561:11
**mature** - 340:3
**Maumee** - 338:15, 356:15

**maximum** - 631:20
**Mccarthy** - 341:10, 341:14, 341:21, 348:7, 355:6, 355:25, 357:23, 357:25, 369:18, 370:2, 370:22, 378:25, 384:13, 423:13, 424:25, 516:9, 516:14, 517:21, 517:22, 517:23, 519:4, 522:23, 536:4, 539:24, 543:14, 543:25, 544:6, 544:15, 545:1, 560:18, 560:20, 579:9, 583:18, 585:2, 585:12, 585:17, 586:13, 586:18, 587:8, 587:19, 588:17, 588:21, 589:11, 591:24, 599:7, 613:2, 613:13, 614:16, 614:17, 628:13, 628:14, 639:3, 639:5, 639:7
**Meadows** - 338:19, 476:9, 477:6, 481:21
**mean** - 340:4, 374:2, 374:4, 376:1, 379:25, 380:16, 387:13, 391:24, 395:6, 395:9, 396:19, 405:16, 410:3, 411:21, 430:17, 438:15, 463:1, 471:17, 476:18, 482:20, 491:8, 491:13, 491:22, 496:21, 497:19, 499:1, 499:15, 508:22, 510:16, 512:5, 512:7, 520:4, 520:12, 523:6, 539:7, 539:11, 542:13, 542:19, 543:21, 546:16, 549:13, 551:20, 558:21, 558:23, 559:4, 559:5, 564:6, 575:8, 576:11, 582:18, 598:15, 617:19, 623:21, 626:2, 626:22, 633:11
**Meaning** - 545:1
**meaning** - 468:16, 478:14
**meaningful** - 477:3
**means** - 459:10, 499:15, 542:12, 542:15, 543:3
**meant** - 376:13, 383:12, 397:15, 486:20, 542:11, 575:8, 610:17
**measure** - 387:10, 387:13, 388:1, 388:19, 472:8, 632:7
**measured** - 365:4, 387:14, 387:16, 387:23, 388:2, 388:15, 613:24
**measurements** - 387:18, 387:19, 387:24, 388:3
**measures** - 616:10
**measuring** - 632:19
**mechanical** - 338:25
**meet** - 506:3
**meeting** - 390:20, 390:21, 391:11, 392:2, 392:19, 393:11, 579:9, 579:11, 583:18, 591:24, 599:6, 599:9
**meetings** - 566:22, 567:16, 567:18
**Member** - 468:17
**members** - 511:1, 511:2, 511:12
**memory** - 439:1
**men** - 347:7, 417:2
**mention** - 389:24, 412:25, 447:16, 540:25
**mentioned** - 353:10, 358:17, 374:20, 384:4, 384:5, 386:5, 402:10, 444:17, 449:10, 457:15, 458:17, 462:13, 496:18, 498:15, 516:8, 564:3, 576:20, 633:5

**mentor** - 423:17
**Mercedes** - 539:13
**merged** - 500:7
**met** - 392:19, 476:9, 483:20, 506:7, 508:10, 508:13, 572:20
**method** - 450:20, 582:1
**methodology** - 446:6, 446:16, 451:7, 481:13, 481:15
**metropolitan** - 468:25
**Michael** - 500:6
**Michigan** - 339:7, 339:18, 341:3, 440:10, 444:21, 456:8, 456:15, 469:20, 469:23, 479:4, 508:25, 510:6
**microphone** - 619:20
**microphones** - 596:21
**mid** - 583:16, 588:2, 591:6
**Mid** - 599:10
**middle** - 379:4, 397:4, 397:11, 397:14, 397:17, 406:17, 421:22, 569:20, 574:9, 574:10, 589:4, 611:10, 624:1
**might** - 363:1, 369:12, 378:8, 378:14, 428:22, 432:17, 432:18, 432:22, 433:11, 433:17, 436:12, 438:12, 438:14, 438:21, 442:21, 444:14, 445:24, 446:25, 449:7, 455:6, 463:16, 466:2, 472:8, 477:1, 478:19, 480:19, 488:14, 488:18, 489:1, 491:15, 505:13, 513:4, 513:9, 541:24, 563:8, 563:12, 578:20, 579:5, 590:6, 590:7, 616:20, 635:10
**Might** - 372:18
**Mighty** - 427:16
**mike** - 341:20
**Mike** - 516:9, 516:15, 516:24, 517:22, 519:4, 519:8, 539:24, 560:18, 560:20
**Mike's** - 346:15
**Mile** - 562:6
**miles** - 577:5
**million** - 426:20, 525:9, 525:20, 525:21, 530:2, 539:6, 539:7, 550:11, 550:12
**million-dollar** - 539:6
**million-nine** - 525:20
**million-one** - 525:9
**million-three** - 525:9
**million-three-plus** - 530:2
**mind** - 339:23, 362:19, 397:17, 403:17, 439:16, 493:22, 533:24, 551:20
**mind's** - 442:21
**mine** - 507:6, 516:9, 591:21
**minimum** - 435:12, 575:25
**minute** - 425:4, 522:23, 530:19
**minutes** - 416:1, 502:12, 607:23, 608:2, 619:7, 629:23
**misfortune** - 341:3
**missing** - 345:1, 345:5, 432:17, 592:17
**misspoke** - 464:23, 495:6, 583:7
**mistake** - 517:14
**mistaken** - 520:23
**mistakenly** - 401:19
**mistakes** - 358:9, 358:12, 360:20, 602:9
**misunderstanding** - 369:4
**misunderstood** - 504:18

**mix** - 447:17
**mixed** - 468:12
**mixed-use** - 468:12
**model** - 451:22, 518:1, 518:2
**modest** - 497:23, 497:24
**modify** - 372:21
**moist** - 564:18
**molded** - 431:10
**molds** - 431:11
**moment** - 454:13, 529:16, 531:21, 553:1
**Monday** - 342:22
**money** - 364:19, 455:18, 455:19, 455:20, 457:7, 457:18, 457:25, 461:2, 478:24, 511:5, 517:15, 522:2, 522:9, 534:25, 535:13, 535:17, 537:7, 537:15, 537:20, 549:8, 552:2, 552:8
**monies** - 457:20
**monitor** - 523:11, 587:11, 590:3, 609:24, 613:19, 614:22, 615:1
**month** - 397:8, 539:22, 540:14
**monthly** - 364:22
**months** - 397:10, 397:15, 495:12, 516:6, 540:2, 628:5
**monument** - 417:18, 417:19, 417:20, 417:21, 417:23, 418:3, 418:6, 571:19, 571:25, 609:13, 609:15, 610:17, 610:24, 610:25, 611:1, 611:2
**monuments** - 376:7
**morning** - 340:25, 342:4, 425:3, 451:4, 451:6, 483:18, 483:19, 516:14, 549:10, 636:24
**Morningside** - 507:4
**mortgage** - 478:14, 529:9, 529:12, 530:21
**Most** - 375:17, 378:10, 411:12, 429:3, 511:15, 594:23
**most** - 365:23, 366:2, 371:2, 371:3, 426:18, 432:10, 436:5, 444:4, 449:12, 454:15, 461:16, 477:7, 478:12, 491:15, 495:25, 497:22, 507:21, 511:5, 546:14, 623:25, 625:23, 626:4, 631:20
**Mostly** - 469:1
**mother** - 513:12, 513:14
**mother-in-law** - 513:12, 513:14
**motioning** - 357:7
**mound** - 348:19, 348:23, 352:8, 376:24, 383:5, 412:8, 413:9, 413:10, 413:16
**Move** - 383:25, 399:8
**move** - 340:7, 367:24, 368:15, 368:25, 369:20, 370:12, 371:12, 372:16, 372:17, 378:20, 383:22, 383:24, 446:15, 518:13, 531:2, 548:22, 584:21, 584:24, 586:18, 593:11, 624:13
**moved** - 367:18, 367:20, 367:25, 368:7, 368:18, 369:5, 370:14, 372:4, 372:8, 372:19, 402:25, 403:1, 417:9, 519:4, 536:24
**moving** - 374:7, 391:3, 491:22, 502:14, 561:7, 583:10, 584:9, 584:19,

586:15, 586:16, 586:21,
586:23, 588:17, 596:12
 **mow** - 340:24, 622:16
 **mower** - 622:16
 **mowing** - 341:20
 **mud** - 352:6, 522:23,
569:11
 **muddy** - 407:18, 564:18
 **multi** - 539:7
 **multi-million-dollar** -
539:7
 **multiflora** - 462:6, 462:10,
462:14
 **multiple** - 433:16
 **multiplied** - 439:15, 443:7
 **Multiplied** - 440:3
 **multiply** - 439:24, 450:8
 **must** - 370:14, 390:7,
464:23, 608:23
 **mute** - 595:18

## N

 **nail** - 593:2
 **nails** - 593:4
 **name** - 353:18, 353:19,
392:16, 425:16, 425:18,
451:4, 462:24, 462:25,
467:18, 471:5, 483:21,
503:17, 515:2, 526:17,
526:25, 544:22, 549:11,
562:1, 572:14, 572:17,
620:1, 620:6, 620:16
 **named** - 506:9
 **names** - 524:6
 **narratives** - 443:23
 **narrow** - 465:9, 580:7
 **nation** - 510:8
 **natural** - 431:15
 **nature** - 427:18, 431:15,
434:8
 **nd** - 470:2
 **near** - 347:17, 364:11,
364:12, 375:15, 375:19,
376:1, 376:3, 404:10,
404:20, 417:23, 418:8,
452:8, 494:19, 547:10,
550:11, 551:10, 551:23,
571:25, 585:5, 585:17
 **necessarily** - 438:4, 464:1,
465:18, 476:4, 487:5,
489:14, 489:15
 **necessary** - 430:24, 491:1
 **need** - 340:11, 340:17,
341:6, 341:19, 341:21,
354:13, 358:9, 363:1, 377:3,
378:14, 413:10, 426:7,
426:10, 428:5, 437:23,
460:20, 475:3, 503:11,
506:10, 534:5, 574:14,
596:2, 612:1, 619:19
 **Need** - 413:9
 **needed** - 352:15, 372:20,
437:21, 545:14, 578:2
 **needs** - 431:24, 432:16,
448:6, 486:10, 576:17
 **negative** - 455:4, 455:6,
499:11
 **negotiating** - 536:22
 **neighbor** - 394:8, 457:4,
600:22
 **neighborhood** - 439:14,
458:13, 461:24, 528:23
 **neighbors** - 404:25
 **nervous** - 509:7
 **nester** - 513:8
 **nester's** - 513:5
 **nesters** - 511:6, 511:16,
512:8, 515:7, 536:7
 **never** - 362:10, 363:16,

364:25, 365:4, 369:2, 369:5,
379:6, 380:21, 384:4, 384:9,
384:11, 384:12, 384:17,
391:20, 393:4, 402:18,
402:21, 406:16, 417:12,
420:24, 427:13, 456:13,
459:11, 460:9, 462:2, 466:3,
466:8, 478:18, 513:15,
530:17, 543:11, 544:2,
560:5, 580:10, 582:7,
613:24, 631:3, 631:5
 **Never** - 384:5
 **New** - 562:6
 **new** - 342:2, 342:25,
345:7, 345:9, 421:13, 430:2,
432:4, 470:18, 501:10,
501:13, 501:14
 **news** - 479:1
 **newsstands** - 498:7
 **next** - 351:21, 359:20,
416:13, 416:15, 419:14,
425:9, 435:23, 457:3, 467:9,
485:10, 487:23, 492:23,
502:1, 502:23, 508:5,
511:11, 512:14, 545:14,
546:4, 551:2, 558:21, 561:8,
561:9, 563:15, 572:9, 579:3,
579:8, 585:16, 585:23,
588:20, 600:16, 611:8,
619:5, 630:22
 **next-door** - 457:3
 **nice** - 426:16, 433:22,
442:23, 521:7, 559:15
 **Nick** - 386:11, 402:13,
420:20
 **Nigh** - 386:11, 386:14,
402:13, 420:20, 459:14,
464:4
 **night** - 339:7, 339:16,
368:20, 503:22
 **nine** - 358:24, 359:22,
427:2, 430:11, 434:18,
440:6, 440:7, 464:3, 464:8,
464:14, 474:6, 474:17,
475:14, 480:9, 516:6,
525:20, 569:22
 **Nine** - 480:13
 **nitrogen** - 432:18
 **nobody** - 373:8, 408:14,
430:7, 434:11, 452:7,
484:15, 485:4, 485:10,
510:3, 511:17, 550:22,
551:10, 551:11, 563:13
 **Nobody** - 373:10, 407:18,
420:4, 459:6, 540:22,
462:10
 **nobody's** - 549:24
 **noise** - 612:3
 **non** - 477:11
 **non-influence** - 477:11
 **none** - 363:3, 376:11,
570:1
 **noon** - 339:22
 **normal** - 345:20, 541:4,
565:19
 **normally** - 433:14, 435:19,
565:25, 566:4, 566:8,
616:19, 629:23
 **north** - 418:9, 439:4,
571:11, 633:16
 **northeast** - 510:6
 **Northern** - 338:1
 **northern** - 339:18
 **northernmost** - 597:11
 **northwest** - 425:20,
425:25, 426:5, 468:25,
478:11, 479:3, 510:6, 556:13
 **Northwest** - 478:18, 521:3
 **Northwood** - 536:12
 **nosedive** - 397:9

 **note** - 363:8, 365:13,
395:12, 439:14, 526:21
 **noted** - 376:23, 608:25,
609:6
 **notereading** - 338:25
 **notes** - 422:9, 428:10,
443:13, 532:11, 570:15,
633:10
 **Nothing** - 410:18, 413:23,
450:24, 457:12, 457:14,
467:4, 467:6, 560:23,
594:14, 617:7, 618:22,
636:16
 **nothing** - 376:14, 409:3,
409:4, 410:1, 410:20,
413:22, 457:11, 487:3,
488:2, 496:2, 510:12,
513:24, 548:11, 548:12,
549:3, 550:15, 553:25,
570:10, 578:17
 **notice** - 426:13, 491:25
 **noticed** - 578:12
 **notified** - 526:8
 **Notre** - 503:20, 508:6
 **Nowhere** - 364:11
 **nowhere** - 364:12, 538:23
 **noxious** - 462:8
 **nuclear** - 468:5
 **number** - 339:6, 351:25,
357:4, 362:8, 366:11, 367:2,
419:11, 431:22, 437:18,
438:9, 438:16, 439:2,
440:14, 443:6, 444:15,
453:18, 455:15, 467:2,
473:17, 482:8, 490:9,
531:11, 533:21, 538:15,
541:18, 595:12
 **Number** - 339:12, 341:17,
343:20, 344:13, 346:12,
346:14, 346:19, 348:15,
349:19, 421:3, 430:13,
432:13, 437:20, 441:7,
442:1, 571:21, 628:16,
632:16
 **numbers** - 356:17, 443:14,
466:22, 473:25, 474:1,
475:24, 479:24, 481:14,
481:16, 482:6, 555:18,
596:15
 **nursery** - 463:16
 **nutrient** - 437:21
 **nutrients** - 432:16, 432:17

## O

 **oak** - 445:10, 445:16,
447:20
 **oaks** - 427:16, 449:10
 **oath** - 369:7, 545:20
 **object** - 345:23, 350:8,
353:25, 354:8, 435:4, 444:5,
449:25, 472:17, 514:16,
517:4, 604:7, 610:13,
612:18, 631:15
 **objected** - 445:3, 445:4
 **Objection** - 344:17,
349:23, 352:17, 353:1,
354:22, 361:7, 364:2, 382:3,
393:21, 412:17, 424:4,
424:11, 445:1, 448:23,
459:13, 524:15, 525:11,
529:15, 531:2, 552:24,
558:11, 559:24, 563:6,
567:8, 580:23, 581:17,
582:11, 585:8, 602:15,
604:24, 623:23, 624:12,
625:25, 629:1, 633:24,
634:8, 635:17
 **objection** - 340:13,
340:14, 354:23, 361:12,

412:18, 443:18, 514:19,
524:25, 527:21, 531:4,
553:6, 563:10, 602:19,
612:25, 624:1, 624:2, 634:3
 **objective** - 465:18
 **obligations** - 534:2
 **obliterated** - 409:20,
409:21
 **observable** - 378:22
 **observe** - 579:25, 602:8
 **obstructions** - 432:2
 **obvious** - 428:15, 433:11
 **Obviously** - 445:6, 588:9
 **obviously** - 341:5, 359:14,
373:20, 401:10, 403:15,
407:1, 457:10, 474:5, 477:2,
478:8, 486:9, 495:19,
501:10, 587:25, 595:4,
602:5, 637:25
 **occasion** - 587:6
 **occasions** - 427:17, 585:2
 **occurred** - 363:19
 **occurs** - 466:22
 **October** - 425:22
 **October/november** -
509:15
 **odor** - 465:16
 **offer** - 373:10, 514:13,
514:14, 518:18
 **offered** - 430:9, 561:19
 **office** - 352:12, 352:15,
373:5, 398:11, 426:15,
500:4, 541:22, 558:9
 **offset** - 574:6, 574:10,
574:11, 574:14
 **offer** - 355:20, 372:20,
436:12, 479:1, 492:8,
500:24, 519:19
 **Ohio** - 338:1, 338:5,
338:22, 425:19, 425:20,
425:21, 425:25, 426:5,
426:19, 468:25, 469:21,
469:22, 478:11, 478:18,
479:4, 510:6, 515:20, 524:1,
524:5, 556:13, 619:1, 620:15
 **oil** - 340:7, 342:9, 344:7,
381:1, 381:5, 431:7, 431:9,
432:7, 466:6, 466:8, 503:18,
504:9, 511:10, 547:22,
548:3, 571:14, 579:13,
593:16, 609:23
 **Old** - 338:4, 354:6, 362:2,
379:4, 385:1, 385:2, 394:5,
394:6, 394:10, 394:18,
394:20, 396:4, 401:16,
401:19, 401:20, 401:23,
467:20, 498:8, 501:15,
534:8, 537:20, 537:23,
537:25, 538:3, 553:16
 **older** - 511:16
 **olive** - 447:21, 462:12,
465:1, 465:2, 465:4, 465:6,
466:5
 **on-site** - 581:21, 603:17,
606:1, 615:8, 615:9
 **once** - 423:8, 432:13,
432:20, 434:15, 484:21,
496:10, 553:5, 553:9, 572:20
 **Once** - 637:18
 **One** - 360:24, 398:10,
410:17, 426:13, 498:14,
512:18, 514:18, 555:3,
569:3, 584:5, 598:23, 607:19
 **one** - 339:14, 342:18,
342:21, 342:23, 343:19,
343:24, 344:8, 344:9,
345:24, 350:5, 351:18,
352:6, 352:14, 353:16,
358:14, 359:6, 360:1, 372:6,
372:7, 374:2, 380:21,

389:15, 402:25, 403:14,
411:4, 415:4, 415:5, 415:11,
417:3, 417:16, 423:9,
423:18, 423:19, 423:21,
423:22, 429:23, 430:22,
430:23, 431:22, 432:24,
437:18, 443:7, 444:23,
445:10, 446:22, 448:1,
449:6, 449:7, 452:4, 452:10,
457:24, 469:4, 474:20,
476:15, 479:19, 479:20,
482:7, 485:25, 486:9,
486:10, 490:20, 492:4,
494:7, 496:20, 496:21,
500:25, 504:11, 504:13,
504:22, 504:24, 505:12,
506:17, 507:1, 508:5,
509:15, 509:21, 509:25,
515:5, 516:12, 516:19,
518:17, 522:24, 525:9,
530:15, 534:10, 534:14,
534:15, 538:2, 538:14,
539:9, 539:13, 540:25,
544:5, 544:6, 549:24, 551:1,
551:23, 556:17, 559:25,
566:11, 566:25, 568:22,
569:6, 588:23, 589:8, 589:9,
589:13, 590:7, 590:11,
590:12, 590:16, 591:8,
591:13, 592:18, 593:10,
595:1, 597:7, 597:18,
598:20, 598:24, 600:3,
606:23, 607:4, 607:6,
607:12, 607:16, 607:18,
607:21, 618:25, 621:5,
621:7, 622:5, 622:6, 622:23,
627:4, 627:8, 630:7, 633:5
**one's** - 350:7
**one-foot** - 445:10
**ones** - 411:17, 444:24,
447:15, 462:13, 462:19,
476:20, 481:20, 507:24,
547:12, 550:4, 590:11
**open** - 426:7, 428:16,
513:6, 513:7, 564:16,
565:13, 577:11, 577:13,
578:23, 611:14
**opened** - 473:20, 619:12
**opening** - 438:12
**opens** - 458:12
**operates** - 478:7, 622:4
**operating** - 401:13
**operation** - 536:20, 539:4,
539:5, 588:6, 609:4
**operations** - 508:23,
508:25, 608:25
**operative** - 410:15
**operator** - 618:11, 629:19
**opinion** - 354:12, 375:24,
397:1, 441:14, 448:15,
458:2, 458:14, 483:9, 493:7,
502:2, 506:24, 523:16,
625:9, 627:25
**opinions** - 356:17
**opportunity** - 451:11,
479:15, 499:24, 503:25
**opposed** - 430:25, 436:6,
611:9, 611:14
**opposite** - 601:24
**option** - 455:9
**orange** - 417:4, 586:7,
586:9, 605:3
**Orchard** - 467:20
**order** - 360:22, 435:23,
561:8, 561:19, 574:15,
576:14, 577:20, 577:24,
586:22, 587:25, 594:14,
598:9
**ordered** - 565:8
**Oregon** - 469:20, 469:21

**organic** - 436:16
**organization** - 468:18,
500:9
**orient** - 592:7
**orientation** - 476:15,
489:17, 592:8
**oriented** - 601:22, 602:1
**Original** - 515:9
**original** - 353:17, 450:18,
473:2, 588:25
**originally** - 415:10,
424:12, 466:25, 506:8, 515:8
**otherwise** - 364:18, 478:6
**Ottawa** - 467:19, 503:19
**ourselves** - 515:18
**outcome** - 530:25
**outline** - 535:8
**outside** - 340:25, 359:9,
439:18, 448:2, 636:12,
637:14
**ovarian** - 623:24
**overall** - 377:23, 479:6,
481:8, 481:16
**overhang** - 366:6, 408:23
**overhanging** - 408:21
**overlooking** - 551:24
**overpasses** - 431:13
**overprice** - 493:22
**overpriced** - 493:8,
493:12, 493:13, 493:14,
493:15
**Overruled** - 349:24, 364:4,
394:3, 424:6, 424:13,
525:13, 580:25, 581:18,
585:11, 605:1, 626:1
**overruled** - 361:13, 602:20
**overwhelming** - 340:4
**owe** - 530:5
**owed** - 530:2, 530:6
**Owens** - 515:12
**Owens-corning** - 515:12
**owes** - 457:6
**own** - 340:5, 357:13,
426:8, 442:21, 446:22,
453:11, 457:5, 462:16,
483:1, 492:6, 550:10,
553:19, 554:4
**owner** - 635:7
**owners** - 426:1, 469:8,
469:13, 470:5
**owns** - 455:22, 461:3,
534:8

**P**

**pacesetter** - 536:5
**package** - 492:9
**packed** - 570:14
**page** - 371:16, 377:12,
397:13, 491:13, 501:1,
501:8, 542:1, 543:7, 544:18,
544:22, 545:14, 546:8,
553:4, 557:16
**Page** - 394:16, 608:18
**pages** - 546:8
**paid** - 511:22, 530:10,
531:15, 533:3, 533:18,
537:15, 555:8, 556:11
**paint** - 374:23
**painted** - 375:10, 621:19
**painting** - 621:19
**paintings** - 447:7
**pair** - 476:19
**Pam** - 518:23, 522:6
**paper** - 534:4
**papers** - 518:22
**parallel** - 434:20
**parcels** - 531:8
**Pardon** - 504:15, 597:21
**pardon** - 512:21, 515:23,

528:19, 535:9, 543:8, 551:7,
552:13
**parents** - 339:18, 339:22,
340:6, 341:7, 508:7, 513:11
**Park** - 467:19, 503:19,
505:14
**parked** - 597:9
**part** - 355:4, 373:17,
373:21, 373:23, 373:24,
374:4, 377:8, 377:11,
377:18, 377:21, 377:24,
396:1, 408:11, 448:12,
451:19, 453:13, 469:17,
469:25, 475:19, 486:6,
487:14, 498:3, 500:5, 513:8,
536:20, 554:17, 559:4,
580:21, 583:23, 584:12,
584:21, 591:25, 601:4,
608:21, 609:23, 632:17
**part-time** - 469:25
**participated** - 363:4,
390:21, 390:22, 392:11
**particular** - 360:22, 363:7,
428:17, 436:4, 444:16,
446:20, 447:13, 573:11,
606:24, 628:1
**particularly** - 350:3, 554:6
**parties** - 455:25, 637:7
**partner** - 386:16, 423:17,
506:11, 552:16, 552:19
**partnership** - 362:1
**parts** - 414:19
**party** - 557:2
**pass** - 527:19, 528:5,
541:5, 564:22
**passed** - 541:2
**past** - 385:18, 385:19,
432:21, 470:3, 500:6, 600:7,
603:6, 603:20
**path** - 519:23, 519:24,
558:14, 597:20, 597:22,
598:15, 599:20, 605:12
**Patrick** - 572:15
**pay** - 482:12, 522:6, 522:7,
526:7, 529:6, 549:20
**paying** - 364:15, 364:22,
512:13, 532:21, 533:10,
540:8
**payments** - 529:9, 529:12,
555:14
**pays** - 537:18
**peddle** - 498:9
**peg** - 422:18, 422:19
**pen** - 592:12
**pending** - 443:21
**People** - 518:13, 536:6,
541:20, 632:25
**people** - 360:7, 360:18,
367:10, 420:16, 433:5,
433:6, 455:24, 478:14,
478:23, 494:18, 499:5,
499:12, 509:11, 509:13,
511:14, 513:4, 515:10,
515:16, 515:17, 518:11,
521:24, 522:17, 522:18,
536:3, 549:1, 551:16,
559:18, 583:3, 583:9,
583:12, 632:3, 632:23
**Per** - 400:12, 440:22
**per** - 439:15, 449:13,
450:19, 480:10, 480:24,
482:2, 485:18, 491:6, 491:7,
491:9, 491:12, 491:14,
491:19, 491:20, 495:15,
531:10, 606:18
**per-lot** - 450:19
**percent** - 438:8, 438:15,
438:17, 450:6, 469:11,
469:12, 482:2, 493:22,
493:24, 493:25, 494:3,

494:5, 494:9, 494:10,
494:12, 530:11, 530:19
**percentage** - 469:6,
494:12
**performed** - 540:4
**Perhaps** - 435:12
**perhaps** - 374:23, 391:16,
454:15, 556:6, 637:21,
637:22
**perimeters** - 442:6
**period** - 434:22, 481:24,
495:16, 540:6
**perking** - 510:12
**Perkins** - 385:7, 520:7,
520:9, 520:18, 520:24, 521:7
**permanently** - 384:1
**permission** - 381:19,
382:2, 382:20, 382:23,
383:1, 384:6, 416:12,
416:15, 543:15, 584:1
**Perrysburg** - 397:2, 476:1,
476:7, 498:15, 499:7,
499:13, 506:20, 506:21,
506:23, 507:3, 508:5, 524:12
**person** - 354:14, 431:14,
444:10, 448:6, 455:22,
458:2, 466:4, 603:8
**personal** - 393:12
**personally** - 414:12,
422:12, 526:17, 526:22,
531:19, 602:8
**Personally** - 531:20
**personnel** - 577:25
**pertains** - 407:5
**Pete** - 561:24, 562:3,
562:4, 565:2, 581:25, 640:3,
640:5
**Peterman** - 399:15, 471:4,
506:18
**Petoskey** - 508:25, 539:5
**phone** - 426:13, 456:7,
589:18, 599:23
**photo** - 347:5, 347:7,
348:1, 351:3, 351:13,
404:12, 410:6, 588:24,
592:11, 628:1
**photograph** - 346:20,
348:12, 348:16, 351:25,
418:12, 423:15, 527:5,
527:12, 587:13, 613:7,
613:25, 614:20, 626:24,
630:5
**photographs** - 350:23,
428:2, 447:3, 448:9, 464:8,
485:16, 587:6, 594:12,
594:15
**photos** - 352:1, 352:2,
587:10
**phrase** - 412:17, 482:15,
482:18, 482:21
**physically** - 374:5, 573:20
**pick** - 383:14, 607:21
**picked** - 438:20, 447:19,
509:23
**picking** - 542:23
**pickup** - 599:20
**picture** - 349:1, 349:4,
349:6, 349:14, 351:16,
364:5, 364:9, 407:11,
418:22, 418:23, 419:7,
419:8, 421:2, 566:21, 571:8,
587:23, 588:4, 588:12,
589:2, 589:11, 589:20,
591:2, 591:7, 591:18,
591:23, 592:8, 592:18,
593:5, 593:13, 593:16,
597:7, 599:22, 605:24,
606:3, 609:19, 609:20,
609:21, 613:8, 613:12,
627:16

**picture's** - 588:11
**pictures** - 348:24, 350:11, 350:16, 350:18, 351:7, 351:14, 351:22, 415:4, 417:18, 419:5, 428:2, 448:9, 462:17, 462:18, 485:25, 489:8, 546:23, 566:11, 566:16, 588:1, 588:2, 588:17, 594:10, 605:23
**piece** - 431:7, 506:11, 578:12, 593:14, 594:4, 594:5, 613:18, 613:20
**pieces** - 381:5
**pile** - 622:21, 622:24
**pin** - 447:20, 449:10
**pink** - 442:4
**pinpointing** - 440:12
**pipe** - 343:9, 343:12, 343:13, 343:15, 345:13, 349:11, 352:2, 353:10, 353:17, 353:21, 353:22, 363:23, 378:8, 378:11, 379:1, 379:2, 379:3, 379:7, 379:9, 380:7, 380:10, 381:8, 381:25, 382:1, 382:14, 382:24, 383:2, 384:3, 384:4, 384:5, 384:21, 388:6, 388:12, 389:1, 389:5, 389:7, 389:10, 389:16, 389:22, 390:3, 390:9, 390:25, 391:4, 392:11, 392:23, 393:15, 393:20, 393:23, 406:11, 406:19, 406:21, 416:5, 416:9, 416:10, 543:22, 543:23, 545:24, 546:9, 546:15, 546:17, 562:23, 563:13, 563:16, 564:5, 564:7, 564:9, 564:14, 564:16, 564:17, 566:11, 567:20, 568:8, 568:11, 568:17, 569:3, 569:4, 569:8, 569:19, 570:2, 570:6, 570:8, 570:11, 574:16, 574:18, 575:14, 575:15, 575:19, 575:22, 576:8, 576:25, 577:5, 577:22, 578:8, 578:10, 578:13, 578:17, 578:19, 579:4, 579:12, 579:14, 579:15, 579:17, 579:20, 580:4, 580:9, 580:12, 580:16, 580:18, 580:19, 580:20, 580:21, 581:7, 581:10, 581:14, 581:15, 581:19, 582:6, 582:7, 582:9, 582:16, 582:20, 583:2, 583:5, 585:20, 585:23, 585:24, 586:1, 586:2, 587:16, 587:17, 588:15, 588:20, 589:2, 589:18, 589:21, 593:14, 594:4, 594:7, 594:8, 601:11, 601:24, 605:24, 606:5, 606:9, 606:12, 608:8, 609:2, 609:5, 613:23, 615:4, 616:5, 616:11, 616:22, 617:1, 617:5, 634:24
**pipeline** - 545:11, 545:18, 601:16, 601:18, 601:21
**pipes** - 380:12, 380:23, 385:2, 520:4, 520:13, 520:14, 520:16, 544:12, 579:1, 614:2, 614:4, 615:23, 616:2
**piping** - 355:12, 356:6
**place** - 352:9, 371:1, 372:18, 389:3, 403:7, 403:8, 403:9, 446:1, 451:20, 462:9, 511:7, 511:11, 572:25, 586:9, 587:18, 588:15, 588:22, 589:2, 599:9,

603:16, 603:17, 605:5, 605:10, 605:21
**Place** - 515:20
**placed** - 350:13, 474:13, 489:17
**places** - 546:11, 592:16, 592:17
**plaintiff** - 502:22, 502:23, 561:2
**Plaintiff's** - 364:6, 389:4
**Plaintiffs** - 338:5, 338:13
**plan** - 353:12, 376:19, 377:8, 377:19, 377:22, 384:19, 386:7, 386:10, 401:24, 402:3, 402:6, 427:11, 502:15, 515:9, 533:12
**planned** - 359:2, 515:8
**planning** - 373:18
**plans** - 397:23, 398:3, 568:10, 571:2, 575:4, 575:6, 575:11, 603:11, 609:7, 609:8, 615:12, 615:24, 617:14, 617:17, 617:19
**plant** - 412:12, 413:8, 413:10, 432:4, 432:23, 433:16, 433:19, 433:20, 434:22, 435:18, 436:1, 436:3, 437:1, 438:9, 438:22, 447:11, 447:25, 449:6, 449:7, 450:12, 451:17, 458:18, 460:23, 462:3, 462:8, 463:3, 463:10, 465:2, 465:6, 465:19, 465:21, 625:18
**planted** - 412:19, 413:4, 426:17, 426:18, 427:14, 432:25, 434:15, 438:17, 448:1, 462:6, 466:11
**planting** - 426:5, 426:18, 427:17, 427:20, 434:1, 434:3, 436:18, 437:14, 437:23, 438:4, 438:6, 438:13, 440:2, 448:17, 452:25, 455:13, 458:16, 460:25, 461:1, 462:10, 465:18, 466:20
**plantings** - 426:10
**plants** - 433:13, 434:9, 462:12, 463:10, 465:2
**plastic** - 417:11
**plat** - 441:2, 471:1, 471:3, 472:14, 473:3, 506:13, 507:15
**plate** - 526:25
**platted** - 505:19, 507:12, 507:14, 509:5, 510:19
**played** - 596:3
**pleasant** - 559:15
**plug** - 582:19
**plugged** - 392:3, 392:5, 392:6, 392:12, 393:6, 569:9
**plugs** - 503:2
**plus** - 443:7, 464:18, 530:2
**Plus** - 395:24
**Pm** - 638:5
**pocket** - 537:21
**point** - 342:14, 357:11, 359:6, 390:2, 390:19, 392:10, 395:7, 411:4, 412:9, 425:4, 431:16, 436:15, 438:19, 447:7, 454:13, 458:11, 473:25, 475:5, 487:6, 494:15, 502:9, 517:8, 520:20, 522:14, 523:16, 533:11, 553:13, 554:4, 558:25, 584:7, 590:19, 596:17, 610:5, 618:24, 623:12, 625:8, 637:3
**Point** - 419:24, 511:11,

512:12
**pointed** - 358:17
**pointer** - 344:3
**pointing** - 378:15
**points** - 576:13, 576:14
**poke** - 580:8
**poked** - 580:9
**policy** - 614:19
**pond** - 355:2, 356:13, 356:14, 361:1, 361:6, 361:17, 362:21, 363:1, 552:7, 552:8
**ponding** - 345:21, 353:11, 356:8, 356:12, 404:7, 404:8, 404:11, 404:13, 404:15, 404:17, 404:19, 405:1, 405:4, 405:6, 405:17, 406:10, 406:13, 558:2
**ponds** - 362:23, 435:19
**pool** - 512:15
**Port** - 503:25, 504:4, 504:17, 505:5, 505:7, 505:8, 505:25, 506:2, 506:4, 507:6
**portion** - 486:12, 553:21, 573:11, 597:11
**portions** - 474:4
**posing** - 419:14
**position** - 393:8, 415:12, 416:9, 457:3
**possession** - 442:2
**possibility** - 578:20, 579:4, 606:9
**possible** - 415:15, 437:6, 449:15, 578:9, 619:2, 634:24
**possibly** - 559:9
**Possibly** - 464:1
**post** - 348:2, 482:3, 610:3, 610:10, 610:12, 627:25, 629:14
**post-sale** - 482:3
**posts** - 592:16, 592:17, 600:3, 628:5, 635:2
**potential** - 366:22, 514:21
**pound** - 621:14
**pounded** - 574:8
**pounds** - 400:15
**practicing** - 468:22
**pre** - 594:17, 594:22, 594:25, 603:4
**pre-construction** - 594:17, 594:22, 594:25, 603:4
**precautions** - 611:8
**predict** - 405:6
**predicted** - 345:14, 345:16, 345:22, 345:24, 346:1, 346:4, 363:21
**prefer** - 437:5, 499:6
**preference** - 340:8
**pregnant** - 517:24
**preliminary** - 506:13, 506:14
**Preliminary** - 506:15
**premade** - 571:3, 571:5
**premier** - 508:2, 511:9
**preparation** - 464:18
**prepare** - 354:13, 355:6
**prepared** - 355:13, 355:14, 395:16, 575:9
**preparing** - 395:12
**presence** - 637:14
**present** - 339:13, 481:25, 594:12
**preserve** - 510:25
**president** - 386:15, 386:17, 505:25
**press** - 478:14
**Presumably** - 581:6, 581:12
**presume** - 590:12
**pretend** - 566:1

**pretty** - 413:1, 418:6, 420:3, 426:21, 428:15, 433:10, 478:11, 497:23, 508:9, 510:21, 512:13, 519:16, 621:6, 630:6, 631:24
**Pretty** - 519:17
**prevented** - 438:13
**previous** - 351:13, 351:22, 368:1, 578:24
**previously** - 358:5
**price** - 476:5, 476:11, 480:10, 480:16, 480:17, 481:5, 481:25, 493:5, 506:19, 512:13, 518:20, 521:21, 556:8, 626:11
**priced** - 494:5, 550:8, 556:7
**prices** - 355:12, 362:6, 482:10, 482:11, 511:22, 556:8, 556:9, 556:11
**pricey** - 556:6
**pricing** - 362:5, 476:10, 494:24, 508:20, 509:2, 606:20
**primarily** - 468:6, 468:9
**primary** - 398:5, 398:9, 398:10, 476:3, 548:13, 548:19, 548:24
**principal** - 530:5
**privacy** - 465:19
**private** - 391:4, 391:20, 426:1, 469:8, 579:18, 579:21, 592:13, 598:20
**privilege** - 446:23
**probe** - 580:7, 580:12
**problem** - 354:7, 355:4, 359:24, 360:3, 376:10, 413:8, 423:10, 430:4, 435:1, 487:7, 498:12, 545:9, 545:21, 545:23, 546:13, 557:22, 558:2, 566:17, 624:23
**problems** - 426:3, 521:16, 523:5, 523:6, 556:17
**procedure** - 565:19
**procedures** - 611:12
**proceed** - 356:2, 423:6, 454:20, 561:20
**Proceedings** - 338:25
**proceedings** - 638:11
**process** - 369:20, 564:8, 577:22
**produced** - 338:25, 546:23, 595:4, 595:6
**producers** - 507:2
**product** - 574:22
**professional** - 386:20
**profit** - 537:22
**programs** - 438:4
**progressing** - 563:25
**project** - 343:17, 344:8, 344:16, 353:17, 355:10, 373:18, 373:23, 373:24, 385:14, 397:6, 412:13, 414:6, 416:13, 416:16, 416:23, 421:15, 562:13, 573:12, 577:20, 578:11, 580:15, 583:8, 583:14, 585:20, 587:4, 598:10, 599:17, 611:7, 616:25, 617:3, 620:19, 624:9
**promptly** - 502:15
**proper** - 354:12, 369:15, 404:5, 427:10, 450:20
**properties** - 468:11, 548:18
**property** - 347:15, 347:16, 347:18, 347:22, 348:3, 349:12, 350:2, 350:5, 351:24, 365:10, 365:11,

365:13, 365:18, 365:24,
366:2, 366:5, 367:4, 367:7,
372:1, 372:4, 374:1, 375:8,
375:21, 375:24, 375:25,
376:2, 376:3, 377:8, 377:18,
378:4, 380:11, 381:20,
381:21, 381:24, 382:15,
382:18, 383:3, 383:7,
383:22, 385:3, 389:2, 391:4,
391:20, 394:13, 394:14,
394:19, 395:1, 395:3,
395:20, 395:24, 396:7,
396:16, 401:9, 401:23,
406:17, 406:19, 406:23,
407:25, 409:5, 409:11,
409:16, 410:2, 410:24,
413:24, 414:10, 415:19,
416:17, 416:18, 419:3,
420:3, 420:10, 421:25,
422:2, 422:7, 424:20, 428:2,
428:11, 428:13, 428:14,
429:23, 430:2, 430:9, 440:5,
440:9, 442:15, 451:15,
451:18, 451:24, 452:13,
452:24, 453:1, 453:11,
456:24, 457:12, 458:19,
458:22, 459:3, 459:4, 459:6,
459:12, 459:24, 460:11,
460:13, 460:20, 460:21,
461:3, 462:16, 465:24,
468:8, 469:8, 469:12, 470:5,
474:16, 490:5, 490:22,
505:24, 507:14, 508:15,
509:5, 515:14, 519:21,
526:4, 541:15, 542:7,
542:20, 544:15, 547:2,
547:10, 547:14, 547:17,
547:20, 552:4, 552:17,
553:17, 553:21, 554:1,
565:15, 565:21, 571:11,
573:25, 579:18, 579:19,
579:21, 583:18, 583:22,
584:21, 585:21, 586:20,
588:3, 588:4, 588:5, 592:12,
592:13, 598:20, 599:23,
600:1, 600:19, 600:20,
604:10, 610:12, 610:14,
610:16, 610:20, 611:3,
611:24, 612:10, 612:16,
612:19, 612:22, 613:23,
614:2, 614:5, 614:7, 614:10,
623:13, 623:20, 624:16,
624:21, 628:2, 628:23,
628:25, 629:2, 632:22,
633:23, 634:23
  proposing - 455:13
  protection - 426:10,
633:20, 634:6
  proud - 426:21, 527:2,
527:4, 558:6
  proven - 495:20, 515:10
  provide - 634:6
  provides - 431:15
  providing - 409:9
  proximity - 448:7
  pubescent - 465:11
  publicizes - 444:22
  puddles - 345:20
  pull - 397:13, 422:5, 441:5
  pulled - 360:15, 418:19,
418:25, 420:6, 420:9,
420:10, 421:14, 538:17,
538:22, 538:25, 539:22,
568:16, 570:10, 590:17
  purchase - 514:14,
534:23, 535:11
  purchased - 509:17,
509:18, 550:22
  purchaser - 482:4, 501:18
  purpose - 393:8, 444:15,

514:12, 524:12, 548:13,
589:15, 594:20
  purposely - 622:19
  purposes - 472:15
  push - 401:2, 477:20,
543:1, 635:2, 635:3
  pushed - 401:18, 415:13,
415:18, 415:19, 527:18,
585:21
  pushing - 401:5, 401:15,
583:21, 588:3, 588:5
  Put - 503:14
  put - 342:16, 342:25,
345:9, 346:12, 348:8,
349:12, 350:10, 351:20,
351:21, 352:16, 353:8,
353:17, 355:1, 355:2,
357:11, 369:11, 369:22,
372:9, 381:25, 389:25,
396:1, 398:16, 398:22,
398:24, 399:15, 402:7,
409:17, 411:25, 412:8,
413:13, 413:15, 413:17,
414:1, 415:2, 417:3, 417:10,
417:12, 417:14, 417:15,
417:17, 422:12, 422:21,
425:3, 430:24, 431:5,
431:20, 432:17, 434:2,
435:8, 435:9, 435:25,
436:21, 438:11, 440:22,
446:8, 446:20, 448:5,
452:25, 459:23, 474:20,
486:12, 512:16, 515:22,
515:25, 516:3, 517:15,
518:18, 520:16, 526:24,
546:9, 548:17, 549:8, 553:4,
564:7, 565:14, 565:22,
574:1, 582:19, 583:23,
586:11, 586:25, 587:1,
588:22, 589:8, 589:9, 593:7,
607:13, 607:22, 610:21,
610:22, 617:19, 622:20
  putdown - 539:8
  puts - 561:13
  putting - 381:8, 401:22,
403:21, 415:16, 416:21,
429:16, 432:11, 450:19,
470:19, 521:6, 527:15,
577:15, 589:7
  Pvc - 608:8

Q

  qualified - 344:20, 354:13,
355:3, 484:4
  qualifying - 478:15
  quality - 465:20
  quarter - 629:7
  question-and-answer -
517:5
  questioning - 502:2, 618:6
  questions - 357:19,
377:16, 383:15, 386:1,
390:1, 395:16, 423:1, 423:4,
424:23, 443:13, 443:23,
466:16, 483:12, 499:8,
502:5, 531:24, 557:11,
558:10, 564:25, 572:5,
602:18
  quick - 478:21
  quicker - 383:18
  quickly - 528:9
  Quite - 468:14
  quite - 355:19, 382:22,
426:7, 447:2, 457:9, 478:16,
485:19, 493:24, 499:13,
508:8, 575:23
  quote - 524:8, 541:6

R

  rabbits' - 463:5
  Radio- 582:2
  rail - 577:19, 579:14,
597:15, 601:20
  railings - 527:16
  railroad - 342:10, 343:7,
344:7, 345:17, 347:19,
347:23, 358:25, 365:11,
365:18, 365:24, 366:1,
366:2, 366:5, 374:1, 375:24,
376:2, 377:8, 378:4, 378:5,
378:10, 381:1, 381:19,
381:24, 381:25, 382:14,
382:17, 384:1, 384:20,
387:6, 388:21, 388:23,
389:2, 391:3, 391:19,
392:18, 392:20, 393:14,
393:17, 393:18, 394:1,
394:13, 394:14, 394:25,
395:2, 395:20, 401:2, 401:7,
401:12, 401:14, 404:20,
408:6, 409:2, 409:11,
414:20, 414:24, 414:25,
415:3, 417:22, 418:2, 420:2,
421:12, 422:2, 428:18,
428:20, 447:5, 447:6,
449:23, 451:15, 451:23,
451:24, 452:13, 459:24,
460:11, 472:6, 472:7,
473:11, 473:15, 473:20,
473:23, 476:17, 476:21,
476:22, 476:23, 477:2,
477:3, 477:10, 477:12,
479:25, 480:4, 486:1,
490:22, 493:11, 494:16,
494:19, 498:12, 510:24,
519:20, 523:7, 540:23,
542:6, 546:17, 550:5,
550:17, 550:23, 551:18,
551:22, 552:23, 553:17,
554:1, 562:24, 568:10,
571:10, 571:13, 577:14,
579:13, 579:19, 579:21,
583:20, 583:21, 584:12,
584:14, 584:16, 584:20,
590:16, 592:8, 592:12,
598:3, 598:7, 610:19, 611:3,
612:19, 612:22, 614:7,
614:11, 616:14, 621:4,
621:5, 621:23, 621:25,
625:8, 627:1, 627:4, 627:25,
628:5, 628:23, 628:25,
629:2, 629:11, 629:14,
629:24, 630:14, 630:18,
630:20, 630:22, 632:8,
633:8, 633:21, 634:22
  railroad's - 452:24, 543:12
  railroads - 580:4
  railway - 578:10, 597:4,
597:9
  rain - 363:23, 364:13,
405:7, 406:6, 406:17,
406:23, 434:2
  rainfall - 385:16
  rains - 433:22
  rainwater - 342:17, 385:18
  rake - 359:16
  ran - 399:21, 534:25,
535:12, 535:17, 544:6,
555:18, 563:18
  range - 424:24, 530:19
  rate - 438:8, 449:19,
463:21, 495:21, 530:8, 530:9
  rather - 432:5, 442:17,
447:4, 449:14
  Rather- 359:21
  ray - 390:21

  Ray- 392:24, 520:19,
520:22, 521:4, 523:4, 579:10
  Rca/whirlpool- 503:24
  reach - 359:14
  reached - 554:9
  read - 368:20, 369:10,
370:11, 377:13, 491:10,
491:15, 491:17, 530:18,
542:1, 542:2, 543:6, 543:9,
546:4, 608:17, 608:19,
608:21
  reading - 346:23, 532:20
  ready - 432:4, 507:15
  real - 397:9, 405:2, 426:12,
430:4, 431:1, 467:23, 478:1,
478:6, 478:21, 479:6,
498:16, 499:6, 499:25,
588:11, 609:24, 618:17,
622:12, 636:7
  realize - 400:20, 515:6,
539:2
  really - 342:14, 346:6,
359:22, 361:15, 364:25,
367:24, 368:4, 372:18,
391:16, 391:25, 392:7,
392:25, 393:4, 396:21,
396:24, 407:8, 412:10,
413:6, 423:9, 462:25,
473:10, 478:18, 479:1,
497:21, 498:2, 498:6, 499:5,
508:8, 510:3, 519:17, 523:4,
539:11, 551:3, 569:4,
588:13, 605:9, 615:1
  realtor - 517:22
  Realty- 500:6, 517:25
  rear - 401:23, 435:17,
525:5, 557:22, 558:4, 612:15
  reason - 341:4, 341:8,
365:15, 365:16, 402:10,
448:20, 487:11, 514:11,
548:6, 548:7, 548:19, 549:7,
588:25
  reasonable - 354:6,
356:19, 431:18, 437:15,
448:15, 474:14, 475:12,
479:8, 480:14, 481:1, 483:9,
577:3
  reasons - 372:17, 444:16,
476:15
  reassembled - 561:11
  rebuild - 453:9
  received - 426:12, 426:16
  recent - 491:15, 495:25
  Recently- 478:12
  recently - 429:3, 479:1,
564:20, 613:9
  reception - 510:23, 511:13
  recess - 425:3, 425:6,
502:10, 502:21, 561:14,
638:4
  Recess- 425:7, 561:15
  recession - 504:8, 504:10,
504:21, 504:24, 504:25,
510:7, 510:8, 510:9, 515:5,
540:21
  recite - 369:16
  recognize - 563:8, 595:15
  recognized - 426:7,
444:22
  recollection - 556:16
  reconnecting - 616:22
  reconvene - 502:17
  Reconvened- 339:1
  record - 339:3, 339:11,
472:16, 487:20, 487:23,
495:20, 502:14, 558:15,
562:2, 591:5, 593:8, 593:9,
619:16, 637:13, 638:11
  recorded - 338:25
  records - 400:7, 400:8,

492:20
**recreate** - 433:3, 434:14, 434:21, 448:6, 460:7
**recreating** - 459:8, 460:10
**red** - 433:18, 447:16
**redid** - 387:20
**redirect** - 423:3, 466:14, 500:16, 557:15, 617:8, 636:17
**Redirect**- 423:13, 466:18, 500:19, 557:19, 617:11, 639:7, 639:13, 639:19, 640:1, 640:11
**refer** - 342:9, 343:7, 367:9, 436:6, 439:14, 463:4, 471:25, 480:19, 486:11, 496:5
**reference** - 346:14, 428:5, 553:7, 572:22, 574:14, 610:15, 610:22
**references** - 546:19
**referencing** - 354:11, 587:16
**referred** - 472:2, 478:13
**referring** - 348:2, 360:6, 396:6, 396:11, 436:13, 441:7, 504:14, 516:14, 532:6, 610:23, 618:15
**refers** - 558:22
**refilled** - 597:18
**reflect** - 339:11
**refrain** - 567:11
**refreshes** - 556:16
**regard** - 344:15, 429:16, 437:14, 523:15, 605:21, 609:1
**regardless** - 436:7
**region** - 377:23
**registered** - 422:24
**regular** - 552:7, 552:9
**Reichle**- 500:5, 500:7
**reinstall** - 606:12
**related** - 440:24, 469:9
**relationship** - 589:21
**relatively** - 476:5
**relevance** - 529:15, 631:15, 635:17
**relevant** - 530:17, 604:8
**reliable** - 496:2
**relied** - 385:1, 385:17
**relies** - 384:20
**reluctant** - 619:10
**rely** - 377:17, 381:2
**remain** - 339:25
**remaining** - 473:5, 550:3
**remains** - 417:22
**remarks** - 399:8, 435:12
**Remarried**- 503:23
**Remember**- 425:6, 618:6
**remember** - 368:6, 368:16, 372:6, 372:7, 374:9, 384:18, 385:8, 402:16, 428:6, 502:17, 541:21, 555:4, 561:13, 577:2, 580:25, 589:6, 595:9, 595:12, 598:14, 615:21
**remembered** - 385:10
**remind** - 637:20
**remnants** - 584:14, 584:16, 584:22, 592:4, 592:14, 592:21, 621:25, 626:20, 626:22
**remodeling** - 508:4, 539:4
**removal** - 441:20, 474:10, 478:10, 605:21
**remove** - 612:19, 612:21, 633:25
**removed** - 342:3, 368:9, 413:22, 413:24, 417:8, 419:1, 428:1, 432:2, 443:2,

**recreate** 457:11, 457:12, 457:14, 464:13, 473:14, 486:19, 490:15, 597:20, 597:23, 598:9, 608:24, 608:25, 609:6, 612:22
**removes** - 484:22
**removing** - 349:14, 472:21, 496:13, 496:14
**renderings** - 506:16
**rent** - 364:15, 540:8
**renting** - 373:15
**reopened** - 577:23
**repair** - 355:6
**repaired** - 387:21
**repairs** - 372:19
**Repeat**- 612:8, 613:11
**repeat** - 580:24, 581:2, 614:9
**rephrase** - 352:20, 382:10, 424:5, 435:12, 444:7, 445:7
**replace** - 430:5, 430:20, 430:21, 440:16, 440:22, 447:11, 451:18, 451:22, 452:12, 452:19, 453:5, 455:15, 457:25, 464:15, 464:17, 588:21, 608:22, 626:5
**replacement** - 429:16, 441:20, 457:20, 457:21, 457:24, 458:15, 458:16, 608:23, 609:10
**replacing** - 381:15, 457:17, 457:18, 458:20, 459:11, 459:23, 460:1, 464:21, 464:24
**replant** - 427:12, 433:10, 433:12
**replanting** - 466:23
**replants** - 434:7, 434:8
**replied** - 384:12, 384:17
**replow** - 553:10
**reply** - 384:9, 384:11, 384:15
**report** - 471:11, 473:1, 473:4, 481:12, 483:3, 484:14, 485:17, 491:4, 491:25, 499:18, 570:15
**reporter** - 454:16, 637:16
**Reporter**- 338:21, 637:17
**represent** - 358:1, 451:4, 572:17, 596:15
**representative** - 592:15
**representatives** - 566:23
**represented** - 439:9, 440:20
**representing** - 483:22
**reputable** - 484:8
**request** - 631:6
**requested** - 634:23, 635:7
**require** - 437:6, 594:23
**required** - 575:25, 576:8, 595:2
**requirements** - 437:21
**reroute** - 401:25
**research** - 466:10, 476:3
**reservations** - 509:14
**reside** - 339:18, 339:20
**residence** - 616:13
**residential** - 468:7, 469:1, 479:7, 481:19, 505:12
**resolve** - 584:10
**respect** - 355:22, 441:22
**responsibility** - 573:14
**responsible** - 361:4, 362:3, 533:24, 534:1
**responsive** - 386:3, 458:7, 558:10
**rest** - 393:1, 478:12
**restaked** - 586:19
**restate** - 496:22, 604:14

**restrictions** - 510:20, 512:16
**result** - 554:9
**resulted** - 346:17
**resume** - 475:4
**retail** - 468:10, 468:11, 470:10, 481:23, 482:10, 501:17
**Retail**- 482:10
**retaining** - 408:6, 410:11, 410:19
**retention** - 355:2, 356:13, 360:25, 361:6, 361:17, 362:21, 362:23
**Retention**- 356:14
**retire** - 504:7
**retired** - 425:19, 426:22
**retiring** - 425:23
**return** - 482:1, 637:20
**reveal** - 624:15
**revenue** - 540:11
**reviewed** - 355:11, 358:7
**reviewing** - 395:12
**ribbon** - 375:1, 375:17
**ribbons** - 374:19, 374:20, 375:11, 621:19
**Ric**- 350:19, 351:1, 351:4, 390:22, 392:16, 393:5, 393:8, 393:10, 416:10, 416:12, 416:22, 417:12, 544:3, 544:10, 562:8, 562:9, 567:14, 573:4, 573:7, 574:1, 574:25, 583:13, 586:12, 608:16, 616:9, 616:22, 620:22, 629:10
**Ric-man**- 350:19, 351:4, 390:22, 392:16, 393:5, 393:8, 393:10, 416:10, 416:12, 544:3, 544:10, 562:8, 562:9, 567:14, 573:4, 573:7, 574:1, 574:25, 583:13, 586:12, 608:16, 616:9, 616:22, 620:22, 629:10
**Ric-man's**- 351:1, 416:22, 417:12
**Richard**- 469:16, 500:3
**rid** - 353:12, 370:20, 486:10, 543:24, 559:19
**Ridge**- 521:14, 521:15, 534:8, 534:16, 548:8, 548:11, 548:20, 548:21, 548:25
**riding** - 637:22
**right-of-way** - 396:25, 401:7, 401:12, 401:15, 408:24, 409:2, 420:2, 421:12, 552:23, 562:24, 571:13, 573:18, 574:9, 580:21, 584:20, 585:20, 586:19, 589:5, 590:17, 591:24, 597:13, 598:3, 598:7, 598:13, 598:19, 600:3, 600:17, 605:4, 616:14, 621:4, 621:5, 633:17
**rim** - 387:14, 388:2
**ringing** - 456:3
**rings** - 548:4
**rivalry** - 456:19
**River**- 342:17, 342:23, 353:20, 356:7, 356:15, 357:15, 357:17, 378:2, 476:6, 497:10, 497:13, 506:11, 507:4, 552:1, 552:6, 528:18, 528:20, 551:24, 552:4
**Rmr**- 338:21, 638:15
**road** - 352:14, 443:8, 445:21, 473:22, 497:10,

507:5, 511:7, 632:20
**Road**- 342:17, 342:23, 353:20, 356:7, 357:16, 357:17, 378:2, 418:11, 476:6, 497:11, 497:13, 506:10, 506:12, 507:4, 521:18, 552:1, 552:6, 553:22, 562:17, 562:18, 571:15, 591:8, 596:12, 604:5, 604:6
**roads** - 470:20, 604:5
**Robert**- 338:17, 467:13, 467:18, 483:16, 500:19, 639:15, 639:17, 639:19
**Robon**- 338:13, 340:14, 341:12, 341:15, 341:19, 341:22, 345:25, 347:4, 348:2, 348:11, 349:5, 349:9, 350:15, 352:20, 352:23, 354:3, 354:15, 354:24, 355:9, 357:18, 361:7, 361:9, 364:2, 378:18, 378:21, 382:3, 382:5, 383:9, 383:12, 385:23, 393:21, 393:24, 395:14, 412:17, 423:4, 423:8, 423:14, 423:23, 424:5, 424:7, 424:23, 425:11, 425:14, 427:24, 429:9, 435:7, 435:15, 439:7, 441:14, 441:23, 444:7, 445:2, 445:7, 445:8, 450:11, 450:24, 459:13, 466:15, 466:19, 467:4, 467:9, 467:14, 472:23, 475:5, 475:7, 477:19, 477:24, 483:12, 484:10, 500:17, 500:20, 501:6, 501:7, 502:5, 502:24, 503:2, 503:7, 524:24, 525:3, 527:19, 528:5, 528:11, 528:12, 529:18, 529:25, 530:15, 531:7, 531:21, 531:24, 535:5, 538:9, 546:3, 552:24, 553:4, 557:16, 557:20, 558:16, 559:7, 560:3, 560:8, 560:23, 561:5, 563:6, 563:10, 565:3, 567:12, 572:5, 580:23, 581:17, 582:11, 585:8, 602:15, 602:21, 602:24, 604:12, 610:7, 610:9, 610:17, 610:18, 612:21, 613:1, 614:25, 617:7, 618:22, 623:23, 624:3, 624:12, 625:13, 625:15, 626:17, 627:11, 627:15, 627:19, 627:22, 630:7, 630:13, 632:9, 632:13, 632:14, 633:2, 633:4, 633:11, 633:13, 633:15, 634:4, 634:14, 636:16, 639:4, 639:8, 639:10, 639:14, 639:16, 639:20, 639:22, 640:2, 640:6, 640:10, 640:16
**rocks** - 542:23, 559:10
**Rocky**- 521:14, 521:15, 534:8, 534:16, 548:8, 548:11, 548:20, 548:21, 548:25
**rod** - 580:7
**Roger**- 425:13, 425:18, 451:2, 466:18, 639:9, 639:11, 639:13
**role** - 355:10, 620:24
**roll** - 586:2
**room** - 460:16, 491:11, 513:7, 564:21, 576:18, 577:24, 598:9
**root** - 432:8, 437:8, 613:21
**roots** - 349:15, 349:21,

350:1, 351:10, 411:7,
436:11, 613:8, 613:14
**Rose**- 518:23, 522:6
**rose** - 462:6, 462:11,
462:14, 463:1
**Rossford**- 476:2, 476:8,
498:15, 498:16, 499:11,
536:12
**Rossford's**- 498:20
**rotten** - 598:25, 599:2
**rough** - 396:21
**Roughly**- 379:22, 400:19,
575:21
**roughly** - 345:8, 372:22,
400:18, 525:20, 531:10,
576:23, 629:4
**round** - 341:7
**rounded** - 440:13
**row** - 343:21, 343:22,
343:24, 343:25, 344:8,
344:9, 519:20
**rows** - 343:18, 344:6,
344:8, 519:18, 519:19
**ruined** - 522:12, 522:13
**rules** - 425:6, 502:17,
561:13
**ruling** - 514:17
**run** - 342:17, 428:16,
445:21, 476:17, 511:18,
518:9, 526:10, 555:13,
559:12
**running** - 343:10, 439:15,
439:24, 512:3, 634:20
**rushed** - 502:16

## S

**sac** - 490:10, 522:18
**safe** - 630:14, 630:17,
637:19, 637:20
**safely** - 634:24
**Safety** - 586:8
**safety** - 586:9, 588:12,
588:17, 589:3, 604:21,
605:3, 605:16, 605:20,
611:12, 631:1
**sake** - 447:18
**sale** - 373:8, 373:12,
373:15, 482:3, 492:17,
501:12, 514:20, 514:21,
529:20, 557:8
**sales** - 352:11, 352:12,
352:15, 373:4, 470:13,
470:15, 470:17, 476:11,
476:25, 481:18, 495:4,
499:3, 500:23, 510:21,
518:3, 518:11, 536:15,
540:19, 540:20
**salesman** - 504:3
**salute** - 456:5
**sample** - 433:20
**samples** - 432:14
**Sanberg** - 353:18, 354:16,
355:22, 355:24, 356:4
**Sanberg's** - 355:10, 356:3
**sanctuary** - 446:23
**sat** - 398:17, 423:19,
483:23, 508:20
**saved** - 616:22
**saving** - 636:2
**saw** - 342:18, 345:19,
358:16, 360:2, 360:16,
372:1, 374:7, 374:14,
374:20, 375:10, 375:13,
375:23, 376:3, 389:6,
406:16, 406:19, 407:7,
409:24, 411:17, 411:19,
411:24, 415:22, 418:24,
420:8, 424:21, 462:17,
462:18, 462:19, 466:3,

486:18, 486:20, 513:4,
525:19, 550:17, 558:20,
564:15, 568:20, 582:7,
595:15, 603:9, 603:20,
612:11, 613:2, 615:16,
615:20, 615:22, 621:20,
622:2, 622:19, 622:20,
628:8, 633:19, 633:20
**scared** - 512:1
**Scared** - 512:2
**scheduled** - 353:4,
518:21, 548:8
**scheme** - 377:23
**Schoen** - 501:9, 501:14,
508:5, 511:20, 511:23,
514:25, 515:1, 537:4, 539:3
**Schoen's** - 537:9
**School** - 503:20
**school** - 426:3, 467:20,
467:21, 476:2, 477:9,
477:11, 503:22, 549:23,
550:1
**schools** - 476:8, 498:15,
498:16, 499:7, 499:11
**scientific** - 462:24
**scoop** - 568:16, 569:3,
569:6, 606:23, 607:8, 607:9,
607:13, 607:15, 607:16,
607:18, 607:21
**scooper** - 618:8
**scope** - 607:6
**scrape** - 618:5, 618:11,
618:13
**scraping** - 401:11
**scrapings** - 401:11
**screen** - 369:10, 370:9,
370:22, 524:13, 571:22,
589:22, 590:20, 590:21,
595:20, 600:13, 601:7,
627:13, 627:14
**screening** - 523:22
**scrub** - 461:10, 486:3
**se** - 485:18
**seal** - 381:4
**search** - 463:17
**seat** - 346:8, 378:20,
381:18, 457:2, 477:18,
619:18, 630:10
**second** - 343:21, 343:22,
438:13, 501:8, 510:14,
513:8, 513:17, 514:18, 533:2
**secondhand** - 405:5
**seconds** - 399:5, 607:24
**section** - 578:18, 579:14,
594:3, 608:22, 609:3
**Section** - 608:22
**sections** - 339:19
**sediment** - 582:10
**see** - 342:3, 342:20, 344:5,
345:2, 347:19, 349:13,
350:1, 350:2, 360:19, 363:8,
370:16, 370:23, 371:21,
374:4, 374:9, 375:20,
377:15, 377:19, 378:15,
378:18, 389:4, 394:16,
395:4, 396:1, 401:10, 402:6,
404:22, 406:23, 410:6,
410:8, 414:9, 414:11,
418:16, 419:22, 420:8,
420:12, 421:8, 422:17,
424:9, 424:14, 429:23,
431:5, 431:10, 451:25,
454:3, 454:6, 454:8, 455:1,
462:20, 472:3, 473:7, 481:9,
484:19, 484:21, 485:6,
485:11, 485:22, 486:4,
486:15, 486:17, 486:18,
486:22, 487:2, 487:7,
487:11, 487:17, 487:18,
487:19, 488:11, 488:14,

488:24, 489:6, 489:10,
489:15, 489:20, 489:21,
489:24, 490:11, 497:21,
503:3, 517:6, 518:18,
518:19, 522:17, 522:20,
525:23, 526:24, 532:6,
532:9, 532:12, 542:10,
544:22, 544:23, 550:5,
555:15, 556:16, 558:14,
559:17, 564:13, 564:14,
565:14, 567:24, 567:25,
568:1, 568:3, 569:19,
578:25, 580:4, 582:6, 585:2,
585:5, 585:17, 588:13,
588:24, 590:15, 591:22,
592:18, 593:11, 593:12,
593:16, 593:23, 594:23,
595:22, 597:8, 597:14,
598:5, 599:14, 600:5, 600:6,
600:8, 600:10, 600:12,
600:13, 601:1, 609:12,
609:15, 609:23, 609:25,
614:21, 614:22, 614:23,
616:2, 616:20, 622:1,
624:24, 627:13, 629:3,
631:11, 634:11, 634:16,
636:7
**See** - 590:22
**seeds** - 434:12, 447:18
**seeing** - 451:10, 524:12,
571:10, 571:14, 571:25,
593:3, 597:2, 597:12,
597:19, 597:22, 615:21
**seem** - 600:17, 603:9,
619:9
**segmented** - 354:20
**select** - 427:10, 437:25
**selected** - 447:15, 476:16,
477:7
**self** - 376:19, 377:10,
377:11, 483:1
**self-contained** - 376:19,
377:10, 377:11
**self-interest** - 483:1
**sell** - 373:6, 474:18,
481:24, 482:7, 492:7, 492:9,
492:12, 495:8, 495:11,
504:13, 504:18, 504:23,
507:18, 507:19, 512:14,
522:15, 523:18, 526:11,
533:14, 549:3, 549:24, 550:2
**seller** - 482:23, 483:1,
549:21
**sellers** - 482:16, 482:19
**selling** - 482:6, 491:5,
494:16, 494:23, 495:1,
495:17, 515:7, 529:21,
550:10, 556:5
**sells** - 455:22, 537:19
**semantics** - 494:11
**send** - 398:15, 428:3,
637:19
**sense** - 358:18, 452:14,
472:20, 559:22
**senseless** - 522:1
**sensible** - 433:14
**sent** - 383:4, 383:20,
428:2, 428:4, 524:8
**separate** - 377:25, 378:1,
378:2
**separates** - 472:5
**September** - 555:23
**series** - 587:10
**served** - 392:23, 393:1,
393:8
**Service** - 620:8
**service** - 540:3, 620:4,
620:10
**serving** - 444:15
**set** - 518:17, 518:23,

522:20, 556:9, 564:5, 590:18
**setting** - 437:3
**settle** - 413:18, 534:14
**settled** - 507:19
**Seven** - 388:4, 388:8
**seven** - 366:12, 433:15,
434:17, 435:25, 453:19,
460:8, 464:4, 479:19,
569:22, 636:14
**seven-foot** - 636:14
**several** - 358:3, 387:22,
417:14, 417:15, 466:23,
506:16, 538:16
**severed** - 363:23, 605:25
**Sewer** - 521:3, 521:4
**sewer** - 470:20, 523:7
**sewers** - 357:17, 608:23
**shade** - 409:9, 445:18,
446:1, 625:21
**shaded** - 471:5
**shallow** - 618:13
**share** - 341:21
**shed** - 345:15, 346:5,
450:3
**sheet** - 531:12, 537:25
**Sherman** - 339:12, 339:15,
341:2
**shiny** - 593:14
**shoots** - 367:2, 409:13,
421:1
**short** - 368:5, 368:19,
381:5, 386:2, 521:25, 561:10
**shorten** - 619:7
**shortly** - 500:12, 520:15
**shot** - 522:13
**shoulder** - 486:6
**shoulder-high** - 486:6
**shovel** - 570:12, 570:13
**show** - 345:11, 346:22,
348:5, 349:14, 349:15,
357:3, 370:9, 371:16,
419:13, 429:19, 441:3,
441:18, 453:15, 475:20,
501:17, 502:11, 527:20,
528:9, 532:17, 539:8,
587:11, 588:25, 589:16,
589:22, 591:19, 610:7,
610:19, 611:2, 613:8,
613:19, 613:25, 614:25,
615:13, 627:11, 627:19,
630:7
**showed** - 348:18, 352:2,
372:15, 430:13, 430:14,
471:5, 525:16, 546:23
**showing** - 348:17, 352:1,
500:23, 525:19, 547:13,
565:15, 568:10, 579:13,
591:24, 598:18, 598:20
**shown** - 343:20, 344:14,
345:8, 346:10, 346:13,
407:16, 438:25, 526:13,
609:7, 609:8, 615:24
**shows** - 343:16, 349:1,
349:21, 385:1, 415:5,
429:17, 435:13, 441:3,
442:4, 471:1, 501:9, 527:25,
531:8, 588:12, 588:14,
589:16
**shrubbery** - 444:11,
481:11
**shrubs** - 444:14, 444:19,
458:18
**shut** - 539:4, 539:5
**side** - 340:12, 340:22,
342:11, 342:19, 343:11,
345:3, 349:10, 358:23,
360:1, 360:5, 360:9, 360:12,
366:3, 399:7, 408:15,
410:11, 410:18, 420:9,
447:5, 451:10, 453:2,

453:16, 463:24, 473:22, 474:24, 480:2, 480:3, 497:10, 497:20, 543:22, 552:1, 563:3, 563:5, 568:9, 569:20, 570:10, 570:24, 582:17, 582:20, 594:6, 600:13, 603:20, 607:22, 621:6, 621:7, 621:15, 621:17, 633:5, 633:6, 633:7, 633:16, 634:10, 634:22, 635:12

**side-bar** - 340:22
**sided** - 395:11
**sides** - 339:13, 564:14, 567:9, 619:20
**sideways** - 415:5
**sign** - 419:13, 526:21, 631:11, 632:23
**Signed** - 509:11
**signed** - 518:22
**significant** - 383:4, 486:7, 493:16, 493:23, 493:25
**Significantly** - 493:14
**signs** - 347:12, 548:17
**silt** - 419:25
**silvery** - 465:11
**similar** - 429:11, 462:14, 481:18
**simple** - 448:20
**simply** - 361:15, 436:13, 449:3
**single** - 479:7, 482:4, 495:8, 495:11, 536:3, 536:6, 536:8, 557:8
**single-families** - 536:8
**single-family** - 479:7, 536:3, 536:6
**sit** - 381:14, 498:14, 512:11
**site** - 471:4, 566:17, 581:21, 582:6, 585:6, 585:17, 587:7, 591:8, 591:10, 603:17, 604:18, 606:1, 606:24, 607:10, 609:16, 615:8, 615:9
**sitting** - 380:18, 395:17, 428:19, 485:10, 487:1, 487:22
**situation** - 342:6, 381:7, 386:13, 403:24, 427:13, 427:20, 436:4, 476:20, 520:10, 524:7, 566:7, 609:1
**situations** - 426:4
**six** - 397:10, 408:9, 408:11, 429:5, 429:21, 429:24, 431:20, 431:25, 432:6, 433:15, 434:19, 436:20, 437:2, 440:7, 442:10, 447:12, 448:13, 448:14, 449:6, 449:16, 450:7, 450:8, 450:12, 453:19, 459:14, 459:15, 460:7, 460:12, 461:25, 462:15, 463:14, 466:24, 467:2, 479:10, 480:13, 481:24, 482:24, 488:17, 504:4, 516:6, 530:11, 562:10, 575:21, 608:5, 614:3, 621:14, 623:3, 626:25, 627:4, 629:15, 630:16
**Six** - 357:6, 449:8, 449:11, 505:20, 505:21
**six-foot** - 437:2, 460:12, 463:14
**size** - 405:24, 429:24, 433:14, 434:16, 463:13, 476:14, 591:16
**skinned** - 613:20
**skinned-up** - 613:20

**slide** - 515:4
**Slogan** - 509:19
**slope** - 576:15
**slopes** - 490:5
**slow** - 389:12
**slower** - 581:4
**small** - 345:21, 359:12, 359:13, 398:11, 404:15, 422:6, 585:22, 587:20, 623:22
**smaller** - 447:22
**snappy** - 383:15, 383:16
**snapshot** - 496:3
**soil** - 426:9, 426:10, 432:4, 432:14, 432:15, 432:19, 433:19, 433:20, 436:5, 436:10, 436:12, 436:13, 436:14, 436:17, 436:18, 437:5, 437:6, 437:8, 437:20, 437:21, 438:23, 439:19, 439:20, 439:21, 439:22, 447:13, 447:15, 447:20, 448:20, 465:3
**soils** - 427:9, 427:21, 436:4
**solid** - 426:20, 473:12, 473:21, 476:20, 491:23, 491:24, 492:1, 492:22, 493:1, 493:4, 496:2, 501:9, 501:19, 505:7, 505:8, 509:25, 511:1, 513:24, 513:25, 514:3, 514:4, 514:6, 514:8, 514:9, 514:10, 514:13, 514:22, 514:24, 515:1, 516:22, 534:16, 534:18, 534:22, 536:2, 537:3, 537:4, 537:24, 537:25, 538:3, 538:7
**solid** - 378:9, 379:9, 420:25, 564:17
**solved** - 435:1
**someone** - 354:5, 361:16, 392:19, 614:18, 637:22
**someplace** - 442:17
**Sometime** - 519:5
**sometime** - 367:19, 370:15, 498:2, 563:16
**sometimes** - 374:25, 566:18
**Sometimes** - 630:4
**somewhat** - 381:6, 489:6, 496:24
**somewhere** - 374:21, 378:15, 379:3, 379:13, 379:18, 426:19, 428:7, 433:15, 461:25, 462:23, 491:11, 550:11, 593:25, 628:2, 628:12
**son** - 343:6, 359:10, 364:6, 365:1, 367:10, 367:18, 370:12, 371:18, 371:23, 372:4, 372:22, 373:14, 407:10, 516:9, 516:23, 516:25
**son's** - 348:20, 372:11
**Soncrant** - 391:19, 579:6, 615:6
**sorry** - 340:18, 340:20, 394:6, 419:12, 429:2, 448:24, 456:2, 464:23, 471:10, 482:17, 484:23, 487:13, 496:22, 502:20, 503:11, 504:20, 508:13, 508:18, 549:16, 583:7, 630:9, 632:13, 633:2, 633:11
**Sorry** - 344:6, 396:19, 398:21, 588:9
**Sort** - 445:14
**sort** - 381:8, 381:25, 402:18, 433:17, 437:23

**sound** - 430:10, 431:6, 440:17, 444:18, 446:24, 558:10, 595:18
**source** - 599:5
**sources** - 447:23
**south** - 600:20
**southeast** - 469:22, 479:4, 510:5
**southern** - 425:20
**Southfield** - 469:20, 500:3
**Sp** - 608:18
**space** - 577:10, 578:2, 578:5
**spade** - 413:7
**speaking** - 411:6, 501:14
**spec** - 373:3, 373:4, 492:6, 511:24, 512:7, 515:21, 519:5, 539:25, 540:11, 540:23, 554:21, 555:14
**special** - 365:13
**specialize** - 397:22, 398:2
**specialized** - 397:25
**specialties** - 427:6
**specie** - 427:11, 432:24, 440:13, 444:12, 446:4
**species** - 432:22, 432:23, 433:16, 438:21, 439:11, 447:11, 447:14, 449:7, 461:25, 464:24, 626:10
**Species** - 462:21
**Species-wise** - 462:21
**specific** - 391:11
**specifically** - 365:10, 384:2, 390:4, 404:22
**specifications** - 575:2
**specs** - 609:3
**speculative** - 478:22, 492:4, 492:5, 515:21
**speech** - 517:5
**speed** - 392:7, 538:16
**spend** - 354:7, 457:20, 522:1
**spent** - 359:24, 511:23, 522:2
**Spielbusch** - 338:21
**spilled** - 401:17, 410:12, 411:18
**spinning** - 634:7
**spins** - 636:11
**spoils** - 601:2
**Spore** - 338:21, 638:14, 638:15
**spot** - 404:9
**spots** - 435:17, 587:2
**spread** - 462:8
**spring** - 498:3, 518:8, 557:21, 603:24
**Spring** - 338:19
**spruce** - 626:6
**square** - 554:23, 555:1, 607:2
**squat** - 412:16
**stacked** - 408:7
**stage** - 392:4
**staging** - 595:9
**stagnant** - 580:2
**stake** - 346:21, 347:14, 347:22, 348:7, 348:8, 350:5, 351:18, 351:24, 375:2, 419:9, 419:15, 421:25, 422:18, 574:12, 589:6, 592:25, 609:13, 610:22, 610:23, 610:25, 621:22
**staked** - 573:24, 583:8, 621:9, 621:21, 630:16
**stakes** - 350:3, 350:4, 350:12, 351:14, 351:19, 351:21, 359:25, 360:4, 360:8, 374:14, 422:15, 565:23, 574:6, 574:7,

574:13, 586:16, 586:17, 586:22, 587:1, 589:7, 625:9, 630:20, 630:22
**staking** - 573:15
**stand** - 376:16, 376:17, 378:19, 384:23, 394:4, 417:9, 456:5, 459:1, 473:6, 475:3, 486:14, 502:25, 528:8, 546:1, 546:13, 556:20, 602:20, 624:7, 624:13
**standard** - 406:3, 406:5, 406:7, 422:8, 452:11, 631:5, 631:19
**standing** - 345:4, 407:1, 407:2, 407:4, 418:2, 419:6, 420:18, 421:11, 421:24, 435:16, 435:18, 445:17, 487:7, 487:22, 488:9, 546:13, 558:2, 566:4, 594:4
**stands** - 607:4
**standstill** - 534:12
**stare** - 533:5
**start** - 355:5, 358:10, 433:13, 467:1, 485:8, 489:13, 490:14, 502:15, 522:23, 583:1, 594:21, 635:12, 635:20, 636:24, 637:11
**started** - 348:18, 348:23, 374:13, 376:24, 419:21, 425:20, 431:25, 434:10, 441:8, 483:23, 495:17, 495:23, 498:6, 504:2, 504:5, 504:9, 505:6, 507:11, 507:17, 510:18, 512:23, 514:5, 515:4, 523:2, 523:8, 526:24, 594:24, 599:18, 624:23
**starting** - 490:17, 545:2, 601:1, 637:7
**starts** - 439:2
**State** - 426:19, 440:10, 444:21, 456:8
**state** - 425:19, 426:17, 562:1, 572:14, 617:2, 620:1
**statement** - 427:15
**States** - 338:1, 338:11, 510:4, 510:10
**station** - 565:22, 595:12, 596:6
**Stationing** - 595:11
**stations** - 350:9
**Statistics** - 510:5, 510:10, 515:4
**Stawinski** - 513:25
**stay** - 442:5, 477:8, 565:6, 565:20, 566:4, 566:6, 566:8, 578:5, 611:22, 625:2, 625:5, 629:16, 631:12, 632:1, 632:3, 632:4
**stayed** - 438:2, 490:16, 490:18, 505:8, 601:14, 629:23
**staying** - 634:5, 635:8, 635:15
**steel** - 580:7
**stems** - 629:3
**stenography** - 338:25
**Step** - 342:3, 431:22
**step** - 424:24, 432:13, 452:4, 467:7, 502:8, 561:1, 572:8, 618:23, 636:19
**Steve** - 516:25
**stick** - 388:24, 447:14, 599:10
**sticks** - 388:16, 388:19
**stiff** - 510:21
**still** - 344:4, 373:12, 385:17, 395:8, 411:5,

411:20, 412:1, 414:5,
417:25, 418:1, 418:15,
421:18, 431:9, 443:10,
451:25, 484:18, 485:5,
485:11, 488:5, 491:1,
494:10, 502:22, 511:10,
535:24, 536:8, 536:13,
536:14, 536:21, 549:14,
549:17, 550:7, 560:2,
560:15, 569:19, 588:13,
592:5, 597:1, 598:22,
599:12, 600:13, 601:1
**Still** - 345:2
**stipulate** - 530:13
**stockholders** - 504:4,
504:6
**stockpiled** - 585:23,
587:17
**stone** - 513:5, 527:15
**stones** - 559:10
**stood** - 418:5, 442:19,
446:20, 560:11
**stop** - 352:14, 495:19,
519:6, 544:3, 544:8, 550:19
**stopped** - 368:4, 413:17,
495:17, 532:21, 556:5, 602:4
**storage** - 468:5
**stored** - 349:12, 368:3,
372:8
**storm** - 346:16, 357:17,
378:12, 378:13, 435:10
**story** - 423:16, 521:8,
521:25, 535:18, 585:3
**straight** - 383:8, 443:4,
487:8, 539:4, 621:8, 629:5,
633:6, 633:16
**straightened** - 368:2
**strategy** - 517:18
**straws** - 559:14
**street** - 442:24, 442:25,
443:1, 443:4, 444:3, 446:9,
450:20, 453:16, 457:13,
458:12, 474:25, 477:1,
480:2, 480:3, 480:6, 490:2,
490:8, 497:20, 527:10,
528:14, 552:9, 559:12
**streets** - 428:12, 510:19,
559:20
**stretch** - 396:8, 637:6
**stricken** - 531:3
**strike** - 531:5, 583:1,
610:15
**strip** - 470:10
**stripped** - 429:21, 431:21
**stroll** - 502:11
**strong** - 478:11
**structure** - 431:1, 494:25,
576:17, 617:20
**structures** - 431:9, 617:17
**strung** - 585:19
**studied** - 356:23, 364:25,
365:5
**study** - 345:15, 346:4,
376:10, 391:15
**studying** - 395:12
**stuff** - 346:24, 360:15,
416:4, 419:17, 421:10,
421:18, 422:3, 422:6,
422:21, 428:6, 444:14,
465:25, 497:17, 512:17,
522:7, 523:8, 532:16
**stumbling** - 548:24,
634:25
**stump** - 366:4, 409:24,
590:7
**stumps** - 366:1, 366:2,
366:7, 408:22, 408:24,
409:1, 409:10, 410:7,
429:23, 432:2, 432:7,
546:23, 547:19, 559:11,

613:14, 614:21, 614:23,
621:1, 626:22, 626:25,
627:24, 628:10, 629:10,
629:13, 630:1
**subcontractor** - 592:1,
602:13, 620:21
**subdivision** - 362:3,
397:23, 398:3, 406:10,
427:25, 430:15, 435:8,
435:9, 451:11, 459:3,
460:11, 460:13, 468:9,
470:18, 470:22, 471:1,
472:14, 473:8, 474:16,
476:5, 476:12, 476:25,
477:6, 477:10, 478:9,
480:18, 481:22, 482:4,
482:7, 494:24, 496:18,
496:20, 496:23, 506:10,
507:9, 507:24, 510:15,
519:3, 521:14, 521:17,
522:13, 522:15, 523:15,
523:17, 523:21, 525:10,
525:17, 525:21, 526:22,
526:24, 527:3, 530:22,
536:16, 536:19, 541:13,
543:11, 552:8, 557:25,
558:18, 559:8, 559:12,
559:16, 564:1, 565:7, 566:1,
566:2, 572:1, 597:8, 611:4,
611:8, 611:15, 611:20,
612:4, 612:12, 615:14,
617:22, 618:2, 623:2,
626:22, 628:18, 631:2,
633:20
**Subdivision** - 479:11,
573:13, 632:6
**subdivision's** - 451:18,
453:1
**subdivisions** - 468:13,
468:14, 470:15, 475:25,
476:4, 476:8, 476:16,
481:19, 497:24, 541:18
**subject** - 514:17
**subjects** - 398:14
**submitted** - 638:2
**subprime** - 478:14, 498:6
**subsequently** - 467:23
**substantial** - 488:19,
489:7
**substantially** - 488:15
**Substantially** - 488:18
**success** - 435:20
**successful** - 440:2, 507:8
**sudden** - 427:15
**sufficient** - 409:15, 577:24
**suggest** - 435:5
**suggesting** - 365:15
**suit** - 399:12
**suite** - 513:6, 513:12,
513:14, 513:16, 515:22
**Suite** - 338:14, 338:18
**summer** - 346:16, 489:7,
489:16, 498:3, 557:21, 558:1
**summertime** - 339:21,
447:2, 486:5
**superintendent** - 351:2,
567:13, 573:6, 573:9,
603:16, 606:17
**supervisor** - 570:18
**supplies** - 577:25
**support** - 499:25
**suppose** - 455:22, 541:6,
549:1
**supposed** - 364:21, 540:8,
631:22, 632:3
**supposedly** - 455:16,
487:24, 566:11
**surface** - 437:11
**surgeon** - 528:17
**surprise** - 426:12, 555:7

**surprised** - 466:2, 567:19,
603:9
**surrounding** - 419:17,
444:13, 497:19, 497:22,
562:21, 617:17, 617:20
**survey** - 349:18, 350:9,
374:14, 398:15, 417:10,
417:20, 419:9, 419:14,
420:21, 428:3, 428:4,
429:20, 430:2, 438:25,
441:15, 441:18, 441:25,
451:9, 471:4, 471:10, 554:8,
592:25, 610:23
**surveyed** - 430:3, 442:4
**surveying** - 374:24,
610:17
**surveyor** - 386:20, 422:23,
422:24, 429:17
**surveyors** - 348:25,
349:18, 422:18, 554:10,
574:5, 586:19, 589:7, 621:22
**surveys** - 441:22
**survival** - 438:8, 449:18
**Surviving** - 539:14
**surviving** - 539:15
**sustain** - 412:18, 514:19,
531:4, 553:6, 612:25, 634:2
**sustained** - 553:13
**Sustained** - 343:3, 523:14,
582:13
**swale** - 360:6
**swampy** - 413:15
**swath** - 636:14
**swear** - 619:15
**sweetgum** - 447:16
**swimming** - 512:15
**swing** - 446:1
**switch** - 461:7, 517:12
**sworn** - 425:8, 425:10,
467:11, 503:1, 561:16,
561:22, 572:10, 619:17
**synonym** - 496:12
**synonymous** - 524:22,
630:20
**system** - 342:11, 342:15,
353:17, 377:11, 377:25,
381:1, 384:7, 385:15,
405:12, 405:22, 405:23,
450:22, 477:11, 576:14,
576:15
**systems** - 437:8

**T**

**table** - 632:11
**talks** - 478:1
**tall** - 359:15, 408:10,
433:13, 434:20, 445:10,
448:18, 450:12, 450:14,
461:17, 461:22, 463:14,
488:14, 488:23, 604:3,
621:14, 626:6, 631:20
**Tall-** 422:14
**taller** - 465:9, 600:5,
600:17
**tallest** - 604:2
**tame** - 369:7
**Tandem-** 591:12
**tandem** - 400:10, 568:25,
569:2, 591:14
**tangle** - 463:3
**tangled** - 463:6, 466:6
**tap** - 382:24, 383:1, 384:3,
543:12
**tapped** - 543:17, 543:19,
543:21
**tapping** - 381:7
**task** - 398:5, 398:9
**tasks** - 398:10
**tax** - 531:14

**taxes** - 529:5, 529:7,
531:9, 531:15, 532:15,
532:21, 533:3, 533:13,
533:18
**Taylor** - 361:10, 361:22,
505:24, 506:1, 506:4,
525:15, 526:17, 526:25,
552:19
**technical** - 576:10
**techniques** - 470:12
**Ted-** 353:18
**telephone** - 371:17, 456:3,
582:2
**temporarily** - 383:6, 417:9
**temporary** - 407:2, 407:4,
407:6, 407:8, 407:21,
425:22, 425:24
**ten** - 358:22, 358:24,
399:21, 400:6, 400:9,
400:14, 415:25, 420:19,
423:11, 434:18, 440:7,
448:10, 448:25, 449:8,
450:8, 451:8, 451:13,
459:18, 459:19, 460:9,
460:15, 468:22, 469:3,
469:4, 505:12, 547:20,
565:7, 568:25, 607:19,
619:7, 627:5, 629:15
**Ten-** 400:11
**tend** - 489:1, 529:17,
637:13
**tends** - 478:25
**term** - 378:8, 404:5, 472:2
**terminal** - 519:22
**terminology** - 417:6,
422:16, 422:20, 465:12,
582:18, 595:10
**terms** - 378:25, 481:18
**territory** - 426:21
**testified** - 361:5, 361:10,
361:16, 361:17, 362:5,
362:17, 362:22, 364:1,
369:19, 369:20, 391:7,
391:18, 393:7, 402:12,
402:13, 429:18, 429:20,
469:7, 470:3, 513:25,
521:19, 551:4, 613:14,
615:16, 615:20
**testify** - 354:1, 532:10
**testifying** - 361:12, 469:8,
532:7, 572:22
**testimony** - 355:21, 371:8,
376:16, 376:17, 383:18,
384:23, 406:9, 435:6, 435:7,
435:9, 435:13, 441:21,
459:14, 490:25, 543:9,
556:20, 567:6, 577:14,
596:4, 614:6, 615:3, 628:13
**testing** - 402:19, 403:18,
403:19, 403:20, 403:25,
439:19, 616:11
**tests** - 437:20, 616:1
**themselves** - 342:8, 381:4,
471:2, 488:23, 551:10,
598:24, 599:5
**thereabouts** - 438:23
**thereafter** - 537:19, 585:1,
585:5
**therefore** - 437:6, 459:19
**they've** - 365:2, 497:16
**thick** - 394:10, 395:21,
395:22, 451:8, 452:22,
605:8, 621:13
**thickness** - 575:22, 628:21
**thin** - 422:13, 465:9
**third** - 493:25
**thirds** - 459:22, 459:25,
526:11
**Thirty-** 562:10
**Thirty-six-** 562:10

**thousands** - 366:13, 367:4, 367:7, 396:14, 429:18, 429:20
**Thousands** - 366:14, 367:6, 367:16, 367:17
**threatened** - 614:17
**threatens** - 614:18
**three** - 351:11, 352:18, 407:15, 426:19, 432:6, 443:8, 458:1, 465:10, 470:11, 470:14, 477:8, 483:7, 491:5, 491:14, 491:19, 491:20, 495:15, 496:1, 508:1, 508:9, 508:10, 509:1, 509:21, 509:25, 510:22, 518:14, 518:15, 521:21, 521:23, 525:9, 528:11, 530:2, 533:22, 537:19, 538:17, 539:21, 548:16, 548:18, 548:22, 552:25, 556:10, 556:11, 556:12, 559:14, 560:22, 594:5, 605:17, 606:11, 607:4, 611:22, 621:12, 621:13, 623:10, 627:3, 627:6, 627:10, 627:24, 629:16, 629:23, 630:2
**Three-** 629:7
**three-eighths** - 621:12
**three-foot** - 594:5, 623:10
**threw** - 510:22, 511:13
**throw** - 464:6, 464:7, 505:9
**throwing** - 604:23
**thrown** - 635:10
**tie** - 347:20, 375:17, 414:25, 627:4
**tied** - 375:2, 479:4
**ties** - 408:7
**tight** - 577:11, 577:13
**tiles** - 607:14
**tilted** - 342:19, 342:21
**timber** - 415:7, 415:9, 415:12, 426:2
**timbers** - 347:17, 415:11, 415:15, 590:7, 590:16
**time-wise** - 398:13
**timeframe** - 349:8, 390:8, 496:5
**timing** - 349:2, 349:3
**Title-** 503:25, 504:17, 505:8, 505:25
**title** - 504:1, 504:2, 504:14, 504:16, 507:21, 526:10, 539:9, 562:11, 573:5
**today** - 342:13, 342:25, 356:18, 376:16, 376:17, 396:13, 475:10, 506:16, 511:18, 546:1, 556:20, 560:15, 562:4, 619:2, 637:13, 637:22, 637:24
**Todd-** 385:7, 385:10, 385:11, 386:6, 386:9, 386:18, 386:21, 386:22, 386:23, 386:24, 402:9, 405:21, 508:2, 508:22, 511:23, 513:21, 514:5, 539:4, 539:10
**together** - 358:3, 463:7, 508:10, 515:13
**toilet** - 396:24
**Toledo-** 338:5, 338:7, 338:22, 373:18, 451:5, 453:9, 467:19, 467:24, 468:20, 468:24, 469:18, 469:24, 470:1, 483:22, 503:18, 503:22, 507:2, 508:3, 508:24, 511:9, 519:22, 521:5, 533:24, 556:13, 562:14, 566:10,

572:17, 573:12, 579:7, 583:14, 587:12, 602:14, 608:17, 615:3, 615:13, 616:10, 616:21, 620:19
**Toledo's-** 479:2, 593:1, 593:2
**Tom-** 505:23, 506:1, 506:4, 507:20, 516:10, 521:19, 533:9
**Tommy-** 515:13, 541:16, 556:10
**tomorrow** - 561:3, 636:24, 637:1, 637:7, 637:11, 637:20
**tonnage** - 400:25, 408:3, 409:14
**tons** - 400:1, 400:17, 400:18, 401:22, 402:7
**took** - 346:21, 347:2, 348:24, 350:22, 351:4, 351:7, 358:5, 371:1, 393:7, 403:8, 403:9, 408:19, 408:20, 408:23, 409:1, 416:24, 419:8, 427:14, 434:12, 437:20, 442:3, 443:5, 447:21, 476:14, 495:16, 498:2, 506:12, 509:15, 509:20, 513:21, 513:22, 558:8, 562:4, 566:11, 568:16, 572:25, 587:13, 590:10, 590:12, 591:2, 592:19, 593:5, 594:12, 599:9, 603:16, 603:17, 605:5, 605:20, 605:23, 606:22, 609:19, 609:20, 609:21, 613:7, 628:13
**tool** - 359:12, 518:12, 580:6
**tools** - 359:11, 359:13
**Top-** 357:8, 357:9
**top** - 345:17, 358:25, 387:14, 388:2, 388:6, 388:8, 388:15, 401:2, 401:11, 401:13, 401:17, 409:2, 410:3, 410:5, 410:13, 411:18, 415:2, 415:15, 415:17, 436:1, 436:22, 437:4, 489:25, 501:4, 507:1, 510:21, 510:22, 578:23, 586:2, 588:24, 590:15, 590:18, 593:2, 593:4, 594:3, 608:7, 608:21
**topic** - 546:7
**topics** - 538:16
**topsoil** - 436:6, 436:9, 436:22, 436:25
**tore** - 529:11
**total** - 354:20, 406:1, 440:4, 444:1, 451:19, 451:21, 460:10, 468:24, 474:6, 474:14, 530:7, 550:11, 555:10
**Total-** 531:14
**totalled** - 480:7
**totally** - 490:25
**touch** - 359:10, 369:24, 370:2, 370:3, 590:21
**Touch-** 370:1, 590:20
**touched** - 369:23
**touches** - 370:8
**touching** - 363:9, 418:3
**tough** - 504:11, 504:21
**tours** - 426:4
**towards** - 379:3, 391:4, 391:19, 401:16, 418:11, 419:19, 419:20, 422:2, 490:5, 563:17, 576:16, 579:18, 579:21, 596:13, 599:25, 635:11
**Township-** 476:2, 476:7,

498:15, 499:7
**track** - 476:21, 477:10, 477:12, 486:17, 495:20, 536:15, 551:22, 597:3
**tracks** - 343:20, 343:23, 449:23, 472:6, 472:7, 473:11, 473:16, 473:20, 473:23, 476:17, 476:22, 476:23, 477:2, 477:3, 480:1, 480:4, 486:1, 486:15, 488:15, 488:21, 489:11, 489:15, 490:6, 510:24, 519:22, 540:23, 551:18, 551:23, 633:6
**Tracy-** 338:21, 638:14, 638:15
**trade** - 540:2, 540:3
**traditional** - 481:21
**train** - 454:3, 454:6, 454:8, 455:2, 484:19, 484:21, 485:6, 485:12, 486:23, 487:2, 487:7, 487:9, 487:12, 487:19, 488:11, 488:15, 488:19, 488:21, 488:24, 489:20, 489:21, 489:24, 489:25, 490:11, 497:6, 551:10, 597:9
**trained** - 390:12
**trains** - 455:8, 522:20, 541:2, 541:5
**Transcript-** 338:10
**transcript** - 338:25, 543:7, 638:10
**transferred** - 425:21
**transfers** - 501:21
**transmittal** - 474:3
**Transportation-** 524:1, 524:5
**treasurer** - 533:11
**treated** - 477:16, 630:14
**treatments** - 623:25
**tree** - 366:4, 366:15, 366:18, 366:20, 366:21, 366:22, 366:23, 375:2, 375:18, 409:6, 411:7, 420:25, 426:5, 430:8, 431:14, 437:1, 437:2, 437:14, 437:23, 438:4, 438:20, 439:16, 440:10, 440:13, 440:14, 445:10, 445:16, 445:19, 445:20, 445:22, 445:24, 446:3, 447:17, 447:18, 450:13, 450:14, 457:4, 457:5, 461:15, 490:22, 546:23, 546:24, 547:19, 547:24, 559:10, 598:18, 598:19, 599:1, 599:4, 604:2, 604:10, 604:12, 604:15, 605:5, 605:21, 620:4, 620:10, 623:1, 623:5, 624:22, 625:23, 626:5, 626:10, 626:11, 631:22
**Tree-** 620:8
**trees** - 342:3, 342:6, 342:8, 343:18, 343:21, 343:22, 344:6, 344:8, 345:1, 345:5, 365:2, 365:17, 365:21, 365:23, 366:14, 367:5, 367:6, 367:7, 374:19, 394:22, 395:19, 396:9, 396:13, 396:17, 408:14, 408:18, 408:21, 409:1, 411:4, 411:6, 411:11, 411:12, 411:15, 411:19, 411:22, 411:24, 412:1, 412:4, 412:15, 413:17, 419:2, 419:3, 422:5, 426:18, 426:20, 427:6, 427:7, 427:9, 430:14, 431:4, 432:11,

433:17, 433:18, 433:21, 434:1, 434:3, 434:18, 437:25, 438:9, 438:17, 440:6, 440:12, 441:10, 441:13, 442:14, 444:2, 444:8, 444:11, 444:13, 444:19, 446:17, 447:9, 447:25, 448:17, 449:12, 450:7, 451:15, 451:22, 452:17, 452:23, 453:4, 458:17, 458:21, 461:8, 464:3, 464:13, 464:14, 464:15, 464:16, 464:17, 471:6, 472:1, 472:10, 474:11, 481:11, 481:16, 484:16, 484:22, 485:5, 485:14, 485:18, 485:22, 487:16, 488:5, 490:15, 490:18, 496:14, 519:10, 519:11, 519:12, 519:16, 519:18, 519:19, 520:20, 520:22, 521:13, 522:11, 522:12, 526:7, 529:11, 529:13, 533:6, 533:22, 541:1, 541:19, 541:20, 542:22, 542:25, 543:1, 545:3, 547:7, 547:21, 547:22, 548:10, 550:24, 558:21, 559:23, 560:5, 560:7, 560:12, 565:8, 565:9, 565:15, 566:3, 598:6, 600:5, 600:14, 600:16, 603:19, 604:13, 604:19, 612:3, 612:19, 620:25, 622:19, 622:20, 623:7, 623:10, 625:16, 625:18, 625:20, 631:9, 631:20
**Trees-** 541:19
**tremendously** - 493:12
**trench** - 358:23, 416:17, 564:6, 569:18, 569:19, 587:21, 587:23, 590:15, 606:11, 608:4, 608:6, 613:10, 613:13, 613:22, 614:21, 614:24
**trenches** - 415:6, 416:13, 416:15, 416:22, 585:23, 586:22
**trenching** - 608:24
**trespass** - 382:5, 602:6, 602:12, 624:16
**Trespass-** 382:6
**trespassed** - 381:24, 623:15
**tri** - 591:12, 591:14
**tri-axle** - 591:12, 591:14
**Trial-** 338:16, 338:10
**trial** - 502:14, 561:7
**trick** - 403:11
**tried** - 384:24, 403:23, 427:16, 430:1, 437:16, 437:24, 440:11, 442:5, 453:1, 476:2, 627:15, 629:16
**tries** - 496:21
**triple** - 457:25
**tripping** - 359:17
**trouble** - 346:23, 426:16, 427:19, 494:16, 597:12
**truck** - 400:5, 400:10, 566:14, 568:25, 569:3, 591:14, 607:22
**trucking** - 588:3, 591:7
**truckload** - 570:9
**trucks** - 399:21, 400:8, 591:9, 591:9, 591:11, 591:12, 591:17
**true** - 350:20, 364:15, 364:16, 364:17, 365:3, 365:22, 366:1, 382:22, 390:18, 393:3, 424:17,

461:19, 464:1, 532:23,
532:25, 533:1, 538:17,
540:18, 541:13, 542:8,
544:2, 544:14, 549:2, 549:5,
596:1, 602:25, 617:16,
623:19
  trunk - 409:10
  **Trunk**- 409:12
  **trunks** - 421:1
  **Trust**- 504:1
  truthfully - 542:19
  **Try-** 549:15, 627:13
  try - 342:5, 352:22, 365:17,
375:1, 428:23, 430:5,
430:23, 430:24, 433:10,
434:21, 435:23, 440:2,
444:19, 448:6, 460:2, 477:8,
477:9, 488:22, 507:17,
507:19, 525:1, 528:22,
533:13, 536:14, 548:22,
549:3, 559:13, 578:22,
595:18, 602:9, 619:4, 619:12
  trying - 349:2, 352:8,
352:11, 368:17, 369:5,
370:18, 376:5, 385:22,
427:10, 427:11, 429:1,
429:10, 431:20, 433:1,
433:2, 434:14, 448:6,
451:22, 452:1, 452:2, 452:4,
452:12, 452:19, 452:22,
456:16, 472:18, 475:5,
545:6, 549:6, 551:12, 578:13
  turn - 437:8, 437:10,
473:3, 599:21
  **Turn-** 345:4
  turned - 421:17, 426:16,
522:19, 536:19
  turning - 536:16
  turnpike - 524:4
  turns - 536:24
  twice - 387:23
  twinplexes - 536:6
  **Two**- 358:11, 358:13,
423:8, 459:22, 491:19
  **two** - 339:19, 343:18,
344:6, 344:8, 344:10,
344:19, 344:23, 344:25,
351:11, 360:21, 388:21,
390:3, 397:8, 411:4, 412:1,
429:4, 437:3, 437:12, 443:8,
459:16, 459:25, 460:15,
465:10, 474:24, 476:8,
477:4, 477:6, 481:20, 482:5,
487:14, 490:9, 490:10,
491:12, 495:14, 496:1,
498:9, 508:16, 508:19,
509:14, 509:21, 514:10,
514:25, 516:3, 516:4,
516:17, 516:19, 519:17,
519:19, 525:20, 526:11,
529:13, 530:2, 531:15,
531:16, 534:3, 539:12,
546:8, 559:14, 580:3, 588:1,
604:5, 608:9, 618:11,
621:13, 622:5, 627:6, 629:6,
631:22, 636:11
  **two-feet** - 437:3
  **Two-thirds**- 459:22
  **two-thirds** - 459:25,
526:11
  type - 355:18, 355:19,
366:16, 417:4, 432:15,
433:8, 433:9, 436:12, 437:4,
437:24, 447:13, 447:15,
447:17, 447:20, 458:13,
462:20, 465:21, 468:2,
468:7, 517:5, 590:6, 591:11,
593:6, 626:20, 628:17
  types - 448:20, 468:11,
470:11, 518:14, 518:15

  **Typically** - 621:13, 625:5
  typically - 461:23, 470:16,
621:21

# U

  ugly - 431:7, 522:21
  ultimate - 501:17
  ultimately - 429:15, 446:8,
563:15
  umbrella - 500:9
  unaware - 492:25
  uncommon - 617:16
  uncover - 580:16
  under - 369:7, 395:8,
402:24, 437:9, 449:8,
470:17, 480:23, 485:18,
494:13, 494:14, 500:8,
517:13, 523:7, 545:20,
549:24, 554:25, 562:24,
573:13, 574:25, 578:10,
580:20, 608:22, 622:5
  Underbrush - 485:20
  underbrush - 471:7,
472:1, 472:10, 485:19,
485:21, 486:7, 488:13,
622:17
  underground - 378:17
  undergrowth - 472:3,
489:8
  underlying - 479:3
  underneath - 436:25,
546:17, 600:2
  underside - 465:11
  **Understandably** - 339:24
  understood - 352:13,
385:16, 390:15, 416:24,
623:12
  undertaking - 623:18
  undoubtedly - 437:23
  unit - 355:11
  United - 338:1, 338:11,
510:4, 510:10
  University - 444:21,
467:22, 503:21
  University's - 440:10
  unless - 354:12, 427:19,
541:19, 604:8, 637:8
  unobstructed - 472:7,
473:23
  unusual - 446:3, 527:2,
617:23
  **Up** - 408:25, 422:4, 478:21,
575:16
  up - 339:17, 340:11, 342:5,
342:21, 346:12, 348:15,
350:4, 353:12, 354:16,
356:6, 356:16, 357:4, 359:3,
360:24, 360:25, 362:6,
362:8, 366:17, 367:3,
367:24, 376:21, 377:2,
382:11, 383:14, 383:17,
387:20, 388:19, 388:23,
392:8, 394:22, 396:10,
401:6, 401:17, 404:14,
406:21, 408:6, 408:7,
408:24, 409:1, 409:10,
409:17, 409:21, 409:23,
410:5, 410:12, 411:3,
411:22, 412:8, 413:14,
414:3, 414:10, 415:6, 417:3,
417:9, 417:11, 417:13,
417:14, 417:15, 417:17,
418:2, 418:5, 418:24,
419:18, 419:21, 419:22,
420:2, 420:5, 420:6, 420:24,
420:25, 421:1, 421:15,
422:7, 424:20, 424:22,
425:21, 425:23, 426:20,
427:15, 427:24, 428:11,

429:15, 429:16, 431:5,
432:12, 434:20, 434:21,
437:10, 437:13, 437:18,
439:12, 439:13, 440:3,
440:15, 440:19, 442:13,
443:11, 443:13, 444:1,
446:7, 446:11, 447:10,
447:24, 448:21, 450:23,
452:2, 453:2, 453:22,
455:11, 456:5, 456:22,
458:12, 460:6, 463:12,
463:19, 464:2, 466:15,
466:21, 467:3, 467:17,
467:18, 473:20, 475:23,
477:20, 478:18, 481:14,
481:15, 482:2, 484:18,
499:24, 503:15, 503:18,
506:9, 506:19, 515:25,
519:18, 520:9, 522:7,
522:22, 527:20, 528:14,
532:6, 538:9, 538:12,
538:16, 540:6, 542:23,
544:22, 546:4, 548:17,
550:6, 552:23, 553:4,
554:11, 555:11, 555:18,
558:14, 559:13, 559:14,
563:21, 566:1, 566:5,
568:17, 569:12, 575:4,
575:6, 575:14, 577:9, 582:5,
584:11, 587:11, 590:7,
596:9, 596:14, 596:21,
599:8, 600:16, 607:22,
612:3, 612:9, 612:10,
612:16, 613:20, 616:13,
618:18, 619:7, 619:9,
629:11, 630:3, 630:19,
632:11, 633:22
  upper - 419:1
  upright - 594:4
  upscale - 496:19, 496:20,
496:24, 528:22
  upset - 519:17
  upside - 359:7
  upstairs - 516:4
  upwards - 342:19
  urgency - 352:8, 352:10
  uses - 482:16
  utilities - 589:17, 599:22
  utility - 407:15

# V

  vacant - 373:7, 468:11,
477:16, 531:10
  vacuum - 478:7
  valuable - 427:6, 427:7,
525:10, 552:5, 625:20
  valuation - 440:12, 444:1,
445:23, 446:7, 446:18,
450:17, 450:21, 469:17,
474:2
  valuations - 444:22
  value - 433:18, 444:2,
444:6, 444:8, 444:19,
445:11, 445:25, 446:21,
447:9, 447:10, 452:2,
452:23, 453:3, 453:4,
455:10, 456:22, 470:9,
472:4, 474:12, 475:13,
479:6, 479:11, 481:2,
481:16, 481:23, 482:1,
482:3, 482:10, 482:24,
484:19, 493:21, 502:3,
526:4, 526:12, 541:20,
549:14, 549:17, 549:20,
550:3
  valued - 445:15, 481:22
  values - 479:19
  valuing - 444:11

  valve - 576:7, 576:11,
576:16, 576:22
  variance - 400:20
  varied - 442:9, 621:7
  varies - 432:1, 438:14
  various - 342:1, 349:21,
354:20, 432:18, 437:16,
437:25
  vary - 432:23, 442:21,
452:15
  vegetation - 366:19,
368:9, 394:10, 394:18,
394:24, 409:19, 410:7,
410:21, 410:23, 412:12,
413:3, 417:25, 418:16,
418:18, 419:1, 428:1,
429:12, 430:25, 431:15,
431:21, 433:13, 434:13,
435:18, 435:24, 440:23,
446:21, 446:24, 447:21,
451:15, 451:23, 458:21,
474:15, 475:9, 476:24,
478:10, 479:23, 480:3,
481:3, 484:16, 486:19,
487:16, 496:14, 584:24,
597:19, 597:22, 598:6
  verify - 374:24, 375:22,
464:9
  **Vermillion** - 408:17, 547:6,
547:9, 573:23, 592:2,
604:16, 604:18, 604:22,
620:7, 620:15, 624:16,
625:2, 625:8
  versa - 592:9
  versus - 365:11, 365:18,
469:7, 494:10
  vertical - 627:4
  vice - 592:9
  video - 451:12, 594:17,
594:22, 595:1, 595:19,
597:2, 600:24, 603:1, 603:6,
603:8
  videographer - 597:3,
597:15, 601:19, 601:22
  videos - 448:9, 603:4
  **Videotape** - 596:3, 602:4
  view - 343:15, 344:2,
349:20, 442:23, 443:5,
457:13, 472:6, 472:7,
473:15, 473:23, 476:22,
476:23, 477:2, 480:4,
499:13, 499:16, 590:14,
598:5, 612:14, 612:20,
622:13, 633:21
  viewing - 365:12
  views - 443:1
  **Villas** - 516:12, 536:1,
536:2, 536:6
  vine - 366:16
  vines - 409:12, 444:14,
444:20, 463:2
  virtually - 468:4, 601:20
  visible - 408:12, 435:24,
579:1
  vision - 444:18
  visit - 368:5, 582:5
  visited - 515:16
  visiting - 367:23, 368:3
  visits - 368:5, 368:19
  visualize - 342:5
  visually - 580:11
  vitrified - 594:4, 594:8
  voice - 602:25, 603:12
  voices - 596:21
  **Volume** - 338:9

# W

  **Wade** - 514:24
  waist - 486:3

**waist-high** - 486:3
**wait** - 434:17, 454:18, 454:19
**waiting** - 434:22
**Wales** - 521:17
**walk** - 431:23, 520:5, 528:8, 559:18, 604:18, 605:9, 605:11, 615:2, 627:20
**walked** - 342:18, 342:22, 365:4, 407:9, 407:10, 407:15, 428:12, 428:14, 442:19, 506:12, 515:24, 521:8, 541:17, 544:5, 554:10, 554:15, 578:12
**walking** - 587:19, 593:18, 597:3, 598:16, 601:19, 601:23, 602:1
**wall** - 408:4, 408:6, 408:9, 408:12, 408:15, 408:21, 408:22, 408:23, 408:25, 409:16, 409:18, 410:2, 410:11, 410:19, 410:22, 410:23, 411:3, 411:23, 431:1, 433:1, 435:25, 440:23, 524:2, 524:3, 524:8
**walls** - 431:2, 431:4, 431:5
**Walsh** - 390:22, 392:15, 563:12, 570:16, 572:12, 572:14, 572:15, 573:3, 596:25, 602:5, 602:23, 602:25, 614:6, 617:11, 617:13, 640:7, 640:9, 640:11
**wants** - 339:9, 461:4, 516:21
**waste** - 468:5
**watch** - 437:9, 595:19
**watching** - 434:11
**Water** - 545:7
**water** - 342:2, 342:16, 345:7, 345:9, 345:11, 345:15, 345:18, 346:4, 346:13, 349:11, 353:11, 353:13, 353:20, 354:7, 356:14, 356:25, 357:1, 357:6, 357:15, 360:4, 360:7, 363:1, 363:9, 363:12, 364:9, 373:18, 378:5, 378:6, 379:11, 380:9, 380:16, 380:17, 381:11, 382:1, 385:18, 389:1, 389:4, 389:21, 390:3, 391:3, 391:14, 391:19, 402:1, 402:19, 402:25, 405:11, 405:13, 405:16, 406:21, 407:1, 407:2, 407:4, 407:20, 407:22, 407:24, 412:13, 414:6, 424:18, 426:9, 435:17, 435:18, 470:20, 521:2, 521:6, 543:24, 544:15, 545:2, 545:6, 545:15, 546:13, 546:19, 552:6, 557:22, 558:2, 562:14, 564:20, 564:22, 568:3, 573:12, 574:7, 574:15, 575:19, 576:14, 577:19, 578:25, 579:25, 580:2, 580:18, 583:14, 597:5, 599:17, 601:16, 601:18, 615:16, 615:21, 620:19, 621:2
**watered** - 449:17
**watering** - 438:7, 438:12
**waterline** - 546:18, 576:13
**Waterville** - 506:22, 521:15
**Watkins** - 338:18
**ways** - 616:5, 616:7
**wealthy** - 497:5, 511:6
**weather** - 433:23, 638:3
**weaves** - 463:7
**websites** - 500:24

**Webster** - 428:7
**weeds** - 461:10, 461:12, 466:1
**week** - 499:22
**weeks** - 429:4, 429:5
**weighs** - 400:14, 400:15
**welcome** - 466:13
**west** - 467:19, 503:18
**Western** - 338:2
**wet** - 434:25, 435:5, 435:7, 435:9
**whatever's** - 548:2
**whatever-it-might-be** - 446:25
**wheat** - 426:21
**whipped** - 360:24
**white** - 627:16
**White** - 563:23, 571:15, 604:6
**whole** - 356:23, 357:12, 362:9, 368:14, 368:25, 371:5, 395:9, 410:8, 424:2, 430:10, 449:18, 469:17, 482:7, 492:9, 507:18, 510:8, 522:13, 544:17, 545:3, 624:25, 636:12
**wide** - 432:6, 442:7, 442:8, 448:10, 448:11, 459:2, 461:4, 577:11, 577:13, 608:5, 608:6, 621:6
**wide-open** - 577:11
**widenings** - 468:8
**width** - 442:10, 442:14, 451:16, 451:19, 451:21, 452:16, 453:2, 460:10
**wife** - 426:24, 426:25, 505:25, 516:16, 623:24
**wild** - 463:1
**wildlife** - 426:11, 430:10, 433:3, 433:6, 440:17, 444:17, 446:23, 447:22, 462:9
**Wildlife** - 462:5
**William** - 499:19, 499:20
**willing** - 482:23, 482:25, 549:20, 549:21
**willingness** - 482:22
**wind** - 465:12
**windbreak** - 426:8, 426:10, 430:10, 440:16, 460:7, 465:19
**window** - 340:25
**windows** - 619:12
**wintertime** - 447:2
**wire** - 610:1, 610:9, 625:6
**wired** - 592:17
**wires** - 610:11
**wise** - 398:13, 428:8, 462:21
**withdraw** - 563:10
**Witness** - 348:9, 349:7, 350:24, 351:1, 351:5, 355:8, 355:16, 355:19, 356:1, 361:19, 370:3, 370:6, 404:2, 412:21, 425:1, 429:3, 429:8, 442:9, 446:13, 454:12, 454:21, 456:8, 456:15, 456:18, 460:3, 466:13, 473:19, 503:3, 505:22, 524:16, 535:9, 535:14, 535:18, 535:21, 535:24, 538:13, 553:11, 557:14, 581:2, 590:21, 590:23, 596:22, 630:9, 630:11, 634:18, 636:21
**witness** - 359:19, 369:16, 370:8, 383:10, 383:16, 385:24, 425:8, 425:10, 441:21, 454:11, 454:17, 467:9, 467:11, 502:23,

503:1, 535:6, 549:10, 553:3, 561:3, 561:8, 561:9, 561:16, 561:19, 561:22, 572:9, 572:10, 618:25, 619:4, 619:17, 626:17
**witness'** - 355:23
**witness's** - 452:10
**witnesses** - 449:2
**wizard** - 595:23, 595:24, 596:2
**wonderful** - 430:9
**wondering** - 590:9
**wood** - 431:9, 613:18, 613:20
**Wood** - 506:21, 520:8, 520:11, 520:19, 521:2, 579:10
**wooding** - 437:19
**Woodland** - 426:1
**woodland** - 445:17
**Woodlands** - 338:15
**woods** - 443:10, 445:12, 574:8, 631:21
**word** - 346:6, 382:5, 396:5, 410:15, 472:16, 472:17, 491:21, 493:16, 496:11, 543:3
**words** - 475:23, 540:20, 553:22, 573:18, 605:8, 619:2
**workmen** - 544:6
**works** - 340:21, 354:25, 362:6, 434:3, 544:23, 627:14
**world** - 498:16, 500:1
**worried** - 417:2
**worse** - 406:12, 406:14, 406:15, 478:17, 586:1
**worst** - 364:9, 510:14
**worth** - 445:24, 446:3, 466:21, 475:10, 525:24, 550:7, 550:15, 626:7
**write** - 387:24
**writing** - 621:17
**wrote** - 499:18
**Ww** - 510:25

**Y**

**yard** - 411:1, 411:2, 411:3, 438:5, 445:18, 445:20, 445:24, 446:5, 485:10, 486:10, 545:3, 607:2, 607:4, 625:21, 626:8
**yards** - 400:3, 400:6, 400:9, 400:11, 400:14, 430:11, 488:16, 568:21, 568:23, 568:24, 568:24, 591:15, 606:23, 607:1
**year** - 339:18, 341:7, 363:22, 368:1, 368:8, 371:3, 371:5, 372:23, 372:25, 373:1, 376:10, 377:5, 397:18, 406:3, 406:7, 426:13, 430:22, 430:23, 434:6, 434:19, 438:6, 449:8, 449:11, 449:13, 449:16, 450:8, 463:22, 465:5, 468:1, 482:2, 488:12, 488:13, 489:10, 491:6, 491:7, 491:9, 491:12, 491:14, 491:19, 491:20, 495:15, 499:22, 500:6, 507:14, 512:22, 526:15, 536:10, 603:24
**years** - 340:7, 352:18, 404:21, 423:20, 425:23, 432:1, 430:6, 434:5, 434:18, 438:2, 448:16, 448:25, 449:21, 450:9, 450:15, 462:5, 463:19, 467:2, 467:24, 481:24, 496:1, 503:18, 503:21, 504:2,

504:3, 504:9, 507:8, 507:21, 511:10, 529:7, 529:10, 529:13, 530:2, 531:16, 533:3, 533:18, 533:22, 537:19, 540:19, 562:10, 573:8, 573:10, 620:11
**yellow** - 370:21, 417:3, 605:3
**yesterday** - 339:21, 341:11, 343:8, 348:17, 348:22, 356:18, 356:21, 366:12, 386:14, 387:15, 387:16, 387:17, 387:22, 389:6, 390:19, 391:18, 392:15, 393:7, 394:15, 399:19, 409:25, 422:22, 429:18, 520:23, 568:24
**young** - 423:9, 551:5, 599:7
**yourself** - 425:15, 467:15, 491:17, 503:8

**Z**

**zero** - 495:22, 536:8
**zoning** - 536:13
**zoom** - 369:12
**Zouhary** - 338:10